# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| BETH and DAVID PETIT, in their individual capacities and as next friends to their minor son, H.P., 12 Emery Lane Stratham, NH 03885 <br><br> and <br><br> NICOLE and BENNIE UNDERWOOD, in their individual capacities and as next friends to their minor daughter, A.U. 9936 Castle Lane Knoxville, TN 37922 <br><br>Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION, 400 Maryland Ave, SW Washington, DC 20202 <br><br> and <br><br> MARGARET SPELLINGS, in her official capacity as Secretary of the United States Department of Education 400 Maryland Ave, SW Washington, DC 20202 <br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civ. No. 1:07CV01583(RMU) |

_____

## DEFENDANTS' MOTION TO DISMISS
## OR ALTERNATIVELY, FOR SUMMARY JUDGMENT

Defendants, the United States Department of Education and Margaret Spellings, in her

1

official capacity as Secretary of Education (collectively, "ED" or "the Secretary"), by and through undersigned counsel, respectfully move to dismiss the above-captioned matter, or alternatively for summary judgment.  As set forth in the accompanying Memorandum of Points and Authorities, Plaintiffs do not have a cause of action against ED under the Individuals with Disabilities Education Act ("the IDEA"), and therefore that claim must be dismissed.  In addition, ED is entitled to judgment as a matter of law on Plaintiffs' Administrative Procedures Act ("APA") claim because the regulations excluding mapping services for cochlear implants from the definition of related services comply with the law and do not involve agency action that is arbitrary, capricious, or an abuse of discretion.

In support of this motion, ED relies on the accompanying Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss Or Alternatively, For Summary Judgment, the Administrative Record relevant to ED's determination to exclude cochlear implant mapping from the definition of related services, and the Statement of Material Facts as to Which There is No Genuine Issue.

Accordingly, for the above-stated reasons, and those explained more fully in the accompanying Memorandum of Points and Authorities, ED respectfully requests that the Court grant this motion, dismiss Plaintiffs' IDEA claim with prejudice, and enter judgment in its favor on Plaintiffs' APA claim.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

2

SHEILA M. LIEBER
Deputy Branch Director

/s/ Tamra T. Moore
TAMRA T. MOORE D.C. Bar No. 488392
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C.  20530
Telephone: (202) 514-8095
Facsimile: (202) 616-8470
Email: Tamra.Moore@usdoj.gov

Dated: December 13, 2007                    Attorneys for Defendants

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| BETH and DAVID PETIT, in their individual capacities and as next friends to their minor son, H.P., 12 Emery Lane Stratham, NH 03885 | ) ) ) ) ) ) |
| and | ) ) |
| NICOLE and BENNIE UNDERWOOD, in their individual capacities and as next friends to their minor daughter, A.U. 9936 Castle Lane Knoxville, TN 37922 | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civ. No. 1:07CV01583(RMU) |
|  | ) |
| UNITED STATES DEPARTMENT OF EDUCATION, 400 Maryland Ave, SW Washington, DC 20202 | ) ) ) ) ) |
| and | ) ) |
| MARGARET SPELLINGS, in her official capacity as Secretary of the United States Department of Education 400 Maryland Ave, SW Washington, DC 20202 | ) ) ) ) ) |
| Defendants. | ) |

_____)

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS OR ALTERNATIVELY, FOR SUMMARY JUDGMENT**

When Congress amended the Individuals with Disabilities Education Act ("the IDEA" or the "Act") in 2004, it narrowed the IDEA's definition of related services to exclude the provision or replacement of surgically implanted medical devices. The 2004 IDEA Amendments, however, do not address whether the Act requires states to optimize and maintain the functioning of those excluded medical devices. In light of that ambiguity, and after conducting notice-and-comment rulemaking, the Secretary of the United States Department of Education promulgated a rule that excludes from the definition of related services the optimization and maintenance of surgically implanted medical devices (including mapping services for cochlear implants). The Secretary made clear, however, that although the IDEA does not require states to optimize and maintain the functioning of surgically implanted medical devices, states are required to conduct routine monitoring of the external components of these otherwise exempt devices. Plaintiffs, who respectively are parents of a child with a cochlear implant, now challenge both of these rules (collectively "the mapping exclusion regulations").

Plaintiffs have filed a two-count complaint against the United States Department of Education and Margaret Spellings, in her official capacity as Secretary of Education (collectively, "ED" or "the Secretary"), alleging violations of the IDEA and the Administrative Procedures Act ("APA"). The gravamen of Plaintiffs' Complaint is that, in promulgating a rule that excludes cochlear implant mapping from the definition of related services, ED violated the IDEA and the APA by failing to adopt their preferred interpretation of an otherwise ambiguous statute. Plaintiffs' claims, however, are without merit. Plaintiffs' IDEA claim must fail because

the IDEA does not create a private right of action against the federal government. To the extent that Plaintiffs seek to challenge ED's regulatory action under the IDEA, Plaintiffs must bring their claim against ED under the APA only.

Plaintiffs' APA claim, however, cannot withstand scrutiny. In their Complaint, Plaintiffs contend that ED's regulations excluding cochlear implant mapping from the definition of related services are at odds with the plain language of the IDEA and its legislative history. But as at least two of the Plaintiffs themselves asserted in other litigation and in a public hearing (see pp. 23-24, *infra*), neither the IDEA's text nor its legislative history clearly addresses whether Congress intended as a condition on receipt of federal funds to require states to pay for services designed to optimize or maintain the functioning of surgically implanted medical devices that are excluded from coverage under the Act. Under the APA, this Court's review of ED's determinations must be based on the Administrative Record. The Administrative Record ("A.R.") demonstrates that the challenged regulations are not only consistent with the IDEA and Supreme Court precedent interpreting the Act but also based on well-reasoned analysis. Such a demonstration entitles ED to judgment in its favor on Plaintiffs' APA claim. Thus, because both of Plaintiffs' claims are fatally flawed, the Court should grant this motion.

## I.    BACKGROUND

### A.    The IDEA

When Congress enacted the IDEA, 20 U.S.C. § 1400 *et seq*., it did so to "ensure that all children with disabilities have available to them a free appropriate public education ("FAPE") that emphasizes special education and related services to meet their unique needs and prepare them for further education employment and independent living." 20 U.S.C. § 1400(d)(1)(A). To

that end, the IDEA establishes a federal grant program that provides funding to states "to assist

them [] [in] provid[ing] special education and related services to children with disabilities."  20

U.S.C. § 1411(a)(1).  In order to receive federal funds, participating states must establish policies

and procedures to ensure that a "free appropriate public education is available to all children

with disabilities residing in the State."  20 U.S.C. § 1412(a)(1)(A).   The IDEA does not set forth

specific standards delineating the requirements for appropriate education for students with a

disability; instead, the Act provides general guidelines states must follow to ensure a FAPE for

children with disabilities.  See generally, 20 U.S.C. § 1412(a).

        A "free appropriate public education" is comprised of  "special education" and "related

services" that have been provided at the state's expense and under its direction, satisfy the state's

standards governing education, and each are provided in conformity with the individualized

education program ("IEP") required for students with a disability under § 1414(d) of the IDEA.

20 U.S.C. § 1401(9).  The Act defines "special education" as "specially designed instruction, at

no cost to parents, to meet the unique needs of a child with a disability," including instruction

conducted in the classroom, home, hospitals and institutions, and other settings.  20 U.S.C. §

1401(29).   In turn, the IDEA defines related services as:

> [T]ransportation, and such developmental, corrective, and other supportive services
> (including speech-language pathology and audiology services, interpreting services,
> psychological services, physical and occupational therapy, recreation, including
> therapeutic recreation, social work services, school nurse services designed to enable a
> child with a disability to receive a free appropriate public education as described in the
> individualized education program of the child, counseling services, including
> rehabilitation counseling, orientation and mobility services, and medical services, except
> that such medical services shall be for diagnostic and evaluation purposes only) as may
> be required to assist a child with a disability to benefit from special education, and
> includes the early identification and assessment of disabling conditions.

20 U.S.C. § 1401(26)(A).  When Congress amended the IDEA in 2004, it specified that the

4

definition of related services excludes the provision of medical devices that are surgically implanted or the replacement of such devices.  See 20 U.S.C. § 1401(26)(B) ("The term [related services] does not include a medical device that is surgically implanted, or the replacement of such device.").

In addition to establishing general guidelines with which states must comply, the IDEA establishes procedures governing the provision of IEPs for children with disabilities.  An IEP is "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with" the standards and procedures set forth in § 1414 of the IDEA.  20 U.S.C. § 1414(d)(1)(A)(i).   The IDEA requires local educational agencies, in consultation with the child's teachers and parents, to develop and prepare an IEP for a child with a disability that sets forth, among other things, the child's present educational achievement, annual academic and functional goals, how the child's progress toward such goals will be measured and reported to parents, and a statement of the special education and related services to be provided to the child, or on behalf of the child.  See 20 U.S.C. § 1414(d)(1)(A)(i)(I)-(VIII).

The IDEA also establishes certain procedural safeguards for children and their parents to protect the student's right to a FAPE.  Section 1415 of the IDEA requires that states establish an administrative process – i.e., procedures for an impartial due process hearing – through which parents of children with disabilities must raise any disputes they have with the school district regarding the school's obligations under the IDEA.  See generally 20 U.S.C. § 1415(f) (setting forth the requirements for an impartial due process hearing).  The IDEA permits a party aggrieved by the findings and decisions made in the due process hearing to seek review of those findings in federal court.  20 U.S.C. § 1415(i) ("Any party aggrieved by the findings and

decision made [] [in the impartial due process hearing] . . . shall have the right to bring a civil

action . . . in any district court of the United States, without regard to the amount in

controversy."). The IDEA's administrative process is mandatory, and a party may not file a

federal court action under the IDEA without first exhausting the IDEA's administrative

remedies. See Spencer v. District of Columbia, 416 F. Supp. 2d 5, 10 (D.D.C. 2006) ("The

[IDEA's] administrative process is not 'just an optional stop on the way to the court[,]'" but

rather, "requires a plaintiff to exhaust administrative remedies before turning to court.") (internal

citation omitted).

### B.    The Mapping Exclusion Regulations

When Congress amended a number of the substantive provisions of the IDEA in 2004, it

also granted the Secretary of Education the authority to promulgate regulations "to the extent

that such regulations are necessary to ensure that there is compliance with the specific

requirements of the [][] [2004 IDEA Amendments]." 20 U.S.C. § 1406(a). In accordance with

this statutory grant of authority, ED, prior to developing and publishing proposed regulations,

first solicited advice and recommendations from the public regarding the nature and scope of the

proposed regulations in light of the 2004 IDEA Amendments. See A.R. ED-005411-5412. In

response, ED received over 6,000 comments that addressed the major provisions of the 2004

IDEA Amendments. A.R. ED-003424.

The vast majority of comments ED received addressing the medical devices exception to

the statutory definition of related services (collectively, "pre-NPRM comments") requested that

ED clarify whether the medical devices exception prohibits the provision of mapping services

for cochlear implants. See, e.g., A.R. ED-003550 ("The regulations need to clarify whether the

mapping of a cochlear device is considered a related service or does the language that prohibits [local educational agencies] LEAs from paying for implanted medical devices cover mapping as well."); A.R. ED-003568 (same); A.R. ED-003672 (requesting that ED clarify whether the medical devices exception applies to cochlear implant mapping and recommending that ED clarify that mapping is not a related service). Other commenters opined that ED should promulgate a regulation that excludes the mapping or programming of cochlear implants from the definition of related services. See, e.g., A.R. ED-003573; A.R. ED-003577. ED reviewed and considered all of these comments in developing the proposed regulations. A.R. ED-003422-3424, ED-003426.

As ED determined the scope of the proposed rules, the agency considered both the pre-NPRM comments and "[w]hether statutory changes required changes to existing regulations." Id. As applied to the medical devices exception, ED formulated a proposed rule that "adddress[ed] the limitation on surgically implanted medical devices," A.R. ED-003426, specifying that related services would not include "the optimization of device functioning, maintenance of the device, or the replacement of the device." A.R. ED-003480. The rationale for the proposed rule was ED's concern that states not bear the burden associated with the cost of maximizing and maintaining the functioning of these exempted medical devices. A.R. ED-003426. On June 21, 2005, ED solicited comments in response to its proposed rule. A.R. ED-003423.

ED received many comments on the proposed rule; some supported the proposed rule, while others opposed it. 71 Fed. Reg. 46,540, 46,569 (Aug. 14, 2006). Some comments suggested that surgically implanted medical devices should not be excluded from the definition

7

of related services.  Id.  Other comments stated that the IDEA does not exclude the maintenance

or programming of surgically implanted medical devices and recommended that the definition of

related services specifically include the provision of mapping services for children with cochlear

implants.  Id.  Some comments requested that ED delineate whether the state or parents are

responsible for providing mapping services to children with cochlear implants.  Id.

ED considered all of these comments and determined that mapping, which optimizes the

functioning of a cochlear implant, should be excluded from the definition of related services.  71

Fed. Reg. at 46,760.  Although ED concluded that the IDEA and its implementing regulation do

not require states to optimize or maintain the functioning of surgically implanted medical

devices (such as mapping services for cochlear implants), the Secretary nevertheless determined

that the IDEA and its implementing regulation require states to "ensure that the external

components of surgically implanted medical devices are functioning properly." 71 Fed. Reg. at

46,764.

### C.    Cochlear Implants & Mapping

A cochlear implant is an electronic prosthesis that partially replaces the functioning of

the cochlea, the portion of the inner ear that converts sound waves into electrical stimuli.

Thomas Balkany, *A Brief Perspective on Cochlear Implants*, 328 NEW ENG. J. MED.  281, 281

(1993).  The cochlear implant converts sound into electrical signals and delivers the electrical

signals to the cochlear nerve.  Id.  The device consists of both internal and external components.

The internal components of a cochlear implant, a receiver connected to electrodes, are surgically

implanted.  Bonnie Poitras Tucker, COCHLEAR IMPLANTS - A HANDBOOK 6 (McFarland &

Company, Inc., Publishers 1998).  The cochlear implant's external components consist of a

8

microphone that is worn at ear level that detects sound and a wearable, pager-size speech processor that converts the sound detected by the microphone into electrical signals and then transmits the electrical signals to the internal components of the cochlear implant.  Id.  The Food and Drug Administration ("FDA") approved the use of cochlear implants for adults in 1980 and for children in 1990.  Id.

 In order to operate effectively, the cochlear implant's speech processor must be "mapped," or "adjusted," to the child.  See Debra Nussbaum, M.A., CCC-A/March 2003, *Cochlear Implants: Navigating a Forest of Information...One Tree at a Time*, 2003, at 61, *available at* http://clerccenter.gallaudet.edu/KidsWorldDeafNet/e-docs/CI/CI.pdf.  Mapping is performed by an audiologist who has specific expertise and training in cochlear implants, including "450 hours of direct contact with individuals with cochlear implants, [] 50 hours of case management of individuals with" cochlear implants, and expertise in cochlear implants. See Complaint, ¶ 22; see also A.R. ED-000388 (delineating the extensive training that audiologists who support children with cochlear implants must undergo and stating that these audiologists  possess "unique knowledge and skills").  When mapping is performed incorrectly, it can lead to physical harm to the child.  See A.R. ED-000388-389 (noting that "utilizing inappropriate stimulation levels may lead to rejection of the cochlear implant" and that "lack of knowledge about electrode array insertion may lead to facial nerve stimulation").

To "map" the cochlear implant, the audiologist connects the child's speech processor to a computer that utilizes specialized computer software to objectively measure the child's response to electrical stimulation.  Debra Nussbaum, M.A., CCC-A/March 2003, *Cochlear Implants: Navigating a Forest of Information...One Tree at a Time*, 2003, at 62, *available at*

http://clerccenter.gallaudet.edu/KidsWorldDeafNet/e-docs/CI/CI.pdf.  The mapping software

measures the characteristics of the implanted electrodes and adjusts the parameters controlling

the electrical stimuli that will be delivered to the electrodes.  Complaint, ¶ 22.   As each

implanted electrode is activated, the mapping software adjusts and programs the speech

processor.  See http://www.asha.org/public/hearing/treatment/cochlear_implants.htm.  The

audiologist must ensure that the surgically implanted electrodes are loud enough for the child to

be aware of sound but not too loud as to cause the child discomfort.  Debra Nussbaum, M.A.,

CCC-A/March 2003, *Cochlear Implants: Navigating a Forest of Information...One Tree at a*

*Time*, 2003, at 62, *available at*

http://clerccenter.gallaudet.edu/KidsWorldDeafNet/e-docs/CI/CI.pdf.  In addition to measuring

electrode characteristics, the mapping software also monitors the integrity of the cochlear

implant's functioning.  Id.

A child who has undergone cochlear implant surgery must attend not only an initial

mapping session at the hospital where the surgery occurred but many subsequent mapping

sessions until a "good initial map is determined."  Debra Nussbaum, M.A., CCC-A/March 2003,

*Cochlear Implants: Navigating a Forest of Information...One Tree at a Time*, 2003, at 61,

*available at* http://clerccenter.gallaudet.edu/KidsWorldDeafNet/e-docs/CI/CI.pdf.  Because

cochlear implants are designed to operate indefinitely, see Thomas Balkany, *A Brief Perspective*

*on Cochlear Implants*, 328 NEW ENG. J. MED.  281, 281 (1993), a child with a cochlear implant

will require ongoing mapping treatment.

According to the American Speech-Language-Hearing Association, the total costs for

cochlear implantation, including post-operative maintenance, mapping, and rehabilitation, can

range between $45,000 and $55,000 and can far exceed $60,000 for patients requiring extensive

post-operative care.  See http://www.cochlear.org/sys-tmpl/cochlearimplantcosts/.  In order to

pay for the cochlear implant and the post-operative maintenance of the device, most individuals

use either private health insurance, Medicaid, or Medicare.  See

http://www.cochlear.org/sys-tmpl/commericalplansandmanagedcare/.  Currently, approximately

90 percent of private health plans provide some level of benefits coverage for cochlear implants

(including mapping).  Id.  In addition, nearly all states provide Medicaid benefits to children

receiving cochlear implants that cover "all costs necessary to effectively use a cochlear implant,"

including mapping and aural rehabilitation.  See

http://www.cochlear.org/sys-tmpl/medicaidandcochlearimplants/.

### D.    Plaintiffs' Allegations

Plaintiffs, Beth and David Petit and Nicole and Bennie Underwood, are parents of

children with cochlear implants.  Plaintiffs contend that, as a result of ED's mapping exclusion

regulations, their children have not received free cochlear implant mapping services as part of

their IEP since late 2006.  Accordingly, Plaintiffs filed the instant action against ED, challenging

the exclusion of cochlear implant mapping as a related service.

Plaintiffs' Complaint charges that ED violated both the IDEA and the APA in

promulgating the challenged rules.  Plaintiffs' IDEA claim asserts that the mapping exclusion

regulations violate ED's rulemaking authority under the statute, violate and contradict provisions

of the Act, and substantively lessen the protections provided to children with disabilities.

Plaintiffs also contend that ED's promulgation of the mapping exclusion regulations violates the

APA because the regulations are "arbitrary, capricious, an abuse of discretion, contrary to law, in

excess of statutory authority, and otherwise not in accordance with law."  Complaint, ¶ 53.

## ARGUMENT

## II.    LEGAL STANDARD

A court must grant a motion to dismiss for failure to state a claim under Federal Rule of

Civil Procedure 12(b)(6) if plaintiffs can prove no set of facts that supports their claim entitling

them to relief.  See Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 325 (1991); Browning v.

Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002).  In evaluating a motion to dismiss, although the

Court must construe the complaint liberally, "the Court need not accept inferences drawn by

plaintiff[s] if those inferences are unsupported by facts alleged in the complaint, nor must the

Court accept plaintiff[]s['] legal conclusions."  National Postal Prof. Nurses, et al.  v. U.S. Postal

Serv., 461 F. Supp. 2d 24, 28 (D.D.C. 2006).

As to Plaintiffs' APA claims, whether agency action is arbitrary, capricious, or contrary

to law is a legal issue that a court resolves on the basis of the record made before the agency in

the context of both a motion under Rule 12(b) and a motion for summary judgment.  Am.

Bioscience, Inc. v. Thompson, 269 F.3d 1077,1083 (D.C. Cir. 2001); Commercial Drapery

Contractors v. U.S., 133 F.3d 1, 7 (D.C. Cir. 1998).  "Under the APA, it is the role of the agency

to resolve factual issues to arrive at a decision that is supported by the administrative record,

whereas 'the function of the district court is to determine whether or not as a matter of law the

evidence in the administrative record permitted the agency to make the decision it did.'"

American Fed'n of Labor Cong. of Indus. Org. v. Chao, 496 F. Supp. 2d 76, 81-82 (D.D.C.

2007) (internal citation omitted).  For this reason, when considering an APA challenge, the

court's review is limited to the administrative record.  Toy v. U.S., 263 F. Supp. 2d 1, 5 (D.D.C. 2002).  The court may not substitute its judgment for that of the agency's unless it finds that the agency's interpretation of the statute is unreasonable or that the agency's action is arbitrary and capricious.  See id.

## III.    PLAINTIFFS' IDEA CLAIM MUST BE DISMISSED BECAUSE THE IDEA DOES NOT CREATE A PRIVATE RIGHT OF ACTION AGAINST THE FEDERAL GOVERNMENT

Plaintiffs fail to state a claim against ED under the IDEA because the statute does not give Plaintiffs a private right of action against the federal government.  It is well-established that "private rights of action to enforce federal law must be created by Congress." San Carlos Apache Tribe v. U.S., 417 F.3d 1091, 1094 (9th Cir. 2005) (citing Alexander v. Sandoval, 532 U.S. 275, 286 (2001)).  In order to determine whether a private right of action exists under a particular statute, "'[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.'" Id.; National Trust for Historic Preservation v. Blanck, 938 F. Supp. 908, 914 (D.D.C. 1996) ("The most important inquiry [when determining whether a statute creates a private right of action] is whether Congress specifically intended to create such a right.").   Such intent may be shown from the language and structure of the statute itself or its legislative history.  See Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 13 (1981).  Here, Plaintiffs purport to bring their IDEA claim against ED under § 1415(i)(2) of the IDEA.  However, a review of the statutory structure and language of the IDEA shows that only the state or other local agency - and not the federal government - may be sued under this section of the IDEA.

The IDEA's statutory provisions demonstrate that Congress placed the burden of ensuring the requirements of the IDEA are met squarely on the states' shoulders. For example, in enacting the IDEA, Congress expressly found that states and other local agencies are "primarily responsible for providing an education for all children with disabilities. . . ." 20 U.S.C. § 1400(c)(6). To that end, under the IDEA, state educational agencies are "responsible for ensuring that the requirements of [Part B of the IDEA] are carried out." 20 U.S.C. § 1412(a)(11). The IDEA also requires participating states to submit a plan that delineates compliance with all statutory and regulatory requirements, see 20 U.S.C. § 1412(a), to supervise "all educational programs for children with disabilities in the State" (including programs administered by other state agencies or local agencies), see 20 U.S.C. § 1412(a)(11), and to review and approve applications submitted by local educational agencies and other public agencies, see 20 U.S.C. § 1413(a).

Courts have recognized that, in light of the state's pervasive role under the IDEA, the state is the proper opposing party to an IDEA claim. See, e.g., David D. v. Dartmouth Sch. Comm., 775 F.2d 411, 422 (1st Cir. 1985), cert. denied, 475 U.S. 1140 (1986) (observing that "Congress intended that the State should be named as an opposing party, if not the sole party to" complaints brought under § 1415(e) alleging a failure to ensure rights under the IDEA). See also Ullmo v. Gilmour Academy, 273 F.3d 671, 679 (6th Cir. 2001) ("Although the IDEA does not specifically name the party against whom such an action may be brought, the 'language and structure of [the] IDEA suggest that [the state educational agency or the local educational agency] may be held liable for the failure to provide a free appropriate public education.'") (internal citation omitted); Smith v. Robinson, 468 U.S. 992, 1010 (1984), superseded by statute

on other grounds, Pub. L. No. 99-372, 100 Stat. 796 (1986) ("The responsibility for providing

the required education remains on the States."); but see Metropolitan Sch. Dist. of Wayne Twp.,

Marion County, Ind. v. Davila, 969 F.2d 485 (7th Cir. 1992).  Moreover, at least one federal

court has recognized that in proceedings brought under § 1415(i) of the IDEA – the provision on

which Plaintiffs rely –  the state, not the federal government, is the proper defendant.  See

Rodriguez-Pedraza v. U.S. Dep't of Defense, 445 F. Supp. 2d 195, 198 (D.P.R. 2006) (finding

that two federal agencies were not amenable to suit under the IDEA because "§ 1415's mandate

is directed at 'State educational agenc[ies], State agenc[ies], or local educational agenc[ies]'"

only).[1]

　　　　Indeed, the IDEA's legislative history supports this interpretation of the Act's provisions.

In discussing the statutory provision giving the states responsibility to carry out the IDEA's

requirements, the Senate Report on the IDEA's predecessor statute (the Education for All

Handicapped Children Act of 1975, Pub. L. No. 94-142) explains:

> This provision is included specifically to assure a single line of responsibility with regard
> to the education of [children with disabilities], and to assure that in the implementation of
> all provisions of this Act and in carrying out the right to education for [children with

---

[1]Moreover, Plaintiffs cannot rely on § 1415(i)(2) to support their IDEA claim because Plaintiffs are not "aggrieved parties" within the meaning of that statutory provision.  Section 1415(i)(2) allows parties to file suit in federal court only if they have exhausted the state administrative process and are "aggrieved" by the findings made in those due process hearings.  In this case, because Plaintiffs' Complaint challenges ED's promulgation of certain rules and does not directly challenge any grievance derived from findings made in their respective states' administrative process, Plaintiffs are not "aggrieved parties" within the meaning of the IDEA.  As this Court has explained, "[t]he administrative process set forth by IDEA is not 'just an optional stop on the way to court.'  Rather, the philosophy underpinning IDEA requires a plaintiff to exhaust [state] administrative remedies before turning to the courts."  Spencer, 416 F. Supp. 2d at 10 (quoting Andersen by Andersen v. Dist. of Columbia, 877 F.2d 1018, 1025 (D.C. Cir. 1989)).  Under the IDEA, a plaintiff's failure to exhaust administrative remedies deprives the court of authority to hear the suit.  Spencer, 416 F. Supp. 2d at 10.  Accordingly, because Plaintiffs are not "aggrieved parties" within the meaning of § 1415, their IDEA claim must be dismissed.

disabilities], the State educational agency shall be the responsible agency. . . .   Without
this requirement, there is an abdication of responsibility for the education of [children
with disabilities].  Presently, in many States, responsibility is divided. . . .  While the
Committee understands that different agencies may, in fact, deliver services, the
responsibility must remain in a central agency overseeing the education of [children with
disabilities], so that failure to deliver services or the violation of the rights of [children
with disabilities] is squarely the responsibility of one agency.

S. Rep. No. 168, 94th Cong. 1st Sess., at 24 (1975), reprinted in 1975 U.S.C.C.A.N. 1425, 1448.

In fact, to clarify its intent that the states are responsible for remedying any demonstrated

violations of the IDEA, Congress amended the statute to waive the sovereign immunity of states

sued in federal court for IDEA violations.  See 20 U.S.C. § 1403(a) ("A State shall not be

immune under the 11th amendment to the Constitution of the United States from suit in Federal

court for a violation of this chapter.").  Congress, however, did not waive the federal

government's sovereign immunity under the IDEA.  Thus, the federal government's immunity

from suit under the IDEA remains unchanged.  See H.R. Rep. No. 544, 101st Cong., 2d Sess., at

12, reprinted in 1990 U.S.C.C.A.N. 1723, 1734.

To the extent that Plaintiffs contend that the IDEA creates an implied private right of

action against the federal government, that argument is foreclosed by well-settled case law that

holds that the APA is the proper mechanism by which Plaintiffs may challenge an alleged

unlawful regulatory action.  See, e.g., Cousins v. Sec'y of the U.S. Dep't of Transp., 880 F.2d

603, 606 (1st Cir. 1989) (observing that "in light of the existence of the APA, it rarely makes

sense to find that a substantive statute creates an 'implied private right of action' against the

federal government for relief from unlawful regulatory action" because "the general provisions

for judicial review of agency action, as embodied in the APA, offer adequate relief").  Indeed,

"'it is difficult to understand why a court would ever hold that Congress, in enacting a statute

16

that creates federal obligations, has implicitly created a private right of action against the federal government, for there is hardly ever any need to do so' because of the omnipresent availability of APA review."[2]  National Trust for Historic Pres., 938 F. Supp. at 915 (quoting N.A.A.C.P. v. Sec'y of Hous. & Urban Dev., 817 F.2d 149, 153 (1st Cir. 1987)).

        As discussed above, neither the express language of the IDEA nor the Act's legislative history provides any basis from which to conclude that the statute gives rise to a private right of action against the federal government.   To the extent that Plaintiffs' Complaint challenges ED's regulatory action under the IDEA – which appears to be the gravamen of Plaintiffs' Complaint, see, e.g., Complaint, ¶ 7 ("In adopting these regulations, the Department acted in an arbitrary and capricious manner, in excess of its statutory authority, and not in accordance with the law[]") – Plaintiffs' claim must be decided under the APA, not the IDEA.  See Natural Trust for Historic Pres., 938 F. Supp. at 915 ("[T]he very existence of the APA makes it reasonable to assume that 'when Congress means to permit a private party to ask a court to review the legality of federal action in a manner that differs from APA review, Congress will say so explicitly in the statute.'")

---

[2]Even assuming *arguendo* that this Court is willing to find that Plaintiffs have an implied right of action under the IDEA (even given the availability of relief under the APA), an "implied right of action" is insufficient to waive the federal government's sovereign immunity under the Act. It is well-settled that "[t]he federal government's waiver of sovereign immunity must be 'unequivocally expressed."  Dorsey v. U.S. Dep't of Labor, 41 F.3d 1551, 1555 (D.C. Cir. 1994). As discussed *supra*, the IDEA does not contain any language that "unequivocally expresses" Congress's intent to waive the federal government's sovereign immunity under the Act. Accordingly,  Plaintiffs do not have a cause of action against ED under the IDEA.  See Dorsey, 41 F.3d at 1555 (observing that "[w]hile private rights of action may be implied, waivers of sovereign immunity may not").

(internal citation omitted).  Accordingly, because Plaintiffs do not have a private right of action

against ED under the IDEA, Count I of the Complaint must be dismissed.[3]

---

[3]Even if this Court finds that Plaintiffs have a private right of action against ED under the IDEA, Plaintiffs' IDEA claim nevertheless must be dismissed because ED's regulations excluding the provision of mapping services from the definition of related services do not violate or contradict any provision of the IDEA, or substantively lessen the protections afforded to children with disabilities embodied in regulations in effect in 1983. See generally 20 U.S.C. § 1406 (proscribing the manner in which, and the limitations on how, the Secretary may prescribe regulations to enforce the provisions of the IDEA).  As discussed in greater detail *infra*, Plaintiffs have not, nor can they, point to any statutory section of the IDEA that expressly requires the provision of mapping services as a related service.  That is because no such statutory provision exists.  ED's regulations cannot violate or contradict a statutory provision that does not exist.

Plaintiffs also contend that ED violated § 1406(b)(2) of the IDEA by enacting regulations that "substantively lessened the protections provided to children with disabilities."  Complaint, ¶ 49.  Section 1406(b)(2) states in relevant part that ED may not promulgate any regulation that "procedurally or substantively lessens the protections provided to children with disabilities . . . **as embodied in regulations in effect on July 20, 1983**. . . ." (emphasis added).  In 1983, however, the FDA had not yet approved the use of cochlear implants for children; thus the need for mapping services for children with cochlear implants did not yet exist.  In fact, the FDA did not approve the use of cochlear implants for children until 1990.  Thomas Balkany, *A Brief Perspective on Cochlear Implants*, 328 NEW ENG. J. MED.  281, 281 (1993).  Because the FDA did not approve the use of cochlear implants for children until 1990, the IDEA regulations in effect in 1983 could not contemplate the provision of  mapping services for children with cochlear implants.   Thus, ED's regulations excluding the provision of mapping services from the definition of related services do not substantively lessen the protections afforded to children with disabilities **as embodied in the 1983 regulations** because children with disabilities were not entitled to mapping services under the IDEA or its implementing regulation in 1983. See Michael C. v. Radnor Twp. Sch. Dist., No. C.A. 98-4690, 1999 WL 89675, at *3 n.9 (E.D. Pa. Feb. 4, 1999) (rejecting plaintiff's argument that ED's policy decision procedurally or substantively lessened the protections provided to children with disabilities as embodied in the 1983 regulations because "[p]laintiff has pointed to no regulation in effect prior to the listed date" that conflicts with the challenged policy decision); see also A.R. ED–000927 (letter from Peter Smith, prior counsel for Plaintiffs Beth and David Petit, acknowledging that "[b]ecause the [] [cochlear implant] was essentially unknown until the last 15 years (especially its use for children), it has been understandable that the regulations would have been silent on the subject up to this point").  Furthermore, Plaintiffs' claim that ED substantively lessened the protections afforded to children under the IDEA by promulgating the challenged regulations is without merit  where, as here, Congress itself amended the IDEA to make clear that the implantation of medical devices is not covered as a related service under the Act.

## IV.     PLAINTIFFS' APA CLAIM IS ALSO WITHOUT MERIT

Plaintiffs' APA claim erroneously alleges that ED's rules excluding the provision of

mapping services for cochlear implants as a related service are "contrary to the plain language,

intent, and purpose of IDEA," "exceed the Secretary's statutory rulemaking authority under [the

IDEA]," and are arbitrary and capricious.  Compl., ¶¶ 52, 53.  As discussed in detail below, the

mapping exclusion regulations are not contrary to the IDEA's text or legislative history, and are

neither arbitrary nor capricious.  Indeed, the detailed Administrative Record belies Plaintiffs'

unsupported assertions to the contrary.  Accordingly, for the reasons set forth below, ED is

entitled to judgment as a matter of law.

### A.     ED's Mapping Exclusion Regulations Are Within the Scope of ED's Statutory Authority Under the IDEA

This Court's determination of whether ED's interpretation of the IDEA is contrary to the

Act is subject to the standard of review articulated in Chevron U.S.A., Inc. v. Natural Res. Def.

Council, Inc., 467 U.S. 837 (1984).  See Universal Health Serv. of McAllen, Inc. v. Sullivan, 770

F. Supp. 704, 715 (D.D.C. 1991) ("In situations when Congress delegates authority to an agency

to administer a statute but does not directly address a particular question arising from the

agency's statutory interpretation, the Court is guided by the Supreme Court holding in

Chevron.").  The Chevron standard of review employs a two-part inquiry.  First, the court must

look to "'whether Congress has directly spoken to the precise question at issue. . . .'" Baker

Norton Pharm. v. U.S. Food & Drug Admin., 132 F. Supp. 2d 30, 33 (D.D.C. 2001) (internal

citation omitted).  If, as here, Congress has not directly spoken on the challenged issue, the Court

must proceed to the second step of the Chevron test.  National Ass'n of Clean Air Agencies v.

EPA, 489 F.3d 1221, 1228 (D.C. Cir. 2007).  Under this second step, "'the question for the court

is whether the agency's interpretation is based on a permissible construction of the statute.'" Baker Norton Pharm., 132 F. Supp. 2d at 33-34 (internal citation omitted).

Plaintiffs can prevail if, and only if, they are able to show that their reading of the IDEA is the "inevitable one." Regions Hospital v. Shalala, 522 U.S. 448, 460 (1998). This is a heavy burden to bear. Indeed, in order to prevail, Plaintiffs must demonstrate either that Congress made a deliberate decision to "compel" the result they urge, Auer v. Robbins, 519 U.S. 452, 458 (1997), in terms so "unambiguously manifest," Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 703 (1995), that Congress "would not have sanctioned [the agency's] interpretation," Am. Mining Congress v. EPA, 965 F.2d 759, 765 (9th Cir. 1992), or that the statutory language "cannot bear the interpretation adopted by the Secretary." Sullivan v. Everhart, 494 U.S. 83, 92 (1990). In other words, Plaintiffs' construction of the statute must be "the only possible interpretation." Regions Hospital, 522 U.S. at 460; Sullivan, 494 U.S. at 89. Thus, because the IDEA's statutory text and legislative history are ambiguous regarding Congress's intent to provide mapping services for cochlear implants as a related service under the IDEA, Plaintiffs cannot prevail.

### 1. The IDEA's Statutory Text and Structure are Ambiguous Regarding Congress's Intent to Provide Mapping Services As A Related Service

To determine whether Congress has spoken directly on the issue of the states' obligation (if any) to provide free cochlear implant mapping as a related service under the IDEA, this Court must focus on the plain language of the Act. See National Home Equity Mortgage Ass'n v. Office of Thrift Supervision, 271 F. Supp. 2d 264, 269 (noting that "the reviewing court inquires whether the plain language of the statute addresses the precise issue"). If the plain language does not provide any insight into Congress's intent, the court employs other tools of statutory

20

construction to ascertain Congress's intent.  See New York State Bar Ass'n v. F.T.C., 276 F.

Supp. 2d 110, 117 (D.D.C. 2003) (observing that "'[i]n the first analytical step, the courts use

'traditional tools of statutory interpretation - text, structure, purpose and legislative history'")

(quoting Citizens Coal Council v. Norton, 330 F.3d 478, 481 (D.C. Cir. 2003)).  As discussed

above, if, after examining the statute's text and legislative history, the court determines that

Congress's intent is unclear, the court must proceed to part two of the Chevron inquiry.

Tellingly, Plaintiffs' Complaint does not cite to any provision of the IDEA that explicitly

requires states to provide cochlear implant mapping as a related service.  In fact, it would be

impossible for Plaintiffs to do so because no such provision exists.  The IDEA defines "related

services" as:

> [T]ransportation, and such developmental, corrective, and other supportive services
> (including speech-language pathology and audiology services, interpreting services,
> psychological services, physical and occupational therapy, recreation, including
> therapeutic recreation, social work services, school nurse services designed to enable a
> child with a disability to receive a free appropriate public education as described in the
> individualized education program of the child, counseling services, including
> rehabilitation counseling, orientation and mobility services, and medical services, except
> that such medical services shall be for diagnostic and evaluation purposes only) as may
> be required to assist a child with a disability to benefit from special education, and
> includes the early identification and assessment of disabling conditions in children.

20 U.S.C. § 1401(26)(A).  In 2004, Congress amended the definition of related services to make

clear that the term does not apply to medical devices, like cochlear implants, that are surgically

implanted.  See  20 U.S.C. § 1401(26)(B) ("The term [related services] does not include a

medical device that is surgically implanted, or the replacement of such device.").  However,

although the medical devices exception is clear that the IDEA does not require states to provide

or replace surgically implanted medical devices, the Act does not clearly address whether the

IDEA requires states to optimize and maintain the functioning of these exempted devices (e.g., mapping services for cochlear implants).

Plaintiffs, implicitly acknowledging that the IDEA does not address mapping services, attempt to obfuscate this ambiguity by pointing to the reference to "audiology services" included in the IDEA's definition of related services. Plaintiffs contend that "the plain language of the [IDEA]" requires the provision of mapping services because the "ordinary meaning of the term 'audiology services,'" as referenced in the definition, "includes a service like cochlear implant mapping which can only be provided by licensed audiologists." Complaint, ¶¶ 3, 4, 7. Plaintiffs must rely on the term's "ordinary meaning" because the IDEA does not define the term "audiology service." Section 300.34 of the IDEA's implementing regulation, moreover, defines the term "audiology" without reference to the provision of mapping services.[4]

The glaring problem with Plaintiffs' proposed statutory interpretation is that it construes the term "audiology services" without considering the term within the statutory context of the IDEA. It is axiomatic that in employing traditional tools of statutory interpretation, "the entire statute [] must be reviewed. . . and not the specific clauses or provisions in isolation." Burnett v.

---

[4] Section 300.34 defines the term "audiology" to include: "(i) Identification of children with hearing loss; (ii) Determination of the range, nature, and degree of hearing loss, including referral for medical or other professional attention for the habilitation of hearing; (iii) Provision of habilitative activities, such as language habilitation, auditory training, speech reading (lip reading), hearing evaluation, and speech conservation; (iv) Creation and administration of programs for prevention of hearing loss; (v) Counseling and guidance of children, parents, and teachers regarding hearing loss; and (vi) Determination of children's needs for group and individual amplification, selecting and fitting an appropriate aid, and evaluating the effectiveness of amplification." 34 C.F.R. § 300.34(c)(1). ED issued its regulation defining this term on August 23, 1977. 42 Fed. Reg. 42,474, 42,479. Since 1977, there has been no substantive change to the regulatory definition of "audiology." As discussed above (pp. 17-18, n.3), the FDA did not approve the use of cochlear implants for children until 1990. Thus, the term "audiology," as defined by the regulation promulgated by ED in 1977, did not contemplate the provision of mapping services for children with cochlear implants.

<u>Al Baraka Inv. & Dev. Corp.</u>, 274 F. Supp. 2d 86, 93 (D.D.C. 2003).  Even if the term "audiology services" may in some contexts encompass the provision of mapping services for cochlear implants, the construction is untenable when considered in connection with the IDEA's medical devices exception.  Congress clearly did not intend to require states to absorb the cost of providing or replacing medical devices (such as cochlear implants) that are surgically implanted.  <u>See</u> 20 U.S.C. § 1401(26)(B).  Given Congress's intent to except the provision or replacement of cochlear implants from the related services definition, it is, at the very least, ambiguous to what extent states must provide "audiology services" in connection with those exempted medical devices.  References to "audiology" and "audiology services" in the IDEA and its implementing regulation do not establish that Congress intended states to provide mapping services for a medical device that Congress clearly intended to exclude from the definition of related services.  Even if this Court were to accept Plaintiffs' contorted construction of the IDEA, that construction remains ambiguous in the context of the IDEA's medical devices exception.

At least one federal court interpreting the 2004 IDEA Amendments reached this exact conclusion, finding that the IDEA is ambiguous regarding Congress's intent to provide mapping services for children with cochlear implants.  In <u>A.U. v. Roane Cty. Bd. of Educ.</u>, 501 F. Supp. 2d 1134 (E.D. Tenn. 2007), plaintiffs, Nicole and Bennie Underwood -- the same Plaintiffs in the case *sub judice* -- took a position directly contrary to what they are now claiming about the "plain language of the statute," arguing that the court should find that "the [related services] amendment is ambiguous and does not specifically exclude mapping."  <u>Id.</u> at 1143.  After examining the IDEA's statutory text and structure, the court agreed with the Underwoods, observing that the medical devices exception to the definition of related services "is anything but

clear" regarding whether Congress intended to provide mapping services for a medical device that is itself excluded from the definition of related services.  Id. at 1144.

Although the A.U. court did not specifically rule on the validity of ED's regulations "because it was beyond the scope of the lawsuit," Complaint, ¶ 44, the court's observations – as well as the Underwood's own arguments – regarding the ambiguity inherent in the IDEA's text and structure nevertheless are instructive on the issue before this Court.  At the time the A.U. court issued this decision, ED's regulations implementing the 2004 IDEA Amendments were not yet effective.  For this reason, the court determined that the school district was required to provide cochlear implant mapping for Plaintiffs' child until October 13, 2006, the effective date of ED's regulations implementing the 2004 IDEA Amendments.  Id.   To that point, the court explained that, given the ambiguity in the 2004 IDEA Amendments, ED's interpretation of the related services definition was entitled to deference and thus concluded that the school district was not required to provide cochlear implant mapping for Plaintiffs' child after October 13, 2006.[5]  Id.

As the foregoing demonstrates, the IDEA's text and structure do not address whether Congress intended for states to include cochlear implant mapping as a related service under an IEP.  Indeed, it is hard to deny the existence of this ambiguity given the overwhelming number of comments ED received in connection with its notice-and-comment rulemaking, requesting that the Secretary clarify whether the medical devices exception to the related services definition

_____

[5]As mentioned before, the A.U. court did not have an opportunity to consider fully the validity of ED's regulations.  Nevertheless, the court's observations in A.U. regarding the deference due to ED's interpretation of the IDEA are instructive on the issue before this Court.

excludes the provision of mapping services for cochlear implants.[6]  See, e.g., A.R. ED-003556

("The regulations need to clarify whether the mapping of a cochlear device is considered a

related service or does the language that excludes surgically implanted medical devices cover

mapping as well."); A.R. ED-003672 (same).

> ## 2.     The IDEA's Legislative History Is Also Ambiguous Regarding Congress's Intent to Provide Mapping Services As a Related Service Under the IDEA

Where, as here, the text of the statute is ambiguous regarding Congress's intent, the

Court must then examine the statute's legislative history to determine whether Congress has

spoken to the precise question at issue.  See New York State Bar Ass'n., 276 F. Supp. 2d at 117.

Plaintiffs' Complaint asserts that "[t]he legislative history of the 2004 amendments to the IDEA

confirms that Congress intended cochlear implant mapping to be provided as a "related

service[]."  Complaint, ¶ 5.  To support their claim, Plaintiffs point to the fact that the final

version of the 2004 IDEA Amendments omits language excluding the post-surgical maintenance

or programming of implanted devices that was contained in a Senate Committee's prior iteration

of the bill.  Plaintiffs contend that Congress's decision to omit this language demonstrates

Congress's intent to provide cochlear implant mapping as a related service.  Complaint, ¶¶ 6, 7,

28, 32, 33.

---

[6]Indeed, it is odd (at best) that Plaintiffs now claim that the IDEA's statutory language is clear when they took a contrary position during public hearings the agency conducted to solicit comments on this and other issues related to its rulemaking under the IDEA.  A.R. ED-003324 (comment of Plaintiff Nicole Underwood at a public hearing in Nashville, Tennessee, requesting "some kind of clarification" on the scope of the medical devices exception "because the regs are not there, and there's no case law"on the issue).

Contrary to Plaintiffs' contentions, the IDEA's legislative history does not provide any insight into Congress's intent regarding the scope of the medical devices exception as applied to the provision of optimization (e.g., mapping of cochlear implants) and maintenance services for surgically implanted medical devices. When considering the 2004 IDEA Amendments, the Senate Committee on Health, Education, Labor and Pensions proposed a version of § 1401(26)(B) that excluded cochlear implant mapping from the definition of related services. The Senate Committee's proposed language for subsection (b) excluded from the definition of related services "a medical device that is surgically implanted, or the post-surgical maintenance, programming, or replacement of such device." S. Rep. No. 108-185 at 8, S. Bill 1248 at 398 (2003). Prior to the full Senate voting on this version of the bill, a manager's amendment deleted the phrase "or the post-surgical [maintenance, programming]" from the Senate Committee bill's proposed language that defined the term "related services." 150 Cong. Rec. S5394 (daily ed. May 13, 2004) (statement of Sen. Gregg). The final version of the bill on which the Senate voted, and which was ultimately enacted, does not include the "or the post-surgical maintenance, programming" language in subsection (b) of the related services definition. 150 Cong. Rec. S5414 (daily ed. May 13, 2004).

Notably, Congress did not replace this language with language expressly requiring states to provide maintenance or programming services as a related service for the medical devices that Congress expressly excluded from the related services definition. Nor, did Congress provide any explanation regarding why this language was deleted from the final version of the bill, or any statement regarding the effect of this deletion on the substantive provisions of the medical devices exception. Thus, the legislative history sheds no light on whether Congress intended to

provide mapping services for cochlear implants when it deleted the language "or the post-surgical maintenance, programming" from the final version of the bill.

Predictably, Plaintiffs assert in their Complaint that the deletion of the phrase "or the post-surgical maintenance, programming" from the final version of the bill demonstrates Congress's intent to "reject [the Senate Committee's] proposal" and "confirms that Congress intended cochlear implant mapping to be provided as a 'related service[].'" Compl., ¶¶ 5, 28. However, "the deletion of a word or phrase in the throes of the legislative process does not ordinarily constitute, without more, evidence of a specific legislative intent." Edison Elec. Inst. v. U.S. Envtl. Prot. Agency, 2 F.3d 438, 451 (D.C. Cir. 1993); Rastelli v. Warden, Metro. Corr. Ctr., 782 F.2d 17, 24 n.3 (2d Cir. 1986) ("Since Congress provided no explanation of its action[, the deletion of language from the final version of the bill], we find this deletion alone an ambiguous indication of Congressional purpose and draw no conclusion from it."). Indeed, without any explanation in the legislative record regarding why Congress deleted the "or the post-surgical maintenance, programming" language from the final version of the bill, it can hardly be said that Congress "rejected" this proposal. See Edison Elec. Inst., 2 F.3d at 451 (rejecting petitioners' argument that Congress "considered and rejected" a certain course of action, as evident by Congress's decision to delete certain language from the final version of the bill, because the deletion of a word or phrase, without more, does not provide sufficient evidence of Congressional intent).

Here, one cannot ascertain from the legislative history whether Congress considered the language superfluous given the medical devices exception, or having delegated to the Secretary the authority to promulgate regulations necessary to ensure compliance with the IDEA, intended

to "explicitly le[ave] a gap for [the Secretary] to fill," <u>National Ass'n of Clean Air Agencies</u>,

489 F.3d at 1229, or - as Plaintiffs postulate - intended to require (without in any way stating)

that states pay for mapping services for cochlear implants.

What is clear from the foregoing is that there are multiple conclusions that can be drawn

from the same legislative record regarding why Congress deleted the "or the post-surgical

maintenance, programming" language from the final version of the bill.  The existence of

numerous reasonable explanations for that congressional action requires this Court to conclude

that the IDEA's legislative history is ambiguous.  <u>See</u>  <u>OSG Bulk Ships, Inc. v. U.S.</u>, 921 F.

Supp. 812, 821 n.10 (D.D.C. 1996) (finding that Congress's failure to explain why it deleted a

proposed amendment from the final version of the bill, coupled with plausible interpretations by

both parties regarding the meaning of this deletion, showed that Congress's intent was unclear

and ambiguous); <u>see also</u> <u>Whittaker v. Whittaker Corp.</u>, 639 F.2d 516, 532 (9th Cir. 1981)

("Without some indication in the legislative history of the reasons why [certain language did not

appear in the final version of the bill] [ ], it is unwise to infer much from the silence of

Congress.").

In an effort to circumvent this ambiguous legislative record, Plaintiffs also claim that

"[b]y reenacting IDEA with 'related services' still defined to include 'audiology services,'

Congress ratified" a decision of the federal district court in New Hampshire, Compl., ¶ 27, which

held that "[a]bsent a clear indication that such audiology services were not intended to be

included within 'related services,' the definition would appear to encompass" cochlear implant

mapping.  <u>Stratham Sch. Dist. v. Beth & David P.</u>, No. 02-135, 2003 WL 260728, at *4 (D.N.H.

2003).  However, as Plaintiffs acknowledge in their Complaint, the court in <u>Stratham</u> interpreted

28

a version of the IDEA in effect prior to the 2004 Amendments that did not contain the medical devices exception to the related services definition Congress enacted when it amended the IDEA in 2004.

Moreover, the legislative history does not, as Plaintiffs proffer, suggest that Congress ratified the (unpublished) <u>Stratham</u> decision; rather, Congress's decision to expressly exclude the provision and replacement of cochlear implants suggests, if anything, that Congress intended to legislatively **overturn** the <u>Stratham</u> decision. <u>Cf.</u>  <u>Public Citizen, Inc. v. F.A.A.</u>, 988 F.2d 186, 194 (D.C. Cir. 1993) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute **without change**.") (emphasis added).  Here, Congress did not simply re-enact the IDEA "without change"; it made affirmative revisions to the statute, including amending the definition of related services to exclude surgically implanted medical devices, such as cochlear implants, from the statute's reach.  Thus, contrary to Plaintiffs' assertions otherwise, the legislative history contains not a shred of evidence that Congress sought to ratify the court's decision in <u>Stratham</u>.  If anything, it suggests that Congress reacted to the <u>Stratham</u> decision by affirmatively amending the definition of related services to expressly exclude cochlear implants and the services specifically associated with them from its coverage.

### 3.     ED's Mapping Exclusion Regulations Are a Permissible Construction of the IDEA

If, as here, Congress's intent with respect to the challenged issue is not clear from either the statute's text, structure, or legislative history, "the question for the court is whether the agency's answer is based on a permissible construction of the statute."  <u>National Home Equity Mortgage Ass'n</u>, 271 F. Supp. 2d at 270 (internal quotation and citation omitted).  In making this

inquiry, this Court must accord considerable weight to the Secretary's construction of the IDEA, the administration of which Congress entrusted to the Secretary. See Irving Indep. Sch. Dist. v. Tatro, 468 U.S. 883, 891-92 (1984) ( "[T]he regulations of the Department of Education [interpreting the IDEA]. . . are entitled to deference."); Honig, 484 U.S. at 325 n.8 (deferring to ED's interpretation of a statute it is charged with monitoring and enforcing); Ms. S. v. Vashon Island Sch. Dist., 337 F.3d 1115, 1134 & n.23 (9th Cir. 2003) (observing that ED's interpretation of the IDEA is entitled to Chevron deference), superseded on other grounds, 20 U.S.C. § 1414(d)(1)(B). Accordingly, to find ED's regulations permissible, this Court need not conclude that it is the best interpretation of the IDEA, see United States v. Haggar Apparel Co., 526 U.S. 380, 394 (1999), or that it is "the most natural one," Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 702 (1992). Rather, this Court must find **only** that ED's interpretation of the IDEA is reasonable. Chevron, 467 U.S. at 843. Given Congress's intent to exclude surgically implanted medical devices from the definition of related services, the Secretary's decision to exclude from that definition the optimization (e.g., mapping) and maintenance of those excluded devices is a reasonable interpretation of the IDEA's requirements.

When Congress amended the IDEA in 2004, it expressly granted the Secretary the authority to promulgate regulations "to the extent necessary to ensure that there is compliance with the specific requirements of [the IDEA]." 20 U.S.C. § 1406(a). Congress did not except from this explicit grant of authority the statutory definition of related services. See Cedar Rapids Cmty. Sch. Dist. v. Garret F., 526 U.S. 66, 75 n.6 (1999) (recognizing that the Secretary of Education "has the authority to enumerate the services that are, and are not, fairly included within the scope of [] [the related services definition]"); D.D. v. New York City Bd. of Educ.,

30

465 F.3d 503, 509 (2d Cir. 2006) ("The Secretary of Education 'is primarily responsible for the interpretation and implementation of the IDEA and has been granted regulatory and enforcement powers.'") (internal citation omitted). The 2004 IDEA Amendments do not explicitly delineate whether the IDEA's medical devices exception to the related services definition also applies to the optimization and maintenance of those excluded devices. Given this ambiguity and the vast number of comments ED received in connection with its notice-and-comment rulemaking that specifically requested clarification on this issue, ED reasonably decided that it was necessary to clarify the states' responsibility to provide free optimization and maintenance services for devices that Congress specifically exempted from the IDEA and its implementing regulation. 71 Fed. Reg. at 46,570.

In formulating the challenged rules, ED considered a number of issues weighing on the states' ability to provide optimization and maintenance services for surgically implanted medical devices. 71 Fed. Reg. at 46,569-585. For example, ED examined the distinction between those services that enable a child with a disability to remain in school during the day and those services that are not necessary to ensure that the child is provided access to education. 71 Fed. Reg. at 46,569. ED determined that as applied to cochlear implants, although the implant must be mapped properly in order for a child to hear well in school, "the mapping does not have to be done in school or during the school day in order to be effective." Id.

ED also considered the services and costs associated with mapping cochlear implants, including transportation and insurance co-payment costs. 71 Fed. Reg. at 46,570. ED determined that these services and costs "are incidental to a particular course of treatment chosen by the child's parents to maximize the child's functioning, and are not necessary to ensure that

the child is provided access to education, regardless of the child's disability, including maintaining health and safety while in school." 71 Fed. Reg. at 46,570. In addition, ED considered the level of expertise and skill required to provide optimization and maintenance services for surgically implanted medical devices. 71 Fed. Reg. at 46,570, 46,571. ED's final rule reflects its reasonable determination that the optimization and maintenance of surgically implanted medical devices, such as the mapping of cochlear implants, often require a level of expertise and equipment beyond that which school personnel, such as school audiologists, typically have. Id. ("The maintenance and monitoring of surgically implanted medical devices require the expertise of a licensed physician or an individual with specialized technical expertise beyond that typically available from school personnel.").

Although ED determined that states are not required to optimize or maintain the functioning of surgically implanted medical devices (such as mapping for cochlear implants), it nevertheless recognized that the IDEA requires states to provide certain services for children who have surgically implanted medical devices. 71 Fed. Reg. at 46,570-571, 46,581, 46,585. Accordingly, for services that are not necessary to provide access to education by maintaining the health or safety of the child while in school, ED established a rule that delineates those services that the IDEA covers, such as verifying that a cochlear implant is functioning properly, and those that the Act excludes, such as mapping. 71 Fed. Reg. at 46,571, 46,581, 46,764. The regulations clarify that, although a public agency is not responsible for optimizing or maintaining surgically implanted medical devices, it "is responsible for the routine checking of the external components of a surgically implanted device in much the same manner as a public agency is

responsible for the proper functioning of hearing aids." 71 Fed. Reg. at 46,571; see also 71 Fed. Reg. at 46,764.

ED's decision to exclude optimization and maintenance services for surgically implanted medical devices (such as mapping services for cochlear implants) is not only a reasonable interpretation of the IDEA but also consistent with Supreme Court precedent interpreting the Act. The Supreme Court has recognized and in fact "endorsed" ED's authority to promulgate regulations under the IDEA that take into consideration the cost of the services sought under the related services definition and the competence of school personnel to provide such services. See, e.g., Tatro, 468 U.S. at 892-93 (interpreting regulations implementing the medical services exception to the related services definition and observing that "the Secretary [of Education] could reasonably have concluded that [the medical services exception] was designed to spare schools from an obligation to provide a service [(clean intermittent catheritization)] that might well prove unduly expensive and beyond the range of their competence"); Garret F., 526 U.S. at 74-75 (explaining that in Tatro, "[w]e referenced the likely cost of the services and the competence of school staff as justifications for drawing a line between [services covered by the IDEA and those services excluded under the IDEA's medical services exception], but our endorsement of that line was unmistakable"). ED's consideration of these factors in its rulemaking is, according to the Supreme Court, proper when construing a state's obligation to provide particular services as part of a FAPE. Tatro, 468 U.S. at 893.

Here, Plaintiffs challenge the scope of the medical devices exception, and not the medical services exception at issue in Tatro and Garret F.. Nevertheless, the Court's endorsement of ED's consideration of the states' obligation to provide services that might be

unduly expensive and beyond the competence of school personnel in those decisions provided

the impetus for the rules ED ultimately formulated that exclude from the definition of related

services optimization (e.g., mapping) and maintenance services for surgically implanted medical

devices.  71 Fed. Reg. at 46,540, 46,547-85, 46,760, 46,764.  Given the foregoing, even if the

IDEA could be read as Plaintiffs suggest, see Complaint, ¶¶ 3, 7, where, as here, "the agency's

interpretation . . . is at least as plausible . . . there is little, if any, reason not to defer to its

construction."  Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 417 (1993).  Accordingly, ED's

interpretation of the IDEA is entitled to deference, and Plaintiffs' statutory challenge to ED's

mapping exclusion regulations must fail.

### B.      The Mapping Exclusion Regulations Are Neither Arbitrary Nor Capricious

Section 706(2)(A) of the APA requires a court to set aside an agency action found to be

arbitrary and capricious.  5 U.S.C. § 706(2)(A).  The court's inquiry in a § 706(2)(A) challenge

to agency action focuses "mainly on the decision-making process and the rationale behind an

agency's decision."  New York State Bar Ass'n, 276 F. Supp. 2d at 140.  This Court must uphold

agency action where the agency has considered the relevant factors, based the rules on that data,

and articulated an explanation for its action.  Motor Vehicle Mfrs. Ass'n v. State Farm Mut.

Auto. Ins. Co., 463 U.S. 29, 43 (1982) ("[T]he agency must examine the relevant data and

articulate a satisfactory explanation for its action, including a 'rational connection between the

facts found and the choice made.'") (internal citation omitted); National Ass'n of Clean Air

Agencies, 489 F.3d at 1228 (explaining that the Court must uphold agency action where "it has

considered the relevant factors and articulated a rational connection between the facts found and

the choice made, and has not relied on improper factors") (internal quotation and citation

omitted).  The scope of review under the arbitrary and capricious standard is narrow, highly

deferential, and presumes the validity of agency action.  See Citizens to Preserve Overton Park v.

Volpe, 401 U.S. 402, 415-16 (1971); National Ass'n of Clean Air Agencies, 489 F.3d at 1228.

As demonstrated by the voluminous Administrative Record, ED's decision to exclude

mapping services for cochlear implants as a related service under the IDEA was neither arbitrary

nor capricious, but instead well-reasoned and deliberate.  See 71 Fed. Reg. 46,540, 46,547-585,

46,760, 46,764 (Aug. 14, 2006).  Prior to developing and publishing proposed regulations, ED

first solicited advice and recommendations from the public regarding the scope of the proposed

regulations in light of the 2004 IDEA Amendments.  A.R. ED-005411-5412.  In response to its

request for public comments about the scope of the proposed regulations, ED received over

6,000 comments that addressed the major provisions of the 2004 IDEA Amendments.  A.R. ED-

003424.  Based on the public comments ED received regarding the medical devices exception,

ED concluded that it was necessary to clarify the states' obligation to provide optimization (e.g.,

mapping) and maintenance services for surgically implanted medical devices.  71 Fed. Reg. at

46,569.  Accordingly, as requested by the commenters, ED formulated a proposed rule that

clarifies that the optimization and maintenance of a surgically implanted medical device "is not a

related service under the [IDEA]" and that the rule applies to mapping services for cochlear

implants. 71 Fed. Reg. at 46,570.

ED received comments that supported its proposed rule to exclude as a related service

mapping for children with cochlear implants, and those that opposed it.  See 71 Fed. Reg. at

46,569.  As the Administrative Record shows, after considering the comments of those who

opposed the proposed rule, ED concluded that excluding mapping services for cochlear implants

35

from the definition of related services was nevertheless necessary policy.  <u>See</u> 71 Fed. Reg.

46,569-571, 46,581, 46,585.  ED explained that "'mapping' and 'optimization' refer to adjusting

the electrical stimulation levels provided by the cochlear implant that is necessary for long-term

post-surgical follow-up of a cochlear implant."  71 Fed. Reg. at 46,569.  For children with

cochlear implants, "[o]ptimization or 'mapping' adjusts or fine tunes the electrical stimulation

levels provided by the cochlear implant and is changed as a child learns to discriminate signals to

a finer degree."  71 Fed. Reg. at 46,570.  After studying the issue and considering the comments

it received, ED determined that it was necessary to clarify that mapping is an example of device

optimization that is excluded under the IDEA because the services and costs associated with

mapping, including transportation and insurance co-payments, "are incidental to a particular

course of treatment chosen by the child's parents to maximize the child's functioning, and are

not necessary to ensure that the child is provided access to education, regardless of the child's

disability, including maintaining health and safety while in school."  71 Fed. Reg. at 46,570.

 A number of commenters expressed concern that by excluding mapping services from the

definition of related services, children with cochlear implants would have limited access to

related services such as speech and language therapy, assistive listening devices, appropriate

classroom acoustics, auditory training, educational interpreters, cued speech transliterators, and

specialized instruction.  In response to these comments, ED stated that the proposal "is not

intended to deny a child with a disability [access to related services] . . . or routine checking to

determine if the external components of the surgically implanted device is turned on and

working.  Neither does the exclusion of mapping as a related service preclude a child with a

cochlear implant from receiving the related services (e.g., speech and language services) that are

necessary for the child to benefit from special education services." Id.  ED expressly recognized

that "a child with a cochlear implant may still require related services, such as speech and

language therapy, to process spoken language just as other children with hearing loss who are

using hearing aids may need those services and are entitled to them under the Act if they are

required for the child to benefit from special education." Id.  To that end, "the regulations

clearly state that a child with a cochlear implant or other surgically implanted device is entitled

to related services that are determined by the child's [individualized education program] IEP

team to be necessary for the child to benefit from special education." Id.; see also 71 Fed. Reg.

at 46,764.

      Other commenters expressed concern that excluding cochlear implant mapping from the

definition of related services would establish different standards for serving children with

cochlear implants and those who use hearing aids and other external amplification devices.  71

Fed. Reg. at 46,570.  These commenters recommended that ED further clarify that the IDEA

permits routine monitoring of surgically implanted medical devices, including cochlear implants,

to ensure that the device is functioning effectively and safely.  Id.

      In response to these comments, ED explained that, although mapping or optimization

services are generally provided by a specialized clinic and are not a related service under the

IDEA and its implementing regulation, "a public agency still has a role in providing services and

supports to help children with cochlear implants."  71 Fed. Reg. at 46,570.  ED recognized that

"[p]articularly with younger children or children who have recently obtained [cochlear] implants,

teachers and related services personnel frequently are the first to notice changes in the child's

perception of sounds that the child may be missing. . . .   The changes may indicate a need for

remapping." 71 Fed. Reg. at 46,570-571. To address this concern, ED expects "that school personnel would communicate with the child's parents about these issues." 71 Fed. Reg. at 46,571. Thus, the final rule states that "a public agency is responsible for the routine checking of the external components of a surgically implanted device in much the same manner as a public agency is responsible for the proper functioning of hearing aids." 71 Fed. Reg. at 46,571; see also 71 Fed. Reg. at 46,764.

This rule reflects ED's determination that "there is no substantive difference between serving a child with a cochlear implant in a school setting and serving a child with a hearing aid." 71 Fed. Reg. at 46,571. Indeed, ED recognized that the externally worn speech processor of the cochlear implant operates in much the same way as a hearing aid in that it must be activated and "properly functioning in order for the child to benefit from his or her education." Id. To that point, ED explained that both the cochlear implant's externally worn speech processor and the hearing aid require extra batteries, cords, and other parts that parents bring to school for their children in order to ensure that their child hears effectively and that the device (i.e., the cochlear implant or the hearing aid) is functioning properly. Id. These observations and considerations led ED to implement a rule requiring states to ensure that the external components of surgically implanted medical devices (e.g., cochlear implants) are functioning properly. See 71 Fed. Reg. at 46,764.

ED's regulations reflect a nuanced and balanced approach that carefully delineates (for those services that do not maintain the health and safety of the child while in school and thus are not necessary to provide access to education) those services that the IDEA covers, such as verifying that a cochlear implant is functioning properly, and those that the IDEA excludes, such

38

as mapping.  71 Fed. Reg. at 46,571.  ED explained that "the distinguishing factor [between those services required by the IDEA and those that the Act does not require] is the level of experience required."  Id.  According to ED, "[t]he maintenance and monitoring of surgically implanted devices require the expertise of a licensed physician or an individual with specialized technical expertise beyond that typically available from school personnel.  On the other hand, trained lay persons or nurses can routinely check an externally worn processor connected with a surgically implanted device to determine if the batteries are charged and the external processor is operating."  Id.  Thus, ED implemented a rule to cover the routine checking of hearing aids and external components of surgically implanted medical devices.  Id.; 71 Fed. Reg. at 46,764.

Given the foregoing, Plaintiffs' suggestion that the only basis for ED's decision to exclude mapping services from the definition of related services is its reliance on language contained in a Senate Committee Report that was deleted from the final version of the bill, see Complaint, ¶¶ 32-33, is without merit.  Indeed, a review of the preamble to the final rule demonstrates that ED thought long and hard about the scope of the challenged regulations and considered many issues related to the challenged rules, including those raised in public comments, prior to developing and publishing the regulations.  See 71 Fed. Reg. at 46,569-571, 46,581, 46,585.  To that point, the Administrative Record contains a well-reasoned analysis of the basis for the regulations ED promulgated.  Where, as here, the agency has articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made, the regulation is reasonable and must be upheld.  Motor Veh. Mfrs. Ass'n, 463 U.S. at 43; Small Refiner Lead Phase-Down Task Force v. E.P.A., 705 F.2d 506, 521 (D.C.

Cir. 1983) (If "the agency's reasons and policy choices . . . conform to 'certain minimal standards of rationality' . . . the rule is reasonable and must be upheld.").

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss or alternatively, for summary judgment, and enter judgment in favor of the Defendants.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SHEILA M. LIEBER
Deputy Branch Director

/s/ Tamra T. Moore
TAMRA T. MOORE D.C. Bar No. 488392
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C.  20530
Telephone: (202) 514-8095
Facsimile: (202) 616-8470
Email:  Tamra.Moore@usdoj.gov

Dated: December 13, 2007            Attorneys for Defendants

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| BETH and DAVID PETIT, in their<br>individual capacities and as next friends<br>to their minor son, H.P.,<br>12 Emery Lane<br>Stratham, NH 03885<br><br>and<br><br>NICOLE and BENNIE UNDERWOOD,<br>in their individual capacities and as<br>next friends to their minor daughter,<br>A.U.<br>9936 Castle Lane<br>Knoxville, TN 37922<br>      Plaintiffs,<br><br>   v.<br><br>UNITED STATES DEPARTMENT<br>OF EDUCATION,<br>400 Maryland Ave, SW<br>Washington, DC 20202<br><br>and<br><br>MARGARET SPELLINGS, in her official<br>capacity as Secretary of the<br>United States Department of Education<br>400 Maryland Ave, SW<br>Washington, DC 20202<br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civ. No. 1:07CV01583(RMU)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

_____

## STATEMENT OF MATERIAL FACTS AS TO WHICH
## THERE IS NO GENUINE ISSUE IN SUPPORT OF DEFENDANTS' MOTION TO
## DISMISS OR ALTERNATIVELY, FOR SUMMARY JUDGMENT

Pursuant to Local Rules 7.1(h) and 56.1, Defendants, the United States Department of

Education and Margaret Spellings, in her official capacity as Secretary of Education (collectively, "ED" or "the Secretary"), by and through undersigned counsel, submit the following statement of material facts as to which there is no genuine issue:

1.    Plaintiffs, Beth and David Petit and Nicole and Bennie Underwood, respectively are parents of a child with a cochlear implant.  Plaintiffs' children have not received free cochlear implant mapping services as part of their individualized education plan ("IEP") since late 2006.

2.    Plaintiffs filed this action against ED, challenging ED's promulgation of rules that exclude cochlear implant mapping from the definition of related services as set forth in the Individuals with Disabilities Education Act ("IDEA").  Plaintiffs' Complaint alleges violations of the IDEA and the Administrative Procedures Act ("APA").

3.    In A.U. v. Roane Cty. Bd. of Educ., Civ. Nos. 3:06-cv-123, 3:06-cv-125 (E.D. Tenn.), Plaintiffs Nicole and Bennie Underwood argued that the provision of the 2004 IDEA Amendments excluding surgically implanted medical devices from the definition of related services is ambiguous.

4.    When Congress amended the IDEA in 2004, Pub. L. No. 108-446, (codified at 20 U.S.C. §§ 1400 et seq.), it amended the provision defining related services.  The amended definition of related services "does not include a medical device that is surgically implanted, or the replacement of such device."  20 U.S.C. § 1401(26)(B).

5.    The 2004 IDEA Amendments do not contain any statutory provision that expressly requires States to optimize or maintain the functioning of the medical devices excluded under § 1401(26)(B).

6.    When Congress amended the IDEA in 2004, it granted the Secretary of Education the

2

authority to issue regulations "to the extent that such regulations are necessary to ensure that there is compliance with the specific requirements of" the IDEA.  20 U.S.C. § 1406(a).

7.    On December 29, 2004, prior to developing and publishing proposed rules to address the 2004 IDEA Amendments, ED invited the public to submit comments and recommendations regarding the nature and scope of the proposed rules and the need to clarify any provisions of the new law.  A.R. ED005411-5412.

8.    In response to its December 29, 2004 solicitation of public comments, ED received comments requesting that the Secretary clarify whether the medical devices exception to the related services definition prohibits the provision of mapping services for children with cochlear implants.  See, e.g., A.R. ED-003550; A.R. ED-003568; A.R. ED-003672.

9.    To respond to the comments seeking clarification regarding the scope of the medical devices exception to the related services definition, ED issued its proposed rule addressing the IDEA's statutory limitation on surgically implanted medical devices.  A.R. ED-003423, ED-003426; A.R. ED-003480.  The proposed rule specified that "related services do not include a medical device that is surgically implanted, the optimization of device functioning, maintenance of the device, or the replacement of the device."  A.R. ED-003480.

10.    On June 21, 2005, ED solicited comments and recommendations from the public regarding its proposed regulations.  A.R. ED-003423.  ED received over 5,000 comments in response to its proposed regulations.  71 Fed. Reg. 46,540, 46,547 (Aug. 14, 2006).

11.    ED reviewed and responded to the comments it received in response to its June 21, 2005 Notice of Proposed Rulemaking, including those comments related to ED's proposed rule excluding the optimization (e.g., mapping) and maintenance of surgically implanted device

3

functioning from the definition of related services.   71 Fed. Reg. at 46,540, 46,569-71, 46,581-82, 46,585.

12.    The final rule that the Secretary promulgated states that "[r]elated services do not include a medical device that is surgically implanted, the optimization of that device's functioning (e.g. mapping), maintenance of that device, or the replacement of that device." 71 Fed. Reg. at 46,760.

13.    The Secretary clarified that, although public agencies are not required to optimize or maintain the functioning of surgically implanted medical devices, they do "have an obligation to change a battery or routinely check an external component of a surgically implanted medical device to make sure that it is turned on and operating." 71 Fed. Reg. at 46,581-582. Accordingly, the final rule states that "each public agency must ensure that the external components of surgically implanted medical devices are functioning properly." 71 Fed. Reg. at 46,764.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SHEILA M. LIEBER
Deputy Branch Director

/s/ Tamra T. Moore
TAMRA T. MOORE D.C. Bar No. 488392
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.

4

Washington, D.C.  20530
Telephone: (202) 514-8095
Facsimile: (202) 616-8470
Email: Tamra.Moore@usdoj.gov

Dated: December 13, 2007              Attorneys for Defendants

# ATTACHMENT



**Monday,**
**August 14, 2006**

Part II

# Department of Education

**34 CFR Parts 300 and 301**
**Assistance to States for the Education of**
**Children With Disabilities and Preschool**
**Grants for Children With Disabilities;**
**Final Rule**

ED-000001

**46540**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

## DEPARTMENT OF EDUCATION

### 34 CFR Parts 300 and 301

**RIN 1820–AB57**

**Assistance to States for the Education of Children With Disabilities and Preschool Grants for Children With Disabilities**

**AGENCY:** Office of Special Education and Rehabilitative Services, Department of Education.

**ACTION:** Final regulations.

**SUMMARY:** The Secretary issues final regulations governing the Assistance to States for Education of Children with Disabilities Program and the Preschool Grants for Children with Disabilities Program. These regulations are needed to implement changes made to the Individuals with Disabilities Education Act, as amended by the Individuals with Disabilities Education Improvement Act of 2004 (Act or IDEA).

**DATES:** These regulations take effect on October 13, 2006.

**FOR FURTHER INFORMATION CONTACT:** Alexa Posny, U.S. Department of Education, Potomac Center Plaza, 550 12th Street, SW., Washington, DC 20202–2641. Telephone: (202) 245–7459, ext. 3.

If you use a telecommunications device for the deaf (TDD), you may call the Federal Relay System (FRS) at 1–800–877–8339.

Individuals with disabilities may obtain this document in an alternate format (e.g., Braille, large print, audiotape, or computer diskette) on request to the contact person listed under **FOR FURTHER INFORMATION CONTACT.**

**SUPPLEMENTARY INFORMATION:** These regulations implement changes in the regulations governing the Assistance to States for Education of Children with Disabilities and the Preschool Grants for Children with Disabilities Program necessitated by the reauthorization of the IDEA. With the issuance of these final regulations, part 301 has been removed and the regulations implementing the Preschool Grants for Children with Disabilities Program are included under subpart H of these final regulations.

On June 21, 2005, the Secretary published in the **Federal Register** (70 FR 35782) (NPRM) to amend the regulations governing the Assistance to States for Education of Children with Disabilities Program, the Preschool Grants for Children with Disabilities Program, and Service Obligations under

Special Education Personnel Development to Improve Services and Results for Children with Disabilities. In the preamble to the NPRM, the Secretary discussed, on pages 35783 through 35819, the changes proposed to the regulations for these programs; specifically, the amendments to 34 CFR part 300, the removal of 34 CFR part 301 and relocation of those provisions to subpart H of 34 CFR part 300, and the amendments to 34 CFR part 304.

Final regulations for 34 CFR Part 304—Special Education-Personnel Development to Improve Services and Results for Children with Disabilities were published in the **Federal Register** (71 FR 32396) on June 5, 2006, and became effective July 5, 2006.

**Major Changes in the Regulations**

The following is a summary of the major substantive changes in these final regulations from the regulations proposed in the NPRM (the rationale for each of these changes is discussed in the *Analysis of Comments and Changes* section of this preamble):

**Subpart A—General**

*Definitions*

• The definition of *child with a disability* in § 300.8 has been revised as follows:

(1) Section 300.8(b) (Children aged three through nine experiencing developmental delays) has been changed to clarify that the use of the term ''developmental delay'' is subject to the conditions described in § 300.111(b).

(2) The definition of *other health impairment* in § 300.8(c)(9)(i) has been changed to add ''Tourette Syndrome'' to the list of chronic or acute health problems.

• The definition of *excess costs* in § 300.16 has been revised to clarify that the computation of excess costs may not include capital outlay and debt service. In addition, a new ''Appendix A to Part 300—Excess Cost Calculation'' has been added to provide a description (and an example) of how to calculate excess costs under the Act and these regulations.

• The definition of *highly qualified special education teacher* in § 300.18 has been revised, as follows:

(1) Section 300.18(b), regarding requirements for highly qualified special education teachers in general, has been modified to clarify that, when used with respect to any special education teacher teaching in a charter school, *highly qualified* means that the teacher meets the certification or licensing requirements, if any, set forth in the State's public charter school law.

(2) A new § 300.18(e), regarding separate ''high objective uniform State standards of evaluation'' (HOUSSE), has been added to provide that a State may develop a separate HOUSSE for special education teachers, provided that any adaptations of the State's HOUSSE would not establish a lower standard for the content knowledge requirements for special education teachers and meets all the requirements for a HOUSSE for regular education teachers. This provision also clarifies that a State may develop a separate HOUSSE for special education teachers, which may include single HOUSSE evaluations that cover multiple subjects.

(3) Section 300.18(g) (proposed § 300.18(f)) (''Applicability of definition to ESEA requirements; and clarification of new special education teacher'') has been revised as follows: (1) The heading has been revised, and (2) the language changed to clarify when a special education teacher is considered ''new'' for some purposes.

(4) Section 300.18(h) (proposed § 300.18(g)) has been modified to clarify that the highly qualified special education teacher requirements also do not apply to private school teachers hired or contracted by LEAs to provide equitable services to parentally-placed private school children with disabilities under § 300.138.

• The definition of *Indian and Indian tribe* in § 300.21 has been changed to clarify that nothing in the definition is intended to indicate that the Secretary of the Interior is required to provide services or funding to a State Indian tribe that is not listed in the **Federal Register** list of Indian entities recognized as eligible to receive services from the United States, published pursuant to Section 104 of the Federally Recognized Indian Tribe List Act of 1994, 25 U.S.C. 479a–1.

• The definition of *parent* in § 300.30 has been revised to substitute ''biological'' for ''natural'' each time it appears in the definition, and to add language clarifying that to be considered a parent under this definition a ''guardian'' must be a person generally authorized to act as the child's parent, or authorized to make educational decisions for the child.

• The definition of *related services* in § 300.34 has been revised as follows:

(1) Section 300.34(a) (General) has been modified to (A) add the statutory term ''early identification and assessment of disabilities in children,'' which was inadvertently omitted from the NPRM, (B) combine ''school health services'' and ''school nurse services,'' and (C) remove the clause relating to a free appropriate public education under

"school nurse services" because it duplicates the clause in § 300.34(c)(13).

(2) Section 300.34(b) has been changed to (A) expand the title to read "Exception; services that apply to children with surgically implanted devices, including cochlear implants," and (B) clarify, in new paragraph (b)(1), that related services do not include a medical device that is surgically implanted, the optimization of that device's functioning (*e.g.*, mapping), maintenance of that device, or the replacement of that device.

(3) A new § 300.34(b)(2) has been added to make clear that nothing in paragraph (b)(1) of § 300.34 (A) limits the right of a child with a surgically implanted device (*e.g.*, a cochlear implant) to receive related services, as listed in § 300.34(a), that are determined by the IEP Team to be necessary for the child to receive FAPE; (B) limits the responsibility of a public agency to appropriately monitor and maintain medical devices that are needed to maintain the health and safety of the child, including breathing, nutrition, or operation of other bodily functions, while the child is transported to and from school or is at school; or (C) prevents the routine checking of an external component of a surgically-implanted device to make sure it is functioning properly, as required in § 300.113(b).

(4) The definition of *interpreting services* in § 300.34(c)(4) has been changed to clarify that the term includes (A) transcription services, such as communication access real-time translation (CART), C-Print, and TypeWell for children who are deaf or hard of hearing, and (B) special interpreting services for children who are deaf-blind.

(5) The definition of *orientation and mobility services* in § 300.34(c)(7) has been changed to remove the term "travel training instruction." The term is under the definition of *special education*, and is defined in § 300.39(b)(4).

(6) The definition of *school nurse services* in 300.34(c)(13) has been expanded and re-named *school health services and school nurse services*. The expanded definition clarifies that "school nurse services" are provided by a qualified school nurse, and "school health services" may be provided by a qualified school nurse or other qualified person.

• A definition of *scientifically based research* has been added in new § 300.35 that incorporates by reference the definition of that term from the Elementary and Secondary Education Act of 1965, as amended, 20 U.S.C. 6301 *et seq.* (ESEA).

With the addition of the new definition in § 300.35, the definitions in subpart A, beginning with the definition of *secondary school*, have been renumbered.

• The definition of *special education* in § 300.39 (proposed § 300.38) has been revised to remove the definition of *vocational and technical education* that was included in proposed § 300.38(b)(6).

• The definition of *supplementary aids and services* in § 300.42 (proposed § 300.41) has been modified to specify that aids, services, and other supports are also provided to enable children with disabilities to participate in extracurricular and nonacademic settings.

**Subpart B—State Eligibility**

*FAPE Requirements*

• Section 300.101(c) has been revised to clarify that a free appropriate public education (FAPE) must be available to any individual child with a disability who needs special education and related services, even though the child has not failed or been retained in a course, and is advancing from grade to grade.

• Section 300.102(a)(3), regarding exceptions to FAPE, has been changed to clarify that a regular high school diploma does not include an alternative degree that is not fully aligned with the State's academic standards, such as a certificate or a general educational development credential (GED).

• Section 300.105, regarding assistive technology and proper functioning of hearing aids, has been re-titled "Assistive technology," and proposed paragraph (b), regarding the proper functioning of hearing aids, has been moved to new § 300.113(a).

• Section 300.107(a), regarding nonacademic services, has been revised to specify the steps each public agency must take, including the provision of supplementary aids and services determined appropriate and necessary by the child's IEP Team, to provide nonacademic and extracurricular services and activities in the manner necessary to afford children with disabilities an equal opportunity for participation in those services and activities.

• Proposed § 300.108(a), regarding physical education services, has been revised to specify that physical education must be made available to all children with disabilities receiving FAPE, unless the public agency enrolls children without disabilities and does not provide physical education to

children without disabilities in the same grades.

• A new § 300.113, regarding routine checking of hearing aids and external components of surgically implanted medical devices, has been added, as follows:

(1) Paragraph (a) of § 300.113 requires each public agency to ensure that hearing aids worn in school by children with hearing impairments, including deafness, are functioning properly.

(2) A new § 300.113(b)(1) requires each public agency to ensure that the external components of surgically implanted medical devices are functioning properly. However, new § 300.113(b)(2) has been added to make it clear that, for a child with a surgically implanted medical device who is receiving special education and related services, a public agency is not responsible for the post-surgical maintenance, programming, or replacement of the medical device that has been surgically implanted (or of an external component of the surgically implanted medical device).

*Least Restrictive Environment*

• Section 300.116(b)(3) and (c) regarding placements, has been revised to remove the qualification "unless the parent agrees otherwise" from the requirements that (1) the child's placement be as close as possible to the child's home, and (2) the child is educated in the school he or she would attend if not disabled.

• Section 300.117 (Nonacademic settings) has been changed to clarify that each public agency must ensure that each child with a disability has the supplementary aids and services determined by the child's individualized education program (IEP) Team to be appropriate and necessary for the child to participate in the nondisabled children in the extracurricular services and activities to the maximum extent appropriate to the needs of that child.

*Children With Disabilities Enrolled by Their Parents in Private Schools*

• Section 300.130 (definition of *parentally-placed private school children with disabilities*) has been revised to clarify that the term means children with disabilities enrolled by their parents in private, including religious, schools or facilities, that meet the definition of *elementary school* in § 300.13 or *secondary school* in § 300.36.

• A new § 300.131(f), regarding child find for out-of-State parentally-placed private school children with disabilities, has been added to clarify that each LEA

in which private (including religious) elementary schools and secondary schools are located must include parentally-placed private school children who reside in a State other than the State in which the private schools that they attend are located.

• Section 300.133, regarding expenditures for parentally-placed private school children with disabilities, has been revised, as follows:

(1) A new § 300.133(a)(2)(ii), has been added to clarify that children aged three through five are considered to be parentally-placed private school children with disabilities enrolled by their parents in private, including religious, elementary schools, if they are enrolled in a private school that meets the definition of *elementary school* in § 300.13.

(2) A new § 300.133(a)(3) has been added to specify that, if an LEA has not expended for equitable services for parentally-placed private school children with disabilities all of the applicable funds described in § 300.133(a)(1) and (a)(2) by the end of the fiscal year for which Congress appropriated the funds, the LEA must obligate the remaining funds for special education and related services (including direct services) to parentally-placed private school children with disabilities during a carry-over period of one additional year.

• Section 300.136, regarding compliance related to parentally-placed private school children with disabilities, has been revised to remove the requirement that private school officials must submit complaints to the SEA using the procedures in §§ 300.151 through 300.153.

• Section 300.138(a), regarding the requirement that services to parentally-placed private school children with disabilities must be provided by personnel meeting the same standards as personnel providing services in the public schools, has been modified to clarify that private elementary school and secondary school teachers who are providing equitable services to parentally-placed private school children with disabilities do not have to meet the highly qualified special education teacher requirements in § 300.18.

• Section 300.140, regarding due process complaints and State complaints, has been revised to make the following changes:

(1) Section 300.140(b)(1) (proposed § 300.140(a)(2)), regarding child find complaints, has been changed to clarify that the procedures in §§ 300.504 through 300.519 apply to complaints that an LEA has failed to meet the child

find requirements in § 300.131, including the requirements in §§ 300.301 through 300.311.

(2) A new paragraph (b)(2) has been added to provide that any due process complaint regarding the child find requirements (as described in § 300.140(b)(1)) must be filed with the LEA in which the private school is located and a copy of the complaint must be forwarded to the SEA.

(3) A new § 300.140(c), regarding State complaints by private school officials, has been added to clarify that (A) any complaint that an SEA or LEA has failed to meet the requirements in §§ 300.132 through 300.135 and 300.137 through 300.144 must be filed in accordance with the procedures described in §§ 300.151 through 300.153, and (B) a complaint filed by a private school official under § 300.136(a) must be filed with the SEA in accordance with the procedures in § 300.136(b).

*Children With Disabilities Enrolled by Their Parents in Private Schools When FAPE Is at Issue*

Section 300.148  Placement of Children by Parents if FAPE Is at Issue

• A new § 300.148(b), regarding disagreements about FAPE, has been added (from current § 300.403(b)) to clarify that disagreements between a parent and a public agency regarding the availability of a program appropriate for a child with a disability, and the question of financial reimbursement, are subject to the due process procedures in §§ 300.504 through 300.520.

*State Complaint Procedures*

• Section 300.152(a)(3)(ii) (proposed paragraph (a)(3)(B)) has been revised to clarify that each SEA's complaint procedures must provide the public agency with an opportunity to respond to a complaint filed under § 300.153, including, at a minimum, an opportunity for a parent who has filed a complaint and the public agency to voluntarily engage in mediation consistent with § 300.506.

• Section 300.152(b)(1)(ii), regarding time extensions for filing a State complaint, has been revised to clarify that it would be permissible to extend the 60-day timeline if the parent (or individual or organization if mediation or other alternative means of dispute resolution is available to the individual or organization under State procedures) and the public agency agree to engage in mediation or to engage in other alternative means of dispute resolution, if available in the State.

• Section 300.152(c), regarding complaints filed under § 300.152 and

due process hearings under § 300.507 and §§ 300.530 through 300.532, has been revised to clarify that if a written complaint is received that is also the subject of a due process hearing under §§ 300.507 or 300.530 through 300.532, or contains multiple issues of which one or more are part of a due process hearing, the State must set aside any part of the complaint that is being addressed in the due process hearing until the conclusion of the hearing. However, any issue in the complaint that is not part of the due process hearing must be resolved using the time limit and procedures described elsewhere in the State complaint procedures. A new paragraph (c)(3) also has been added to require SEAs to resolve complaints alleging a public agency's failure to implement a due process hearing. This is the same requirement in current § 300.661(c)(3).

• Section 300.153(c), regarding the one year time limit from the date the alleged violation occurred and the date the complaint is received in accordance with § 300.151, has been revised by removing the exception clause related to complaints covered under § 300.507(a)(2).

*Methods of Ensuring Services*

• Section 300.154(d), regarding children with disabilities who are covered by public benefits or insurance, has been revised to clarify that the public agency must (1) obtain parental consent each time that access to the parent's public benefits or insurance is sought, and (2) notify parents that refusal to allow access to their public benefits or insurance does not relieve the public agency of its responsibility to ensure that all required services are provided at no cost to the parents.

*Additional Eligibility Requirements*

• Section 300.156(e), regarding personnel qualifications, has been revised (1) to add ''or a class of students,'' to clarify that a judicial action on behalf of a class of students may not be filed for failure of a particular SEA or LEA employee to be highly qualified, and (2) to substitute the word ''employee'' for ''staff person,'' to be more precise in the rule of construction in new § 300.18(f) (proposed § 300.18(e)).

• Section 300.160 (participation in assessments) has been removed, and the section has been designated as ''Reserved.'' Participation in assessments is the subject of a new notice of proposed rulemaking issued on December 15, 2005 (70 FR 74624) to amend the regulations governing programs under Title I of the ESEA and

Part B of the IDEA regarding additional flexibility for States to measure the achievement of children with disabilities based on modified achievement standards.

*Other Provisions Required for State Eligibility*

• Section 300.172, regarding access to instructional materials, has been revised: (1) To make clear that States must adopt the National Instructional Materials Accessibility Standard (NIMAS), published as Appendix C to these final regulations; (2) to establish a definition of "timely manner," for purposes of § 300.172(b)(2) and (b)(3) if the State is not coordinating with the National Instructional Materials Access Center (NIMAC), or § 300.172(b)(3) and (c)(2) if the State is coordinating with the NIMAC; (3) to add a new § 300.172(b)(4) to require SEAs to ensure that all public agencies take all reasonable steps to provide instructional materials in accessible formats to children with disabilities who need those instructional materials at the same time as other children receive instructional materials; and (4) to add a new § 300.172(e)(2) to clarify, that all definitions in § 300.172(e)(1) apply to each State and LEA, whether or not the State or LEA chooses to coordinate with the NIMAC.

• A new § 300.177 has been added to include a provision regarding "States' sovereign immunity." That provision, which has been added to incorporate the language in section 604 of the Act, makes clear that a State that accepts funds under Part B of the Act waives its immunity under the 11th amendment of the Constitution of the United States from suit in Federal court for a violation of Part B of the Act.

**Subpart D—Evaluations, Eligibility Determinations, Individualized Education Programs, and Educational Placements**

*Parental Consent*

• Section 300.300, regarding parental consent, has been revised, as follows:

(1) Paragraph (a) of § 300.300, regarding consent for initial evaluation, has been changed to provide that the public agency proposing to conduct an initial evaluation to determine if a child qualifies as a child with a disability must, after providing notice consistent with §§ 300.503 and 300.504, obtain informed consent, consistent with § 300.9, from the parent of the child before conducting the evaluation. A new paragraph (a)(1)(iii) has been added to require a public agency to make reasonable efforts to obtain the informed

consent from the parent for an initial evaluation.

(2) Section 300.300(a)(3), regarding a parent's failure to provide consent for initial evaluation, has been changed to clarify, in a new paragraph (a)(3)(ii), that the public agency does not violate its obligation under § 300.111 and §§ 300.301 through 300.311 if it declines to pursue the evaluation.

(3) Section 300.300(b), regarding parental consent for services, has been modified by a new paragraph (b)(2) that requires a public agency to make reasonable efforts to obtain informed consent from the parent for the initial provision of special education and related services.

(4) Section 300.300(c)(1), regarding parental consent for reevaluations, has been modified to clarify that if a parent refuses to consent to a reevaluation, the public agency may, but is not required to, pursue the reevaluation by using the consent override procedures in § 300.300(a)(3), and the public agency does not violate its obligation under § 300.111 and §§ 300.301 through 300.311 if it declines to pursue the evaluation or reevaluation.

(5) A new § 300.300(d)(4) has been added to provide that if a parent of a child who is home schooled or placed in a private school by the parent at the parent's expense, does not provide consent for an initial evaluation or a reevaluation, or the parent fails to respond to a request to provide consent, the public agency (A) may not use the consent override procedures (described elsewhere in § 300.300), and (B) is not required to consider the child eligible for services under the requirements relating to parentally-placed private school children with disabilities (§§ 300.132 through 300.144).

(6) A new § 300.300(d)(5) has been added to clarify that in order for a public agency to meet the reasonable efforts requirement to obtain informed parental consent for an initial evaluation, initial services, or a reevaluation, a public agency must document its attempts to obtain parental consent using the procedures in § 300.322(d).

*Additional Procedures for Evaluating Children With Specific Learning Disabilities (SLD)*

• Section 300.307 (Specific learning disabilities) has been revised, as follows:

(1) Proposed paragraph (a)(1) of § 300.307, which allowed a State to prohibit the use of a severe discrepancy between intellectual ability and achievement for determining if a child has an SLD, has been removed, and

proposed paragraph (a)(2) of § 300.307 has been redesignated as paragraph (a)(1).

(2) Section 300.307(a)(2) (proposed paragraph (a)(3)) has been changed to clarify that the criteria adopted by the State must permit the use of a process based on the child's response to scientific, research-based intervention.

• Section 300.308 (Group members) has been changed to require the eligibility group for children suspected of having SLD to include the child's parents and a team of qualified professionals, which must include the child's regular teacher (or if the child does not have a regular teacher, a regular classroom teacher qualified to teach a child of his or her age) or for a child of less than school age, an individual qualified by the SEA to teach a child of his or her age; and at least one person qualified to conduct individual diagnostic examinations of children, such as a school psychologist, speech-language pathologist, or remedial reading teacher. These are the same requirements in current § 300.540.

• Section 300.309 (Determining the existence of a specific learning disability) has been revised, as follows:

(1) Paragraph (a) of § 300.309 has been changed (A) to clarify that the group described in 300.306 may determine that a child has a specific learning disability if the child does not achieve adequately for the child's age or to meet State-approved grade-level standards in one or more of eight areas (e.g., oral expression, basic reading skill, etc.), when provided with learning experiences and instruction appropriate for the child's age or State-approved grade-level standards; and (B) to add "limited English proficiency" to the other five conditions that could account for the child's learning problems, and that the group considers in determining whether the child has an SLD.

(2) Section 300.309(b) has been changed to clarify (A) that, in order to ensure that underachievement in a child suspected of having an SLD is not due to lack of appropriate instruction in reading or math, the group must consider, as part of the evaluation described in §§ 300.304 through 300.306, data that demonstrate that prior to, or as a part of, the referral process, the child was provided appropriate instruction in regular education settings, delivered by qualified personnel, and (B) to replace (in paragraph (b)(1)) the term "high quality research-based instruction" with "appropriate instruction."

(3) Section 300.309(c) has been changed to provide that the public agency must promptly request parental

consent to evaluate a child suspected of having an SLD who has not made adequate progress after an appropriate period of time when provided appropriate instruction, and whenever a child is referred for an evaluation.

• Section 300.310, regarding Observation, has been revised, as follows:

(1) Paragraph (a) of proposed § 300.310 has been revised (A) to remove the phrase "trained in observation, and (B) to specify that the public agency must ensure that the child is observed in the child's learning environment.

(2) A new § 300.310(b) has been added to require the eligibility group to decide to (A) use information obtained from an observation in routine classroom instruction and monitoring of the child's performance that was done before the child was referred for an evaluation, or (B) have at least one member of the group described in § 300.306(a)(1) conduct an observation of the child's academic performance in the regular classroom after the child has been referred for an evaluation and parental consent is obtained.

Paragraph (b) of proposed § 300.310 has been redesignated as new § 300.310(c).

• Section 300.311 (Written report) has been renamed "Specific documentation for the eligibility determination," and has been revised, as follows:

(1) Section 300.311(a)(5), regarding whether the child does not achieve commensurate with the child's age, has been modified and expanded to add whether the child does not achieve adequately for the child's age or to meet State-approved grade-level standards consistent with § 300.309(a)(1), and (A) the child does not make sufficient progress to meet age or to meet State-approved grade-level standards consistent with § 300.309(a)(2)(i), or (B) the child exhibits a pattern of strengths and weaknesses in performance, achievement, or both, relative to age, State-approved grade level standards or intellectual development consistent with § 300.309(a)(2)(ii).

(2) Proposed § 300.311(a)(6), regarding whether there are strengths or weaknesses or both in performance or achievement or both relative to intellectual development, has been removed.

(3) A new § 300.311(a)(6) has been added to clarify that the documentation must include a statement of the determination of the group concerning the effects of visual, hearing, or motor disability, mental retardation, emotional disturbance, cultural factors, environmental or economic

disadvantage, or limited English proficiency on the child's achievement level.

(4) A new § 300.311(a)(7) has been added to provide that if the child has participated in a process that assesses the child's response to scientific, research-based intervention, the documentation must include the instructional strategies used and the student-centered data collected, and documentation that the child's parents were notified about (A) the State's policies regarding the amount and nature of student performance data that would be collected and the general education services that would be provided, (B) strategies for increasing the child's rate of learning, and (C) the parents' right to request an evaluation.

### Individualized Education Programs

• Section 300.320 (Definition of IEP) has been revised in paragraph (a)(5) to replace "regular education environment" with "regular class," in order to be consistent with the language in the Act.

• Section 300.321(e), regarding attendance at IEP Team meetings, has been revised to clarify that the excusal of IEP Team members from attending an IEP Team meeting under certain circumstances, refers to the IEP Team members in § 300.320(a)(2) through (a)(5).

• Section 300.322, regarding parent participation, has been revised to: (1) Include, in § 300.322(d), examples of the records a public agency must keep of its attempts to involve the parents in IEP meetings; (2) add a new § 300.322(e), which requires the public agency to take whatever action is necessary to ensure that the parent understands the proceedings of the IEP meeting, including arranging for an interpreter for parents with deafness or whose native language is other than English; and (3) redesignate paragraph (e) as paragraph (f) accordingly.

• Section 300.323(d) has been revised to require public agencies to ensure that each regular teacher, special education teacher, related services provider, and any other service provider who is responsible for the implementation of a child's IEP, is informed of his or her specific responsibilities related to implementing the child's IEP and the specific accommodations, modifications, and supports that must be provided for the child in accordance with the child's IEP. These are the same requirements in current § 300.342(b)(3)(i) and (b)(3)(ii).

• Section 300.323(e), regarding IEPs for children who transfer public agencies, has been revised to: (1) Divide

the provision into three separate paragraphs (§ 300.323(e), (f), and (g)) for purposes of clarity and improved readability (e.g., transfers within the same State, transfers from another State, and transmittal of records); (2) adopt "school year" in lieu of "academic year" as the term commonly used by parents and public agencies; and (3) adopt other modifiers (e.g., "new" and "previous") to distinguish between States and public agencies that are involved in transfers by children with disabilities.

• Section 300.324(a)(4), regarding changes to an IEP after the annual IEP meeting for a school year, has been restructured into two paragraphs, and a new paragraph (a)(4)(ii) has been added to require the public agency to ensure that, if changes are made to a child's IEP without an IEP meeting, that the child's IEP Team is informed of the changes.

• Section 300.324(b), regarding the review and revision of IEPs, has been changed to include a new paragraph (b)(2), to clarify that, in conducting a review of a child's IEP, the IEP Team must consider the same special factors it considered when developing the child's IEP.

### Subpart E—Procedural Safeguards

• Section 300.502, regarding independent educational evaluations, has been revised, as follows:

(1) A new § 300.502(b)(5) has been added to make clear that a parent is entitled to only one independent educational evaluation at public expense each time the public agency conducts an evaluation with which the parent disagrees.

(2) Section 300.502(c) has been changed to clarify that if a parent obtains an independent evaluation at public expense or shares with the public agency an evaluation obtained at private expense, the public agency must consider the evaluation, if it meets agency criteria, in any decision made with respect to the provision of FAPE to the child.

• Section 300.504 (Procedural safeguards notice) has been revised, as follows:

(1) Paragraph (a)(2) of § 300.504 has been changed to add that a copy of the procedural safeguards notice must be given upon receipt of the first due process complaint under § 300.507 in a school year, as well as upon receipt of the first State complaint under § 300.151 through 300.153.

(2) A new § 300.504(a)(3) has been added to provide that the notice must be given to the parents of a child with a disability in accordance with the discipline procedures in § 300.530(h).

• Section 300.506(b), regarding the requirements for mediation, has been revised by (1) removing the provision about the "confidentiality pledge," in proposed paragraph (b)(9), because it is no longer required under the Act, and (2) changing paragraph (b)(8), regarding the prohibition against using discussions that occur in the mediation process, to clarify that "civil proceedings" includes any Federal court or State court of a State receiving assistance under this part.

• Section 300.509, regarding model forms to assist parents and public agencies in filing due process complaints and parents and other parties in filing State complaints, has been revised to add, with respect to due process complaints, "public agencies," and with respect to State complaints, "other parties," as well as parents, and to clarify that (1) while each SEA must develop model forms, the SEA or LEA may not require the use of the forms, and (2) parents, public agencies, and other parties may either use the appropriate model form, or another form or other document, so long as the form or document meets, as appropriate, the requirements for filing a due process complaint or a State complaint.

• Section 300.510 (Resolution process) has been revised, as follows:

(1) Section 300.510(b)(1), regarding the resolution period, has been changed to state that a due process hearing "may occur" (in lieu of "must occur") by the end of the resolution period, if the parties have not resolved the dispute that formed the basis for the due process complaint.

(2) A new § 300.510(b)(3) has been added to provide that, except where the parties have jointly agreed to waive the resolution process or to use mediation (notwithstanding § 300.510(b)(1) and (2)), the failure of a parent filing a due process complaint to participate in the resolution meeting will delay the timelines for the resolution process and due process hearing until the meeting is held.

(3) A new § 300.510(b)(4) has been added to provide that if an LEA is unable to obtain the participation of the parent in the resolution meeting after reasonable efforts have been made, and documented using the procedures in § 300.322(d), the LEA may, at the conclusion of the 30-day resolution period, request that a hearing officer dismiss the parent's due process complaint.

(4) A new paragraph (b)(5) of § 300.510 has been added to provide that, if the LEA fails to hold the resolution meeting within 15 days of receiving notice of a parent's due process complaint or fails to participate in the resolution meeting, the parent may seek the intervention of a hearing officer to begin the due process hearing timelines.

(5) A new § 300.510(c) (Adjustments to the 30-day resolution period) has been added that specifies exceptions to the 30-day resolution period (e.g., (A) both parties agree in writing to waive the resolution meeting; (B) after either the mediation or resolution meeting starts but before the end of the 30-day period, the parties agree in writing that no agreement is possible; or (C) if both parties agree in writing to continue the mediation at the end of the 30-day resolution period, but later, the parent or public agency withdraws from the mediation process). Subsequent paragraphs have been renumbered accordingly.

(6) Paragraph (d)(2) of § 300.510 (proposed paragraph(c)(2)), regarding the enforceability of a written settlement agreement in any State court of competent jurisdiction or in a district court of the United States, has been expanded to add the SEA, if the State has other mechanisms or procedures that permit parties to seek enforcement of resolution agreements, pursuant to a new § 300.537.

• Section 300.513(a) (Decision of hearing officer) has been revised by (1) changing the paragraph title to read "Decision of hearing officer on the provision of FAPE," and (2) clarifying that a hearing officer's determination of whether a child received FAPE must be based on substantive grounds.

• Section 300.515(a), regarding timelines and convenience of hearings and reviews, has been revised to include a specific reference to the adjusted time periods described in § 300.510(c).

• Section 300.516(b), regarding the 90-day time limitation from the date of the decision of the hearing to file a civil action, has been revised to provide that the 90-day period begins from the date of the decision of the hearing officer or the decision of the State review official.

• Section 300.518 (Child's status during proceedings) has been revised by adding a new paragraph (c), which provides that if a complaint involves an application for initial services under this part from a child who is transitioning from Part C of the Act to Part B and is no longer eligible for Part C services because the child has turned 3, the public agency is not required to provide the Part C services that the child had been receiving. If the child is found eligible for special education and related services under Part B and the parent consents to the initial provision of special education and related services under § 300.300(b), then the public agency must provide those special education and related services that are not in dispute between the parent and the public agency.

• Section 300.520(b), regarding a special rule about the transfer of parental rights at the age of majority, has been revised to more clearly state that a State must establish procedures for appointing the parent of a child with a disability, or if the parent is not available, another appropriate individual, to represent the educational interests of the child throughout the child's eligibility under Part B of the Act if, under State law, a child who has reached the age of majority, but has not been determined to be incompetent, can be determined not to have the ability to provide informed consent with respect to the child's educational program.

*Discipline Procedures*

• Section 300.530(d)(1)(i), regarding services, has been revised to be consistent with section 615(k)(1)(D)(i) of the Act, by adding a reference to the FAPE requirements in § 300.101(a).

• Section 300.530(d)(4), regarding the removal of a child with a disability from the child's current placement for 10 school days in the same school year, has been revised to remove the reference to school personnel, in consultation with at least one of the child's teachers, determining the location in which services will be provided.

• Section 300.530(d)(5), regarding removals that constitute a change of placement under § 300.536, has been revised to remove the reference to the IEP Team determining the location in which services will be provided.

• A new § 300.530(e)(3), has been added to provide that, if the LEA, the parent, and members of the child's IEP Team determine that the child's behavior was the direct result of the LEA's failure to implement the child's IEP, the LEA must take immediate steps to remedy those deficiencies.

• Section 300.530(h), regarding notification, has been changed to specify that, on the date on which a decision is made to make a removal that constitutes a change in the placement of a child with a disability because of a violation of a code of student conduct, the LEA must notify the parents of that decision, and provide the parents the procedural safeguards notice described in § 300.504.

• Section 300.532 (Appeal) has been revised, as follows:

(1) Paragraph (a) of § 300.532, regarding the conditions in which the parent of a child with a disability or an LEA may request a hearing, has been

modified to clarify that the hearing is requested by filing a complaint pursuant to §§ 300.507 and 300.508(a) and (b).

(2) Section 300.532(b)(3) has been changed to more definitively provide that if the LEA believes that returning the child to his or her original placement is substantially likely to result in injury to the child or others.

(3) Section 300.532(c)(3), regarding an expedited due process hearing, has been adjusted to provide that unless the parents and an LEA agree in writing to waive a resolution meeting, or agree to use the mediation process described in § 300.506, the resolution meeting must occur within seven days of receiving notice of the due process complaint, and the hearing may proceed within 15 days of receipt of the due process complaint unless the matter has been resolved to satisfaction of both parties.

(4) Proposed § 300.532(c)(4), regarding the two-day timeframe for disclosing information to the opposing party prior to an expedited due process hearing, has been removed.

• Section 500.536(a)(2)(ii) (proposed § 300.536(b)(2)) has been revised to remove the requirement that a child's behavior must have been a manifestation of the child's disability before determining that a series of removals constitutes a change in placement under § 300.536. Paragraph (a)(2)(ii) has also been amended to reference the child's behavior in ''previous'' incidents that resulted in the series of removals.

• A new § 300.536(b) has been added to clarify that the public agency (subject to review through the due process and judicial proceedings) makes the determination, on a case-by-case basis, whether a pattern of removals constitutes a change in placement and that the determination is subject to review through due process and judicial determinations.

• A new § 300.537 (State enforcement mechanisms) has been added to clarify that notwithstanding § 300.506(b)(7) and § 300.510(c)(2), which provide for judicial enforcement of a written agreement reached as a result of a mediation or resolution meeting, nothing in this part would prevent the SEA from using other mechanisms to seek enforcement of that agreement, provided that use of those mechanisms is not mandatory and does not delay or deny a party the right to seek enforcement of the written agreement in a State court of competent jurisdiction or in a district court of the United States.

## Subpart F—Monitoring, Enforcement, Confidentiality, and Program Information

*Monitoring, Technical Assistance, and Enforcement*

• Section 300.600 (State monitoring and enforcement) has been revised, as follows:

(1) Section 300.600(a) has been amended to require the State to enforce Part B of the Act in accordance with § 300.604(a)(1) and (a)(3), (b)(2)(i) and (b)(2)(v), and (c)(2).

(2) A new paragraph (d) has been added, which provides that the State must monitor the LEAs located in the State, using quantifiable indicators in each of the following priority areas, and such qualitative indicators as are needed to adequately measure performance in those areas, including: (A) Provision of FAPE in the least restrictive environment; (B) State exercise of general supervision, including child find, effective monitoring, the use of resolution meetings, and a system of transition services as defined in § 300.43 and in 20 U.S.C. 1437(a)(9); and (C) disproportionate representation of racial and ethnic groups in special education and related services, to the extent the representation is the result of inappropriate identification.

• A new § 300.601(b)(2), regarding State use of targets and reporting, has been added to specify that, if permitted by the Secretary, if a State collects data on an indicator through State monitoring or sampling, the State must collect data on the indicator at least once during the period of the State performance plan.

• A new § 300.608(b), regarding State enforcement, has been added to specify that States are not restricted from utilizing any other authority available to them to monitor and enforce the requirements of Part B of the Act.

*Confidentiality of Information*

• Section 300.622 (Consent) has been restructured and revised to more accurately reflect the Department's policy regarding when parental consent is required for disclosures of personally identifiable information, as follows:

(1) Paragraph (a) of § 300.622 has been changed to provide that parental consent must be obtained before personally identifiable information is disclosed to parties other than officials of participating agencies, unless the information is contained in education records, and the disclosure is authorized without parental consent under the regulations for the Family Educational

Rights and Privacy Act (FERPA, 34 CFR part 99).

(2) A new § 300.622(b)(1) has been added to clarify that parental consent is not required before personally identifiable information is released to officials of participating agencies for purposes of meeting a requirement of Part B of the Act or these regulations.

(3) A new § 300.622(b)(2) has been added to provide that parental consent must be obtained before personally identifiable information is released to officials of participating agencies that provide or pay for transition services.

(4) A new paragraph (b)(3) has been added to require that, with respect to parentally-placed private school children with disabilities, parental consent must be obtained before any personally identifiable information is released between officials in the LEA where the private school is located and the LEA of the parent's residence.

(5) Proposed § 300.622(c), regarding the requirement to provide policies and procedures for use in the event that a parent refuses to consent, has been removed because it is covered elsewhere in these regulations.

## Subpart G—Authorization, Allotment, Use of Funds, and Authorization of Appropriations

*Allotments, Grants, and Use of Funds*

• Section 300.701(a)(1)(ii)(A), regarding the applicable requirements of Part B of the Act that apply to freely associated States, has been revised by removing the five listed requirements because those requirements did not include all requirements that apply to freely associated States. This change clarifies that freely associated States must meet the applicable requirements that apply to States under Part B of the Act.

• Section 300.704(c)(3)(i), regarding the requirement to develop, annually review, and revise (if necessary) a State plan for the high cost fund, has been revised to add a new paragraph (F) that requires that if the State elects to reserve funds for supporting innovative and effective ways of cost sharing, it must describe in its State plan how these funds will be used.

• Section 300.706 (Allocation for State in which by-pass is implemented for parentally-placed private school children with disabilities) has been removed because it is no longer applicable. The section has been redesignated as ''Reserved.''

*Secretary of the Interior*

• Section 300.707 (Use of amounts by Secretary of the Interior) has been changed, as follows:

(1) The definition of *Tribal governing body of a school* has been replaced with the definition of *tribal governing body* from 25 U.S.C. 2021(19).

(2) Section 300.707(c), regarding an additional requirement under ''Use of amounts by Secretary of the Interior,'' has been revised to clarify that, with respect to all other children aged 3 to 21, inclusive, on reservations, the SEA of the State in which the reservation is located must ensure that all the requirements of Part B of the Act are met.

• Section 300.713 (Plan for coordination of services) has been revised to require (1) in § 300.713(a), the Secretary of the Interior to develop and implement a plan for the coordination of services for all Indian children with disabilities residing on reservations served by elementary schools and secondary schools for Indian children operated or funded by the Secretary of the Interior, and (2) in § 300.713(b), the plan to provide for the coordination of services benefiting these children from whatever source covered by the plan, including SEAs, and State, local, and tribal juvenile and adult correctional facilities.

**Analysis of Comments and Changes**

*Introduction*

In response to the invitation in the NPRM, more than 5,500 parties submitted comments on the proposed regulations. An analysis of the comments and of the changes in the regulations since publication of the NPRM immediately follows this introduction.

The perspectives of parents, individuals with disabilities, teachers, related services providers, State and local officials, members of Congress, and others were very important in helping us to identify where changes to the proposed regulations were necessary, and in formulating many of the changes. In light of the comments received, a number of significant changes are reflected in these final regulations.

We discuss substantive issues under the subpart and section to which they pertain. References to subparts in this analysis are to those contained in the final regulations. The analysis generally does not address—

(a) Minor changes, including technical changes made to the language published in the NPRM;

(b) Suggested changes the Secretary is not legally authorized to make under applicable statutory authority; and

(c) Comments that express concerns of a general nature about the Department

or other matters that are not directly relevant to these regulations, such as requests for information about innovative instructional methods or matters that are within the purview of State and local decision-makers.

**Subpart A—General**

*Definitions Used in This Part*

Applicability of This Part to State and Local Agencies (§ 300.2)

*Comment:* None.

*Discussion:* Section § 300.2(c)(2) contains an incorrect reference to § 300.148(b). The correct reference should be to § 300.148.

*Changes:* We have removed the reference to § 300.148(b) and replaced it with a reference to § 300.148.

Assistive Technology Device (§ 300.5)

*Comment:* Some commenters opposed the exclusion of surgically implanted medical devices in the definition of *assistive technology device*. Another commenter recommended limiting the definition of *assistive technology device* to a device that is needed to achieve educational outcomes, rather than requiring local educational agencies (LEAs) to pay for any assistive technology device that increases, maintains, or improves any functional need of the child.

*Discussion:* The definition of *assistive technology device* in § 300.5 incorporates the definition in section 602(1)(B) of the Act. We do not believe the definition should be changed in the manner suggested by the commenters because the changes are inconsistent with the statutory definition. The definition in the Act specifically refers to any item, piece of equipment, or product system that is used to increase, maintain, or improve the functional capabilities of the child and specifically excludes a medical device that is surgically implanted or the replacement of such device. Accordingly, we continue to believe it is appropriate to exclude surgically implanted medical devices from this definition. In response to the second comment, § 300.105(a) requires each public agency to ensure that assistive technology devices (or assistive technology services, or both) are made available to a child with a disability if required as part of the child's special education, related services, or supplementary aids and services. This provision ties the definition to a child's educational needs, which public agencies must meet in order to ensure that a child with a disability receives a free appropriate public education (FAPE).

*Changes:* None.

*Comment:* One commenter requested that the regulations clarify that an assistive technology device is not synonymous with an augmentative communication device. A few commenters recommended including recordings for the blind and dyslexic playback devices in the definition of *assistive technology devices*. Some commenters recommended including language in the regulations clarifying that medical devices used for breathing, nutrition, and other bodily functions are assistive technology devices.

*Discussion:* The definition of *assistive technology device* does not list specific devices, nor would it be practical or possible to include an exhaustive list of assistive technology devices. Whether an augmentative communication device, playback devices, or other devices could be considered an assistive technology device for a child depends on whether the device is used to increase, maintain, or improve the functional capabilities of a child with a disability, and whether the child's individualized education program (IEP) Team determines that the child needs the device in order to receive a free appropriate public education (FAPE). However, medical devices that are surgically implanted, including those used for breathing, nutrition, and other bodily functions, are excluded from the definition of an *assistive technology device* in section 602(1)(B) of the Act. The exclusion applicable to a medical device that is surgically implanted includes both the implanted component of the device, as well as its external components.

*Changes:* None.

*Comment:* A few commenters asked whether the definition of *assistive technology device* includes an internet-based instructional program, and what the relationship is between internet-based instructional programs and specially-designed instruction.

*Discussion:* An instructional program is not a device, and, therefore, would not meet the definition of an *assistive technology device*. Whether an internet-based instructional program is appropriate for a particular child is determined by the child's IEP Team, which would determine whether the program would be needed in order for the child to receive FAPE.

*Changes:* None.

*Comment:* A few commenters recommended including the proper functioning of hearing aids in the definition of *assistive technology device*.

*Discussion:* We believe that the provision requiring public agencies to ensure that hearing aids worn in school are functioning properly is more appropriately included in new § 300.113

(proposed § 300.105(b)). As noted in the *Analysis of Comments and Changes* section discussing subpart B, we have added a new § 300.113 to address the routine checking (*i.e.*, making sure they are turned on and working) of hearing aids and external components of surgically implanted devices.

*Changes:* None.

Assistive Technology Service (§ 300.6)

*Comment:* One commenter requested clarifying "any service" in the definition of *assistive technology service.*

*Discussion:* We believe the definition is clear that an *assistive technology service* is any service that helps a child with a disability select an appropriate assistive technology device, obtain the device, or train the child to use the device.

*Changes:* None.

*Comment:* One commenter stated that services necessary to support the use of playback devices for recordings for the blind and dyslexic should be added to the definition of *assistive technology service.*

*Discussion:* A service to support the use of recordings for the blind and dyslexic on playback devices could be considered an assistive technology service if it assists a child with a disability in the selection, acquisition, or use of the device. If so, and if the child's IEP Team determines it is needed for the child to receive FAPE, the service would be provided. The definition of *assistive technology service* does not list specific services. We do not believe it is practical or possible to include an exhaustive list of assistive technology services, and therefore, decline to add the specific assistive technology service recommended by the commenter to the definition.

*Changes:* None.

*Comment:* One commenter recommended evaluating all children with speech or hearing disabilities to determine if they can benefit from the Federal Communications Commission's specialized telephone assistive services for people with disabilities.

*Discussion:* Evaluations under section 614 of the Act are for the purpose of determining whether a child has a disability and because of that disability needs special education and related services, and for determining the child's special education and related services needs. It would be inappropriate under the Act to require evaluations for other purposes or to require an evaluation for telephone assistive services for all children with speech and hearing disabilities. However, if it was determined that learning to use

telephone assisted services, was an important skill for a particular child (e.g., as part of a transition plan), it would be appropriate to conduct an evaluation of that particular child to determine if the child needed specialized instruction in order to use such services.

*Changes:* None.

*Comment:* One commenter requested that the definition of *assistive technology service* specifically exclude a medical device that is surgically implanted, the optimization of device functioning, maintenance of the device, and the replacement of the device.

*Discussion:* The definition of *related services* in § 300.34(b) specifically excludes a medical device that is surgically implanted, the optimization of device functioning, maintenance of the device, or the replacement of that device. In addition, the definition of *assistive technology device* in § 300.5 specifically excludes a medical device that is surgically implanted and the replacement of that device. We believe it is unnecessary to repeat these exclusions in the definition of *assistive technology service.*

*Changes:* None.

Charter School (§ 300.7)

*Comment:* Several commenters suggested that we include in the regulations the definitions of terms that are defined in other statutes. For example, one commenter requested including the definition of *charter school* in the regulations.

*Discussion:* Including the actual definitions of terms that are defined in statutes other than the Act is problematic because these definitions may change over time (*i.e.*, through changes to statutes that establish the definitions). In order for these regulations to retain their accuracy over time, the U.S. Department of Education (Department) would need to amend the regulations each time an included definition that is defined in another statute changes. The Department believes that this could result in significant confusion.

However, we are including the current definition of *charter school* in section 5210(1) of the ESEA here for reference.

The term *charter school* means a public school that:

1. In accordance with a specific State statute authorizing the granting of charters to schools, is exempt from significant State or local rules that inhibit the flexible operation and management of public schools, but not from any rules relating to the other requirements of this paragraph [the

paragraph that sets forth the Federal definition];

2. Is created by a developer as a public school, or is adapted by a developer from an existing public school, and is operated under public supervision and direction;

3. Operates in pursuit of a specific set of educational objectives determined by the school's developer and agreed to by the authorized public chartering agency;

4. Provides a program of elementary or secondary education, or both;

5. Is nonsectarian in its programs, admissions policies, employment practices, and all other operations, and is not affiliated with a sectarian school or religious institution;

6. Does not charge tuition;

7. Complies with the Age Discrimination Act of 1975, Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, Title II of the Americans with Disabilities Act of 1990, and Part B of the Individuals with Disabilities Education Act;

8. Is a school to which parents choose to send their children, and that admits students on the basis of a lottery, if more students apply for admission than can be accommodated;

9. Agrees to comply with the same Federal and State audit requirements as do other elementary schools and secondary schools in the State, unless such requirements are specifically waived for the purpose of this program [the Public Charter School Program];

10. Meets all applicable Federal, State, and local health and safety requirements;

11. Operates in accordance with State law; and

12. Has a written performance contract with the authorized public chartering agency in the State that includes a description of how student performance will be measured in charter schools pursuant to State assessments that are required of other schools and pursuant to any other assessments mutually agreeable to the authorized public chartering agency and the charter school.

*Changes:* None.

Child With a Disability (§ 300.8)

General (§ 300.8(a))

*Comment:* Several commenters stated that many children with fetal alcohol syndrome (FAS) do not receive special education and related services and recommended adding a disability category for children with FAS to help solve this problem.

*Discussion:* We believe that the existing disability categories in section

602(3) of the Act and in these regulations are sufficient to include children with FAS who need special education and related services. Special education and related services are based on the identified needs of the child and not on the disability category in which the child is classified. We, therefore, do not believe that adding a separate disability category for children with FAS is necessary to ensure that children with FAS receive the special education and related services designed to meet their unique needs resulting from FAS.

*Changes:* None.

*Comment:* Some commenters suggested that the definition of *child with a disability* be changed to "student with a disability" and that the word "student," rather than "child," be used throughout the regulations because students over the age of 18 are not children.

*Discussion:* Section 602(3) of the Act defines *child with a disability,* not student with a disability. Therefore, we do not believe it is appropriate to change the definition as requested by the commenters. The words "child" and "student" are used throughout the Act and we generally have used the word "child" or "children," except when referring to services and activities for older students (e.g., transition services, postsecondary goals).

*Changes:* None.

*Comment:* Some commenters supported § 300.8(a)(2), which states that if a child needs only a related service and not special education, the child is not a child with a disability under the Act. Another commenter recommended a single standard for the provision of a related service as special education, rather than allowing States to determine whether a related service is special education.

*Discussion:* Section 300.8(a)(2)(i) states that if a child has one of the disabilities listed in § 300.8(a)(1), but only needs a related service, the child is not a child with a disability under the Act. However, § 300.8(a)(2)(ii) provides that, if a State considers a particular service that could be encompassed by the definition of *related services* also to be special education, then the child would be determined to be a child with a disability under the Act. We believe it is important that States have the flexibility to determine whether, consistent with the definition of the term *special education* in section 602(29) of the Act and new § 300.39 (proposed § 300.38), such a service should be regarded as special education and to identify a child who needs that service as a child with a disability. States are in the best position to

determine whether a service that is included in the definition of *related services* should also be considered special education in that State.

*Changes:* None.

*Comment:* None.

*Discussion:* Section § 300.8(a)(2)(ii) contains an incorrect reference to § 300.38(a)(2). The correct reference should be to § 300.39(a)(2).

*Changes:* We have removed the reference to § 300.38(a)(2) and replaced it with a reference to § 300.39(a)(2).

Children Aged Three Through Nine Experiencing Developmental Delays (§ 300.8(b))

*Comment:* Several commenters expressed support for allowing LEAs to select a subset of the age range from three through nine for their definition of *developmental delay.* A few commenters recommended clarifying that States, not the LEAs, define the age range of children eligible under this category of developmental delay.

*Discussion:* Section 300.8(b) states that the use of the developmental delay category for a child with a disability aged three through nine, or any subset of that age range, must be made in accordance with § 300.111(b). Section 300.111(b) gives States the option of adopting a definition of *developmental delay,* but does not require an LEA to adopt and use the term. However, if an LEA uses the category of developmental delay, the LEA must conform to both the State's definition of the term and the age range that has been adopted by the State. If a State does not adopt the category of developmental delay, an LEA may not use that category as the basis for establishing a child's eligibility for special education and related services.

Based on the comments, it appears that § 300.8(b) has been misinterpreted as stating that LEAs are allowed to establish the age range for defining *developmental delay* independent of the State. We believe it is important to avoid such confusion and, therefore, will modify § 300.8(b) to clarify the provision.

*Changes:* For clarity, we have removed the phrase, "at the discretion of the State and LEA in accordance with § 300.111(b)" and replaced it with "subject to the conditions in § 300.111(b)."

Deafness (§ 300.8(c)(3))

*Comment:* One commenter stated that children who are hard of hearing are often denied special education and related services because the definition of *deafness* includes the phrase, "adversely affects a child's educational

performance," which school district personnel interpret to mean that the child must be failing in school to receive special education and related services.

*Discussion:* As noted in the *Analysis of Comments and Changes* section discussing subpart B, we have clarified in § 300.101(c) that a child does not have to fail or be retained in a course or grade in order to be considered for special education and related services. However, in order to be a child with a disability under the Act, a child must have one or more of the impairments identified in section 602(3) of the Act and need special education and related services because of that impairment. Given the change in § 300.101(c), we do not believe clarification in § 300.8(c)(3) is necessary.

*Changes:* None.

Emotional Disturbance (§ 300.8(c)(4))

*Comment:* Numerous commenters requested defining or eliminating the term "socially maladjusted" in the definition of *emotional disturbance* stating that there is no accepted definition of the term, and no valid or reliable instruments or methods to identify children who are, or are not, "socially maladjusted." Some commenters stated that children who need special education and related services have been denied these services, or have been inappropriately identified under other disability categories and received inappropriate services because the definition of *emotional disturbance* excludes children who are socially maladjusted. One commenter stated that using the term "socially maladjusted" contributes to the negative image of children with mental illness and does a disservice to children with mental illness and those who seek to understand mental illness.

One commenter stated that emotional disturbance is one of the most misused and misunderstood disability categories and is often improperly used to protect dangerous and aggressive children who violate the rights of others. The commenter stated that the definition of *emotional disturbance* is vague and offers few objective criteria to differentiate an emotional disability from ordinary development, and requires the exclusion of conditions in which the child has the ability to control his or her behavior, but chooses to violate social norms.

One commenter recommended adding autism to the list of factors in § 300.8(c)(4)(i)(A) that must be ruled out before making an eligibility determination based on emotional disturbance. The commenter stated that

many children with autism are inappropriately placed in alternative educational programs designed for children with serious emotional and behavioral problems.

*Discussion:* Historically, it has been very difficult for the field to come to consensus on the definition of *emotional disturbance,* which has remained unchanged since 1977. On February 10, 1993, the Department published a "Notice of Inquiry" in the **Federal Register** (58 FR 7938) soliciting comments on the existing definition of *serious emotional disturbance.* The comments received in response to the notice of inquiry expressed a wide range of opinions and no consensus on the definition was reached. Given the lack of consensus and the fact that Congress did not make any changes that required changing the definition, the Department recommended that the definition of *emotional disturbance* remain unchanged. We reviewed the Act and the comments received in response to the NPRM and have come to the same conclusion. Therefore, we decline to make any changes to the definition of *emotional disturbance.*

*Changes:* None.

*Comment:* One commenter suggested that the regulations include a process to identify children who are at risk for having an emotional disturbance.

*Discussion:* We decline to include a process to identify children who are at risk for having a emotional disturbance. A child who is at risk for having any disability under the Act is not considered a *child with a disability* under § 300.8 and section 602(3) of the Act and, therefore, is not eligible for services under the Act.

*Changes:* None.

Mental Retardation (§ 300.8(c)(6))

*Comment:* One commenter suggested using the term "intellectual disability" in place of "mental retardation" because "intellectual disability" is a more acceptable term. The commenter also stated that the definition of *mental retardation* is outdated and should, instead, address a child's functional limitations in specific life areas.

*Discussion:* Section 602(3)(A) of the Act refers to a "child with mental retardation," not a "child with intellectual disabilities," and we do not see a compelling reason to change the term. However, States are free to use a different term to refer to a child with mental retardation, as long as all children who would be eligible for special education and related services under the Federal definition of *mental retardation* receive FAPE.

We do not believe the definition of *mental retardation* needs to be changed because it is defined broadly enough in § 300.8(c)(6) to include a child's functional limitations in specific life areas, as requested by the commenter. There is nothing in the Act or these regulations that would prevent a State from including "functional limitations in specific life areas" in a State's definition of *mental retardation,* as long as the State's definition is consistent with these regulations.

*Changes:* None.

Multiple Disabilities (§ 300.8(c)(7))

*Comment:* One commenter asked why the category of multiple disabilities is included in the regulations when it is not in the Act.

*Discussion:* The definition of *multiple disabilities* has been in the regulations since 1977 and does not expand eligibility beyond what is provided for in the Act. The definition helps ensure that children with more than one disability are not counted more than once for the annual report of children served because States do not have to decide among two or more disability categories in which to count a child with multiple disabilities.

*Changes:* None.

Orthopedic Impairment (§ 300.8(c)(8))

*Comment:* One commenter requested that the examples of congenital anomalies in the definition of *orthopedic impairment* in current § 300.7(c)(8) be retained.

*Discussion:* The examples of congenital anomalies in current § 300.7(c)(8) are outdated and unnecessary to understand the meaning of *orthopedic impairment.* We, therefore, decline to include the examples in § 300.8(c)(8).

*Changes:* None.

Other Health Impairment (§ 300.8(c)(9))

*Comment:* We received a significant number of comments requesting that we include other examples of specific acute or chronic health conditions in the definition of *other health impairment.* A few commenters recommended including children with dysphagia because these children have a swallowing and feeding disorder that affects a child's vitality and alertness due to limitations in nutritional intake. Other commenters recommended including FAS, bipolar disorders, and organic neurological disorders. Numerous commenters requested including Tourette syndrome disorders in the definition of *other health impairment* because children with Tourette syndrome are frequently

misclassified as emotionally disturbed. A number of commenters stated that Tourette syndrome is a neurological disorder and not an emotional disorder, yet children with Tourette syndrome continue to be viewed as having a behavioral or conduct disorder and, therefore, do not receive appropriate special education and related services.

*Discussion:* The list of acute or chronic health conditions in the definition of *other health impairment* is not exhaustive, but rather provides examples of problems that children have that could make them eligible for special education and related services under the category of other health impairment. We decline to include dysphagia, FAS, bipolar disorders, and other organic neurological disorders in the definition of *other health impairment* because these conditions are commonly understood to be health impairments. However, we do believe that Tourette syndrome is commonly misunderstood to be a behavioral or emotional condition, rather than a neurological condition. Therefore, including Tourette syndrome in the definition of *other health impairment* may help correct the misperception of Tourette syndrome as a behavioral or conduct disorder and prevent the misdiagnosis of their needs.

*Changes:* We have added Tourette syndrome as an example of an acute or chronic health problem in § 300.8(c)(9)(i).

*Comment:* A few commenters expressed concern about determining a child's eligibility for special education services under the category of other health impairment based on conditions that are not medically determined health problems, such as "central auditory processing disorders" or "sensory integration disorders." One commenter recommended that the regulations clarify that "chronic or acute health problems" refer to health problems that are universally recognized by the medical profession.

*Discussion:* We cannot make the change requested by the commenters. The determination of whether a child is eligible to receive special education and related services is made by a team of qualified professionals and the parent of the child, consistent with § 300.306(a)(1) and section 614(b)(4) of the Act. The team of qualified professionals and the parent of the child must base their decision on careful consideration of information from a variety of sources, consistent with § 300.306(c). There is nothing in the Act that requires the team of qualified professionals and the parent to consider only health problems that are

universally recognized by the medical profession, as requested by the commenters. Likewise, there is nothing in the Act that would prevent a State from requiring a medical evaluation for eligibility under other health impairment, provided the medical evaluation is conducted at no cost to the parent.

*Changes:* None.

*Comment:* One commenter stated that the category of other health impairment is one of the most rapidly expanding eligibility categories because the definition is vague, confusing, and redundant. The commenter noted that the definition of *other health impairment* includes terms such as "alertness" and "vitality," which are difficult to measure objectively.

*Discussion:* We believe that the definition of *other health impairment* is generally understood and that the group of qualified professionals and the parent responsible for determining whether a child is a child with a disability are able to use the criteria in the definition and appropriately identify children who need special education and related services. Therefore, we decline to change the definition.

*Changes:* None.

Specific Learning Disability (§ 300.8(c)(10))

*Comment:* One commenter recommended changing the definition of *specific learning disability* to refer to a child's response to scientific, research-based intervention as part of the procedures for evaluating children with disabilities, consistent with § 300.307(a). A few commenters recommended aligning the definition of *specific learning disability* with the requirements for determining eligibility in § 300.309.

One commenter recommended using the word "disability," instead of "disorder," and referring to specific learning disabilities as a "disability in one or more of the basic psychological processes." A few commenters stated that the terms "developmental aphasia" and "minimal brain dysfunction" are antiquated and should be removed from the definition. A few commenters questioned using "imperfect ability" in the definition because it implies that a child with minor problems in listening, thinking, speaking, reading, writing, spelling, or calculating math could be determined to have a specific learning disability.

*Discussion:* The definition of *specific learning disability* is consistent with the procedures for evaluating and determining the eligibility of children suspected of having a specific learning disability in §§ 300.307 through 300.311. We do not believe it is necessary to repeat these procedures in the definition of *specific learning disability*.

Section 602(30) of the Act refers to a "disorder" in one or more of the basic psychological processes and not to a "disability" in one or more of the basic psychological processes. We believe it would be inconsistent with the Act to change "disorder" to "disability," as recommended by one commenter. We do not believe that the terms "developmental aphasia" and "minimal brain dysfunction" should be removed from the definition. Although the terms may not be as commonly used as "specific learning disability," the terms continue to be used and we see no harm in retaining them in the definition. We do not agree that the phrase "imperfect ability" implies that a child has a minor problem and, therefore, decline to change this phrase in the definition of *specific learning disability*.

*Changes:* None.

*Comment:* We received several requests to revise the definition of *specific learning disability* to include specific disabilities or disorders that are often associated with specific learning disabilities, including Aspergers syndrome, FAS, auditory processing disorders, and nonverbal learning disabilities.

*Discussion:* Children with many types of disabilities or disorders may also have a specific learning disability. It is not practical or feasible to include all the different disabilities that are often associated with a specific learning disability. Therefore, we decline to add these specific disorders or disabilities to the definition of *specific learning disability*.

*Changes:* None.

*Comment:* A few commenters suggested clarifying the word "cultural" in § 300.8(c)(10)(ii) to clarify that cultural disadvantage or language cannot be the basis for determining that a child has a disability.

*Discussion:* We believe the term "cultural" is generally understood and do not see a need for further clarification. We also do not believe that it is necessary to clarify that language cannot be the basis for determining whether a child has a specific learning disability. Section 300.306(b)(1)(iii), consistent with section 614(b)(5)(C) of the Act, clearly states that limited English proficiency cannot be the basis for determining a child to be a child with a disability under any of the disability categories in § 300.8.

*Changes:* None.

Consent (§ 300.9)

*Comment:* Numerous commenters noted that the regulations include the terms "consent," "informed consent," "agree," and "agree in writing" and asked whether all the terms have the same meaning.

*Discussion:* These terms are used throughout the regulations and are consistent with their use in the Act. The definition of *consent* requires a parent to be fully informed of all information relevant to the activity for which consent is sought. The definition also requires a parent to agree in writing to an activity for which consent is sought. Therefore, whenever *consent* is used in these regulations, it means that the consent is both informed and in writing.

The meaning of the terms "agree" or "agreement" is not the same as *consent*. "Agree" or "agreement" refers to an understanding between the parent and the public agency about a particular question or issue, which may be in writing, depending on the context.

*Changes:* None.

*Comment:* A few commenters recommended adding a requirement to the definition of *consent* that a parent be fully informed of the reasons why a public agency selected one activity over another.

*Discussion:* We do not believe it is necessary to include the additional requirement recommended by the commenter. The definition of *consent* already requires that the parent be fully informed of all the information relevant to the activity for which consent is sought.

*Changes:* None.

*Comment:* A few commenters requested that the Department address situations in which a child is receiving special education services and the child's parent wants to discontinue services because they believe the child no longer needs special education services. A few commenters stated that public agencies should not be allowed to use the procedural safeguards to continue to provide special education and related services to a child whose parent withdraws consent for the continued provision of special education and related services.

*Discussion:* The Department intends to propose regulations to permit parents who previously consented to the initiation of special education services, to withdraw their consent for their child to receive, or continue to receive, special education services. Because this is a change from the Department's longstanding policies and was not proposed in the NPRM, we will provide the public the opportunity to comment

on this proposed change in a separate notice of proposed rulemaking.

*Changes:* None.

Core Academic Subjects (§ 300.10)

*Comment:* A few commenters suggested adding the definition of *core academic subjects* from the ESEA to the regulations and including any additional subjects that are considered core academic subjects for children in the State in which the child resides.

*Discussion:* The definition of *core academic subjects* in § 300.10, consistent with section 602(4) of the Act, is the same as the definition in section 9101 of the ESEA. We believe it is unnecessary to change the definition to include additional subjects that particular States consider to be core academic subjects. However, there is nothing in the Act or these regulations that would prevent a State from including additional subjects in its definition of ''core academic subjects.''

*Changes:* None.

*Comment:* A few commenters requested clarifying the definition of *core academic subjects* for a secondary school student when the student is functioning significantly below the secondary level.

*Discussion:* The definition of *core academic subjects* does not vary for secondary students who are functioning significantly below grade level. The Act focuses on high academic standards and clear performance goals for children with disabilities that are consistent with the standards and expectations for all children. As required in § 300.320(a), each child's IEP must include annual goals to enable the child to be involved in and make progress in the general education curriculum, and a statement of the special education and related services and supplementary aids and services to enable the child to be involved and make progress in the general education curriculum. It would, therefore, be inconsistent and contrary to the purposes of the Act for the definition of *core academic subjects* to be different for students who are functioning below grade level.

*Changes:* None.

*Comment:* One commenter asked that the core content area of ''science'' apply to social sciences, as well as natural sciences.

*Discussion:* We cannot change the regulations in the manner recommended by the commenter because the ESEA does not identify ''social sciences'' as a core academic subject. Neither does it identify ''social studies'' as a core academic subject. Instead, it identifies specific core academic areas: History, geography, economics, and civics and

government. The Department's nonregulatory guidance on ''Highly Qualified Teachers, Improving Teacher Quality State Grants'' (August 3, 2005) explains that if a State issues a composite social studies license, the State must determine in which of the four areas (history, geography, economics, and civics and government), if any, a teacher is qualified. (see question A–20 in the Department's nonregulatory guidance available at *http://www.ed.gov/programs/ teacherqual/legislation.html#guidance).*

*Changes:* None.

Day; Business Day; School Day (§ 300.11)

*Comment:* A few commenters stated that a partial day should be considered a school day only if there is a safety reason for a shortened day, such as a two hour delay due to snow, and that regularly scheduled half days should not be considered a *school day* for funding purposes. One commenter stated that many schools count the time on the bus, recess, lunch period, and passing periods as part of a school day for children with disabilities, and recommended that the regulations clarify that non-instructional time does not count against a child's instructional day unless such times are counted against the instructional day of all children. One commenter recommended the definition of *school day* include days on which extended school year (ESY) services are provided to children with disabilities.

*Discussion:* The length of the school day and the number of school days do not affect the formula used to allocate Part B funds to States. *School day,* as defined in § 300.11(c)(1), is any day or partial day that children are in attendance at school for instructional purposes. If children attend school for only part of a school day and are released early (e.g., on the last day before summer vacation), that day would be considered to be a *school day.*

Section 300.11(c)(2) already defines *school day* as having the same meaning for all children, including children with and without disabilities. Therefore, it is unnecessary for the regulations to clarify that non-instructional time (e.g., recess, lunch) is not counted as instructional time for a child with a disability unless such times are counted as instructional time for all children. Consistent with this requirement, days on which ESY services are provided cannot be counted as a *school day* because ESY services are provided only to children with disabilities.

*Changes:* None.

Educational Service Agency (§ 300.12)

*Comment:* One commenter questioned the accuracy of the citation, 20 U.S.C. 1401(5), as the basis for including ''intermediate educational unit'' in the definition of *educational service agency.*

*Discussion:* The definition of *educational service agency* is based on the provisions in section 602(5) of the Act. The definition was added by the Amendments to the Individuals with Disabilities Education Act in 1997, Pub. L. 105–17, to replace the definition of ''intermediate educational unit'' (IEU) in section 602(23) of the Act, as in effect prior to June 4, 1997. *Educational service agency* does not exclude entities that were considered IEUs under prior law. To avoid any confusion about the use of this term, the definition clarifies that *educational service agency* includes entities that meet the definition of IEU in section 602(23) of the Act as in effect prior to June 4, 1997. We believe the citation for IEU is consistent with the Act.

*Changes:* None.

*Comment:* One commenter requested that the regulations clarify that the reference to the definition of *educational service agency* in the definition of *local educational agency or LEA* in § 300.28 means that educational service agencies (ESAs) and Bureau of Indian Affairs (BIA) schools have full responsibility and rights as LEAs under all provisions of the Act, including § 300.226 (early intervening services).

*Discussion:* With respect to ESAs, we believe that the provisions in § 300.12 and § 300.28 clarify that ESAs have full responsibility and rights as LEAs, including the provisions in § 300.226 related to early intervening services. However, the commenter's request regarding BIA schools is inconsistent with the Act. The definition of *local educational agency* in § 300.28 and section 602(19) of the Act, including the provision on BIA funded schools in section 602(19)(C) of the Act and in § 300.28(c), states that the term ''LEA'' includes an elementary school or secondary school funded by the BIA, ''but only to the extent that the inclusion makes the school eligible for programs for which specific eligibility is not provided to the school in another provision of law and the school does not have a student population that is smaller than the student population of the LEA receiving assistance under the Act with the smallest student population.'' Therefore, BIA schools do not have full responsibility and rights as LEAs under all provisions of the Act.

*Changes:* None.

Excess Costs (§ 300.16)

*Comment:* One commenter stated that an example on calculating excess costs would be a helpful addition to the regulations.

*Discussion:* We agree with the commenter and will include an example of calculating excess costs in *Appendix A to Part 300—Excess Costs Calculation.* In developing the example, we noted that while the requirements in § 300.202 exclude debt service and capital outlay in the calculation of excess costs, the definition of *excess costs* in § 300.16 does not mention this exclusion. We believe it is important to include this exclusion in the definition of *excess costs* and will add language in § 300.16 to make this clear and consistent with the requirements in § 300.202.

*Changes:* We have revised § 300.16(b) to clarify that the calculation of excess costs may not include capital outlay or debt service. We have also added *Appendix A to Part 300—Excess Costs Calculation* that provides an example and an explanation of how to calculate excess costs under the Act. A reference to Appendix A has been added in § 300.16(b).

Free Appropriate Public Education or FAPE (§ 300.17)

*Comment:* One commenter stated that the requirements in §§ 300.103 through 300.112 (Other FAPE Requirements) should be included in the definition of *FAPE.*

*Discussion:* The other FAPE requirements in §§ 300.103 through 300.112 are included in subpart B of these regulations, rather than in the definition of *FAPE* in subpart A, to be consistent with the order and structure of section 612 of the Act, which includes all the statutory requirements related to State eligibility. The order and structure of these regulations follow the general order and structure of the provisions in the Act in order to be helpful to parents, State and LEA personnel, and the public both in reading the regulations, and in finding the direct link between a given statutory requirement and the regulation related to that requirement.

*Changes:* None.

*Comment:* Some commenters stated that the definition of *FAPE* should include special education services that are provided in conformity with a child's IEP in the least restrictive environment (LRE), consistent with the standards of the State educational agency (SEA).

*Discussion:* The definition of *FAPE* in § 300.17 accurately reflects the specific language in section 602(9) of the Act. We believe it is unnecessary to change the definition of *FAPE* in the manner recommended by the commenters because providing services in conformity with a child's IEP in the LRE is implicit in the definition of *FAPE.* Consistent with § 300.17(b), *FAPE* means that special education and related services must meet the standards of the SEA and the requirements in Part B of the Act, which include the LRE requirements in §§ 300.114 through 300.118. Additionally, § 300.17(d) provides that *FAPE* means that special education and related services are provided in conformity with an IEP that meets the requirements in section 614(d) of the Act. Consistent with section 614(d)(1)(i)(V) of the Act, the IEP must include a statement of the extent, if any, to which the child will not participate with nondisabled children in the regular education class.

*Changes:* None.

*Comment:* One commenter recommended removing ''including the requirements of this part'' in § 300.17(b) because this phrase is not included in the Act, and makes every provision in Part B of the Act a component of FAPE.

*Discussion:* Section 300.17 is the same as current § 300.13, which has been in the regulations since 1977. We do not believe that § 300.17 makes every provision of this part applicable to FAPE.

*Changes:* None.

Highly Qualified Special Education Teachers (§ 300.18)

*Comment:* One commenter requested including the definition of ''highly qualified teacher,'' as defined in the ESEA, in the regulations.

*Discussion:* The ESEA defines ''highly qualified'' with regard to any public elementary or secondary school teacher. For the reasons set forth earlier in this notice, we are not adding definitions from other statutes to these regulations. However, we will include the current definition here for reference.

The term ''highly qualified''—

(A) When used with respect to any public elementary school or secondary school teacher teaching in a State, means that—

(i) The teacher has obtained full State certification as a teacher (including certification obtained through alternative routes to certification) or passed the State teacher licensing examination, and holds a license to teach in such State, except that when used with respect to any teacher teaching in a public charter school, the term means that the teacher meets the requirements set forth in the State's public charter school law; and

(ii) The teacher has not had certification or licensure requirements waived on an emergency, temporary, or provisional basis;

(B) When used with respect to—

(i) An elementary school teacher who is new to the profession, means that the teacher—

(I) Holds at least a bachelor's degree; and

(II) Has demonstrated, by passing a rigorous State test, subject knowledge and teaching skills in reading, writing, mathematics, and other areas of the basic elementary school curriculum (which may consist of passing a State-required certification or licensing test or tests in reading, writing, mathematics, and other areas of the basic elementary school curriculum); or

(ii) A middle or secondary school teacher who is new to the profession, means that the teacher holds at least a bachelor's degree and has demonstrated a high level of competency in each of the academic subjects in which the teacher teaches by—

(I) Passing a rigorous State academic subject test in each of the academic subjects in which the teacher teaches (which may consist of a passing level of performance on a State-required certification or licensing test or tests in each of the academic subjects in which the teacher teaches); or

(II) Successful completion, in each of the academic subjects in which the teacher teaches, of an academic major, a graduate degree, coursework equivalent to an undergraduate academic major, or advanced certification or credentialing; and

(C) When used with respect to an elementary, middle, or secondary school teacher who is not new to the profession, means that the teacher holds at least a bachelor's degree and—

(i) Has met the applicable standard in clause (i) or (ii) of subparagraph (B), which includes an option for a test; or

(ii) Demonstrates competence in all the academic subjects in which the teacher teaches based on a high objective uniform State standard of evaluation that—

(I) Is set by the State for both grade appropriate academic subject matter knowledge and teaching skills;

(II) Is aligned with challenging State academic content and student academic achievement standards and developed in consultation with core content specialists, teachers, principals, and school administrators;

(III) Provides objective, coherent information about the teacher's attainment of core content knowledge in

the academic subjects in which a teacher teaches;

(IV) Is applied uniformly to all teachers in the same academic subject and the same grade level throughout the State;

(V) Takes into consideration, but not be based primarily on, the time the teacher has been teaching in the academic subject;

(VI) Is made available to the public upon request; and

(VII) May involve multiple, objective measures of teacher competency.

*Changes:* None.

*Comment:* A few commenters recommended defining the term "special education teacher." Other commenters recommended that States define highly qualified special education teachers and providers. One commenter stated that the regulations should define the role of the special education teacher as supplementing and supporting the regular education teacher who is responsible for teaching course content.

One commenter requested that the regulations clarify that a special education teacher who is certified as a regular education teacher with an endorsement in special education meets the requirements for a highly qualified special education teacher. Another commenter recommended changing the definition of a *highly qualified special education teacher* so that States cannot provide a single certification for all areas of special education. One commenter requested clarification regarding the highly qualified special education teacher standards for special education teachers with single State endorsements in the area of special education. A few commenters recommended clarifying that when a State determines that a teacher is fully certified in special education, this means that the teacher is knowledgeable and skilled in the special education area in which certification is received. One commenter recommended that teacher qualifications and standards be consistent from State to State.

*Discussion:* Section 300.18(b), consistent with section 602(10)(B) of the Act, provides that a highly qualified special education teacher must have full State special education certification (including certification obtained through alternative routes to certification) or have passed the State special education teacher licensing examination and hold a license to teach in the State; have not had special education certification or licensure requirements waived on an emergency, temporary, or provisional basis; and hold at least a bachelor's degree. Except

to the extent addressed in § 300.18(c) and (d), special education teachers who teach core academic subjects must, in addition to meeting these requirements, demonstrate subject-matter competency in each of the core academic subjects in which the teacher teaches.

States are responsible for establishing certification and licensing standards for special education teachers. Each State uses its own standards and procedures to determine whether teachers who teach within that State meet its certification and licensing requirements. Teacher qualifications and standards are consistent from State to State to the extent that States work together to establish consistent criteria and reciprocity agreements. It is not the role of the Federal government to regulate teacher certification and licensure.

*Changes:* None.

*Comment:* One commenter stated that LEAs must train special education teachers because most special education teachers are not highly qualified upon graduation from a college program. A few commenters recommended that the regulations encourage SEAs to require coursework for both special education and general education teachers in the areas of behavior management and classroom management. One commenter recommended that the requirements for special education teachers include competencies in reading instruction and in properly modifying and accommodating instruction. Another commenter supported training in special education and related services for general education teachers. One commenter expressed support for collaboration between special education and regular education teachers. Some commenters recommended requiring a highly qualified general education teacher teaching in a self-contained special education classroom to work in close collaboration with the special education teacher assigned to those children. Another commenter stated that the definition of a *highly qualified special education teacher* will be meaningless if the training for teachers is not consistent across States.

*Discussion:* Personnel training needs vary across States and it would be inappropriate for the regulations to require training on specific topics. Consistent with § 300.156 and section 612(a)(14) of the Act, each State is responsible for ensuring that teachers, related services personnel, paraprofessionals, and other personnel serving children with disabilities under Part B of the Act are appropriately and adequately prepared and trained and have the content knowledge and skills

required to serve children with disabilities.

*Changes:* None.

*Comment:* One commenter recommended that the regulations include standards for highly qualified special education paraprofessionals, similar to the requirements under the ESEA.

*Discussion:* Section § 300.156(b) specifically requires the qualifications for paraprofessionals to be consistent with any State-approved or State-recognized certification, licensing, registration, or other comparable requirements that apply to the professional discipline in which those personnel are providing special education or related services.

In addition, the ESEA requires that paraprofessionals, including special education paraprofessionals who assist in instruction in title I-funded programs, have at least an associate's degree, have completed at least two years of college, or meet a rigorous standard of quality and demonstrate, through a formal State or local assessment, knowledge of, and the ability to assist in instruction in reading, writing, and mathematics, reading readiness, writing readiness, or mathematics readiness, as appropriate. Paraprofessionals in title I schools do not need to meet these requirements if their role does not involve instructional support, such as special education paraprofessionals who solely provide personal care services. For more information on the ESEA requirements for paraprofessionals, see 34 CFR 200.58 and section 1119 of the ESEA, and the Department's nonregulatory guidance, *Title I Paraprofessionals* (March 1, 2004), which can be found on the Department's Web site at: *http://www.ed.gov/policy/elsec/guid/paraguidance.pdf.*

We believe these requirements are sufficient to ensure that children with disabilities receive services from paraprofessionals who are appropriately and adequately trained. Therefore, we decline to include additional standards for paraprofessionals.

*Changes:* None.

*Comment:* Numerous commenters requested clarification as to whether early childhood and preschool special education teachers must meet the highly qualified special education teacher standards. Several commenters stated that requiring early childhood and preschool special education teachers to meet the highly qualified special education teacher standards would exceed statutory authority and exacerbate the shortage of special education teachers. A few commenters supported allowing States to decide

whether the highly qualified special education teacher requirements apply to preschool teachers.

*Discussion:* The highly qualified special education teacher requirements apply to all public school elementary school and secondary school special education teachers, including early childhood or preschool teachers if a State includes the early childhood or preschool programs as part of its elementary school and secondary school system. If the early childhood or preschool program is not a part of a State's public elementary school and secondary school system, the highly qualified special education teacher requirements do not apply.

*Changes:* None.

*Comment:* One commenter requested clarification regarding the scope of the highly qualified special education teacher requirements for instructors who teach core academic subjects in specialized schools, such as schools for the blind, and recommended that there be different qualifications for instructors who provide orientation and mobility instruction or travel training for children who are blind or visually impaired.

One commenter requested adding travel instructors to the list of special educators who need to be highly qualified. Some commenters recommended adding language to include certified and licensed special education teachers of children with low incidence disabilities as highly qualified special education teachers. A few commenters requested that the requirements for teachers who teach children with visual impairments include competencies in teaching Braille, using assistive technology devices, and conducting assessments, rather than competencies in core subject areas. Some commenters requested more flexibility in setting the standards for teachers of children with visual impairments and teachers of children with other low incidence disabilities. One commenter requested clarification regarding the requirements for teachers of children with low incidence disabilities.

*Discussion:* Consistent with § 300.156 and section 612(a)(14) of the Act, it is the responsibility of each State to ensure that teachers and other personnel serving children with disabilities under Part B of the Act are appropriately and adequately prepared and trained and have the content knowledge and skills to serve children with disabilities, including teachers of children with visual impairments and teachers of children with other low incidence disabilities.

The highly qualified special education teacher requirements apply to all public school special education teachers. There are no separate or special provisions for special education teachers who teach in specialized schools, for teachers of children who are blind and visually impaired, or for teachers of children with other low incidence disabilities and we do not believe there should be because these children should receive the same high quality instruction from teachers who meet the same high standards as all other teachers and who have the subject matter knowledge and teaching skills necessary to assist these children to achieve to high academic standards.

*Changes:* None.

*Comment:* One commenter requested clarification on how the highly qualified special education teacher requirements impact teachers who teach children of different ages. A few commenters recommended adding a provision for special education teachers who teach at multiple age levels, similar to the special education teacher who teaches multiple subjects.

*Discussion:* The Act does not include any special requirements for special education teachers who teach at multiple age levels. Teachers who teach at multiple age levels must meet the same requirements as all other special education teachers to be considered highly qualified. The clear intent of the Act is to ensure that all children with disabilities have teachers with the subject matter knowledge and teaching skills necessary to assist children with disabilities achieve to high academic standards. Therefore, we do not believe there should be different requirements for teachers who teach at multiple age levels.

*Changes:* None.

*Comment:* One commenter recommended including specific criteria defining a highly qualified special education literacy teacher.

*Discussion:* Under § 300.18(a), a special education literacy teacher who is responsible for teaching reading must meet the ESEA highly qualified teacher requirements including competency in reading, as well as the highly qualified special education teacher requirements. We do not believe that further regulation is needed as the Act leaves teacher certification and licensing requirements to States.

*Changes:* None.

*Comment:* Many commenters expressed concern that the highly qualified special education teacher standards will make it more difficult to recruit and retain special education teachers. Some commenters stated that

most special education teachers will need to hold more than one license or certification to meet the highly qualified special education teacher requirements and that the time and expense needed to obtain the additional licenses or certifications is unreasonable. One commenter stated that schools will have to hire two or three teachers for every one special education teacher, thereby increasing education costs.

One commenter expressed concern about losing special education teachers who teach multiple subjects in alternative education and homebound programs because they will not meet the highly qualified special education teacher requirements. One commenter expressed concern that the requirements set a higher standard for teachers in self-contained classrooms. Another commenter stated that requiring special education teachers in secondary schools to be experts in all subjects is a burden that elementary teachers do not have.

*Discussion:* The Department understands the concerns of the commenters. However, the clear intention of the Act is to ensure that all children with disabilities have teachers with the subject-matter knowledge and teaching skills necessary to assist children with disabilities achieve to high academic standards.

To help States and districts meet these standards, section 651 of the Act authorizes State Personnel Development grants to help States reform and improve their systems for personnel preparation and professional development in early intervention, educational, and transition services in order to improve results for children with disabilities. In addition, section 662 of the Act authorizes funding for institutions of higher education, LEAs, and other eligible local entities to improve or develop new training programs for teachers and other personnel serving children with disabilities.

*Changes:* None.

*Comment:* One commenter requested further clarification regarding the requirements for secondary special education teachers to be highly qualified in the core subjects they teach, as well as certified in special education.

*Discussion:* Consistent with § 300.18(a) and (b) and section 602(10)(A) and (B) of the Act, secondary special education teachers who teach core academic subjects must meet the highly qualified teacher standards established in the ESEA (which includes competency in each core academic subject the teacher teaches) and the highly qualified special education teacher requirements in

**46556** **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

§ 300.18(b) and section 602(10)(B) of the Act.

Consistent with § 300.18(c) and section 602(10)(C) of the Act, a secondary special education teacher who teaches core academic subjects exclusively to children assessed against alternate achievement standards can satisfy the highly qualified special education teacher requirements by meeting the requirements for a highly qualified elementary teacher under the ESEA, or in the case of instruction above the elementary level, have subject matter knowledge appropriate to the level of instruction being provided, as determined by the State, to effectively teach to those standards.

*Changes:* None.

*Comment:* One commenter expressed concern that the highly qualified teacher requirements will drive secondary teachers who teach children with emotional and behavioral disorders out of the field and requested that the requirements be changed to require special education certification in one core area, plus a reasonable amount of training in other areas. Another commenter recommended permitting special education teachers of core academic subjects at the elementary level to be highly qualified if they major in elementary education and have coursework in math, language arts, and science. One commenter recommended that any special education teacher certified in a State prior to 2004 be exempt from having to meet the highly qualified special education teacher requirements.

*Discussion:* The definition of a *highly qualified special education teacher* in § 300.18 accurately reflects the requirements in section 602(10) of the Act. To change the regulations in the manner recommended by the commenters would be inconsistent with the Act and the Act's clear intent of ensuring that all children with disabilities have teachers with the subject matter knowledge and teaching skills necessary to assist children with disabilities achieve to high academic standards. Therefore, we decline to change the requirements in § 300.18.

*Changes:* None.

*Comment:* One commenter stated that there is a double standard in the highly qualified teacher requirements because general education teachers are not required to be certified in special education even though they teach children with disabilities. Another commenter recommended requiring general education teachers who teach children with disabilities to meet the highly qualified special education teacher requirements.

*Discussion:* We cannot make the changes suggested by the commenter because the Act does not require general education teachers who teach children with disabilities to be certified in special education. Further, the legislative history of the Act would not support these changes. Note 21 in the U.S. House of Representatives Conference Report No. 108–779 (Conf. Rpt.), p. 169, clarifies that general education teachers who are highly qualified in particular subjects and who teach children with disabilities in those subjects are not required to have full State certification as a special education teacher. For example, a reading specialist who is highly qualified in reading instruction, but who is not certified as a special education teacher, would not be prohibited from providing reading instruction to children with disabilities.

The Act focuses on ensuring that children with disabilities achieve to high academic standards and have access to the same curriculum as other children. In order to achieve this goal, teachers who teach core academic subjects to children with disabilities must be competent in the core academic areas in which they teach. This is true for general education teachers, as well as special education teachers.

*Changes:* None.

*Comment:* Some commenters expressed concern that LEAs may reduce placement options for children with disabilities because of the shortage of highly qualified teachers. A few commenters recommended requiring each State to develop and implement policies to ensure that teachers meet the highly qualified special education teacher requirements, while maintaining a full continuum of services and alternative placements to respond to the needs of children with disabilities.

*Discussion:* It would be inconsistent with the LRE requirements in section 612(a)(5) of the Act for a public agency to restrict the placement options for children with disabilities. Section 300.115, consistent with section 612(a)(5) of the Act, requires each public agency to ensure that a continuum of alternative placements is available to meet the needs of children with disabilities.

The additional requirements requested by the commenter are not necessary because States already must develop and implement policies to ensure that the State meets the LRE and personnel standards requirements in sections 612(a)(5) and (a)(14) of the Act, respectively.

*Changes:* None.

*Comment:* One commenter stated that personnel working in charter schools should meet the same requirements as all other public school personnel. Several commenters expressed concern regarding the exemption of charter school teachers from the highly qualified special education teacher requirements. One commenter stated that while a special education teacher in a charter school does not have to be licensed or certified by the State if the State's charter school law does not require such licensure or certification, all other elements of the highly qualified special education teacher requirements should apply to charter school teachers, including demonstrated competency in core academic subject areas.

*Discussion:* The certification requirements for charter school teachers are established in a State's public charter school law, and may differ from the requirements for full State certification for teachers in other public schools. The Department does not have the authority to change State charter school laws to require charter school teachers to meet the same requirements as all other public school teachers.

In addition to the certification requirements established in a State's public charter school law, if any, section 602(10) of the Act requires charter school special education teachers to hold at least a bachelor's degree and, if they are teaching core academic subjects, demonstrate competency in the core academic areas they teach. We will add language in § 300.18(b) to clarify that special education teachers in public charter schools must meet the certification or licensing requirements, if any, established by a State's public charter school law.

*Changes:* We have added the words "if any" in § 300.18(b)(1)(i) to clarify that special education teachers in public charter schools must meet any certification or licensing requirements established by a State's public charter school law.

*Comment:* One commenter stated that the regulations use the terms "highly qualified" and "fully certified" in a manner that implies they are synonymous, and recommended that the regulations maintain the distinction between the two terms.

*Discussion:* Full State certification is determined under State law and policy and means that a teacher has fully met State requirements, including any requirements related to a teacher's years of teaching experience. For example, State requirements may vary for first-year teachers versus teachers who are not new to the profession. Full State

certification also means that the teacher has not had certification or licensure requirements waived on an emergency, temporary, or provisional basis.

The terms "highly qualified" and "fully certified" are synonymous when used to refer to special education teachers who are not teaching core academic subjects. For special education teachers teaching core academic subjects, however, both full special education certification or licensure and subject matter competency are required.

*Changes:* We have changed the heading to § 300.18(a) and the introductory material in § 300.18(a) and (b)(1) for clarity.

*Comment:* A few commenters recommended prohibiting States from creating new categories to replace emergency, temporary, or provisional licenses that lower the standards for full certification in special education.

*Discussion:* We do not believe it is necessary to add the additional language recommended by the commenters. Section 300.18(b)(1)(ii) and section 602(10)(B)(ii) of the Act are clear that a teacher cannot be considered a highly qualified special education teacher if the teacher has had special education certification or licensure waived on an emergency, temporary, or provisional basis. This would include any new certification category that effectively allows special education certification or licensure to be waived on an emergency, temporary, or provisional basis.

*Changes:* None.

*Comment:* Some commenters supported alternative route to certification programs for special education teachers. One commenter stated that these programs are necessary to increase the number of highly qualified teachers and will help schools on isolated tribal reservations recruit, train, and retain highly qualified teachers. However, numerous commenters expressed concerns and objections to alternative route to certification programs for special education teachers. Several commenters stated that allowing individuals making progress in an alternative route to certification program to be considered highly qualified and fully certified creates a lower standard, short-changes children, is not supported by any provision in the Act, and undermines the requirement for special education teachers to be fully certified. One commenter stated that this provision is illogical and punitive to higher education teacher training programs because it allows individuals in an alternative route to certification program to be considered highly qualified and

fully certified during their training program, while at the same time individuals in regular teacher training programs that meet the same requirements as alternative route to certification programs are not considered highly qualified or fully certified. One commenter argued that an individual participating in an alternative route to certification program would need certification waived on an emergency, temporary, or provisional basis, which means the individual has not met the requirements in § 300.18(b)(1)(ii). Another commenter stated that three years is not enough time for a teacher enrolled in an alternative route to certification program to assume the functions of a teacher.

*Discussion:* While we understand the general objections to alternative route to certification programs expressed by the commenters, the Department believes that alternative route to certification programs provide an important option for individuals seeking to enter the teaching profession. The requirements in § 300.18(b)(2) were included in these regulations to provide consistency with the requirements in 34 CFR 200.56(a)(2)(ii)(A) and the ESEA, regarding alternative route to certification programs. To help ensure that individuals participating in alternative route to certification programs are well trained, there are certain requirements that must be met as well as restrictions on who can be considered to have obtained full State certification as a special education teacher while enrolled in an alternative route to certification program. An individual participating in an alternative route to certification program must (1) hold at least a bachelor's degree and have demonstrated subject-matter competency in the core academic subject(s) the individual will be teaching; (2) assume the functions of a teacher for not more than three years; and (3) demonstrate satisfactory progress toward full certification, as prescribed by the State. The individual also must receive, before and while teaching, high-quality professional development that is sustained, intensive, and classroom-focused and have intensive supervision that consists of structured guidance and regular ongoing support.

It was the Department's intent to allow an individual who wants to become a special education teacher, but does not plan to teach a core academic subject, to enroll in an alternative route to certification program and be considered highly qualified, provided that the individual holds at least a bachelor's degree. This requirement,

however, was inadvertently omitted in the NPRM. Therefore, we will add appropriate references in § 300.18(b)(3) to clarify that an individual participating in an alternative route to certification program in special education who does not intend to teach a core academic subject, may be considered a highly qualified special education teacher if the individual holds at least a bachelor's degree and participates in an alternative route to certification program that meets the requirements in § 300.18(b)(2).

*Changes:* Appropriate citations have been added in § 300.18(b)(3) to clarify the requirements for individuals enrolled in alternative route to special education teacher certification programs.

*Comment:* A few commenters recommended more specificity in the requirements for teachers participating in alternative route to certification programs, rather than giving too much discretion to States to develop programs that do not lead to highly qualified personnel. However, one commenter recommended allowing States the flexibility to create their own guidelines for alternative route to certification programs.

Several commenters recommended clarifying the requirements for the teacher supervising an individual who is participating in an alternative route to certification program. One commenter recommended requiring supervision, guidance, and support by a professional with expertise in the area of special education in which the teacher desires to become certified.

*Discussion:* Consistent with § 300.18(b)(2)(ii), States are responsible for ensuring that the standards for alternative route to certification programs in § 300.18(b)(2)(i) are met. It is, therefore, up to each State to determine whether to require specific qualifications for the teachers responsible for supervising teachers participating in an alternative route to certification program.

*Changes:* None.

*Comment:* One commenter requested clarification regarding the roles and responsibilities of special education teachers who do not teach core academic subjects.

*Discussion:* Special education teachers who do not directly instruct children in any core academic subject or who provide only consultation to highly qualified teachers of core academic subjects do not need to demonstrate subject-matter competency in those subjects. These special educators could provide consultation services to other teachers, such as adapting curricula,

using behavioral supports and interventions, or selecting appropriate accommodations for children with disabilities. They could also assist children with study skills or organizational skills and reinforce instruction that the child has already received from a highly qualified teacher in that core academic subject.

*Changes:* None.

*Comment:* Many commenters recommended including language in the regulations to clarify that special education teachers who do not teach core academic subjects and provide only consultative services must restrict their services to areas that supplement, not replace, the direct instruction provided by a highly qualified general education teacher. One commenter recommended that States develop criteria for teachers who provide consultation services. Another commenter stated that special education teachers should not work on a consultative basis.

*Discussion:* The definition of consultation services and whether a special education teacher provides consultation services are matters best left to the discretion of each State. While States may develop criteria to distinguish consultation versus instructional services, the Act and the ESEA are clear that teachers who provide direct instruction in a core academic subject, including special education teachers, must meet the highly qualified teacher requirements, which include demonstrated competency in each of the core academic subjects the teacher teaches.

*Changes:* None.

Requirements for Highly Qualified Special Education Teachers Teaching to Alternate Achievement Standards (§ 300.18(c))

*Comment:* One commenter recommended replacing "alternate achievement standards" with "alternate standards." A few commenters requested including a definition of alternate achievement standards in the regulations.

*Discussion:* "Alternate achievement standards" is statutory language and, therefore, it would be inappropriate to change "alternate achievement standards" to "alternate standards."

For the reasons set forth earlier in this notice, we are not adding definitions from other statutes to these regulations. However, we will include the current description of alternate achievement standards in 34 CFR 200.1(d) of the ESEA regulations here for reference.

For children under section 602(3) of the Individuals with Disabilities Education Act with the most significant

cognitive disabilities who take an alternate assessment, a State may, through a documented and validated standards-setting process, define alternate academic achievement standards, provided those standards—

(1) Are aligned with the State's academic content standards;

(2) Promote access to the general curriculum; and

(3) Reflect professional judgment of the highest achievement standards possible.

*Changes:* None.

*Comment:* Several commenters expressed concern with allowing high school students with significant cognitive disabilities to be taught by a certified elementary school teacher. One commenter stated that high school students with disabilities should be prepared to lead productive adult lives, and not be treated as young children. Another commenter stated that these requirements foster low expectations for children with the most significant cognitive disabilities and will be used to justify providing children with instruction that is not age appropriate or that denies access to the general education curriculum. A few commenters stated that the requirements for special education teachers teaching to alternate achievement standards should be the same as the requirements for all special education teachers.

Some commenters recommended requiring teachers who teach to alternate achievement standards to have subject matter knowledge to provide instruction aligned to the academic content standards for the grade level in which the student is enrolled. One commenter recommended requiring any special education teacher teaching to alternate achievement standards to demonstrate knowledge of age-appropriate core curriculum content to ensure children with disabilities are taught a curriculum that is closely tied to the general education curriculum taught to other children of the same age.

*Discussion:* The regulations promulgated under section 1111(b)(1) of the ESEA permit States to use alternate achievement standards to evaluate the performance of a small group of children with the most significant cognitive disabilities who are not expected to meet grade-level standards even with the best instruction. An alternate achievement standard sets an expectation of performance that differs in complexity from a grade-level achievement standard. Section 602(10)(C)(ii) of the Act, therefore, allows special education teachers teaching exclusively children who are

assessed against alternate achievement standards to meet the highly qualified teacher standards that apply to elementary school teachers. In the case of instruction above the elementary level, the teacher must have subject matter knowledge appropriate to the level of instruction being provided, as determined by the State, in order to effectively teach to those standards.

We do not agree that allowing middle and high school students with the most significant cognitive disabilities to be taught by teachers who meet the qualifications of a highly qualified elementary teacher fosters low expectations, encourages students to be treated like children, promotes instruction that is not age appropriate, or denies students access to the general curriculum. Although alternate achievement standards differ in complexity from grade-level standards, 34 CFR 200.1(d) requires that alternate achievement standards be aligned with the State's content standards, promote access to the general curriculum, and reflect professional judgment of the highest achievement standards possible. In short, we believe that the requirements in § 300.18(c) will ensure that teachers teaching exclusively children who are assessed against alternate achievement standards will have the knowledge to provide instruction aligned to grade-level content standards so that students with the most significant cognitive disabilities are taught a curriculum that is closely tied to the general curriculum.

*Changes:* None.

*Comment:* A few commenters requested clarification regarding the meaning of "subject matter knowledge appropriate to the level of instruction provided" in § 300.18(c)(2).

*Discussion:* Section 300.18(c)(2) requires that if a teacher (who is teaching exclusively to alternate achievement standards) is teaching students who need instruction above the elementary school level, the teacher must have subject matter knowledge appropriate to the level of instruction needed to effectively teach to those standards. The purpose of this requirement is to ensure that teachers exclusively teaching children who are assessed based on alternate academic achievement standards above the elementary level have sufficient subject matter knowledge to effectively instruct in each of the core academic subjects being taught, at the level of difficulty being taught. For example, if a high school student (determined by the IEP Team to be assessed against alternate achievement standards) has knowledge and skills in math at the 7th grade level,

but in all other areas functions at the elementary level, the teacher would need to have knowledge in 7th grade math in order to effectively teach the student to meet the 7th grade math standards. No further clarification is necessary.

*Changes:* None.

*Comment:* A few commenters recommended that the regulations include requirements for teachers who provide instruction to children assessed against modified achievement standards. Several commenters stated that the requirements for teachers teaching children assessed against modified achievement standards should be the same for teachers teaching children assessed against alternate achievement standards.

*Discussion:* The Department has not issued final regulations addressing modified achievement standards and the specific criteria for determining which children with disabilities should be assessed based on modified achievement standards. As proposed, the modified achievement standards must be aligned with the State's academic content standards for the grade in which the student is enrolled and provide access to the grade-level curriculum. For this reason, we see no need for a further exception to the "highly qualified teacher" provisions at this time.

*Changes:* None.

Requirements for Highly Qualified Special Education Teachers Teaching Multiple Subjects (§ 300.18(d))

*Comment:* A few commenters stated that the requirements for teachers who teach two or more core academic subjects exclusively to children with disabilities are confusing. Some commenters requested additional guidance and flexibility for special education teachers teaching two or more core academic subjects. Other commenters recommended allowing special education teachers more time to become highly qualified in all the core academic subjects they teach.

*Discussion:* The requirements in § 300.18(d), consistent with section 602(10)(C) of the Act, provide flexibility for teachers who teach multiple core academic subjects exclusively to children with disabilities. Section 300.18(d)(2) and (3) allows teachers who are new and not new in the profession to demonstrate competence in all the core academic subjects in which the teacher teaches using a single, high objective uniform State standard of evaluation (HOUSSE) covering multiple subjects. In addition, § 300.18(d)(3) gives a new special education teacher

who teaches multiple subjects, and who is highly qualified in mathematics, language arts, or science at the time of hire, two years after the date of employment to demonstrate competence in the other core academic subjects in which the teacher teaches. We do not believe that further clarification is necessary.

*Changes:* None.

*Comment:* One commenter requested clarification regarding the meaning of the following phrases in § 300.18(d): "multiple subjects," "in the same manner," and "all the core academic subjects."

*Discussion:* "Multiple subjects" refers to two or more core academic subjects. Section 300.18(d) allows teachers who are new or not new to the profession to demonstrate competence in "all the core subjects" in which the teacher teaches "in the same manner" as is required for an elementary, middle, or secondary school teacher under the ESEA. As used in this context, "in the same manner" means that special education teachers teaching multiple subjects can demonstrate competence in the core academic subjects they teach in the same way that is required for elementary, middle, or secondary school teachers in 34 CFR 200.56 of the ESEA regulations. "All the core subjects" refers to the core academic subjects, which include English, reading or language arts, mathematics, science, foreign languages, civics and government, economics, arts, history, and geography, consistent with § 300.10.

*Changes:* None.

*Comment:* One commenter recommended ensuring that the requirements in § 300.18(d) apply to special education teachers who teach children with severe disabilities in more than one core subject area.

*Discussion:* The requirements in § 300.18(d) do not exclude teachers who teach children with severe disabilities in more than one core subject area. Consistent with § 300.18(d) and section 602(10)(D) of the Act, the requirements apply to special education teachers who teach two or more core academic subjects exclusively to children with disabilities, including, but not limited to, children with severe disabilities. We do not believe that further clarification is necessary.

*Changes:* None.

*Comment:* A significant number of commenters recommended adding language to the regulations to permit a separate HOUSSE for special education teachers, including a single HOUSSE that covers multiple subjects. Some commenters supported a single HOUSSE covering multiple subjects for

special education teachers, as long as those adaptations of a State's HOUSSE for use with special education teachers do not establish lower standards for the content knowledge requirements for special education teachers.

*Discussion:* States have the option of developing a method by which teachers can demonstrate competency in each subject they teach on the basis of a HOUSSE. Likewise, we believe States should have the option of developing a separate HOUSSE for special education teachers.

States have flexibility in developing their HOUSSE evaluation as long as it meets each of the following criteria established in section 9101(23)(C)(ii) of the ESEA:

• Be set by the State for both grade-appropriate academic subject-matter knowledge and teaching skills;

• Be aligned with challenging State academic content and student academic achievement standards and developed in consultation with core content specialists, teachers, principals, and school administrators;

• Provide objective, coherent information about the teacher's attainment of core content knowledge in the academic subjects in which a teacher teaches;

• Be applied uniformly to all teachers in the same academic subject and teaching in the same grade level throughout the State;

• Take into consideration, but not be based primarily on, the time the teacher has been teaching in the academic subject; and

• Be made available to the public upon request.

The ESEA also permits States, when developing their HOUSSE procedures, to involve multiple, objective measures of teacher competency. Each evaluation should have a high, objective, uniform standard that the candidate is expected to meet or to exceed. These standards for evaluation must be applied to each candidate in the same way.

We believe it is appropriate and consistent with the Act to permit States to develop a separate HOUSSE for special education teachers to demonstrate subject matter competency and to use a single HOUSSE covering multiple subjects, provided that any adaptations to the HOUSSE do not establish a lower standard for the content knowledge requirements for special education teachers and meet all the requirements for a HOUSSE for regular education teachers established in section 9101(23)(C)(ii) of the ESEA.

*Changes:* We have added a new paragraph (e) to § 300.18 to allow States to develop a separate HOUSSE for

special education teachers and to permit the use of a single HOUSSE covering multiple subjects. Subsequent paragraphs have been renumbered.

*Comment:* A few commenters stated that the HOUSSE should only be used to address the content requirements, not primary certification as a special educator.

*Discussion:* A HOUSSE is a method by which teachers can demonstrate competency in each subject they teach. A HOUSSE does not address the requirement for full State certification as a special education teacher.

*Changes:* None.

*Comment:* Several commenters recommended clarifying the requirements for a HOUSSE, particularly at the high school level. One commenter recommended clarifying the use of a separate HOUSSE for teachers of children with visual impairments.

*Discussion:* The requirements for a HOUSSE apply to public school elementary, middle, and high school special education teachers. Neither the Act nor the ESEA provides for different HOUSSE procedures at the high school level. Similarly, there are no requirements for separate HOUSSE procedures for teachers who teach children with visual impairments or any other specific type of disability. We do not believe it is necessary or appropriate to establish separate requirements for separate HOUSSE procedures for teachers who teach children with visual impairments or any other specific type of disability. All children with disabilities, regardless of their specific disability, should have teachers with the subject matter knowledge to assist them to achieve to high academic standards.

*Changes:* None.

*Comment:* One commenter recommended that States work collaboratively to ensure there is State reciprocity of content area standards for special education teachers, including HOUSSE provisions.

*Discussion:* It is up to each State to determine when and on what basis to accept another State's determination that a particular teacher is highly qualified. Additionally, each State determines whether to consider a teacher from another State to be both fully certified and competent in each subject area.

*Changes:* None.

*Comment:* One commenter requested specific guidance on how to design a multi-subject HOUSSE for special education teachers.

*Discussion:* The Department's non-regulatory guidance on *Improving Teacher Quality State Grants* issued on

August 3, 2005 (available at *http://www.ed.gov/programs/teacherqual/guidance.doc.*) provides the following guidance to States when developing their HOUSSE procedures (see question A–10):

• Do the HOUSSE procedures provide an "objective" way of determining whether teachers have adequate subject-matter knowledge in each core academic subject they teach?

• Is there a strong and compelling rationale for each part of the HOUSSE procedures?

• Do the procedures take into account, but not primarily rely on, previous teaching experience?

• Does the plan provide solid evidence that teachers have mastered the subject-matter content of each of the core academic subjects they are teaching? (Note: experience and association with content-focused groups or organizations do not necessarily translate into an objective measure of content knowledge.)

• Has the State consulted with core content specialists, teachers, principals, and school administrators?

• Does the State plan to widely distribute its HOUSSE procedures, and are they presented in a format understandable to all teachers?

*Changes:* None.

*Comment:* A few commenters asked whether the additional time allowed for teachers living in rural areas who teach multiple subjects applies to special education teachers. One commenter requested that teachers in rural areas have three extra years after the date of employment to meet the standards. Another commenter stated it will be difficult for these teachers to meet the highly qualified special education teacher requirements even with an extended deadline.

*Discussion:* The Department's policy on flexibility for middle and high school teachers in rural schools applies to special education teachers. Under this policy, announced on March 15, 2004, States may permit LEAs eligible to participate in the Small Rural School Achievement (SRSA) program that employ teachers who teach multiple subjects and are highly qualified in at least one core academic subject, to have until the end of the 2006–07 school year for these teachers to be highly qualified in each subject that they teach. Newly-hired teachers in these covered LEAs have three years from the date of hire to become highly qualified in each core academic subject that they teach. More information about this policy is available in the Department's nonregulatory guidance, *Improving Teacher Quality State Grants* (August 3,

2005), which can be found on the Department's Web site at: *http://www.ed.gov/programs/teacherqual/guidance.doc.*

*Changes:* None.

*Comment:* Some commenters requested a definition of "new" special education teacher and asked whether it applies to teachers hired after the date of enactment of the Act, December 3, 2004, or after the 2005–06 school year. One commenter asked whether a fully certified regular education teacher who enrolls in a special education teacher training program would be considered "new" to the profession when he or she completes the training program.

*Discussion:* Under the Act, mere completion of a special education teacher training program is not a sufficient predicate for being considered a highly qualified special education teacher. Section 602(10)(B) of the Act requires full State certification or licensure as a special education teacher, and this would apply to teachers who are already certified or licensed as a regular education teacher, as well as to other individuals.

On the question of when a person is "new to the profession," the Department's non-regulatory guidance on *Improving Teacher Quality State Grants* issued on August 3, 2005, clarifies that States have the authority to define which teachers are new and not new to the profession; however, those definitions must be reasonable. The guidance further states that the Department strongly believes that a teacher with less than one year of teaching experience is "new" to the profession (see Question A–6). (The guidance is available at *http://www.ed.gov/programs/teacherqual/guidance.doc*). This guidance is applicable to determinations of when a person is new or not new to the profession under section 602(10)(C) and (D)(ii) of the Act and § 300.18(c) and (d)(2).

Under section 602(10)(D)(iii) of the Act, and reflected in § 300.18(d)(3), there is additional flexibility for "a new special education teacher" who is teaching multiple subjects and is highly qualified in mathematics, language arts, or science, to demonstrate competence in the other core academic subjects in which the teacher teaches in the same manner as is required for an elementary, middle, or secondary school teacher who is not new to the profession, which may include a single, high objective uniform State standard of evaluation covering multiple subjects, not later than 2 years after the date of employment. The phrase "2 years after the date of employment" in section

602(10)(D)(iii) of the Act is interpreted to mean 2 years after employment as a special education teacher.

For purposes of this provision, we consider it appropriate to consider a fully certified regular education teacher who subsequently becomes fully certified or licensed as a special education teacher to be considered a ''new special education teacher'' when they are first hired as a special education teacher. We will add language to new § 300.18(g) (proposed § 300.18(f)) to make this clear.

*Changes:* We have restructured § 300.18(g) (proposed § 300.18(f)) and added a new paragraph (g)(2) to permit a fully certified regular education teacher who subsequently becomes fully certified or licensed as a special education teacher to be considered a new special education teacher when first hired as a special education teacher.

*Comment:* Some commenters recommended that the regulations clarify how co-teaching fits with the highly qualified special education teacher requirements. A few commenters stated that a special education teacher should be considered a highly qualified teacher if co-teaching with a highly qualified general education teacher. One commenter stated that co-teaching will encourage districts to work toward more inclusive settings for children with disabilities while also ensuring that teachers with appropriate qualifications are in the classroom. One commenter supported co-teaching as a method for special education teachers to learn core content knowledge and be supported by the general education teacher. One teacher recommended that a highly qualified general education teacher supervise teachers who do not meet the highly qualified special education teacher requirements.

*Discussion:* The term ''co-teaching'' has many different meanings depending on the context in which it is used. Whether and how co-teaching is implemented is a matter that is best left to State and local officials' discretion. Therefore, we decline to include language regarding co-teaching in these regulations. Regardless of whether co-teaching models are used, States and LEAs must ensure that teachers meet the highly qualified teacher requirements in 34 CFR 200.56 and section 9101(23) of the ESEA and the highly qualified special education teacher requirements in § 300.18 and section 602(10) of the Act, as well as the personnel requirements in § 300.156 and section 612(a)(14) of the Act.

*Changes:* None.

*Comment:* One commenter recommended requiring schools to post the credentials of educational personnel in a place with public access, and to include in the procedural safeguards notice a parent's right to request the credentials of any teacher who supports the child in an educational environment. Another commenter stated that parents should have access to records documenting the type of supervision that is being provided when a teacher or other service provider is under the supervision of a highly qualified teacher. One commenter stated that the ESEA requires districts to provide parents with information about the personnel qualifications of their child's classroom teachers and asked whether this requirement applies to special education teachers.

*Discussion:* There is nothing in the Act that authorizes the Department to require schools to publicly post the credentials of educational personnel or to provide parents with information about the qualification of their child's teachers and other service providers. Section 615 of the Act describes the guaranteed procedural safeguards afforded to children with disabilities and their parents under the Act but does not address whether parents can request information about the qualifications of teachers and other service providers.

However, section 1111(h)(6) of the ESEA requires LEAs to inform parents about the quality of a school's teachers in title I schools. The ESEA requires that at the beginning of each school year, an LEA that accepts title I, part A funding must notify parents of children in title I schools that they can request information regarding their child's classroom teachers, including, at a minimum: (1) Whether the teacher has met the State requirements for licensure and certification for the grade levels and subject matters in which the teacher provides instruction; (2) whether the teacher is teaching under emergency or other provisional status through which State qualification or licensing criteria have been waived; (3) the college major and any other graduate certification or degree held by the teacher, and the field of discipline of the certification or degree; and (4) whether the child is provided services by paraprofessionals, and if so, their qualifications. In addition, each title I school must provide parents with timely notice that the parent's child has been assigned, or has been taught for four or more consecutive weeks by, a teacher who is not highly qualified. These requirements apply only to those special education teachers who teach core academic subjects in title I schools.

*Changes:* None.

Rule of Construction (New § 300.18(f)) (Proposed § 300.18(e))

*Comment:* A number of commenters stated that the rule of construction in new § 300.18(f) (proposed § 300.18(e)) and § 300.156(e) should use the same language. One commenter stated that in order to prevent confusion, the right of action limitations regarding highly qualified teachers in new § 300.18(f) (proposed § 300.18(e)) and personnel qualifications in § 300.156(e) should use consistent language regarding individual and class actions, and clearly underscore that the limitations are applicable to both administrative and judicial actions. One commenter recommended reiterating the language from section 612(a)(14)(D) of the Act that nothing prevents a parent from filing a State complaint about staff qualifications. Another commenter expressed concern because new § 300.18(f) (proposed § 300.18(e)) and § 300.156(e) may be construed to prevent due process hearings when an LEA or SEA fails to provide a highly qualified teacher.

*Discussion:* We agree that the rule of construction in new § 300.18(f) (proposed § 300.18(e)) and § 300.156(e) should be the same. We will change the regulations to clarify that a parent or student may not file a due process complaint on behalf of a student, or file a judicial action on behalf of a class of students for the failure of a particular SEA or LEA employee to be highly qualified; however, a parent may file a complaint about staff qualifications with the SEA. In addition to permitting a parent to file a complaint with the SEA, an organization or an individual may also file a complaint about staff qualifications with the SEA, consistent with the State complaint procedures in §§ 300.151 through 300.153.

*Changes:* We have added ''or to prevent a parent from filing a complaint about staff qualifications with the SEA as provided for under this part'' in new § 300.18(f) (proposed § 300.18(e)).

*Comment:* Several commenters recommended that the regulations specify that the failure of an SEA or LEA to provide a child with a disability a highly qualified teacher can be a consideration in the determination of whether a child received FAPE, if the child is not learning the core content standards or not meeting IEP goals. However, a few commenters recommended that the regulations clarify that it is not a denial of FAPE if a special education teacher is not highly qualified.

*Discussion:* If the only reason a parent believes their child has been denied FAPE is that the child did not have a highly qualified teacher, the parent would have no right of action under the Act on that basis. The rules of construction in new § 300.18(f) (proposed § 300.18(e)) and § 300.156(e) do not allow a parent or student to file a due process complaint for failure of an LEA or SEA to provide a highly qualified teacher.

*Changes:* None.

*Comment:* One commenter expressed concern with the rule of construction in new § 300.18(f) (proposed § 300.18(e)) because there are no requirements to develop a specific enforcement system to ensure that teachers meet the highly qualified standard. A few commenters recommended changing the rule of construction so that States meet their supervisory responsibilities under the Act if LEAs in the State are sanctioned under the ESEA for not having highly qualified teachers.

Some commenters recommended clarifying that when the SEA or LEA employs an individual who is not highly qualified, States meet their responsibilities for general supervision under the Act through the notice and other sanction procedures identified under the ESEA.

One commenter stated that the regulations are silent with regard to SEA actions when meeting the general supervision requirements under the Act, and noted that unless the regulations are expanded to clarify that SEA enforcement procedures under compliance monitoring are limited to ESEA enforcement procedures, the highly qualified teacher requirements of an individual teacher may inappropriately become the target for a finding of noncompliance. This commenter further stated that the ESEA contains specific procedures for failure of a district to comply with the highly qualified teacher provisions, and if the SEA also exercises sanctioning authority under the Act, schools could be punished twice under two separate provisions of Federal law for the same infraction. The commenter recommended that to avoid double jeopardy the regulations should clarify that the ESEA enforcement procedures for a district's failure to hire a highly qualified teacher follow the provisions of the ESEA, not the Act.

*Discussion:* The implementation and enforcement of the highly qualified teacher standards under the ESEA and the Act complement each other. The Office of Elementary and Secondary Education (OESE) currently monitors the implementation of the highly qualified teacher standards for teachers of core academic subjects under the ESEA. This includes special education teachers who teach core academic subjects.

The Office of Special Education programs (OSEP) collects data about special education personnel qualifications and requires that SEAs establish and maintain qualifications to ensure that personnel essential to carrying out the purposes of Part B of the Act are appropriately and adequately prepared and trained. Those personnel must also have the content knowledge and skills to serve children with disabilities, consistent with § 300.156.

OESE and OSEP will share their data to ensure that the highly qualified teacher requirements under the ESEA and the Act are met. This sharing of information will also prevent schools from being punished twice for the same infraction.

*Changes:* None.

### Teachers Hired by Private Elementary and Secondary Schools (New § 300.18(h)) (Proposed § 300.18(g))

*Comment:* Some commenters agreed with new § 300.18(h) (proposed § 300.18(g)), which states that the highly qualified special education teacher requirements do not apply to teachers hired by private elementary schools and secondary schools. However, many commenters disagreed, stating that children placed by an LEA in a private school are entitled to receive the same high quality instruction as special education children in public schools. A few commenters stated that LEAs will place children in private schools to avoid hiring highly qualified teachers. Some commenters stated that public funds should not be used for any school that is not held to the same high standards as public schools. Other commenters stated that children with the most significant disabilities who are placed in private schools are children with the most need for highly qualified teachers. A few commenters stated that this provision is contrary to the intent of the ESEA and the Act to support the educational achievement of children with disabilities. Other commenters stated that if instruction by a highly qualified teacher is a hallmark of FAPE, it should be an element of FAPE in any educational setting in which the child is enrolled by a public agency.

A few commenters recommended that States have the discretion to determine whether and to what extent the highly qualified teacher requirements apply to teachers who teach publicly-placed and parentally-placed children with disabilities. The commenters stated that the SEA is in the best position to weigh the needs of private school children for highly qualified teachers and to assess what effect these requirements would have on the shortage of special education teachers in the State. One commenter asked whether the highly qualified teacher requirements apply to providers in private residential treatment centers where children with disabilities are placed to receive FAPE.

*Discussion:* New § 300.18(h) (proposed § 300.18(g)) accurately reflects the Department's position that the highly qualified special education teacher requirements do not apply to teachers hired by private elementary schools and secondary schools. This includes teachers hired by private elementary schools and secondary schools who teach children with disabilities. Consistent with this position and in light of comments received regarding the requirements for private school teachers providing equitable services to parentally-placed private school children with disabilities under § 300.138, we will add language to new § 300.18(h) (proposed § 300.18(g)) to clarify that the highly qualified special education teacher requirements also do not apply to private school teachers who provide equitable services to parentally-placed private school children with disabilities under § 300.138.

*Changes:* We have added language in new § 300.18(h) (proposed § 300.18(g)) to clarify that the highly qualified special education teacher requirements also do not apply to private school teachers who provide equitable services to parentally-placed private school children with disabilities under § 300.138.

### Homeless Children (§ 300.19)

*Comment:* Several commenters requested adding the definition of *homeless children* in the regulations so that it is readily accessible to parents, advocates, and educators.

*Discussion:* The term *homeless children* is defined in the McKinney-Vento Homeless Assistance Act. For the reasons set forth earlier in this notice, we are not adding the definitions of other statutes to these regulations. However, we will include the current definition of *homeless children* in section 725 (42 U.S.C. 11434a) of the McKinney-Vento Homeless Assistance Act, as amended, 42 U.S.C. 11431 *et seq.* (McKinney-Vento Act) here for reference.

The term homeless children and youths—

(A) means individuals who lack a fixed, regular, and adequate nighttime

residence (within the meaning of section 103(a)(1)); and

(B) includes—

(i) children and youths who are sharing the housing of other persons due to loss of housing, economic hardship, or a similar reason; are living in motels, hotels, trailer parks, or camping grounds due to the lack of alternative adequate accommodations; are living in emergency or transitional shelters; are abandoned in hospitals; or are awaiting foster care placement;

(ii) children and youths who have a primary nighttime residence that is a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings (within the meaning of section 103(a)(2)(C));

(iii) children and youths who are living in cars, parks, public spaces, abandoned buildings, substandard housing, bus or train stations, or similar settings; and

(iv) migratory children (as such term is defined in section 1309 of the Elementary and Secondary Education Act of 1965) who qualify as homeless for the purposes of this subtitle because the children are living in circumstances described in clauses (i) through (iii).

*Changes:* None.

*Comment:* One commenter stated that regulations are needed to address school selection and enrollment provisions under the McKinney-Vento Act. Another commenter recommended that the regulations include the McKinney-Vento Act's requirement that school stability for homeless children be maintained during periods of residential mobility and that homeless children enrolled in new schools have the ability to immediately attend classes and participate in school activities.

*Discussion:* We appreciate the commenters' concerns, but do not believe it is necessary to duplicate the requirements of the McKinney-Vento Act in these regulations. We believe that these issues, as well as other issues regarding children with disabilities who are homeless, would be more appropriately addressed in non-regulatory guidance, in which more detailed information and guidance can be provided on how to implement the requirements of the Act and the McKinney-Vento Act to best meet the needs of homeless children with disabilities. We will work with the Office of Elementary and Secondary Education to provide guidance and disseminate information to special education teachers and administrators regarding their responsibilities for serving children with disabilities who are homeless.

*Changes:* None.

Indian and Indian Tribe (§ 300.21)

*Comment:* One commenter expressed support for combining and moving the definition of *Indian and Indian tribe* from current § 300.264 to the definitions section of these regulations because the term is applicable in instances not related to BIA schools. However, another commenter stated that the definition was unnecessary because the purpose of the Act is to ensure that every child has FAPE.

*Discussion:* The definitions of *Indian and Indian tribe* are included in sections 602(12) and (13) of the Act, respectively, and are, therefore, included in subpart A of these regulations. Subpart A includes definitions for those terms and phrases about which we are frequently asked and which we believe will assist SEAs and LEAs in implementing the requirements of the Act. Including the definitions of *Indian and Indian tribe* in the definitions section does not in any way affect the provision of FAPE to all eligible children under the Act.

*Changes:* None.

*Comment:* One commenter requested omitting "State Indian tribes" that are not also federally-recognized tribes from the definition of *Indian and Indian tribe* stating that Federal recognition of an Indian tribe should be a predicate for the tribe's eligibility for Federal programs and services. One commenter expressed concern that including "State Indian tribes" in the definition could imply that the Secretary of the Interior is responsible for providing special education and related services or funding to all State Indian tribes.

*Discussion:* Section 602(13) of the Act and § 300.21(b) define *Indian tribe* as "any Federal or State Indian tribe" and do not exclude State Indian tribes that are not federally-recognized tribes. We will add a new paragraph (c) to § 300.21 clarifying that the definition of *Indian and Indian tribe* is not intended to indicate that the Secretary of Interior is required to provide services or funding to a State Indian tribe that is not listed in the **Federal Register** list of Indian entities recognized as eligible to receive services from the United States, published pursuant to Section 104 of the Federally Recognized Indian Tribe List Act of 1994, 25 U.S.C. 479a–1.

*Changes:* A new paragraph (c) has been added to § 300.21 to provide this clarification.

*Comment:* One commenter stated that it was unclear how many States have defined Indian tribes that are not defined by the Federal government and asked what the effect would be on the provision of services by including State Indian tribes in the definition. Another commenter stated that including State Indian tribes in the definition of *Indian and Indian tribe* implies that children of State-recognized tribes are considered differently than other children.

*Discussion:* As noted in the discussion responding to the previous comment, the list of Indian entities recognized as eligible to receive services from the United States is published in the **Federal Register**, pursuant to Section 104 of the Federally Recognized Indian Tribe List Act of 1994, 25 U.S.C. 479a–1. The Federal government does not maintain a list of other State Indian tribes. Including State Indian tribes that are not federally recognized in the definition does not affect who is responsible under the Act for the provision of services to children with disabilities who are members of State Indian tribes. Under section 611(h)(1) of the Act, the Secretary of the Interior is responsible for providing special education and related services to children age 5 through 21 with disabilities on reservations who are enrolled in elementary schools and secondary schools for Indian children operated or funded by the Secretary of the Interior. With respect to all other children aged 3 through 21 on reservations, the SEA of the State in which the reservation is located is responsible for ensuring that all the requirements of Part B of the Act are implemented.

*Changes:* None.

Individualized Family Service Plan (§ 300.24)

*Comment:* A few commenters recommended including the entire definition of *individualized family service plan* in the regulations so that parents and school personnel do not have to shift back and forth between documents.

*Discussion:* Adding the entire definition of *individualized family service plan* in section 636 of the Act, which includes information related to assessment and program development; periodic review; promptness after assessment; content of the plan; and parental consent, would unnecessarily add to the length of the regulations. However, the required content of the IFSP in section 636(d) of the Act is added here for reference.

The *individualized family service plan* shall be in writing and contain—

(1) A statement of the infant's or toddler's present levels of physical development, cognitive development, communication development, social or emotional development, and adaptive

development, based on objective criteria;

(2) a statement of the family's resources, priorities, and concerns relating to enhancing the development of the family's infant or toddler with a disability;

(3) a statement of the measurable results or outcomes expected to be achieved for the infant or toddler and the family, including pre-literacy and language skills, as developmentally appropriate for the child, and the criteria, procedures, and timelines used to determine the degree to which progress toward achieving the results or outcomes is being made and whether modifications or revisions of the results or outcomes or services are necessary;

(4) a statement of specific early intervention services based on peer-reviewed research, to the extent practicable, necessary to meet the unique needs of the infant or toddler and the family, including the frequency, intensity, and method of delivering services;

(5) a statement of the natural environments in which early intervention services will appropriately be provided, including a justification of the extent, if any, to which the services will not be provided in a natural environment;

(6) the projected dates for initiation of services and the anticipated length, duration, and frequency of the services;

(7) the identification of the service coordinator from the profession most immediately relevant to the infant's or toddler's or family's needs (or who is otherwise qualified to carry out all applicable responsibilities under this part) who will be responsible for the implementation of the plan and coordination with other agencies and persons, including transition services; and

(8) the steps to be taken to support the transition of the toddler with a disability to preschool or other appropriate services.

*Changes:* None.

Infant or Toddler With a Disability (§ 300.25)

*Comment:* A few commenters recommended including the entire definition of *infant or toddler with a disability* in the regulations so that parents and school personnel do not have to shift back and forth between documents.

*Discussion:* We agree with the commenters and, therefore, will include the definition of *infant or toddler with a disability* from section 632(5) of the Act in these regulations for reference.

*Changes:* Section 300.25 has been revised to include the entire definition of *infant or toddler with a disability* from section 632(5) of the Act.

Institution of Higher Education (§ 300.26)

*Comment:* One commenter recommended including the definition of *institution of higher education* in these regulations.

*Discussion:* The term *institution of higher education* is defined in section 101 of the Higher Education Act of 1965, as amended, 20 U.S.C. 1021 *et seq.* (HEA). For the reasons set forth earlier in this notice, we are not adding definitions from other statutes to these regulations. However, we are including the current definition here for reference.

(a) Institution of higher education—For purposes of this Act, other than title IV, the term *institution of higher education* means an educational institution in any State that—

(1) Admits as regular students only persons having a certificate of graduation from a school providing secondary education, or the recognized equivalent of such a certificate;

(2) is legally authorized within such State to provide a program of education beyond secondary education;

(3) provides an educational program for which the institution awards a bachelor's degree or provides not less than a 2-year program that is acceptable for full credit toward such a degree;

(4) is a public or other nonprofit institution; and

(5) is accredited by a nationally recognized accrediting agency or association, or if not so accredited, is an institution that has been granted preaccreditation status by such an agency or association that has been recognized by the Secretary for the granting of preaccreditation status, and the Secretary has determined that there is satisfactory assurance that the institution will meet the accreditation standards of such an agency or association within a reasonable time.

(b) Additional Institutions Included—For purposes of this Act, other than title IV, the term *institution of higher education* also includes—

(1) Any school that provides not less than a 1-year program of training to prepare students for gainful employment in a recognized occupation and that meets the provision of paragraphs (1), (2), (4), and (5) of subsection (a); and

(2) a public or nonprofit private educational institution in any State that, in lieu of the requirement in subsection (a)(1), admits as regular students persons who are beyond the age of

compulsory school attendance in the State in which the institution is located.

*Changes:* None.

*Comment:* One commenter requested that we add language to the regulations that would allow Haskell and Sipi, postsecondary programs under the Haskell Indian Nations University and Southwestern Indian Polytechnic Institute Administrative Act of 1988, 25 U.S.C. 3731 *et seq.*, to be included in the definition of *institution of higher education*.

*Discussion:* The Haskell and Sipi postsecondary programs under the Haskell Indian Nations University and Southwestern Indian Polytechnic Institute Administrative Act of 1988, 25 U.S.C. 3731 *et seq.* meet the statutory definition of *institution of higher education* in section 602(17) of the Act because they meet the definition of the term in section 101 of the HEA. The Act does not include specific institutions in the definition of *institution of higher education*, nor do we believe it is necessary to add specific institutions to the definition in § 300.26.

*Changes:* None.

Limited English Proficient (§ 300.27)

*Comment:* One commenter requested specific information about bilingual qualified personnel and qualified interpreters. Some commenters recommended including the definition of ''limited English proficient'' in the regulations.

*Discussion:* Each State is responsible for determining the qualifications of bilingual personnel and interpreters for children with limited English proficiency.

The term *limited English proficient* is defined in the ESEA. For the reasons set forth earlier in this notice, we are not adding the definitions from other statutes to these regulations. However, we will include the current definition in section 9101(25) of the ESEA here for reference.

The term *limited English proficient* when used with respect to an individual, means an individual—

(A) Who is aged 3 through 21;

(B) Who is enrolled or preparing to enroll in an elementary school or secondary school;

(C)(i) who was not born in the United States or whose native language is a language other than English;

(ii)(I) who is a Native American or Alaska Native, or a native resident of the outlying areas; and

(II) who comes from an environment where a language other than English has had a significant impact on the individual's level of English language proficiency; or

(iii) who is migratory, whose native language is a language other than English, and who comes from an environment where a language other than English is dominant; and

(D) whose difficulties in speaking, reading, writing, or understanding the English language may be sufficient to deny the individual—

(i) the ability to meet the State's proficient level of achievement on State assessments described in section 1111(b)(3);

(ii) the ability to successfully achieve in classrooms where the language of instruction is English; or

(iii) the opportunity to participate fully in society.

*Changes:* None.

Local Educational Agency (§ 300.28)

*Comment:* One commenter suggested revising § 300.28 to ensure that all responsibilities and rights attributed to an LEA apply to an ESA.

*Discussion:* We believe that the provisions in § 300.12 and § 300.28 are clear that ESAs have full responsibilities and rights as LEAs. We, therefore, decline to revise § 300.28.

*Changes:* None.
*Comment:* None.
*Discussion:* Through its review of charter schools' access to Federal funding, it has come to the Department's attention that additional guidance is needed regarding whether charter schools that are established as their own LEAs must be nonprofit entities in order to meet the definition of LEA in § 300.28. The definition of *LEA* in § 300.28(b)(2) specifically includes a public charter school that is established as an LEA under State law and that exercises administrative control or direction of, or performs a service function for, itself. For purposes of the Act, the definitions of *charter school, elementary school,* and *secondary school* in §§ 300.7, 300.13, and 300.36, respectively, require that a public elementary or secondary charter school be a nonprofit entity. Therefore, a public elementary or secondary charter school established as its own *LEA* under State law, also must be a nonprofit entity. Although these regulations do not specifically define nonprofit, the definition in 34 CFR § 77.1 applies to these regulations. In order to eliminate any confusion on this issue, we will revise the definition of *LEA* to reflect that a public elementary or secondary charter school that is established as its own LEA under State law must be a nonprofit entity.

*Changes:* For clarity, we have revised § 300.28(b)(2) by inserting the term "nonprofit" before "charter school that

is established as an LEA under State law."

*Comment:* One commenter stated that § 300.28(c) is in error from a technical drafting perspective because it does not follow the statutory language in section 602(19)(C) of the Act. The commenter also suggested adding a definition of "BIA funded school," rather than adding a new definition of LEA related to BIA funded schools.

*Discussion:* We agree that § 300.28(c) does not accurately reflect the statutory language in section 602(19)(C) of the Act and, as written, could be interpreted as defining BIA funded schools. This was not our intent. Rather, the intent was to include "BIA funded schools" in the definition of *LEA*, consistent with section 602(19)(C) of the Act.

In order to correct the technical drafting error, we will change § 300.28(c) to accurately reflect section 602(19)(C) of the Act. We decline to add a definition of "BIA funded schools." The Act does not define this term and the Department does not believe that it is necessary to define the term.

*Changes:* In order to correct a technical drafting error, § 300.28(c) has been revised to be consistent with statutory language.

Native Language (§ 300.29)

*Comment:* A few commenters expressed support for retaining the definition of *native language*, stating that it is important to clarify that sign language is the native language of many children who are deaf. One commenter stated it is important to clarify that the language normally used by the child may be different than the language normally used by the parents. Another commenter stated that the definition of *native language* does not adequately cover individuals with unique language and communication techniques such as deafness or blindness or children with no written language.

*Discussion:* The definition of *native language* was expanded in the 1999 regulations to ensure that the full range of needs of children with disabilities whose native language is other than English is appropriately addressed. The definition clarifies that in all direct contact with the child (including an evaluation of the child), *native language* means the language normally used by the child and not that of the parents, if there is a difference between the two. The definition also clarifies that for individuals with deafness or blindness, or for individuals with no written language, the *native language* is the mode of communication that is normally used by the individual (such as sign language, Braille, or oral

communication). We believe this language adequately addresses the commenters' concerns.

*Changes:* None.

Parent (§ 300.30)

*Comment:* Several commenters objected to the term "natural parent" in the definition of *parent* because "natural parent" presumes there are "unnatural parents." The commenters recommended using "birth parent" or "biological parent" throughout the regulations.

*Discussion:* We understand that many people find the term "natural parent" offensive. We will, therefore, use the term "biological parent" to refer to a non-adoptive parent.

*Changes:* We have replaced the term "natural parent" with "biological parent" in the definition of *parent* and throughout these regulations.

*Comment:* A significant number of commenters recommended retaining the language in current § 300.20(b), which states that a foster parent can act as a parent if the biological parent's authority to make educational decisions on the child's behalf have been extinguished under State law, and the foster parent has an ongoing, long-term parental relationship with the child; is willing to make the educational decisions required of parents under the Act; and has no interest that would conflict with the interest of the child.

A few commenters stated that current § 300.20(b) better protects children's interests and should not be removed. Another commenter stated that removing current § 300.20 will have unintended consequences for the many foster children who move frequently to new homes because there will be confusion as to who has parental rights under the Act. A few commenters stated that short-term foster parents may not have the knowledge of the child or the willingness to actively participate in the special education process, which will effectively leave the child without a parent.

One commenter stated that § 300.30 needs to be changed to protect biological and adoptive parents from arbitrary decisions by educational officials who lack the legal authority to make educational decisions for the child and to ensure that when no biological or adoptive parent is available, a person with a long-term relationship with, and commitment to, the child has decision-making authority.

*Discussion:* Congress changed the definition of parent in the Act. The definition of *parent* in these regulations reflects the revised statutory definition of *parent* in section 602(23) of the Act.

The Department understands the concerns expressed by the commenters, but believes that the changes requested would not be consistent with the intent of the statutory changes. In changing the definition of *parent* in the Act, Congress incorporated some of the wording from the current regulations and did not incorporate in the new definition of *parent*, the current foster parent language referenced by the commenters.

*Changes:* None.

*Comment:* One commenter recommended allowing a foster parent who does not have a long-term relationship to be the parent, if a court, after notifying all interested parties, determines that it is in the best interest of the child.

*Discussion:* Section 300.30(b)(2) clearly states that if a person is specified in a judicial order or decree to act as the parent for purposes of § 300.30, that person would be considered the parent under Part B of the Act.

*Changes:* None.

*Comment:* One commenter stated that § 300.30(a)(2) withdraws the rights of biological parents under the Act without due process of law.

*Discussion:* We do not agree with the commenter. If more than one person is attempting to act as a parent, § 300.30(b)(1) provides that the biological or adoptive parent is presumed to be the parent if that person is attempting to act as the parent under § 300.30, unless the biological or adoptive parent does not have legal authority to make educational decisions for the child, or there is a judicial order or decree specifying some other person to act as a parent under Part B of the Act. We do not believe that provisions regarding lack of legal authority or judicial orders or decrees would apply unless there has already been a determination, through appropriate legal processes, that the biological parent should not make educational decisions for the child or that another person has been ordered to serve as the parent.

*Changes:* None.

*Comment:* One commenter stated that § 300.30(a)(2) is unwieldy and difficult to implement because it requires extensive fact finding by the LEA to determine whether any contractual obligations would prohibit the foster parent from acting as a parent.

*Discussion:* The statutory language concerning the definition of *parent* was changed to permit foster parents to be considered a child's parent, unless State law prohibits a foster parent from serving as a parent. The language in the regulations also recognizes that similar restrictions may exist in State regulations or in contractual agreements between a State or local entity and a foster parent, and should be accorded similar deference. We believe it is essential for LEAs to have knowledge of State laws, regulations, and any contractual agreements between a State or local entity and a foster parent to ensure that the requirements in § 300.30(a)(2) are properly implemented. States and LEAs should develop procedures to make this information more readily and easily available so that LEAs do not have to engage in extensive fact finding each time a child with a foster parent enrolls in a school.

*Changes:* None.

*Comment:* One commenter stated that the regulations need to clarify that guardians *ad litem* do not meet the definition of a *parent* except for wards of the State where consent for the initial evaluation has been given by an individual appointed by the judge to represent the child in the educational decisions concerning the child.

*Discussion:* We agree that guardians with limited appointments that do not qualify them to act as a parent of the child generally, or do not authorize them to make educational decisions for the child, should not be considered to be a *parent* within the meaning of these regulations. What is important is the legal authority granted to individuals appointed by a court, and not the term used to identify them. Whether a person appointed as a guardian *ad litem* has the requisite authority to be considered a *parent* under this section depends on State law and the nature of the person's appointment. We will revise § 300.30(a)(3) to clarify that a guardian must be authorized to act as the child's parent generally or must be authorized to make educational decisions for the child in order to fall within the definition of *parent*.

*Changes:* We have added language in § 300.30(a)(3) to clarify when a guardian can be considered a *parent* under the Act.

*Comment:* One commenter requested adding a "temporary parent" appointed in accordance with sections 615(b)(2) or 639(a)(5) of the Act to the definition of *parent*.

*Discussion:* There is nothing in the Act that would prevent a temporary surrogate parent from having all the rights of a parent. Note 89 of the Conf. Rpt., p. 35810, provides that appropriate staff members of emergency shelters, transitional shelters, independent living programs, and street outreach programs would not be considered to be employees of agencies involved in the education or care of unaccompanied youth (and thus prohibited from serving as a surrogate parent), provided that such a role is temporary until a surrogate parent can be appointed who meets the requirements for a surrogate parent in § 300.519(d). This provision is included in § 300.519(f), regarding surrogate parents. Therefore, we do not believe it is necessary to add "temporary parent" to the definition of *parent* in § 300.30.

*Changes:* None.

*Comment:* A few commenters stated that the definition of *parent* is confusing, especially in light of the definition of *ward of the State* in new § 300.45 (proposed § 300.44) and the LEA's obligation to appoint a surrogate parent. These commenters stated that § 300.30 should cross-reference the definition of *ward of the State* in new § 300.45 (proposed § 300.44) and state that the appointed surrogate parent for a child who is a ward of the State is the parent.

*Discussion:* Section 615(b)(2) of the Act does not require the automatic appointment of a surrogate parent for every child with a disability who is a ward of the State. States and LEAs must ensure that the rights of these children are protected and that a surrogate parent is appointed, if necessary, as provided in § 300.519(b)(1). If a child who is a ward of the State already has a person who meets the definition of *parent* in § 300.30, and that person is willing and able to assume the responsibilities of a parent under the Act, a surrogate parent might not be needed. Accordingly, we do not believe it is necessary to make the changes suggested by the commenters.

*Changes:* None.

*Comment:* One commenter expressed concern that public agencies will require biological or adoptive parents to affirmatively assert their rights or to take action in order to be presumed to be the parent. The commenter requested clarifying in § 300.30(b)(1) that biological or adoptive parents do not have to take affirmative steps in order for the presumption to apply.

*Discussion:* The biological or adoptive parent would be presumed to be the parent under these regulations, unless a question was raised about their legal authority. There is nothing in the Act that requires the biological or adoptive parent to affirmatively assert their rights to be presumed to be the parent. We continue to believe that § 300.30(b)(1) is clear and, therefore, will not make the changes requested by the commenters.

*Changes:* None.

*Comment:* Some commenters recommended removing "when attempting to act as a parent under this

part'' in § 300.30(b)(1). A few commenters stated that there is no explanation of what it means for a biological parent to ''attempt to act as a parent.'' Another commenter stated that the regulations do not set any guidelines for determining how a public agency decides if a biological or adoptive parent is attempting to act as a parent.

One commenter stated ''attempting to act'' would require LEAs to make determinations about a biological parent's decision-making authority and this should be left up to courts to determine. One commenter stated that the regulations permit multiple persons to act as a child's parent and do not adequately set forth a process to determine who should be identified as the actual parent for decision-making purposes. The commenter further stated that the regulations do not set out a procedure or a timeframe by which public agency officials should determine if a biological parent has retained the right to make educational decisions for his or her child.

One commenter stated that the definition of *parent* gives school districts excessive power; for example a school could appoint a surrogate parent if the foster parent was excessively demanding. The commenter further stated that a clearer order of priority and selection mechanism with judicial oversight needs to be in place so that school districts cannot ''parent shop'' for the least assertive individual, and so that relatives, foster parents, social workers, and others involved with the child will know who has educational decision making authority.

One commenter questioned whether § 300.30(b) helps identify parents or confuses situations in which the person to be designated the parent is in dispute. Another commenter stated that the requirements in § 300.30(b) place the responsibility of determining who serves as the parent of a child in foster care directly on the shoulders of school administrators who are not child welfare experts. The commenter recommended that a foster parent automatically qualify as a parent when the rights of the child's biological parents have been extinguished and the foster parent has a long-term relationship with the child, no conflict of interest, and is willing to make educational decisions.

*Discussion:* Section 300.30(b) was added to assist schools and public agencies in determining the appropriate person to serve as the parent under Part B of the Act in those difficult situations in which more than one individual is ''attempting to act as a parent'' and make educational decisions for a child.

It recognizes the priority of the biological or adoptive parent and the authority of the courts to make decisions, and does not leave these decisions to school administrators.

The phrase ''attempting to act as a parent'' is generally meant to refer to situations in which an individual attempts to assume the responsibilities of a parent under the Act. An individual may ''attempt to act as a parent'' under the Act in many situations; for example, if an individual provides consent for an evaluation or reevaluation, or attends an IEP Team meeting as the child's parent. We do not believe it is necessary or possible to include in these regulations the numerous situations in which an individual may ''attempt to act as a parent.''

Section 300.30(b)(1) provides that the biological or adoptive parent is presumed to be the parent if that person is attempting to act as the parent under § 300.30, unless the biological or adoptive parent does not have legal authority to make educational decisions for the child, or there is a judicial order or decree specifying some other person to act as a parent under Part B of the Act. Section 300.30(b)(2) provides that if a person (or persons) is specified in a judicial order or decree to act as the parent for purposes of § 300.30, that person would be the parent under Part B of the Act. We do not believe that it is necessary for these regulations to establish procedures or a timeline for a public agency to determine whether a biological parent has retained the right to make educational decisions for a child. Such procedures and timelines will vary depending on how judicial orders or decrees are routinely handled in a State or locality, and are best left to State and local officials to determine.

*Changes:* None.

*Comment:* A few commenters recommended modifying § 300.30(b)(2) to clarify that a court has the discretion to decide who has the right to make educational decisions for a child. One commenter recommended clarifying that the judicial decree referred to in § 300.30(b)(2) relates specifically to divorce situations, rather than situations involving children who are wards of the State. Another commenter stated that § 300.30(b)(2) appears to be aimed at situations where the court has designated a parent, such as in a custody decree, and that it is not clear what the provision adds.

*Discussion:* Section 300.30(b)(2) specifically states that if a judicial decree or order identifies a person or persons to act as the parent of a child or to make educational decisions on behalf of a child, then that person

would be determined to be the parent. It was intended to add clarity about who would be designated a parent when there are competing individuals under § 300.30(a)(1) through (4) who could be considered a parent for purposes of this part. It is not necessary to specify or limit this language to provide that the judicial decree or order applies to specific situations, such as divorce or custody cases. However, it should not authorize courts to appoint individuals other than those identified in § 300.30(a)(1) through (4) to act as parents under this part. Specific authority for court appointment of individuals to provide consent for initial evaluations in limited circumstances is in § 300.300(a)(2)(c). Authority for court appointment of a surrogate parent in certain situations is in § 300.519(c).

*Changes:* We have revised § 300.30(b)(2) to limit its application to individuals identified under § 300.30(a)(1) through (4) and have deleted the phrase ''except that a public agency that provides education or care for the child may not act as the parent'' as unnecessary.

*Comment:* One commenter recommended allowing foster parents to act as parents only when the birth parent's rights have been extinguished or terminated. A few commenters requested that the regulations clarify the circumstances under which a foster parent can take over educational decision making. One commenter stated that allowing a foster parent to act as a parent would disrupt the special education process.

*Discussion:* Under § 300.30(a)(2), a foster parent can be considered a parent, unless State law, regulations, or contractual obligations with a State or local entity prohibit a foster parent from acting as a parent. However, in cases where a foster parent and a biological or adoptive parent attempt to act as the parent, § 300.30(b)(1) clarifies that the biological or adoptive parent is presumed to be the parent, unless the biological or adoptive parent does not have legal authority to make educational decisions for the child. Section 300.30(b)(2) further clarifies that if a person or persons such as a foster parent or foster parents is specified in a judicial order or decree to act as the parent for purposes of § 300.30, that person would be the parent under Part B of the Act. We do not believe that further clarification is necessary.

*Changes:* None.

*Comment:* A few commenters recommended that ''extinguished under State law'' be defined to mean both temporary and permanent termination

of parental rights to make educational decisions because this would allow courts to make more timely decisions regarding the role of a parent and not feel bound to wait for a full termination of parental rights.

*Discussion:* The phrase "extinguished under State law" is not used in the Act or these regulations. The phrase was used in the definition of parent in current § 300.20(b)(1). The comparable provision in these regulations is in § 300.30(b)(1), which refers to situations in which the "biological or adoptive parent does not have legal authority to make educational decisions for the child." We do not believe that either of these phrases affects the timeliness of decision making by courts regarding parental rights.

*Changes:* None.

*Comment:* Some commenters stated that "consistent with State law" should be included in § 300.30(b)(2) in order to honor local laws already in place to protect these children.

*Discussion:* We do not believe the change recommended by the commenters is necessary. Courts issue decrees and orders consistent with applicable laws.

*Changes:* None.

*Comment:* One commenter stated that it would not be wise to completely exclude an agency involved in the education or care of the child from serving as a parent because situations in which an LEA acts as a parent are very rare and only occur under very unusual circumstances.

*Discussion:* The exclusion of an agency involved in the education or care of the child from serving as a parent is consistent with the statutory prohibition that applies to surrogate parents in sections 615(b)(2) and 639(a)(5) of the Act.

*Changes:* None.

*Comment:* One commenter recommended that the regulations clarify the responsibilities of the LEA when a biological or adoptive parent and a foster parent attempt to act as the parent. Although the regulations state that the biological or adoptive parent must be presumed to be the parent unless the biological or adoptive parent has been divested of this authority by a court, the commenter stated that the regulations are not clear as to whether the LEA has the duty to notify the biological or adoptive parent, accommodate his or her schedule, or otherwise take steps to facilitate the biological or adoptive parent's participation.

One commenter recommended clarifying the relative rights of a biological or adoptive parent and a foster parent when a child is in foster care and the foster parent is not prohibited by the State from acting as a parent.

*Discussion:* Section 300.30(b)(1) states that when more than one party is qualified under § 300.30(a) to act as the parent, the biological or adoptive parent is presumed to be the parent (unless a judicial decree or order identifies a specific person or persons to act as the parent of a child). The biological or adoptive parent has all the rights and responsibilities of a parent under the Act, and the LEA must provide notice to the parent, accommodate his or her schedule when arranging meetings, and involve the biological or adoptive parent in the education of the child with a disability. Thus, if a child is in foster care (and the foster parent is not prohibited by the State from acting as a parent) and the biological or adoptive parent is attempting to act as a parent, the biological or adoptive parent is presumed to be the parent unless the biological or adoptive parent does not have legal authority to make educational decisions for the child or a judicial decree or order identifies a specific person or persons to act as the parent of a child.

*Changes:* None.

*Comment:* A few commenters stated that it is unclear when or under what circumstances a biological or adoptive parent ceases or surrenders their rights to a foster parent to make educational decisions for a child. One commenter stated that the regulations should define clearly the situations when this would occur and the level of proof that must be shown by the party seeking to make educational decisions on behalf of a child. The commenter stated that only under the most extreme and compelling circumstances should a court be able to appoint another individual to take the place of a biological or adoptive parent.

*Discussion:* It would be inappropriate and beyond the authority of the Department to regulate on the termination of parental rights to make educational decisions. It is the responsibility of a court to decide whether to appoint another person or persons to act as a parent of a child or to make educational decisions on behalf of a child.

*Changes:* None.

*Comment:* One commenter requested clarifying to whom LEAs must provide notice, or obtain consent in situations where there are disputes between biological or adoptive parents (e.g., when parents separate or divorce).

*Discussion:* In situations where the parents of a child are divorced, the parental rights established by the Act apply to both parents, unless a court order or State law specifies otherwise.

*Changes:* None.

*Comment:* A few commenters recommended clarifying in the regulations that a private agency that contracts with a public agency for the education or care of the child may not act as a parent.

*Discussion:* A private agency that contracts with a public agency for the education or care of the child, in essence, works for the public agency, and therefore, could not act as a parent under the Act. We do not believe it is necessary to regulate on this matter.

*Changes:* None.

Parent Training and Information Center (§ 300.31)

*Comment:* One commenter requested describing a *parent training and information center* (PTI) and a community parent resource center (CPRC) in the regulations, rather than referencing section 671 or 672 of the Act.

*Discussion:* We do not believe it is necessary to include these descriptions in the regulations. Section 671 of the Act describes the program requirements for a PTI and section 672 of the Act describes the program requirements for a CPRC. These sections describe the activities required of PTIs and CPRCs, as well as the application process for discretionary funding under Part D of the Act, and would unnecessarily add to the length of the regulations.

*Changes:* None.

*Comment:* One commenter stated that, in order for a State or LEA to be considered for funding under the Act, the regulations should require partnerships with the PTIs and the CPRCs, as well as input from PTIs and CPRCs on assessing State and local needs, and developing and implementing a plan to address State and local needs.

*Discussion:* We disagree with the commenter. There is nothing in the Act that requires States or LEAs, as a condition of funding, to obtain input from PTIs and CPRCs in assessing needs or developing and implementing a plan to address State or local needs. States and LEAs are free to do so, but it is not a requirement for funding.

*Changes:* None.

Public Agency (§ 300.33)

*Comment:* One commenter stated that the term *public agency* is not in the Act and noted that no State has created a new type of public education agency beyond LEAs and SEAs. The commenter stated that including the definition of *public agency* in the regulations,

therefore, raises concerns regarding the responsibility and authority for future special education services.

*Discussion:* The definition of *public agency* refers to all agencies responsible for various activities under the Act. The terms ''LEA'' or ''SEA'' are used when referring to a subset of public agencies. We disagree that the definition raises concerns about the responsibility and authority for future educational services because the term *public agency* is used only for those situations in which a particular regulation does not apply only to SEAs and LEAs.

During our internal review of the NPRM, we found several errors in the definition of *public agency.* Our intent was to use the same language in current § 300.22. We will, therefore, correct these errors to be consistent with current § 300.22. Additionally, we will clarify that a charter school must be a nonprofit charter school. As noted in the discussion regarding § 300.28(b)(2), we clarified that a charter school established as its own LEA under State law, must be a nonprofit charter school.

*Changes:* We have removed the phrase ''otherwise included as'' the second time it appears, and replaced it with ''a school of an'' in § 300.33. We have also changed ''LEAs'' to ''LEA'' and ''ESAs'' to ''ESA'' the third time these abbreviations appear in § 300.33.

Related Services (§ 300.34)

Related Services, General (§ 300.34(a))

*Comment:* One commenter requested defining *related services* as enabling a child with a disability to receive FAPE in the LRE.

*Discussion:* The definition of *related services* is consistent with section 601(26) of the Act, which does not refer to LRE. The Department believes that revising the regulations as requested would inappropriately expand the definition in the Act. Furthermore, the regulations in § 300.114(a)(2)(ii) already prevent placement of a child outside the regular education environment unless the child cannot be satisfactorily educated in the regular education environment with the use of supplementary aids and services. Therefore, we see no need to make the change suggested by the commenter.

*Changes:* None.

*Comment:* We received numerous requests to revise § 300.34 to add specific services in the definition of *related services.* A few commenters recommended including marriage and family therapy. One commenter recommended adding nutrition therapy and another commenter recommended adding recreation therapy. A significant

number of commenters recommended adding art, music, and dance therapy. One commenter recommended adding services to ensure that medical devices, such as those used for breathing, nutrition, and other bodily functions, are working properly. One commenter requested adding programming and training for parents and staff as a related service.

A few commenters requested clarification on whether auditory training and aural habilitation are related services. One commenter asked whether hippotherapy should be included as a related service. Other commenters recommended adding language in the regulations stating that the list of related services is not exhaustive. A few commenters asked whether a service is prohibited if it is not listed in the definition of *related services.*

*Discussion:* Section 300.34(a) and section 602(26) of the Act state that *related services* include other supportive services that are required to assist a child with a disability to benefit from special education. We believe this clearly conveys that the list of services in § 300.34 is not exhaustive and may include other developmental, corrective, or supportive services if they are required to assist a child with a disability to benefit from special education. It would be impractical to list every service that could be a related service, and therefore, no additional language will be added to the regulations.

Consistent with §§ 300.320 through 300.328, each child's IEP Team, which includes the child's parent along with school officials, determines the instruction and services that are needed for an individual child to receive FAPE. In all cases concerning related services, the IEP Team's determination about appropriate services must be reflected in the child's IEP, and those listed services must be provided in accordance with the IEP at public expense and at no cost to the parents. Nothing in the Act or in the definition of *related services* requires the provision of a related service to a child unless the child's IEP Team has determined that the related service is required in order for the child to benefit from special education and has included that service in the child's IEP.

*Changes:* None.

*Comment:* One commenter recommended adding behavior interventions to the list of related services, stating that while positive behavioral interventions and supports are often provided by one of the professionals listed in § 300.34(c), other

types of specialists also often provide them.

*Discussion:* The list of related services in § 300.34 is consistent with section 602(26) of the Act and, as noted above, we do not believe it is necessary to add additional related services to this list. We agree with the commenter that there may be many professionals in a school district who are involved in the development of positive behavioral interventions. Including the development of positive behavioral interventions in the description of activities under *psychological services* (§ 300.34(b)(10)) and *social work services in schools* (§ 300.34(b)(14)) is not intended to imply that school psychologists and social workers are automatically qualified to perform these services or to prohibit other qualified personnel from providing these services, consistent with State requirements.

*Changes:* None.

Exception; Services That Apply to Children With Cochlear Implants (§ 300.34(b))

*Comment:* Many commenters opposed the exclusion of surgically implanted devices from the definition of *related services.* Many commenters stated that the Act does not exclude the maintenance or programming of surgically implanted devices from the definition of related services, and that the regulations should specifically state that *related services* includes the provision of mapping services for a child with a cochlear implant. A few commenters stated that the issue of mapping cochlear implants needs to be clarified so that schools and parents understand who is responsible for providing this service. One commenter requested that the regulations clearly specify that optimization of a cochlear implant is a medical service and define mapping as an audiological service.

*Discussion:* The term ''mapping'' refers to the optimization of a cochlear implant and is not included in the definition of *related services.* Specifically, ''mapping'' and ''optimization'' refer to adjusting the electrical stimulation levels provided by the cochlear implant that is necessary for long-term post-surgical follow-up of a cochlear implant. Although the cochlear implant must be properly mapped in order for the child to hear well in school, the mapping does not have to be done in school or during the school day in order for it to be effective. The exclusion of mapping from the definition of *related services* reflects the language in Senate Report (S. Rpt.) No. 108–185, p. 8, which states that the Senate committee did not intend that

mapping a cochlear implant, or even the costs associated with mapping, such as transportation costs and insurance co-payments, be the responsibility of a school district. These services and costs are incidental to a particular course of treatment chosen by the child's parents to maximize the child's functioning, and are not necessary to ensure that the child is provided access to education, regardless of the child's disability, including meeting health and safety while in school. We will add language in § 300.34(b) to clarify that mapping a cochlear implant is an example of device optimization and is not a related service under the Act.

*Changes:* We have added "(e.g., mapping)" following "functioning" in § 300.34(b) to clarify that mapping a surgically implanted device is not a related service under the Act.

*Comment:* A significant number of commenters stated that children with cochlear implants need instruction in listening and language skills to process spoken language, just as children with hearing loss who use hearing aids, and requested that the regulations clarify that excluding the optimization of device functioning from the definition of *related services* does not impact a child's access to related services such as speech and language therapy, assistive listening devices, appropriate classroom acoustics, auditory training, educational interpreters, cued speech transliterators, and specialized instruction.

One commenter requested that the regulations explicitly state whether a public agency is required to provide more speech and language services or audiology services to a child with a cochlear implant. Another commenter requested that the regulations clarify that optimization only refers to access to assistive technology, such as assistive listening devices (e.g., personal frequency modulation (FM) systems) and monitoring and troubleshooting of the device function that is required under proper functioning of hearing aids.

*Discussion:* Optimization generally refers to the mapping necessary to make the cochlear implant work properly and involves adjusting the electrical stimulation levels provided by the cochlear implant. The exclusion of mapping as a related service is not intended to deny a child with a disability assistive technology (e.g., FM system); proper classroom acoustical modifications; educational support services (e.g., educational interpreters); or routine checking to determine if the external component of a surgically implanted device is turned on and working. Neither does the exclusion of

mapping as a related service preclude a child with a cochlear implant from receiving the related services (e.g., speech and language services) that are necessary for the child to benefit from special education services. As the commenters point out, a child with a cochlear implant may still require related services, such as speech and language therapy, to process spoken language just as other children with hearing loss who use hearing aids may need those services and are entitled to them under the Act if they are required for the child to benefit from special education. Each child's IEP Team, which includes the child's parent along with school officials, determines the related services, and the amount of services, that are required for the child to benefit from special education. It is important that the regulations clearly state that a child with a cochlear implant or other surgically implanted medical device is entitled to related services that are determined by the child's IEP Team to be necessary for the child to benefit from special education. Therefore, we will add language in § 300.34(b) to clarify that a child with a cochlear implant or other surgically implanted medical device is entitled to those related services that are required for the child to benefit from special education, as determined by the child's IEP Team.

*Changes:* We have reformatted § 300.34(b) and added a new paragraph (2) to clarify that a child with a cochlear implant or other surgically implanted device is entitled to the related services that are determined by the child's IEP Team to be required for the child to benefit from special education. We have also added the phrase "services that apply to children with surgically implanted devices, including cochlear implants' to the heading in § 300.34(b).

*Comment:* One commenter expressed concern that excluding the optimization of device functioning and maintenance of the device as related services will establish different standards for serving children with cochlear implants versus children who use hearing aids and other external amplification devices, and recommended clarifying that routine monitoring of cochlear implants and other surgically implanted devices to ensure that they are functioning in a safe and effective manner is permitted under the Act.

A few commenters stated that some schools are interpreting the exclusion of device optimization, functioning, and maintenance to mean that they do not have to help the child change a battery in the externally worn speech processor connected with the surgically implanted

device, make certain that it is turned on, or help the child to learn to listen with the cochlear implant. One commenter stated that children with cochlear implants should have the same services as children who use a hearing aid when the battery needs changing or equipment breaks down.

One commenter stated that § 300.34(b) is confusing and should explicitly state that the exception of the optimization of device functioning, maintenance of the device, or replacement of the device is limited to surgically implanted devices. The commenter stated that the language could erroneously lead to an interpretation that this exception is applicable to all medical devices. One commenter expressed concern that this misinterpretation could put insulin pumps and other medical devices that are required for the health of the child in the same category as cochlear implants.

A few commenters stated that it is important to clarify that excluding the optimization of device functioning and the maintenance of the device should not be construed to exclude medical devices and services that children need to assist with breathing, nutrition, and other bodily functions while the child is involved with education and other school-related activities.

One commenter stated that a school nurse, aide, teacher's aide, or any other person who is qualified and trained should be allowed to monitor and maintain, as necessary, a surgically implanted device.

*Discussion:* A cochlear implant is an electronic device surgically implanted to stimulate nerve endings in the inner ear (cochlea) in order to receive and process sound and speech. The device has two parts, one that is surgically implanted and attached to the skull and, the second, an externally worn speech processor that attaches to a port in the implant. The internal device is intended to be permanent.

Optimization or "mapping" adjusts or fine tunes the electrical stimulation levels provided by the cochlear implant and is changed as a child learns to discriminate signals to a finer degree. Optimization services are generally provided at a specialized clinic. As we discussed previously regarding § 300.34, optimization services are not a covered service under the Act. However, a public agency still has a role in providing services and supports to help children with cochlear implants.

Particularly with younger children or children who have recently obtained implants, teachers and related services personnel frequently are the first to notice changes in the child's perception

of sounds that the child may be missing. This may manifest as a lack of attention or understanding on the part of the child or frustration in communicating. The changes may indicate a need for remapping, and we would expect that school personnel would communicate with the child's parents about these issues. To the extent that adjustments to the devices are required, a specially trained professional would provide the remapping, which is not considered the responsibility of the public agency.

In many ways, there is no substantive difference between serving a child with a cochlear implant in a school setting and serving a child with a hearing aid. The externally worn speech processor connected with the surgically implanted device is similar to a hearing aid in that it must be turned on and properly functioning in order for the child to benefit from his or her education. Parents of children with cochlear implants and parents of children with hearing aids both frequently bring to school extra batteries, cords, and other parts for the hearing aids and externally worn speech processors connected with the surgically-implanted devices, especially for younger children. The child also may need to be positioned so that he or she can directly see the teacher at all times, or may need an FM amplification system such as an audio loop.

For services that are not necessary to provide access to education by maintaining the health or safety of the child while in school, the distinguishing factor between those services that are not covered under the Act, such as mapping, and those that are covered, such as verifying that a cochlear implant is functioning properly, in large measure, is the level of expertise required. The maintenance and monitoring of surgically implanted devices require the expertise of a licensed physician or an individual with specialized technical expertise beyond that typically available from school personnel. On the other hand, trained lay persons or nurses can routinely check an externally worn processor connected with a surgically implanted device to determine if the batteries are charged and the external processor is operating. (As discussed below, the Act does require public agencies to provide those services that are otherwise related services and are necessary to maintain a child's health or safety in school even if those services require specialized training.) Teachers and related services providers can be taught to first check the externally worn speech processor to make sure it is turned on, the volume and sensitivity settings are correct, and the cable is connected, in much the same manner as they are taught to make sure a hearing aid is properly functioning. To allow a child to sit in a classroom when the child's hearing aid or cochlear implant is not functioning is to effectively exclude the child from receiving an appropriate education. Therefore, we believe it is important to clarify that a public agency is responsible for the routine checking of the external components of a surgically implanted device in much the same manner as a public agency is responsible for the proper functioning of hearing aids.

The public agency also is responsible for providing services necessary to maintain the health and safety of a child while the child is in school, with breathing, nutrition, and other bodily functions (e.g., nursing services, suctioning a tracheotomy, urinary catheterization) if these services can be provided by someone who has been trained to provide the service and are not the type of services that can only be provided by a licensed physician. (*Cedar Rapids Community School District* v. *Garret F.*, 526 U.S. 66 (1999)).

*Changes:* We have added new § 300.113 to cover the routine checking of hearing aids and external components of surgically implanted devices. The requirement for the routine checking of hearing aids has been removed from proposed § 300.105 and included in new § 300.113(a). The requirement for routine checking of an external component of a surgically implanted medical device has been added as new § 300.113(b). The requirements for assistive technology devices and services remain in § 300.105 and the heading has been changed to reflect this change. We have also included a reference to new § 300.113(b) in new § 300.34(b)(2).

*Comment:* A few commenters stated that specialized cochlear implant audiologists who are at implant centers or closely associated with them should program cochlear implants. One commenter stated that, typically, school audiologists and school personnel do not have the specialized experience to program cochlear implants.

*Discussion:* The personnel with the specific expertise or licensure required for the optimization (e.g., mapping) of surgically implanted devices are decisions to be made within each State based on applicable State statutes and licensing requirements. Since mapping is not covered under the Act, personnel standards for individuals who provide mapping services are beyond the scope of these regulations.

*Changes:* None.

## Audiology (§ 300.34(c)(1))

*Comment:* One commenter stated that the definition of *audiology* does not reflect current audiology practice in schools and recommended new language to include services for children with auditory-related disorders, provision of comprehensive audiologic habilitation and rehabilitation services; consultation and training of teachers and other school staff; and involvement in classroom acoustics.

*Discussion:* The definition of *audiology* is sufficiently broad to enable audiologists to be involved in the activities described by the commenter. We do not believe it is necessary to change the definition to add the specific functions recommended by the commenter.

*Changes:* None.

*Comment:* A few commenters requested adding mapping services to the definition of *audiology*.

*Discussion:* For the reasons discussed previously in this section, § 300.34(b) specifically excludes the optimization of a surgically implanted device from the definition of *related services*. This includes mapping of a cochlear implant.

*Changes:* None.

*Comment:* One commenter stated that the definition of *audiology* appears to be limited to children who are deaf or hard of hearing, and recommended adding language to allow children without expressive speech to receive such services.

*Discussion:* The term *audiology,* as defined in § 300.34(c)(1), focuses on identifying and serving children who are deaf or hard of hearing. It is not necessary to add language in the regulations regarding children without expressive speech because the determining factor of whether audiology services are appropriate for a child is whether the child may be deaf or hard of hearing, not whether a child has expressive speech.

*Changes:* None.

## Early Identification and Assessment of Disabilities (§ 300.34(c)(3))

*Comment:* Some commenters noted that "early identification and assessment of disabilities" was removed from the list of related services in § 300.34(a).

*Discussion:* "Early identification and assessment of disabilities" was inadvertently omitted from the list of related services in § 300.34(a).

*Changes:* "Early identification and assessment" will be added to the list of related services in § 300.34(a).

ED-000033

## Interpreting Services (§ 300.34(c)(4))

*Comment:* One commenter recommended that the definition of *interpreting services* requires that such services be provided by a qualified interpreter who is able to effectively, accurately, and impartially use any specialized vocabulary, both receptively and expressively. A few commenters strongly recommended requiring interpreting services to be provided by qualified interpreters to ensure equivalent communication access and effective communication with, and for, children who are deaf or hard of hearing. The commenter stated that personnel standards for interpreters vary greatly across SEAs and LEAs, and requiring qualified interpreters would be consistent with the definition of other related services included in these regulations such as *physical therapy* and *occupational therapy.*

One commenter recommended defining the function of an interpreter as a person who facilitates communication between children who are deaf or hard of hearing, staff, and children, regardless of the job title.

*Discussion:* Section 300.156, consistent with section 612(a)(14) of the Act, clarifies that it is the responsibility of each State to establish personnel qualifications to ensure that personnel necessary to carry out the purposes of the Act are appropriately and adequately prepared and trained and have the content knowledge and skills to serve children with disabilities. It is not necessary to add more specific functions of individuals providing interpreting services, as recommended by the commenters. States are appropriately given the flexibility to determine the qualifications and responsibilities of personnel, based on the needs of children with disabilities in the State.

*Changes:* None.

*Comment:* A few commenters recommended including American sign language and sign language systems in the definition of *interpreting services.*

*Discussion:* The definition of *interpreting services* is sufficiently broad to include American sign language and sign language systems, and therefore, will not be changed. We believe it is important to include sign language transliteration (e.g., translation systems such as Signed Exact English and Contact Signing), in addition to sign language interpretation of another language (e.g., American sign language) in the definition of *interpreting services,* and will add this language to § 300.34(c)(4)(i).

*Changes:* We have added language to § 300.34(c)(4)(i) to include sign language transliteration.

*Comment:* A few commenters recommended changing the definition of *interpreting services* to clarify that the need for interpreting services must be based on a child's disability and not degree of English proficiency.

*Discussion:* The definition of *interpreting services* clearly states that interpreting services are used with children who are deaf or hard of hearing. The nature and type of interpreting services required for children who are deaf or hard of hearing and also limited in English proficiency are to be determined by reference to the Department's regulations and policies regarding students with limited English proficiency. For example, the Department's regulations in 34 CFR part 100, implementing Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d, require that recipients of Federal financial assistance ensure meaningful access to their programs and activities by students who are limited English proficient, including those who are deaf or hard of hearing. The requirement to provide services to students who are limited English proficient and others is also governed by various Department policy memoranda including the September 27, 1991 memorandum, "Department of Education Policy Update on Schools' Obligations Toward National Origin Minority Students With Limited English Proficiency"; the December 3, 1985 guidance document, "The Office for Civil Rights' Title VI Language Minority Compliance Procedures"; and the May 1970 memorandum to school districts, "Identification of discrimination and Denial of Services on the Basis of National Origin," 35 FR 11595. These documents are available at *http:// www.lep.gov.* We do not believe additional clarification is necessary.

*Changes:* None.

*Comment:* One commenter stated that the definition of *interpreting services* appears to be limited to children who are deaf or hard of hearing, and recommended adding language to allow children without expressive speech to receive such services.

*Discussion:* Interpreting services, as defined in § 300.34(c)(4), clearly states that interpreting services are used with children who are deaf and hard of hearing. Therefore, a child who is not deaf or hard of hearing, but who is without expressive speech, would not be considered eligible to receive interpreting services as defined in § 300.34(c)(4). However, such a child could be considered eligible for speech-language pathology services, consistent with § 300.34(c)(15).

*Changes:* None.

*Comment:* Some commenters recommended including communication access real-time transcription (CART) services in the definition of *interpreting services* because these services are being used with increasing frequency in postsecondary education and employment settings, and familiarity and experience with CART services may better prepare children who are deaf or hard of hearing to transition to higher education and employment environments. A few commenters stated that the definition of *interpreting services* appears to limit interpreting services to the methods listed in § 300.34(c)(4), which exclude tactile and close vision interpreting for children who are deaf-blind.

*Discussion:* Although the definition of *interpreting services* is written broadly to include other types of interpreting services, we believe that it is important to include in the definition services in which oral communications are transcribed into real-time text. Therefore, we are adding language to § 300.34(c)(4) to refer to transcription services and include several examples of transcription systems used to provide such services.

We also believe that it is important that the definition of *interpreting services* include services for children who are deaf-blind. However, because there are many types of interpreting services for children who are deaf-blind, in addition to tactile and close vision interpreting services, we will add a more general statement to include interpreting services for children who are deaf-blind, rather than listing all the different methods that might be used for children who are deaf-blind.

*Changes:* We have restructured § 300.34(c)(4) and added "and transcription services such as communication real-time translation (CART), C-Print, and TypeWell" to the definition of interpreting services in paragraph (c)(4)(i). We have also added a new paragraph (c)(4)(ii) to include interpreting services for children who are deaf-blind.

## Medical Services (§ 300.34(c)(5))

*Comment:* One commenter stated that the definition of *medical services* is not in the Act and recommended that the definition be broader than the decision in *Cedar Rapids Community School Dist.* v. *Garrett F.,* 526 U.S. 66 (1999), which the definition appears to follow.

*Discussion:* The list of related services in § 300.34(a) includes medical services

for diagnostic and evaluation purposes, consistent with section 602(26) of the Act. The Department continues to believe that language from the Act to define *medical services* is essential. Defining *medical services* more broadly, as recommended by the commenter, would not be consistent with the Act.

*Changes:* None.

Orientation and Mobility Services (§ 300.34(c)(7))

*Comment:* Several commenters supported including travel training in the definition of *orientation and mobility services* and recommended adding a reference to the definition of *travel training* in new § 300.39(b)(4) (proposed § 300.38(b)(4)). However, other commenters stated that travel training should appear as a distinct related service and should not be included in the definition of *orientation and mobility services* because children who are blind and visually impaired receive this type of instruction from certified orientation and mobility specialists. One commenter stated that the regulations should specify that travel training is for children with cognitive or other disabilities.

*Discussion:* We believe that including travel training in the definition of *orientation and mobility services* may be misinterpreted to mean that travel training is available only for children who are blind or visually impaired or that travel training is the same as orientation and mobility services. We will, therefore, remove travel training from § 300.34(c)(7). This change, however, does not diminish the services that are available to children who are blind or visually impaired.

*Travel training* is defined in new § 300.39(b)(4) (proposed § 300.38(b)(4)) for children with significant cognitive disabilities and any other children with disabilities who require this instruction, and, therefore, would be available for children who are blind or visually impaired, as determined by the child's IEP Team. Travel training is not the same as orientation and mobility services and is not intended to take the place of appropriate orientation and mobility services.

*Changes:* We have removed "travel training instruction" from § 300.34(c)(7)(ii) to avoid confusion with the definition of *travel training* in new § 300.39(b)(4) (proposed § 300.38(b)(4)), and to clarify that travel training is not the same as orientation and mobility services and cannot take the place of appropriate orientation and mobility services.

*Comment:* One commenter recommended that the regulations

specify who is qualified to provide travel training instruction and stated that it is critical that skills such as street crossing be taught correctly.

*Discussion:* Section 300.156, consistent with section 612(a)(14) of the Act, requires each State to establish personnel qualifications to ensure that personnel necessary to carry out the purposes of the Act are appropriately and adequately prepared and trained and have the content knowledge and skills to serve children with disabilities. It is, therefore, the State's responsibility to determine the qualifications that are necessary to provide travel training instruction.

*Changes:* None.

Parent Counseling and Training (§ 300.34(c)(8))

*Comment:* A few commenters stated that the definition of *parent counseling and training* in § 300.34(c)(8) is not included in the definition of *related services* in section 602(26)(A) of the Act and, therefore, should not be included in the regulations.

*Discussion:* Paragraphs (i) and (ii) of § 300.34(c)(8), regarding assisting parents in understanding the special needs of their child, and providing parents with information about child development, respectively, are protected by section 607(b) of the Act, and cannot be removed. Section 300.34(c)(8)(iii), regarding helping parents acquire the skills to allow them to support the implementation of their child's IEP or IFSP, was added in the 1999 regulations to recognize the more active role of parents as participants in the education of their children. Although not included in the Act, we believe it is important to retain this provision in these regulations so that there is no question that parent counseling and training includes helping parents acquire skills that will help them support the implementation of their child's IEP or IFSP.

*Changes:* None.

*Comment:* One commenter recommended that the regulations describe the responsibility of LEAs to provide parent counseling and training.

*Discussion:* As with other related services, an LEA only is responsible for providing parent counseling and training if a child's IEP Team determines that it is necessary for the child to receive FAPE. To include this language in the definition of *parent counseling and training,* moreover, would be unnecessarily duplicative of § 300.17(d), which states that FAPE means special education and related services that are provided in conformity with an IEP that meets the requirements in §§ 300.320 through 300.324.

*Changes:* None.

Physical Therapy (§ 300.34(c)(9))

*Comment:* One commenter recommended that the definition of *physical therapy* include related therapeutic services for children with degenerative diseases.

*Discussion:* We do not believe the suggested change is necessary because the definition of *physical therapy* is broadly defined and could include therapeutic services for children with degenerative diseases. It is the responsibility of the child's IEP Team to determine the special education and related services that are necessary for a child to receive FAPE. There is nothing in the Act that prohibits the provision of therapeutic services for children with degenerative diseases, if the IEP Team determines they are needed for an individual child and, thereby, includes the services in the child's IEP.

*Changes:* None.

*Comment:* One commenter stated that the definition of *physical therapy* in § 300.34(c)(9) is circular and requested that a functional definition be provided.

*Discussion:* The definition of *physical therapy* has been in the regulations since 1977 and is commonly accepted by SEAs, LEAs, and other public agencies. We do not believe it is necessary to change the definition.

*Changes:* None.

Psychological Services (§ 300.34(c)(10))

*Comment:* One commenter recommended that the definition of *psychological services* include strategies to facilitate social-emotional learning.

*Discussion:* We do not believe the definition should be revised to add a specific reference to the strategies recommended by the commenter. The definition of *psychological services* is sufficiently broad to enable psychologists to be involved in strategies to facilitate social-emotional learning.

*Changes:* None.

*Comment:* One commenter stated that unless the definition of *psychological services* includes research-based counseling, schools will argue that they are required to provide counseling services delivered by social workers because counseling is included in the definition of *social work services in schools.*

*Discussion:* We do not believe including research-based counseling in the definition of *psychological services* is necessary. Including counseling in the definition of *social work services in schools* in § 300.34(c)(14) is intended to indicate the types of personnel who assist in this activity and is not intended

**46574**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

either to imply that school social workers are automatically qualified to perform counseling or to prohibit other qualified personnel from providing counseling, consistent with State requirements.

*Changes:* None.

*Comment:* One commenter stated that other related services personnel, in addition to school psychologists, should be permitted to develop and deliver positive behavioral intervention strategies.

*Discussion:* There are many professionals who might also play a role in developing and delivering positive behavioral intervention strategies. The standards for personnel who assist in developing and delivering positive behavioral intervention strategies will vary depending on the requirements of the State. Including the development and delivery of positive behavioral intervention strategies in the definition of *psychological services* is not intended to imply that school psychologists are automatically qualified to perform these duties or to prohibit other qualified personnel from providing these services, consistent with State requirements.

*Changes:* None.

Recreation (§ 300.34(c)(11))

*Comment:* A few commenters requested modifying the definition of *recreation* to include therapeutic recreation services provided by a qualified recreational therapist, which include services that restore, remediate, or rehabilitate to improve functioning and independence, and reduce or eliminate the effects of illness or disability.

*Discussion:* We do not believe it is necessary to change the definition of *recreation* as recommended by the commenters because the definition is sufficiently broad to include the services mentioned by the commenters.

*Changes:* None.

School Health Services and School Nurse Services (Proposed School Nurse Services) (§ 300.34(c)(13))

*Comment:* Some commenters noted that while "school health services" is included in the list of related services in § 300.34(a), it is not defined, which will result in confusion about the relationship between "school health services" and "school nurse services."

Some commenters stated that adding the definition of *school nurse services* and eliminating the definition of *school health services* must not narrow the range of related services available to children. One commenter recommended that the definition of *school nurse services* allow school nurse services to

be provided by other qualified persons, as well as a qualified school nurse, because the majority of schools do not have a school nurse on staff. One commenter requested that the regulations clarify that schools can continue to use registered nurses or other personnel to provide school nurse services, consistent with State law. Another commenter stated that there is well-established case law upholding the obligation of an SEA and LEA to provide health-related services necessary for a child to benefit from special education.

*Discussion:* School health services was retained in the definition of *related services* in § 300.34(a). However, the definition of *school health services* was inadvertently removed in the NPRM. To correct this error, we will add school health services to the definition of *school nurse services* and clarify that *school health services and school nurse services* means health services that are designed to enable a child with a disability to receive FAPE. We will also add language to clarify that school nurse services are provided by a qualified school nurse and that school health services are provided by either a qualified school nurse or other qualified person. We recognize that most schools do not have a qualified school nurse on a full-time basis (i.e., a nurse that meets the State standards for a qualified school nurse), and that many schools rely on other qualified school personnel to provide school health services under the direction of a school nurse. Therefore, we believe it is important to retain the definition of *school health services and school nurse services* in these regulations.

With the changes made in § 300.34(c), it is not necessary for the reference to "school nurse services" in § 300.34(a) to include the phrase, "designed to enable a child with a disability to receive a free appropriate public education as described in the IEP of the child." We will, therefore, remove this phrase in § 300.34(a).

*Changes:* Section 300.34(c)(13) has been revised to include a definition of *school health services and school nurse services*. Additional language has been added to clarify who provides school health services and school nurse services. We have also modified § 300.34(a) by deleting the redundant phrase, "designed to enable a child with a disability to receive a free appropriate public education as described in the IEP of the child."

*Comment:* One commenter stated that adding *school nurse services* to the definition of *related services* makes it more burdensome for the delivery of

services to children who are medically-fragile.

*Discussion:* It is unclear how adding *school nurse services* to the definition of *related services* affects services to children who are medically fragile. As defined in § 300.34(c)(13), *school health services and school nurse services* are designed to enable a child with a disability to receive FAPE as described in the child's IEP. A child who is medically fragile and needs school health services or school nurse services in order to receive FAPE must be provided such services, as indicated in the child's IEP.

*Changes:* None.

*Comment:* One commenter stated that the definition of *school nurse services* should include services that enable a child with a disability to receive FAPE in the LRE. Another commenter stated that school nurses can be extremely supportive of children with disabilities receiving FAPE in the LRE and recommended changing the regulations to ensure that parents understand that the definition of *related services* includes school nurse services.

*Discussion:* The LRE requirements in §§ 300.114 through 300.120 provide, that to the maximum extent appropriate, children with disabilities are to be educated with children who are not disabled. It is not necessary to repeat this requirement in the definition of *school health services and school nurse services*.

We agree that school health services and school nurse services are important related services. Section 300.34(a) and section 602(26)(A) of the Act are clear that the definition of *related services* includes school health services and school nurse services. The IEP Team, of which the parent is an integral member, is responsible for determining the services that are necessary for the child to receive FAPE. We, therefore, do not believe that it is necessary to add a regulation requiring public agencies to ensure that parents understand that related services include school health services and school nurse services.

*Changes:* None.

*Comment:* One commenter stated that including the phrase, "designed to enable a child with a disability to receive a free appropriate public education" in § 300.34(c)(13) in relation to school nurse services, is unnecessary and confusing.

*Discussion:* As stated in § 300.34(a), the purpose of related services is to assist a child with a disability to benefit from special education. We believe it is necessary to specify that school health services and school nurse services are related services only to the extent that

the services allow a child to benefit from special education and enable a child with a disability to receive FAPE.

*Changes:* None.

Social Work Services in Schools (§ 300.34(c)(14))

*Comment:* One commenter recommended including strategies to facilitate social-emotional learning in the definition of *social work services in schools.* A few commenters stated that the role of the school social worker is evolving and recommended that the definition include the role of social workers as integral members of pre-referral teams that deliver interventions to decrease the number of referrals to special education. One commenter recommended that the definition include a reference to the social worker's role in addressing the relevant history and current functioning of an individual within his or her environmental context, rather than referring to social-developmental histories. Another commenter stated that social workers are trained to find resources in the home, school, and community and recommended including such language in the definition.

*Discussion:* The definition of *social work services in schools* is sufficiently broad to include the services described by the commenters and we do not believe the definition should be revised to add these more specific functions.

*Changes:* None.

*Comment:* One commenter stated that the definition of *social work services in schools* removes language from the 1983 regulations that states that social work services allow children with disabilities to maximize benefit from the learning program. The commenter stated that this is a higher standard than what is required in § 300.34(c)(14), which only requires that services enable a child to learn as effectively as possible, and, therefore, the 1983 definition should be retained, consistent with section 607(b) of the Act.

*Discussion:* We disagree with the commenter. The definition of *social work services in schools* in the 1977 regulations included "mobilizing school and community resources to enable the child to receive maximum benefit from his or her educational program." As explained in the preamble to the final 1992 regulations, the phrase "to receive maximum benefit" was intended only to provide that the purpose of activities carried out by personnel qualified to provide social work services in schools is to mobilize resources so that a child can learn as effectively as possible in his or her educational program. The

language in the preamble to the final 1992 regulations also clarified that this provision did not set a legal standard for that program or entitle the child to a particular educational benefit. The preamble further explained that, during the public comment period for the 1992 regulations, commenters raised concerns that the term "maximum benefit" appeared to be inconsistent with the decision by the United States Supreme Court in *Board of Education* v. *Rowley,* 458 U.S. 176 (1982). Therefore, the phrase was revised to read "to learn as effectively as possible in his or her educational program." This is the same phrase used in the 1999 regulations and in these regulations in § 300.34(c)(14)(iv). Because the language in the 1977 final regulations did not entitle a child to any particular benefit, the change made in 1992 did not lessen protections for a child, and, therefore, is not subject to section 607(b) of the Act.

*Changes:* None.

*Comment:* One commenter recommended adding a reference to "functional behavioral assessments" in § 300.34(c)(14)(v) because functional behavioral assessments should always precede the development of behavioral intervention strategies. Another commenter expressed concern that § 300.34(c)(14)(iv), regarding social work services to mobilize school and community resources to enable the child to learn as effectively as possible, creates a potential for litigation. The commenter asked whether a school district could face a due process hearing for failure to mobilize community resources if there are no community resources to address the needs of the child or family.

*Discussion:* The definition of *social work services in schools* includes examples of the types of social work services that may be provided. It is not a prescriptive or exhaustive list. The child's IEP Team is responsible for determining whether a child needs social work services, and what specific social work services are needed in order for the child to receive FAPE. Therefore, while conducting a functional behavioral assessment typically precedes developing positive behavioral intervention strategies, we do not believe it is necessary to include functional behavioral assessments in the definition of *social work services in schools* because providing positive behavioral intervention strategies is just an example of a social work service that might be provided to a child if the child's IEP Team determines that such services are needed for the child to receive FAPE. Similarly, if a child's IEP Team determines that mobilizing

community resources would not be an effective means of enabling the child to learn as effectively as possible because there are no community resources to address the needs of the child, the IEP Team would need to consider other ways to meet the child's needs. While there is the possibility that a due process hearing might be filed based on a failure to mobilize community resources that do not exist, we do not believe that such a claim could ever be successful, as the regulation does not require the creation of community resources that do not exist.

*Changes:* None.

Speech-language Pathology Services (§ 300.34(c)(15))

*Comment:* One commenter stated that children who need speech therapy should have it for a full classroom period, five days a week, and not be removed from other classes to receive this related service.

*Discussion:* It would be inconsistent with the Act to dictate the amount and location of services for all children receiving speech-language pathology services, as recommended by the commenter. As with all related services, section 614(d)(1)(A)(i)(IV) of the Act provides that the child's IEP Team is responsible for determining the services that are needed for the child to receive FAPE. This includes determining the type of related service, as well as the amount and location of services.

*Changes:* None.

*Comment:* One commenter stated that the definition of *speech-language pathology services* appears to be limited to children who are deaf or hard of hearing, and recommended adding language to the regulations to allow children without expressive speech to receive such services.

*Discussion:* There is nothing in the Act or the regulations that would limit speech-language pathology services to children who are deaf or hard of hearing or to children without expressive speech. The definition of *speech-language pathology services* specifically includes services for children who have language impairments, as well as speech impairments.

*Changes:* None.

*Comment:* One commenter requested the definition of *speech-language pathology services* specify the qualifications and standards for speech-language professionals. Another commenter requested that the definition require a highly qualified provider to deliver speech-language services. One commenter requested that the definition require a speech-language pathologist to provide speech-language services.

**46576**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

*Discussion:* Consistent with § 300.156 and section 612(a)(14) of the Act, it is up to each State to establish personnel qualifications to ensure that personnel necessary to carry out the purposes of the Act are appropriately and adequately prepared and trained and have the content knowledge and skills to serve children with disabilities. Section 300.156(b), consistent with section 614(a)(14)(B) of the Act, specifically requires that include personnel qualifications for related services personnel. Establishing qualifications for individuals providing speech-language services in these regulations would be inconsistent with these statutory and regulatory requrements.

*Changes:* None.

*Comment:* One commenter stated that the roles and responsibilities for speech-language pathologists in schools have been expanded to help all children gain language and literacy skills and recommended that the definition of *speech-language pathology services* be revised to include consultation and collaboration with other staff members to plan and implement special intervention monitoring programs and modify classroom instruction to assist children in achieving academic success. The commenter also recommended including services for other health impairments, such as dysphagia, in the definition of *speech-language pathology services.*

*Discussion:* The Act provides for speech-language pathology services for children with disabilities. It does not include speech-language pathology services to enable all children to gain language and literacy skills, as suggested by the commenter. It would, therefore, be inconsistent with the Act to change the definition of *speech-language pathology services* in the manner recommended by the commenter. We believe that the definition is sufficiently broad to include services for other health impairments, such as dysphagia, and therefore, decline to revise the definition to include this specific service.

*Changes:* None.

Transportation (§ 300.34(c)(16))

*Comment:* A few commenters stated that the definition of *transportation* should require transportation to be provided between school and other locations in which IEP services are provided. Other commenters requested that the definition explicitly define transportation as door-to-door services, including provisions for an aide to

escort the child to and from the bus each day.

*Discussion:* A child's IEP Team is responsible for determining whether transportation between school and other locations is necessary in order for the child to receive FAPE. Likewise, if a child's IEP Team determines that supports or modifications are needed in order for the child to be transported so that the child can receive FAPE, the child must receive the necessary transportation and supports at no cost to the parents. We believe the definition of *transportation* is sufficiently broad to address the commenters' concerns. Therefore, we decline to make the requested changes to the definition.

*Changes:* None.

*Comment:* Some commenters recommended removing the term ''special transportation'' from the definition of *transportation* because the term gives the impression that adapted buses are used for a separate and different transportation system, when, in fact, adapted buses are part of the regular transportation fleet and system. These commenters stated that adapted buses should only be used as a separate, special transportation service if the child's IEP indicates that the transportation needs of the child can be met only with transportation services that are separate from the transportation services for all children.

*Discussion:* We do not believe it is necessary to make the change requested by the commenters. It is assumed that most children with disabilities will receive the same transportation provided to nondisabled children, consistent with the LRE requirements in §§ 300.114 through 300.120, unless the IEP Team determines otherwise. While we understand the commenter's concern, adapted buses may or may not be part of the regular transportation system in a particular school system. In any case, if the IEP Team determines that a child with a disability requires transportation as a related service in order to receive FAPE, or requires supports to participate in integrated transportation with nondisabled children, the child must receive the necessary transportation or supports at no cost to the parents.

*Changes:* None.

Scientifically Based Research (new § 300.35)

*Comment:* A number of commenters requested that the regulations include a definition of *scientifically based research.*

*Discussion:* The definition of *scientifically based research* is important to the implementation of Part

B of the Act and, therefore, we will include a reference to the definition of that term in section 9101(37) of the ESEA.

For the reasons set forth earlier in this notice, we are not including definitions from other statutes in these regulations. However, we will include the current definition of *scientifically based research* in section 9101(37) of the ESEA here for reference.

Scientifically based research—

(a) Means research that involves the application of rigorous, systematic, and objective procedures to obtain reliable and valid knowledge relevant to education activities and programs; and

(b) Includes research that—

(1) Employs systematic, empirical methods that draw on observation or experiment;

(2) Involves rigorous data analyses that are adequate to test the stated hypotheses and justify the general conclusions drawn;

(3) Relies on measurements or observational methods that provide reliable and valid data across evaluators and observers, across multiple measurements and observations, and across studies by the same or different investigators;

(4) Is evaluated using experimental or quasi-experimental designs in which individuals, entities, programs, or activities are assigned to different conditions and with appropriate controls to evaluate the effects of the condition of interest, with a preference for random-assignment experiments, or other designs to the extent that those designs contain within-condition or across-condition controls;

(5) Ensures that experimental studies are presented in sufficient detail and clarity to allow for replication or, at a minimum, offer the opportunity to build systematically on their findings; and

(6) Has been accepted by a peer-reviewed journal or approved by a panel of independent experts through a comparably rigorous, objective, and scientific review.

*Changes:* A cross-reference to the definition of *scientifically based research* in section 9101(37) of the ESEA has been added as new § 300.35. Subsequent definitions have been renumbered accordingly.

Secondary School (New § 300.36) (Proposed § 300.35)

*Comment:* One commenter requested clarification regarding the definition of *secondary school* and whether ''grade 12'' refers to the regular grade 12 curriculum aligned to State academic achievement standards under the ESEA or a limit on the number of years

children with a disabilities can spend in school.

*Discussion:* The term "grade 12" in the definition of *secondary school* has the meaning given it under State law. It is not intended to impose a Federal limit on the number of years a child with a disability is allowed to complete his or her secondary education, as some children with disabilities may need more than 12 school years to complete their education.

*Changes:* None.

Services Plan (New § 300.37) (Proposed § 300.36)

*Comment:* One commenter stated that the term services plan is not in the Act and, therefore, should be removed. However, the commenter stated that if the definition of *services plan* remained in the regulations, it should reflect the fact that parentally-placed private school children are not entitled to FAPE.

*Discussion:* The definition of *services plan* was included to describe the content, development, and implementation of plans for parentally-placed private school children with disabilities who have been designated to receive equitable services. The definition cross-references the specific requirements for the provision of services to parentally-placed private school children with disabilities in § 300.132 and §§ 300.137 through 300.139, which provide that parentally-placed private school children have no individual right to special education and related services and thus are not entitled to FAPE. We do not believe further clarification is necessary.

*Changes:* None.

Special Education (New § 300.39) (Proposed § 300.38)

*Comment:* One commenter requested modifying the definition of *special education* to distinguish special education from other forms of education, such as remedial programming, flexible grouping, and alternative education programming. The commenter stated that flexible grouping, diagnostic and prescriptive teaching, and remedial programming have expanded in the general curriculum in regular classrooms and the expansion of such instruction will only be encouraged with the implementation of early intervening services under the Act.

*Discussion:* We believe the definition of *special education* is clear and consistent with the definition in section 602(29) of the Act. We do not believe it is necessary to change the definition to distinguish special education from the

other forms of education mentioned by the commenter.

*Changes:* None.

Individual Special Education Terms Defined (New § 300.39(b)) (Proposed § 300.38(b))

*Comment:* A few commenters provided definitions of "accommodations" and "modifications" and recommended including them in new § 300.39(b) (proposed § 300.38(b)).

*Discussion:* The terms "accommodations" and "modifications" are terms of art referring to adaptations of the educational environment, the presentation of educational material, the method of response, or the educational content. They are not, however, examples of different types of "education" and therefore we do not believe it is appropriate to define these terms of art or to include them in new § 300.39(b) (proposed § 300.38(b)).

*Changes:* None.

Physical Education (New § 300.39(b)(2)) (Proposed § 300.38(b)(2))

*Comment:* One commenter requested that adaptive physical education be subject to the LRE requirements of the Act.

*Discussion:* The requirements in §§ 300.114 through 300.120 require that, to the maximum extent appropriate, children with disabilities are educated with children who are nondisabled. This requirement applies to all special education services, including adaptive physical education. We see no need to repeat this requirement specifically for the provision of adaptive physical education.

*Changes:* None.

Specially Designed Instruction (New § 300.39(b)(3)) (Proposed § 300.38(b)(3))

*Comment:* One commenter stated that the regulations should strengthen the requirements ensuring children access to the general curriculum, because many children with disabilities still do not have the tools they need or the teachers with expertise to access the general curriculum.

*Discussion:* We believe the regulations place great emphasis on ensuring that children with disabilities have access to the general education curriculum. New § 300.39(b)(3) (proposed § 300.38(b)(3)) defines *specially designed instruction* as adapting the content, methodology, or delivery of instruction to address the unique needs of the child and to ensure access to the general curriculum so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children. In addition, ensuring that children with

disabilities have access to the general curriculum is a major focus of the requirements for developing a child's IEP. For example, § 300.320(a)(1) requires a child's IEP to include a statement of how the child's disability affects the child's involvement and progress in the general education curriculum; § 300.320(a)(2)(i) requires annual IEP goals to be designed to enable the child to be involved in and make progress in the general education curriculum; and § 300.320(a)(4) requires the IEP to include a statement of the special education and related services the child will receive, as well as the program modifications or supports for school personnel that will be provided, to enable the child to be involved in and make progress in the general education curriculum. We do not believe additional language is necessary.

*Changes:* None.

Travel Training (New § 300.39(b)(4)) (Proposed § 300.38(b)(4))

*Comment:* A few commenters recommended strengthening the definition of *travel training* in new § 300.39(b)(4) (proposed § 300.38(b)(4)) and adding travel training to new § 300.43 (proposed § 300.42) (*transition services*) to acknowledge that transportation is vitally important for children with disabilities to have full participation in the community. The commenters recommended that the definition of *travel training* include providing instruction to children with disabilities, other than blindness, to enable them to learn the skills and behaviors necessary to move effectively and safely in various environments, including use of public transportation.

*Discussion:* We believe the definition of *travel training* already acknowledges the importance of transportation in supporting children with disabilities to fully participate in their communities. New § 300.43(a)(4) (proposed § 300.42(a)(4)) defines *travel training* to include providing instruction that enables children to learn the skills necessary to move effectively and safely from place to place in school, home, at work and in the community. Therefore, we do not believe that further clarification is necessary. We also do not believe that it is necessary to add travel training to the definition of *transition services*, as recommended by the commenters. We believe that IEP Teams already consider the importance of transportation and travel training services in the course of planning for a student's postsecondary transition needs. It is unnecessary to state that travel training includes instructing children with disabilities other than

blindness, as requested by the commenters, because the definition of *travel training* already states that travel training is appropriate for any child with a disability who requires this instruction.

*Changes:* None.

*Comment:* A few commenters strongly recommended clarifying that the definition of *travel training* does not include training for children with visual impairments, regardless of whether they have additional disabilities.

*Discussion:* Any child with a disability, including a child with a visual impairment, who needs travel training instruction to receive FAPE, as determined by the child's IEP Team, can receive travel training instruction. New § 300.39(b)(4) (proposed § 300.38(b)(4)) specifically states that *travel training* means providing instruction to children with significant cognitive disabilities and any other children with disabilities who require this instruction. We, therefore, decline to change the definition, as recommended by the commenters.

*Changes:* None.

Vocational Education (New § 300.39(b)(5)) (Proposed § 300.38(b)(5))

*Comment:* A few commenters recommended revising the definition of *vocational education* to include specially designed educational programs that are directly related to the preparation of individuals for paid or unpaid employment or for additional preparation for a career not requiring a baccalaureate or advanced degree.

*Discussion:* We believe that the more general reference to "organized education programs" in the definition of *vocational education* is accurate and should not be changed to refer to "specially designed educational programs," as recommended by the commenter, because some children with disabilities will benefit from educational programs that are available for all children and will not need specially designed programs.

*Changes:* None.

*Comment:* Some commenters stated that Congress did not intend that the definition of *vocational education* would include vocational and technical education. The commenters stated that the addition of vocational and technical education to the definition of *vocational education* creates a right under the Act to educational services that would be extremely costly for States and LEAs to implement.

Other commenters stated that including the definition of *vocational and technical education* from the Carl D. Perkins Act expands FAPE beyond

secondary education, which is an unwarranted responsibility for school districts. One commenter stated that the definition could be interpreted to require public agencies to provide two years of postsecondary education for students with disabilities. A few commenters strongly recommended removing the definition of *vocational and technical education.*

Some commenters recommended removing the reference to the postsecondary level for a 1-year certificate, an associate degree, and industry-recognized credential in the definition of *vocational and technical education.* One commenter suggested that proposed § 300.38(b)(6)(i)(A) conclude with the word "or" to clarify that the sequence of courses is discretionary.

*Discussion:* The definition of *vocational education* was revised to include the definition of *vocational and technical education* in the Carl D. Perkins Vocational and Applied Technology Act of 1988, as amended, 20 U.S.C. 2301, 2302(29). However, based on the comments we received, it is apparent that including the definition of *vocational and technical education* has raised concerns and confusion regarding the responsibilities of SEAs and LEAs to provide vocational education. Therefore, we will remove the definition of *vocational and technical education* in proposed § 300.38(b)(6) and the reference to vocational and technical education in proposed § 300.38(b)(5)(ii).

*Changes:* The definition of *vocational and technical education* in proposed § 300.38(b)(6) has been removed. Accordingly, the reference to vocational and technical education in proposed § 300.38(b)(5)(ii)) has also been removed.

Supplementary Aids and Services (New § 300.42) (Proposed § 300.41)

*Comment:* A few commenters stated that the definition of *supplementary aids and services* should be changed to mean aids, services, and other supports provided in general education classes or other settings to children with disabilities, as well as to educators, other support staff, and nondisabled peers, if necessary, to support the inclusion of children with disabilities.

*Discussion:* The definition of *supplementary aids and services* in new § 300.42 (proposed § 300.41) is consistent with the specific language in section 602(33) of the Act, and refers to aids, services, and other supports for children with disabilities. We do not believe it is necessary to change the definition to include providing aids, services, and supports to other

individuals because § 300.320(a)(4) requires each child's IEP to include a statement of the program modifications or supports for school personnel that will be provided to enable the child to be involved in and make progress in the general education curriculum, and to participate in extracurricular and other nonacademic activities.

As noted in the *Analysis of Comments and Changes* section for subpart B, we have clarified in § 300.107(a) that States must ensure that public agencies take steps to provide nonacademic and extracurricular services and activities, including providing supplementary aids and services determined appropriate and necessary by the child's IEP Team to afford children with disabilities an equal opportunity for participation in those services and activities. We have, therefore, revised the definition of *supplementary aids and services* in new § 300.42 (proposed § 300.41) to be consistent with this change.

*Changes:* We have added language in new § 300.42 (proposed § 300.41) to clarify that supplementary aids and services can be provided in extracurricular and nonacademic settings to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate.

*Comment:* None.

*Discussion:* New § 300.42 (proposed § 300.41) contains an incorrect reference to § 300.112. The correct reference should be to § 300.114.

*Changes:* We have removed the reference to § 300.112 and replaced it with a reference to § 300.114.

Transition Services (New § 300.43) (Proposed § 300.42)

*Comment:* One commenter recommended replacing the word "child" with "student" in the definition of *transition services.*

*Discussion:* The definition of *transition services* follows the language in section 602(34) of the Act. The words "child" and "student" are used throughout the Act and we have used the statutory language in these regulations whenever possible.

*Changes:* None.

*Comment:* One commenter recommended that the regulations include vocational and career training through work-study as a type of transition service. A few commenters stated that the definition of *transition services* must specify that a student's need for transition services cannot be based on the category or severity of a student's disability, but rather on the student's individual needs.

*Discussion:* We do not believe it is necessary to change the definition of *transition services* because the definition is written broadly to include a range of services, including vocational and career training that are needed to meet the individual needs of a child with a disability. The definition clearly states that decisions regarding transition services must be made on the basis of the child's individual needs, taking into account the child's strengths, preferences, and interests. As with all special education and related services, the student's IEP Team determines the transition services that are needed to provide FAPE to a child with a disability based on the needs of the child, not on the disability category or severity of the disability. We do not believe further clarification is necessary.

*Changes:* None.

*Comment:* A few commenters stated that the regulations do not define "functional" or explain how a student's functional performance relates to the student's unique needs or affects the student's education. The commenters noted that the word "functional" is used throughout the regulations in various forms, including "functional assessment," "functional goals," "functional abilities," "functional needs," "functional achievement," and "functional performance," and should be defined to avoid confusion. One commenter recommended either defining the term or explicitly authorizing States to define the term.

One commenter recommended clarifying that "functional performance" must be a consideration for any child with a disability who may need services related to functional life skills and not just for students with significant cognitive disabilities. A few commenters stated that the definition of *transition services* must specify that "functional achievement" includes achievement in all major life functions, including behavior, social-emotional development, and daily living skills.

*Discussion:* We do not believe it is necessary to include a definition of "functional" in these regulations because the word is generally used to refer to activities and skills that are not considered academic or related to a child's academic achievement as measured on Statewide achievement tests. There is nothing in the Act that would prohibit a State from defining "functional," as long as the definition and its use are consistent with the Act.

We also do not believe it is necessary for the definition of *transition services* to refer to all the major life functions or to clarify that functional performance must be a consideration for any child

with a disability, and not just for students with significant cognitive disabilities. As with all special education and related services, the student's IEP Team determines the services that are needed to provide FAPE to a child with a disability based on the needs of the child.

*Changes:* None.

*Comment:* One commenter requested a definition of "results-oriented process."

*Discussion:* The term "results-oriented process," which appears in the statutory definition of *transition services*, is generally used to refer to a process that focuses on results. Because we are using the plain meaning of the term (i.e., a process that focuses on results), we do not believe it is necessary to define the term in these regulations.

*Changes:* None.

*Comment:* A few commenters stated that "acquisition of daily living skills and functional vocational evaluation" is unclear as a child does not typically "acquire" an evaluation. The commenters stated that the phrase should be changed to "functional vocational skills."

*Discussion:* We agree that the phrase is unclear and will clarify the language in the regulation to refer to the "provision of a functional vocational evaluation."

*Changes:* We have added "provision of a" before "functional vocational evaluation" in new § 300.43(a)(2)(v) for clarity.

Universal Design (New § 300.44) (Proposed § 300.43)

*Comment:* Many commenters requested including the full definition of *universal design* in the regulations, rather than providing a reference to the definition of the term.

*Discussion:* The term *universal design* is defined in the Assistive Technology Act of 1998, as amended. For the reasons set forth earlier in this notice, we are not including in these regulations full definitions of terms that are defined in other statutes. However, we will include the definition of this term from section 3 of the Assistive Technology Act of 1998, as amended, 29 U.S.C. 3002, here for reference.

The term *universal design* means a concept or philosophy for designing and delivering products and services that are usable by people with the widest possible range of functional capabilities, which include products and services that are directly accessible (without requiring assistive technologies) and products and services that are

interoperable with assistive technologies.

*Changes:* None.

*Comment:* Several commenters stated that the definition of *universal design* should be changed to include the universal design of academic content standards, curricula, instructional materials, and assessments.

*Discussion:* The definition of *universal design* is statutory. Congress clearly intended that we use this specific definition when it used this term in the Act. We do not believe we can change this definition as suggested by the commenters.

*Changes:* None.

## Subpart B—State Eligibility

*FAPE Requirements*

Free Appropriate Public Education (FAPE) (§ 300.101)

*Comment:* One commenter recommended revising § 300.101 to ensure that children with disabilities who are suspended or expelled from their current placement are provided educational services consistent with State academic achievement standards. One commenter asked whether children with disabilities who are suspended or expelled from their current placement must continue to be taught by highly qualified teachers.

*Discussion:* We believe the concern raised by the commenter is already addressed by this regulation and elsewhere in the regulations and that no changes to § 300.101 are necessary. Section 300.530(d), consistent with section 615(k)(1)(D) of the Act, clarifies that a child with a disability who is removed from his or her current placement for disciplinary reasons, irrespective of whether the behavior is determined to be a manifestation of the child's disability, must be allowed to participate in the general education curriculum, although in another setting, and to progress toward meeting his or her IEP goals. As the term "general education curriculum" is used throughout the Act and in these regulations, the clear implication is that there is an education curriculum that is applicable to all children and that this curriculum is based on the State's academic content standards.

Children with disabilities who are suspended or expelled from their current placement in public schools must continue to be taught by highly qualified teachers, consistent with the requirements in §§ 300.156 and 300.18. Private school teachers are not subject to the highly qualified teacher requirements under this part.

*Changes:* None.

**46580**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

*Comment:* One commenter suggested clarifying in § 300.101 that FAPE must be available to children with disabilities in the least restrictive environment.

*Discussion:* We do not believe further clarification is needed in § 300.101, as the matter is adequately covered elsewhere in the regulations. Section 300.101 clarifies that, in order to be eligible to receive funds under Part B of the Act, States must, among other conditions, ensure that FAPE is made available to all children with specified disabilities in mandated age ranges. The term *FAPE* is defined in § 300.17 and section 602(9)(D) of the Act as including, among other elements, special education and related services, provided at no cost to parents, in conformity with an individualized education program (IEP). Sections 300.114 through 300.118, consistent with section 612(a)(5) of the Act, implement the Act's strong preference for educating children with disabilities in regular classes with appropriate aids and supports. Specifically, § 300.114 provides that States must have in effect policies and procedures ensuring that, to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are nondisabled, and that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

*Changes:* None.

*Comment:* A few commenters recommended including language in § 300.101(a) specifying that children with disabilities expelled or suspended from the general education classroom must be provided FAPE in the least restrictive environment.

*Discussion:* The Department believes it would not be appropriate to include the requested language in this section because services in these circumstances are provided under somewhat different criteria than is normally the case. Section 300.530 clarifies the procedures school personnel must follow when removing a child with a disability who violates a code of student conduct from their current placement (e.g., suspension and expulsion). This includes how decisions are made regarding the educational services the child receives and the location in which they will be provided. School officials need some reasonable amount of flexibility in providing services to children who have

violated school conduct rules, and should not necessarily have to provide exactly the same services, in the same settings, to these children. Therefore, we decline to regulate further in this regard.

*Changes:* None.

*Comment:* Some commenters expressed concern that children with disabilities have to fail or be retained in a grade or course in order to be considered eligible for special education and related services.

*Discussion:* Section 300.101(c) provides that a child is eligible to receive special education and related services even though the child is advancing from grade to grade. Further, it is implicit from paragraph (c) of this section that a child should not have to fail a course or be retained in a grade in order to be considered for special education and related services. A public agency must provide a child with a disability special education and related services to enable him or her to progress in the general curriculum, thus making clear that a child is not ineligible to receive special education and related services just because the child is, with the support of those individually designed services, progressing in the general curriculum from grade-to-grade or failing a course or grade. The group determining the eligibility of a child for special education and related services must make an individual determination as to whether, notwithstanding the child's progress in a course or grade, he or she needs or continues to need special education and related services. However, to provide additional clarity we will revise paragraph (c)(1) of this section to explicitly state that children do not have to fail or be retained in a course or grade in order to be considered eligible for special education and related services.

*Changes:* Section 300.101(c)(1) has been revised to provide that children do not have to fail or be retained in a course or grade in order to be considered eligible for special education and related services.

### Limitation—Exception to FAPE for Certain Ages (§ 300.102)

*Comment:* One commenter requested that the regulations clarify that children with disabilities who do not receive a regular high school diploma continue to be eligible for special education and related services. One commenter expressed concern that the provision in § 300.102(a)(3)(ii) regarding children with disabilities who have not been awarded a regular high school diploma could result in the delay of transition services in the context of the child's

secondary school experience and postsecondary goals.

*Discussion:* We believe that § 300.102(a)(3) is sufficiently clear that public agencies need not make FAPE available to children with disabilities who have graduated with a regular high school diploma and that no change is needed to the regulations. Children with disabilities who have not graduated with a regular high school diploma still have an entitlement to FAPE until the child reaches the age at which eligibility ceases under the age requirements within the State. However, we have reviewed the regulations and believe that it is important for these regulations to define "regular diploma" consistent with the ESEA regulations in 34 CFR § 200.19(a)(1)(i). Therefore, we will add language to clarify that a regular high school diploma does not include an alternative degree that is not fully aligned with the State's academic standards, such as a certificate or general educational development (GED) credential.

We do not believe § 300.102 could be interpreted to permit public agencies to delay implementation of transition services, as stated by one commenter because transition services must be provided based on a child's age, not the number of years the child has remaining in the child's high school career. Section 300.320(b), consistent with section 614(d)(1)(A)(i)(VIII) of the Act, requires each child's IEP to include, beginning not later than the first IEP to be in effect when the child turns 16, or younger if determined appropriate by the IEP Team, appropriate measurable postsecondary goals and the transition services needed to assist the child in reaching those goals.

*Changes:* A new paragraph (iv) has been added in § 300.102(a)(3) stating that a regular high school diploma does not include an alternative degree that is not fully aligned with the State's academic standards, such as a certificate or GED.

*Comment:* One commenter requested clarification as to how States should include children with disabilities who require special education services through age 21 in calculating, for adequate yearly progress (AYP) purposes, the percentage of children who graduate with a regular high school diploma in the standard number of years. The commenter expressed concern that States, in order to comply with their high school graduation rate academic outcome requirements under the ESEA, will change the grade status from 12th grade to 11th grade for those children with disabilities who will typically age out of the public education

system under the Act. The commenter further stated that this will affect the exception to FAPE provisions in § 300.102 for children with disabilities who require special education services through age 21.

*Discussion:* The calculation of graduation rates under the ESEA for AYP purposes (34 CFR 200.19(a)(1)(i)) does not alter the exception to FAPE provisions in § 300.102(a)(3) for children with disabilities who graduate from high school with a regular high school diploma, but not in the standard number of years. The public agency must make FAPE available until age 21 or the age limit established by State law, even though the child would not be included as graduating for AYP purposes under the ESEA. In practice, though, there is no conflict between the Act and the ESEA, as the Department interprets the ESEA title I regulations to permit States to propose a method for accurately accounting for students who legitimately take longer than the standard number of years to graduate.

*Changes:* None.

Residential Placement: (§ 300.104)

*Comment:* A few commenters requested that the regulations clarify that parents cannot be held liable for any costs if their child with a disability is placed in a residential setting by a public agency in order to provide FAPE to the child.

*Discussion:* Section 300.104, consistent with section 612(a)(1) and (a)(10)(B) of the Act, is a longstanding provision that applies to placements that are made by public agencies in public and private institutions for educational purposes and clarifies that parents are not required to bear the costs of a public or private residential placement if such placement is determined necessary to provide FAPE. If a public agency determines in an individual situation that a child with a disability cannot receive FAPE from the programs that the public agency conducts and, therefore, placement in a public or private residential program is necessary to provide special education and related services to the child, the program, including non-medical care and room and board, must be at no cost to the parents of the child.

In situations where a child's educational needs are inseparable from the child's emotional needs and an individual determination is made that the child requires the therapeutic and habilitation services of a residential program in order to "benefit from special education," these therapeutic and habilitation services may be "related services" under the Act. In

such a case, the SEA is responsible for ensuring that the entire cost of that child's placement, including the therapeutic care as well as room and board, is without cost to the parents. However, the SEA is not responsible for providing medical care. Thus, visits to a doctor for treatment of medical conditions are not covered services under Part B of the Act and parents may be responsible for the cost of the medical care.

*Changes:* None.

Assistive Technology (§ 300.105)

*Comment:* One commenter recommended removing § 300.105 and including the requirements in this section in the definition of *assistive technology device* in § 300.5 and *assistive technology service* in § 300.6.

*Discussion:* Section 300.5 and § 300.6 define the terms *assistive technology device* and *assistive technology service*, respectively. Section 300.105 is not part of the definition of these terms, but rather is necessary to specify the circumstances under which public agencies are responsible for making available assistive technology devices and assistive technology services to children with disabilities.

*Changes:* None.

*Comment:* A few commenters requested clarifying in § 300.105(b) whether hearing aids are included in the definition of an *assistive technology device.*

*Discussion:* An *assistive technology device,* as defined in § 300.5, means any item, piece of equipment, or product system that is used to increase, maintain, or improve the functional capabilities of a child with a disability. The decision of whether a hearing aid is an assistive technology device is a determination that is made on an individual basis by the child's IEP Team. However, even if the IEP Team determines that a hearing aid is an *assistive technology device,* within the meaning of § 300.5, for a particular child, the public agency is responsible for the provision of the assistive technology device as part of FAPE, only if, as specified in § 300.105, the device is required as part of the child's *special education* defined in § 300.39, *related services* defined in § 300.34, or *supplementary aids and services* defined in § 300.42.

As a general matter, public agencies are not responsible for providing personal devices, such as eyeglasses or hearing aids that a child with a disability requires, regardless of whether the child is attending school. However, if it is not a surgically implanted device and a child's IEP

Team determines that the child requires a personal device (e.g., eyeglasses) in order to receive FAPE, the public agency must ensure that the device is provided at no cost to the child's parents.

*Changes:* None.

*Comment:* One commenter recommended adding language to § 300.105(b) to include, in addition to hearing aids, other hearing enhancement devices, such as a cochlear implant.

*Discussion:* Section 300.105(b), as proposed, requires a public agency to ensure that hearing aids worn in school by children with hearing impairments, including deafness, are functioning properly. This is a longstanding requirement and was included pursuant to a House Committee Report on the 1978 appropriations bill (H. Rpt. No. 95–381, p. 67 (1977)) directing the Department to ensure that children with hearing impairments are receiving adequate professional assessment, follow-up, and services. The Department believes that, given the increase in the number of children with disabilities with surgically implanted devices (e.g., cochlear implants, vagus nerve stimulators, electronic muscle stimulators), and rapid advances in new technologies to help children with disabilities, it is important that these regulations clearly address any obligation public agencies have to provide follow-up and services to ensure that such devices are functioning properly.

Section 602(1) of the Act clarifies that the definition of *assistive technology device* does not include a medical device that is surgically implanted or the replacement of such device. Section 602(26) of the Act also stipulates that only medical services that are for diagnostic and evaluative purposes and required to assist a child with a disability to benefit from special education are considered a *related service.* We believe Congress was clear in its intent in S. Rpt. 108–185, p. 8, which states:

[T]he definitions of "assistive technology device" and "related services" do not include a medical device that is surgically implanted, or the post-surgical maintenance, programming, or replacement of such device, or an external device connected with the use of a surgically implanted medical device (other than the costs of performing routine maintenance and monitoring of such external device at the same time the child is receiving other services under the act).

The Department believes, however, that public agencies have an obligation to change a battery or routinely check an external component of a surgically

**46582** **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

implanted medical device to make sure it is turned on and operating. However, mapping a cochlear implant (or paying the costs associated with mapping) is not routine checking as described above and should not be the responsibility of a public agency. We will add language to the regulations to clarify a public agency's responsibility regarding the routine checking of external components of surgically implanted medical devices.

*Changes:* A new § 300.113 has been added with the heading, ''Routine checking of hearing aids and external components of surgically implanted medical devices.'' Section 300.105(b), regarding the proper functioning of hearing aids, has been removed and redesignated as new § 300.113(a). We have added a new paragraph (b) in new § 300.113 clarifying that, for a child with a surgically implanted medical device who is receiving special education and related services under this part, a public agency is responsible for routine checking of external components of surgically implanted medical devices, but is not responsible for the post-surgical maintenance, programming, or replacement of a medical device that has been surgically implanted (or of an external component of a surgically implanted medical device).

The provisions in § 300.105 have been changed to conform with the other changes to this section and the phrase ''proper functioning of hearing aids'' has been removed from the heading.

Extended School Year Services (§ 300.106)

*Comment:* Several commenters recommended removing § 300.106 because the requirement to provide extended school year (ESY) services to children with disabilities is not required in the Act.

*Discussion:* The requirement to provide ESY services to children with disabilities who require such services in order to receive FAPE reflects a longstanding interpretation of the Act by the courts and the Department. The right of an individual child with a disability to receive ESY services is based on that child's entitlement to FAPE under section 612(a)(1) of the Act. Some children with disabilities may not receive FAPE unless they receive necessary services during times when other children, both disabled and nondisabled, normally would not be served. We believe it is important to retain the provisions in § 300.106 because it is necessary that public agencies understand their obligation to ensure that children with disabilities

who require ESY services in order to receive FAPE have the necessary services available to them, and that individualized determinations about each disabled child's need for ESY services are made through the IEP process.

*Changes:* None.

*Comment:* One commenter stated that the ESY requirements in § 300.106 should not be included as part of the State eligibility requirements and would be more appropriately included in the definition of FAPE in § 300.17.

*Discussion:* The definition of FAPE in § 300.17 is taken directly from section 602(9) of the Act. We believe the ESY requirements are appropriately included under the FAPE requirements as a part of a State's eligibility for assistance under Part B of the Act because the right of an individual child with a disability to ESY services is based on a child's entitlement to FAPE. As a part of the State's eligibility for assistance under Part B of the Act, the State must make FAPE available to all children with disabilities residing in the State in mandated age ranges.

*Changes:* None.

*Comment:* One commenter recommended removing the word ''only'' in § 300.106(a)(2) because it is unduly limiting.

*Discussion:* The inclusion of the word ''only'' is intended to be limiting. ESY services must be provided ''only'' if a child's IEP Team determines, on an individual basis, in accordance with §§ 300.320 through 300.324, that the services are necessary for the provision of FAPE to the child. We do not think this language is overly restrictive; instead, we think it is necessary for providing appropriate parameters to the responsibility of the IEP Team.

*Changes:* None.

*Comment:* A few commenters suggested revising § 300.106(a)(3)(i) to specifically state that, in addition to particular categories of disabilities, public agencies may not limit ESY services to particular age ranges. Other commenters proposed adding ''preschooler with a disability'' to the definition of ESY services in § 300.106(b)(1).

*Discussion:* The revisions recommended by the commenters are not necessary. Section 300.106(a) clarifies that each public agency must ensure that ESY services are available for children with disabilities if those services are necessary for the children to receive FAPE. Section 300.101(a) clearly states that FAPE must be available to all children aged 3 through 21, inclusive, residing in the State, except for children ages 3, 4, 5, 18, 19, 20, or 21 to the

extent that its application to those children would be inconsistent with State law or practice, or the order of any court, regarding the provision of public education to children of those ages. We do not believe any further clarification is necessary.

*Changes:* None.

*Comment:* One commenter requested that language be added to § 300.106(b)(1)(i) to clarify that providing ESY services to a child with a disability beyond the normal school year includes, but is not limited to, before and after regular school hours, on weekends, and during regular school vacations.

*Discussion:* Typically, ESY services are provided during the summer months. However, there is nothing in § 300.106 that would limit a public agency from providing ESY services to a child with a disability during times other than the summer, such as before and after regular school hours or during school vacations, if the IEP Team determines that the child requires ESY services during those time periods in order to receive FAPE. The regulations give the IEP Team the flexibility to determine when ESY services are appropriate, depending on the circumstances of the individual child.

*Changes:* None.

*Comment:* One commenter suggested adding language to § 300.106 clarifying that ''recoupment and retention'' should not be used as the sole criteria for determining the child's eligibility for ESY services.

*Discussion:* We do not believe the commenter's suggested change should be made. The concepts of ''recoupment'' and ''likelihood of regression or retention'' have formed the basis for many standards that States use in making ESY eligibility determinations and are derived from well-established judicial precedents. (See, for example, *Johnson* v. *Bixby Independent School District 4*, 921 F.2d 1022 (10th Cir. 1990); *Crawford* v. *Pittman*, 708 F.2d 1028 (5th Cir. 1983); *GARC* v. *McDaniel*, 716 F.2d 1565 (11th Cir. 1983)). States may use recoupment and retention as their sole criteria but they are not limited to these standards and have considerable flexibility in determining eligibility for ESY services and establishing State standards for making ESY determinations. However, whatever standard a State uses must be consistent with the individually-oriented requirements of the Act and may not limit eligibility for ESY services to children with a particular disability category or be applied in a manner that denies children with disabilities who

require ESY services in order to receive FAPE access to necessary ESY services.

*Changes:* None.

Nonacademic Services (§ 300.107)

*Comment:* One commenter recommended adding more specific language in § 300.107 regarding services and accommodations available for nonacademic activities to ensure that children with disabilities are fully included in nonacademic activities.

*Discussion:* We agree with the commenter. Section 300.107(a), as proposed, requires public agencies to take steps to provide nonacademic and extracurricular services and activities in a manner necessary to afford children with disabilities an equal opportunity to participate in those services and activities. In addition, § 300.320(a)(4)(ii), consistent with section 614(d)(1)(i)(IV)(bb) of the Act, clarifies that an IEP must include a statement of the special education and related services and supplementary aids and services to be provided to the child to participate in extracurricular and other nonacademic activities. We will add language in § 300.107(a) to clarify that the steps taken by public agencies to provide access to nonacademic and extracurricular services and activities include the provision of supplementary aids and services determined appropriate and necessary by the child's IEP Team.

*Changes:* Additional language has been added in § 300.107(a) to clarify that the steps taken by public agencies to provide access to nonacademic and extracurricular services and activities include the provision of supplementary aids and services determined appropriate and necessary by the child's IEP Team.

*Comment:* One commenter expressed concern about including "nonacademic services" in § 300.107, because it is not in the Act. The commenter stated that services such as athletics, recreational activities and clubs, counseling, transportation and health services should not be included in the regulations because they may be costly and are usually available on a limited basis. One commenter stated that it is confusing to include related services in the examples of nonacademic services and recommended that they be removed.

*Discussion:* The list of nonacademic and extracurricular services and activities in § 300.107(b) is not exhaustive. The list provides public agencies with examples of services and activities that may afford children with disabilities an equal opportunity for participation in the services offered to other children of the public agency. We disagree that the list of activities causes confusion with related services, as we think that the public can easily recognize the difference between academic counseling services, for example, that are offered to all children, and the type of counseling services that might be included in a child's IEP as a related service. For these reasons, we believe it is appropriate to maintain the list of nonacademic and extracurricular services and activities in § 300.107, including those services that are also *related services* in § 300.34.

*Changes:* None.

Physical Education (§ 300.108)

*Comment:* A few commenters stated that, in some States, physical education is not required for every nondisabled child every year and this creates situations in which children with disabilities are segregated physical education classes. The commenters recommended that the regulations clarify the requirements for public agencies to make physical education available to children with disabilities when physical education is not available to children without disabilities.

*Discussion:* Section 300.108 describes two considerations that a public agency must take into account to meet the physical education requirements in this section. First, physical education must be made available equally to children with disabilities and children without disabilities. If physical education is not available to all children (*i.e.,* children with and without disabilities), the public agency is not required to make physical education available for children with disabilities (*e.g.,* a district may provide physical education to all children through grade 10, but not to any children in their junior and senior years). Second, if physical education is specially designed to meet the unique needs of a child with a disability and is set out in that child's IEP, those services must be provided whether or not they are provided to other children in the agency.

This is the Department's longstanding interpretation of the requirements in § 300.108 and is based on legislative history that the intent of Congress was to ensure equal rights for children with disabilities. The regulation as promulgated in 1977 was based on an understanding that physical education was available to all children without disabilities and, therefore, must be made available to all children with disabilities. As stated in H. Rpt. No. 94–332, p. 9, (1975):

Special education as set forth in the Committee bill includes instruction in physical education, which is provided as a matter of course to all non-handicapped children enrolled in public elementary and secondary schools. The Committee is concerned that although these services are available to and required of all children in our school systems, they are often viewed as a luxury for handicapped children.

We agree that § 300.108(a) could be interpreted to mean that physical education must be made available to all children with disabilities, regardless of whether physical education is provided to children without disabilities. We will, therefore, revise paragraph (a) to clarify that the public agency has no obligation to provide physical education for children with disabilities if it does not provide physical education to nondisabled children attending their schools.

*Changes:* Section 300.108(a) has been revised as described in the preceding paragraph.

Full Education Opportunity Goal (FEOG) (§ 300.109)

*Comment:* One commenter requested that the regulations clarify how a State communicates and monitors the progress of the State's FEOG.

*Discussion:* We do not believe it is appropriate to regulate how a State communicates and monitors its progress toward the State's FEOG. We believe the State should have the flexibility needed to implement the provisions of this section and the State is in the best position to make this determination.

*Changes:* None.

Program Options (§ 300.110)

*Comment:* A few commenters recommended revising § 300.110 to require States to ensure that each public agency have in effect policies, procedures, and programs to provide children with disabilities the variety of educational programs and services available to nondisabled children. The commenters stated that § 300.110 does not provide any guidance to educators. A few commenters stated that "vocational education is an outdated term" and proposed replacing it with "career-technical and adult education" or "career and technical education."

*Discussion:* We do not believe it is necessary to change § 300.110. Under this provision, States must ensure that public agencies take steps to ensure that children with disabilities have access to the same program options that are available to nondisabled children in the area served by the agency, whatever those options are, and we are not aware of any implementation problems with

**46584**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

this requirement. We believe that it is important that educators understand that children with disabilities must have access to the same range of programs and services that a public agency provides to nondisabled children and that the regulation conveys this point. We also do not believe it is necessary to replace the term "vocational education" with the language recommended by the commenter. The term is broad in its meaning and generally accepted and understood in the field and, therefore, would encompass such areas as "career-technical" and "technical education."

*Changes:* None.

*Comment:* Several commenters requested that the regulations explicitly state that a child with a disability who has not yet received a regular high school diploma or "aged out" of special education may participate in dual enrollment programs and receive services in a postsecondary or community-based setting if the IEP Team decides it is appropriate.

*Discussion:* Section 300.110, consistent with section 612(a)(2) of the Act, requires States to ensure that public agencies take steps to ensure that children with disabilities have access to the same program options that are available to nondisabled children in the area served by the agency. This would apply to dual enrollment programs in post-secondary or community-based settings. Therefore, a State would be responsible for ensuring that a public agency that offered dual enrollment programs in post-secondary or community-based settings to a nondisabled student would have that option available to a student with disabilities whose IEP Team determined that such a program would best meet the student's needs. However, we do not believe that the Act requires public agencies to provide dual enrollment programs in post-secondary or community-based settings for students with disabilities, if such programs are not available to nondisabled secondary school students. Therefore, we are not modifying the regulations.

*Changes:* None.

Child Find (§ 300.111)

*Comment:* Several commenters expressed confusion about the child find requirements in § 300.111 and the parental consent requirements in § 300.300, and requested clarification on whether child find applies to private school children and whether LEAs may use the consent override procedures for children with disabilities enrolled in private schools. Two commenters requested that § 300.111(a)(1)(i) specify that child find does not apply to private

school children whose parents refuse consent.

*Discussion:* This issue is addressed in the *Analysis of Comments and Changes* section for subpart D in response to comments on § 300.300.

*Changes:* None.

*Comment:* One commenter recommended retaining current § 300.125(b) to ensure that the child find requirements are retained for parentally-placed private school children.

*Discussion:* Current § 300.125(b) was removed from these regulations because, under the Act, States are no longer required to have State policies and procedures on file with the Secretary. Furthermore, the Department believes the requirements in §§ 300.111 and 300.131 adequately ensure that parentally-placed private school children are considered in the child find process.

*Changes:* None.

*Comment:* One commenter requested a definition of the term "private school," as used in § 300.111.

*Discussion:* The term "private school" as used in § 300.111 means a private *elementary school* or *secondary school*, including a religious school. The terms elementary school and secondary school are defined in subpart A of these regulations. The term *private* is defined in 34 CFR Part 77, which applies to this program, and we see no need to include those definitions here.

*Changes:* None.

*Comment:* One commenter requested that the child find requirements in § 300.111(c)(2) include homeless children.

*Discussion:* Homeless children are already included in the child find requirements. Section 300.111(a)(1)(i) clarifies that the State must have policies and procedures to ensure that children with disabilities who are homeless and who are in need of special education and related services, are identified, located, and evaluated. No further clarification is needed.

*Changes:* None.

*Comment:* A few commenters recommended including in § 300.111 the requirements in current § 300.125(c), regarding child find for children from birth through age two when the SEA and lead agency for the Part C program are different. The commenters stated that this will ensure that children with disabilities from birth through age two are eligible to participate in child find activities when the Part C lead agency is not the SEA.

*Discussion:* The Department does not believe it is necessary to retain the language in current § 300.125(c). The child find requirements in § 300.111

have traditionally been interpreted to mean identifying and evaluating children beginning at birth. While child find under Part C of the Act overlaps, in part, with child find under Part B of the Act, the coordination of child find activities under Part B and Part C is an implementation matter that is best left to each State. Nothing in the Act or these regulations prohibits a Part C lead agency's participation, with the agreement of the SEA, in the actual implementation of child find activities for infants and toddlers with disabilities.

*Changes:* None.

*Comment:* One commenter recommended removing § 300.111(c) because child find for children with developmental delays, older children progressing from grade to grade, and highly mobile children is not specifically required by the Act.

*Discussion:* The changes requested by the commenter cannot be made because they are inconsistent with the Act. Section 300.111(a)(1)(i), consistent with section 612(a)(3)(A) of the Act, explicitly requires that *all* children with disabilities residing in the State are identified, located, and evaluated. This includes children suspected of having developmental delays, as defined in section 602(3)(B) of the Act. We recognize that it is difficult to locate, identify, and evaluate highly mobile and migrant children with disabilities. However, we strongly believe it is important to stress in these regulations that the States' child find responsibilities in § 300.111 apply equally to such children. We also believe it is important to clarify that a child suspected of having a disability but who has not failed, is making academic progress, and is passing from grade to grade must be considered in the child find process as any other child suspected of having a disability. As noted earlier in the discussion regarding § 300.101, paragraph (c)(1) of § 300.111 has been revised to clarify that children do not have to fail or be retained in a course or grade in order to be considered for special education and related services.

*Changes:* None.

*Comment:* One commenter requested that § 300.111 explicitly require that children in residential facilities be included in the public agency's child find process.

*Discussion:* We believe § 300.111(a), consistent with section 612(a)(3)(A) of the Act, clarifies that the State must ensure that all children with disabilities residing in the State are identified, located, and evaluated. This would

include children in residential facilities. No further clarification is necessary.

*Changes:* None.

Individualized Education Programs (IEP) (§ 300.112)

*Comment:* One commenter objected to including the reference to § 300.300(b)(3)(ii) in § 300.112, stating that it is not necessary to ensure compliance with the requirement for an IEP or IFSP to be developed, reviewed, and revised for each child with a disability.

*Discussion:* Section 300.300(b)(3)(ii) states that if a parent refuses to consent to the initial provision of special education and related services, or the parent fails to respond to a request to provide consent for the initial provision of special education and related services, the public agency is not required to convene an IEP meeting or develop an IEP for the child. It is necessary to include this reference in § 300.112 to clarify the circumstances under which a public agency is not required to develop an IEP for an eligible child with a disability.

*Changes:* None.

Routine Checking of Hearing Aids and External Components of Surgically Implanted Medical Devices (§ 300.113)

*Comment:* None.
*Discussion:* New § 300.113 is addressed in the *Analysis of Comments and Changes* section for subpart A in response to comments on § 300.34(b).
*Changes:* We have added new § 300.113 to cover the routine checking of hearing aids and external components of surgically implanted medical devices. The requirement for the routine checking of hearing aids has been removed from proposed § 300.105 and included in new § 300.113(a). The requirement for routine checking of an external component of a surgically implanted medical device has been added as new § 300.113(b). The requirements for assistive technology devices and services remain in § 300.105 and the heading has been changed to reflect this change. We have also included a reference to new § 300.113(b) in new § 300.34(b)(2).

*Least Restrictive Environment (LRE)*

LRE Requirements (§ 300.114)

*Comment:* One commenter recommended including language in the regulations that respects and safeguards parental involvement and protects the rights of children with disabilities to be educated in the least restrictive environment (LRE).

*Discussion:* We believe that the LRE requirements in §§ 300.114 through 300.120 address the rights of children with disabilities to be educated in the LRE, as well as safeguard parental rights. Section 300.114, consistent with section 612(a)(5) of the Act, requires each public agency to ensure that, to the maximum extent appropriate, children with disabilities are educated with children who are not disabled. Further, § 300.116 ensures that a child's parent is included in the group of persons making the decision about the child's placement.

*Changes:* None.
*Comment:* A number of comments were received regarding § 300.114(a)(2)(ii), which requires each public agency to ensure that the removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that the education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. Many commenters recommended replacing "regular educational environment" with "regular classroom" because "regular classroom" is less likely to be misinterpreted to mean any kind of contact with children without disabilities. A few commenters expressed concern that using the phrase "regular educational environment" weakens the LRE protections. Another commenter recommended the regulations clarify that the "regular educational environment" means the participation of children with disabilities with their nondisabled peers in regular classrooms and other educational settings including nonacademic settings.

*Discussion:* Section 300.114(a)(2)(ii) follows the specific language in section 612(a)(5)(A) of the Act and reflects previous regulatory language. This requirement is longstanding. We do not believe the language should be revised, as recommended by the commenters, because "regular educational environment" encompasses regular classrooms and other settings in schools such as lunchrooms and playgrounds in which children without disabilities participate.

*Changes:* None.
*Comment:* One commenter requested revising § 300.114(a)(2) to require a public agency to document and justify placements of children with disabilities in environments outside the general education classroom.

*Discussion:* The additional language requested by the commenter is not necessary and would impose unwarranted paperwork burdens on schools. Section 300.320(a)(5), consistent with section

614(d)(1)(A)(i)(V) of the Act, already requires a child's IEP to include an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class. As noted previously, parents are a part of the group making placement decisions. We believe these provisions provide sufficient safeguards on the placement process.

*Changes:* None.
*Comment:* One commenter stated that the LRE requirements are often misinterpreted to be a mandate to include all children who are deaf or hard of hearing in their local schools. The commenter stated that the placement decision for a child who is deaf or hard of hearing should be based on the child's communication needs and must be the environment that presents the fewest language and communication barriers to the child's cognitive, social, and emotional development. Some commenters cautioned that inclusive settings might be inappropriate for a child who is deaf and who requires communication support and stated that the LRE should be the place where a child can be educated successfully. A few commenters requested the regulations clarify that all placement options must remain available for children who are deaf.

One commenter recommended strengthening the requirement for a continuum of alternative placements and stated that a full range of placement options is necessary to meet the needs of all children with visual impairments. Another commenter urged the Department to ensure that children with low-incidence disabilities (including children who are deaf, hard of hearing, or deaf-blind) have access to appropriate educational programming and services at all times, including center-based schools, which may be the most appropriate setting for children with low-incidence disabilities.

*Discussion:* The LRE requirements in §§ 300.114 through 300.117 express a strong preference, not a mandate, for educating children with disabilities in regular classes alongside their peers without disabilities. Section 300.114(a)(2), consistent with section 612(a)(5)(A) of the Act, requires that, to the maximum extent appropriate, children with disabilities are educated with children who are not disabled, and that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and

**46586** **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

services cannot be achieved satisfactorily.

With respect to the recommendation that the placement for children who are deaf or hard of hearing be based on the child's communication needs, § 300.324(a)(2)(iv), consistent with section 614(d)(3)(B)(iv) of the Act, clarifies that the IEP Team, in developing the IEP for a child who is deaf or hard of hearing, must consider the child's language and communication needs, opportunities for direct communication with peers and professional personnel in the child's language and communication mode, and the child's academic level and full range of needs, including opportunities for direct instruction in the child's language and communication mode.

With respect to strengthening the continuum of alternative placement requirements, nothing in the LRE requirements would prevent an IEP Team from making a determination that placement in the local school is not appropriate for a particular child. Section 300.115 already requires each public agency to ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services. We believe this adequately addresses the commenter's concern.

The process for determining the educational placement for children with low-incidence disabilities (including children who are deaf, hard of hearing, or deaf-blind) is the same process used for determining the educational placement for all children with disabilities. That is, each child's educational placement must be determined on an individual case-by-case basis depending on each child's unique educational needs and circumstances, rather than by the child's category of disability, and must be based on the child's IEP. We believe the LRE provisions are sufficient to ensure that public agencies provide low-incidence children with disabilities access to appropriate educational programming and services in the educational setting appropriate to meet the needs of the child in the LRE.

*Changes:* None.
*Comment:* One commenter requested that the regulations clarify that children with disabilities who are suspended or expelled from school are entitled to be educated with children who are not disabled. The commenter stated that this clarification is necessary to reduce the use of home instruction as a placement option for these children.

*Discussion:* The Act does not require that children with disabilities

suspended or expelled for disciplinary reasons continue to be educated with children who are not disabled during the period of their removal. However, it is important to ensure that children with disabilities who are suspended or expelled from school receive appropriate services, while preserving the flexibility of school personnel to remove a child from school, when necessary, and to determine how best to address the child's needs during periods of removal and where services are to be provided to the child during such periods of removals, including, if appropriate, home instruction. Sections 300.530 through 300.536 address the options available to school authorities in disciplining children with disabilities and set forth procedures that must be followed when taking disciplinary actions and in making decisions regarding the educational services that a child will receive and the location in which services will be provided. We believe including the language recommended by the commenter would adversely restrict the options available to school personnel for disciplining children with disabilities and inadvertently tie the hands of school personnel in responding quickly and effectively to serious child behaviors and in creating safe classrooms for all children.

*Changes:* None.

Additional Requirement—State Funding Mechanism (§ 300.114(b))

*Comment:* One commenter stated that § 300.114(b) does not adequately address the requirements for funding mechanisms relative to the LRE requirements and requested that note 89 of the Conf. Rpt. be included in the regulations.

*Discussion:* Section 300.114(b) incorporates the language from section 612(a)(5)(B) of the Act and prohibits States from maintaining funding mechanisms that violate the LRE provisions. We do not believe it is necessary to provide additional clarification in the regulations. While we agree with the commenter that note 89 of the Conf. Rpt. makes clear Congress' intent that State funding mechanisms support the LRE requirements and do not provide an incentive or disincentive for certain placement decisions, we believe the requirements in § 300.114(b) accurately capture the essence of the Conf. Rpt. and including additional language in this paragraph is not needed.

*Changes:* None.
*Comment:* One commenter urged the Department to impose financial sanctions on States that continue to base

their funding on certain placement decisions. A few commenters suggested changing the requirement in § 300.114(b)(2) for States to provide an assurance that the State will revise its funding mechanism "as soon as feasible" to "no later than the start of the 2006–2007 school year."

*Discussion:* Section 300.114(b)(2) incorporates the language in section 612(a)(5)(B)(ii) of the Act, and requires that if a State does not have policies and procedures to ensure that the State's funding mechanism does not violate the LRE requirements, the State must provide the Secretary an assurance that the State will revise its funding mechanism as soon as feasible. We do not believe it is necessary to include in these regulations a specific timeline for a State to revise its funding mechanism, if required to do so pursuant to 300.114(b)(2). We believe the statutory language "as soon as feasible," while providing flexibility as to how each State meets the requirement, is sufficient to ensure States' compliance with this requirement.

Further, we believe the enforcement options in § 300.604 give the Secretary sufficient means to address a State's noncompliance with the requirements in § 300.114(b)(2). Section 300.604 describes the enforcement options available to the Secretary if the Secretary determines that a State needs assistance or intervention implementing the requirements of Part B of the Act, or that there is a substantial failure to comply with any condition of an SEA's or LEA's eligibility under Part B of the Act. Enforcement options available to the Secretary include, among others, recovery of funds or withholding, in whole or in part, any further payments to the State under Part B of the Act.

*Changes:* None.

Continuum of Alternative Placements (§ 300.115)

*Comment:* One commenter recommended revising § 300.115 so that only the specific allowable alternative settings listed in the definition of *special education* in new § 300.39 (proposed § 300.38) (i.e., classroom, home, hospitals, institutions) are permitted.

*Discussion:* Section 300.115 requires each public agency to ensure that a continuum of alternative placements (including instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions) is available to meet the needs of children with disabilities for special education and related services. The list of placement options in this section only expands the settings

mentioned in new § 300.39 (proposed § 300.38) by recognizing the various types of classrooms and settings for classrooms in which special education is provided. This continuum of alternative placements is intended to ensure that a child with a disability is served in a setting where the child can be educated successfully in the LRE.

*Changes:* None.

*Comment:* One commenter suggested adding language to the regulations to clarify that difficulty recruiting and hiring qualified special education teachers does not relieve an LEA of its obligation to ensure a continuum of alternative placements and to offer a full range of services to meet the needs of children with disabilities.

*Discussion:* We do not believe it is necessary to include the language suggested by the commenter, because § 300.116 is sufficiently clear that placement decisions must be based on the individual needs of each child with a disability. Public agencies, therefore, must not make placement decisions based on a public agency's needs or available resources, including budgetary considerations and the ability of the public agency to hire and recruit qualified staff.

*Changes:* None.

*Comment:* A few commenters recommended revising § 300.115(a) to clarify that the continuum of alternative placements must be available to eligible preschool children with disabilities.

*Discussion:* It is not necessary to revise § 300.115(a) in the manner suggested by the commenters. Section 300.116 clearly states that the requirements for determining the educational placement of a child with a disability include preschool children with disabilities and that such decisions must be made in conformity with the LRE provisions in §§ 300.114 through 300.118. This includes ensuring that a continuum of services is available to meet the needs of children with disabilities for special education and related services.

*Changes:* None.

Placements (§ 300.116)

*Comment:* One commenter recommended the regulations clarify that the regular class must always be considered the first placement option.

*Discussion:* We do not believe it is necessary to include the clarification recommended by the commenter. Section 300.116 clarifies that placement decisions must be made in conformity with the LRE provisions, and § 300.114(a)(2) already requires that special classes, separate schooling or other removal of children with

disabilities from the regular education environment only occurs if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

*Changes:* None.

*Comment:* A few commenters recommended revising § 300.116 to require that children with disabilities have access to, and make progress in, the general curriculum, and that children receive the special education and related services included in their IEPs.

*Discussion:* The issues raised by the commenters are already addressed elsewhere in the regulations. The IEP requirements in § 300.320(a), consistent with section 614(d) of the Act, clarify that children with disabilities must be provided special education and related services and needed supplementary aids and services to enable them to be involved in and make progress in the general curriculum. In addition, § 300.323(c)(2) requires that, as soon as possible following the development of an IEP, special education and related services are made available to the child in accordance with the child's IEP. We believe that these regulations adequately address the commenters' concerns, and that no further clarification is necessary.

*Changes:* None.

*Comment:* One commenter stated that the placement requirements in § 300.116 encourage school districts to assign a child with a disability to a particular place or setting, rather than providing a continuum of increasingly individualized and intensive services. The commenter suggested requiring that the continuum of alternative placements include a progressively more intensive level of individualized, scientifically based instruction and related services, both with increased time and lower pupil-teacher ratio, in addition to regular instruction with supplementary aids and services.

*Discussion:* The overriding rule in § 300.116 is that placement decisions for all children with disabilities must be made on an individual basis and ensure that each child with a disability is educated in the school the child would attend if not disabled unless the child's IEP requires some other arrangement. However, the Act does not require that every child with a disability be placed in the regular classroom regardless of individual abilities and needs. This recognition that regular class placement may not be appropriate for every child with a disability is reflected in the requirement that LEAs make available a range of placement options, known as a continuum of alternative placements, to

meet the unique educational needs of children with disabilities. This requirement for the continuum reinforces the importance of the individualized inquiry, not a ''one size fits all'' approach, in determining what placement is the LRE for each child with a disability. The options on this continuum must include the alternative placements listed in the definition of special education under § 300.38 (instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions). These options must be available to the extent necessary to implement the IEP of each child with a disability. The group determining the placement must select the placement option on the continuum in which it determines that the child's IEP can be implemented in the LRE. Any alternative placement selected for the child outside of the regular educational environment must include appropriate opportunities for the child to interact with nondisabled peers, to the extent appropriate to the needs of the children, consistent with § 300.114(a)(2)(i).

Because placement decisions must be determined on an individual case-by-case basis depending on each child's unique educational needs and circumstances and based on the child's IEP, we do not believe it is appropriate to require in the regulations that the continuum of alternative placements include a progressively more intensive level of individualized scientifically based instruction and related services as suggested by the commenter.

*Changes:* None.

*Comment:* We received a number of comments regarding the phrase, ''unless the parent agrees otherwise'' in proposed § 300.116(b)(3) and (c). As proposed, § 300.116(b)(3) requires the child's placement to be as close as possible to the child's home, ''unless the parent agrees otherwise;'' and § 300.116(c) requires that, unless the child's IEP requires some other arrangement, the child must be educated in the school that he or she would attend if nondisabled, ''unless the parent agrees otherwise.'' Many commenters requested removing the phrase ''unless the parent agrees otherwise,'' because it is not included in section 612(a)(5) of the Act and is not necessary to clarify that a parent may place his or her child in a charter, magnet, or other specialized school without violating the LRE requirements. Other commenters suggested removing the phrase and clarifying that a decision by the child's parent to send the child to a charter, magnet, or other specialized

**46588**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

school is not a violation of the LRE requirements.

Several commenters stated that including the phrase undermines the statutory requirement for children with disabilities to be placed in the LRE based on their IEPs and allows more restrictive placements based on parental choice. Many commenters interpreted this phrase to mean that placement is a matter of parental choice even in public school settings and stated that a child's LRE rights should not be overridden by parental choice. One commenter stated that the phrase might intimidate parents into accepting inappropriate placements.

A few commenters stated that this phrase is unnecessary because the Act already requires parents to be involved in placement decisions, and expressed concern that including this phrase in the regulations could lead to confusion and litigation. One commenter stated that the phrase suggests that additional consent is required if the parent chooses to send the child to a charter, magnet, or other specialized school.

*Discussion:* The phrase "unless the parent agrees otherwise" in proposed § 300.116(b)(3) and (c) was added to clarify that a parent may send the child to a charter, magnet, or other specialized school without violating the LRE mandate. A parent has always had this option; a parent who chooses this option for the child does not violate the LRE mandate as long as the child is educated with his or her peers without disabilities to the maximum extent appropriate. However, we agree that this phrase is unnecessary, confusing, and may be misunderstood to mean that parents have a right to veto the placement decision made by the group of individuals in § 300.116(a)(1). We will, therefore, remove the phrase.

*Changes:* We have removed the phrase "unless the parent agrees otherwise" in § 300.116(b)(3) and (c).

*Comment:* One commenter disagreed with the requirement in § 300.116(b)(3) that placements be as close as possible to the child's home, stating that the requirement is administratively prohibitive and beyond the scope of the Act. The commenter stated that it is not possible for school districts to provide classes for children with all types and degrees of disabilities in each school building. The commenter stated that "placement" should be understood as the set of services outlined in a child's IEP, and recommended that school districts be permitted to provide these services in the school building that is most administratively feasible.

*Discussion:* We do not believe the requirement imposes unduly restrictive

administrative requirements. The Department has consistently maintained that a child with a disability should be educated in a school as close to the child's home as possible, unless the services identified in the child's IEP require a different location. Even though the Act does not mandate that a child with a disability be educated in the school he or she would normally attend if not disabled, section 612(a)(5)(A) of the Act presumes that the first placement option considered for each child with a disability is the regular classroom in the school that the child would attend if not disabled, with appropriate supplementary aids and services to facilitate such placement. Thus, before a child with a disability can be placed outside of the regular educational environment, the full range of supplementary aids and services that could be provided to facilitate the child's placement in the regular classroom setting must be considered. Following that consideration, if a determination is made that a particular child with a disability cannot be educated satisfactorily in the regular educational environment, even with the provision of appropriate supplementary aids and services, that child could be placed in a setting other than the regular classroom.

Although the Act does not require that each school building in an LEA be able to provide all the special education and related services for all types and severities of disabilities, the LEA has an obligation to make available a full continuum of alternative placement options that maximize opportunities for its children with disabilities to be educated with nondisabled peers to the extent appropriate. In all cases, placement decisions must be individually determined on the basis of each child's abilities and needs and each child's IEP, and not solely on factors such as category of disability, severity of disability, availability of special education and related services, configuration of the service delivery system, availability of space, or administrative convenience.

*Changes:* None.

*Comment:* One commenter requested clarifying the difference, if any, between "placement" and "location." One commenter recommended requiring the child's IEP to include a detailed explanation of why a child's educational needs cannot be met in the location requested by the parent when the school district opposes the parent's request for services to be provided to the child in the school that the child would attend if the child did not have a disability.

*Discussion:* Historically, we have referred to "placement" as points along the continuum of placement options available for a child with a disability, and "location" as the physical surrounding, such as the classroom, in which a child with a disability receives special education and related services. Public agencies are strongly encouraged to place a child with a disability in the school and classroom the child would attend if the child did not have a disability. However, a public agency may have two or more equally appropriate locations that meet the child's special education and related services needs and school administrators should have the flexibility to assign the child to a particular school or classroom, provided that determination is consistent with the decision of the group determining placement. It also should be noted that, under section 615(b)(3) of the Act, a parent must be given written prior notice that meets the requirements of § 300.503 a reasonable time before a public agency implements a proposal or refusal to initiate or change the identification, evaluation, or educational placement of the child, or the provision of FAPE to the child. Consistent with this notice requirement, parents of children with disabilities must be informed that the public agency is required to have a full continuum of placement options, as well as about the placement options that were actually considered and the reasons why those options were rejected. While public agencies have an obligation under the Act to notify parents regarding placement decisions, there is nothing in the Act that requires a detailed explanation in children's IEPs of why their educational needs or educational placements cannot be met in the location the parents' request. We believe including such a provision would be overly burdensome for school administrators and diminish their flexibility to appropriately assign a child to a particular school or classroom, provided that the assignment is made consistent with the child's IEP and the decision of the group determining placement.

*Changes:* None.

*Comment:* One commenter recommended including in the regulations the Department's policy that a child's placement in an educational program that is substantially and materially similar to the former placement is not a change in placement.

*Discussion:* As stated by the commenter, it is the Department's longstanding position that maintaining a child's placement in an educational

program that is substantially and materially similar to the former placement is not a change in placement. We do not believe further clarification is necessary in the regulations, however, as the distinction seems to be commonly accepted and understood.

*Changes:* None.

*Comment:* Many commenters suggested requiring a public agency to pay all costs associated with providing FAPE for a child in a private preschool, including paying for tuition, transportation and such special education, related services and supplementary aids and services as the child needs, if an inclusive preschool is the appropriate placement for a child, and there is no inclusive public preschool that can provide all the appropriate services and supports.

*Discussion:* The LRE requirements in §§ 300.114 through 300.118 apply to all children with disabilities, including preschool children who are entitled to FAPE. Public agencies that do not operate programs for preschool children without disabilities are not required to initiate those programs solely to satisfy the LRE requirements of the Act. Public agencies that do not have an inclusive public preschool that can provide all the appropriate services and supports must explore alternative methods to ensure that the LRE requirements are met. Examples of such alternative methods might include placement options in private preschool programs or other community-based settings. Paying for the placement of qualified preschool children with disabilities in a private preschool with children without disabilities is one, but not the only, option available to public agencies to meet the LRE requirements. We believe the regulations should allow public agencies to choose an appropriate option to meet the LRE requirements. However, if a public agency determines that placement in a private preschool program is necessary as a means of providing special education and related services to a child with a disability, the program must be at no cost to the parent of the child.

*Changes:* None.

*Comment:* One commenter suggested clarifying that if a child's behavior in the regular classroom significantly impairs the learning of the child or others, that placement would not meet the child's needs and would not be appropriate for that child.

*Discussion:* Although the Act places a strong preference in favor of educating children with disabilities in the regular classroom with appropriate aids and supports, a regular classroom placement is not appropriate for every child with a disability. Placement decisions are made on a case-by-case basis and must be appropriate for the needs of the child. The courts have generally concluded that, if a child with a disability has behavioral problems that are so disruptive in a regular classroom that the education of other children is significantly impaired, the needs of the child with a disability generally cannot be met in that environment. However, before making such a determination, LEAs must ensure that consideration has been given to the full range of supplementary aids and services that could be provided to the child in the regular educational environment to accommodate the unique needs of the child with a disability. If the group making the placement decision determines, that even with the provision of supplementary aids and services, the child's IEP could not be implemented satisfactorily in the regular educational environment, that placement would not be the LRE placement for that child at that particular time, because her or his unique educational needs could not be met in that setting. (*See Roncker* v. *Walter,* 700 F. 2d 1058 (6th Cir. 1983); *Devries* v. *Fairfax County School Bd.,* 882 F. 2d 876, 879 (4th Cir. 1989); *Daniel R.R.* v. *State Bd. of Educ.,* 874 F. 2d 1036 (5th Cir. 1989); and *A.W.* v. *Northwest R–1 School Dist.,* 813 F.2d 158, 163 (8th Cir. 1987).)

*Changes:* None.

### Nonacademic Settings (§ 300.117)

*Comment:* One commenter requested that the regulations clarify that children with disabilities should receive the supplementary aids and services necessary to ensure their participation in nonacademic and extracurricular services and activities.

*Discussion:* Section 300.117, consistent with section 612(a)(5) of the Act, requires that children with disabilities participate in nonacademic and extracurricular services and activities with their nondisabled peers to the maximum extent appropriate to the needs of the child. The Act places great emphasis on ensuring that children with disabilities are educated, to the maximum extent appropriate, with children who are nondisabled and are included in nonacademic and extracurricular services and activities as appropriate to the needs of the child. We believe the public agency has an obligation to provide a child with a disability with appropriate aids, services, and other supports, as determined by the IEP Team, if necessary to ensure the child's participation in nonacademic and extracurricular services and activities.

Therefore, we will clarify in § 300.117 that each public agency must ensure that children with disabilities have the supplementary aids and services determined necessary by the child's IEP Team for the child to participate in nonacademic and extracurricular services and activities to the maximum extent appropriate to the needs of that child.

*Changes:* We have added language to § 300.117 to ensure that children with disabilities receive the supplementary aids and services needed to participate in nonacademic and extracurricular services and activities.

### Technical Assistance and Training Activities (§ 300.119)

*Comment:* One commenter requested that the regulations define "training."

*Discussion:* The Department intends the term "training," as used in § 300.119, to have its generally accepted meaning. Training is generally agreed to be any activity used to enhance one's skill or knowledge to acquire, maintain, and advance knowledge, skills, and abilities. Given the general understanding of the term "training," we do not believe it is necessary to regulate on this matter.

*Changes:* None.

### Children in Private Schools

### Children With Disabilities Enrolled by Their Parents in Private Schools

### General Comments

*Comment:* Many comments were received regarding the parentally-placed private school children with disabilities requirements in §§ 300.130 through 300.144. Many commenters supported the changes to the regulations and believed the regulations simplify the processes for both private schools and public schools. Numerous commenters, however, expressed concern regarding the implementation of the private school requirements.

Many of the commenters expressed concern with the requirement that the LEAs where private elementary schools and secondary schools are located are now responsible for child find, individual evaluations, and the provision of services for children with disabilities enrolled by their parents in private schools located in the LEA. These commenters described the private school provisions in the Act and the NPRM as burdensome and difficult to understand.

*Discussion:* The revisions to the Act in 2004 significantly changed the obligation of States and LEAs to children with disabilities enrolled by their parents in private elementary

**46590** **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

schools and secondary schools. Section 612(a)(10)(A) of the Act now requires LEAs in which the private schools are located, rather than the LEAs in which the parents of such children reside, to conduct child find and provide equitable services to parentally-placed private school children with disabilities.

The Act provides that, in calculating the proportionate amount of Federal funds under Part B of the Act that must be spent on parentally-placed private school children with disabilities, the LEAs where the private schools are located, after timely and meaningful consultation with representatives of private elementary schools and secondary schools and representatives of parents of parentally-placed private school children with disabilities, must conduct a thorough and complete child find process to determine the number of parentally-placed children with disabilities attending private elementary schools and secondary schools located in the LEAs. In addition, the obligation of the LEA to spend a proportionate amount of funds to provide services to children with disabilities enrolled by their parents in private schools is now based on the total number of children with disabilities who are enrolled in private schools located in the LEA whether or not the children and their parents reside in the LEA.

We believe these regulations and the additional clarification provided in our responses to comments on §§ 300.130 through 300.144 will help States and LEAs to better understand their obligations in serving children with disabilities placed by their parents in private elementary schools and secondary schools. In addition, the Department has provided additional guidance on implementing the parentally-placed private school requirements on the Department's Web site. We also are including in these regulations *Appendix B to Part 300— Proportionate Share Calculation* to assist LEAs in calculating the proportionate amount of Part B funds that they must expend on parentally-placed private school children with disabilities attending private elementary schools and secondary schools located in the LEA.

*Changes:* We have added a reference to Appendix B in § 300.133(b).

*Comment:* Several commenters expressed concern that §§ 300.130 through 300.144 include requirements that go beyond the Act and recommended that any requirement beyond what is statutory be removed from these regulations.

*Discussion:* In general, the regulations track the language in section

612(a)(10)(A) of the Act regarding children enrolled in private schools by their parents. However, we determined that including clarification of the statutory language on parentally-placed private school children with disabilities in these regulations would be helpful. The volume of comments received concerning this topic confirm the need to regulate in order to clarify the statutory language and to help ensure compliance with the requirements of the Act.

*Changes:* None.

*Comment:* Some commenters requested that the regulations provide flexibility to States to provide services to parentally-placed private school children with disabilities beyond what they would be able to do with the proportionate share required under the Act. A few of these commenters requested that those States already providing an individual entitlement to special education and related services or providing a full range of special education services to parentally-placed private school children be deemed to have met the requirements in §§ 300.130 through 300.144 and be permitted to continue the State's current practices. One commenter specifically recommended allowing States that provide additional rights or services to parentally-placed private school children with disabilities (including FAPE under section 612 of the Act and the procedural safeguards under section 615 of the Act), the option of requesting that the Secretary consider alternate compliance with these requirements that would include evidence and supporting documentation of alternate procedures under State law to meet all the requirements in §§ 300.130 through 300.144.

A few commenters requested that the child find and equitable participation requirements should not apply in States with dual enrollment provisions where children with disabilities who are parentally-placed in private elementary schools or secondary schools are also enrolled in public schools for special education and have IEPs and retain their due process rights.

*Discussion:* The Act in no way prohibits States or LEAs from spending additional State or local funds to provide special education or related services for parentally-placed private school children with disabilities in excess of those required in § 300.133 and section 612(a)(10)(A) of the Act, consistent with State law or administrative procedures. The Act, however, does not provide the Secretary with the authority to waive, in whole or in part, the parentally-placed private

school requirements in §§ 300.130 through 300.144 for States or LEAs that spend State or local funds to provide special education or related services beyond those required under Part B of the Act. The Secretary, therefore, cannot consider alternative compliance with the parentally-placed private school provisions in the Act and these regulations or consider States and LEAs that use State and local funds to provide services to parentally-placed private school children with disabilities beyond the required proportionate share of Federal Part B funds, including providing FAPE to such children, to have met the statutory and regulatory requirements governing parentally-placed private school children with disabilities. States and LEAs must meet the requirements in the Act and these regulations.

With regard to the comment requesting that the child find and equitable participation requirements for parentally-placed private school children with disabilities not apply in States with dual enrollment, there is no exception in the Act to the child find and equitable participation requirements of section 612(a)(10)(A) for States that permit dual enrollment of a child at a parent's discretion. Therefore, there is no basis to regulate to provide such an exception. It would be a matter of State or local discretion to decide whether to have a dual enrollment policy and, if established, how it would be implemented. Whether dual enrollment alters the rights of parentally-placed private school children with disabilities under State law is a State matter. There is nothing, however, in Part B of the Act that would prohibit a State from requiring dual enrollment as a condition for a parentally-placed private school child with a disability to be eligible for services from a public agency. As long as States and LEAs meet the requirements in §§ 300.130 through 300.144, the local policy covering enrollment is a matter of State and local discretion.

*Changes:* None.

*Comment:* Several commenters expressed concern regarding the applicability of the child find and equitable participation requirements in §§ 300.130 through 300.144 for children with disabilities who reside in one State and are enrolled by their parents in private elementary schools or secondary schools located in another State. These commenters recommended that the regulations clarify whether the LEA in the State where the private elementary school or secondary school is located or the LEA in the State where the child

resides is responsible for conducting child find (including individual evaluations and reevaluations), and providing and paying for equitable services for children who are enrolled by their parents in private elementary schools or secondary schools.

*Discussion:* Section 612(a)(10)(A)(i)(II) of the Act provides that the LEA where the private elementary schools and secondary schools are located, after timely and meaningful consultation with private school representatives, is responsible for conducting the child find process to determine the number of parentally-placed children with disabilities attending private schools located in the LEA. We believe this responsibility includes child find for children who reside in other States but who attend private elementary schools and secondary schools located in the LEA, because section 612(a)(10)(A)(i)(II) of the Act is clear about which LEA is responsible for child find and the Act does not provide an exception for children who reside in one State and attend private elementary schools and secondary schools in other States.

Under section 612(a)(10)(A)(i) of the Act, the LEA where the private elementary schools and secondary schools are located, in consultation with private school officials and representatives of parents of parentally-placed private school children with disabilities, also is responsible for determining and paying for the services to be provided to parentally-placed private school children with disabilities. We believe this responsibility extends to children from other States who are enrolled in a private school located in the LEA, because section 612(a)(10)(A)(i) of the Act clarifies that the LEA where the private schools are located is responsible for spending a proportionate amount of its Federal Part B funds on special education and related services for children enrolled by their parents in the private schools located in the LEA. The Act does not provide an exception for out-of-State children with disabilities attending a private school located in the LEA and, therefore, out-of-State children with disabilities must be included in the group of parentally-placed children with disabilities whose needs are considered in determining which parentally-placed private school children with disabilities will be served and the types and amounts of services to be provided.

*Changes:* We have added a new paragraph (f) to § 300.131 clarifying that each LEA where private, including religious, elementary schools and secondary schools are located must, in

carrying out the child find requirements in this section, include parentally-placed private school children who reside in the State other than where the private schools they attend are located.

*Comment:* A few commenters recommended the regulations clarify the LEA's obligation under §§ 300.130 through 300.144 regarding child find and equitable participation for children from other countries enrolled in private elementary schools and secondary schools by their parents.

*Discussion:* The obligation to consider children with disabilities for equitable services extends to all children with disabilities in the State who are enrolled by their parents in private schools within each LEA's jurisdiction.

*Changes:* None.

*Comment:* Several commenters recommended the regulations clarify the applicability of the child find and equitable participation requirements in §§ 300.130 through 300.144 for children with disabilities, aged three through five, enrolled by their parents in private preschools or day care programs. Many commenters recommended the regulations clarify that preschool children with disabilities should be counted in determining the proportionate share of funds available to serve children enrolled in private elementary schools by their parents.

*Discussion:* If a private preschool or day care program is considered an elementary school, as defined in § 300.13, the child find and equitable services participation requirements in §§ 300.130 through 300.144, consistent with section 612(a)(10) of the Act, apply to children with disabilities aged three through five enrolled by their parents in such programs. Section 300.13, consistent with section 602(6) of the Act, defines an *elementary school* as a nonprofit institutional day or residential school, including a public elementary charter school, which provides elementary education, as determined under State law. We believe it is important to clarify in the regulations that children aged three through five are considered parentally-placed private school children with disabilities enrolled in private elementary schools only if they are enrolled in private schools that meet the definition of *elementary school* in § 300.13.

*Changes:* We have added a new § 300.133(a)(2)(ii) to clarify that children aged three through five are considered to be parentally-placed private school children with disabilities enrolled by their parents in private, including religious, elementary schools, if they are enrolled in a private school that meets

the definition of *elementary school* in § 300.13.

## Definition of Parentally-Placed Private School Children With Disabilities (§ 300.130)

*Comment:* A few commenters recommended removing ''or facilities'' from the definition of parentally-placed private school children because it is not defined in the Act or the regulations. Another commenter recommended including a definition of ''facilities.''

*Discussion:* Under section 612(a)(10)(A) of the Act, the obligation to conduct child find and provide equitable services extends to children who are enrolled by their parents in private elementary schools and secondary schools. This obligation also applies to children who have been enrolled by their parents in private facilities if those facilities are elementary schools or secondary schools, as defined in subpart A of the regulations. Because facilities that meet the definition of elementary school or secondary school are covered under this section, we believe it is important to retain the reference to facilities in these regulations. We will, however, revise § 300.130 to clarify that children with disabilities who are enrolled by their parents in facilities that meet the definition of *elementary school* in § 300.13 or *secondary school* in new § 300.36 (proposed § 300.35) would be considered parentally-placed private school children with disabilities.

*Changes:* Section 300.130 has been revised to clarify that parentally-placed private school children with disabilities means children with disabilities enrolled by their parents in private, including religious, schools or facilities that meet the definition of an *elementary school* in § 300.13 or *secondary school* in § 300.36.

## Child Find for Parentally-Placed Private School Children With Disabilities (§ 300.131)

*Comment:* A few commenters recommended permitting the LEA where private schools are located to request reimbursement from the LEA where the child resides for the cost of conducting an individual evaluation, as may be required under the child find requirements in § 300.131.

One commenter recommended that the LEA where private schools are located be responsible for locating and identifying children with disabilities enrolled by their parents in private schools and the LEA where the children reside be responsible for conducting individual evaluations.

*Discussion:* Section 300.131, consistent with section 612(a)(10)(A)(i) of the Act, requires that the LEA where private elementary schools and secondary schools in which the child is enrolled are located, not the LEA where the child resides, is responsible for conducting child find, including an individual evaluation for a child with a disability enrolled by the child's parent in a private elementary school or secondary school located in the LEA. The Act specifies that the LEA where the private schools are located is responsible for conducting both the child find process and the initial evaluation. Therefore, the LEA where private schools are located may not seek reimbursement from the LEA of residence for the cost of conducting the evaluation or to request that the LEA of residence conduct the evaluation. However, the LEA where the private elementary school or secondary school is located has options as to how it meets its responsibilities. For example, the LEA may assume the responsibility itself, contract with another public agency (including the public agency of residence), or make other arrangements.

*Changes:* None.

*Comment:* One commenter recommended permitting a parent who enrolled a child in a private elementary school or secondary school the option of not participating in child find required under § 300.131.

*Discussion:* New § 300.300(e)(4) clarifies that parents who enroll their children in private elementary schools and secondary schools have the option of not participating in an LEA's child find activities required under § 300.131. As noted in the *Analysis of Comments and Changes* section for subpart D, once parents opt out of the public schools, States and school districts do not have the same interest in requiring parents to agree to the evaluation of their children as they do for children enrolled in public schools, in light of the public agencies' obligation to educate public school children with disabilities. We further indicate in the discussion of subpart D that we have added new § 300.300(e)(4) (proposed § 300.300(d)) to clarify that if the parent of a child who is home schooled or placed in a private school by the child's parent at the parent's own expense does not provide consent for an initial evaluation or reevaluation, the public agency may not use the due process procedures in section 615 of the Act and the public agency is not required to consider the child for equitable services.

*Changes:* None.

*Comment:* Several commenters recommended permitting amounts expended for child find, including individual evaluations, to be deducted from the required amount of funds to be expended on equitable services for parentally-placed private school children with disabilities.

*Discussion:* The requested changes would be inconsistent with the Act. There is a distinction under the Act between the obligation to conduct child find activities, including individual evaluations, for parentally-placed private school children with disabilities, and the obligation to use an amount of funds equal to a proportionate amount of the Federal Part B grant flowing to LEAs to provide special education and related services to parentally-placed private school children with disabilities. The obligation to conduct child find for parentally-placed private school children, including individual evaluations, is independent of the services provision. Further, § 300.131(d), consistent with section 612(a)(10)(A)(ii)(IV) of the Act, clarifies that the costs of child find activities for parentally-placed private school children, including individual evaluations, may not be considered in determining whether the LEA has spent an appropriate amount on providing special education and related services to parentally-placed private school children with disabilities.

*Changes:* None.

*Comment:* One commenter requested clarifying whether an LEA may exclude children suspected of having certain disabilities, such as those with specific learning disabilities, in conducting individual evaluations of suspected children with disabilities enrolled in private schools by their parents.

*Discussion:* The LEA where the private elementary schools and secondary schools are located must identify and evaluate all children suspected of having disabilities as defined under section 602(3) of the Act. LEAs may not exclude children suspected of having certain disabilities, such as those with specific learning disabilities, from their child find activities. The Department recommends that LEAs and private elementary schools and secondary schools consult on how best to implement the State's evaluation criteria and the requirements under this part for identifying children with specific learning disabilities enrolled in private schools by their parents. This is explained in more detail in the discussion of comments under § 300.307.

*Changes:* None.

*Comment:* A few commenters expressed concern that parents who place their children in private

elementary schools and secondary schools outside the district of residence, and who are determined by the LEA where the private schools are located, through its child find process, to be children with disabilities eligible for special education and related services, would have no knowledge of the special education and related services available for their children if they choose to attend a public school in their district of residence. A few commenters suggested clarifying the obligation of the LEA where the private school is located to provide the district of residence the results of an evaluation and eligibility determination of the parentally-placed private school child.

A few commenters recommended that the parent of a child with a disability identified through the child find process in § 300.131 be provided with information regarding an appropriate educational program for the child.

*Discussion:* The Act is silent on the obligation of officials of the LEA where private elementary schools and secondary schools are located to share personally identifiable information, such as individual evaluation information, with officials of the LEA of the parent's residence. We believe that the LEA where the private schools are located has an obligation to protect the privacy of children placed in private schools by their parents. We believe that when a parentally-placed private school child is evaluated and identified as a child with a disability by the LEA in which the private school is located, parental consent should be required before such personally identifiable information is released to officials of the LEA of the parent's residence. Therefore, we are adding a new paragraph (b)(3) to § 300.622 to make this clear. We explain this revision in more detail in the discussion of comments under § 300.622.

We believe the regulations adequately ensure that parents of children enrolled in private schools by their parents, who are identified as children with disabilities through the child find process, receive information regarding an appropriate educational program for their children. Section 300.138(b) provides that each parentally-placed private school child with a disability who has been designated to receive equitable services must have a services plan that describes the specific education and related services that the LEA where the private school is located has determined it will make available to the child and the services plan must, to the extent appropriate, meet the IEP content, development, review and revision requirements described in

section 614(d) of the Act, or, when appropriate, for children aged three through five, the IFSP requirements described in section 636(d) of the Act as to the services that are to be provided.

Furthermore, the LEA where the private school is located must, pursuant to § 300.504(a) and section 615(d) of the Act, provide the parent a copy of the procedural safeguards notice upon conducting the initial evaluation.

*Changes:* We have added a new paragraph (b)(3) to § 300.622 to require parental consent for the disclosure of records of parentally-placed private school children between LEAs.

*Comment:* A few commenters stated that § 300.131 does not address which LEA has the responsibility for reevaluations.

*Discussion:* The LEA where the private schools are located is responsible for conducting reevaluations of children with disabilities enrolled by their parents in private elementary schools and secondary schools located within the LEA. Reevaluation is a part of the LEA's child find responsibility for parentally-placed private school children under section 612(a)(10)(A) of the Act.

*Changes:* None.

*Comment:* One commenter expressed concern that the regulations permit a parent to request an evaluation from the LEA of residence at the same time the child is being evaluated by the LEA where the private elementary school or secondary school is located, resulting in two LEAs simultaneously conducting evaluations of the same child.

*Discussion:* We recognize that there could be times when parents request that their parentally-placed child be evaluated by different LEAs if the child is attending a private school that is not in the LEA in which they reside. For example, because most States generally allocate the responsibility for making FAPE available to the LEA in which the child's parents reside, and that could be a different LEA from the LEA in which the child's private school is located, parents could ask two different LEAs to evaluate their child for different purposes at the same time. Although there is nothing in this part that would prohibit parents from requesting that their child be evaluated by the LEA responsible for FAPE for purposes of having a program of FAPE made available to the child at the same time that the parents have requested that the LEA where the private school is located evaluate their child for purposes of considering the child for equitable services, we do not encourage this practice. We note that new § 300.622(b)(4) requires parental consent

for the release of information about parentally-placed private school children between LEAs; therefore, as a practical matter, one LEA may not know that a parent also requested an evaluation from another LEA. However, we do not believe that the child's best interests would be well-served if the parents requested evaluations of their child by the resident school district and the LEA where the private school is located, even though these evaluations are conducted for different purposes. A practice of subjecting a child to repeated testing by separate LEAs in close proximity of time may not be the most effective or desirable way of ensuring that the evaluation is a meaningful measure of whether a child has a disability or of providing an appropriate assessment of the child's educational needs.

*Changes:* None.

*Comment:* Some commenters requested the regulations clarify which LEA (the LEA of residence or the LEA where the private elementary schools or secondary schools are located) is responsible for offering FAPE to children identified through child find under § 300.131 so that parents can make an informed decision regarding their children's education.

*Discussion:* If a determination is made by the LEA where the private school is located that a child needs special education and related services, the LEA where the child resides is responsible for making FAPE available to the child. If the parent makes clear his or her intention to keep the child enrolled in the private elementary school or secondary school located in another LEA, the LEA where the child resides need not make FAPE available to the child. We do not believe that a change to the regulations is necessary, as § 300.201 already clarifies that the district of residence is responsible for making FAPE available to the child. Accordingly, the district in which the private elementary or secondary school is located is not responsible for making FAPE available to a child residing in another district.

*Changes:* None.

*Comment:* One commenter requested clarification of the term "activities similar" in § 300.131(c). Another commenter recommended clarifying that these activities include, but are not limited to, activities relating to evaluations and reevaluations. One commenter requested that children with disabilities parentally-placed in private schools be identified and evaluated as quickly as possible.

*Discussion:* Section 300.131(c), consistent with section

612(a)(10)(A)(ii)(III) of the Act, requires that, in carrying out child find for parentally-placed private school children, SEAs and LEAs must undertake activities similar to those activities undertaken for their publicly enrolled or publicly-placed children. This would generally include, but is not limited to, such activities as widely distributing informational brochures, providing regular public service announcements, staffing exhibits at health fairs and other community activities, and creating direct liaisons with private schools. Activities for child find must be completed in a time period comparable to those activities for public school children. This means that LEAs must conduct child find activities, including individual evaluations, for parentally-placed private school children within a reasonable period of time and without undue delay, and may not wait until after child find for public school children is conducted. In addition, evaluations of all children suspected of having disabilities under Part B of the Act, regardless of whether they are enrolled by their parents in private elementary schools or secondary schools, must be conducted in accordance with the requirements in §§ 300.300 through 300.311, consistent with section 614(a) through (c) of the Act, which describes the procedures for evaluations and reevaluations for all children with disabilities. We believe the phrase "activities similar" is understood by SEAs and LEAs and, therefore, it is not necessary to regulate on the meaning of the phrase.

*Changes:* None.

Provision of Services for Parentally-Placed Private School Children With Disabilities—Basic Requirement (§ 300.132)

*Comment:* Several commenters expressed confusion regarding which LEA is responsible for paying for the equitable services provided to a parentally-placed private elementary school or secondary school child, the district of the child's residence or the LEA where the private school is located.

*Discussion:* We believe § 300.133, consistent with section 612(a)(10)(A) of the Act, is sufficiently clear that the LEA where the private elementary schools and secondary schools are located is responsible for paying for the equitable services provided to a parentally-placed private elementary school or secondary school child. These provisions provide that the LEA where the private elementary and secondary schools are located must spend a proportionate amount of its Federal funds available under Part B of the Act

for services for children with disabilities enrolled by their parents in private elementary schools and secondary schools located in the LEA. The Act does not permit an exception to this requirement. No further clarification is needed.

*Changes:* None.

*Comment:* One commenter recommended the regulations clarify which LEA in the State is responsible for providing equitable services to parentally-placed private school children with disabilities who attend a private school that straddles two LEAs in the State.

*Discussion:* The Act does not address situations where a private school straddles more than one LEA. However, the Act does specify that the LEA in which the private school is located is responsible for providing special education to children with disabilities placed in private schools by their parents, consistent with the number of such children and their needs. In situations where more than one LEA potentially could assume the responsibility of providing equitable services, the SEA, consistent with its general supervisory responsibility, determines which LEA in the State is responsible for ensuring the equitable participation of children with disabilities attending that private school. We do not believe that the situation is common enough to warrant a change in the regulations.

*Changes:* None.

*Comment:* A few commenters recommended revising the heading for § 300.132(b) to clarify that LEAs, not SEAs, are responsible for developing service plans.

*Discussion:* We agree with the commenters that the heading for § 300.132(b) should be changed to accurately reflect the requirement and to avoid confusion.

*Changes:* We have revised the heading for § 300.132(b) by removing the reference to SEA responsibility.

*Comment:* One commenter requested requiring in § 300.132(c) that data on parentally-placed private school children with disabilities be submitted to the Department. Another commenter agreed, stating that the data should be submitted the same day as the annual child count.

*Discussion:* The purpose of the child count under § 300.132(c) is to determine the amount of Federal funds that the LEA must spend on providing special education and related services to parentally-placed private school children with disabilities in the next fiscal year. We are not requiring States to submit these data to the Department

as the Department does not have a programmatic or regulatory need to collect this information at this time. Section 300.644 permits the SEA to include in its annual report of children served those parentally-placed private school children who are eligible under the Act and receive special education or related services. We believe this is sufficient to meet the Department's need to collect data on this group of children and we do not wish to place an unnecessary data collection and paperwork burden on States.

*Changes:* None.

Expenditures (§ 300.133)

*Comment:* One commenter requested the regulations clarify whether an LEA must spend its entire proportionate share for parentally-placed private school children with disabilities by the end of a fiscal year or could carry over any remaining funds into the next fiscal year.

*Discussion:* We agree with the commenter that a provision should be included in these regulations to clarify that, if an LEA has not expended for equitable services all of the proportionate amount of Federal funds to be provided for parentally-placed private school children with disabilities by the end of the fiscal year for which Congress appropriated the funds, the LEA must obligate the remaining funds for special education and related services (including direct services) to parentally-placed private school children with disabilities during a carry-over period of one additional year.

*Changes:* A new paragraph (a)(3) has been added to § 300.133 to address the carry over of funds not expended by the end of the fiscal year.

*Comment:* One commenter.

*Discussion:* It has come to our attention that there is some confusion among States and LEAs between the count of the number of children with disabilities receiving special education and related services as required under section 618 of the Act, and the requirement under section 612(a)(10)(A)(i)(II) of the Act that each LEA conduct an annual count of the number of parentally-placed private school children with disabilities attending private schools in the LEA. We will, therefore, revise the heading (child count) for § 300.133(c) and the regulatory language in § 300.133(c) to avoid any confusion regarding the requirements in paragraph (c).

*Changes:* Section 300.133(c) has been revised as described above.

*Comment:* One commenter interpreted § 300.133(d) to require that: (1) LEAs provide services to parentally-

placed private school children with disabilities with funds provided under the Act and (2) LEAs no longer have the option of using local funds equal to, and in lieu of, the Federal pro-rated share amount. This commenter recommended that LEAs continue to be allowed to use local funds for administrative convenience.

*Discussion:* The commenter's interpretation is correct. The Act added the supplement, not supplant requirement in section 612(a)(10)(A)(i)(IV), which is included in § 300.133(d). This requirement provides that State and local funds may supplement, but in no case supplant the proportionate amount of the Federal Part B funds that must be expended under this provision. Prior to the change in the Act, if a State was spending more than the Federal proportional share of funds from State or local funds, then the State would not have to spend any Federal Part B funds. That is no longer permissible under the Act.

*Changes:* None.

*Comment:* A few commenters requested revising § 300.133 to include home-schooled children with disabilities in the same category as parentally-placed private school children with disabilities.

*Discussion:* Whether home-schooled children with disabilities are considered parentally-placed private school children with disabilities is a matter left to State law. Children with disabilities in home schools or home day cares must be treated in the same way as other parentally-placed private school children with disabilities for purposes of Part B of the Act only if the State recognizes home schools or home day cares as private elementary schools or secondary schools.

*Changes:* None.

Consultation (§ 300.134)

*Comment:* Some commenters recommended requiring, in § 300.134(e), that the LEA include, in its written explanation to the private school, its reason whenever: (1) The LEA does not provide services by a professional directly employed by that LEA to parentally-placed private school children with a disability when requested to do so by private school officials; and (2) the LEA does not provide services through a third party provider when requested to do so by the private school officials.

*Discussion:* Section 300.134(e) incorporates the language from section 612(a)(10)(A)(iii)(V) of the Act and requires the LEA to provide private school officials with a written explanation of the reasons why the LEA

chose not to provide services directly or through contract. We do not believe that the additional language suggested by the commenter is necessary because we view the statutory language as sufficient to ensure that the LEA meets its obligation to provide private school officials a written explanation of any reason why the LEA chose not to provide services directly or through a contract.

*Changes:* None.

Written Affirmation (§ 300.135)

*Comment:* Several commenters recommended requiring LEAs to forward the written affirmation to the SEA, because this information is important for the SEA to exercise adequate oversight over LEAs with respect to the participation of private school officials in the consultation process.

*Discussion:* Section 300.135, regarding written affirmation, tracks the language in section 612(a)(10)(A)(iv) of the Act. Including a requirement in the regulations that the LEA must submit a copy of signed written affirmations to the SEA would place reporting burdens on the LEA that are not required by the Act and that we do not believe are warranted in this circumstance. We expect that in most circumstances private school officials and LEAs will have cooperative relationships that will not need State involvement. If private school officials believe that there was not meaningful consultation, they may raise that issue with the SEA through the procedures in § 300.136. However, there is nothing in the Act or these regulations that would preclude a State from requiring LEAs to submit a copy of the written affirmation obtained pursuant to § 300.135, in meeting its general supervision responsibilities under § 300.149 or as a part of its monitoring of LEAs' implementation of Part B of the Act as required in § 300.600. Consistent with § 300.199(a)(2) and section 608(a)(2) of the Act, a State that chooses to require its LEAs to submit copies of written affirmations to the SEA beyond what is required in § 300.135 would have to identify, in writing, to the LEAs located in the State and to the Secretary, that such rule, regulation, or policy is a State-imposed requirement that is not required by Part B of the Act or these regulations.

*Changes:* None.

Compliance (§ 300.136)

*Comment:* One commenter recommended revising § 300.136 to permit an LEA to submit a complaint to the State if private school officials do not engage in meaningful consultation with the LEA.

*Discussion:* Section 300.136, consistent with section 612(a)(10)(A)(v) of the Act, provides that a private school official has the right to complain to the SEA that the LEA did not engage in consultation that was meaningful and timely, or did not give due consideration to the views of the private school official. The provisions in the Act and the regulations apply to the responsibilities of the SEA and its LEAs and not to private schools or entities. Because the requirements of the Act do not apply to private schools, we do not believe requiring SEAs to permit an LEA to submit a complaint to the SEA alleging that representatives of the private schools did not consult in a meaningful way with the LEA would serve a meaningful purpose. The equitable services made available under Part B of the Act are a benefit to the parentally-placed private school children and not services provided to the private schools.

*Changes:* None.

*Comment:* Several commenters recommended revising § 300.136 to allow States to determine the most appropriate procedures for a private school official to submit a complaint to the SEA that an LEA did not engage in consultation that was meaningful and timely, or did not give due consideration to the views of the private school officials. Many of these commenters stated that requiring such complaints be filed pursuant to the State complaint procedures in §§ 300.151 through 300.153 is not required by the Act and recommended we remove this requirement.

*Discussion:* We agree with the commenters that section 612(a)(10)(A)(v) of the Act does not stipulate how a private school official must submit a complaint to the SEA that the LEA did not engage in consultation that was meaningful and timely, or did not give due consideration to the views of the private school official. We also agree with the commenters that the SEA should have flexibility to determine how such complaints will be filed with the State. We will, therefore, revise § 300.136(a) to remove the requirement that private school officials must file a complaint with the SEA under the State complaint procedures in §§ 300.151 through 300.153. States may, if they so choose, use their State complaint procedures under §§ 300.151 through 300.153 as the means for a private school to file a complaint under § 300.136.

*Changes:* Section 300.136 has been revised to remove the requirement that a private school official submit a complaint to the SEA using the procedures in §§ 300.151 through 300.153.

Equitable Services Determined (§ 300.137)

*Comment:* One commenter recommended removing § 300.137(a), stating it is discriminatory and that parentally-placed private school children must receive the same amount of services as children with disabilities in public schools.

*Discussion:* Section 300.137(a) reflects the Department's longstanding policy, consistent with section 612(a)(10) of the Act, and explicitly provides that children with disabilities enrolled in private schools by their parents have no individual entitlement to receive some or all of the special education and related services they would receive if enrolled in the public schools. Under the Act, LEAs only have an obligation to provide parentally-placed private school children with disabilities an opportunity for equitable participation in the services funded with Federal Part B funds that the LEA has determined, after consultation, to make available to its population of parentally-placed private school children with disabilities. LEAs are not required to spend more than the proportionate Federal share on those services.

*Changes:* None.

Equitable Services Provided (§ 300.138)

*Comment:* Several commenters requested clarifying whether the requirement in § 300.138(a) that services provided to parentally-placed private school children with disabilities be provided by personnel meeting the same standards (*i.e.,* highly qualified teacher requirements) as personnel providing services in the public schools applies to private school teachers who are contracted by the LEA to provide equitable services.

*Discussion:* As discussed in the *Analysis of Comments and Changes* section, in the response to comments on § 300.18, it is the Department's position that the highly qualified special education teacher requirements do not apply to teachers hired by private elementary schools and secondary schools. This includes teachers hired by private elementary schools and secondary schools who teach children with disabilities. Further, it is the Department's position that the highly qualified special education teacher requirements also do not apply to private school teachers who provide equitable services to parentally-placed private school children with disabilities.

In addition to the revision we are making to new § 300.18(h) (proposed § 300.18(g)) to make this position clear, we also will revise § 300.138(a)(1) to clarify that private elementary school and secondary school teachers who are providing equitable services to parentally-placed private school children with disabilities do not have to meet the highly qualified special education teacher requirements.

*Changes:* We have revised § 300.138(a)(1) as indicated.

*Comment:* A few commenters requested clarifying the process for developing a services plan and explaining how a services plan differs from an IEP.

*Discussion:* We do not believe that additional explanation in the regulation is needed. Under § 300.138(b), each parentally-placed private school child with a disability who has been designated by the LEA in which the private school is located to receive special education or related services must have a services plan. The services plan must describe the specific special education and related services offered to a parentally-placed private school child with a disability designated to receive services. The services plan also must, to the extent appropriate, meet the IEP content, development, review, and revision requirements described in section 614(d) of the Act, or, when appropriate, for children aged three through five, the IFSP requirements described in section 636(d) of the Act as to the services that are to be provided. The LEA must ensure that a representative of the private school attends each meeting to develop the services plan and if the representative cannot attend, use other methods to ensure participation by the private school, including individual or conference telephone calls.

Children with disabilities enrolled in public schools or who are publicly-placed in private schools are entitled to FAPE and must receive the full range of services under Part B of the Act that are determined by the child's IEP Team to be necessary to meet the child's individual needs and provide FAPE. The IEPs for these children generally will be more comprehensive than the more limited services plans developed for parentally-placed private school children with disabilities designated to receive services.

*Changes:* None.

*Comment:* A few commenters recommended revising the definition of *services plan* to clarify that an IEP could serve as the services plan; otherwise, States that provide IEP services to parentally-placed private school

children with disabilities would be required to develop a services plan and an IEP.

*Discussion:* We do not believe it is appropriate to clarify in the regulations that the IEP can serve as the services plan because, as stated elsewhere in this preamble, a services plan should only describe the specific special education and related services offered to a parentally-placed private school child with a disability designated to receive services. We believe that using an IEP in lieu of a services plan for these children may not be appropriate in light of the fact that an IEP developed pursuant to section 614(d) of the Act will generally include much more than just those services that a parentally-placed private school child with a disability may receive, if designated to receive services. There is nothing, however, in these regulations that would prevent a State that provides more services to parentally-placed private school children with disabilities than they are required to do under the Act to use an IEP in place of a services plan, consistent with State law.

*Changes:* None.

### Location of Services and Transportation (§ 300.139)

*Comment:* A few commenters asked for clarification as to how the location where services will be provided to parentally-placed private school children with disabilities is determined.

*Discussion:* Under § 300.134(d), how, where, and by whom special education and related services are provided to parentally-placed private school children with disabilities are subjects of the process of consultation among LEA officials, private school representatives, and representatives of parents of parentally-placed private school children with disabilities. Further, § 300.137(b)(2) clarifies that, after this consultation process, the final decision with respect to the services provided to eligible parentally-placed private school children with disabilities is made by the LEA.

*Changes:* None.

*Comment:* Some commenters recommended specifying that providing services on the premises of private elementary schools and secondary schools is the preferred means of serving parentally-placed private school children with disabilities. A few commenters recommended revising § 300.139(a) to stipulate that services "should" or "must" be provided on the premises of private schools, unless there is a compelling rationale for these services to be provided off-site. In contrast, several commenters objected to

the statement in the preamble to the NPRM that services should be provided on-site unless there is a compelling rationale to provide services off-site. A few of these commenters stated that the Act does not indicate a preference for one location of services over another and the Department has no authority to provide such a strong comment on this issue.

*Discussion:* Services offered to parentally-placed private school children with disabilities may be provided on-site at a child's private school, including a religious school, or at another location. The Department believes, in the interests of the child, LEAs should provide services on site at the child's private school so as not to unduly disrupt the child's educational experience, unless there is a compelling rationale for these services to be provided off-site. The phrase "to the extent consistent with law" is in section 612(a)(10)(A)(i)(III) of the Act. We interpret this language to mean that the provision of services on the premises of a private school takes place in a manner that would not violate the Establishment Clause of the First Amendment to the U.S. Constitution and would not be inconsistent with applicable State constitutions or law. We, therefore, do not have the statutory authority to require that services be provided on-site.

*Changes:* None.

*Comment:* A few commenters expressed concern that § 300.139(b), regarding transportation services, goes beyond the requirements in the Act and should be removed. A few commenters stated that transportation is a related service and should be treated as such with respect to parentally-placed children with disabilities in private schools.

*Discussion:* We do not agree that transportation services should be removed from § 300.139(b). If services are offered at a site separate from the child's private school, transportation may be necessary to get the child to and from that other site. Failure to provide transportation could effectively deny the child an opportunity to benefit from the services that the LEA has determined through consultation to offer its parentally-placed private school children with disabilities. In this situation, although transportation is not a *related service*, as defined in § 300.34, transportation is necessary to enable the child to participate and to make the offered services accessible to the child. LEAs should work in consultation with representatives of private school children with disabilities to ensure that services are

provided at sites, including on the premises of the child's private school, so that LEAs do not incur significant transportation costs.

However, for some children with disabilities, special modifications in transportation may be necessary to address the child's unique needs. If the group developing the child's services plan determines that a parentally-placed private school child with a disability chosen to receive services requires transportation as a related service in order to receive special education services, this transportation service should be included as a related service in the services plan for the child.

In either case, the LEA may include the cost of the transportation in calculating whether it has met the requirement of § 300.133.

*Changes:* None.

Due Process Complaints and State Complaints (§ 300.140)

*Comment:* Several commenters expressed concern that the right of parents of children with disabilities enrolled by their parents in private elementary schools and secondary schools to file a due process complaint against an LEA is limited to filing a due process complaint that an LEA has failed to comply with the child find and evaluation requirements, and not an LEA's failure to provide special education and related services as required in the services plan. A few commenters recommended that the regulations clarify whether the parent should file a due process complaint with the LEA of residence or with the LEA where the private school is located.

*Discussion:* Section 615(a) of the Act specifies that the procedural safeguards of the Act apply with respect to the identification, evaluation, educational placement, or provision of FAPE to children with disabilities. The special education and related services provided to parentally-placed private school children with disabilities are independent of the obligation to make FAPE available to these children.

While there are legitimate issues regarding the provision of services to a particular parentally-placed private school child with a disability an LEA has agreed to serve, the due process provisions in section 615 of the Act and §§ 300.504 through 300.519 do not apply to these disputes, because there is no individual right to these services under the Act. Disputes that arise about these services are properly subject to the State complaint procedures under §§ 300.151 through 300.153.

Child find, however, is a part of the basic obligation that public agencies

have to all children with disabilities, and failure to locate, identify, and evaluate a parentally-placed private school child would be subject to due process. Therefore, the due process provisions in §§ 300.504 through 300.519 do apply to complaints that the LEA where the private school is located failed to meet the consent and evaluation requirements in §§ 300.300 through 311.

In light of the comments received, we will clarify in § 300.140 that parents of parentally-placed private school children with disabilities may file a due process complaint with the LEA in which the private school is located (and forward a copy to the SEA) regarding an LEA's failure to meet the consent and evaluation requirements in §§ 300.300 through 300.311. We also will clarify that a complaint can be filed with the SEA under the State complaint procedures in §§ 300.151 through 300.153 that the SEA or LEA has failed to meet the requirements in §§ 300.132 through 300.135 and §§ 300.137 through 300.144. There would be an exception, however, for complaints filed pursuant to § 300.136. Complaints under § 300.136 must be filed in accordance with the procedures established by each State under § 300.136.

*Changes:* Proposed § 300.140(a)(2) has been redesignated as new paragraph (b). A new paragraph (b)(2) has been added to this section to clarify that any due process complaint regarding the evaluation requirements in § 300.131 must be filed with the LEA in which the private school is located, and a copy must be forwarded to the SEA. Proposed § 300.140(b) has been redesignated as new paragraph (c), and has been revised to clarify that a complaint that the SEA or LEA has failed to meet the requirements in §§ 300.132 through 300.135 and §§ 300.137 through 300.144 can be filed with the SEA under the State complaint procedures in §§ 300.151 through 300.153. Complaints filed pursuant to § 300.136 must be filed with the SEA under the procedures established under § 300.136(b).

*Comment:* A few commenters requested clarification as to whether a parent of a parentally-placed private school child should request an independent educational evaluation at public expense under § 300.502(b) with the LEA of residence or the LEA where the private school is located.

*Discussion:* We do not believe that this level of detail needs to be included in the regulation. If a parent of a parentally-placed private school child disagrees with an evaluation obtained by the LEA in which the private school is located, the parent may request an independent

educational evaluation at public expense with that LEA.

*Changes:* None.

Use of Personnel (§ 300.142)

*Comment:* Several commenters requested clarifying language regarding who must provide equitable services to parentally-placed private school children with disabilities.

*Discussion:* Under section 612(a)(10)(A)(vi)(I) of the Act, equitable services must be provided by employees of a public agency or through contract by the public agency with an individual, association, agency, organization, or other entity. Section 300.142(a) provides that an LEA may use Part B funds to make public school personnel available in other than public facilities to the extent necessary to provide equitable services for parentally-placed children with disabilities attending private schools and if those services are not otherwise provided by the private school to children as a benefit provided to all children attending that school. Under § 300.142(b), an LEA may use Part B funds to pay for the services of an employee of a private school to provide equitable services if the employee performs the services outside of his or her regular hours of duty and the employee performs the services under public supervision and control. We believe that the regulation is sufficiently clear on this point.

*Changes:* None.

Property, Equipment, and Supplies (§ 300.144)

*Comment:* A few commenters requested clarification as to whether private school officials may purchase equipment and supplies with Part B funds to provide services to parentally-placed private school children with disabilities designated to receive services.

*Discussion:* We do not believe the additional clarification suggested by the commenters is necessary. Section 300.144, consistent with section 612(a)(10)(A)(vii) of the Act, already requires that the LEA must control and administer the funds used to provide special education and related services to parentally-placed private school children with disabilities, and maintain title to materials, equipment, and property purchased with those funds. Thus, the regulations and the Act prevent private school officials from purchasing equipment and supplies with Part B funds.

*Changes:* None.

ED-000059

**46598**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

*Children With Disabilities in Private Schools Placed or Referred by Public Agencies*

**Applicability of §§ 300.146 Through 300.147 (§ 300.145)**

*Comment:* One commenter stated that §§ 300.145 through 300.147 are unnecessary and solely administrative, because these sections are addressed in the Act and the proposed regulations provide no additional information on the application of the statutory requirements.

*Discussion:* We do not agree with the commenter that the provisions in §§ 300.146 through 300.147 are unnecessary and solely administrative. We believe it is necessary to retain these requirements in the regulations, consistent with section 612(a)(10)(B) of the Act, to ensure that public agencies are fully aware of their obligation to ensure that children with disabilities who are placed in or referred to a private school or facility by public agencies are entitled to receive FAPE to the same extent as they would if they were placed in a public agency school or program.

*Changes:* None.

**Responsibility of SEA (§ 300.146)**

*Comment:* Many commenters disagreed with the exception to the "highly qualified teacher" requirements in paragraph (b) of this section and stated that the "highly qualified teacher" requirements should apply to private school teachers of children with disabilities placed or referred by public agencies. Several commenters stated that these children are likely to have more severe disabilities and, therefore, have a greater need for highly qualified teachers than children served in public schools.

Several commenters stated that exempting teachers in private schools from the requirement to be "highly qualified" in situations where children with disabilities are publicly-placed in order to receive FAPE is not consistent with the requirement that the education provided to children in such settings meet the standards that apply to children served by public agencies, or with the ESEA and the goal in the Act of helping all children with disabilities achieve high standards.

A few commenters supported the exception to "highly qualified teacher" requirements. One commenter stated that States should make their own decisions in this area in light of resource constraints.

One commenter opposed the expenditure of public school funds for the education of publicly-placed private school children by teachers who do not meet the "highly qualified" requirements.

*Discussion:* Section 602(10) of the Act states that "highly qualified" has the meaning given the term in section 9101 of the ESEA, which clarifies that the requirements regarding highly qualified teachers apply to public school teachers and not teachers teaching as employees of private elementary schools and secondary schools. As we stated in the *Analysis of Comments and Changes* section regarding § 300.138 in this subpart and § 300.18 in subpart A, it is the Department's position that the highly qualified teacher requirements do not apply to teachers hired by private elementary schools and secondary schools. This includes teachers hired by private elementary schools and secondary schools who teach children with disabilities. We agree with the commenters that, in many instances, a public agency may choose to place a child with a severe disability and with more intensive educational needs in a private school or facility as a means of providing FAPE. When the public agency chooses to place a child with a significant disability, or any child with a disability, in a private school as a means of providing FAPE, the public agency has an obligation to ensure that the child receives FAPE to the same extent the child would if placed in a public school, irrespective of whether the private school teachers meet the highly qualified teacher requirements in §§ 300.18 and 300.156(c). FAPE includes not just the special education and related services that a child with a disability receives, but also includes an appropriate preschool, elementary and secondary school education in the State involved. The required special education and related services must be provided at public expense, at no cost to the parent, in accordance with an IEP, and the education provided to the child must meet the standards that apply to educational services provided by the SEA and LEA (except for the highly qualified teacher requirements in §§ 300.18 and 300.156(c)). In addition, the SEA must ensure that the child has all the rights of a child with a disability who is served by a public agency.

We do not agree with the premise of the commenters that not requiring private school teachers who provide services to publicly-placed children with disabilities to meet the highly qualified teacher requirements means that the education provided to these children in the private school setting does not meet the standards that apply to children with disabilities served by the public agency. States have flexibility in developing standards that meet the requirements of the Act. The standards that SEAs apply to private schools that contract with public agencies to provide FAPE to children with disabilities, are, so long as they meet the requirements of Part B of the Act and its regulations, a State matter. Federal law does not encourage or prohibit the imposition of additional requirements as a condition of placing these children in the private school.

With regard to the comment opposing the use of public school funds for the education of publicly-placed private school children by teachers who do not meet the highly qualified teacher requirements, a State or public agency may use whatever State, local, Federal, and private sources of support that are available in the State to meet the requirements of the Act. We believe restricting the use of public school funds as requested by the commenter would not only be inconsistent with the Act, but also may unnecessarily limit a public agency's options for providing FAPE to its publicly-placed children with disabilities.

*Changes:* None.

*Comment:* A few commenters recommended requiring States to have rules, regulations, and contracts requiring private schools that accept publicly-placed children with disabilities to guarantee that children with disabilities receive FAPE and their parents retain all of the protections mandated for public schools, including the right to pendency placements if the parents challenge the decisions of the private school to terminate the children's placements. One commenter recommended that the regulations clarify that private schools serving children placed by a public agency are not exempt from the obligation to provide FAPE.

*Discussion:* The Act does not give States and other public agencies regulatory authority over private schools and does not place requirements on private schools. The Act imposes requirements on States and public agencies that refer to or place children with disabilities in private schools for the purposes of providing FAPE to those children because the public agency is unable to provide FAPE in a public school or program. The licensing and regulation of private schools are matters of State law. The Act requires States and public agencies, including LEAs, to ensure that FAPE is made available to all children with disabilities residing in the State in mandatory age ranges, and that the rights and protections of the Act are extended to eligible children and their parents. If the State or public

agency has placed children with disabilities in private schools for purposes of providing FAPE to those children, the State and the public agency must ensure that these children receive the required special education and related services at public expense, at no cost to the parents, in accordance with each child's IEP. It is the responsibility of the public agency to determine whether a particular private school in which the child with a disability will be placed for purposes of providing FAPE meets the standards that apply to the SEA and LEA and that a child placed by a public agency be afforded all the rights, including FAPE, that the child would otherwise have if served by the public agency directly.

*Changes:* None.

*Comment:* One commenter stated that, in cases where the public agency places a child in a private school or residential treatment facility for the purposes of providing FAPE, the public agency should be required to determine and inform the private school or residential treatment facility about the person or persons who have the legal authority to make educational decisions for the child.

*Discussion:* The change requested by the commenter is not needed because the public agency, not the private agency, is responsible for providing FAPE to a child who is placed by the public agency in a private school. Consistent with § 300.146 and section 612(a)(10)(B) of the Act, a public agency that places a child with a disability in a private school or facility as a means of carrying out the requirements of Part B of the Act, must ensure that the child has all the rights of a child with a disability who is served by a public agency, which includes ensuring that the consent requirements in § 300.300 and sections 614(a)(1)(D) and 614(c) of the Act are followed. A public agency must, therefore, secure the needed consent from the person or persons who have the legal authority to make such decisions, unless the public agency has made other arrangements with the private school or facility to secure that consent. We do not believe it is necessary or appropriate to require the public agency to inform the private school or facility of the persons or persons who have the legal authority to make educational decisions for the child because this will depend on the specific arrangements made by the public agency with a private school or facility and, should, therefore, be determined by the public agency on a case by case basis.

*Changes:* None.

### Children With Disabilities Enrolled by Their Parents in Private Schools When FAPE Is at Issue

Placement of Children by Parents When FAPE Is at Issue (§ 300.148)

*Comment:* Several commenters recommended retaining in these regulations the requirement in current § 300.403(b) that disagreements between a parent and the LEA regarding the availability of a FAPE and the question of financial responsibility, are subject to the due process procedures in section 615 of the Act.

*Discussion:* The provision in current § 300.403(b) was in the 1983 regulations and, therefore, should have been included in the NPRM in light of section 607(b) of the Act. Section 607(b) of the Act provides that the Secretary cannot publish final regulations that would procedurally or substantively lessen the protections provided to children with disabilities in the regulations that were in effect on July 20, 1983. We will revise § 300.148 to include the requirement in current § 300.403(b).

*Changes:* Section 300.148 has been revised to include the requirement in current § 300.403(b) that disagreements between a parent and a public agency regarding the availability of a program appropriate for the child and the question of financial responsibility are subject to the due process procedures in §§ 300.504 through 300.520.

*Comment:* One commenter requested revising the regulations to eliminate financial incentives for parents to refer children for special education and then unilaterally placing their child in private schools without first receiving special education and related services from the school district. The commenter stated that it should be clear that a unilateral placement in a private school without first receiving special education and related services from the LEA does not require the public agency to provide reimbursement for private school tuition.

One commenter stated that proposed § 300.148(b) goes beyond the Act and only applies if the court or hearing officer finds that the agency had not made FAPE available to the child in a timely manner prior to enrollment in the private school. The commenter stated that a determination that a placement is "appropriate," even if it does not meet the State standards that apply to education provided by the SEA or LEAs, conflicts with the SEA's or LEA's responsibility to ensure FAPE to children with disabilities.

*Discussion:* The provision in § 300.148(b) that a parental placement does not need to meet State standards in

order to be "appropriate" under the Act is retained from current § 300.402(c) to be consistent with the Supreme Court's decisions in *School Committee of the Town of Burlington* v. *Department of Education,* 471 U.S. 359 (1985) (*Burlington*) and *Florence County School District Four* v. *Carter,* 510 U.S. 7 (1993) (*Carter*). Under the Supreme Court's decision in *Carter,* a court may order reimbursement for a parent who unilaterally withdraws his or her child from a public school that provides an inappropriate education under the Act and enrolls the child in a private school that provides an education that is otherwise proper under the Act, but does not meet the State standards that apply to education provided by the SEA and LEAs. The Court noted that these standards apply only to public agencies' own programs for educating children with disabilities and to public agency placements of children with disabilities in private schools for the purpose of providing a program of special education and related services. The Court reaffirmed its prior holding in *Burlington* that tuition reimbursement is only available if a Federal court concludes "both that the public placement violated IDEA, and that the private school placement was proper under the Act." (510 U.S. at 12). We believe LEAs can avoid reimbursement awards by offering and providing FAPE consistent with the Act either in public schools or in private schools in which the parent places the child. However, a decision as to whether an LEA's offer or provision of FAPE was proper under the Act and any decision regarding reimbursement must be made by a court or hearing officer. Therefore, we do not believe it is appropriate to include in these regulations a provision relieving a public agency of its obligation to provide tuition reimbursement for a unilateral placement in a private school if the child did not first receive special education and related services from the LEA.

This authority is independent of the court's or hearing officer's authority under section 612 (a)(10)(C)(ii) of the Act to award reimbursement for private placements of children who previously were receiving special education and related services from a public agency.

*Changes:* None.

### SEA Responsibility for General Supervision and Implementation of Procedural Safeguards

SEA Responsibility for General Supervision (§ 300.149)

*Comment:* One commenter requested that the Department clarify in these

regulations how the requirements for SEA responsibility in § 300.149 apply with respect to children attending BIA-funded schools who are sent to State prisons, including whether the Office of Indian Education Programs in the Department of the Interior can delegate the responsibility of ensuring that the requirements of Part B of the Act are met by the State prison. The commenter further requested clarification regarding tribally controlled detention facilities that incarcerate a student from a different reservation than the reservation where the student attended a BIA-funded school.

*Discussion:* As a general matter, for educational purposes, students who were enrolled in a BIA-funded school and are subsequently convicted as an adult and incarcerated in a State run adult prison are the responsibility of the State where the adult prison is located. Section 612(a)(11)(C) of the Act and § 300.149(d) allow flexibility to States in that the Governor, or another individual pursuant to State law, can designate a public agency in the State, other than the SEA, as responsible for ensuring that FAPE is made available to eligible students with disabilities who are convicted under State law and incarcerated in the State's adult prisons. This provision does not apply to the Secretary of the Interior. Therefore, the Office of Indian Education Programs cannot delegate the responsibility of ensuring that the requirements of Part B of the Act are met by the State prison. The Act does not specifically address who is responsible for education of students with disabilities in tribally controlled detention facilities. However, the Secretary of the Interior is only responsible for students who are enrolled in schools operated or funded by the Department of the Interior.

*Changes:* None.

*Comment:* One commenter recommended adding a heading prior to § 300.149 to separate this section from the regulations governing private schools.

*Discussion:* We agree with the commenter that a heading should be added to separate the private school provisions from other State eligibility requirements.

*Changes:* We have added a heading before § 300.149 to separate the private school provisions from the provisions relating to the SEA's responsibility for general supervision and implementation of procedural safeguards.

State Complaint Procedures (§§ 300.151 through 300.153)

*Comment:* We received several comments questioning the statutory basis for the State complaint provisions in §§ 300.151 through 300.153. One commenter stated that the Act includes only two statutory references to State complaints and both references (sections 612(a)(14)(E) and 615(f)(3)(F) of the Act) immediately follow statutory prohibitions on due process remedies.

One commenter stated that Congress did not require SEAs to create a complaint system and that section 1232c(a) of the General Education Provisions Act, 20 U.S.C. 1232c(a) (GEPA), provides only that the Department may require a State to investigate and resolve all complaints received by the State related to the administration of an applicable program. The commenter stated that the permissive wording of this provision suggests that the Secretary or the Department can choose not to require a complaint investigation and resolution mechanism, particularly when such mechanism is unnecessary or, as in the case of the Act, effectively preempted by more specific requirements in the Act governing the applicable program.

Another commenter concluded that there is no basis for the State complaint procedures in §§ 300.151 through 300.153 because the Act only allows complaints to be filed with the State in two situations: (1) By private school officials, regarding consultation and child find for parentally-placed private school children pursuant to section 612(a)(10)(A)(i) and (10)(A)(iii) of the Act, and (2) by parents, regarding personnel qualifications in section 612(a)(14)(E) of the Act. The commenter stated that in both cases, the Act does not detail a complaint process.

*Discussion:* Although Congress did not specifically detail a State complaint process in the Act, we believe that the State complaint process is fully supported by the Act and necessary for the proper implementation of the Act and these regulations. We believe a strong State complaint system provides parents and other individuals an opportunity to resolve disputes early without having to file a due process complaint and without having to go to a due process hearing. The State complaint procedures are referenced in the following three separate sections of the Act: (1) Section 611(e)(2)(B)(i) of the Act, which requires that States spend a portion of the amount of Part B funds that they can use for State-level activities on complaint investigations; (2) Section 612(a)(14)(E) of the Act, which provides that nothing in that paragraph creates a private right of action for the failure of an SEA or LEA staff person to be highly qualified or prevents a parent from filing a complaint about staff qualifications with the SEA, as provided for under this part; and (3) Section 615(f)(3)(F) of the Act, which states that "[n]othing in this paragraph shall be construed to affect the right of a parent to file a complaint with the State educational agency." Paragraph (f)(3) is titled "Limitations on Hearing" and addresses issues such as the statute of limitations and that hearing issues are limited to the issues that the parent has raised in their due process notice. The Senate Report explains that this provision clarifies that "nothing in section 615 shall be construed to affect a parent's right to file a complaint with the State educational agency, including complaints of procedural violations' (S. Rpt. No. 108–185, p. 41).

Furthermore, the State complaint procedures were a part of the initial Part B regulations in 1977 (45 CFR 121a.602). These regulations were moved into part 76 of the Education Department General Administrative Regulations (EDGAR) in the early 1980s, and were returned to the Part B regulations in 1992 (after the Department decided to move the regulations out of EDGAR and place them in program regulations for the major formula grant programs). Although the State complaint procedures have changed in some respects in the years since 1977, the basic right of any individual or organization to file a complaint with the SEA alleging any violation of program requirements has remained the same. For these reasons, we believe the State complaint procedures should be retained in the regulations.

*Changes:* None.

*Comment:* Several commenters stated that use of the term "complaint" in reference to due process complaints and State complaint procedures is confusing. One commenter requested that we use the phrase "due process hearing request" instead of "due process complaint" in the regulations to avoid confusion between the two processes.

*Discussion:* Section 615 of the Act uses the term "complaint" to refer to due process complaints. We have used the phrase "due process complaint" instead of the statutory term "complaint" throughout these regulations to provide clarity and reduce confusion between due process complaints in section 615 of the Act and complaints under the State complaint procedures in §§ 300.151 through 300.153. We believe this distinction is sufficient to reduce confusion and it is not necessary to add further clarification regarding the use of the term "complaint" in these regulations.

The regulations for State complaints under §§ 300.151 through 300.153 provide for the resolution of any complaint, including a complaint filed by an organization or an individual from another State alleging that the public agency violated a requirement of Part B of the Act or of part 300. The public agency must resolve a State complaint within 60 days, unless there is a time extension as provided in § 300.152(b). Due process complaints, as noted in § 300.507, however, may be filed by a parent or a public agency, consistent with §§ 300.507 through 300.508 and §§ 300.510 through 300.515.

*Changes:* None.

Adoption of State Complaint Procedures (§ 300.151)

*Comment:* Many commenters recommended that only issues related to violations of the law should be subject to the State complaint process. One commenter stated that the State complaint procedures should be used only for systemic violations that reach beyond the involvement of one child in a school.

A few commenters requested that the regulations clarify that the State complaint procedures can be used for the denial of appropriate services and the failure to provide FAPE in accordance with a child's IEP. However, some commenters requested that the regulations clarify that disputes involving appropriateness of services and whether FAPE was provided should be dealt with in a due process hearing. One commenter stated that the State complaint procedures should be used to investigate whether required procedures were followed and not to determine if evaluation data and student-specific data support the IEP Team's determination of what is appropriate for the child. The commenter went on to state that the procedures for administrative hearings permit the examination and cross-examination of expert witnesses and establishing the credibility of the testimonies, which are the functions of a hearing officer, not SEA complaint specialists.

*Discussion:* Some commenters, as noted above, seek to limit the scope of the State complaint system. We believe the broad scope of the State complaint procedures, as permitted in the regulations, is critical to each State's exercise of its general supervision responsibilities. The complaint procedures provide parents, organizations, and other individuals with an important means of ensuring that the educational needs of children with disabilities are met and provide the SEA with a powerful tool to identify

and correct noncompliance with Part B of the Act or of part 300. We believe placing limits on the scope of the State complaint system, as suggested by the commenters, would diminish the SEA's ability to ensure its LEAs are in compliance with Part B of the Act and its implementing regulations, and may result in an increase in the number of due process complaints filed and the number of due process hearings held.

We do not believe it is necessary to clarify in the regulations that the State complaint procedures can be used to resolve a complaint regarding the denial of appropriate services or FAPE for a child, since § 300.153 is sufficiently clear that an organization or individual may file a written complaint that a public agency has violated a requirement of Part B of the Act or part 300. The State complaint procedures can be used to resolve any complaint that meets the requirements of § 300.153, including matters concerning the identification, evaluation, or educational placement of the child, or the provision of FAPE to the child.

We believe that an SEA, in resolving a complaint challenging the appropriateness of a child's educational program or services or the provision of FAPE, should not only determine whether the public agency has followed the required procedures to reach that determination, but also whether the public agency has reached a decision that is consistent with the requirements in Part B of the Act in light of the individual child's abilities and needs. Thus, the SEA may need to review the evaluation data in the child's record, or any additional data provided by the parties to the complaint, and the explanation included in the public agency's notice to the parent as to why the agency made the determination regarding the child's educational program or services. If necessary, the SEA may need to interview appropriate individuals, to determine whether the agency followed procedures and applied standards that are consistent with State standards, including the requirements of Part B of the Act, and whether the determination made by the public agency is consistent with those standards and supported by the data. The SEA may, in its effort to resolve a complaint, determine that interviews with appropriate individuals are necessary for the SEA to obtain the relevant information needed to make an independent determination as to whether the public agency is violating a requirement of Part B of the Act or of part 300. However, such interviews conducted by the SEA, as part of its effort to resolve a State complaint, are

not intended to be comparable to the requirement in section 615(h)(2) of the Act, which provides any party to a due process hearing the right to present evidence and confront, cross-examine, and compel the attendance of witnesses.

In addition, a parent always has the right to file a due process complaint and request a due process hearing on any matter concerning the identification, evaluation, or educational placement of his or her child, or the provision of FAPE and may seek to resolve their disputes through mediation. It is important to clarify that when the parent files both a due process complaint and a State complaint on the same issue, the State must set aside any part of the complaint that is being addressed in the due process hearing until the conclusion of the hearing. However, any issue in the complaint that is not a part of the due process hearing must be resolved using the State complaint procedures in § 300.152, including using the time limit and procedures in paragraphs (b) and (d) of § 300.152. (See § 300.152(c)(1)). Under the Act, the decision reached through the due process proceedings is the final decision on those matters, unless a party to the hearing appeals that decision by requesting State-level review, if applicable, or by bringing a civil action in an appropriate State or Federal court.

*Changes:* None.

*Comment:* A few commenters requested amending § 300.151(a)(2) to specifically include school personnel and teacher organizations in the list of entities to whom the SEA must disseminate the State complaint procedures. Another commenter requested that representatives of private schools or residential treatment facilities be included on the list of entities to whom the State must disseminate complaint procedures.

*Discussion:* Section 300.151(a)(2) already requires the State to widely disseminate the State complaint procedures in §§ 300.151 through 300.153 to parents and other interested parties, including parent training and information centers, protection and advocacy organizations, independent living centers, and other appropriate entities. There is nothing in these regulations that would prevent a State from disseminating information about the State complaint procedures to school personnel, teacher organizations, or representatives of private schools or residential facilities. However, we believe this decision is best left to the States. We do not believe that there is a need to add these entities to the mandatory distribution as individuals involved in the education of children

**46602**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

with disabilities are generally acquainted with these procedures.

*Changes:* None.

Remedies for Denial of Appropriate Services (§ 300.151(b))

*Comment:* Many commenters requested retaining current § 300.660(b)(1), regarding the awarding of monetary reimbursement as a remedy for denial of appropriate services. One commenter stated that the regulations should clarify that States continue to have authority to award monetary reimbursement, when appropriate. A few commenters stated that the regulations should clarify that monetary reimbursement is not appropriate for a majority of State complaints. Some commenters stated that removing current § 300.660(b)(1) creates ambiguity and may result in increased litigation because parents may choose to use the more costly and time-consuming due process system if they believe that monetary relief is not available to them under the State complaint system. Some commenters stated that removing current § 300.660(b)(1) implies that monetary reimbursement is never appropriate. A few commenters stated that removing the monetary reimbursement provision in current § 300.660(b)(1) suggests that the Department no longer supports the use of this remedy. A few commenters requested that the regulations clarify that compensatory services are an appropriate remedy when the LEA has failed to provide appropriate services.

*Discussion:* The SEA is responsible for ensuring that all public agencies within its jurisdiction meet the requirements of the Act and its implementing regulations. In light of the SEA's general supervisory authority and responsibility under sections 612(a)(11) and 616 of the Act, we believe the SEA should have broad flexibility to determine the appropriate remedy or corrective action necessary to resolve a complaint in which the SEA has found that the public agency has failed to provide appropriate services to children with disabilities, including awarding monetary reimbursement and compensatory services. To make this clear, we will change § 300.151 to include monetary reimbursement and compensatory services as examples of corrective actions that may be appropriate to address the needs of the child.

*Changes:* We have added ''compensatory services or monetary reimbursement'' as examples of corrective actions in § 300.151(b)(1).

*Comment:* One commenter stated that the remedies available in § 300.151(b)

are silent about whether the complainant may be reimbursed for attorneys' fees and requested clarification as to whether reimbursement is permissible for State complaints. Another commenter requested that the language in section 615(i)(3)(B) of the Act, regarding the awarding of attorneys' fees for due process hearings, be included in the State complaint procedures as a way to limit repetitive, harassing complaints.

*Discussion:* The awarding of attorneys' fees is not addressed in § 300.151(b) because the State complaint process is not an administrative proceeding or judicial action, and, therefore, the awarding of attorneys' fees is not available under the Act for State complaint resolutions. Section 615(i)(3)(B) of the Act clarifies that a court may award attorneys' fees to a prevailing party in any action or proceeding brought under section 615 of the Act. We, therefore, may not include in the regulations the language from section 615(i)(3)(B) of the Act, as suggested by the commenters, because State complaint procedures are not an action or proceeding brought under section 615 of the Act.

*Changes:* None.

Minimum State Complaint Procedures (§ 300.152)

Time Limit; Minimum Procedures (§ 300.152(a))

*Comment:* One commenter suggested changing § 300.152(a)(1), to include situations when the SEA is the subject of a complaint. Another commenter recommended that the State complaint procedures include how the SEA should handle a complaint against the SEA for its failure to supervise the LEA or failure to provide direct services when given notice that the LEA has failed to do so.

*Discussion:* We do not believe it is necessary to specify in the regulations how the SEA should handle a complaint filed against the SEA because § 300.151 clarifies that, if an organization or individual files a complaint, pursuant to §§ 300.151 through 300.153, that a public agency has violated a requirement of Part B of the Act or part 300, the SEA must resolve the complaint. Pursuant to § 300.33 and section 612(a)(11) of the Act, the term *public agency* includes the SEA. The SEA must, therefore, resolve any complaint against the SEA pursuant to the SEA's adopted State complaint procedures. The SEA, however, may either appoint its own personnel to resolve the complaint, or may make arrangements with an outside party to

resolve the complaint. If it chooses to use an outside party, however, the SEA remains responsible for complying with all procedural and remediation steps required in part 300.

*Changes:* None.

*Comment:* One commenter suggested that the regulations include language requiring an on-site investigation unless the SEA determines that it can collect all evidence and fairly determine whether a violation has occurred with the evidence provided by the complainant and a review of records.

*Discussion:* We do not believe the regulations should require the SEA to conduct an on-site investigation in the manner suggested by the commenter because we believe § 300.152(a)(1) is sufficient to ensure that an independent on-site investigation is carried out if the SEA determines that such an investigation is necessary to resolve a complaint. The minimum State complaint procedures in § 300.152 are intended to be broad in recognition of the fact that States operate differently and standards appropriate to one State may not be appropriate in another State. Therefore, the standards to be used in conducting an on-site investigation are best determined by the State.

*Changes:* None.

*Comment:* One commenter stated that § 300.152 would allow an unlimited period of time to resolve complaints and requested that the regulations limit the complaint resolution process to 30 days, similar to the procedures when a due process hearing is requested. A few commenters requested that the 60-day time limit be lengthened to 90 days, given that many complaints involve complex issues and multiple interviews with school administrators.

*Discussion:* Section 300.152 does not allow an unlimited period of time to resolve a complaint. Paragraph (a) of this section provides that an SEA has a time limit of 60 days after a complaint is filed to issue a written decision to the complainant that addresses each allegation in the complaint (unless, under paragraph (b) of this section, there is an extension for exceptional circumstances or the parties agree to extend the timeline because they are engaged in mediation or in other alternative means of dispute resolution, if available in the State). We believe the right of parents to file a complaint with the SEA alleging any violation of Part B of the Act or part 300 to receive a written decision within 60 days is reasonable in light of the SEA's responsibilities in resolving a complaint pursuant to its complaint procedures, and is appropriate to the interest of resolving allegations promptly. In

addition, the 60-day time limit for resolving a State complaint is a longstanding requirement and States have developed their State complaint procedures based on the 60-day time limit. We believe altering this timeframe would be unnecessarily disruptive to States' developed complaint procedures. For these reasons, we do not believe it is appropriate to change the time limit as recommended by the commenters.

*Changes:* None.

*Comment:* One commenter expressed concern that the regulations are silent as to how an amended State complaint should be handled. One commenter expressed concern about resolving complaints within the 60-day time limit when the complainant submits additional information about the complaint and amends the complaint. The commenter requested that in such cases, the regulations should allow the 60-day time limit to begin from the date the State receives the amended complaint.

*Discussion:* Section 300.152 provides that the complaint must be resolved 60 days after a complaint is filed and that the complainant must be given an opportunity to submit additional information, either orally or in writing, about the allegations in the complaint. Generally, if the additional information a parent submits is on the same or related incident, it would be part of the amended complaint. If the information submitted by the complainant is on a different or unrelated incident, generally, the new information would be treated as a separate complaint. On the other hand, if the information submitted by the complainant were on the same incident, generally, the new information would be treated as an amendment to the original complaint. It is, ultimately, left to each State to determine whether the new information constitutes a new complaint or whether it is related to a pending complaint. We believe the decision regarding whether the additional information is a new complaint or an amendment to an existing complaint, is best left to the State. The State must have the flexibility to make this determination based on the circumstances of a particular complaint and consistent with its State complaint process and, therefore, we do not believe it is appropriate to regulate further on this matter.

There are no provisions in Part B of the Act or in these regulations that permit the 60-day time limit to begin from the date the State receives an amended complaint, if additional information submitted by the complainant results in an amendment to the complaint. However, § 300.152(b)

permits an extension of the 60-day time limit if exceptional circumstances exist or the parent and the public agency agree to extend the time limit to attempt to resolve the complaint through mediation.

*Changes:* None.

*Comment:* One commenter requested clarification regarding the time limit for a public agency to respond with a proposal to resolve the complaint.

*Discussion:* The 60-day time limit to resolve a complaint does not change if a public agency decides to respond to the complaint with a proposal to resolve the complaint. However, § 300.152(b)(2) permits the 60-day time limit to be extended under exceptional circumstances or if the parent and public agency agree to engage in mediation or in other alternative means of dispute resolution, if available in the State.

*Changes:* None.

*Comment:* One commenter expressed concern that § 300.152(a) could limit the SEA's investigation of a complaint to an exchange of papers since the SEA is not required to conduct an on-site investigation.

*Discussion:* Section 300.152 provides that the SEA must review all relevant information and, if it determines it to be necessary, carry out an independent on-site investigation in order to make an independent determination as to whether the public agency is violating a requirement of Part B of the Act or part 300. We believe the SEA is in the best position, and should have the flexibility, to determine what information is necessary to resolve a complaint, based on the facts and circumstances of the individual case. It is true that, in some cases, a review of documents provided by the parties may be sufficient for the SEA to resolve a complaint and that conducting an on-site investigation or interviews with staff, for example, may be unnecessary. The SEA, based on the facts in the case, must decide whether an on-site investigation is necessary. We also believe requiring an on-site investigation for each State complaint would be overly burdensome for public agencies and unnecessary.

*Changes:* None.

*Comment:* A few commenters requested adding language to proposed § 300.152(a)(3) to allow an SEA to provide opportunities for resolving the complaint through mediation and other informal mechanisms for dispute resolution with any party filing a complaint, not only the parents. Some commenters requested that the regulations clarify that mediation is the appropriate method to resolve State

complaints regarding the denial of appropriate services.

A few commenters expressed concern that the phrase "[w]ith the consent of the parent" in proposed § 300.152(a)(3) implies that complaints are disagreements between parents and public agencies, rather than allegations of violations of a child's or a parent's rights under the Act.

A few commenters supported the use of mediation to resolve a complaint, but requested that alternative means of dispute resolution be deleted. Other commenters expressed concern that providing yet another means of initiating mediation or other dispute resolution is unnecessary because these options are already available to parties who wish to use them. A few commenters requested that the regulations define alternative means of dispute resolution.

*Discussion:* Section 300.152(a)(3) was proposed to encourage meaningful, informal, resolution of disputes between the public agency and parents, organizations, or other individuals by providing an opportunity for parties to resolve disputes at the local level without the need for the SEA to resolve the matter. We believe that, at a minimum, the State's complaint procedures should allow the public agency that is the subject of the complaint the opportunity to respond to a complaint by proposing a resolution and provide an opportunity for a parent who has filed a complaint and the public agency to resolve a dispute by voluntarily engaging in mediation. However, we do not believe that the SEA should be required to offer other alternative means of dispute resolution, and so will remove the reference to these other alternatives from the minimum procedures in § 300.152(a)(3).

We believe it is important to retain the provision in § 300.152(a)(3)(ii) (proposed § 300.152(a)(3)(B)), with modification, to reinforce the use of voluntary mediation as a viable option for resolving disputes between the public agency and the parents at the local level prior to the SEA investigating, if necessary, and resolving a dispute. Resolving disputes between parties at the local level through the use of mediation, or other alternative means of dispute resolution, if available in the State, will be less adversarial and less time consuming and expensive than a State complaint investigation, if necessary, or a due process hearing and, ultimately, children with disabilities will be the beneficiaries of a local level resolution.

Requiring that the public agency provide an opportunity for the parent

**46604** **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

who has filed a complaint and the public agency to voluntarily engage in mediation in an effort to resolve a dispute is an appropriate minimum requirement and consistent with the statutory provision in section 615(e) of the Act that voluntary mediation be made available to parties (*i.e.*, parent and public agency) to disputes involving any matter under Part B of the Act, including matters arising prior to the filing of a due process complaint. However, the statute does not require that mediation be available to other parties, and we believe it would be burdensome to expand, through regulation, new § 300.152(a)(3)(ii) (proposed § 300.152(a)(3)(B)) to require that States offer mediation to non-parents. Although we do not believe we should regulate to require that mediation be offered to non-parents, there is nothing in the Act or these regulations that would preclude an SEA from permitting the use of mediation, or other alternative means of dispute resolution mechanisms, if available in the State, to resolve a State complaint filed by an organization or individual other than a parent, and we will add language to § 300.152(b)(1)(ii) to permit extensions of the timeline if the parties are voluntarily engaged in any of these dispute resolution procedures. In fact, we encourage SEAs and their public agencies to consider alternative means of resolving disputes between the public agency and organizations or other individuals, at the local level, consistent with State law and administrative procedures. It is up to each State, however, to determine whether non-parents can use mediation or other alternative means of dispute resolution.

Section 615(e) of the Act makes clear that mediation is a voluntary mechanism for resolving disputes and may not be used to delay or deny a parent's right to a due process hearing on the parent's due process complaint, or to deny any other rights afforded under Part B of the Act. In light of the fact that mediation is a voluntary process, the parties only need to agree to engage in mediation and it is not necessary to obtain parental written consent to engage in this voluntary process. We will, therefore, change new § 300.152(a)(3)(ii) (proposed § 300.152(a)(3)(B)) by removing the phrase "[w]ith the consent of the parent" and adding a reference to § 300.506.

We do not believe it is necessary to include in the regulations a definition of the term "alternative means of dispute resolution" because the term is generally understood to refer to other procedures and processes that States

have found to be effective in resolving disputes quickly and effectively but does not include those dispute resolution processes required under the Act or these final regulations.

*Changes:* We have changed new § 300.152(a)(3)(ii) (proposed § 300.152(a)(3)(B)) by removing "with the consent of the parent" and "or other alternative means of dispute resolution" and adding a reference to § 300.506. We have also amended § 300.152(b)(1)(ii), as stated above, to clarify that a public agency's State complaint procedures must permit an extension of the 60-day time limit if a parent (or individual or organization, if mediation, or other alternative means of dispute resolution is available to the individual or organization under State procedures) who has filed a complaint and the public agency voluntarily agree to extend the time to engage in mediation or other alternative means of dispute resolution, if available in the State.

*Comment:* A few commenters stated that the agreement to extend the 60-day time limit (to allow the parties to engage in mediation, or alternative means of dispute resolution, or both) should meet the consent requirements in § 300.9. One commenter requested an extension of the 60-day time limit to resolve complaints when mediation is underway.

*Discussion:* We do not agree that *consent*, as defined in § 300.9, should be required to extend the 60-day time limit because it would add burden and is not necessary. It is sufficient to require agreement of the parties. At any time that either party withdraws from mediation or other alternative means of dispute resolution, or withdraws agreement to the extension of the time limit, the extension would end. We believe § 300.152(b) is sufficiently clear that an extension of the 60-day time limit is permissible if exceptional circumstances exist with respect to a particular complaint, or if the parent and the public agency agree to extend the time to engage in mediation. We also believe it would be permissible to extend the 60-day time limit if the public agency and an organization or other individual agree to engage in an alternative means of dispute resolution, if available in the State, and the parties agree to extend the 60-day time limit. We will revise § 300.152(b)(1)(ii) to include this exception.

*Changes:* We have revised § 300.152(b)(1)(ii) to clarify that it would be permissible to extend the 60-day time limit if the parties agree to engage in other alternative means of dispute resolution, if available in the State.

*Comment:* Several commenters requested that § 300.152(a) be modified to include language allowing parents, in addition to the public agency, an opportunity to submit a proposal to resolve the complaint.

*Discussion:* We do not believe it is necessary to include the language in § 300.152(a) as suggested by the commenter because § 300.153(b)(4)(v) already requires that the signed written complaint submitted to the SEA by the complainant include a proposed resolution to the problem. A parent who is a complainant must include a proposed resolution to the problem to the extent known and available to the parent at the time the complaint is filed.

*Changes:* None.

Complaints Filed Under This Section and Due Process Hearings Under § 300.507 or §§ 300.530 Through 300.532 (§ 300.152(c))

*Comment:* A few commenters requested that the regulations include a provision to allow parents to use the State complaint process to enforce agreements reached in mediation and resolution sessions. One commenter expressed concern that if an SEA does not have authority to enforce agreements arising from mediation and resolution sessions, the burden will be on a parent to incur costs necessary to file a petition with a court to have the agreement enforced.

*Discussion:* The Act provides that the enforcement and implementation of agreements reached through mediation and resolution sessions may be obtained through State and Federal courts. Section 300.506(b)(7), consistent with section 615(e)(2)(F)(iii) of the Act, states that a written, signed mediation agreement is enforceable in any State court of competent jurisdiction or in a district court of the United States. Similarly, § 300.510(c)(2), consistent with section 615(f)(1)(B)(iii)(II) of the Act, states that a written settlement agreement resulting from a resolution meeting is enforceable in any State court of competent jurisdiction or in a district court of the United States.

However, as noted in the *Analysis of Comments and Changes* for subpart E, we have added new § 300.537 that allows, but does not require, a State to have mechanisms or procedures that permit parties to mediation or resolution agreements to seek enforcement of those agreements and decisions at the SEA level. We believe this provision is sufficient to allow States the flexibility to determine what mechanisms or procedures, if any, may be appropriate to enforce such agreements, including utilizing their

State complaint procedures, if they choose to do so, so long as the mechanisms or procedures are not used to deny or delay a parent's right to seek enforcement through State and Federal courts.

*Changes:* None.

*Comment:* Numerous commenters requested that current § 300.661(c)(3), regarding the SEA's responsibility to resolve complaints alleging a public agency's failure to implement due process decisions, be retained. Many commenters raised concerns that removing this language will lead to more litigation. One commenter stated that parents would be forced to litigate due process decisions, which will prolong the denial of FAPE to children. Another commenter stated that not allowing States to enforce a hearing officer's decision encourages litigation because it is the only avenue for relief. Several commenters stated that parents are placed at a disadvantage because they may not have the resources to file in State or Federal court.

*Discussion:* The SEA's obligation to implement a final hearing decision is consistent with the SEA's general supervisory responsibility, under sections 612(a)(11) and 616 of the Act, over all education programs for children with disabilities in the State, which includes taking necessary and appropriate actions to ensure that the provision of FAPE and all the requirements in Part B of the Act and part 300 are carried out. However, we agree that the requirements from current § 300.661(c)(3) should be retained for clarity.

*Changes:* We have added the requirement in current § 300.661(c)(3) as new § 300.152(c)(3).

*Comment:* Numerous commenters requested retaining current § 300.661(c)(1), which requires that any issue in the complaint that is not a part of a due process complaint be resolved using the applicable State complaint timelines and procedures. One commenter stated that § 300.152(c)(1) requires the State to set aside an entire complaint if due process proceedings commence with respect to any subject that is raised in the complaint. A few commenters expressed concern that if issues in a State complaint, which are not part of a due process complaint, are not investigated until the due process complaint is resolved, children may go without FAPE for extended periods of time. These commenters also stated that parents are likely to file for due process on every issue of concern, rather than using the more expeditious and less expensive State complaint procedures.

*Discussion:* We agree that language in current § 300.661(c), requiring that States set aside any part of a State complaint that is being addressed in a due process hearing, until the conclusion of the hearing and resolve any issue that is not a part of the due process hearing, should be retained.

*Changes:* We have revised § 300.152(c)(1) by adding the requirements in current § 300.661(c)(1) to the regulations.

*Comment:* One commenter stated that the regulations do not address the disposition of a complaint if a parent and a public agency come to a resolution of a complaint through mediation. One commenter recommended that the regulations provide guidance on how an SEA should handle a complaint that is withdrawn. Another commenter requested clarification on what should occur if an SEA does not approve of the agreement reached between the parent and the public agency.

*Discussion:* We do not believe it is necessary to regulate on these matters, as recommended by the commenters. Section 615(e)(2)(F) of the Act and § 300.506(b)(7) clarify that an agreement reached through mediation is a legally binding document enforceable in State and Federal courts. Therefore, an agreement reached through mediation is not subject to the SEA's approval. We strongly encourage parties to resolve a complaint at the local level without the need for the SEA to intervene. If a complaint is resolved at the local level or is withdrawn, no further action is required by the SEA to resolve the complaint.

*Changes:* None.

*Comment:* One commenter suggested including language in the regulations that would require parties to provide evidence under threat of perjury. Another commenter stated that the State complaint process should be non-adversarial and that neither party should have the right to review the other's submissions or to cross-examine the other party.

*Discussion:* We do not believe it is appropriate to include the language suggested by the commenters because we believe requiring parties to provide evidence under the threat of perjury, permitting parties to review submissions, and allowing one party to cross-examine the other party are contrary to the intent of the State complaint process. The State complaint process is intended to be less adversarial than the more formal filing of a due process complaint and possibly going to a due process hearing. To make the changes requested by the

commenters will serve only to make the State complaint process more adversarial and will not be in the best interest of the child. The State complaint procedures in §§ 300.151 through 300.153 do not require parties to provide evidence, nor do they require that a State allow parties to review the submissions of the other party or to cross-examine witnesses.

*Changes:* None.

Filing a Complaint (§ 300.153)

*Comment:* One commenter recommended the regulations include a limit on the number of times that an individual may file a State complaint against a public agency.

*Discussion:* An SEA is required to resolve any complaint that meets the requirements of § 300.153, including complaints that raise systemic issues, and individual child complaints. It would be inconsistent with the Act's provisions in section 616 regarding enforcement and the Act's provisions in section 612 regarding general supervision for an SEA to have a State complaint procedure that removes or limits a party's right to file a complaint that a public agency has violated a requirement of Part B of the Act or part 300, including limiting the number of times a party can file a complaint with the SEA. Therefore, it is not appropriate to include in the regulations the language suggested by the commenter, nor should the SEA include in its State complaint procedures any restriction on the number of times a party can file a complaint, as long as the complaint meets the requirements of § 300.153.

*Changes:* None.

*Comment:* Many commenters requested retaining current § 300.662(c), which permits a complaint to be filed about a violation that occurred more than one year prior to the date the complaint is received if the violation is continuing or the complainant is requesting compensatory services for a violation that occurred more than three years prior to the date the complaint is received.

Some commenters requested that the regulations permit a parent to have as much time to file a State complaint as a parent would have to file a due process complaint (two years, unless provided otherwise by State law). One commenter stated that extensions of the statute of limitations should be granted when circumstances warrant an extension.

Another commenter suggested adding language providing that the timeline begins when a parent first learns about the violation. A few commenters stated that parents need a longer statute of

**46606** **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

limitations for State complaints because they do not always know about violations when they occur and may not fully understand how the violation affects their child's education.

Several commenters stated that Congress did not intend to create a one-year statute of limitations for State complaints when it created a two-year statute of limitations for due process hearings. Several commenters stated that there is no evidence that Congress intended to change the current three-year statute of limitations on the parents' right to file a State complaint when the violation is ongoing or compensatory services are being requested.

*Discussion:* We believe a one-year timeline is reasonable and will assist in smooth implementation of the State complaint procedures. The references to longer periods for continuing violations and for compensatory services claims in current § 300.662(c) were removed to ensure expedited resolution for public agencies and children with disabilities. Limiting a complaint to a violation that occurred not more than one year prior to the date that the complaint is received will help ensure that problems are raised and addressed promptly so that children receive FAPE. We believe longer time limits are not generally effective and beneficial to the child because the issues in a State complaint become so stale that they are unlikely to be resolved. However, States may choose to accept and resolve complaints regarding alleged violations that occurred outside the one-year timeline, just as they are free to add additional protections in other areas that are not inconsistent with the requirements of the Act and its implementing regulations. For these reasons, we do not believe it is necessary to retain the language in current § 300.662(c).

We do not believe it is appropriate to change the timeline to begin when a parent first learns about the violation, as suggested by the commenter, because such a provision could lead to some complaints being filed well beyond one year from the time the violation actually occurred. This also would make the issue of the complaint so stale that the SEA would not be able to reasonably resolve the complaint and recommend an appropriate corrective action.

As we stated earlier in the *Analysis of Comments and Changes* for this subpart, Congress did not specifically address or detail a State complaint process in the Act; nor did Congress express an opinion regarding the time limit for filing a complaint under a State's complaint process.

*Changes:* None.

*Comment:* Several commenters stated that § 300.153(c) appears to indicate that if a State complaint, is also the subject of a due process complaint, the time period to file the complaint is two years, rather than the one-year time limit applicable for all other State complaints. Several commenters stated that this provision should be removed and that a one-year limitation should apply to all State complaints, regardless of whether a request for a due process hearing is filed on the issue(s) in the complaint.

*Discussion:* If a State complaint contains multiple issues of which one or more is part of a due process hearing, the one-year statute of limitations would apply to the issues that are resolved under the State complaint procedures; the State due process statute of limitations would apply to the issues that are the subject of the due process hearing. We agree that the language in § 300.153 is confusing and will amend the language to remove the reference to the due process complaint.

*Changes:* We have removed the phrase, "Except for complaints covered under § 300.507(a)(2)" in § 300.153(c).

*Comment:* Some commenters recommended removing the requirement in § 300.153(d) that requires the party filing the complaint to forward a copy of the complaint to the LEA or public agency serving the child at the same time the party files the complaint with the SEA. One commenter stated that filing a complaint is onerous enough for parents, without including an extra step of requiring a copy of the complaint to be forwarded to the school. One commenter stated that this poses an unnecessary paperwork burden on parents. A few commenters stated that forwarding a copy of the complaint to the LEA should be the responsibility of the SEA, not the parents.

One commenter expressed concern that requiring the party filing the complaint to forward a copy of the complaint to the LEA or public agency serving the child will discourage parents or school personnel whistle blowers from filing a complaint and recommended instead, that the regulations require SEAs to provide the LEA with a concise statement of fact upon which the complaint is based and the provisions of laws and rules that are at issue. A few commenters requested including language in § 300.153(d) giving the SEA discretion to protect the confidentiality of the complainant. A few commenters recommended removing the requirement in § 300.153(b)(3) for the written complaint to include the signature and contact information for the complainant.

*Discussion:* The purpose of requiring the party filing the complaint to forward a copy of the complaint to the LEA or public agency serving the child, at the same time the party files the complaint with the SEA, is to ensure that the public agency involved has knowledge of the issues and an opportunity to resolve them directly with the complaining party at the earliest possible time. The sooner the LEA knows that a complaint is filed and the nature of the issue(s), the quicker the LEA can work directly with the complainant to resolve the complaint. We believe the benefit of having the complainant forward a copy of the complaint to the LEA or public agency far outweigh the minimal burden placed on the complainant because it will lead to a faster resolution of the complaint at the local level. For these reasons, we also do not believe it is more efficient to have the SEA forward the complaint to the public agency or provide the public agency with a statement summarizing the complaint.

We do not believe that the complaint procedures should provide for the confidentiality of the complainant. The complainant should not remain unknown to the public agency that is the subject of the complaint because that public agency needs to know who the complainant is and something about the complaint (consistent with § 300.153) before it can be expected to resolve the issues. We believe it is reasonable to require a party to file a signed complaint and provide contact information to the SEA in order to ensure the credibility of the complaint and provide the SEA with the basic contact information necessary for the SEA to handle complaints expeditiously. If the SEA receives a complaint that is not signed, as required in § 300.153, the SEA may choose to dismiss the complaint.

*Changes:* None.

*Comment:* One commenter expressed concern that a parent must have legal knowledge in order to correctly file a State complaint.

*Discussion:* Contrary to the commenter's assertion that a parent must have legal knowledge to file a complaint, we believe the State complaint procedures, which are under the direct control of the SEA, provide the parent and the school district with mechanisms that allow them to resolve differences without having to resort to a more costly and cumbersome due process complaint, which, by its nature, is litigious. We believe if a State effectively implements its State complaint procedures, both parents and public agencies will generally find the

**Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations **46607**

process efficient and easy to initiate. We further believe that the requirement in § 300.509 that each SEA must develop model forms to assist parents in filing a State complaint in accordance with §§ 300.151 through 300.153, and in filing a due process complaint in accordance with §§ 300.507(a) and 300.508(a) through (c), will make the process of filing such complaints much easier for parents and others.

*Changes:* We have made a minor wording change in § 300.153(b)(4) for clarity.

*Comment:* One commenter stated that the complainant should not have to propose a resolution to the problem, as required in § 300.153(b)(4)(v), in order to have the State investigate a complaint.

*Discussion:* Section 300.153(b)(4)(v) requires the complainant to propose a resolution to the complaint only to the extent known and available to the complainant at the time the complaint is filed. We believe this proposed resolution is necessary because it gives the complainant an opportunity to state what he or she believes to be the problem and how the complainant believes it can be resolved. This is important because it gives the complainant an opportunity to tell the public agency what is wrong and what it would take to fix the problem from the complainant's point of view. It also will give the LEA an opportunity to choose either to do as the complainant requests or propose a solution that it believes would resolve the issue raised by the complainant. Thus, if successful, the parties will avoid an adversarial relationship and possibly the expense of a due process hearing.

*Changes:* None.

*Comment:* One commenter requested that § 300.153(d) include language allowing an LEA to appeal an SEA finding to an administrative hearing or the courts. Another commenter expressed concern that the State complaint procedures lack an appeals process for parties that lose under the State complaint procedures.

*Discussion:* The regulations neither prohibit nor require the establishment of procedures to permit an LEA or other party to request reconsideration of a State complaint decision. We have chosen to be silent in the regulations about whether a State complaint decision may be appealed because we believe States are in the best position to determine what, if any, appeals process is necessary to meet each State's needs, consistent with State law.

If a State chooses, however, to adopt a process for appealing a State complaint decision, such process may

not waive any of the requirements in §§ 300.151 through 300.153. Section 300.152 requires that the SEA issue a final decision on each complaint within 60 calendar days after the complaint is filed, unless the SEA extends the timeline as provided in § 300.152(b). This means that, absent an appropriate extension of the timeline for a particular complaint, the State must issue a final decision within 60 calendar days.

However, if after the SEA's final decision is issued, a party who has the right to request a due process hearing (that is, the parent or LEA) and who disagrees with the SEA's decision may initiate a due process hearing, provided that the subject of the State complaint involves an issue about which a due process hearing can be filed and the two-year statute of limitations for due process hearings (or other time limit imposed by State law) has not expired.

*Changes:* None.

Method of Ensuring Services (§ 300.154)

Establishing Responsibility for Services (§ 300.154(a))

*Comment:* One commenter suggested posting interagency agreements on SEA Web sites and in public buildings, and making them available upon request.

*Discussion:* There is nothing in the Act or these regulations that would prohibit an SEA from posting interagency agreements on Web sites, in public buildings, or making them available upon request. However, we believe that it would be unnecessarily burdensome to require SEAs to do so and any decision regarding posting interagency agreements is best left to the States' discretion.

*Changes:* None.

*Comment:* One commenter stated that interagency agreements are important because agencies other than SEAs (*e.g.*, mental health agencies that place children in residential facilities) are responsible for providing special educational services. The commenter requested that the regulations specify that residential facilities be allowed reimbursement for providing educational services and that children in these facilities are entitled to FAPE.

*Discussion:* We do not believe it is necessary to further clarify in the regulations that children with disabilities who are placed in residential facilities by public agencies are entitled to FAPE because § 300.146, consistent with section 612(a)(10)(B) of the Act, provides that SEAs must ensure that children with disabilities receive FAPE when they are placed in or referred to private schools or facilities by public agencies. Whether residential

facilities can receive reimbursement for educational services will depend on how States have apportioned financial responsibility among State agencies and we do not believe that regulating on this issue is appropriate or necessary.

*Changes:* None.

Obligation of Noneducational Public Agencies (§ 300.154(b))

*Comment:* One commenter expressed concern that § 300.154(b) allows LEAs to discontinue services when there is a dispute with other agencies and requested the regulations require LEAs to bear the ultimate responsibility for providing services.

*Discussion:* We do not believe it is necessary to further clarify that the LEA is ultimately responsible for providing services because § 300.154(b)(2) sufficiently requires that if a public agency other than an educational agency fails to provide or pay for the special education and related services in § 300.154(b)(1), the LEA or State agency responsible for developing the child's IEP must provide or pay for these services to the child in a timely manner. Disagreements about the interagency agreements should not stop or delay the receipt of the services described in the child's IEP. Section 300.103(c) also addresses timely services and clarifies that, consistent with § 300.323(c), the State must ensure there is no delay in implementing a child's IEP, including any situation in which the source for providing or paying for the special education or related services to a child is being determined. Section 612(a)(12)(A)(i) of the Act provides that the financial responsibility of public agencies (other than an educational agency), including Medicaid and other public insurers obligated under Federal or State law or assigned responsibility under State policy, must precede financial responsibility of the LEA.

*Changes:* None.

Children With Disabilities Who Are Covered by Public Benefits or Insurance (§ 300.154(d))

*Comment:* One commenter expressed concern regarding the use of a parent's public benefits or insurance to pay for services required under Part B of the Act because co-payments and other out-of-pocket expenses would be a hardship to low-income families. A few commenters stated that services paid for by public benefits or insurance would count against a child's lifetime cap.

*Discussion:* The commenters' concerns are addressed in § 300.154(d)(2)(ii) and (d)(2)(iii). Section 300.154(d)(2)(ii) states that a public agency may not require parents to incur

an out-of-pocket expense, such as the payment of a deductible or co-pay amount, in filing a claim for services, and may pay from funds reserved under the Act, the cost that the parent would otherwise be required to pay. In addition, § 300.154(d)(2)(iii) states that a public agency may not use a child's benefits under a public benefits or insurance program if that use would decrease lifetime coverage or any other insured benefit; result in the family paying for services that would otherwise be covered by the public benefits or insurance program and that are required for the child outside of the time the child is in school; increase premiums or lead to the discontinuation of benefits or insurance; or risk loss of eligibility for home and community-based waivers, based on aggregate health-related expenditures.

*Changes:* None.

*Comment:* One commenter suggested changing "parental consent" to "informed parental consent." One commenter recommended requiring public agencies to obtain parental consent each time the public agency seeks to access the parent's public benefits or insurance. Some commenters recommended removing the requirement to obtain parental consent to use Medicaid benefits to pay for services required under Part B of the Act. A few commenters opposed requiring parental consent, stating the process is an administrative burden. Other commenters recommended waiving the requirement for consent if the agency has taken reasonable measures to obtain such consent or the parent's consent was given to the State Medicaid Agency.

*Discussion:* In order for a public agency to use the Medicaid or other public benefits or insurance program in which a child participates to provide or pay for services required under the Act, the public agency must provide the benefits or insurance program with information from the child's education records (*e.g.,* services provided, length of the services). Information from a child's education records is protected under the Family Educational Rights and Privacy Act of 1974, 20 U.S.C. 1232(g) (FERPA), and section 617(c) of the Act. Under FERPA and section 617(c) of the Act, a child's education records cannot be released to a State Medicaid agency without parental consent, except for a few specified exceptions that do not include the release of education records for insurance billing purposes. Parental consent requires, among other things, that the parent be fully informed in his or her native language, or other mode of

communication, consistent with § 300.9. Thus, there is no need to change "parental consent" to "informed consent," as recommended by one commenter. However, we believe it would avoid confusion for the references to "consent" in paragraphs (d) and (e) in § 300.154 to be consistent. Therefore, we will add a reference to § 300.9 in § 300.154(d)(2)(iv)(A) and delete "informed" from § 300.154(e)(1).

We believe obtaining parental consent each time the public agency seeks to use a parent's *public* insurance or other public benefits to provide or pay for a service is important to protect the privacy rights of the parent and to ensure that the parent is fully informed of a public agency's access to his or her public benefits or insurance and the services paid by the public benefits or insurance program. Therefore, we will revise § 300.154(d)(2)(iv) to clarify that parental consent is required each time the public agency seeks to use the parent's *public* insurance or other public benefits. We do not believe that it would be appropriate to include a provision permitting waiver of parental consent in this circumstance, even where a public agency makes reasonable efforts to obtain the required parental consent. However, we agree with the commenter that a public agency could satisfy parental consent requirements under FERPA and section 617(c) of the Act if the parent provided the required parental consent to the State Medicaid agency, and the consent satisfied the Part B definition of *consent* in § 300.9.

We also believe that it is important to let parents know that their refusal to allow access to their public benefits or insurance does not relieve the public agency of its responsibility to ensure that all required services are provided at no cost to the parents. We will, therefore, add a new paragraph (B) to § 300.154(d)(2)(iv) to make this clear.

Finally, because we have referenced the definition of *consent* in § 300.9 throughout the rest of these regulations, rather than the consent provisions in § 300.622, we have removed the reference to § 300.622.

*Changes:* Section 300.154(d)(2)(iv) has been changed to clarify that consent must be obtained each time the public agency seeks to access a parent's *public* benefits or insurance and to clarify that a parent's refusal to allow access to the parent's public benefits or insurance does not relieve the public agency of its responsibility to ensure that all required services are provided at no cost to the parent. The reference to § 300.622 has been removed and we have added "consistent with § 300.9" following "parental consent" in

§ 300.154(d)(2)(iv)(A). For consistency, we have removed "informed" before "consent" in § 300.154(e)(1).

*Comment:* One commenter stated that LEAs and agencies that, by law, must provide educational services should not be allowed to use public benefits or insurance to pay for these programs. One commenter suggested that the Act be more closely aligned with the Medicaid laws. One commenter requested requiring public benefits or insurance agencies, when paying for special education, to meet the standards of the Act, and not the standards for medical environments.

*Discussion:* We disagree with the comment that LEAs and other public agencies responsible for providing special education and related services to children with disabilities should not be allowed to use public benefits or insurance to pay for these services. Pursuant to section 612(a)(12) of the Act, if a child is covered by a public benefits or insurance program and there is no cost to the family or the child in using the benefits of that program to support a service included in a child's IEP, the public agency is encouraged to use the public benefits or insurance to the extent possible. We believe public benefits or insurance are important resources for LEAs and other public agencies to access, when appropriate, to assist in meeting their obligation to make FAPE available to all children who are eligible to receive services.

Section 300.103 retains the Department's longstanding provision that clarifies that each State may use whatever State, local, Federal, and private sources of support are available in the State to meet the requirements of part 300. Nothing in part 300 relieves an insurer or similar third party from an otherwise valid obligation to provide or pay for services provided to a child with a disability.

The Act does not give the Department the authority to impose the standards of the Act on public benefits or insurance agencies, when paying for special education. If, however, a third party provider, such as a public benefits or insurance company, is unable to provide funding for services outside a clinical setting or other specific setting, the public agency cannot use the third party provider's inability to provide such funding as an appropriate justification for not providing a child with a disability FAPE in the LRE. Nothing in part 300 alters the requirements imposed on a State Medicaid agency, or any other agency administering a public benefits or insurance program by Federal statute, regulation, or policy under Title XIX or

Title XXI of the Social Security Act, 42 U.S.C. 1396 through 1396(v) and 42 U.S.C. 1397aa through 1397jj, or any other public benefits or insurance program. See section 612(a)(12) and (e) of the Act.

We believe the regulations are sufficiently aligned with the Medicaid program and consistent with the Act and no further clarification is necessary.

*Changes:* None.

*Comment:* One commenter requested clarifying that a child cannot be denied Medicaid-supported medical services merely because he or she receives educational services funded by Medicaid.

*Discussion:* We do not believe further clarification is necessary because § 300.154(d)(2) is sufficiently clear that the child's receipt of Medicaid-funded educational services, consistent with the Act and these regulations, should not deny the child receipt of other services for which he or she may be eligible under Medicaid or other noneducational programs. Further, § 300.103(b) provides that nothing in part 300 relieves an insurer or third party from an otherwise valid obligation to pay for services provided to a child with a disability.

*Changes:* None.

*Comment:* One commenter stated that LEAs and agencies that, by law, must provide educational services should not be allowed to use public benefits or insurance to pay for these programs. One commenter suggested that the Act be more closely aligned with the Medicaid laws. One commenter requested requiring public benefits or insurance agencies, when paying for special education, to meet the standards of the Act, and not the standards for medical environments.

*Discussion:* We disagree with the comment that LEAs and other public agencies responsible for providing special education and related services to children with disabilities should not be allowed to use public benefits or insurance to pay for these services. Pursuant to section 612(a)(12) of the Act, if a child is covered by a public benefits or insurance program and there is no cost to the family or the child in using the benefits of that program to support a service included in a child's IEP, the public agency is encouraged to use the public benefits or insurance to the extent possible. We believe public benefits or insurance are important resources for LEAs and other public agencies to access, when appropriate, to assist in meeting their obligation to make FAPE available to all children who are eligible to receive services.

Section 300.103 retains the Department's longstanding provision

that clarifies that each State may use whatever State, local, Federal, and private sources of support are available in the State to meet the requirements of part 300. Nothing in part 300 relieves an insurer or similar third party from an otherwise valid obligation to provide or pay for services provided to a child with a disability.

The Act does not give the Department the authority to impose the standards of the Act on public benefits or insurance agencies, when paying for special education. If, however, a third party provider, such as a public benefits or insurance company, is unable to provide funding for services outside a clinical setting or other specific setting, the public agency cannot use the third party provider's inability to provide such funding as an appropriate justification for not providing a child with a disability FAPE in the LRE. Nothing in part 300 alters the requirements imposed on a State Medicaid agency, or any other agency administering a public benefits or insurance program by Federal statute, regulation, or policy under Title XIX or Title XXI of the Social Security Act, 42 U.S.C. 1396 through 1396(v) and 42 U.S.C. 1397aa through 1397jj, or any other public benefits or insurance program. See section 612(a)(12) and (e) of the Act.

We believe the regulations are sufficiently aligned with the Medicaid program and consistent with the Act and no further clarification is necessary.

*Changes:* None.

*Comment:* One commenter requested clarifying that a child cannot be denied Medicaid-supported medical services merely because he or she receives educational services funded by Medicaid.

*Discussion:* We do not believe further clarification is necessary because § 300.154(d)(2) is sufficiently clear that the child's receipt of Medicaid-funded educational services, consistent with the Act and these regulations, should not deny the child receipt of other services for which he or she may be eligible under Medicaid or other noneducational programs. Further, § 300.103(b) provides that nothing in part 300 relieves an insurer or third party from an otherwise valid obligation to pay for services provided to a child with a disability.

*Changes:* None.

### Personnel Qualifications (§ 300.156)

*Comment:* One commenter requested that § 300.156 use the term "standards" when referring to personnel qualifications.

*Discussion:* We are not changing § 300.156 because its language follows

the specific language in section 612(a)(14) of the Act. Current § 300.136 refers to "personnel standards" but was removed consistent with the changes in section 612(a)(14) of the Act.

*Changes:* None.

*Comment:* Some commenters requested that the personnel qualification requirements in § 300.156 apply to personnel who provide travel instruction and teachers of children with visual impairments. Other commenters requested that personnel who provide therapeutic recreation services be required to meet the personnel qualifications. Some commenters requested that the personnel qualifications apply to preschool special education teachers.

*Discussion:* It is not necessary to list the specific personnel who provide services to children with disabilities under the Act and to whom the requirements in § 300.156 apply because the regulations are sufficiently clear that all needed personnel are covered. This includes personnel who provide travel instruction or therapeutic recreation services; teachers of children with visual impairments, if such personnel are necessary to carry out the purposes of this part; and preschool teachers in States where preschool teachers are considered elementary school teachers. Section 300.156(a), consistent with section 612(a)(14)(A) of the Act, requires each SEA to establish and maintain personnel qualification requirements to ensure that personnel necessary to carry out the purposes of Part B of the Act and part 300 are appropriately and adequately prepared and trained, and have the content knowledge and skills to serve children with disabilities.

*Changes:* None.

*Comment:* One commenter stated that the regulations should define what it means to be qualified to provide services to children with disabilities under the Act. The commenter stated that the regulations do not include any requirements for general education teachers or administrators who are involved in providing instruction and services for children in special education.

*Discussion:* It is not necessary to change the regulations to define what it means to be qualified to provide services because we believe that, aside from the "highly qualified" requirements for teachers and special education teachers in ESEA and the Act, other personnel qualifications are appropriately left to the States, in light of the variability in State circumstances. Further, § 300.156, consistent with section 612(a)(14) of the Act, makes it clear that it is the responsibility of the

SEA, not the Federal government, to establish and maintain qualifications for personnel who provide services to children with disabilities under the Act.

*Changes:* None.

*Comment:* One commenter objected to the removal of the requirements for a comprehensive system of personnel development in current § 300.135. The commenter also stated that regular education teachers need to be trained to work with children with disabilities to ensure that their inclusion in the regular classroom is successful.

*Discussion:* Current § 300.135 required States to have in effect a system of personnel development to ensure an adequate supply of qualified special education, regular education, and related services personnel. Section 612(a)(14) of the Act removed this requirement. The removal of current § 300.135, however, does not diminish the responsibility of each State to establish and maintain qualifications to ensure that personnel (including regular education teachers) necessary to carry out the purposes of the Act are appropriately and adequately prepared and trained, consistent with § 300.156.

*Changes:* None.

*Comment:* Some commenters recommended that the regulations include language from note 97 of the Conf. Rpt., p. 192, which requires SEAs to establish rigorous qualifications for related services providers to ensure that children with disabilities receive the appropriate quality and quantity of care. Several commenters requested that the regulations require SEAs to consult with LEAs, other State agencies, the disability community, and professional organizations regarding appropriate qualifications for related services providers and different service delivery models (*e.g.*, consultative, supervisory, and collaborative models).

*Discussion:* We believe that States already have sufficient incentive to ensure that related services providers provide services of appropriate quality so that children with disabilities can achieve to high standards and that further regulation in this area is not necessary. Section 300.156(b), consistent with section 612(a)(14)(B) of the Act, includes the qualifications for related services personnel. There is nothing in the Act that requires SEAs to consult with LEAs, other State agencies, or other groups and organizations to determine the appropriate qualifications for related services providers and the use of different service delivery models, and while we agree that this is good practice and encourage SEAs to participate in such consultation, we do not believe that we should regulate in

this manner. States should have the flexibility, based on each State's unique circumstances, to determine how best to establish and maintain standards for all personnel who are providers of special education and related services.

*Changes:* None.

*Comment:* Numerous commenters objected to § 300.156(b) and the removal of the requirement in current § 300.136 for State professional requirements to be based on the highest requirements in the State. The commenters stated that the removal of this requirement relaxes the qualification standards for speech-language pathologists and other related services personnel. Several commenters stated that speech-language professionals should be required to have advanced degrees (i.e., master's level) because a bachelor's degree does not provide adequate preparation. Many commenters expressed concern that the requirements in § 300.156(b) will lead to a decline in the quality of related services provided to children with disabilities in public schools. Other commenters expressed concern that increasing the standards will exacerbate the shortage of related services personnel experienced by large urban school districts.

*Discussion:* We are not changing § 300.156 because it reflects the specific language in section 612(a)(14) of the Act, which was intended to provide greater flexibility to SEAs to establish appropriate personnel standards, including the standards for speech-language pathologists. As indicated in note 97 of the Conf. Rpt., p. 192, section 612(a)(14) of the Act removes the requirement for State professional requirements to be based on the highest requirements in the State because of concerns that the previous law, regarding the qualifications of related services providers, established an unreasonable standard for SEAs to meet, and as a result, led to a shortage of related services providers for children with disabilities. We believe that States can exercise the flexibility provided in § 300.156 and section 612(a)(14) of the Act while ensuring appropriate services for children with disabilities without additional regulation.

*Changes:* None.

*Comment:* Many commenters expressed concern that § 300.156(b) establishes qualifications for related services providers in public schools that are less rigorous than the qualifications for related services providers who provide Medicaid services or services in other public settings, such as hospitals. The commenters stated that less rigorous qualifications would result in a two-tiered system in which related

services providers in public schools will be less qualified than related services providers in other public agencies. Another commenter expressed concern that the relaxation of standards for speech-language pathologists would cause LEAs to lose Medicaid funds that are used to assist children with disabilities.

*Discussion:* Section 300.156, consistent with section 612(a)(14)(B)(i) of the Act, clarifies that it is up to each SEA to establish qualifications for personnel to carry out the purposes of the Act. This will require weighing the various policy concerns unique to each State. The qualifications of related services providers required under Medicaid, or in hospitals and other public settings, and the fact that Medicaid will not pay for providers who do not meet Medicaid provider qualifications should serve as an incentive for States that want to bill for medical services on children's IEPs to impose consistent requirements for qualifications of related services providers.

*Changes:* None.

*Comment:* Some commenters stated that related services personnel should be considered to have met the qualifications in § 300.156(b)(1), regarding State-recognized certification, licensing, registration or other comparable requirements, if such personnel hold an academic degree consistent with their profession's national certification or State license to practice; demonstrate satisfactory progress toward full certification in the schools as prescribed by the State; and assume related services personnel functions for a specified period not to exceed three years.

A few commenters objected to the requirement that related services personnel must not have had certification or licensure requirements waived. One commenter stated that emergency, temporary, or provisional certificates are necessary for professionals relocating from different States or different countries, and predicted that professionals with emergency, temporary, or provisional certification would work for contract agencies to bypass the requirements.

*Discussion:* We believe the provisions in § 300.156(b) that State qualifications for related services personnel must include qualifications that are consistent with any State-approved or State-recognized certification, licensing, registration, or other comparable requirements that apply to the professional discipline in which those personnel are providing special education or related services, are

sufficient to ensure related services personnel are qualified to provide appropriate services to children with disabilities while maintaining the States' flexibility to establish appropriate personnel standards for related services personnel. We do not believe, therefore, that it is necessary to include additional regulation as suggested by commenters.

Section 300.156(b)(2)(ii) tracks the statutory requirement in section 612(a)(14)(B)(ii) of the Act, which requires that related services personnel not have certification or licensure requirements waived on an emergency, temporary, or provisional basis. We do not believe this provision unnecessarily hinders States from hiring professionals from other States or countries. States, in examining the credentials of prospective related services personnel from other States or countries, may find that their existing certification or licensure requirements are ones that these related services personnel could readily meet. Because each State has full authority to define and enforce its own requirements that personnel must meet in order to receive full State certification or licensure, States that employ related services personnel from other States or countries may, consistent with State law and policy, consider establishing a separate category of certification that would differ from emergency, temporary, or provisional certification in that the State would not be waiving any training or experiential requirements.

*Changes:* None.

*Comment:* One commenter recommended using nationally recognized standards to determine the qualifications of related services personnel. Another commenter recommended requiring SEAs to consider current professional standards in establishing appropriate qualifications for related services personnel. One commenter requested adding language to the regulations to prevent professional organizations from establishing personnel standards for related services personnel that override standards set by the SEA.

*Discussion:* We do not believe it is necessary to regulate as suggested by the commenters because these matters are better left to States to decide as States are in the best position to determine appropriate professional requirements for their States. There is nothing in the Act that requires an SEA to determine qualifications of related services personnel based on nationally recognized standards or current professional standards. Professional organizations may establish personnel

standards for related services personnel that differ from the standards established by a State, but section 612(a)(14) of the Act clarifies that the State is responsible for establishing and maintaining personnel qualifications to ensure that related services personnel have the knowledge and skills to serve children with disabilities under the Act.

*Changes:* None.

*Comment:* A few commenters requested that the regulations specify that an SEA, and not the State, has the authority to establish certification and licensure qualifications of related services personnel.

*Discussion:* We do not believe it is necessary to change the regulation because § 300.156(b), which follows the language in section 612(a)(14)(B) of the Act, clarifies that the SEA must establish qualifications for related services personnel that are consistent with State-approved or State-recognized certification, licensing, registration, or other comparable requirements that apply to related services personnel.

*Changes:* None.

*Comment:* Some commenters requested that the regulations require related services providers who do not meet existing State standards to be supervised by qualified personnel.

*Discussion:* Related services providers who do not meet the personnel qualifications established by the SEA would not be considered qualified to serve children with disabilities under the Act even with supervision by qualified personnel. Section 300.156(d), consistent with section 612(a)(14)(D) of the Act, clarifies that each State must ensure that LEAs take measurable steps to recruit, hire, train, and retain highly qualified special education personnel to provide special education and related services to children with disabilities under the Act.

*Changes:* None.

*Comment:* Some commenters recommended that the regulations require high standards for paraprofessionals. Several commenters requested guidance on the appropriate use of paraprofessionals to ensure that paraprofessionals and assistants are not used as a means of circumventing certification and licensing requirements for related services providers. A few commenters requested language clarifying that the elimination of the requirement that State professional requirements be based on the highest requirements in the State in current § 300.136(b) must not be used to justify the inappropriate use of paraprofessionals or related services providers. Another commenter asked that the regulations require States to

ensure that paraprofessionals are properly supervised at all times. One commenter stated that the regulations should clarify the use of State standards for speech-language pathology paraprofessionals.

*Discussion:* We believe the provisions in § 300.156, consistent with section 612(a)(14) of the Act, are sufficient to ensure that paraprofessionals meet high standards and that including additional requirements in these regulations is unnecessary. These provisions require an SEA to establish and maintain qualifications to ensure that personnel, including paraprofessionals, are appropriately and adequately prepared and trained, and have the content knowledge and skills to serve children with disabilities; and require the qualifications for paraprofessionals to be consistent with any State-approved or State-recognized certification, licensing, registration, or other comparable requirements that apply to the professional discipline in which those personnel are providing special education or related services. In addition, the ESEA requires that paraprofessionals working in a program supported by title I of the ESEA, including special education paraprofessionals who assist in instruction in title I-funded programs, have at least an associate's degree, have completed at least two years of college, or meet a rigorous standard of quality and demonstrate, through a formal State or local assessment, knowledge of, and the ability to assist in instruction in reading, writing, and mathematics, reading readiness, writing readiness, or mathematics readiness, as appropriate. Paraprofessionals in title I schools do not need to meet these requirements if their role does not involve instructional support, such as special education paraprofessionals who solely provide personal care services. For more information on the ESEA requirements for paraprofessionals, see 34 CFR 200.58 and section 1119 of the ESEA, and the Department's nonregulatory guidance, *Title I Paraprofessionals* (March 1, 2004), which can be found on the Department's Web site at: *http://www.ed.gov/policy/elsec/guid/paraguidance.pdf*.

With regard to the commenter requesting that the regulations clarify the use of State standards for speech-language paraprofessionals, we do not believe it is appropriate to include clarification regarding a specific discipline in these regulations because the Act requires States to establish and maintain qualifications to ensure that paraprofessionals, including speech-language paraprofessionals, are

appropriately and adequately prepared and trained.

Section 300.156(b)(2)(iii), consistent with section 612(a)(14)(B)(iii) of the Act, does specifically allow paraprofessionals and assistants who are appropriately trained and supervised, in accordance with State law, regulation, or written policy, to assist in providing special education and related services to children with disabilities under the Act. However, this provision should not be construed to permit or encourage the use of paraprofessionals as a replacement for teachers or related services providers who meet State qualification standards. To the contrary, using paraprofessionals and assistants as teachers or related services providers would be inconsistent with the State's duty to ensure that personnel necessary to carry out the purposes of Part B of the Act are appropriately and adequately prepared and trained. Paraprofessionals in public schools are not directly responsible for the provision of special education and related services to children with disabilities; rather, these aides provide special education and related services to children with disabilities only under the supervision of special education and related services personnel. We believe the provision in § 300.156(b)(2)(iii) sufficiently ensures that paraprofessionals and assistants are adequately supervised and further clarification in these regulations is unnecessary.

The Act makes clear that the use of paraprofessionals and assistants who are appropriately trained and supervised must be contingent on State law, regulation, and written policy giving States the option of determining whether paraprofessionals and assistants can be used to assist in the provision of special education and related services under Part B of the Act, and, if so, to what extent their use would be permissible. However, it is critical that States that use paraprofessionals and assistants to assist in providing special education and related services to children with disabilities do so in a manner that is consistent with the rights of children with disabilities to FAPE under Part B of the Act. There is no need to provide additional guidance on how States and LEAs should use paraprofessionals and assistants because States have the flexibility to determine whether to use them, and, if so, to determine the scope of their responsibilities.

*Changes:* None.

*Comment:* One commenter recommended different requirements for paraprofessionals who perform routine tasks and those who perform specific activities to assist in the provision of special education and related services.

*Discussion:* We do not see the need to make a change to the regulations as suggested by the commenter because, under § 300.156, consistent with section 612(a)(14) of the Act, SEAs have the responsibility for establishing and maintaining qualifications to ensure that personnel necessary to carry out the purposes of this part are appropriately and adequately prepared and trained. Furthermore, SEAs and LEAs have the flexibility to determine the tasks and activities to be performed by paraprofessionals and assistants, as long as they are consistent with the rights of children with disabilities to FAPE.

It should be kept in mind, however, that the ESEA has different requirements for paraprofessionals, including special education paraprofessionals, who assist in instruction in title I schools versus paraprofessionals in title I schools who do not provide instructional support, such as special education paraprofessionals who solely provide personal care services.

*Changes:* None.

*Comment:* A number of comments were received on the qualifications for special education teachers in § 300.156(c) that were similar to the comments received regarding the definition of *highly qualified special education teacher* in § 300.18.

*Discussion:* We combined and responded to these comments with the comments received in response to the requirements in § 300.18.

*Changes:* None.

*Comment:* Some commenters requested that the regulations allow alternative routes to certification for related services personnel and other non-teaching personnel, just as such routes are allowed for highly qualified teachers.

*Discussion:* As we stated earlier in this section, section 612(a)(14)(B) of the Act, clarifies that the SEA must establish qualifications for related services personnel that are consistent with State-approved or State-recognized certification, licensing, registration, or other comparable requirements that apply to related services personnel. While the Act does not address alternative routes to certification programs for related services personnel or other non-teaching personnel, there is nothing in the Act or the regulations that would preclude a State from providing for alternate routes for certification for related services personnel or other non-teaching personnel. It is, however, up to a State to determine whether related services or

non-teaching personnel participating in alternative routes to certification programs meet personnel requirements established by the State, consistent with the requirements in § 300.156 and section 612(a)(14) of the Act.

*Changes:* None.

*Comment:* Many commenters recommended that § 300.156 provide more guidance to ensure that States and LEAs implement proven strategies for recruiting and retaining qualified personnel. A few commenters stated that this is especially important for speech-language pathologists because large caseloads, increased paperwork, and lack of time for planning and collaboration have been shown to contribute to their burn out and attrition. Several commenters recommended that strategies to recruit and retain qualified personnel include reasonable workloads, improved working conditions, incentive programs, salary supplements, loan forgiveness, tuition assistance, signing bonuses, streamlined application processes, State and national advertising venues, school and university partnerships, release time for professional development, certification reciprocity between States, grants to LEAs for recruitment and retention programs, alternate professional preparation models, caseload size standards, and classroom size standards.

One commenter requested that the requirements to recruit, hire, train, and retain highly qualified personnel in § 300.156(d) apply to paraprofessionals who provide special education and related services.

*Discussion:* The list of strategies recommended by the commenters includes many strategies that may be effective in recruiting and retaining highly qualified personnel; however, we do not believe it is appropriate to include these or other strategies in our regulations because recruitment and retention strategies vary depending on the unique needs of each State and LEA. States and LEAs are in the best position to determine the most effective recruitment and retention strategies for their location.

With regard to the comment regarding the applicability of § 300.156(d) to paraprofessionals who provide special education and related services, § 300.156(d), consistent with section 612(a)(14)(C) of the Act, applies to all personnel who provide special education and related services under the Act, including paraprofessionals.

*Changes:* None.

*Comment:* A few commenters stated that the rule of construction in § 300.156(e) is inconsistent with the rule

of construction in the definition of highly qualified teacher in proposed § 300.18(e). Some commenters requested that the regulations clarify that the rule of construction in § 300.156(e) is applicable to both administrative and judicial actions.

A few commenters requested that the regulations specify that a parent may file a State complaint with the State regarding failure of a child to receive FAPE because staff is not highly qualified. However, several commenters stated that parents should not be allowed to file a State complaint under §§ 300.151 through 300.153 regarding staff qualifications.

*Discussion:* We agree that the rules of construction in both proposed § 300.156(e) and proposed § 300.18(e) must be revised so that both rules are the same. The changes will clarify that a parent or student may not file a due process complaint on behalf of a student, or file a judicial action on behalf of a class of students for the failure of a particular SEA or LEA employee to be highly qualified; however, a parent may file a complaint about staff qualifications with the SEA. In addition to permitting a parent to file a State complaint with the SEA, an organization or an individual may also file a complaint about staff qualifications with the SEA, consistent with the State complaint procedures in §§ 300.151 through 300.153. We believe that this is appropriate given the wording of section 612(a)(14)(E) of the Act " * * * or to prevent a parent from filing a complaint about staff qualifications with the State educational agency" and incorporated in the regulations in § 300.156(e) and new § 300.18(f) (proposed § 300.18(e)). By incorporating the wording from the construction clause in section 612(a)(14)(E) of the Act in the regulations as previously noted, parents and other interested parties, may seek compliance through the State complaint process.

*Changes:* We have added "or a class of students" to § 300.156(e) to clarify that a judicial action on behalf of a class of students may not be filed for failure of a particular SEA or LEA employee to be highly qualified. We have substituted the word, "employee" for "staff person" to be more precise and for consistency with the rule of construction in new § 300.18(f) (proposed § 300.18(e)). We have also reformatted § 300.156(e).

*Comment:* Some commenters recommended adding language to the regulations restricting a parent's right to file a complaint regarding an LEA's failure to take measurable steps to recruit, hire, train, and retain highly qualified personnel.

*Discussion:* We believe the regulations do not need clarification. Section § 300.151(a) is sufficiently clear that an organization or individual may file a State complaint under §§ 300.151 through 300.153 alleging a violation of a requirement of Part B of the Act or of this part. This includes the requirement that an LEA take measurable steps to recruit, hire, train, and retain highly qualified personnel consistent with section 612(a)(14)(D) of the Act.

*Changes:* None.

*Comment:* Some commenters requested that the regulations clarify that, unless the State has statutory control over district staffing, parents cannot obtain compensatory damages or services or a private school placement based on the lack of highly qualified personnel.

*Discussion:* We do not agree that the exception requested by the commenter should be added to the regulations because new § 300.18(f) (proposed § 300.18(e)), and § 300.156(e) are sufficiently clear that nothing in part 300 shall be construed to create a right of action on behalf of an individual child for the failure of a particular SEA or LEA staff person to be highly qualified.

*Changes:* None.

*Comment:* One commenter recommended that the qualifications of all personnel should be made a matter of public record.

*Discussion:* To do as the commenter recommends would add burden for local school personnel and it is not required under the Act. In contrast, title I of the ESEA required that LEAs receiving title I funds provide parents, at their request, the qualifications of their children's classroom teachers. There is nothing in the Act or these regulations, however, which would prevent an SEA or LEA from adopting such a policy should it wish to do so. In the absence of a congressional requirement in the Act, such policies are matters best left to State law.

Section 1111(h)(6) of the ESEA requires LEAs to inform parents about the professional qualifications of their children's classroom teachers. The ESEA requires that at the beginning of each school year, an LEA that accepts title I, part A funding must notify parents of students in title I schools that they can request information regarding their children's classroom teachers, including, at a minimum: (1) Whether the teacher has met the State requirements for licensure and certification for the grade levels and subject-matters in which the teacher provides instruction; (2) whether the teacher is teaching under emergency or other provisional status through which State qualification or licensing criteria have been waived; (3) the college major and any other graduate certification or degree held by the teacher, and the field of discipline of the certification or degree; and (4) whether the child is provided services by paraprofessionals, and if so, their qualifications. In addition, each title I school must provide each parent timely notice that the parent's child has been assigned, or has been taught for four or more consecutive weeks by, a teacher who is not highly qualified. These requirements apply only to special education teachers who teach core academic subjects in Title I schools.

*Changes:* None.

Performance Goals and Indicators (§ 300.157)

*Comment:* Several commenters recommended that the regulations retain current § 300.137(a)(2), which requires that States have goals for the performance of children with disabilities in the State that are consistent, to the maximum extent appropriate, with other goals and standards for all children established by the State. The commenters specifically objected to the removal of the word "maximum" before "extent appropriate;" and the removal of the word "all" before "children" in § 300.157(a)(4).

*Discussion:* Section 612(a)(15)(A)(iv) of the Act specifically removed the words in current § 300.137(a)(2) that the comment references. Therefore, we believe that it would be contrary to the intent of the statutory drafters to restore these words to the regulatory provision.

*Changes:* None.

*Comment:* A few commenters requested that the regulations in § 300.156(b) require States to involve parent centers in establishing the performance goals and indicators and measurable annual objectives for children with disabilities.

*Discussion:* We encourage broad stakeholder involvement in the development of performance goals, indicators, and annual objectives for children with disabilities, including the involvement of parent centers. We see no need to single out a particular group, however. The regulations in § 300.165(a) already require specific public participation in the adoption of policies and procedures needed to demonstrate eligibility under Part B, including this requirement.

*Changes:* None.

**46614**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

Participation in Assessments (Proposed § 300.160)

*Comment:* None.

*Discussion:* Participation in assessments is the subject of a notice of proposed rulemaking published in the **Federal Register** on December 15, 2005 (70 FR 74624) to amend the regulations governing programs under title I of the ESEA and Part B of the Act, regarding additional flexibility for States to measure the achievement of children with disabilities based on modified achievement standards.

*Changes:* Therefore, we are removing proposed § 300.160 and designating the section as "Reserved."

Supplementation of State, Local, and Other Federal Funds (§ 300.162)

*Comment:* One commenter disagreed with the removal of current § 300.155, which requires that States have policies and procedures on file with the Secretary to ensure that funds paid to the State under Part B of the Act are spent in accordance with the provisions of Part B.

*Discussion:* Current § 300.155 was removed from these regulations consistent with section 612(a)(17) of the Act. The removal of this requirement is also consistent with section 612(a) of the Act, which requires a State to submit a plan that provides assurances to the Secretary that the State has in effect policies and procedures to ensure that the State meets the requirements of the Act rather than submitting the actual policies and procedures to the Department. To alleviate burden, Congress removed the statutory provisions which required that States have policies and procedures on file with the Secretary to ensure that funds paid to the State under Part B of the Act are spent in accordance with the provisions of Part B. OSEP continues to have responsibility to ensure that States are properly implementing the Act. Given the statutory change that Congress made to remove the prior requirement, we believe it would be inappropriate to include it in these regulations.

*Changes:* None.

Maintenance of State Financial Support (§ 300.163)

*Comment:* One commenter requested that § 300.163(c)(1), regarding waivers for maintenance of State financial support for exceptional or uncontrollable circumstances, provide examples of what would be considered a precipitous and unforeseen decline in the State's financial resources.

*Discussion:* We decline to limit the Secretary's discretion in these matters in the abstract. The Secretary makes the determinations regarding these waivers on a case-by-case basis and given the facts and circumstances at the time such a request is made.

*Changes:* None.

Public Participation (§ 300.165)

*Comment:* Several commenters objected to the removal of current §§ 300.280 through 300.284, regarding public participation, and recommended that all provisions, including those related to public hearings, comment periods, and review of public comments be restored.

*Discussion:* We do not believe it is necessary to retain in the regulations the requirements in current §§ 300.280 through 300.284 because the provisions in § 300.165 and GEPA, in 20 U.S.C. 1232d(b)(7), provide sufficient opportunities for public participation. We also believe retaining the requirements in §§ 300.280 through 300.284 would place unnecessary regulatory burden on States. Section 300.165(a) incorporates the language in section 612(a)(19) of the Act, regarding public participation in the adoption of policies and procedures to implement Part B of the Act, and requires States to ensure that there are public hearings, adequate notice of hearings, and an opportunity for comment available to the general public. Furthermore, paragraph (b) of this section requires States to comply with the public participation requirements of GEPA, in 20 U.S.C. 1232d(b)(7), before submitting a State plan under this part. In accordance with the GEPA requirement, the State must assure that it will provide reasonable opportunities for participation by local agencies, representatives of the class of individuals affected by programs under this part and other interested institutions, organizations, and individuals in the planning for the operation of programs under this part. GEPA also requires that the State publish each proposed State plan under this part, in a manner that will ensure circulation throughout the State, at least 60 days prior to the date on which the State plan is submitted to the Secretary or on which the State plan becomes effective, whichever occurs earlier, with an opportunity for public comments on such plan to be accepted for at least 30 days. In addition, the State must comply with any State-specific public participation requirements in adopting policies and procedures related to Part B of the Act.

*Changes:* None.

*Comment:* One commenter requested that the regulations define the meaning of "adequate notice" as it is used in § 300.165(a) to ensure that there is adequate notice of public hearings prior to adopting any policies and procedures needed to comply with Part B of the Act.

*Discussion:* We do not think it is appropriate or necessary to include in the regulations a definition of "adequate notice" because what constitutes "adequate notice" will vary depending on the unique circumstances in each State and we believe States should have the flexibility of determining and applying a workable and reasonable standard that meets their circumstances to ensure public participation at public hearings. We believe it would be reasonable for the State to assume that it provided adequate notice if, at its public hearings, there were sufficient representatives of the general public, including individuals with disabilities and parents of children with disabilities, in attendance.

*Changes:* None.

*Comment:* One commenter requested that the regulations require States to provide notices of public hearings in multiple languages and alternative formats.

*Discussion:* It is unnecessary to include regulations requiring States to provide notice of public hearings in multiple languages and alternative formats. Public agencies are required by other Federal statutes to take appropriate actions to ensure that the public has access, in alternative formats and languages other than English, to public hearings. The other Federal statutory provisions that apply in this regard are section 504 of the Rehabilitation Act of 1973 and its implementing regulations in 34 CFR part 104 (prohibiting discrimination on the basis of disability by recipients of Federal financial assistance), title II of the Americans With Disabilities Act and its implementing regulations in 28 CFR part 35 (prohibiting discrimination on the basis of disability by public entities, regardless of receipt of Federal funds), and title VI of the Civil Rights Act of 1964 and its implementing regulations in 34 CFR part 100 (prohibiting discrimination on the basis of race, color, or national origin by recipients of Federal financial assistance).

*Changes:* None.

*Comment:* One commenter requested that the regulations require States to work with the parent centers to identify appropriate locations and times for public hearings.

*Discussion:* There is nothing in the Act or these regulations that would prohibit a State from working with the parent centers to identify appropriate

locations and times for public hearings, but we see no need to require States to do so. We believe that this matter should be left to State discretion.

*Changes:* None.

Rule of Construction (§ 300.166)

*Comment:* One commenter requested clarification regarding the use of Federal funds to offset decreases in State formula allocations to LEAs that use attendance, enrollment, or inflation as elements of the State funding formula for special education.

*Discussion:* Section 300.166 was added to incorporate language in section 612(a)(20) of the Act. It specifies that States with laws that require a specific level of funding to their LEAs cannot use Federal Part B funds for this purpose.

*Changes:* None.

*State Advisory Panel*

State Advisory Panel (§ 300.167)

*Comment:* One commenter stated that §§ 300.167 through 300.169 are unnecessary and do not add any requirements beyond those in section 612(a)(21) of the Act. The commenter recommended removing these requirements and stated that they can be adequately implemented through guidance provided by the Department and not through regulation.

*Discussion:* The requirements of the State advisory panel in §§ 300.167 through 300.169 reflect the specific language in section 612(a)(21) of the Act. We believe it is necessary to include these statutory requirements in the regulations to provide parents, public agencies, and others with information on the requirements applicable to State advisory panels.

*Changes:* None.

*Comment:* Several commenters recommended retaining the procedures to govern State advisory panels in current § 300.653 and strengthening the requirements of notice and opportunity for public comment at State advisory panel meetings by mandating publication of meeting dates, agendas, and minutes on Web sites. A few commenters stated that eliminating the notice requirements and the opportunity to participate in meetings in current § 300.653(d) and (e) will result in fewer low income, hearing-impaired, and foreign-language speaking parents attending State advisory panel meetings. One commenter expressed concern that the removal of current § 300.653 will result in less panel visibility, less public participation, and that State advisory panels will become "rubber-stamps" for positions taken by State officials. One

commenter stated that the removal of the requirements in current § 300.653 weakens the protection of children with disabilities, and, therefore, violates section 607(b) of the Act.

*Discussion:* The requirements in current § 300.653 were removed to provide greater State flexibility in the operation of advisory panels. We do not believe the removal of current § 300.653 will mean that the States will not ensure that State advisory panel meetings are announced in advance and open to the public because States generally have adequate sunshine laws that ensure public access to governmental agency meetings. We do not believe it is necessary to require that information regarding State advisory panel meetings be posted on State Web sites because sunshine laws generally contain provisions regarding meeting notices, agendas, and the availability of minutes of public meetings. However, it is important that individuals consult the laws governing their State and locality on the issue of open meetings and public access.

Section 607(b)(2) of the Act provides that the Secretary may not implement, or publish in final form, any regulation pursuant to the Act that procedurally or substantively lessens the protections provided to children with disabilities as embodied in regulations in effect on July 20, 1983. We do not believe removing from these regulations the requirements in current § 300.653 procedurally or substantively lessens the protections provided to children with disabilities pursuant to section 607(b)(2) of the Act because we do not view public notice of advisory committee meetings to be a protection provided to children with disabilities.

*Changes:* None.

Membership (§ 300.168)

*Comment:* We received numerous, specific requests to revise § 300.168 to add to the list of individuals who can serve as members of the State advisory panels. Some commenters recommended requiring State advisory panels to include representatives from the Parent Training and Information Centers and Community Parent Resource Centers funded by the Department under sections 671 and 672 of the Act because their representation would ensure a diverse group of people experienced with children with different disabilities on the panels. One commenter expressed concern that, without representation from these groups, panel members would make recommendations based solely on their individual circumstances and backgrounds. A few commenters

requested including school psychologists and other student support staff on State advisory panels. One commenter suggested including a representative of a residential treatment facility as a member on State advisory panels because children in these facilities are a growing population and have specialized needs. A few commenters requested adding representatives from centers for independent living because these individuals are experienced in advocating for people with disabilities. One commenter suggested including State coordinators for education of homeless children and youth. A few commenters suggested including disabled high school and postsecondary students on the list because the intended beneficiaries of the Act are often denied a voice. A few commenters proposed requiring each State advisory panel to be racially, culturally, linguistically, and socio-economically representative of the State. One commenter expressed concern that the new regulations could lead States to abruptly replace current panel members causing discontinuity and decreasing expertise in the new requirements and recommended phasing in the new requirements and allowing panel members to complete their terms of office.

*Discussion:* The membership of State advisory panels is described in section 612(a)(21)(B) and (C) of the Act and the Department does not agree that there is a need to require additional representatives or to change the panel composition. However, nothing in the Act or these regulations would prevent the appointment of additional representatives, if a State elected to add these individuals. With respect to the request to include State coordinators for education of homeless children on the panels, State and local officials who carry out activities under the McKinney-Vento Homeless Assistance Act are already included in the list of individuals identified to serve in the State advisory panels in § 300.168(a)(5).

Section 612(a)(21)(B) of the Act, as reflected in § 300.168, requires the State advisory panel to be representative of the State population and be composed of individuals involved in, or concerned with, the education of children with disabilities. Also, the Act and these regulations require a majority of the panel members to be individuals with disabilities or parents of children with disabilities (ages birth through 26). We also do not believe there is a need to phase in the new requirements, as those members that do not need to change should provide sufficient continuity of panel functions.

*Changes:* None.

Duties (§ 300.169)

*Comment:* A few commenters recommended requiring States to submit any rules or regulations related to children with disabilities to the State advisory panel for consideration before the rules are finalized. One commenter requested requiring panel members to take positions on State proposed rules and regulations regarding the education of children with disabilities and offer their views to the appropriate State agencies.

*Discussion:* Section 612(a)(21)(D) of the Act clearly specifies the duties of the State advisory panel and these duties are accurately reflected in § 300.169. Paragraph (b) of this section clarifies that the advisory panel must comment publicly on any State proposed rules or regulations regarding the education of children with disabilities. We believe § 300.169(b) is sufficient to ensure that the advisory panel has the opportunity to consider any State rules or regulations before they are final and, accordingly, further regulatory language is unnecessary. Further, we believe it is inappropriate to require that panel members "take positions" on proposed rules and regulations because to do so would be overly controlling of the advisory panel and may impact the panel's ability to effectively meet its statutory responsibility of providing public comment on State proposed rules and regulations.

*Changes:* None.

*Comment:* Many commenters suggested retaining current § 300.652(b), which requires State advisory panels to provide advice for educating students with disabilities in adult correctional facilities. A few of these commenters noted that students in adult correctional facilities are members of one of the most vulnerable populations.

*Discussion:* Given the breadth of the State advisory panel's statutory responsibilities we removed from the regulations all nonstatutory mandates on the State advisory panel, including the provision in current § 300.652(b), regarding advising on the education of eligible students with disabilities who have been convicted as adults and have been incarcerated in adult prisons. We believe placing such nonstatutory mandates on the State advisory panel may hinder the advisory panel's ability to effectively provide policy guidance with respect to special education and related services for children with disabilities in the State. There is nothing, however, that would prevent a State from assigning other

responsibilities to its State advisory panel, as long as those other duties do not prevent the advisory panel from carrying out its responsibilities under the Act.

*Changes:* None.

Access to Instructional Materials (§ 300.172)

*Comment:* One commenter recommended including the National Instructional Materials Accessibility Standard (NIMAS) in these regulations.

*Discussion:* We agree with the commenter. The final NIMAS was published in the **Federal Register** on July 19, 2006 (71 FR 41084) and will be included as *Appendix C to Part 300— National Instructional Materials Accessibility Standard* of these regulations. We will add language in § 300.172(a) to refer to this location and to reference the publication date of the NIMAS in the **Federal Register**.

*Changes:* The final NIMAS has been added as appendix C to part 300. We have added language in § 300.172(a) to refer to the location of the NIMAS in these regulations and the publication date of the NIMAS in the **Federal Register**.

*Comment:* Several commenters expressed concern that the language requiring States to adopt the NIMAS "in a timely manner" is ambiguous and could lead to delays in providing instructional materials to children with disabilities, inconsistencies across States, and increased litigation. Several commenters requested that the regulations specify a timeline for States to adopt the NIMAS. Some commenters recommended requiring all States to adopt the NIMAS by December 3, 2006. However, one commenter stated that States should not be given a deadline to adopt the NIMAS.

A number of commenters requested that the regulations define the meaning of "adopt" in § 300.172(a) and specify what States must do to adopt the NIMAS. Several commenters recommended defining "adopt" to mean that the State, through regulatory or legislative procedures, designates NIMAS as the only required source format for publishers to convert print instructional materials into specialized formats for children with disabilities. One commenter urged the Department to define "adopt" to mean that a State must accept a NIMAS file as satisfying the publisher's legal obligation to provide accessible instructional materials. Other commenters recommended that the regulations clearly state that adoption of the NIMAS means that SEAs and LEAs must accept and use electronic copies of

instructional materials in the NIMAS format that are provided by the publishers.

*Discussion:* Section 300.172(a), consistent with section 612(a)(23)(A) of the Act, requires States to adopt the NIMAS in a timely manner after the publication of the NIMAS in the **Federal Register** for the purpose of providing instructional materials to blind or other persons with print disabilities. As noted in the discussion to the previous comment, the NIMAS is included as *Appendix C to Part 300—National Instructional Materials Accessibility Standard* and was published in the **Federal Register** on July 19, 2006 (71 FR 41084). The Department believes that States should make every effort to adopt the NIMAS in a timely manner following the publication of the NIMAS in the **Federal Register**, recognizing that the timelines and requirements for adopting new rules, policies, or procedures vary from State to State. States choosing to coordinate with the NIMAC must, consistent with section 612(a)(23)(C) of the Act and § 300.172(c) of these regulations, not later than December 3, 2006, as part of any print instructional materials adoption process, procurement contract, or other practice or instrument used for purchase of print instructional materials, enter into a written contract with the publisher of the print instructional materials to: (1) Require the publisher to prepare and, on or before delivery of the print instructional materials, provide the NIMAC with electronic files containing the content of the print instructional materials using the NIMAS; or (2) purchase instructional materials from the publisher that are produced in, or may be rendered in, specialized formats. Clearly, we would expect that these States would have adopted the NIMAS by December 3, 2006. We decline to require a specific adoption date for all States, however, given the lack of specificity in the Act. We also decline to include a definition of "adopt" in these regulations because requirements for adopting new rules and policies may vary from State to State. The Department's view is that it is inherent in the adoption requirement that, at a minimum, upon "adoption" of the NIMAS, a State must accept and use electronic copies of instructional materials in the NIMAS format for the purpose of providing instructional materials to blind or other persons with print disabilities. Under § 300.172(a), adopting the NIMAS is a State responsibility and does not impose any legal obligations on publishers of instructional materials.

*Changes:* We have made technical changes in § 300.172(c). For clarity, we have replaced the phrase "not later than" with "as of." We have removed the phrase "two years after the date of enactment of the Individuals with Disabilities Education Improvement Act of 2004" because it is unnecessary.

*Comment:* One commenter recommended requiring States to comply with the requirements for public hearings and public comment in section 612(a)(19) of the Act before adopting policies and procedures to implement the requirements in § 300.172 related to access to instructional materials. The commenter stated that all interested members of the public, including parents of children with disabilities, are entitled to participate in designing the plan for implementing these policies and procedures.

*Discussion:* Section 300.165(a), consistent with section 612(a)(19) of the Act, requires States to hold public hearings and receive public comment before implementing any policies and procedures needed to comply with Part B of the Act. These public hearing and public comment requirements apply to the policies and procedures needed to implement the requirements in § 300.172.

*Changes:* None.

*Comment:* One commenter requested clarification on whether the NIMAS is limited to print materials on the medium of paper or also includes the iconic representation of letters and words.

*Discussion:* The NIMAS is the standard established by the Secretary to be used in the preparation of electronic files of print instructional materials so they can be more easily converted to accessible formats, such as Braille. In addition to print materials, the NIMAS provides standards for textbooks and related core materials where icons replace text. Materials with icons will be available if they are in printed textbooks and related printed core materials that are written and published primarily for use in elementary and secondary school instruction and are required by an SEA or LEA for use by children in the classroom, consistent with section 674(e)(3)(C) of the Act.

*Changes:* None.

*Comment:* A few commenters recommended clarifying that providing materials in accessible formats includes changes in the depth, breadth, and complexity of materials. Some commenters stated that § 300.172 should include language regarding universal design of instructional materials.

*Discussion:* Section 300.172 is consistent with section 612(a)(23) of the Act and focuses specifically on providing access to print instructional materials using the NIMAS. The NIMAS is designed to improve the quality and consistency of print instructional materials converted into accessible formats for persons who are blind and persons with print disabilities, not to alter the content (e.g., the depth, breadth, or complexity) of the print instructional materials. While the NIMAS is designed to make print instructional materials more readily and easily accessible to persons who are blind and persons with print disabilities, it is not intended to provide materials that are universally designed. Therefore, while the Department acknowledges the importance of universal design, it would be inappropriate to reference universal design in this section.

The NIMAS Development Center has been charged with examining the need for future changes in the NIMAS. This Center, funded by the Department, is looking at a variety of issues, including the extent to which universal design features should be incorporated into future iterations of the NIMAS. Information about the NIMAS Development Center can be found at: *http://nimas.cast.org/.*

*Changes:* None.

*Comment:* One commenter recommended that books on tape be made available in the same manner as print materials.

*Discussion:* The conversion of text to speech for digital talking books is one of the accessible formats that can be generated from a NIMAS file. The NIMAS makes it possible for such talking books to be generated more efficiently so that children who need them will receive them more quickly than in the past. Such audio formats will be made available for printed textbooks and related printed core materials that are written and published primarily for use in elementary and secondary school instruction and are required by an SEA or LEA for use by children in the classroom, consistent with section 674(e)(3)(C) of the Act. The NIMAS does not pertain to books on tape that are produced in sound studios.

*Changes:* None.

*Comment:* Many commenters requested that the regulations specify that providing instructional materials to children with disabilities in a timely manner means providing these materials at the same time they are provided to children without disabilities. One commenter recommended defining "in a timely manner" as the start of the school

year or, for children who transfer schools after the start of the school year, within 30 days of the start of the school year, regardless of whether a State chooses to coordinate with the NIMAC.

*Discussion:* The Department agrees that States should make every effort to provide children with disabilities accessible instructional materials at the same time as other children receive their instructional materials. The Department's position is consistent with S. Rpt. No. 108–185, p. 19, which states, "The committee feels strongly that instructional materials should be provided to blind and print disabled students at the same time their fellow students without print disabilities are receiving the same materials." This position also is consistent with H. Rpt. No. 108–77, pp. 97–98.

However, the Department recognizes that this may not be possible in all circumstances, for example, when a child with a disability transfers to a new school in the middle of a school year. Additionally, there could be circumstances beyond the control of the public agency that could prevent children with disabilities who need instructional materials in accessible formats from receiving them at the same time as instructional materials are provided to other children, such as if the public agency's contractor is unable to produce the instructional materials in an accessible format because of some unforeseen circumstance. In situations such as these, it is understandable that the accessible format materials may not be immediately available. Therefore, we will add a provision to the regulations to specify that in order to meet their obligation to provide accessible format instructional materials in a timely way, public agencies must take all reasonable steps to make those instructional materials available at the same time as instructional materials are provided to other children. Reasonable steps, for example, would include requiring publishers or other contractors to provide instructional materials in accessible formats by the beginning of the school year for children whom the public agency has reason to believe will be attending its schools. Reasonable steps also might include having a means of acquiring instructional materials in accessible formats as quickly as possible for children who might transfer into the public agency in the middle of the year. Reasonable steps would not include withholding instructional materials from other children until instructional materials in accessible formats are available. To clarify that the obligation to make instructional materials available in a timely manner applies even to

**46618** **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

States that coordinate with the NIMAC, we are adding a new provision to that effect. We also are clarifying that the definitions in § 300.172(e) apply to each State and LEA, whether or not the State or LEA chooses to coordinate with the NIMAC.

*Changes:* We have amended paragraph (b) in § 300.172 by adding a new paragraph (b)(4) requiring the SEA to ensure that all public agencies take all reasonable steps to provide instructional materials in accessible formats to children with disabilities who need those instructional materials at the same time as other children receive instructional materials. We have reorganized paragraph (c) and added a new paragraph (c)(2) requiring States that coordinate with the NIMAC to provide accessible materials in a timely manner. We have also amended paragraph (e) by adding a new paragraph (e)(2) to clarify that the definitions in § 300.172(e)(1) apply to each SEA and LEA whether or not the SEA or LEA chooses to coordinate with the NIMAC. We have made technical changes to § 300.172(e) and renumbered § 300.172(e) to be consistent with this change.

*Comment:* Many commenters expressed concern that the regulations fail to ensure timely access to instructional materials for children with other types of disabilities besides print disabilities. One commenter recommended clarifying that children do not have to be blind or have print disabilities to fit into the description of children who need accessible materials. However, another commenter stated that § 300.172(b)(3), which require SEAs to be responsible for providing accessible materials for children for whom assistance is not available from the NIMAC, should be removed because the Act does not include these requirements.

A few commenters requested adding a regulation to clarify that the requirements in § 300.172 do not apply if an SEA is not responsible for purchasing textbooks. The commenters stated that if an SEA cannot purchase textbooks, it has no legal relationship with textbook publishers and cannot comply with the requirements in § 300.172.

*Discussion:* Timely access to appropriate and accessible instructional materials is an inherent component of a public agency's obligation under the Act to ensure that FAPE is available for children with disabilities and that children with disabilities participate in the general curriculum as specified in their IEPs. Section 300.172(b)(3) provides that nothing relieves an SEA of

its responsibility to ensure that children with disabilities who need instructional materials in accessible formats, but who do not fall within the category of children who are eligible to receive materials produced from NIMAS files obtained through the NIMAC, receive those instructional materials in a timely manner. Therefore, we do not believe that any further clarification is necessary. Even SEAs that are not directly responsible for purchasing textbooks have this responsibility. In short, we believe these regulations are necessary to fully implement the Act.

*Changes:* None.

*Comment:* One commenter stated that all children with disabilities should receive assistance from the NIMAC.

*Discussion:* We disagree with the commenter. Section 674(e) of the Act limits the authority of the NIMAC to provide assistance to SEAs and LEAs in acquiring instructional materials for children who are blind, have visual disabilities, or are unable to read or use standard print materials because of physical limitations, and children who have reading disabilities that result from organic dysfunction, as provided for in 36 CFR 701.6. Clearly, SEAs and LEAs that choose to use the services of the NIMAC will be able to assist blind persons or other persons with print disabilities who need accessible instructional materials through this mechanism. However, SEAs and LEAs still have an obligation to provide accessible instructional materials in a timely manner to other children with disabilities who also may need accessible materials even though their SEA or LEA may not receive assistance from the NIMAC, as provided in §§ 300.172(b)(3) and 300.210(b).

*Changes:* None.

Rights and Responsibilities of SEAs (§ 300.172(b))

*Comment:* Many commenters expressed concern about allowing States to choose not to coordinate with the NIMAC. A few commenters stated that coordination with the NIMAC should be mandatory for all States. One commenter recommended that the Department strongly encourage States to coordinate with the NIMAC, because it may be difficult for States to provide the assurances required in § 300.172(b)(2) if they choose not to coordinate with the NIMAC. A few commenters recommended that States that cannot demonstrate a past history of providing instructional materials to children with disabilities in a timely manner should be required to coordinate with the NIMAC.

*Discussion:* It would be inconsistent with section 612(a)(23)(B) of the Act to make coordination with the NIMAC mandatory for all States or to require certain States to coordinate with the NIMAC (e.g., States that do not have a history of providing instructional materials to children with disabilities in a timely manner), as suggested by the commenters. Section 612(a)(23)(B) of the Act provides that nothing in the Act shall be construed to require any SEA to coordinate with the NIMAC.

*Changes:* None.

*Comment:* Several commenters requested that the regulations clearly define the process for a State to choose not to coordinate with the NIMAC. A few commenters requested additional details on what assurances States must provide if they choose not to coordinate with the NIMAC. Other commenters requested that State assurances provide the public with information to evaluate the capacity of the State to provide materials to children who are blind or have print disabilities. Some commenters stated that the assurances provided by States that choose not to coordinate with the NIMAC should be done annually and in writing.

Several commenters requested that the regulations provide a means for the public to obtain information about which States choose not to coordinate with the NIMAC. A few commenters requested that the Department publish the assurances made by SEAs that choose not to coordinate with the NIMAC. Some commenters stated that SEAs that choose to coordinate with the NIMAC should be required to provide information to the Department on the LEAs in the State that elect not to coordinate with the NIMAC.

*Discussion:* Section 300.172(b)(2), consistent with section 612(a)(23)(B) of the Act, requires SEAs that choose not to coordinate with the NIMAC to provide an assurance to the Secretary that the agency will provide instructional materials to blind persons and other persons with print disabilities in a timely manner. As part of a State's application for Part B funds, § 300.100 and section 612(a) of the Act require States to provide assurances to the Secretary that the State has in effect policies and procedures to ensure that the State meets the conditions of eligibility. (The Part B Annual State Application for 2006, OMB No. 1820–0030, can be found at: *http://www.ed.gov/fund/grant/apply/osep/2006apps.html.*)

Therefore, the Department will compile a list of the States that choose to coordinate with the NIMAC and those that do not, and will make this list

available on OSEP's monitoring Web site at: *http://www.ed.gov/policy/speced/guid/idea/monitor/index.html.*

Section 612(a)(23)(B) of the Act does not mandate that States coordinate with the NIMAC or place conditions on which States can choose to coordinate with the NIMAC. Therefore, it is unnecessary to require a State's assurance to include information on its capacity to provide instructional materials to children who are blind or have print disabilities, as commenters recommended.

We do not believe it is appropriate to regulate to require States to provide information to the Department on the LEAs in the State that elect not to coordinate with the NIMAC. Under § 300.149 and section 612(a)(11) of the Act, States are responsible for ensuring that LEAs in the State meet the requirements of the Act, including providing instructional materials to blind persons or other persons with print disabilities in a timely manner. As stated in § 300.210 and section 613(a)(6)(B) of the Act, if an LEA chooses not to coordinate with the NIMAC, the LEA must provide an assurance to the SEA that the LEA will provide instructional materials to blind persons or other persons with print disabilities in a timely manner.

*Changes:* None.

*Comment:* Some commenters proposed that the regulations require States that choose not to coordinate with the NIMAC to annually report to the public on when children with disabilities receive their materials, how print materials are provided in a timely manner, and the steps the State has taken to ensure that materials will be provided at the same time as materials are provided to children without disabilities. One commenter stated that, if a State chooses not to coordinate with the NIMAC, the State should be required to submit data to the Department on the number of children with print disabilities served by the State and when those children received the accessible version of print instructional materials compared with when other children received their materials. Other commenters recommended that States choosing not to coordinate with the NIMAC should be required to develop and publish their policies and procedures that govern how they maintain and distribute NIMAS files.

*Discussion:* It would be unfair to impose additional data collection and reporting requirements, such as those requested by the commenters, only on those States that choose not to coordinate with the NIMAC. All States,

regardless of whether they choose to coordinate with the NIMAC, must ensure that children with disabilities who need instructional materials in accessible formats receive instructional materials in a timely manner, consistent with § 300.172(b)(3).

Furthermore, even States that choose to coordinate with the NIMAC will need to take steps to ensure that the instructional materials for children eligible to receive print instructional materials derived from NIMAS files are received in a timely manner. As provided in section 674(e)(3)(A) of the Act, the NIMAC is a distribution center for NIMAS files obtained from publishers, SEAs, and LEAs. Section 612(a)(23) of the Act requires SEAs that choose to coordinate with the NIMAC to enter into written contracts with publishers to require the publishers to provide electronic files using the NIMAS to the NIMAC on, or before, delivery of the print instructional materials to the SEA.

The NIMAC is not responsible for converting NIMAS files to the accessible formats needed by the children eligible to receive print instructional materials derived from NIMAS files. All States will need to arrange to have the NIMAS files converted to student-ready versions of instructional materials in the accessible formats needed by these children.

*Changes:* None.

*Comment:* One commenter requested that the Department provide information and training to States and LEAs on the NIMAC so that they can make an informed choice regarding whether to coordinate with the NIMAC. Another commenter recommended that the Department provide written guidance for States and LEAs regarding the NIMAS and the NIMAC.

*Discussion:* The Department recognizes the need to provide information to SEAs and LEAs regarding the NIMAS and the NIMAC and will provide technical assistance through the NIMAS Technical Assistance Center after the Department has approved the NIMAC procedures.

*Changes:* None.

Preparation and Delivery of Files (§ 300.172(c))

*Comment:* One commenter recommended that the regulations require instructional materials provided to children with disabilities to be complete and accurate. Another commenter requested requiring publishers to provide copies of the original books to the NIMAC along with the electronic files, because a copy of the original book is necessary for

alignment of page numbers and descriptions of pictures.

*Discussion:* We understand and appreciate the importance of having a copy of the original material to ensure accuracy of the files. However, the NIMAC is not responsible for ensuring the accuracy of materials, aligning page numbers, or describing pictures. Rather, the NIMAC is a distribution center for NIMAS files obtained from publishers, SEAs, and LEAs. Consistent with section 674(e)(3)(A) of the Act, the duties of the NIMAC are to receive and maintain a catalog of print instructional materials prepared in the NIMAS format and made available to the NIMAC by the textbook publishing industry, SEAs, and LEAs. Accessible, student-ready versions of instructional materials are created from NIMAS source files by national third-party conversion organizations; regional or State conversion sources; desktop applications created by software developers; or curriculum publishers that produce accessible alternate format versions for direct sale to SEAs and LEAs. The Act does not authorize the Department to impose obligations on such entities to provide accurate materials. States and LEAs that contract with such entities, however, may wish to require the accuracy of such materials, including the alignment of page numbers and descriptions of pictures, as part of their agreements.

*Changes:* None.

*Comment:* One commenter suggested that the regulations permit an SEA to receive assistance from the NIMAC, even if the SEA is not formally coordinating with the NIMAC.

*Discussion:* The Act does not require the NIMAC to provide assistance to SEAs if the SEA has chosen not to coordinate with the NIMAC. However, there is nothing in the Act that would prevent the NIMAC from doing so. As stated in section 674(e)(2)(B) of the Act, the NIMAC must provide access to print instructional materials, including textbooks, in accessible, media, free of charge, to blind or other persons with print disabilities in elementary and secondary schools, in accordance with such terms and procedures as the NIMAC may prescribe. Providing this access could include assisting an SEA, even if the SEA has chosen not to coordinate with the NIMAC.

*Changes:* None.

*Comment:* One commenter recommended that the regulations include an accountability mechanism so that parents and schools know whether the State or LEA is responsible for the timely delivery of instructional materials.

ED-000081

*Discussion:* Whether instructional materials are purchased by the State or LEA is a State matter. The Act does not authorize the Department to impose obligations on States or LEAs with respect to the process for timely delivery of instructional materials.

*Changes:* None.

*Comment:* One commenter emphasized the need to track the progress and monitor the advancement of accessible materials on a national and regional level. Another commenter stated that there is a need to establish SEA and LEA baseline data regarding the timeliness, quality, and quantity of alternate formats in schools. One commenter stated that States should be required to publicize information regarding whether the State is meeting its responsibilities to provide accessible materials to persons who are blind or other persons with print disabilities in a timely manner.

*Discussion:* We believe that it would be overly burdensome to require States to collect and report data on the timeliness, quality, and quantity of alternate formats provided to children with disabilities in order to track the availability of accessible materials for children with disabilities on a regional or national level. Under the State complaint procedures, States are responsible for resolving complaints alleging violations of requirements under the Act, including this one.

*Changes:* None.

*Comment:* One commenter requested information on the scope of the NIMAC's responsibilities.

*Discussion:* The duties of the NIMAC are specified in section 674(e)(2) of the Act and include: (a) receiving and maintaining a catalog of print instructional materials prepared in the NIMAS format; (b) providing access to print instructional materials in accessible media, free of charge to blind or other persons with print disabilities in elementary schools and secondary schools; and (c) developing, adopting, and publishing procedures to protect against copyright infringement, with respect to print instructional materials provided under sections 612(a)(23) and 613(a)(6) of the Act.

Section 674(c) of the Act provides that NIMAC's duties apply to print instructional materials published after July 19, 2006, the date on which the final rule establishing the NIMAS is published in the **Federal Register** (71 FR 41084). The Department interprets ''publish'' to have the plain meaning of the word, which is to issue for sale or distribution to the public. The NIMAC's duties, therefore, apply to print instructional materials made available

to the public for sale after the NIMAS is published in the **Federal Register**. However, this does not relieve SEAs and LEAs of their responsibility to provide accessible instructional materials in a timely manner, regardless of when the instructional materials were ''published.''

*Changes:* None.

*Comment:* A few commenters expressed concern that the regulations do not specify the structure and operation of the NIMAC. One commenter requested that the Department provide more information about the operation of the NIMAC. Another commenter recommended that the NIMAC's management board include representatives of authorized entities. One commenter requested information on the legal protections that the Department will provide to the NIMAC. Another commenter requested specific information on the process and timing of the funding of the NIMAC. One commenter recommended a timeline with a series of activities (e.g., establishment of a cooperative agreement, cost projections) to ensure that the NIMAC is operational. Another commenter recommended that the Department develop a process to ensure that the files included in the NIMAC are NIMAS compliant, complete, and of the highest quality. One commenter expressed concern about how NIMAS files will be bundled and delivered to the NIMAC.

*Discussion:* We do not believe that regulations on the structure, operation, or budget of the NIMAC are necessary. Section 674(e) of the Act establishes the NIMAC through the American Printing House for the Blind (APH) and allows the NIMAC to prescribe terms and procedures to perform its duties under the Act. The Department's Office of Special Education Programs (OSEP) will oversee the administration of the NIMAC through a cooperative agreement with the APH and will work with the NIMAC to establish its structure, operating procedures, and budget. The NIMAC procedures will be available on the NIMAC Web site at: *http://www.nimac.us.*

*Changes:* None.

*Comment:* One commenter stated that the duties of the NIMAC to receive and maintain electronic files of instructional materials provided by publishers should not be misconstrued as imposing a duty on the NIMAC itself to use the NIMAS files to reproduce the instructional materials in accessible formats for children with print disabilities.

*Discussion:* The Act clarifies that the NIMAC is not responsible for producing instructional materials in accessible

formats. As stated in section 674(e)(2) of the Act, the NIMAC receives and maintains a catalog of print instructional materials prepared in the NIMAS, and made available to the NIMAC by the textbook publishing industry, SEAs, and LEAs.

*Changes:* None.

*Comment:* One commenter expressed concern about clear guidance regarding electronic rights. Another commenter recommended that the regulations require the NIMAC to develop a user agreement that any entity seeking access to a NIMAS file must sign. The commenters stated that the agreement should detail the entities that are eligible under Federal copyright law and the Act to access the NIMAS files, the alternate formats that may be produced, and any other restrictions on the dissemination and use of NIMAS files.

One commenter stated that the regulations should require that the authorized entities have full, complete, and immediate access to deposited files and clarify that the authorized entities are responsible for reproducing the instructional materials in an accessible format and therefore, the files housed by the NIMAC should be free of charge. Another commenter stated that the Department should ensure that NIMAS books are available to all authorized entities and the appropriate State organizations within five days after the books are deposited in the NIMAC.

*Discussion:* We do not believe it is appropriate or necessary to regulate on the authorized entities eligible to have access to the NIMAS files. Under section 674(e)(2)(C) of the Act, the NIMAC is required to develop, adopt, and publish procedures to protect against copyright infringement, with respect to the print instructional materials produced using the NIMAS and provided by SEAs and LEAs to blind persons or other persons with print disabilities. Such procedures will address, for example, information regarding the authorized entities that are eligible to have access to NIMAS files, responsibilities of such authorized entities, and how and when access will be provided. The NIMAC procedures will be available on the NIMAC Web site at: *http://www.nimac.us.*

*Changes:* None.

*Comment:* One commenter suggested several changes in the process to make Braille copies of instructional materials including constructing directions for choosing answers in universal terms, such as ''write the correct response,'' rather than ''circle'' or ''underline;'' describing, in writing, visuals that cannot be easily interpreted; using hard

paper for Braille and raised drawings, rather than thermoform; using hard-bound bindings for text, rather than plastic spiral binders; using audio formats as supplemental materials; and using simple graphics with easy access to map keys on the same page.

*Discussion:* Procedures for Braille transcribers and for conversion entities are the responsibility of SEAs and LEAs and, as such, are beyond the scope of these regulations.

*Changes:* None.

*Comment:* One commenter recommended that software companies routinely create desktop publishing programs that contain text to speech capabilities.

*Discussion:* It is beyond the Department's authority to impose requirements on software companies.

*Changes:* None.

*Comment:* One commenter recommended that a NIMAS style guide be developed that is textbook specific.

*Discussion:* The NIMAS Technical Assistance Center will develop a best practices Web page with exemplars and a style guide. This technical assistance resource will be available at: *http://nimas.cast.org.*

*Changes:* None.

Assistive Technology (§ 300.172(d))

*Comment:* A few commenters requested that the regulations clarify that the "assistive technology programs," referred to in § 300.172(d), are the programs established in each State pursuant to the Assistive Technology Act of 1998, as amended.

*Discussion:* Section 300.172(d) and section 612(a)(23)(D) of the Act provide that in carrying out the requirements in § 300.172, the SEA, to the maximum extent possible, must work collaboratively with the State agency responsible for assistive technology programs. Section 612(a)(23)(D) of the Act does not refer to any particular assistive technology program. Therefore, we interpret broadly the phrase "State agency responsible for assistive technology programs" to mean the agency determined by the State to be responsible for assistive technology programs, which may include programs established under section 4 of the Assistive Technology Act of 1998, as amended.

*Changes:* None.

Definitions (§ 300.172(e))

*Comment:* Several commenters requested that § 300.172(e) include the full definition of terms, rather than the citations to the definitions in the laws. A number of commenters requested that

the regulations include a definition of "persons with print disabilities."

*Discussion:* We have published the NIMAS as *Appendix C to Part 300—National Instructional Materials Accessibility Standard* of these regulations, which will include the definition of NIMAS from section 674(e)(3)(B) of the Act.

The definition of the NIMAC in new § 300.172(e)(1)(ii) (proposed § 300.172(e)(2)) and section 612(a)(23)(E)(i) of the Act refers to the center established pursuant to section 674(e) of the Act. Paragraph (e)(1) in section 674 of the Act establishes the center at the APH and paragraph (e)(2) outlines the duties of the NIMAC. We do not believe it is necessary to include this information in the regulations in order to implement the requirements of the Act, but will include it here for the convenience of the readers.

*National Instructional Materials Access Center or NIMAC* means the center established pursuant to section 674(e) of the Act. Section 674(e) of the Act provides, in part, that—

(1) *In general.* The Secretary shall establish and support, through the American Printing House for the Blind, a center to be known as the "National Instructional Materials Access Center" not later than one year after the date of enactment of the Individuals with Disabilities Education Improvement Act of 2004.

(2) *Duties.* The duties of the NIMAC are the following:

(A) To receive and maintain a catalog of print instructional materials prepared in the NIMAS, as established by the Secretary, made available to such center by the textbook publishing industry, State educational agencies, and local educational agencies.

(B) To provide access to print instructional materials, including textbooks, in accessible media, free of charge, to blind or other persons with print disabilities in elementary schools and secondary schools, in accordance with such terms and procedures as the NIMAC may prescribe.

(C) To develop, adopt and publish procedures to protect against copyright infringement, with respect to the print instructional materials provided under sections 612(a)(23) and 613(a)(6).

The definitions of *blind persons or other persons with print disabilities* and *specialized format* both refer to statutes other than the Act. For the reasons set forth earlier in this notice, we are referencing the definitions of terms in § 300.172(e), rather than adding them to these regulations. However, we will include them here for the convenience of the readers.

The Library of Congress regulations (36 CFR 701.6(b)(1)) related to the Act to Provide Books for the Adult Blind (approved March 3, 1931, 2 U.S.C. 135a) provide that *blind persons or other persons with print disabilities* include:

(i) Blind persons whose visual acuity, as determined by competent authority, is 20/200 or less in the better eye with correcting glasses, or whose widest diameter if visual field subtends an angular distance no greater than 20 degrees.

(ii) Persons whose visual disability, with correction and regardless of optical measurement, is certified by competent authority as preventing the reading of standard printed material.

(iii) Persons certified by competent authority as unable to read or unable to use standard printed material as a result of physical limitations.

(iv) Persons certified by competent authority as having a reading disability resulting from organic dysfunction and of sufficient severity to prevent their reading printed material in a normal manner.

*Competent authority is defined in 36 CFR 701.6(b)(2) as follows:*

(i) In cases of blindness, visual disability, or physical limitations "competent authority" is defined to include doctors of medicine, doctors of osteopathy, ophthalmologists, optometrists, registered nurses, therapists, professional staff of hospitals, institutions, and public or welfare agencies (e.g., social workers, case workers, counselors, rehabilitation teachers, and superintendents).

(ii) In the case of a reading disability from organic dysfunction, competent authority is defined as doctors of medicine who may consult with colleagues in associated disciplines.

*Specialized formats* has the meaning given the term in section 121(d)(4) of title 17, United States Code:

(A) Braille, audio, or digital text which is exclusively for use by blind or other persons with disabilities.

(B) With respect to print instructional materials, includes large print formats when such materials are distributed exclusively for use by blind or other persons with disabilities.

*Changes:* As noted earlier, we have amended paragraph (e) of § 300.172 by adding a new paragraph (e)(2) to clarify that the definitions in § 300.172(e)(1) apply to each SEA and LEA whether or not the SEA or LEA chooses to coordinate with the NIMAC. We have made technical changes to § 300.172(e) and renumbered § 300.172(e) to be consistent with this change.

Prohibition on Mandatory Medication (§ 300.174)

*Comment:* A few commenters expressed concern that the regulations do not provide sufficient guidance on what school personnel can communicate to parents regarding medication. The commenters stated that in the absence of additional guidance, the regulations have the unintended effect of preventing school personnel from speaking openly with parents regarding classroom behavior, options for addressing behavior problems, and the impact of a child's medication on classroom behavior. Further, the commenters requested that the regulations do more to encourage school personnel to recommend evaluations for children with behavior problems and communicate openly with parents about the effectiveness of treatment, and protect school personnel. Other commenters recommended requiring school personnel to inform parents if they suspect that a child's behavior may be related to a disability.

*Discussion:* We believe that § 300.174 provides sufficient guidance on what school personnel can and cannot communicate to parents regarding a child's medication. Paragraph (a) clarifies that school personnel cannot require parents to obtain a prescription for medication for a child as a condition of attending school, receiving an evaluation to determine if a child is eligible for special education services, or receiving special education and related services under the Act. Paragraph (b) clearly permits classroom personnel to speak with parents or guardians regarding a child's academic and functional performance, behavior in the classroom or school, or the need for an evaluation to determine the need for special education or related services.

We do not believe that further regulations are needed to encourage school personnel to recommend evaluations for children with behavior problems or to require school personnel to inform parents if they suspect a child's behavior may be related to a disability. The child find requirements in § 300.111 clarify that States must have in effect policies and procedures to ensure that all children with disabilities residing in a State and who are in need of special education and related services, are identified, located, and evaluated.

*Changes:* None.

States' Sovereign Immunity (New § 300.177)

*Comment:* None.
*Discussion:* In developing the proposed regulations, we incorporated

those provisions of subpart A that apply to States. We inadvertently omitted the provisions in section 604 of the Act, regarding States' sovereign immunity. We have added these to the regulations in new § 300.177. In paragraph (a), we have clarified that the statutory language means that a State must waive immunity in order to receive Part B funds. This is the longstanding interpretation of the Department and is consistent with Federal Circuit Courts' decisions interpreting this statutory language. (*See, e.g., Pace* v. *Bogalusa City Sch. Bd.,* 403 F.3d 272 (5th Cir. 2005); *M.A. ex rel. E.S.* v. *State-Operated Sch. Dist.,* 344 F.3d 335 (3rd Cir. 2003); *Little Rock Sch. Dist.* v. *Mauney,* 183 F.3d 816 (8th Cir. 1999); *Marie O.* v. *Edgar,* 131 F.3d 610 (7th Cir. 1997).)

*Changes:* We have added the provisions in section 604 of the Act, regarding States' sovereign immunity, to new § 300.177.

Department Procedures (§§ 300.178 Through 300.186)

*Comment:* One commenter stated that the requirements in §§ 300.179 through 300.183, regarding the notice and hearing procedures before the Secretary determines a State is not eligible to receive a grant under Part B of the Act, are unnecessary and go beyond what is required in section 612(d) of the Act. The commenter recommended removing §§ 300.179 through 300.183 and including additional language in § 300.178 clarifying that the Secretary has the authority to develop specific administrative procedures to determine if States meet statutory requirements for eligibility under Part B of the Act and that such procedures must include notification of eligibility or non-eligibility, an opportunity for a hearing, and an opportunity for appeal of the hearing decision.

*Discussion:* The Department does not agree with the commenter that the notification and hearing procedures included in §§ 300.179 through 300.183 are unnecessary and go beyond what is required in section 612(d) of the Act. Section 612(d)(2) of the Act states that the Secretary shall not make a final determination that a State is not eligible to receive a grant under this part until after providing the State with reasonable notice and an opportunity for a hearing. When the Secretary proposes to deny a State's eligibility to receive a grant under Part B of the Act, withhold funds, or take other enforcement action, it is important to all parties that the process through which those issues will be decided is clearly described, so that time, money, and effort are not spent

resolving procedural questions instead of the underlying issues. For these reasons, we believe it is important to retain §§ 300.179 through 300.183 in the regulations.

*Changes:* None.

Judicial Review (§ 300.184)

*Comment:* One commenter requested that we clarify in the regulations the status of a State's operation of a program or eligibility to receive a grant under Part B of the Act while a final judicial decision is pending with respect to the State's eligibility under section 612 of the Act.

*Discussion:* Under section 612(a) of the Act, States must meet certain conditions in order to be eligible for a grant under the Part B program. Under section 612(d) of the Act, if the Secretary, after notice and an opportunity for a hearing, makes a final determination that a State is not eligible for a grant, the Secretary may not award funds to the State. The procedures in §§ 300.179 through 300.183 detail the process through which the Secretary notifies a State of a proposed ineligibility determination, the hearing available to the State to dispute this proposal, and the process through which the Secretary makes a final determination. The Secretary's final determination may be appealed through the judicial review procedure described in section 616(e)(8) of the Act and § 300.184. We decline to address this issue more specifically in the regulations, however, as we think the regulations already adequately convey the idea that only States that the Secretary determines to be eligible can receive a grant.

*Changes:* None.

By-Pass for Children in Private Schools (§§ 300.190 through 300.198)

*Comment:* One commenter stated that §§ 300.190 through 300.198 are unnecessary because the Act gives sufficient authority for the Secretary to implement a by-pass for children with disabilities enrolled in private elementary schools and secondary schools.

*Discussion:* Section 300.190 retains the authority for a by-pass in current § 300.480 and includes additional authority for a by-pass, consistent with section 612(f)(1) of the Act, in cases where the Secretary determines that an SEA, LEA, or public agency has substantially failed, or is unwilling, to provide for equitable participation of parentally-placed private school children with disabilities. When the Secretary authorizes a by-pass it is important that all parties understand the

process by which the Secretary determines the funds that will be deducted from the State's allocation under Part B of the Act to provide services, as well as the actions that are required before the Secretary takes any final action to implement a by-pass. When such processes and procedures are clearly described, time, money, and effort are not spent resolving procedural questions. The requirements in §§ 300.190 through 300.198 provide this information and we believe are necessary to clarify and ensure effective implementation of the by-pass provisions in the Act. We are making one change to § 300.191(d) to clarify that the Secretary deducts amounts the Secretary determines necessary to implement a by-pass from the State's allocations under sections 611 and 619 of the Act.

*Changes:* In § 300.191(d) we have substituted a reference to sections 611 and 619 of the Act for a reference to Part B of the Act.

Show Cause Hearing (§ 300.194)

*Comment:* One commenter opposed allowing a lawyer for the SEA or LEA to present oral and written evidence and arguments at a show cause hearing because parents are often intimidated by having to face a lawyer.

*Discussion:* Section 300.194(a)(3) provides an opportunity for an SEA, LEA, or other public agency, and representatives of private elementary schools and secondary schools to be represented by legal counsel and to submit oral or written evidence or arguments at a hearing to show cause why a by-pass should not be implemented. Parents are not parties to this hearing and generally would not appear before the show cause hearing officer, and would, therefore, not be intimidated by a participating lawyer. We believe that it is only fair that the party to the hearing (SEA, LEA, or other public agency, and representatives of private schools) be provided the option to be represented by legal counsel because legal counsel will generally represent the Department, as a party to the hearing.

*Changes:* None.

State Administration (§ 300.199)

*Comment:* One commenter indicated that § 300.199 is improperly placed in the regulations under the general heading "By-pass for Children in Private Schools."

*Discussion:* We agree with the commenter that § 300.199 does not belong under the general heading "By-Pass for Children in Private Schools."

*Changes:* A new undesignated center heading entitled "State Administration" will be added immediately preceding § 300.199 to separate that section from the regulations related to implementation of the by-pass provisions of the Act.

*Comment:* One commenter recommended including in § 300.199 a requirement that States may not eliminate from their rules, regulations, and policies any provisions required by Part B of the Act and its implementing regulations.

*Discussion:* Section 300.199 incorporates the requirement in section 608 of the Act that any rulemaking related to the Act conducted by the State conform to the purposes of the Act. Consistent with section 608 of the Act, § 300.199 makes clear that each State that receives funds under Part B of the Act must ensure that any State rules, regulations, and policies relating to 34 CFR part 300 conform to the provisions of 34 CFR part 300. We do not believe it is necessary to add a provision in § 300.199 prohibiting States from eliminating from their rules, regulations, and policies any provisions required by Part B of the Act and its implementing regulations, as requested by the commenter. If a State were to do so, the State's rules, regulations, and policies would not conform to the provisions in 34 CFR part 300. Under this provision, a State, and not the Secretary, determines whether a particular rule, regulation, or policy conforms to the purposes of the Act.

*Changes:* None.

*Comment:* Some commenters expressed concern that the mandate to minimize State rules and regulations might discourage States from developing beneficial programs, and, therefore, should not pertain to policies that promote best practices, increased parental involvement, educating children in the least restrictive environment, and improving access to the general curriculum. One commenter recommended including a statement in the regulations that a State would not be penalized for exceeding the minimum requirements of the Act. A few commenters stated that the services provided by the Act were intended to be a "floor," rather than a "ceiling" and recommended a pilot program to encourage States to adopt rules that best serve the needs of children with disabilities.

*Discussion:* We do not agree that the regulations discourage States from developing beneficial programs or establishing rules that best serve the needs of children with disabilities. In fact, § 300.199(b), consistent with

section 608(b) of the Act, requires State rules, regulations, and policies under the Act to support and facilitate LEA and school-level system improvement designed to enable children with disabilities to meet challenging State student academic achievement standards.

Section 300.199(a), consistent with section 608(a) of the Act, is intended to minimize the number of rules, regulations, and policies to which LEAs and schools are subject under the Act, and to identify in writing any rule, regulation, or policy that is State-imposed and not required under the Act and its implementing regulations. The Department's position is consistent with S. Rpt. No. 108–185, p. 10, which states "Through section 608(a), the committee is in no way attempting to reduce State input or State practice in this area, but intends to make clear what is a Federal obligation and what is a State or local educational agency requirement for the Act." We believe it is important for parents, teachers, school administrators, State lawmakers, and others to understand what is required under the Act, and, therefore, do not believe that § 300.199 should be changed.

*Changes:* None.

**Subpart C—Local Educational Agency Eligibility**

*Consistency With State Policies (§ 300.201)*

*Comment:* Some commenters recommended requiring LEAs to seek input from parents of children with disabilities in the development of LEA policies, procedures, and programs.

*Discussion:* Section 300.201, consistent with section 613(a)(1) of the Act, requires each LEA to have in effect policies, procedures, and programs that are consistent with State policies and procedures. It is up to each State and its LEAs to determine the manner in which LEAs develop their policies, procedures, and programs, consistent with State law and procedures. The Act does not authorize the Department to impose additional obligations on States or LEAs with respect to the development of LEA policies, procedures, and programs.

*Changes:* None.

*Maintenance of effort (§§ 300.202 through 300.205)*

*Comment:* A few commenters stated that the maintenance of effort requirements are complicated and unnecessary and should be eliminated or simplified.

*Discussion:* Sections 300.202 through 300.205, regarding maintenance of effort and the LEA's use of funds received

**46624**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

under Part B of the Act, reflect the specific statutory requirements in section 613(a)(2) of the Act, as well as necessary information regarding the implementation of these requirements. Much of the additional information in §§ 300.202 through 300.205 was included in various sections throughout the current regulations. We continue to believe that this information is necessary for the proper implementation of the Act. Section 300.204(e), which has been newly added to the regulations, includes the assumption of costs by the high cost fund as an additional condition under which an LEA may reduce its level of expenditures. We believe this provision is necessary because LEAs should not be required to maintain a level of fiscal effort based on costs that are assumed by the SEA's high cost fund.

In short, we have tried to present the regulations relating to LEA maintenance of effort in a clear manner, while being consistent with the language of the Act (which we do not have the authority to change) and including only as much additional information as is necessary to ensure proper implementation of the Act.

*Changes:* None.

*Comment:* One commenter stated that LEAs should be permitted to use a reasonable amount of their Part B funds to meet the Act's requirements relating to student assessment, outcomes, complaints, compliance monitoring, mediation, and due process hearings.

*Discussion:* With one exception, nothing in the Act or these regulations would prevent an LEA from using its Part B allotment for the activities noted by the commenter, so long as the expenditures meet the other applicable requirements under the Act and regulations.

LEAs may not use their Part B funds to support the mediation process described in § 300.506. Consistent with section 615(e)(2)(D) of the Act, § 300.506(b)(4) requires the State (not the LEA) to bear the cost of that mediation process. Although LEAs may not use their Part B funds to support the mediation process required under § 300.506(b)(4), they may use their Part B funds to support alternative mediation processes that they offer. Some LEAs (and States) offer alternative mediation processes, in addition to the mediation process required under section 615 of the Act. These alternative mediation processes generally were established prior to the Federal mandate for mediation and some LEAs (and States) continue to offer parents the option of using these alternative mediation processes to resolve disputes. Therefore,

if an LEA has an alternative mediation process, it may use its Part B funds for this process, so long as parents are provided access to the required mediation process under section 615 of the Act and are not required to use an alternative mediation process in order to engage in the mediation process provided under section 615 of the Act.

*Changes:* None.

*Comment:* Several commenters requested clarifying that "per capita" in § 300.203(b) means the amount per child with a disability in an LEA.

*Discussion:* We do not believe it is necessary to include a definition of "per capita" in § 300.203(b) because we believe that, in the context of the regulations, it is clear that we are using this term to refer to the amount per child with a disability served by the LEA.

*Changes:* None.

### Exception to Maintenance of Effort (§ 300.204)

*Comment:* One commenter recommended expanding the exceptions to the maintenance of effort requirements in § 300.204(a) to include negotiated reductions in staff salaries or benefits so that LEAs are not penalized for being proactive in reducing costs. Another commenter recommended revising § 300.204 to allow LEAs to apply for a waiver of the maintenance of effort requirements in cases of fiscal emergencies.

*Discussion:* Section 300.204(a) through (d) reflects the language in section 613(a)(2)(B) of the Act and clarifies the conditions under which LEAs may reduce the level of expenditures below the level of expenditures for the preceding year. Nothing in the Act permits an exception for negotiated reductions in staff salaries or benefits or financial emergencies. Accordingly, to expand the exceptions to the maintenance of effort requirements, as recommended by the commenters, would be beyond the authority of the Department.

*Changes:* None.

*Comment:* Some commenters requested clarification as to whether the exceptions to the maintenance of effort requirements apply to an LEA that uses funds from its SEA's high cost fund under § 300.704(c) during the preceding year.

*Discussion:* We do not believe further clarification is necessary because § 300.204(e) clearly states that the assumption of costs by a State-operated high cost fund under § 300.704(c) would be a permissible reason for reducing local maintenance of effort. This provision was included in the proposed

regulations in recognition that the new statutory authority in section 611(e)(3) of the Act that permits States to establish a fund to pay for some high costs associated with certain children with disabilities could logically and appropriately result in lower expenditures for some LEAs.

*Changes:* None.

### Adjustments to Local Fiscal Efforts in Certain Fiscal Years (§ 300.205)

*Comment:* A few commenters stated that the link between early intervening services and reductions in maintenance of effort in § 300.205(d) is not in the Act. Some commenters expressed concern that this requirement forces an LEA to choose between providing early intervening services and directing local funds toward nondisabled children. One commenter stated that linking the use of funds for early intervening services to reduction in maintenance of effort in § 300.205 is not logical and was not the intent of Congress.

*Discussion:* The link between reductions in local maintenance of effort (reflected in § 300.205(d)) and the amount of Part B funds that LEAs may use to provide early intervening services (reflected in § 300.226) is established in the Act. Section 300.205(d) tracks the statutory language in section 613(a)(2)(C)(iv) of the Act and § 300.226(a) tracks the statutory language in section 613(f)(1) of the Act. Section 300.205(d) states that the amount of funds expended by an LEA for early intervening services under § 300.226 counts toward the maximum amount of expenditures that an LEA may reduce in its local maintenance of effort. Section 300.226(a) clearly states that the amount of Part B funds an LEA may use to provide early intervening services may not exceed 15 percent of the funds the LEA receives under Part B of the Act less any amount reduced by the LEA under § 300.205.

As noted in the NPRM, the Department believes it is important to caution LEAs that seek to reduce their local maintenance of effort in accordance with § 300.205(d) and use some of their Part B funds for early intervening services under § 300.226 because the local maintenance of effort reduction provision and the authority to use Part B funds for early intervening services are interconnected. The decision that an LEA makes about the amount of funds that it uses for one purpose affects the amount that it may use for the other. *Appendix D to Part 300—Maintenance of Effort and Early Intervening Services* includes examples that illustrate how §§ 300.205(d) and 300.226(a) affect one another.

*Changes:* We have added a reference to Appendix D in § 300.226(a).

## Schoolwide Programs Under Title I of the ESEA (§ 300.206)

*Comment:* A few commenters recommended specifying in § 300.206(b) that LEAs can use only funds provided under section 611 of the Act (and not section 619 of the Act) to carry out a schoolwide program under section 1114 of the ESEA. The commenters stated that this change is necessary so that the per capita amount of Federal Part B funds used to carry out a schoolwide program is not artificially inflated by including preschool grant funds that are used to serve children ages three through five who are not placed in a title I school.

*Discussion:* Section 613(a)(2)(D) of the Act specifically provides that an LEA may use any funds it receives under Part B of the Act to carry out schoolwide programs under title I of the ESEA. Part B funds include any funds an LEA receives under sections 611 and 619 of the Act.

*Changes:* None.

## Personnel Development (§ 300.207)

*Comment:* A few commenters suggested requiring LEAs to train their personnel through research-based practices in order to ensure that personnel are appropriately and adequately prepared to implement Part B of the Act.

*Discussion:* We believe the regulations already address the commenters' concern and reflect the Department's position that high-quality professional development, including the use of scientifically based instructional practices, is important to ensure that personnel have the skills and knowledge necessary to improve the academic achievement and functional performance of children with disabilities. Section 300.207, consistent with section 613(a)(3) of the Act, requires each LEA to ensure that all personnel necessary to carry out Part B of the Act are appropriately prepared, subject to the requirements in § 300.156 and section 2122 of the ESEA.

Section 300.156(a), consistent with section 612(a)(14) of the Act, clearly states that each State must establish and maintain qualifications to ensure that personnel are appropriately and adequately prepared and trained, and have the content knowledge and skills to serve children with disabilities. Further, section 2122(b)(1)(B) of the ESEA requires an LEA's application to the State for title II funds (Preparing, training, and recruiting high quality teachers and principals) to address how

the LEA's activities will be based on a review of scientifically based research.

*Changes:* None.

## Purchase of Instructional Materials (§ 300.210)

*Comment:* One commenter recommended requiring LEAs to hold public hearings that meet the requirements in section 612(a)(19) of the Act before adopting its policies and procedures to purchase instructional materials. The commenter stated that all interested members of the public, including parents of children with disabilities, are entitled to participate in designing the plan to meet the requirements in § 300.210.

*Discussion:* The Act does not require LEAs to hold public hearings before implementing new policies and procedures. This is a matter for each State to determine, based on its rules governing public hearings and public comment. Therefore, we do not believe it is appropriate for these regulations to require LEAs to hold public hearings and receive public comment on the LEA's purchase of instructional materials, as requested by the commenter.

*Changes:* None.

*Comment:* One commenter stated that the requirements in § 300.210(b)(3) are unnecessary and should be removed because the Act does not require LEAs to provide accessible materials for children with disabilities for whom assistance is not available from the NIMAC.

*Discussion:* We believe that § 300.210(b)(3) is necessary because timely access to appropriate and accessible instructional materials is an inherent component of an LEA's obligation under the Act to ensure that FAPE is available for all children with disabilities and that children with disabilities participate in the general curriculum as specified in their IEPs. Because the NIMAC is not required to serve all children with disabilities who need accessible materials, we believe it is important that the regulations make clear that LEAs are still responsible for ensuring that children with disabilities who need instructional materials in accessible formats, but who do not fall within the definition of children who are eligible to receive materials produced from NIMAS files obtained through the NIMAC, receive them in a timely manner. We, therefore, decline to delete § 300.210(b)(3).

*Changes:* None.

*Comment:* A significant number of commenters expressed concern about allowing LEAs to choose not to coordinate with the NIMAC. A few

commenters stated that coordination with the NIMAC should be mandatory for all LEAs. Other commenters recommended that LEAs that cannot demonstrate a history of providing instructional materials to children with disabilities in a timely manner should be required to coordinate with the NIMAC.

*Discussion:* It would be inconsistent with section 613(a)(6)(B) of the Act to make coordination with the NIMAC mandatory for all LEAs or to require certain LEAs to coordinate with the NIMAC (*e.g.*, LEAs that do not have a history of providing instructional materials to children with disabilities in a timely manner). Section 613(a)(6)(B) of the Act provides that nothing in the Act shall be construed to require any LEA to coordinate with the NIMAC.

*Changes:* None.

*Comment:* Several commenters requested that the regulations clearly define the process LEAs must go through if they choose not to coordinate with the NIMAC. A few commenters requested additional details on what assurances LEAs must provide if they choose not to coordinate with the NIMAC. A few commenters requested that LEA assurances provide the public with information to evaluate the capacity of the LEA to provide materials to children who are blind or have print disabilities. Some commenters stated that the assurances provided by LEAs that choose not to coordinate with the NIMAC should be done annually and in writing.

Several commenters requested that the regulations provide a means for the public to obtain information about which LEAs choose not to coordinate with the NIMAC. A few commenters recommended requiring LEAs to report to the Department whether they choose to coordinate with the NIMAC. Some commenters requested that the Department publish the assurances made in accordance with § 300.210(b) by LEAs that choose not to coordinate with the NIMAC.

*Discussion:* The process by which LEAs choose not to coordinate with the NIMAC and the assurances that LEAs must provide if they choose not to coordinate with the NIMAC are determined by each State. Section 300.210(b)(2), consistent with section 613(a)(6)(B) of the Act, states that, if an LEA chooses not to coordinate with the NIMAC, the LEA must provide an assurance to the SEA that the LEA will provide instructional materials to blind persons or other persons with print disabilities in a timely manner. Therefore, it would be unnecessary and burdensome to require LEAs to provide

assurances to the Department or to require LEAs to report to the Department whether they choose to coordinate with the NIMAC. Each State has its own mechanisms and processes for obtaining assurances from its LEAs, and we believe it would be inappropriate for these regulations to define the process by which LEAs inform the SEA that they choose not to coordinate with the NIMAC or to specify the content of the assurances that LEAs must provide to the SEA if they choose not to coordinate with the NIMAC. Similarly, it is up to each State to determine whether and how the State will provide information to the public about LEAs in the State that choose not to coordinate with the NIMAC.

*Changes:* None.

*Comment:* Some commenters proposed that the regulations require LEAs that choose not to coordinate with the NIMAC to annually report to the public on when children with disabilities receive their materials, how print materials are provided in a timely manner, and the steps the LEA has taken to ensure that materials are provided at the same time as materials are provided to children without disabilities. Other commenters recommended requiring LEAs that choose not to coordinate with the NIMAC to develop and publish their policies and procedures that govern how they maintain and distribute NIMAS files.

*Discussion:* We believe that imposing additional data collection and reporting requirements, such as those requested by the commenters, on LEAs that choose not to coordinate with the NIMAC is a matter that is best left to the States. States are responsible for ensuring that accessible instructional materials are provided in a timely manner to all children with disabilities who need them, and are, therefore, in the best position to know what controls, if any, are needed in their State to ensure that LEAS comply with the requirements in § 300.210(b)(3). All LEAs, regardless of whether they choose to coordinate with the NIMAC, must ensure that children with disabilities who need instructional materials in accessible formats receive them in a timely manner, consistent with § 300.210(b)(3).

*Changes:* None.

*Comment:* A few commenters requested that the Department provide information to LEAs on the NIMAC and the NIMAS so that LEAs can make an informed choice regarding whether to coordinate with the NIMAC.

*Discussion:* The Department recognizes the need to provide information to LEAs regarding the NIMAC and the NIMAS. The Department has already provided numerous informational sessions on the NIMAC and NIMAS and more are planned following the publication of the regulations and approval of the NIMAC procedures. Information about the NIMAC Technical Assistance Center is available at the following Web site: *http://www.aph.org/nimac/index.html.* Information on the NIMAS can be obtained at: *http://nimas.cast.org.*

*Changes:* None.

*Early Intervening Services (§ 300.226)*

*Comment:* One commenter recommended clarifying that early intervening services should not be used to delay the evaluation of children suspected of having a disability.

*Discussion:* We believe that § 300.226(c), which states that nothing in § 300.226 will be construed to delay appropriate evaluation of a child suspected of having a disability, makes clear that early intervening services may not delay an appropriate evaluation of a child suspected of having a disability.

*Changes:* None.

*Comment:* One commenter expressed concern that the requirements for early intervening services do not adequately protect the child's right to FAPE and recommended that the requirements include provisions regarding notice, consent, and withdrawal of consent, as well as guidelines for referrals for evaluation.

*Discussion:* Children receiving early intervening services do not have the same rights and protections as children identified as eligible for services under sections 614 and 615 of the Act. Section 300.226(c), consistent with section 613(f)(3) of the Act, is clear that early intervening services neither limit nor create a right to FAPE.

*Changes:* None.

*Comment:* Some commenters recommended that the regulations specify how long a child may receive early intervening services before an initial evaluation for special education services under § 300.301 is conducted.

*Discussion:* We do not believe it is appropriate or necessary to specify how long a child can receive early intervening services before an initial evaluation is conducted. If a child receiving early intervening services is suspected of having a disability, the LEA must conduct a full and individual evaluation in accordance with §§ 300.301, 300.304 and 300.305 to determine if the child is a child with a disability and needs special education and related services.

*Changes:* None.

*Comment:* A few commenters suggested clarifying that Part B funds for early intervening services should not be used for any child previously identified as being a child with a disability.

*Discussion:* A child previously identified as being a child with a disability who currently does not need special education or related services would not be prevented from receiving early intervening services. For example, a child who received special education services in kindergarten and had services discontinued in grade 1 (because the public agency and the parent agreed that the child was no longer a child with a disability), could receive early intervening services in grade 2 if the child was found to be in need of additional academic and behavioral supports to succeed in the general education environment. We believe that language should be added to § 300.226 to clarify that early intervening services are for children who are not currently identified as needing special education or related services.

*Changes:* We have modified § 300.226(a) to clarify that early intervening services are available to children who currently are not identified as needing special education or related services.

*Comment:* One commenter recommended specifying that unless LEAs have significant over-identification and over-representation of minority students in special education, LEAs may not use Federal Part B funds for early intervening services unless they can demonstrate that all eligible children are receiving FAPE. Another commenter suggested prohibiting the use of Part B funds for early intervening services if an LEA is not providing FAPE to all eligible children.

*Discussion:* The Act does not restrict the use of funds for early intervening services only to LEAs that can demonstrate that all eligible children with disabilities are receiving FAPE. Section 613(f)(1) of the Act generally permits LEAs to use funds for early intervening services for children in kindergarten through grade 12 (with a particular emphasis on children in kindergarten through grade 3) who have not been identified as needing special education or related services, but who need additional academic and behavioral support to succeed in a general education environment. No other restrictions on this authority, such as a requirement that the LEA first demonstrate that it is providing FAPE to all eligible children, are specified or appropriate. The authority to use some Part B funds for early intervening

services has the potential to benefit special education, as well as the education of other children, by reducing academic and behavioral problems in the regular educational environment and reducing the number of referrals to special education that could have been avoided by relatively simple regular education interventions. Therefore, we believe the use of Part B funds for early intervening services should be encouraged, rather than restricted.

In one instance, however, the Act requires the use of funds for early intervening services. Under section 618(d)(2)(B) of the Act, LEAs that are identified as having significant disproportionality based on race and ethnicity with respect to the identification of children with disabilities, the placement of children with disabilities in particular educational settings, and the incidence, duration, and type of disciplinary actions taken against children with disabilities, including suspensions and expulsions, are required to reserve the maximum amount of funds under section 613(f)(1) of the Act to provide early intervening services to children in the LEA, particularly to children in those groups that were significantly over-identified. This requirement is in recognition of the fact that significant disproportionality in special education may be the result of inappropriate regular education responses to academic or behavioral issues.

*Changes:* None.

*Comment:* One commenter recommended permitting LEAs to spend funds for early intervening services on literacy instruction programs that target at-risk limited English proficient students.

*Discussion:* There is nothing in the Act that would preclude LEAs from using Part B funds for early intervening services, including literacy instruction, that target at-risk limited English proficient students who have not been identified as needing special education or related services, but who need additional academic and behavioral support to succeed in a general education environment.

*Changes:* None.

*Comment:* One commenter requested clarification as to whether ESAs or other public institutions or agencies, in addition to LEAs, have the authority to provide early intervening services.

*Discussion:* We do not believe any clarification is necessary because § 300.226, consistent with section 613(f) of the Act, states that LEAs may use Part B funds to develop and implement coordinated early intervening services. As defined in § 300.28(b), *local*

*educational agency* or *LEA* includes ESAs and any other public institution or agency having administrative control and direction of a public elementary school or secondary school, including a public nonprofit charter school that is established as an LEA under State law.

*Changes:* None.

*Comment:* Some commenters suggested modifying the regulations to permit children age 3 through 21 to receive early intervening services. The commenters stated that this change would allow schools to provide early academic and behavioral supports to preschool children.

*Discussion:* Early intervening services may not be used for preschool children. Section 300.226(a) tracks the statutory language in section 613(f)(1) of the Act, which states that early intervening services are for children in kindergarten through grade 12, with a particular emphasis on children in kindergarten through grade 3.

*Changes:* None.

*Comment:* One commenter recommended clarifying in the regulations that early intervening services are not equivalent to early intervention services.

*Discussion:* We do not believe any changes are necessary to the regulations to clarify the difference between early intervening services provided under Part B of the Act and early intervention services provided under Part C of the Act. Following is a description of the two types of services:

Early intervening services provided under section 613(f) of the Act are services for children in kindergarten through grade 12 (with a particular emphasis on children in kindergarten through grade 3) who have not been identified as needing special education and related services, but who need additional academic and behavioral support to succeed in a general education environment.

Early intervention services, on the other hand, are services for children birth through age two that are designed to meet the developmental needs of infants and toddlers with disabilities under section 632 in Part C of the Act. Section 632(5)(A) of the Act defines *infant or toddler with a disability* as a child under the age of three years who (a) is experiencing developmental delays in one or more of the areas of cognitive development, physical development, communication development, social or emotional development, and adaptive development, or (b) has a diagnosed physical or mental condition that has a high probability of resulting in developmental delay. In addition, some

States also provide early intervention services to infants and toddlers who are at risk of having a developmental delay. The Part C regulations will address, in detail, the early intervention services provided under section 632 of the Act.

*Changes:* None.

*Comment:* One commenter asked whether the reference to scientifically based academic and behavioral interventions in § 226.(b) means that such interventions must be aligned with recommended practices and peer-reviewed research.

*Discussion:* Section 300.226(b) follows the specific language in section 613(f)(2) of the Act and requires that in implementing coordinated, early intervening services, an LEA may provide, among other services, professional development for teachers and other personnel to enable such personnel to deliver scientifically based academic and behavioral interventions. The use of the term scientifically based in § 300.226(b) is intended to be consistent with the definition of the term *scientifically based research* in section 9101(37) of the ESEA. Because this definition of *scientifically based research* is important to the implementation of Part B of the Act, a reference to section 9101(37) of the ESEA has been added in new § 300.35, and the full definition of the term has been included in the discussion of new § 300.35. Under the definition, scientifically based research must be accepted by a peer-reviewed journal or approved by a panel of independent experts through a comparably rigorous, objective, and scientific review. We expect that the professional development activities authorized under § 300.226(b)(1) will be derived from scientifically based research. The statute and regulations do not refer to "recommended practices," which is a term of art that, generally, refers to practices that the field has adopted as "best practices," and which may or may not be based on evidence from scientifically based research.

*Changes:* None.

*Comment:* Several commenters requested including related services personnel, including speech pathologists and school psychologists, in the development and delivery of educational and behavioral evaluations, services, and supports for teachers and other school staff to enable them to deliver coordinated, early intervening services.

*Discussion:* State and local officials are in the best position to make decisions regarding the provision of early intervening services, including the specific personnel to provide the

**46628**     **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

services and the instructional materials and approaches to be used. Nothing in the Act or regulations prevents States and LEAs from including related services personnel in the development and delivery of educational and behavioral evaluations, services, and supports for teachers and other school staff to enable them to deliver coordinated, early intervening services.

*Changes:* None.

*Comment:* Several commenters recommended revising the regulations to allow public agencies to use Part B funds for early intervening services to purchase supplemental instructional materials to support the activities in § 300.226(b).

*Discussion:* We agree that supplemental instructional materials may be used, where appropriate, to support early intervening activities. The Conf. Rpt. in note 269 provides that

[E]arly intervening services should make use of supplemental instructional materials, where appropriate, to support student learning. Children targeted for early intervening services under IDEA are the very students who are most likely to need additional reinforcement to the core curriculum used in the regular classroom. These are in fact the additional instructional materials that have been developed to supplement and therefore strengthen the efficacy of comprehensive core curriculum.

We believe the terms ''services'' and ''supports'' in § 300.226(b)(2) are broad enough to include the use of supplemental instructional materials. Accordingly, we believe that it is unnecessary to add further clarification regarding the use of supplemental instructional materials in § 300.226. Of course, use of funds for this purpose is subject to other requirements that apply to any use of funds, such as the limitation on purchase of equipment in section 605 of the Act and applicable requirements in 34 CFR Parts 76 and 80.

*Changes:* None.

*Comment:* Several commenters requested requiring LEAs to provide parents with written notice regarding their child's participation in early intervening services, the goals for such services, and an opportunity to refuse services. Some commenters requested requiring LEAs to inform parents of their child's progress in early intervening services at reasonable intervals.

*Discussion:* Section 300.226, consistent with section 613(f) of the Act, gives LEAs flexibility to develop and implement coordinated, early intervening services for children who are not currently receiving special education services, but who require additional academic and behavioral

support to succeed in a regular education environment. Early intervening services will benefit both the regular and special education programs by reducing academic and behavioral problems in the regular education program and the number of inappropriate referrals for special education and related services. It would be overly restrictive and beyond the Department's authority to modify the regulations to include the additional requirements suggested by the commenters.

*Changes:* None.

*Comment:* One commenter stated that data should be collected regarding the effectiveness of early intervening services. Several commenters requested requiring LEAs to report to the SEA, and make available to the public, the number of children receiving early intervening services, the length of time the children received the services, the impact of the services, and the amount of Federal Part B funds used for early intervening services.

*Discussion:* Section 300.226(d), consistent with section 613(f)(4) of the Act, requires LEAs that develop and maintain coordinated, early intervening services to annually report to their SEA on the number of children receiving early intervening services and the number of those children who eventually are identified as children with disabilities and receive special education and related services during the preceding two year period (i.e., the two years after the child has received early intervening services). We believe that these data are sufficient to provide LEAs and SEAs with the information needed to determine the impact of early intervening services on children and to determine if these services reduce the number of referrals for special education and related services. Requiring LEAs to collect and report data on the implementation of early intervening services beyond what is specifically required in section 613(f)(4) of the Act is unnecessary and would place additional paperwork burdens on LEAs and SEAs.

*Changes:* None.

*Comment:* Some commenters requested that the meaning of the terms ''subsequently'' and ''preceding two year period'' in § 300.226(d)(2) be clarified.

*Discussion:* Section 300.226(d)(2), consistent with section 613(f)(4)(B) of the Act, requires LEAs to report on the number of children who are provided early intervening services who subsequently receive special education and related services under Part B of the Act during the preceding two years to

determine if the provision of these services reduces the number of overall referrals for special education and related services. The Department intends for LEAs to report on children who began receiving special education services no more than two years after they received early intervening services. For the preceding two year period, the LEA would report on the number of children who received both early intervening services and special education services during those two years.

*Changes:* None.

*Direct Services by the SEA (§ 300.227)*

*Comment:* Some commenters requested that the regulations specify that SEAs providing direct services must make placement decisions based on the child's individual needs and must comply with all requirements for providing FAPE in the LRE.

*Discussion:* We do not believe any changes to the regulations are necessary because § 300.227(b), consistent with section 613(g)(2) of the Act, clearly states that SEAs providing direct special education and related services must do so in accordance with Part B of the Act. Accordingly, the special education and related services provided under § 300.227 would be subject to the placement requirements in § 300.116 and the LRE requirements in § 300.114 and section 612(a)(5) of the Act.

*Changes:* None.

*Disciplinary Information (§ 300.229)*

*Comment:* One commenter recommended clarifying that not all student disciplinary records can be transmitted by public agencies.

*Discussion:* We believe that § 300.229 is clear that not all student disciplinary records can be transmitted by public agencies. Section 300.229(a) provides that public agencies can transmit disciplinary information on children with disabilities only to the extent that the disciplinary information is included in, and transmitted with, the student records of nondisabled children. Section 300.229(b) specifies the disciplinary information that may be transmitted, which includes a description of any behavior engaged in by the child that required disciplinary action, a description of the disciplinary action taken, and any other information that is relevant to the safety of the child and other individuals involved with the child.

*Changes:* None.

*Comment:* Some commenters requested that the required transmission of student records include both the child's current IEP and any statement of

current or previous disciplinary action related to weapons, drugs, or serious bodily injury that has been taken against the child.

*Discussion:* It is important to clarify that the Act does not require the transmission of student disciplinary information when the child transfers from one school to another. Rather, section 613(i) of the Act allows each State to decide whether to require its public agencies to include disciplinary statements in student records and transmit such statements with student records when a child transfers from one school to another. The State's policy on transmitting disciplinary information must apply to both students with disabilities and students without disabilities.

Section 300.229(b) provides that if a State requires its public agencies to include disciplinary statements in student records, these disciplinary statements may include a description of any behavior engaged in by the child that required disciplinary action, a description of the disciplinary action taken, and any other information that is relevant to the safety of the child and other individuals involved with the child; disciplinary actions taken against a child related to weapons, drugs, or serious bodily injury also could be included in these descriptions. If a State adopts such a policy, § 300.229(c) requires that the transmission of any of the child's student records include the child's current IEP and any statement of current or previous disciplinary action that has been taken against the child.

Therefore, with regard to the commenters' request that the transmission of student records include any statement of current or previous disciplinary action related to weapons, drugs, or serious bodily injury that has been taken against the child, this information would be transmitted only to the extent that disciplinary statements are included in, and transmitted with, the student records of nondisabled children.

*Changes:* None.

*Comment:* One commenter recommended requiring that the transmission of a student's records include functional behavioral assessments and behavior intervention plans.

*Discussion:* Any existing functional behavioral assessments and behavioral intervention plans would be part of the materials that must be transmitted under § 300.323(g). In addition, if a State requires student records to include disciplinary information and the child transfers from one school to another, § 300.229(c) requires that the

transmission of any of the child's student records include the child's current IEP. Functional behavioral assessments and behavior intervention plans are not required components of the IEP under § 300.320. However, if a State considers functional behavioral assessments and behavior intervention plans to be part of a student's IEP, this information would be required to be transmitted when the child transfers from one school to another, consistent with § 300.323(c).

*Changes:* None.

## Subpart D—Evaluations, Eligibility Determinations, Individualized Education Programs, and Educational Placements

### Parental Consent

Parental Consent (§ 300.300)

*Comment:* A few commenters noted that the terms, "consent," "informed consent," "agree," and "agree in writing" are used throughout the regulations and stated that differences between the terms should be clarified. One commenter recommended that the regulations include the term "informed" every time the term "parental consent" is used.

*Discussion:* The use of these terms throughout the regulations is consistent with their use in the Act. The definition of *consent* in § 300.9 includes the requirement that a parent be fully informed of all information relevant to the activity for which consent is sought. The definition also requires that a parent agree in writing to carrying out the activity for which the parent's consent is sought. Therefore, whenever the term "consent" is used in these regulations, it means that the consent is both "informed" and "written." Similarly, the terms "consent," "informed consent," "parental consent," and "written informed consent," as used in these regulations, all are intended to have the same meaning.

The meaning of the terms "agree" or "agreement" is not the same as "consent." "Agree" or "agreement" refer to an understanding between the parent and the LEA about a particular question or issue. There is no requirement that an agreement be in writing unless specifically stated in the Act and regulations.

*Changes:* None.

*Comment:* One commenter recommended that the regulations clarify what the required safeguards are if parents elect to receive notices electronically or provide electronic or digital signatures for consents, such as consent for an initial evaluation.

*Discussion:* Section 300.505, consistent with section 615(n) of the Act, permits parents to elect to receive prior written notices, procedural safeguards notices, and due process complaint notices by an electronic mail communication, if the public agency makes that option available. The Act does not specify documentation requirements if the public agency makes the electronic notice delivery option available to parents, and we believe that this is a matter that is best left to States and LEAs that choose to use the electronic communication option.

In addition, States that wish to utilize electronic or digital signatures for consent may do so if they choose. *Consent* under § 300.9(b) requires a parent to understand and agree in writing to the carrying out of the activity for which the parent's consent is sought. Therefore, States that permit the use of electronic or digital signatures for parental consent would need to take the necessary steps to ensure that there are appropriate safeguards to protect the integrity of the process.

*Changes:* None.

Parental Consent for Initial Evaluation (§ 300.300(a))

*Comment:* One commenter recommended that the regulations require a public agency to conduct the following activities to obtain parental consent for an initial evaluation: identify the child's parents and their address and phone number; contact social service providers for children who are wards of the State; provide parents with copies of the Act; and inform parents of the consequences of withholding consent.

*Discussion:* The regulations already provide sufficient safeguards regarding consent, and we believe that the changes requested would be unduly burdensome. As a matter of practice, public agencies begin the process of obtaining parental consent by identifying the parent and contacting the parent by phone or through written correspondence, or speaking to the parent in parent-teacher conferences.

We do not believe it is necessary to regulate to require public agencies to contact social service agencies to obtain consent for children who are wards of the State because it may not always be necessary or appropriate, for example, when a child who is a ward of the State has a foster parent who can act as a parent, consistent with § 300.30(a)(2). Additionally, section 614(a)(1)(D)(iii)(I) of the Act provides that the public agency must make reasonable efforts to obtain informed parental consent for children who are wards of the State and

**46630**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

not residing with the parent. Public agencies are in the best position to determine, on a case-by-case basis, when it is necessary to contact social service providers to assist in obtaining parental consent for children who are wards of the State.

We also do not believe that additional regulations are necessary to require public agencies to inform parents of the consequences of withholding consent for an initial evaluation or to provide parents with copies of the Act. Section 300.503, consistent with section 615(c)(1) of the Act, already requires that prior written notice be provided to parents before an initial evaluation, which will explain, among other things, why the agency is proposing to conduct the evaluation; a description of each evaluation procedure, assessment, record, or report the agency used as a basis for proposing to conduct the evaluation; and sources for the parent to contact to obtain assistance in understanding the provisions under the Act. Additionally, § 300.504(a)(1), consistent with section 615(d)(1)(A)(i) of the Act, requires the public agency to provide a copy of the procedural safeguards to parents upon initial referral for an evaluation, which provides information about parents' rights under the Act. Although we do not believe the recommended requirements should be added to the regulations, we will add the cross-references to the consent requirements in § 300.9, and the requirements for prior written notice and the procedural safeguards notice in §§ 300.503 and 300.504, respectively, to § 300.300(a).

*Changes:* We have added cross-references to §§ 300.9, 300.503, and 300.504 in § 300.300(a).

*Comment:* One commenter recommended revising § 300.300(a)(1)(ii) and using the statutory language in section 614(a)(1)(D)(i) of the Act to require that parental consent for evaluation may not be construed as consent for placement for receipt of special education and related services.

*Discussion:* We believe it is appropriate to use the phrase, "initial provision of services" in § 300.300(a)(1)(ii), rather than the statutory phrase "consent for placement for receipt of special education and related services," in section 614(a)(1)(D)(i) of the Act to clarify that consent does not need to be sought every time a particular service is provided to the child. In addition, the distinction between consent for an initial evaluation and consent for initial services is more clearly conveyed in § 300.300(a)(1)(ii) than in the statutory

language, and is consistent with the Department's longstanding position that "placement" refers to the provision of special education services, rather than a specific place, such as a specific classroom or specific school. We, therefore, decline to change the regulation, as requested by the commenter.

*Changes:* None.

*Comment:* One commenter recommended that the regulations clarify whether the reference to "parent" in § 300.300(a)(2) means "biological or adoptive parent" or anyone who meets the definition of *parent* in § 300.30.

*Discussion:* Section 300.300(a)(2) applies to circumstances in which the child is a ward of the State and is not residing with the child's parents, and requires the public agency to make reasonable efforts to obtain parental consent from the parent for an initial evaluation. The reference to "parent," in this context, refers to anyone who meets the definition of *parent* in § 300.30, consistent with section 614(a)(1)(D)(iii) of the Act.

*Changes:* None.

*Comment:* One commenter requested clarification on the interplay between new § 300.300(a)(2) (proposed § 300.300(a)(2)(ii)), regarding circumstances when the public agency is not required to obtain informed parental consent for an initial evaluation of a child who is a ward of the State, and the provisions in § 300.519(c), which require that a surrogate parent be appointed for a child who is a ward of the State.

*Discussion:* New § 300.300(a)(2) (proposed § 300.300(a)(2)(ii)), consistent with section 614(a)(1)(D)(iii)(II) of the Act, creates an exception to the parental consent requirements for initial evaluations for a child who is a ward of the State who is not residing with the child's parent if the public agency has made reasonable efforts to obtain the parent's consent, but is unable to discover the whereabouts of the parent, the rights of the parent of the child have been terminated under State law, or the rights of the parent to make educational decisions have been subrogated by a judge under State law and consent for the initial evaluation has been given by an individual appointed by the judge to represent the child. New § 300.300(a)(2) (proposed § 300.300(a)(2)(ii)) permits the public agency to proceed with the child's initial evaluation without first obtaining the requisite parental consent only in the circumstances detailed in § 300.300(a)(2). Therefore, when one or more of the circumstances in § 300.300(a)(2) are met and a surrogate

has not yet been appointed, the public agency need not postpone the child's evaluation to await the appointment of a surrogate. This is appropriate because in situations involving requests for initial evaluations, in most cases a surrogate parent has not yet been appointed and delaying an initial evaluation until after a surrogate is appointed and has given consent may not be in the best interests of the child. In contrast, in most situations involving consent for reevaluation, a surrogate parent should already have been appointed under § 300.519 if no parent can be identified, the public agency has been unable to locate a parent, the child is a ward of the State or the child is an unaccompanied homeless youth. Therefore, we do not think it is appropriate to apply the provisions in § 300.300(a)(2) to reevaluation situations.

Nothing in this section is intended to relieve a public agency of its obligation to ensure that the rights of a child who is a ward of the State are protected through the appointment of a surrogate parent in accordance with the procedures in § 300.519(b) through (h). Once a surrogate parent is appointed in accordance with the procedures in § 300.519(b) through (h), that person assumes the responsibilities of a parent under the Act, and the public agency must seek consent from that individual.

Moreover, if a child has a foster parent who can act as a *parent*, as defined in § 300.30(a)(2), or a person such as a grandparent or step-parent who is legally responsible for the child's welfare, and that person's whereabouts are known or the person can be located after reasonable efforts by the public agency, parental consent would be required for the initial evaluation.

We believe that the phrase "except as provided in paragraph (a)(2) of this section (regarding consent for wards of the State)" in proposed § 300.300(a)(1)(i) may incorrectly convey that a public agency is not required to make reasonable efforts to obtain informed consent from the parent of a child who is a ward of the State, or from a surrogate parent, foster parent, or other person meeting the definition of a *parent* in § 300.30(a). Therefore, we will remove the phrase. To clarify that the provisions in § 300.300(a)(2) apply only to initial evaluations, and not reevaluations, we will modify both §§ 300.300(a)(2) and (c)(1).

*Changes:* We have removed the phrase "except as provided in paragraph (a)(2) of this section (regarding consent for wards of the State)" in § 300.300(a)(1)(i), for clarity. We have also added introductory language to

**Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations **46631**

§ 300.300(a)(2) to specify that it applies only to initial evaluations, and we have changed the cross-reference in § 300.300(c)(1) to refer to § 300.300(a)(1).

*Comment:* One commenter recommended that the regulations specify the minimum steps that public agencies must take to obtain consent for initial evaluations from parents of children who are wards of the State. Another commenter recommended that the regulations define ''reasonable efforts,'' as used in new § 300.300(a)(1)(iii) (proposed § 300.300(a)(2)(i)). One commenter recommended requiring LEAs to maintain documentation of their efforts to obtain parental consent for initial evaluations, including attempts to obtain consent by telephone calls, visits to the parent's home, and correspondence in the parent's native language. Several commenters requested that the requirements in current § 300.345(d) be included in new § 300.300(a)(2)(i) (proposed § 300.300(a)(2)(ii)(A)). Current § 300.345(d) requires a public agency to document the specific steps it has taken to arrange a mutually convenient time and place for an IEP Team meeting (*e.g.,* detailed records of telephone calls, any correspondence sent to the parents, visits to the parent's home or place of employment) and it is cross-referenced in current § 300.505(c)(2) to identify documentation of the reasonable measures that an LEA took to obtain consent for a reevaluation.

*Discussion:* We believe it is important to emphasize that a public agency must make reasonable efforts to obtain informed consent from the parent for an initial evaluation to determine whether the child is a child with a disability. This includes the parent of a child who is a ward of the State. Therefore, we will add a new paragraph (a)(1)(iii) to § 300.300 to make clear that a public agency must make reasonable efforts to obtain informed parental consent whenever a public agency seeks to conduct an initial evaluation of a child to determine whether the child is a child with a disability. This requirement applies to all children including children who are wards of the State. With the addition of this new paragraph, the requirement for public agencies to make reasonable efforts to obtain informed consent from the parent for an initial evaluation for children who are wards of the State in § 300.300(a)(2)(i) is no longer necessary and will be removed.

We also agree with the commenters that a public agency should document and make the same reasonable efforts to

obtain consent for an initial evaluation from a parent, including a parent of a child who is a ward of the State, that are required when a public agency attempts to arrange a mutually convenient time and place for an IEP Team meeting (*e.g.,* detailed records of telephone calls, any correspondence sent to the parents, visits made to the parent's home or place of employment), and will add a new paragraph (d)(5) to make this clear. We recognize that the statute uses both ''reasonable measures'' and ''reasonable efforts'' when referring to a public agency's responsibility to obtain parental consent for an evaluation, initial services, and a reevaluation. We believe these two phrases, when used in this context, have the same meaning and, therefore, have used ''reasonable efforts'' throughout the regulations related to parental consent for consistency.

*Changes:* We have added a new paragraph (a)(1)(iii) to § 300.300 to require a public agency to make reasonable efforts to obtain informed parental consent for an initial evaluation. We will remove § 300.300(a)(2)(i) because it is redundant with the new paragraph. Section 300.300(a)(2) has been reformatted consistent with the removal of paragraph (a)(2)(i). We also have added a new paragraph (d)(5) to § 300.300 to require a public agency to document its attempts to obtain parental consent using the procedures in § 300.322(d).

*Comment:* A few commenters asked whether a public agency must obtain consent for an initial evaluation from the biological or adoptive parent of the child when there is another person who meets the definition of *parent* in § 300.30. Another commenter recommended the regulations clarify whether a public agency must seek informed consent for an initial evaluation from a biological or adoptive parent when a surrogate parent has already been appointed.

*Discussion:* Section 300.30(b)(1) provides that, when more than one party is qualified to act as a parent, the biological or adoptive parent, when attempting to act as the parent under the Act, must be presumed to be the parent, unless the biological or adoptive parent does not have legal authority to make educational decisions for the child.

If a surrogate parent already has been appointed because the public agency, after reasonable efforts, could not locate a parent, the public agency would not have to again attempt to contact other individuals meeting the definition of *parent* in § 300.30 to seek consent.

*Changes:* None.

*Comment:* One commenter recommended that the regulations clarify whether the qualifications of a judge-appointed surrogate parent in § 300.519(c) would apply to new § 300.300(a)(2)(iii) (proposed § 300.300(a)(2)(ii)(C)), regarding consent for an initial evaluation for a child who is a ward of the State.

*Discussion:* Section 614(a)(1)(D)(iii)(II)(cc) of the Act, which is the basis for new § 300.300(a)(2)(iii) (proposed § 300.300(a)(2)(ii)(C)), provides that the public agency is not required to obtain informed consent from the parent for an initial evaluation of a child who is a ward of the State and is not living with the child's parent if the rights of the parent to make educational decisions have been subrogated by a judge in accordance with State law and consent for an initial evaluation has been given by an individual appointed by the judge to represent the child. This is a special situation, limited only to children who are wards of the State not living with a parent and limited only to the situation of seeking consent for an initial evaluation. A person appointed under this provision is not a surrogate parent as that term is used in these regulations. The requirements of § 300.519(c) do not apply to persons authorized to provide consent for initial evaluations under this provision.

It is noteworthy that the provision in new § 300.300(a)(2)(iii) (proposed § 300.300(a)(2)(ii)(C)) is only a limited exception to the requirement to obtain informed parental consent for an initial evaluation. Most children will not have a surrogate parent already appointed at this stage of their involvement with services under the Act. However, if a child has a surrogate parent appointed under § 300.519(c), and the rights of that person to make educational decisions for the child have not been subrogated by a judge under State law, the public agency would have to seek informed parental consent from that person.

*Changes:* None.

*Comment:* One commenter recommended revising § 300.300(a)(3) to prohibit a public agency from pursuing an initial evaluation without parental consent. Another commenter recommended requiring a public agency to use the due process procedures to conduct an initial evaluation if the parent does not provide consent and the public agency believes that the child would not otherwise receive needed services. A few commenters stated that § 300.300(a)(3) is inconsistent with statutory language and opposed language stating that the public agency may, but is not required to, pursue the

**46632** **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

initial evaluation of a child whose parents have refused to consent or failed to respond to a request for consent.

*Discussion:* Section 300.300(a)(3) is consistent with section 614(a)(1)(D)(ii) of the Act, which states that a public agency *may* pursue the initial evaluation of a child using the procedural safeguards if a parent does not provide consent or fails to respond to a request to provide consent for an initial evaluation. Consistent with the Department's position that public agencies should use their consent override procedures only in rare circumstances, § 300.300(a)(3) clarifies that a public agency is not required to pursue an initial evaluation of a child suspected of having a disability if the parent does not provide consent for the initial evaluation. State and local educational agency authorities are in the best position to determine whether, in a particular case, an initial evaluation should be pursued.

*Changes:* None.

*Comment:* A few commenters recommended clarifying the parental consent requirements for an initial evaluation. Many commenters recommended that LEAs maintain documentation that the parent has been fully informed and understands the nature and scope of the evaluation. One commenter recommended that the regulations require that informed parental consent for an initial evaluation be documented in writing.

*Discussion:* Section 300.300(a)(1)(i), consistent with section 614(a)(1)(D)(i)(I) of the Act, is clear that the public agency proposing to conduct an initial evaluation to determine if a child qualifies as a child with a disability under § 300.8 must obtain consent from the parent of the child before conducting the evaluation. *Consent,* as defined in § 300.9, means that the parent has been fully informed in his or her native language, or other mode of communication, and understands and agrees *in writing* to the initial evaluation. The methods by which a public agency seeks to obtain parental consent for an initial evaluation (beyond the requirement that the public agency use the parent's native language or mode of communication) and how a public agency documents its efforts to obtain the parent's written consent are appropriately left to the discretion of SEAs and LEAs.

*Changes:* None.

*Comment:* A few commenters recommended that the regulations include language clarifying that a public agency is not in violation of the FAPE requirements if the public agency does not pursue an initial evaluation when

the parent refuses to consent or fails to respond to a request for consent. One commenter recommended adding language to the regulations to clarify that if a parent refuses to consent to an initial evaluation, the child would not be considered to be a child with a disability.

*Discussion:* While we agree that a public agency would not be in violation of the FAPE requirements for failing to pursue an initial evaluation through due process, we do not believe that a change to the regulations is necessary. The FAPE requirements in §§ 300.101 through 300.112, consistent with section 612(a) of the Act, apply only to a *child with a disability,* as defined in § 300.8 and section 602(3) of the Act. A child would not be considered a child with a disability under the Act if the child has not been evaluated in accordance with §§ 300.301 through 300.311 and determined to have one of the disabilities in § 300.8(a), and because of that disability, needs special education and related services.

Further, § 300.534(c)(1), consistent with section 615(k)(5)(C) of the Act, provides that a public agency would not be deemed to have knowledge that a child is a child with a disability, for disciplinary purposes, if a parent has not allowed the child to be evaluated or refuses services under the Act.

*Changes:* None.

*Comment:* A few commenters recommended that the regulations clarify that the public agency is not in violation of the child find requirements if the public agency does not pursue an initial evaluation when the parent refuses to consent or fails to respond to a request for consent.

*Discussion:* We agree that States and LEAs should not be considered to be in violation of their obligation to locate, identify, and evaluate children suspected of being children with disabilities under § 300.111 and section 612(a)(3) of the Act if they decline to pursue an evaluation (or reevaluation) to which a parent has refused or failed to consent. We will add language to the regulations to make this clear.

*Changes:* We have added language to § 300.300(a)(3) and (c)(1) to clarify that a State or public agency does not violate the requirements of § 300.111 and §§ 300.301 through 300.311 if it declines to pursue an evaluation or reevaluation to which a parent has refused or failed to consent.

*Comment:* A few commenters recommended that the regulations define "fails to respond" as used in § 300.300(a)(3).

*Discussion:* Section 300.300(a)(3), consistent with section 614(a)(1)(D)(ii)(I)

of the Act, states that if a parent of a child enrolled in public school, or seeking to be enrolled in public school, does not provide consent for an initial evaluation, or the parent "fails to respond" to a request to provide consent, the public agency may, but is not required to, pursue the initial evaluation of the child by utilizing the procedural safeguards, if appropriate, except to the extent inconsistent with State law relating to such parental consent. The meaning of "fails to respond," in this context, is generally understood to mean that, in spite of a public agency's efforts to obtain consent for an initial evaluation, the parent has not indicated whether the parent consents or refuses consent to the evaluation. We believe the meaning is clear in the regulations and, therefore, decline to define the phrase in these regulations.

*Changes:* None.

*Comment:* One commenter recommended that the regulations include language to require a public agency to provide the following information (in the parent's native language) to a parent who refuses consent or fails to respond to a request for consent for an initial evaluation: The reasons why the public agency believes the child may be eligible for special education; confirmation that the requested evaluation and any subsequent special education services will be provided at no cost and scheduled in cooperation with parents with transportation provided; The nature of the evaluations and credentials of evaluators; the types of special education services that the child could receive if eligible; and the risks of delaying an evaluation.

*Discussion:* The prior written notice requirements in § 300.503, consistent with section 615(c)(1) of the Act, address many of the concerns raised by the commenter. Consistent with § 300.503(b) and (c), prior notice must be given to the parents when a public agency proposes to evaluate a child and would explain why the public agency believes the child needs an evaluation to determine whether the child is a child with a disability under the Act; describe each evaluation procedure, assessment, record, or report the agency used as a basis for proposing that the child needs an evaluation; explain that the parents have protection under the Act's procedural safeguards; provide sources for parents to contact to obtain assistance in understanding the provisions of the Act; and describe other factors that are relevant to the agency's proposal to conduct the evaluation of the child.

ED-000094

In addition to the prior written notice, § 300.504(a)(1), consistent with section 615(d)(1)(A)(i) of the Act, requires that a copy of the procedural safeguards notice be given to parents upon an initial referral or parental request for an evaluation. Consistent with § 300.503(c) and § 300.504(d), the prior written notice and the procedural safeguards notice, respectively, must be written in language understandable to the general public and be provided in the native language of the parent or other mode of communication used by the parent, unless it is clearly not feasible to do so.

As a matter of practice, public agencies provide parents with general information about the special education and related services that are available to eligible children with disabilities and inform the parent that the public agency's evaluation is provided at no cost. We believe that this information, along with the information provided in the prior written notice and procedural safeguards notice, will help a parent determine whether there are any risks of delaying an evaluation. Therefore, we do not believe additional regulations are necessary.

With regard to information regarding an evaluator's credentials, we do not believe it is necessary to require public agencies to provide this information to parents because § 300.304(c)(1)(v) and section 614(b)(3)(A)(iv) of the Act require the public agency to ensure that the evaluation is conducted by trained and knowledgeable personnel.

If transportation to an evaluation outside the school environment is necessary, the public agency would have to provide it, as a part of its obligation to ensure that all eligible children are located, identified, and evaluated. However, we do not believe that the parents need to be notified of this fact because, in most cases, children can be evaluated at school during the school day and there is no requirement that a parent be present during the evaluation. Thus, requiring that all parents be notified about transportation to evaluations would be unnecessarily burdensome.

*Changes:* None.

Parental Consent for Services (§ 300.300(b))

*Comment:* A few commenters requested that the Department address situations in which a child is receiving special education services and a parent wants to withdraw consent or refuse services because the parent believes the child no longer needs special education services. A few commenters stated that public agencies should not be allowed to use the procedural safeguards to

continue to provide special education and related services to a child whose parents withdraw consent for the continued provision of special education and related services.

*Discussion:* We are considering the question of whether parents who previously consented to the initiation of special education services should have the right to subsequently remove their child from special education services. We anticipate publishing a notice of proposed rulemaking in the near future seeking public comment on this issue.

*Changes:* None.

*Comment:* One commenter recommended changing the regulations to allow the public agency to provide services in anticipation of receiving parental consent when the public agency initiates a due process hearing to obtain parental consent for initial services.

*Discussion:* To implement the change requested by the commenter would be inconsistent with the Act. Section 614(a)(1)(D)(i)(II) of the Act requires a public agency to obtain informed parental consent before providing initial special education and related services to a child. In addition, a public agency may not initiate a due process hearing to provide special education and related services to a child when a parent refuses to consent to initial services, consistent with section 614(a)(1)(D)(ii)(II) of the Act. A child whose parent has refused consent for initial services would not be provided special education and related services and would continue to receive general education services.

*Changes:* None.

*Comment:* A few commenters requested that the regulations clarify the meaning of "initial provision of services" as used in § 300.300(b).

*Discussion:* We believe § 300.300(b) is clear that the "initial provision of services" means the first time a parent is offered special education and related services after the child has been evaluated in accordance with the procedures in §§ 300.301 through 300.311, and has been determined to be a child with a disability, as defined in § 300.8.

*Changes:* None.

*Comment:* One commenter requested that the regulations permit mediation when a parent of a child refuses to consent to the provision of special education and related services. A few commenters recommended revising the regulations to require a public agency to use the due process procedures, or other alternative dispute resolution procedures, if a parent refuses to consent to initial services.

*Discussion:* Section 300.300(b)(2), consistent with section 614(a)(1)(D)(ii)(II) of the Act, is clear that if a parent fails to respond or refuses to consent to initial services, the public agency may not use the mediation procedures in § 300.506 or the due process procedures in §§ 300.507 through 300.516 in order to obtain agreement or a ruling that the services may be provided to a child.

*Changes:* None.

*Comment:* One commenter stated that additional documentation is necessary if a parent does not provide consent for initial services and suggested adding language to the regulations to require public agencies to document the steps they have taken to obtain parental consent for initial services and to maintain them in the child's permanent file. Another commenter recommended requiring that the parent's refusal to consent for initial services occur during a properly convened IEP Team meeting. The commenter also suggested requiring that the documentation of a parent's refusal to provide consent include evidence that all options waived by the parent have been explained, that the parent has refused services, and the reasons for the parent's refusal.

*Discussion:* We believe that a public agency must make reasonable efforts to obtain informed consent from the parent for the initial provision of special education and related services to the child and will make this clear in § 300.300(b). We noted in our discussion regarding the reasonable efforts that a public agency must make to obtain parental consent for an initial evaluation to determine whether the child is a child with a disability, that we added a new paragraph (d)(5) to § 300.300 that provides that to meet the reasonable efforts requirement, a public agency must document its attempts to obtain consent using the procedures in § 300.322(d). We believe a public agency should make these same reasonable efforts to obtain parental consent for initial services, and will include this in new § 300.300(d)(5).

We do not believe it is necessary or appropriate to require a public agency to maintain additional documentation, beyond that required in new § 300.300(d)(5), of a parent's refusal to provide consent for initial services or to prescribe where this documentation must be obtained or maintained. Public agencies understand the importance of properly documenting a parent's refusal to consent to the initial provision of special education and related services and are in the best position to determine any additional documentation that is

ED-000095

**46634**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

necessary and where to obtain and maintain such documentation.

*Changes:* We have added a new paragraph (b)(2) to § 300.300 to clarify that the public agency must make reasonable efforts to obtain informed consent from the parent for the initial provision of special education and related services to the child. Subsequent paragraphs have been renumbered accordingly. We also have included a reference to new § 300.300(b)(2) in new § 300.300(d)(5) that requires a public agency to document its attempts to obtain consent using the procedures in § 300.322(d).

*Comment:* One commenter recommended adding language to clarify that if a parent does not consent to initial services, the child would be considered a part of the general education enrollment and subject to the same disciplinary provisions as nondisabled children.

*Discussion:* The language requested by the commenter is not necessary because section 615(k)(5)(C) of the Act already provides for situations in which a parent refuses consent for initial services and the child subsequently engages in behavior that violates a code of student conduct. Section 300.534(c)(1), consistent with section 615(k)(5)(C) of the Act, provides that a public agency would not be deemed to have knowledge that a child is a child with a disability if the parent of the child has not allowed an evaluation of the child pursuant to §§ 300.301 through 300.311, or has refused services under this part. Therefore, such a child would not be able to assert any of the protections provided to children with disabilities under the Act, and would be subject to the same disciplinary procedures as any other child.

*Changes:* None.

*Comment:* A few commenters recommended requiring a public agency to refer parents who do not provide consent for initial services to the State's PTI center so that the parents can be advised of the benefits of special education and their rights and responsibilities under the Act.

*Discussion:* We do not believe it would be appropriate to require a public agency to refer parents to a particular agency or program. Such matters are best left to States and LEAs to decide and should not be included in the regulations.

*Changes:* None.

*Comment:* One commenter recommended that the regulations require a public agency to report a parent for suspected child abuse or neglect to the appropriate agency if the public agency believes that the parent's failure or refusal to consent to initial services meets the definition of child abuse or neglect under the State's mandatory reporting law.

*Discussion:* It is not necessary to include the requirement recommended by the commenter in these regulations, as the issue would already be addressed by State law, if under State law a parent's failure to consent to initial services under the Act was considered child abuse or neglect.

*Changes:* None.

*Comment:* Numerous commenters expressed concern about new § 300.300(b)(4)(ii) (proposed § 300.300(b)(3)(ii)), which provides that if a parent fails to consent for initial services or refuses to respond to a request for consent, the public agency is not required to convene an IEP Team meeting or develop an IEP for the child. A few commenters stated that this should be permitted only when a parent refuses services, but not when a parent fails to respond to a request for initial services. A few commenters stated that the regulations should be revised to clarify that this applies only to subsequent IEP Team meetings, not the initial IEP Team meeting. One commenter recommended revising the regulations to require an IEP Team meeting to be held and an IEP developed to provide a basis for informed consent.

*Discussion:* New 300.300(b)(4)(ii) (proposed § 300.300(b)(3)(ii)) follows the specific language in section 614(a)(1)(D)(ii)(III)(bb) of the Act and reflects the new provision in the Act that relieves public agencies of any potential liability for failure to convene an IEP Team meeting or develop an IEP for a child whose parents have refused consent or failed to respond to a request for consent to the initial provision of special education and related services. It does not, however, prevent a public agency from convening an IEP Team meeting and developing an IEP for a child as a means of informing the parent about the services that would be provided with the parent's consent.

*Changes:* None.

*Comment:* A few commenters questioned how a parent could be adequately informed of the services the parent is refusing if the public agency is not required to develop an IEP when the parent refuses to consent to the initial provision of special education and related services.

*Discussion:* We understand the commenters' concern that a parent of a child with a disability who refuses to consent to the provision of special education and related services may not fully understand the extent of the special education and related services their child would receive without the development of an IEP for their child. However, we do not view the consent provisions of the Act as creating the right of parents to consent to each specific special education and related service that their child receives. Instead, we believe that parents have the right to consent to the initial provision of special education and related services. "Fully informed," in this context, means that a parent has been given an explanation of what special education and related services are and the types of services that might be found to be needed for their child, rather than the exact program of services that would be included in an IEP.

*Changes:* None.

*Comment:* One commenter stated that the regulations should include sanctions for parents who repeatedly fail to respond to requests for consent from public agencies, such as paying the costs incurred by agencies attempting to obtain consent.

*Discussion:* The Act does not authorize sanctions against parents who fail to respond to requests for consent.

*Changes:* None.

Parental Consent for Reevaluations (§ 300.300(c))

*Comment:* Several commenters recommended allowing public agencies to use the due process procedures to override a parent's refusal to consent to a reevaluation.

*Discussion:* Override of parental refusal to consent to a reevaluation is already addressed in the regulations. Section 300.300(c) states that each public agency must obtain informed parental consent in accordance with § 300.300(a)(1) prior to conducting any reevaluation of a child with a disability. Section 300.300(a)(3) allows a public agency to override parental refusal to consent to an initial evaluation by utilizing the mediation procedures under § 300.506 or the due process procedures under §§ 300.507 through 300.516. The cross-reference in § 300.300(c)(1)(i) to the provision in § 300.300(a)(1) provides the basis for allowing a public agency to override the parent's refusal of consent to a reevaluation. However, we believe it is important to state this more directly and will, therefore, add language to § 300.300(c)(1) to clarify that if a parent refuses to consent to a reevaluation, the public agency may, but is not required to, pursue the reevaluation by using the procedural safeguards in subpart E of this part.

*Changes:* We have restructured § 300.300(c)(1) and added a new

§ 300.300(c)(1)(ii) to clarify that a public agency may, but is not required to, pursue a reevaluation using the procedural safeguards.

*Comment:* One commenter requested that the regulations clarify a public agency's responsibilities for a reevaluation if the agency has taken reasonable measures to obtain consent and the parent has failed to respond.

*Discussion:* We do not believe that further clarification in the regulations is necessary. Section 300.300(c)(2), consistent with section 614(c)(3) of the Act, is clear that a public agency may conduct a reevaluation of a child with a disability, if the public agency can demonstrate that it has made reasonable efforts to obtain such consent and the child's parent has failed to respond to a request for consent.

*Changes:* None.

*Comment:* One commenter recommended that the regulations require a public agency to obtain parental consent for any tests needed for a reevaluation that were not used for the initial evaluation or previous reevaluations.

*Discussion:* We do not agree that a change should be made. Section 614(c)(3) of the Act, which is incorporated in § 300.300(c), already requires a public agency to obtain parental consent before conducting any tests needed for a reevaluation, regardless of whether the tests differ from tests used in previous evaluations of the child.

*Changes:* None.

*Comment:* Many commenters recommended retaining current § 300.505(c)(2), which requires a public agency to document the specific reasonable measures it has taken to obtain parental consent for a reevaluation, including detailed records of telephone calls made or attempted and the results of those calls; copies of any correspondence sent to the parents and any responses received; and detailed records of visits made to the parents' home or place of employment and the results of those visits. One commenter suggested that if the requirements in current § 300.505(c)(2) were not retained, the regulations should define reasonable measures as at least three good-faith attempts to contact a parent. Many commenters stated that current § 300.505(c)(2) must be retained because it is protected by section 607(b) of the Act, which provides that the Secretary may not publish final regulations that would procedurally or substantively lessen the protections provided to children with disabilities in the regulations that were in effect on July 20, 1983.

*Discussion:* We agree that the requirements in current § 300.505(c)(2) should be retained. We noted in our discussions regarding the reasonable efforts that a public agency must make to obtain parental consent for an initial evaluation and the initial provision of services, that we added a new paragraph (d)(5) to § 300.300 that provides that to meet the reasonable efforts requirement, a public agency must document its attempts to obtain consent using the procedures in § 300.322(d). These are the same procedures in current § 300.505(c)(2). Therefore, we will include a reference to § 300.300(c)(2)(i) in new § 300.300(d)(5).

*Changes:* We included a reference to § 300.300(c)(2)(i) in new § 300.300(d)(5).

Other Consent Requirements (§ 300.300(d))

*Comment:* Many commenters recommended that the regulations include language clarifying that a public agency is not authorized to override the lack of parental consent for an initial evaluation for children who are home schooled or placed in a private school by the parents at their own expense. One commenter recommended removing the phrase ''public school or seeking to enroll in public school'' in § 300.300(a)(3) to permit a public agency to override lack of parental consent for children who are home schooled or placed in a private school by parents at their own expense.

*Discussion:* We agree with the commenters who recommended that, for children who are home schooled or placed in a private school by their parents at their own expense, consent override should not be permitted. We will add a new paragraph (4) to § 300.300(d) to make this clear.

There are compelling policy reasons why the Act's consent override procedures should be limited to children who are enrolled, or who are seeking to enroll, in public school. Because the school district has an ongoing obligation to educate a public school child it suspects has a disability, it is reasonable for a school district to provide the parents with as much information as possible about their child's educational needs in order to encourage them to agree to the provision of special education services to meet those needs, even though the parent is free, ultimately, to reject those services. The school district is accountable for the educational achievement of all of its children, regardless of whether parents refuse the provision of educationally appropriate services. In addition, children who do not receive appropriate educational services may develop behavioral problems that have a negative impact on the learning environment for other children.

By contrast, once parents opt out of the public school system, States and school districts do not have the same interest in requiring parents to agree to the evaluation of their children. In such cases, it would be overly intrusive for the school district to insist on an evaluation over a parent's objection. The Act gives school districts no regulatory authority over private schools. Moreover, the Act does not require school districts to provide FAPE to children who are home schooled or enrolled in private schools by their parents.

Public agencies do have an obligation to actively seek parental consent to evaluate children attending private schools (including children who are home schooled, if a home school is considered a private school under State law) who are suspected of being children with disabilities under the Act, in order to properly identify the number of private school children with disabilities and consider those children as eligible for equitable services under §§ 300.132 through 300.144. However, this obligation does not extend to overriding refusal of parental consent to evaluate parentally-placed private school children.

Section 300.300(a)(3) provides that a public agency may override parental consent for an initial evaluation only for children who are enrolled in public school or seeking to be enrolled in public school, so we are not making the suggested change in § 300.300(a)(3).

*Changes:* We have added a new paragraph (4) to § 300.300(d) to clarify that consent override is not permitted for children who are home schooled or placed in private schools by their parents.

*Evaluations and Reevaluations*

Initial Evaluations (§ 300.301)

Request for Initial Evaluation (§ 300.301(b))

*Comment:* Several commenters recommended that teachers and related services providers be included as individuals who can refer a child for an initial evaluation. A few commenters requested clarification as to whether States can authorize other individuals who are acting on behalf of a public agency (e.g., family court, probation officers, staff from other public agencies) to refer a child for an initial evaluation, and whether individuals responsible for protecting the welfare of a child who are not acting on behalf of an SEA or LEA, such as physicians and

**46636**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

social workers, can refer a child for an initial evaluation.

*Discussion:* Section 614 (a)(1)(A) of the Act provides that an SEA, other State agency, or LEA shall conduct a full and individual evaluation of a child before the provision of special education and related services. In § 300.301(a), we interpret this language as requiring *public agencies,* as that term is defined in § 300.33, to conduct evaluations, because those are the only agencies in the State responsible for providing FAPE to eligible children. The same language is used in section 614(a)(1)(B) of the Act to describe the agencies that may initiate a request for an initial evaluation to determine if a child is a child with a disability. We similarly interpret this language to be referring to the entities that are public agencies under § 300.33. Therefore, § 300.301(b) states that either a parent or a public agency may initiate a request for an initial evaluation. The language does not include employees of SEAs or LEAs (*e.g.,* teachers and related services providers), unless they are acting for the SEA or LEA, or of other State agencies (*e.g.,* probation officers, social workers, or staff from State agencies that are not public agencies as defined in § 300.33).

The requirements in § 300.301(b) pertain to the initiation of an evaluation under §§ 300.301 through 300.305 and should not be confused with the State's child find responsibilities in § 300.111 and section 612(a)(3) of the Act. The child find requirements permit referrals from any source that suspects a child may be eligible for special education and related services. Child find activities typically involve some sort of screening process to determine whether the child should be referred for a full evaluation to determine eligibility for special education and related services. Therefore, persons such as employees of the SEA, LEA, or other public agencies responsible for the education of the child may identify children who might need to be referred for an evaluation. However, it is the parent of a child and the public agency that have the responsibility to initiate the evaluation procedures in §§ 300.301 through 300.311 and section 614 of the Act.

*Changes:* None.
*Comment:* Several commenters stated that the regulations should clarify that the 60-day timeframe in § 300.301(c) to complete an evaluation does not begin if a parent requests an initial evaluation, the LEA denies the request, and the parent challenges the LEA's decision in a due process hearing.

*Discussion:* We believe the regulations already address the commenters' concern. Section 300.301(b) provides

that a parent may initiate a request for an initial evaluation to determine if the child is a child with a disability. If the public agency agrees to conduct the evaluation, § 300.304(a) requires the public agency to provide notice to the parents, in accordance with § 300.503, that describes any evaluation procedures that the agency proposes to conduct. The public agency must obtain informed consent for the evaluation, consistent with §§ 300.9 and 300.300, prior to conducting the evaluation. The 60-day timeframe begins when the public agency receives the consent for evaluation.

If, however, the public agency does not suspect that the child has a disability and denies the request for an initial evaluation, the public agency must provide written notice to the parents, consistent with § 300.503(b) and section 615(c)(1) of the Act, which explains, among other things, why the public agency refuses to conduct an initial evaluation and the information that was used as the basis to make that decision. The parent may challenge such a refusal by requesting a due process hearing, but the timeline for conducting the evaluation does not begin prior to parental consent for evaluation. A parent would not be able to give consent under this part without knowing what specific evaluation procedures the public agency is proposing to conduct.

*Changes:* None.
*Comment:* A few commenters recommended that the regulations clarify whether a public agency has the right to deny a parent's request for an initial evaluation.

*Discussion:* The regulations are sufficiently clear on this point. Section 300.503(a), consistent with section 615(b)(3) of the Act, provides that a public agency may refuse to initiate or change the identification, evaluation, or educational placement of the child, or the provision of FAPE to the child, if the public agency provides written notice. This includes situations in which a public agency wishes to deny a parent's request for an initial evaluation. The written notice must meet the requirements in § 300.503(b). Thus, for situations in which a public agency wishes to deny a parent's request for an initial evaluation, the written notice would provide, among other things, an explanation of why the public agency refuses to conduct an initial evaluation and the information that was used to make that decision. A parent may challenge the public agency's refusal to conduct an initial evaluation by requesting a due process hearing.

*Changes:* None.

Procedures for Initial Evaluation (§ 300.301(c))

*Comment:* Numerous commenters requested that the regulations clarify when the 60-day timeframe for a public agency to conduct an initial evaluation begins. One commenter requested that the 60-day timeframe include completing both the evaluation and eligibility determination.

Several commenters recommended reducing the timeframe for evaluations from 60 days to 30 days. Some commenters recommended that the 60-day timeframe be 60 school days. A few commenters stated that the timeframe for evaluation should be longer if additional time is required for specific assessments, such as behavioral assessments or other assessments based on scientific practices.

*Discussion:* It would be inconsistent with the Act to reduce the timeframe from 60 days to 30 days, require the 60-day timeframe to be 60 school days, extend the timeframe for particular types of assessments, or require that the 60-day timeframe cover both the evaluation and determination of eligibility. Section 614(a)(1)(C)(i)(I) of the Act requires an initial evaluation to be conducted within 60 days of receiving parental consent for the evaluation or, if the State establishes a timeframe within which the evaluation must be conducted, within that timeframe. The regulations in § 300.301(c) reflect this requirement.

*Changes:* None.
*Comment:* A few commenters asked whether a State could establish a timeframe of more than 60 days to complete an initial evaluation. A significant number of commenters recommended that if a State establishes its own timeframe within which an evaluation must be conducted, that the timeframe be less, but not more, than 60 days. Several commenters recommended that if a State has its own timeframe for evaluation, the timeframe should be reasonable and ''reasonable'' should be defined. Some commenters recommended that if a State's timeframe is greater than 60 days, the Department should provide guidance to the State and to parents in that State. One commenter recommended that if a State establishes its own timeframe, the State must offer parents an adequate opportunity to assert their procedural rights.

*Discussion:* Section 300.301(c), consistent with section 614(a)(1)(C)(i)(I) of the Act, requires an initial evaluation to be completed within 60 days of receiving parental consent for evaluation or, if the State establishes a

**Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations    **46637**

timeframe within which the evaluation must be conducted, within such timeframe. The Department declines to require that a State-established timeframe be less than 60 days or to place additional requirements on States with timeframes of greater than 60 days because the Act gives States the authority to establish different timeframes and imposes no restrictions on State exercise of that authority. We believe this is evidence of an intent to permit States to make reasoned determinations of the appropriate period of time in which evaluations should be conducted based on particular State circumstances.

*Changes:* None.

*Comment:* Numerous commenters requested clarification regarding the timeframe to complete an initial evaluation and convene the IEP Team. A few commenters stated that the timeframe from referral to IEP development could be as long as 120 calendar days (30 days from referral to consent; 60 days from consent to the eligibility determination; and 30 days from the eligibility determination to development of the IEP), and recommended that this timeframe be 60 days.

One commenter recommended that public agencies provide consent forms to parents promptly after a referral for evaluation has been made so that the child's evaluation is not delayed. A few commenters asked how promptly an LEA must seek parental consent following a referral for evaluation, and whether an LEA can wait until September to obtain consent if a referral is made in June or July.

*Discussion:* We cannot change the timeframe for an initial evaluation specified in section 614(a)(1)(C) of the Act. Section 614(a)(1)(C) of the Act requires that an initial evaluation be conducted within 60 days of receiving parental consent for the evaluation, or within the timeframe established by the State. Section 300.323(c) is a longstanding requirement that a meeting be held to develop the child's IEP within 30 days of determining that a child needs special education and related services. We decline, however, to specify the timeframe from referral for evaluation to parental consent, or the timeframe from the completion of an evaluation to the determination of eligibility, as we are not in a position to determine the maximum number of days that should apply to these periods in all circumstances.

However, it has been the Department's longstanding policy that evaluations be conducted within a reasonable period of time following the agency's receipt of parental consent, if the public agency agrees that an initial evaluation is needed to determine whether a child is a child with a disability. Likewise, the Department believes that eligibility decisions should be made within a reasonable period of time following the completion of an evaluation.

The child find requirements in § 300.111 and section 612(a)(3)(A) of the Act require that all children with disabilities in the State who are in need of special education and related services be identified, located, and evaluated. Therefore, it would generally not be acceptable for an LEA to wait several months to conduct an evaluation or to seek parental consent for an initial evaluation if the public agency suspects the child to be a child with a disability.

If it is determined through the monitoring efforts of the Department or a State that there is a pattern or practice within a particular State or LEA of not conducting evaluations and making eligibility determinations in a timely manner, this could raise questions as to whether the State or LEA is in compliance with the Act.

With regard to the total timeframe from referral to IEP development, this will vary based on a number of factors, including the timing of parental consent following referral for an evaluation and whether a State establishes its own timeframe to conduct an initial evaluation. Given such factors, we do not believe it is feasible to further regulate on this timeframe.

*Changes:* None.

*Comment:* Numerous commenters recommended that an initial evaluation be conducted in an expedited timeframe for children who are homeless or in the custody of a child welfare agency. The commenters stated that public agencies should take into consideration the date on which the child was first referred for evaluation by any public agency.

*Discussion:* Congress recognized the unique problems homeless children face and included several new provisions in the Act to ensure that homeless children and youth with disabilities have access to the same services and supports as all other children with disabilities. The Department recognizes that the high mobility rates of some homeless children with disabilities (as well as other children, including some children who are in the custody of a State child welfare agency) pose unique challenges when a child is referred for an evaluation, but moves to another district or State before an evaluation can be initiated or completed. In such cases, the Department believes it is important that the evaluations be completed as expeditiously as possible, taking into consideration the date on which the child was first referred for evaluation in any LEA. However, the mobility rate of these children and their potential range of evaluation needs means that any specific expedited timeframe could be both too long to ensure that all children are evaluated before they move, and too short to be reasonable in all circumstances. There is nothing, however, in Part B of the Act or these regulations that would prohibit a State from establishing its own policies to address the needs of homeless children, including adopting a timeframe for initial evaluations that is less than 60 days.

*Changes:* None.

Exception (§ 300.301(d))

*Comment:* Numerous commenters requested clarification regarding whether the 60-day timeframe for initial evaluations could be extended by mutual agreement between the parent and the public agency. A few commenters asked whether the 60-day timeframe could be extended for reasons other than the exceptions listed in § 300.301(d), and whether a State could include other exceptions in its State policies and procedures.

*Discussion:* Congress was clear in limiting the exceptions to the 60-day timeframe to the situations in section 614(a)(1)(C)(ii) of the Act. Therefore, we do not believe it is appropriate to include in the regulations other exceptions, such as permitting a parent and a public agency to mutually agree to extend the 60-day timeframe or to include exceptions to the timeframe, that would be in addition to those in the Act and listed in § 300.301(d). However, the Act gives States considerable discretion with a State-adopted timeframe. A State could adopt a timeframe of 60 days or some other number of days, with additional exceptions.

*Changes:* None.

*Comment:* A number of comments were received requesting clarification on the provision in § 300.301(d)(1), which allows an extension of the 60-day or State-established timeframe to complete an initial evaluation if the parent of a child repeatedly fails or refuses to produce the child for an evaluation. A few commenters asked whether the exception applies when a child is not available because of absences on the days the evaluation is scheduled. Several commenters stated that "produce" does not necessarily mean the child's physical presence in school. Other commenters requested that the regulations define "repeatedly

fails'' and ''refuses to produce'' so that LEAs do not have to engage in exhaustive efforts to obtain access to the child to complete the evaluation.

One commenter recommended that the regulations clarify that an LEA must document that it has made several attempts to address the parent's concerns and clarify any confusion the parent may have about the evaluation, as well as address issues that make it difficult for the parent to bring the child to a scheduled evaluation, such as lack of transportation and childcare.

*Discussion:* Section 300.301(d) follows the specific language in section 614(a)(1)(C)(ii)(II) of the Act. We do not believe it is appropriate or reasonable to define ''repeatedly fails'' or ''refuses to produce'' because the meaning of these phrases will vary depending on the specific circumstances in each case. For example, situations in which a child is absent on the days the evaluation is scheduled because the child is ill would be treated differently than if a parent repeatedly fails to keep scheduled appointments. Similarly, situations in which a parent fails to keep scheduled appointments when a public agency repeatedly schedules the evaluation to accommodate the parent's schedule would be treated differently than situations in which a public agency makes no attempt to accommodate a parent's schedule.

We do not believe it is necessary to clarify that an LEA must document that it has made several attempts to address a parent's concerns and issues about the evaluation. As a matter of practice, LEAs attempt to address parent's concerns and issues prior to scheduling an evaluation because repeated cancellations of appointments or repeated failures to produce the child for an evaluation are costly in terms of staff time and effort.

*Changes:* None.

*Comment:* Numerous commenters recommended that there be an exception to the 60-day timeframe when a child transfers to a new school before an evaluation is completed.

*Discussion:* The exception referred to by the commenters is already in the regulations. Section 300.301(d)(2), consistent with section 614(a)(1)(C)(ii)(I) of the Act, states that the 60-day or State-established timeframe does not apply when a child transfers to a new school before an evaluation is completed, if the new public agency is making sufficient progress to ensure prompt completion of the evaluation, and the parent and new public agency agree to a specific time when the evaluation will be completed. While the exception to the 60-day timeframe, as

stated in section 614(a)(1)(C)(ii)(I) of the Act and paragraph (d)(2) of this section, only applies when a child transfers to a school located in another public agency, we do not believe the language in paragraph (d)(2), as proposed in the NPRM, is necessarily clear on this matter. We, therefore, have added language in paragraph (d)(2) to provide additional clarity. We believe it is important that it is understood that the 60-day or State-established timeframe does not apply when a child transfers from one school to another school in the same public agency. When a child transfers from one school to another school in the same public agency, we expect that an initial evaluation will be conducted within 60 days of receiving parental consent for the evaluation, or within the State-established timeframe.

*Changes:* We have added language to § 300.301(d)(2) to clarify that the exception to the 60-day or State-established timeframe only applies when a child transfers to a new school located in another public agency.

*Comment:* Several comments were received on the provision in new § 300.301(e) (proposed § 300.301(d)(2)(ii)) that allows an exception to the 60-day or State-established timeframe, only if the new public agency is making sufficient progress to ensure a prompt completion of the evaluation and the parent and new public agency agree to a specific time when the evaluation will be completed. One commenter stated that schools would be unable to meet the 60-day timeframe for children who transfer from another public agency if the new public agency has not been notified of the evaluation timeframe. Another commenter recommended that exceptions to the 60-day timeframe should not be permitted because the term ''sufficient progress'' is not defined. A few commenters requested that the regulations define ''sufficient progress.''

One commenter stated that there might be legitimate reasons for not completing an evaluation within the 60-day timeframe, such as differences in the assessment instruments used in the previous and new public agency, and requested that the regulations provide guidance on how a public agency should determine if appropriate progress is being made.

One commenter recommended that if there is no date certain when an evaluation must be completed when a child transfers public agencies, the new public agency should conduct an evaluation within 60 days of the enrollment date of the child; make reasonable efforts to obtain evaluation

information from the previous public agency; and consider any available evaluation information from the previous public agency.

One commenter recommended requiring the new public agency to contact the previous public agency within five days to request a report of any actions taken to transfer the child's records, copies of completed evaluations, a copy of the child's file, and an estimate as to when the information will be sent. The commenter stated that public agencies should be required to keep records of such attempts to inform parents of all actions through written communication. The commenter stated that if the information is not received within 15 days, the new public agency should be required to begin a new evaluation and complete it within the 60-day or State-established timeframe.

*Discussion:* The exceptions to the 60-day or State-established timeframe must be permitted because they are statutory. Section 614(a)(1)(C)(ii)(I) of the Act, which is incorporated in § 300.300(d)(2), provides that the 60-day or State-established timeframe does not apply if a child enrolls in a school served by the public agency after the relevant timeframe has begun, and prior to a determination by the child's previous public agency as to whether the child is a child with a disability. The exception applies only if the subsequent public agency is making sufficient progress to ensure prompt completion of the evaluation, and the parent and subsequent public agency agree to a specific time when the evaluation will be completed.

We do not believe it is necessary to define the phrase ''sufficient progress'' because the meaning will vary depending on the specific circumstances in each case. As one commenter noted, there may be legitimate reasons for not completing the evaluation within the 60-day timeframe, such as differences in assessment instruments used in the previous and new public agencies, and the length of time between a child leaving one school and enrolling in the next school. Therefore, we believe that whether a new public agency is making sufficient progress to ensure prompt completion of an evaluation is best left to the discretion of State and local officials and parents to determine.

It would be over-regulating to specify the number of days within which a new public agency must request a child's records from the previous public agency or to require the new public agency to document its attempts to obtain the records and keep parents informed of all

actions through written communication. We note, however, that § 300.304(c)(5), consistent with section 614(b)(3)(D) of the Act, requires each public agency to ensure that the evaluations of children with disabilities who transfer from one school district to another school district in the same school year are coordinated with the children's prior and subsequent schools, as necessary, and as expeditiously as possible, to ensure prompt completion of full evaluations.

Additionally, new § 300.323(g) (proposed § 300.323(e)(2)), consistent with section 614(d)(2)(C)(ii) of the Act, requires the new school in which the child enrolls to take reasonable steps to promptly obtain the child's records (including the IEP and supporting documents and any other records relating to the provision of special education or related services to the child) from the previous public agency in which the child was enrolled. The previous public agency in which the child was enrolled must also take reasonable steps to promptly respond to the request from the new public agency. We believe that these requirements will help to ensure that a child's records are promptly received by the new public agency.

The Act does not require the evaluation of a child who is transferring to a new school to be completed within 60 days of the enrollment date of the child, as recommended by one commenter, and we do not believe that such a requirement should be included in the regulations. The completion of evaluations for children who transfer to another school are subject to multiple factors and we decline to regulate on a specific timeframe that would apply in all circumstances.

*Changes:* None.

*Comment:* One commenter recommended sanctions against a new public agency that fails to make an effort to complete an evaluation of a child who transfers to another school that was begun by a previous public agency. The commenter stated that the previous public agency should also be sanctioned for failure to cooperate with a new public agency or for otherwise impeding the ability of the new public agency to complete the evaluation promptly.

*Discussion:* As part of its general supervisory responsibilities in § 300.149 and section 612(a)(11) of the Act, each SEA is responsible for ensuring that the requirements of Part B of the Act are followed, including the requirements for children who transfer from one public agency to another public agency within the school year. Whether sanctions against a particular LEA are appropriate should be determined by the SEA in the

first instance, as they are in the best position to determine what sanctions, technical assistance, or combination of the two are likely to lead to future compliance. For that reason, we decline to regulate with more specificity in this area.

*Changes:* None.

Screening for Instructional Purposes Is Not Evaluation (§ 300.302)

*Comment:* One commenter requested clarification on the difference between screening and evaluation and recommended that the regulations include specific examples of what constitutes screening, including testing instruments that are appropriate to be used for screening to determine appropriate instructional strategies. Many commenters recommended permitting States to determine the screening process for identifying appropriate instructional strategies.

One commenter stated that "screening" is too loosely defined and may be confused with State regulations that require screening for a child's entrance into school. The commenter recommended that the regulations address issues such as the need for parental consent prior to screening and a timeframe for screening subsequent to a request.

*Discussion:* An "evaluation," as used in the Act, refers to an individual assessment to determine eligibility for special education and related services, consistent with the evaluation procedures in §§ 300.301 through 300.311. "Screening," as used in § 300.302 and section 614(a)(1)(E) of the Act, refers to a process that a teacher or specialist uses to determine appropriate instructional strategies. Screening is typically a relatively simple and quick process that can be used with groups of children. Because such screening is not considered an evaluation under §§ 300.301 through 300.311 to determine eligibility for special education services, parental consent is not required.

Section 300.302 does not address screening for a child's entrance into school under a State's rules. Screening required under a State's rules for a child's entrance into school is the responsibility of the State and is not within the purview of the Act. We believe that the provisions in §§ 300.301 through 300.311, regarding evaluations, and § 300.302, regarding screening for instructional purposes, are clear, and therefore, we do not believe it is necessary to add language to the regulations.

We decline to provide specific examples of testing instruments to

determine appropriate instructional strategies because this will vary based on the age of the child and the subject matter, and is best left to State and local officials to determine. Likewise, the process for screening, including the timeframe to complete the screening process, is a decision that is best left to State and local officials to determine, based on the instructional needs of the children.

*Changes:* None.

*Comment:* One commenter asked whether the provisions in § 300.302, regarding screening, apply to a child with a disability, as well as a child who has not been identified as a child with a disability. One commenter noted that § 300.302 refers to screening of a child by a teacher or a specialist and asked who would be considered a specialist. Another commenter requested clarification regarding the term "instructional strategies for curriculum implementation," as used in § 300.302.

*Discussion:* Section 300.302, consistent with section 614(a)(1)(E) of the Act, states that the screening of a child by a teacher or specialist to determine appropriate instructional strategies is not considered an evaluation for purposes of determining eligibility for special education and related services. This applies to a child with a disability, as well as a child who has not been identified as a child with a disability. Such screening, therefore, could occur without obtaining informed parental consent for screening.

We believe the determination of who is considered a "specialist" should be left to the discretion of the public agency and should not be specified in the regulations. The term, "instructional strategies for curriculum implementation" is generally used to refer to strategies a teacher may use to more effectively teach children.

*Changes:* None.

*Comment:* One commenter recommended clarification regarding whether States can develop and implement policies that permit screening of children to determine if evaluations are necessary.

*Discussion:* There is nothing in the Act that requires a State to, or prohibits a State from, developing and implementing policies that permit screening children to determine if evaluations are necessary. However, screening may not be used to delay an evaluation for special education and related services. If a child is referred for an evaluation to determine eligibility for special education and related services, the public agency must implement the requirements in §§ 300.301 through 300.311 and adhere to the 60-day or the

**46640**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

State-established timeframe to complete the evaluation.

*Changes:* None.

Reevaluations (§ 300.303)

*Comment:* A few commenters recommended clarifying that a parent is not required to provide a reason for requesting a reevaluation. Several commenters recommended that the regulations require a public agency to provide prior written notice if a parent requests a reevaluation within a year and the public agency refuses the request.

*Discussion:* Section 300.303(b), consistent with section 614(a)(2)(A)(ii) of the Act, states that a reevaluation may occur if the child's parent or teacher requests a reevaluation. There is no requirement that a reason for the reevaluation be given and we agree that a reevaluation cannot be conditioned on the parent providing a reason for requesting a reevaluation.

Section 300.303(b), consistent with section 614(a)(2)(B) of the Act, provides that a reevaluation may occur not more than once a year and must occur at least once every three years, unless the parent and the public agency agree otherwise. If a parent requests more than one reevaluation in a year and the public agency does not believe a reevaluation is needed, we believe the regulations are clear that the public agency must provide the parents with written notice of the agency's refusal to conduct a reevaluation, consistent with § 300.503 and section 615(c)(1) of the Act. We do not believe additional regulations are necessary to address this specific instance of a public agency's refusal to initiate a reevaluation and the written notice requirements in § 300.503.

*Changes:* None.

*Comment:* A few commenters requested clarification regarding whether an evaluation that assesses skills that were not previously assessed in the same related services area would be considered an evaluation or reevaluation. One commenter, asked, for example, if a speech-language evaluation was conducted to assess a child's speech impairment one year, would an evaluation the following year to assess the child's language abilities be considered an evaluation or reevaluation?

*Discussion:* An initial evaluation of a child is the first complete assessment of a child to determine if the child has a disability under the Act, and the nature and extent of special education and related services required. Once a child has been fully evaluated, a decision has been rendered that a child is eligible for services under the Act, and the required

services have been determined, any subsequent evaluation of a child would constitute a reevaluation. In the example provided by the commenter, the second evaluation would be considered a reevaluation.

*Changes:* None.

*Comment:* One commenter recommended that reevaluations be required at least once every three years because a child's mental and physical profile changes in three years, and thus, so would the child's educational needs. Another commenter recommended requiring LEAs to inform parents that information from the most recent evaluation, which could be three or more years old if the parent agrees that a reevaluation is unnecessary, will be used in the development of a child's IEP.

A few commenters recommended an accountability process for LEAs that do not conduct reevaluations at least every three years. The commenters recommended requiring LEAs to report to the State the number of children with disabilities who qualified for, but were not given a three-year reevaluation; provide prior written notice to parents if the LEA determines that a three-year reevaluation is not necessary, including the justification for such determination; and inform the parent in writing in the parent's language that a three-year reevaluation will be conducted if the parent disagrees with the LEA's determination.

One commenter recommended requiring an LEA that does not conduct a reevaluation at least once every three years to justify the reasons in writing, especially if there is evidence that the child is not meeting the State's academic achievement standards.

*Discussion:* Section 300.303(b)(2), consistent with section 614(a)(2)(B)(ii) of the Act, requires a reevaluation to occur at least once every three years, unless the parent and the public agency agree that a reevaluation is unnecessary.

It would be overly burdensome to require an LEA to report to the State the number of children with disabilities who qualified for, but were not given a three-year reevaluation. Similarly, it would be overly burdensome to require LEAs to inform parents that information from the most recent evaluation will be used to develop a child's IEP or to justify to the parent in writing the LEA's reasons for not conducting a reevaluation every three years if the parent and the agency have already agreed that a reevaluation is unnecessary.

If a parent requests a reevaluation and the public agency disagrees that a reevaluation is needed, the public

agency must provide prior written notice to the parent, consistent with § 300.503, that explains, among other things, why the agency refuses to conduct the reevaluation and the parent's right to contest the agency's decision through mediation or a due process hearing.

In situations where a public agency believes a reevaluation is necessary, but the parent disagrees and refuses consent for a reevaluation, new § 300.300(c)(1)(ii) is clear that the public agency may, but is not required to, pursue the reevaluation by using the consent override procedures described in § 300.300(a)(3).

*Changes:* None.

*Comment:* One commenter recommended the following requirements for the reevaluation of a child with the most significant cognitive disabilities who is assessed based on alternate achievement standards: (a) Prohibiting the public agency from automatically determining that a three-year reevaluation is not needed; (b) requiring the public agency to consider whether the child has been correctly identified to be assessed against alternate achievement standards; and (c) requiring a review of evaluation data to determine whether the child is, to the extent possible, being educated in the general curriculum and assessed with instruments aligned with that curriculum.

*Discussion:* We do not believe changes to the regulations are necessary to address the commenter's concerns. The Act does not include any special requirements for the reevaluation of a child with the most significant cognitive disabilities who is assessed against alternate achievement standards. It would be inconsistent with the individualized evaluation and reevaluation procedures in section 614(b) and (c) of the Act for a public agency to automatically determine that reevaluations are unnecessary for a specific group of children. In determining whether a reevaluation is needed, the parent and the public agency must consider the child's educational needs, which may include whether the child is participating in the general education curriculum and being assessed appropriately.

*Changes:* None.

*Comment:* One commenter recommended clarifying that parents have the right to prevent the over-testing of their child and that the requirements for reevaluations do not diminish the rights of parents to make decisions regarding the reevaluation. Several commenters recommended that the regulations require States to establish

additional procedural safeguards to ensure that parents who agree that a reevaluation is unnecessary are aware of the implications of their decision.

*Discussion:* There is nothing in the Act to suggest that the requirements for reevaluations in § 300.303 diminish the rights of parents. As stated in § 300.303, consistent with section 614(a)(2) of the Act, a parent can request a reevaluation at any time, and can agree with the public agency to conduct a reevaluation more frequently than once a year. Likewise, a parent and a public agency can agree that a reevaluation is not necessary. We believe that in reaching an agreement that a reevaluation is unnecessary, as provided for in § 300.303(b), the parent and public agency will discuss the advantages and disadvantages of conducting a reevaluation, as well as what effect a reevaluation might have on the child's educational program. Therefore, we do not agree with the commenter that additional procedural safeguards are necessary to ensure that parents who agree that a reevaluation is unnecessary are aware of the implications of their decision.

*Changes:* None.

*Comment:* Many commenters requested that the opportunity to waive a reevaluation occur only after the IEP Team has reviewed extant data to determine whether additional data are needed to determine the child's eligibility and the educational needs of the child.

*Discussion:* The review of existing data is part of the reevaluation process. Section 300.305(a), consistent with section 614(c)(1) of the Act, is clear that, as part of any reevaluation, the IEP Team and other qualified professionals, as appropriate, must review existing evaluation data, and on the basis of that review, and input from the child's parents, identify what additional data, if any, are needed to determine whether the child continues to have a disability, and the educational needs of the child. Therefore, the opportunity for a parent and the public agency to agree that a reevaluation is unnecessary occurs before a reevaluation begins. It would be inconsistent with the Act to implement the commenters' recommendation.

*Changes:* None.

*Comment:* One commenter recommended that the regulations clarify that waiving a three-year reevaluation must not be adopted as routine agency policy or practice and should only be used in exceptional circumstances. Another commenter recommended that the regulations require the LEA to offer parents a reevaluation at least annually when a parent agrees that a three-year reevaluation is not needed. Another commenter recommended that the regulations clarify that a reevaluation may be warranted more than once a year if the child's condition changes or new information becomes available that has an impact on the child's educational situation.

*Discussion:* It is not necessary to add language clarifying that waiving three-year reevaluations must not be a routine agency policy or practice because the regulations are clear that this is a decision that is made individually for each child by the parent of the child and the public agency. Section 300.303(b)(2), consistent with section 614(a)(2)(B)(ii) of the Act, states that a reevaluation must occur at least once every three years, unless the parent and the public agency agree that a reevaluation is unnecessary. When a parent and a public agency agree that a three-year reevaluation is unnecessary, there is no requirement that the public agency offer the parent a reevaluation each year. We do not believe that it is necessary to have such a requirement because if parents who have waived a three year reevaluation later decide to request an evaluation, they can do so. Also, public agencies have a continuing responsibility to request parental consent for a reevaluation if they determine that the child's educational or related services needs warrant a reevaluation.

We do not believe additional regulations are needed to clarify that a reevaluation can occur more than once a year. Section 300.303(b)(1), consistent with section 614(a)(2)(B)(i) of the Act, already provides that a reevaluation can occur more than once a year if the parent and the public agency agree that a reevaluation is needed.

*Changes:* None.

*Comment:* One commenter asked whether the agreement between the parent and the public agency that a reevaluation is unnecessary is the same as parental consent in § 300.9.

*Discussion:* An agreement between a parent and a public agency is not the same as parental consent in § 300.9. Rather, an agreement refers to an understanding between a parent and the public agency and does not need to meet the requirements for parental consent in § 300.9.

*Changes:* None.

*Comment:* One commenter recommended that the regulations clarify that when a parent obtains an independent educational evaluation (IEE) and provides new information to the public agency, a reevaluation could be conducted more than once a year so that the public agency can verify the results of the IEE.

*Discussion:* The changes recommended by the commenter are unnecessary. Section 300.303(b)(1), consistent with section 614(a)(2)(B)(i) of the Act, is clear that a reevaluation can be conducted more than once a year if the parent and the public agency agree that it is necessary. Therefore, in the situation presented by the commenter, if the results of an IEE provide new information that the public agency and the parent agree warrant a reevaluation, the parent and the public agency could agree to conduct a reevaluation.

*Changes:* None.

*Comment:* One commenter asked whether an IEE is considered a reevaluation and whether an IEE is prohibited within less than a year of the public agency's most recent evaluation.

*Discussion:* An IEE would be considered as a potential source of additional information that the public agency and parent could consider in determining whether the educational or related services needs of the child warrant a reevaluation, but it would not be considered a reevaluation. There is no restriction on when a parent can request an IEE.

*Changes:* None.

Evaluation Procedures (§ 300.304)

Notice (§ 300.304(a))

*Comment:* Numerous commenters recommended that the regulations clarify that the requirement for prior written notice to parents in § 300.304(a) is satisfied if the public agency notifies the parent of the type(s) of assessment(s) that will be conducted. One commenter stated that the prior written notice requirements for evaluations should be satisfied if the public agency notifies the parent of the type(s) of assessment(s) that will be conducted, the method(s) of assessment, and the persons who will conduct the assessment(s).

*Discussion:* It would be inconsistent with the Act for a public agency to limit the contents of the prior written notice in the manner requested by the commenters. In addition to describing the evaluation procedures the agency proposes to use, as required in § 300.303(a), section 615(c)(1) of the Act requires the prior written notice to include an explanation of why the agency proposes to evaluate the child; a description of each evaluation procedure, assessment, record, or report the agency used as a basis for requesting the evaluation; a statement that the parents have protection under the procedural safeguards of the Act, and if this notice is not an initial referral for

**46642** **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

evaluation, the means by which a copy of the procedural safeguards can be obtained; sources for the parents to contact to obtain assistance in understanding the provisions of the Act; a description of other options that were considered and why these reasons were rejected; and a description of other factors that are relevant to the agency's proposal to request consent for an evaluation.

*Changes:* None.

*Comment:* A few commenters stated that the notice to parents regarding the evaluation procedures the agency proposes to use must be provided in the native language of the parents, and recommended that this requirement be clarified in § 300.304.

*Discussion:* Information regarding the evaluation procedures the agency proposes to use, as required in § 300.303(a), is included in the prior written notice required in § 300.503(c)(1)(ii). Section 300.503(c)(1)(ii) requires, that the prior written notice to parents be provided in the native language of the parent or other mode of communication used by the parent, unless it is clearly not feasible to do so. We see no need to repeat these requirements in § 300.304 and believe that doing so could cause confusion about the status of other applicable requirements that would not be repeated in this section.

*Changes:* None.

Conduct of Evaluation (§ 300.304(b))

*Comment:* One commenter asked whether the "procedure" referred to in § 300.304(b)(2) is the same as the "measure or assessment" referred to in section 614(b)(2)(B) of the Act. Another commenter recommended changing § 300.304(b)(2) to follow the statutory language.

*Discussion:* Section 300.304(b)(2), as proposed, states that the public agency may not use any single "procedure" as the sole criterion for determining whether a child is a child with a disability and for determining an appropriate educational program for the child. Section 614(b)(2)(B) of the Act states that in conducting an evaluation, the LEA must not use any single "measure or assessment" as the sole criterion for determining whether a child is a child with a disability or determining an appropriate educational program. We agree that the statutory language should be used in § 300.304(b)(2) because use of the term "procedure," rather than "measurement or assessment," could be confusing.

*Changes:* We have changed "procedure" to "measurement or

assessment" in § 300.304(b)(2), consistent with the statutory language.

*Comment:* One commenter recommended adding the word "always" to § 300.304(b) to state that the public agency must "always" conduct an evaluation in accordance with the requirements in § 300.304(b)(1) through (b)(3).

*Discussion:* Adding the word "always" to § 300.304(b) would not change the requirements for conducting an evaluation consistent with § 300.304(b). The regulation already requires a public agency to conduct the evaluation in accordance with § 300.304(b)(1) through (b)(3) and there are no exceptions to that requirement. Therefore, we decline to change § 300.304(b) in the manner recommended by the commenter.

*Changes:* None.

*Comment:* One commenter recommended that the regulations define "technically sound instruments" and "relative contribution" in § 300.304(b)(3). Another commenter recommended that the instruments used in reevaluations to determine whether the child continues to have a disability should be based on scientific research methods.

*Discussion:* Section 300.304(b)(3) follows the specific language in section 614(b)(2)(C) of the Act and requires that the evaluation of a child use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical and developmental factors. "Technically sound instruments" generally refers to assessments that have been shown through research to be valid and reliable. Therefore, it would be redundant to add language requiring that instruments used in reevaluations be based on scientific research methods, as recommended by one commenter. The phrase "relative contribution," as used in § 300.304(b)(3), generally means that assessment instruments that allow the examiner to determine the extent to which a child's behavior is a result of cognitive, behavioral, physical, or developmental factors may be used in evaluating a child in accordance with § 300.304. Because the meaning of "relative contribution" is context specific, we do not believe it should be defined in these regulations.

*Changes:* None.

Other Evaluation Procedures (§ 300.304(c))

*Comment:* One commenter recommended clarifying that differences in language and socialization practices must be considered when determining eligibility for special education and

related services, including biases related to the assessment.

*Discussion:* We do not believe that the clarification requested by the commenter is necessary. The Act and these regulations recognize that some assessments may be biased and discriminatory for children with differences in language and socialization practices. Section 614(b)(3)(A)(i) of the Act requires that assessments and other evaluation materials used to assess a child under the Act are selected and administered so as not to be discriminatory on a racial or cultural basis. Additionally, in interpreting evaluation data for the purpose of determining eligibility of a child for special education and related services, § 300.306(c) requires each public agency to draw upon information from a variety of sources, including aptitude and achievement tests, parent input, teacher recommendations, as well as information regarding a child's physical condition, social or cultural background, and adaptive behavior. We believe that these provisions provide adequate protection for the concerns raised by the commenter.

*Changes:* None.

*Comment:* One commenter requested that the regulations clarify that a public agency should not use the "not clearly feasible" exception in § 300.304(c)(1)(ii) to improperly limit a child's right to be evaluated in the child's native language or other mode of communication.

*Discussion:* Section 300.304(c)(1)(ii), consistent with section 614(b)(3)(A)(ii) of the Act, requires that assessments and other evaluation materials used to assess a child be provided and administered in the child's native language or other mode of communication and in the form most likely to yield accurate information on what the child knows and can do, unless it is clearly not feasible to so provide or administer. We agree that this provision should not be improperly used to limit evaluations in a child's native language, but we do not believe that a change to the regulations is necessary or that it would prevent inappropriate application of the existing rule.

*Changes:* None.

*Comment:* One commenter recommended including "behavior" in the list of areas to be evaluated in § 300.304(c)(4). Another commenter recommended requiring a functional behavioral assessment to be part of a child's evaluation whenever any member of the IEP Team requests it or raises concerns about the child's behavior. One commenter asked why physical assessments were not included

in the list of assessments that should be conducted.

*Discussion:* Section 300.304(c)(4) requires the public agency to ensure that the child is assessed in all areas related to the suspected disability. This could include, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities. This is not an exhaustive list of areas that must be assessed. Decisions regarding the areas to be assessed are determined by the suspected needs of the child. If a child's behavior or physical status is of concern, evaluations addressing these areas must be conducted. No further clarification is necessary.

*Changes:* None.

*Comment:* Many commenters recommended that the evaluation report include a description of the extent to which an assessment varied from standard conditions because there are few assessments that produce valid and reliable information for English language learners suspected of having a disability. Several commenters stated that it is standard practice for professionals administering assessments to include information in their reports when assessments are conducted using nonstandard conditions. One commenter recommended that the regulations require all evaluation reports to clearly indicate the language or other mode of communication used in assessing a child and a determination of whether using such language or other mode of communication yielded accurate information.

*Discussion:* As stated by several commenters, it is standard test administration practice to include in the evaluation report the extent to which an assessment varied from standard conditions, including the language or other mode of communication that was used in assessing a child. It is, therefore, unnecessary to include this requirement in the regulations.

*Changes:* None.

*Comment:* Many commenters recommended that the regulations require public agencies to provide parents with evidence that the assessments to be used are reliable and valid for their particular use, as well as assurances that the assessments will be administered in the child's primary language or mode of communication. The commenters also recommended that public agencies be required to provide parents with information regarding the assumptions being made about the tests and the inferences that can be drawn from the test results.

*Discussion:* Section 300.304(a), consistent with section 614(b)(1) of the Act, requires the public agency to provide notice to the parents of a child with a disability, in accordance with § 300.503, that describes the evaluation procedures the agency proposes to conduct. To require public agencies to provide all parents with the specific information recommended by the commenters would be burdensome for public agencies, and could be overwhelming for some parents, and therefore, we decline to add such a requirement to the regulations. While we understand that some parents will want the detailed information mentioned by the commenter, parents can always request such additional information before providing informed written consent for the evaluation or reevaluation.

*Changes:* None.

*Comment:* A few commenters recommended that the regulations require comprehensive psychological and educational evaluations to rule out alternate causes of functional impairments in academic achievement.

*Discussion:* We believe the regulations already address the commenters' concerns and we do not believe any further clarification is necessary. Section 300.304(c)(6) requires that evaluations are sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been identified. In addition, § 300.306(b), consistent with section 614(b)(5) of the Act, states that a child must not be determined to be a child with a disability if the determinant factor for that determination is lack of appropriate instruction in reading or math, or limited English proficiency.

*Changes:* None.

*Comment:* Several commenters recommended that the requirements in new § 300.301(d)(2) and (e) (proposed § 300.301(d)(2)(i) and (ii)), regarding children who transfer to another public agency before an initial evaluation is completed, should be cross-referenced in § 300.304(c)(5).

*Discussion:* We agree that a cross-reference in § 300.304(c)(5) is appropriate.

*Changes:* We have added "consistent with § 300.301(d)(2) and (e)," following "possible" in § 300.304(c)(5).

*Comment:* None.

*Discussion:* In reviewing § 300.304(c)(5), we determined that § 300.304(c)(5) should be amended to refer to children with disabilities who transfer to another public agency "in the

same school year" rather than "in the same academic year" because that is the term most commonly understood by parents and school officials.

*Changes:* We have changed "academic year" to "school year" in § 300.304(c)(5).

*Comment:* One commenter recommended adding language regarding scientifically based special education and related services to § 300.304(c)(6).

*Discussion:* Section 300.304(c)(6) requires that the evaluation of a child with a disability be sufficiently comprehensive to identify all the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified. We believe that the focus on providing scientifically based special education and related services is clear in the Act and these regulations and do not believe it is necessary to refer to "scientifically based" services each time we refer to special education and related services. Therefore, we decline to add this language in § 300.304(c)(6), as requested by the commenter.

*Changes:* None.

Additional Requirements for Evaluations and Reevaluations (§ 300.305)

Review of Existing Evaluation Data (§ 300.305(a))

*Comment:* One commenter stated that a comma should be added after "current classroom-based" in § 300.305(a)(1)(ii) to clarify that a review of existing evaluation data for a child must include, as appropriate, data from three types of assessments: Current classroom-based, local, or State assessments.

*Discussion:* We agree with the commenter and will revise the language consistent with the commenter's suggestion and consistent with section 614(c)(1)(A)(ii) of the Act. The changes will clarify that a review of existing evaluation data on a child must include, as appropriate, current classroom-based, local, or State assessment data.

*Changes:* We have inserted a comma following "classroom based" and "local" in § 300.305(a)(1)(ii), consistent with the statutory language.

*Comment:* One commenter asked whether a public agency must conduct a reevaluation when a reevaluation is requested to determine the child's educational and functional needs, but the child's eligibility for special education and related services is not in question.

*Discussion:* Section 300.305(a)(2), consistent with section 614(c)(1)(B) of

the Act, states that one of the purposes of a reevaluation is to determine the educational needs of the child, including whether any additions or modifications to the special education and related services are needed to enable the child to meet the child's IEP goals and to participate in the general education curriculum. Thus, if a reevaluation is requested to determine the child's educational needs when the child's continued eligibility is not in question, the public agency must either conduct the reevaluation or provide notice to the parents as to why the public agency believes a reevaluation is unnecessary.

*Changes:* None.

Requirements if Additional Data Are Not Needed (§ 300.305(d))

*Comment:* One commenter requested that the regulations define or remove the phrase ''qualified professionals, as appropriate'' in § 300.305(d)(1).

*Discussion:* Section 300.305(d)(1) follows the specific language in section 614(c)(1) of the Act and refers to the decision made by the IEP Team and ''other qualified professionals, as appropriate'' regarding whether additional data are needed to determine whether a child continues to be a child with a disability and the child's educational needs. The phrase, ''qualified professionals, as appropriate'' is used to provide flexibility for public agencies to include other professionals who may not be a part of the child's IEP Team in the group that determines if additional data are needed to make an eligibility determination and determine the child's educational needs. We believe that public agencies should have flexibility in determining how to define ''qualified professionals'' and we do not believe a definition should be included in the regulations.

*Changes:* None.

Evaluations Before Change in Eligibility (Proposed Evaluations Before Change in Placement) (§ 300.305(e))

*Comment:* One commenter stated that the heading for § 300.305(e), ''Evaluations before change in placement'' should be changed because the regulations that follow do not deal with changes in placement. Another commenter requested clarification regarding the meaning of the term ''placement.'' The commenter stated that § 300.305(e) uses the term to mean that special education services are no longer required, but that this is not the meaning when used in the context of alternative educational placements. The commenter also asked whether moving a child from a self-contained classroom

to a resource room is a change of placement.

*Discussion:* We agree that the heading for § 300.305(e) should be changed to more accurately reflect the requirements in this subsection. We will, therefore, change the heading to ''Evaluations before change in eligibility,'' which is consistent with the heading in section 614(c)(5) of the Act.

With regard to the commenter's question about whether moving a child from a self-contained classroom to a resource room would be a change of placement, we believe that it would be, as it would change the child's level of interaction with his or her nondisabled peers. However, as noted previously, the term ''change of placement'' should not have been used in connection with this regulation.

In the example provided by the commenter, generally, if a child is moved from a self-contained classroom to a resource room, it is likely that the child's current IEP cannot be implemented in the resource room, because the educational program in the resource room is likely to be substantially and materially different than the educational program in the self-contained classroom or the educational program in the resource room would change the level of interaction with nondisabled peers. Therefore, this situation would likely be a change of placement under the Act.

*Changes:* We have removed the heading ''Evaluations before change in placement'' in § 300.305(e) and replaced it with ''Evaluations before change in eligibility'' for clarity and consistency with the heading in section 614(c)(5) of the Act.

*Comment:* Many commenters recommended that evaluations for other institutions (e.g., vocational rehabilitation agencies, colleges and universities) should be required before a child graduates from secondary school with a regular diploma or exceeds the age limit for FAPE. However, a number of commenters disagreed and stated that public agencies should not be required to conduct evaluations that will be used to meet the entrance or eligibility requirements of another institution or agency. One commenter requested clarification regarding whether schools must provide updated evaluations for college testing and admissions purposes and recommended including language in the regulations that explicitly states that public agencies are not required to conduct tests that are needed for admission to postsecondary programs. Another commenter recommended that the regulations clarify that LEAs have responsibility for providing the

postsecondary services that are included in the summary of the child's academic achievement and functional performance.

One commenter requested requiring a reevaluation before a child exits the school system. Another commenter recommended clarifying that a comprehensive evaluation is not required for children aging out of special education.

A number of commenters provided recommendations on the information that should be included in the summary of a child's academic and functional performance required in § 300.305(e)(3). Commenters suggested that the summary report should include information about the child's disability; the effect of the disability on the child's academic and functional performance (sufficient to establish eligibility under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act, if appropriate); any needed modifications or adaptations essential to the child's success; the child's most recent evaluations by professionals, including the child's academic achievement and functional performance levels; assistive technology and other supports used by the child; and any modifications and supports that would facilitate the child's successful transition to postsecondary education or employment.

*Discussion:* We do not believe that the regulations should require public agencies to conduct evaluations for children to meet the entrance or eligibility requirements of another institution or agency because to do so would impose a significant cost on public agencies that is not required by the Act. While the requirements for secondary transition are intended to help parents and schools assist children with disabilities transition beyond high school, section 614(c)(5) in the Act does not require a public agency to assess a child with a disability to determine the child's eligibility to be considered a child with a disability in another agency, such as a vocational rehabilitation program, or a college or other postsecondary setting. The Act also does not require LEAs to provide the postsecondary services that may be included in the summary of the child's academic achievement and functional performance. We believe it would impose costs on public agencies not contemplated by the Act to include such requirements in the regulations.

It would be inconsistent with the Act to require public agencies to conduct evaluations for children who are exiting the school system because they exceed the age for eligibility under State law. Section 300.305(e)(2), consistent with

section 614(c)(5)(B)(i) of the Act, is clear that an evaluation in accordance with §§ 300.304 through 300.311 is not required before the termination of a child's eligibility under the Act due to graduation from secondary school with a regular diploma or due to exceeding the age eligibility for FAPE under State law.

Section 300.305(e)(3), consistent with section 614(c)(5)(B)(ii) of the Act, states that the summary required when a child graduates with a regular diploma or exceeds the age eligibility under State law must include information about the child's academic achievement and functional performance, as well as recommendations on how to assist the child in meeting the child's postsecondary goals. The Act does not otherwise specify the information that must be included in the summary and we do not believe that the regulations should include a list of required information. Rather, we believe that State and local officials should have the flexibility to determine the appropriate content in a child's summary, based on the child's individual needs and postsecondary goals.

*Changes:* None.

*Comment:* One commenter stated that public agencies should not be required to conduct an evaluation of a child who graduates with a regular diploma because a regular diploma means that the child has met the same requirements and achieved the same or similar level of competency as the child's nondisabled classmates. The commenter also requested that the regulations define a regular diploma to mean that the child has reached a comparable level of achievement as the child's nondisabled classmates.

*Discussion:* Section 300.305(e)(2) specifically states that a public agency does not need to evaluate a child with a disability who graduates with a regular diploma. In addition, as noted in the *Analysis of Comments and Changes* section for subpart B, we have clarified in § 300.101(a)(3)(iv) that a regular diploma does not include alternate degrees, such as a general educational development (GED) credential. We do not believe that any further clarification with respect to the definition of "regular diploma" is necessary.

*Changes:* None.

Determination of Eligibility (§ 300.306)

*Comment:* One commenter recommended that the regulations require public agencies to provide parents with copies of all evaluations at no cost. However, another commenter stated that evaluations are often lengthy and requested clarification as to whether public agencies must provide copies of evaluations to parents at no cost.

*Discussion:* Section 300.306(a)(2), consistent with section 614(b)(4)(B) of the Act, requires that a copy of the evaluation report and the documentation of determination of eligibility be given to the parent. We have added language to § 300.306(a)(2) to clarify that the public agency must provide these copies at no cost to the parent.

With regard to providing parents with copies of all evaluations, § 300.501(a), consistent with section 615(b)(1) of the Act, affords parents an opportunity to inspect and review all education records with respect to the identification, evaluation, and educational placement of the child, and the provision of a FAPE to the child. Specific procedures for access to records are contained in the confidentiality provisions in §§ 300.610 through 300.627.

Section 300.613 requires a public agency to permit a parent to inspect and review any education records relating to their child that are collected, maintained, or used by the agency under the Act. The right to inspect and review records includes the right to a response from the agency to reasonable requests for explanations and interpretations of the records; the right to request that the agency provide copies of the records containing the information if failure to provide those copies would effectively prevent the parent from exercising the right to inspect and review the records; and the right to have a representative of the parent inspect and review the records. To the extent that the commenters may have been concerned about free copies of evaluation documents that would not be provided under the above regulations, we decline to regulate further, as we believe that the cited provisions adequately balance the interests of the parents for free copies and the public agencies in controlling costs.

*Changes:* We have added language to § 300.306(a)(2) to clarify that the evaluation report and the documentation of determination of eligibility must be provided at no cost to the parent.

*Comment:* One commenter recommended that parents receive evaluation reports prior to an IEP Team meeting because the reports may have information that parents need to participate in making decisions about the IEP. The commenter stated that, if parents receive reports at meetings, rather than before the meetings, they cannot be active participants. Another commenter stated that parents should be provided with copies of documents related to the determination of eligibility at least five days prior to the eligibility determination meeting.

*Discussion:* The Act does not establish a timeline for providing a copy of the evaluation report or the documentation of determination of eligibility to the parents and we do not believe that a specific timeline should be included in the regulations because this is a matter that is best left to State and local discretion. It is, however, important to ensure that parents have the information they need to participate meaningfully in IEP Team meetings, which may include reviewing their child's records. Section 300.613(a) requires a public agency to comply with a parent request to inspect and review existing education records, including an evaluation report, without unnecessary delay and before any meeting regarding an IEP, and in no case more than 45 days after the request has been made. This includes the right to a response from the public agency to reasonable requests for explanations and interpretations of records, consistent with § 300.613(b)(1).

While it would be appropriate for parents to review documents related to the determination of eligibility prior to the eligibility determination, there is no requirement that eligibility be determined at an IEP Team meeting and it would not be appropriate for a public agency to provide documentation of the determination of eligibility prior to discussing a child's eligibility for special education and related services with the parent. Section 300.306(a)(1) and section 614(b)(4)(A) of the Act require that a group of qualified professionals and the parent determine whether the child is a child with a disability. Therefore, providing documentation of the eligibility determination to a parent prior to a discussion with the parent regarding the child's eligibility would indicate that the public agency made its determination without including the parent and possibly, qualified professionals, in the decision.

*Changes:* None.

Special Rule for Eligibility Determination (§ 300.306(b))

*Comment:* A number of commenters recommended other factors that should be ruled out before a child is determined to be a child with a disability. Many commenters stated that a child should not be determined to be a child with a disability if the determinant factor is lack of instruction in English language development or lack of access to State content standards. A

**46646**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

few commenters expressed concern regarding subjective judgments about the definition of "appropriate instruction." One commenter stated that determining the quality of reading instruction that children received in the past might be difficult, if not impossible, especially when children are referred for an evaluation after they enter middle school or are highly mobile.

*Discussion:* We agree that a child should not be determined to be a child with a disability if the determinant factor is lack of access to State content standards, and we believe this is implicit in section 614(b)(5) of the Act, which states that a child must not be determined to be a child with a disability if the determinant factor is lack of appropriate instruction in reading (including the essential components of reading instruction, as defined in the ESEA) or lack of instruction in math.

During the Department's internal review of these regulations, we noted that, while § 300.306(b)(1)(i) refers to lack of "appropriate" instruction in reading, there is no similar qualifier for math. We believe it is equally important that a child not be determined to be a child with a disability if the determinant factor is the lack of "appropriate" instruction in math. Therefore, we will revise § 300.306(b)(1)(ii) to make this clear.

We are unclear what the commenter means by lack of instruction in English language development. However, if a child's low achievement is a result of limited English proficiency or lack of access to instruction in reading, the child must not be determined to be a child with a disability, consistent with section 614(b)(5) of the Act.

Whether a child has received "appropriate instruction" is appropriately left to State and local officials to determine. While information regarding the quality of instruction a child received in the past may be helpful in determining whether a child is eligible for special education services, it is not essential. Schools, however, must ensure that the determinant factor in deciding that a child is a child with a disability is not a lack of appropriate instruction in reading and math.

*Changes:* We have added "appropriate" in § 300.306(b)(1)(ii) to refer to a "lack of appropriate instruction in math."

*Comment:* Some commenters requested that we include in the regulations the essential components of reading instruction defined in the ESEA.

*Discussion:* For reasons set forth elsewhere in this preamble, we are not adding definitions to these regulations from statutes other than the Act. However, the definition of the essential components of reading instruction from section 1208(3) of the ESEA is included here for reference.

*Essential Components of Reading Instruction*—The term "essential components of reading instruction" means explicit and systematic instruction in—

(A) Phonemic awareness;

(B) Phonics;

(C) Vocabulary development;

(D) Reading fluency, including oral reading skills; and

(E) Reading comprehension strategies.

*Changes:* None.

Procedures for Determining Eligibility and Educational Need (Proposed Procedures for Determining Eligibility and Placement) (§ 300.306(c))

*Comment:* None.

*Discussion:* During the review of these regulations, we noted that section 614(b)(4) of the Act refers to procedures for determining eligibility and "educational need," rather than procedures for determining eligibility and "placement," as in the heading for proposed § 300.306(c). Therefore, we will change the heading in § 300.306(c) to be consistent with section 614(b)(4) of the Act.

*Changes:* We have replaced "placement" with "educational need" in the heading to § 300.306(c), consistent with section 614(b)(4) of the Act.

*Additional Procedures for Identifying Children With Specific Learning Disabilities*

Specific Learning Disabilities (§ 300.307)

*Comment:* Numerous commenters supported proposed § 300.307(a)(1), which allowed States to prohibit LEAs from using a severe discrepancy between IQ and achievement (discrepancy models) to determine eligibility under the specific learning disability (SLD) category. However, many commenters supported the use of discrepancy models and requested that the regulations allow discrepancy models to continue to be used. Numerous commenters stated that § 300.307(a)(1) exceeds statutory authority and that LEAs should be permitted to use discrepancy models. Many commenters cited Conf. Rpt. 108–779 and stated that Congress did not intend to prohibit LEAs from using discrepancy models.

*Discussion:* The Department agrees that proposed § 300.307(a)(1) should be removed. We believe this will improve the clarity of the regulations and make it easier for parents and professionals to understand. With respect to permitting LEAs to use discrepancy models, even with the removal of § 300.307(a)(1), States are responsible for developing criteria to determine whether a child is a child with a disability, as defined in § 300.8 and section 602(3) of the Act, including whether a particular child meets the criteria for having an SLD. Under section 614(b)(6) of the Act, States are free to prohibit the use of a discrepancy model. States, including States that did not use a discrepancy model prior to the Act, are not required to develop criteria that permit the use of a discrepancy model.

*Changes:* We have removed § 300.307(a)(1) and redesignated the subsequent provisions in § 300.307.

*Comment:* Many commenters stated that response to intervention (RTI) should be considered one component of the evaluation process and not the sole component. Another commenter stated that neither a discrepancy model nor an RTI model alone can correctly identify children with SLD and that other data are needed, such as informal and formal assessments, histories, and observations. One commenter stated that all relevant and available evaluation data, such as the nature and type of evaluation, evaluator qualifications, and outcome data should be considered. One commenter recommended that RTI be tied to the general evaluation procedures. Another commenter recommended referencing the evaluation procedures in § 300.309 to clarify that RTI must be used as one component of the evaluation process to determine eligibility for special education and related services. Several commenters stated that relying solely on an RTI model would result in larger numbers of children being identified with an SLD.

*Discussion:* Consistent with § 300.304(b) and section 614(b)(2) of the Act, the evaluation of a child suspected of having a disability, including an SLD, must include a variety of assessment tools and strategies and cannot rely on any single procedure as the sole criterion for determining eligibility for special education and related services. This requirement applies to all children suspected of having a disability, including those suspected of having an SLD.

To simplify new § 300.307(a)(2) (proposed § 300.307(a)(3)) and remove unnecessary repetition, we will: (a) Remove the phrase "as part of the

evaluation procedures described in § 300.304;'' and (b) replace ''process that determines if the child responds to scientific, research-based intervention'' with ''process based on the child's response to scientific, research-based intervention.'' Section 300.311(a)(7) will also be revised, consistent with this language.

*Changes:* We have revised new § 300.307(a)(2) (proposed § 300.307(a)(3)) and § 300.311(a)(7) for clarity.

*Comment:* Several commenters recommended changing new § 300.307(a)(2) (proposed § 300.307(a)(3)) to require that State criteria ''may'' rather than ''must'' permit a process that determines if a child responds to research-based intervention in order to be consistent with section 614(b)(6)(B) of the Act.

*Discussion:* Making the requested change to new § 300.307(a)(2) (proposed § 300.307(a)(3)) would be inconsistent with the Act. Section 614(b)(6)(B) of the Act gives LEAs the option of using a process that determines if a child responds to research-based interventions.

*Changes:* None.

*Comment:* Several commenters recommended that the regulations include a statement that discrepancy models have been discredited and that there is no evidence that they can be applied in a valid and reliable manner. Several commenters recommended that the Department urge States, at least through guidance, to eliminate provisions under State laws that permit the use of discrepancy models.

*Discussion:* We do not believe it is appropriate to add language in the regulations discouraging the use of discrepancy models to identify children with SLD. We removed current § 300.541(a)(2), which required States to use a discrepancy model to determine whether a child has a SLD, because section 614(b)(6) of the Act now specifies that an LEA shall not be required to consider a severe discrepancy in determining whether a child has an SLD. New § 300.307(a)(2) (proposed § 300.307(a)(3)) requires States to permit the use of a process that examines whether the child responds to scientific, research-based interventions as part of the information reviewed to determine whether a child has an SLD. The regulations reflect the Department's position on the identification of children with SLD and our support for models that focus on assessments that are related to instruction and promote intervention for identified children.

*Changes:* None.

*Comment:* One commenter recommended that any guidance the Department issues on RTI models should emphasize that RTI represents a shift in how children are identified for special education services and not just an additional task that special education teachers must do.

*Discussion:* Consensus reports and empirical syntheses indicate a need for major changes in the approach to identifying children with SLD. Models that incorporate RTI represent a shift in special education toward goals of better achievement and improved behavioral outcomes for children with SLD because the children who are identified under such models are most likely to require special education and related services. We will consider addressing this issue in future guidance.

*Changes:* None.

*Comment:* Many commenters stated that the elimination of discrepancy models would result in an inability to identify children with SLD who are gifted. One commenter stated that a scatter of scores should be used to identify children with SLD who are gifted.

*Discussion:* Discrepancy models are not essential for identifying children with SLD who are gifted. However, the regulations clearly allow discrepancies in achievement domains, typical of children with SLD who are gifted, to be used to identify children with SLD.

*Changes:* None.

*Comment:* Many commenters opposed the use of RTI models to determine whether a child has an SLD, stating that there is a lack of scientific evidence demonstrating that RTI models correctly identify children with SLD. One commenter stated that RTI is a subjective method of determining whether treatment is effective and is not a treatment itself. A few commenters requested additional research demonstrating the efficacy of the wide-scale use of RTI models. Some commenters stated that research on the use of RTI models has been conducted only in the area of reading in the primary grades and pointed to the lack of scientific data on achievement gains or long-term success. One commenter stated that there is no evidence that RTI is effective for non-native speakers of English and minority populations. Another commenter stated that RTI would fail to identify young children with SLD. One commenter stated that when a child fails to respond to an intervention, it is unclear why the child failed (*e.g.,* inappropriate intervention, ineffective teaching, unreasonable expectations). One commenter stated that longitudinal data are needed to

determine if children who succeed in an RTI process later become eligible under the category of SLD based on reading fluency and comprehension difficulties, or difficulties in other academic areas, such as mathematics problem-solving or written expression.

*Discussion:* The Act requires that LEAs be permitted to use a process that determines if a child responds to research-based interventions. Further, there is an evidence base to support the use of RTI models to identify children with SLD on a wide scale, including young children and children from minority backgrounds. These include several large-scale implementations in Iowa (the Heartland model; Tilly, 2002); the Minneapolis public schools (Marston, 2003); applications of the Screening to Enhance Equitable Placement (STEEP) model in Mississippi, Louisiana, and Arizona (VanDerHeyden, Witt, & Gilbertson, in press); and other examples (NASDE, 2005).[1] While it is true that much of the research on RTI models has been conducted in the area of reading, 80 to 90 percent of children with SLD experience reading problems. The implementation of RTI in practice, however, has included other domains. RTI is only one component of the process to identify children in need of special education and related services. Determining why a child has not responded to research-based interventions requires a comprehensive evaluation.

*Changes:* None.

*Comment:* One commenter expressed concern about how LEAs will conduct evaluations for children suspected of having an SLD who attend private schools because requiring an RTI process could become entangled with the private school's instructional practices. The commenter recommended clarifying that child find does not require an LEA to use RTI to

[1] Tilly III, W. D. (2002). School psychology as a problem solving enterprise. In A. Thomas & J. Grimes (Eds.), *Best Practices in School Psychology IV.* Washington D.C.: National Association of School Psychologists; VanDerHeyden, A.M, Witt, J.C, & Gilbertson, D. (in press). Effect of a problem solving intervention on the accurate identification of children. *Journal of School Psychology;* Marston, D., Muyskens, P., Lau, M., & Canter, A. (2003). Problem-solving model for decision making with high incidence disabilities: The Minneapolis experience. *Learning Disabilities Research and Practice,* 18, 187–200; Gresham, F., VanDerHeyden, A.M, & Witt, J.C. (in press). Response to intervention in the identification of learning disabilities: Empirical support and future challenges. *School Psychology Review;* National Association of State Directors of Special Education (2005). Response to intervention: policy considerations and implementations. Alexandria VA: Author.

**46648**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

identify children with SLD who are attending private schools.

*Discussion:* An RTI process does not replace the need for a comprehensive evaluation. A public agency must use a variety of data gathering tools and strategies even if an RTI process is used. The results of an RTI process may be one component of the information reviewed as part of the evaluation procedures required under §§ 300.304 and 300.305. As required in § 300.304(b), consistent with section 614(b)(2) of the Act, an evaluation must include a variety of assessment tools and strategies and cannot rely on any single procedure as the sole criterion for determining eligibility for special education and related services.

It is up to each State to develop criteria to determine whether a child has a disability, including whether a particular child has an SLD. In developing their criteria, States may wish to consider how the criteria will be implemented with a child for whom systematic data on the child's response to appropriate instruction is not available. However, many private schools collect assessment data that would permit a determination of how well a child responds to appropriate instruction. The group making the eligibility determination for a private school child for whom data on the child's response to appropriate instruction are not available may need to rely on other information to make their determination, or identify what additional data are needed to determine whether the child is a child with a disability. However, under § 300.306(b), a public agency may not identify any public or private school child as a child with a disability if the determinant factor is lack of appropriate instruction in reading or math.

*Changes:* None.
*Comment:* One commenter stated that adoption of new procedures for evaluating children suspected of having an SLD should not penalize or declassify children who under prior procedures were found to have an SLD. The commenter recommended using the requirements in § 300.305, rather than data from a child's response to a scientific, research-based intervention process, to consider whether a child continues to have an SLD.

*Discussion:* An RTI process does not replace the need for a comprehensive evaluation, and a child's eligibility for special education services cannot be changed solely on the basis of data from an RTI process. Consistent with § 300.303 and section 614(a)(2) of the Act, a child with a disability must be reevaluated if the public agency

determines that the educational or related services needs of the child warrant a reevaluation or if the child's parent or teacher requests a reevaluation. A reevaluation must occur no more than once a year, unless the parent and the public agency agree otherwise, and at least once every three years, unless the parent and the public agency agree that a reevaluation is unnecessary, to determine whether the child continues to have a disability and to determine the educational needs of the child. Reevaluations must be conducted in accordance with §§ 300.304 through 300.311. In addition, as noted in § 300.305(e)(1), except for children at the end of their secondary school career, a reevaluation must be done before determining that a child is no longer a child with a disability. In conducting a reevaluation, as noted in § 300.305, consistent with section 614(c) of the Act, the IEP Team and other qualified professionals must review existing evaluation data on the child including evaluations provided by the parents of the child; current classroom-based, local, or State assessments and classroom-based observations; and observations by teachers and related services providers.

The results of an RTI process may be one component of the information reviewed as part of the reevaluation process. It is up to each State to develop criteria to determine whether a child continues to have a disability, including whether a particular child has an SLD.

States that change their eligibility criteria for SLD may want to carefully consider the reevaluation of children found eligible for special education services using prior procedures. States should consider the effect of exiting a child from special education who has received special education and related services for many years and how the removal of such supports will affect the child's educational progress, particularly for a child who is in the final year(s) of high school. Obviously, the group should consider whether the child's instruction and overall special education program have been appropriate as part of this process. If the special education instruction has been appropriate and the child has not been able to exit special education, this would be strong evidence that the child's eligibility needs to be maintained.

*Changes:* None.

Alternative Research-Based Procedures (New § 300.307(a)(3)) (Proposed § 300.307(a)(4))

*Comment:* Many commenters expressed support for allowing the use

of alternative research-based procedures to determine whether a child has an SLD. However, a few commenters stated that the use of alternative research-based procedures should be removed because there is no indication that these procedures will assist in identifying a child with an SLD and because the Act does not use this term.

*Discussion:* New § 300.307(a)(3) (proposed § 300.307(a)(4)) recognizes that there are alternative models to identify children with SLD that are based on sound scientific research and gives States flexibility to use these models. For example, a State could choose to identify children based on absolute low achievement and consideration of exclusionary factors as one criterion for eligibility. Other alternatives might combine features of different models for identification. We believe the evaluation procedures in section 614(b)(2) and (b)(3) of the Act give the Department the flexibility to allow States to use alternative, research-based procedures for determining whether a child has an SLD and is eligible for special education and related services.

*Changes:* None.
*Comment:* One commenter stated that alternative research-based procedures are not based on scientific research and should therefore be removed.

*Discussion:* The Department does not support the use of identification procedures that are not based on scientific research. Models or procedures that claim to assist in identifying a child with an SLD, but which are not based on sound scientific research, are not appropriate and should not be adopted by LEAs or States.

*Changes:* None.
*Comment:* A few commenters stated that the meaning of alternative research-based procedures is unclear and should be defined. One commenter stated that there would be inappropriate interventions and procedures without further clarification as to the meaning of alternative research-based procedures.

*Discussion:* As noted in the *Analysis of Comments and Changes* section for subpart A, we have added the definition of *scientifically based research* from section 9101(37) of the ESEA to the definitions section of these regulations. This definition is the most appropriate definition to include in these regulations, given the importance Congress placed on aligning the Act with the ESEA. The Department does not intend to dictate how extensive the research must be or who, within an LEA or State, should determine that the research is of high quality. We believe that this is a matter best left to State and

local officials because determining the presence of an appropriate instructional process is part of the State-adopted criteria. This addition should provide the clarity requested by the commenters.

*Changes:* We have added a definition of *scientifically based research* to § 300.35, giving the term the definition in section 9101(37) of the ESEA.

Consistency With State Criteria (§ 300.307(b))

*Comment:* Several commenters expressed concern about allowing States to decide on the approach to determining whether a child has an SLD, and requested the Department develop criteria to be used across the nation. However, numerous commenters supported the development of State criteria and requiring public agencies to use the State criteria to determine whether a child has an SLD. Many commenters stated that this requirement is necessary to prevent inconsistent eligibility requirements among LEAs in a State. Other commenters stated that the requirement exceeds statutory authority and that LEAs should be allowed to make decisions about the criteria and methods to identify children with SLD.

*Discussion:* The Department believes that eligibility criteria must be consistent across a State to avoid confusion among parents and school district personnel. The Department also believes that requiring LEAs to use State criteria for identifying children with disabilities is consistent with the State's responsibility under section 612(a)(3) of the Act to locate, identify, and evaluate all eligible children with disabilities in the State. We believe this provides the Department with the authority to require a public agency to use State criteria in determining whether a child has an SLD, consistent with §§ 300.307 through 300.311.

*Changes:* None.

*Comment:* A few commenters requested requiring States to adopt and implement only one model to determine whether a child has an SLD. However, several commenters requested that States and LEAs have the flexibility to use more than one model. One commenter noted that States need flexibility to determine eligibility criteria until there is greater understanding of the effectiveness of evidence-based protocols in identifying children with SLD.

*Discussion:* There is nothing in the Act that would require a State to use one model of identification to identify a child with an SLD. We do not believe the regulations should include such a requirement, because section 614(b)(6) of the Act indicates that some flexibility in the selection of models of identification by LEAs can be appropriate, if permitted by the State.

*Changes:* None.

*Comment:* One commenter recommended that the Department require States to develop a plan to implement Statewide eligibility criteria that includes dissemination of research-based models, collecting data on the use of such models, providing professional development on the State's criteria, and implementing appropriate services and instruction.

*Discussion:* We agree that it could be helpful for States to develop a plan to implement any new SLD criteria, as recommended by the commenter. However, we do not believe States should be required to adopt such a plan, as this is a matter that is best left to individual States to decide.

*Changes:* None.

Group Members (§ 300.308)

*Comment:* Several commenters requested an explanation of the use of "group members" rather than "team members" to describe the group that determines whether a child suspected of having an SLD is a child with a disability. One commenter stated that the eligibility determination is an IEP Team function and, therefore, using the term "group members" is inappropriate. One commenter stated that § 300.308 is confusing because the group seems to be the same as the IEP Team.

*Discussion:* The change from "team members" to "group members" was made in the 1999 regulations to distinguish this group from the IEP Team, because the team of qualified professionals and the parent in § 300.306(a)(1) that makes the eligibility determination does not necessarily have the same members as an IEP Team. In some States, this group of professionals may have the same individuals as the IEP Team, but in other States, this is not the case. We inadvertently referred to "team members" in 300.309(a)(2)(ii) and, therefore, will change this to "group."

*Changes:* We have changed "team members" to "group" in § 300.309(a)(2)(ii) to be consistent with § 300.306(a)(1).

*Comment:* Several commenters stated that the requirements for the qualifications of the group members in proposed § 300.308(a) are unnecessary and should be removed because they are not included in the Act, are overly prescriptive, and add another set of procedural requirements. On the other hand, a number of commenters recommended additional or different qualifications that should be required of the group members in § 300.308. Several commenters recommended that the group members be qualified to conduct assessments in the area of "cognition" rather than "intellectual development" to ensure that specific cognitive abilities are assessed, rather than global intellectual abilities.

Several commenters recommended that proposed § 300.308(a)(2), requiring group members to apply "critical analysis" to the data, be changed to require group members to apply "clinical" analysis to the data. One commenter stated that clinical analysis should be defined and suggested a definition that includes professional judgment informed by empirical research, training, and experience, and guided by interpretation of patterns in evaluation findings from a number of sources (*e.g.*, test scores; interviews; work samples; observational data; and information from parents, school personnel, and other related services providers).

A few commenters recommended requiring evaluations to be completed by certified speech-language pathologists and school psychologists to ensure that qualified professionals conduct the assessments. One commenter recommended that the examples of the areas for diagnostic assessments be preceded by "such as" to avoid a misinterpretation that a speech-language pathologist, for example, is mandated to participate in every SLD determination.

Several commenters agreed with the professional competencies for the group members described in § 300.308(a). However, one commenter stated that "collectively qualified" is too broad a term and should be more narrowly defined. Another commenter stated that there is no way to ensure that the group members possess the necessary expertise unless there is a mechanism to determine whether the group members have the specified competencies in proposed § 300.308(a).

One commenter stated that, although professionals from more than one discipline may be qualified to administer certain assessments, they do not bring the same expertise to the process. One commenter asked if a special education teacher, a regular education teacher, and parent were all that would be necessary if they collectively met the competency requirements.

Several commenters stated that the list of professionals in proposed § 300.308(b) for the eligibility group should be removed and decisions about group members left to schools and

districts. Other commenters stated that the requirements for the eligibility group should be the same as those for the group that determines the eligibility of children suspected of all other disabilities.

Many commenters recommended that additional or different professionals should be included in the group. Numerous commenters recommended including speech-language pathologists in the group because of their expertise in reading and conducting individual diagnostic assessments in the areas of speech and language.

A few commenters stated that a school psychologist should be a required member of the group, rather than listed as "if appropriate." One of these commenters stated that, even if school psychologists are no longer required to administer assessments to determine whether there is a discrepancy between the child's achievement and ability, school psychologists conduct assessments related to cognitive functioning, behavior, and other issues that may affect a child's learning.

Numerous commenters recommended requiring the special education teacher who is part of the eligibility group to have expertise in the area of SLD. However, one commenter stated that it is unnecessary for a special education teacher to be part of the group because the teacher would not have any instructional experience with the yet-to-be identified child and nothing in the Act requires special education teachers to possess any diagnostic expertise in the area of SLD.

One commenter recommended that the group include a teacher with experience in teaching children who are failing or at-risk for failing, in addition to a general education and special education teacher. Several commenters recommended adding a reading specialist as a required member. A few commenters recommended including a social worker as a required member, stating that it is important that one of the members examine the child's home and community environment to rule out environmental and economic factors as a primary source of the child's learning difficulties. Another commenter recommended adding a guidance counselor as a required member. One commenter recommended including a school nurse and stated that a school nurse can contribute information about educationally relevant medical findings.

One commenter stated that a reading teacher and an educational therapist should always be included in the group. A few commenters were not familiar with the role of an educational therapist and requested a definition or elimination of the term from the list of "other professionals." One commenter stated that two of the three professionals listed as "other professionals" (school psychologist, reading teacher, educational therapist) are not credentialed and questioned why they were included in the group.

*Discussion:* The Department has considered the diversity of comments received and, given the lack of consensus about which individuals should be included in the group that makes eligibility determinations for children suspected of having an SLD, believes that the requirements in current § 300.540 should be retained. Current § 300.540 states that the eligibility group for children suspected of having SLD must include the child's parents and a team of qualified professionals, which must include the child's regular teacher (or if the child does not have a regular teacher, a regular classroom teacher qualified to teach a child of his or her age) or for a child of less than school age, an individual qualified by the SEA to teach a child of his or her age; and at least one person qualified to conduct individual diagnostic examinations of children, such as a school psychologist, speech-language pathologist or remedial reading teacher. We believe this allows decisions about the specific qualifications of the members to be made at the local level, so that the composition of the group may vary depending on the nature of the child's suspected disability, the expertise of local staff, and other relevant factors. For example, for a child suspected of having an SLD in the area of reading, it might be important to include a reading specialist as part of the eligibility group. However, for a child suspected of having an SLD in the area of listening comprehension, it might be appropriate for the group to include a speech-language pathologist with expertise in auditory processing disorders. Current § 300.540 provides flexibility for schools and districts, and ensures that the group includes individuals with the knowledge and skills necessary to interpret the evaluation data and make an informed determination as to whether the child is a child with an SLD, and the educational needs of the child.

*Changes:* Section 300.308 has been changed to include the requirements from current § 300.540.

**Determining the Existence of a Specific Learning Disability (§ 300.309)**

*Comment:* One commenter stated that there is no authority in the Act for the SLD eligibility requirements outlined in § 300.309.

*Discussion:* We agree that the statutory language is broad and does not include the specific requirements to determine whether a child suspected of having an SLD is a child with a disability. The purpose of these regulations, however, is to provide details to assist States in the appropriate implementation of the Act. We believe the requirements in § 300.309 are necessary to ensure that States have the details necessary to implement the Act.

*Changes:* None.

*Comment:* One commenter stated that RTI was Congress' preference for determining eligibility under SLD, and therefore, the criteria for RTI should be the first paragraph of § 300.309 (Determining the existence of a specific learning disability).

*Discussion:* The Department believes that the criteria in § 300.309 are presented in a logical order and are consistent with the Act.

*Changes:* None.

*Comment:* One commenter stated that a discrepancy between intellectual ability and achievement can differentiate between children with disabilities and children with general low achievement, and noted that the problems with discrepancy models have been in implementation, rather than in the concept itself for identifying children with SLD.

*Discussion:* There is a substantial research base summarized in several recent consensus reports (Donovan & Cross, 2002; Bradley et al., 2003) and meta-analyses (Hoskyn & Swanson, 2000; Steubing et al., 2002) that does not support the hypothesis that a discrepancy model by itself can differentiate children with disabilities and children with general low achievement.[2] Therefore, we disagree with the comment because such a differentiation is not possible with any single criterion, including RTI.

*Changes:* None.

*Comment:* One commenter requested retaining the language in current § 300.541, regarding the use of discrepancy models.

---

[2] Donovan, M.S., & Cross, C.T. (2002). *Minority students in special and gifted education.* Washington, DC: National Academy Press; Bradley, L., Danielson, & Hallahan, D.P. (Eds.). Identification of learning disabilities: Research to practice. Mahway, NJ: Erlbaum; Hoskyn, M., & Swanson, H.L (2000). Cognitive processing of low achievers and children with reading disabilities: A selective meta-analytic review of the published literature. *The School Psychology Review, 29, 102–119;* Steubing, K.K., Fletcher, J.M., LeDoux, J.M., Lyon, G.R., Shaywitz, S.E., & Shoywitz B.A. (2002). Validity of IQ-discrepancy, classifications of reading disabilities: A meta-analysis. *American Educational Research Journal, 39, 469–518.*

ED-000112

*Discussion:* Section 614(b)(6) of the Act prohibits States from requiring a discrepancy approach to identify children with SLD. Current § 300.541 requires a discrepancy determination and is, therefore, inconsistent with the Act.

*Changes:* None.

*Comment:* One commenter requested that the eligibility group be allowed to consider the results from standardized, individualized testing (not just criterion-based testing or functional assessments) in the eligibility determination.

*Discussion:* Nothing in the Act or these regulations would preclude the eligibility group from considering results from standardized tests when making eligibility determinations.

*Changes:* None.

*Comment:* Many commenters recommended adding the concept of psychological processing disorders to the eligibility criteria in § 300.309. Several commenters noted that the criteria in § 300.309 do not fully address the definition of SLD in § 300.8(c)(10), which includes a processing disorder in one or more of the basic psychological processes. Several commenters stated that, without requiring documentation of a basic psychological processing disorder, the number of children identified with SLD will significantly increase and the use of assessment tools that have the potential to significantly guide instruction will decrease. Several commenters stated that failure to consider individual differences in cognitive processing skills reverses more than 20 years of progress in cognitive psychology and developmental neuroscience. One commenter stated that identifying a basic psychological processing disorder would help ensure that children identified with an SLD are not simply victims of poor instruction. One commenter stated that the shift away from requiring diagnostic assessments in the area of cognition would make it conceptually impossible to document that a child has a disorder in one or more of the basic psychological processes, as required in the definition of SLD in § 300.8(c)(10).

*Discussion:* The Department does not believe that an assessment of psychological or cognitive processing should be required in determining whether a child has an SLD. There is no current evidence that such assessments are necessary or sufficient for identifying SLD. Further, in many cases, these assessments have not been used to make appropriate intervention decisions. However, § 300.309(a)(2)(ii) permits, but does not require,

consideration of a pattern of strengths or weaknesses, or both, relative to intellectual development, if the evaluation group considers that information relevant to an identification of SLD. In many cases, though, assessments of cognitive processes simply add to the testing burden and do not contribute to interventions. As summarized in the research consensus from the OSEP Learning Disability Summit (Bradley, Danielson, and Hallahan, 2002), "Although processing deficits have been linked to some SLD (e.g., phonological processing and reading), direct links with other processes have not been established. Currently, available methods for measuring many processing difficulties are inadequate. Therefore, systematically measuring processing difficulties and their link to treatment is not yet feasible * * *. Processing deficits should be eliminated from the criteria for classification * * *." (p. 797).[3] Concerns about the absence of evidence for relations of cognitive discrepancy and SLD for identification go back to Bijou (1942;[4] see Kavale, 2002)[5]. Cronbach (1957)[6] characterized the search for aptitude by treatment interactions as a "hall of mirrors," a situation that has not improved over the past few years as different approaches to assessment of cognitive processes have emerged (Fletcher *et al.*, 2005; Reschly & Tilly, 1999)[7].

*Changes:* None.

*Comment:* Several commenters requested that the regulations include a definition of "intellectual development."

*Discussion:* We do not believe it is necessary to define "intellectual development" in these regulations. Intellectual development is included in § 300.309(a)(2)(ii) as one of three

[3] Bradley, R., Danielson, L., & Hallahan, D.P. (Eds.). (2002). *Identification of learning disabilities: Research to practice.* Mahwah, NJ: Erlbaum.

[4] Bijou, S.W. (1942). The psychometric pattern approach as an aid to clinical assessment—a review. *American Journal of Mental Deficiency, 46,* 354–362.

[5] Kavale, K. (2002). Discrepancy models in the identification of learning disabilities. In R. Bradley, L. Danielson, & D.P. Hallahan (Eds.). Identification of learning disabilities: Research to practice (pp. 370–371). Mahwah, NJ: Erlbaum.

[6] Cronbach, L.J. (1957). The two disciplines of scientific psychology. *American Psychologist, 12,* 671–684.

[7] Fletcher, J.M., Denton, C., & Francis, D.J. (2005). Validity of alternative approaches for the identification of LD: Operationalizing unexpected underachievement. *Journal of Learning Disabilities, 38,* 545–552; Reschly, D.J., & Tilly, W.D. (1999). Reform trends and system design alternatives. In D.J. Reschly, W.D. Tilly, III, and J.P. Grimes (Eds.). Special education in transition: Functional assessment and noncategorical programming. Longmont, CO: Sopris West.

standards of comparison, along with age and State-approved grade-level standards. The reference to "intellectual development" in this provision means that the child exhibits a pattern on strengths and weaknesses in performance relative to a standard of intellectual development such as commonly measured by IQ tests. Use of the term is consistent with the discretion provided in the Act in allowing the continued use of discrepancy models.

*Changes:* None.

*Comment:* Several commenters stated that intra-individual differences, particularly in cognitive functions, are essential to identifying a child with an SLD and should be included in the eligibility criteria in § 300.309.

*Discussion:* As indicated above, an assessment of intra-individual differences in cognitive functions does not contribute to identification and intervention decisions for children suspected of having an SLD. The regulations, however, allow for the assessment of intra-individual differences in achievement as part of an identification model for SLD. The regulations also allow for the assessment of discrepancies in intellectual development and achievement.

*Changes:* None.

*Comment:* One commenter requested guidance on how to determine whether a child was provided with learning experiences appropriate for the child's age, as required in § 300.309(a)(1).

*Discussion:* While such guidance might be helpful, we believe SEAs and LEAs are in the best position to provide guidance on age-appropriate learning experiences.

*Changes:* None.

*Comment:* Several commenters expressed support for the requirements in § 300.309(a)(1) and stated that the first element of determining eligibility for an SLD is a finding that the child does not achieve commensurate with the child's age in one or more of the eight areas when provided with learning experiences appropriate to the child's age. However, several commenters requested requiring that eligibility determinations for an SLD include evidence that the child's achievement level is not commensurate with the child's age *and* ability (emphasis added). One commenter indicated that knowledge of a child's ability level is important to ensure that a determination is not based on deficits in areas not related to cognitive processing (*e.g.,* lack of opportunity to learn, social or emotional disturbances), and to prevent misdiagnosis of children with mental

retardation and SLD. One commenter stated that § 300.309(a)(1) would allow any child who failed to achieve commensurate with his or her age to be considered to have an SLD, and this will increase the number of children referred for special education and related services.

Several commenters expressed concern that the eligibility determination for SLD is based on whether the child achieves commensurate with his or her age because current practice uses normative data that are based on grade level. These commenters recommended clarifying that grade level or classmate performance should also be considered.

*Discussion:* The first element in identifying a child with SLD should be a child's mastery of grade-level content appropriate for the child's age or in relation to State-approved grade-level standards, not abilities. This emphasis is consistent with the focus in the ESEA on the attainment of State-approved grade-level standards for all children. State-approved standards are not expressed as "norms" but represent benchmarks for all children at each grade level. The performance of classmates and peers is not an appropriate standard if most children in a class or school are not meeting State-approved standards. Furthermore, using grade-based normative data to make this determination is generally not appropriate for children who have not been permitted to progress to the next academic grade or are otherwise older than their peers. Such a practice may give the illusion of average rates of learning when the child's rate of learning has been below average, resulting in retention. A focus on expectations relative to abilities or classmates simply dilutes expectations for children with disabilities.

We will modify § 300.309(a)(1) to clarify that, as a first element in determining whether a child has an SLD, the group must determine that the child does not demonstrate achievement that is adequate for the child's age or the attainment of State-approved grade-level standards, when provided with learning experiences and instruction appropriate for the child's age or State-approved grade-level standards in one or more of the areas listed in § 300.309(a)(1). The reference to "State-approved grade-level standards" is intended to emphasize the alignment of the Act and the ESEA, as well as to cover children who have been retained in a grade, since age level expectations may not be appropriate for these children. The reference to "instruction" will be added to emphasize that children may not be

identified as having SLD if there is no documentation of appropriate instruction, consistent with the Act and the ESEA. Consistent with this change, we will add a reference to "State-approved grade-level standards" in §§ 300.309(a)(2)(i) and (ii). We will also combine proposed § 300.311(a)(5) and (6) into § 300.311(a)(5) to ensure consistency with the requirements in § 300.309(a).

*Changes:* We have modified § 300.309(a)(1) and §§ 300.309(a)(2)(i) and (ii), and combined proposed § 300.311(a)(5) and (6) into § 300.311(a)(5) to ensure consistency with the requirements in § 300.309(a).

*Comment:* Several commenters expressed support for including reading fluency in the list of areas to be considered when determining whether a child has an SLD. However, several commenters recommended removing reading fluency from the list in § 300.309(a)(1), stating that a weakness in reading fluency, in isolation, does not indicate a reading disability.

*Discussion:* No assessment, in isolation, is sufficient to indicate that a child has an SLD. Including reading fluency in the list of areas to be considered when determining whether a child has an SLD makes it more likely that a child who is gifted and has an SLD would be identified. Fluency assessments are very brief and highly relevant to instruction. We, therefore, do not believe that reading fluency should be removed from § 300.309(a)(1).

*Changes:* None.

*Comment:* Many commenters stated that eligibility criteria based on RTI models will result in dramatic increases in referrals, special education placements, and legal problems. One commenter stated that the eligibility criteria in § 300.309 do not provide sufficient checks and balances to ensure that only those children who truly require special education are identified as having SLD. A few commenters stated that using an RTI model would result in incorrectly identifying underachieving children as having SLD.

*Discussion:* We do not believe that eligibility criteria based on RTI models will result in dramatic increases in referrals and special education placements. Well-implemented RTI models and models that identify problems early and promote intervention have reduced, not increased, the number of children identified as eligible for special education services and have helped raise achievement levels for all children

in a school.[8] We believe that the regulations do provide sufficient checks to ensure that only children who need special education and related services are identified as having SLD.

*Changes:* None.

*Comment:* Several commenters stated that the language in § 300.309(a)(2)(ii) is very confusing and should be rewritten. Many commenters stated that the word "or" instead of "and" should be used between § 300.309(a)(2)(i) and § 300.309(a)(2)(ii), because otherwise a child could be identified with an SLD because he or she failed to meet passing criteria on a State assessment, and failure to make sufficient progress on a State-approved assessment alone is not grounds for a determination that a child has an SLD. Several commenters stated that the phrase, "pattern of strengths and weaknesses in performance, achievement, or both" is a typographical error because it is repeated twice.

*Discussion:* We do not agree that "and" should be used instead of "or" between § 300.309(a)(2)(i) and (ii), because this would subject the child to two different identification models. We agree that failing a State assessment alone is not sufficient to determine whether a child has an SLD. However, failing a State assessment may be one factor in an evaluation considered by the eligibility group. As required in § 300.304(b)(1), consistent with section 614(b)(2)(A) of the Act, the evaluation must use a variety of assessment tools and strategies to gather relevant information about the child. Further, § 300.304(b)(2), consistent with section 614(b)(2)(B) of the Act, is clear that determining eligibility for special education and related services cannot be based on any single measure or assessment as the sole criterion for determining whether a child is a child with a disability.

We agree that § 300.309(a)(2)(ii) could be stated more clearly and will rewrite it to state that the eligibility group can determine that a child has an SLD if the child meets the criteria in § 300.309(a)(1) and exhibits a pattern of strengths and weaknesses in performance, achievement, or both, relative to age and State-approved grade-level standards, or intellectual development, that is determined by the group to be relevant to the identification of an SLD.

*Changes:* We have changed § 300.309(a)(2)(ii) for clarity.

---

[8] Burns, M., Appleton, J., Stehouwer, J. (2005). Meta-analytic review of responsiveness-to-intervention research: Examining field-based and research-implemented models. *Journal of Psychoeducational Assessment, 23,* 381–394.

*Comment:* Several commenters requested a definition of "State-approved results." One commenter stated that the language was extremely confusing and that "State-approved results" could be interpreted to mean approved results that are equivalent to proficiency on State assessments under the ESEA, and this could lead to eligibility determinations for a very large group of older children with poor reading performance for whom it would be nearly impossible to make sufficient progress to become proficient readers. This commenter recommended changing the language to refer to a child's failure to achieve a rate of learning to make sufficient progress based on "State-defined criteria." Another commenter recommended substituting "State achievement standards" for "State approved results."

*Discussion:* The intention is to refer to State assessments approved under the ESEA. We have changed "State-approved results" to "State-approved grade-level standards." We believe this change adequately addresses the commenters concerns.

*Changes:* We have removed "State-approved results" and inserted in its place "State-approved grade-level standards" in § 300.309 and § 300.311.

*Comment:* One commenter stated that including "State-approved results" in § 300.309(a)(2)(i) means that there is no Federal definition of SLD.

*Discussion:* States must develop criteria for determining whether a child has an SLD that are consistent with the Federal requirements in §§ 300.307 through 300.311 and the definition of SLD in § 300.8(c)(10).

*Changes:* None.

*Comment:* A few commenters stated that using the criteria in § 300.309(a)(2), a child could meet State standards and still be identified as a child with an SLD.

*Discussion:* We agree with the commenters. Accelerated growth toward, and mastery of, State-approved grade-level standards are goals of special education. Furthermore, as stated in § 300.101, the fact that a child is advancing from grade to grade does not make a child with a disability ineligible for special education and related services. However, consistent with § 300.8, the group making the eligibility determination must conclude both that the child has an SLD and that, because of that disability, the child needs special education and related services.

*Changes:* None.

*Comment:* Many commenters requested more detail and specific guidelines on RTI models, such as information on who initiates the RTI process and who should be involved in the process; how one ensures there is a strong leader for the RTI process; the skills needed to implement RTI models; the role of the general education teacher; how to determine that a child is not responsive to instruction, particularly a child with cultural and linguistic differences; the number of different types of interventions to be tried; the responsibility for monitoring progress; the measurement of treatment integrity; and ways to document progress. One commenter stated that it is imperative that the regulations allow the flexibility necessary to accommodate the array of RTI models already in use.

Several commenters requested that the Department define and set a standard for responsiveness that calls for demonstrated progress and improvement in the rate of learning, to indicate that a child can function in the classroom. Several commenters stated that there would be a dramatic increase in the number of children identified with an SLD without a clearly defined system in place.

*Discussion:* There are many RTI models and the regulations are written to accommodate the many different models that are currently in use. The Department does not mandate or endorse any particular model. Rather, the regulations require States with the flexibility to adopt criteria that best meet local needs. Language that is more specific or prescriptive would not be appropriate. For example, while we recognize that rate of learning is often a key variable in assessing a child's response to intervention, it would not be appropriate for the regulations to set a standard for responsiveness or improvement in the rate of learning. As we discussed earlier in this section, we do not believe these regulations will result in significant increases in the number of children identified with SLD.

*Changes:* None.

*Comment:* One commenter stated that, without additional clarity, eligibility criteria will vary substantially among States and that States will have definitions that are suited to their individual preferences, rather than a universal sense of what constitutes eligibility under SLD based on the research and national standards of professional practice.

*Discussion:* State eligibility criteria must meet the requirements in §§ 300.307 through 300.111 and LEAs must use these State-adopted criteria. We believe that, although these provisions allow States some flexibility in how children with SLD are identified, the requirements in these provisions will ensure that SLD criteria do not vary substantially across States.

*Changes:* None.

*Comment:* One commenter stated that, without more clarity in the requirements for RTI models, there would be an increase in the number of eligibility disputes between parents and school districts.

*Discussion:* We do not believe more clarity in the requirements for RTI models is necessary. States can avoid disputes over eligibility determinations by developing clear criteria, consistent with the regulatory parameters, and providing staff with the necessary guidance and support to implement the criteria.

*Changes:* None.

*Comment:* One commenter urged the Department to encourage States to convene a group of education, disability, and parent stakeholders to discuss and design a model approach to early identification of children with SLD.

*Discussion:* The Department agrees that it is important to identify children with SLD early and to provide the necessary instruction and supports to avoid referrals to special education. The extent to which States involve other interested parties (*e.g.*, disability groups, parent groups) in the design or development of such a system is a decision that should be made by each State.

*Changes:* None.

*Comment:* A few commenters stated that professional development requirements to implement RTI models should be incorporated into the regulations so RTI models are not haphazardly implemented. One commenter stated that before RTI can be used systematically as part of the special education identification process, school districts must have administrative support at all levels, ongoing professional development for all staff, and coordination with institutions of higher education. Several commenters recommended encouraging States to develop efficient, collaborative evaluation systems. One commenter recommended requiring regular education teachers to address the needs of children with different learning styles, identify early and appropriate interventions for children with behavioral challenges, and understand and use data and assessments to improve classroom practices and learning.

*Discussion:* We agree that administrative support, professional development, and coordination with teacher training programs would be

helpful in the effective implementation of RTI models. We also agree that efficient and collaborative evaluation systems should be developed, and that all teachers, including regular education teachers, should be trained to address the needs of children with different learning styles, identify early and appropriate interventions for children with behavioral challenges, and understand and use data and assessments to improve classroom practices and learning. However, professional development requirements are a State responsibility, consistent with § 300.156 and section 612(a)(14) of the Act, and it would be inappropriate for the Department to include specific professional development requirements in these regulations.

*Changes:* None.

*Comment:* One commenter stated that if a State prohibits the use of a discrepancy model, there would not be sufficient time or funds necessary to effectively train staff. Several commenters asked that there be a transition period so that personnel can be adequately trained in RTI or other forms of assessment and observation.

*Discussion:* It is not necessary for these regulations to require a transition period for implementing RTI models, particularly because there are many schools and districts currently implementing RTI models. Under the requirements in section 614(b)(6) of the Act, which took effect July 1, 2005, States should have developed mechanisms to permit LEAs to use RTI models. States may need to make adjustments based on these final regulations. Nothing in these regulations requires an LEA to drop current practices in favor of a new model with no transition. Obviously, a plan would need to be developed when changing to an RTI model, including strategies for implementation and professional development.

*Changes:* None.

*Comment:* Many commenters stated that the use of RTI models would be costly, requiring massive staff training and resources. Many commenters recommended ways in which the Department could support States in improving identification and interventions for children with SLD. Commenters' recommendations included the following: long-term, Statewide pilot studies on assessments and interventions for children with SLD; methods to increase the use of RTI; guidance on establishing appropriate timelines for instructional interventions; and information on new scientifically based approaches to identifying children with SLD.

*Discussion:* The Department recognizes the need for technical assistance and training to implement RTI models and is directing technical assistance funds under Part D of the Act, administered by the Department's Office of Special Education Programs (OSEP), toward this effort. OSEP plans to develop and disseminate an RTI resource kit and devote additional resources to technical assistance providers to assist States in implementing RTI models. OSEP will also continue to identify and develop model RTI implementation sites and evaluate SLD identification models in math and reading. In addition, the Comprehensive Center on Instruction, jointly funded by OSEP and the Office of Elementary and Secondary Education (OESE), will provide technical assistance to States on RTI implementation.

*Changes:* None.

*Comment:* Many commenters supported examining the pattern of strengths and weaknesses in determining whether a child is considered to have an SLD. A number of commenters stated that it is important that groups use a process to determine whether a child responds to scientific, research-based interventions, as well as consider relevant, empirically validated patterns of strengths and weaknesses in achievement, performance, or both, relative to intellectual development. One commenter stated that "pattern of strengths and weaknesses in performance" in § 300.309(a)(2)(ii) is insufficiently defined and without a clearer definition of "pattern," schools will continue the wait-to-fail model. One commenter recommended clarifying the meaning of "weakness," stating that weakness does not mean failure, and that there may be specific actions that could address weaknesses in performance that would result in failure if left alone.

*Discussion:* Patterns of strengths and weaknesses commonly refer to the examination of profiles across different tests used historically in the identification of children with SLD. We believe that the meaning of "pattern of strengths and weaknesses" is clear and does not need to be clarified in these regulations.

*Changes:* None.

*Comment:* Some commenters stated that using a pattern of strengths and weaknesses in a child's performance to identify a child with an SLD could be misinterpreted to identify children, other than children with disabilities, who are underperforming due to cultural factors, environmental or economic disadvantage, or low effort.

*Discussion:* Section 300.309(a)(3) is clear that children should not be identified with SLD if the underachievement is primarily the result of a visual, hearing, or motor disability; mental retardation; emotional disturbance; cultural factors; or environmental or economic disadvantage. The eligibility group makes the determination after the evaluation of the child is completed. Therefore, we believe that there is minimal risk that a child who is underachieving due to these factors will be identified as having an SLD.

*Changes:* None.

*Comment:* Some commenters recommended using "cognitive ability" in place of "intellectual development" because "intellectual development" could be narrowly interpreted to mean performance on an IQ test. One commenter stated that the term "cognitive ability" is preferable because it reflects the fundamental concepts underlying SLD and can be assessed with a variety of appropriate assessment tools. A few commenters stated that the reference to identifying a child's pattern of strengths and weaknesses that are not related to intellectual development should be removed because a cognitive assessment is critical and should always be used to make a determination under the category of SLD.

*Discussion:* We believe the term "intellectual development" is the appropriate reference in this provision. Section 300.309(a)(2)(ii) permits the assessment of patterns of strengths and weakness in performance, including performance on assessments of cognitive ability. As stated previously, "intellectual development" is included as one of three methods of comparison, along with age and State-approved grade-level standards. The term "cognitive" is not the appropriate reference to performance because cognitive variation is not a reliable marker of SLD, and is not related to intervention.

*Changes:* None.

*Comment:* One commenter reviewed the list of factors in § 300.309(a)(3) that must be ruled out as primary reasons for a child's performance and asked whether children with other health impairments (OHI), traumatic brain injury (TBI), or speech impairments would overlap with the SLD definition. Several commenters noted that many children with hearing, visual, or motor disabilities; mental retardation; or emotional disturbances (ED) also have concomitant learning disabilities that go unidentified, and that these children end up with lower academic and functional achievement levels than they

should because an important contributing factor to their learning problems has not been addressed. Several commenters recommended adding language to the regulations stating that a child with a disability other than an SLD may also be identified with an SLD.

*Discussion:* Children with one of the disabilities in § 300.8 should be identified as a child with a disability using the category that is most appropriate for the child. Some children may be identified under other disability categories, such as OHI, TBI, ED, or speech impairment, and may also have low achievement and even meet SLD criteria. Services must meet the child's needs and cannot be determined by the child's eligibility category. We believe it is unnecessary to add language regarding SLD as a concomitant disability.

*Changes:* None.

*Comment:* One commenter asked what kind of assessment identifies culture as a primary cause of academic performance deficits and recommended removing the requirement in § 300.309(a)(3)(iv) unless there are objective methods to determine whether a child's low performance is a result of cultural factors.

*Discussion:* The identification of the effect of cultural factors on a child's performance is a judgment made by the eligibility group based on multiple sources of information, including the home environment, language proficiency, and other contextual factors gathered in the evaluation. The Department believes that the identification of children with SLD will improve with models based on systematic assessments of a child's response to appropriate instruction, the results of which are one part of the information reviewed during the evaluation process to determine eligibility for special education and related services. States and public agencies must follow the evaluation procedures in §§ 300.304 and 300.305 and section 614(b) of the Act, including using assessments and other evaluation materials that do not discriminate on a racial or cultural basis, consistent with § 300.304(c)(1)(i) and section 614(b)(3)(A)(i) of the Act.

*Changes:* None.

*Comment:* Many commenters recommended that limited English proficiency be among the factors that the eligibility group must rule out as a primary factor affecting a child's performance.

*Discussion:* Section 300.306(b)(1)(iii), consistent with section 614(b)(5)(C) of the Act, is clear that a child must not

be identified as a child with a disability if the determinant factor for that determination is limited English proficiency. However, we agree that it is important to re-emphasize this requirement in § 300.309 and will add this to the list of factors that the eligibility group must rule out as a primary factor affecting a child's performance.

*Changes:* We have added a new paragraph (vi) to § 300.309(a)(3) to include "limited English proficiency" in the list of factors that must be ruled out as a primary factor affecting a child's performance before determining that a child is eligible for special education services under the category of SLD.

*Comment:* Numerous commenters supported the requirement in § 300.309(b)(1) for data demonstrating that a child suspected of having an SLD has been provided with high-quality, research-based instruction in regular education settings delivered by qualified personnel. Several commenters stated that this requirement should apply to all children and asked why this requirement is confined to only children suspected of having SLD. One commenter stated that if schools would use proven best practices, there would be fewer children in need of special education in the later grades. However, one commenter stated that it is incorrect to assume that any child who is not responding to interventions must have an SLD when there are a myriad of reasons why children may not be responding to instruction. One commenter recommended adding "to the extent practicable" to acknowledge that scientific research-based interventions are not available in many areas, particularly in mathematics. One commenter recommended decreasing the emphasis on research-based instruction.

*Discussion:* Sections 300.306(b)(1)(i) and (ii), consistent with section 614(b)(5)(A) and (B) of the Act, specifically state that children should not be identified for special education if the achievement problem is due to lack of appropriate instruction in reading or mathematics. This issue is especially relevant to SLD because lack of appropriate instruction in these areas most commonly leads to identifying a child as having an SLD. All children should be provided with appropriate instruction provided by qualified personnel. This is an important tenet of the Act and the ESEA. Both the Act and the ESEA focus on doing what works as evidenced by scientific research and providing children with appropriate instruction delivered by qualified teachers.

*Changes:* None.

*Comment:* We received a number of comments concerning the requirement for high-quality, research-based instruction provided by qualified personnel. One commenter stated that it would be difficult for rural school districts to meet this requirement because of staffing requirements in the regular education setting. Several commenters stated that the requirement for high-quality, research-based instruction exceeds statutory authority and should be removed, because it provides a basis for challenging any determination under the category of SLD. One commenter asked for clarification regarding the legal basis for providing high-quality, research-based instruction if the child is not determined eligible for special education. Another commenter stated that attorneys will read § 300.309(b) as providing a legal entitlement to ESEA, research-based instruction and data-based documentation for every child considered for eligibility under the category of SLD, and that when this standard is not met, will bring the matter to a due process hearing and request compensatory education.

Numerous commenters requested a definition of high-quality, research-based instruction. One commenter asked who validates that the research meets the highest quality. Another commenter asked that the regulations specify how much research a program must undergo before it is deemed to be research-based. One commenter stated that the Department must address how States determine whether a child has been provided with a high-quality, research-based instructional program; whether appropriate classroom interventions were delivered; and whether an intervention has been successful. One commenter stated that the absence of additional clarification would result in great disparity in States' policies and lead to inappropriate interventions and procedures. One commenter recommended that there be evidence that the instruction is effective for the child's age and cultural background.

A few commenters recommended that children who are not progressing because they have not received research-based instruction by a qualified teacher should immediately receive intensive, high-quality, research-based instruction by qualified personnel. One commenter expressed concern that § 300.309(b) restricts referrals to only those children who have received high-quality, research-based instruction from qualified teachers. One commenter stated that a child's eligibility to receive

special education services under the category of SLD appears to be contingent on the LEA's commitment to providing effective regular education services by qualified staff, and, as such, a child with an SLD is held hostage by a system that is not working. One commenter asked whether the eligibility group can make a determination that a child has an SLD in the absence of a child's response to high-quality research-based instruction.

Several commenters stated that the lack of research-based instruction by a qualified teacher should not limit a child's eligibility for services. Another commenter recommended clarifying that a child should not be found ineligible under the category of SLD because the child either did not respond to a scientific, research-based intervention during a truncated evaluation, or because the child was not provided an opportunity to respond to such an intervention.

*Discussion:* Watering down a focus on appropriate instruction for any children, including children with disabilities or children living in rural areas would be counter to both the Act and the ESEA. However, we agree that the requirement for high quality, research-based instruction exceeds statutory authority. The Act indicates that children should not be eligible for special education if the low achievement is due to lack of appropriate instruction in reading or math. Therefore, we will change the regulations to require that the eligibility group consider evidence that the child was provided appropriate instruction and clarify that this means evidence that lack of appropriate instruction was the source of underachievement.

The eligibility group should not identify a child as eligible for special education services if the child's low achievement is the result of lack of appropriate instruction in reading or math. Eligibility is contingent on the ability of the LEA to provide appropriate instruction. Determining the basis of low achievement when a child has been given appropriate instruction is the responsibility of the eligibility group.

Whether a child has received "appropriate instruction" is appropriately left to State and local officials to determine. Schools should have current, data-based evidence to indicate whether a child responds to appropriate instruction before determining that a child is a child with a disability. Children should not be identified as having a disability before concluding that their performance deficits are not the result of a lack of appropriate instruction. Parents of

children with disabilities have due process rights that allow them to file a complaint on any matter that relates to the identification, evaluation, and educational placement of their child with a disability, and the provision of FAPE to their child.

*Changes:* We have revised the introductory material in § 300.309(b) to emphasize that the purpose of the review is to rule out a lack of appropriate instruction in reading or math as the reason for a child's underachievement. We have also revised § 300.309(b)(1) to refer to appropriate instruction rather than high-quality, research-based instruction, and removed the cross reference to the ESEA.

*Comment:* One commenter stated that many reading programs claim to be research-based, but lack credible evidence of the program's effectiveness.

*Discussion:* Programs that claim to be research-based, but which are not based on sound scientific research, should not be considered research-based instruction by a State or LEA.

*Changes:* None.

*Comment:* One commenter asked what criteria should be used to determine that the child was provided with appropriate high quality, research-based instruction, especially when the child has been home schooled or attends a private school. One commenter asked about children referred for evaluation from charter schools and expressed concern that these children would not be eligible under the category of SLD because they did not have instruction delivered by qualified personnel.

*Discussion:* As part of the evaluation, the eligibility group must consider whether the child received appropriate instruction from qualified personnel. For children who attend private schools or charter schools or who are home-schooled, it may be necessary to obtain information from parents and teachers about the curricula used and the child's progress with various teaching strategies. The eligibility group also may need to use information from current classroom-based assessments or classroom observations. On the basis of the available information, the eligibility group may identify other information that is needed to determine whether the child's low achievement is due to a disability, and not primarily the result of lack of appropriate instruction. The requirements for special education eligibility or the expectations for the quality of teachers or instructional programs are not affected, and do not differ, by the location or venue of a child's instruction.

*Changes:* None.

*Comment:* Many commenters requested a definition of "qualified personnel." One commenter stated that teachers should be trained to deliver the program of instruction and simply saying they should be highly qualified is not sufficient. One commenter recommended removing the phrase "qualified personnel" in § 300.309(b)(1), because it is likely to be interpreted to mean that instruction must be delivered by highly qualified teachers, as defined in the ESEA.

*Discussion:* Section 300.156 and section 614(a)(14) of the Act are clear that each State is responsible for establishing and maintaining personnel qualifications to ensure that personnel are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities. Consistent with § 300.18 and section 602(10) of the Act, a public school teacher, including a special education teacher, who teaches core academic subjects must meet the highly qualified teacher standards under the Act. The term that is used in § 300.309(b)(1), "qualified personnel," does not, and should not be interpreted to, require that private school teachers be "highly qualified" to deliver the instruction discussed in § 300.309(b)(1).

*Changes:* None.

*Comment:* One commenter asked whether the regulations require an LEA to provide high-quality, research-based instruction in the regular education setting prior to, or as part of, the referral process before the group can determine whether a child has an SLD. One commenter recommended that research-based interventions occur prior to a referral to special education. Several commenters stated that an evaluation to assess all areas of suspected disability should follow an assessment of a child's response to instruction.

*Discussion:* What is important is that the group making the eligibility decision has the information that it needs to rule out that the child's underachievement is a result of a lack of appropriate instruction. That could include evidence that the child was provided appropriate instruction either before, or as a part of, the referral process. Evidence of appropriate instruction, including instruction delivered in an RTI model, is not a substitute for a complete assessment of all of the areas of suspected need. As discussed earlier in this section, we have revised § 300.309(b) to make this clear.

*Changes:* As discussed previously, we have revised § 300.309(b).

*Comment:* One commenter recommended that data be maintained on the number of children identified with SLD.

*Discussion:* Data are maintained on the number of children identified with SLD. Section 618 of the Act requires States to report annually to the Department the number and percentage of children with disabilities by disability category, in addition to race, ethnicity, limited English proficiency status, and gender.

*Changes:* None.

*Comment:* Many commenters recommended reinforcing the role of parents in determining whether a child has an SLD by adding language to § 300.309(b) stating that the child's parents and the group of qualified professionals must consider whether the child is a child with a disability.

*Discussion:* Section 300.306(a)(1), consistent with section 614(b)(4)(A) of the Act, is clear that the parent of the child is included in eligibility determinations. Section 300.309(a) cross-references the group in § 300.306, which includes the parent. We believe this adequately addresses the role of the parent and that no changes are necessary.

*Changes:* None.

*Comment:* One commenter requested a definition of "data-based documentation."

*Discussion:* Data-based documentation refers to an objective and systematic process of documenting a child's progress. This type of assessment is a feature of strong instruction in reading and math and is consistent with § 300.306(b)(1)(i) and (ii) and section 614(b)(5)(A) and (B) of the Act, that children cannot be identified for special education if an achievement problem is due to lack of appropriate instruction in reading or math.

*Changes:* None.

*Comment:* Numerous commenters supported requiring data-based documentation of repeated assessments of achievement at reasonable intervals to be provided to parents during the time the child is receiving instruction. One commenter emphasized the importance of documenting that the interventions used are data based and implemented with fidelity. One commenter stated that data-based documentation should be provided to all parents of children with disabilities, not just children suspected of having SLD. However, several commenters stated that requiring data-based documentation of repeated assessments is an additional bureaucratic requirement that is overly prescriptive

and costly, and will require additional paperwork.

*Discussion:* We believe that one of the most important aspects of good teaching is the ability to determine when a child is learning and then to tailor instruction to meet the child's individual needs. Effective teachers use data to make informed decisions about the effectiveness of a particular instructional strategy or program. A critical hallmark of appropriate instruction is that data documenting a child's progress are systematically collected and analyzed and that parents are kept informed of the child's progress. Assessments of a child's progress are not bureaucratic, but an essential component of good instruction.

*Changes:* None.

*Comment:* Several commenters requested definitions for "repeated assessments" and "reasonable intervals."

*Discussion:* Instructional models vary in terms of the frequency and number of repeated assessments that are required to determine a child's progress. It would be inappropriate for the Department to stipulate requirements in Federal regulations that would make it difficult for districts and States to implement instructional models they determine appropriate to their specific jurisdictions.

*Changes:* None.

*Comment:* One commenter recommended removing the requirement for data-based documentation of repeated assessments of achievement at reasonable intervals because it would make it impossible to determine eligibility if a child is new to a school district and district personnel do not have a child's records with such information.

*Discussion:* We do not believe removing the requirement is the appropriate solution to the commenter's problem. States will need to adopt criteria for determining how to provide such data for children new to a district. Children should not be identified as having SLD if there is no evidence of appropriate instruction.

*Changes:* None.

*Comment:* One commenter expressed concern that § 300.309(b)(2), requiring parents to be informed of their child's repeated failure to perform well on assessments, could be interpreted to refer to the assessments under the ESEA and that this would mean that a child must perform poorly over a period of several school years to be considered for eligibility under the category of SLD.

*Discussion:* While the results of a child's performance on assessments

under the ESEA may be included as data documenting a child's progress, relying exclusively on data from Statewide assessments under the ESEA would likely not meet the requirement for repeated assessments at "reasonable intervals," as required by these regulations. It is possible that a State could develop other assessments tied to the State approved test that would meet these requirements.

*Changes:* None.

*Comment:* Numerous commenters asked how long an intervention should continue before determining a child has not made adequate progress and a referral for an evaluation to determine eligibility for special education is made. Several commenters recommended that if a child is not making progress within 45 days, an evaluation should take place. Other commenters recommended a time limit of 90 days. One commenter recommended the regulations include a range of active intervention days, not just a waiting period, within which the IEP Team expects to notice a change, and recommended between 45–75 school days. One commenter suggested 6–10 weeks as an appropriate period of time.

A few commenters recommended requiring States to establish reasonable time limits for decision making. Several commenters recommended requiring the IEP Team and the parents to agree on an appropriate period of time.

Several commenters stated that unless a timeline is specified in the regulations, there would be different standards occurring throughout the country. A few commenters expressed concern that if time limits were not clarified, school districts and parents would interpret the timelines differently, which would result in contentious situations and litigation. One commenter stated that a parent could sue for compensatory services if, after requesting an evaluation, the LEA requires an assessment of how the child responds to high quality research-based instruction.

Several commenters stated that the lack of a specific timeline means that an evaluation could be indefinitely delayed and children denied services. Several commenters recommended adding language to the regulations to ensure that RTI models could not be used to delay an evaluation of a child suspected of having a disability, access to special education and related services, or protections under the Act.

In addition to requesting a definition of an "appropriate period of time," a few commenters requested a definition of "adequate progress" and recommended adding language to

**46658**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

require States to define "adequate progress." One commenter stated that a child's rate of learning needs to be examined carefully. One commenter offered a definition of a "developmentally appropriate rate" as the time or the number of repetitions required to have at least 85 percent of children at the same age or grade level acquire and retain the particular skill or academic levels, as established by research or by experience with the delivery of that curriculum or program.

*Discussion:* Instructional models vary in terms of the length of time required for the intervention to have the intended effect on a child's progress. It would not be appropriate for the Department to establish timelines or the other requirements proposed by the commenters in Federal regulations, because doing so would make it difficult for LEAs to implement models specific to their local school districts. These decisions are best left to State and local professionals who have knowledge of the instructional methods used in their schools.

The Department believes that good instruction depends on repeated assessments of a child's progress. This allows teachers to make informed decisions about the need to change their instruction to meet the needs of the child, and also provides parents with information about their child's progress so that they can support instruction and learning at home. Parents should be informed if there are concerns about their child's progress and should be aware of the strategies being used to improve and monitor their child's progress.

We understand the commenters' requests for more specific details on timelines and measures of adequate progress. However, as noted above, these decisions are best left to professionals who have knowledge about the instructional models and strategies used in their States and districts.

We also understand the commenters' concerns that the requirements in § 300.309(b) may result in untimely evaluations or services and that parents must be fully informed about the school's concerns about their child's progress and interventions provided by the school. Therefore, we will combine proposed § 300.309(c) and (d), and revise the new § 300.309(c) to ensure that the public agency promptly requests parental consent to evaluate a child suspected of having an SLD who has not made adequate progress when provided with appropriate instruction, which could include instruction in an RTI model, and whenever a child is referred for an evaluation. We will also add a new § 300.311(a)(7)(ii) to ensure that the parents of a child suspected of having an SLD who has participated in a process that evaluates the child's response to scientific, research-based intervention, are notified about the State's policies regarding collection of child performance data and the general education services that will be provided; strategies to increase their child's rate of learning; and their right to request an evaluation at any time. If parents request an evaluation and provide consent, the timeframe for evaluation begins and the information required in § 300.309(b) must be collected (if it does not already exist) before the end of that period.

*Changes:* We have combined proposed § 300.309(c) and (d), and revised the new paragraph (c) in § 300.309 to require the public agency to promptly request parental consent to evaluate a child suspected of having an SLD who has not made adequate progress when provided appropriate instruction, and whenever a child is referred for an evaluation. We also have added a new § 300.311(a)(7)(ii) to require that the eligibility report include evidence that when a child has participated in an RTI process, the parents were informed of State policies regarding child performance data that would be collected and the general education services that would be provided; strategies to support the child's rate of learning; and a parent's right to request an evaluation at any time.

*Comment:* Many commenters recommended clarifying when parental consent for evaluation should be obtained and when the 60-day timeline to complete an evaluation begins. Several commenters recommended ensuring that the 60-day timeline for evaluation applies regardless of the evaluation model used. One commenter asked how scientific research-based interventions could be completed within a 60-day evaluation timeline. One commenter stated that 60 days may not be enough time to appropriately determine whether a child responds to instruction, particularly for children who have not had exposure to such interventions (e.g., children entering the public school system for the first time). One commenter asked if the intent of the regulations is to allow a determination that a child has an SLD to take place outside the timeline for an initial evaluation, and stated that without clarification of the intersection between an RTI process (that may, by definition, require additional time beyond that which is permitted for an evaluation) and the required period of time for an initial assessment, the regulations would cause confusion and result in improper evaluations and eligibility determinations.

Several commenters recommended that the regulations address the need for an extension of the timeline and allow States to set an alternative timeline without a written agreement. Several commenters requested adding a provision for an extended timeline, with parental consent, in exceptional circumstances. Several commenters stated that the language regarding an extension of timelines is confusing.

*Discussion:* Section 300.309(c), as revised, clarifies that if a child has not made adequate progress after an appropriate period of time, a referral for an evaluation must be made. As required in § 300.301(c), the initial evaluation must be conducted within 60 days of receiving consent for an evaluation (or if the State establishes a timeframe within which the evaluation must be completed, within that timeframe). Models based on RTI typically evaluate the child's response to instruction prior to the onset of the 60-day period, and generally do not require as long a time to complete an evaluation because of the amount of data already collected on the child's achievement, including observation data. RTI models provide the data the group must consider on the child's progress when provided with appropriate instruction by qualified professionals as part of the evaluation.

Section 300.309(b)(1) requires that the eligibility group consider data on the child's progress when provided with appropriate instruction by qualified professionals as part of this evaluation. These data, along with other relevant information, will assist the eligibility group in determining whether the child's low achievement is attributable to a lack of appropriate instruction. As required in § 300.306(b)(1)(i) and (ii), consistent with section 614(b)(5)(A) and (B) of the Act, a child cannot be identified as a child with a disability if the determinant factor for that determination is lack of appropriate instruction in reading or math.

Based on their review of the existing data, and input from the child's parents, the eligibility group must decide, on a case-by-case basis, depending on the needs of the child and the information available regarding the child, what additional data, if any, are needed to determine whether the child is a child with a disability, and the educational needs of the child. If the eligibility group determines that additional data are needed and that these data cannot be

**Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations     **46659**

obtained within the 60-day timeframe (or the timeframe established by the State), new § 300.309(c) (proposed § 300.309(d)) allows the extension of the timeframe with mutual written agreement of the child's parent and the eligibility group.

*Changes:* None.

*Comment:* One commenter asked how the 60-day timeframe would be followed if the time extends over school breaks.

*Discussion:* The 60-day timeframe refers to 60 calendar days and would include school breaks.

*Changes:* None.

*Comment:* Several commenters stated that the regulations appear to set up a separate process and procedure for the evaluation and identification of children with SLD, and then impose the timeframe and procedures that apply to the evaluation of all other disability categories. One commenter stated that the timeframe for evaluating children with SLD is less stringent than for other disability categories and is, therefore, discriminatory.

*Discussion:* Although there are additional criteria and procedures for evaluating and identifying children suspected of having SLD, the group must also comply with the procedures and timelines that apply to all evaluations, including evaluations for SLD. Evaluation of children suspected of having SLD must follow the same procedures and timeframes required in §§ 300.301 through 300.306, in addition to those in §§ 300.307 through 300.311.

*Changes:* None.

*Comment:* One commenter stated that "appropriate period of time" should be replaced with "reasonable period of time" because courts are accustomed to deciding what constitutes a reasonable timeframe in various evaluation contexts.

*Discussion:* It is not necessary to change "appropriate period of time" to "reasonable period of time," because the terms here have similar meanings and are commonly understood to be synonymous.

*Changes:* None.

*Comment:* One commenter requested that the regulations clarify who should refer a child for an evaluation to determine eligibility for special education services.

*Discussion:* Under § 300.301(b), and consistent with the requirements in § 300.300 and section 614(a)(1)(D) of the Act, either a parent of a child or a public agency may initiate a request for an evaluation at any time to determine if the child is a child with a disability. We do not believe that further clarification is necessary.

*Changes:* None.

*Comment:* One commenter stated that a school district should retain its discretion not to evaluate a child subject to the parent's right to contest the decision through due process procedures.

*Discussion:* The commenter's concern is already addressed in § 300.111, which provides that an LEA must identify, locate, and evaluate children who are in need of special education and related services. If an LEA refuses to evaluate a child, the LEA must provide prior written notice, consistent with § 300.503 and section 615(b)(3) of the Act. The parent can challenge this decision through a due process hearing.

*Changes:* None.

**Observation (§ 300.310)**

*Comment:* Many commenters recommended removing the observation requirements in § 300.310, stating that they are costly and overly prescriptive and have no statutory basis. One commenter stated that the requirements for determining eligibility under the category of SLD are so specific that the observation requirements are unnecessary.

*Discussion:* The observation requirements for children suspected of having SLD have been in the regulations since before 1983. Important information can be obtained about a child through observation in the classroom, or for a child less than school age, in an environment appropriate for a child of that age. Objective observations are essential to assessing a child's performance and should be a part of routine classroom instruction and are not costly or overly prescriptive. We believe the observation requirements are an important matter to regulate clearly. We will, therefore, change § 300.310(a) through § 300.310(c) to clearly state that the public agency must ensure appropriate observation and documentation of the child's academic performance and behavior in the areas of difficulty to determine whether a child has an SLD.

*Changes:* We have changed § 300.310(a) through § 300.310(c) to clearly state the observation requirements in determining whether a child has an SLD.

*Comment:* Several commenters supported requiring a member of the group to be trained in observation. Many commenters requested clarification regarding what it means to be trained in observation. One commenter stated that there are no established training protocols or uniform professional standards for conducting an observation.

*Discussion:* We agree that the requirement for an individual to be trained in observation is unclear and should be removed. States are responsible for determining specific personnel qualification requirements, and, for the reasons stated under § 300.308, States and LEAs should determine appropriate group membership.

*Changes:* We have removed the phrase "trained in observation" from § 300.310(a).

*Comment:* Several commenters stated that the public agency should determine the most appropriate individual to conduct the observation. One commenter recommended specifying a reading specialist to conduct the observation when the child's learning problems involve reading. Another commenter stated that the observer should not be limited to a member of the eligibility group. One commenter stated that it is not necessary to obtain parental consent for the observation.

*Discussion:* The person conducting the observation should be a member of the eligibility group because information from the observation will be used in making the eligibility determination. If information is available from an observation conducted as part of routine classroom instruction that is important for the eligibility group to consider, the eligibility group should include the person who conducted that routine classroom. This will eliminate redundant observations and save time and resources. Parental consent is not required for observations conducted as part of routine classroom instruction and monitoring of the child's performance before the child is referred for an evaluation.

If an observation has not been conducted, or additional observation data are needed, the decision as to which person should conduct the observation is best left to members of the eligibility group, based on the type of information that is needed to make the eligibility determination and identify the child's needs. Parental consent is required for observations conducted after the child is suspected of having a disability and is referred for an evaluation. We will revise § 300.310 to clarify the different ways in which observation data may be obtained and to clarify that parental consent is required for observations conducted after the child is suspected of having a disability and is referred for an evaluation.

*Changes:* We have revised § 300.310 to specify in paragraph (a) that the public agency must ensure that the child is observed in the child's learning environment. A new § 300.310(b) has

been added to require the eligibility group to use the information obtained from the routine classroom observation or conduct a new observation and to require parental consent for observations conducted after the child is suspected of having a disability and is referred for an evaluation. Proposed § 300.310(b) has been redesignated as new § 300.310(c).

*Comment:* One commenter requested clarification regarding the definition of an "appropriate" environment in which to conduct the observation of a child who is less than school age, as well as guidance in determining what such an environment would be for children who are out of school.

*Discussion:* The eligibility group is in the best position to determine the environment appropriate for a child who is less than school age or out of school.

*Changes:* None.

*Comment:* One commenter requested clear guidance about the working relationship between the special education teacher and the general education teacher in conducting an observation.

*Discussion:* We decline to provide specific guidance on the working relationship between the special education teacher and the general education teacher in conducting an observation because this relationship will necessarily vary depending on how classrooms are structured and teacher responsibilities assigned. Such decisions are best made at the local level. Generally, we would expect that the child's general education teacher would have data from routine classroom instruction and would work with the other members of the eligibility group to determine what additional data, if any, are needed to determine whether a child has an SLD. A special education teacher who is experienced in working with children with SLD, for example, might have suggestions on ways to structure a particular observation session to obtain any additional information that is needed, and may be able to assist the general education teacher in gathering the data.

*Changes:* None.

*Comment:* One commenter recommended requiring an observation for any child suspected of having a disability, not just those suspected of having an SLD.

*Discussion:* Observation data will generally be a part of the existing data reviewed for any child suspected of having a disability. Section 300.305(a)(1) requires the eligibility group for any child suspected of having a disability to review existing evaluation

data, including classroom-based observations and observations by teachers and related services providers. We do not believe that requiring an observation of children suspected of other disabilities is necessary, however, as identification of those other disabilities is not always as dependent on classroom performance and behavior as is identification of children with SLD.

*Changes:* None.

Specific Documentation for the Eligibility Determination (Proposed Written Report) (§ 300.311)

*Comment:* Several commenters supported the requirements for the written report, stating that they provide a useful framework for practitioners. However, several commenters stated that the requirements for the written report should be removed because they go beyond the requirements of the Act and impose additional procedural and paperwork burdens for school personnel. Several commenters stated that the report is much more detailed than the evaluation and eligibility report for children with other disabilities, and stated that this could discourage schools from evaluating children suspected of having SLD.

*Discussion:* Section 614(b)(4)(B) of the Act requires the public agency to provide a copy of the evaluation report and the documentation of determination of eligibility to the parents for all children evaluated under the Act. Section 300.311 specifies the content for the evaluation report for children suspected of having SLD. States and LEAs have more discretion over the specific content of an evaluation report for children suspected of having a disability under the other disability categories. Therefore, whether the SLD evaluation report is more detailed or burdensome than other evaluation reports would depend on State and local requirements. We believe that the elements of the report specified in § 300.311 provide important checks to prevent misidentification and ensure that children who actually have SLD are identified.

*Changes:* None.

*Comment:* Several commenters recommended that the written report include statements regarding the existence of a psychological processing disorder and the basis for making the determination; whether the child achieved commensurate with the child's age and ability; whether the child achieved commensurate with the child's age and intellectual development; whether the child achieved commensurate with the child's peers;

and whether there are strengths and weaknesses in performance or cognitive abilities in one or more of the areas in § 300.309(a) that require special education and related services.

*Discussion:* We decline to change the content of the written report in the manner recommended by the commenters because the statements that commenters recommended be included in the written report are inconsistent with the eligibility requirements for children with SLD in § 300.309.

*Changes:* None.

*Comment:* One commenter recommended including an assurance that the eligibility determination was made in accordance with § 300.306(c)(1), regarding procedures for determining eligibility and placement, and § 300.8(c)(10), regarding the definition of *specific learning disability.*

*Discussion:* Section 300.311(b) requires each member of the eligibility group to certify in writing whether the report reflects the particular member's conclusion about whether the child has an SLD, and if it does not reflect his or her conclusion, submit a separate statement presenting his or her conclusions. There is no need for any additional assurances.

*Changes:* None.

*Comment:* One commenter stated that including "evaluation report" in the description of the written report is confusing because it is unclear whether the evaluation report is something additional to the written report.

*Discussion:* The information required in the written report in § 300.311 is a part of the documentation of eligibility required in § 300.306(a)(2). Section 300.306(b) and (c) lists the requirements for eligibility determinations for all children suspected of having a disability, including children suspected of having SLD. Section 300.311 provides specific elements that must be addressed in the report for children suspected of having SLD. Two separate reports are not necessary as long as the information in § 300.311 is included in the documentation of the eligibility determination in § 300.306(a)(2). We agree that this should be clarified. Therefore, we will change the heading for § 300.311 from "Written report" to "Specific documentation for the eligibility determination" and will modify the language in § 300.311(a) accordingly.

*Changes:* We have changed the heading for § 300.311 and modified § 300.311(a) to clarify that the requirements in § 300.311 are in addition to the requirements for the documentation of the eligibility

determination required in § 300.306(a)(2).

*Comment:* Several commenters requested that the written report include the determination of the group concerning the effects of cultural factors, limited English proficiency, and environmental or economic disadvantage to be consistent with all the elements in § 300.309(a)(3).

*Discussion:* We agree that it is important to emphasize the importance of considering such factors in determining eligibility under SLD and will add these factors in § 300.311(a).

*Changes:* We have added a new paragraph (6) to § 300.311(a) to require the written report to include a statement on the effects of cultural factors, limited English proficiency, environmental, or economic disadvantage.

*Comment:* Several commenters requested clarification of what happens if a group member disagrees with the report and agreement is never reached. Other commenters asked whether services are delayed pending a group consensus; whether the submission of a separate statement is synonymous with a veto for eligibility; whether it matters which group member submits a separate report; and whether each group member has equal standing.

*Discussion:* The eligibility group should work toward consensus, but under § 300.306, the public agency has the ultimate responsibility to determine whether the child is a child with a disability. Parents and school personnel are encouraged to work together in making the eligibility determination. If the parent disagrees with the public agency's determination, under § 300.503, the public agency must provide the parent with prior written notice and the parent's right to seek resolution of any disagreement through an impartial due process hearing, consistent with the requirements in § 300.503 and section 615(b)(3) of the Act.

Every effort should be made to resolve differences between parents and school staff through voluntary mediation or some other informal dispute resolution process. However, as stated in § 300.506(b)(1)(ii) and section 615(e)(2)(A)(ii) of the Act, mediation or other informal procedures may not be used to deny or delay a parent's right to a due process hearing, or to deny any other rights afforded under Part B of the Act.

*Changes:* None.

## Individualized Education Programs

Definition of Individualized Education Program (§ 300.320)

General (§ 300.320(a))

We received numerous comments requesting that we require the IEP to include additional content that is not in the Act. Under section 614(d)(1)(A)(ii)(I) of the Act, the Department cannot interpret section 614 of the Act to require public agencies to include additional information in a child's IEP that is not explicitly required under the Act. Therefore, we generally have not included these comments in our analysis and discussion of § 300.320.

*Comment:* One commenter recommended that § 300.320 refer to a "student with a disability" instead of a "child with a disability."

*Discussion:* The words "child" and "student" are used interchangeably throughout the Act. The regulations follow the statutory language whenever possible. In § 300.320, we used the term "child with a disability," consistent with section 614(d) of the Act.

*Changes:* None.

*Comment:* Many commenters recommended that the regulations include a definition of "functional" as it is used, for example, in "functional performance" in § 300.320(a)(1) and "functional goals" in § 300.320(a)(2). Some commenters suggested defining "functional" as the acquisition of essential and critical skills needed for children with disabilities to learn specific daily living, personal, social, and employment skills, or the skills needed to increase performance and independence at work, in school, in the home, in the community, for leisure time, and for postsecondary and other life long learning opportunities. One commenter recommended that the regulations include examples of functional skills and how functional skills should be measured.

*Discussion:* It is not necessary to include a definition of "functional" in these regulations because we believe it is a term that is generally understood to refer to skills or activities that are not considered academic or related to a child's academic achievement. Instead, "functional" is often used in the context of routine activities of everyday living. We do not believe it is necessary to include examples of functional skills in the regulations because the range of functional skills is as varied as the individual needs of children with disabilities. We also decline to include examples of how functional skills are measured because this is a decision that is best left to public agencies, based on

the needs of their children. However, it should be noted that the evaluation procedures used to measure a child's functional skills must meet the same standards as all other evaluation procedures, consistent with § 300.304(c)(1).

*Changes:* None.

*Comment:* One commenter recommended revising § 300.320(a) to state that "an IEP includes" rather than "an IEP must include" in order to reflect the specific language in section 614(d) of the Act. The commenter stated that use of the word "must" limits the contents of an IEP to the items listed in § 300.320(a).

*Discussion:* The word "must" is used in § 300.320(a) to clarify that an IEP is required to include the items listed in § 300.320(a). We believe it is important to retain this language in § 300.320(a). Under section 614(d)(1)(A)(ii)(I) of the Act, section 614 of the Act cannot be interpreted to require content in the IEP beyond that which is specified in the Act.

*Changes:* None.

*Comment:* One commenter requested clarifying the meaning of "appropriate" as used, for example, in § 300.320(a)(1)(ii) to refer to a child's participation in "appropriate" activities.

*Discussion:* The word "appropriate" in these regulations does not have a different meaning from its common usage. Generally, the word "appropriate" is used to mean "suitable" or "fitting" for a particular person, condition, occasion, or place.

*Changes:* None.

*Comment:* Some commenters recommended requiring the IEP to include a statement of the relevant social and cultural background of a child and how those factors affect the appropriate participation, performance, and placement of the child in special education.

*Discussion:* Section 614(d)(1)(A)(ii)(I) of the Act precludes the Department from interpreting section 614 of the Act to require public agencies to include information in a child's IEP other than what is explicitly required in the Act. Therefore, we cannot require the IEP to include the statement requested by the commenters. However, a child's social or cultural background is one of many factors that a public agency must consider in interpreting evaluation data to determine if a child is a child with a disability under § 300.8 and the educational needs of the child, consistent with § 300.306(c)(1)(i).

*Changes:* None.

*Comment:* One commenter stated that adapted physical education should be part of a child's IEP. Another

**46662**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

commenter recommended that travel training be required in the IEP.

*Discussion:* The definition of *special education* in new § 300.39 (proposed § 300.38) includes adapted physical education and travel training. We do not believe adapted physical education and travel training should be mandated as part of an IEP because, as with all special education and related services, each child's IEP Team determines the special education and related services that are needed to meet each child's unique needs in order for the child to receive FAPE. In addition, section 614(d)(1)(A)(ii)(I) of the Act prohibits the Department from interpreting section 614 of the Act to require public agencies to include information in a child's IEP that is not explicitly required under the Act.

*Changes:* None.

*Comment:* One commenter recommended that IEPs include the array of new tools used with nondisabled children, so that children with disabilities have access to the materials they need to progress in the general education curriculum.

*Discussion:* There is nothing in the Act that requires new tools or the same tools or materials used by nondisabled children to be used with children with disabilities or be specified in children's IEPs. Therefore, we cannot make the requested change because section 614(d)(1)(A)(ii)(I) of the Act prohibits the Department from interpreting section 614 of the Act to require public agencies to include information in a child's IEP that is not explicitly required under the Act. Each child's IEP Team determines the special education and related services, as well as supplementary aids, services, and supports that are needed to meet the child's needs in order to provide FAPE consistent with § 300.320(a)(4) and section 614(d)(1)(A)(i)(IV) of the Act.

*Changes:* None.

Present Levels of Academic Achievement and Functional Performance (§ 300.320(a)(1))

*Comment:* A few commenters stated that § 300.320(a)(1) requires an IEP to include a statement of the child's present levels of academic achievement, and recommended that the regulations define "academic achievement."

*Discussion:* "Academic achievement" generally refers to a child's performance in academic areas (e.g., reading or language arts, math, science, and history). We believe the definition could vary depending on a child's circumstance or situation, and therefore, we do not believe a definition of "academic achievement" should be included in these regulations.

*Changes:* None.

*Comment:* Some commenters recommended that the regulations clarify that not every child requires a functional performance statement or functional annual goals. Some commenters stated that requiring functional assessments for all children places an unnecessary burden on an LEA, does not add value for every child, and creates a potential for increased litigation. One commenter recommended that § 300.320(a)(1), regarding the child's present levels of performance, and § 300.320(a)(2), regarding measurable annual goals, clarify that functional performance and functional goals should be included in a child's IEP only if determined appropriate by the child's IEP Team.

*Discussion:* We cannot make the changes requested by the commenters. Section 614(d)(1)(A)(i)(I) of the Act requires an IEP to include a statement of the child's present levels of academic achievement and functional performance.

*Changes:* None.

*Comment:* One commenter requested that the regulations require a child's present levels of performance to be aligned with the child's annual goals. Another commenter stated that the content of the IEP should be aligned with the State's core curriculum content standards and the knowledge and skills needed for children with disabilities to become independent, productive, and contributing members of their communities and the larger society.

*Discussion:* The IEP Team's determination of how the child's disability affects the child's involvement and progress in the general education curriculum is a primary consideration in the development of the child's annual IEP goals. Section 300.320(a)(1)(i), consistent with section 614(d)(1)(A)(i)(I)(aa) of the Act, requires the statement of a child's present levels of performance in the IEP to include how the child's disability affects the child's involvement and progress in the general education curriculum. This directly corresponds with the provision in § 300.320(a)(2)(i)(A) and section 614(d)(1)(A)(i)(II)(aa) of the Act, which requires the IEP to include measurable annual goals designed to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum. We do not believe further clarification is needed regarding the alignment of a child's present levels of performance with the child's annual goals.

With regard to the alignment of the IEP with the State's content standards, § 300.320(a)(1)(i) clarifies that the general education curriculum means the same curriculum as all other children. Therefore, an IEP that focuses on ensuring that the child is involved in the general education curriculum will necessarily be aligned with the State's content standards. Congress acknowledged, in section 601(c)(5)(A) of the Act, that ensuring access to the general education curriculum in the regular classroom, to the maximum extent possible, is also effective in preparing children with disabilities to lead productive and independent adult lives. We do not believe further clarification is necessary to address the commenters' concerns.

*Changes:* None.

Measurable Annual Goals (§ 300.320(a)(2))

*Comment:* One commenter requested clarification as to whether IEP goals must be specific to a particular discipline (e.g., physical therapy goals, occupational therapy goals). One commenter recommended that goals be explicitly defined and objectively measured. Another commenter recommended requiring IEP goals to have specific outcomes and measures on an identified assessment tool. One commenter recommended clarifying that an IEP Team is permitted, under certain circumstances, to write goals that are intended to be achieved in less than one year.

*Discussion:* Section 300.320(a)(2)(i), consistent with section 614(d)(1)(A)(i)(II) of the Act, requires the IEP to include measurable annual goals. Further, § 300.320(a)(3)(i), consistent with section 614(d)(1)(A)(i)(III) of the Act, requires the IEP to include a statement of how the child's progress toward meeting the annual goals will be measured. The Act does not require goals to be written for each specific discipline or to have outcomes and measures on a specific assessment tool. Furthermore, to the extent that the commenters are requesting that we mandate that IEPs include specific content not in section 614(d)(1)(A)(i) of the Act, under section 614(d)(1)(A)(ii)(I), we cannot interpret section 614 to require that additional content. IEPs may include more than the minimum content, if the IEP Team determines the additional content is appropriate.

*Changes:* None.

*Comment:* Some commenters recommended requiring related services in every child's IEP. The commenters stated that related services are necessary

ED-000124

to enhance the overall health and well-being of the child to prevent secondary conditions; ensure that the child progresses towards independent functioning and community integration; increase the child's ability to function and learn in his or her educational environment; develop social interaction skills to enhance a child's ability to communicate, build relationships, and reinforce other positive behavior skills; and further advance the child's ability to complete his or her own educational requirements and goals.

*Discussion:* To require related services for every child with a disability would be inconsistent with the concept of individualization that has been part of the Act since its inception in 1975. Related services are only required to the extent that such services are necessary to enable the child to benefit from special education. Related services, as with any other service in an IEP, are determined on an individual basis by the child's IEP Team.

*Changes:* None.

*Comment:* Many commenters opposed the removal of benchmarks and short-term objectives as required components of the IEP and recommended that States and LEAs be permitted to require benchmarks and short-term objectives for all children with disabilities. Many commenters recommended that the regulations allow the IEP Team to determine whether to include short-term objectives in a child's IEP to measure progress in functional areas that are not measurable through other means.

*Discussion:* Benchmarks and short-term objectives were specifically removed from section 614(d)(1)(A)(i)(II) of the Act. However, because benchmarks and short-term objectives were originally intended to assist parents in monitoring their child's progress toward meeting the child's annual goals, we believe a State could, if it chose to do so, determine the extent to which short-term objectives and benchmarks would be used. However, consistent with § 300.199(a)(2) and sections 608(a)(2) and 614(d)(1)(A)(ii)(I) of the Act, a State that chooses to require benchmarks or short-term objectives in IEPs in that State would have to identify in writing to the LEAs located in the State and to the Secretary that such rule, regulation, or policy is a State-imposed requirement, which is not required by Part B of the Act or the Federal regulations.

*Changes:* None.

*Comment:* A few commenters supported the requirement in § 300.320(a)(2)(ii) for benchmarks or short-term objectives to be developed

for children who take alternate assessments aligned to alternate achievement standards. However, a few commenters stated that limiting short-term objectives to children who take alternate assessments is not acceptable because the one percent limit on the percentage of children who may take alternate assessments is arbitrary.

*Discussion:* The requirement to develop short-term objectives or benchmarks covers all children with disabilities who are assessed using alternate assessments aligned to alternate achievement standards, consistent with section 614(d)(1)(A)(i)(I)(cc) of the Act. The one percent cap referred to by the commenter is not a limit on the number of children who may take an alternate assessment based on alternate achievement standards. Rather, it is a limit on the number of proficient and advanced scores that may be included in calculating adequate yearly progress (AYP) under the ESEA, consistent with 34 CFR § 200.13(c)(1)(ii). As noted previously, the requirement to include benchmarks or short-term objectives for all children with disabilities was specifically removed from section 614(d)(1)(A)(i)(II) of the Act.

*Changes:* None.

*Comment:* One commenter stated that the IEP should not include benchmarks for alternate achievement standards because this would be teaching to the test and would lower expectations for children.

*Discussion:* Section 300.320(a)(2)(ii) requires benchmarks or short-term objectives only for children with disabilities who take alternate assessments aligned to alternate achievement standards. By ''teaching to the test,'' we assume that the commenter believes that a benchmark or short-term objective must be written for each alternate achievement standard. There is no such requirement in the Act or these regulations.

*Changes:* None.

*Comment:* One commenter requested clarification on how schools should determine which children in kindergarten through grade two must have short-term objectives or benchmarks in their IEPs. Another commenter requested clarification on how the requirements for benchmarks or short-term objectives apply to preschoolers.

*Discussion:* Section 300.320(a)(2)(ii), consistent with section 614(d)(1)(A)(i)(I)(cc) of the Act, requires an IEP to include benchmarks or short-term objectives for children with disabilities who take an alternate assessment aligned to alternate

achievement standards. This would apply to preschool children and children with disabilities in kindergarten through grade two only if these children are assessed in a State or districtwide assessment program and the State has opted to develop an alternate assessment based on alternate achievement standards. Under title I of the ESEA, States are only required to assess children in grades 3 through 8 and once in high school, so it is unlikely that even States that choose to develop alternate achievement standards will include this age population in a Statewide assessment program or develop an alternate achievement standard for these children.

*Changes:* None.

*Comment:* One commenter recommended that the regulations require IEP Team members, including the parents, to be involved in developing short-term objectives.

*Discussion:* Sections 300.320 through 300.324 and section 614(d) of the Act are clear that the IEP Team, which includes the parent, is responsible for developing benchmarks or short-term objectives for children who take alternate assessments aligned to alternate achievement standards.

*Changes:* None.

*Comment:* One commenter recommended clarifying that goals and objectives must be aligned with the State's alternate assessment.

*Discussion:* Section 612(a)(16)(C)(ii) of the Act requires alternate assessments to be aligned with the State's challenging academic content standards and academic achievement standards, and if the State has adopted alternate academic achievement standards permitted under 34 CFR § 200.1(d), to measure the achievement of children with disabilities against those standards. Section 614(d)(1)(A)(i)(II) of the Act requires the IEP to include a statement of measurable annual goals, including academic and functional goals, designed to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum. However, there is nothing in the Act that requires a child's IEP goals to be aligned with the State's alternate assessment based on alternate achievement standards. Additionally, for some children, goals may be needed for activities that are not closely related to a State's academic content and academic achievement standards.

*Changes:* None.

*Comment:* A few commenters stated that the regulations should be more specific about what must be included in an IEP goal if benchmarks or short-term

objectives are not required in every child's IEP.

*Discussion:* The regulations are clear on the requirements for IEP goals. Section 300.320(a)(2)(i), consistent with section 614(d)(1)(A)(i)(II) of the Act, requires that annual IEP goals be measurable and designed to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum, and to meet each of the child's other educational needs that result from the child's disability. We believe that these requirements will ensure that progress toward achieving a child's annual goals can be objectively monitored and measured. We do not believe that additional specificity is needed.

*Changes:* None.

*Comment:* One commenter suggested requiring SEAs to ensure that LEAs receive professional development in writing measurable goals and effective methods of measuring progress toward achieving those goals.

*Discussion:* We do not believe that the requested requirement should be included in the regulations. State and local officials are in the best position to determine the training and professional development needs of their personnel.

*Changes:* None.

*Comment:* One commenter recommended retaining current § 300.350, regarding the responsibilities of the public agency to provide special education and related services to a child with a disability in accordance with the child's IEP and to make a good-faith effort to assist the child to achieve the goals and objectives or benchmarks in the IEP.

*Discussion:* The requirement in current § 300.350(a)(1), regarding a public agency's responsibility to provide special education and related services to a child with a disability in accordance with the child's IEP, is unnecessary, because entitlement to FAPE under the Act includes the provision of special education and related services in accordance with an IEP. Paragraphs (a)(2) and (b) in current § 300.350, regarding accountability for a child achieving his or her goals, are unnecessary because other Federal laws, such as title I of the ESEA, already provide sufficient motivation for agency effort to assist children with disabilities in making academic progress. Current § 300.350(c), regarding the rights of parents to invoke due process procedures if a parent feels that efforts are not being made to achieve the IEP goals, is unnecessary because it merely provides explanatory information regarding the due process procedures

for parents and children that are available in §§ 300.500 through 520.

*Changes:* None.

Periodic Progress Reports (§ 300.320(a)(3)(ii))

*Comment:* A few commenters supported the language in § 300.320(a)(3)(ii), which requires the IEP to include a description of when periodic reports on the child's progress toward meeting the annual goals will be provided. However, many commenters recommended retaining current § 300.347(a)(7), which requires parents of a child with a disability to be informed about their child's progress at least as often as parents of nondisabled children and for the report to include information on the extent to which the child's progress is sufficient to enable the child to achieve the goals by the end of the year.

One commenter recommended requiring progress reports to be provided with enough time to allow changes in the IEP if the goals will not be met by the end of the year. A few commenters recommended requiring the reports to explain, in reasonable detail and with specific progress measures, the extent to which the child is making progress on each of the annual goals in the child's IEP. Another commenter recommended requiring LEAs to report progress in measurable terms. The commenter stated that many LEAs convert a measurable objective or goal into subjective and vague language, such as "adequate progress," which does not provide objective measurements of achievement. Another commenter recommended requiring progress reports to be specifically linked to the measurable outcomes of a child's annual goals.

Numerous commenters requested that progress reports be provided with school report cards. However, one commenter stated that not all school districts have quarterly report cards, and, therefore, the regulations should require progress reports to be issued at the same time as other report cards in the district.

*Discussion:* Section 300.320(a)(3)(ii) follows the language in section 614(d)(1)(A)(i)(III) of the Act and requires the IEP to include a description of when periodic reports on the child's progress toward meeting the annual goals will be provided. The Act does not require report cards or quarterly report cards. Report cards and quarterly report cards are used as examples in § 300.320(a)(3)(ii) of when periodic reports on the child's progress toward meeting the annual goals might be provided. The specific times that

progress reports are provided to parents and the specific manner and format in which a child's progress toward meeting the annual goals is reported is best left to State and local officials to determine. In addition, under section 614(d)(1)(A)(i)(I) of the Act we cannot interpret section 614 of the Act to require additional information in a child's IEP that is not specifically required by the Act.

*Changes:* None.

Statement of Special Education and Related Services (§ 300.320(a)(4))

*Comment:* One commenter recommended requiring the regular education teacher to offer modifications for every assignment given to a child with a disability.

*Discussion:* It would be inconsistent with the Act to implement the commenter's recommendation. Consistent with § 300.320(a)(4) and section 614(d)(1)(A)(i)(IV) of the Act, the child's IEP Team determines the special education and related services, and supplementary aids, services, and other supports that are needed for the child to advance appropriately toward meeting the child's annual goals.

*Changes:* None.

*Comment:* A significant number of commenters recommended the regulations include a definition of "peer-reviewed research," as used in § 300.320(a)(4). One commenter recommended that the definition of peer-reviewed research be consistent with the work of the National Research Council.

*Discussion:* "Peer-reviewed research" generally refers to research that is reviewed by qualified and independent reviewers to ensure that the quality of the information meets the standards of the field before the research is published. However, there is no single definition of "peer reviewed research" because the review process varies depending on the type of information to be reviewed. We believe it is beyond the scope of these regulations to include a specific definition of "peer-reviewed research" and the various processes used for peer reviews.

*Changes:* None.

*Comment:* Some commenters recommended revising § 300.320(a)(4) to require special education and related services, and supplementary aids and services, to be based on "evidenced-based practices" rather than "peer-reviewed research." A few commenters recommended revising § 300.320(a)(4) to require special education and related services, and supplementary aids and services to be based on peer-reviewed research, evidenced-based practices,

and emerging best practices. Many commenters recommended clarifying the meaning and intent of the phrase "to the extent practicable." One commenter recommended requiring all IEP Team meetings to include a focused discussion on research-based methods and to provide parents with prior written notice when the IEP Team refuses to provide documentation of research-based methods.

*Discussion:* Section 300.320(a)(4) incorporates the language in section 614(d)(1)(A)(i)(IV) of the Act, which requires that special education and related services and supplementary aids and services be based on peer-reviewed research to the extent practicable. The Act does not refer to "evidenced-based practices" or "emerging best practices," which are generally terms of art that may or may not be based on peer-reviewed research. Therefore, we decline to change § 300.320(a)(4) in the manner suggested by the commenters. The phrase "to the extent practicable," as used in this context, generally means that services and supports should be based on peer-reviewed research to the extent that it is possible, given the availability of peer-reviewed research. We do not believe further clarification is necessary.

We decline to require all IEP Team meetings to include a focused discussion on research-based methods or require public agencies to provide prior written notice when an IEP Team refuses to provide documentation of research-based methods, as we believe such requirements are unnecessary and would be overly burdensome.

*Changes:* None.

*Comment:* One commenter recommended clear guidance on the responsibilities of States, school districts, and school personnel to provide special education and related services, and supplementary aids and services that are based on peer-reviewed research. One commenter requested clarification that the requirement for special education and related services, and supplementary aids and services to be based on peer-reviewed research does not mean that the service with the greatest body of research is the service necessarily required for FAPE. Another commenter requested that the regulations clarify that the failure of a public agency to provide special education and related services, and supplementary aids and services based on peer-reviewed research, does not result in a denial of FAPE, and that the burden of proof is on the moving party when the denial of FAPE is at issue.

*Discussion:* Section 612(d)(1)(A)(i)(IV) of the Act requires special education

and related services, and supplementary aids and services, to be based on peer-reviewed research to the extent practicable. States, school districts, and school personnel must, therefore, select and use methods that research has shown to be effective, to the extent that methods based on peer-reviewed research are available. This does not mean that the service with the greatest body of research is the service necessarily required for a child to receive FAPE. Likewise, there is nothing in the Act to suggest that the failure of a public agency to provide services based on peer-reviewed research would automatically result in a denial of FAPE. The final decision about the special education and related services, and supplementary aids and services that are to be provided to a child must be made by the child's IEP Team based on the child's individual needs.

With regard to the comment regarding the burden of proof when the denial of FAPE is at issue, we have addressed this issue in the *Analysis of Comments and Changes* section for subpart E.

*Changes:* None.

*Comment:* Several commenters recommended including a construction clause in the regulations to clarify that no child should be denied special education and related services, or supplementary aids and services, based on a lack of available peer-reviewed research on a particular service to be provided.

*Discussion:* We do not believe that the recommended construction clause is necessary. Special education and related services, and supplementary aids and services based on peer-reviewed research are only required "to the extent practicable." If no such research exists, the service may still be provided, if the IEP Team determines that such services are appropriate. A child with a disability is entitled to the services that are in his or her IEP whether or not they are based on peer-reviewed research. The IEP Team, which includes the child's parent, determines the special education and related services, and supplementary aids and services that are needed by the child to receive FAPE.

*Changes:* None.

*Comment:* A few commenters recommended that the regulations clarify that the reference to "peer-reviewed research" does not require an IEP to include instructional methodologies. However, a few commenters recommended that the regulations require all elements of a program provided to a child, including program methodology, to be specified in the child's IEP.

*Discussion:* There is nothing in the Act that requires an IEP to include specific instructional methodologies. Therefore, consistent with section 614(d)(1)(A)(ii)(I) of the Act, we cannot interpret section 614 of the Act to require that all elements of a program provided to a child be included in an IEP. The Department's longstanding position on including instructional methodologies in a child's IEP is that it is an IEP Team's decision. Therefore, if an IEP Team determines that specific instructional methods are necessary for the child to receive FAPE, the instructional methods may be addressed in the IEP.

*Changes:* None.

*Comment:* A few commenters requested that the regulations require programs provided to a child with a disability to be research-based with demonstrated effectiveness in addressing the particular needs of a child.

*Discussion:* While the Act clearly places an emphasis on practices that are based on scientific research, there is nothing in the Act that requires all programs provided to children with disabilities to be research-based with demonstrated effectiveness in addressing the particular needs of a child where not practicable. We do not believe the recommended change should be made because, ultimately, it is the child's IEP Team that determines the special education and related services that are needed by the child in order for the child to receive FAPE.

*Changes:* None.

*Comment:* A few commenters recommended that § 300.320(a)(4) specifically refer to assistive technology devices as supplementary aids that must be provided to the child.

*Discussion:* It is not necessary to refer to assistive technology devices in § 300.320(a)(4). Section 300.324(a)(2)(v), consistent with section 614(d)(3)(B)(v) of the Act, already requires the IEP Team to consider whether the child needs assistive technology devices and services.

*Changes:* None.

Participation With Nondisabled Children (§ 300.320(a)(5))

*Comment:* Many commenters recommended that § 300.320(a)(5), regarding the participation of children with disabilities with nondisabled children, follow the language in section 614(d)(1)(A)(i)(V) of the Act and use the term "regular class" instead of "regular educational environment." One commenter stated that parents, school staff, and the community consider the "regular class" to be the place where a

**46666**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

child's nondisabled peers go to school, while "regular educational environment" is interpreted to be anywhere in the school, such as down the hallway, in a separate wing of the school, or across the lunch room. One commenter stated that the term "regular education environment" could be interpreted to mean only special classes such as art, music, and gym. A few commenters recommended defining "regular education environment" to mean the participation of children with disabilities with their nondisabled peers in the regular classroom and other educational settings, including nonacademic settings.

*Discussion:* We agree that use of the term "regular educational environment" may be misinterpreted. Therefore, we will revise § 300.320(a)(5) to require the IEP to include an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class.

*Changes:* We have changed § 300.320(a)(5) to refer to the "regular class" instead of the "regular education environment."

*Comment:* One commenter recommended adding language to § 300.320(a)(5) for preschool children with disabilities and stated that "regular education environment" should be replaced with "settings with typically developing peers."

*Discussion:* Section 300.320(a)(5) follows the language in section 614(d)(1)(A)(i)(V) of the Act and applies to all children with disabilities covered by Part B of the Act, which includes preschool children under section 619 of the Act. We do not believe it is necessary to change the regulations in the manner suggested by the commenter because the "regular class" includes a preschool setting with typically developing peers.

*Changes:* None.

Statewide and Districtwide Assessments (§ 300.320(a)(6))

*Comment:* A few commenters recommended requiring parents to be informed in writing of the consequences of their child taking an alternate assessment, including any effect on the child's eligibility for graduation with a regular high school diploma. The commenters stated that providing this information to parents is particularly important in States that require passing a State exam in order to obtain a regular high school diploma.

*Discussion:* Section 612(a)(16) of the Act requires that the State (or, in the case of a districtwide assessment, the LEA) develop and implement guidelines for the participation of children with

disabilities in alternate assessments, including alternate assessments aligned to alternate achievement standards permitted under 34 CFR 200.1(d). Section 200.6(a)(2)(iii)(A)(2) of the ESEA title I regulations requires States to inform parents that their child's achievement will be measured against alternate achievement standards.

We acknowledge that these requirements do not specifically require a public agency to inform parents of any potential consequences of a child participating in an alternate assessment. The commenters' recommendation will be considered along with other comments we have received in response to the NPRM proposing changes to § 300.160, which was published in the **Federal Register** on December 15, 2005 (70 FR 74624). As noted elsewhere in this preamble, the final regulations for § 300.160, regarding participation in assessments, will be published in a separate final rule.

*Changes:* None.

*Comment:* One commenter recommended defining "appropriate accommodations" and "individual appropriate accommodations" as accommodations that are needed to meet the child's unique needs that maintain and preserve test validity, reliability, and technical testing standards.

*Discussion:* Section 614(d)(1)(A)(i)(VI)(aa) of the Act requires that the IEP include a statement of any individual appropriate accommodations that are necessary to measure the academic and functional performance of the child on State and districtwide assessments. The requirements in proposed § 300.160, published in the **Federal Register** on December 15, 2005, provide additional information about accommodations and the participation of children with disabilities in State and districtwide assessments. As noted elsewhere in this preamble, the final § 300.160 will be published in a separate final rule. We will consider the commenter's recommendation along with other comments received in response to the NPRM proposing changes to § 300.160.

*Changes:* None.

*Comment:* One commenter recommended changing the word "must" in § 300.320(a)(6)(ii) to state that if an IEP Team determines that the child will take an alternate assessment, the IEP "will" include a statement of why the child cannot participate in the regular assessment. The commenter stated that "will" is less coercive and more in line with the consensus decision-making model of IEP Team meetings.

*Discussion:* Generally, we have used the word "must" for regulations that describe what a public agency must do and the word "will" when referring to what the IEP Team has determined a child will do. While we understand the commenter's concern, we believe it is unnecessary to change § 300.320(a)(6)(ii).

*Changes:* None.

*Comment:* One commenter recommended that § 300.320(a)(6) clarify that a child with the most significant cognitive disabilities, who has been determined by the IEP Team to be unable to make progress toward the regular achievement standards even with the best instruction, will be taught and assessed based on alternate achievement standards.

*Discussion:* It would be inappropriate to require a child with the most significant cognitive disabilities to be taught and assessed based on alternate achievement standards. Consistent with section 614(d)(1)(A)(i)(VI)(bb) of the Act, the child's IEP Team is responsible for determining the particular assessment that is appropriate for a child. Under § 200.1(d) of the ESEA title I regulations, a State is permitted, but not required, to adopt alternate achievement standards and develop an alternate assessment based on those standards for children with the most significant cognitive disabilities. There is no requirement under the Act or the ESEA that a State develop an alternate assessment based on alternate achievement standards.

*Changes:* None.

*Comment:* One commenter stated that § 300.320(a)(6) should include information about alternate assessments because there will be children who will not be successful with generic accommodations.

*Discussion:* Section 612(a)(16)(C) of the Act provides information regarding alternate assessments and the requirements for alternate assessments under the Act. As noted elsewhere in this preamble, the final regulations for § 300.160, which will incorporate the requirements in section 612(a)(16) of the Act and provide further clarification regarding the participation of children with disabilities in assessments, will be published in a separate document. We will consider the commenter's recommendation along with other comments received in response to the NPRM proposing changes to § 300.160.

*Changes:* None.

*Comment:* One commenter suggested revising § 300.320(a)(6)(i), which requires the IEP to include a statement of any individual appropriate accommodations that are necessary to

"measure" the academic and functional performance of the child on State and districtwide assessments. The commenter recommended revising the statement to require the IEP to include a statement of any individual appropriate accommodations that are necessary to allow the child to "participate" in assessments.

*Discussion:* To change the regulation in the manner suggested by the commenter would be inconsistent with the Act. Section 300.320(a)(6)(i) reflects the language in section 614(d)(1)(A)(i)(VI)(aa) of the Act and requires accommodations that are necessary to measure a child's performance. Accommodations that allow a child to "participate" in assessments could include accommodations that invalidate the child's test score, thereby resulting in an assessment that does not "measure" a child's performance.

*Changes:* None.

Initiation, Frequency, Location, and Duration of Services (§ 300.320(a)(7))

*Comment:* One commenter recommended clarifying that the term "duration" in § 300.320(a)(7), regarding services and modifications in the IEP, refers to the length of a particular service session and not the entire IEP.

*Discussion:* The meaning of the term "duration" will vary, depending on such things as the needs of the child, the service being provided, the particular format used in an IEP, and how the child's day and IEP are structured. What is required is that the IEP include information about the amount of services that will be provided to the child, so that the level of the agency's commitment of resources will be clear to parents and other IEP Team members. The amount of time to be committed to each of the various services to be provided must be appropriate to the specific service, and clearly stated in the IEP in a manner that can be understood by all involved in the development and implementation of the IEP.

*Changes:* None.

*Comment:* One commenter requested that the regulations require the IEP to include information about the person(s) providing the services, rather than just a listing of the services.

*Discussion:* The Act does not require the IEP to include information about the specific person(s) providing the services. Section 614(d)(1)(A)(ii)(I) of the Act precludes the Department from interpreting section 614 of the Act to require public agencies to include information in the IEP beyond what is specifically required by the Act.

*Changes:* None.

Transition Services (§ 300.320(b))

*Comment:* Many commenters disagreed with changing the age at which transition services must be provided to a child with a disability from 14 years to 16 years. One commenter recommended that transition services begin at age 13. Another commenter recommended that transition services begin before high school, because if there is a choice of high schools, transition goals may be a determining factor in the selection process. A few commenters requested that the regulations clarify that States may continue to begin transition services with the first IEP after the child turns age 14. Some commenters recommended that transition begin two to four full school years before the child is expected to graduate because some children may exit school at age 17.

Numerous commenters recommended that the regulations clarify that States have discretion to require transition services to begin before age 16 for all children in the State. However, a few commenters recommended removing the phrase "or younger if determined appropriate by the IEP Team" in § 300.320(b) because the language is not in the Act and promotes additional special education services.

A few commenters recommended that the regulations require transition planning to begin earlier than age 16 if necessary for the child to receive FAPE. Other commenters recommended clarifying that, in order for transition services to begin by age 16, transition assessments and other pre-planning needs that would facilitate movement to post-school life must be completed prior to the child's 16th birthday. One commenter recommended requiring transition planning to begin no later than the child's freshman year in high school and that this planning include selecting assessment instruments and completing assessments that will lead to the development of transition goals and objectives in the child's IEP.

*Discussion:* Section 614(d)(1)(A)(i)(VIII) of the Act requires that transition services begin no later than the first IEP to be in effect when the child turns 16. Because IEP Team decisions must always be individualized, we have included the phrase "or younger if determined appropriate by the IEP Team" in § 300.320(b).

The Act does not require transition planning or transition assessments, as recommended by some commenters. Therefore, consistent with section 614(d)(1)(A)(ii)(I) of the Act, we cannot interpret section 614 of the Act to require that IEPs include this information because it is beyond what is specifically required in the Act.

The Department believes that a State could require transition services, if it chose to do so, to begin before age 16 for all children in the State. However, consistent with § 300.199(a)(2) and section 608(a)(2) of the Act, a State that chooses to require transition services before age 16 for all children would have to identify in writing to its LEAs and to the Secretary that such rule, regulation, or policy is a State-imposed requirement that is not required by Part B of the Act and Federal regulations.

*Changes:* None.

*Comment:* A few commenters recommended that § 300.320(b) clarify that the child is a participating IEP Team member and that the IEP Team is required to consider the child's preferences in developing transition goals and services.

*Discussion:* The clarification requested is not needed because § 300.321(b)(1) already requires the public agency to invite a child with a disability to attend the child's IEP Team meeting, if a purpose of the meeting is to consider the child's postsecondary goals and the transition services needed to assist the child to reach those goals. In addition, § 300.321(b)(2) requires the public agency to take steps to ensure that the child's preferences and interests are considered, if the child does not attend the IEP Team meeting. We believe that this is sufficient clarification that, for the purposes mentioned by the commenter, the child is a participating IEP Team member.

*Changes:* None.

*Comment:* A few commenters requested that the regulations clarify whether "transition assessments" are formal evaluations or competency assessments. One commenter stated that transition assessments should be different for a college-bound child with a disability than for a child with severe disabilities whose future is a group home.

*Discussion:* We do not believe the requested clarification is necessary because the specific transition assessments used to determine appropriate measurable postsecondary goals will depend on the individual needs of the child, and are, therefore, best left to States and districts to determine on an individual basis.

*Changes:* None.

*Comment:* One commenter requested clarification of the term "postsecondary goals." Another commenter recommended defining "postsecondary

goals'' in the definition section of these regulations.

*Discussion:* We do not believe it is necessary to include a definition of ''postsecondary goals'' in the regulations. The term is generally understood to refer to those goals that a child hopes to achieve after leaving secondary school (i.e., high school).

*Changes:* None.

*Comment:* One commenter requested clarification regarding whether § 300.320(b)(1) requires measurable postsecondary goals in each of the areas of training, education, employment, and, independent living skills.

*Discussion:* Beginning not later than the first IEP to be in effect when the child turns 16 years of age, section 614(d)(1)(A)(i)(VIII)(aa) of the Act requires a child's IEP to include measurable postsecondary goals in the areas of training, education, and employment, and, where appropriate, independent living skills. Therefore, the only area in which postsecondary goals are not required in the IEP is in the area of independent living skills. Goals in the area of independent living are required only if appropriate. It is up to the child's IEP Team to determine whether IEP goals related to the development of independent living skills are appropriate and necessary for the child to receive FAPE.

*Changes:* None.

*Comment:* Some commenters recommended that the regulations retain the requirement in current § 300.347(b)(1) that requires IEPs to include a statement of the transition service needs of the child under applicable components of the child's IEP that focus on the child's courses of study (such as participation in advanced-placement courses or a vocational education program).

*Discussion:* The requirement referred to by the commenter is already in the regulations. Section 300.320(b)(2) includes a reference to ''courses of study'' as part of transition services, consistent with section 614(d)(1)(A)(i)(VIII)(bb) of the Act. The examples in current § 300.347(b)(2) (i.e., advanced placement course or a vocational education program) are not included in § 300.320(b)(2) because we do not believe they are necessary to understand and implement the requirement.

*Changes:* None.

*Comment:* Several commenters recommended that the regulations explicitly require transition services to include vocational and career training through work-study and documentation of accommodations needed in the workplace.

*Discussion:* The Act does not require IEPs to include vocational and career training or documentation of workplace accommodations. Consistent with section 614(d)(1)(A)(ii)(I) of the Act, we cannot interpret section 614 of the Act to require IEPs to include information beyond what is specifically required in the Act. It is up to each child's IEP Team to determine the transition services that are needed to meet the unique transition needs of the child.

*Changes:* None.

*Comment:* A few commenters recommended that the regulations clarify that schools can use funds provided under Part B of the Act to support children in transitional programs on college campuses and in community-based settings.

*Discussion:* We do not believe that the clarification requested by the commenters is necessary to add to the regulations because, as with all special education and related services, it is up to each child's IEP Team to determine the special education and related services that are needed to meet each child's unique needs in order for the child to receive FAPE. Therefore, if a child's IEP Team determines that a child's needs can best be met through participation in transitional programs on college campuses or in community-based settings, and includes such services on the child's IEP, funds provided under Part B of the Act may be used for this purpose.

*Changes:* None.

*Comment:* One commenter recommended more accountability for transition services.

*Discussion:* The Act contains significant changes to the monitoring and enforcement requirements under Part B of the Act. Section 300.600, consistent with section 616(a) of the Act, requires the primary focus of monitoring to be on improving educational results and functional outcomes for children with disabilities. The provisions in section 616(a) and (b)(2)(C)(ii) of the Act set forth the responsibility of States to monitor the implementation of the Act, enforce the Act, and annually report on performance of the State and each LEA.

Section 300.600(c), consistent with section 616(a)(3) of the Act, requires States to measure performance in monitoring priority areas using quantifiable indicators and such qualitative indicators as are needed to adequately measure performance. Section 300.601 reflects statutory language in section 616(b) of the Act and requires States to have a performance plan that evaluates their efforts to implement the requirement

and purposes of the Act. Transition services are specifically being addressed in State performance plans. We believe that these changes to the monitoring and enforcement requirements will ensure that States and LEAs are held accountable for the transition services they provide.

*Changes:* None.

*Comment:* One commenter requested that the regulations be revised to include an affirmative statement that transition services can be used to drive the IEP for the child.

*Discussion:* It would be inappropriate to include such a requirement in these regulations because, while section 614(d)(1)(A)(i)(VIII) of the Act includes transition services in a child's IEP, there is no suggestion that it be the only component or the component that governs a child's IEP.

*Changes:* None.

Transfer of Rights at Age of Majority (§ 300.320(c))

*Comment:* One commenter recommended that the regulations specify how the child is to be informed of the transfer of rights. The commenter also recommended that the regulations require public agencies to explain to the child the rights that will transfer to the child on reaching the age of majority.

*Discussion:* The specific manner in which a child is informed about his or her rights is best left to States, districts, and IEP Teams to decide, based on their knowledge of the child and any unique local or State requirements. Section 300.320(c), consistent with section 614(d)(1)(A)(i)(VIII)(cc) of the Act, already requires the IEP to include a statement that the child has been informed of the child's rights under Part B of the Act, if any, that will transfer to the child on reaching the age of majority. We do not believe further clarification is necessary.

*Changes:* None.

*Comment:* One commenter stated that § 300.320(c) is redundant with § 300.520.

*Discussion:* Sections 300.320 and 300.520 are related, but not redundant. Section 300.320(c) requires the IEP to include a statement that the child has been informed of the child's rights under Part B of the Act that will transfer to the child on reaching the age of majority. Section 300.520 provides additional information about the transfer of rights as part of the procedural safeguards for parents and children under the Act.

*Changes:* None.

ED-000130

Construction (§ 300.320(d))

*Comment:* One commenter stated that § 300.320(d)(2) constrains States and LEAs from adding elements to the IEP and misses the opportunity to make sense of the one percent and two percent rules under the ESEA. One commenter recommended that the regulations explicitly state that nothing limits a State from adding its own mandatory components of the IEP, especially given the purpose and intent to align the Act with the ESEA.

*Discussion:* There is nothing in the Act that limits States and LEAs from adding elements to the IEP, so long as the elements are not inconsistent with the Act or these regulations, and States do not interpret the Act to require these additional elements. Section 300.320(d), consistent with section 614(d)(1)(A)(ii)(I) of the Act, does not prohibit States or LEAs from requiring IEPs to include information beyond that which is explicitly required in section 614 of the Act. However, if a State requires IEPs to include information beyond that which is explicitly required in section 614 of the Act, the State must identify in writing to its LEAs and the Secretary that it is a State-imposed requirement and not one based on the Act or these regulations, consistent with § 300.199(a)(2) and section 608(a)(2) of the Act.

*Changes:* None.

IEP Team (§ 300.321)

*Comment:* One commenter recommended that the regulations clarify whether regular education teachers are required at every IEP Team meeting.

*Discussion:* Consistent with § 300.321(a)(2) and section 614(d)(1)(B)(ii) of the Act, a regular education teacher is a required member of an IEP Team if the child is, or may be, participating in the regular education environment. In such cases, the regular education teacher would be expected to attend each IEP Team meeting, unless the regular education teacher has been excused from attending a meeting, pursuant to § 300.321(e) and section 614(d)(1)(C) of the Act. We do not believe further clarification is necessary.

*Changes:* None.

*Comment:* Many comments were received recommending that the IEP Team include additional members beyond those required by § 300.321(a). Several commenters stated that occupational therapists should be part of the IEP Team because of their unique training in assisting children to learn in changing environments. A few commenters recommended that a recreation therapist or specialist be included on the IEP Team. Other commenters stated that a practitioner skilled in assistive technology should be included. Several commenters recommended that the IEP Team include individuals with knowledge or special expertise regarding the related services needs of a child.

Some commenters stated that individuals from the child welfare system should be included as members of the IEP Team and should be invited to attend IEP Team meetings when the purpose of the meeting is to consider transition services for a child who is a ward of the State or in the custody of the child welfare agency. The commenters recommended that the IEP Team should specifically include any of the following individuals: The child's attorney or guardian *ad litem*, court appointed special advocate, caseworker, foster parent, caretaker, or judge.

*Discussion:* It would be inappropriate to require that individuals with specific professional knowledge or qualifications attend all IEP Team meetings. These decisions should be made on a case-by-case basis in light of the needs of a particular child. Section 300.321(a)(6), consistent with section 614(d)(1)(B)(vi) of the Act, already allows other individuals who have knowledge or special expertise regarding the child, including related services personnel, as appropriate, to be included as members of a child's IEP Team at the discretion of the parent or the agency. Therefore, we decline to make the changes recommended by the commenters. However, it should be noted that if a public agency wishes to invite officials from another agency, such as officials of the child welfare agency that are not representing the child, the public agency must obtain parental consent for the individual to participate in the IEP Team meeting because confidential information about the child from the child's education records would be shared at the meeting.

*Changes:* None.

*Comment:* A few commenters recommended that the IEP Team include a representative of the private school or facility when an IEP is developed for a child in a private school.

*Discussion:* We believe the commenters' concerns are already addressed in the regulations. Section 300.325(a) requires that, before a public agency places a child with a disability in, or refers a child to, a private school or facility, the agency must initiate and conduct a meeting to develop an IEP for the child and must ensure that a representative of the private school or facility attends the meeting.

*Changes:* None.

*Comment:* A few commenters stated that the IEP Team should include other persons whose presence on the IEP Team would be beneficial to the child, regardless of their academic qualifications. Other commenters recommended that the IEP Team include credentialed and licensed personnel, even though it is important to recognize that people who are not credentialed have important roles to play.

*Discussion:* We believe the commenters' concerns are already addressed. Section 614(d)(1)(B)(vi) of the Act states that other individuals who have knowledge or special expertise regarding the child may be included as members of a child's IEP Team at the discretion of the parent or the agency. Consistent with § 300.321(c), the party (parents or public agency) who invites the individual to be a member of the IEP Team determines the knowledge or special expertise of such individual.

*Changes:* None.

*Comment:* Several commenters recommended that the IEP Team include an IEP manager who would communicate with IEP members not in attendance, ensure that the IEP requirements are met, and assume responsibility for implementing the IEP.

*Discussion:* The Act does not require an IEP Team manager as a part of the IEP Team. While having one individual manage the provision of services under the IEP might be a good practice in particular circumstances, we decline to require IEP Team managers for all IEPs because, in many cases, it would be unnecessary. In addition, to ensure that all IEP Team members are aware of their responsibilities regarding the implementation of a child's IEP, § 300.323(d) requires that the child's IEP be accessible to each regular education teacher, special education teacher, related services provider, and any other service provider who is responsible for its implementation.

*Changes:* None.

*Comment:* A few commenters recommended that the special education teacher on a child's IEP Team should be required to have expertise in the area of the child's disability. The commenters stated that this is especially important for children with dyslexia and children with other learning disabilities.

A few commenters recommended that the child's future teacher be required to attend an end-of-the-year IEP Team meeting.

*Discussion:* Section 612(d)(1)(B)(iii) of the Act requires that not less than one special education teacher of the child (or where appropriate, not less than one special education provider of the child) be included on the IEP Team. Decisions as to which particular teacher(s) or special education provider(s) are members of the IEP Team and whether IEP Team meetings are held at the end of the school year or some other time, are best left to State and local officials to determine, based on the needs of the child.

*Changes:* None.

*Comment:* A few commenters recommended defining "regular education environment" in § 300.321(a)(2) to mean the regular classroom and the non-academic environment. A few commenters requested that the regulations require children to be in the regular classroom and in nonacademic activities with their nondisabled peers.

*Discussion:* It is not necessary to define "regular education environment" or to repeat that children with disabilities should be included in the regular classroom and in nonacademic activities with their nondisabled peers. The LRE requirements in §§ 300.114 through 300.120, consistent with section 612(a)(5) of the Act, are clear that each public agency must ensure that, to the maximum extent appropriate, children with disabilities are educated with children who are nondisabled. Section 300.117, consistent with section 612(a)(5) of the Act, is clear that this includes nonacademic and extracurricular services and activities.

*Changes:* None.

*Comment:* A few commenters stated that a special education provider should be allowed to substitute for a special education teacher only when the child does not have a special education teacher because the role of a special education teacher is different from the role of a special education provider.

*Discussion:* The recommended change is not appropriate. Section 300.321(a)(2) incorporates the language in section 614(d)(1)(B)(iii) of the Act and requires the IEP Team to include not less than one special education teacher, or where appropriate, not less than one special education provider. The special education provider may substitute when there is no special education teacher. However, the Act leaves open the possibility that there may be other appropriate circumstances when a special education provider could substitute for a special education teacher. These are decisions best left to State and local officials.

*Changes:* None.

*Comment:* A few commenters recommended that the regulations define "special education teacher" and "special education provider," as used in § 300.321(a)(3).

*Discussion:* Section 300.321(a)(3), consistent with section 614(d)(1)(B)(iii) of the Act, requires that the IEP Team include not less than one special education teacher, or where appropriate, not less than one special education provider of the child. This is not a new requirement. The same requirement is in current § 300.344(a)(3). As noted in Attachment I of the March 12, 1999 final regulations, the special education teacher or provider who is a member of the child's IEP Team should be the person who is, or will be, responsible for implementing the IEP. For example, if the child's disability is a speech impairment, the special education teacher or special education provider could be the speech language pathologist. We do not believe that further clarification is needed.

*Changes:* None.

*Comment:* Many commenters recommended that the regulations require the IEP Team to include a representative of the public agency who has the authority to commit resources. One commenter stated that the failure of this individual to attend an IEP Team meeting lengthens the decision-making process, delays services, and removes parents from equal participation in an IEP Team meeting.

*Discussion:* Section 300.321(a)(4) incorporates the language in section 614(d)(1)(B)(iv) of the Act and requires the IEP Team to include a representative of the public agency who is qualified to provide or supervise the provision of specially designed instruction to meet the unique needs of children with disabilities; is knowledgeable about the general education curriculum; and is knowledgeable about the availability of LEA resources.

A public agency may determine which specific staff member will serve as the agency representative in a particular IEP Team meeting, so long as the individual meets these requirements. It is important, however, that the agency representative have the authority to commit agency resources and be able to ensure that whatever services are described in the IEP will actually be provided. However, we do not need to regulate in the manner suggested, as the public agency will be bound by the IEP that is developed at an IEP Team meeting.

*Changes:* None.

*Comment:* One commenter recommended that the IEP Team include an individual who is qualified to conduct individual diagnostic assessments.

*Discussion:* Section 300.321(a)(5) follows the language in section 614(d)(1)(B)(v) of the Act and requires the IEP Team to include an individual who can interpret the instructional implications of evaluation results. An individual who is qualified to conduct a particular assessment does not necessarily have the skills or knowledge to assist the IEP Team in determining the special education, related services, and other supports that are necessary in order for the child to receive FAPE. Therefore, we do not believe that it is necessary to require that the IEP Team also include an individual who can conduct diagnostic assessments.

*Changes:* None.

*Comment:* A few commenters expressed concern that IEP Team meetings are being used by parent advocates to train parents of other children, and by attorneys to train their associates about the school's IEP process. In order to prevent this, these commenters stated that the regulations should identify the specific knowledge and expertise that an individual must have to be included on an IEP Team. One commenter expressed concern about confidentiality rights; the lack of credentials for advocates; and the lack of authority for a parent or school district to prevent advocates from participating in an IEP Team meeting.

*Discussion:* Section 614(d)(1)(B)(vi) of the Act allows other individuals who have knowledge or special expertise regarding the child to be included on a child's IEP Team. Section 300.321(c) provides that the determination of the knowledge or special expertise of these individuals must be made by the party (parents or public agency) who invited the individual to be a member of the IEP Team. We continue to believe that this determination is best left to parents and the public agency. We also believe that it would be inappropriate to regulate on the specific knowledge and expertise that an individual must have to be included on an IEP Team because it would be burdensome for both parents and public agencies.

Additionally, nothing in the Act prevents parents from consenting to have an observer who is not a member of the IEP Team present at the meeting, as the parent can consent to the sharing of confidential information about the child. With that exception, it should be emphasized that a person who does not have knowledge and special expertise regarding the child and who is not requested to be present at the IEP Team meeting by the parent or public agency would not be permitted to be a member

of the IEP Team or be permitted to attend the IEP Team meeting as an observer.

*Changes:* None.

*Comment:* A few commenters recommended changing § 300.321(a)(7) to clarify that a parent has the right to bring their child to any or all IEP Team meetings at any age.

*Discussion:* We do not believe that the additional clarification requested by the commenters is necessary. Section 614(d)(1)(B)(vii) of the Act clearly states that the IEP Team includes the child with a disability, whenever appropriate. Generally, a child with a disability should attend the IEP Team meeting if the parent decides that it is appropriate for the child to do so. If possible, the agency and parent should discuss the appropriateness of the child's participation before a decision is made, in order to help the parent determine whether or not the child's attendance would be helpful in developing the IEP or directly beneficial to the child, or both.

Until the child reaches the age of majority under State law, unless the rights of the parent to act for the child are extinguished or otherwise limited, only the parent has the authority to make educational decisions for the child under Part B of the Act, including whether the child should attend an IEP Team meeting.

*Changes:* None.

Transition Services Participants (§ 300.321(b))

*Comment:* A few commenters recommended requiring the public agency to invite the child with a disability to attend the child's IEP Team meeting no later than age 16 or at least two years prior to the child's expected graduation, whichever comes first.

*Discussion:* The commenters' concerns are addressed in § 300.321(b), which requires the public agency to invite a child with a disability to attend the child's IEP Team meeting if a purpose of the meeting will be the consideration of the postsecondary goals for the child and the transition services needed to assist the child in reaching the child's postsecondary goals. Furthermore, a child's IEP must include transition services beginning not later than the first IEP to be in effect when the child turns 16, or younger, if determined appropriate by the IEP Team, consistent with § 300.320(b).

*Changes:* None.

*Comment:* One commenter requested that the regulations clarify that parents and children are not required to use the transition services offered by agencies

that the school invites to the IEP Team meeting.

*Discussion:* There is nothing in the Act or these regulations that requires a parent or child to participate in transition services that are offered by agencies that the public agency has invited to participate in an IEP Team meeting. However, if the IEP Team determines that such services are necessary to meet the needs of the child, and the services are included on the child's IEP, and the parent (or a child who has reached the age of majority) disagrees with the services, the parent (or the child who has reached the age of majority) can request mediation, file a due process complaint, or file a State complaint to resolve the issue. We do not believe further clarification in the regulations is necessary.

*Changes:* None.

*Comment:* A few commenters recommended requiring the public agency to include all the notice requirements in § 300.322(b) with the invitation to a child to attend his or her IEP Team meeting. The commenters stated that children need to be fully informed about the details and purpose of the meeting in order for them to adequately prepare and, therefore, should have the same information that is provided to other members of the IEP Team.

*Discussion:* We decline to make the suggested change. We believe it would be overly burdensome to require a public agency to include all the notice requirements in § 300.322(b) with an invitation to a child to attend his or her IEP Team meeting, particularly because the information is provided to the child's parents who can easily share this information with the child. However, when a child with a disability reaches the age of majority under State law, the public agency must provide any notice required by the Act to both the child and the parents, consistent with § 300.520 and section 615(m)(1)(A) of the Act.

*Changes:* None.

*Comment:* One commenter requested clarification regarding the public agency's responsibility to invite a child who has not reached the age of majority to the child's IEP Team meeting when a parent does not want the child to attend.

*Discussion:* Section 300.321(b)(1) requires the public agency to invite a child with a disability to attend the child's IEP Team meeting if a purpose of the meeting will be the consideration of the postsecondary goals for the child and the transition services needed to assist the child in reaching those goals, regardless of whether the child has

reached the age of majority. However, until the child reaches the age of majority under State law, unless the rights of the parent to act for the child are extinguished or otherwise limited, only the parent has the authority to make educational decisions for the child under Part B of the Act, including whether the child should attend an IEP Team meeting.

*Changes:* None.

*Comment:* A few commenters expressed concern that § 300.321(b) does not require children to have sufficient input as a member of the IEP Team and recommended requiring the IEP Team to more strongly consider the child's preferences and needs.

*Discussion:* Section 300.321(a)(7) includes the child as a member of the IEP Team, when appropriate, and § 300.321(b)(1) requires the public agency to invite the child to the child's IEP Team meeting when the purpose of the meeting will be the consideration of the postsecondary goals for the child and the transition services needed to assist the child in reaching those goals. Further, if the child does not attend the IEP Team meeting, § 300.321(b)(2) requires the public agency to take other steps to ensure that the child's preferences and interests are considered. We believe this is sufficient to ensure that the child's preferences and needs are considered and do not believe that any changes to § 300.321(b) are necessary.

*Changes:* None.

*Comment:* One commenter stated that the requirements in § 300.321(b), regarding transition services participants, are not in the Act, are too rigid, and should be modified to provide more flexibility for individual children.

*Discussion:* We believe that, although not specified in the Act, the requirements in § 300.321(b) are necessary to assist children with disabilities to successfully transition from high school to employment, training, and postsecondary education opportunities. We believe it is critical for children with disabilities to be involved in determining their transition goals, as well as the services that will be used to reach those goals. Section 300.321(b), therefore, requires the public agency to invite the child to attend IEP Team meetings in which transition goals and services will be discussed. If the child does not attend the IEP Team meeting, § 300.321(b)(2) requires the public agency to take other steps to ensure that the child's preferences and interests are considered.

We also believe that, when it is likely that a child will be involved with other

**46672**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

agencies that provide or pay for transition services or postsecondary services, it is appropriate (provided that the parent, or a child who has reached the age of majority, consents) for representatives from such agencies to be invited to the child's IEP Team meeting. The involvement and collaboration with other public agencies (e.g., vocational rehabilitation agencies, the Social Security Administration) can be helpful in planning for transition and in providing resources that will help children when they leave high school. We believe that children with disabilities will benefit when transition services under the Act are coordinated with vocational rehabilitation services, as well as other supports and programs that serve all children moving from school to adult life. Therefore, we decline to change the requirements in § 300.321(b).

*Changes:* None.

*Comment:* One commenter stated that § 300.321(b)(1), which requires the public agency to invite the child to an IEP Team meeting when transition is to be considered, duplicates § 300.321(a)(7), which requires a child with a disability to be invited to his or her IEP Team meeting, whenever possible.

*Discussion:* These two provisions are not redundant. Section 300.321(a)(7) requires the public agency to include the child with a disability, when appropriate (not "whenever possible," as stated by the commenter), in the child's IEP Team meeting, and, thus, provides discretion for the parent and the public agency to determine when it is appropriate to include the child in the IEP Team meeting. Section 300.321(b), on the other hand, requires a public agency to invite a child to attend an IEP Team meeting when the purpose of the meeting will be to consider the postsecondary goals for the child and the transition services needed to assist the child to reach those goals. The Department believes it is important for a child with a disability to participate in determining the child's postsecondary goals and for the IEP Team to consider the child's preferences and interests in determining those goals.

*Changes:* None.

*Comment:* Many commenters recommended removing the requirement in § 300.321(b)(3) for parental consent (or consent of a child who has reached the age of majority) before inviting personnel from participating agencies to attend an IEP Team meeting because it is burdensome, may reduce the number of agencies participating in the IEP Team meeting, and may limit the options for transition

services for the child. The commenters stated that this consent is unnecessary under FERPA, and inconsistent with § 300.321(a)(6), which allows the parent or the agency to include other individuals in the IEP Team who have knowledge or special expertise regarding the child.

*Discussion:* Section 300.321(b)(3) was included in the regulations specifically to address issues related to the confidentiality of information. Under section 617(c) of the Act the Department must ensure the protection of the confidentiality of any personally identifiable data, information, and records collected or maintained by the Secretary and by SEAs and LEAs pursuant to Part B of the Act, irrespective of the requirements under FERPA. We continue to believe that a public agency should be required to obtain parental consent (or the consent of a child who has reached the age of majority) before inviting representatives from other participating agencies to attend an IEP Team meeting, consistent with § 300.321(b)(3).

We do not believe that the requirements in § 300.321(b)(3) are inconsistent with § 300.321(a)(6). Section 300.321(a)(6) permits other individuals who have knowledge or special expertise regarding the child to attend the child's IEP Team meeting at the discretion of the parent or the public agency. It is clear that in § 300.321(b)(3), the individuals invited to the IEP Team meeting are representatives from other agencies who do not necessarily have special knowledge or expertise regarding the child. In these situations, we believe that consent should be required because representatives of these agencies are invited to participate in a child's IEP Team meeting only because they may be providing or paying for transition services. We do not believe that representatives of these agencies should have access to all the child's records unless the parent (or the child who has reached the age of majority) gives consent for such a disclosure. Therefore, we believe it is important to include the requirement for consent in § 300.321(b)(3).

*Changes:* None.

*Comment:* Some commenters recommended removing the phrase, "to the extent appropriate" in § 300.321(b)(3) and requiring public agencies to invite a representative of any participating agency that is likely to be responsible for providing or paying for transition services to the IEP Team meeting.

*Discussion:* We disagree with the recommended change because the decision as to whether to invite a

particular agency to participate in a child's IEP Team meeting is a decision that should be left to the public agency and the parent (or the child with a disability who has reached the age of majority).

*Changes:* None.

*Comment:* Numerous commenters recommended retaining current § 300.344(b)(3)(ii), which requires the public agency to take steps to ensure the participation of invited agencies in the planning of any transition services when the agencies do not send a representative to the IEP Team meeting. These commenters stated that the participation of other agencies is vital to ensuring that the child receives the necessary services. One commenter requested that the regulations clarify that, aside from inviting other agencies to attend a child's IEP Team meeting, public agencies have no obligation to obtain the participation of agencies likely to provide transition services.

*Discussion:* The Act has never given public agencies the authority to compel other agencies to participate in the planning of transition services for a child with a disability, including when the requirements in § 300.344(b)(3)(ii) were in effect. Without the authority to compel other agencies to participate in the planning of transition services, public agencies have not been able to meet the requirement in current § 300.344(b)(3)(ii) to "ensure" the participation of other agencies in transition planning. Therefore, while we believe that public agencies should take steps to obtain the participation of other agencies in the planning of transition services for a child, we believe it is unhelpful to retain current § 300.344(b)(3)(ii).

*Changes:* None.

*Comment:* A few commenters recommended that the regulations require the public agency to put parents in touch with agencies providing transition services.

*Discussion:* We do not believe it is necessary to regulate to require public agencies to put parents in touch with agencies providing transition services. As a matter of practice, public agencies regularly provide information to children and parents about transition services during the course of planning and developing transition goals and determining the services that are necessary to meet the child's transition goals.

*Changes:* None.

*Comment:* One commenter asked whether a parent could exclude an individual from the IEP Team.

*Discussion:* A parent can refuse to provide consent only for the public

agency to invite other agencies that are likely to be responsible for providing or paying for transition services. A parent may not exclude any of the required members of the IEP Team.

*Changes:* None.

IEP Team Attendance (§ 300.321(e))

*Comment:* We received many comments from individuals expressing concern about allowing IEP Team members to be excused from attending an IEP Team meeting. A few commenters recommended that the regulations require all IEP Team members to attend all IEP Team meetings without exception. One commenter stated that excusing members from attending IEP Team meetings interrupts the flow of the meeting and takes away time from discussing the child's needs. Another commenter expressed concern that the integrity of the IEP Team meeting process depends on a discussion to determine the services that are necessary to meet the child's unique needs, and that the richness of this discussion may be diminished if IEP Team members are allowed to be excused too frequently and the IEP Team must rely on written input.

Several commenters recommended that the regulations acknowledge that, in most circumstances, interactive discussion in IEP Team meetings is preferable to written input. Many commenters requested that the multidisciplinary scope of the IEP Team meeting be maintained. One commenter stated that written input from an excused IEP Team member is not sufficient and will be burdensome for both the writer and the readers.

*Discussion:* Section 614(d)(1)(C) of the Act allows a parent of a child with a disability and the LEA to agree that the attendance of an IEP Team member at an IEP Team meeting, in whole or in part, is not necessary under certain conditions. Allowing IEP Team members to be excused from attending an IEP Team meeting is intended to provide additional flexibility to parents in scheduling IEP Team meetings and to avoid delays in holding an IEP Team meeting when an IEP Team member cannot attend due to a scheduling conflict.

*Changes:* None.

*Comment:* Many commenters stated that the excusal provisions in § 300.321 should be optional for States and that States should be allowed to require that all IEP Team members attend each IEP Team meeting. Several commenters recommended allowing States to determine the circumstances or conditions under which attendance at

the IEP Team meeting is not required. A few commenters recommended clarifying whether a State must have policies and procedures to excuse IEP Team members.

*Discussion:* Under section 614(d)(1)(C) of the Act, a State must allow a parent and an LEA to agree to excuse a member of the IEP Team. Section 300.321(e) reflects this requirement and we do not have the authority to make this optional for States. We also do not have the authority to allow a State to restrict, or otherwise determine, when an IEP Team member can be excused from attending a meeting, or to prohibit the excusal of an IEP Team member when the LEA and parent agree to the excusal. Whether a State must have policies and procedures to excuse IEP Team members from attending an IEP Team meeting will depend on whether such policies and procedures are required by a State to implement this statutory requirement. However, every State must allow a parent and an LEA to agree to excuse an IEP Team member from attending an IEP Team meeting.

*Changes:* None.

*Comment:* Several commenters recommended that the regulations clarify whether the excusal agreement must meet the standard for informed consent. Some commenters stated that Congress intended excusal agreements to mean informed written consent. Other commenters stated that parents, not the public agency, can provide consent and therefore, only parents should be allowed to provide consent for excusing IEP Team members from IEP Team meetings. A few commenters recommended simplifying § 300.321(e) by eliminating the different procedures for different types of excusals.

*Discussion:* Whether a parent must provide consent to excuse a member of the IEP Team from attending an IEP Team meeting depends on whether the member's area of the curriculum or related services is being modified or discussed at the IEP Team meeting. We cannot eliminate the different procedures for different types of excusals because section 614(d)(1)(C) of the Act clearly differentiates between circumstances in which parental consent is required and when an agreement is required to excuse an IEP member from attending an IEP Team meeting.

If the member's area is not being modified or discussed, § 300.321(e)(1), consistent with section 614(d)(1)(C) of the Act, provides that the member may be excused from the meeting if the parent and LEA agree in writing that the member's attendance is not necessary.

An agreement is not the same as consent, but instead refers to an understanding between the parent and the LEA. Section 614(d)(1)(C) of the Act specifically requires that the agreement between a parent and an LEA to excuse a member's attendance at an IEP Team meeting must be in writing. If, however, the member's area is being modified or discussed, § 300.321(e)(2), consistent with section 614(d)(1)(C)(ii) of the Act, requires the LEA and the parent to provide written informed consent.

*Changes:* None.

*Comment:* One commenter asked whether parents must be provided any information when asked to excuse IEP Team members. A few commenters recommended that the request for an excusal include the reason for the request to excuse a member of the IEP Team, that it be written in the chosen language of the parent, and accompanied by written evaluations and recommendations of the excused IEP Team member.

A few commenters recommended that no IEP Team member should be excused from attending an IEP Team meeting until the parent is informed about the purpose of the meeting for which the public agency proposes to excuse the IEP Team member; the IEP Team member's name and position; the reason(s) the public agency wants to excuse the IEP Team member; the parent's right to have the IEP Team member present; and the parent's right to discuss with the IEP Team member any issues in advance of the meeting so the parent is adequately informed. The commenters stated that this notice should be included in any statement of parent's rights that is distributed.

Numerous commenters recommended that the regulations include specific language to clarify that, before agreeing to excuse an IEP Team member, serious consideration must be given to determining if written input will be sufficient to thoroughly examine what services are needed and whether changes to the current IEP are necessary. A few commenters recommended that parents be informed of the roles and responsibilities of the excused member prior to giving consent for the excusal. Some commenters stated that parents must understand that they have the right to disagree and not excuse a member of the IEP Team who the parents believe may be essential to developing or revising an IEP. One commenter recommended that the written agreement be required to include information that the parent was informed of the parent's right to have all IEP Team members present.

**46674**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

One commenter recommended permitting States to establish additional procedural safeguards that guarantee that parents who consent to excuse an IEP member from a meeting do so freely and are aware of the implications of their decisions. Some commenters expressed concern that a parent could be pressured to agree to excuse an IEP Team member for what, in reality, are economic or staffing reasons. One commenter stated that parents should have the right to consent to excusal only after conferring with the individual to be excused. Some commenters recommended that parents be informed that they have a legal right to require an IEP Team member to participate in the meeting.

A few commenters expressed concern that the permission to excuse IEP Team members from attending IEP Team meetings will be abused, particularly with language-minority parents who are often misinformed or misled by school districts. Some commenters stated that parents do not understand the roles of the various members and could easily be pressured into excusing vital members of the IEP Team.

A few commenters recommended that the regulations include requirements to guard against excessive excusals. Some commenters stated that an LEA that routinely prevents general or special education teachers, or related services providers, from attending IEP Team meetings using the excusal provisions should be subject to monitoring and review.

*Discussion:* When an IEP Team member's area is not being modified or discussed, § 300.321(e)(1), consistent with section 614(d)(1)(C) of the Act, provides that the member may be excused from the meeting if the parent and LEA agree in writing that the member's attendance is not necessary. We believe it is important to give public agencies and parents wide latitude about the content of the agreement and, therefore, decline to regulate on the specific information that an LEA must provide in a written agreement to excuse an IEP Team member from attending the IEP Team meeting when the member's area of the curriculum or related services is not being modified or discussed.

When an IEP Team member's area is being modified or discussed, § 300.321(e)(2), consistent with section 614(d)(1)(C)(ii) of the Act, requires the LEA and the parent to provide written informed consent. Consistent with § 300.9, *consent* means that the parent has been fully informed in his or her native language, or other mode of communication, and understands that

the granting of consent is voluntary and may be revoked at any time. The LEA must, therefore, provide the parent with appropriate and sufficient information to ensure that the parent fully understands that the parent is consenting to excuse an IEP Team member from attending an IEP Team meeting in which the member's area of the curriculum or related services is being changed or discussed and that if the parent does not consent the IEP Team meeting must be held with that IEP Team member in attendance.

We believe that these requirements are sufficient to ensure that the parent is fully informed before providing consent to excuse an IEP Team member from attending an IEP Team meeting in which the member's area of the curriculum will be modified or discussed, and do not believe that it is necessary to include in the regulations the more specific information that commenters recommended be provided to parents.

We also do not believe it is necessary to add a regulation permitting States to establish additional procedural safeguards for parents who consent to excuse an IEP Team member, as recommended by one commenter, because we believe the safeguard of requiring consent will be sufficient to prevent parents from feeling pressured to excuse an IEP Team member. Furthermore, parents who want to confer with an excused team member may ask to do so before agreeing or consenting to excusing the member from attending the IEP Team meeting, but it would be inappropriate to add a regulation that limited parent rights by requiring a conference before the parent could agree or consent to the excusal of an IEP Team member.

With regard to the recommendation that the notice state that the parent has a legal right to require an IEP Team member to participate in an IEP Team meeting, it is important to emphasize that it is the public agency that determines the specific personnel to fill the roles for the public agency's required participants at the IEP Team meeting. A parent does not have a legal right to require other members of the IEP Team to attend an IEP Team meeting. Therefore, if a parent invites other public agency personnel who are not designated by the LEA to be on the IEP Team, they are not required to attend.

An LEA may not routinely or unilaterally excuse IEP Team members from attending IEP Team meetings as parent agreement or consent is required in each instance. We encourage LEAs to carefully consider, based on the

individual needs of the child and the issues that need to be addressed at the IEP Team meeting whether it makes sense to offer to hold the IEP Team meeting without a particular IEP Team member in attendance or whether it would be better to reschedule the meeting so that person could attend and participate in the discussion. However, we do not believe that additional regulations on this subject are warranted.

An LEA that routinely excuses IEP Team members from attending IEP Team meetings would not be in compliance with the requirements of the Act, and, therefore, would be subject to the State's monitoring and enforcement provisions.

*Changes:* None.

*Comment:* A few commenters requested clarification on whether excusals from IEP Team meetings apply to only regular education teachers, special education teachers, and related services providers, or to all individuals whose curriculum areas may be discussed at an IEP Team meeting. One commenter recommended clarifying that all IEP Team members, as defined in § 300.321, must be represented at the IEP Team meeting unless excused by the parents and the LEA.

One commenter stated that § 300.321(e) can be read to require that each individual invited to the IEP Team meeting by the parent or the public agency (who has knowledge or special expertise) must attend the meeting unless the parent and the agency agree in writing that they need not attend. The commenter recommended that the regulations clarify that the attendance of the other individuals invited to attend the IEP Team meeting by the parent and public agency is discretionary and that no waiver is needed to hold the IEP Team meeting without them. The commenter recommended revising § 300.321(e)(1) to refer to "mandatory" members of the IEP Team. Another commenter expressed concern that it is not possible to pre-determine the areas of the curriculum that may be addressed at an IEP Team meeting, and recommended that excusals be permitted only for the IEP Team members identified by the public agency in § 300.321(a).

One commenter recommended that the regulations allow teachers with classroom responsibilities to attend an IEP Team meeting for 15 to 20 minutes and leave the meeting when necessary. Some commenters requested clarification regarding situations in which there is more than one regular education teacher at an IEP Team meeting and whether one or both

teachers must have a written excusal to leave before the end of an IEP Team meeting.

One commenter stated that it is unclear whether consent must be obtained if a speech pathologist or occupational therapist cannot attend a meeting because speech pathologists and occupational therapists are not required members of an IEP Team.

*Discussion:* We believe that the excusals from IEP Team meetings apply to the members of the IEP Team in paragraphs (a)(2) through (5) in § 300.321, that is, to the regular education teacher of the child (if the child is, or may be participating in the regular education environment); not less than one special education teacher of the child (or where appropriate, not less than one special education provider of the child); a representative of the public agency who meets the requirements in § 300.321(a)(4); and an individual who can interpret the instructional implications of evaluation results. We do not believe it is necessary to require consent or a written agreement between the parent and the public agency to excuse individuals who are invited to attend IEP Team meetings at the discretion of the parent or the public agency because such individuals are not required members of an IEP Team. We will add new language to § 300.321(e) to clarify the IEP Team members for whom the requirements regarding excusals apply.

With regard to situations in which there is more than one regular education teacher, the IEP Team need not include more than one regular education teacher. The regular education teacher who serves as a member of a child's IEP Team should be a teacher who is, or may be, responsible for implementing a portion of the IEP so that the teacher can participate in discussions about how best to instruct the child. If the child has more than one regular education teacher responsible for carrying out a portion of the IEP, the LEA may designate which teacher or teachers will serve as the IEP member(s), taking into account the best interest of the child. An LEA could also agree that each teacher attend only the part of the meeting that involves modification to, or discussion of, the teacher's area of the curriculum.

Section 300.321(a)(3) requires the IEP Team to include not less than one special education teacher or where appropriate, not less than one special education provider of the child. As explained earlier, a special education provider is a person who is, or will be, responsible for implementing the IEP. Therefore, if a speech pathologist, occupational therapist, or other special education provider, other than the child's special education teacher is on the IEP Team, written consent from the parent would be required for the speech pathologist, occupational therapist, or other special education provider to be excused from attending an IEP Team meeting, in whole or in part, when the IEP Team meeting involves a modification to, or discussion of, the IEP Team member's related service or area of the curriculum.

*Changes:* We have added language in § 300.321(e)(1) to refer to paragraphs (a)(2) through (a)(5), and a reference to paragraph (e)(1) in § 300.321(e)(2) to clarify the IEP Team members for whom a parent and public agency must consent or agree in writing to excuse from an IEP Team meeting.

*Comment:* A few commenters stated that excusal of the regular education teacher is already built into the requirements and questioned the circumstances under which a State might exceed these requirements.

*Discussion:* Section 300.321(a)(2) does not require a regular education teacher to be part of the IEP Team for a child who is not participating in the regular education environment or is not anticipated to participate in the regular education environment. The excusals from IEP Team meetings in § 300.321(e) apply to a regular education teacher who is part of the IEP Team by virtue of the fact that the child with a disability is participating, or may be participating, in the regular education environment.

*Changes:* None.

*Comment:* Some commenters recommended setting a limit as to how often teachers can be excused from IEP Team meetings. A few commenters recommended prohibiting the excusal of IEP Team members for initial IEP Team meetings. One commenter recommended allowing an IEP Team meeting to occur only if there is one person who cannot attend the meeting.

Many commenters opposed the excusal of teachers, therapists, speech providers, and other experts who work with a child on an ongoing basis. A few commenters stated that regular education teachers should not be excused from IEP Team meetings because they have the content expertise that is critical to the IEP process. One commenter stated that the excusal of an LEA representative should not be allowed.

A few commenters requested guidance to make it more difficult for IEP Team members to be excused from IEP Team meetings. Some commenters stated that excusing IEP Team members should only be done in limited circumstances and only when absolutely necessary.

Some commenters recommended that the regulations provide an opportunity for the parents to challenge a public agency's attempt to exclude staff members who believe their attendance is necessary at an IEP Team meeting. A few commenters suggested that the regulations prohibit excusal of personnel based on the cost of providing coverage in the classroom for a teacher to attend the IEP Team meeting, disagreements over appropriate services among staff, or scheduling problems. One commenter recommended that the regulations clearly state that teachers cannot be barred from attending an IEP Team meeting.

*Discussion:* We decline to make the changes requested by the commenters because it would be inconsistent with section 614(d)(1)(C) of the Act to set a limit on the number of times an IEP Team member could be excused; prohibit excusals for initial IEP Team meetings; restrict the number of excusals per meeting; prohibit certain IEP Team members from being excused from attending an IEP Team meeting; or otherwise restrict or limit parents and LEAs from agreeing to excuse IEP Team members from attending an IEP Team meeting. Likewise, it would be inconsistent with section 614(d)(1)(C) of the Act for an LEA to unilaterally excuse an IEP Team member from attending an IEP Team meeting.

The public agency determines the specific personnel to fill the roles for the public agency's required participants at the IEP Team meeting. Whether other teachers or service providers who are not the public agency's required participants at the IEP Team meeting can attend an IEP Team meeting is best addressed by State and local officials.

*Changes:* None.

*Comment:* A few commenters asked whether the regular teacher, the special education teacher, principal, or the LEA makes the decision with the parent to excuse an IEP member. Some commenters recommended that the regulations require the excused IEP Team member to agree to be excused from an IEP Team meeting. Other commenters stated that a teacher should be included as one of the parties that decide whether a teacher should be excused from attending the IEP Team meeting.

Numerous commenters recommended that, before an IEP Team member is excused from attending an IEP Team meeting, sufficient notice must be given so that other IEP Team members can consider the request. Some commenters requested that the regulations clarify

**46676**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

whether the entire IEP Team must meet and then agree on whether a member's attendance at the IEP Team meeting is needed.

*Discussion:* It would not be appropriate to make the changes recommended by the commenters. There is no requirement that the excused IEP Team member agree to be excused from the IEP Team meeting, that a teacher be included as one of the parties that decides whether a teacher should be excused from attending the IEP Team meeting, or that other IEP Team members agree to excuse a member's attendance. It is up to each public agency to determine the individual in the LEA with the authority to make the agreement (or provide consent) with the parent to excuse an IEP Team member from attending an IEP Team meeting. The designated individual must have the authority to bind the LEA to the agreement with the parent or provide consent on behalf of the LEA.

*Changes:* None.

*Comment:* A few commenters recommended that the regulations specifically state that parents retain the right to change their mind to excuse an IEP Team member and have full IEP Team member participation, if it becomes apparent during the IEP Team meeting that the absence of an excused IEP Team member inhibits the development of the IEP. One commenter expressed concern that parents will be informed of excusals at the beginning of a meeting or be given a note, report, or letter from the absent IEP Team member.

*Discussion:* The IEP Team is expected to act in the best interest of the child. As with any IEP Team meeting, if additional information is needed to finalize an appropriate IEP, there is nothing in the Act that prevents an IEP Team from reconvening after the needed information is obtained, as long as the IEP is developed in a timely manner, consistent with the requirements of the Act and these regulations. The parent can request an additional IEP Team meeting at any time and does not have to agree to excuse an IEP Team member. Likewise, if a parent learns at the IEP Team meeting that a required participant will not be at the meeting, the parent can agree to continue with the meeting and request an additional meeting if more information is needed, or request that the meeting be rescheduled.

*Changes:* None.

*Comment:* Several commenters recommended that the regulations specify the amount of time prior to an IEP Team meeting by which notice must

be received by the parent about the LEA's desire to excuse an IEP Team member from attending an IEP Team meeting. A few commenters recommended that an LEA's request for excusal of an IEP Team member be provided to the parent 10 business days prior to the date of the IEP Team meeting and other commenters recommended five business days before an IEP Team meeting.

One commenter recommended that the regulations specify when the parent's written consent to excuse IEP Team members from the meeting must be received by the agency. Many commenters recommended that the regulations include language requiring that any agreement to excuse an IEP Team member from attending the IEP Team meeting be done in advance of the meeting. Some commenters stated that requiring an agreement in advance of an IEP Team meeting would allow the parent to review the IEP Team member's written input prior to the IEP Team meeting and ensure that parental consent is informed. A few commenters recommended that the Act prohibit a written agreement from being signed before the meeting occurs.

*Discussion:* The Act does not specify how far in advance of an IEP Team meeting a parent must be notified of an agency's request to excuse a member from attending an IEP Team meeting or when the parent and LEA must sign a written agreement or provide consent to excuse an IEP Team member. Ideally, public agencies would provide parents with as much notice as possible to request that an IEP Team member be excused from attending an IEP Team meeting, and have agreements or consents signed at a reasonable time prior to the IEP Team meeting. However, this might not always be possible, for example, when a member has an emergency or an unavoidable scheduling conflict. To require public agencies to request an excusal or obtain a signed agreement or consent to excuse a member a specific number of days prior to an IEP Team meeting would effectively prevent IEP Team members from being excused from IEP Team meetings in many situations and, thus, be counter to the intent of providing additional flexibility to parents in scheduling IEP Team meetings. Furthermore, if an LEA requests an excusal at the last minute or a parent needs additional time or information to consider the request, the parent always has the right not to agree or consent to the excusal of the IEP Team member. We, therefore, decline to regulate on these matters.

*Changes:* None.

*Comment:* One commenter requested that the regulations clarify the timeframe in which the written input must be provided to the parent and the IEP Team. Another commenter expressed concern that without knowing whether the information submitted is sufficient to answer any of the parent's questions, the parent could not agree, in any informed way, to excuse an IEP Team member from attending the IEP Team meeting.

Several commenters recommended that written input be provided to parents a reasonable amount of time prior to the meeting and not at the beginning of the meeting. One commenter recommended requiring that parents receive written evaluations and recommendations from the excused member at least 10 business days before the IEP Team meeting. Another commenter recommended that written input be provided at least 10 school days in advance of the meeting; another commenter suggested no later than seven days before the meeting; a few commenters recommended at least five days in advance of the meeting; and some commenters recommended at least three business days before the meeting.

A few commenters recommended requiring public agencies to send parents the written input of excused IEP Team members as soon as they receive it so that parents have sufficient time to consider the input. One commenter recommended that the regulations require the written input to be provided to IEP Team members and parents at the same time.

*Discussion:* Section 614(d)(1)(C)(ii)(II) of the Act requires that input into the development of the IEP by the IEP Team member excused from the meeting be provided prior to the IEP Team meeting that involves a modification to, or discussion of the member's area of the curriculum or related services. The Act does not specify how far in advance of the IEP Team meeting that the written input must be provided to the parent and IEP Team members. For the reasons stated earlier, we do not believe it is appropriate to impose a specific timeframe for matters relating to the excusal of IEP Team members. Parents can always reschedule an IEP Team meeting or request that an IEP Team meeting be reconvened if additional time is needed to consider the written information.

*Changes:* None.

*Comment:* A few commenters recommended language clarifying that IEP Team members who submit input prior to an IEP Team meeting may still attend the meeting. Other commenters requested that the regulations specify

that failure to provide prior written input, due to inadequate notice or unreasonable workloads, does not prohibit the excused member from attending the meeting in person.

*Discussion:* The Act does not address circumstances in which an IEP Team member is excused from an IEP Team meeting, but desires to attend the meeting. We believe such circumstances are best addressed by local officials and are not appropriate to include in these regulations.

*Changes:* None.

*Comment:* A few commenters recommended that the format of the written input required in § 300.321(e) be flexible and not unduly burdensome. One commenter stated that no new form should be created for the written input.

A few commenters recommended that the regulations clarify that the written input must be sufficient to allow the IEP Team to thoroughly examine the services needed and decide whether changes to the current IEP are needed. Other commenters recommended that the written input provide information about a child's level of academic achievement and functional performance; recommendations for services, supports, and accommodations to improve academic and functional performance; revisions to the current annual goals; and other appropriate guidance.

Other commenters recommended that the written input include the IEP Team member's opinions regarding the child's eligibility and services needed; the basis for the opinions, including any evaluations or other documents that formed the basis for the IEP Team member's opinion; and whether the evaluations were conducted by the IEP Team member or another person. These commenters also recommended that the regulations require the excused IEP Team member to include a telephone number where the IEP Team member can be reached prior to the meeting if the parent wants to contact the member, and a telephone number where the member can be reached during the meeting in case immediate input during the meeting is required.

A few commenters recommended prohibiting public agencies from giving the child the written input at school to take home to his or her parents. One commenter recommended that the written input be provided with the meeting notice required in § 300.322. Another commenter recommended that the regulations allow the written input to be provided to parents and other IEP Team members by electronic mail or other less formal methods.

*Discussion:* The Act does not specify the format or content to be included in the written input provided by an excused member of the IEP Team. Neither does the Act specify the method(s) by which a public agency provides parents and the IEP Team with the excused IEP Team member's written input. We believe that such decisions are best left to local officials to determine based on the circumstances and needs of the individual child, parent, and other members of the IEP Team, and therefore decline to regulate in this area.

*Changes:* None.

*Comment:* One commenter recommended requiring any IEP Team member who is excused from an IEP Team meeting to be trained in the updated IEP within one calendar week of the IEP Team meeting. A few commenters recommended that the excused IEP Team members be provided a copy of the new or amended IEP after the meeting. One commenter recommended that one person be designated to be responsible for sharing the information from the meeting with the excused IEP Team member and for communicating between the parent and the excused IEP Team member after the meeting.

*Discussion:* Section 300.323(d) already requires each public agency to ensure that the child's IEP is accessible to each regular education teacher, special education teacher, related services provider and other service provider who is responsible for its implementation, regardless of whether the IEP Team member was present or excused from an IEP Team meeting. How and when the information is shared with the IEP Team member who was excused from the IEP Team meeting is best left to State and local officials to determine.

*Changes:* None.

*Comment:* A few commenters recommended that the regulations require the LEA to inform a parent when the absent IEP Team member will address the parent's questions and concerns. Another commenter recommended that the regulations require the LEA to inform the parent of procedures for obtaining the requested information.

*Discussion:* We do not believe it is appropriate to regulate on these matters. The manner in which the parent's questions and concerns are addressed, and how the information is shared with the parent, are best left for State and local officials to determine.

*Changes:* None.

*Comment:* One commenter requested clarification on how the provisions in § 300.321(e), which allow IEP Team members to be excused from IEP Team meetings, relate to revising an IEP without convening an IEP Team meeting.

*Discussion:* The two provisions referred to by the commenter are independent provisions. Section 300.321(e), consistent with section 614(d)(1)(C) of the Act, describes the circumstances under which an IEP Team member may be excused from an IEP Team meeting. Section 300.324(a)(4), consistent with section 614(d)(3)(D) of the Act, permits the parent and the public agency to agree not to convene an IEP Team meeting to make changes to a child's IEP after the annual IEP Team meeting has been held.

*Changes:* None.

Initial IEP Team Meeting for Child Under Part C (§ 300.321(f))

*Comment:* Several commenters recommended that the regulations require the public agency to inform parents of their right to request that the public agency invite their child's Part C service coordinator to the initial IEP Team meeting. One commenter recommended that the regulations require parents to be informed of this option in writing.

*Discussion:* Section 300.321(f), consistent with section 614(d)(1)(D) of the Act, requires the public agency, at the request of the parent, to send an invitation to the Part C service coordinator or other representatives of the Part C system to attend the child's initial IEP Team meeting. We believe it would be useful to add a cross-reference to § 300.321(f) in § 300.322 to emphasize this requirement.

*Changes:* We have added a cross-reference to § 300.321(f) in § 300.322.

Parent Participation (§ 300.322)

Public Agency Responsibility—General (§ 300.322(a))

*Comment:* A few commenters recommended that the notice of the IEP Team meeting include a statement that the time and place of the meeting are negotiable and must be mutually agreed on by the parent and public agency. Other commenters recommended that the regulations emphasize the need for flexibility in scheduling meetings so that districts make every effort to secure parent participation in meetings.

Many commenters requested that the regulations specify how far in advance a public agency must notify parents of an IEP Team meeting. One commenter recommended requiring that parents be notified a minimum of five school days before the date of the meeting.

*Discussion:* We do not agree with the changes recommended by the commenters. Section 300.322(a) already requires each public agency to take steps to ensure that one or both parents are present at each meeting, including notifying parents of the meeting early enough to ensure that they have an opportunity to attend, and scheduling the meeting at a mutually agreed on time and place. We believe that these requirements are sufficient to ensure that parents are provided the opportunity to participate in meetings. We also believe that State and local officials are in the best position to determine how far in advance parents must be notified of a meeting, as this will vary based on a number of factors, including, for example, the distance parents typically have to travel to the meeting location and the availability of childcare.

*Changes:* None.

Information Provided to Parents (§ 300.322(b))

*Comment:* Several comments were received requesting that additional information be provided to parents when the public agency notifies parents about an IEP Team meeting. One commenter recommended informing parents that they can request an IEP Team meeting at any time. Other commenters recommended that the notice include any agency requests to excuse an IEP Team member from attending the meeting, and any written input from an IEP Team member who is excused from the meeting. Another commenter recommended that parents receive all evaluation reports before an IEP Team meeting. A few commenters recommended that parents receive a draft IEP so that they have time to examine the child's present levels of performance; prepare measurable goals; and consider appropriate programs, services, and placements.

*Discussion:* The purpose of the notice requirement in § 300.322 is to inform parents about the IEP Team meeting and provide them with relevant information (*e.g.*, the purpose, time, and place of the meeting, and who will be in attendance). This is not the same as the procedural safeguards notice that informs parents of their rights under the Act.

If, at the time the IEP Team meeting notice is sent, a public agency is aware of the need to request that an IEP Team member be excused from the IEP Team meeting, the public agency could include this request with the meeting notice. We do not believe that it is appropriate to require that the request to excuse an IEP Team member from an IEP Team meeting be included in the meeting notice, because the public agency may not be aware of the need to request an excusal of a member at the time the IEP Team meeting notice is sent. For similar reasons, it is not appropriate to require that the IEP Team meeting notice include any written input from an IEP Team member who may be excused from the IEP Team meeting.

As noted in § 300.306(a)(2), the public agency must provide a copy of an evaluation report and the documentation of determination of eligibility at no cost to the parent. Whether parents receive all evaluation reports before an IEP Team meeting, however, is a decision that is best left to State and local officials to determine.

With respect to a draft IEP, we encourage public agency staff to come to an IEP Team meeting prepared to discuss evaluation findings and preliminary recommendations. Likewise, parents have the right to bring questions, concerns, and preliminary recommendations to the IEP Team meeting as part of a full discussion of the child's needs and the services to be provided to meet those needs. We do not encourage public agencies to prepare a draft IEP prior to the IEP Team meeting, particularly if doing so would inhibit a full discussion of the child's needs. However, if a public agency develops a draft IEP prior to the IEP Team meeting, the agency should make it clear to the parents at the outset of the meeting that the services proposed by the agency are preliminary recommendations for review and discussion with the parents. The public agency also should provide the parents with a copy of its draft proposals, if the agency has developed them, prior to the IEP Team meeting so as to give the parents an opportunity to review the recommendations of the public agency prior to the IEP Team meeting, and be better able to engage in a full discussion of the proposals for the IEP. It is not permissible for an agency to have the final IEP completed before an IEP Team meeting begins.

*Changes:* None.

Other Methods To Ensure Parent Participation (§ 300.322(c))

*Comment:* One commenter recommended that the regulations permit parents to provide input through a written report in order to document that the parents provided input into their child's education.

*Discussion:* Parents are free to provide input into their child's IEP through a written report if they so choose.

Therefore, we do not believe that a change is needed.

*Changes:* None.

Conducting an IEP Team Meeting Without a Parent in Attendance (§ 300.322(d))

*Comment:* Many commenters recommended that § 300.322(d) retain paragraphs (d)(1) through (d)(3) in current § 300.345, which provide examples of the types of records a public agency may keep to document its attempts to arrange a mutually agreed upon time and place for an IEP Team meeting. These examples include detailed records of telephone calls made or attempted and the results of those calls; copies of correspondence sent to the parents and any responses received; and detailed records of visits made to the parent's home or place of employment and the results of those visits. A few commenters stated that removing these provisions violates section 607(b) of the Act.

*Discussion:* We agree that these provisions are important to encourage parent participation in the IEP process, which is an important safeguard for ensuring FAPE under the Act. We will, therefore, add the requirements in current § 300.345(d)(1) through (d)(3) to § 300.322(d).

*Changes:* We have added the requirements in current § 300.345(d)(1) through (d)(3) to § 300.322(d).

*Comment:* One commenter stated that parents who do not participate in IEP Team meetings when the school has made good-faith efforts to include them should be sanctioned.

*Discussion:* There is nothing in the Act that would permit sanctioning a parent who does not participate in an IEP Team meeting, nor do we believe that it would be appropriate or helpful to do so. Sanctioning a parent is unlikely to engender the type of active participation at IEP Team meetings that would be desirable or helpful in developing, reviewing, or revising a child's IEP.

*Changes:* None.

*Comment:* One commenter recommended that the regulations make explicit that the LEA can move forward and hold an IEP Team meeting without the parent, if notice has been provided consistent with § 300.322(a)(1) and (b)(1), and the parent does not participate. The commenter recommended that this requirement be consistent with the parent participation requirements for placement meetings in § 300.501(c)(3) and (c)(4).

*Discussion:* Section 300.322(d) explicitly allows a meeting to be conducted without a parent if the public

agency is unable to convince the parent to attend. The requirements for parent participation in IEP Team meetings in § 300.322, and placement meetings in § 300.501 are consistent. Section 300.322(d) states that an IEP Team meeting may be conducted without a parent in attendance if the public agency is unable to convince a parent to attend the IEP Team meeting. Similarly, § 300.501(c)(4) provides that a group, without the involvement of the parent, may make a placement decision if the public agency is unable to obtain the parent's participation in the decision. In both cases, the public agency must keep a record of its attempts to obtain the parent's involvement.

*Changes:* None.

*Comment:* One commenter expressed concern that allowing school districts to hold IEP Team meetings without parents could increase the over-representation of African American children placed in special education.

*Discussion:* Section 300.322(a) requires a public agency to take steps to ensure that one or both parents are afforded the opportunity to participate in an IEP Team meeting, including notifying parents of the meeting early enough to ensure that they will have an opportunity to attend, and scheduling the meeting at a mutually agreed on time and place. Section 300.322(c) requires the public agency to use other methods to ensure parent participation if neither parent can attend an IEP Team meeting, including individual or conference telephone calls. Only when a public agency is unable to convince a parent to participate in an IEP Team meeting may the meeting be conducted without a parent. We disagree with the implication in the comment that parents of one race are less likely to participate in IEP Team meetings.

*Changes:* None.

*Comment:* Many commenters recommended retaining current § 300.345(e), which requires the public agency to take whatever action is necessary to ensure that the parent understands the proceedings at an IEP Team meeting, including arranging for an interpreter for parents with deafness or whose native language is other than English. Some commenters stated that current § 300.345(e) is protected by section 607(b) of the Act and, therefore, cannot be removed.

Many commenters acknowledged that there are other Federal laws that require public agencies to take appropriate measures to ensure that parents understand the proceedings at an IEP Team meeting, but stated that not all stakeholders are aware of the applicability of those other protections in IEP Team meetings. Several commenters expressed concern with the removal of current § 300.345(e) stating that other Federal laws are not enforceable at special education due process hearings.

*Discussion:* We agree that current § 300.345(e) is an important safeguard of parent participation for parents with deafness or whose native language is other than English. We will, therefore, add the requirements in current § 300.345(e) to the regulations.

*Changes:* We have added the requirements in current § 300.345(e) as new § 300.322(e), and redesignated the subsequent paragraph as § 300.322(f).

Parent Copy of Child's IEP (New § 300.322(f)) (Proposed § 300.322(e))

*Comment:* One commenter recommended that the regulations clarify that the public agency must provide the parent a copy of any amended IEPs, in addition to the original IEP.

*Discussion:* Section 300.324(a)(6), consistent with section 614(d)(3)(F) of the Act, requires the public agency to, upon request of the parent, provide the parent with a revised copy of the IEP with the amendments incorporated. We do not believe any further clarification is necessary.

*Changes:* None.

When IEPs Must Be in Effect (§ 300.323)

*Comment:* Some commenters recommended retaining current § 300.342(b)(1)(i) to ensure that an IEP is in effect before special education services are provided to a child.

*Discussion:* We do not believe it is necessary to retain current § 300.342(b)(1)(i) because we believe this requirement is implicit in § 300.323(a), which requires each public agency to have an IEP in effect for each child with a disability in the public agency's jurisdiction at the beginning of each school year.

*Changes:* None.

IEP or IFSP for Children Aged Three Through Five (§ 300.323(b))

*Comment:* One commenter recommended revising the regulations to clarify when an IEP must be in place for a child transitioning from an early intervention program under Part C of the Act to a preschool special education program under Part B of the Act whose third birthday occurs after the start of the school year.

*Discussion:* The commenter's concern is already addressed in the regulations. Section 300.101(b), consistent with section 612(a)(1)(A) of the Act, requires an IEP to be in effect no later than the child's third birthday. However, § 300.323(b)(1), consistent with section 614(d)(2)(B) of the Act, provides that a State, at its discretion, may provide special education and related services to two-year-old children with disabilities who will turn three during the school year. In such cases, the State must ensure that an IEP is developed and in effect at the start of the school year in which the child turns three.

*Changes:* None.

*Comment:* One commenter stated that an IFSP that was incorrectly developed by the early intervention agency should not be the school district's responsibility to correct.

*Discussion:* The development of an IFSP for children from birth through age two is the responsibility of the designated lead agency responsible for early intervention programs under section 635(a)(10) in Part C of the Act. When a child turns age three, section 612(a)(9) of the Act requires each State to ensure that an IEP has been developed and implemented. However, if a child turns age three and an LEA and a parent agree to use an IFSP in lieu of an IEP, as allowed under section 614(d)(2)(B) of the Act, the LEA is responsible for ensuring that the requirements in § 300.323(b) are met. Therefore, if an IFSP was incorrectly developed by the early intervention agency and the public agency and the parent agree to use the IFSP in lieu of an IEP, the LEA is responsible for modifying the IFSP so that it meets the requirements in § 300.323(b).

Section 300.323(b), consistent with section 614(d)(2)(B) of the Act, allows an IFSP to serve as an IEP for a child with a disability aged three through five (or at the discretion of the SEA, a two-year old child with a disability, who will turn age three during the school year), under the following conditions: (a) using the IFSP as the IEP is consistent with State policy and agreed to by the agency and the child's parents; (b) the child's parents are provided with a detailed explanation of the differences between an IFSP and an IEP; (c) written informed consent is obtained from the parent if the parent chooses an IFSP; (d) the IFSP contains the IFSP content, including the natural environments statement; (e) the IFSP includes an educational component that promotes school readiness and incorporates pre-literacy, language, and numeracy skills for children with IFSPs who are at least three years of age; and (f) the IFSP is developed in accordance with the IEP procedures under Part B of the Act.

*Changes:* None.

*Comment:* One commenter recommended that the regulations

**46680**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

require the IEP Team to explain the changes in services and settings in the initial IEP Team meeting for a child transitioning from an early intervention program under Part C of the Act to a preschool program under Part B of the Act.

*Discussion:* We do not believe it is necessary to change the regulations in the manner recommended by the commenter. Section 300.124, consistent with section 612(a)(9) of the Act, already requires States to have in effect policies and procedures to ensure that children transitioning from an early intervention program under Part C of the Act to a preschool program under Part B of the Act experience a smooth and effective transition to those preschool programs. In addition, each LEA is required to participate in transition planning conferences with the lead agency responsible for providing early intervention services and to have an IEP (or an IFSP, if consistent with § 300.323(b) and section 636(d) of the Act) for the child developed and implemented by the child's third birthday. We believe that in the course of the transition planning conferences and developing the child's IEP, there would be many opportunities for discussions regarding the services provided under Parts B and C of the Act.

*Changes:* None.

*Comment:* One commenter stated that there is no statutory basis to require detailed explanations of the differences between an IEP and an IFSP or for written informed parental consent when an IFSP is used in lieu of an IEP.

*Discussion:* We believe it is important to retain these requirements in § 300.323(b)(2) because of the importance of the IEP as the statutory vehicle for ensuring FAPE to a child with a disability. Although the Act does not specifically require a public agency to provide detailed explanations to the parent of the differences between an IEP and an IFSP, we believe parents need this information to make an informed choice regarding whether to continue to use an IFSP in lieu of an IEP. Parents, for example, should understand that it is through the IEP that the child is entitled to the special education and related services that the child's IEP Team determines are necessary to enable the child to be involved in and make progress in the general education curriculum and to receive FAPE. If a parent decides to use an IFSP in lieu of an IEP, the parent must understand that the child will not necessarily receive the same services and supports that are afforded under an IEP. For a parent to waive the right to an IEP, informed parental consent is necessary.

*Changes:* None.

*Comment:* Some commenters recommended that the regulations explicitly state that the IFSP does not have to include all the elements of an IEP when the IFSP is used in lieu of an IEP.

*Discussion:* Section 300.323(b)(1) provides that, in order for the IFSP to be used as the IEP, the IFSP must contain the IFSP content (including the natural environments statement) in section 636(d) of the Act and be developed in accordance with the IEP procedures under Part B of the Act. For children who are at least three years of age, the IFSP must also include an educational component that promotes school readiness and incorporates pre-literacy, language, and numeracy skills. There is no requirement for the IFSP to include all the required elements in an IEP. We think this point is clear in the regulations and that no further clarification is necessary.

*Changes:* None.

*Comment:* Some commenters recommended changing § 300.323(b)(2)(i) to require parental consent before a preschool-aged child receives an IFSP in States that have a policy under section 635(c) of the Act. Some commenters recommended that the regulations clarify whether States have flexibility to continue early intervention services until the end of the school year in which a child turns three.

*Discussion:* Section 300.323(b) outlines the specific requirements that apply when an IFSP is used in lieu of an IEP for children aged three through five, as a means of providing FAPE for the child under Part B of the Act. This is not the same as the policy in section 635(c) of the Act, which gives States the flexibility to provide early intervention services under Part C of the Act to those three year old children with disabilities until they enter into, or are eligible under State law to enter into, kindergarten.

Under § 300.323(b), when an IFSP is used in lieu of an IEP, the child continues to receive FAPE. This would not be the case under section 635(c) of the Act. Under section 635(c) of the Act, parents of children with disabilities who are eligible for preschool services under section 619 of the Act and previously received early intervention services under Part C of the Act, may choose to continue early intervention services until the child enters, or is eligible under State law to enter, kindergarten. The option to continue early intervention services is available only in States where the lead agency under Part C of the Act and the SEA have developed and implemented a State policy to provide this option. This option will be detailed in the Part C regulations, and not the Part B regulations, as it permits a continuation of eligibility and coverage under Part C of the Act, rather than FAPE under Part B of the Act.

Parental consent is required under § 300.323(b), when the IFSP is used in lieu of an IEP, and under section 635(c) of the Act, when a parent opts to continue early intervention services.

*Changes:* None.

**Initial IEPs; Provision of Services (§ 300.323(c))**

*Comment:* One commenter recommended removing the requirement for an IEP Team meeting to be conducted within 30 days of determining that the child needs special education and related services. Another commenter recommended extending the time to 60 days. A few commenters recommended that the regulations require the meeting to be held no later than 15 days after the eligibility determination.

*Discussion:* The requirement to conduct a meeting to develop a child's IEP within 30 days of the determination that a child needs special education and related services is longstanding, and has been included in the regulations since they were first issued in final form in 1977. Experience has shown that many public agencies choose to conduct the meeting to develop the child's IEP well before the 30-day timeline. Reducing the timeline to 15-days, as some commenters suggest, would be impractical, because there are situations when both public agencies and parents need additional time to ensure that appropriate individuals can be present at the meeting. Experience has demonstrated that the 30-day timeline for conducting a meeting to develop an IEP is a reasonable time to provide both public agencies and parents the opportunity to ensure that required participants can be present at the IEP Team meeting. Therefore, we decline to alter this longstanding regulatory provision.

*Changes:* None.

**Accessibility of Child's IEP to Teachers and Others (§ 300.323(d))**

*Comment:* Many commenters recommended retaining current § 300.342(b)(3)(i) and (b)(3)(ii), which require teachers and providers to be informed of their specific responsibilities for implementing an IEP, and the specific accommodations, modifications, and supports that must be provided to the child in accordance with the child's IEP. Several

commenters stated that a child's IEP should be readily accessible and all those involved in a child's education should be required to read and understand it.

*Discussion:* Section 300.323(d) requires that the child's IEP be accessible to each regular education teacher, special education teacher, related services provider, and any other service provider who is responsible for its implementation. The purpose of this requirement is to ensure that teachers and providers understand their specific responsibilities for implementing an IEP, including any accommodations or supports that may be needed. We agree with the commenters' recommendation and believe retaining current § 300.342(b)(3)(i) and (b)(3)(ii) is necessary to ensure proper implementation of the child's IEP and the provision of FAPE to the child. However, the mechanism that the public agency uses to inform each teacher or provider of his or her responsibilities is best left to the discretion of the public agency.

*Changes:* We have restructured § 300.323(d) and added a new paragraph (d)(2) to include the requirements in current § 300.342(b)(3)(i) and (b)(3)(ii).

IEPs for Children Who Transfer Public Agencies in the Same State (§ 300.323(e), IEPs for Children Who Transfer From Another State § 300.323(f), and Transmittal of Records § 300.323(g)) (Proposed Program for Children Who Transfer Public Agencies (§ 300.323(e))

*Comment:* None.
*Discussion:* Several technical changes are needed in proposed § 300.323(e) for clarity and improved readability. We believe that readability will be improved by reorganizing this provision into three separate paragraphs— paragraph (e), which will address transfers within the same State, paragraph (f), which will address transfers from another State, and paragraph (g), which will address the transmittal of records.

In addition, clarity will be improved by changing certain terms to align with terms that are more commonly used in this part. For example, while the Act uses the term "Program" in the title of this requirement (referring to an "individualized education program"), we believe it would be clearer to use "IEP" throughout this provision. In addition, as noted in the discussion of § 300.304(c)(5), we believe that it is important to include language stating that the requirements in § 300.323 are applicable to children with disabilities who have an IEP in effect in a previous

public agency and who transfer to a new school within the same "school year," rather than the same "academic year," because "school year" is the term most commonly understood by parents and school officials. Further, it is important that the regulations clearly and consistently differentiate between the responsibilities of the "new" public agency and the "previous" public agency.

*Changes:* We have restructured proposed § 300.323(e) into three separate paragraphs, and each paragraph has been re-named to comport with the three concepts in the statutory requirement. Proposed § 300.323(e)(1)(i) has been changed to new § 300.323(e), "IEPs for children who transfer public agencies in the same State." Proposed § 300.323(e)(1)(ii) has been changed to new § 300.323(f), "IEPs for children who transfer from another State." Proposed § 300.323(e)(2) has been changed to new § 300.323(g), "Transmittal of records."

We have substituted "IEP" for "program" in new § 300.323(e) (proposed § 300.323(e)(1)(i)), and have made the following changes to new § 300.323(e) (proposed § 300.323(e)(1)(i)) and new § 300.323(f) (proposed § 300.323(e)(1)(ii)): (1) added language to clarify that the requirements apply to a child with a disability who has an IEP in effect in a previous public agency and transfers to a new school within the same school year; (2) replaced the term "is consistent with Federal and State law" with "meets the applicable requirements in §§ 300.320 through 300.324;" and (3) clarified when a requirement applies to the "new" public agency to which the child transfers versus the "previous" public agency.

*Comment:* Several commenters requested that the regulations clarify the meaning of "comparable services."

*Discussion:* We do not believe it is necessary to define "comparable services" in these regulations because the Department interprets "comparable" to have the plain meaning of the word, which is "similar" or "equivalent." Therefore, when used with respect to a child who transfers to a new public agency from a previous public agency in the same State (or from another State), "comparable" services means services that are "similar" or "equivalent" to those that were described in the child's IEP from the previous public agency, as determined by the child's newly-designated IEP Team in the new public agency.

*Changes:* None.

IEPs for Children Who Transfer From Another State (New § 300.323(f)) (Proposed § 300.323(e)(1)(ii))

*Comment:* One commenter requested clarification regarding the responsibilities of LEAs who receive a child transferring from out of State.

*Discussion:* When a child transfers from another State, new § 300.323(f) (proposed § 300.323(e)(1)(ii)), consistent with section 614(d)(2)(C)(i)(II) of the Act, requires the LEA, in consultation with the parents, to provide the child with FAPE, including services comparable to those in the IEP from the previous public agency, until such time as the new public agency conducts an evaluation (if determined to be necessary) and adopts a new IEP.

*Changes:* None.
*Comment:* Several commenters requested that the regulations clarify what happens when a child transfers to a State with eligibility criteria that are different from the previous public agency's criteria.

*Discussion:* Under § 300.323(f)(1), if the new public agency determines that an evaluation of the child is necessary to determine whether the child is a child with a disability under the new public agency's criteria, the new public agency must conduct the evaluation. Until the evaluation is conducted, § 300.323(f) requires the new public agency, in consultation with the parent, to provide the child with FAPE, including services comparable to those described in the IEP from the previous public agency. The specific manner in which this is accomplished is best left to State and local officials and the parents to determine. We do not believe that any further clarification is necessary.

*Changes:* None.
*Comment:* One commenter requested clarification about whether parental consent must be obtained for the new public agency to evaluate a child with an IEP who transfers from another State. Another commenter requested that the regulations clarify that an evaluation of a child who transfers from another State is considered a reevaluation.

One commenter requested that the regulations address circumstances in which comparable services are considered unreasonable in the State receiving the child. Some commenters stated that the stay-put provision should be imposed by the new State if the parent disagrees with the new public agency about the comparability of services.

*Discussion:* New § 300.323(f) (proposed § 300.323(e)(1)(ii)), consistent with section 614(d)(2)(C)(i)(II) of the

Act, states that, in the case of a child with a disability who enrolls in a new school in another State, the public agency, in consultation with the parents, must provide FAPE to the child, until such time as the public agency conducts an evaluation pursuant to §§ 300.304 through 300.306, if determined necessary by the public agency, and develops a new IEP, if appropriate, that is consistent with Federal and State law. The evaluation conducted by the new public agency would be to determine if the child is a child with a disability and to determine the educational needs of the child. Therefore, the evaluation would not be a reevaluation, but would be an initial evaluation by the new public agency, which would require parental consent. If there is a dispute between the parent and the public agency regarding what constitutes comparable services, the dispute could be resolved through the mediation procedures in § 300.506 or, as appropriate, the due process hearing procedures in §§ 300.507 through 300.517. We believe these options adequately address circumstances in which comparable services are considered unreasonable.

With regard to the comment that the stay-put provisions should be imposed by the new State if the parent disagrees with the new public agency about the comparability of services, stay-put would not apply, because the evaluation is considered an initial evaluation and not a reevaluation.

*Changes:* None.

*Comment:* A few commenters requested clarification regarding the responsibilities of the new public agency for a child with a disability who moves during the summer.

*Discussion:* Section 614(d)(2)(a) is clear that at the beginning of each school year, each LEA, SEA, or other State agency, as the case may be, must have an IEP in effect for each child with a disability in the agency's jurisdiction. Therefore, public agencies need to have a means for determining whether children who move into the State during the summer are children with disabilities and for ensuring that an IEP is in effect at the beginning of the school year.

*Changes:* None.

*Comment:* Some commenters requested clarification regarding what a new public agency should do when a child's IEP is developed (or revised) by the child's previous public agency at the end of a school year (or during the summer), for implementation during the next school year, and the child moves to the new public agency before the next

school year begins (e.g., during the summer).

*Discussion:* This is a matter to be decided by each individual new public agency. However, if a child's IEP from the previous public agency was developed (or reviewed and revised) at or after the end of a school year for implementation during the next school year, the new public agency could decide to adopt and implement that IEP, unless the new public agency determines that an evaluation is needed. Otherwise, the newly designated IEP Team for the child in the new public agency could develop, adopt, and implement a new IEP for the child that meets the applicable requirements in §§ 300.320 through 300.324.

*Changes:* None.

Transmittal of Records (New § 300.323(g)) (Proposed § 300.323(e)(2))

*Comment:* Several commenters recommended that the regulations require the previous public agency to transmit a child's records to the new public agency within 15 business days after receiving the request. Other commenters recommended that the regulations require a specific timeframe for the school to obtain and review the previous educational placement and services of the transfer child.

*Discussion:* New § 300.323(g) (proposed § 300.323(e)(2)) follows the language in section 614(d)(2)(C)(ii) of the Act, and requires the new public agency to take reasonable steps to promptly obtain the child's records from the previous public agency in which the child was enrolled. New § 300.323(g) (proposed § 300.323(e)(2)) also requires the previous public agency to take reasonable steps to promptly respond to the request from the new public agency. There is nothing in the Act that would prevent a State from requiring its public agencies to obtain a child's records or respond to requests for a child's records within a specific timeframe. This is an issue appropriately left to States to determine.

*Changes:* None.

*Development of IEP*

Development, Review, and Revision of IEP (§ 300.324)

*Comment:* A few commenters recommended requiring all IEP members to sign the IEP.

*Discussion:* There is nothing in the Act that requires IEP members to sign the IEP and we believe it would be overly burdensome to impose such a requirement.

*Changes:* None.

*Comment:* A few commenters requested that the regulations require

the IEP Team to consider the social and cultural background of the child in the development, review, or revision of the child's IEP.

*Discussion:* Under § 300.306(c)(1)(i), a child's social or cultural background is one of many factors that a public agency must consider in interpreting evaluation data to determine if a child is a child with a disability under § 300.8 and the educational needs of the child. We do not believe it is necessary to repeat this requirement in § 300.324.

*Changes:* None.

*Comment:* A few commenters recommended retaining current § 300.343(a), regarding the public agency's responsibility to initiate and conduct meetings to develop, review, and revise a child's IEP.

*Discussion:* It is not necessary to retain § 300.343(a) because the requirements for the public agency to initiate and conduct meetings to develop, review, and revise a child's IEP are covered in § 300.112 and § 300.201. Section 300.112, consistent with section 614(a)(4) of the Act, requires the State to ensure that an IEP (or an IFSP that meets the requirements of section 636(d) of the Act) is developed, reviewed, and revised for each child with a disability. Section 300.201, consistent with section 613(a)(1) of the Act, requires LEAs to have in effect policies, procedures, and programs that are consistent with the State policies and procedures established under §§ 300.101 through 300.163, and §§ 300.165 through 300.174, which include the requirements related to developing, reviewing, and revising an IEP for each child with a disability.

*Changes:* None.

*Comment:* A few commenters recommended retaining current § 300.346(a)(1)(iii), regarding the IEP Team's consideration of the results of the child's performance on any general State or districtwide assessment programs in developing the child's IEP. The commenter stated that it is important to retain this requirement because such testing informs the IEP Team of the child's success in the general education curriculum.

*Discussion:* The Department agrees that State and districtwide assessments provide important information concerning the child's academic performance and success in the general education curriculum. However, current § 300.346(a)(1)(iii) was removed, consistent with section 614(d)(3)(A)(iv) of the Act. Because the language from current § 300.346(a)(1)(iii) was specifically excluded from the Act, we do not believe it is appropriate to retain it in the regulations. We do not believe

**Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations       **46683**

that an explicit regulation is needed, however, because § 300.324(a)(1)(iv) requires the IEP Team, in developing each child's IEP, to consider the academic, developmental, and functional needs of the child. A child's performance on State or districtwide assessments logically would be included in the IEP Team's consideration of the child's academic needs. In addition, as a part of an initial evaluation or reevaluation, § 300.305(a) requires the IEP Team to review existing evaluation data, including data from current classroom based, local, and State assessments.

*Changes:* None.

Consideration of Special Factors (§ 300.324(a)(2))

*Comment:* Many commenters recommended changing § 300.324(a)(2)(i) to require that the positive behavioral interventions and supports for a child whose behavior impedes the child's learning or that of others be based on a functional behavioral assessment.

*Discussion:* Section 300.324(a)(2)(i) follows the specific language in section 614(d)(3)(B)(i) of the Act and focuses on interventions and strategies, not assessments, to address the needs of a child whose behavior impedes the child's learning or that of others. Therefore, while conducting a functional behavioral assessment typically precedes developing positive behavioral intervention strategies, we do not believe it is appropriate to include this language in § 300.324(a)(2)(i).

*Changes:* None.

*Comment:* A few commenters recommended that § 300.324(a)(2)(i) refer specifically to children with internalizing and externalizing behaviors.

*Discussion:* We do not believe it is necessary to make the recommended change because § 300.324(a)(2)(i) is written broadly enough to include children with internalizing and externalizing behaviors.

*Changes:* None.

*Comment:* Many commenters expressed concern that the consideration of special factors in § 300.324(a)(2)(i) is not sufficient to address the behavioral needs of children with disabilities in the IEP process and recommended strengthening the regulations by encouraging school districts to utilize research-based positive behavioral supports and systematic and individual research-based interventions. One commenter recommended training teachers regarding the use of positive behavioral interventions and supports.

*Discussion:* We do not believe that the changes recommended by the commenters need to be made to § 300.324(a)(2)(i). Whether a child needs positive behavioral interventions and supports is an individual determination that is made by each child's IEP Team. Section 300.321(a)(2)(i) requires the IEP Team, in the case of a child whose behavior impedes the child's learning or that of others, to consider the use of positive behavioral supports, and other strategies to address that behavior. We believe that this requirement emphasizes and encourages school personnel to use positive behavioral interventions and supports.

In addition, the regulations reflect the Department's position that high-quality professional development, including the use of scientifically based instructional practices, is important to ensure that personnel have the skills and knowledge necessary to improve the academic achievement and functional performance of children with disabilities. Section 300.207, consistent with section 613(a)(3) of the Act, requires each LEA to ensure that all personnel necessary to carry out Part B of the Act are appropriately and adequately prepared, subject to the requirements in § 300.156 and section 2122 of the ESEA.

Section 300.156(a), consistent with section 612(a)(14) of the Act, clearly states that each State must establish and maintain qualifications to ensure that personnel are appropriately and adequately prepared and trained, and have the content knowledge and skills to serve children with disabilities. Further, section 2122(b)(1)(B) of the ESEA requires an LEA's application to the State for title II funds (Preparing, training, and recruiting high quality teachers and principals) to address how the LEA's activities will be based on a review of scientifically based research.

In addition, the implementation of early intervening services in § 300.226 specifically focuses on professional development for teachers and other school staff to enable such personnel to deliver scientifically based academic and behavioral interventions, and providing educational and behavioral evaluations, services, and supports. We expect that the professional development activities and the services authorized under § 300.226(b)(1) will be derived from scientifically based research.

Finally, because the definition of *scientifically based research* is important to the implementation of Part B of the Act, a reference to section 9101(37) of the ESEA has been added in new § 300.35, and the full definition of the term has been included in the discussion to the new § 300.35. Under the definition, scientifically based research must be accepted by a peer-reviewed journal or approved by a panel of independent experts through a comparably rigorous, objective, and scientific review. In short, we believe that the Act and the regulations place a strong emphasis on research based supports and interventions, including positive behavioral interventions and supports.

*Changes:* None.

*Comment:* One commenter recommended requiring positive behavioral interventions and supports for all children identified as having an emotional disturbance.

*Discussion:* Section 300.324(a)(2)(i), consistent with section 614(d)(3)(B)(i) of the Act, requires the IEP Team to consider the use of positive behavioral interventions and supports, and other strategies to address the behavior of a child whose behavior impedes the child's learning or that of others. We do not believe there should be a requirement that the IEP Team consider such interventions, supports, and strategies for a particular group of children, or for all children with a particular disability, because such decisions should be made on an individual basis by the child's IEP Team.

*Changes:* None.

*Comment:* A few commenters expressed concern that the regulations regarding special factors for the IEP Team to consider in developing IEPs imply that particular methods, strategies, and techniques should be used.

*Discussion:* The requirements in § 300.324 are not intended to imply that a particular method, strategy, or technique should be used to develop a child's IEP. For example, while § 300.324(a)(2)(i) requires the IEP Team to consider the use of positive behavioral interventions and supports, and other strategies, it does not specify the particular interventions, supports, or strategies that must be used.

*Changes:* None.

*Comment:* Some commenters recommended that the special factors for a child who is blind or visually impaired include a requirement for a clinical low vision evaluation to determine whether the child has the potential to utilize optical devices for near and distance information before providing instruction in Braille and the use of Braille.

*Discussion:* Section 614(d)(3)(B)(iii) of the Act requires instruction in Braille to be provided unless the IEP Team

**46684** **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

determines that instruction in Braille or in the use of Braille is not appropriate for the child. However, the Act does not require a clinical low vision evaluation, and we do not believe it would be appropriate to include such a requirement in the regulations. Whether a clinical low vision evaluation is conducted is a decision that should be made by the child's IEP Team.

*Changes:* None.

*Comment:* Some commenters recommended that the regulations include language requiring that instruction in Braille be considered at all stages of IEP development, review, and revision. These commenters also stated that consideration should be given to providing services and supports to improve a child's skills in the areas of socialization, independent living, orientation and mobility, and the use of assistive technology devices.

*Discussion:* The issues raised by the commenters are already covered in the regulations. Section 300.324(a)(2)(iii), consistent with section 614(d)(3)(B)(iii) of the Act, requires the IEP Team, in the case of a child who is blind or visually impaired, to provide for instruction in Braille and the use of Braille, unless the IEP Team determines (after an evaluation of the child's reading and writing skills, needs, and appropriate reading and writing media) that instruction in Braille or the use of Braille is not appropriate. As noted earlier, a new paragraph (b)(2) has been added to § 300.324 to require the IEP Team to consider the special factors in § 300.324(a)(2) when the IEP is reviewed and revised. This includes considering instruction in Braille and the use of Braille for a child who is blind or visually impaired.

In addition, § 300.324(a)(1)(iv) requires the IEP Team to consider, for all children with disabilities, the academic, developmental, and functional needs of the child, which could include, as appropriate, the child's need to develop skills in the areas of socialization, independent living, and orientation and mobility. Consideration of a child's needs for assistive technology devices and services is required by § 300.324(a)(2)(v).

*Changes:* None.

*Comment:* Several commenters recommended that the regulations require IEP Teams, for a child who is deaf, to consider the child's communication abilities, ensure that the child can access language and communicate with peers and adults, and ensure that the child has an educational placement that will meet the child's communication needs. The

commenters also recommended that the IEP Team be required to consider the qualifications of the staff delivering the child's educational program.

*Discussion:* The commenters' concerns are already addressed in the regulations. Section 300.324(a)(2)(iv), consistent with section 614(d)(3)(B)(iv) of the Act, requires the IEP Team to consider the communication needs of the child, and in the case of a child who is deaf or hard of hearing, consider the child's language and communication needs, opportunities for direct communications with peers and professional personnel in the child's language and communication mode, academic level, and full range of needs, including opportunities for direct instruction in the child's language and communication mode.

With respect to the commenters' recommendation regarding qualified staff to deliver the child's educational program, § 300.156, consistent with section 612(a)(14) of the Act, requires the SEA to establish and maintain qualifications to ensure that personnel necessary to carry out the purposes of the Act are appropriately and adequately prepared and trained to serve children with disabilities.

*Changes:* None.

*Comment:* Some commenters suggested that § 300.324(a)(2)(iv) explain that: (a) a primary language assessment and assessment of communication abilities may be required to determine the child's most effective language; (b) program and placement decisions must be based on such assessments; (c) a child must be in an educational placement where the child may communicate with peers and adults; and (d) a deaf child's educational placement must include a sufficient number of peers and adults who can communicate fluently in the child's primary language.

*Discussion:* It is not necessary to include in the regulations the additional language recommended by the commenters. Section 300.324(a)(1)(iii), consistent with section 614(d)(3)(A)(iii) of the Act, requires the IEP Team to consider, among other things, the results of the initial or most recent evaluation of the child, which for a child who is deaf, may include an assessment of a child's communication abilities. Further, § 300.324(a)(2)(iv), consistent with section 614(d)(3)(B)(iv) of the Act, requires the IEP Team to consider opportunities for direct communications with peers and professional personnel in the child's language and communication mode, academic level, and full range of needs, including opportunities for direct instruction in

the child's language and communication mode. We believe this adequately addresses the commenters' concerns.

*Changes:* None.

*Comment:* One commenter requested that emotional issues be considered as an additional special factor that can impede learning. The commenter stated that emotional issues can be addressed through individual interventions focused on the child's needs and systemic interventions to improve the overall school climate.

*Discussion:* Section 614(d)(3)(B) of the Act does not include emotional issues as a special factor to be considered by the IEP Team. We decline to add it to the regulations because there are already many opportunities for the IEP Team to consider the affect of emotional issues on a child's learning. For example, § 300.324(a)(1), consistent with section 614(d)(3)(A) of the Act, requires the IEP Team to consider the strengths of the child; the concerns of the parents for enhancing the education of their child; the results of the initial evaluation or most recent evaluation of the child; and the academic, developmental, and functional needs of the child, all of which could be affected by emotional issues and would, therefore, need to be considered by the IEP Team.

*Changes:* None.

*Comment:* A few commenters requested that children with medical conditions that are degenerative be added to the list of special factors considered by the IEP Team. The commenters stated that the IEP Team should consider the need for children with degenerative conditions to maintain their present levels of functioning by including related therapeutic services prior to the loss of their abilities, such as occupational and physical therapy, and other services to address the child's needs in the areas of self-help, mobility, and communication.

*Discussion:* Section 614(d)(3)(B) of the Act does not include consideration of children with degenerative conditions as a special factor. We decline to add it to the regulations because we believe that the regulations already address the commenters' concerns. As with any child with a disability, the child's IEP Team, which includes the parent, determines the special education and related services that are needed in order for the child to receive FAPE. For children with degenerative diseases, this may include related services such as physical and occupational therapy (or other services to address the child's needs in the areas of self-help, mobility, and communication) to help maintain the child's present levels of functioning for as long as possible in order for the

child to benefit from special education. In addition, as part of an evaluation or reevaluation, § 300.305 requires the IEP Team and other qualified professionals, as appropriate, to review existing evaluation data on the child to determine the child's needs, which may include evaluations and information from parents, as well as medical professionals who know the child and the child's specific medical condition.

S. Rpt. No. 108–185, p. 33, and H. Rpt. No. 108–77, p. 112, recognized the special situations of children with medical conditions that are degenerative (*i.e.*, diseases that result in negative progression and cannot be fully corrected or fully stabilized). For children with degenerative diseases who are eligible for services under the Act, both reports state that special education and related services can be provided to help maintain the child's present levels of functioning for as long as possible in order for the child to fully benefit from special education services. The reports also state, ''The IEP Team can include related services designed to provide therapeutic services prior to loss of original abilities to extend current skills and throughout the child's enrollment in school. These services may include occupational and physical therapy, self-help, mobility, and communication, as appropriate.''

*Changes:* None.

*Comment:* Some commenters stated that the IEP Team's review of the special factors in § 300.324(a)(2) is duplicative and should be eliminated.

*Discussion:* The requirements in § 300.324(a)(2) are directly from section 614(d)(3)(B) of the Act and cannot be removed.

*Changes:* None.

*Comment:* Many commenters recommended that the regulations retain current § 300.346(b) and require the IEP Team to consider the special factors in § 300.324(a)(2) when the IEP is reviewed and revised. The commenters stated that these special factors may affect a child's instructional needs and ability to obtain FAPE beyond the period when an IEP is initially developed.

*Discussion:* The Department agrees that the IEP Team should consider the special factors in § 300.324(a)(2) when an IEP is reviewed and revised. We will, therefore, add this requirement to the regulations.

*Changes:* A new paragraph (b)(2) has been added to § 300.324 to require the IEP Team to consider the special factors in § 300.324(a)(2) when the IEP is reviewed and revised. Proposed § 300.324(b)(2) has been redesignated accordingly.

*Comment:* One commenter requested changing § 300.324(a)(2)(v), regarding the IEP Team's consideration of a child's need for assistive technology devices and services, to require assistive technology devices and services that are needed for a child to be included in the child's IEP.

*Discussion:* Section 300.320(a)(4) requires the IEP to include a statement of the special education and related services and supplementary aids and services to be provided to the child, or on behalf of the child. This would include any assistive technology devices and services determined by the IEP Team to be needed by the child in order for the child to receive FAPE. Therefore, it is unnecessary to repeat this in § 300.324(a)(2)(v).

*Changes:* None.

### Agreement (§ 300.324(a)(4))

*Comment:* Many commenters expressed concern that permitting changes to a child's IEP without an IEP Team meeting will be detrimental to the child's overall education. Several commenters requested that § 300.324(a)(4) clarify whether such changes to the IEP can only be made between the annual IEP Team meetings to review the IEP and not in place of an annual IEP Team meeting. These commenters also requested clarification regarding the types of revisions that could be made without an IEP Team meeting. A few commenters recommended limiting the circumstances under which an IEP may be revised without convening an IEP Team meeting. One commenter requested that the regulations include safeguards to ensure that key elements of a child's IEP are not altered without a discussion of the changes with the parent.

*Discussion:* Section 300.324(a)(4), consistent with section 614(d)(3)(D) of the Act, allows a parent and a public agency to agree not to convene an IEP Team meeting to make changes to the child's IEP, and instead, to develop a written document to amend or modify the child's current IEP. The Act does not place any restrictions on the types of changes that may be made, so long as the parent and the public agency agree. Accordingly, we do not believe it would be appropriate to include restrictions on such changes in the regulations.

We do not believe that an amendment to an IEP can take the place of an annual IEP Team meeting. It is unnecessary to regulate on this issue because section 614(d)(4)(A)(i) of the Act clearly requires the IEP Team to review the child's IEP annually to determine whether the annual goals for the child are being achieved. We believe that the procedural safeguards in §§ 300.500 through 520 are sufficient to ensure that a child's IEP is not changed without prior notice by a public agency and an opportunity to discuss any changes with the public agency.

*Changes:* None.

*Comment:* Several commenters asked whether the agreement to make changes to a child's IEP without an IEP Team meeting must be in writing. Many commenters recommended requiring informed written consent to amend an IEP without an IEP Team meeting.

*Discussion:* Section 614(d)(3)(D) of the Act does not require the agreement between the parent and the public agency to be in writing. In addition, the parent is not required to provide *consent,* as defined in § 300.9, to amend the IEP without an IEP Team meeting. However, it would be prudent for the public agency to document the terms of the agreement in writing, in the event that questions arise at a later time. Of course, changes to the child's IEP would have to be in writing.

*Changes:* None.

*Comment:* One commenter requested that the regulations include safeguards to ensure that key elements of a child's prior IEP program are not altered without discussion of the change with parents, and that parents are provided with information that will allow them to fully consider the alternatives.

*Discussion:* Section 300.324(a)(4), consistent with section 614(d)(3)(D) of the Act, permits the public agency and the parent to agree to amend the child's IEP without an IEP Team meeting. If the parent needs further information about the proposed change or believes that a discussion with the IEP Team is necessary before deciding to change the IEP, the parent does not have to agree to the public agency's request to amend the IEP without an IEP Team meeting.

*Changes:* None.

*Comment:* A few commenters recommended that when an IEP is changed without an IEP Team meeting, all personnel with responsibility for implementing the revised IEP should be informed of the changes with respect to their particular responsibilities and have access to the revised IEP. Some commenters recommended that once the parent has approved the IEP changes, the IEP Team members should be notified and trained on the amended IEP within one calendar week of the changes.

*Discussion:* We agree that when the parent and the public agency agree to change the IEP without an IEP Team meeting, it is important that the personnel responsible for implementing

**46686** **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

the revised IEP be notified and informed of the changes with respect to their particular responsibilities. We will add language to address this in § 300.324(a)(4). We do not believe that it is necessary to regulate on the timeframe within which a public agency must make the IEP accessible to the service providers responsible for implementing the changes, or otherwise notify them of the changes, as this will vary depending on the circumstances (e.g., whether the changes are minor or major changes) and is, therefore, best left to State and local public agency officials to determine.

*Changes:* We have restructured § 300.324(a)(4) and added a new paragraph (a)(4)(ii) to require a public agency to ensure that the child's IEP Team is informed of changes made to a child's IEP when changes to the IEP are made without an IEP Team meeting.

*Comment:* One commenter asked whether States must allow parents and school districts to agree to change the IEP without an IEP Team meeting.

*Discussion:* The provisions in section 614(d)(3)(D) of the Act are intended to benefit parents by providing the flexibility to amend an IEP without convening an IEP Team meeting. Therefore, a State must allow changes to an IEP without an IEP Team meeting when a parent and public agency agree not to convene an IEP Team meeting, and instead develop a written document to amend or modify a child's current IEP, consistent with § 300.324(a)(4) and section 614(d)(3)(D) of the Act.

*Changes:* None.

Amendments (§ 300.324(a)(6))

*Comment:* Many commenters requested revising § 300.324(a)(6) to require public agencies to provide a copy of a revised IEP to the parent without requiring the parent to request the copy when amendments are made to the IEP. The commenters stated that this safeguard is needed to ensure that negotiated amendments are actually instituted. Some commenters recommended that, at a minimum, the parent should be provided with notice that they have the right to receive a copy of the revised IEP.

*Discussion:* The requirement for a public agency to provide a parent with a revised copy of the IEP upon the request of a parent is in section 614(d)(3)(F) of the Act. There is nothing in the Act that would prevent a school from providing a copy of a revised IEP to a parent whenever amendments are made. However, under the Act, the school is not required to provide the parent a copy of the revised IEP absent the parent's request for a copy. It would

be inconsistent with the Act to include such a requirement in the regulations.

*Changes:* None.

*Comment:* Some commenters recommended that changes to the IEP should not take effect until a notice has been sent to the parent explaining the changes and written consent from the parent has been obtained. One commenter recommended that the regulations require a core group of the IEP Team to meet and address any changes to the IEP.

*Discussion:* To implement the commenters' recommendations would be inconsistent with the Act. Section 614(d)(3)(F) of the Act cross-references section 614(d)(3)(D) of the Act, which provides that changes to the IEP may be made either by the entire IEP Team, which includes the parent, at an IEP Team meeting, or amended without an IEP Team meeting when the parent and public agency agree. The phrase "at an IEP Team meeting" following "by the entire IEP Team" was inadvertently omitted in § 300.324(a)(6). We will, therefore, add the phrase to clarify that changes to an IEP may be made by the entire IEP Team at an IEP Team meeting, or amended without an IEP Team meeting when the parent and public agency agree.

*Changes:* We have added the phrase "at an IEP Team meeting" following "by the entire IEP Team."

Failure To Meet Transition Objectives (§ 300.324(c))

*Comment:* One commenter recommended that § 300.324(c) emphasize collaboration between public agencies providing education and transportation in order to resolve problems concerning a child's transportation IEP objectives related to transition.

*Discussion:* Section 300.321(b)(3) requires the IEP Team to invite a representative of any agency that is likely to be responsible for providing or paying for transition services, when appropriate, and with the consent of the parent (or a child who has reached the age of majority). In addition, § 300.154(a), consistent with section 612(a)(12) of the Act, requires each State to ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each non-educational public agency and the SEA, in order to ensure that services needed to ensure FAPE are provided. Section 300.154(b) and section 612(a)(12)(B)(i) of the Act specifically refer to interagency agreements or other mechanisms for interagency coordination with agencies assigned responsibility under State policy to

provide special education or related services relating to transition. This would include a public agency that is responsible for transportation under State policy. We believe this is sufficient to address the commenter's concern.

*Changes:* None.

*Comment:* A few commenters requested that § 300.324(c)(1) clarify that public agencies are under a legal obligation to provide services related to the transition objectives in a child's IEP.

*Discussion:* It is not necessary to include additional language in § 300.324(c)(1). Section 300.101, consistent with section 612(a)(1)(A) of the Act, requires each SEA to ensure that the special education and related services that are necessary for the child to receive FAPE are provided in conformity with the child's IEP. If an agency, other than the public agency, fails to provide the transition services described in the IEP, the public agency must reconvene the IEP Team to develop alternative strategies to meet the transition objectives for the child set out in the child's IEP, consistent with section 614(d)(6) of the Act and § 300.324(c)(1).

*Changes:* None.

Children With Disabilities in Adult Prisons (§ 300.324(d))

*Comment:* A few commenters stated that guidance is needed regarding what requirements apply when serving incarcerated children with disabilities. One commenter recommended requiring that children with disabilities incarcerated in local jails continue with their established school schedules and IEP services, which States may provide directly or through an LEA.

*Discussion:* No change to the regulations is needed. Section 300.324(d)(1), consistent with section 614(d)(7) of the Act, specifies the requirements of the Act that do not apply to children with disabilities who are convicted as adults under State law and incarcerated in adult prisons. If a child with a disability is incarcerated, but is not convicted as an adult under State law and is not incarcerated in an adult prison, the requirements of the Act apply. Whether the special education and related services are provided directly by the State or through an LEA is a decision that is best left to States and LEAs to determine.

*Changes:* None.

*Comment:* One commenter stated that SEAs and LEAs should not be allowed to restrict the types of services provided to children with disabilities simply because they are incarcerated.

**Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations **46687**

*Discussion:* We disagree with the commenter. The Act allows services to be restricted for a child with a disability who is convicted as an adult under State law and incarcerated in an adult prison. Section 614(d)(7)(B) of the Act states that the IEP Team of a child with a disability who is convicted as an adult under State law and incarcerated in an adult prison may modify the child's IEP or placement if the State has demonstrated a bona fide security or compelling penological interest that cannot otherwise be accommodated. Further, the LRE requirements in § 300.114 and the requirements related to transition services in § 300.320 do not apply.

*Changes:* None.

Private School Placements by Public Agencies (§ 300.325)

*Comment:* One commenter stated that § 300.325, regarding private school placements by public agencies, is not in the Act and should be removed.

*Discussion:* We disagree with the commenter. Section 612(a)(10)(B) of the Act provides that children with disabilities who are placed in private schools and facilities are provided special education and related services, in accordance with an IEP, and have all the rights the children would have if served by a public agency. In order to comply with this statutory requirement, § 300.325 explains the responsibilities of the public agency that places a child with a disability in a private school or facility with respect to developing, reviewing, and revising the child's IEP.

*Changes:* None.

*Comment:* A few commenters requested clarifying § 300.325(b)(1), which allows the private school or facility to initiate and conduct IEP Team meetings to review and revise the child's IEP at the discretion of the public agency. The commenters stated that this should be changed to "only with the consent of the public agency."

*Discussion:* We do not believe the suggested change is necessary. Section 300.325(c) is clear that for publicly-placed children with disabilities, even if a private school or facility implements a child's IEP, responsibility for compliance with Part B of the Act remains with the public agency and the SEA. Therefore, it is up to the public agency to determine whether the private school or facility can initiate and conduct an IEP Team meeting to review and revise a child's IEP.

*Changes:* None.

Educational Placements (§ 300.327)

*Comment:* A few commenters stated that the terms "educational placement"

and "placement" are used throughout the regulations and recommended that only one of the terms be used to avoid confusion. A few commenters suggested that the term "educational placement" be defined to include location, supports, and services provided.

*Discussion:* The terms "educational placement" and "placement" are used throughout the Act, and we have followed the language of the Act whenever possible. We do not believe it is necessary to define "educational placement." Section 300.116, consistent with section 612(a)(5) of the Act, states that the determination of the educational placement of a child with a disability must be based on a child's IEP. The Department's longstanding position is that placement refers to the provision of special education and related services rather than a specific place, such as a specific classroom or specific school.

*Changes:* None.

Alternative Means of Meeting Participation (§ 300.328)

*Comment:* One commenter requested that electronic mail be used as an alternative means of communication for administrative matters if the parents and the public agency agree.

*Discussion:* There is nothing in the Act or these regulations that prohibits the use of electronic mail to carry out administrative matters under section 615 of the Act, so long as the parent of the child with a disability and the public agency agree.

*Changes:* None.

*Comment:* A few commenters recommended that the regulations clarify that video conferences may be used to allow general education teachers to participate in IEP Team meetings.

*Discussion:* The regulations already address the use of video conferences. Section 300.328, consistent with section 614(f) of the Act, allows the use of video conferences and other alternative means of meeting participation if the parent of the child with a disability and the public agency agree.

*Changes:* None.

*Comment:* One commenter recommended that the regulations specify that the cost of using alternative means of meeting participation shall be borne by the LEA and not the parent.

*Discussion:* If a public agency uses an alternative means of meeting participation that results in additional costs, the public agency is responsible for paying the additional costs. We do not believe it is necessary to include this additional language in the regulations. Section 300.101, consistent with section 612(a)(1)(A) of the Act,

requires that the public education provided to children with disabilities must be free and appropriate. The benefits of including parents in the IEP process by providing parents means by which parents can participate is an important part of ensuring that a child receives FAPE and far outweighs any additional costs for the alternative means of participation that a public agency may incur.

*Changes:* None.

*Comment:* A few commenters recommended requiring the parent's agreement to use alternative means of meeting participation to conform to the consent requirements in § 300.9.

*Discussion:* Section 614(f) of the Act allows the parent and a public agency to agree to use alternative means of meeting participation. *Consent,* as defined in § 300.9 is not required by the Act. Therefore, we do not believe it should be required by regulation.

*Changes:* None.

*Comment:* One commenter recommended that there be additional requirements when using alternative means of meeting participation. The commenter stated that parents should be informed of their right to refuse a telephone conference and should be required to provide consent at least seven days prior to the meeting. Another commenter recommended clarifying that alternative means of meeting should only be used when necessary.

*Discussion:* Section 614(f) of the Act allows a parent and a public agency to agree to use alternative means of meeting participation. The Act does not specify any additional requirements or restrictions. We view this provision as providing flexibility for parents and public agencies in arranging convenient meetings and believe that additional requirements would be inconsistent with that purpose.

*Changes:* None.

*Comment:* One commenter recommended that the regulations require LEAs to provide the parent with an IEP in a timely manner (within five business days) when alternative means of meeting participation are used for an IEP Team meeting. The commenter stated this was necessary so that the parent can verify the contents of the IEP.

*Discussion:* New 300.322(f) (proposed § 300.322(e)) requires the public agency to give the parent a copy of the child's IEP at no cost to the parent. We believe the specific timeframe in which the public agency provides a copy of the IEP to the parent is best left to the public agency to determine.

*Changes:* None.

*Comment:* One commenter stated that the requirements for alternative means of meeting participation in § 300.328 should be placed in the regulations following § 300.321, because the requirements add flexibility to the special education process.

*Discussion:* The requirements in § 300.328, regarding alternative means of meeting participation, apply to IEP Team meetings as well as placement meetings, and carrying out administrative matters under section 615 of the Act. Therefore, it would not be appropriate to move § 300.328 to the location in the regulations suggested by the commenter.

*Changes:* None.

## Subpart E—Procedural Safeguards

*Due Process Procedures for Parents and Children*

Opportunity To Examine Records; Parent Participation in Meetings (§ 300.501)

*Comment:* One commenter recommended adding language in § 300.501(a) stating that parents have the right to obtain a free copy of all education records.

*Discussion:* Section 300.501(a), consistent with section 615(b)(1) of the Act, affords parents an opportunity to inspect and review all education records with respect to the identification, evaluation, and educational placement of the child, and the provision of FAPE to the child. Specific procedures for access to records are contained in the confidentiality provisions in §§ 300.613 through 300.621. A participating agency, consistent with § 300.613(b)(2), however, must provide copies of a child's education records to a parent, if failure to do so would effectively prevent a parent from exercising the right to inspect and review the records, such as if a parent lives outside of commuting distance of the agency. This provision is consistent with the access rights afforded under FERPA in 34 CFR 99.10(d)(1).

We decline to make the change requested by the commenter because such a change would impose a significant new burden on public agencies that is not necessary. Public agencies, however, are free to provide copies whenever requested by the parent, if they choose to do so. We have, however, made a change to this section to correct the cross-references to the procedures for inspection and review of records.

*Changes:* We have corrected the cross-references to the procedures for inspection and review of records to §§ 300.613 through 300.621.

*Comment:* One commenter recommended adding a provision to § 300.501 that would give parents the opportunity to prepare their own reports and provide information that would become part of the child's education record.

*Discussion:* The Act and these regulations encourage parental input and involvement in all aspects of a child's educational program, and provide many opportunities for parents to provide information that becomes part of the child's education record. For example, § 300.304(a)(1), consistent with section 614(b)(2)(A) of the Act, requires any evaluation to include information provided by the parent; § 300.305(a)(2), consistent with section 614(c)(1)(B) of the Act, requires the review of existing data for evaluations and reevaluations to include input from the child's parents; § 300.306(a)(1), consistent with section 614(b)(4) of the Act, requires the parent to be part of the group that determines whether the child is a child with a disability and the educational needs of the child; and § 300.321(a)(1), consistent with section 614(d)(1)(B)(i) of the Act, requires the IEP Team that is responsible for developing, reviewing and revising the child's IEP to include the parent. In addition, § 300.322(a) specifies the steps a public agency must take to ensure that one or both parents are present at the IEP Team meeting and afforded the opportunity to participate in the meeting. Therefore, we do not believe that it is necessary to regulate on this issue. However, if a parent provides a report for the child's education record and the public agency chooses to maintain a copy of the written report, that report becomes part of the child's education record and is subject to the confidentiality of information requirements in §§ 300.610 through 300.627, and FERPA and its implementing regulations in 34 CFR part 99.

*Changes:* None.

*Comment:* Many commenters suggested adding language in § 300.501(b)(2) requiring the public agency to take whatever action is necessary to ensure that parents understand the proceedings at any of the meetings described in this section. The commenters stated that this requirement is not unnecessarily duplicative and removing it gives the impression that interpreters are no longer required. Several commenters recommended that if school staff determines that a parent has difficulty understanding the procedural safeguards, the public agency must explain the parent's rights at any time

that a change in services is contemplated.

*Discussion:* It is not necessary to add language to § 300.501(b)(2) to require a public agency to take whatever action is necessary to ensure that parents understand the proceedings at any of the meetings described in this section. Public agencies are required by other Federal statutes to take appropriate actions to ensure that parents who themselves have disabilities and limited English proficient parents understand proceedings at any of the meetings described in this section. The other Federal statutory provisions that apply in this regard are Section 504 of the Rehabilitation Act of 1973 and its implementing regulations in 34 CFR part 104 (prohibiting discrimination on the basis of disability by recipients of Federal financial assistance), title II of the Americans With Disabilities Act and its implementing regulations in 28 CFR part 35 (prohibiting discrimination on the basis of disability by public entities, regardless of receipt of Federal funds), and title VI of the Civil Rights Act of 1964 and its implementing regulations in 34 CFR part 100 (prohibiting discrimination on the basis of race, color, or national origin by recipients of Federal financial assistance).

As noted in the *Analysis of Comments and Changes* section to subpart D, we have retained the requirements in current § 300.345(e), which require the public agency to take whatever action is necessary to ensure that the parent understands the proceedings at an IEP Team meeting, including arranging for an interpreter for parents with deafness or whose native language is other than English. This requirement is in new § 300.322(e). We have also included a cross reference to new § 300.322(e) in § 300.501(c)(2) to clarify that.

It is not necessary to include regulations to require a public agency to explain the procedural safeguards to parents any time that a change in services is contemplated. Section 300.503 already requires prior written notice to be given to the parents of a child with a disability a reasonable time before the public agency proposes (or refuses) to initiate or change the identification, evaluation, or educational placement of the child, or the provision of FAPE to the child. As required in § 300.503(b)(4), the prior written notice must include a statement that the parents have protections under the procedural safeguards of this part. Consistent with §§ 300.503(c) and 300.504(d), the prior written notice and the procedural safeguards notice, respectively, must be written in language understandable to the general

public and provided in the native language or other mode of communication of the parent, unless it is clearly not feasible to do so. If the native language or other mode of communication of the parent is not a written language, the public agency must take steps to ensure that the notice is translated orally or by other means to the parent in his or her native language or other mode of communication and that the parent understands the content of the notice.

*Changes:* None.

*Comment:* Several commenters stated that § 300.501(b)(3) implies that teaching methodologies and lesson plans must be included in the IEP, which exceeds the requirements of the Act. The commenters recommended removing ''if those issues are not addressed in the child's IEP'' from § 300.501(b)(3).

*Discussion:* We agree that the phrase referred to by the commenters is confusing and open to misinterpretation and are removing it from § 300.501(b)(3).

*Changes:* We have removed the phrase ''if those issues are not addressed in the child's IEP'' from § 300.501(b)(3) for clarity.

*Comment:* Many commenters recommended requiring a public agency to make several attempts to involve parents in placement decisions and requested that § 300.501 be changed to require a public agency to maintain: (1) Detailed records of telephone calls made or attempted and the results of those calls; (2) copies of correspondence sent to parents and any responses received; and (3) detailed records of visits made to a parent's home or place of employment and the results of those visits.

*Discussion:* We do not believe the additional language requested by the commenters is necessary. Section 300.501(c)(4) requires a public agency to maintain a record of its attempts to contact parents prior to making a placement decision without parent participation. We believe this requirement is sufficient to ensure that a public agency holding a placement meeting with neither parent in attendance takes the necessary steps to contact parents and maintain appropriate documentation of its attempts to ensure parent participation. As a matter of practice, public agencies use a variety of methods to contact parents depending on the ways they find to be most efficient and effective for a particular situation. Public agencies take seriously their obligation to include parents in placement decisions and are in the best position to determine the

records they need to demonstrate that they have taken appropriate steps to include parents in placement decisions before holding a placement meeting without a parent in attendance.

*Changes:* None.

*Comment:* A few commenters recommended that placement meetings not be held, or decisions made, without a representative of the child. The commenters recommended appointing a surrogate parent when the biological or adoptive parent refuses to attend, or is unable to participate, in the placement meeting.

*Discussion:* There is no statutory authority to permit the appointment of a surrogate parent when a parent is either unable or unwilling to attend a meeting in which a decision is made relating to a child's educational placement. In section 615(b)(2) of the Act, a public agency does not have the authority to appoint a surrogate parent where a child's parent is available or can be identified and located after reasonable efforts, but refuses, or is unable, to attend a meeting or otherwise represent the child.

*Changes:* None.

Independent Educational Evaluation (§ 300.502)

*Comment:* One commenter suggested adding language to § 300.502 requiring evaluators who conduct independent educational evaluations (IEEs) to be licensed by the State.

*Discussion:* We are not changing the regulations in the manner requested by the commenter because the regulations already require that the standards be the same for all evaluators, as long as the agency's criteria for evaluators do not prohibit a parent from obtaining an IEE. An IEE is defined in § 300.502(a)(3)(i) as an evaluation conducted by a qualified examiner who is not employed by the public agency responsible for the education of the child in question. Section 300.502(e) provides that in order for an IEE to be at public expense, the criteria under which the evaluation is obtained, including the location of the evaluation and the qualifications of the examiner, must be the same as the criteria that the public agency uses when it initiates an evaluation, to the extent those criteria are consistent with the parent's right to an IEE. Except for these criteria, § 300.502(e)(2) provides that a public agency may not impose conditions or timelines related to obtaining an IEE at public expense. Consistent with applicable agency criteria, it would be appropriate for a public agency to require an IEE examiner to hold, or be eligible to hold, a particular license when a public

agency requires the same licensure for personnel who conduct the same types of evaluations for the agency. In contrast, it would be inconsistent with a parent's right to an IEE for a public agency to require all evaluators to be licensed, if only individuals employed by a public agency may obtain a license.

*Changes:* None.

*Comment:* One commenter requested clarification regarding parental rights to an IEE when a public agency is using a response to intervention process to determine whether a child has SLD.

*Discussion:* If a parent disagrees with the results of a completed evaluation that includes a review of the results of a child's response to intervention process, the parent has a right to an IEE at public expense, subject to the conditions in § 300.502(b)(2) through (b)(4). The parent, however, would not have the right to obtain an IEE at public expense before the public agency completes its evaluation simply because the parent disagrees with the public agency's decision to use data from a child's response to intervention as part of its evaluation to determine if the child is a child with a disability and the educational needs of the child.

*Changes:* None.

*Comment:* One commenter requested clarification regarding a public agency's right to limit the amount it pays for an IEE and asked whether a public agency can place limits on the frequency of an IEE (e.g., a single IEE in an evaluation cycle or in a child's school career).

*Discussion:* It is the Department's longstanding position that public agencies should not be required to bear the cost of unreasonably expensive IEEs. This position is reflected in the regulatory provisions. Section 300.502(a)(2) provides that if a parent requests an IEE at public expense, the public agency must provide the parent with information about where an IEE may be obtained and the agency criteria applicable for IEEs. In order for an evaluation to be at public expense, § 300.502(e)(1) requires that the criteria under which an IEE is obtained, including the location of the IEE and the qualifications of the examiner, be the same as the criteria that the public agency uses when it initiates an evaluation, to the extent that those criteria are consistent with a parent's right to an IEE. In addition, § 300.502(e)(2) states that, except for the criteria described above, a public agency may not impose conditions or timelines related to obtaining an IEE at public expense.

Although it is appropriate for a public agency to establish reasonable cost containment criteria applicable to

**46690**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

personnel used by the agency, as well as to personnel used by parents, a public agency would need to provide a parent the opportunity to demonstrate that unique circumstances justify selection of an evaluator whose fees fall outside the agency's cost containment criteria. Section 300.502(b)(2) provides that if the parent requests an IEE at public expense, the public agency either must ensure that the IEE is provided at public expense or file a due process complaint notice to request a hearing to demonstrate that the agency's evaluation is appropriate.

We do not, however, believe that the parent should be limited to one IEE at public expense in a child's school career. In the school career of a child, there could be more than one point when there is a legitimate disagreement between a parent and the public agency over evaluations of the child. Nevertheless, we do believe that it is important to clarify that a parent is not entitled to more than one IEE at public expense when the parent disagrees with a specific evaluation or reevaluation conducted or obtained by the public agency. Therefore, we are adding a new paragraph (b)(5) in § 300.502 to clarify that a parent is entitled to only one IEE each time the public agency conducts an evaluation with which the parent disagrees. This regulatory provision is consistent with a parent's statutory right to an IEE at public expense, while recognizing that public agencies should not be required to bear the cost of more than one IEE when a parent disagrees with an evaluation conducted or obtained by the public agency.

*Changes:* We have added a new paragraph (b)(5) in § 300.502 to clarify that a parent is entitled to only one IEE at public expense each time the public agency conducts an evaluation with which the parent disagrees.

*Comment:* Some commenters suggested adding language allowing an evaluator conducting an IEE the opportunity to review existing data, receive input from the child's parents, determine what additional data are needed to determine the scope of the evaluation, and select the instruments appropriate to evaluate the child. The commenters also stated that the public agency should not restrict the scope of the evaluation.

*Discussion:* We do not believe it is necessary to add language to the regulations regarding the review of existing data, input from the child's parents, the scope of the evaluation, or the instruments used to evaluate the child, because an IEE must meet the agency criteria that the public agency

uses when it initiates an evaluation, consistent with § 300.502(e).

Section 300.305(a) provides that, as part of an initial evaluation (if appropriate) and as part of any reevaluation under this part, the IEP Team and other qualified professionals, as appropriate, must review existing evaluation data on the child, including input from the child's parents. Since the review of existing evaluation data and input from the child's parents are part of the public agency's evaluation, they would also be appropriate elements in an IEE.

Similarly, § 300.304(b)(1) provides that an evaluation conducted by a public agency must use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child, including information provided by the parent, that may assist in determining whether the child is a child with a disability under § 300.8, and the content of the child's IEP, including information related to enabling the child to be involved in and progress in the general education curriculum (or for a preschool child to participate in appropriate activities). These requirements also apply to an IEE conducted by an independent evaluator, since these requirements will be a part of the agency's criteria.

Generally, the purpose of an evaluation under the Act is to determine whether the child is a child with a disability, and in the case of a reevaluation, whether the child continues to have a disability, and the educational needs of the child. It would be inconsistent with the Act for a public agency to limit the scope of an IEE in a way that would prevent an independent evaluator from fulfilling these purposes.

*Changes:* None.

*Comment:* Some commenters recommended adding language to the regulations requiring a parent to provide consent for release of education records when a hearing officer orders an LEA to provide an IEE at public expense.

*Discussion:* Consistent with § 300.622(b), parental consent is not required for a public agency to release education records to a hearing officer because a hearing officer is an official of a participating agency, as defined in § 300.611(c). However, when a hearing officer orders an IEE, parental consent would be required under § 300.622(a) for a public agency to release education records to the independent evaluator who will conduct the IEE, since in these situations, the independent evaluator is not an official of a participating agency. If a parent refuses to consent to the

release of education records to an independent evaluator, a hearing officer could decide to dismiss the complaint. Therefore, we are not changing the regulations in the manner suggested by the commenter.

*Changes:* None.

*Comment:* A few commenters requested clarification regarding what an LEA must do to satisfy the requirement in § 300.502(c)(1) that a public agency consider the results of an evaluation obtained by a parent at private expense. The commenters stated that public agencies often ignore the results of an IEE and recommended requiring public agencies to explain why an IEE was rejected.

*Discussion:* Section 300.502(c)(1) imposes an affirmative obligation on a public agency to consider the results of a parent-initiated evaluation at private expense in any decision regarding the provision of FAPE to the child, if that evaluation meets agency criteria. The requirement, however, does not mean that the public agency is compelled to consider the parent-initiated evaluation at private expense in its decision regarding the provision of FAPE, if it does not meet agency criteria. If the agency believes that the parent-initiated evaluation does not meet agency criteria, it would be appropriate for the agency to explain to the parent why it believes that the parent-initiated evaluation does not meet agency criteria.

*Changes:* None.

*Comment:* Several commenters indicated that permitting any party to use the results from a privately-funded IEE as evidence at a due process hearing may discourage parents from initiating and paying for evaluations of their child.

*Discussion:* If a parent obtains an evaluation at private expense, there is nothing in the Act or these regulations that requires a parent to share that evaluation with the public agency. A privately-funded evaluation that is not shared with a public agency would not be considered an IEE under this regulation. If, however, the parent chooses to share the evaluation with the public agency, that evaluation may be presented by any party as evidence in a due process hearing, in accordance with § 300.502(c)(2). Similarly, if a public agency reimburses a parent for an IEE, and the parent disagrees with the results of the IEE, there is nothing in the Act or these regulations that would prevent a public agency from introducing that evaluation in a due process hearing over the parent's objection. We disagree with the commenters to the extent that they believe that parents should have an

expectation of privacy regarding an evaluation that is publicly-funded or for which they seek public funding. We believe it is necessary to change § 300.502(c)(2) to ensure that public agencies have the opportunity to introduce the results of publicly-funded IEEs at a due process hearing.

*Changes:* We have added language in § 300.502(c) to permit any party to present the results of a publicly-funded IEE. We have also clarified that if a parent shares a privately-funded IEE with the public agency, the privately-funded IEE may be used as evidence in a due process hearing.

*Comment:* One commenter recommended that the regulations prohibit the testimony of experts who did not evaluate the child before the due process hearing, unless the other party has an equal opportunity to evaluate the child at public expense, both parties consent to such testimony, or the hearing officer or judge orders the evaluation.

*Discussion:* It would be inappropriate to regulate in the manner recommended by the commenter. Such determinations are made on a case-by-case basis in light of the specific facts of each case at the discretion of the hearing officer. We believe that the hearing officer, as the designated trier of fact under the Act, is in the best position to determine whether expert testimony should be admitted and what weight, if any, should be accorded that expert testimony. We would expect that these decisions will be governed by commonly applied State evidentiary standards, such as whether the testimony is relevant, reliable, and based on sufficient facts and data.

*Changes:* None.

Prior Notice by the Public Agency; Content of Notice (§ 300.503)

*Comment:* One commenter stated that the prior written notice be given to parents as soon as possible, but no later than 15 days before the public agency proposes to initiate or refuse a change. Another commenter recommended requiring IEP Teams to carefully consider all the data and options before making a decision to change a child's placement or refuse the parent's request for services.

*Discussion:* Section 300.503(a) incorporates section 615(b)(3) of the Act and requires a public agency to provide parents with written notice that meets the requirements in § 300.503(b) a reasonable time before the public agency proposes or refuses to initiate or change the identification, evaluation, or educational placement of the child, or the provision of FAPE to the child. We

do not believe that it is necessary to substitute a specific timeline to clarify what is meant by the requirement that the notice be provided within a reasonable period of time, because we are not aware of significant problems in the timing of prior written notices. In addition, prior written notice is provided in a wide variety of circumstances for which any one timeline would be too rigid and, in many cases, might prove unworkable.

We do not believe that it is necessary to add a requirement that IEP Teams carefully consider all the data and options before making a decision to change a child's placement or refuse the parent's request for services. Section 300.306(c) already requires the group of professionals and the parent of the child to carefully consider information from a variety of sources for determining a child's eligibility and placement. Furthermore, the requirements for developing, reviewing, and revising a child's IEP in § 300.324, ensure that IEP Teams carefully consider all available information in developing an IEP, including information from the child's parents.

*Changes:* None.

*Comment:* One commenter suggested permitting the prior written notice to be the IEP itself, rather than requiring a separate document.

*Discussion:* There is nothing in the Act or these regulations that would prohibit a public agency from using the IEP as part of the prior written notice so long as the document(s) the parent receives meet all the requirements in § 300.503.

*Changes:* None.

*Comment:* One commenter asked how a parent would know that the public agency is refusing to initiate or change the identification, evaluation, or placement of a child without an IEP Team meeting. Another commenter stated that prior written notice should be provided in advance of an IEP Team meeting, not at the IEP Team meeting, so that parents could prepare for the meeting. The commenter suggested adding language to the regulations requiring that the notice be given a reasonable time before an IEP Team meeting.

*Discussion:* The commenter confuses the Act's prior written notice requirements with the requirements governing IEP Team meetings. Section 300.503(a), consistent with section 615(b)(3) of the Act, requires prior written notice whenever a public agency proposes to initiate or change (or refuses to initiate or change) the identification, evaluation, or educational placement of a child, or the provision of FAPE to a

child. A public agency meets the requirements in § 300.503 so long as the prior written notice is provided a reasonable time before the public agency implements the proposal (or refusal) described in the notice. A public agency is not required to convene an IEP Team meeting before it proposes a change in the identification, evaluation, or educational placement of the child, or the provision of FAPE to the child. The proposal, however, triggers the obligation to convene an IEP Team meeting. Providing prior written notice in advance of meetings could suggest, in some circumstances, that the public agency's proposal was improperly arrived at before the meeting and without parent input. Therefore, we are not changing § 300.503 to require the prior written notice to be provided prior to an IEP Team meeting.

*Changes:* None.

*Comment:* A few commenters recommended retaining current § 300.503(a)(2), which provides that if the prior written notice relates to an action that also requires parental consent, the agency may give notice at the same time it requests parental consent.

*Discussion:* It is not necessary to explain in the regulations that prior written notice can be provided at the same time as parental consent is requested, because parental consent cannot be obtained without the requisite prior written notice. The removal of this regulatory provision, however, is not intended to prohibit a public agency from giving prior written notice at the same time that parental consent is sought, should the agency choose to do so.

*Changes:* None.

*Comment:* One commenter asked that the public agency be required to provide a description of all the proposals made by anyone on the IEP Team and the reasons why one proposal was chosen over another.

*Discussion:* Section 300.503(b)(1) and (b)(2) require the prior written notice to include a description of the action proposed or refused by the agency and an explanation of why the agency proposes or refuses to take the action. We do not believe that the change suggested by the commenter is needed because § 300.503(b)(6) and (b)(7) already require that the prior written notice include a description of the other options that the IEP Team considered, the reasons why those options were rejected, and a description of other factors that are relevant to the agency's proposal or refusal.

*Changes:* None.

*Comment:* One commenter suggested requiring the SEA to provide a list of resources for parents to obtain assistance in understanding the requirements of the Act, including providing easy access to the information on the State's Web site.

*Discussion:* Section 300.503(b)(5), consistent with section 615(c)(1)(D) of the Act, already requires the prior written notice to include sources for parents to contact to obtain assistance in understanding the provisions of this part. The Department believes that parents should have easy access to information regarding resources to understand the provisions of the Act. For many parents, this may include accessing such information on the State's Web site. Each State is in the best position to determine whether including this information on its Web site would be helpful for parents. Therefore, we decline to add this requirement to the regulations.

*Changes:* None.

*Comment:* One commenter recommended removing § 300.503(c)(2), regarding the public agency's responsibilities when the parent's native language or other mode of communication is not a written language. The commenter recommended, instead, requiring a public agency to use procedures that involve little or no cost. One commenter stated that § 300.503(c)(2) should be removed because all but paragraph (c)(2)(ii), regarding ensuring that the parent understands the content of the prior written notice, exceed statutory requirements.

*Discussion:* For parents whose mode of communication is not a written language, § 300.503(c)(2) requires the public agency to ensure that the notice is translated orally or by other means to the parent and that the parent understands the content of the notice. We decline to remove § 300.503(c) because we believe that these rights, as well as the other rights enumerated in § 300.503(c), are essential to ensure that public agencies provide all parents the requisite prior written notice in a meaningful and understandable manner.

*Changes:* None.

Procedural Safeguards Notice
(§ 300.504)

*Comment:* Many comments were received regarding when the procedural safeguards notice must be provided to parents. One commenter stated that these requirements add paperwork and procedural burdens. Several commenters expressed concern that parents will have knowledge of their procedural safeguards only when they

file a State complaint or request a due process hearing. Some commenters recommended deleting the requirement in § 300.504(a)(2) for the public agency to give parents the procedural safeguards notice upon receipt of the first State complaint or due process hearing in the school year. Other commenters suggested amending § 300.504(a)(2) to require that the procedural safeguards notice be provided to parents upon receipt of the first due process complaint in that school year. Some commenters asked whether parents would receive a copy of the procedural safeguards notice only upon the first filing of a State complaint or a due process complaint, but not twice, if a parent submits a complaint and also a request for a due process hearing in the same school year.

One commenter was concerned that the parents of a child with a disability who transfers into a new school will not be notified of their procedural rights in a timely manner.

*Discussion:* Section 300.504(a) reflects the new statutory language in section 615(d)(1) of the Act, regarding the timing of the procedural safeguards notice. Section 300.504(a)(1) and (4), consistent with section 615(d)(1)(A) of the Act, states that a copy of the procedural safeguards must be given to parents one time a year, except that a copy must also be given to parents upon initial referral or parent request for evaluation; upon receipt of the first State complaint and due process complaint in that school year; and upon request by a parent. There is no longer a requirement that the procedural safeguards notice be given to parents upon notification of each IEP Team meeting, as in current § 300.504(a).

We disagree that § 300.504(a)(2) should be removed. The Department intends for parents to receive a copy of the procedural safeguards notice upon receipt of the first State complaint under §§ 300.151 through 300.153 and upon receipt of the first due process complaint under § 300.507 in a school year because we believe that parents particularly need a clear understanding of their rights when they embark on these processes and might not have available copies of the procedural safeguards notice provided earlier in the year, or the notice they previously received may be outdated. We are changing § 300.504(a)(2) to make this clear. We also are changing § 300.504(a) to specify that the statutory phrase "one time a year" refers to "one time a school year."

Regarding the concern that a parent whose child transfers to a new school district might not receive appropriate

notice of the Act's procedural safeguards, we do not believe that additional clarification is necessary. We believe that these regulatory provisions are sufficient to ensure that the parent of a child who changes school districts receives the requisite notice in a timely manner. When the child with a disability transfers to a new school district, that school district would have an obligation to ensure that the child's parents are provided notice at least once in that school year and at the other times specified in § 300.504(a).

We believe that the requirements in § 300.504(a) are necessary to ensure that parents have information about the due process procedures when they are most likely to need them and do not view these requirements as unduly burdensome.

*Changes:* Section 300.504(a)(2) has been changed to require public agencies to provide parents with a copy of the procedural safeguards notice upon receipt of the first State complaint under §§ 300.151 through 300.153 in a school year and upon receipt of the first due process complaint under § 300.507 in a school year. We have also changed paragraph (a) in § 300.504 to clarify that the statutory phrase "one time a year" refers to a "school" year.

*Comment:* Several commenters recommended that the procedural safeguards notice be given to parents when a decision has been made to take disciplinary action. Another commenter recommended that the procedural safeguards notice be given at the time a manifestation determination is reviewed.

*Discussion:* Section 615(k)(1)(H) of the Act requires public agencies to provide parents with a copy of the procedural safeguards notice not later than the date on which the decision to take disciplinary action is made. Therefore, we are adding this requirement in § 300.504(a). We will not add a requirement for public agencies to provide parents with a copy of the procedural safeguards notice following the manifestation determination conducted under § 300.530(e), because it would be unnecessarily duplicative to require a procedural safeguards notice to be provided both prior to and after a decision to take disciplinary action has been made.

*Changes:* A new paragraph (3) has been added in § 300.504(a) to require the procedural safeguards notice to be provided to parents in accordance with the discipline procedures in § 300.530(h). The subsequent paragraph has been renumbered, consistent with this change.

*Comment:* Some commenters requested that public agencies inform parents when the procedural safeguards notice has been revised, so that parents can request the updated version.

*Discussion:* Section 300.504(c), consistent with section 615(d) of the Act, lists the required contents of the procedural safeguards notice. If these requirements change because of changes made to the Act, public agencies would be required to change their procedural safeguards notice accordingly. Such changes, along with any additional changes to a State's rules, would be subject to the public participation requirements in § 300.165 and section 612(a)(19) of the Act.

*Changes:* None.

*Comment:* One commenter recommended requiring that the procedural safeguards notice include a parent's right to request the credentials of any teacher who supports the child in the educational environment, as well as documentation regarding the type of supervision provided for any teacher who is supervised by a highly qualified teacher.

*Discussion:* The content of the procedural safeguards notice is based on the items listed in section 615(d)(2) of the Act, which do not include providing information about teachers' credentials and personnel qualifications in a procedural safeguards notice, as requested by the commenter. Nor is there any requirement elsewhere in the Act for public agencies to provide information about teachers' credentials and personnel qualifications.

Section 1111(h)(6) of the ESEA, however, requires LEAs to inform parents about the quality of a school's teachers in title I schools. Under the ESEA, an LEA that accepts title I, part A funding must notify parents of students in title I schools that they can request information regarding their child's teacher, including, at a minimum: (1) whether the teacher has met State requirements for licensure and certification for the grade level(s) and subject-matter(s) in which the teacher provides instruction; (2) whether the teacher is teaching under emergency or other provisional status through which State qualification or licensing criteria has been waived; (3) the college major and any other graduate certifications or degrees held by the teacher, and the field of discipline of the certifications or degrees; and (4) whether the child is provided services by paraprofessionals, and if so, their qualifications. In addition, each title I school must provide each parent timely notice that the parent's child has been assigned, or has been taught for four or more

consecutive weeks, by a teacher who is not highly qualified. These requirements also apply to special education teachers who teach core academic subjects in title I schools.

*Changes:* None.

*Comment:* Numerous commenters expressed concern with allowing LEAs to post the procedural safeguards notice on the school's Web site. Several commenters asked whether directing a parent to the Web site constitutes distribution of the notice under the Act. One commenter suggested adding specific language to the regulations stating that posting the notice on the school Web site does not replace other Part B requirements regarding distribution of the notice.

*Discussion:* Section 300.504(b), incorporates section 615(d)(1)(B) of the Act, and permits, but does not require, a public agency to post a current copy of the procedural safeguards notice on its Web site, if one exists. The public agency would not meet its obligation in § 300.504(a) by simply directing a parent to the Web site. Rather, a public agency must still offer parents a printed copy of the procedural safeguards notice. If, however, a parent declines the offered printed copy of the notice and indicates a clear preference to obtain the notice electronically on their own from the agency's Web site, it would be reasonable for the public agency to document that it offered a printed copy of the notice that the parent declined. Posting the procedural safeguards notice on a public agency's Web site is clearly optional and for the convenience of the public and does not replace the distribution requirements in the Act. We do not believe it is necessary to add a regulation to clarify this.

*Changes:* None.

*Comment:* None.

*Discussion:* As noted in the *Analysis of Comments and Changes* section for subpart B, § 300.152(c) has been amended to require that States set aside any part of a State complaint filed under §§ 300.151 through 300.153 that is being addressed in a due process hearing until the conclusion of the hearing, and resolve any issue that is not a part of the due process hearing decision within the 60-day timeline for State complaints (unless the timeline is extended, consistent with § 300.152(b)). This change was made to address those limited occasions when a parent files both a State complaint and a due process hearing on the same or similar issues. While the Department does not encourage the dual filing of complaints, we are aware that this occasionally occurs and it is important for the regulations to be clear as to how such

situations should be handled. In light of this change, we are amending the requirement in § 300.504(c)(5), regarding the contents of the procedural safeguards notice, to inform parents of the opportunity to present and resolve complaints through the due process complaint and the State complaint procedures.

*Changes:* We have removed the "or" in § 300.504(c)(5) and replaced it with "and" to require that the procedural safeguards notice include a full explanation of the opportunity to present and resolve complaints through the due process complaint and the State complaint procedures.

*Comment:* None.

*Discussion:* We are aware of the fact that over the years there has been much confusion about exactly what must be included in the procedural safeguards notice. To help clear up this confusion, the Department is publishing a model procedural safeguards notice on its Web site today in accordance with section 617(e) of the Act. In addition to making this model procedural safeguards notice available on the Department's Web site, we also are amending the cross-references in § 300.504(c) to identify the specific regulatory provisions that include procedural safeguards for which an explanation must be provided in the procedural safeguards notice.

*Changes:* We have revised the cross-references to specific regulatory sections in the introductory paragraph of § 300.504(c), consistent with the content listed in § 300.504(c)(1) through (13).

*Comment:* A few commenters asked that the regulations require a State to develop its procedural safeguards notice with the State's PTIs and CPRCs to ensure that it is appropriate for parents. One commenter recommended including contact information for PTIs and CPRCs in the notice.

*Discussion:* Section 300.165 and section 612(a)(19) of the Act require each State to ensure that there are public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities, prior to adopting any policies and procedures to comply with Part B of the Act. There is nothing in the Act or these regulations that would prevent a public agency from consulting representatives of PTIs, CPRCs, or other advocacy organizations for assistance in developing the procedural safeguards notice so that it is appropriate for parents and the general public.

It would be unnecessarily prescriptive to require States to consult with representatives from particular

organizations in developing their procedural safeguards notice or to require that a State's procedural safeguards notice include contact information for particular organizations. We believe that such decisions are best left to States.

*Changes:* None.

*Comment:* Several commenters suggested requiring the procedural safeguards notice to explain how a resolution meeting works and the responsibilities of parents who participate in a resolution meeting. Some commenters recommended requiring public agencies to inform parents in writing about the differences between mediation and resolution meetings including the differences in confidentiality rules; whether attorneys' fees may be reimbursed; the effect of resolution and mediation sessions on due process hearing timelines; and the requirements governing the execution of resolution and mediation agreements.

*Discussion:* Section 300.504(c)(6), consistent with section 615(d)(2)(E)(iii) of the Act, requires the procedural safeguards notice to include a full explanation regarding the availability of mediation to resolve complaints. In addition, § 300.504(c)(5) requires the procedural safeguards notice to provide a full explanation of the opportunity for parents to present and resolve complaints through the due process complaint and State complaint procedures, including the time period in which to file a complaint, the opportunity for the agency to resolve the complaint, and the differences between the due process complaint and the State complaint procedures, including the jurisdiction of each procedure, what issues may be raised, filing and decisional timelines, and relevant procedures. Because resolution meetings are part of the due process procedures, consistent with § 300.510 and section 615(f)(1)(B) of the Act, the explanation of due process procedures would necessarily include information about how the resolution meeting works and the responsibilities of the parties in the resolution meeting.

We do not believe it is necessary to require the procedural safeguards notice to explain the differences between mediation and resolution meetings because the differences will be apparent from the clear explanations of the respective procedures that are already required in the notice. However, there is nothing in the Act or these regulations that would prohibit a State from describing the differences between mediation and resolution meetings in its procedural safeguards notice, if it chose to do so.

*Changes:* None.

*Comment:* Several commenters requested clarification regarding the differences between the State complaint and due process complaint procedures that are required to be included in the procedural safeguards notice. Some commenters requested clarification regarding the meaning of the phrases ''jurisdiction of each procedure'' and ''what issues may be raised'' in State complaints versus due process complaints.

*Discussion:* It is important for public agencies to include an explanation of the State complaint procedures in §§ 300.151 through 300.153 and the due process complaint procedures in § 300.507 in the procedural safeguards notice to assist parents in understanding the differences between these procedures. The reference to ''jurisdictional issues'' addresses the scope of the State complaint and due process complaint procedures. An organization or individual may file a State complaint under §§ 300.151 through 300.153 alleging that a public agency has violated a requirement of the Act for a violation that occurred not more than one year prior to the date on which the complaint is received, unless one of the exceptions in § 300.153(c) is applicable. The Department's longstanding position is that a State must resolve any complaint, and may not remove from the jurisdiction of its State complaint procedures complaints regarding the identification, evaluation, or educational placement of the child, or the provision of FAPE to the child simply because those issues also could be the subject of a due process complaint. We view the State complaint procedures as a very important tool in a State's exercise of its general supervision responsibilities, consistent with sections 612(a)(11) and 616(a) of the Act, to monitor LEA implementation of the requirements in Part B of the Act. These responsibilities extend to both systemic and child-specific issues.

A parent or a public agency may file a due process complaint under § 300.507 on any matter relating to the identification, evaluation, or educational placement of the child, or the provision of FAPE to such child for an alleged violation that occurred not more than two years (or, within the timeframe established by the State) before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint.

*Changes:* None.

Electronic Mail (§ 300.505)

*Comment:* One commenter requested that the regulations clarify that a parent who elects to receive notices by electronic mail must do so in writing.

*Discussion:* Section 300.505, which incorporates section 615(n) of the Act, permits public agencies to make the electronic mail option available for notices required in section 615 of the Act, including the prior written notice, procedural safeguards notice, and due process complaint notice. It would be an unnecessary paperwork burden to require a parent who elects to receive notices by electronic mail to do so in writing, particularly when there are other methods available to document such a request, for example, by the LEA making a notation of the parent's verbal request. We believe public agencies should have the flexibility to determine whether and how to document that a parent elects to receive these notices by electronic mail.

*Changes:* None.

Mediation (§ 300.506)

*Comment:* Several commenters stated that the S. Rpt. No. 108–185 expressed Congressional intent for a hearing officer to have the same plenary power over a due process hearing as a Federal or State judge. The commenters, therefore, recommended permitting a hearing officer to require mediation.

*Discussion:* Section 300.506(a) incorporates section 615(e)(1) of the Act and requires public agencies to establish and implement procedures to allow parties to resolve disputes involving any matter under Part B of the Act, including matters arising prior to the filing of a due process complaint, to resolve disputes through a mediation process. Section 615(e)(2)(A)(i) of the Act requires the public agency to ensure, among other things, that the mediation process is voluntary on the part of the parties. In light of these explicit statutory requirements, we do not believe that a hearing officer can order that the parties to a due process complaint engage in mediation.

*Changes:* None.

*Comment:* One commenter suggested that the regulations include language to ensure that the mediation process is not used to deny or delay a parent's right to have a State complaint investigated.

*Discussion:* We do not believe that additional language is necessary to address the commenter's concern. Section 300.506(a) requires each public agency to ensure that procedures are established and implemented to allow parties to resolve disputes involving any matter under Part B of the Act,

including matters arising prior to the filing of a due process complaint, to resolve disputes through mediation. We believe that parties could use mediation prior to, or after, filing a State complaint.

Section 300.506(b)(1)(ii), consistent with section 615(e)(2)(A)(ii) of the Act, is clear that mediation cannot be used to deny or delay a parent's right to a hearing on the parent's due process complaint, or to deny other rights afforded under Part B of the Act. "Other rights under Part B of the Act" include a parent's right to file a State complaint and to have that complaint resolved within applicable timelines. If the parties involved voluntarily wish to engage in mediation once the complaint is filed, and the mediation is not successful in resolving the dispute, the entity responsible for resolving the complaint at the State level must ensure that the complaint is resolved within the applicable timelines in § 300.152. Mediation is not an exceptional circumstance that would justify extension of the 60-day timeline for issuing the final decision in a State complaint, unless the parties agree otherwise. However, as provided in § 300.152(b)(1)(ii), the parent and the public agency involved can agree to extend the time limit to engage in mediation to resolve the complaint.

*Changes:* None.

*Comment:* One commenter recommended allowing parties in a dispute to engage in mediation and have the mediator facilitate the IEP Team meeting to incorporate the terms of the mediation agreement into the child's IEP.

*Discussion:* Although not required by the Act, there is nothing in the Act that would prohibit the parties in a dispute to agree during mediation to have the mediator facilitate an IEP Team meeting and to incorporate the terms of the mediation agreement into the child's IEP.

*Changes:* None.

*Comment:* Some commenters suggested defining "effective mediation techniques" as techniques recognized by any State or national accreditation or professional mediation association. The commenters also recommended requiring a formal training and certification process for mediators, which is created and paid for by the SEA.

*Discussion:* We decline to define "effective mediation techniques" in the manner suggested by the commenters. States have used a number of successful techniques over the years to resolve disputes between parents and public agencies, and we do not want to restrict

a State's discretion by providing a particular definition. Whether formal training and certification for mediators is required is a decision best left to each State, depending on State policy.

*Changes:* None.

*Comment:* A few commenters recommended requiring mediators to be unbiased and knowledgeable in laws, regulations, and best practices related to children with disabilities. Some commenters recommended requiring the list of mediators to include information on the mediator's qualifications. Other commenters recommended that the list of mediators and their qualifications be provided to parents and the public.

*Discussion:* We do not believe additional regulations regarding the qualifications of mediators are necessary. Section 300.506(b)(3), consistent with section 615(e)(2)(C) of the Act, requires States to maintain a list of individuals who are qualified mediators and knowledgeable in the laws and regulations relating to the provision of special education and related services. In addition, § 300.506(c)(1)(ii) requires impartial mediators who do not have a personal or professional interest that would conflict with the person's objectivity.

Parents do not select the mediator to mediate a particular case. Rather, § 300.506(b)(3)(ii) requires that the process for selecting mediators be impartial. Therefore, we do not believe that public agencies should be required to provide the list of mediators and their qualifications to parents and the public. However, there is nothing in the Act that would prohibit a State from making this information available to parents and the public, if it chooses to do so.

*Changes:* None.

*Comment:* One commenter recommended that the regulations clarify whether the public agency is required to offer parents who choose not to use the mediation process an opportunity to meet with a disinterested party.

*Discussion:* We believe the regulations are clear. Section 300.506(b)(2), consistent with section 615(e)(2)(B) of the Act, states that a public agency may establish procedures to offer parents and schools that choose not to use mediation, an opportunity to meet with a disinterested party who would explain the benefits of, and encourage the use of, mediation. Therefore, States may establish such procedures, but are not required to do so. No further clarification is necessary.

*Changes:* None.

*Comment:* One commenter objected to the requirement in § 300.506(b)(3)(ii) that States select mediators on a

random, rotational, or other impartial basis, and requested retaining current § 300.506(b)(2)(ii), which permits the parties to agree on a mediator when the mediator is not selected on a random basis.

*Discussion:* Section 300.506(b)(3)(ii) replaces current § 300.506(b)(2)(ii) and requires the State to select mediators on a random, rotational, or other impartial basis. These provisions are sufficient to ensure that the selection of the mediator is not biased, while providing SEAs additional flexibility in selecting mediators. Selecting mediators on an impartial basis would include permitting the parties involved in a dispute to agree on a mediator.

*Changes:* None.

*Comment:* One commenter requested a definition of "timely manner" in § 300.506(b)(5), regarding the scheduling of mediation sessions.

*Discussion:* Section 300.506(b)(5) incorporates section 615(e)(2)(E) of the Act and requires that the scheduling of each session in the mediation process be completed in a timely manner. It is not necessary to define "timely manner" because this requirement must be read consistent with the State's responsibility to ensure that the mediation process does not operate to deny or delay a parent's right to a hearing on a due process complaint, or to deny other rights afforded under Part B of the Act.

*Changes:* None.

*Comment:* Many commenters stated that mediation discussions should remain confidential and not be used in any subsequent due process hearings or proceedings. The commenters recommended that the phrase "arising from that dispute" in § 300.506(b)(6)(i) and § 300.506(b)(8) be removed. The commenters viewed these provisions as permitting confidentiality to apply only to the current issue in dispute, and not in other subsequent actions. Some commenters expressed concern that mediation could be used as "discovery" for some future dispute between parties, or for a simultaneous dispute between the same public agency and some other children, or disputes involving the same lawyers but different parties.

*Discussion:* We agree with the commenters that the phrase "arising from that dispute" should be removed in § 300.506(b)(6)(i) or § 300.506(b)(8). We believe that it is important to preserve the integrity of the mediation process to ensure that mediation discussions remain confidential and not be used in subsequent due process hearings or civil proceedings. To ensure that we do not interfere with the evidentiary privilege laws of States that might not participate in the Part B

**46696**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

program (a possibility, but not a current actuality), we are adding new language that limits the confidentiality provision to apply to due process hearings and proceedings in any Federal court and any State court of a State participating in Part B of the Act.

*Changes:* We have removed the phrase "arising from that dispute" from § 300.506(b)(6)(i). We also have removed the phrase "proceedings arising from that dispute" and replaced it with "proceeding of any Federal court or State court of a State receiving assistance under this part" from § 300.506(b)(8).

*Comment:* None.

*Discussion:* Following the publication of the NPRM, the Department reconsidered the subject of confidentiality pledges prior to the commencement of mediation. Section 300.506(b)(9) was included in the NPRM in light of note 208 of Conf. Rpt. No. 108–779, p. 216, which indicates the Conference committee's intention that parties could be required to sign confidentiality pledges prior to the commencement of mediation, without regard to whether the mediation ultimately resolves the dispute. However, § 300.506(b)(8), already requires that discussions that occur during the mediation process be confidential and not be used as evidence in any subsequent due process hearing or civil proceeding. Therefore, we are removing § 300.506(b)(9). Removing § 300.506(b)(9), however, is not intended to prevent States from allowing parties to sign a confidentiality pledge to ensure that discussions during the mediation process remain confidential, irrespective of whether the mediation results in a resolution.

*Changes:* Paragraph (b)(9) in § 300.506 has been removed.

*Comment:* A few commenters expressed concern regarding the requirement in § 300.506(c)(1)(ii) that mediators must not have a personal or professional interest that conflicts with "the person's objectivity." The commenters stated that disputes will arise and compromise the integrity of the proceedings without a mechanism to determine whether a conflict exists.

*Discussion:* Section 300.506(c)(1)(ii) incorporates section 615(e) of the Act, and provides that mediators must not have a personal or professional interest that would conflict with the person's objectivity. SEAs have an interest in ensuring that their mediators are seen as impartial persons so that the parties to disputes will be willing to use mediation to resolve those disputes. We do not believe that further regulation is needed, as the SEAs' interest in

ensuring that mediators are seen as impartial should be sufficient to provide for mechanisms to resolve conflicts to the extent needed in that State.

*Changes:* None.

*Comment:* One commenter recommended that the regulations clarify that a mediator cannot be employed simultaneously as a hearing officer.

*Discussion:* Case-by-case determinations would need to be made as to whether there is a conflict of interest in the situation that the commenter describes. For example, we believe that a conflict would arise if a mediator was subsequently assigned as a hearing officer for the same matter. We believe that the requirements in § 300.506(c)(1)(ii), applicable to mediators, and the corresponding requirements in § 300.511(c)(1)(i)(B), applicable to hearing officers, which prohibit a mediator and a hearing officer from having a personal or professional interest that would conflict with the person's objectivity at the mediation or the hearing, are sufficient to ensure that mediators and hearing officers are fair and unbiased.

*Changes:* None.

Filing a Due Process Complaint (§ 300.507)

*Comment:* Some commenters recommended changing the section heading in § 300.507 from "Filing a due process complaint" to "Requesting a due process hearing" to avoid confusion with the State complaint process. A few commenters requested that the regulations clarify that a request for due process hearing may be made regarding any matter pertaining to the identification, evaluation, educational placement, or provision of FAPE for a child.

*Discussion:* We do not believe that changing the heading to this section is necessary or that further clarification is needed regarding the matters about which a due process complaint can be filed. Section 300.507(a) and section 615(b)(6)(A) of the Act are clear that a parent or public agency may file a due process complaint on any matter relating to the identification, evaluation, or educational placement of the child, or the provision of FAPE to the child. A party must file a due process complaint in accordance with §§ 300.507 through 300.508 prior to the opportunity for a due process hearing under this part. If the LEA does not resolve the complaint to the satisfaction of the parents during the resolution process, the disputed issues that were raised in the due process complaint

would be the subject of a due process hearing.

*Changes:* None.

*Comment:* Several commenters objected to the removal of current § 300.507(a)(2), which requires the public agency to inform the parent about the availability of mediation when a hearing is initiated. The commenters stated that the notice about the availability of mediation should be expanded, not eliminated.

*Discussion:* Section 615(e)(1) of the Act expands the availability of mediation by requiring public agencies to offer mediation to resolve disputes about any matter under this part. Current § 300.507(a)(2) was replaced by § 300.506(a), which incorporates section 615(e)(1) of the Act, and requires mediation to be available to resolve disputes involving any matter under this part, including matters arising prior to the filing of a due process complaint. Section 300.506(a), therefore, expands the availability of mediation beyond that required in current § 300.507(a)(2). Therefore, there is no need to add the provision requested by the commenter.

*Changes:* None.

*Comment:* A few commenters stated that the requirement in § 300.507(a) places the burden on the parent to file a due process complaint.

*Discussion:* Section 300.507(a), consistent with section 615(b)(6) of the Act, permits either a parent or a public agency to file a due process complaint. Section 615(b)(7) of the Act is clear that a parent or a public agency must file a due process complaint notice before a due process hearing may commence.

*Changes:* None.

*Comment:* Many commenters supported the time limit for submitting a due process complaint. Some commenters stated that the regulations should clarify that, while States may adopt an explicit statute of limitations that is shorter than two years, they may not adopt a time period that is longer than two years. Other commenters recommended that the regulations clarify that if a State has an explicit time limit for requesting a due process hearing the State time limit must be reasonable. A few commenters recommended requiring States to conduct public hearings and provide an opportunity for public comment before the State establishes a reasonable time limit for filing a due process complaint. Still other commenters stated that the regulations should include a statement that common-law directives regarding statutes of limitations should not override the Act or State regulatory time limits.

ED-000158

Some commenters expressed concern that reducing the statute of limitations from three years to two years makes it impossible to protect the rights of children. The commenters stated that parents and school districts will be discouraged from participating in alternative dispute resolution options because of the short timeframe for filing a due process complaint.

*Discussion:* Section 300.507(a)(2) and section 615(b)(6)(B) of the Act are clear that a due process complaint must allege a violation that occurred not more than two years before the date the parent or public agency knew, or should have known, about the alleged action that forms the basis of the due process complaint, or if the State has an explicit time limit for filing a due process complaint, in the time allowed by that State law.

There is nothing in the Act that would preclude a State from having a time limit for filing a complaint that is shorter or longer than two years. We believe that the Act leaves this decision to the States. A State choosing to adopt a time limit for requesting a hearing, other than the two year time limit in the Act, must comply with the public participation requirements in § 300.165 and section 612(a)(19) of the Act, which require that prior to the adoption of any policies and procedures needed to comply with Part B of the Act (including any amendments to such policies and procedures), the State must ensure that there are public hearings, adequate notice of the hearings, and an opportunity for public comment. However, if a State already has an explicit time limit in statute or regulation, and has met the requirements in § 300.165 and section 612(a)(19) of the Act in establishing that requirement, new public hearings and public comment periods are not required.

It is not necessary to clarify that common-law directives regarding statutes of limitations should not override the Act or State regulatory timelines, as the commenters recommended, because the Act and these regulations prescribe specific limitation periods which supersede common law directives in this regard.

*Changes:* None.

*Comment:* One commenter suggested that the regulations allow extensions of the statute of limitations when a violation is continuing or the parent is requesting compensatory services for a violation that occurred not more than three years prior to the date the due process complaint is received.

*Discussion:* Section 615(f)(3)(D) of the Act provides explicit exceptions to the timeline for requesting a due process hearing. Section 300.511(f) incorporates these provisions. These exceptions do not include when a violation is continuing or where a parent is requesting compensatory services for a violation that occurred not more than three years from the date that the due process complaint was filed. Therefore, we do not believe that the regulations should be changed.

*Changes:* None.

*Comment:* One commenter suggested removing § 300.507(b), which requires a public agency to inform parents of any free or low-cost legal and other relevant services in the area. The commenter stated that schools should voluntarily provide this information to parents. One commenter requested clarification regarding the meaning of "other relevant services" about which the public agency must inform parents. Another commenter requested that public agencies post information about free or low-cost legal services on their Web sites.

*Discussion:* The provisions in § 300.507(b) are protected by section 607(b) of the Act and require the public agency to inform parents about the availability of free or low-cost legal and other relevant services, if the parent requests such information or the parent or the agency requests a due process hearing. Generally, "other relevant services" refers to other sources that parents could consult for information, such as parent centers.

The Department believes that parents should have easy access to information about any free or low-cost legal and other relevant services in the area. Making the information available on the State's Web site may be a good way of providing parents easily accessible information, but it may not be effective in all cases. Each State is in the best position to determine whether including this information on its Web site would be helpful for parents. Therefore, we decline to add this as a requirement in these regulations, as recommended by the commenter.

*Changes:* None.

*Comment:* None.

*Discussion:* Upon internal review, we determined that it would be clearer for § 300.507(b)(2) to state that the parents or the agency files a due process complaint, rather than request a hearing under § 300.507.

*Changes:* We have amended the language of § 300.507(b)(2) to refer to filing a due process complaint rather than requesting a hearing.

**Due Process Complaint (§ 300.508)**

*Comment:* A few commenters expressed concern regarding the use of similar terminology for due process complaints and State complaints. Some commenters stated that the State complaint procedures may mistakenly be considered a pre-requisite to commencing a due process hearing. A few commenters requested changing the heading in § 300.508 from "Due process complaint" to "Requesting a due process hearing" to avoid unnecessary confusion.

*Discussion:* Section 615(b)(7)(B) of the Act states that a party may not have a hearing on a due process complaint or engage in a resolution meeting until the party, or the attorney representing the party, files a due process complaint that meets the requirements in § 300.508(b). There is no requirement that a party file a State complaint prior to filing a due process hearing, and we believe that the regulation is sufficiently clear about this point. Renaming this section "Requesting a due process hearing" could incorrectly suggest that there is no requirement to file a due process complaint prior to a due process hearing. Therefore, we decline to change the name of the heading, as requested by the commenters.

*Changes:* None.

*Comment:* A few commenters requested clarification regarding when a determination about the sufficiency of a due process complaint must be made and who makes the determination. One commenter stated that any party who alleges that a notice is insufficient should be required to state in writing the basis for that belief, including the information that is missing or inadequate.

Many commenters recommended removing the phrase "or engage in a resolution meeting" in § 300.508(c). The commenters expressed concern that requiring parties to engage in a resolution meeting before a due process hearing will delay the due process hearing, particularly when the parties must wait for a hearing officer to determine the sufficiency of a due process complaint before holding a resolution meeting. One commenter requested that the regulations state that the public agency may not deny or delay a parent's right to a due process hearing. A few commenters recommended that the regulations clarify that a resolution meeting cannot be held until the complaint is deemed sufficient.

Some commenters questioned the appropriateness of requiring a substantive response to a due process complaint during a resolution meeting

before the complaint is determined to be sufficient. Other commenters asked whether the 10-day timeline for the party receiving the complaint to respond to the due process complaint resets when a party deems a due process complaint to be insufficient or when a hearing officer rules that the complaint is insufficient.

One commenter asked whether two resolution meetings are required when the sufficiency of the complaint is challenged, and whether the 30-day resolution period is reset by an insufficient complaint. The same commenter asked whether the resolution meeting should be scheduled within 50 days of receiving the parent's original due process complaint, if insufficiency has been determined or is pending.

*Discussion:* Section 300.510(a), consistent with section 615(f)(1)(B) of the Act, requires the LEA, within 15 days of receiving notice of the parent's due process complaint, and prior to the initiation of a hearing, to convene a meeting with the parent and the relevant members of the IEP Team to discuss the parent's due process complaint so that the LEA has an opportunity to resolve the dispute. Section 300.508(d)(1), consistent with section 615(c)(2)(A) and (D) of the Act, provides that the due process complaint must be deemed sufficient unless the party receiving the due process complaint notifies the hearing officer and the other party in writing, within 15 days of receipt of the due process complaint, that the due process complaint does not meet the requirements in § 300.508(b). If the party receiving the due process complaint notice believes the complaint is insufficient, the hearing officer determines the sufficiency of the complaint. There is no requirement that the party who alleges that a notice is insufficient state in writing the basis for the belief.

Section 300.508(d)(2), consistent with section 615(c)(2)(D) of the Act, states that the hearing officer must make a determination within five days of receiving notice that the party believes the complaint is insufficient and immediately notify the parties in writing of that determination.

If the hearing officer determines that the notice is not sufficient, the hearing officer's decision will identify how the notice is insufficient, so that the filing party can amend the notice, if appropriate. We are not further regulating on how the sufficiency claim is raised, however, as we believe that this matter is more appropriately

addressed by each State, in light of their other hearing procedures.

Section 615(b)(7)(B) of the Act, provides that a party may not have a hearing on a due process complaint until the party or the party's attorney files a due process complaint that meets the content standards in section 615(b)(7)(A) of the Act, which are reflected in § 300.508(b). If the complaint is determined to be insufficient and is not amended, the complaint could be dismissed.

We agree with S. Rpt. No. 108–185, p. 38, which states that the resolution meeting should not be postponed when the LEA believes that a parent's complaint is insufficient. While the period to file a sufficiency claim is the same as the period for holding the resolution meeting, parties receiving due process complaint notices should raise their sufficiency claims as early as possible, so that the resolution period will provide a meaningful opportunity for the parties to resolve the dispute.

In order to resolve ambiguity on the relationship of a sufficiency claim to the resolution meeting, we are revising § 300.508(c) to remove the reference, which is not statutory, to the resolution meeting. There is no need to hold more than one resolution meeting, impose additional procedural rules, or otherwise adjust the resolution timeline.

We do not believe it is necessary to add language to the regulations stating that a public agency may not deny or delay a parent's right to a due process hearing. We believe that the timelines and requirements for filing a due process complaint, and the timelines for hearing officer decisions regarding the sufficiency of a complaint will safeguard against due process hearings being unfairly or unnecessarily delayed.

*Changes:* We have removed the words "or engage in a resolution meeting" in § 300.508(c) for clarity.

*Comment:* One commenter stated that the timeline for filing a due process hearing should begin when the due process complaint is deemed sufficient. However, some commenters stated that the timeline should begin when a party files a due process complaint notice. Several commenters stated that a hearing officer should be allowed to determine whether an amended complaint relates to the original complaint for purposes of determining the time limit for filing a due process complaint.

*Discussion:* We do not believe that a separate filing of a due process complaint notice and due process complaint, with separate timelines, is required by the Act, as those distinctions would be unnecessarily

burdensome and cumbersome. Section 615(b)(7)(A)(i) of the Act describes the due process complaint notice as being filed "in the complaint," and we have organized our regulation consistent with this provision.

Section 300.507(a)(2), consistent with section 615(b)(6)(B) of the Act, states that a due process complaint must allege a violation that occurred not more than two years (or the time allowed by State law), before the date the parent or public agency knew, or should have known, about the alleged action that forms the basis of the due process complaint. Section 615(f)(3)(D) of the Act provides exceptions to the timeline if a parent was prevented from filing a due process complaint, which are reflected in § 300.511(f). It is up to hearing officers to determine whether a specific complaint is within the allowable timeline, including whether an amended complaint relates to a previous complaint.

*Changes:* None.

*Comment:* Many commenters stated that the process for amending a due process complaint is complex and unnecessarily complicated, and will force parents to seek the services of an attorney and make the relationship between parties more adversarial. One commenter recommended allowing a hearing request to be amended up to five days before the parties meet to set a hearing schedule, rather than five days before the hearing.

*Discussion:* We do not agree that the process for amending a due process complaint is complex and unnecessarily complicated. Section 300.508(d)(3) and section 615(c)(2)(E) of the Act allow the party filing the due process complaint an opportunity to amend the complaint to ensure that the complaint accurately sets out their differences with the other party. The complaint can be amended only if the parties mutually agree in writing to the amendment and are given the opportunity for a resolution meeting, or the hearing officer grants permission to amend the complaint at any time not later than five days before the due process hearing begins. This process ensures that the parties involved understand and agree on the nature of the complaint before the hearing begins. We, therefore, decline to change these regulations, and see no reason to change the timeline for amending a complaint in the manner suggested by the commenter.

Section 300.508(d)(4) and section 615(c)(2)(E)(ii) of the Act provide that when a due process complaint is amended, the timelines for the resolution meeting and the time period for resolving the complaint begin again

with the filing of the amended due process complaint.

*Changes:* None.

*Comment:* Some commenters stated that parents who are filing a due process complaint without the assistance of an attorney should have more flexibility when the sufficiency of the complaint is determined. The commenters stated that parents should be able to receive assistance from their State's due process office to complete the due process complaint so that it meets the standard for sufficiency.

*Discussion:* To assist parents in filing a due process complaint, § 300.509 and section 615(b)(8) of the Act require each State to develop a model due process complaint form. While there is no requirement that States assist parents in completing the due process complaint form, resolution of a complaint is more likely when both parties to the complaint have a clear understanding of the nature of the complaint. Therefore, the Department encourages States, to the extent possible, to assist a parent in completing the due process complaint so that it meets the standards for sufficiency. However, consistent with section 615(c)(2)(D) of the Act, the final decision regarding the sufficiency of a due process complaint is left to the discretion of the hearing officer.

*Changes:* None.

*Comment:* One commenter stated that parents who file a due process complaint without the assistance of an attorney should be allowed to amend their complaint without having to start the process all over again, as long as their statement provides the information LEAs need to proceed toward resolution. A few commenters stated that a formal amendment should not be required for minor insufficiencies, such as leaving out the child's address or name of the child's school, especially if the LEA already has this information.

Many commenters recommended that a hearing officer be allowed to permit a party to amend the due process complaint, unless doing so would prejudice the opposing party. The commenters stated that, at a minimum, the regulations should state that hearing officers must follow the standard that permits them to freely grant amendments, regardless of timelines, when justice so requires.

*Discussion:* Section 300.508(d)(3), consistent with section 615(c)(2)(E) of the Act, provides that a party may only amend its complaint in two circumstances: (1) if the other party consents in writing to the amendment and is given the opportunity to resolve the complaint in a resolution meeting convened under § 300.510, or (2) if the

hearing officer grants permission for the amendment, but only at a time not later than five days before the hearing begins. Therefore, we do not believe further clarification is necessary. With regard to parents who file a due process complaint without the assistance of an attorney or for minor deficiencies or omissions in complaints, we would expect that hearing officers would exercise appropriate discretion in considering requests for amendments.

*Changes:* None.

*Comment:* One commenter suggested adding language to the regulations stating that an LEA may request and, as a matter of right, be granted one 10-day extension to respond to a parent's due process complaint.

*Discussion:* Section 615(c)(2)(B)(ii) of the Act provides that the receiving party must provide the party that filed the complaint a response to the complaint within 10 days of receiving the complaint. The Act makes no provision for extending this time period, and we do not believe it would be appropriate to amend the regulations in this manner. Allowing an LEA additional time to respond to a parent's due process complaint could be used to unduly delay the due process hearing, to the detriment of the interests of the child.

*Changes:* None.

*Comment:* A few commenters expressed concern that the regulations appear to require parents to be represented by an attorney in due process proceedings and requested that the regulations permit a party in a due process hearing to be represented by a non-attorney advocate. The commenters stated that this would allow more uniform access to assistance across all socio-economic groups and decrease the formality of hearings.

*Discussion:* We are considering the issue of non-attorney representation of parties in a due process hearing under the Act, in light of State rules concerning the unauthorized practice of law. We anticipate publishing a notice of proposed rulemaking in the near future seeking public comment on this issue.

*Changes:* None.

*Comment:* One commenter requested clarification regarding whether there is legal significance or consequence to a responding party who fails to file the required response to a due process complaint or to an LEA that fails to send both the prior written notice and the due process complaint notice.

*Discussion:* The Act does not establish consequences for parents who are the receiving parties to complaints if they fail to respond to a due process complaint notice. However, either

party's failure to respond to, or to file, the requisite notices could increase the likelihood that the resolution meeting will not be successful in resolving the dispute and that a more costly and time-consuming due process hearing will occur.

*Changes:* None.

*Comment:* One commenter recommended that the regulations specifically state that a party has a right to seek immediate intervention from a hearing officer to resolve pre-hearing issues and disputes.

*Discussion:* Section 300.508, consistent with section 615(b) and (c) of the Act, sets out the requirements and timelines for filing a due process complaint. We do not believe the further clarification requested by the commenter is necessary because the due process complaint procedures are intended to resolve pre-hearing issues and disputes and allow parties to seek immediate resolution by a hearing officer, when necessary, regarding the sufficiency of a due process complaint and amendments to a complaint.

*Changes:* None.

*Comment:* One commenter requested that the regulations require a hearing officer to dismiss a complaint when the hearing officer determines that all issues and allegations are insufficient to go forward.

*Discussion:* We do not believe that Federal regulations on this matter are required, as we believe that States and individual hearing officers are in a better position to decide on the utility of, or need for, dismissals.

*Changes:* None.

Model Forms (§ 300.509)

*Comment:* None.

*Discussion:* In reviewing this section, we realized that the language in paragraph (a) might incorrectly be read to suggest that parties other than parents and public agencies could file due process complaints.

*Changes:* We have amended the language of § 300.509(a) to clarify that only parents and public agencies can file due process complaints, while parents, public agencies, and other parties can file State complaints.

*Comment:* One commenter suggested including a statement in § 300.509 clarifying that parents can use a model form, create their own form, or use a form created by their attorney, as long as it meets the requirements of the Act.

*Discussion:* We agree that the use of the model forms should not be required by an SEA or LEA, and that parents (or other parties filing a State complaint) may use some other form of notice, so long as their notice meets the content

requirements of the Act. We are clarifying this is § 300.509.

*Changes:* We have restructured § 300.509 and clarified that SEAs or LEAs cannot require the use of the model forms. We have added a new paragraph (b) to § 300.509 to provide that parents and other parties may use another form, so long as the form that is used meets the content requirements in § 300.508(b) for filing a due process complaint, or the requirements in § 300.153(b) for filing a State complaint.

*Comment:* A few commenters requested language requiring the State to work with the State PTI and CPRC to develop the model forms so that they are written in a manner that parents can understand.

*Discussion:* It would be over-regulating to require a State to work with a particular group or groups to develop their model forms. We believe that such decisions are best made by each State and, therefore, decline to require a State to work with the State PTI and CPRC to develop the model forms. However, States must comply with the public participation requirements in § 300.165 and section 612(a)(19) of the Act prior to adopting a model form. To meet the public participation requirements, the State must ensure that there are public hearings and an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities.

*Changes:* None.

*Comment:* A few commenters recommended that the regulations clarify that a hearing officer may not determine that a due process complaint is insufficient in any State that has not developed the model forms required in § 300.509.

*Discussion:* It would be inappropriate to prohibit a hearing officer from finding that a complaint is insufficient if the receiving party properly challenges the sufficiency of the complaint in accordance with § 300.508(d)(1) because the State has failed to develop the model forms in accordance with § 300.509 and section 615(b)(8) of the Act. Development of the model forms is a State responsibility and parties to a due process hearing should not be penalized because a State fails to meet the requirements in section 615(b)(8) of the Act. The Department is authorized to impose sanctions on a State, in accordance with section 616(d), (e), and (g) of the Act, if it fails to develop the model forms required in § 300.509.

*Changes:* None.

*Comment:* One commenter recommended that model forms should

be developed to assist education agencies in filing a due process complaint.

*Discussion:* We disagree with the commenter. We believe that the due process complaint requirements in § 300.508 provide sufficient information for education agencies that wish to file a due process complaint.

*Changes:* None.

Resolution Process (§ 300.510)

Resolution Meeting (§ 300.510(a))

*Comment:* One commenter expressed concern that the resolution process under the due process complaint procedures could limit the State complaint procedures as a means of resolving disputes.

*Discussion:* The due process complaint procedures and the State complaint procedures are separate and distinct. The State complaint procedures remain a viable alternative to the due process procedures for parents to resolve disputes with public agencies in a less formal and more cost-effective manner.

*Changes:* None.

*Comment:* Several commenters recommended that the regulations require an LEA to notify the parent, within five days of receiving a due process complaint, whether the LEA intends to convene a resolution meeting or waive the session. The commenters recommended that the notice include a signature line for a parent to indicate an agreement to waive the resolution meeting.

*Discussion:* Section 615(f)(1)(B) of the Act requires an LEA to convene a resolution meeting with the parent and the relevant member(s) of the IEP Team within 15 days of receiving notice of the parent's due process complaint. The purpose of the meeting is for the parent to discuss the due process complaint and the facts that form the basis of the due process complaint so that the LEA has an opportunity to resolve the dispute. We do not believe it is necessary to require an LEA to notify the parent within five days of receiving a due process complaint about the LEA's intention to convene or waive the resolution process. An LEA that wishes to engage in a resolution meeting will need to contact the parent to arrange the meeting soon after the due process complaint is received in order to ensure that the resolution meeting is held within 15 days.

Section 300.510(a)(3) provides that the resolution meeting does not need to be held if the parent and the LEA agree in writing to waive the meeting, or if the parent and LEA agree to use the

mediation process to resolve the complaint. The manner in which the LEA and parent come to an agreement to waive the resolution meeting is left to the discretion of States and LEAs. We do not believe that there is a need to regulate further in this area.

*Changes:* None.

*Comment:* Some commenters asked whether the requirements for resolution meetings apply when an LEA initiates a due process hearing. A few commenters recommended that the requirements for resolution meetings should not apply when an LEA initiates a due process hearing.

*Discussion:* Section 615(f)(1)(B)(i) of the Act requires an LEA to convene a resolution meeting when a parent files a due process complaint. Consistent with section 615(f)(1)(B)(i)(IV) of the Act, the resolution meeting provides an opportunity for the parents of the child to discuss their complaint, and the facts that form the basis of the complaint, so that the LEA has an opportunity to resolve the complaint. There is no provision requiring a resolution meeting when an LEA is the complaining party. The Department's experience has shown that LEAs rarely initiate due process proceedings.

*Changes:* None.

*Comment:* Some commenters recommended that the regulations clarify that, in addition to their attorney, parents may bring other participants to the resolution meeting, such as an advocate or family friend. Other commenters recommended that neither party should be permitted to bring an attorney to the resolution meeting. Some commenters recommended requiring parents to notify the LEA at least one day before the resolution meeting whether their attorney will be participating in the resolution meeting. Other commenters, however, stated that parents should not be required to notify the LEA in advance of the meeting whether the parent plans to bring anyone to the meeting.

*Discussion:* Section 615(f)(1)(B)(i) of the Act states that an LEA must convene a resolution meeting with the parents and the relevant members of the IEP Team who have specific knowledge of the facts identified in the due process complaint that includes a representative of the public agency who has decision-making authority on behalf of that agency, and may not include the LEA's attorney unless the parent is accompanied by an attorney.

Section 300.510(a)(4) states that the parent and the LEA determine the relevant members of the IEP Team to attend the resolution meeting. We do not believe it is necessary to clarify that

a parent may bring other participants, such as an advocate or family friend, to the resolution meeting because section 614(d)(1)(B)(vi) of the Act and § 300.321(a)(6) are clear that the IEP Team may include, at the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child. Therefore, such individuals could attend the resolution meeting if the LEA or parent determined that such individuals are relevant members of the IEP Team.

We do not believe it is necessary to regulate on whether a parent must provide advance notice to the LEA that the parent intends to bring an attorney to the resolution meeting because we expect that it would not be in the interest of the parent to withhold such information prior to a resolution meeting so as to appear at the resolution meeting with an attorney without advance notice to the public agency. In such cases, the public agency could refuse to hold the resolution meeting until it could arrange the attendance of its attorney (within the 15-day period). The parent would incur additional expenses from having to bring their attorney to two resolution meetings.

*Changes:* None.

*Comment:* Some commenters requested clarification regarding whether the parent and the LEA must agree to the parties who will attend the resolution meeting, or whether the parent and the LEA can decide independently who will attend the meeting. The commenters recommended that any disputes regarding who should attend the resolution meeting should be resolved in a timely manner and the meeting should proceed with all the disputed participants when there is no agreement within the 15-day period. Some commenters stated that allowing parents to determine which members of the IEP Team should attend the resolution meeting exceeds statutory authority.

*Discussion:* Section 615(f)(1)(B)(i) of the Act requires the LEA to convene a resolution meeting with the parent and the relevant member(s) of the IEP Team who have specific knowledge of the facts identified in the complaint. Section 300.510(a)(4) requires the parent and the LEA to determine the relevant members of the IEP Team who will attend the meeting. We urge LEAs and parents to act cooperatively in determining who will attend the resolution meeting, as a resolution meeting is unlikely to aid in any resolution of the dispute if the parties cannot even agree on who should attend. The parties should keep in mind

that the resolution process offers a valuable chance to resolve disputes before expending what can be considerable time and money in due process hearings. We decline to regulate further on how to resolve disputes about who should attend these meetings in the absence of information about specific problems in the process.

*Changes:* None.

*Comment:* Some commenters recommended that the regulations provide information on how a resolution meeting should proceed. Several commenters expressed concern that the regulations offer no guidance on the protocol or structure of resolution meetings, and do not specify whether an impartial mediator or facilitator should conduct the meeting.

*Discussion:* Section 615(f)(1)(B)(i)(IV) of the Act states that the purpose of a resolution meeting is for parents to discuss their due process complaint and the facts that form the basis of the due process complaint so that the LEA has an opportunity to resolve the dispute. We do not believe that it is necessary or appropriate to regulate on the specific structure or protocol for resolution meetings as doing so could interfere with the LEA and the parent in their efforts to resolve the complaint in the resolution meeting.

*Changes:* None.

*Comment:* A few commenters recommended that the regulations address the need for families to receive training in dispute resolution.

*Discussion:* There is nothing in the Act that would prevent a public agency from offering training in dispute resolution or referring parents to organizations that provide training in dispute resolution. Such matters are best left to local and State officials to determine, based on the training needs of parents and families. Therefore, we decline to regulate on this matter.

*Changes:* None.

*Comment:* One commenter recommended allowing parents to participate in resolution meetings through alternative means (*e.g.,* teleconferences) and alternative procedures (*e.g.,* participation by a child's court-appointed advocate) when parents are unavailable (*e.g.,* military service, hospitalization).

*Discussion:* We understand that circumstances beyond a parent's control (*e.g.,* military service, hospitalization) may prevent a parent from attending a resolution meeting in person. If the LEA notifies the parent of its intent to schedule a resolution meeting within 15 days of receiving notice of the parent's due process complaint, and the parent informs the LEA in advance of the

meeting that circumstances prevent the parent from attending the meeting in person, it would be appropriate for an LEA to offer to use alternative means to ensure parent participation, such as those described in § 300.328, including videoconferences or conference telephone calls, subject to the parent's agreement.

There is no authority in the Act for an LEA to permit a court-appointed advocate to attend the resolution meeting in place of a parent, unless the public agency has appointed that individual as a surrogate parent in accordance with § 300.519, or the agency determines that the person is a person acting in the place of the biological or adoptive parent of the child in accordance with § 300.30(a)(4).

*Changes:* None.

Resolution Period (§ 300.510(b))

*Comment:* One commenter noted that § 300.510(b)(1) states that if an LEA has not resolved a due process complaint within 30 days of the receipt of the complaint, the due process hearing "must" occur, which is inconsistent with section 615(f)(1)(B)(ii) of the Act, which states that the due process hearing "may" occur. However, another commenter recommended retaining the language in § 300.510(b), in lieu of the permissive statutory language.

*Discussion:* We believe that § 300.510(b)(1) should be changed to be consistent with section 615(f)(1)(B)(ii) of the Act. A requirement that a due process hearing must occur when the resolution period is not successful in resolving the underlying dispute could prove unduly restrictive for the parties, particularly in situations where the parties agree to an extension of the resolution period or reach a settlement after the resolution period has expired. Therefore, we are changing § 300.510(b)(1) to state that a due process hearing "may" occur if the parties have not resolved the dispute that formed the basis for the due process complaint by the end of the resolution period.

*Changes:* Section 300.510(b)(1) has been changed by removing the word "must" and replacing it with "may" prior to the word "occur" to reflect the language in section 615(f)(1)(B)(ii) of the Act.

*Comment:* Some commenters recommended requiring LEAs to waive the resolution period when a parent can show that, prior to the filing of the complaint, the LEA had specific knowledge of the facts later identified in the complaint and had a reasonable time to resolve the issue, or did not notify the parent within five days of the resolution

**46702**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

meeting or inform the parent of their options.

*Discussion:* Section 615(f)(1)(B)(i) of the Act provides two occasions when a resolution meeting need not occur: (1) when the parent and LEA agree in writing to waive the meeting; and (2) when the parent and LEA agree to use the mediation process in § 300.506. There are no provisions that allow a parent or an LEA to unilaterally waive the resolution meeting. In the circumstances mentioned by the commenter, the resolution meeting still is a required vehicle for the parent and the LEA to attempt to resolve their differences prior to initiating a due process hearing.

*Changes:* None.

*Comment:* We received numerous comments expressing concern about the resolution process and requesting changes to the regulations to ensure that the resolution process is used effectively to resolve disputes and not to delay or deny the right to a due process hearing. Some commenters requested that § 300.510(b)(3) be removed because it allows a public agency to delay the due process hearing by scheduling resolution meetings at times or places that are inconvenient for the parent. Many commenters recommended that if an LEA fails to convene a resolution meeting within the required 15 days, bring the required personnel to a resolution meeting, or participate in a resolution meeting in good faith, the 45-day timeline for a hearing decision should begin on the date that the due process complaint notice was filed.

Several commenters requested clarification on what is considered "participation" or "good faith" participation in a resolution meeting and who decides if participation has occurred. A number of commenters recommended that the regulations permit a hearing officer to determine whether a parent or LEA has participated in the resolution meeting and whether the due process hearing can proceed. Another commenter requested clarification on when the 45-day timeline for a due process hearing begins when a hearing officer determines that a parent has participated.

Several commenters asked how long a due process complaint remains open if the parent does not participate during the 30-day resolution period. A number of commenters requested clarification as to whether and how an LEA can dismiss a due process complaint when a parent refuses to participate in a resolution meeting. One commenter recommended that the regulations clarify the

consequences of indefinitely delaying a due process hearing.

*Discussion:* We do not agree that § 300.510(b)(3) should be removed. This provision is based on H. Rpt. No. 108–77, p. 114, that provides:

[If] the parent and the LEA mutually agree that the meeting does not need to occur, the resolution meeting does not need to take place. However, unless such an agreement is reached, the failure of the party bringing the complaints to participate in the meeting will delay the timeline for convening a due process hearing until the meeting is held.

We fully expect that only in very rare situations will an LEA fail to meet its obligation to convene a resolution meeting within 15 days of receiving notice of the parent's due process complaint, delay the due process hearing by scheduling meetings at times or places that are inconvenient for the parent, or otherwise not participate in good faith in the resolution process. However, in instances of noncompliance, we believe parents should be able to request a hearing officer to allow the due process hearing to proceed.

In situations where an LEA convenes a meeting with the parent and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the due process complaint, and the parent fails to participate in the resolution meeting, the LEA would need to continue to make diligent efforts throughout the remainder of the 30-day resolution period to convince the parent to participate in the resolution meeting. If, however, at the end of the 30-day resolution period, the LEA is still unable to convince the parent to participate in the resolution meeting, we believe that an LEA should be able to seek intervention by a hearing officer to dismiss the complaint.

Therefore, we are adding language to the regulations to allow the parents to seek a hearing officer's intervention in cases where an LEA fails to convene a resolution meeting within 15 days of receiving notice of a parent's due process complaint or fails to participate in the resolution meeting. We also are adding language to allow an LEA, at the conclusion of the 30-day resolution period, to request a hearing officer to dismiss a complaint when the LEA is unable to obtain the participation of a parent in a resolution meeting despite making reasonable efforts to do so during the 30-day resolution period.

*Changes:* We have added a new paragraph (b)(4) in § 300.510 to allow an LEA, at the conclusion of the 30-day resolution period to seek the intervention of a hearing officer to

dismiss the parent's complaint, if the LEA is unable to obtain the participation of the parent in the resolution meeting, after reasonable efforts have been made.

We have also added a new paragraph (b)(5) to allow a parent to seek the intervention of a hearing officer to begin the due process hearing, if the LEA fails to hold the resolution meeting within 15 days of receiving notice of a parent's due process complaint or fails to participate in the resolution meeting.

*Comment:* Some commenters stated that the 45-day timeline for a due process hearing should begin when both parties agree that the complaint will not be resolved in a resolution meeting or mediation session. Other commenters suggested that when a resolution meeting or mediation session is held and it is clear before the end of the 30-day resolution period that the LEA and the parent cannot resolve the dispute, the 45-day timeline should be allowed to begin prior to the end of the 30-day resolution period. A few commenters requested further clarification regarding how the timeline is counted once the parent participates in a resolution meeting. A few commenters recommended that the 45-day timeline for the hearing commence once both parties agree that the issue will not be resolved without a due process hearing. One commenter recommended that the regulations require the waiver to be in writing so that hearing officers have a specific point in time to know when they should be counting the 45 days.

*Discussion:* We agree that the due process hearing should be allowed to proceed if the LEA and parent agree in writing to waive the resolution meeting. We also believe that the due process hearing should be allowed to proceed when an LEA and the parent agree to waive the remainder of the 30-day resolution period when it becomes apparent that the LEA and the parent will be unable to reach agreement through resolution or mediation. There may also be situations in which both parties agree to continue the mediation session beyond the 30-day resolution period. Therefore, we are adding language to the regulations to clarify these exceptions to the 30-day resolution period.

The new language specifies that the 45-day timeline for the due process hearing starts the day after one of the following events: (a) both parties agree in writing to waive the resolution meeting; (b) after either the mediation or resolution meeting starts, but before the end of the 30-day resolution period, both parties agree in writing that no agreement is possible; and (c) if both

parties agree in writing to continue the mediation at the end of the 30-day resolution period, but later the parent or public agency withdraws from the mediation process.

*Changes:* We have added a new paragraph (c) in § 300.510 that specifies adjustments to the 30-day resolution period. Subsequent paragraphs have been renumbered accordingly.

*Comment:* Some commenters recommended that the regulations require public agencies to document their attempts to ensure parent participation in resolution meetings, and to do so in the same manner that they are required to document their attempts to involve parents in IEP Team meetings.

*Discussion:* We agree with the commenters and will add language to § 300.510(b)(4) to make this clear.

*Changes:* We have added language in § 300.510(b)(4) to require an LEA to use the same procedures it uses in § 300.322(d) to document its efforts to obtain the participation of a parent in a resolution meeting. We also have amended § 300.510(b)(4) to refer to "due process complaints," for clarity.

Written Settlement Agreement (New § 300.510(d)) (Proposed § 300.510(c))

*Comment:* One commenter asked whether decisions agreed to in resolution meetings supersede previous IEP decisions and whether the IEP Team must reconvene to sanction the decisions made in a resolution meeting. One commenter recommended that if the resolution agreement includes IEP-related matters, the agreement must state that the LEA will convene an IEP Team meeting within a specific number of days to revise the IEP accordingly or develop an IEP addendum, as appropriate.

*Discussion:* Unless the agreement specifically requires that the IEP Team reconvene, there is nothing in the Act or these regulations that requires the IEP Team to reconvene following a resolution agreement that includes IEP-related matters. We do not believe that it is necessary or appropriate to anticipate the elements of a particular settlement agreement, which may supersede an existing IEP. The contents of settlement agreements are left to the parties who execute a settlement agreement.

*Changes:* None.

*Comment:* One commenter recommended that the regulations clarify whether the SEA, a hearing officer, or an administrative law judge has the authority to enforce a written resolution agreement. A few commenters recommended permitting a parent to seek assistance from the SEA to compel a school district to abide by a resolution agreement. The commenters stated that many families cannot afford legal representation and, in jurisdictions in which parents cannot represent themselves at the Federal district court level, this would, in essence, leave such parents without meaningful redress, except through the State court system.

One commenter recommended that the regulations specify that a resolution agreement is enforceable in court without exhausting administrative remedies. The commenter stated that unless this is clearly stated, parents may be forced to proceed through a two-tier due process system, rather than proceed directly to court, which would be counter to the purpose of a resolution agreement.

Several commenters suggested adding language in § 300.506(b)(7) clarifying that a written, signed mediation agreement can be enforced through a State's administrative complaint process, as well as in State and Federal court. The commenters stated that such a provision would be consistent with Congressional intent to reduce litigation and permit parties to resolve disagreements in a more positive, less costly manner. The commenters also suggested permitting State- or circuit-based variation in enforcement mechanisms.

*Discussion:* Section 615(f)(1)(B)(iii) of the Act provides that if an agreement is reached in a resolution meeting, the parties must execute a legally binding agreement that is signed by both the parent and a representative of the agency who has the authority to bind the agency, and is enforceable in any State court of competent jurisdiction or in a district court of the United States. These same requirements apply to agreements reached through mediation sessions, pursuant to section 615(e)(2)(F)(iii) of the Act. The Act is clear that exhaustion of administrative remedies is not required since the Act provides that the agreement is enforceable in a State court of competent jurisdiction or in a district court of the United States.

If a party to a resolution agreement or a mediation agreement believes that the agreement has been breached, we believe that, in addition to enforcement in a State court of competent jurisdiction or district court of the United States, States should be able to offer the option of using other available State mechanisms (e.g., State complaint procedures) to enforce resolution agreements and mediation agreements, as long as those other enforcement mechanisms are voluntary.

Therefore, we are adding a new regulation on State enforcement mechanisms to clarify that States have the option of allowing resolution agreements and mediation agreements to be enforced through other mechanisms, provided that the other enforcement mechanisms do not operate to deny or delay the right of any party to the agreement to seek enforcement in an appropriate State or Federal court.

Regarding the commenters' suggestion of allowing State and circuit variations in enforcement mechanisms, we do not believe the Department has the authority to regulate in this area because doing so would interfere with matters reserved for State and Federal courts. In general, a written resolution or mediation agreement is a binding contract between the parties, and therefore, the validity and enforceability of that agreement would be reviewed in light of applicable State and Federal laws, including State contract laws.

*Changes:* We have added a new § 300.537 on State enforcement mechanisms to clarify that, notwithstanding §§ 300.506(b)(7) and new § 300.510(d)(2) (proposed § 300.510(c)(2)), nothing in this part prevents a State from providing parties to a written agreement reached as a result of a mediation or resolution meeting other mechanisms to enforce that agreement, provided that such mechanisms are not mandatory and do not deny or delay the right of the parties to seek enforcement of the written agreement in a State court of competent jurisdiction or in a district court of the United States. We have also added a cross reference to new § 300.537 in new § 300.510(d) (proposed § 300.510(c)), regarding written settlement agreements.

Agreement Review Period (New § 300.510(e)) (Proposed § 300.510(d))

*Comment:* Many commenters recommended including language in the regulations to ensure that parents are informed orally and in writing that either party to a resolution agreement may reconsider and void the resolution agreement within three business days. One commenter expressed concern that some parents lack the education or legal expertise of school districts, and will miss this important right unless informed both orally and in writing. A few commenters stated that this notice must be provided to parents in their native language or primary mode of communication.

*Discussion:* Section 300.504(a), consistent with section 615(d)(1)(A) of the Act, requires a public agency to provide parents with a copy of the

**46704**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

procedural safeguards notice at least one time in a school year and under the exceptional circumstances specified in § 300.504(a), which includes the first occurrence of the filing of a due process complaint in a school year. The procedural safeguards notice, which must be written in language understandable to the general public and in the native language of the parent, unless clearly not feasible to do so, must include a full explanation of the Act's procedural safeguards. If the native language or other mode of communication of the parent is not a written language, § 300.503(c)(2) requires the public agency to take steps to ensure that the notice is translated orally or by other means for the parent in his or her native language or other mode of communication and that the parent understands the content of the notice. Under § 300.504(c)(5)(ii), the notice must inform parents about the opportunity to present and resolve a due process complaint in accordance with the resolution process required in § 300.510 and section 615(f)(1)(B) of the Act, including a party's right to void the resolution agreement within three business days of execution. We believe it would be overly burdensome to require public agencies to provide the procedural safeguards notice both orally and in writing to an individual parent, and, therefore, decline to change the regulation.

*Changes:* None.

*Comment:* Several commenters recommended that the regulations clarify whether discussions during the resolution meeting remain confidential.

*Discussion:* We decline to regulate on this matter because the Act is silent regarding the confidentiality of resolution discussions. However, there is nothing in the Act or these regulations that would prohibit the parties from entering into a confidentiality agreement as part of their resolution agreement. A State could not, however, require that the participants in a resolution meeting keep the discussions confidential or make a confidentiality agreement a condition of a parent's participation in the resolution meeting.

*Changes:* None.

*Comment:* One commenter recommended that the regulations require each SEA to develop a model settlement agreement form with appropriate release language, a withdrawal form to be filed with the hearing officer, and a confidentiality agreement.

*Discussion:* The terms of settlement agreements will necessarily vary based on numerous factors, including the

nature of the dispute and the specific resolution agreed to by the parties involved. Therefore, we do not believe it is practical or useful to require SEAs to develop a model settlement agreement form.

*Changes:* None.

*Comment:* A few commenters recommended that the regulations define "days" in this section to mean "business days."

*Discussion:* Under § 300.11(a), *day* means calendar day, unless otherwise indicated as a business day or school day. All references to *day* in § 300.510 are calendar days, except for new § 300.510(e) (proposed § 300.510(d)), which specifies that the parties may void a resolution agreement within three business days of the agreement's execution.

*Changes:* None.

Impartial Due Process Hearing (§ 300.511)

*Comment:* One commenter stated that section 615(f)(1)(A) of the Act refers to when a due process complaint is "received" and recommended using this language in § 300.511(a), which refers to when a due process complaint is "filed." The commenter stated that LEAs are more likely to understand and relate to when a due process complaint is "received" versus when a due process complaint is "filed."

*Discussion:* We agree with the commenter and are changing § 300.511(a) to be consistent with section 615(f)(1)(A) of the Act, which provides that a parent or the LEA must have the opportunity for an impartial due process hearing under this part when a due process complaint is received under section 615(b)(6) or (k) of the Act.

*Changes:* For consistency with statutory language, we have changed the first clause in the first sentence of § 300.511(a) by removing the words "filed under § 300.507" and adding in their place the words "received under § 300.507 or § 300.532".

*Comment:* Some commenters recommended that the regulations clarify that a party has a right to seek immediate intervention from a hearing officer to resolve pre-hearing issues and disputes. One commenter recommended that the regulations clarify that hearing officers are empowered and obligated to promptly hear and decide all pre-hearing issues and disputes so that decisions can be made about whether to proceed to a hearing, as well as to focus and streamline the evidentiary hearing process. The commenter provided the following examples of pre-hearing issues that should be resolved prior to

a hearing: the sufficiency of the complaint; the sufficiency of the response and notice pursuant to § 300.508(e); the sufficiency of the response pursuant to § 300.508(f); motions for stay-put; the hearing schedule; the order of witnesses; the burden of proof; the burden of going forward; witness testimony by telephone or video conference; production of records; exchange of evidence; admissibility of evidence; and issuance and enforcement of subpoenas and subpoenas *duces tecum.*

*Discussion:* Section 615(c)(2)(D) and (E) of the Act, respectively, address situations where it is necessary for hearing officers to make determinations regarding the sufficiency of a complaint and amendments to a complaint before a due process hearing. We do not believe it is necessary to regulate further on the other pre-hearing issues and decisions mentioned by the commenters because we believe that States should have considerable latitude in determining appropriate procedural rules for due process hearings as long as they are not inconsistent with the basic elements of due process hearings and rights of the parties set out in the Act and these regulations. The specific application of those procedures to particular cases generally should be left to the discretion of hearing officers who have the knowledge and ability to conduct hearings in accordance with standard legal practice. There is nothing in the Act or these regulations that would prohibit a hearing officer from making determinations on procedural matters not addressed in the Act so long as such determinations are made in a manner that is consistent with a parent's or a public agency's right to a timely due process hearing.

*Changes:* None.

*Comment:* One commenter stated that the Act does not provide adequate guidance on the specific set of legal procedures that must be followed in conducting a due process hearing and recommended that the regulations include guidance regarding the following: Limiting the use of hearsay testimony; requiring all testimony to be subject to cross-examination; the order of testimony; timelines; and the statute of limitations. The commenter stated that while timelines and the statute of limitations are addressed in the Act, there are no consequences for failure to comply.

*Discussion:* In addition to addressing timelines, hearing rights, and statutes of limitations, the Act and these regulations also address a significant due process right relating to the impartiality and qualifications of

hearing officers. Under Section 615(f)(3) of the Act and § 300.511(c), a hearing officer must possess the knowledge and ability to conduct hearings in accordance with appropriate, standard legal practice. Hearing officers consider failure to comply with timelines and statutes of limitations on a case-by-case basis, depending on the specific circumstances in each case. We believe that the requirements for hearing officers are sufficient to ensure that proper legal procedures are used and that it is not appropriate to regulate on every applicable legal procedure that a hearing officer must follow, because those are matters of State law.

*Changes:* None.

Agency Responsible for Conducting the Due Process Hearing (§ 300.511(b))

*Comment:* One commenter noted that § 300.511(b) refers to the State or a public agency holding a hearing, whereas the Act refers to the State or an LEA holding a hearing. The commenter requested clarification regarding whether any agency, other than an LEA, is permitted to hold a hearing under the Act.

*Discussion:* The term "public agency" in these regulations is intended to address situations where an entity might satisfy the definition of *public agency* in § 300.33, but would not satisfy the definition of *LEA* in § 300.28. As set forth in § 300.33, a *public agency* may be responsible for the education of a child with a disability. In these circumstances, the public agency would hold the due process hearing.

*Changes:* None.

Impartial Hearing Officer (§ 300.511(c))

*Comment:* A few commenters recommended revising § 300.511(c)(1)(i)(B) to state that a hearing officer must not have a personal or professional conflict of interest.

*Discussion:* Section 300.511(c)(1)(i)(B) incorporates the language in section 615(f)(3)(A)(i)(II) of the Act and provides that a hearing officer must not be a person having a personal or professional interest that conflicts with the person's objectivity in the hearing. The meaning of this requirement is clear and we do not believe it is necessary to change it to ensure continued compliance with this longstanding requirement.

*Changes:* None.

*Comment:* One commenter recommended that the regulations require the conduct of impartial hearing officers to be addressed by the State judicial code of conduct.

*Discussion:* Under section 615(f)(3) of the Act and § 300.511(c), a hearing

officer must possess the knowledge and ability to conduct hearings and to render and write decisions in accordance with appropriate, standard legal practice. We believe that this provides sufficient guidance. The application of State judicial code of conduct standards is a State matter.

*Changes:* None.

*Comment:* One commenter noted that § 300.511(c)(1)(iii) and (iv) require a hearing officer to possess the knowledge and ability to conduct hearings and render and write decisions in accordance with appropriate, standard legal practice, and recommended that the regulations outline standard legal practice so that parents without attorney representation will have this information.

*Discussion:* The requirements in § 300.511(c)(1)(iii) and (iv) incorporate the requirements in section 615(f)(3)(A)(iii) and (iv) of the Act. These requirements are general in nature and appropriately reflect the fact that standard legal practice will vary depending on the State in which the hearing is held. Accordingly, it would not be feasible to outline standard legal practice in these regulations, as recommended by the commenter.

*Changes:* None.

*Comment:* Some commenters recommended that the regulations require hearing officers to receive ongoing, periodic professional development regarding new regulations and court decisions so that their decisions reflect the latest developments and interpretations. A few commenters recommended requiring SEAs to provide training for hearing officers by trainers who are experienced in conducting hearings and writing decisions in accordance with standard legal practice. A few commenters recommended that the regulations require hearing officers to be informed that they are bound by the decisions of courts that govern their jurisdiction.

*Discussion:* It is not necessary to regulate in the manner recommended by the commenters because this is a responsibility of each State. The Act prescribes minimum qualifications for hearing officers, which are reflected in § 300.511(c). Pursuant to its general supervisory responsibility, each State must ensure that individuals selected to conduct impartial due process hearings meet the requirements in § 300.511(c)(1)(ii) through (iv). States are in the best position to determine the required training and the frequency of the required training, consistent with State rules and policies.

*Changes:* None.

*Comment:* One commenter noted that the Act does not include the provision in § 300.511(c)(2), which provides that a person who otherwise qualifies to conduct a hearing is not an employee of the agency solely because he or she is paid by the agency to serve as a hearing officer. The commenter, therefore, recommended removing § 300.511(c)(2).

*Discussion:* We do not agree that the provision should be removed. This provision is longstanding. Although the Act prohibits an individual who is employed by a public agency involved in the education or care of the child to be a hearing officer, we believe that it is important to continue to clarify that a person's payment for serving as a hearing officer does not render that individual a public agency employee who is excluded from serving as a hearing officer. In many instances, public agencies retain hearing officers under contract. The fact that an individual is hired by a public agency solely for the purpose of serving as a hearing officer does not create an excluded employee relationship. Public agencies need to ensure that hearing officers conduct due process hearings and it is only reasonable that those persons are paid for their work as hearing officers.

*Changes:* None.

*Comment:* Some commenters requested that the regulations require SEAs to make the list of hearing officers and their qualifications available to the public.

*Discussion:* Public agencies must maintain a list of persons who serve as hearing officers and a statement of their qualifications. However, there is nothing in the Act that requires a public agency to make information regarding the qualifications of hearing officers available to the public. Parents do not select the hearing officer to hear their complaints. Therefore, we do not believe that it is necessary to require public agencies to provide information regarding the qualifications of hearing officers to the public, and we decline to regulate in this regard. The commenter's recommendation would impose an additional burden on public agencies that is not required by the Act.

*Changes:* None.

Subject Matter of Due Process Hearings (§ 300.511(d))

*Comment:* A few commenters requested that the regulations clarify that the party requesting the due process hearing may raise issues that are included in any amendments to the complaint. One commenter requested clarification regarding whether the party that the complaint is against can raise

other issues. A few commenters recommended that the regulations clarify that hearing officers may raise and resolve issues concerning noncompliance even if the party requesting the hearing does not raise the issues.

*Discussion:* Section 300.508(d)(4) and section 615(c)(2)(E)(ii) of the Act provide that the applicable timeline for a hearing shall begin at the time that a party files an amended complaint, and makes clear that after the party files an amended complaint, timelines for the resolution meeting and the opportunity to resolve the complaint begin again. The issues raised in the amended complaint would be the subjects of the resolution meeting, and these issues also would be addressed in a due process hearing, if the LEA does not resolve the dispute to the satisfaction of the parent through the resolution process.

The Act does not address whether the non-complaining party may raise other issues at the hearing that were not raised in the due process complaint, and we believe that such matters should be left to the discretion of hearing officers in light of the particular facts and circumstances of a case. The Act also does not address whether hearing officers may raise and resolve issues concerning noncompliance even if the party requesting the hearing does not raise the issues. Such decisions are best left to individual State's procedures for conducting due process hearings.

*Changes:* None.

*Comment:* One commenter recommended that the Department include in the regulations language that allocates the burden of proof to the moving party.

*Discussion:* Although the Act does not address allocation of the burden of proof in due process hearings brought under the Act, the U.S. Supreme Court recently addressed the issue. In *Schaffer* v. *Weast*, 546 U.S. —, 126 S. Ct. 528 (2005) (*Schaffer*), the Court first noted that the term ''burden of proof'' is commonly held to encompass both the burden of persuasion (i.e., which party loses if the evidence is closely balanced) and the burden of production (i.e., the party responsible for going forward at different points in the proceeding). In *Schaffer*, only the burden of persuasion was at issue. The Court held that the burden of persuasion in a hearing challenging the validity of an IEP is placed on the party on which this burden usually falls—on the party seeking relief—whether that is the parent of the child with a disability or the school district. Since Supreme Court precedent is binding legal authority,

further regulation in this area is unnecessary. In addition, we are not aware of significant questions regarding the burden of production that would require regulation.

*Changes:* None.

Timeline for Requesting a Hearing (§ 300.511(e)) and Exceptions to the Timeline (§ 300.511(f))

*Comment:* Some commenters stated that exceptions to the timeline in § 300.511(f) should include situations in which a parent is unable to file a due process complaint because the parent is not literate or cannot write in English. One commenter recommended considering the parent's degree of English fluency and other factors in determining the parent's ability to have knowledge about the alleged action that is the basis for the due process complaint.

*Discussion:* Section 300.511(f), consistent with section 615(f)(3)(D) of the Act, provides explicit exceptions to the statute of limitations for filing a due process complaint. These exceptions include situations in which the parent is prevented from filing a due process complaint because the LEA withheld from the parent information that is required to be provided to parents under these regulations, such as failing to provide prior written notice or a procedural safeguards notice that was not in the parent's native language, as required by §§ 300.503(c) and 300.504(d), respectively. Additionally, in States using the timeline in § 300.511(e) (i.e., ''within two years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint''), hearing officers will have to make determinations, on a case-by-case basis, of factors affecting whether the parent ''knew or should have known'' about the action that is the basis of the complaint. Therefore, we decline to add additional exceptions to § 300.511(f).

*Changes:* None.

*Comment:* Some commenters requested that the regulations clarify whether the statute of limitations in section 615(b)(6)(B) of the Act is the same statute of limitations in section 615(f)(3)(C) of the Act. The commenters stated that the Act and regulations are confusing because the statute of limitations is mentioned twice and implies that the timeline for filing a complaint and filing a request for a due process hearing are different.

*Discussion:* The statute of limitations in section 615(b)(6)(B) of the Act is the same as the statute of limitations in section 615(f)(3)(C) of the Act. Because

we are following the structure of the Act, we have included this language in §§ 300.507(a)(2) and 300.511(e).

*Changes:* None.

*Comment:* Some commenters recommended that the regulations clarify that ''misrepresentations'' by an LEA in § 300.511(f)(1) include misleading, as well as false, statements. The commenters stated that misleading statements create the same obstacle for parents as false statements in terms of when parents know about an alleged violation. One commenter recommended that ''misrepresentations'' include both intentional and unintentional misrepresentations.

*Discussion:* We do not believe it is appropriate to define or clarify the meaning of ''misrepresentations,'' as requested by the commenters. Such matters are within the purview of the hearing officer. If the complaining party believes that the timeline in § 300.511(e) should not apply, the complaining party would need to ask the hearing officer to determine whether an untimely due process complaint can proceed to hearing based on misrepresentations by an LEA. The hearing officer would then determine whether the party's allegation constitutes an exception to the applicable timeline.

*Changes:* None.

Additional Disclosure of Information (§ 300.512(b))

*Comment:* One commenter recommended that the regulations permit parties to mutually consent to waive the five-day timeline and exchange documents closer to the hearing date.

*Discussion:* There is nothing in the Act or these regulations that would prevent the parties from agreeing to disclose relevant information to all other parties less than five business days prior to a due process hearing.

*Changes:* None.

Hearing Decisions (§ 300.513)

Decision of Hearing Officer (§ 300.513(a))

*Comment:* Some commenters requested that the regulations clarify that LRE is a substantive, not a procedural, issue and that a hearing officer can base relief on the failure of an LEA to provide FAPE in the LRE to the maximum extent possible. A few commenters recommended that the regulations allow a hearing officer to dismiss a complaint or to rule on summary judgment if there is no claim or controversy to be adjudicated. The commenters stated that hearing officers

should be allowed to dismiss cases when the alleged violation does not focus on a substantive issue.

*Discussion:* Section 300.513(a)(1) and section 615(f)(3)(E) of the Act provide that, in general, a decision made by a hearing officer must be made on substantive grounds based on a determination of whether the child received FAPE. Furthermore, § 300.513(a)(3), consistent with section 615(f)(3)(E)(iii) of the Act, allows a hearing officer to order an LEA to comply with procedural requirements under §§ 300.500 through 300.536.

Although the Act and these regulations require that hearing officers base determinations of whether a child received FAPE on substantive grounds, hearing officers also may find that a child did not receive FAPE based on the specific procedural inadequacies set out in § 300.513(a)(2), consistent with section 615(f)(3)(E)(ii) of the Act.

Hearing officers continue to have the discretion to dismiss complaints and to make rulings on matters in addition to those concerning the provision of FAPE, such as the other matters mentioned in § 300.507(a)(1). To clarify this point, we are revising the heading of § 300.513(a) to refer to decisions of hearing officers about FAPE, and are revising § 300.513(a)(1). The requirements in §§ 300.507 through 300.508 governing the content of the due process complaint, including requirements for sufficiency and complaint amendment, and requirements governing the resolution process in § 300.510 should help to ensure that due process complaints that are the subject of a due process hearing under this part contain claims that are appropriate for a hearing officer's decision.

*Changes:* We have reworded § 300.513(a)(1) and revised the heading of § 300.513(a) to refer to decisions regarding FAPE.

Construction Clause (§ 300.513(b))

*Comment:* Some commenters recommended that the construction clause in § 300.513(b) include that nothing in §§ 300.507 through 300.513 shall be construed to affect the right of a parent to file a complaint with the SEA under §§ 300.151 through 300.153 for a procedural violation that does not meet the requirements in § 300.513(a)(2).

*Discussion:* We decline to make the change requested because we think that these matters are already addressed in the regulations. Section 300.507(a) describes the matters on which a party can request a due process hearing. Section 300.151(a) provides that an organization or individual may file a

signed written complaint alleging that a public agency has violated a requirement of Part B of the Act, which would include procedural violations that would not meet the standard in § 300.507(a)(1).

*Changes:* None.

Finality of Hearing Decision; Appeal; Impartial Review (§ 300.514)

*Comment:* One commenter recommended clarifying that § 300.514(b) applies only to States with a two-tier due process system.

*Discussion:* We believe that § 300.514(b)(1) is clear that a State-level appeal of a due process decision is available only in States that have a two-tiered due process system. This is a longstanding provision, which is consistent with section 615(g) of the Act. We do not believe further clarification in the text of the regulations is necessary.

*Changes:* None.

Timelines and Convenience of Hearings and Reviews (§ 300.515)

*Comment:* One commenter recommended that the regulations clarify when the various timelines for resolution meetings and due process hearings start and stop. One commenter disagreed with § 300.515(a), stating that the 45-day timeline should begin when the public agency receives a request for a due process hearing.

*Discussion:* We agree that clarification is needed regarding the various timelines for resolution meetings and due process hearings. As stated earlier in the *Analysis of Comments and Changes* in § 300.510, we have added a new paragraph (c) in § 300.510 to specify adjustments to the 30-day resolution period and when the 45-day timeline for due process hearings begins for these exceptions. In order to be consistent with this change, we are changing the introductory language in § 300.515(a).

*Changes:* We have changed the introductory language in § 300.515(a) to reference the adjustments to the 30-day timeline in new § 300.510(c).

*Comment:* A few commenters recommended that the hearings and reviews be conducted at a time and place that are "mutually convenient" to the parent and child involved, rather than "reasonably convenient," as required in § 300.515(d). Another commenter recommended that the hearings and reviews be conducted at a time and place that is reasonably convenient to "all parties involved."

*Discussion:* The Department believes that every effort should be made to schedule hearings at times and locations

that are convenient for the parties involved. However, given the multiple individuals that may be involved in a hearing, it is likely that hearings would be delayed for long periods of time if the times and locations must be "mutually convenient" for all parties involved. Therefore, we decline to change this regulation.

*Changes:* None.

Civil Action (§ 300.516)

*Comment:* Several commenters recommended that the regulations clarify that the 90-day timeline for a party aggrieved by the findings and decision of a due process hearing to file a civil action begins either from the date of a hearing officer's decision or from the date of a State review officer's decision, if the State has a two-tiered due process system. One commenter stated that many cases would be inappropriately dismissed if this regulation is not clarified.

*Discussion:* We agree with the commenters and are clarifying that the party bringing the action has 90 days from the date of the decision of the hearing officer or the decision of the State review official to file a civil action, or, if the State has an explicit time limitation for bringing civil actions under Part B of the Act, in the time allowed by that State law. This change is needed to ensure that the applicable time limitation does not penalize parties in States with two-tier due process systems that require a party aggrieved by the due process hearing officer's decision to file a State-level appeal prior to bringing a civil action in State or Federal court.

*Changes:* We have added "or, if applicable, the decision of the State review official," in § 300.516(b) to clarify the timeline for bringing a civil action in States that have a two-tiered due process system.

*Comment:* Some commenters recommended that the regulations clarify that the State time limit for bringing a civil action under Part B of the Act can only be used if it is longer than 90 days. One commenter recommended that the regulations clarify whether State law may establish a time limit of less than the 90 days for filing a civil action.

*Discussion:* Section 300.516(b) and section 615(i)(2)(B) of the Act provide that the party bringing the action shall have 90 days from the date of the decision of the hearing officer or the decision of the State review official to file a civil action or, if the State has an explicit time limitation for bringing civil actions under Part B of the Act, in the time allowed by that State law. There is

**46708**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

no requirement that would limit the State's authority to set a time limit longer than or shorter than 90 days and we believe that the regulations are clear that a State may set a longer or shorter time limit under State law.

*Changes:* None.

*Comment:* One commenter recommended that the regulations require an LEA, at the conclusion of a due process hearing, to provide a parent who is not represented by counsel, a written notice regarding the time limit for filing a civil action.

*Discussion:* Parents involved in a due process hearing would already have received information about the availability of a civil action and the timeline for filing a civil action when they received the procedural safeguards notice, in accordance with § 300.504. We decline to require an additional notice at the conclusion of a due process hearing, because this would impose an additional paperwork burden on public agencies.

*Changes:* None.

Attorneys' Fees (§ 300.517)

*Comment:* We received a number of comments seeking clarification of, or modifications to, the statutory language governing the award of attorneys' fees. Some commenters recommended that the regulations require the SEA or LEA to affirmatively prove that the parent's intent was improper in order to be awarded attorneys' fees under this provision. A few commenters recommended modifying the regulations to expressly require a determination by a court that the complaint or cause of action was frivolous, unreasonable, or without foundation, before an award of attorneys' fees can be considered.

One commenter requested that the regulations clarify that section 615(i)(3)(B)(i) of the Act seeks to codify the standards set forth in *Christiansburg Garment Co.* v. *EEOC,* 434 U.S. 412 (1978), and that the principles set forth in this action (that attorneys' fees may only be awarded to defendants in actions where the plaintiffs' claims are frivolous, without foundation, or brought in bad faith) should apply in favor of school districts and parents, since either party can bring complaints.

One commenter recommended that § 300.517(a)(1)(ii) and (iii) be revised to refer to an attorney of a parent or a parent because there are many parents who are attorneys representing their children in due process hearings. Another commenter recommended including language that the parent must be the prevailing party on substantive grounds in order to claim an award of attorneys' fees.

*Discussion:* Section 300.517(a) incorporates the language in section 615(i)(3)(B) of the Act. Further guidance on the interpretation of this statutory language is not appropriate since judicial interpretations of statutory provisions will necessarily vary based upon case-by-case factual determinations, consistent with the requirement that the award of reasonable attorneys' fees is left to a court's discretion.

With regard to the recommendation that we include language that the parent must be the prevailing party on substantive grounds, we decline to regulate because we believe that the statutory provisions regarding attorneys' fees are appropriately described in § 300.517. Furthermore, section 615(f)(3)(E) of the Act, reflected in § 300.513, recognizes both that hearing officer determinations that a child did not receive FAPE, in some circumstances, may be based on procedural violations, and that hearing officers may order LEAs to comply with procedural requirements. Either of these circumstances, in appropriate cases, might result in a parent being determined to be a prevailing party for purposes of claiming attorneys' fees.

We decline to add language to § 300.517(a)(1)(ii) to refer to a parent who is an attorney, because the reference to ''an attorney of a parent'' would include anyone serving as an attorney.

*Changes:* None.

*Comment:* One commenter recommended that § 300.517(a)(1)(iii), regarding attorneys' fees, be changed to include non-attorney advocates who are acting on behalf of parents and provide that these individuals be held to the same standard as attorneys. Another commenter expressed concern regarding circuit court rulings that require SEAs to pay for expert witnesses for parents who cannot afford them. The commenter recommended that the regulations permit SEAs to establish a list of private experts who are willing to testify at due process hearings and to use funds provided under Part B of the Act to pay such experts when either party uses them.

*Discussion:* Section 615(i)(3)(B) of the Act allows a court to award reasonable attorneys' fees as a part of the costs to a parent who is the prevailing party. Although the Act also provides parents with the right to be accompanied and advised by individuals with special knowledge or training with respect to the problems of children with disabilities at a due process hearing, it does not provide for awarding attorneys' fees to these other individuals. Lay advocates are, by definition, not attorneys and are not entitled to compensation as if they were attorneys. In addition, consistent with the Supreme Court's recent decision in *Arlington Central Sch. Dist. Bd. of Educ.* v. *Murphy,* No. 05–18, U.S., 2006 U.S. LEXIS 5162 (June 26, 2006), if Congress wishes to allow recovery of experts' fees by prevailing parents, it must provide explicit language authorizing that recovery, which was not done in the Act. This would apply whether the expert was seeking payment for testifying or advocating.

*Changes:* None.

*Comment:* One commenter stated that attorneys' fees should be available for resolution meetings because parents are required to attend these meetings before a due process hearing can begin. Another commenter recommended that the regulations clarify that the prohibition on attorneys' fees for resolution activities applies to the resolution meeting, as well as any resolution agreement. One commenter requested that the regulations clarify that attorneys' fees for resolution meetings will not be paid until a compromise is reached, and will be based on the resolution meeting itself and not the work that the attorney puts into preparing for the resolution meeting.

*Discussion:* Section 300.517(c)(2)(iii) of the regulations, consistent with section 615(i)(3)(D)(iii) of the Act, specifies that the resolution meeting is not considered to be a meeting convened as a result of an administrative hearing or judicial action or an administrative hearing or judicial action for purposes of the attorneys' fees provision. Accordingly, such fees may not be awarded for resolution meetings.

While it is clear that attorneys' fees may not be awarded for resolution meetings, the Act is silent as to whether attorneys' fees are available for activities that occur outside the resolution meeting conducted pursuant to section 615(f)(1)(B)(i) of the Act and § 300.510(a). We decline to regulate on this issue because we believe these determinations will be fact-specific and should be left to the discretion of the court.

*Changes:* None.

*Comment:* A few commenters asked whether attorneys' fees can be awarded for attending an IEP Team meeting that is convened as a result of a mediation session conducted prior to the filing of a due process complaint or for attending an IEP Team meeting that is convened as a result of a mediation session conducted at any time.

*Discussion:* Section 615(i)(3)(D)(ii) of the Act permits States to determine whether attorneys' fees may be awarded for an IEP Team meeting that results from a mediation session described in § 300.506. Section 300.517(c)(2)(ii), as proposed, inadvertently, limited States to considering awarding attorneys' fees for an IEP Team meeting conducted as the result of a mediation arising prior to the filing of a due process request. This was an error and has been corrected to allow States the discretion to award attorneys' fees for a meeting of the IEP Team conducted as a result of any mediation described in § 300.506.

*Changes:* In order to be consistent with section 615(i)(3)(D)(ii) of the Act, we have revised § 300.517(c)(2)(ii) by placing a period after the reference to § 300.506 and removing the rest of the sentence.

*Comment:* One commenter recommended that attorneys' fees should also apply to due process complaints brought by private schools or agencies, not just families.

*Discussion:* Section 300.507(a)(1) permits a parent or a public agency to file a due process complaint under the Act. Private schools or agencies are not permitted to file a due process complaint under the Act. Under section 615(f)(1)(A) of the Act, only the parents and public agency are authorized to request a due process hearing.

*Changes:* None.

*Comment:* One commenter requested that the regulations clarify in § 300.517(c)(3) what standard will be used to determine whether a parent was substantially justified in rejecting a settlement offer.

*Discussion:* It would be inappropriate to include a standard for determining whether a parent is substantially justified in rejecting a settlement offer because such matters will depend on the specific facts and circumstances in each case. The hearing officer, as the designated trier of fact under the Act, is in the best position to determine whether a parent was substantially justified in rejecting a settlement offer. We would expect that a hearing officer's decision will be governed by commonly applied State evidentiary standards, such as whether the testimony is relevant, reliable, and based on sufficient facts and data.

*Changes:* None.

## Child's Status During Proceedings (§ 300.518)

*Comment:* A few commenters requested clarification regarding whether the current educational placement is the last agreed-upon placement. One commenter requested clarification as to whether the pendent placement is the regular education class or a class or program selected by the child's IEP Team.

*Discussion:* We believe that there is no need for further regulations in this area. The current educational placement during the pendency of any administrative or judicial proceeding described in § 300.518 and section 615(j) of the Act, refers to the setting in which the IEP is currently being implemented. The child's current placement is generally not considered to be location-specific.

*Changes:* None.

*Comment:* One commenter recommended clarifying that an IFSP is not a child's pendent placement as the child transitions from a Part C early intervention program to a Part B preschool program.

*Discussion:* The programs under Parts B and C of the Act differ in their scope, eligibility, and the services available. Services under Part B of the Act are generally provided in a school setting. By contrast, services under Part C of the Act are provided, to the maximum extent appropriate, in the natural environment, which is often the infant or toddler's home or other community program designed for typically developing infants or toddlers. The Department has long interpreted the current educational placement language in the stay-put provisions in section 615(j) of the Act and § 300.518(a) as referring only to the child's placement under Part B of the Act and not to the early intervention services received by the child under Part C of the Act. We believe that a child who previously received services under Part C of the Act, but has turned three and is no longer eligible under Part C of the Act, and is applying for initial services under Part B of the Act, does not have a ''current educational placement.''

We are adding language to clarify that if the complaint involves an application for initial services under Part B of the Act from a child who has turned three and is no longer eligible under Part C of the Act, the public agency is not required to continue providing the early intervention services on the child's IFSP. The provision clarifies that a public agency must obtain parental consent prior to the initial provision of special education and related services, consistent with § 300.300(b), and if a child is eligible under Part B of the Act and the parent provides consent under § 300.300(b), the public agency must provide those special education and related services that are not in dispute between the parent and the public agency.

*Changes:* We have added a new paragraph (c) in § 300.518 to clarify the Department's longstanding policy that if a complaint involves an application for initial services under Part B of the Act from a child who has turned three and is no longer eligible under Part C of the Act, the public agency is not required to continue providing the early intervention services on the child's IFSP. Proposed § 300.518(c) has been redesignated as new § 300.518(d).

*Comment:* One commenter recommended revising § 300.518 to clearly state that during the pendency of any administrative or judicial proceeding, LEAs are not absolved of their obligation to fully comply with all substantive and procedural requirements in Part B of the Act, with the exception of requirements that are impossible to fulfill because of the stay put order or because of a parent's refusal.

*Discussion:* We do not agree that the change requested by the commenter is necessary. Section 615(j) of the Act and § 300.518 provide that during the pendency of any administrative or judicial proceeding regarding a due process complaint under § 300.507, except as provided in § 300.533, unless the parent and the SEA or LEA agree to a proposed change in the educational placement of the child, the child remains in the current educational placement. Implicit in maintaining a child's current educational placement is the requirement that the public agency must ensure that FAPE continues to be made available to the child.

*Changes:* None.

*Comment:* A few commenters recommended that stay put not apply to a child if the child's parent fails to participate in a resolution meeting. Another commenter expressed concern about the applicability of the stay put provision when resolution meetings are delayed.

*Discussion:* The Act now makes the resolution process a prerequisite to an impartial due process hearing. Under section 615(j) of the Act, a child must be maintained in the current educational placement while proceedings under the Act are pending, and paragraph (a) of § 300.518 clarifies that unless the parent and the public agency agree otherwise, the child involved in the complaint must remain in his or her current educational placement during the pendency of any administrative or judicial proceeding regarding a due process complaint under § 300.507. Thus, the Act is clear that the public agency must maintain the child's current educational placement during the pendency of the

30-day resolution process, which is triggered once the parent files a due process complaint under this part, regardless of whether the due process complaint is resolved prior to a due process hearing. We believe it is important for this to be clear in the procedural safeguards notice. Therefore, we are changing § 300.504(c)(7) to clarify that the notice must inform parents about the child's placement during the pendency of any due process complaint.

Since a party must file a due process complaint as the first step in the hearing process, we also are making a change in § 300.518(a) to refer to a due process complaint, rather than a request for a due process hearing. This change is needed to clarify that a child's right to remain in the current educational placement attaches when a due process complaint is filed, regardless of whether the due process complaint results in a request for a due process hearing.

*Changes:* We have removed the reference in § 300.504(c)(7) to due process "hearings" and added "any due process complaint" to clarify that the procedural safeguards notice must include information regarding the child's placement during the pendency of any due process complaint. We also have changed § 300.518 by removing the words "request for a due process hearing" prior to the reference to § 300.507 and adding, in their place, the words "due process complaint."

*Comment:* One commenter recommended including language to invalidate the stay put agreement if the original decision is reversed at the second tier hearing or in a judicial appeal. One commenter recommended providing interim financial relief for parents if an LEA appeals the decision of a due process hearing officer to maintain a child with a disability in a private school setting.

*Discussion:* We are maintaining the provisions in proposed § 300.518(c), (new § 300.518(d)), but with one modification. The basis for this regulation is the longstanding judicial interpretation of the Act's pendency provision that when a hearing officer's decision is in agreement with the parent that a change in placement is appropriate, that decision constitutes an agreement by the State agency and the parent for purposes of determining the child's current placement during subsequent appeals. See, e.g., *Burlington School Committee* v. *Dept. of Educ.,* 471 U.S. 359, 372 (1985); *Susquenita School District* v. *Raelee S.,* 96 F.3d 78, 84 (3rd Cir. 1996); *Clovis Unified Sch. Dist.* v. *Cal. Office of Administrative Hearings,* 903 F.2d 635, 641 (9th Cir. 1990). To

clarify that new § 300.518(d) (proposed § 300.518(c)) does not apply to a first-tier due process hearing decision in a State that has two tiers of administrative review, but only to a State-level hearing officer's decision in a one-tier system or State review official's decision in a two-tier system that is in favor of a parent's proposed placement, we are removing the reference to "local agency" in new § 300.518(d). This change is made to align the regulation more closely with case law.

With regard to the concern about providing financial relief for prevailing parents when an LEA appeals the decision of a due process hearing to maintain a child with a disability in a private school setting, we decline to regulate on this issue because such decisions are matters best left to State law, hearing officers, and courts.

*Changes:* We have removed "or local agency" in new § 300.518(d) (proposed § 300.518(c)) because a decision by a hearing officer or a State review official in favor of a parent's proposed placement is an agreement between the parent and the State, not the local agency.

*Comment:* One commenter recommended clarifying that any agreement by a parent to waive the stay put protection must comply with the requirements for consent in § 300.9.

*Discussion:* Consent is required when a pending complaint involves an application for initial admission to public school. In this case, parental consent is required for the child to be placed in the public school until the completion of all proceedings, consistent with § 300.518(b) and section 615(j) of the Act. Other waivers of the stay put protections while an administrative or judicial proceeding is pending, need only be by agreement between the parent and the public agency.

*Changes:* None.

Surrogate Parents (§ 300.519)

*Comment:* A few commenters asked whether a student in the penal system has a right to a surrogate parent.

*Discussion:* Students with disabilities in State correctional facilities do not have an automatic right to a surrogate parent solely by reason of their confinement at a correctional facility. Public agencies must make case-by-case determinations in accordance with the requirements in § 300.519, regarding whether a student with a disability in a State correctional facility needs a surrogate parent. Whether a student with a disability confined in a State correctional facility is considered a *ward of the State,* as defined in new

§ 300.45 (proposed § 300.44) whose rights must be protected through the appointment of a surrogate parent, is a matter that must be determined under State law.

*Changes:* None.

*Comment:* One commenter recommended defining the term "locate" as used in § 300.519.

*Discussion:* "Locate," as used in § 300.519(a)(2), regarding a public agency's efforts to locate a child's parent, means that a public agency makes reasonable efforts to discover the whereabouts of a parent, as defined in § 300.30, before assigning a surrogate parent. We do not believe that it is necessary to define "locate" in these regulations because it has the same meaning as the common meaning of the term.

*Changes:* None.

Duties of Public Agency (§ 300.519(b))

*Comment:* A number of comments were received regarding the procedures for assigning surrogate parents. One commenter recommended requiring LEAs to appoint a surrogate parent unless the juvenile court has already appointed one. The commenter stated that this would avoid situations in which the LEA and juvenile court each believe that the other is assuming this responsibility and a surrogate parent is never appointed.

A few commenters recommended that the process for assigning surrogate parents within the 30-day timeframe be developed in collaboration with judges and other child advocates. Some commenters recommended that the regulations require the involvement of child welfare agencies, homeless liaisons, and any other party who has knowledge about the needs of homeless children or children in foster care in determining whether a surrogate parent is needed.

*Discussion:* It is not necessary to amend the regulations in the manner recommended by the commenters. To ensure that the rights of children with disabilities are protected, § 300.519(b) requires public agencies to have a method for determining whether a child needs a surrogate parent and for assigning a surrogate parent to a child. Such methods would include determining whether a court has already appointed a surrogate parent, as provided under § 300.519(c). Therefore, it is unnecessary to add language requiring LEAs to appoint a surrogate parent unless the juvenile court has already appointed one, as requested by a commenter. Section 300.519(d)(1) allows a public agency to select a surrogate parent in any way permitted

under State law, and § 300.519(h) requires the SEA to make reasonable efforts to ensure the assignment of a surrogate parent not more than 30 days after a public agency determines that the child needs a surrogate parent.

We believe that the determination of whether public agencies collaborate with other parties, such as child welfare agencies or homeless liaisons, in appointing surrogate parents is best left to State discretion. There is nothing in the Act that would prohibit a public agency from collaborating with judges and child advocates in establishing a process for assigning surrogate parents, as recommended by the commenter. However, in situations where a public agency involves other parties in determining whether a surrogate parent is needed, the public agency must ensure that the confidentiality of personally identifiable data, information, and records collected or maintained by SEAs and LEAs is protected in accordance with §§ 300.610 through 300.627, and that the privacy of education records is protected under FERPA and its implementing regulations in 34 CFR part 99.

*Changes:* None.

*Comment:* One commenter recommended retaining current § 300.370(b)(2), which specifically mentions the recruitment and training of surrogate parents as a State-level activity for which funds provided under Part B of the Act may be used. One commenter requested clarification as to who should provide training for surrogate parents. A few commenters recommended that PTIs in each State be responsible for training surrogate parents.

*Discussion:* It is not necessary to retain current § 300.370(b)(2) in order to permit the continued use of funds provided under Part B of the Act for the recruitment and training of surrogate parents. Section 300.704(b) and section 611(e)(2)(C)(i) of the Act provide that funds reserved for other State-level activities may be used for support and direct services, including technical assistance, personnel preparation, and professional development and training. This would include the recruitment and training of surrogate parents.

Determinations regarding who should conduct the training for surrogate parents are best left to the discretion of State and local officials. There is nothing in the Act or these regulations that requires or prohibits surrogate parent training to be conducted by PTIs.

*Changes:* None.

*Comment:* A few commenters recommended that a child have the same surrogate parent for each IEP Team

meeting, eligibility meeting, and other meetings in which a parent's presence is requested by the public agency.

*Discussion:* The Act and these regulations do not address the length of time that a surrogate parent must serve. Nor do we believe that it would be appropriate to impose a uniform rule in light of the wide variety of circumstances that might arise related to a child's need for a surrogate parent. Even so, to minimize disruption for the child, public agencies should take steps to ensure that the individual appointed as a surrogate parent can serve in that capacity over the period of time that the child needs a surrogate.

*Changes:* None.

Wards of the State (§ 300.519(c))

*Comment:* Many commenters stated that the requirements for a surrogate parent for public wards of the State (when a judge overseeing a case appoints a surrogate parent) are less stringent than the requirements for surrogate parents for other children. The commenters stated that the requirements that surrogate parents have no personal or professional interest that conflicts with the interest of the child, and have knowledge and skills that ensure adequate representation of the child, as required in § 300.519(d)(2)(ii) and (iii), respectively, should be required for surrogate parents for children who are wards of the State. One commenter recommended that court-appointed surrogate parents should have to meet Federal requirements for surrogate parents, not the requirements promulgated by LEAs. The commenter stated that courts may have jurisdiction over cases from more than one school district and should not have to apply different standards depending on which school district is involved.

*Discussion:* The criteria for selecting surrogate parents in § 300.519(d)(2)(ii) and (iii), which apply to surrogate parents appointed by a public agency for children with disabilities under Part B of the Act, do not apply to the selection of surrogate parents for children who are wards of the State under the laws of the State. Section 615(b)(2)(A)(i) of the Act provides that, in the case of a child who is a ward of the State, a surrogate parent may alternatively be appointed by the judge overseeing the child's care, provided that the surrogate parent is not an employee of the SEA, the LEA, or any other agency that is involved in the education or care of the child. We decline to impose additional requirements for surrogate parents for children who are wards of the State

beyond what is required in the Act, so as to interfere as little as possible with State practice in appointing individuals to act for the child. However, we would expect that in most situations, the court-appointed individuals will not have personal or professional interests that conflict with the interests of the child and will have the knowledge and skills to adequately represent the interests of the child.

*Changes:* None.

*Comment:* One commenter recommended that the regulations clarify that if a parent under § 300.30 is known and the child is a ward of the State, the public agency must appoint a surrogate parent only if the public agency determines that a surrogate parent is needed to protect the educational interests of the child. The commenter stated that the public agency should not appoint a surrogate parent without approval of a court of competent jurisdiction if the parent is the biological or adoptive parent whose rights to make educational decisions for the child have not been terminated, suspended, or limited.

*Discussion:* The commenters' concern is already addressed in the regulations. Section 300.30(b)(1) provides that when there is more than one party attempting to act as a parent, the biological or adoptive parent must be presumed to be the parent, unless the biological or adoptive parent does not have legal authority to make educational decisions for the child.

*Changes:* None.

*Comment:* Some commenters noted that the regulations do not protect a child who is a ward of the tribe in the same manner as a child who is a ward of the State. The commenters stated that this means that American Indian children have less protection than children of other ethnicities and recommended that the regulations clarify that wards of the State include children who are wards of a tribe of competent jurisdiction.

*Discussion:* The definition of *State* in new § 300.40 (proposed § 300.39) is based on section 602(31) of the Act, which does not include an Indian tribe or tribal governing body. Therefore, the Department does not have the authority to interpret ward of the State to include children who are wards of a tribe of competent jurisdiction. However this does not relieve States or the BIA of their responsibility to ensure that the rights of a child who is a ward of a tribe are protected through the appointment of a surrogate parent under § 300.519 when no parent can be identified; when the agency cannot, after reasonable efforts, locate a parent; or when the

child is an unaccompanied homeless youth.

*Changes:* None.

Criteria for Selection of Surrogates (§ 300.519(d))

*Comment:* Many commenters recommended that the regulations require public agencies to develop procedures to terminate the appointment of a surrogate parent if the person does not perform the duties of a surrogate parent. The commenters stated that such procedures should be developed in collaboration with the child welfare agency, as well as any other party knowledgeable about a child's need for surrogate assignments, including homeless liaisons, court-appointed special advocates, guardians *ad litem,* attorneys, or judges.

*Discussion:* If a public agency learns that an individual appointed as a surrogate parent is not carrying out the responsibilities of a surrogate parent in § 300.519(g), the public agency, consistent with its obligation to protect the rights of children with disabilities under the circumstances set out in § 300.519(a), would need to take steps to terminate the appointment of a surrogate parent. It is up to each State to determine whether procedures to terminate surrogate parents are needed and whether to collaborate with other agencies as part of any procedures they may choose to develop.

*Changes:* None.

*Comment:* A few commenters stated that the regulations should specify that an LEA cannot replace a surrogate parent simply because the surrogate parent disagrees with an LEA.

*Discussion:* As noted in the response to the prior comment, public agencies have a responsibility to ensure that a surrogate parent is carrying out their responsibilities, so there are some circumstances when removal may be appropriate. A mere disagreement with the decisions of a surrogate parent about appropriate services or placements for the child, however, generally would not be sufficient to give rise to a removal, as the role of the surrogate parent is to represent the interests of the child, which may not be the same as the interests of the public agency. We do not think a regulation is necessary, however, as we believe that the rights of the child with a disability are adequately protected under Section 504 of the Rehabilitation Act (Section 504) and Title II of the Americans with Disabilities Act (Title II), which prohibit retaliation or coercion against any individual who exercises their rights under Federal law for the purpose of assisting children with disabilities by protecting rights protected under those statutes. See, 34 CFR 104.61, referencing 34 CFR 100.7(e); 28 CFR 35.134. These statutes generally prohibit discrimination against individuals on the basis of disability by recipients of Federal financial assistance (Section 504) and prohibit discrimination against individuals on the basis of disability by State and local governments (Title II).

*Changes:* None.

Non-Employee Requirement; Compensation (§ 300.519(e))

*Comment:* A few commenters recommended that the regulations state that a foster parent is not prohibited from serving as a surrogate parent for a child solely because the foster parent is an employee of the SEA, LEA, or other agency that is involved in the education or care of the child.

*Discussion:* A child with a foster parent who is considered a parent, as defined in § 300.30(a), does not need a surrogate parent unless State law, regulations, or contractual obligations with a State or local entity prohibit a foster parent from acting as a parent, consistent with § 300.30(a)(2). Therefore, there is no need to change the regulations in the manner suggested by the commenters.

*Changes:* None.

Unaccompanied Homeless Youth (§ 300.519(f))

*Comment:* A few commenters requested clarification on how long the appointment should be for a temporary surrogate for an unaccompanied homeless youth. A few commenters also requested clarification on how the conflict of interest, and knowledge and skills requirements for surrogate parents apply to temporary surrogate parents for unaccompanied homeless youth.

*Discussion:* Section 300.519(f) allows LEAs to appoint a temporary surrogate parent for a child who is an unaccompanied homeless youth, without regard to the requirement in § 300.519(d)(2)(i) that a surrogate parent not be an employee of any agency involved in the education or care of the child. Thus, a temporary surrogate parent for an unaccompanied homeless youth may include State, LEA, or agency staff that is involved in the education or care of the child.

The Act does not specify how long a temporary surrogate parent can represent the child. Nor do we believe it is necessary or appropriate to specify a time limit for a temporary surrogate parent, as the need for a temporary surrogate parent will vary depending on the specific circumstances and unique problems faced by each unaccompanied homeless youth.

Section 300.519(f) specifically allows the appointment of a temporary surrogate parent without regard to the non-employee requirements in § 300.519(d)(2)(i). There are no similar exceptions for the requirements in § 300.519(d)(2)(ii) and (iii). Therefore, temporary surrogate parents for unaccompanied homeless youth must not have a personal or professional interest that conflicts with the interest of the child the surrogate parent represents, and must have the knowledge and skills that ensure adequate representation of the child, consistent with § 300.519(d)(2)(ii) and (iii), respectively.

*Changes:* None.

Surrogate Parent Responsibilities (§ 300.519(g))

*Comment:* A few commenters requested a definition of "surrogate parent." Some commenters stated that § 300.519(g) provides only general parameters regarding the responsibilities of surrogate parents and does not provide guidance on specific duties or responsibilities of surrogate parents. The commenters stated that, at a minimum, the regulations should require that States develop duties and responsibilities for surrogate parents, such as meeting with the child, participating in meetings, and reviewing the child's education record.

*Discussion:* We do not believe that it is necessary to define "surrogate parent" because § 300.519(g), consistent with section 615(b)(2) of the Act, clarifies that a surrogate parent is an individual who represents the child in all matters related to the identification, evaluation, and educational placement of the child, and the provision of FAPE to the child. This is a longstanding provision and is intended to describe the areas in which a surrogate parent may represent the child.

We believe that the provisions in § 300.519 are sufficient to ensure that public agencies fulfill their obligation to ensure that the rights of children are protected in the circumstances in § 300.519(a). Therefore, we believe it is unnecessary, and would be over regulating, to specify in these regulations requirements for surrogate parents to meet and get to know the child prior to meetings, as recommended by one commenter. Likewise, we do not believe that it is necessary to require public agencies to develop specific duties and responsibilities for surrogate parents because public agencies already must ensure that a surrogate parent has the

knowledge and skills that ensure adequate representation of the child, consistent with § 300.519(d). However, if a public agency determined there was a need to specify the duties and responsibilities for surrogate parents, there is nothing in the Act or these regulations that would prohibit them from doing so.

*Changes:* None.

SEA Responsibility (§ 300.519(h))

*Comment:* Some commenters recommended requiring LEAs to report to the SEA when a child needs a surrogate parent so that the SEA can fulfill its obligation to ensure that surrogate parents are assigned within the 30-day timeframe required in § 300.519(h). Some commenters requested clarification regarding what it means for the SEA to make "reasonable efforts" to appoint surrogate parents within the 30-day timeframe. The commenters recommended that SEAs track whether LEAs or courts appoint surrogate parents in a timely manner and provide technical assistance to LEAs and courts that fail to meet the 30-day timeframe.

Some commenters stated that LEAs spend too much time determining that a surrogate parent is needed and prolong the decision that a surrogate parent is needed until the LEA is ready to appoint the surrogate parent. One commenter stated that children in residential care facilities often have an immediate need for a surrogate parent and waiting 30 days to appoint a surrogate parent could cause lasting damage to a child.

*Discussion:* It would be over-regulating to specify the specific "reasonable efforts" that a State must take to ensure that a surrogate parent is appointed within the 30-day timeframe required in § 300.519(h), because what is considered a "reasonable effort" will vary on a case-by-case basis. We do not believe we should require LEAs to report to the State when a child in their district needs a surrogate parent or to require SEAs to track how long it takes LEAs and courts to appoint surrogate parents because to do so would be unnecessarily burdensome. States have the discretion to determine how best to monitor the timely appointment of surrogate parents by their LEAs. States also have discretion to use funds reserved for other State-level activities to provide technical assistance to LEAs and courts that fail to meet the 30-day timeframe, as requested by the commenters.

Under their general supervisory authority, States have responsibility for ensuring that LEAs appoint surrogate

parents for children who need them, consistent with the requirements in § 300.519 and section 615(b)(2) of the Act. Therefore, if an LEA consistently fails to meet the 30-day timeframe or unnecessarily delays the appointment of a surrogate parent, the State is responsible for ensuring that measures are taken to remedy the situation.

*Changes:* None.

Transfer of Rights at Age of Majority (§ 300.520)

*Comment:* A few commenters recommended clarifying § 300.520(a)(2) to mean that all rights transfer to children who have reached the age of majority under State law.

*Discussion:* To change the regulation in the manner suggested by the commenters would be inconsistent with the Act. Section 615(m)(1)(D) of the Act allows, but does not require, a State to transfer all rights accorded to parents under Part B of the Act to children who are incarcerated in an adult or juvenile, State or local correctional institution when a child with a disability reaches the age of majority under State law.

*Changes:* None.

*Comment:* A few commenters stated that families are often unaware of the transfer of rights at the age of majority and recommended requiring schools to inform parents and students in writing of the transfer of rights one year prior to the day the student reaches the age of majority.

*Discussion:* The commenters' concerns are addressed elsewhere in the regulations. Section 300.320(c), consistent with section 614(d)(1)(A)(VIII)(cc) of the Act, requires that, beginning not later than one year before the child reaches the age of majority under State law, the IEP must include a statement that the child has been informed of the child's rights under Part B of the Act, if any, that will transfer to the child on reaching the age of majority. Section 300.322(f) (proposed § 300.322(e)) requires the public agency to give a copy of the child's IEP to the parent, and, therefore, parents are informed as well.

*Changes:* None.

*Comment:* One commenter recommended that the regulations allow parents to continue to serve as the decision-maker and to retain the rights under the Act even in situations where the child is not determined to be incompetent under State law, if the student and parent agree in writing that the parent retains such rights. The commenter stated that a State may not have a mechanism to determine that the child does not have the ability to provide informed consent, as required

in § 300.520(b), and if a State does have such a mechanism, it may be costly and time consuming for a parent to go to court to retain such rights. The commenter stated that an agreement between the parent and student should be a simple process whereby the student and parent both sign a form stating their agreement.

*Discussion:* Section 300.520(b) recognizes that some States have mechanisms to determine that a child with a disability who has reached the age of majority under State law does not have the ability to provide informed consent with respect to his or her educational program, even though the child has not been determined incompetent under State law. In such States, the State must establish procedures for appointing the parent (or, if the parent is not available, another appropriate individual) to represent the educational interests of the child throughout the remainder of the child's eligibility under Part B of the Act. Whether parents may retain the ability to make educational decisions for a child who has reached the age of majority and who can provide informed consent is a matter of State laws regarding competency. That is, the child may be able to grant the parent a power of attorney or similar grant of authority to act on the child's behalf under applicable State law. We believe that the rights accorded individuals at the age of majority, beyond those addressed in the regulation, are properly matters for States to control.

To ensure that this provision is clear, we are making minor changes to the language. These changes are not intended to change the meaning of § 300.520(b) from the meaning in current § 300.517(b).

*Changes:* We have changed § 300.520(b) for clarity.

*Discipline Procedures (§§ 300.530 through 300.536)*

Authority of School Personnel (§ 300.530)

Case-by-Case Determination (§ 300.530(a))

*Comment:* Many commenters requested clarifying the phrase "consider any unique circumstances on a case-by-case basis" in § 300.530(a) and what, if any, unique circumstances should be considered. A few of these commenters requested that the regulations include specific criteria to be used when making a case-by-case determination. Other commenters suggested clarifying that the purpose of a case-by-case determination is to not allow school personnel to remove a

**46714**     **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

child to an interim alternative educational setting for violating a code of student conduct when to do so would seem unjust under the circumstances. Some commenters suggested clarifying that the purpose of a case-by-case determination is to limit, not expand, disciplinary actions for a child with a disability. One commenter expressed concern that permitting school personnel to consider any unique circumstances on a case-by-case basis when determining a change in placement may result in schools applying this provision to cases for which it was not intended, potentially resulting in a denial of FAPE. Other commenters requested clarifying that a child's disciplinary history, ability to understand consequences, and expression of remorse should be factors considered when making a case-by-case determination. A few commenters requested school personnel document any supports provided to a child with a disability prior to the child's violation of a code of student behavior when making a case-by-case determination.

*Discussion:* We believe that the regulations do not need to be amended to clarify "consider any unique circumstances on a case-by-case basis" because what constitutes "unique circumstances" is best determined at the local level by school personnel who know the individual child and all the facts and circumstances regarding a child's behavior. We believe it would impede efforts of school personnel responsible for making a determination as to whether a change in placement for disciplinary purposes is appropriate for a child if the Department attempted to restrict or limit the interpretation of "consider any unique circumstances on a case-by-case-basis." Factors such as a child's disciplinary history, ability to understand consequences, expression of remorse, and supports provided to a child with a disability prior to the violation of a school code could be unique circumstances considered by school personnel when determining whether a disciplinary change in placement is appropriate for a child with a disability. We believe providing school personnel the flexibility to consider whether a change in placement is appropriate for a child with a disability on a case-by-case basis and to determine what unique circumstances should be considered regarding a child who violates a code of conduct, as provided for under section 615(k)(1)(A) of the Act, will limit the inappropriate removal of a child with a disability from his or her current placement to an interim alternative educational setting,

another setting, or suspension. We also decline the commenters' suggestion to regulate further about the case-by-case determination in light of the discretion granted under the Act to school personnel in making this determination.

*Changes:* None.

*Comment:* Several commenters expressed concern that § 300.530(a) could be used to justify ignoring a manifestation determination when determining whether a change in placement is appropriate for a child. These commenters stated that the authority of school personnel to consider any unique circumstances on a case-by-case basis could be used to usurp the authority of the group making the manifestation determination and the IEP Team. Some commenters recommended removing the phrase "consistent with the requirements of this section" in § 300.530(a) because it is not included in the Act and limits the individualized disciplinary options that might arise under this authority.

*Discussion:* Section 300.530(a), consistent with section 615(k)(1) of the Act, clarifies that, on a case-by-case basis, school personnel may consider whether a change in placement, that is otherwise permitted under the disciplinary procedures, is appropriate and should occur. It does not independently authorize school personnel, on a case-by-case basis, to institute a change in placement that would be inconsistent with § 300.530(b) through (i), including the requirement in paragraph (e) of this section regarding manifestation determinations. We are revising § 300.530(a) to clarify that any consideration regarding a change in placement under paragraph (a) of this section must be consistent with all other requirements in § 300.530.

*Changes:* We have revised § 300.530(a) to refer to the other requirements of § 300.530.

*Comment:* One commenter recommended changing § 300.530(a) to include the role of the IEP Team when determining whether a change in placement is appropriate for a child with a disability who violates a code of student conduct.

*Discussion:* We believe § 300.530(a), which follows the language in section 615(k)(1)(A) of the Act, appropriately gives school personnel the authority to determine, on a case-by-case basis, whether a change in placement that is consistent with the other requirements of § 300.530, would be appropriate for a child with a disability who violates a code of student conduct and, therefore, we do not believe it is appropriate to define a role for the IEP Team in this paragraph. There is nothing, however,

in the Act or these regulations that would preclude school personnel from involving parents or the IEP Team in making this determination.

*Changes:* None.

*Comment:* Some commenters requested clarifying who constitute "school personnel" as used in § 300.530(a).

*Discussion:* We do not believe it is necessary or appropriate to clarify in these regulations the "school personnel" that may consider whether a change in placement for disciplinary reasons is appropriate for a child because such decisions are best made at the local school or district level and based on the circumstances of each disciplinary case.

*Changes:* None.

*Comment:* Several commenters requested that the regulations clarify the meaning of "violates a code of student conduct." The commenters expressed concern that school personnel could use any minor infraction to remove a child.

*Discussion:* Local school personnel have the necessary authority to protect the safety and well-being of all children in their school and, therefore, are in the best position to determine a code of student conduct that is uniform and fair for all children in their school. We, therefore, do not believe it is necessary or appropriate to clarify in § 300.530(a) the meaning of "violates a code of student conduct."

*Changes:* None.

General (§ 300.530(b))

*Comment:* Several commenters requested removing "consecutive" from §§ 300.530 and 300.536 because there is no reference to consecutive school days in the Act.

*Discussion:* We are not removing "consecutive" from §§ 300.530 through 300.536, as recommended by the commenters, because the Department has long interpreted the Act to permit children with disabilities who violate a code of student conduct to be removed from their current educational placement for not more than 10 consecutive school days at a time, and that additional removals of 10 consecutive school days or less in the same school year would be possible, as long as any removal does not constitute a change in placement. We do not believe the changes to section 615(k) of the Act justify any change in this position. Further, the Department's position is consistent with S. Rpt. No. 108–185, p. 43, which states that "a school may order a change in placement for a child who violates a code of student conduct to an appropriate interim educational setting, another

setting, or suspension, for 10 consecutive school days or less, to the same extent that it would apply such a discipline measure to a child without a disability.''

*Changes:* None.

*Comment:* One commenter recommended replacing ''school days'' with ''calendar days'' in § 300.530 because using ''school days'' in the regulations might create a disincentive for school personnel to find solutions and develop an appropriate IEP in a timely manner.

*Discussion:* Section 615(k)(1)(B) of the Act clearly states that school personnel may remove a child with a disability who violates a code of student conduct from their current placement to an appropriate alternative education setting, other setting, or suspension, for not more than 10 ''school days;'' therefore, it would be inconsistent with section 615(k)(1)(B) of the Act to change ''school days'' to ''calendar days'' as suggested by the commenter.

*Changes:* None.

*Comment:* One commenter requested that § 300.530 and all sections that pertain to discipline stipulate that children with disabilities must not be disciplined more severely than non-disabled children and disciplinary measures applied to them must not be longer in duration than those applied to non-disabled students.

*Discussion:* We do not believe that it is necessary to change the regulations to state that children with disabilities must not be disciplined more severely than non-disabled children because § 300.530(b)(1), consistent with section 615(k)(1)(B) of the Act, is sufficiently clear that disciplinary measures are to be applied to children with disabilities to the extent they are applied to children without disabilities. Further, the manifestation determination provision in paragraph (e) of this section, and the right of a parent to request an expedited due process hearing in § 300.532, regarding the disciplinary placement or manifestation determination, are sufficient to ensure that schools implement disciplinary policies that provide for a uniform and fair way of disciplining children with disabilities in line with the discipline expectations for non-disabled students. A primary intent of Congress in revising section 615(k) of the Act was to provide for a uniform and fair way of disciplining all children—both for those children with disabilities and those children without disabilities. (S. Rpt. No. 108–185, p. 43; H. Rpt. No. 108–77, pp. 116–119).

*Changes:* None.

*Comment:* A few commenters requested clarifying the Department's basis for the general authority of school personnel to remove a child with a disability for up to 10 consecutive school days, so as not to preclude subsequent short-term removals in the same school year. Many commenters expressed concern that permitting subsequent removals of up to 10 consecutive school days in the same school year could be misapplied and result in a denial of services. Several commenters stated that § 300.530 is not clear as to whether students who are removed for more than 10 school days in a school year must continue to receive services.

*Discussion:* The Department has long interpreted the Act to permit schools to remove a child with a disability who violates a code of student conduct from his or her current placement for not more than 10 consecutive school days, and that additional removals of 10 consecutive school days or less in the same school year would be possible, as long as those removals do not constitute a change in placement. The requirements in § 300.530(b) do not permit using repeated disciplinary removals of 10 school days or less as a means of avoiding the change in placement options in § 300.536. We believe it is important for purposes of school safety and order to preserve the authority that school personnel have to be able to remove a child for a discipline infraction for a short period of time, even though the child already may have been removed for more than 10 school days in that school year, as long as the pattern of removals does not itself constitute a change in placement of the child.

On the other hand, discipline must not be used as a means of disconnecting a child with a disability from education. Section 300.530(d) clarifies, in general, that the child must continue to receive educational services so that the child can continue to participate in the general curriculum (although in another setting), and progress toward meeting the goals in the child's IEP.

*Changes:* None.

*Comment:* Several commenters recommended retaining the Department's long term policy that an in-school suspension would not be considered a part of the days of suspension as long as the child is afforded the opportunity to continue to appropriately progress in the general curriculum, continue to receive services specified on the child's IEP, and continue to participate with nondisabled children to the extent they would have in their current placement.

Other commenters recommended including in the regulations the commentary from the March 12, 1999 **Federal Register** (64 FR 12619) regarding whether an in-school suspension or a bus suspension constitutes a day of removal.

*Discussion:* It has been the Department's long term policy that an in-school suspension would not be considered a part of the days of suspension addressed in § 300.530 as long as the child is afforded the opportunity to continue to appropriately participate in the general curriculum, continue to receive the services specified on the child's IEP, and continue to participate with nondisabled children to the extent they would have in their current placement. This continues to be our policy. Portions of a school day that a child had been suspended may be considered as a removal in regard to determining whether there is a pattern of removals as defined in § 300.536.

Whether a bus suspension would count as a day of suspension would depend on whether the bus transportation is a part of the child's IEP. If the bus transportation were a part of the child's IEP, a bus suspension would be treated as a suspension under § 300.530 unless the public agency provides the bus service in some other way, because that transportation is necessary for the child to obtain access to the location where services will be delivered. If the bus transportation is not a part of the child's IEP, a bus suspension is not a suspension under § 300.530. In those cases, the child and the child's parent have the same obligations to get the child to and from school as a nondisabled child who has been suspended from the bus. However, public agencies should consider whether the behavior on the bus is similar to behavior in a classroom that is addressed in an IEP and whether the child's behavior on the bus should be addressed in the IEP or a behavioral intervention plan for the child.

Because the determination as to whether an in-school suspension or bus suspension counts as a day of suspension under § 300.530 depends on the unique circumstances of each case, we do not believe that we should include these policies in our regulations.

*Changes:* None.

Services (§ 300.530(d))

*Comment:* Many commenters expressed concern that the change from ''continue to progress in the general curriculum'' in current § 300.522(b)(1) to ''continue to participate in the

**46716** **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

general education curriculum'' in § 300.530(d)(1)(i) is a lower standard. They requested that we use the language from current § 300.522(b)(1).

*Discussion:* Section 615(k)(1)(D)(i) of the Act and § 300.530(d)(1) provide that a child must continue to receive educational services so as to enable the child ''to continue to participate in the general educational curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP.'' We believe that using the statutory language in the regulation is appropriate because the Act specifically uses different language to describe a child's relationship to the general education curriculum in periods of removal for disciplinary reasons than for services under the child's regular IEP in section 614(d)(1)(A)(i)(IV) of the Act. Based on this difference, we decline to make the change requested.

We caution that we do not interpret ''participate'' to mean that a school or district must replicate every aspect of the services that a child would receive if in his or her normal classroom. For example, it would not generally be feasible for a child removed for disciplinary reasons to receive every aspect of the services that a child would receive if in his or her chemistry or auto mechanics classroom as these classes generally are taught using a hands-on component or specialized equipment or facilities.

*Changes:* None.

*Comment:* Many commenters recommended § 300.530(d) clarify that children with disabilities who violate a code of student conduct and are removed from their current placement to an interim alternative educational setting or another setting, or are suspended, are entitled to FAPE in accordance with section 612(a)(1) of the Act. Several commenters recommended revising § 300.530(d)(1)(i) to explicitly state that the educational services provided to a child removed for disciplinary reasons must include all the special education services, related services, supplementary aids and services, and accommodations required by the child's IEP to ensure the child receives FAPE. Many commenters requested that the regulations clarify that LEAs must continue to implement a child's IEP as written, including related services, while the child is in an interim alternative educational setting.

*Discussion:* Section 612(a)(1)(A) of the Act provides that FAPE must be made available to all children with disabilities ages 3 through 21, inclusive, including children with disabilities who have been suspended or expelled from school. Further, section 615(k)(1)(D)(i) of the Act provides that if school personnel seek to order a change in placement of a child with a disability who violates a code of student conduct, the child must continue to receive education services (as provided in section 612(a)(1) of the Act) so as to enable him or her to continue to participate in the general curriculum, although in another setting (which includes an interim alternative education setting), and to progress toward meeting the goals set out in the child's IEP. In other words, while children with disabilities removed for more than 10 school days in a school year for disciplinary reasons must continue to receive FAPE, we believe the Act modifies the concept of FAPE in these circumstances to encompass those services necessary to enable the child to continue to participate in the general curriculum, and to progress toward meeting the goals set out in the child's IEP. An LEA is not required to provide children suspended for more than 10 school days in a school year for disciplinary reasons, exactly the same services in exactly the same settings as they were receiving prior to the imposition of discipline. However, the special education and related services the child does receive must enable the child to continue to participate in the general curriculum, and to progress toward meeting the goals set out in the child's IEP.

Section 300.530(d) clarifies that decisions regarding the extent to which services would need to be provided and the amount of services that would be necessary to enable a child with a disability to appropriately participate in the general curriculum and progress toward achieving the goals on the child's IEP may be different if the child is removed from his or her regular placement for a short period of time. For example, a child who is removed for a short period of time and who is performing at grade level may not need the same kind and amount of services to meet this standard as a child who is removed from his or her regular placement for 45 days under § 300.530(g) or § 300.532 and not performing at grade level.

We believe it is reasonable for school personnel (if the child is to be removed for more than 10 school days in the same school year and not considered a change in placement) and the IEP Team (if the child's removal is a change in placement under § 300.536 and not a manifestation of the child's disability or a removal pursuant to § 300.530(g)) to make informed educational decisions about the extent to which services must be provided for a child with a disability placed in an interim alternative educational setting, another setting, or suspension to enable the child to participate in the general education curriculum and make progress toward the goals of the child's IEP.

As stated above, we read the Act as modifying the concept of FAPE in circumstances where a child is removed from his or her current placement for disciplinary reasons. Specifically, we interpret section 615(k)(1)(D)(i) of the Act to require that the special education and related services that are necessary to enable the child to continue to participate in the general education curriculum and to progress toward meeting the goals set out in the child's IEP, must be provided at public expense, under public supervision and direction, and, to the extent appropriate to the circumstances, be provided in conformity with the child's IEP. We, therefore, believe § 300.530(d)(1) should be amended to be consistent with the Act by adding the reference to the FAPE requirements in § 300.101(a), and to ensure it is understood that the educational services provided to a child removed for disciplinary reasons are consistent with the FAPE requirements in section 612(a)(1) of the Act.

We are making additional technical changes to paragraph (d)(1) to eliminate cross-references, where appropriate, and to provide greater clarity that children with disabilities removed for disciplinary reasons pursuant to paragraphs (c) and (g) of this section must continue to receive services and receive, as appropriate, a functional behavior assessment and behavior intervention services and modifications. We are, therefore, removing from paragraph (d)(1) of this section the phrase ''except as provided in paragraphs (d)(3) and (d)(4)'' and removing the reference to paragraph (b) of this section, which references the general authority for removing a child who violates a code of student conduct, as it is unnecessary.

*Changes:* Section 300.530(d)(1)(i) has been amended to be consistent with section 615(k)(1)(D)(i) of the Act by cross-referencing the FAPE requirement in § 300.101(a). We have also revised paragraph (d)(1) by removing the reference to the exceptions for paragraph (d)(3) and (d)(4) of this section and removing the reference to paragraph (b) of this section.

*Comment:* None.

*Discussion:* In light of the changes made to proposed paragraph (d)(1) of this section by removing the phrase regarding the exceptions for paragraph (d)(3) and (d)(4) of this section, it is necessary to revise § 300.530(d)(2) to

accurately reflect when services may be provided in an alternative educational setting.

*Changes:* We have modified § 300.530(d)(2) to clarify that services required by paragraph (d)(1), (d)(3), (d)(4), and (d)(5) of this section may be provided in an interim alternative educational setting.

*Comment:* Several commenters stated that § 300.530(d)(3) is not clear and requested clarification as to whether children who are removed for more than 10 school days in the same school year must continue to receive services. One commenter expressed concern that § 300.530(d)(3), which clarifies that a public agency is only required to provide services to a child with a disability who is removed from his or her current placement for 10 school days or less in that school year if it provides services to a child without disabilities who is similarly removed, is unsupported by the Act and substantially undermines the rights afforded to children with disabilities removed from their current placement for disciplinary reasons. The commenter wanted this provision removed from the regulations. Other commenters requested clarifying the authority of school personnel with respect to the procedures in § 300.530(d)(3).

*Discussion:* The Act and the regulations recognize that school officials need some reasonable degree of flexibility when disciplining children with disabilities who violate a code of student conduct. Interrupting a child's participation in education for up to 10 school days over the course of a school year, when necessary and appropriate to the circumstances, does not impose an unreasonable limitation on a child with a disability's right to FAPE. Section 300.530(d)(3) is consistent with section 612(a)(1)(A) of the Act and current § 300.121(d) and reflects the Department's longstanding position that public agencies need not provide services to a child with a disability removed for 10 school days or less in a school year, as long as the public agency does not provide educational services to nondisabled children removed for the same amount of time. This position was affirmed by the Supreme Court in *Honig v. Doe,* 484 U.S. 305 (1988). We are amending § 300.530(d)(3) to replace "need not" with "is only required to" for greater clarity. We also are amending paragraph (d)(3) of this section to write it in active voice and in the positive and removed the cross-reference to the general provision in paragraph (b) of this section, as it is not necessary.

*Changes:* Technical changes have been made to § 300.530(d)(3) to remove the cross-reference to paragraph (b) of this section. We also amended this paragraph as stated above to provide greater clarity.

*Comment:* Many commenters wanted us to remove the words "if any" from § 300.530(d)(4). Several commenters thought that § 300.530(d)(4), which allows school personnel to determine the extent to which services are needed, "if any," gives public agencies the authority to deny special education services to students who have been suspended or expelled for more than 10 school days in a school year. Other commenters also thought that including the phrase "if any" implies that special education services are not mandatory for a child who has been removed for 10 or more non-consecutive days and do not constitute a change in placement.

*Discussion:* We believe § 300.530(d)(4) ensures that children with disabilities removed for brief periods of time receive appropriate services, while preserving the flexibility of school personnel to move quickly to remove a child when needed and determine how best to address the child's needs. Paragraph (d)(4) of this section is not intended to imply that a public agency may deny educational services to children with disabilities who have been suspended or expelled for more than 10 school days in a school year, nor is § 300.530(d)(4) intended to always require the provision of services when a child is removed from school for just a few days in a school year. We believe the extent to which educational services need to be provided and the type of instruction to be provided would depend on the length of the removal, the extent to which the child has been removed previously, and the child's needs and educational goals. For example, a child with a disability who is removed for only a few days and is performing near grade level would not likely need the same level of educational services as a child with a disability who has significant learning difficulties and is performing well below grade level. The Act is clear that the public agency must provide services to the extent necessary to enable the child to appropriately participate in the general curriculum and appropriately advance toward achieving the goals in the child's IEP.

We recognize the concern of the commenters that the phrase "if any" could imply that school personnel need not provide educational services to these children. Therefore, we are removing the phrase "if any" from paragraph (d)(4). For clarity, we are replacing the cross-reference to § 300.530(d)(1) with the language from § 300.530(d)(1)(i) and restructure the paragraph.

*Changes:* The phrase "if any" has been removed from § 300.530(d)(4). For clarity, we have removed a cross reference in § 300.530(d)(4) and replaced it with the language from § 300.530(d)(1)(i) and made technical edits to restructure the paragraph.

*Comment:* One commenter questioned whether the ability of school personnel to remove a child from his or her current placement for disciplinary reasons means, if a child's current placement is a special education classroom setting, school personnel may remove the child from special education services.

*Discussion:* If the child's current placement is a special education setting, the child could be removed from the special education setting to another setting for disciplinary reasons. Similarly, if the child with a disability who violated a school code of conduct receives services in a regular classroom, the child could be removed to an appropriate interim alternative educational setting, another setting, or suspension. Section 300.530(b), consistent with section 615(k)(1)(B) of the Act, provides that school personnel may remove a child with a disability who violates a code of student conduct from his or her current placement to an appropriate interim alternative educational setting, another setting, or suspension. However, § 300.530(d) is clear that the child who is removed for more than 10 school days in the same school year must continue to receive educational services, to enable the child to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in his or her IEP.

*Changes:* None.

*Comment:* One commenter requested clarifying how many days a child with a disability may be placed in an interim alternative educational setting before the public agency must provide services.

*Discussion:* School personnel may remove a child with a disability from his or her current placement to an interim alternative educational setting, another setting, or suspension for up to 10 school days in the same school year without providing educational services. Beginning, however, on the eleventh cumulative day in a school year that a child with a disability is removed from the child's current placement, and for any subsequent removals, educational services must be provided to the extent required in § 300.530(d), while the removal continues.

**46718**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

*Changes:* None.

*Comment:* Numerous commenters recommended revising § 300.530(d)(4) to require that the parent be included in the consultation school personnel must have with at least one of the child's teachers to determine the extent to which services are needed for a child with a disability who has been removed from his or her current placement for more than 10 school days (if the current removal is for not more than 10 consecutive school days and is not a change in placement under § 300.536).

*Discussion:* The provisions in § 300.530(d)(4) only address the provision of services in those situations where a removal of a child with a disability from the child's current placement is for a short period of time and the removal does not constitute a change in placement. In many instances, these short-term removals are for one or two days. We believe that, in these instances, it is reasonable for appropriate school personnel, in consultation with at least one of the teachers of a child, to determine how best to address the child's needs during these relatively brief periods of removal. We believe it would place an unreasonable burden on school personnel to require that the parent be involved in making the determination of the extent to which services are needed for a child removed for such a short period of time. We do not believe requiring school personnel to make these decisions under these circumstances imposes an unreasonable limitation on a child with a disability's right to FAPE. For these reasons, we do not believe § 300.530(d)(4) should be revised to require that the parent be included in the consultation. However, there is nothing in these regulations that would prohibit school personnel, if they choose to do so, from including parents in the consultation.

*Changes:* None.

*Comment:* One commenter requested that § 300.530(d)(4) be modified to include the requirement in current § 300.121(d)(3)(i) that school personnel consult with the child's special education teacher as opposed to any of the child's teachers. The commenter stated that it makes sense that the special education teacher be considered the first choice for this role given that the special education teacher generally has the most knowledge of the child and the student's educational needs.

*Discussion:* The determination of which teacher school personnel should consult should be based on the facts and circumstances of each case, the needs of the child and the expertise of the child's teachers. We agree that, in many cases,

the special education teacher may be the most appropriate teacher with whom school personnel should consult. This, however, is not always the case. In light of the short-term nature of the removals under paragraph (d)(4) of the section and the need for school personnel to make quick decisions regarding services, we believe local school personnel need broad flexibility in making such decisions and are in the best position to determine the appropriate teacher with whom to consult. For these reasons, we are not amending § 300.530(d)(4) to require consultation with the child's special education teacher as in current § 300.121(d)(3)(i). There is nothing, however, in the Act or these regulations that would prohibit school personnel from consulting with one of the child's special education teachers.

*Changes:* None.

*Comment:* Several commenters recommended the regulations clarify that a child placed in an appropriate interim alternative educational setting will participate in all State and districtwide assessments.

*Discussion:* It is not necessary to include the language recommended by the commenters as section 612(a)(16)(A) of the Act is clear that the State must ensure that all children with disabilities are included in all general State and districtwide assessment programs, including assessments described in section 1111 of the ESEA, 20 U.S.C. 6311, with appropriate accommodations and alternate assessments, if necessary, and as indicated in each child's respective IEP. This requirement applies to children with disabilities who have been placed in an appropriate interim alternative education setting or another setting, or who are suspended.

*Changes:* None.

*Comment:* One commenter requested specifying in § 300.530(d) that LEAs must include children with disabilities placed in interim alternative educational settings in their determination of AYP. The writer expressed concern that LEAs may try to avoid accountability by placing children with disabilities in interim alternative educational settings.

*Discussion:* The Act does not address the issue of AYP. However, title 1 of the ESEA is clear that children who are enrolled within a district for a full academic year must be included in the AYP reports of an LEA. (20 U.S.C. 7325) Title 1 of the ESEA does not provide an exception for children with disabilities placed in interim alternative educational settings. In addition, State agencies, LEAs, and schools must assess all children, regardless of whether a

child is to be included for reporting or accountability purposes and regardless of the amount of time the child has been enrolled in the State agency, LEA, or school. The only public school children with disabilities enrolled in public settings who are exempted from participation in State and districtwide assessment programs under the Act are children with disabilities convicted as adults under State law and incarcerated in adult prisons (§ 300.324(d)(1)(i)). As AYP is addressed under title 1 of the ESEA, we do not need to regulate on this matter.

*Changes:* None.

*Comment:* A few commenters stated that § 300.530(d)(5) is inconsistent with section 615(k)(1)(E) of the Act, which requires that within 10 school days of any decision to change a child's placement because of a violation of a code of conduct, the LEA, parent, and relevant members of the IEP Team (as determined by the parent and the LEA) shall consider whether the conduct was caused by or had a direct and substantial relationship to the disability or whether the conduct was caused by the failure of the LEA to implement the IEP. These commenters stated that § 300.530(d)(5) gives the IEP Team control over determinations regarding services and placement, regardless of manifestation, and does not give control to the LEA, parent and relevant members of the IEP Team as provided in the Act.

*Discussion:* We disagree with the commenters that § 300.530(d)(5) is inconsistent with section 615(k)(1)(E) of the Act because paragraph (d)(5) of this section describes who is responsible for determining the appropriate services for a child with a disability whose disciplinary removal is a change in placement under § 300.536, while section 615(k)(1)(E) of the Act describes who is responsible for making a manifestation determination. These are very different and distinct provisions. Further, section 615(k) of the Act does not specifically address who is responsible for determining the educational services to be provided a child with a disability whose disciplinary removal is a change in placement. Section 615(k)(1)(E) of the Act, consistent with § 300.530(e), provides that, within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct, the LEA, the parent, and relevant members of the IEP Team (as determined by the parent and the LEA) shall determine whether the child's conduct was a manifestation of the child's disability. We believe that in

**Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations **46719**

instances where a child's disciplinary removal constitutes a change in placement, and given the length of time of such removals, the IEP Team is the appropriate entity to determine the educational services necessary to enable the child to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP. Section 300.530(d)(5) is clear that whenever a removal constitutes a change in placement under § 300.536, the child's IEP Team determines the services the child will be provided.

*Changes:* None.

*Comment:* One commenter stated that the phrase "location in which services will be provided" as used in § 300.530(d)(5) is not included in the Act. The commenter pointed out that section 615(k)(2) of the Act refers to the IEP Team's "determination of setting." The commenter stated that using the statutory language will make it less likely the IEP Team will interpret the regulations to require the IEP Team to determine the specific location of the services to be provided to a child removed from his or her current placement to an interim alternative educational setting. Several other commenters stated that the use of the phrase "location in which services will be provided" in paragraph (d)(5) of this section is confusing and recommended limiting the IEP Team responsibility to determining the setting (as required under section 615(k)(2) of the Act) and the services and not the specific location.

*Discussion:* Section 615(k)(2) of the Act provides that the IEP Team is responsible for determining the interim alternative educational setting for a child with a disability for certain removals that are a change of placement. In § 300.531, for reasons described elsewhere in this preamble, we interpret this obligation to apply to all removals that constitute a change of placement for disciplinary reasons, as defined in § 300.536. We interpret "setting" in this context to be the environment in which the child will receive services, such as an alternative school, alternative classroom, or home setting. In many instances, the location and the setting or environment in which the child will receive services are the same. It is possible, however, that a school may have available more than one location that meets the criteria of the setting chosen by the IEP Team. For example, an LEA may have available two alternative schools that meet the criteria of the interim alternative educational setting chosen by the IEP Team. In those

cases school personnel would be able to assign the child to either of these locations, if the IEP Team has not specified a particular one.

We are persuaded by the commenters and, therefore, are removing the reference to "location in which services will be provided" in paragraphs (d)(4) and (d)(5) of this section. We are also removing the phrase "is for more than 10 consecutive school days or" from paragraphs (d)(5) of this section because it is unnecessary since such a removal is a change in placement under § 300.536.

*Changes:* We have amended paragraphs (d)(4) and (d)(5) of this section by removing the phrase "location in which services will be provided." We also have amended paragraph (d)(5) of this section by removing the phrase "is for more than 10 consecutive school days or."

**Manifestation Determination (§ 300.530(e))**

*Comment:* Several commenters requested including in § 300.530(e) the following measures when determining the relationship between a behavior and a disability: (1) whether the child's disability impaired the ability of the child to control the behavior; (2) whether the child understood the impact and consequences of the behavior; (3) whether the placement was appropriate; or (4) whether the IEP, the identified services, and their implementation were appropriate.

Another commenter recommended clarifying that when a determination is made that a child's behavior is not a manifestation of his or her disability, if the group does not consider whether the IEP and placement were appropriate, the parents have the right to file a complaint.

*Discussion:* The language requested by the commenters was included in section 615(k)(4) of the Individuals with Disabilities Education Act Amendments of 1997, Public Law 105–17. Congress later removed the requirements mentioned by the commenters for conducting a review to determine whether a child's behavior was a manifestation of the child's disability and it would be beyond the authority of the Department to include the language in these regulations. Section 615(k)(1)(E) of the Act now requires the LEA, the parent, and relevant members of the IEP Team (as determined by the parent and the LEA), to determine whether a child's behavior was a manifestation of the child's disability based on two inquiries: (1) was the conduct caused by, or did it have a direct and substantial relationship to the child's

disability; or (2) was the conduct the direct result of the LEA's failure to implement the child's IEP?

It is not necessary to clarify that a parent has the right to file a complaint, as the commenters suggest. Section 300.532, consistent with section 615(k)(3) of the Act, provides that a parent of a child with a disability who disagrees with any decision regarding placement under §§ 300.530 and 300.531, or the manifestation determination under § 300.530(e), may request an expedited due process hearing, which must occur within 20 school days of the date the complaint requesting the hearing is filed, and the determination by the hearing officer must be rendered within 10 school days after the hearing.

*Changes:* None.

*Comment:* Several commenters recommended that the observations used for the manifestation determination review be from both teachers and related service personnel. Some commenters requested § 300.530(e) clarify that the phrase "all relevant information in the child's file" includes a review of the child's IEP, placement appropriateness, special education services, supplementary aids and services, and if the behavior intervention strategies were appropriate and consistent with the IEP. One commenter recommended documents and discussions at IEP Team meetings referencing the child's behavior should be maintained and considered at a manifestation determination.

*Discussion:* Section 300.530(e)(1), which tracks section 615(k)(1)(E) of the Act, requires a review of all relevant information in the child's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents. We believe this clearly conveys that the list of relevant information in paragraph (e)(1) of the section is not exhaustive and may include other relevant information in the child's file, such as the information mentioned by the commenters. It would be impractical to list all the possible relevant information that may be in a child's file and, therefore, it is not necessary to further regulate on this matter.

*Changes:* None.

*Comment:* Several commenters requested clarifying that a manifestation determination under § 300.530(e) would not need to be conducted for removals of not more than 10 consecutive days or for removals that otherwise do not constitute a change in placement.

*Discussion:* By including an introductory phrase to proposed § 300.530(e)(1) we intended to clarify

**46720**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

that a manifestation determination need not be conducted for removals that will be for not more than 10 consecutive school days and will not constitute a change in placement under § 300.536. In other words, manifestation determinations are limited to removals that constitute a change in placement under § 300.536. Upon further consideration, we believe the phrase "except for removals that will be for not more than 10 consecutive school days and will not constitute a change in placement under § 300.536" is unnecessary and confusing. We believe limiting § 300.530(e)(1) to the statutory language in section 615(k)(1)(E)(i) of the Act makes it sufficiently clear that within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct a manifestation determination must be conducted and, therefore, we are removing the introductory phrase as it is unnecessary.

*Changes:* We have revised § 300.530(e) by removing the introductory phrase "except for removals that will be for not more than 10 consecutive school days and will not constitute a change in placement under § 300.536."

*Comment:* A few commenters expressed concern that the manifestation determination is too narrow and does not account for the spectrum of inter-related and individual challenges associated with many disabilities.

*Discussion:* We believe the criteria in § 300.530(e)(1) that the LEA, parent, and relevant members of the IEP Team must determine whether a child's conduct is a manifestation of the child's disability is broad and flexible, and would include such factors as the inter-related and individual challenges associated with many disabilities. The revised manifestation provisions in section 615 of the Act provide a simplified, common sense manifestation determination process that could be used by school personnel. The basis for this change is provided in note 237–245 of the Conf. Rpt., pp. 224–225, which states, "the Conferees intend to assure that the manifestation determination is done carefully and thoroughly with consideration of any rare or extraordinary circumstances presented." The Conferees further intended that "if a change in placement is proposed, the manifestation determination will analyze the child's behavior as demonstrated across settings and across time when determining whether the conduct in question is a direct result of the disability." No further clarification is necessary.

*Changes:* None.
*Comment:* A few commenters recommended that the manifestation determination in § 300.530(e) include a case-by-case analysis of the disability of the child involved compared with the child's conduct as many children with disabilities display behaviors that can be disruptive to a classroom, but these behaviors should not be considered a current disciplinary issue when the behaviors are characteristic of the disability.

*Discussion:* We believe that it is not necessary to modify the regulations to include a requirement that a manifestation determination include a case-by-case analysis of the disability of the child because section 615(k)(1)(E) of the Act and § 300.530(e) are sufficiently clear that decisions regarding the manifestation determination must be made on a case-by-case basis. We believe the Act recognizes that a child with a disability may display disruptive behaviors characteristic of the child's disability and the child should not be punished for behaviors that are a result of the child's disability. The intent of Congress in developing section 615(k)(1)(E) was that, in determining that a child's conduct was a manifestation of his or her disability, it must be determined that "the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability, and was not an attenuated association, such as low self-esteem, to the child's disability." (Note 237–245 of the Conf. Rpt., p. 225). The regulation, which follows the statutory language, thus accurately reflects the manner in which the Act describes the behavior of the child is to be considered in the manifestation determination.

Further, section 615(k)(1)(F) of the Act and § 300.530(f) provide that if the LEA, the parent, and relevant members of the IEP Team make the determination that the behavior resulting in the removal was a manifestation of the child's disability, the following actions must be implemented: (1) the IEP Team must conduct a functional behavioral assessment, unless the LEA had conducted a functional behavioral assessment before the behavior that resulted in the change in placement occurred, and implement a behavioral intervention plan for the child; (2) if a behavioral intervention plan already has been developed, review the behavioral intervention plan, and modify it, as necessary, to address the behavior; and (3) return the child to the placement from which the child was removed (other than a 45-day placement under § 300.530(g)), unless the parent and the LEA agree to a change in placement as part of the modification of the behavioral intervention plan.

*Changes:* None.
*Comment:* One commenter recommended clarifying that when a determination is made that a child's behavior is not a manifestation of his or her disability, if the group does not consider whether the placement was appropriate, the parents have the right to file a complaint.

*Discussion:* The Act no longer requires that the appropriateness of the child's IEP and placement be considered when making a manifestation determination. The Act now requires that the LEA, the parent, and relevant members of the IEP Team must, when making a manifestation determination, determine whether (1) the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or (2) the conduct in question was the direct result of the LEA's failure to implement the IEP. However, § 300.532, consistent with section 615(k)(3) of the Act, does provide that a parent of a child with a disability who disagrees with any decision regarding placement under §§ 300.530 and 300.531, or the manifestation determination under § 300.530(e), may request an expedited due process hearing, which must occur within 20 school days of the date the hearing is requested and must result in a determination within 10 school days after the hearing.

*Changes:* None.
*Comment:* Several commenters requested clarification on the potential range of consequences when a disciplinary change in placement has occurred for a child with a disability and the child's behavior is determined to be a manifestation of his or her disability.

*Discussion:* Under section 615(k)(1)(F) of the Act and section 504 of the Rehabilitation Act of 1973, if the behavior that resulted in the change of placement is determined to be a manifestation of a child's disability, the child must be returned to the placement from which the child was removed (other than a 45-day placement under §§ 300.530(g), 300.532(b)(2), and 300.533), unless the public agency and the parents otherwise agree to a change of placement.

When the behavior is related to the child's disability, proper development of the child's IEP should include development of strategies, including positive behavioral interventions, supports, and other strategies to address that behavior, consistent with § 300.324(a)(2)(i) and (a)(3)(i). When the behavior is determined to be a

manifestation of a child's disability but has not previously been addressed in the child's IEP, the IEP Team must review and revise the child's IEP so that the child will receive services appropriate to his or her needs. Implementation of the behavioral strategies identified in a child's IEP, including strategies designed to correct behavior by imposing disciplinary consequences, is appropriate under the Act and section 504, even if the behavior is a manifestation of the child's disability. A change in placement that is appropriate and consistent with the child's needs may be implemented subject to the parent's procedural safeguards regarding prior notice (§ 300.503), mediation (§ 300.506), due process (§§ 300.507 through 300.517) and pendency (§ 300.518).

*Changes:* None.

*Comment:* Many commenters requested modifying § 300.530(e) to require that, if it is determined that the child's behavior was a direct result of the LEA's failure to implement the child's IEP, it must take immediate steps to remedy those deficiencies.

*Discussion:* If the LEA, the parent, and the relevant members of the IEP Team determine that the child's conduct is a manifestation of the child's disability because the child's behavior was the direct result of the LEA's failure to implement the IEP, the LEA has an affirmative obligation to take immediate steps to ensure that all services set forth in the child's IEP are provided, consistent with the child's needs as identified in the IEP. We agree with the commenters that these regulations should require that, if it is determined that the child's behavior was a direct result of the LEA's failure to implement the child's IEP, the LEA must take immediate steps to remedy those deficiencies. Therefore, we are adding a new paragraph (e)(3) to this section, consistent with this obligation.

*Changes:* We have added a new paragraph (3) to § 300.532(e) which provides that, if the LEA, the parent, and relevant members of the child's IEP Team determine that the child's behavior was a direct result of the LEA's failure to implement the child's IEP, the LEA must take immediate steps to remedy those deficiencies.

*Comment:* A few commenters expressed concern that the absence of short-term objectives in the IEP hampers the ability to determine if the child's conduct was the direct result of the LEA's failure to implement the IEP.

*Discussion:* We disagree with the commenters that the absence of short-term objectives in the IEP will hinder the ability of LEA, the parent, and

relevant members of the IEP Team to determine whether a child's conduct is the direct result of the LEA's failure to implement the child's IEP. The group members making the manifestation determination are required to review not only the IEP of the child, but all relevant information in the child's folder, any teacher observations of the child, and any relevant information provided by the parents. We believe the information available to the group making the manifestation determination, when reviewed in its totality, is sufficient to make a manifestation determination.

*Changes:* None.

Determination That Behavior Was a Manifestation (§ 300.530(f))

*Comment:* Some commenters recommended requiring that, even if a child's conduct is determined not to be a manifestation of the child's disability pursuant to § 300.530(e), the IEP Team, in determining how the child will be provided services, must, at a minimum, consider whether to conduct a functional behavioral assessment and implement a behavior plan. One commenter requested that the requirement in § 300.530(f) for conducting a functional behavioral assessment be removed from this section and added to §§ 300.320 through 300.324, regarding IEPs.

*Discussion:* Section 300.530(f), consistent with section 615(k)(1)(F) of the Act, requires that a child with a disability receive, as appropriate, a functional behavioral assessment, and behavioral intervention plan and modifications, that are designed to address the child's behavior if the child's behavior that gave rise to the removal is a manifestation of the child's disability. As provided in § 300.530(e), a manifestation determination is only required for disciplinary removals that constitute a change of placement under § 300.536. However, we must recognize that Congress specifically removed from the Act a requirement to conduct a functional behavioral assessment or review and modify an existing behavioral intervention plan for all children within 10 days of a disciplinary removal, regardless of whether the behavior was a manifestation or not.

We also recognize, though, that as a matter of practice, it makes a great deal of sense to attend to behavior of children with disabilities that is interfering with their education or that of others, so that the behavior can be addressed, even when that behavior will not result in a change in placement. In fact, the Act emphasizes a proactive approach to behaviors that interfere

with learning by requiring that, for children with disabilities whose behavior impedes their learning or that of others, the IEP Team consider, as appropriate, and address in the child's IEP, ''the use of positive behavioral interventions, and other strategies to address the behavior.'' (See section 614(d)(3)(B)(i) of the Act). This provision should ensure that children who need behavior intervention plans to succeed in school receive them. For these reasons, we decline to make the changes suggested.

*Changes:* None.

*Comment:* Many commenters requested requiring that a functional behavioral assessment older than one year be considered invalid in a manifestation determination review. One commenter suggested that the regulations include language that requires the agency to conduct a new functional behavioral assessment when the child's most recent functional assessment is not current.

*Discussion:* We believe it would be inappropriate to specify through regulation what constitutes a ''current'' or ''valid'' functional behavioral assessment as such decisions are best left to the LEA, the parent, and relevant members of the IEP Team (as determined by the LEA and the parent) who, pursuant to section 615(k)(1)(E) of the Act, are responsible for making the manifestation determination. As a policy matter, a previously conducted functional behavioral assessment that is valid and relevant should be included in the information reviewed by the LEA, the parent, and relevant members of the IEP Team when making a manifestation determination.

*Changes:* None.

Special Circumstances (§ 300.530(g))

*Comment:* Some commenters recommended requiring that an appropriate permanent placement be in effect at the beginning of the next school year to ensure that a child is not held in the 45-school day interim alternative educational setting for a period that extends into the new academic year.

*Discussion:* Interim alternative educational settings under section 615(k)(1)(G) of the Act and § 300.530(g) are limited to not more than 45 school days, unless extended by the hearing officer under § 300.532(b)(3) because returning the child to his or her original placement would be substantially likely to cause injury to him or herself or to others. The 45-school day placement in an interim alternative educational setting, unless extended by § 300.532(b)(3), is a maximum time limit for a change in placement to an

appropriate interim alternative educational setting. We decline to change the regulations as suggested by the commenters based on the school year ending before a child completes the ordered school day placement in an interim alternative educational setting (in this example 45 school days). There is nothing in the Act or these regulations that precludes the public agency from requiring the child to fulfill the remainder of the placement when a new school year begins as agency personnel have this flexibility under section 615(k)(1)(G) of the Act.

*Changes:* None.

*Comment:* Some commenters requested that the regulations clarify that a child's home is not a suitable placement setting for an interim alternative educational setting for a child with a disability removed pursuant to § 300.530 for disciplinary reasons.

*Discussion:* While the Act does not specify the alternative setting in which educational services must be provided, the Act is clear that the determination of an appropriate alternative educational setting must be selected ''so as to enable the child to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP.'' (See section 615(k)(1)(D)(i) of the Act). Further, section 615(k)(2) of the Act provides that the interim alternative educational setting must be determined by the IEP Team. What constitutes an appropriate interim alternative educational setting will depend on the circumstances of each individual case.

Whether a child's home would be an appropriate interim alternative educational setting under § 300.530 would depend on the particular circumstances of an individual case such as the length of the removal, the extent to which the child previously has been removed from his or her regular placement, and the child's individual needs and educational goals. In general, though, because removals under §§ 300.530(g) and 300.532 will be for periods of time up to 45 days, care must be taken to ensure that if home instruction is provided for a child removed under § 300.530, the services that are provided will satisfy the requirements for services for a removal under § 300.530(d) and section 615(k)(1)(D) of the Act. We do not believe, however, that it is appropriate to include in the regulations that a child's home is not a suitable placement setting for an interim alternative educational setting as suggested by the commenter. As stated above, the Act

gives the IEP Team the responsibility of determining the alternative setting and we believe the IEP Team must have the flexibility to make the setting determination based on the circumstances and the child's individual needs.

*Changes:* None.

*Comment:* One commenter expressed concern that the high standard of ''serious bodily injury'' is unreasonable. The commenter states that school personnel should be given discretion to remove children for a 45 school-day period who have committed assault or otherwise acted dangerously. The commenter stated that the standard for having inflicted ''serious bodily injury'' would seldom be met without a child being incarcerated. Another commenter stated that the statutory definition of *serious bodily injury* is too narrow to have much practical value for school purposes since most injuries on school grounds are not related to the use of dangerous weapons. This commenter recommended expanding the definition to include more typical injuries that occur on school property, and not limiting the definition by the language in section 1365(3)(h) of title 18, United States Code.

*Discussion:* Section 300.530(g)(3) incorporates the new provision in section 615(k)(1)(G)(iii) of the Act that permits school personnel to remove a child to an interim alternative educational setting for not more than 45 school days without regard to whether the behavior is a manifestation of the child's disability if the child has inflicted serious bodily injury upon another person while at school, on school premises, or at a school function. Section 615(k)(7)(D) of the Act is clear that the term *serious bodily injury* has the meaning given the term in section 1365(3)(h) of title 18, United States Code. That provision defines *serious bodily injury* as bodily injury, which involves substantial risk of death; extreme physical pain; protracted and obvious disfigurement; or protracted loss or impairment of the function of a bodily member, organ, or mental faculty. Nothing in the Act permits the Department to expand the definition of *serious bodily injury,* as used in § 300.530(g), to include a bodily injury beyond that included in 18 U.S.C. 1365(3)(h). Therefore, we are not amending § 300.530(g)(3).

*Changes:* None.

*Comment:* One commenter recommended clarifying the distinction between the removal of a child to an interim alternative educational setting by school personnel for inflicting ''serious bodily injury upon another

person'' (§ 300.530(g)(3)) and the removal of the child by a hearing officer because maintaining the child's current placement is ''substantially likely to result in injury to the child or others'' (§ 300.532(b)(2)(ii)).

*Discussion:* The provision in § 300.530(g)(3), consistent with section 615(k)(1)(G)(iii) of the Act, indicates that school personnel have the discretion to remove a child with a disability who inflicts ''serious bodily injury upon another person'' from his or her current placement to an interim alternative educational setting for up to 45 school days (defined in 18 U.S.C. 1365(3)(h) as bodily injury), which involve substantial risk of death; extreme physical pain; protracted and obvious disfigurement; or protracted loss or impairment of the function of a bodily member, organ, or mental faculty. Section 300.530(g)(3) applies to school personnel's unilateral removal of a child from the current educational placement. School officials must seek permission from the hearing officer under § 300.532 to order a change of placement of the child to an appropriate interim alternative educational setting. Hearing officers have the authority under § 300.532 to exercise their judgments after considering all factors and the body of evidence presented in an individual case when determining whether a child's behavior is substantially likely to result in injury to the child or others. Given that the phrase ''serious bodily injury,'' as used in § 300.530(g), has a definitive meaning and the meaning of ''substantially likely to result in injury to the child or others'' is left to the judgment of the hearing officer, we do not believe further clarification is needed.

*Changes:* None.

Notification (§ 300.530(h))

*Comment:* Some commenters recommended clarifying that parental notification in § 300.530(h) must take place following disciplinary action proposing a removal of a child for more than 10 consecutive days or when there is a disciplinary change in placement. One commenter suggested that, to be consistent with the Act, the parental notification requirement should only pertain to disciplinary decisions made pursuant to § 300.530(g).

*Discussion:* We agree with the commenters that the meaning of the term ''disciplinary action'' in section 615(k)(1)(H) of the Act, regarding parental notification, is unclear. We believe that, on the one hand, it would be unreasonably burdensome to read the term as applying to every imposition of discipline, including those that might

not result in the child being removed from the regular educational environment at all. On the other hand, we think the suggestion that the term be applied only to removals under § 300.530(g) would inappropriately narrow the application of the notification provision and result in parents not being notified for removals that could reasonably have a significant impact on a child's education, such as a removal for 10 school days or more. Therefore, we agree with those commenters who suggested that paragraph (h) of this section should be amended to clarify that the requirement for parental notification applies to a removal that constitutes a change in placement of a child with a disability for a violation of a code of student conduct.

*Changes:* Section 300.530(h) has been amended to clarify that on the date on which the decision is made to make a removal that constitutes a change in the placement of a child with a disability because of a violation of a code of student conduct, the LEA must notify the parents of that decision, and provide the parents the procedural safeguards notice described in § 300.504.

*Comment:* One commenter stated that the requirement in § 300.530(h), which requires the LEA to provide the parents the procedural safeguards notice described in § 300.504 whenever the decision to take disciplinary action is made, is inconsistent with the Act and recommended revising § 300.530(h) to be consistent with section 615(k)(1)(H) of the Act. The commenter stated that section 615(k)(1)(H) of the Act requires the LEA to "notify" the parents of the decision to take disciplinary action and of all the procedural safeguards. The commenter stated that the statutory language implies that the LEA simply needs to remind (notify) the parent of the procedural safeguards given to them for the school year as required in section 615(d)(1)(A)(i) through (iii) of the Act, not to "provide" the parents with the procedural safeguards notice as required in § 300.530(h).

*Discussion:* The commenter is correct that section 615(k)(1)(H) of the Act does not specifically state that the LEA must "provide a copy" of the procedural safeguards notice but, that the LEA must "notify" the parent of the LEA's decision to take disciplinary action and of all procedural safeguards accorded under section 615 of the Act. We believe, however, that implicit in the Act is a much higher standard for "notify" than "remind" parents as suggested by the commenter. Further, in other places where "notify" is used in the Act, it is clear the meaning of the

term is "to provide notice" (for example, section 615(c)(2)(A) and (D) of the Act). We believe § 300.530(h), which requires the LEA to notify the parents of its decision to change the placement of their child with a disability because of a violation of a code of student conduct and provide the parents the procedural safeguards notice described in § 300.504, is reasonable and consistent with the Act.

*Changes:* None.

Definitions (§ 300.530(i))

*Comment:* Many commenters stated that the definitions for *serious bodily injury, controlled substance,* and *weapon* are not readily available to school personnel and parents and requested that the full definitions be included in § 300.530(i) and not only referenced.

*Discussion:* As we stated in the *Analysis of Comments and Changes* discussion for subpart A of this part, including the actual definitions of terms that are defined in statutes other than the Act is problematic because these definitions may change over time and the Department would need to amend the regulations each time an included definition that is defined in another statute changes. However, we are including the definitions of *serious bodily injury* from section 1365(h)(3) of title 18, United States Code, and *dangerous weapon* from section 930(g)(2) of title 18, United States Code, here for reference. We are not including the definition of *controlled substance* from section 202(c) of the Controlled Substances Act because the definition is lengthy and frequently changes.

The term *serious bodily injury* means bodily injury that involves—

1. A substantial risk of death;
2. Extreme physical pain;
3. Protracted and obvious disfigurement; or
4. Protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

The term *dangerous weapon* means a weapon, device, instrument, material, or substance, animate or inanimate, that is used for, or is readily capable of, causing death or serious bodily injury, except that such term does not include a pocket knife with a blade of less than 2½ inches in length.

*Changes:* None.

Determination of Setting (§ 300.531)

*Comment:* None.

*Discussion:* In light of the restructuring of § 300.530 and the elimination of cross-references in that section, we are revising § 300.531 to include a cross-reference to paragraph

(d)(5) of § 300.530 to make clear that, for a removal that is a change of placement under § 300.536, the child's IEP Team must determine the appropriate interim alternative educational setting for the child.

*Changes:* We have revised § 300.531 to include a cross-reference to paragraph (d)(5) of § 300.530.

Appeal (§ 300.532)

*Comment:* Numerous commenters requested clarifying in the regulations that the public agency has the burden to prove to a hearing officer that removing the child is necessary because maintaining the current placement is substantially likely to result in injury to self or others.

*Discussion:* Although the Act does not address allocation of the burden of proof in due process hearings brought under the Act, the U.S. Supreme Court recently addressed the issue. In *Schaffer,* the Court first noted that the term "burden of proof" is commonly held to encompass both the burden of persuasion (i.e., which party loses if the evidence is closely balanced) and the burden of production (i.e., the party responsible for going forward at different points in the proceeding). In *Schaffer,* only the burden of persuasion was at issue. The Court held that the burden of persuasion in a hearing challenging the validity of an IEP is placed on the party on which this burden usually falls—on the party seeking relief—whether that is the parent of the child with a disability or the LEA. Where the public agency has requested that a hearing officer remove a child to an interim alternative educational setting, the burden of persuasion is on the public agency. Since Supreme Court precedent is binding legal authority, further regulation in this area is unnecessary.

*Changes:* None.

*Comment:* Many commenters requested that the regulations clarify that the LEA has the burden of proof in determining whether the child's behavior was or was not a manifestation of the child's disability and that the IEP was appropriate and properly implemented. Other commenters expressed concern that the regulations, as written, put the burden on the parent to prove either that the conduct was caused by or had a direct and substantial relationship to the child's disability or that the IEP was not being implemented.

*Discussion:* The concept of burden of proof is not applicable to the manifestation determination, which does not occur in a hearing under the Act. Under § 300.530(e), the LEA, the

parent, and relevant members of the IEP Team (as determined by the parent and the LEA) are responsible for determining whether the child's behavior is a manifestation of the child's disability, by conducting a fair inquiry into the issues posed by § 300.530(e)(1)(i) and (ii). If the parent disagrees with the manifestation determination, they have the right to appeal that decision by requesting a due process hearing under § 300.532. At the point a due process hearing is requested, the concept of burden of proof would be applicable. As stated above, the Supreme Court determined in *Schaffer* that the burden of proof ultimately is allocated to the moving party.

*Changes:* None.

*Comment:* A few commenters recommended requiring that the hearing officer must consider the appropriateness of the child's current placement; consider whether the public agency has made reasonable efforts to minimize the risk of harm in the child's current placement, including the use of supplementary aids and services; and determine that the interim alternative educational setting meets specified requirements.

*Discussion:* We are not making changes to the regulations, regarding a hearing officer's decision-making, to require a hearing officer to consider such factors as those suggested by the commenters because a hearing officer must have the ability to conduct hearings and render and write decisions in accordance with appropriate, standard legal practice and exercise his or her judgment in the context of all the factors involved in an individual case.

*Changes:* None.

*Comment:* Some commenters recommended clarifying the reference to a "hearing" in § 300.532(a) and an "expedited hearing" in § 300.532(c). Some of these commenters stated that there seems to be a conflict between the two hearings. Other commenters questioned whether the hearing referenced in paragraphs (a) and (c) of this section must be conducted consistent with all the impartial due process hearing requirements. Another commenter suggested that a hearing requested pursuant to § 300.532 may be contrary to section 615(h) of the Act, which provides for the right to counsel, to cross-examine witnesses, and to present evidence and receive the record of due process hearings.

*Discussion:* The hearing referenced in § 300.532(a) and (c) is the same hearing and not separate hearings. Paragraph (a) in this section states that a parent of a child with a disability who disagrees

with any decision regarding a placement, or the manifestation determination, or an LEA that believes that maintaining the current placement of the child is substantially likely to result in injury to the child or to others, may request a hearing. Paragraph (c) of this section clarifies that a hearing requested under paragraph (a) of this section is an impartial due process hearing consistent with the due process hearing requirements of §§ 300.510 through 300.514 (including hearing rights, such as a right to counsel, presenting evidence and cross-examining witnesses, and obtaining a written decision), except that the timelines for the hearing are expedited and a State may establish different procedural rules for expedited due process hearings as long as the rules ensure the requirements in §§ 300.510 through 300.514 are met. We believe these regulations will ensure that the basic protections regarding hearings under the Act are met, while enabling States to adjust other procedural rules they may have superimposed on due process hearings in light of the expedited nature of these hearings. Further, we believe it is important that all the due process protections in §§ 300.510 through 300.514 are maintained because of the importance of the rights at issue in these hearings.

*Changes:* None.

*Comment:* One commenter recommended the regulations clarify that a placement determination made by a hearing officer pursuant to his or her authority under § 300.532(b), regarding an appeal requested by a parent who disagrees with the placement of a child, is final and cannot be augmented by the SEA or LEA.

*Discussion:* Section 300.514, consistent with section 615(i)(1)(A) of the Act, is clear that a hearing officer's decision made in a hearing conducted pursuant to §§ 300.530 through 300.534 is final, except that a party may appeal the decision under the provisions in § 300.514(b). Absent a decision upon appeal, the SEA or the LEA may not augment or alter the hearing officer's decision. We do not believe that the regulations need to be clarified.

*Changes:* None.

*Comment:* One commenter recommended clarifying whether there is a difference between "likely to result in injury to child or others" as used in § 300.532(b)(2)(ii) and "child would be dangerous" as used in § 300.530(b)(3). The commenter suggested that § 300.532(b)(3), which permits the LEA to return to the hearing officer to request continuation of an interim alternative education placement if the LEA believes

the child would be dangerous if returned to the original placement, is a lesser standard than that required of the hearing officer in § 300.532(b)(2)(ii), which permits a hearing officer to order a change in placement to an appropriate interim alternative education setting if the hearing officer determines that maintaining the current placement of the child is substantially likely to result in injury to the child or to others.

*Discussion:* There is no intended difference between the phrase "likely to result in injury to the child or others" as used in § 300.532(b)(2)(ii) and "child would be dangerous" as used in § 300.532(b)(3). Section 300.532(b)(2)(ii) clarifies that the hearing officer can order a change in placement of a child with a disability to an interim alternative educational setting for not more than 45 school days if the hearing officer determines that maintaining the current placement of the child is substantially likely to result in injury to the child or others. To avoid confusion, the term "dangerous" is replaced with "substantially likely to result in injury to the child or to others."

*Changes:* We have replaced the term "dangerous" in § 300.532(b)(3) with "substantially likely to result in injury to the child or to others."

*Comment:* A few commenters questioned whether the change from the heading "expedited due process hearings" in current § 300.528 to "expedited hearing" in § 300.532(c) represents a change in the hearings that are available under § 300.532.

*Discussion:* The removal of "due process" from the heading in current 300.528 does not represent a substantive change. The change was made to track the statutory requirements in the Act. However, we believe it is important to clarify that an expedited hearing under § 300.532(c) is a due process hearing and the heading to paragraph (c) has been amended to retain the heading in current § 300.528. We also have made additional technical and clarifying changes to paragraphs (c)(2) and (c)(3) of § 300.532. In paragraph (c)(2) of this section, we are clarifying that an expedited hearing must occur within 20 school days of the date the complaint requesting the hearing is filed and restructuring the paragraph for clarity. In paragraph (c)(3) of this section, we are clarifying that the meeting referenced in this paragraph is a resolution meeting.

*Changes:* The heading in § 300.532(c) has been revised to clarify that a hearing under paragraph (c) of this section is an "expedited due process hearing." We have also made technical and clarifying

changes to paragraphs (c)(2) and (c)(3) of this section.

*Comment:* Many commenters requested clarifying whether the requirements in § 300.508(d), regarding sufficiency of the complaint, apply to the expedited hearing requested under § 300.532(c), pertaining to disagreements with a decision regarding disciplinary placements.

*Discussion:* In light of the shortened timelines for conducting an expedited due process hearing under § 300.532(c), it is not practical to apply to the expedited due process hearing the sufficiency provision in § 300.508(d), which requires that the due process complaint must be deemed sufficient unless the party receiving the due process complaint notifies the hearing officer and the other party in writing, within 15 days of receipt of the due process complaint, that the receiving party believes the due process complaint does not include all the necessary content of a complaint as required in § 300.508(b).

To identify the provisions that do apply when a parent requests a hearing under § 300.532(a), we have changed § 300.532(a) to clarify that parents and the LEA may request a hearing under § 300.532(a) by filing a complaint pursuant to §§ 300.507 and 300.508(a) and (b).

*Changes:* We have changed § 300.532(a) to provide that the parent and the LEA may request a hearing under this section by filing a complaint pursuant to §§ 300.507 and 300.508(a) and (b).

*Comment:* Several commenters stated that section 615(k) of the Act does not require a resolution meeting as part of an expedited hearing and recommended removing the requirement in § 300.532(c)(3)(i) that a resolution meeting must occur within seven days of the date an expedited hearing is requested under § 300.532(a). One commenter stated that, given the expedited timelines for the hearing and the decision, Congress did not intend for the resolution meeting to apply to an expedited hearing under section 615(k)(4) of the Act.

*Discussion:* We are not removing the requirement in § 300.532(c) requiring a resolution meeting because an expedited hearing under section 615(k)(3) of the Act is a due process hearing subject to the provisions in section 615(f) of the Act, including the requirement that the LEA convene a resolution meeting when the parent files a due process complaint. Recognizing the need to promptly resolve a disagreement regarding a disciplinary decision, we believe the resolution

meeting provides an opportunity for an LEA and parents to resolve a disagreement regarding a disciplinary placement or manifestation determination before the timeframe for conducting a due process hearing begins. In light of the requirement in section 615(k)(4)(B) of the Act that an expedited hearing must occur within 20 school days of the date the complaint requesting the hearing is filed and a determination must be made within 10 school days after the hearing, which is a much shorter time frame than the one for a due process complaint filed pursuant to 615(f) of the Act, we shortened the resolution meeting timeline to fit into the expedited hearing timeline. Recognizing the need to ensure that the resolution meeting does not delay the expedited hearing if an agreement is not reached, § 300.532(c)(3) provides that the resolution meeting must occur within seven days of receiving notice of the parent's due process complaint regarding a disciplinary placement under §§ 300.530 and 300.531, or the manifestation determination under § 300.530(e), and the hearing may proceed unless the matter is resolved within 15 days of the receipt of the parent's due process complaint requesting the expedited due process hearing, and all the applicable timelines for an expedited due process hearing under paragraph (c) of this section commence. However, the parties may agree to waive the resolution meeting or agree to use the mediation process.

*Changes:* None.

*Comment:* Several commenters noted that § 300.532(c)(3)(i) states that a resolution meeting must occur within seven days of the date the "hearing is requested," while § 300.510(a)(1), consistent with section 615(f)(1)(B)(i)(I) of the Act, states that the resolution meeting must occur within 15 days of "receiving notice of the due process complaint." The commenters recommended that the Department amend § 300.532(c)(3)(i) to be consistent with § 300.510(a)(1).

*Discussion:* We agree with the commenters that the language in § 300.532(c)(3)(i) should be consistent with § 300.510(a)(1) and are amending § 300.532(c)(3)(i) to state that a resolution meeting must occur within seven days of "receiving notice of the parent's due process complaint" to be consistent with § 300.510(a)(1). In addition, for consistency, we are amending § 300.532(c)(3)(ii) to state that the due process hearing may proceed unless the matter has been resolved to the satisfaction of both parties within 15

days of "the receipt of the parent's due process complaint."

*Changes:* Paragraphs (c)(3)(i) and (ii) of § 300.532 have been amended as stated above. Paragraph (c)(3) of this section has also been amended to remove the cross-reference to § 300.510(a)(3) and specific explanatory language has been inserted.

*Comment:* One commenter asked whether the intent of § 300.532(c)(3)(ii) is to allow the expedited hearing to go forward if the parent fails to participate in the resolution meeting within 15 days of receipt of a hearing request or whether the resolution meeting and hearing would be indefinitely delayed in the context of the expedited hearing for the failure of a parent to participate in the resolution meeting.

*Discussion:* Section 300.532(c)(3)(i) clearly states that the resolution meeting must occur within seven days of a public agency's receiving notice of the parent's due process complaint. It is not expected that parties will necessarily reach agreement during the resolution meeting; the parties often need time to consider the resolution options offered at the meeting. The intent of § 300.532(c)(3)(ii) is to allow parties sufficient time to consider the resolution options discussed in the resolution meeting. However, if the parties do not reach agreement within 15 days of receipt of the parent's due process complaint, the expedited hearing may proceed and all the applicable timelines for an expedited due process hearing under paragraph (c) commence. Lack of parent participation in the resolution meeting would be addressed the same way it is in a regular due process hearing under § 300.510(b), except that the timeframes will differ. For these reasons, we believe it is unnecessary to clarify the regulations.

*Changes:* None.

*Comment:* Several commenters recommended removing proposed § 300.532(c)(4), which allows a State to shorten the time periods for the disclosure of evidence, evaluations, and recommendations for expedited due process hearings to two business days, because it will not give a parent adequate time to prepare for hearings, especially when a parent doesn't have a lawyer. One commenter stated that because LEAs have possession and control of education records, a reduction to two days for disclosure is unfair and creates a hardship on a parent in preparing for the hearing. Other commenters stated that this provision is inconsistent with section 615(f)(2) of the Act, which requires that not less than five business days prior to a hearing, parties must disclose all

evaluations and recommendations that parties intend to use at a hearing. A few commenters stated that proposed § 300.532(c)(4) diminishes the protections for children with disabilities and their parents found in the July 20, 1983 regulations, and, therefore, violates section 607(b)(1) and (b)(2) of the Act.

*Discussion:* We are persuaded by the commenters that limiting the disclosure time to two days would significantly impair the ability of the parties to prepare for the hearing, since one purpose of the expedited hearing is to provide protection to the child. We are removing proposed § 300.532(c)(4), which provides an exception to the normal five day disclosure requirement.

*Changes:* We have removed proposed § 300.532(c)(4) for the reason stated above. In addition, proposed paragraphs (c)(5) and (c)(6) of this section have been redesignated as paragraphs (c)(4) and (c)(5), respectively. A technical edit has been made to paragraph (c)(1) of this section to ensure the reference to proposed paragraphs (c)(2) through (5) of this section now reference paragraphs (c)(2) through (4) consistent with these changes.

*Comment:* Numerous commenters expressed concern that proposed § 300.532(c)(5) (new § 300.532(c)(4)), which permits States to establish a different set of procedural rules for expedited due process hearings, could permit States to re-write rules regarding basic procedural safeguards. One commenter expressed concern that proposed § 300.532(c)(5) may lead to abuse if the rules from §§ 300.511 through 300.514 regarding complaints, sufficiency, raising new issues, losing on procedural grounds, and appeals are not part of the expedited due process hearing requirements.

*Discussion:* We agree with the commenters that proposed § 300.532(c)(5), as written, could be interpreted to give States authority to change due process rules provided for in the Act. Therefore, we are amending new § 300.532(c)(4) (proposed § 300.532(c)(5)) to clarify that while a State may establish different State-imposed procedural rules for expedited due process hearings conducted under this section than it has established for other due process hearings, the State must ensure that the requirements in §§ 300.510 through 300.514 are met. This will ensure that the basic protections regarding expedited hearings under the Act are met, while enabling States, in light of the expedited nature of these hearings, to adjust other procedural rules they have established for due process hearings.

*Changes:* New § 300.532(c)(4) (proposed § 300.532(c)(5)) has been amended to clarify that a State may establish different State imposed rules for expedited due process hearings under § 300.532(c) than it has established for other due process hearings but, except for the timelines modified as in paragraph (c)(3) of § 300.532, the State must ensure that the requirements in §§ 300.510 through 300.514 are met.

Placement During Appeals (§ 300.533)

*Comment:* One commenter recommended retaining the "stay-put" requirement in current § 300.526(b). This section provides that if a child is placed in an interim alternative education setting and school personnel propose to change the child's placement after expiration of the interim alternative educational placement, during the pendency of any proceeding to challenge the proposed change in placement, the child must remain in the child's placement prior to the interim alternative educational setting. One commenter requested clarification as to whether the removal of current § 300.526(b) represents a substantive change in the Department's policy. Other commenters requested clarifying what the child's placement would be after the 45-day interim alternative educational setting if the LEA requests another hearing under § 300.532(b)(3).

*Discussion:* The Act changed the stay-put provision applying to disciplinary actions. The provisions regarding stay-put in current § 300.527(b) are not included in these regulations because the provisions upon which § 300.527(b) were based, were removed by Congress from section 615(k)(4) of the Act. We, therefore, are not revising the regulations in light of Congress' clear intent that, when there is an appeal under section 615(k)(3) of the Act by the parent or the public agency, the child shall remain in the interim alternative educational setting chosen by the IEP Team pending the hearing officer's decision or until the time period for the disciplinary action expires, whichever occurs first, unless the parent and the public agency agree otherwise.

Section 300.533 reflects the statutory requirements in section 615(k)(4)(A) of the Act. For example, consistent with § 300.533, if a child's parents oppose a proposed change in placement at the end of a 45-day interim alternative educational placement, during the pendency of the proceeding to challenge the change in placement, the child remains in the interim alternative educational setting pending the decision of the hearing officer or until the

expiration of the time period for the disciplinary action, whichever occurs first, unless the parent and the public agency agree otherwise.

*Changes:* None.

*Comment:* One commenter recommended that LEAs and SEAs not be allowed to have a policy prohibiting the IEP Team from deciding where the child would "stay-put" during an appeal under § 300.532. The commenter stated that the IEP Team should have the authority to maintain a child in his or her current placement when appropriate.

*Discussion:* Section 300.531, consistent with section 615(k)(2) of the Act, provides that the IEP Team determines the interim alternative educational setting for removals that constitute a change in placement under § 300.536. Additionally, section 615(k)(4)(A) of the Act is clear that, during an appeal under section 615(k)(3) of the Act, the child must remain in the interim alternative education setting pending the decision of the hearing officer or until the expiration of the time period for the disciplinary action expires, whichever comes first, unless the parent and the LEA agree otherwise. Thus, under the Act, whenever a hearing is requested under section 615(k)(3) of the Act by the parent or the LEA, it is the parties involved in the hearing (i.e., the parent and the LEA), not the IEP Team, that may agree to change the time period of the removal or the interim setting for the child. We, therefore, do not believe it is necessary or appropriate to regulate as suggested by the commenter. There is nothing in the Act or these regulations, however, which would prohibit the parents and the LEA from agreeing to involve the IEP Team in any decision to change the time period of the removal or interim alternative educational setting.

*Changes:* None.

Protections of Children Not Determined Eligible for Special Education and Related Services (§ 300.534)

*Comment:* A few commenters requested including in § 300.534(b)(1) language allowing the parent of the child to express concerns about his or her child orally to supervisory or administrative personnel, rather than requiring written notification. Other commenters requested clarifying what it means for parents to "express concern" to school personnel.

*Discussion:* Section 615(k)(5)(B)(i) of the Act clearly states that parents must express concern "in writing" to supervisory or administrative personnel, or a teacher of the child, that their child

is in need of special education and related services. To include the language recommended by the commenters in § 300.534(b)(1) to allow the parent of the child to orally express their concerns (as opposed to doing so in writing) is inconsistent with and would impermissibly broaden the requirements in the Act. We do not believe it is necessary to clarify the phrase "express concern" in § 300.534(b) because we believe that, in the context of this section, it is understood to mean that a parent is concerned that his or her child is in need of special education and related services and expresses that concern in writing to the child's teacher or administrative personnel.

*Changes:* None.

*Comment:* One commenter recommended adding to the basis of knowledge criteria in § 300.534(b) that if the child were currently receiving early intervening services under § 300.226 the LEA would be deemed to have knowledge that a child is a child with a disability.

*Discussion:* A public agency will not be considered to have a basis of knowledge under § 300.534(b) merely because a child receives services under the coordinated, early intervening services in section 613(f) of the Act and § 300.226 of these regulations. The basis of knowledge criteria is clearly stated in section 615(k)(5)(B) of the Act and § 300.534. We do not believe that expanding the basis of knowledge provision, as recommended by the commenter, would be appropriate given the specific requirements in the Act. However, if a parent or a teacher of a child receiving early intervening services expresses a concern, in writing, to appropriate agency personnel, that the child may need special education and related services, the public agency would be deemed to have knowledge that the child is a child with a disability under this part.

*Changes:* None.

*Comment:* A few commenters recommended removing the requirement in § 300.534(b)(3) that the teacher of the child must express specific concerns regarding a child's pattern of behavior directly to the director of special education of the LEA or to other supervisory personnel of the LEA "in accordance with the agency's established child find or special education referral system." One of the commenters stated that this language is confusing and is not required by the Act. One commenter requested clarifying whether the LEA would be deemed to have knowledge if the information was relayed by a child's

teacher in a written manner not consistent with the LEA's referral system.

*Discussion:* Since not all child find and referral processes in States and LEAs would necessarily meet the requirement in section 615(k)(5)(B)(iii) of the Act that the teacher of the child, or other personnel of the LEA, must express specific concerns about a pattern of behavior demonstrated by the child "directly to the director of special education of such agency or to other supervisory personnel of the agency," we are removing from § 300.534(b)(3) the requirement that concerns be expressed in accordance with the agency's established child find or special education referral system.

We continue to believe the child find and special education referral system is an important function of schools, LEAs, and States. School personnel should refer children for evaluation through the agency's child or special education referral system when the child's behavior or performance indicates that they may have a disability covered under the Act. Having the teacher of a child (or other personnel) express his or her concerns regarding a child in accordance with the agency's established child find or referral system helps ensure that the concerns expressed are specific, rather than casual comments, regarding the behaviors demonstrated by the child and indicate that the child may be a child with a disability under the Act. For these reasons, we would encourage those States and LEAs whose child find or referral processes do not permit teachers to express specific concerns directly to the director of special education of such agency or to other supervisory personnel of the agency, to change these processes to meet this requirement.

*Changes:* In light of some State child find procedures, we have removed from § 300.534(b)(3) the requirement that the teacher or other LEA personnel must express concerns regarding a child's pattern of behavior in accordance with the agency's established child find or special education referral system.

*Comment:* Several commenters recommended clarifying that a child who was evaluated and determined ineligible for special education and related services years ago would not be an exception under § 300.534(c) to the basis of knowledge requirement in paragraph (b) of this section. Many commenters recommended that an evaluation and eligibility determination that is more than three years old not prevent deeming an LEA to have a basis of knowledge. One of these commenters

specifically recommended revising § 300.534(c)(1)(i) to clarify that a public agency would not be deemed to have knowledge that a child is a child with a disability if the parent of the child has not allowed an evaluation of the child pursuant to §§ 300.300 through 300.311 "within three years prior to the incident."

*Discussion:* The exceptions included in § 300.534(c) track the statutory requirements in section 615(k)(5)(C) of the Act. The intent of Congress in revising section 615(k)(5) of the Act was to "ensure that schools can appropriately discipline students, while maintaining protections for students whom the school had valid reason to know had a disability" and that the provisions in the Act should not have the "unintended consequence of providing a shield against the ability of a school district to be able to appropriately discipline a student." (S. Rpt. No. 108–185, p. 46). We are not including time restrictions, as suggested by the commenters, to the exceptions in paragraph (c) of this section because we believe such restrictions are unnecessary and could have the unintended consequence of hindering the school's ability to appropriately discipline a child. We believe the basis of knowledge provision in § 300.534(b) is sufficient to ensure that a school had valid reason to know that a child may need special education and related services.

*Changes:* None.

*Comment:* A few commenters recommended removing § 300.534(c)(1)(i), which states that a public agency would not be deemed to have knowledge that a child is a child with a disability if the parent has not allowed an evaluation of the child pursuant to §§ 300.300 through 300.311. The commenters stated that this would deny children with disabilities FAPE and the procedural protections granted children with disabilities removed from their educational placement for disciplinary reasons.

*Discussion:* The requirement in § 300.534(c)(1)(i), regarding the exception to the basis of knowledge if a parent refuses to consent to an evaluation, is statutory. Further, § 300.300(a)(3), consistent with section 614(a)(1)(D)(ii)(I) of the Act, clearly states that the public agency may, but is not required to, pursue an initial evaluation of a child if the parents refuse to provide consent, or fail to respond to a request to provide consent, for the initial evaluation, by utilizing the Act's due process procedures. If a public agency chooses not to utilize the Act's due process procedures, the LEA

is not considered in violation of the requirement to provide FAPE.

*Changes:* None.

*Comment:* A few commenters recommended retaining in § 300.534(c)(2) the language in current § 300.527(c)(1)(i) to clarify that the evaluation used to determine whether a child is a child with a disability under this part must be conducted pursuant to §§ 300.300 through 300.311.

*Discussion:* It is accurate that the evaluation referenced in § 300.534(c)(2) must be conducted consistent with the evaluation requirements in §§ 300.300 through 300.311. We agree with the commenters that paragraph (c)(2) of this section should be amended to make clear that the evaluation conducted under this paragraph must be conducted consistent with the evaluation requirements in §§ 300.300 through 300.311.

*Changes:* We have amended paragraph (c)(2) to make clear that the evaluation under this provision must be conducted in accordance with §§ 300.300 through 300.311.

*Comment:* A few commenters recommended amending § 300.534(d)(2) to require that if a request is made for an evaluation of a child during the time period in which the child is subjected to a disciplinary removal under § 300.530, the evaluation must be completed within ten days of the parent's request and that an eligibility determination be made within five days of the completion of the evaluation.

*Discussion:* We do not believe a specific timeline for an expedited evaluation or an eligibility determination should be included in these regulations. What may be required to conduct an evaluation will vary widely depending on the nature and extent of a child's suspected disability and the amount of additional information that would be necessary to make an eligibility determination. However, § 300.534(d)(2)(i), consistent with section 615(k)(5)(D)(ii) of the Act, specifies that the evaluation in these instances be "expedited", which means that an evaluation should be conducted in a shorter period of time than a typical evaluation conducted pursuant to section 614 of the Act, which must be conducted within 60 days of receiving parental consent for the evaluation. (See section 614(a)(1)(C)(i)(I) of the Act). Further, we believe it would be inappropriate to specify the timeframe from the completion of an evaluation to the determination of eligibility when there is no specific statutory basis to do so. The Department has long held that eligibility decisions should be made within a reasonable period of time

following the completion of an evaluation.

*Changes:* None.

*Comment:* A few commenters stated that § 300.534(d)(2) seems to imply that when a request is made for an expedited evaluation of a child subjected to a disciplinary removal, the child would receive an educational placement and services pending the results of the evaluation.

*Discussion:* We believe that § 300.534(d) is clear. Section 300.534(d) does not require the provision of services to a child while an expedited evaluation is being conducted, if the public agency did not have a basis of knowledge that the child was a child with a disability. An educational placement under § 300.534(d)(2)(ii) may include a suspension or expulsion without services, if those measures are comparable to disciplinary measures applied to children without disabilities who engage in comparable behavior. Of course, States and LEAs are free to choose to provide services to children under § 300.534(d).

*Changes:* None.

Referral to and Action by Law Enforcement and Judicial Authorities (§ 300.535)

*Comment:* One commenter stated that the requirement in § 300.535(b)(2), which requires a public agency reporting a crime to transmit copies of the child's special education and disciplinary records only to the extent that the transmission is permitted by the Family Educational Rights and Privacy Act (FERPA), is beyond the scope of the Act and should be removed.

*Discussion:* We do not believe that § 300.535(b)(2) goes beyond the scope of the Act as sections 612(a)(8) and 617(c) of the Act direct the Secretary to take appropriate action, in accordance with FERPA, to assure the confidentiality of personally identifiable information contained in records collected or maintained by the Secretary and by SEAs and LEAs. We therefore are not removing this provision. We maintain that the provisions in section 615(k)(6)(B) of the Act, as reflected in § 300.535(b)(2), must be read consistent with the disclosures permitted under FERPA for the education records of all children. Under FERPA, personally identifiable information (such as the child's status as a special education child) can only be released with parental consent, except in certain very limited circumstances. Therefore, the transmission of a child's special education and disciplinary records under paragraph (b)(2) of this section without parental consent is permissible

only to the extent that such transmission is permitted under FERPA.

*Changes:* None.

Change of Placement Because of Disciplinary Removals (§ 300.536)

*Comment:* A few commenters expressed concern that the requirements in § 300.536 do not account for schools with zero tolerance policies.

*Discussion:* We believe the provisions in §§ 300.530 through 300.536 do account for zero tolerance policies by providing public agencies the flexibility to implement discipline policies as they deem necessary to create safe classrooms and schools for teachers and children as long as those policies are fair and equitable for all children and protect the rights of children with disabilities. If a child with a disability is removed from his or her current placement and placed in an interim alternative educational setting, another setting, or suspended or expelled under the public agency's zero tolerance policy, the disciplinary requirements in §§ 300.530 through 300.536 apply. Therefore, we do not believe it is necessary to include language in § 300.536 regarding a public agency's zero tolerance policy as such policies are irrelevant to what constitutes a change in placement for disciplinary removals under the Act.

*Changes:* None.

*Comment:* Many commenters recommended removing proposed § 300.536(b) (new § 300.536(a)(2)) regarding a series of removals that constitute a change in placement stating it has no statutory basis.

*Discussion:* We believe section 615(k)(1)(B) of the Act regarding the authority of school personnel to remove children with disabilities for not more than 10 school days, to the same extent as nondisabled children, provides the statutory basis for proposed § 300.536(b) (new § 300.536(a)(2)). This section of the Act does not permit using repeated disciplinary removals of 10 school days or less as a means of avoiding the normal change in placement protections under Part B of the Act.

*Changes:* None.

*Comment:* Numerous commenters recommended removing the reference to manifestation determination in proposed § 300.536(b)(2) (new § 300.536(a)(2)(ii)). Several of these commenters stated that it is unnecessary since the manifestation determination is reserved for removals longer than 10 school days. Some commenters stated if the language in proposed paragraph (b)(1) of this section (new paragraph (a)(2)(i) of this section) that a series of removals constitutes a pattern because

the series of removals total more than 10 school days in a school year is going to be retained, proposed paragraph (b)(2) of this section (new paragraph (a)(2)(ii) of this section) should be eliminated because it is excessive and has no basis in the Act. Other commenters found the manifestation determination requirement in proposed paragraph (b)(2) of this section "circular" because requiring a child's behavior to be a manifestation of his or her disability before determining that a change in placement has occurred under proposed paragraph (b)(2) of this section (new paragraph (a)(2)(ii) of this section) and then requiring that a manifestation determination be conducted under § 300.530(e), whenever a child's removal constitutes a change in placement, is redundant and confusing.

*Discussion:* We agree with the commenters that requiring that a child's behavior must be a manifestation of the child's disability before determining that a series of removals constitutes a change in placement under proposed paragraph (b) of this section (new paragraph (a)(2) of this section) should be removed. We believe it is sufficient for the public agency to conclude that a change in placement has occurred if a child has been subjected to a series of removals that total more than 10 school days in a school year, the behaviors are substantially similar in nature, and such additional factors as the length of each removal, the total amount of time the child has been removed, and the proximity of the removals to one another support the premise that the series of removals constitute a pattern. However, our removal of the manifestation determination under proposed paragraph (b)(2) of this section (new paragraph (a)(2) of this section) does not eliminate the obligation to conduct a manifestation determination under § 300.530(e) if the public agency's determination is that the series of removals constitutes a change in placement. Section 300.530(e) requires that a manifestation determination be conducted within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct.

*Changes:* We have restructured proposed § 300.536(b) as follows: Proposed paragraph (b)(1) of this section is redesignated as new paragraph (a)(2)(i); proposed paragraph (b)(2) of this section is redesignated as new paragraph (a)(2)(ii); proposed paragraph (b)(3) of this section is redesignated as paragraph (a)(2)(iii). We also removed from new paragraph (a)(2)(ii) of this section (proposed paragraph (b)(2) of this section) the requirement that a

child's behavior must have been a manifestation of the child's disability before determining that a series of removals constitutes a change in placement under § 300.536.

*Comment:* One commenter recommended revising proposed § 300.536(b)(2) (new § 300.536(a)(2)(ii)) to clarify that the child's behavior must be substantially similar to the child's behavior in "previous" incidents that resulted in the series of removals.

*Discussion:* Our intent in including new § 300.536(a)(2)(ii) (proposed § 300.536(b)(2)) to these regulations is to assist in the appropriate application of the change in placement provisions in paragraph (a)(2) of this section. We concur with the commenter and believe adding the reference to "previous" incidents provides clarity to the provision that, when determining whether a child has been subjected to a series of removals that constitute a pattern under § 300.536(a)(2), school personnel should determine whether the child's behavior that resulted in the removal is substantially similar to the previous incidents that resulted in the series of removals.

*Changes:* New § 300.536(a)(2)(ii) (proposed § 300.536(b)(2)) has been amended to reference the child's behavior in "previous" incidents that resulted in the series of removals.

*Comment:* Many commenters requested the regulations define "substantially similar behavior." Many commenters expressed concern that there is no precedent or statutory support for the use of "substantially similar behavior" and requested explaining the statutory basis for including the provision. One commenter suggested including a provision in proposed § 300.536(b)(2) that substantially similar behaviors must have been recognized by the IEP Team or be included in the IEP as related to the child's disability. One commenter stated that what constitutes "substantially similar behavior" is highly subjective, prone to overuse, and likely to lead to litigation.

*Discussion:* We are not changing the regulations because, in light of the Department's longstanding position that a change in placement has occurred if a child has been subjected to a series of disciplinary removals that constitute a pattern, we believe requiring the public agency to carefully review the child's previous behaviors to determine whether the behaviors, taken cumulatively, are substantially similar is an important step in determining whether a series of removals of a child constitutes a change in placement, and is necessary to ensure that public

agencies appropriately apply the change in placement provisions. Whether the behavior in the incidents that resulted in the series of removals is "substantially similar" should be made on a case-by-case basis and include consideration of any relevant information regarding the child's behaviors, including, where appropriate, any information in the child's IEP. However, we do not believe it is appropriate to require in these regulations that the "substantially similar behaviors" be recognized by the IEP Team or included in the child's IEP as recommended by the commenter. The commenter is correct that what constitutes "substantially similar behavior" is a subjective determination. However, we believe that when the child's behaviors, taken cumulatively, are objectively reviewed in the context of all the criteria in paragraph (a)(2) of this section for determining whether the series of behaviors constitutes a change in placement, the public agency will be able to make a reasonable determination as to whether a change in placement has occurred. Of course, if the parent disagrees with the determination by the public agency, the parent may request a due process hearing pursuant to § 300.532.

*Changes:* None.

*Comment:* One commenter requested an explanation of what recourse parents have if they disagree with the public agency's change in placement decision for a child who violates a code of student conduct.

*Discussion:* If a parent of a child with a disability disagrees with any decision regarding a disciplinary change in placement of a child under §§ 300.530 and 300.531, or the manifestation determination under § 300.530(e), the parent may request a due process hearing pursuant to § 300.532.

*Changes:* None.

*Comment:* Several commenters requested clarifying who determines whether a series of removals under proposed § 300.536(b) (new paragraph (a)(2) of this section) constitutes a change in placement. One commenter recommended adding in proposed paragraph (b) language from the *Analysis of Comments and Changes* to current § 300.520 clarifying that any decision regarding whether a pattern of removals constitutes a change in placement must be made on a case-by-case basis by the public agency. (March 12, 1999 (64 FR 12618)).

*Discussion:* Whether a pattern of removals constitutes a "change in placement" under new paragraph (a)(2) of this section (proposed § 300.536(b)) must be determined on a case-by-case

basis by the public agency. We agree it is important to clarify this position in these regulations and is necessary to ensure proper implementation of this section. We are including the language from the *Federal Register* of March 12, 1999 (64 FR 12618), (as suggested by the commenter).

*Changes:* A new paragraph (b) has been added to § 300.536 to clarify that the public agency (subject to review through the due process and judicial proceedings) makes the determination, on a case-by-case basis, whether a pattern of removals constitutes a change in placement.

State Enforcement Mechanisms (§ 300.537)

*Comment:* None.

*Discussion:* New § 300.537 is addressed under the *Analysis of Comments and Changes* section for this subpart in response to comments on § 300.510(d).

*Changes:* We have added a new § 300.537 on State enforcement mechanisms to clarify that, notwithstanding §§ 300.506(b)(7) and new 300.510(d)(2)(proposed § 300.510(c)(2)), nothing in this part prevents a State from providing parties to a written agreement reached as a result of a mediation or resolution process other mechanisms to enforce that agreement, provided that such mechanisms are not mandatory and do not deny or delay the right of the parties to seek enforcement of the written agreement in a State court of competent jurisdiction or in a district court of the United States. We have also added a cross reference to new § 300.573 in new § 300.510(d) (proposed § 300.510(c)), regarding written settlement agreements.

**Subpart F—Monitoring, Enforcement, Confidentiality, and Program Information**

*Monitoring, Technical Assistance, and Enforcement*

State Monitoring and Enforcement (§ 300.600)

*Comment:* Several commenters recommended modifying § 300.600 to include language from section 616(a)(1) and (a)(3) of the Act to clarify that the Department, like the States, has the authority and obligation to monitor and enforce Part B of the Act. The commenters recommended that the requirements in section 616(a)(1) of the Act be included in the regulations because improving accountability is one of the most important goals of this reauthorization and the Act mandates

the Secretary to monitor and enforce the Act.

*Discussion:* We take the responsibility to monitor and enforce compliance with the Act seriously, but that responsibility comes from the Act, and from the Department's inherent authority to ensure that the laws it is charged with implementing are carried out, and not from these regulations. In general, we do not believe that it is necessary to include language on the responsibility of the Secretary in the regulations, as, under § 300.2, the regulations apply to States that receive payments under Part B of the Act and public agencies of those States, but not to the Department. Information on our monitoring and enforcement activities is available on the Department's Web site at: *http://www.ed.gov/policy/speced/guid/idea/monitor/index.html*.

*Changes:* None.

*Comment:* Several commenters stated that the monitoring priority areas in section 616(a)(3) of the Act should be included in § 300.600.

*Discussion:* We agree that the monitoring priority areas in section 616(a)(3) of the Act related to State responsibilities should be included in the regulations because these provisions require each State to monitor its LEAs in each of the monitoring priority areas specified in the Act. Accordingly, we will add further clarification regarding the monitoring priority areas from section 616(a)(3) of the Act in § 300.600.

*Changes:* A new paragraph (d) has been added to § 300.600 to include the State monitoring priority areas in section 616(a)(3) of the Act.

*Comment:* One commenter expressed concern that there will be no accountability on the part of States and the Department for complying with the requirements in section 616(a)(1) and (a)(3) of the Act because the regulations do not reflect these requirements.

*Discussion:* The requirements in section 616(a)(1) of the Act, relating to a State's monitoring responsibilities, are included in the regulations in § 300.600(a). Further, as indicated in the response to the previous comment, a provision regarding the State's responsibility to monitor LEAs located in the State using the indicators in the monitoring priority areas in section 616(a)(3) of the Act has been added in new § 300.600(d). Regarding the Secretary's monitoring responsibility, section 616(a)(1) of the Act is clear that the Secretary must monitor implementation of Part B of the Act through the oversight of States' exercise of general supervision and through the State performance plans. Sections 616(a)(3) and 616(b) further describe the

Secretary's responsibilities to monitor States' implementation of Part B of the Act. In addition, note 253–258 of the Conf. Rpt. No. 108–779, p. 232, provides that the Secretary must request such information from States and stakeholders as is necessary to implement the purposes of the Act, including the use of on-site monitoring visits and file reviews to enforce the requirements of the Act. We continue to believe it is unnecessary to include the Secretary's obligations in the regulations. We also do not believe further clarification regarding State accountability is necessary in § 300.600.

*Changes:* None.

*Comment:* One commenter noted that § 300.600(c) requires States to use quantifiable indicators and such qualitative indicators as are needed to adequately measure performance in the monitoring priority areas identified in section 616(a)(3) of the Act. The commenter expressed concern that this requirement expands the data collection burden on States and focuses on inputs, processes, and whether certain procedural rights are met, rather than focusing on educational results and outcomes for children with disabilities.

*Discussion:* Section 300.600 reflects the requirements in the Act and Congress' determination that collection of this data is necessary to fulfill the purposes of the Act. Specifically, section 616(b)(2) of the Act requires each State to develop a State performance plan that includes measurable and rigorous targets for the indicators established under the monitoring priority areas. As directed by section 616(a)(3) of the Act, the Secretary also has established quantifiable indicators in each of the monitoring priority areas listed in the Act and these regulations. These indicators focus on improving educational results and functional outcomes for children with disabilities, and include issues such as the provision of services in the LRE, participation and performance on Statewide assessments, and graduation and dropout rates. In addition, important systemic indicators, such as monitoring, mediation, and child find, are included. More information about State performance plans, the indicators, and the Department's review of the State performance plans is available on the Department's Web site at: *http://www.ed.gov/policy/speced/guid/idea/bapr/index.html*.

*Changes:* None.

*Comment:* One commenter recommended changing § 300.600 to require States to develop policies and procedures to analyze the performance

of each public agency; develop written policies and procedures to guide monitoring activities; and develop and maintain a stakeholder group, which would include public school administrators, advocates, family members, and others, to guide monitoring and enforcement activities.

*Discussion:* Section 300.149(b), consistent with section 612(a)(11) of the Act, already requires States to have policies and procedures in effect to ensure compliance with the monitoring and enforcement requirements in §§ 300.600 through 300.602 and §§ 300.606 through 300.608. Sections 300.167 through 300.169, consistent with section 612(a)(21) of the Act, require States to establish and maintain an advisory panel with broad and diverse representation to advise States on, among other things, developing evaluations and corrective action plans to address findings identified in Federal monitoring reports. Accordingly, we do not believe any modification of § 300.600, regarding State monitoring procedures, is necessary.

*Changes:* None.

*Comment:* Several commenters recommended modifying § 300.600 to require States to establish a committee, which includes advocates to oversee monitoring and enforcement activities. A number of commenters suggested that this group, at a minimum, include representatives of PTIs; protection and advocacy groups; and parent, disability advocacy, and education organizations.

Several commenters also recommended requiring the advisory committee to provide advice on the development of the State's performance goals and indicators required in § 300.157, the State's performance plan, including measurable and rigorous targets required in § 300.601(a)(1) and (a)(3), the State's report to the public required in § 300.602(b)(2), the State's corrective action or improvement plan under § 300.604(b)(2)(i), and other State monitoring, improvement, and enforcement activities.

*Discussion:* The State advisory panel, required in § 300.167 through 300.169, consistent with section 612(a)(21)(A) of the Act, addresses many of the commenters' suggestions. The purpose of the State advisory panel, as stated in § 300.167 and section 612(a)(21)(A) of the Act, is to provide policy guidance to each SEA with respect to special education and related services for children with disabilities. Pursuant to § 300.168 and section 612(a)(21)(B) of the Act, a broad membership is required. The duties of the panel are, among other things, to advise the SEA on unmet needs, evaluations, and

corrective action plans to address findings identified in Federal monitoring reports, consistent with § 300.169 and section 612(a)(21)(D) of the Act. However, although we believe that broad stakeholder involvement in the development of the State performance plans and annual performance reports is very important, we decline to regulate that a specific group be involved in their development. We have, however, provided guidance in OSEP's August 9, 2005 memorandum to States, *Submission of Part B State Performance Plans and Annual Performance Reports,* (OSEP Memo 05–12), located at *http://www.ed.gov/policy/speced/guid/idea/bapr/index.html,* which directs States to provide information in their State performance plans on how they obtained broad input from stakeholders on the State performance plan. Accordingly, we find it unnecessary to add any further clarification in § 300.600.

*Changes:* None.

*Comment:* Some commenters recommended modifying § 300.600(b)(2) to clarify that monitoring and enforcement activities also apply to programs under Part C of the Act. A few commenters suggested clarifying that Part C of the Act should be monitored to evaluate how well it serves infants and toddlers with disabilities and their families.

*Discussion:* Section 300.600 applies only to Part B of the Act. However, the commenters are correct that the monitoring and enforcement activities in section 616 of the Act also apply to Part C of the Act, as provided in section 642 of the Act. The Department will address this recommendation in the promulgation of regulations implementing Part C of the Act.

*Changes:* None.

*Comment:* A few commenters recommended clarifying that the monitoring priority in section 616(a)(3)(A) of the Act, relating to the provision of FAPE in the LRE, should be based on the unique needs of the individual child. One commenter stated that the regulations should stress individualization when determining LRE. This commenter recommended including language from note 89 of the Conf. Rpt. No. 108–779, p. 186, which highlights Congress' intent that each public agency ensure that a "continuum of alternative placements (instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions) is available to meet the needs of children with disabilities for special education and related services."

*Discussion:* Section 300.115, consistent with section 612(a)(5) of the Act, requires each public agency to ensure that a continuum of alternative placements (including instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions) is available to meet the needs of children with disabilities for special education and related services. The LRE provisions are intended to ensure that a child with a disability is served in a setting where the child can be educated successfully and that placement decisions are individually determined based on each child's abilities and needs. We do not believe that the change recommended by the commenter is needed.

*Changes:* None.

*Comment:* One commenter recommended changing § 300.600 to specify that the Department's monitoring of States for compliance with the LRE requirements in §§ 300.114 through 300.117 include a review of IEPs to determine if: (1) Placements were based on the individual unique needs of each child; (2) placements were requested by parents; (3) IEP Teams followed the IEP requirements in §§ 300.320 through 300.328; (4) children received the services required to participate and progress in the general curriculum; (5) children are in appropriate environments; and (6) the educational and emotional advancements of children were considered. The commenter recommended adding language to direct individuals who monitor the implementation of the Act to look further than ''numbers'' when monitoring the LRE requirements.

*Discussion:* As noted in section 616(a)(1) of the Act, the Secretary monitors implementation of the Act through oversight of States' exercise of general supervision and States' performance plans. Section 616(a)(1) of the Act further states that the Secretary requires States to monitor and enforce the implementation of the Act by LEAs. The activities listed by the commenter are not the type of monitoring activities the Act requires the Secretary to undertake. The commenter's listed activities are more appropriately the responsibilities of States as they monitor the implementation of the Act in their LEAs.

*Changes:* None.

*Comment:* One commenter recommended avoiding references to the Act in §§ 300.600 through 300.609 when references to the regulations could accomplish the same result.

*Discussion:* We agree with the commenter and will revise §§ 300.600 through 300.609 accordingly.

*Changes:* We have revised §§ 300.600 through 300.609 by replacing statutory citations with relevant regulatory citations, where appropriate.

*Comment:* One commenter recommended clarifying that racial disproportionality in educational placements falls within the monitoring priority areas for monitoring and enforcement.

*Discussion:* New § 300.600(d), consistent with section 616(a)(3) of the Act, includes disproportionate representation of racial and ethnic groups in special education and related services (to the extent the representation is the result of inappropriate identification) as a monitoring priority. Because the monitoring priority area clearly refers to disproportionate representation to the extent the representation is a result of inappropriate identification of children with disabilities, and not placement, we do not believe we can include disproportionate representation resulting from educational placement within the scope of this monitoring priority area.

*Changes:* None.

*Comment:* One commenter recommended including a requirement in § 300.600(c) that States develop corrective action plans for each LEA monitored to improve performance in the monitoring priority areas. The commenter also suggested requiring that corrective action plans be completed by the State within one year of the monitoring report.

*Discussion:* Section 300.600(a), consistent with section 616(a)(1)(C) of the Act, requires States to monitor implementation and enforcement of the Act. As discussed elsewhere in this section in response to comments regarding § 300.604 (Enforcement), we have revised § 300.600(a) to identify the specific enforcement actions included in § 300.604 that are appropriate for States to use with LEAs. The new § 300.600(a) identifies specific methods that must be used to ensure correction when an LEA has been determined to need assistance for two consecutive years or to need intervention for three or more consecutive years. For example, § 300.600(a) refers to § 300.604(b)(2)(i), which discusses the preparation of a corrective action or improvement plan. In addition, new § 300.608(b) clarifies that States can use other authority available to them to monitor and enforce the Act. States need the flexibility to select the most appropriate mechanism to ensure correction in a timely manner.

Requiring that corrective action plans be developed in every instance is overly prescriptive when there are multiple methods that can be used. Accordingly, we do not think it is necessary to make the change suggested by the commenter.

*Changes:* None.

## State Performance Plans and Data Collection (§ 300.601)

*Comment:* One commenter expressed concern that § 300.601(a)(3) and (b)(1) over-regulate by requiring measurable and rigorous targets beyond those established in the Act. The commenter expressed concern that this would result in additional data collection and analyses and require substantial administrative staff time and additional costs at the State and local levels. The commenter stated that, while the Department may monitor any area and review any data, it is unnecessary to establish additional non-statutory indicators and targets.

*Discussion:* Section 300.601(a)(3), consistent with section 616(a)(3) of the Act, requires the Secretary to establish indicators to adequately measure performance in the monitoring priority areas. Under section 616(b)(2)(A) of the Act, States are required to establish measurable and rigorous targets for the indicators established under the monitoring priority areas described in section 616(a)(3). The Department established indicators only in the three monitoring priority areas listed in new § 300.600(d), consistent with section 616(a)(3) of the Act. Given that States are required to establish targets for indicators established under the monitoring priority areas and indicators were established only under the three statutory monitoring priority areas, the Secretary is not requiring measurable and rigorous targets in areas beyond those established in the Act. We disagree with the commenter and do not believe the Department has over-regulated in this area.

*Changes:* None.

*Comment:* A few commenters recommended changing § 300.601 to specify that States must provide an opportunity for public comment in developing the State performance plan.

*Discussion:* We agree that the public should be represented in developing State performance plans. In note 253–258 of the Conf. Rpt. No. 108–779, p. 232, Congress stated its expectation that State performance plans, indicators, and targets be developed with broad stakeholder input and public dissemination. OSEP Memo 05–12 requires States to provide information in the overview section of the State performance plan, clarifying how the

State obtained broad input from stakeholders on the State performance plan. Furthermore, §§ 300.167 through 300.169 clarify the State's responsibility to establish and maintain an advisory panel, whose membership consists of broad and diverse representation, to advise States on many issues, including developing evaluations and reporting on data to the Secretary. Accordingly, we believe that no additional clarification is needed.

*Changes:* None.

*Comment:* One commenter expressed concern that the requirement in § 300.601(a)(3) reflects a "one-size-fits-all" approach that is not in the Act because it requires the Secretary to establish indicators for the State performance plan and annual performance reports and requires States to collect data on each of the indicators.

*Discussion:* Section 616(a)(3) of the Act requires the Secretary to establish quantifiable indicators in each of the monitoring priority areas, and qualitative indicators, as needed, to adequately measure performance. Section 300.601(a) reflects this requirement. The requirement that each State establish measurable and rigorous targets for the indicators established by the Secretary and collect relevant data is set forth in section 616(b)(2)(B) of the Act. We do not agree that this presents a one-size-fits-all approach because States set their own targets for indicators such as graduation, dropout, and performance on assessments, and identify improvement strategies specific to the unique circumstances of their State. In addition, OSEP Memo 05–12 includes the indicators established by the Secretary and also indicates that States have the flexibility to establish their own indicators, in addition to the indicators established by the Secretary.

*Changes:* None.

*Comment:* One commenter recommended amending § 300.601 to specify that, as part of the State's performance plan, measurable and rigorous targets are only required for the indicators established by the Secretary and are not required for any additional indicators established by the State.

*Discussion:* Pursuant to the guidance in OSEP Memo 05–12, the Secretary has established indicators under the three monitoring priority areas in new § 300.600(d), consistent with section 616(a)(3) of the Act. States may choose to add additional indicators if there are other areas the State wishes to improve. If the State adds indicators to the State Performance Plan, the State must include measurable and rigorous targets for each additional indicator because the purpose of the State performance

**Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations **46733**

plan is to evaluate the State's efforts to implement the statutory requirements and describe how the State will improve. States are free to have additional indicators that are not included in the State performance plan and these indicators would not need to have measurable and rigorous targets.

*Changes:* None.

State Use of Targets and Reporting (§ 300.602)

*Comment:* A few commenters recommended modifying § 300.602(b)(1)(A) to require each LEA to work with an LEA monitoring stakeholder advisory committee that would advise the LEA on analyzing and reporting its performance on the targets in the State performance plan and on developing LEA plans. The commenters stated that, at a minimum, the advisory committee should include representatives of parents, disability advocacy groups, and other organizations.

*Discussion:* There is nothing in section 616 of the Act that requires LEAs to establish local stakeholder groups. Given the wide variation in the size of LEAs across the country and the wide variety of issues facing those LEAs, we do not believe that a Federal requirement is appropriate. States have the discretion to establish (or have their LEAs establish) local advisory groups to advise the LEAs, if they so choose.

*Changes:* None.

*Comment:* One commenter recommended modifying § 300.602 to require each State to include LEA corrective action plans (including indicators, targets, findings, and timelines for LEAs to correct any findings) in the State's report to the public on the performance of each LEA in the State on the targets in the State's performance plan.

*Discussion:* Section 300.602, consistent with section 616(b)(2)(C) of the Act, requires States to report annually on the performance of each LEA against targets in the State performance plan. We believe requiring States to include LEAs' corrective action plans in the States' public reports would create additional burden for States that is not required by the Act.

*Changes:* None.

*Comment:* Several commenters recommended revising § 300.602 to specify that the State performance plan and the public report on LEAs' performance must be in language that is accessible to, and understandable by, all interested parties.

*Discussion:* The Department expects the information that a State reports in its annual performance reports and in the public reports on LEA performance will be made available in an understandable and uniform format across the State, including alternative formats upon request, and, to the extent practicable, in a language that parents understand. We do not believe it is necessary to add a specific requirement to the regulations because other Federal laws and policies already require that information to parents be available in alternative formats and to parents who are limited English proficient. Specifically, Title VI of the Civil Rights Act of 1964 requires SEAs and LEAs to communicate to parents with limited English proficiency what is communicated to parents who are not limited English proficient. Under Title VI, SEAs and LEAs have flexibility in determining what mix of oral and written translation services may be necessary and reasonable for communicating this information. Similarly, Executive Order 13166 requires that recipients of Federal financial assistance take reasonable steps to ensure meaningful access by individuals with limited English proficiency. For individuals with disabilities, title II of the Americans with Disabilities Act requires that State and local governments, and Section 504 of the Rehabilitation Act of 1973 requires that recipients of Federal financial assistance, ensure that their communications with individuals with disabilities are as effective as their communications with others, and that appropriate auxiliary aids and services are available when necessary to ensure effective communication.

*Changes:* None.

*Comment:* One commenter suggested that the annual performance report include cross-references or links to the State report card and local report cards on the academic performance of children with disabilities under the ESEA.

*Discussion:* States may choose, but are not required, to include in the annual performance report the cross-references or links suggested by the commenter. States also may choose, but are not required, to use their ESEA report cards for reporting annually on the performance of LEAs on the indicators in the State performance plan. We do not believe it is appropriate to require States to cross-reference or link to ESEA report cards because it is overly burdensome and may create confusion because the indicators and timeframe for reporting may not be the same between the two reporting systems.

*Changes:* None.

*Comment:* One commenter recommended requiring States to post their monitoring reports of LEAs on the States' Web site and make reports on monitoring activities for each LEA available to the public in written format and to the media.

*Discussion:* States have the discretion to decide how these reports are made available to the public. There is nothing in the Act that requires States to post monitoring reports of LEAs on the States' Web site or through other means. However, States may, if they wish, make such postings.

*Changes:* None.

*Comment:* One commenter suggested removing § 300.602(b)(1)(ii), which requires a State to include in its report to the public on the performance of each LEA, the most recent performance data on each individual LEA and the date the data were obtained, if the State collects these data through monitoring or sampling.

*Discussion:* We believe that the data we are requiring the States to provide under § 300.602(b)(1)(ii) are necessary for the proper implementation of the Act. Providing the most recent LEA performance data and the date the data were obtained will reduce data burden while maintaining the States' accountability for results, specifically related to indicator data that are more difficult to collect because those data are not collected through State-reported data collection systems under section 618 of the Act. However, the proposed regulations were not as clear as they should have been about the conditions under which States may use monitoring and sampling data. Therefore, we are revising § 300.601(b) by adding a new provision that specifies that if the Secretary permits States to collect data on specific indicators through State monitoring or sampling, and a State chooses to collect data on those indicators through State monitoring or sampling, the State must collect data on those indicators on each LEA at least once during the period of the State performance plan. This will require that States collect data to assess each LEA's performance on indicators for which State monitoring or sampling data are permitted during the period of the State performance plan, so that the public will receive specific information about each LEA. We also are revising § 300.602(b)(1)(ii) to make clear that the required information about specific LEAs would only have to be included in the reports to the public on LEA performance required by § 300.602(b)(1)(i)(A), which should prevent this provision from being interpreted to require LEA-specific reporting to the Secretary.

*Changes:* We have renumbered § 300.601(b)(2) as § 300.601(b)(3) and

added a new § 300.601(b)(2) to specify that, if permitted by the Secretary, if a State collects data on an indicator through State monitoring or sampling, the State must collect data on the indicator at least once during the period of the State performance plan. We also have revised § 300.602(b)(1)(ii) to provide a more specific reference to the public report required under § 300.602(b)(1)(i)(A).

*Comment:* One commenter recommended that § 300.602 specify that data on disproportionality be reported to the public, pursuant to sections 616(b)(2)(C) and 618 of the Act.

*Discussion:* The provisions in § 300.602 already include the requirement suggested by the commenter. Section 300.602, consistent with section 616(b)(2)(C) of the Act, requires each State to use the targets established in its State performance plan and the monitoring priority areas described in § 300.600(d), to analyze the performance of each LEA in the State, and to report annually to the public on such performance. As described in new § 300.600(d), the monitoring priority areas on which the State will report include the disproportionate representation of racial and ethnic groups in special education and related services, to the extent the disproportionate representation is the result of inappropriate identification. Accordingly, States are required to report this information to the public. States must establish targets on each of the indicators set by the Secretary.

We also note that § 300.642(a), consistent with section 618(b) of the Act, requires that data collected pursuant to section 618 of the Act be reported publicly. These data will include State-level data on the number and percentage of children with disabilities by race and ethnicity on a number of measures, including identification as children with disabilities, placement, graduation and drop-out, and discipline. Accordingly, we do not believe any further changes to the regulations are necessary.

*Changes:* None.

Secretary's Review and Determination Regarding State Performance (§ 300.603)

*Comment:* One commenter expressed concern that the tone and substance of the monitoring and enforcement provisions in §§ 300.603 through 300.609, related to approval or disapproval by the Secretary of the State's performance plan and interventions against the SEA, are overly prescriptive and negative. The commenter stated that enforcement provisions applicable to all elementary

school and secondary school programs already exist in GEPA.

*Discussion:* We do not agree that the enforcement provisions are overly prescriptive. These enforcement provisions simply reflect the statutory requirements in section 616(d) and (e) of the Act. These provisions are more specific than the provisions in GEPA.

*Changes:* None.

*Comment:* A few commenters recommended including in the regulations the provisions in section 616(c) of the Act, regarding the process the Secretary must follow if the Secretary finds that a State performance plan does not meet the requirements in section 616 of the Act.

*Discussion:* We believe that the review process spelled out in section 616(c) of the Act is sufficiently clear and that regulations are not necessary. Further, under the statutory framework, the State performance plans were due to the Department by December 3, 2005, and the Department's review of the State performance plans for the six-year period of federal fiscal years 2005 through 2011 has already been completed. Accordingly, we believe it is unnecessary to add further clarification regarding the Secretary's responsibilities in § 300.603.

*Changes:* None.

*Comment:* One commenter recommended that the Department's process for approval of targets in State performance plans be rational, consistent, and transparent. For example, the commenter suggested that as the Department responds to and negotiates with a State regarding the State's targets, the process should be open so that States can learn from the Department's discussions with other States.

*Discussion*: We agree with the commenter. Accordingly, the Department has posted its analyses of each State's performance plan on the Department's Web site at: *http://www.ed.gov/fund/data/report/idea/partbspap/index.html.* In so doing, the Department's analyses are transparent and provide States with the opportunity to review the Department's responses to other States' performance plans.

*Changes:* None.

Enforcement (§ 300.604)

*Comment:* A few commenters recommended changing the enforcement requirements in § 300.604 to clarify the actions a State must take relating to enforcement. The commenters stated that it is essential that States understand their explicit authority under the Act to take certain enforcement actions against LEAs if the

State is identified as a State that needs assistance, needs intervention, or needs substantial intervention. The commenters stated that some of the enforcement mechanisms available to the Secretary in section 616(e) of the Act, such as requiring entry into a GEPA compliance agreement or referral to the Office of the Inspector General, may have no direct counterpart under State law and therefore, would not be available to States.

*Discussion:* The Department agrees that it is important to clarify the specific enforcement actions that States must use against an LEA if the LEA is determined to need assistance, intervention, or substantial intervention. We are revising § 300.600(a) to identify the specific enforcement actions identified in § 300.604 that are appropriate for a State, as opposed to the Federal government, to use if it determines that an LEA needs assistance or intervention in implementing the requirements of Part B of the Act.

*Changes:* We have revised § 300.600(a) to require States to enforce Part B of the Act in accordance with the enforcement mechanisms identified in § 300.604(a)(1) and (a)(3), (b)(2)(i) and (b)(2)(v), and (c)(2).

*Comment:* One commenter recommended including in §§ 300.600 through 300.609 a method for individuals or organizations to inform the Department about compliance issues in their district or State.

*Discussion:* The Department is committed to obtaining input from individuals and organizations as part of its monitoring process, and has a system for receiving and responding to citizen complaints about LEA and State compliance. However, detailed operational procedures for monitoring State activities are not typically included in regulations. Accordingly, we believe it is unnecessary to provide further clarification regarding specific monitoring procedures in §§ 300.600 through 300.609.

*Changes:* None.

*Comment:* One commenter recommended clarifying in § 300.604 that withholding State administrative funds would only occur following the Secretary's determination that, for three or more consecutive years, the State needs intervention in implementing the requirements of Part B of the Act.

*Discussion:* Section 300.604(b)(2)(iii), consistent with section 616(e)(2)(iii) of the Act, clearly delineates that consideration of withholding State administrative funds occurs following a "needs intervention" determination by the Secretary for three or more consecutive years. Therefore, we do not

believe it is necessary to add further clarification regarding the withholding of State administrative funds.

*Changes:* None.

State Enforcement and Rule of Construction (§§ 300.608 and 300.609)

*Comment:* One commenter recommended including in § 300.608 a provision that would allow an SEA to use any means authorized by law to effect compliance when it is determined that an LEA is not meeting the requirements of Part B of the Act, including the targets in the State's performance plan.

*Discussion:* The enforcement scheme outlined in §§ 300.600(a), 300.604, and 300.608 represents the minimum steps that a State must take to enforce compliance with the Act. (The minimum enforcement steps the Department must take are specified in § 300.604.) However, we believe that the regulations should be clear that States have the flexibility to use other mechanisms to bring about compliance, just as section 616(g) of the Act and § 300.609 recognize that the Department needs the flexibility to use the authority in GEPA to monitor and enforce the Act, in addition to the enforcement program laid out in section 616(e) of the Act. Therefore, we will add to § 300.608 a new provision noting that States are not restricted from using any other authority available to them to monitor and enforce the Act. Taking steps under any such authority, however, does not relieve a State from complying with the requirements of §§ 300.600(a), 300.604, and 300.608(a).

*Changes:* We have designated proposed § 300.608 as § 300.608(a) and added a new paragraph (b) to specify that States are not restricted from utilizing any other authority available to them to monitor and enforce the Act. We also have clarified in § 300.609 that the reference to "authority under GEPA" includes the provisions of 34 CFR parts 76, 77, 80, and 81, including the imposition of special conditions under 34 CFR 80.12.

*Confidentiality of Information*

Confidentiality (§ 300.610) and Definitions (§ 300.611)

*Comment:* None.
*Discussion:* Both §§ 300.610 and 300.611 contained incorrect references to § 300.628, which does not exist. We have revised those references.

*Changes:* We have removed the incorrect references to § 300.628 in §§ 300.610 and 300.611 and replaced them with references to § 300.627 and § 300.625, respectively.

Notice to Parents (§ 300.612)

*Comment:* One commenter stated that § 300.612 exceeds the authority under sections 612(a)(8) and 617(c) of the Act.

*Discussion:* Proposed § 300.612 incorrectly referenced the requirements in § 300.121. The correct reference is § 300.123, which requires each State to have policies and procedures to ensure that public agencies in the State protect the confidentiality of personally identifiable information. We will make this correction in § 300.612. With this correction, § 300.612 requires the SEA to give notice to parents that fully informs them about the requirements regarding the confidentiality of personally identifiable information.

We do not agree that § 300.612 exceeds the authority under sections 612(a)(8) and 617(c) of the Act. Section 612(a)(8) of the Act requires agencies in the State to comply with section 617(c) of the Act, and section 617(c) of the Act gives the Secretary the authority to take appropriate measures to protect the confidentiality of any personally identifiable data, information, and records collected or maintained by the Secretary and by SEAs and LEAs. This is a longstanding requirement in the regulations that we do not believe should be changed.

*Changes:* We have changed § 300.612(a) by removing the incorrect reference to § 300.121 and replacing it with a reference to § 300.123.

*Comment:* One commenter expressed concern that summaries of the policies and procedures that participating agencies must follow regarding storage, disclosure to third parties, retention, and destruction of personally identifiable information would not be adequate to fully inform parents.

*Discussion:* Section 300.612(a)(3) is a longstanding requirement that has been in the Part B regulations since they were published in 1977. The Department's experience in administering this program indicates that the requirement to include a summary of policies that participating agencies must follow regarding storage, disclosure to third parties, retention, and destruction of personally identifiable information is an effective way for parents to be informed about these requirements. Parents who desire additional information regarding their rights, consistent with these policies, can request the additional information from the SEA. SEAs are encouraged to comply with such requests without undue delay.

*Changes:* None.

*Comment:* One commenter recommended requiring the SEA to post its confidentiality of personally

identifiable information notice for parents on the State's Web site.

*Discussion:* We believe that it is up to each State to determine whether posting this notice on the State's Web site will serve the needs of parents and public agencies in the State. We, therefore, decline to regulate on this matter.

*Changes:* None.

Amendment of Records at Parent's Request (§ 300.618) and Opportunity for a Hearing (§ 300.619)

*Comment:* A few commenters requested clarification regarding how parents can register their disagreement with information in their child's record and request that their child's record be changed.

*Discussion:* Sections 300.618, 300.619, and 300.621 all address the process that parents must use to seek changes in their child's records if they believe the record is inaccurate, misleading, or otherwise in violation of the privacy or other rights of the child. When a parent requests that a change be made in the child's record, under § 300.618, agencies must amend the information within a reasonable time or inform parents of the agency's refusal to amend the information and the parent's right to a hearing to challenge the public agency's determination. If parents want to challenge the accuracy of information in the child's education records, they may do so by requesting a hearing under § 300.619 (by contacting the LEA staff member assigned that responsibility). Section 300.621 specifically provides that a hearing held under § 300.619 must be conducted according to the procedures in 34 CFR 99.22. 34 CFR 99.22, in turn, requires a hearing to meet the following minimum requirements:

(a) The educational agency or institution shall hold the hearing within a reasonable time after it has received the request for the hearing from the parent or eligible student.

(b) The educational agency or institution shall give the parent or eligible student notice of the date, time, and place, reasonably in advance of the hearing.

(c) The hearing may be conducted by any individual, including an official of the educational agency or institution, who does not have a direct interest in the outcome of the hearing.

(d) The educational agency or institution shall give the parent or eligible student a full and fair opportunity to present evidence relevant to the issues raised under § 99.21. The parent or eligible student may, at their own expense, be assisted or represented by one or more

**46736**   **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

individuals of his or her own choice, including an attorney.

(e) The educational agency or institution shall make its decision in writing within a reasonable period of time after the hearing.

(f) The decision must be based solely on the evidence presented at the hearing, and must include a summary of the evidence and the reasons for the decision.

The parent is not required, under the Act and these regulations, to follow the procedures that are applicable to filing a due process complaint under §§ 300.507 through 300.510. This is because the hearing authorized under § 300.619 is for the explicit purpose of giving a parent the opportunity to challenge the information in education records when a parent believes the information is inaccurate, misleading, or otherwise in violation of the privacy or other rights of the child. We do not believe further clarification regarding the specific procedures in §§ 300.618 and 300.619 is necessary. The procedures used for these hearings vary from State to State, and we believe it is best to give States the flexibility to develop their own procedures for such hearings, as long as they meet the requirements in § 300.621.

*Changes:* None.

Consent (§ 300.622)

*Comment:* One commenter suggested requiring schools to obtain parental consent before disclosing personally identifiable information to any party, unless authorized by 34 CFR part 99. Another commenter requested clarification regarding the requirements in § 300.622.

*Discussion:* We agree that § 300.622 should be revised to more accurately reflect the Department's policies regarding when parental consent is or is not required for disclosures of personally identifiable information to officials of participating agencies, and other individuals and entities. In some instances, current § 300.571 (proposed § 300.622) has been construed to prohibit disclosures without parental consent under this part that would be permitted without parental consent under FERPA. Accordingly, when final regulations for this program were issued in 1999, we amended current § 300.571(a) (proposed § 300.622(a)) to clarify that the release of disciplinary records to law enforcement authorities could occur without parental consent, to the extent that such disclosure was permitted under FERPA. In order to more clearly state the Department's longstanding position that consent is required for disclosures of personally

identifiable information to parties, other than officials of participating agencies collecting or using the information under this part, unless the information is contained in education records and the disclosure is allowed without parental consent under 34 CFR part 99, we are reorganizing § 300.622(a).

Under FERPA and § 300.622(a), schools, generally, must have written permission from the parent (or child who has reached the age of majority) in order to release information from a child's education records. However, there are exceptions to this general rule under FERPA that also apply to the records of children with disabilities and permit the release of information from education records without parental consent. Under 34 CFR 99.31(a), schools can disclose education records without consent under the circumstances specified in § 99.31 including if the disclosure meets one or more of the following conditions:

School officials with legitimate educational interests, as determined by the educational agency or institution;

Other schools where the student seeks or intends to enroll, subject to the requirements of § 99.34;

Specified authorized representatives, subject to the requirements of § 99.35, in connection with an audit or evaluation of Federal or State-supported education programs, or compliance with or enforcement of Federal legal requirements which relate to those programs;

Appropriate parties in connection with financial aid to a student for which the student has applied or which the student has received, if necessary for specified purposes;

Organizations conducting certain studies for or on behalf of the school;

Accrediting organizations;

To comply with a judicial order or lawfully issued subpoena;

Appropriate officials in cases of health and safety emergencies; and

State and local authorities, within a juvenile justice system, pursuant to specific State law.

We believe that the changes to § 300.622(a) state more clearly that under § 300.622, disclosures of personally identifiable information from education records of children with disabilities can be made without parental consent if the disclosure without parental consent would be permissible under FERPA. For example, in a situation involving a health emergency, information from a child with a disability's education records could be released to a hospital without parental consent in order to ensure that

the child received appropriate emergency health services.

Under proposed § 300.622(b), parental consent is not required for disclosures of personally identifiable information to officials of participating agencies for purposes of carrying out a requirement of this part. This is not a new requirement; proposed § 300.622(b) is the same as current § 300.571(b). However, we believe the requirement should be stated more clearly, and therefore, are changing the language in paragraph (b). We believe that this provision is particularly important to ensure that participating agencies have the information they need to carry out the requirements of this part in an effective manner. For example, if another State agency provides school health services under the Act, consent would not be required for a school nurse to have access to personally identifiable information in a child's education records in order to provide the school health services that are included on the child's IEP.

However, despite the recognition that officials of participating agencies need access to records of children with disabilities to carry out the requirements of this part, there are important privacy concerns that we feel need to be protected in certain specified situations. We believe that parental consent should be required before personally identifiable information can be released to representatives of participating agencies who are likely to provide or pay for transition services in accordance with § 300.321(b)(3). Representatives of these agencies, generally, are invited to participate in a child's IEP meeting because they may be providing or paying for transition services. We do not believe that the representatives of these agencies should have access to all the child's records unless the parent (or the child who has reached the age of majority) gives consent for the disclosure. We are, therefore, adding a new paragraph (b)(2) in § 300.622 to make this clear.

We also believe it is important to be clear about the confidentiality requirements for children who are placed in private schools by their parents, given the significant change in the child find requirements for these children. Under section 612(a)(10)(A)(i)(II) of the Act, child find for these children now is the responsibility of the LEA in which the private school is located and not the child's LEA of residence. We can anticipate situations in which there may be requests for information to be exchanged between the two LEAs, such as when a child is evaluated and

identified as a child with a disability by the LEA in which the private school is located and the child subsequently returns to public school in the LEA of residence. We believe under such circumstances parental consent should be required before personally identifiable information is released between officials of the LEA where a private school is located and the LEA of the parent's residence. We believe that consent is important in these situations to protect the privacy of the child and the child's family. Therefore, we are adding a new paragraph (b)(3) to § 300.622 to make this clear.

We are removing the requirement in proposed § 300.622(c) (current § 300.571(c)), which requires the SEA to provide policies and procedures that are used in the event that a parent refuses to provide consent under this section. This is already included in § 300.504(c)(3), which requires the procedural safeguards notice to include, among other things, a full explanation of the parental consent requirements and the opportunity to present and resolve complaints through the due process or State complaint procedures.

*Changes:* We have reorganized § 300.622 to more accurately reflect the Department's policy regarding when parental consent is and is not required for disclosures of personally identifiable information to officials of participating agencies, and other individuals and entities. We made changes to § 300.622(a) and added a new paragraph (b)(1) to clarify the Department's longstanding policy that consent is required for disclosures of personally identifiable information to parties, unless the interested parties are officials of participating agencies, collecting or using the information under this part, or the information is contained in education records and the disclosure is allowed without parental consent under FERPA. We added a new paragraph (b)(2) to clarify that parental consent is required for the disclosure of information to participating agencies that likely may provide or pay for transition services. We also added a new paragraph (b)(3) to require parental consent for the disclosure of records of parentally placed private school children between LEAs. Finally, we removed the requirement in proposed § 300.622(c) (current § 300.571(c)), because the information is included in § 300.504(c)(3).

Safeguards (§ 300.623)

*Comment:* None.
*Discussion:* We have corrected the incorrect reference to § 300.121 in the text of this regulation, which should

have referred to the State eligibility requirement concerning confidentiality, and not the State eligibility requirement regarding procedural safeguards.

*Changes:* We have removed the incorrect reference to § 300.121 and replaced it with a reference to § 300.123.

Children's Rights (§ 300.625)

*Comment:* One commenter requested clarifying the requirement in § 300.625(a) that children receive privacy rights similar to those received by parents.

*Discussion:* Section 300.625 is the same as current § 300.574 and has been in the regulations since 1977. It provides that States must have policies and procedures concerning the extent to which children are afforded rights of privacy similar to those of parents, taking into consideration the age of the child and type or severity of disability. It does not require States to grant particular privacy rights to a child in addition to those that apply when the child reaches the age of majority, as specified in paragraphs (b) and (c) of § 300.625. We do not believe further clarification is necessary.

*Changes:* None.

*Comment:* A few commenters stated that the notice to transfer parental rights to a child at the age of majority should be provided to the child and parents one year before the child reaches the age of majority.

*Discussion:* We do not believe this change is necessary because the regulations in § 300.320(c) already address the notification requirement. Specifically, § 300.320(c) requires that, beginning no later than one year before the child reaches the age of majority under State law, the IEP must include a statement that the child has been informed of the child's rights under Part B of the Act, if any, that will transfer to the child on reaching the age of majority under § 300.520. Because the regulations already contain the notice requirement, we do not believe it is necessary to add further clarification of this requirement to § 300.625.

*Changes:* None.

Enforcement (§ 300.626)

*Comment:* None.
*Discussion:* This provision, concerning State enforcement, should not refer to § 300.610, which is a requirement that applies to the Secretary.

*Changes:* We have removed the incorrect reference to § 300.610 and replaced it with a reference to § 300.611.

Annual report of children served— information required in the report (§ 300.641)

*Comment:* A few commenters stated that § 300.641 is inconsistent with the requirement in § 300.111(d), which states that the Act does not require the classification of children by their disability. The commenter noted that it is difficult to comply with the requirements for data collection and analysis without classifying children by their disability.

*Discussion:* We do not believe there is any inconsistency between the requirements in § 300.641(c) and § 300.111, as suggested by the commenter. Section 300.641(c) addresses counting children who have already been identified as having a disability and is consistent with the requirements in section 618 of the Act. Section 300.111 addresses child find and the determination of a child's eligibility for special education and related services. The Act does not require children to be identified with a particular disability category for purposes of the delivery of special education and related services. In other words, while the Act requires that the Department collect aggregate data on children's disabilities, it does not require that particular children be labeled with particular disabilities for purposes of service delivery, since a child's entitlement under the Act is to FAPE and not to a particular disability label.

*Changes:* None.
*Comment:* A few commenters recommended removing § 300.641(c) because States have reporting policies in place that might not be consistent with these new requirements. Numerous commenters stated that LEAs often report children with vision and hearing loss who have an additional disability in the category of multiple disabilities, which has resulted in under-reporting of children who are deaf-blind. The commenters stated that an accurate count of children with deaf-blindness is necessary to ensure that these children receive the specialized communication services they need, and to ensure that a sufficient number of specialists are trained to meet the specialized needs of these children. One commenter stated that a child's secondary disability should not affect the reporting of the child's primary disability. Another commenter suggested referring to deaf-blindness as the primary disability, if a child has multiple disabilities.

*Discussion:* The reporting requirements in § 300.641(c) are not new. Section 300.641(c) is the same as

current § 300.751(e); State reporting policies therefore should already be consistent with these regulations. Section 300.641(d) addresses how States must report a child with a disability who has more than one disability for purposes of the annual report of children served under the Act. Paragraph (d)(1) states that if a child has only two disabilities and those disabilities are deafness and blindness, and the child is not reported as having a developmental delay, that child must be reported under the category of deaf-blindness. Paragraph (d)(2) states that if a child has more than one disability and is not reported as having deaf-blindness or as having a developmental delay, the child must be reported under the category of multiple disabilities. We believe that § 300.641(d) is clear that children with deaf-blindness who have an additional disability must be included in the category of multiple disabilities. To designate deaf-blindness as the primary disability and include children with deaf-blindness who have an additional disability in the category of deaf-blindness would be inconsistent with the requirements in § 300.641(d).

Although we do not believe that any changes to the requirements in § 300.641(d) are necessary, we will review the instructions we provide to States regarding the reporting of children with deaf-blindness who have an additional disability and make any needed clarifications.

*Changes:* None.

Disproportionality (§ 300.646)

*Comment:* One commenter requested clarification as to whether the determination of disproportionality is based solely on a numerical formula or on district policies, procedures, and practices. One commenter recommended amending the regulations to clarify that the determination of disproportionality is based on a review of LEA policies and procedures, and not just a numerical determination. Another commenter requested a definition of significant disproportionality. Several commenters requested that the regulations clarify that States need only address statistically significant disproportionality based on the use of reliable data.

*Discussion:* Section 618(d)(1) of the Act is clear that the determination of significant disproportionality by race or ethnicity is based on a collection and examination of data and not on a district's policies, procedures, or practices. This requirement is clearly reflected in § 300.646. We do not believe it is appropriate to change § 300.646 because the commenter's suggestion is

inconsistent with the provisions in section 618(d) of the Act.

With respect to the definition of significant disproportionality, each State has the discretion to define the term for the LEAs and for the State in general. Therefore, in identifying significant disproportionality, a State may determine statistically significant levels. The State's review of its constituent LEAs' policies, practices, and procedures for identifying and placing children with disabilities would occur in LEAs with significant disproportionality in identification, placement, or discipline, based on the examination of the data. The purpose of this review is to determine if the policies, practices, and procedures are consistent with the Act. Establishing a national standard for significant disproportionality is not appropriate because there are multiple factors at the State level to consider in making such determinations. For example, States need to consider the population size, the size of individual LEAs, and composition of State population. States are in the best position to evaluate those factors. The Department has provided guidance to States on methods for assessing disproportionality. This guidance can be found at: *http://www.ideadata.org/docs/Disproportionality%20Technical%20Assistance%20Guide.pdf.*

*Changes:* None.

*Comment:* A few commenters suggested adding gender to the analysis of disproportionality. The commenters expressed concern that males are over-identified as children with disabilities.

*Discussion:* Although States will be collecting data on the gender of children with disabilities for other purposes, the Act does not require an analysis for disproportionality on the basis of gender. We are concerned about increasing the burden on States. Given that there is no statement of congressional intent indicating the need to do this analysis, we do not believe it should be included in the regulations.

*Changes:* None.

*Comment:* One commenter expressed concern that the regulations are not consistent with the statutory requirements for data collection on suspension, expulsion, identification, and placement.

*Discussion:* We disagree with the commenter. The regulations in § 300.646 reflect the requirements in section 618(d) of the Act.

*Changes:* None.

*Comment:* Several commenters raised concerns and made recommendations regarding § 300.646(b)(2), which requires the State to require any LEA

identified with significant disproportionality to reserve the maximum amount under section 613(f) of the Act for comprehensive, coordinated early intervening services to serve children in the LEA, particularly, but not exclusively children in those groups that were significantly overidentified. A few commenters recommended that LEAs not be required to reserve the maximum amount under section 613(f) of the Act. Several commenters recommended adding language in § 300.646(b)(2) to require LEAs to monitor the effect of early intervening services on disproportionate representation.

*Discussion:* The requirements in § 300.646(b)(2) follow the specific language in section 616(d) of the Act. To allow LEAs to reserve less than the maximum amount required in section 613(f) of the Act when significant disproportionality is identified would be inconsistent with the Act. Therefore, we do not believe a change in this requirement is appropriate.

As part of the requirements in §§ 300.600 through 300.604, States must report annually on indicators in three monitoring priority areas. One of the monitoring priority areas is disproportionality, for which there are two indicators. In addition to annually reviewing State performance on each indicator in each monitoring priority area, the State must review each LEA against indicators established for each monitoring priority area, so the State will be examining data annually to identify any disproportionality. If disproportionality is identified in LEAs, the policies, procedures, and practices of the LEAs will be examined to determine if they are leading to inappropriate identification, and, pursuant to section 618(d)(2)(C) of the Act and § 300.646(b)(3), the LEA will be required to report publicly on the revision of policies, practices, and procedures used in identification or placement. It is, therefore, unnecessary to add a requirement that LEAs monitor the effect of early intervening services on disproportionality because the LEAS will have to continue to publicly report on their revision of policies, practices and procedures until the significant disproportionality in the LEA is eliminated. We believe that the intent of the suggestion will be accomplished through this other requirement.

*Changes:* None.

## Subpart G—Authorization, Allotment, Use of Funds, and Authorization of Appropriations

### Outlying Areas, Freely Associated States, and the Secretary of the Interior (§ 300.701).

*Comment:* None.

*Discussion:* The requirements of Part B of the Act that were listed in the NPRM under § 300.701(a)(1)(ii)(A)(1) through (5) did not include all of the requirements that apply to freely associated States. To ensure that freely associated States do not interpret these regulations as including all of the requirements in Part B of the Act that apply to them, we are removing these provisions. Section 300.701(a)(1)(ii) and (2) clarifies that, consistent with section 611(b)(1)(A)(ii) of the Act, freely associated States must meet the applicable requirements that apply to States under Part B of the Act.

*Changes:* We have removed paragraphs (1) through (5) in § 300.701(a)(1)(ii)(A).

### Technical Assistance (§ 300.702)

*Comment:* One commenter requested that the regulations clarify whether the technical assistance funds referred to in § 300.702 are available to both SEAs and lead agencies under Part C of the Act.

*Discussion:* Section 300.702, consistent with section 611(c) of the Act, allows the Secretary to reserve funds under Part B of the Act to support technical assistance activities authorized in section 616(i) of the Act. Under section 642 of the Act, section 616 applies to the early intervention programs for infants and toddlers with disabilities under Part C of the Act. Section 616(i) of the Act requires the Secretary to review the data collection and analysis capacity of States to ensure that data and information necessary for monitoring the implementation of Parts B and C of the Act are collected, analyzed, and accurately reported to the Secretary, and to provide technical assistance, as needed. Therefore the technical assistance referred to in § 300.702 can be provided to both SEAs and lead agencies under Part C of the Act.

*Changes:* None.

### Allocations to States (§ 300.703)

*Comment:* A few commenters noted that States need additional funding to comply with these regulations.

*Discussion:* The Department does not have the authority to allocate more funds than Congress appropriates. Section 300.703, consistent with section 611(d) of the Act, describes how the appropriated funds must be distributed to States.

*Changes:* None.

### State-Level Activities (§ 300.704)

*Comment:* One commenter suggested adding language in the regulations requiring public agencies to provide technical assistance to personnel in residential treatment facilities. The commenter stated that this assistance would help residential treatment facilities meet the requirements of FAPE for the children they serve.

*Discussion:* Section 300.704(a)(1), consistent with section 611(e)(1) of the Act, allows, but does not require, States to use funds reserved for State administration to provide technical assistance to other programs that provide services to children with disabilities, which could include residential treatment facilities providing services to children with disabilities under the Act. Section 300.704(b)(4)(i), consistent with section 611(e)(2)(C)(i) of the Act, allows, but does not require, States to use funds reserved for other State-level activities to provide support and direct services, including technical assistance, personnel preparation, and professional development and training, which could include technical assistance to staff who provide services to children with disabilities at residential treatment centers and other such facilities. Because the Act gives States the discretion to determine how to use these funds, so long as they are used in accordance with the requirements in Part B of the Act, the Department does not believe it would be appropriate to remove this discretion by regulation and require States to use these funds to provide technical assistance to particular types of facilities, as suggested by the commenter.

*Changes:* None.

*Comment:* We received a number of comments requesting that the regulations require States to use funds reserved for State-level activities for specific purposes. Some commenters stated that these funds should be used to find and train surrogate parents. Other commenters requested that these funds be used to support parent centers. One commenter requested that these funds be used for programs that employ well-researched best practices. Another commenter suggested that the funds be used for family involvement activities. One commenter requested that the regulations clarify that these funds may be used to purchase supplemental educational materials.

*Discussion:* The Act does not require States to use their funds reserved for other State-level activities for the purposes requested by the commenters. The Act also does not prohibit the use of funds for these purposes. Instead, States have discretion in determining how these funds are used, so long as they are used to carry out the activities in § 300.704(b)(3) and (4). Therefore, we do not believe it would be appropriate to regulate as suggested by the commenters.

*Changes:* None.

*Comment:* One commenter stated that the term "maximize" in § 300.704(b)(4)(v), regarding the use of funds to support the use of technology to maximize accessibility to the general education curriculum, was an "affirmative duty" and, thus, required more detailed instruction. This commenter also stated that the term "improve" in § 300.704(b)(4)(xi), regarding the use of funds to provide professional development to teachers who teach children with disabilities in order to improve academic achievement, was an "affirmative duty" and, thus, required more detailed instruction.

*Discussion:* The language referred to by the commenter is from the Act. The activities noted by the commenter are authorized under the Act but are not required. The Department has reviewed § 300.704(b)(4)(v) and (b)(4)(xi) and does not believe that additional detail is necessary, as States need the flexibility that the Act provides to appropriately meet the needs within the State.

*Changes:* None.

*Comment:* One commenter agreed with the provision in § 300.704(b)(4)(v) that allows States to use funds to support the use of technology to maximize access to the general education curriculum for children with disabilities. The commenter stated, however, that SEAs and LEAs would be unwilling to research and employ new technologies and asked who would be responsible for conducting this activity.

*Discussion:* Supporting the use of technology to maximize accessibility to the general education curriculum is a State-level activity that States are permitted, but not required, to fund. States have considerable flexibility in determining what State-level activities will be funded, provided the requirements of Part B of the Act are met. How a State implements a particular activity or program is a matter best left to each State to decide.

*Changes:* None.

*Comment:* One commenter stated that § 300.704(b)(4)(v), regarding the use of technology to maximize accessibility to the general education curriculum for

**46740**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

children with disabilities, lacked specificity and asked for definitions of the terms "universal design principles," "maximize accessibility to the general curriculum," and "maximum extent."

*Discussion:* The definition of *universal design,* as used in the Assistive Technology Act of 1998, as amended, is included in the *Analysis of Comments and Changes* section for subpart A. We believe this will clarify the meaning of "universal design principles," as used in § 300.704(b)(4)(v). The term "maximize accessibility to the general education curriculum" is sufficiently specific in the context used and does not need further definition. The term "maximum extent" is not used in § 300.704(b)(4)(v).

*Changes:* None.

Local Educational Agency High Cost Fund (§ 300.704(c))

*Comment:* One commenter expressed concern that the regulations for the high cost fund, particularly the reference to the cost of room and board for a residential placement, would discourage educational placements in the LRE. The commenter stated that many children with disabilities are sent out of their school districts for special education and related services and asked that the regulations ensure that this practice does not increase.

*Discussion:* The language regarding room and board in § 300.704(c)(4)(ii) was included to clarify that the cost of room and board for a necessary residential placement could be supported by the high cost fund. Section § 300.704(c)(4)(ii) clarifies that the cost of room and board for a residential placement must be determined necessary and be consistent with the LRE requirements in § 300.114. We believe this is adequate to ensure that educational placements in the LRE are not discouraged.

*Changes:* None.

*Comment:* One commenter stated that reimbursements from a high cost fund would be difficult to compute and requested a template to assist LEAs in their calculations. Another commenter requested a list of specific procedures that would be excluded from coverage by a high cost fund.

*Discussion:* How States implement the high cost fund is a matter left to the discretion of each State, so long as the State meets the requirements of Part B of the Act. Accordingly, the Department does not believe it would be appropriate to develop a template, prepared at the Federal level, or a list of specific procedures that would be excluded from coverage. Whether a particular expenditure is appropriate will vary

with the specific facts and circumstances of the situation.

*Changes:* None.

*Comment:* One commenter asked whether high cost funds could be used for court-ordered placements.

*Discussion:* Nothing in the Act or the regulations prohibits payment for providing special education and related services to high need children with disabilities in court-ordered placements, if a State wishes to fund such placements and the other provisions of Part B of the Act are met.

*Changes:* None.

*Comment:* A few commenters requested that the regulations include plans for continuing programs funded by high cost funds should these funds become unavailable.

*Discussion:* The availability of Federal support for a high cost fund, as described in § 300.704(c) and section 611(e)(3) of the Act, is based on a number of factors, including continued Federal appropriations for the Grants to States program and the continued authorization for such a fund under the Act. Funding of a high cost fund in a particular State is dependent on a State's decision to use a portion of its State-level set-aside for a high cost fund. This is a matter of State discretion and is not appropriate for regulation at the Federal level.

*Changes:* None.

*Comment:* A few commenters requested an opportunity for public comment before a State implements a high cost fund.

*Discussion:* Section 300.704(c)(3)(i), consistent with section 611(e)(3)(C)(ii) of the Act, requires an SEA to develop, annually review, and amend, as necessary, a State plan for a high cost fund. Under § 300.704(c)(3)(i)(A), the State plan must, among other components, establish, in consultation and coordination with representatives from LEAs, a definition of a high need child with a disability that meets certain criteria. This plan must be developed no later than 90 days after the State reserves funds for a high cost fund. Section 300.704(c)(3)(ii), consistent with section 611(e)(3)(C)(iii) of the Act, requires a State to make its final State plan for the high cost fund available to the public not less than 30 days before the beginning of the school year, including dissemination of such information on the State's Web site. Although there is nothing in the Act that requires that the public be given the opportunity to comment on the State's plan, there also is nothing in the Act that would prohibit a State from providing an opportunity for public comment prior to finalizing the State's

plan for the high cost fund. We believe the decision to provide opportunity for public comment is best left to each State.

*Changes:* None.

*Comment:* A few commenters asked if LEAs are obligated to participate in the State Medicaid program and whether States could limit the types of reimbursement to LEAs from Medicaid.

*Discussion:* LEAs are not obligated under the Act to participate in a State Medicaid program. Title XIX of the Social Security Act of 1965, as amended, controls Medicaid reimbursement for medical assistance for eligible individuals and families with low incomes and resources. Therefore, it would not be appropriate to address in these regulations whether States, under the Act, could limit the type of Medicaid reimbursement to LEAs.

*Changes:* None.

*Comment:* One commenter asked if there was any intent to develop criteria for the development of innovative cost sharing consortia, as stated in § 300.704(c)(1)(i)(B). The commenter stated that there are no regulations for submitting a State plan for innovative cost-sharing consortia, similar or parallel to the requirements associated with the high cost fund.

*Discussion:* The commenter is correct that the proposed regulations would not require the development of a State plan for the high cost fund that includes information or criteria about the development of innovative cost-sharing consortia. It is important that, if a State elects to reserve funds for supporting innovative and effective ways of cost sharing under § 300.704(c)(1)(i)(B), the State, in its State plan under § 300.704(c)(3)(i), include a description of how those funds will be used. Therefore, a change will be made to make this clear.

*Changes:* A new paragraph (F) has been added to § 300.704(c)(3)(i) to clarify that, if a State elects to reserve funds for supporting innovative and effective ways of cost sharing, it must describe in its State plan how these funds will be used.

*Comment:* One commenter asked whether State administrative funds could be used for administering the high cost fund.

*Discussion:* Section 300.704(c)(2) is clear that a State cannot use any of the funds the State reserves for the high cost fund for costs associated with establishing, supporting, and otherwise administering the fund. However, a State may use funds reserved for State administration under § 300.704(a) for administering the high cost fund.

*Changes:* None.

*Comment:* One commenter requested that the regulations require an SEA to describe in its State plan for the high cost fund the ways in which the SEA will work with State child welfare programs.

*Discussion:* Section 300.704(c)(3) incorporates the language in section 611(e)(3)(C) of the Act, regarding a State plan for the high cost fund. The Act does not require that the State plan include the ways in which the SEA will work with State child welfare agencies. However, there is nothing in the Act or these regulations that would prohibit a State from including such information in its plan if it chooses to do so. We believe that the decision whether to include this information in the State plan for the high cost fund is a matter best left to the State.

*Changes:* None.

*Comment:* A few commenters stated that parents, representatives of the State Advisory Panel, and other stakeholders should participate in developing the definition of a high need child for the purposes of the high cost fund.

*Discussion:* Section 300.704(c)(3)(i)(A), consistent with section 611(e)(3)(C)(i) of the Act, requires the SEA to establish a State definition of a high need child with a disability in consultation with LEAs. The Act does not require the involvement of parents, representatives of the State Advisory panel, or other stakeholders. However, there is nothing in the Act or these regulations that would prohibit a State from consulting with these or other groups, if the State chooses to do so. The Department believes that it would be inappropriate to require SEAs to consult with specific groups, because the appropriate groups for consultation will vary from State to State.

*Changes:* None.

Flexibility in Using Funds for Part C (§ 300.704(f))

*Comment:* A few commenters requested that § 300.704(f) require States that offer early intervention services to children with disabilities who are eligible for services under section 619 of the Act to notify families of the details of this program and a parent's right to change immediately to special education services should the parent desire. Another commenter recommended that § 300.704(f) require LEAs to obtain parental consent before providing early intervention services to children eligible for services under section 619 of the Act.

*Discussion:* Section 300.704(f) adopts the requirements of, and is consistent

with, section 611(e)(7) of the Act. Under section 611(e)(7) of the Act, funds that are available under §§ 300.704(a)(1), 300.705(c), and 300.814(e) may be used to develop and implement a State policy to provide services under Part C of the Act to children beyond the age of three. The provisions that authorize such programs are reflected in Part C of the Act, predominantly in section 635(c) of the Act, which contains specific notice and consent requirements. The notice of proposed rulemaking for Part C of the Act will address the notice, consent, and other requirements that apply to State lead agencies that elect to offer services to children with disabilities and their families beyond the age of three under section 635(c) of the Act. The public will have a separate opportunity to comment on the proposed regulations for Part C of the Act when they are published in the **Federal Register**. Accordingly, it would not be appropriate to include the requested information in these regulations implementing Part B of the Act.

*Changes:* None.

Allocation for State in Which By-Pass Is Implemented for Parentally-Placed Private School Children With Disabilities (§ 300.706)

*Comment:* None.

*Discussion:* We have determined that § 300.706 is no longer applicable. Under section 611(d) of the Act, distribution of funds under Part B of the Act to States is not based on child count. Section 300.191 details the amount of funds under Part B of the Act that the Secretary deducts from a State's allocation if a by-pass is implemented.

*Changes:* We have removed § 300.706, because it is no longer applicable.

Use of amounts by Secretary of Interior (§ 300.707)

Definitions (§ 300.707(a))

*Comment:* A few commenters requested that the Department add a new definition of LEA and SEA for the purposes of regulations related to schools operated or funded by the Secretary of the Interior. One commenter stated that the regulations would be clearer if these terms were defined for BIA-funded schools, because the definition of *state educational agency* makes no mention of the BIA. Another commenter recommended defining LEAs as BIA-funded schools and defining SEA as the Secretary of the Interior for the purposes of regulations related to schools operated or funded by the Secretary of the Interior.

*Discussion:* We believe the definition of *local educational agency* in § 300.28,

with a specific reference to BIA-funded schools in § 300.28(c), and the definition of *State educational agency* in § 300.41, along with the requirements in §§ 300.707 through 300.716, provide sufficient clarity on the Secretary of the Interior's responsibilities to implement the requirements of the Act. However, we understand that the definitions of *local educational agency* and *State educational agency* by themselves may not be directly applicable to the regulations related to schools operated or funded by the Secretary of the Interior. Therefore, the Department will consider taking action to clarify the definitions of *local educational agency* and *State educational agency* for the purpose of this regulation in the future.

*Changes:* None.

*Comment:* One commenter stated that the definition of *tribal governing body of a school* is similar to the definition of "tribal governing body" in the principal statute governing BIA-funded schools (section 1141 of the Education Amendments of 1978, 25 U.S.C. 2021(19)) and suggested using that definition if the intent was to define "tribal governing body." The commenter also noted that tribal governing body of a school is not used anywhere in the regulations.

*Discussion:* The Department agrees that the definition of "tribal governing body" in 25 U.S.C. 2021(19) is a better definition than the definition of *tribal governing body of a school*. The definition is more accurate and defines a term used in these regulations. We are replacing the definition of *tribal governing body of a school* with the definition of *tribal governing body*, as defined in 25 U.S.C. 2021(19): *Tribal governing body* means, with respect to any school, the tribal governing body, or tribal governing bodies, that represent at least 90 percent of the children served by such school.

*Changes:* The definition of *tribal governing body of a school* in § 300.707(a)(2) has been replaced with the definition of *tribal governing body* from 25 U.S.C. 2021(19).

Provision of Amounts for Assistance (§ 300.707(b))

*Comment:* One commenter suggested adding specific language to the regulations to require the Secretaries of the Interior and Education to meet the statutory deadlines for providing and distributing funds under Part B of the Act.

*Discussion:* Section 300.707(b), consistent with section 611(h)(1)(A) of the Act, sets specific dates for the Secretary of the Interior to allocate funds provided to the Secretary of the

**46742**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

Interior under the Act to elementary schools and secondary schools for Indian children operated or funded by the Secretary of the Interior. The Secretary of the Interior must allocate 80 percent of these funds by July 1 of each fiscal year, and the remaining 20 percent by September 30 of each fiscal year. The Act does not require the Secretary of Education to meet any deadline for providing and distributing funds to the Secretary of the Interior. Provision of funds under Part B of the Act to the Department of the Interior (DOI) will always depend on whether the DOI has properly established and maintained its eligibility. Therefore, we do not believe it would be appropriate to establish such a deadline.

*Changes:* None.

*Comment:* One commenter stated that BIA-funded schools do not require State accreditation and asked how a program affiliated with a BIA-funded school could be mandated by the State to be accredited.

*Discussion:* The commenter appears to be referring to current § 300.715(c), regarding counting children aged three through five who are enrolled in programs affiliated with BIA-funded schools that are State accredited. Current § 300.715(c) was removed because a State can no longer require a BIA-funded school to attain or maintain State accreditation.

*Changes:* None.

*Comment:* A few commenters recommended revising § 300.707(c) to clarify that, for children living on reservations who do not attend BIA-funded schools, the SEA in which the reservation is located is responsible for ensuring that the requirements of Part B of the Act are implemented, and if the reservation is in more than one State, the SEA in which the child resides is responsible.

*Discussion:* The Department agrees that there is a need to clarify that States are responsible for serving Indian children on reservations located in their State who are not attending BIA-funded schools. We will revise § 300.707(c) to clarify that, for children on reservations who do not attend BIA-funded schools, the State in which the reservation is located must ensure that all the requirements of Part B of the Act are implemented.

The Act does not address who is responsible if a reservation is located in more than one State. Under section 612(a)(1)(A) of the Act, a State must make FAPE available to all children with disabilities residing in the State. Therefore, as a general matter, if a reservation is located in more than one State, the State in which the child

resides would be responsible for ensuring that the requirements of Part B of the Act are met for that child.

*Changes:* Section 300.707(c) has been revised to clarify that, for children on reservations who do not attend BIA-funded schools, the State in which the reservation is located must ensure that all the requirements of Part B of the Act are met.

Use of Funds Under Part B of the Act (§ 300.710(a))

*Comment:* One commenter stated that the Secretary of the Interior has no statutory authority to reserve funds for administration under section 611(h)(1)(A) of the Act, and therefore, § 300.710 should be removed from the regulations.

*Discussion:* The Secretary of the Interior may reserve funds for administration under § 300.710. Section 300.707(b), consistent with section 611(h)(1)(A) of the Act, requires the Secretary of Education to provide amounts to the Secretary of the Interior to meet the need for assistance for the education of children with disabilities on reservations aged 5 to 21, inclusive, enrolled in elementary schools and secondary schools for Indian children operated or funded by the Secretary of the Interior. The amount of such payment for any fiscal year must be equal to 80 percent of the amount allotted for the Secretary of the Interior under section 611(b)(2) of the Act for that fiscal year.

Since the enactment of regulations implementing Pub. L. 94–142 in 1977, the regulations have permitted the Secretary of the Interior to use five percent of the funds under Part B of the Act allocated for the education of children with disabilities enrolled in BIA-funded schools for administration. The Act added the requirement in section 611(h)(1)(A) for 80 percent of the funds to be allocated to BIA-funded schools by July 1 of each fiscal year, and 20 percent of the funds allocated by September 30 of each fiscal year. Congress' intent in adding this requirement was to ensure that the Secretary of the Interior distributes funds under Part B of the Act quickly and efficiently to BIA-funded schools to ensure that they have the resources they need to provide services to children with disabilities. (See H. Rpt. 108–77, p. 92.) There is no indication that Congress intended to eliminate the Department's longstanding regulatory provision permitting the Secretary of the Interior to reserve funds for administration, which assist the Office of Indian Education Programs in carrying out its monitoring activities. Section

611(h)(4)(F) of the Act specifically prohibits the Secretary of the Interior from using any of the 20 percent of the funds under Part B of the Act allocated for coordinating services for preschool children with disabilities for administrative purposes. However, there is no provision that prohibits the Secretary of the Interior from using any of the 80 percent of funds under Part B of the Act allocated to provide special education and related services in BIA-funded schools for administrative purposes.

*Changes:* None.

Early Intervening Services (§ 300.711)

*Comment:* One commenter supported permitting BIA-funded schools to use funds under Part B of the Act for early intervening services, but stated that not all BIA-funded schools receive funds under Part B of the Act, because the BIA will not provide any such funds until a school uses 15 percent of its Indian School Equalization Program funds (ISEP). The commenter requested that the regulations specify that BIA-funded schools are permitted and encouraged to use their ISEP funds to provide early intervening services and that schools, upon doing so, would be eligible for funds under Part B of the Act.

*Discussion:* While the Act requires that the Secretary of the Interior allocate funds under Part B of the Act to BIA-funded schools to meet the educational needs of children with disabilities, the Act does not establish requirements for how those funds must be distributed to BIA-funded schools. The Secretary of the Interior requires that BIA-funded schools use 15 percent of ISEP formula funds for special education services before receiving funds under Part B of the Act. While the Department understands the concern that not every BIA-funded school will have special education needs sufficient to meet the 15 percent threshold and, therefore, may not receive any funds under Part B of the Act, the Department does not have the authority to permit or encourage BIA-funded schools to use their 15 percent ISEP threshold funds to provide early intervening services or to require the Secretary of the Interior to provide Part B funds to those schools once they have spent 15 percent of their ISEP funds on early intervening services.

*Changes:* None.

Plan for Coordination of Services (§ 300.713)

*Comment:* One commenter stated that the requirements in § 303.713 go beyond the legal authority of the Secretary of the Interior. The commenter stated that the Secretary of the Interior provides

services only in BIA-funded schools, and the Office of Indian Education Programs does not have jurisdiction over a State to ensure that the State is providing services to Indian children under Part B of the Act. In addition, the commenter stated that the term "all Indian children" was too broad, because the Secretary of the Interior is authorized to provide funding only for programs for children who are at least one-fourth Indian blood of a federally recognized tribe; residing on or near a reservation; and enrolled in a BIA-funded school.

*Discussion:* Section 300.713(a) and section 611(h)(5) of the Act do not require the Secretary of the Interior to provide services or funding to Indian children who are not at least one-fourth Indian blood of a federally recognized tribe, residing on or near a reservation, and enrolled in a BIA-funded school. These sections require the Secretary of the Interior to develop and implement a plan for the coordination of services for all Indian children with disabilities residing on reservations covered under Part B of the Act. In order to clarify the Secretary of the Interior's responsibility under this provision, we are revising § 300.713(a) to clarify that reservations covered under Part B of the Act means reservations served by elementary schools and secondary schools for Indian children operated or funded by the Secretary of the Interior.

Section 300.713(a) and section 611(h)(5) of the Act require that the plan address the coordination of services for all Indian children residing on those reservations. This includes Indian children residing on those reservations that are enrolled in public schools in the local school district, as well as Indian children that are enrolled in BIA-funded schools. This also includes Indian students incarcerated in State, local, and tribal juvenile and adult correctional facilities. We are revising § 300.713(b) to ensure that the plan provides for coordination of services benefiting all Indian children with disabilities, including services provided by SEAs and State, local, and tribal juvenile and adult correctional facilities.

*Changes:* Section 300.713(a) has been revised to require the Secretary of the Interior to develop and implement a plan for the coordination of services for all Indian children with disabilities residing on reservations served by elementary schools and secondary schools for Indian children operated or funded by the Secretary of the Interior. Section 300.713(b) has been revised to require the plan to provide for the coordination of services benefiting these children from whatever source,

including SEAs, and State, local, and tribal juvenile and adult correctional facilities.

Establishment of Advisory Board (§ 300.714)

*Comment:* One commenter requested definitions of "collaboration" and "collaborated teachers."

*Discussion:* We do not believe it is necessary to define "collaboration" in these regulations, because it is a commonly used term, which means working jointly with others, especially in an intellectual endeavor. Although the Act does not prohibit the Department from regulating on this issue, we do not believe it is necessary. The term "collaborated teachers" is not used in the Act or these regulations and, thus, is not appropriate for inclusion in the definitions in these regulations.

*Changes:* None.

## Subpart H—Preschool Grants for Children with Disabilities

Allocation for State in Which By-Pass Is Implemented for Parentally-Placed Private School Children With Disabilities (§ 300.811)

*Comment:* None.

*Discussion:* We have determined that § 300.811, regarding allocation for a State in which by-pass is implemented for parentally-placed private school children with disabilities, is no longer applicable. Under section 619(c) of the Act, distribution of Part B funds to States is not based on child count. Section 300.191 details the amount of Part B funds the Secretary deducts from a State's allocation if a by-pass is implemented.

*Changes:* We are removing § 300.811 from the final regulations.

Subgrants to LEAs (§ 300.815)

*Comment:* One commenter asked whether the base year that applies to section 611 of the Act also applies to section 619 of the Act.

*Discussion:* The base year that applies to section 611 of the Act is not the same as the base year that applies to section 619 of the Act. The formula for allocating funds to LEAs under sections 611 and 619 of the Act is based on the amount of program funds received in a prior year (the base year), the relative numbers of children enrolled in public and private elementary schools and secondary schools within the LEA's jurisdiction, and the relative numbers of children living in poverty. Under section 619(g)(1)(A) of the Act, the base year for allocating section 619 funds to LEAs under the Preschool Grant program is Federal fiscal year (FFY)

1997. Under section 611(f)(2)(A) of the Act, the base year for allocating section 611 funds to LEAs under the Grants to States for the Education of Children with Disabilities Program is FFY 1999.

*Changes:* None.

**Executive Order 12866**

*Costs and Benefits*

Under Executive Order 12866, we have assessed the costs and benefits of this regulatory action.

Summary of Public Comments

The Department received four comments on the role of school psychologists in administering IQ tests as described in the proposed analysis of the costs and benefits of this regulatory action. The first commenter stated that it is inaccurate to conclude that fewer school psychologists will be needed, and asserted that school psychologists typically do more than administer IQ tests to students. The second commenter stated that public agencies could realize savings under the proposed regulation by reducing the amount of time school psychologists spend conducting cognitive assessments to document IQ discrepancies. The third commenter requested that the Department remove all language suggesting that potential savings may result from the need for fewer school psychologists to administer IQ tests. The fourth commenter stated that time saved on formal assessments as a result of the need to conduct fewer IQ tests could be used by school psychologists to train school staff in research-validated instructional and behavioral interventions, and to engage in other pro-active pre-referral policies.

All of these comments were considered in conducting the analysis of the costs and benefits of the final regulations. All of the Department's estimates and assumptions on which they are based are described below.

Summary of Costs and Benefits

Costs and Benefits of Statutory Changes

For the information of readers, the following is an analysis of the costs and benefits of the most significant statutory changes made by the Act that are incorporated into the final regulations governing the Assistance to States for the Education of Children with Disabilities program under Part B of the Act. In conducting this analysis, the Department examined the extent to which the regulations add to or reduce the costs for public agencies and others in relation to the costs of implementing the program regulations prior to the enactment of the new statute. Based on

this analysis, the Secretary has concluded that the statutory changes reflected in these final regulations will not impose significant net costs in any one year, and may result in savings to SEAs and LEAs. An analysis of specific provisions follows:

Requirement for State Certification for Highly Qualified Special Education Teachers

Section 300.156(c) requires that each person employed as a public school special education teacher who teaches in an elementary, middle, or secondary school be highly qualified, as defined in § 300.18, by the deadline established in section 1119(a)(2) of the ESEA, no later than the end of the 2005–2006 school year. Section 300.18(b)(1) requires that every public elementary and secondary school special education teacher obtain full State certification as a special education teacher or pass the State special education teacher licensing examination, and hold a license to teach in the State as a special education teacher as one of the conditions of being considered highly qualified to teach as a special education teacher. Previously, special education teachers were not required by Federal law to be certified as special education teachers in their States. The regulations preclude teachers for whom the special education certification or licensure requirements have been waived on an emergency, temporary, or provisional basis from meeting the definition of a highly qualified special education teacher. Teachers employed by a public charter school are exempt from these requirements and are subject to the requirements for highly qualified teachers in their State's public charter school law.

The impact of the requirement in the final regulations that all special education teachers have full special education certification depends on whether States and districts comply with the requirement by helping existing teachers who lack certification acquire it, or by hiring new fully-certified teachers, or some combination of the two.

According to State-reported data collected by the Department's Office of Special Education Programs, certification or licensure requirements have been waived for eight percent of special education teachers, or approximately 30,000 teachers. If States and districts respond to the statutory change reflected in the final regulations by hiring certified teachers to fill these positions, it could cost well over $1 billion to cover the salaries for a single year. (Occupational Employment and Wages Survey, November 2004, indicates a median national salary of $44,330 for elementary school teachers and $46,300 for secondary school teachers.) However, given that the *Study of Personnel Needs in Special Education* (SPENSE) found that in 1999–2000, 12,241 positions for special education teachers were left vacant or filled by substitute teachers because suitable candidates could not be found, it is unlikely that States and districts can meet this requirement through hiring.

The SPENSE study also found that 12 percent of special education teachers who lack full certification in their main teaching assignment field are fully certified in their main teaching assignment field in another State. This means that States should be able to certify an estimated 3,600 additional special education teachers at relatively little expense through reciprocal certification agreements with other States.

Responses to the 1999–2000 *Schools and Staffing Survey* indicate that nearly 10 percent (approximately 3,000 teachers) of special education teachers who lacked full certification, including those teaching under provisional, temporary, or emergency certification, were enrolled in a program to obtain State certification. If teachers already participating in a certification program are presumed to be within 10 semester hours of meeting their coursework requirements and the estimated cost of a semester hour in a university or college program is $200, then it would cost $6 million to help these teachers obtain full State certification. If teachers require more than 10 semester hours to complete their certification programs, it is unlikely they will be able to obtain certification through coursework in a timely manner.

States and districts are unlikely to be able to meet these requirements entirely through reciprocity agreements and college and university programs. The above estimates involve fewer than 7,000 of the approximately 30,000 teachers who lack full certification. Other options States and districts might use to certify the more than 23,000 remaining teachers include assessments of academic skill and subject matter knowledge and professional development. Assessment requirements for special education teachers vary across States and teaching assignment fields, but most States require at least two subject matter tests, a general test on core content knowledge, and a disability-specific test, for special education teacher certification. The average cost of each test is $75. The SPENSE study found that one-fourth of beginning special education teachers who took a certification test reported having to take it more than once before passing. If States and districts certified the remaining 23,000 teachers through existing assessments and 25 percent of the teachers took the tests twice, the cost would be approximately $4.3 million.

Some subset of special education teachers currently teaching through waivers will require additional training to obtain special education certification. The cost of certifying these teachers depends on State special education certification requirements and the types of professional development needed to help these teachers meet the requirements. Most studies in the year 2000 found that district expenditures for professional development range from one to four percent of a district's total budget or $2,062 per teacher. If 18,000 teachers need additional training, costing an average expenditure of $2,000 per teacher for professional development, the cost of certifying these teachers through training would be $36 million.

Because there is little information available on what is required to implement these statutory changes and the cost of doing so, the Secretary concludes that the cost may be significant given the number of special education teachers who lack certification. The Secretary further concludes that the benefits of State certification may not necessarily outweigh the costs.

The Secretary believes that teacher certification can be a valuable tool in ensuring that teachers have the knowledge and skills they need to help students meet high academic standards. Because the highly qualified teacher requirements in the ESEA, which focus on content knowledge, already applied to special education teachers providing instruction in core academic subjects, the benefits of requiring special education teachers to also meet State certification requirements for special education teachers will largely depend on the extent to which these requirements reflect pedagogical knowledge and other teacher characteristics that are likely to have a positive effect on achievement of students with disabilities. As of now, there is minimal research showing the relationship between special education certification and academic achievement for students with disabilities.

Special Education Teachers Teaching to Alternate Achievement Standards

Section 9101 of the ESEA requires that teachers of a core academic subject

have full State teacher certification, hold at least a bachelor's degree, and be able to demonstrate knowledge of the subject matter they teach. Elementary-level teachers may demonstrate subject matter expertise by passing a rigorous State test of their subject knowledge and teaching skills in reading, writing, mathematics, and other areas of the basic elementary school curriculum, but middle or secondary school teachers must demonstrate a high level of competence in each of the academic subjects that they teach.

Section 300.18(c) permits special education teachers who teach core academic subjects exclusively to children who are assessed against the alternate achievement standards, established under 34 CFR 200.1(d), to fulfill the highly qualified teacher requirements in section 9101(23)(B) or (C) of the ESEA as applied to an elementary school teacher, or, in the case of instruction above the elementary level, to meet the requirements in section 9101(23)(B) or (C) for an elementary school teacher and have subject matter knowledge appropriate to the level of instruction being provided, as determined by the State, needed to effectively teach to those standards.

The cost of demonstrating subject area competence depends on the number of special education teachers who teach core academic subjects exclusively to children assessed against alternate achievement standards, the number of these teachers who already would be considered highly qualified under section 9101(23) of the ESEA and the number who would not, and the cost of helping special education teachers who are not highly qualified meet the highly qualified teacher requirements for teaching core academic subjects at the middle and high school levels (or replacing them with highly qualified teachers). The final regulations will generate savings for public agencies to the extent that the cost of helping teachers demonstrate subject area competence at the elementary level and obtain the knowledge appropriate to the level of instruction needed to teach to alternate achievement standards is lower than the cost of demonstrating subject matter competence at the level (middle or high school) at which they are teaching.

Under 34 CFR 200.1(d), States are permitted to assess up to one percent of students against alternate achievement standards. Based on estimated 2005–2006 school enrollment data compiled by the National Center for Education Statistics (NCES), States could assess up to 257,650 students in the middle and secondary levels (grades 6–12) against

alternate achievement standards. Based on a typical ratio of one teacher for every six students for instruction based on alternate achievement standards, as many as 43,000 special education teachers would be eligible to demonstrate that they fulfill the requirements for highly qualified teachers in section 9101 of the ESEA by demonstrating subject matter knowledge appropriate to the level of instruction being provided instead of the student's grade level. The number of affected teachers would depend on the extent to which these special education teachers are teaching exclusively children assessed against alternate achievement standards.

Although it is difficult to estimate the savings from these final regulations, the Secretary expects some savings to be produced because affected special education teachers are not required to demonstrate the same level of content knowledge as other middle and high school teachers of core academic subjects, thereby reducing the amount of additional coursework or professional development that is needed to meet State standards. The savings depend on the gap between what State standards require in terms of content knowledge for middle and high school teachers in various academic areas and what the affected teachers are able to demonstrate in the academic subjects they are teaching. Any savings will be offset in part by the cost of developing a means for the affected teachers to demonstrate subject matter knowledge appropriate to the level of instruction being provided. However, this cost is not expected to be significant. On balance, the Secretary concludes that the final regulations could produce significant savings without adversely affecting the quality of instruction provided to children assessed against alternate achievement standards.

Special Education Teachers Teaching Multiple Subjects

Section 300.18(d) permits special education teachers who are not new to the profession and teach two or more core academic subjects exclusively to children with disabilities to demonstrate competence in all the core academic subjects that the teacher teaches in the same manner as other elementary, middle, and secondary school teachers who are new to the profession under 34 CFR 200.56(c), including through a High Objective Uniform State Standards of Evaluation (HOUSSE) covering multiple subjects. The final regulations allow more time (two years after the date of employment) for new special education teachers who

teach multiple subjects and who have met the highly qualified requirements for mathematics, language arts, or science to demonstrate competence in other core academic subjects that they teach, as required by 34 CFR 200.56(c). The final regulations also clarify in § 300.18(e) that States have the option of developing separate HOUSSE standards for special education teachers, including a single HOUSSE for special education teachers of multiple subjects. States may not establish lesser standards for content knowledge for special education teachers, however.

We are unable to estimate the number of new teachers who teach two or more core academic subjects exclusively to children with disabilities who might be affected by the additional time afforded by the regulation. However, the extent of savings relates to the number of subjects taught by teachers of multiple subjects and the benefits of enabling the affected teachers to take whatever coursework they need to demonstrate competence in those additional areas over a longer period of time. Under prior law, public agencies might have needed to employ additional teachers (or redeploy some existing teachers) in those subject areas in which their newly hired teachers could not immediately demonstrate competence. The Secretary concludes that the benefits of being able to hire teachers who are qualified in at least one subject area outweigh any costs to students being taught by teachers who currently do not meet the requirements in other areas but are working to demonstrate their knowledge in other areas in which they teach.

Since States are not permitted to establish a lesser standard for the content knowledge requirements for special education teachers, they are not likely to realize additional savings due to reduced expenses for coursework or professional development for special education teachers who have not demonstrated content area knowledge. States may realize administrative savings, however, by being able to use separate HOUSSE standards that are both aligned with their licensing or certification standards for special education teachers and that cover multiple subjects. The Secretary concludes that the final regulations could produce administrative savings for States without adversely affecting the quality of instruction provided to children taught by special education teachers assessed through a separate mechanism that upholds the same standards for content knowledge.

## Limitation on Number of Reevaluations in a Single Year

Section 300.303(b)(1) prohibits conducting more than one reevaluation in a single year without the agreement of the school district and the parent. The previous regulations required reevaluations when conditions warranted one or at the request of either the child's parent or teacher.

Multiple evaluations in a single year are rare and are conducted when parents are not satisfied with the evaluation findings or methodology, children have a degenerative condition that affects the special education and related services needed, or very young children (ages three through four) are experiencing rapid development that may affect the need for services. The final regulations will not significantly affect the number of evaluations in the latter two instances because public agencies and parents are likely to agree that multiple evaluations are warranted. These cases, however, account for a very small number of the cases in which multiple evaluations are conducted each year.

Because evaluation findings may be used to support requests for due process hearings, we can use data on the number of requests for due process hearings to estimate the number of cases in which more than one evaluation in a single year would have been conducted because parents were not satisfied with the evaluation findings or methodology. Based on data from the recent Government Accountability Office (GAO) report, "Special Education: Numbers of Formal Disputes Are Generally Low and States Are Using Mediation and Other Strategies to Resolve Conflicts" (GAO–03–897), in which States reported receiving 11,068 requests for due process hearings during 1999–2000, we estimate that States would receive 20 requests for every 10,000 students with disabilities during the 2006–2007 school year. Based on the prevalence of complaints by parents, we estimate that, of the 1.7 million children estimated to be eligible for reevaluation in 2006–2007, multiple evaluations would have been requested by parents for an estimated 3,400 children. If we assume that these additional evaluations would cost about $1,000 each, public agencies could save $3.4 million under the final regulations by not agreeing to more than one evaluation of children in these instances.

### Triennial Evaluations

The previous regulations required a school district to conduct an evaluation of each child served under the Act every three years to determine, among other things, whether the child was still eligible for special education. The previous regulations also permitted the evaluation team to dispense with additional tests to determine the child's continued eligibility if the team concluded that this information was not needed and the parents provided consent. Section 300.303(b)(2) permits districts to dispense with the triennial evaluation when the child's parents and the public agency agree that a reevaluation is unnecessary. The impact of this change depends on the following factors: the number of children eligible for a reevaluation, the cost of the evaluation, and the extent to which districts and parents agree to waive reevaluations.

Published estimates of the cost of multidisciplinary evaluations range from $500 to $2,500, but these estimates may overestimate potential savings because testing is a significant factor in the cost of evaluations, and districts are already permitted to dispense with additional testing when extant data are sufficient for reevaluation. The extent to which States and districts eliminated unnecessary testing during triennial evaluations under the previous regulations is unclear, but program officers estimate that additional testing or observation by a school psychologist is not needed for as many as half of the approximately 1.7 million children eligible for triennial evaluations each year. In the estimated 850,000 cases in which additional testing is not needed, review of the extant data may still be warranted to determine if a child still needs special education and related services under the Act or to assess whether any additions or modifications to the special education and related services being provided are needed to help the child meet the child's IEP goals. Even if additions or modifications to special education and related services are not likely, parents may not want to dispense with the triennial evaluation if they believe further information could be gained from the extant data or they want to compare their child's progress against his or her previous assessments. If parents and the district agree that a reevaluation is not needed in 15 percent, or 127,500, of these cases and a reevaluation using only extant data would have cost $150, the final regulations could save $19.125 million.

These savings will be partially offset by increased administrative costs associated with obtaining consent from parents to dispense with reevaluation. To estimate the cost of obtaining parental consent, the Department assumes that schools could use a standard pre-printed document that would take approximately 15 minutes of administrative personnel time to fill out and send to parents. In addition, we estimate that an average of 2.5 additional written notices or telephone calls would be needed to obtain consent, requiring 15 minutes of administrative personnel time per additional contact. At an average hourly compensation of $25, the cost to public agencies of obtaining parental consent would be $2.8 million, resulting in estimated net savings to public agencies from the final regulations of $16.3 million.

### IEP Team Attendance

Section 300.321(e)(1) permits certain members of the IEP Team to be excused from attending an IEP Team meeting, in whole or in part, if the parent of the child with a disability and the public agency agree in writing that the member's attendance is not necessary because the member's area of the curriculum or related services is not being modified or discussed. The previous regulations required that all IEP Team meetings include the parents of the child, at least one regular education teacher (if the child is, or may be, participating in the regular education environment), at least one special education teacher, a representative of the public agency, and someone who could interpret the instructional implications of the evaluation results (who may be one of the other required IEP Team members). The extent to which public agencies will realize savings from the final regulations depends on which team members are excused from how much of the meeting. If the average IEP Team meeting lasts 1.5 hours and requires a half an hour of teacher preparation, then we estimate that the opportunity costs for a teacher of attending a meeting (based on average compensation per hour of $48) would be $96. If we assume an average of 1.2 IEP Team meetings are held for each of the 6.947 million children with disabilities, then 8.34 million IEP Team meetings will be held in 2006–2007. If one teacher could be excused from five percent of these meetings, the final regulation could result in savings of $40 million.

These savings will be partially offset by increased administrative costs associated with obtaining written consent from parents and public agency staff. Based on the above estimate of the cost of obtaining consent from parents under § 300.303(b)(2), the Department estimates that the cost to public agencies of obtaining written consent from these parents would be $9.1

ED-000208

million, resulting in net savings to public agencies from the final regulations of $30.9 million.

Section 300.321(e)(2) permits certain members of an IEP Team to be excused from attending an IEP Team meeting that involves a modification to or discussion of the member's area of the curriculum or related service if the parent and the public agency consent in writing to the excusal and the member submits written input to the parent and the other members of the IEP Team prior to the meeting. The change is unlikely to generate notable savings because reduced time spent in meetings is likely to be offset by the time required to draft written input, send it to the parents and other IEP Team members, and secure the consent of parents and public agency to the excusal. In cases in which IEP Team meetings take longer than the average time of 1.5 hours, there are likely to be controversial issues or significant modifications to the IEP under discussion. Parents are presumably less likely to consent to the excusal of team members in these instances.

Definition of Individualized Education Program (IEP)

Section 300.320(a)(2)(i) requires that each IEP include a statement of measurable annual goals, including academic and functional goals, for the child. The previous regulations required that each IEP contain benchmarks or short-term objectives for each of the annual goals. By eliminating the need to develop benchmarks or short-term objectives, the final regulations could result in teachers spending less time on each IEP. Under § 300.320(a)(2)(ii), however, IEPs for the estimated 486,000 children with disabilities who take alternate assessments aligned to alternate achievement standards would still be required to include a statement of benchmarks or short-term objectives.

Based on average compensation for teachers of $48 per hour, a reduction in time as modest as 15 minutes could save approximately $12 per IEP or $77.5 million total in opportunity costs for teachers related to the development of IEPs during the 2006–2007 school year for the 6.461 million children with disabilities who do not take alternate assessments aligned to alternate achievement standards.

Amendments to an IEP

When changes to a child's IEP are needed after the annual IEP Team meeting for the school year has been held, § 300.324(a)(4) allows the parent of a child with a disability and the public agency to agree to forego a meeting and develop a written document to amend or modify the child's current IEP. Under the previous regulations, the IEP Team was required to reconvene in order to make amendments to an IEP. Based on our estimate of an average of 1.2 IEP Team meetings per child per year, approximately 1.4 million IEP Team meetings beyond the required annual IEP Team meeting would be held during the 2006–2007 school year. If half of these meetings concerned amendments or modifications to an IEP and parents and agency representatives agreed to forego a meeting and develop a written document in half of these cases, then 350,000 IEP Team meetings would not be needed. The combined opportunity costs for personnel participating in a typical IEP Team meeting are estimated at $307. If drafting a written document to amend or modify an IEP is assumed to cost half as much as a meeting, then this change could result in savings of $53.7 million.

Procedural Safeguards Notice

Section 300.504(a), which incorporates changes in section 615(d)(1) of the Act, requires that a copy of the procedural safeguards notice be given to parents of children with disabilities only once a school year, except that a copy must also be given when an initial evaluation or parent request for an evaluation occurs; the first time a due process hearing is requested during a school year; when the decision to take disciplinary action is made; and when a parent requests the notice. The prior law required that a copy of the procedural safeguards notice be given to the parents upon initial referral for an evaluation, each notification of an IEP Team meeting, each reevaluation of the child, and the registration of each request for a due process hearing. Under the final regulations, a copy of the procedural safeguards notice no longer has to be given to parents with each notice for an IEP Team meeting or every time a request for a due process hearing is received. Instead, the document only has to be given to parents once a year, and the first time a due process hearing is requested in a year, when the decision to take disciplinary action is made, when a copy of the document is specifically requested by a parent, or when an initial evaluation or request for a reevaluation occurs.

To determine the impact of this change, it is necessary to estimate the savings created by providing fewer notices to parents who are notified about more than one IEP Team meeting during the year or who file more than one request for a due process hearing. Given the small number of hearing requests in a year (about 20 per 10,000 children with disabilities), our analysis will focus on the number of parents involved in more than one IEP Team meeting. Although we lack detailed data on the number of IEP Team meetings conducted each year, we estimate that approximately 6.947 million children with disabilities will be served in school year 2006–2007. For the vast majority of these children, we believe there will be only one IEP Team meeting during the year. For purposes of estimating an upper limit on savings, if we assume an average of 1.2 meetings per year per child, 1.39 million children will have two IEP Team meetings each year and the change reflected in § 300.504(a) will result in 1.39 million fewer procedural notices provided to parents. While some people may believe this change represents a significant reduction in paperwork for schools, the actual savings are likely to be minimal given the low cost of producing a notice of this size (about 10 pages) and the small amount of administrative staff time involved in providing this notice to parents (about 10 minutes). Taking all of this into consideration, total savings are unlikely to exceed $5 million.

Due Process Request Notices

Section 300.511(d) prohibits the party who requested the due process hearing from raising issues not raised in the due process request notice, unless the other party agrees. Under previous regulations, there was no prohibition on raising issues at due process hearings that were not raised in the due process notice.

By encouraging the party requesting the hearing to clearly identify and articulate issues sooner, the final regulations could generate actual savings by facilitating early resolution of disagreements through less costly means, such as mediation or resolution meetings. But early identification of issues could come at the cost of more extensive involvement of attorneys earlier in the process. At the same time, prohibiting the party requesting the hearing from raising new issues at the time of the hearing could result in additional complaints or protracted conflict and litigation. On balance, net costs or savings are not likely to be significant.

Using data from recent State data collections conducted by the Consortium for Appropriate Dispute Resolution in Special Education (CADRE), in which States reported receiving 12,914 requests for due process hearings during 2000–2001, we

estimate that there will be approximately 14,059 requests in 2006–2007. Because some parties already hire attorneys or consult other resources such as advocates or parent training centers to develop the request for due process, the Department assumes that only a portion of the requests would be affected by this new requirement. Although we have no reliable data on average attorneys' fees in due process cases, for purposes of this analysis, the Department assumes an hourly rate of $300 as an upper limit. The Department further assumes that each instance in which a party chooses to hire an attorney sooner as a result of this change will involve no more than three additional hours of work. Even if we assume that parties requesting the hearing will incur this additional cost in the case of 8,000 of the expected requests for due process, the total costs would not be significant (less than $8 million), and could be outweighed by the benefits of early identification and resolution of issues. Although such benefits are largely unquantifiable, early identification and resolution of disputes would likely benefit all parties involved in disputes.

Resolution Meetings

Section 300.510 requires the parents, relevant members of the IEP Team, and a representative of the public agency to participate in a resolution meeting, prior to the initiation of a due process hearing, unless the parents and LEA agree to use mediation or agree to waive the requirement for a resolution meeting. The impact of these final regulations will depend on the following factors: the number of requests for due process hearings, the extent to which disagreements are already resolved without formal hearings, the likelihood that parties will agree to participate in mandatory resolution meetings instead of other potentially more expensive alternatives to due process hearings (e.g., mediation), and the likelihood that parties will avoid due process hearings by reaching agreement as a result of mandatory resolution meetings.

Available data suggest that overall savings are not likely to be significant because of the small number of due process requests and the extent to which disagreements are already being successfully resolved through mediation.

Based on data reported in a recent CADRE State data collection in which States reported receiving 12,914 requests for due process hearings during 2000–2001, we estimate that there will be approximately 14,059 requests for

due process hearings in school year 2006–2007. Based on data from the same study, we also estimate that the large majority of these disagreements will be successfully resolved through mediation or dropped. Out of the 12,914 requests for school year 2000–2001, approximately 5,536 went to mediation and only 3,659 ended up in formal hearings. Assuming no change in the use and efficacy of mediation, we predict that 6,028 requests would go to mediation in school year 2006–2007. We further predict that another 4,047 complaints will be dropped, leaving no more than 3,985 requests for due process hearings that would require resolution meetings.

Because of the high cost of due process hearings and the low expected cost of conducting a resolution meeting, there would likely be some savings for all parties involved if resolution meetings were relatively successful in resolving disagreements. For example, California reports an average cost of $18,600 for a due process hearing, while Texas reports having spent an average of $9,000 for a hearing officer's services. Anticipating that attorneys will participate in approximately 40 percent of the predicted 3,985 resolution meetings (including drafting legally binding agreements when parties reach agreement), we expect resolution meetings to cost just over twice the average cost of IEP Team meetings, or approximately $700 per meeting. Even with a very low success rate (eight percent), given the expected costs of these meetings compared to the high cost of conducting a hearing, all parties involved would likely realize some modest savings. However, because disputes that result in formal hearings tend to be the most difficult to resolve, we do not expect that mandatory resolution meetings will be highly successful in resolving such cases. By definition, these are cases in which the parties are not amenable to using existing alternatives to formal hearings such as mediation. Moreover, assuming an average cost of between $10,000 and $20,000 per due process hearing, even if as many as 20 percent of the 3,985 complaints were successfully resolved through resolution meetings, net savings still would not exceed $10 million. (Note that it is unclear to what extent data on average mediation and due process hearing costs account for LEA opportunity costs (e.g., cost per teacher and/or administrator participating). To the extent that these data do not reflect the opportunity costs of participating LEA officials and staff, we have

overestimated the potential savings from resolution meetings.)

Beyond those savings to all parties resulting from reductions in the total number of formal hearings, we also expect some additional savings to result from parties agreeing to participate in resolution meetings instead of mediation, particularly if the resolution meetings are as effective as mediation in resolving disagreements. However, unlike due process hearings, the expected cost of conducting a resolution meeting ($700 per meeting) is only somewhat less than the cost of a mediation session (between $600 and $1,800 per session). Because the cost differential between resolution meetings and mediations is relatively small (compared to the difference in cost between resolution meetings and due process hearings) the potential for savings generated by parties agreeing to resolution meetings instead of mediation is minimal.

The Secretary concludes that requiring parties to participate in resolution meetings prior to due process hearings could generate modest savings for all parties to disputes, insofar as mandatory resolution meetings could result in fewer due process hearings and may be used as a less expensive alternative to mediation.

Manifestation Determination Review Procedures

Section 300.530(e) and (f) incorporate the change in the statutory standard for conducting manifestation determination reviews. Under the prior law, the IEP Team could conclude that the behavior of a child with a disability was not a manifestation of the child's disability only after considering a list of factors, determining that the child's IEP and placement were appropriate, and that FAPE, supplemental services, and behavioral intervention strategies were being provided in a manner consistent with the child's IEP. Previous law also required the IEP Team to consider whether a child's disability impaired the child's ability to understand the impact and consequences of the behavior in question, and to control such behavior. The Act eliminated or substantially revised these requirements. The final regulations simply require an IEP Team to review all relevant information in the child's file to determine if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability, or if the conduct in question was the direct result of the LEA's failure to implement the IEP. The purpose of the change in the law is to simplify the discipline process and

make it easier for school officials to discipline children with disabilities when discipline is appropriate and justified.

Because fewer factors need to be considered during each manifestation determination review, the time required to conduct such reviews will likely be reduced, and some minimal savings may be realized. However, the more significant impact relates to secondary effects. Because it will be less burdensome for school personnel to conduct manifestation determinations, it is reasonable to expect an overall increase in the number of these reviews as school personnel take advantage of the streamlined process to pursue disciplinary actions against those children with disabilities who commit serious violations of student codes of conduct. This prediction is consistent with a recent GAO report ("Student Discipline: Individuals with Disabilities Education Act" (GAO–01–210)), which found that a "sizable minority of principals" voiced concern that discipline policies under previous law impeded proper disciplinary action for students with disabilities, and that some of these comments "may have stemmed from the additional time and resources that principals reportedly use to discipline special education students compared with regular education students." Even more importantly, the changes in the law will make it easier for review team members to conclude that the behavior in question is not a manifestation of a child's disability, enabling school personnel to apply disciplinary sanctions in more cases involving children with disabilities.

We have minimal data on the number of manifestation determination reviews being conducted. However, State-reported data for the 2002–2003 school year suggest that schools are conducting a relatively small number of manifestation reviews. According to these data, for every 1,000 children with disabilities, approximately 11 will be suspended or expelled for longer than 10 days during the school year (either through a single suspension or as a result of multiple short-term suspensions)—the disciplinary action triggering a manifestation review. (Please note that we have no way of accurately estimating what portion of short-term suspensions that add up to 10 days could be determined by school personnel to constitute a change in placement. Therefore, we assume, for purposes of this analysis, that 100 percent of these instances would require a manifestation review because they would be deemed a change in placement). Based on a recent GAO

study ("Student Discipline: Individuals with Disabilities Education Act" (GAO–01–210)), we assume that under previous law at least 85 percent of manifestation reviews resulted in disciplinary actions (e.g., long-term suspensions or expulsion). In other words, approximately 15 percent of all manifestation reviews did not result in disciplinary action because the behavior in question was determined to be a manifestation of the child's disability.

Without taking into consideration increases in the frequency of manifestation reviews, using suspension and expulsion data from previous years, we estimate that the total number of manifestation reviews in 2006–2007 will be approximately 87,880. If we assume that the streamlining reflected in the regulations will produce a 20 percent increase in the total number of manifestation reviews, we predict that 17,576 additional meetings will occur, for a total of 105,456 meetings.

Under the final regulations, the Secretary also expects an increase in the total number of manifestation reviews resulting in disciplinary actions, but it is not likely to be a significant increase. GAO's finding that there is little practical difference in how school personnel disciplined regular and special education students under previous law suggests that manifestation reviews are already highly likely to result in disciplinary actions.

The Secretary concludes that the final regulations will generate some minimal savings from the reduction in time required to conduct the manifestation reviews. Schools would also realize some qualitative benefits related to the increased likelihood that the outcome of the review will result in disciplinary action, thereby fostering a school environment that is safer, more orderly, and more conducive to learning. The Secretary acknowledges that the final regulations could create additional costs for parents of children who, but for this change, would not have been subject to disciplinary removals, to the extent that such parents disagree with the manifestation determination and choose to appeal it. On balance, the Secretary believes that the benefits likely to result from this change relating to school safety and order outweigh the costs to families.

**Authority To Remove Students With Disabilities to Interim Alternative Educational Settings**

Sections 300.530(g) through 300.532 incorporate two significant statutory changes relating to the authority of school personnel to remove children with disabilities to interim alternative

educational settings. First, the Act now gives school personnel the authority to remove to interim alternative educational settings children who have inflicted serious bodily injury to themselves, or others. Under previous law, school personnel were authorized to remove children to alternative settings only for misconduct involving: (1) The use and possession of weapons; and (2) the knowing possession, sale, or use of illegal drugs or controlled substances. The Act added the commission of serious bodily injury to this list. In cases involving serious bodily injury, school personnel would be able to unilaterally remove children with disabilities to interim alternative educational settings for up to 45 school days without having to request that a hearing officer review the facts to determine whether or not the child is substantially likely to harm him or herself or others. Second, the 45-day rule has changed. Under previous law, students could not be removed to interim alternative educational settings for more than 45 days. Now, under the Act, the comparable time limitation is 45 school days.

Although the addition of serious bodily injury significantly simplifies the process for removing a child who has engaged in such misconduct, the data suggest that the savings from the final regulations will be minimal. Recent Department of Justice data show that "fighting without a weapon" is by far the most common type of serious misconduct engaged in by all students. However, State-reported data suggest that, of the 20,000 instances in 2002–2003 in which children with disabilities were suspended or expelled for longer than 10 days, only 1,200 involved serious bodily injury or removal "by a hearing officer for likely injury." We estimate that approximately 6.947 million children with disabilities will be served during the 2006–2007 school year. Using these data, we project that there would have been approximately 1,283 instances in 2006–2007 in which a school district might have requested approval from a hearing officer to remove a child for inflicting serious bodily injury, if the law had not been changed. Taking into account the time that would have been spent by both relevant school administrators and the hearing officers and their estimated hourly wages (about $125 per hour for hearing officers and $50 per hour for school administrators), we conclude that the unilateral authority afforded school officials under the final regulations produce only minimal savings (less than $1 million).

A much more significant benefit relates to the enhanced ability of school officials to provide for a safe and orderly environment for all students in the 1,283 cases in which school officials would have been expected to seek and secure hearing officer approval for removing a child with a disability and the other cases in which they might not have taken such action, but where removal of a child with a disability who has caused injury is justified and produces overall benefits for the school.

The change in how days are to be counted (*e.g.,* from "calendar days" under previous law to "school days" under the final regulations) allows school officials to extend placements in alternative settings for approximately two additional weeks. This generates some savings to the extent that it obviates the need for school officials to seek hearing officer approval to extend a child's placement in an alternative setting.

While school personnel are not required to use the new authority to remove children who have inflicted serious bodily injury or to remove children for the total amount of time that is authorized, we acknowledge that it would create additional costs for schools that choose to take full advantage of this authority because of the added costs of providing services in interim alternative educational settings. Using data from a recent GAO study ("Student Discipline: Individuals with Disabilities Education Act" (GAO–01–210)), we estimate that approximately 3,007 children will be removed to an interim alternative educational setting in 2006–2007 for misconduct involving drugs or weapons and at least another 1,283 for misconduct involving serious bodily injury. Although we do not have data on the costs of educating these children in an alternative setting for 45 school days, the Secretary concludes that the costs of doing so will be outweighed by the qualitative benefits to schools associated with ensuring children a safe and orderly environment that is conducive to learning.

Costs and Benefits of Non-Statutory Final Regulatory Provisions

The following is an analysis of the costs and benefits of the non-statutory final regulatory provisions that includes consideration of the special effects these changes may have on small entities.

The final regulations primarily affect SEAs and LEAs, which are responsible for carrying out the requirements of Part B of the Act as a condition of receiving Federal financial assistance under the Act. Some of the changes also affect children attending private schools and consequently indirectly affect private schools.

For purposes of this analysis as it relates to small entities, the Secretary has focused on LEAs because these regulations most directly affect local public agencies. The analysis uses a definition of small school district developed by the NCES for purposes of its recent publication, *Characteristics of Small and Rural School Districts.* In that publication, NCES defines a small school district as "one having fewer students in membership than the sum of (a) 25 students per grade in the elementary grades it offers (usually K–8) and (b) 100 students per grade in the secondary grades it offers (usually 9–12)". Using this definition, approximately 38 percent of the Nation's public agencies in the 2002–2003 *Common Core of Data* were considered small and served three percent of the Nation's students. Approximately 17 percent of children in small districts had IEPs.

Both small and large districts will be affected economically by the final regulations, but no data are available to analyze the effect on small districts separately. For this reason, this analysis assumes that the effect of the final regulations on small entities will be roughly proportional to the number of children with disabilities served by those districts.

For school year 2006–2007, we project that approximately 48.6 million children will be enrolled in public elementary and secondary schools. Using the NCES definition and assuming that all districts grew at the same rate between school years 2002–2003 and 2005–2006, we estimate that in the 2006–2007 school year, approximately 1.46 million children will be enrolled in small districts. Based on the percentage of students in small districts with IEPs in 2002–2003, we estimate that in the 2006–2007 school year, these districts will serve approximately 248,000 children with disabilities of the 6.947 million children with disabilities served nationwide.

There are many provisions in the final regulations that will result in economic impacts, both positive and negative. The following analysis estimates the impact of the final regulations that were not required by the Act:

Procedures for Evaluating Children With Specific Learning Disabilities

Section 300.307(a) requires that States adopt criteria for determining whether a child has a specific learning disability. Under the final regulations, States may not require that LEAs use criteria based on a severe discrepancy between intellectual ability and achievement for determining whether a child has a specific learning disability. The final regulations also require that criteria adopted by States permit the use of a process that determines if the child responds to scientific, research-based intervention. States are also permitted to use other alternative procedures to determine if a child has a specific learning disability.

Before determining that a child has a specific learning disability, § 300.309(b) requires that the evaluation team consider data that demonstrate that prior to, or as part of the referral process, the child received appropriate instruction in regular education settings and that data-based documentation of repeated assessments of achievement during instruction was provided to the child's parents. If the child has not made adequate progress under these conditions after an appropriate period of time, the final regulations further require that the public agency refer the child for an evaluation to determine if special education and related services are needed. Under the final regulations, the child's parents and the team of qualified professionals, described in § 300.306(a)(1), are permitted to extend the evaluation timelines described in §§ 300.301 through 300.303 by mutual written agreement.

If the estimated number of initial evaluations each year is 1.7 million and the percentage of evaluations involving children with specific learning disabilities is equivalent to the percentage of all children served under Part B of the Act with specific learning disabilities, then the final regulations will affect approximately 816,000 evaluations each year. Depending on the criteria adopted by their States pursuant to § 300.307(a), public agencies could realize savings under the final regulations by reducing the amount of a school psychologist's time involved in conducting cognitive assessments that would have been needed to document an IQ discrepancy. However, these savings could be offset by increased costs associated with documenting student achievement through regular formal assessments of their progress, as required under § 300.309(b).

Although the cost of evaluating children suspected of having specific learning disabilities might be affected by the final regulations, the Department expects that the most significant benefits of the changes will be achieved through improved identification of children suspected of having specific learning disabilities. By requiring that States permit alternatives to an IQ-

discrepancy criterion, the final regulations facilitate more appropriate and timely identification of children with specific learning disabilities, so that they can benefit from research-based interventions that have been shown to produce better achievement and behavioral outcomes.

The final regulations may impose additional costs on small public agencies that currently lack capacity to conduct repeated assessments of achievement during instruction and provide parents with documentation of the formal assessments of their child's progress. These costs are likely to be offset by reduced need for psychologists to administer intellectual assessments. To the extent that small districts may not employ school psychologists, the revised criteria may alleviate testing burdens felt disproportionately by small districts under an IQ discrepancy evaluation model.

Transition Requirements

Section 300.321(b) modifies previous regulations regarding transition services planning for children with disabilities who are 16 through 21 years old. Public agencies are still required to invite other agencies that are likely to be responsible for providing or paying for transition services to the child's IEP Team meeting. If the invited agency does not send a representative, public agencies are no longer required to take additional steps to obtain the participation of those agencies in the planning of transition, as required under former § 300.344(b)(3)(ii).

Public agencies will realize savings from the change to the extent that they will not have to contact agencies that declined to participate in IEP Team meetings on transition planning. In school year 2006–2007, we project that public agencies will conduct 1.193 million meetings for children with disabilities who are 16 through 21 years old. We used data from the *National Longitudinal Transition Study 2* (NLTS2) on school contacts of outside agency personnel to project the number of instances in which outside agencies would be invited to IEP Team meetings during the 2006–2007 school year. Based on these data, we project that schools will invite 1.492 million personnel from other agencies to IEP Team meetings for these students during the 2006–2007 school year. The NLTS2 also collected data on the percentage of children with a transition plan for whom outside agency staff were actively involved in transition planning. Based on these data, we project that 432,800 (29 percent) of the contacts will result in the active participation of outside

agency personnel in transition planning for children with disabilities who are age 16 through 21.

We base our estimate of the savings from the change on the projected 1,059,200 (71 percent) instances in which outside agencies will not participate in transition planning despite school contacts that, under the previous regulations, would have included both an invitation to participate in the child's IEP Team meeting and additional follow-up attempts. If public agencies made only one additional attempt to contact the outside agency and each attempt required 15 minutes of administrative personnel time, then the change will save $6.6 million (based on an average hourly compensation for office and administrative support staff of $25).

Studies of best practices conducted by the National Center on Secondary Education and Transition indicate that effective transition planning requires structured interagency collaboration. Successful approaches cited in the studies included memoranda of understanding between relevant agencies and interagency teams or coordinators to ensure that educators, State agency personnel and other community service providers share information with parents and children with disabilities. The previous regulations focused on administrative contact instead of active strategic partnerships between agencies that facilitate seamless transitions for children with disabilities between school and adult settings. For this reason, the Department believes that the elimination of the non-statutory requirement that public agencies make additional attempts to contact other agencies will reduce administrative burden and allow public agencies to focus their efforts on interagency collaborative transition planning for children with disabilities.

**Paperwork Reduction Act of 1995**

The Paperwork Reduction Act of 1995 does not require you to respond to a collection of information unless it displays a valid OMB control number. We display the valid OMB control numbers assigned to the collections of information in these final regulations at the end of the affected sections of the regulations.

These final regulations include 9 information collection requirements associated with the following provisions: §§ 300.100 through 300.176, § 300.182, § 300.199, §§ 300.201 through 300.213, § 300.224, § 300.226, §§ 300.506 through 300.507, § 300.511, §§ 300.601 through 300.602, § 300.640,

§ 300.704, and § 300.804. A description of these provisions is given below with an estimate of the annual recordkeeping burden. Included in the estimate is the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing each collection of information.

Collection of Information: Annual State Application under Part B of the Act. §§ 300.100 through 300.176, § 300.182, and § 300.804. Each State is eligible for assistance under Part B of the Act for a fiscal year if the State submits a plan that provides assurances to the Secretary that the State has in effect policies and procedures to ensure that the State meets the eligibility criteria under Part B of the Act and these final regulations. Under the Act, States are no longer required to have on file with the Secretary policies and procedures to demonstrate to the satisfaction of the Secretary that the State meets specific conditions for assistance under Part B of the Act. Information collection 1820–0030 has been revised to reflect this change in the Act and these regulations.

Annual reporting and recordkeeping burden for this collection of information is estimated to average twelve hours for each response for 60 respondents, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Thus, the total annual reporting and recordkeeping burden for information collection 1820–0030 is estimated to be 720 hours.

Collection of Information: Part B State Performance Plan (SPP) and Annual Performance Report (APR). §§ 300.600 through 300.602. Each State must have in place, not later than one year after the date of enactment of the Act, a performance plan that evaluates the State's efforts to implement the requirements and purposes of Part B of the Act and these final regulations and describe how the State will improve such implementation. Each State shall report annually to the public on the performance of each LEA located in the State on the targets in the State's performance plan. The State must report annually to the Secretary on the performance of the State under the State's performance plan.

Annual reporting and recordkeeping burden for this collection of information is estimated to average 325 hours for each response for 60 respondents, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the

data needed, and completing and reviewing the collection of information. Thus, the total annual reporting and recordkeeping burden for information collection 1820–0624 is estimated to be 19,500 hours.

Collection of Information: Report of Children with Disabilities Receiving Special Education under Part B of the Individuals with Disabilities Education Act. §§ 300.640 through 300.645. Each State that receives assistance under Part B of the Act shall provide data each year to the Secretary and the public on children with disabilities by race/ ethnicity, disability, gender, and limited English proficiency status receiving special education and related services in each State.

Annual reporting and recordkeeping burden for this collection is estimated to average 9 hours for each of 60 State agencies and 2 hours for LEAs in each State. Thus, the total annual reporting and recordkeeping burden for collection 1820–0043 is 33,276 hours.

Collection of Information: Report of Children with Disabilities Subject to Disciplinary Removal. § 300.640. Each State must provide data to the Secretary and the public by race, ethnicity, limited English proficiency status, gender, and disability category on children with disabilities who are removed to an interim alternative educational setting and the acts or items precipitating those removals. Data must also be reported by race, ethnicity, limited English proficiency status, gender, and disability category on the number of children with disabilities who are subject to long-term suspensions or expulsions. In addition, data must be reported on the number and percentage of children with disabilities who are removed to alternative educational settings or expelled as compared to children without disabilities, and on the incidence and duration of disciplinary actions, including suspensions of one day or more. Information collection 1820–0621 has been revised to reflect the new statutory requirements and the final regulations.

Annual reporting and record keeping burden for this collection of information is estimated to average 17.5 hours for each of an average of 260 LEAs per State to collect, review, and report the data and 74 hours per State agency (60) to collect, maintain, and report these data. Thus, the total annual reporting and recordkeeping burden for information collection 1820–0621 for all States (60) is estimated to be 277,440 hours.

Collection of Information: Personnel (in Full-Time Equivalency of Assignments) Employed to Provide Special Education and Related Services for Children with Disabilities. § 300.640, § 300.642, and § 300.645. Each LEA must ensure that all personnel are appropriately and adequately prepared and each SEA must establish and maintain qualifications to ensure that personnel are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities. To help ensure that these requirements are met, the Secretary must collect data that can be used to monitor these requirements. Information collection 1820–0518 has been revised to reflect the new statutory requirements and the final regulations.

Annual reporting and recordkeeping burden for this collection of information is estimated to average 0.5 hours for each of an average of 260 LEAs per State and 2.5 hours for each of 60 State agencies. Thus, the total annual reporting and recordkeeping burden for information collection 1820–0518 for all States is 7,950 hours.

Collection of Information: Report of Children with Disabilities Exiting Special Education. § 300.640. Each State must report to the Secretary children by race, ethnicity, limited English proficiency status, gender, and disability category, the number of children with disabilities aged 14 through 21 who stopped receiving special education and related services because of program completion (including graduation with a regular secondary school diploma), or other reasons, and the reasons why those children stopped receiving special education and related services. Information collection 1820–0521 has been revised to reflect the new statutory requirements and the final regulations.

Annual reporting and recordkeeping burden for this collection of information is estimated to average 6 hours for each of an average of 260 LEAs per State and 11 hours for each of 60 State agencies. Thus, the total annual reporting and recordkeeping burden for information collection 1820–0521 for all States is 94,260 hours.

Collection of Information: Part B, Individuals with Disabilities Education Act Implementation of FAPE Requirements. § 300.640. Each State must provide to the Secretary and the public data on children with disabilities by race, ethnicity, limited English proficiency status, gender, and disability category who are receiving a free appropriate public education, participating in regular education, in separate classes, separate schools or facilities, or public or private residential facilities. Information collection 1820– 0517 has been revised to reflect the new statutory requirement.

Annual reporting and recordkeeping burden for this collection of information is estimated to average 27 hours for each of an average of 260 LEAs per State and 28 hours for each of 60 State agencies. Thus, the total annual reporting and recordkeeping burden for information collection 1820–0517 for all States is 422,880 hours.

Collection of Information: Report of Dispute Resolution Under Part B of the Individuals with Disabilities Education Act: Complaints, Mediations, and Due Process Hearings. § 300.640. Each State must report to the Secretary and the public, the number of due process complaints filed under section 615 of the Act and the number of hearings conducted; the number of hearings requested under section 615(k) of the Act and the number of changes in placement ordered as a result of those hearings; and the number of mediations held and the number of settlement agreements reached through those mediations.

Annual reporting and recordkeeping burden for this collection of information is estimated to average 70 hours for each of 60 State agencies. Thus, the total annual reporting and recordkeeping burden for information collection 1820– 0677 is estimated to be 4,200 hours.

Collection of Information: State and LEA Record Keeping and Reporting Requirements under Part B. § 300.132, §§ 300.134 through 300.136, §§ 300.151 through 300.153, §§ 300.201 through 300.213, § 300.224, § 300.226, § 300.504, § 300.506, § 300.507, § 300.511, and § 300.704. The Act requires States and LEAs to gather, maintain, and report various information and data, but the Act does not require this information and data to be submitted to the Department. In the NPRM, these requirements were reflected in separate information collections. For the purpose of clarity and efficiency we have combined these separate collections of information into one collection that reflects all the record keeping and reporting that must be completed at the State or LEA level, which do not require reporting to the Department. The following collections of information referenced in the NPRM are combined into information collection 1820–0600: LEA Application under Part B of the Act; List of Hearing Officers and Mediators, Complaint Procedures; LEA Consultation with Private School Representatives; Private School Complaint of Noncompliance with Consultation Requirements; Identification of State-Imposed Rules, Regulations, or Policies; Number of

Children with Disabilities Enrolled in Private Schools by Their Parents; State Plan for High Cost Fund; Free and Low-Cost Legal Services; and Confidentiality Pledge Prior to the Commencement of Mediation.

Annual reporting and recordkeeping burden for this collection of information is estimated to approximately 6 hours for 79,194 respondents (LEAs and State agencies). The total annual reporting and recordkeeping burden for information collection 1820–0600 for all States and LEAs is 472,651 hours.

### Intergovernmental Review

This program is subject to the requirements of Executive Order 12372 and the regulations in 34 CFR part 79. The objective of the Executive order is to foster an intergovernmental partnership and a strengthened federalism by relying on processes developed by State and local governments for coordination and review of proposed Federal financial assistance.

In accordance with this order, we intend this document to provide early notification of the Department's specific plans and actions for this program.

### Assessment of Educational Impact

In the NPRM published in the **Federal Register** on June 21, 2005, we requested comments on whether the proposed regulations would require transmission of information that any other agency or authority of the United States gathers or makes available.

Based on the response to the NPRM and on our own review, we have determined that these final regulations do not require transmission of information that any other agency or authority of the United States gathers or makes available.

### Electronic Access to this Document

You may view this document, as well as all other Department of Education documents published in the **Federal Register**, in text or portable document format (PDF) at the following site: *http://www.ed.gov/news/fedregister*.

To use PDF you must have Adobe Acrobat Reader, which is available free at this site. If you have questions about using PDF, call the U.S. Government Printing Office (GPO) toll free at 1–800–293–4922; or in the Washington, DC area at (202) 512–1530.

**Note:** The official version of this document is the document published in the **Federal Register**. Free Internet access to the official edition of the **Federal Register** and the Code of Federal Regulations is available on GPO Access at: *http://www.gpoaccess.gov/nara/index.html*.

### List of Subjects

*34 CFR Part 300*

Administrative practice and procedure, Education of individuals with disabilities, Elementary and secondary education, Equal educational opportunity, Grant programs'education, Privacy, Private schools, Reporting and recordkeeping requirements.

*34 CFR Part 301*

Education of individuals with disabilities, Elementary and secondary education, Equal educational opportunity, Grant programs—education, Infants and children, Reporting and recordkeeping requirements.

Dated: July 31, 2006.

**Margaret Spellings,**
*Secretary of Education.*

For the reasons discussed in this preamble, and under the authority of 20 U.S.C. 1221(e)(3) and 1406, the Secretary amends title 34 of the Code of Federal Regulations as follows:

■ 1. Part 300 is revised to read as follows:

## PART 300—ASSISTANCE TO STATES FOR THE EDUCATION OF CHILDREN WITH DISABILITIES

### Subpart A—General

**Purposes and Applicability**

Sec.
300.1    Purposes.
300.2    Applicability of this part to State and local agencies.

**Definitions Used in This Part**

300.4    Act.
300.5    Assistive technology device.
300.6    Assistive technology service.
300.7    Charter school.
300.8    Child with a disability.
300.9    Consent.
300.10    Core academic subjects.
300.11    Day; business day; school day.
300.12    Educational service agency.
300.13    Elementary school.
300.14    Equipment.
300.15    Evaluation.
300.16    Excess costs.
300.17    Free appropriate public education.
300.18    Highly qualified special education teachers.
300.19    Homeless children.
300.20    Include.
300.21    Indian and Indian tribe.
300.22    Individualized education program.
300.23    Individualized education program team.
300.24    Individualized family service plan.
300.25    Infant or toddler with a disability.
300.26    Institution of higher education.
300.27    Limited English proficient.
300.28    Local educational agency.
300.29    Native language.
300.30    Parent.
300.31    Parent training and information center.
300.32    Personally identifiable.
300.33    Public agency.
300.34    Related services.
300.35    Scientifically based research.
300.36    Secondary school.
300.37    Services plan.
300.38    Secretary.
300.39    Special education.
300.40    State.
300.41    State educational agency.
300.42    Supplementary aids and services.
300.43    Transition services.
300.44    Universal design.
300.45    Ward of the State.

**Subpart B—State Eligibility**

**General**

300.100    Eligibility for assistance.

**FAPE Requirements**

300.101    Free appropriate public education (FAPE).
300.102    Limitation—exception to FAPE for certain ages.

**Other FAPE Requirements**

300.103    FAPE—methods and payments.
300.104    Residential placement.
300.105    Assistive technology.
300.106    Extended school year services.
300.107    Nonacademic services.
300.108    Physical education.
300.109    Full educational opportunity goal (FEOG).
300.110    Program options.
300.111    Child find.
300.112    Individualized education programs (IEP).
300.113    Routine checking of hearing aids and external components of surgically implanted medical devices.

**Least Restrictive Environment (LRE)**

300.114    LRE requirements.
300.115    Continuum of alternative placements.
300.116    Placements.
300.117    Nonacademic settings.
300.118    Children in public or private institutions.
300.119    Technical assistance and training activities.
300.120    Monitoring activities.

**Additional Eligibility Requirements**

300.121    Procedural safeguards.
300.122    Evaluation.
300.123    Confidentiality of personally identifiable information.
300.124    Transition of children from the Part C program to preschool programs.
300.125–300.128    [Reserved]

**Children in Private Schools**

300.129    State responsibility regarding children in private schools.

**Children With Disabilities Enrolled by Their Parents in Private Schools**

300.130    Definition of parentally-placed private school children with disabilities.
300.131    Child find for parentally-placed private school children with disabilities.

300.132  Provision of services for parentally-placed private school children with disabilities—basic requirement.
300.133  Expenditures.
300.134  Consultation.
300.135  Written affirmation.
300.136  Compliance.
300.137  Equitable services determined.
300.138  Equitable services provided.
300.139  Location of services and transportation.
300.140  Due process complaints and State complaints.
300.141  Requirement that funds not benefit a private school.
300.142  Use of personnel.
300.143  Separate classes prohibited.
300.144  Property, equipment, and supplies.

**Children With Disabilities in Private Schools Placed or Referred by Public Agencies**

300.145  Applicability of §§ 300.146 through 300.147.
300.146  Responsibility of SEA.
300.147  Implementation by SEA.

**Children With Disabilities Enrolled by Their Parents in Private Schools When FAPE is at Issue**

300.148  Placement of children by parents when FAPE is at issue.

**SEA Responsibility for General Supervision and Implementation of Procedural Safeguards**

300.149  SEA responsibility for general supervision.
300.150  SEA implementation of procedural safeguards.

**State Complaint Procedures**

300.151  Adoption of State complaint procedures.
300.152  Minimum State complaint procedures.
300.153  Filing a complaint.

**Methods of Ensuring Services**

300.154  Methods of ensuring services.

**Additional Eligibility Requirements**

300.155  Hearings relating to LEA eligibility.
300.156  Personnel qualifications.
300.157  Performance goals and indicators.
300.158–300.161  [Reserved]
300.162  Supplementation of State, local, and other Federal funds.
300.163  Maintenance of State financial support.
300.164  Waiver of requirement regarding supplementing and not supplanting with Part B funds.
300.165  Public participation.
300.166  Rule of construction.

**State Advisory Panel**

300.167  State advisory panel.
300.168  Membership.
300.169  Duties.

**Other Provisions Required for State Eligibility**

300.170  Suspension and expulsion rates.
300.171  Annual description of use of Part B funds.
300.172  Access to instructional materials.
300.173  Overidentification and disproportionality.

300.174  Prohibition on mandatory medication.
300.175  SEA as provider of FAPE or direct services.
300.176  Exception for prior State plans.
300.177  States' sovereign immunity.

**Department Procedures**

300.178  Determination by the Secretary that a State is eligible to receive a grant.
300.179  Notice and hearing before determining that a State is not eligible to receive a grant.
300.180  Hearing official or panel.
300.181  Hearing procedures.
300.182  Initial decision; final decision.
300.183  Filing requirements.
300.184  Judicial review.
300.185  [Reserved]
300.186  Assistance under other Federal programs.

**By-pass for Children in Private Schools**

300.190  By-pass—general.
300.191  Provisions for services under a by-pass.
300.192  Notice of intent to implement a by-pass.
300.193  Request to show cause.
300.194  Show cause hearing.
300.195  Decision.
300.196  Filing requirements.
300.197  Judicial review.
300.198  Continuation of a by-pass.

**State Administration**

300.199  State administration.

**Subpart C—Local Educational Agency Eligibility**

300.200  Condition of assistance.
300.201  Consistency with State policies.
300.202  Use of amounts.
300.203  Maintenance of effort.
300.204  Exception to maintenance of effort.
300.205  Adjustment to local fiscal efforts in certain fiscal years.
300.206  Schoolwide programs under title I of the ESEA.
300.207  Personnel development.
300.208  Permissive use of funds.
300.209  Treatment of charter schools and their students.
300.210  Purchase of instructional materials.
300.211  Information for SEA.
300.212  Public information.
300.213  Records regarding migratory children with disabilities.
300.214–300.219  [Reserved]
300.220  Exception for prior local plans.
300.221  Notification of LEA or State agency in case of ineligibility.
300.222  LEA and State agency compliance.
300.223  Joint establishment of eligibility.
300.224  Requirements for establishing eligibility.
300.225  [Reserved]
300.226  Early intervening services.
300.227  Direct services by the SEA.
300.228  State agency eligibility.
300.229  Disciplinary information.
300.230  SEA flexibility.

**Subpart D—Evaluations, Eligibility Determinations, Individualized Education Programs, and Educational Placements**

**Parental Consent**

300.300  Parental consent.

**Evaluations and Reevaluations**

300.301  Initial evaluations.
300.302  Screening for instructional purposes is not evaluation.
300.303  Reevaluations.
300.304  Evaluation procedures.
300.305  Additional requirements for evaluations and reevaluations.
300.306  Determination of eligibility.

**Additional Procedures for Identifying Children With Specific Learning Disabilities**

300.307  Specific learning disabilities.
300.308  Additional group members.
300.309  Determining the existence of a specific learning disability.
300.310  Observation.
300.311  Specific documentation for the eligibility determination.

**Individualized Education Programs**

300.320  Definition of individualized education program.
300.321  IEP Team.
300.322  Parent participation.
300.323  When IEPs must be in effect.

**Development of IEP**

300.324  Development, review, and revision of IEP.
300.325  Private school placements by public agencies.
300.326  [Reserved]
300.327  Educational placements.
300.328  Alternative means of meeting participation.

**Subpart E—Procedural Safeguards**

**Due Process Procedures for Parents and Children**

300.500  Responsibility of SEA and other public agencies.
300.501  Opportunity to examine records; parent participation in meetings.
300.502  Independent educational evaluation.
300.503  Prior notice by the public agency; content of notice.
300.504  Procedural safeguards notice.
300.505  Electronic mail.
300.506  Mediation.
300.507  Filing a due process complaint.
300.508  Due process complaint.
300.509  Model forms.
300.510  Resolution process.
300.511  Impartial due process hearing.
300.512  Hearing rights.
300.513  Hearing decisions.
300.514  Finality of decision; appeal; impartial review.
300.515  Timelines and convenience of hearings and reviews.
300.516  Civil action.
300.517  Attorneys' fees.
300.518  Child's status during proceedings.
300.519  Surrogate parents.
300.520  Transfer of parental rights at age of majority.
300.521–300.529  [Reserved]

**Discipline Procedures**

300.530   Authority of school personnel.
300.531   Determination of setting.
300.532   Appeal.
300.533   Placement during appeals.
300.534   Protections for children not determined eligible for special education and related services.
300.535   Referral to and action by law enforcement and judicial authorities.
300.536   Change of placement because of disciplinary removals.
300.537   State enforcement mechanisms.
300.538–300.599   [Reserved]

**Subpart F—Monitoring, Enforcement, Confidentiality, and Program Information**

**Monitoring, Technical Assistance, and Enforcement**

300.600   State monitoring and enforcement.
300.601   State performance plans and data collection.
300.602   State use of targets and reporting.
300.603   Secretary's review and determination regarding State performance.
300.604   Enforcement.
300.605   Withholding funds.
300.606   Public attention.
300.607   Divided State agency responsibility.
300.608   State enforcement.
300.609   Rule of construction.

**Confidentiality of Information**

300.610   Confidentiality.
300.611   Definitions.
300.612   Notice to parents.
300.613   Access rights.
300.614   Record of access.
300.615   Records on more than one child.
300.616   List of types and locations of information.
300.617   Fees.
300.618   Amendment of records at parent's request.
300.619   Opportunity for a hearing.
300.620   Result of hearing.
300.621   Hearing procedures.
300.622   Consent.
300.623   Safeguards.
300.624   Destruction of information.
300.625   Children's rights.
300.626   Enforcement.
300.627   Department use of personally identifiable information.

**Reports—Program Information**

300.640   Annual report of children served—report requirement.
300.641   Annual report of children served—information required in the report.
300.642   Data reporting.
300.643   Annual report of children served—certification.
300.644   Annual report of children served—criteria for counting children.
300.645   Annual report of children served—other responsibilities of the SEA.
300.646   Disproportionality.

**Subpart G—Authorization, Allotment, Use of Funds, Authorization of Appropriations**

**Allotments, Grants, and Use of Funds**

300.700   Grants to States.

300.701   Outlying areas, freely associated States, and the Secretary of the Interior.
300.702   Technical assistance.
300.703   Allocations to States.
300.704   State-level activities.
300.705   Subgrants to LEAs.
300.706   [Reserved]

**Secretary of the Interior**

300.707   Use of amounts by Secretary of the Interior.
300.708   Submission of information.
300.709   Public participation.
300.710   Use of funds under Part B of the Act.
300.711   Early intervening services.
300.712   Payments for education and services for Indian children with disabilities aged three through five.
300.713   Plan for coordination of services.
300.714   Establishment of advisory board.
300.715   Annual reports.
300.716   Applicable regulations.

**Definitions That Apply to This Subpart**

300.717   Definitions applicable to allotments, grants, and use of funds.

**Acquisition of Equipment and Construction or Alteration of Facilities**

300.718   Acquisition of equipment and construction or alteration of facilities.

**Subpart H—Preschool Grants for Children With Disabilities**

300.800   In general.
300.801–300.802   [Reserved]
300.803   Definition of State.
300.804   Eligibility.
300.805   [Reserved]
300.806   Eligibility for financial assistance.
300.807   Allocations to States.
300.808   Increase in funds.
300.809   Limitations.
300.810   Decrease in funds.
300.811   [Reserved]
300.812   Reservation for State activities.
300.813   State administration.
300.814   Other State-level activities.
300.815   Subgrants to LEAs.
300.816   Allocations to LEAs.
300.817   Reallocation of LEA funds.
300.818   Part C of the Act inapplicable.
Appendix A to Part 300—Excess Costs Calculation
Appendix B to Part 300—Proportionate Share Calculation
Appendix C to Part 300—National Instructional Materials Accessibility Standard (NIMAS)
Appendix D to Part 300—Maintenance of Effort and Early Intervening Services
Appendix E to Part 300—Index for IDEA—Part B Regulations (34 CFR Part 300)

**Authority:** 20 U.S.C. 1221e–3, 1406, 1411–1419, unless otherwise noted.

## Subpart A—General

### Purposes and Applicability

**§ 300.1   Purposes.**

The purposes of this part are—
(a) To ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living;

(b) To ensure that the rights of children with disabilities and their parents are protected;

(c) To assist States, localities, educational service agencies, and Federal agencies to provide for the education of all children with disabilities; and

(d) To assess and ensure the effectiveness of efforts to educate children with disabilities.

(Authority: 20 U.S.C. 1400(d))

**§ 300.2   Applicability of this part to State and local agencies.**

(a) *States.* This part applies to each State that receives payments under Part B of the Act, as defined in § 300.4.

(b) *Public agencies within the State.* The provisions of this part—

(1) Apply to all political subdivisions of the State that are involved in the education of children with disabilities, including:

(i) The State educational agency (SEA).

(ii) Local educational agencies (LEAs), educational service agencies (ESAs), and public charter schools that are not otherwise included as LEAs or ESAs and are not a school of an LEA or ESA.

(iii) Other State agencies and schools (such as Departments of Mental Health and Welfare and State schools for children with deafness or children with blindness).

(iv) State and local juvenile and adult correctional facilities; and

(2) Are binding on each public agency in the State that provides special education and related services to children with disabilities, regardless of whether that agency is receiving funds under Part B of the Act.

(c) *Private schools and facilities.* Each public agency in the State is responsible for ensuring that the rights and protections under Part B of the Act are given to children with disabilities—

(1) Referred to or placed in private schools and facilities by that public agency; or

(2) Placed in private schools by their parents under the provisions of § 300.148.

(Authority: 20 U.S.C. 1412)

### Definitions Used in This Part

**§ 300.4   Act.**

*Act* means the Individuals with Disabilities Education Act, as amended.

(Authority: 20 U.S.C. 1400(a))

**46756**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

### § 300.5 Assistive technology device.

*Assistive technology device* means any item, piece of equipment, or product system, whether acquired commercially off the shelf, modified, or customized, that is used to increase, maintain, or improve the functional capabilities of a child with a disability. The term does not include a medical device that is surgically implanted, or the replacement of such device.

(Authority: 20 U.S.C. 1401(1))

### § 300.6 Assistive technology service.

*Assistive technology service* means any service that directly assists a child with a disability in the selection, acquisition, or use of an assistive technology device. The term includes—

(a) The evaluation of the needs of a child with a disability, including a functional evaluation of the child in the child's customary environment;

(b) Purchasing, leasing, or otherwise providing for the acquisition of assistive technology devices by children with disabilities;

(c) Selecting, designing, fitting, customizing, adapting, applying, maintaining, repairing, or replacing assistive technology devices;

(d) Coordinating and using other therapies, interventions, or services with assistive technology devices, such as those associated with existing education and rehabilitation plans and programs;

(e) Training or technical assistance for a child with a disability or, if appropriate, that child's family; and

(f) Training or technical assistance for professionals (including individuals providing education or rehabilitation services), employers, or other individuals who provide services to, employ, or are otherwise substantially involved in the major life functions of that child.

(Authority: 20 U.S.C. 1401(2))

### § 300.7 Charter school.

*Charter school* has the meaning given the term in section 5210(1) of the Elementary and Secondary Education Act of 1965, as amended, 20 U.S.C. 6301 *et seq.* (ESEA).

(Authority: 20 U.S.C. 7221i(1))

### § 300.8 Child with a disability.

(a) *General.* (1) *Child with a disability* means a child evaluated in accordance with §§ 300.304 through 300.311 as having mental retardation, a hearing impairment (including deafness), a speech or language impairment, a visual impairment (including blindness), a serious emotional disturbance (referred to in this part as ''emotional

disturbance''), an orthopedic impairment, autism, traumatic brain injury, an other health impairment, a specific learning disability, deaf-blindness, or multiple disabilities, and who, by reason thereof, needs special education and related services.

(2)(i) Subject to paragraph (a)(2)(ii) of this section, if it is determined, through an appropriate evaluation under §§ 300.304 through 300.311, that a child has one of the disabilities identified in paragraph (a)(1) of this section, but only needs a related service and not special education, the child is not a child with a disability under this part.

(ii) If, consistent with § 300.39(a)(2), the related service required by the child is considered special education rather than a related service under State standards, the child would be determined to be a child with a disability under paragraph (a)(1) of this section.

(b) *Children aged three through nine experiencing developmental delays. Child with a disability* for children aged three through nine (or any subset of that age range, including ages three through five), may, subject to the conditions described in § 300.111(b), include a child—

(1) Who is experiencing developmental delays, as defined by the State and as measured by appropriate diagnostic instruments and procedures, in one or more of the following areas: Physical development, cognitive development, communication development, social or emotional development, or adaptive development; and

(2) Who, by reason thereof, needs special education and related services.

(c) *Definitions of disability terms.* The terms used in this definition of a child with a disability are defined as follows:

(1)(i) *Autism* means a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age three, that adversely affects a child's educational performance. Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences.

(ii) Autism does not apply if a child's educational performance is adversely affected primarily because the child has an emotional disturbance, as defined in paragraph (c)(4) of this section.

(iii) A child who manifests the characteristics of autism after age three could be identified as having autism if the criteria in paragraph (c)(1)(i) of this section are satisfied.

(2) *Deaf-blindness* means concomitant hearing and visual impairments, the combination of which causes such severe communication and other developmental and educational needs that they cannot be accommodated in special education programs solely for children with deafness or children with blindness.

(3) *Deafness* means a hearing impairment that is so severe that the child is impaired in processing linguistic information through hearing, with or without amplification that adversely affects a child's educational performance.

(4)(i) *Emotional disturbance* means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:

(A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.

(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

(C) Inappropriate types of behavior or feelings under normal circumstances.

(D) A general pervasive mood of unhappiness or depression.

(E) A tendency to develop physical symptoms or fears associated with personal or school problems.

(ii) Emotional disturbance includes schizophrenia. The term does not apply to children who are socially maladjusted, unless it is determined that they have an emotional disturbance under paragraph (c)(4)(i) of this section.

(5) *Hearing impairment* means an impairment in hearing, whether permanent or fluctuating, that adversely affects a child's educational performance but that is not included under the definition of deafness in this section.

(6) *Mental retardation* means significantly subaverage general intellectual functioning, existing concurrently with deficits in adaptive behavior and manifested during the developmental period, that adversely affects a child's educational performance.

(7) *Multiple disabilities* means concomitant impairments (such as mental retardation-blindness or mental retardation-orthopedic impairment), the combination of which causes such severe educational needs that they cannot be accommodated in special education programs solely for one of the impairments. Multiple disabilities does not include deaf-blindness.

(8) *Orthopedic impairment* means a severe orthopedic impairment that adversely affects a child's educational

performance. The term includes impairments caused by a congenital anomaly, impairments caused by disease (e.g., poliomyelitis, bone tuberculosis), and impairments from other causes (e.g., cerebral palsy, amputations, and fractures or burns that cause contractures).

(9) *Other health impairment* means having limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that—

(i) Is due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle cell anemia, and Tourette syndrome; and

(ii) Adversely affects a child's educational performance.

(10) *Specific learning disability*—(i) *General.* Specific learning disability means a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia.

(ii) *Disorders not included.* Specific learning disability does not include learning problems that are primarily the result of visual, hearing, or motor disabilities, of mental retardation, of emotional disturbance, or of environmental, cultural, or economic disadvantage.

(11) *Speech or language impairment* means a communication disorder, such as stuttering, impaired articulation, a language impairment, or a voice impairment, that adversely affects a child's educational performance.

(12) *Traumatic brain injury* means an acquired injury to the brain caused by an external physical force, resulting in total or partial functional disability or psychosocial impairment, or both, that adversely affects a child's educational performance. Traumatic brain injury applies to open or closed head injuries resulting in impairments in one or more areas, such as cognition; language; memory; attention; reasoning; abstract thinking; judgment; problem-solving; sensory, perceptual, and motor abilities; psychosocial behavior; physical functions; information processing; and speech. Traumatic brain injury does not apply to brain injuries that are

congenital or degenerative, or to brain injuries induced by birth trauma.

(13) *Visual impairment including blindness* means an impairment in vision that, even with correction, adversely affects a child's educational performance. The term includes both partial sight and blindness.

(Authority: 20 U.S.C. 1401(3); 1401(30))

**§ 300.9   Consent.**

*Consent* means that—

(a) The parent has been fully informed of all information relevant to the activity for which consent is sought, in his or her native language, or other mode of communication;

(b) The parent understands and agrees in writing to the carrying out of the activity for which his or her consent is sought, and the consent describes that activity and lists the records (if any) that will be released and to whom; and

(c)(1) The parent understands that the granting of consent is voluntary on the part of the parent and may be revoked at anytime.

(2) If a parent revokes consent, that revocation is not retroactive (i.e., it does not negate an action that has occurred after the consent was given and before the consent was revoked).

(Authority: 20 U.S.C. 1414(a)(1)(D))

**§ 300.10   Core academic subjects.**

Core academic subjects means English, reading or language arts, mathematics, science, foreign languages, civics and government, economics, arts, history, and geography.

(Authority: 20 U.S.C. 1401(4))

**§ 300.11   Day; business day; school day.**

(a) *Day* means calendar day unless otherwise indicated as business day or school day.

(b) *Business day* means Monday through Friday, except for Federal and State holidays (unless holidays are specifically included in the designation of business day, as in § 300.148(d)(1)(ii)).

(c)(1) *School day* means any day, including a partial day that children are in attendance at school for instructional purposes.

(2) *School day* has the same meaning for all children in school, including children with and without disabilities.

(Authority: 20 U.S.C. 1221e–3)

**§ 300.12   Educational service agency.**

*Educational service agency* means—

(a) A regional public multiservice agency—

(1) Authorized by State law to develop, manage, and provide services or programs to LEAs;

(2) Recognized as an administrative agency for purposes of the provision of special education and related services provided within public elementary schools and secondary schools of the State;

(b) Includes any other public institution or agency having administrative control and direction over a public elementary school or secondary school; and

(c) Includes entities that meet the definition of intermediate educational unit in section 602(23) of the Act as in effect prior to June 4, 1997.

(Authority: 20 U.S.C. 1401(5))

**§ 300.13   Elementary school.**

*Elementary school* means a nonprofit institutional day or residential school, including a public elementary charter school, that provides elementary education, as determined under State law.

(Authority: 20 U.S.C. 1401(6))

**§ 300.14   Equipment.**

*Equipment* means—

(a) Machinery, utilities, and built-in equipment, and any necessary enclosures or structures to house the machinery, utilities, or equipment; and

(b) All other items necessary for the functioning of a particular facility as a facility for the provision of educational services, including items such as instructional equipment and necessary furniture; printed, published and audio-visual instructional materials; telecommunications, sensory, and other technological aids and devices; and books, periodicals, documents, and other related materials.

(Authority: 20 U.S.C. 1401(7))

**§ 300.15   Evaluation.**

*Evaluation* means procedures used in accordance with §§ 300.304 through 300.311 to determine whether a child has a disability and the nature and extent of the special education and related services that the child needs.

(Authority: 20 U.S.C. 1414(a) (c))

**§ 300.16   Excess costs.**

*Excess costs* means those costs that are in excess of the average annual per-student expenditure in an LEA during the preceding school year for an elementary school or secondary school student, as may be appropriate, and that must be computed after deducting—

(a) Amounts received—

(1) Under Part B of the Act;

(2) Under Part A of title I of the ESEA; and

(3) Under Parts A and B of title III of the ESEA and;

**46758**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

(b) Any State or local funds expended for programs that would qualify for assistance under any of the parts described in paragraph (a) of this section, but excluding any amounts for capital outlay or debt service. (See Appendix A to part 300 for an example of how excess costs must be calculated.)

(Authority: 20 U.S.C. 1401(8))

### § 300.17 Free appropriate public education.

*Free appropriate public education* or *FAPE* means special education and related services that—

(a) Are provided at public expense, under public supervision and direction, and without charge;

(b) Meet the standards of the SEA, including the requirements of this part;

(c) Include an appropriate preschool, elementary school, or secondary school education in the State involved; and

(d) Are provided in conformity with an individualized education program (IEP) that meets the requirements of §§ 300.320 through 300.324.

(Authority: 20 U.S.C. 1401(9))

### § 300.18 Highly qualified special education teachers.

(a) *Requirements for special education teachers teaching core academic subjects.* For any public elementary or secondary school special education teacher teaching core academic subjects, the term *highly qualified* has the meaning given the term in section 9101 of the ESEA and 34 CFR 200.56, except that the requirements for highly qualified also—

(1) Include the requirements described in paragraph (b) of this section; and

(2) Include the option for teachers to meet the requirements of section 9101 of the ESEA by meeting the requirements of paragraphs (c) and (d) of this section.

(b) *Requirements for special education teachers in general.* (1) When used with respect to any public elementary school or secondary school special education teacher teaching in a State, highly qualified requires that—

(i) The teacher has obtained full State certification as a special education teacher (including certification obtained through alternative routes to certification), or passed the State special education teacher licensing examination, and holds a license to teach in the State as a special education teacher, except that when used with respect to any teacher teaching in a public charter school, highly qualified means that the teacher meets the certification or licensing requirements, if any, set forth in the State's public charter school law;

(ii) The teacher has not had special education certification or licensure requirements waived on an emergency, temporary, or provisional basis; and

(iii) The teacher holds at least a bachelor's degree.

(2) A teacher will be considered to meet the standard in paragraph (b)(1)(i) of this section if that teacher is participating in an alternative route to special education certification program under which—

(i) The teacher—

(A) Receives high-quality professional development that is sustained, intensive, and classroom-focused in order to have a positive and lasting impact on classroom instruction, before and while teaching;

(B) Participates in a program of intensive supervision that consists of structured guidance and regular ongoing support for teachers or a teacher mentoring program;

(C) Assumes functions as a teacher only for a specified period of time not to exceed three years; and

(D) Demonstrates satisfactory progress toward full certification as prescribed by the State; and

(ii) The State ensures, through its certification and licensure process, that the provisions in paragraph (b)(2)(i) of this section are met.

(3) Any public elementary school or secondary school special education teacher teaching in a State, who is not teaching a core academic subject, is highly qualified if the teacher meets the requirements in paragraph (b)(1) or the requirements in (b)(1)(iii) and (b)(2) of this section.

(c) *Requirements for special education teachers teaching to alternate achievement standards.* When used with respect to a special education teacher who teaches core academic subjects exclusively to children who are assessed against alternate achievement standards established under 34 CFR 200.1(d), highly qualified means the teacher, whether new or not new to the profession, may either—

(1) Meet the applicable requirements of section 9101 of the ESEA and 34 CFR 200.56 for any elementary, middle, or secondary school teacher who is new or not new to the profession; or

(2) Meet the requirements of paragraph (B) or (C) of section 9101(23) of the ESEA as applied to an elementary school teacher, or, in the case of instruction above the elementary level, meet the requirements of paragraph (B) or (C) of section 9101(23) of the ESEA as applied to an elementary school teacher and have subject matter knowledge appropriate to the level of instruction being provided and needed

to effectively teach to those standards, as determined by the State.

(d) *Requirements for special education teachers teaching multiple subjects.* Subject to paragraph (e) of this section, when used with respect to a special education teacher who teaches two or more core academic subjects exclusively to children with disabilities, highly qualified means that the teacher may either—

(1) Meet the applicable requirements of section 9101 of the ESEA and 34 CFR 200.56(b) or (c);

(2) In the case of a teacher who is not new to the profession, demonstrate competence in all the core academic subjects in which the teacher teaches in the same manner as is required for an elementary, middle, or secondary school teacher who is not new to the profession under 34 CFR 200.56(c) which may include a single, high objective uniform State standard of evaluation (HOUSSE) covering multiple subjects; or

(3) In the case of a new special education teacher who teaches multiple subjects and who is highly qualified in mathematics, language arts, or science, demonstrate, not later than two years after the date of employment, competence in the other core academic subjects in which the teacher teaches in the same manner as is required for an elementary, middle, or secondary school teacher under 34 CFR 200.56(c), which may include a single HOUSSE covering multiple subjects.

(e) *Separate HOUSSE standards for special education teachers.* Provided that any adaptations of the State's HOUSSE would not establish a lower standard for the content knowledge requirements for special education teachers and meets all the requirements for a HOUSSE for regular education teachers—

(1) A State may develop a separate HOUSSE for special education teachers; and

(2) The standards described in paragraph (e)(1) of this section may include single HOUSSE evaluations that cover multiple subjects.

(f) *Rule of construction.* Notwithstanding any other individual right of action that a parent or student may maintain under this part, nothing in this part shall be construed to create a right of action on behalf of an individual student or class of students for the failure of a particular SEA or LEA employee to be highly qualified, or to prevent a parent from filing a complaint under §§ 300.151 through 300.153 about staff qualifications with the SEA as provided for under this part.

(g) *Applicability of definition to ESEA; and clarification of new special*

*education teacher.* (1) A teacher who is highly qualified under this section is considered highly qualified for purposes of the ESEA.

(2) For purposes of § 300.18(d)(3), a fully certified regular education teacher who subsequently becomes fully certified or licensed as a special education teacher is a new special education teacher when first hired as a special education teacher.

(h) *Private school teachers not covered.* The requirements in this section do not apply to teachers hired by private elementary schools and secondary schools including private school teachers hired or contracted for by LEAs to provide equitable services to parentally-placed private school children with disabilities under § 300.138.

(Authority: 20 U.S.C. 1401(10))

**§ 300.19   Homeless children.**

*Homeless children* has the meaning given the term *homeless children and youths* in section 725 (42 U.S.C. 11434a) of the McKinney-Vento Homeless Assistance Act, as amended, 42 U.S.C. 11431 *et seq.*

(Authority: 20 U.S.C. 1401(11))

**§ 300.20   Include.**

*Include* means that the items named are not all of the possible items that are covered, whether like or unlike the ones named.

(Authority: 20 U.S.C. 1221e–3)

**§ 300.21   Indian and Indian tribe.**

(a) *Indian* means an individual who is a member of an Indian tribe.

(b) *Indian tribe* means any Federal or State Indian tribe, band, rancheria, pueblo, colony, or community, including any Alaska Native village or regional village corporation (as defined in or established under the Alaska Native Claims Settlement Act, 43 U.S.C. 1601 *et seq.*).

(c) Nothing in this definition is intended to indicate that the Secretary of the Interior is required to provide services or funding to a State Indian tribe that is not listed in the **Federal Register** list of Indian entities recognized as eligible to receive services from the United States, published pursuant to Section 104 of the Federally Recognized Indian Tribe List Act of 1994, 25 U.S.C. 479a–1.

(Authority: 20 U.S.C. 1401(12) and (13))

**§ 300.22   Individualized education program.**

*Individualized education program* or IEP means a written statement for a child with a disability that is developed, reviewed, and revised in accordance with §§ 300.320 through 300.324.

(Authority: 20 U.S.C. 1401(14))

**§ 300.23   Individualized education program team.**

*Individualized education program team* or *IEP Team* means a group of individuals described in § 300.321 that is responsible for developing, reviewing, or revising an IEP for a child with a disability.

(Authority: 20 U.S.C. 1414(d)(1)(B))

**§ 300.24   Individualized family service plan.**

*Individualized family service plan* or *IFSP* has the meaning given the term in section 636 of the Act.

(Authority: 20 U.S.C. 1401(15))

**§ 300.25   Infant or toddler with a disability.**

*Infant or toddler with a disability*—

(a) Means an individual under three years of age who needs early intervention services because the individual—

(1) Is experiencing developmental delays, as measured by appropriate diagnostic instruments and procedures in one or more of the areas of cognitive development, physical development, communication development, social or emotional development, and adaptive development; or

(2) Has a diagnosed physical or mental condition that has a high probability of resulting in developmental delay; and

(b) May also include, at a State's discretion—

(1) At-risk infants and toddlers; and

(2) Children with disabilities who are eligible for services under section 619 and who previously received services under Part C of the Act until such children enter, or are eligible under State law to enter, kindergarten or elementary school, as appropriate, provided that any programs under Part C of the Act serving such children shall include—

(i) An educational component that promotes school readiness and incorporates pre-literacy, language, and numeracy skills; and

(ii) A written notification to parents of their rights and responsibilities in determining whether their child will continue to receive services under Part C of the Act or participate in preschool programs under section 619.

(Authority: 20 U.S.C. 1401(16) and 1432(5))

**§ 300.26   Institution of higher education.**

*Institution of higher education*—

(a) Has the meaning given the term in section 101 of the Higher Education Act of 1965, as amended, 20 U.S.C. 1021 *et seq.* (HEA); and

(b) Also includes any community college receiving funds from the Secretary of the Interior under the Tribally Controlled Community College or University Assistance Act of 1978, 25 U.S.C. 1801, *et seq.*

(Authority: 20 U.S.C. 1401(17))

**§ 300.27   Limited English proficient.**

*Limited English proficient* has the meaning given the term in section 9101(25) of the ESEA.

(Authority: 20 U.S.C. 1401(18))

**§ 300.28   Local educational agency.**

(a) *General. Local educational agency* or *LEA* means a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for a combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary schools or secondary schools.

(b) *Educational service agencies and other public institutions or agencies.* The term includes—

(1) An educational service agency, as defined in § 300.12; and

(2) Any other public institution or agency having administrative control and direction of a public elementary school or secondary school, including a public nonprofit charter school that is established as an LEA under State law.

(c) *BIA funded schools.* The term includes an elementary school or secondary school funded by the Bureau of Indian Affairs, and not subject to the jurisdiction of any SEA other than the Bureau of Indian Affairs, but only to the extent that the inclusion makes the school eligible for programs for which specific eligibility is not provided to the school in another provision of law and the school does not have a student population that is smaller than the student population of the LEA receiving assistance under the Act with the smallest student population.

(Authority: 20 U.S.C. 1401(19))

**§ 300.29   Native language.**

(a) *Native language,* when used with respect to an individual who is limited English proficient, means the following:

(1) The language normally used by that individual, or, in the case of a child, the language normally used by the parents of the child, except as provided in paragraph (a)(2) of this section.

(2) In all direct contact with a child (including evaluation of the child), the

language normally used by the child in the home or learning environment.

(b) For an individual with deafness or blindness, or for an individual with no written language, the mode of communication is that normally used by the individual (such as sign language, Braille, or oral communication).

(Authority: 20 U.S.C. 1401(20))

### § 300.30   Parent.

(a) *Parent* means—

(1) A biological or adoptive parent of a child;

(2) A foster parent, unless State law, regulations, or contractual obligations with a State or local entity prohibit a foster parent from acting as a parent;

(3) A guardian generally authorized to act as the child's parent, or authorized to make educational decisions for the child (but not the State if the child is a ward of the State);

(4) An individual acting in the place of a biological or adoptive parent (including a grandparent, stepparent, or other relative) with whom the child lives, or an individual who is legally responsible for the child's welfare; or

(5) A surrogate parent who has been appointed in accordance with § 300.519 or section 639(a)(5) of the Act.

(b) (1) Except as provided in paragraph (b)(2) of this section, the biological or adoptive parent, when attempting to act as the parent under this part and when more than one party is qualified under paragraph (a) of this section to act as a parent, must be presumed to be the parent for purposes of this section unless the biological or adoptive parent does not have legal authority to make educational decisions for the child.

(2) If a judicial decree or order identifies a specific person or persons under paragraphs (a)(1) through (4) of this section to act as the "parent" of a child or to make educational decisions on behalf of a child, then such person or persons shall be determined to be the "parent" for purposes of this section.

(Authority: 20 U.S.C. 1401(23))

### § 300.31   Parent training and information center.

*Parent training and information center* means a center assisted under sections 671 or 672 of the Act.

(Authority: 20 U.S.C. 1401(25))

### § 300.32   Personally identifiable.

*Personally identifiable* means information that contains—

(a) The name of the child, the child's parent, or other family member;

(b) The address of the child;

(c) A personal identifier, such as the child's social security number or student number; or

(d) A list of personal characteristics or other information that would make it possible to identify the child with reasonable certainty.

(Authority: 20 U.S.C. 1415(a))

### § 300.33   Public agency.

*Public agency* includes the SEA, LEAs, ESAs, nonprofit public charter schools that are not otherwise included as LEAs or ESAs and are not a school of an LEA or ESA, and any other political subdivisions of the State that are responsible for providing education to children with disabilities.

(Authority: 20 U.S.C. 1412(a)(11))

### § 300.34   Related services.

(a) *General. Related services* means transportation and such developmental, corrective, and other supportive services as are required to assist a child with a disability to benefit from special education, and includes speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, early identification and assessment of disabilities in children, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services for diagnostic or evaluation purposes. Related services also include school health services and school nurse services, social work services in schools, and parent counseling and training.

(b) *Exception; services that apply to children with surgically implanted devices, including cochlear implants.*

(1) Related services do not include a medical device that is surgically implanted, the optimization of that device's functioning (e.g., mapping), maintenance of that device, or the replacement of that device.

(2) Nothing in paragraph (b)(1) of this section—

(i) Limits the right of a child with a surgically implanted device (e.g., cochlear implant) to receive related services (as listed in paragraph (a) of this section) that are determined by the IEP Team to be necessary for the child to receive FAPE.

(ii) Limits the responsibility of a public agency to appropriately monitor and maintain medical devices that are needed to maintain the health and safety of the child, including breathing, nutrition, or operation of other bodily functions, while the child is transported to and from school or is at school; or

(iii) Prevents the routine checking of an external component of a surgically implanted device to make sure it is functioning properly, as required in § 300.113(b).

(c) *Individual related services terms defined.* The terms used in this definition are defined as follows:

(1) *Audiology* includes—

(i) Identification of children with hearing loss;

(ii) Determination of the range, nature, and degree of hearing loss, including referral for medical or other professional attention for the habilitation of hearing;

(iii) Provision of habilitative activities, such as language habilitation, auditory training, speech reading (lip-reading), hearing evaluation, and speech conservation;

(iv) Creation and administration of programs for prevention of hearing loss;

(v) Counseling and guidance of children, parents, and teachers regarding hearing loss; and

(vi) Determination of children's needs for group and individual amplification, selecting and fitting an appropriate aid, and evaluating the effectiveness of amplification.

(2) *Counseling services* means services provided by qualified social workers, psychologists, guidance counselors, or other qualified personnel.

(3) *Early identification and assessment of disabilities in children* means the implementation of a formal plan for identifying a disability as early as possible in a child's life.

(4) *Interpreting services* includes—

(i) The following, when used with respect to children who are deaf or hard of hearing: Oral transliteration services, cued language transliteration services, sign language transliteration and interpreting services, and transcription services, such as communication access real-time translation (CART), C-Print, and TypeWell; and

(ii) Special interpreting services for children who are deaf-blind.

(5) *Medical services* means services provided by a licensed physician to determine a child's medically related disability that results in the child's need for special education and related services.

(6) *Occupational therapy*—

(i) Means services provided by a qualified occupational therapist; and

(ii) Includes—

(A) Improving, developing, or restoring functions impaired or lost through illness, injury, or deprivation;

(B) Improving ability to perform tasks for independent functioning if functions are impaired or lost; and

(C) Preventing, through early intervention, initial or further impairment or loss of function.

(7) *Orientation and mobility services*—

(i) Means services provided to blind or visually impaired children by qualified personnel to enable those students to attain systematic orientation to and safe movement within their environments in school, home, and community; and

(ii) Includes teaching children the following, as appropriate:

(A) Spatial and environmental concepts and use of information received by the senses (such as sound, temperature and vibrations) to establish, maintain, or regain orientation and line of travel (e.g., using sound at a traffic light to cross the street);

(B) To use the long cane or a service animal to supplement visual travel skills or as a tool for safely negotiating the environment for children with no available travel vision;

(C) To understand and use remaining vision and distance low vision aids; and

(D) Other concepts, techniques, and tools.

(8)(i) *Parent counseling and training* means assisting parents in understanding the special needs of their child;

(ii) Providing parents with information about child development; and

(iii) Helping parents to acquire the necessary skills that will allow them to support the implementation of their child's IEP or IFSP.

(9) *Physical therapy* means services provided by a qualified physical therapist.

(10) *Psychological services* includes—

(i) Administering psychological and educational tests, and other assessment procedures;

(ii) Interpreting assessment results;

(iii) Obtaining, integrating, and interpreting information about child behavior and conditions relating to learning;

(iv) Consulting with other staff members in planning school programs to meet the special educational needs of children as indicated by psychological tests, interviews, direct observation, and behavioral evaluations;

(v) Planning and managing a program of psychological services, including psychological counseling for children and parents; and

(vi) Assisting in developing positive behavioral intervention strategies.

(11) *Recreation* includes—

(i) Assessment of leisure function;

(ii) Therapeutic recreation services;

(iii) Recreation programs in schools and community agencies; and

(iv) Leisure education.

(12) *Rehabilitation counseling services* means services provided by qualified personnel in individual or group sessions that focus specifically on career development, employment preparation, achieving independence, and integration in the workplace and community of a student with a disability. The term also includes vocational rehabilitation services provided to a student with a disability by vocational rehabilitation programs funded under the Rehabilitation Act of 1973, as amended, 29 U.S.C. 701 *et seq.*

(13) *School health services and school nurse services* means health services that are designed to enable a child with a disability to receive FAPE as described in the child's IEP. School nurse services are services provided by a qualified school nurse. School health services are services that may be provided by either a qualified school nurse or other qualified person.

(14) *Social work services in schools* includes—

(i) Preparing a social or developmental history on a child with a disability;

(ii) Group and individual counseling with the child and family;

(iii) Working in partnership with parents and others on those problems in a child's living situation (home, school, and community) that affect the child's adjustment in school;

(iv) Mobilizing school and community resources to enable the child to learn as effectively as possible in his or her educational program; and

(v) Assisting in developing positive behavioral intervention strategies.

(15) *Speech-language pathology services* includes—

(i) Identification of children with speech or language impairments;

(ii) Diagnosis and appraisal of specific speech or language impairments;

(iii) Referral for medical or other professional attention necessary for the habilitation of speech or language impairments;

(iv) Provision of speech and language services for the habilitation or prevention of communicative impairments; and

(v) Counseling and guidance of parents, children, and teachers regarding speech and language impairments.

(16) *Transportation* includes—

(i) Travel to and from school and between schools;

(ii) Travel in and around school buildings; and

(iii) Specialized equipment (such as special or adapted buses, lifts, and ramps), if required to provide special transportation for a child with a disability.

(Authority: 20 U.S.C. 1401(26))

### § 300.35   Scientifically based research.

*Scientifically based research* has the meaning given the term in section 9101(37) of the ESEA.

(Authority: 20 U.S.C. 1411(e)(2)(C)(xi))

### § 300.36   Secondary school.

*Secondary school* means a nonprofit institutional day or residential school, including a public secondary charter school that provides secondary education, as determined under State law, except that it does not include any education beyond grade 12.

(Authority: 20 U.S.C. 1401(27))

### § 300.37   Services plan.

*Services plan* means a written statement that describes the special education and related services the LEA will provide to a parentally-placed child with a disability enrolled in a private school who has been designated to receive services, including the location of the services and any transportation necessary, consistent with § 300.132, and is developed and implemented in accordance with §§ 300.137 through 300.139.

(Authority: 20 U.S.C. 1412(a)(10)(A))

### § 300.38   Secretary.

*Secretary* means the Secretary of Education.

(Authority: 20 U.S.C. 1401(28))

### § 300.39   Special education.

(a) *General.* (1) *Special education* means specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability, including—

(i) Instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and

(ii) Instruction in physical education.

(2) *Special education* includes each of the following, if the services otherwise meet the requirements of paragraph (a)(1) of this section—

(i) Speech-language pathology services, or any other related service, if the service is considered special education rather than a related service under State standards;

(ii) Travel training; and

(iii) Vocational education.

(b) *Individual special education terms defined.* The terms in this definition are defined as follows:

(1) *At no cost* means that all specially-designed instruction is provided without charge, but does not preclude incidental fees that are normally charged to nondisabled students or their parents as a part of the regular education program.

(2) *Physical education* means—

(i) The development of—
(A) Physical and motor fitness;
(B) Fundamental motor skills and patterns; and
(C) Skills in aquatics, dance, and individual and group games and sports (including intramural and lifetime sports); and
(ii) Includes special physical education, adapted physical education, movement education, and motor development.
(3) *Specially designed instruction* means adapting, as appropriate to the needs of an eligible child under this part, the content, methodology, or delivery of instruction—
(i) To address the unique needs of the child that result from the child's disability; and
(ii) To ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children.
(4) *Travel training* means providing instruction, as appropriate, to children with significant cognitive disabilities, and any other children with disabilities who require this instruction, to enable them to—
(i) Develop an awareness of the environment in which they live; and
(ii) Learn the skills necessary to move effectively and safely from place to place within that environment (e.g., in school, in the home, at work, and in the community).
(5) *Vocational education* means organized educational programs that are directly related to the preparation of individuals for paid or unpaid employment, or for additional preparation for a career not requiring a baccalaureate or advanced degree.

(Authority: 20 U.S.C. 1401(29))

## § 300.40  State.

*State* means each of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, and each of the outlying areas.

(Authority: 20 U.S.C. 1401(31))

## § 300.41  State educational agency.

*State educational agency* or *SEA* means the State board of education or other agency or officer primarily responsible for the State supervision of public elementary schools and secondary schools, or, if there is no such officer or agency, an officer or agency designated by the Governor or by State law.

(Authority: 20 U.S.C. 1401(32))

## § 300.42  Supplementary aids and services.

*Supplementary aids and services* means aids, services, and other supports that are provided in regular education classes, other education-related settings, and in extracurricular and nonacademic settings, to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate in accordance with §§ 300.114 through 300.116.

(Authority: 20 U.S.C. 1401(33))

## § 300.43  Transition services.

(a) *Transition services* means a coordinated set of activities for a child with a disability that—
(1) Is designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including postsecondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;
(2) Is based on the individual child's needs, taking into account the child's strengths, preferences, and interests; and includes—
(i) Instruction;
(ii) Related services;
(iii) Community experiences;
(iv) The development of employment and other post-school adult living objectives; and
(v) If appropriate, acquisition of daily living skills and provision of a functional vocational evaluation.
(b) *Transition services* for children with disabilities may be special education, if provided as specially designed instruction, or a related service, if required to assist a child with a disability to benefit from special education.

(Authority: 20 U.S.C. 1401(34))

## § 300.44  Universal design.

*Universal design* has the meaning given the term in section 3 of the Assistive Technology Act of 1998, as amended, 29 U.S.C. 3002.

(Authority: 20 U.S.C. 1401(35))

## § 300.45  Ward of the State.

(a) *General.* Subject to paragraph (b) of this section, *ward of the State* means a child who, as determined by the State where the child resides, is—
(1) A foster child;
(2) A ward of the State; or
(3) In the custody of a public child welfare agency.
(b) *Exception.* Ward of the State does not include a foster child who has a foster parent who meets the definition of a *parent* in § 300.30.

(Authority: 20 U.S.C. 1401(36))

## Subpart B—State Eligibility

### General

### § 300.100  Eligibility for assistance.

A State is eligible for assistance under Part B of the Act for a fiscal year if the State submits a plan that provides assurances to the Secretary that the State has in effect policies and procedures to ensure that the State meets the conditions in §§ 300.101 through 300.176.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a))

### FAPE Requirements

### § 300.101  Free appropriate public education (FAPE).

(a) *General.* A free appropriate public education must be available to all children residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school, as provided for in § 300.530(d).
(b) *FAPE for children beginning at age 3.* (1) Each State must ensure that—
(i) The obligation to make FAPE available to each eligible child residing in the State begins no later than the child's third birthday; and
(ii) An IEP or an IFSP is in effect for the child by that date, in accordance with § 300.323(b).
(2) If a child's third birthday occurs during the summer, the child's IEP Team shall determine the date when services under the IEP or IFSP will begin.
(c) *Children advancing from grade to grade.* (1) Each State must ensure that FAPE is available to any individual child with a disability who needs special education and related services, even though the child has not failed or been retained in a course or grade, and is advancing from grade to grade.
(2) The determination that a child described in paragraph (a) of this section is eligible under this part, must be made on an individual basis by the group responsible within the child's LEA for making eligibility determinations.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(1)(A))

### § 300.102  Limitation—exception to FAPE for certain ages.

(a) *General.* The obligation to make FAPE available to all children with disabilities does not apply with respect to the following:

(1) Children aged 3, 4, 5, 18, 19, 20, or 21 in a State to the extent that its application to those children would be inconsistent with State law or practice, or the order of any court, respecting the provision of public education to children of those ages.

(2)(i) Children aged 18 through 21 to the extent that State law does not require that special education and related services under Part B of the Act be provided to students with disabilities who, in the last educational placement prior to their incarceration in an adult correctional facility—

(A) Were not actually identified as being a child with a disability under § 300.8; and

(B) Did not have an IEP under Part B of the Act.

(ii) The exception in paragraph (a)(2)(i) of this section does not apply to children with disabilities, aged 18 through 21, who—

(A) Had been identified as a child with a disability under § 300.8 and had received services in accordance with an IEP, but who left school prior to their incarceration; or

(B) Did not have an IEP in their last educational setting, but who had actually been identified as a child with a disability under § 300.8.

(3)(i) Children with disabilities who have graduated from high school with a regular high school diploma.

(ii) The exception in paragraph (a)(3)(i) of this section does not apply to children who have graduated from high school but have not been awarded a regular high school diploma.

(iii) Graduation from high school with a regular high school diploma constitutes a change in placement, requiring written prior notice in accordance with § 300.503.

(iv) As used in paragraphs (a)(3)(i) through (a)(3)(iii) of this section, the term *regular high school diploma* does not include an alternative degree that is not fully aligned with the State's academic standards, such as a certificate or a general educational development credential (GED).

(4) Children with disabilities who are eligible under subpart H of this part, but who receive early intervention services under Part C of the Act.

(b) *Documents relating to exceptions.* The State must assure that the information it has provided to the Secretary regarding the exceptions in paragraph (a) of this section, as required by § 300.700 (for purposes of making grants to States under this part), is current and accurate.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(1)(B)—(C))

**Other FAPE Requirements**

### § 300.103   FAPE—methods and payments.

(a) Each State may use whatever State, local, Federal, and private sources of support are available in the State to meet the requirements of this part. For example, if it is necessary to place a child with a disability in a residential facility, a State could use joint agreements between the agencies involved for sharing the cost of that placement.

(b) Nothing in this part relieves an insurer or similar third party from an otherwise valid obligation to provide or to pay for services provided to a child with a disability.

(c) Consistent with § 300.323(c), the State must ensure that there is no delay in implementing a child's IEP, including any case in which the payment source for providing or paying for special education and related services to the child is being determined.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1401(8), 1412(a)(1)).

### § 300.104   Residential placement.

If placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(1), 1412(a)(10)(B))

### § 300.105   Assistive technology.

(a) Each public agency must ensure that assistive technology devices or assistive technology services, or both, as those terms are defined in §§ 300.5 and 300.6, respectively, are made available to a child with a disability if required as a part of the child's—

(1) Special education under § 300.36;

(2) Related services under § 300.34; or

(3) Supplementary aids and services under §§ 300.38 and 300.114(a)(2)(ii).

(b) On a case-by-case basis, the use of school-purchased assistive technology devices in a child's home or in other settings is required if the child's IEP Team determines that the child needs access to those devices in order to receive FAPE.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(1), 1412(a)(12)(B)(i))

### § 300.106   Extended school year services.

(a) *General.* The State and each public agency must ensure that extended school year services are available as necessary to provide FAPE, consistent with paragraph (a)(2) of this section.

(2) Extended school year services must be provided only if a child's IEP Team determines, on an individual basis, in accordance with §§ 300.320 through 300.324, that the services are necessary for the provision of FAPE to the child.

(3) In implementing the requirements of this section, a public agency may not—

(i) Limit extended school year services to particular categories of disability; or

(ii) Unilaterally limit the type, amount, or duration of those services.

(b) *Definition.* As used in this section, the term extended school year services means special education and related services that—

(1) Are provided to a child with a disability—

(i) Beyond the normal school year of the public agency;

(ii) In accordance with the child's IEP; and

(iii) At no cost to the parents of the child; and

(2) Meet the standards of the SEA.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(1))

### § 300.107   Nonacademic services.

The State must ensure the following:

(a) Each public agency must take steps, including the provision of supplementary aids and services determined appropriate and necessary by the child's IEP Team, to provide nonacademic and extracurricular services and activities in the manner necessary to afford children with disabilities an equal opportunity for participation in those services and activities.

(b) Nonacademic and extracurricular services and activities may include counseling services, athletics, transportation, health services, recreational activities, special interest groups or clubs sponsored by the public agency, referrals to agencies that provide assistance to individuals with disabilities, and employment of students, including both employment by the public agency and assistance in making outside employment available.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(1))

### § 300.108  Physical education.

The State must ensure that public agencies in the State comply with the following:

(a) *General.* Physical education services, specially designed if necessary, must be made available to every child with a disability receiving FAPE, unless the public agency enrolls children without disabilities and does not provide physical education to children without disabilities in the same grades.

(b) *Regular physical education.* Each child with a disability must be afforded the opportunity to participate in the regular physical education program available to nondisabled children unless—

(1) The child is enrolled full time in a separate facility; or

(2) The child needs specially designed physical education, as prescribed in the child's IEP.

(c) *Special physical education.* If specially designed physical education is prescribed in a child's IEP, the public agency responsible for the education of that child must provide the services directly or make arrangements for those services to be provided through other public or private programs.

(d) *Education in separate facilities.* The public agency responsible for the education of a child with a disability who is enrolled in a separate facility must ensure that the child receives appropriate physical education services in compliance with this section.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(5)(A))

### § 300.109  Full educational opportunity goal (FEOG).

The State must have in effect policies and procedures to demonstrate that the State has established a goal of providing full educational opportunity to all children with disabilities, aged birth through 21, and a detailed timetable for accomplishing that goal.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(2))

### § 300.110  Program options.

The State must ensure that each public agency takes steps to ensure that its children with disabilities have available to them the variety of educational programs and services available to nondisabled children in the area served by the agency, including art, music, industrial arts, consumer and homemaking education, and vocational education.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(2), 1413(a)(1))

### § 300.111  Child find.

(a) *General.* (1) The State must have in effect policies and procedures to ensure that—

(i) All children with disabilities residing in the State, including children with disabilities who are homeless children or are wards of the State, and children with disabilities attending private schools, regardless of the severity of their disability, and who are in need of special education and related services, are identified, located, and evaluated; and

(ii) A practical method is developed and implemented to determine which children are currently receiving needed special education and related services.

(b) *Use of term developmental delay.* The following provisions apply with respect to implementing the child find requirements of this section:

(1) A State that adopts a definition of *developmental delay* under § 300.8(b) determines whether the term applies to children aged three through nine, or to a subset of that age range (*e.g.*, ages three through five).

(2) A State may not require an LEA to adopt and use the term *developmental delay* for any children within its jurisdiction.

(3) If an LEA uses the term *developmental delay* for children described in § 300.8(b), the LEA must conform to both the State's definition of that term and to the age range that has been adopted by the State.

(4) If a State does not adopt the term *developmental delay,* an LEA may not independently use that term as a basis for establishing a child's eligibility under this part.

(c) *Other children in child find.* Child find also must include—

(1) Children who are suspected of being a child with a disability under § 300.8 and in need of special education, even though they are advancing from grade to grade; and

(2) Highly mobile children, including migrant children.

(d) *Construction.* Nothing in the Act requires that children be classified by their disability so long as each child who has a disability that is listed in § 300.8 and who, by reason of that disability, needs special education and related services is regarded as a child with a disability under Part B of the Act.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1401(3); 1412(a)(3))

### § 300.112  Individualized education programs (IEP).

The State must ensure that an IEP, or an IFSP that meets the requirements of section 636(d) of the Act, is developed, reviewed, and revised for each child with a disability in accordance with §§ 300.320 through 300.324, except as provided in § 300.300(b)(3)(ii).

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(4))

### § 300.113  Routine checking of hearing aids and external components of surgically implanted medical devices.

(a) *Hearing aids.* Each public agency must ensure that hearing aids worn in school by children with hearing impairments, including deafness, are functioning properly.

(b) *External components of surgically implanted medical devices.* (1) Subject to paragraph (b)(2) of this section, each public agency must ensure that the external components of surgically implanted medical devices are functioning properly.

(2) For a child with a surgically implanted medical device who is receiving special education and related services under this part, a public agency is not responsible for the post-surgical maintenance, programming, or replacement of the medical device that has been surgically implanted (or of an external component of the surgically implanted medical device).

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1401(1), 1401(26)(B))

### Least Restrictive Environment (LRE)

### § 300.114  LRE requirements.

(a) *General.* (1) Except as provided in § 300.324(d)(2) (regarding children with disabilities in adult prisons), the State must have in effect policies and procedures to ensure that public agencies in the State meet the LRE requirements of this section and §§ 300.115 through 300.120.

(2) Each public agency must ensure that—

(i) To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are nondisabled; and

(ii) Special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and

services cannot be achieved satisfactorily.

(b) *Additional requirement—State funding mechanism*—(1) *General.* (i) A State funding mechanism must not result in placements that violate the requirements of paragraph (a) of this section; and

(ii) A State must not use a funding mechanism by which the State distributes funds on the basis of the type of setting in which a child is served that will result in the failure to provide a child with a disability FAPE according to the unique needs of the child, as described in the child's IEP.

(2) *Assurance.* If the State does not have policies and procedures to ensure compliance with paragraph (b)(1) of this section, the State must provide the Secretary an assurance that the State will revise the funding mechanism as soon as feasible to ensure that the mechanism does not result in placements that violate that paragraph.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(5))

### § 300.115   Continuum of alternative placements.

(a) Each public agency must ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services.

(b) The continuum required in paragraph (a) of this section must—

(1) Include the alternative placements listed in the definition of special education under § 300.38 (instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions); and

(2) Make provision for supplementary services (such as resource room or itinerant instruction) to be provided in conjunction with regular class placement.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(5))

### § 300.116   Placements.

In determining the educational placement of a child with a disability, including a preschool child with a disability, each public agency must ensure that—

(a) The placement decision—

(1) Is made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options; and

(2) Is made in conformity with the LRE provisions of this subpart, including §§ 300.114 through 300.118;

(b) The child's placement—

(1) Is determined at least annually;

(2) Is based on the child's IEP; and

(3) Is as close as possible to the child's home;

(c) Unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled;

(d) In selecting the LRE, consideration is given to any potential harmful effect on the child or on the quality of services that he or she needs; and

(e) A child with a disability is not removed from education in age-appropriate regular classrooms solely because of needed modifications in the general education curriculum.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(5))

### § 300.117   Nonacademic settings.

In providing or arranging for the provision of nonacademic and extracurricular services and activities, including meals, recess periods, and the services and activities set forth in § 300.107, each public agency must ensure that each child with a disability participates with nondisabled children in the extracurricular services and activities to the maximum extent appropriate to the needs of that child. The public agency must ensure that each child with a disability has the supplementary aids and services determined by the child's IEP Team to be appropriate and necessary for the child to participate in nonacademic settings.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(5))

### § 300.118   Children in public or private institutions.

Except as provided in § 300.149(d) (regarding agency responsibility for general supervision for some individuals in adult prisons), an SEA must ensure that § 300.114 is effectively implemented, including, if necessary, making arrangements with public and private institutions (such as a memorandum of agreement or special implementation procedures).

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(5))

### § 300.119   Technical assistance and training activities.

Each SEA must carry out activities to ensure that teachers and administrators in all public agencies—

(a) Are fully informed about their responsibilities for implementing § 300.114; and

(b) Are provided with technical assistance and training necessary to assist them in this effort.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(5))

### § 300.120   Monitoring activities.

(a) The SEA must carry out activities to ensure that § 300.114 is implemented by each public agency.

(b) If there is evidence that a public agency makes placements that are inconsistent with § 300.114, the SEA must—

(1) Review the public agency's justification for its actions; and

(2) Assist in planning and implementing any necessary corrective action.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(5))

## Additional Eligibility Requirements

### § 300.121   Procedural safeguards.

(a) *General.* The State must have procedural safeguards in effect to ensure that each public agency in the State meets the requirements of §§ 300.500 through 300.536.

(b) *Procedural safeguards identified.* Children with disabilities and their parents must be afforded the procedural safeguards identified in paragraph (a) of this section.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(6)(A))

### § 300.122   Evaluation.

Children with disabilities must be evaluated in accordance with §§ 300.300 through 300.311 of subpart D of this part.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(7))

### § 300.123   Confidentiality of personally identifiable information.

The State must have policies and procedures in effect to ensure that public agencies in the State comply with §§ 300.610 through 300.626 related to protecting the confidentiality of any personally identifiable information collected, used, or maintained under Part B of the Act.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(8); 1417(c))

### § 300.124 Transition of children from the Part C program to preschool programs.

The State must have in effect policies and procedures to ensure that—

(a) Children participating in early intervention programs assisted under Part C of the Act, and who will participate in preschool programs assisted under Part B of the Act, experience a smooth and effective transition to those preschool programs in a manner consistent with section 637(a)(9) of the Act;

(b) By the third birthday of a child described in paragraph (a) of this section, an IEP or, if consistent with § 300.323(b) and section 636(d) of the Act, an IFSP, has been developed and is being implemented for the child consistent with § 300.101(b); and

(c) Each affected LEA will participate in transition planning conferences arranged by the designated lead agency under section 635(a)(10) of the Act.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(9))

### §§ 300.125–300.128    [Reserved]

## Children in Private Schools

### § 300.129 State responsibility regarding children in private schools.

The State must have in effect policies and procedures that ensure that LEAs, and, if applicable, the SEA, meet the private school requirements in §§ 300.130 through 300.148.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(10))

## Children With Disabilities Enrolled by Their Parents in Private Schools

### § 300.130 Definition of parentally-placed private school children with disabilities.

*Parentally-placed private school children with disabilities* means children with disabilities enrolled by their parents in private, including religious, schools or facilities that meet the definition of elementary school in § 300.13 or secondary school in § 300.36, other than children with disabilities covered under §§ 300.145 through 300.147.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(10)(A))

### § 300.131 Child find for parentally-placed private school children with disabilities.

(a) *General.* Each LEA must locate, identify, and evaluate all children with disabilities who are enrolled by their parents in private, including religious, elementary schools and secondary schools located in the school district served by the LEA, in accordance with paragraphs (b) through (e) of this section, and §§ 300.111 and 300.201.

(b) *Child find design.* The child find process must be designed to ensure—

(1) The equitable participation of parentally-placed private school children; and

(2) An accurate count of those children.

(c) *Activities.* In carrying out the requirements of this section, the LEA, or, if applicable, the SEA, must undertake activities similar to the activities undertaken for the agency's public school children.

(d) *Cost.* The cost of carrying out the child find requirements in this section, including individual evaluations, may not be considered in determining if an LEA has met its obligation under § 300.133.

(e) *Completion period.* The child find process must be completed in a time period comparable to that for students attending public schools in the LEA consistent with § 300.301.

(f) *Out-of-State children.* Each LEA in which private, including religious, elementary schools and secondary schools are located must, in carrying out the child find requirements in this section, include parentally-placed private school children who reside in a State other than the State in which the private schools that they attend are located.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(10)(A)(ii))

### § 300.132 Provision of services for parentally-placed private school children with disabilities—basic requirement.

(a) *General.* To the extent consistent with the number and location of children with disabilities who are enrolled by their parents in private, including religious, elementary schools and secondary schools located in the school district served by the LEA, provision is made for the participation of those children in the program assisted or carried out under Part B of the Act by providing them with special education and related services, including direct services determined in accordance with § 300.137, unless the Secretary has arranged for services to those children under the by-pass provisions in §§ 300.190 through 300.198.

(b) *Services plan for parentally-placed private school children with disabilities.* In accordance with paragraph (a) of this section and §§ 300.137 through 300.139, a services plan must be developed and implemented for each private school child with a disability who has been designated by the LEA in which the private school is located to receive special education and related services under this part.

(c) *Record keeping.* Each LEA must maintain in its records, and provide to the SEA, the following information related to parentally-placed private school children covered under §§ 300.130 through 300.144:

(1) The number of children evaluated;

(2) The number of children determined to be children with disabilities; and

(3) The number of children served.

(Approved by the Office of Management and Budget under control numbers 1820–0030 and 1820–0600)

(Authority: 20 U.S.C. 1412(a)(10)(A)(i))

### § 300.133 Expenditures.

(a) *Formula.* To meet the requirement of § 300.132(a), each LEA must spend the following on providing special education and related services (including direct services) to parentally-placed private school children with disabilities:

(1) For children aged 3 through 21, an amount that is the same proportion of the LEA's total subgrant under section 611(f) of the Act as the number of private school children with disabilities aged 3 through 21 who are enrolled by their parents in private, including religious, elementary schools and secondary schools located in the school district served by the LEA, is to the total number of children with disabilities in its jurisdiction aged 3 through 21.

(2)(i) For children aged three through five, an amount that is the same proportion of the LEA's total subgrant under section 619(g) of the Act as the number of parentally-placed private school children with disabilities aged three through five who are enrolled by their parents in a private, including religious, elementary school located in the school district served by the LEA, is to the total number of children with disabilities in its jurisdiction aged three through five.

(ii) As described in paragraph (a)(2)(i) of this section, children aged three through five are considered to be parentally-placed private school children with disabilities enrolled by their parents in private, including religious, elementary schools, if they are enrolled in a private school that meets the definition of elementary school in § 300.13.

(3) If an LEA has not expended for equitable services all of the funds described in paragraphs (a)(1) and (a)(2) of this section by the end of the fiscal

year for which Congress appropriated the funds, the LEA must obligate the remaining funds for special education and related services (including direct services) to parentally-placed private school children with disabilities during a carry-over period of one additional year.

(b) *Calculating proportionate amount.* In calculating the proportionate amount of Federal funds to be provided for parentally-placed private school children with disabilities, the LEA, after timely and meaningful consultation with representatives of private schools under § 300.134, must conduct a thorough and complete child find process to determine the number of parentally-placed children with disabilities attending private schools located in the LEA. (See Appendix B for an example of how proportionate share is calculated).

(c) *Annual count of the number of parentally-placed private school children with disabilities.* (1) Each LEA must—

(i) After timely and meaningful consultation with representatives of parentally-placed private school children with disabilities (consistent with § 300.134), determine the number of parentally-placed private school children with disabilities attending private schools located in the LEA; and

(ii) Ensure that the count is conducted on any date between October 1 and December 1, inclusive, of each year.

(2) The count must be used to determine the amount that the LEA must spend on providing special education and related services to parentally-placed private school children with disabilities in the next subsequent fiscal year.

(d) *Supplement, not supplant.* State and local funds may supplement and in no case supplant the proportionate amount of Federal funds required to be expended for parentally-placed private school children with disabilities under this part.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(10)(A))

### § 300.134  Consultation.

To ensure timely and meaningful consultation, an LEA, or, if appropriate, an SEA, must consult with private school representatives and representatives of parents of parentally-placed private school children with disabilities during the design and development of special education and related services for the children regarding the following:

(a) Child find. The child find process, including—

(1) How parentally-placed private school children suspected of having a disability can participate equitably; and

(2) How parents, teachers, and private school officials will be informed of the process.

(b) *Proportionate share of funds.* The determination of the proportionate share of Federal funds available to serve parentally-placed private school children with disabilities under § 300.133(b), including the determination of how the proportionate share of those funds was calculated.

(c) *Consultation process.* The consultation process among the LEA, private school officials, and representatives of parents of parentally-placed private school children with disabilities, including how the process will operate throughout the school year to ensure that parentally-placed children with disabilities identified through the child find process can meaningfully participate in special education and related services.

(d) *Provision of special education and related services.* How, where, and by whom special education and related services will be provided for parentally-placed private school children with disabilities, including a discussion of—

(1) The types of services, including direct services and alternate service delivery mechanisms; and

(2) How special education and related services will be apportioned if funds are insufficient to serve all parentally-placed private school children; and

(3) How and when those decisions will be made;

(e) *Written explanation by LEA regarding services.* How, if the LEA disagrees with the views of the private school officials on the provision of services or the types of services (whether provided directly or through a contract), the LEA will provide to the private school officials a written explanation of the reasons why the LEA chose not to provide services directly or through a contract.

(Approved by the Office of Management and Budget under control numbers 1820–0030 and 1820–0600)

(Authority: 20 U.S.C. 1412(a)(10)(A)(iii))

### § 300.135  Written affirmation.

(a) When timely and meaningful consultation, as required by § 300.134, has occurred, the LEA must obtain a written affirmation signed by the representatives of participating private schools.

(b) If the representatives do not provide the affirmation within a reasonable period of time, the LEA must forward the documentation of the consultation process to the SEA.

(Approved by the Office of Management and Budget under control numbers 1820–0030 and 1820–0600)

(Authority: 20 U.S.C. 1412(a)(10)(A)(iv))

### § 300.136  Compliance.

(a) *General.* A private school official has the right to submit a complaint to the SEA that the LEA—

(1) Did not engage in consultation that was meaningful and timely; or

(2) Did not give due consideration to the views of the private school official.

(b) *Procedure.* (1) If the private school official wishes to submit a complaint, the official must provide to the SEA the basis of the noncompliance by the LEA with the applicable private school provisions in this part; and

(2) The LEA must forward the appropriate documentation to the SEA.

(3)(i) If the private school official is dissatisfied with the decision of the SEA, the official may submit a complaint to the Secretary by providing the information on noncompliance described in paragraph (b)(1) of this section; and

(ii) The SEA must forward the appropriate documentation to the Secretary.

(Approved by the Office of Management and Budget under control numbers 1820–0030 and 1820–0600)

(Authority: 20 U.S.C. 1412(a)(10)(A)(v))

### § 300.137  Equitable services determined.

(a) *No individual right to special education and related services.* No parentally-placed private school child with a disability has an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school.

(b) *Decisions.* (1) Decisions about the services that will be provided to parentally-placed private school children with disabilities under §§ 300.130 through 300.144 must be made in accordance with paragraph (c) of this section and § 300.134(c).

(2) The LEA must make the final decisions with respect to the services to be provided to eligible parentally-placed private school children with disabilities.

(c) *Services plan for each child served under §§ 300.130 through 300.144.* If a child with a disability is enrolled in a religious or other private school by the child's parents and will receive special education or related services from an LEA, the LEA must—

(1) Initiate and conduct meetings to develop, review, and revise a services plan for the child, in accordance with § 300.138(b); and

(2) Ensure that a representative of the religious or other private school attends

**46768** **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

each meeting. If the representative cannot attend, the LEA shall use other methods to ensure participation by the religious or other private school, including individual or conference telephone calls.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(10)(A))

**§ 300.138  Equitable services provided.**

(a) *General.* (1) The services provided to parentally-placed private school children with disabilities must be provided by personnel meeting the same standards as personnel providing services in the public schools, except that private elementary school and secondary school teachers who are providing equitable services to parentally-placed private school children with disabilities do not have to meet the highly qualified special education teacher requirements of § 300.18.

(2) Parentally-placed private school children with disabilities may receive a different amount of services than children with disabilities in public schools.

(b) *Services provided in accordance with a services plan.* (1) Each parentally-placed private school child with a disability who has been designated to receive services under § 300.132 must have a services plan that describes the specific special education and related services that the LEA will provide to the child in light of the services that the LEA has determined, through the process described in §§ 300.134 and 300.137, it will make available to parentally-placed private school children with disabilities.

(2) The services plan must, to the extent appropriate—

(i) Meet the requirements of § 300.320, or for a child ages three through five, meet the requirements of § 300.323(b) with respect to the services provided; and

(ii) Be developed, reviewed, and revised consistent with §§ 300.321 through 300.324.

(c) *Provision of equitable services.* (1) The provision of services pursuant to this section and § 300.139 through 300.143 must be provided:

(i) By employees of a public agency; or

(ii) Through contract by the public agency with an individual, association, agency, organization, or other entity.

(2) Special education and related services provided to parentally-placed private school children with disabilities, including materials and equipment, must be secular, neutral, and nonideological.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(10)(A)(vi))

**§ 300.139  Location of services and transportation.**

(a) *Services on private school premises.* Services to parentally-placed private school children with disabilities may be provided on the premises of private, including religious, schools, to the extent consistent with law.

(b) *Transportation—(1) General.* (i) If necessary for the child to benefit from or participate in the services provided under this part, a parentally-placed private school child with a disability must be provided transportation—

(A) From the child's school or the child's home to a site other than the private school; and

(B) From the service site to the private school, or to the child's home, depending on the timing of the services.

(ii) LEAs are not required to provide transportation from the child's home to the private school.

(2) *Cost of transportation.* The cost of the transportation described in paragraph (b)(1)(i) of this section may be included in calculating whether the LEA has met the requirement of § 300.133.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(10)(A))

**§ 300.140  Due process complaints and State complaints.**

(a) *Due process not applicable, except for child find.* (1) Except as provided in paragraph (b) of this section, the procedures in §§ 300.504 through 300.519 do not apply to complaints that an LEA has failed to meet the requirements of §§ 300.132 through 300.139, including the provision of services indicated on the child's services plan.

(b) *Child find complaints—to be filed with the LEA in which the private school is located.* (1) The procedures in §§ 300.504 through 300.519 apply to complaints that an LEA has failed to meet the child find requirements in § 300.131, including the requirements in §§ 300.300 through 300.311.

(2) Any due process complaint regarding the child find requirements (as described in paragraph (b)(1) of this section) must be filed with the LEA in which the private school is located and a copy must be forwarded to the SEA.

(c) *State complaints.* (1) Any complaint that an SEA or LEA has failed to meet the requirements in §§ 300.132 through 300.135 and 300.137 through 300.144 must be filed in accordance

with the procedures described in §§ 300.151 through 300.153.

(2) A complaint filed by a private school official under § 300.136(a) must be filed with the SEA in accordance with the procedures in § 300.136(b).

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(10)(A))

**§ 300.141  Requirement that funds not benefit a private school.**

(a) An LEA may not use funds provided under section 611 or 619 of the Act to finance the existing level of instruction in a private school or to otherwise benefit the private school.

(b) The LEA must use funds provided under Part B of the Act to meet the special education and related services needs of parentally-placed private school children with disabilities, but not for meeting—

(1) The needs of a private school; or

(2) The general needs of the students enrolled in the private school.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(10)(A))

**§ 300.142  Use of personnel.**

(a) *Use of public school personnel.* An LEA may use funds available under sections 611 and 619 of the Act to make public school personnel available in other than public facilities—

(1) To the extent necessary to provide services under §§ 300.130 through 300.144 for parentally-placed private school children with disabilities; and

(2) If those services are not normally provided by the private school.

(b) *Use of private school personnel.* An LEA may use funds available under sections 611 and 619 of the Act to pay for the services of an employee of a private school to provide services under §§ 300.130 through 300.144 if—

(1) The employee performs the services outside of his or her regular hours of duty; and

(2) The employee performs the services under public supervision and control.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(10)(A))

**§ 300.143  Separate classes prohibited.**

An LEA may not use funds available under section 611 or 619 of the Act for classes that are organized separately on the basis of school enrollment or religion of the children if—'

(a) The classes are at the same site; and

(b) The classes include children enrolled in public schools and children enrolled in private schools.

ED-000230

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(10)(A))

### § 300.144   Property, equipment, and supplies.

(a) A public agency must control and administer the funds used to provide special education and related services under §§ 300.137 through 300.139, and hold title to and administer materials, equipment, and property purchased with those funds for the uses and purposes provided in the Act.

(b) The public agency may place equipment and supplies in a private school for the period of time needed for the Part B program.

(c) The public agency must ensure that the equipment and supplies placed in a private school—

(1) Are used only for Part B purposes; and

(2) Can be removed from the private school without remodeling the private school facility.

(d) The public agency must remove equipment and supplies from a private school if—

(1) The equipment and supplies are no longer needed for Part B purposes; or

(2) Removal is necessary to avoid unauthorized use of the equipment and supplies for other than Part B purposes.

(e) No funds under Part B of the Act may be used for repairs, minor remodeling, or construction of private school facilities.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(10)(A)(vii))

### Children With Disabilities in Private Schools Placed or Referred by Public Agencies

### § 300.145   Applicability of §§ 300.146 through 300.147.

Sections 300.146 through 300.147 apply only to children with disabilities who are or have been placed in or referred to a private school or facility by a public agency as a means of providing special education and related services.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(10)(B))

### § 300.146   Responsibility of SEA.

Each SEA must ensure that a child with a disability who is placed in or referred to a private school or facility by a public agency—

(a) Is provided special education and related services—

(1) In conformance with an IEP that meets the requirements of §§ 300.320 through 300.325; and

(2) At no cost to the parents;

(b) Is provided an education that meets the standards that apply to education provided by the SEA and LEAs including the requirements of this part, except for § 300.18 and § 300.156(c); and

(c) Has all of the rights of a child with a disability who is served by a public agency.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(10)(B))

### § 300.147   Implementation by SEA.

In implementing § 300.146, the SEA must—

(a) Monitor compliance through procedures such as written reports, on-site visits, and parent questionnaires;

(b) Disseminate copies of applicable standards to each private school and facility to which a public agency has referred or placed a child with a disability; and

(c) Provide an opportunity for those private schools and facilities to participate in the development and revision of State standards that apply to them.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(10)(B))

### Children With Disabilities Enrolled by Their Parents in Private Schools When FAPE Is at Issue

### § 300.148   Placement of children by parents when FAPE is at issue.

(a) *General.* This part does not require an LEA to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made FAPE available to the child and the parents elected to place the child in a private school or facility. However, the public agency must include that child in the population whose needs are addressed consistent with §§ 300.131 through 300.144.

(b) *Disagreements about FAPE.* Disagreements between the parents and a public agency regarding the availability of a program appropriate for the child, and the question of financial reimbursement, are subject to the due process procedures in §§ 300.504 through 300.520.

(c) *Reimbursement for private school placement.* If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private preschool, elementary school, or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to

reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made FAPE available to the child in a timely manner prior to that enrollment and that the private placement is appropriate. A parental placement may be found to be appropriate by a hearing officer or a court even if it does not meet the State standards that apply to education provided by the SEA and LEAs.

(d) *Limitation on reimbursement.* The cost of reimbursement described in paragraph (c) of this section may be reduced or denied—

(1) If—

(i) At the most recent IEP Team meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide FAPE to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

(ii) At least ten (10) business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in paragraph (d)(1)(i) of this section;

(2) If, prior to the parents' removal of the child from the public school, the public agency informed the parents, through the notice requirements described in § 300.503(a)(1), of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for the evaluation; or

(3) Upon a judicial finding of unreasonableness with respect to actions taken by the parents.

(e) *Exception.* Notwithstanding the notice requirement in paragraph (d)(1) of this section, the cost of reimbursement—

(1) Must not be reduced or denied for failure to provide the notice if—

(i) The school prevented the parents from providing the notice;

(ii) The parents had not received notice, pursuant to § 300.504, of the notice requirement in paragraph (d)(1) of this section; or

(iii) Compliance with paragraph (d)(1) of this section would likely result in physical harm to the child; and

(2) May, in the discretion of the court or a hearing officer, not be reduced or denied for failure to provide this notice if—

(i) The parents are not literate or cannot write in English; or

(ii) Compliance with paragraph (d)(1) of this section would likely result in serious emotional harm to the child.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(10)(C))

## SEA Responsibility for General Supervision and Implementation of Procedural Safeguards

### §300.149   SEA responsibility for general supervision.

(a) The SEA is responsible for ensuring—

(1) That the requirements of this part are carried out; and

(2) That each educational program for children with disabilities administered within the State, including each program administered by any other State or local agency (but not including elementary schools and secondary schools for Indian children operated or funded by the Secretary of the Interior)—

(i) Is under the general supervision of the persons responsible for educational programs for children with disabilities in the SEA; and

(ii) Meets the educational standards of the SEA (including the requirements of this part).

(3) In carrying out this part with respect to homeless children, the requirements of subtitle B of title VII of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11431 *et seq.*) are met.

(b) The State must have in effect policies and procedures to ensure that it complies with the monitoring and enforcement requirements in §§ 300.600 through 300.602 and §§ 300.606 through 300.608.

(c) Part B of the Act does not limit the responsibility of agencies other than educational agencies for providing or paying some or all of the costs of FAPE to children with disabilities in the State.

(d) Notwithstanding paragraph (a) of this section, the Governor (or another individual pursuant to State law) may assign any public agency in the State the responsibility of ensuring that the requirements of Part B of the Act are met with respect to students with disabilities who are convicted as adults under State law and incarcerated in adult prisons.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(11); 1416)

### §300.150   SEA implementation of procedural safeguards.

The SEA (and any agency assigned responsibility pursuant to § 300.149(d)) must have in effect procedures to inform each public agency of its responsibility for ensuring effective implementation of procedural safeguards for the children with disabilities served by that public agency.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(11); 1415(a))

## State Complaint Procedures

### §300.151   Adoption of State complaint procedures.

(a) *General.* Each SEA must adopt written procedures for—

(1) Resolving any complaint, including a complaint filed by an organization or individual from another State, that meets the requirements of § 300.153 by—

(i) Providing for the filing of a complaint with the SEA; and

(ii) At the SEA's discretion, providing for the filing of a complaint with a public agency and the right to have the SEA review the public agency's decision on the complaint; and

(2) Widely disseminating to parents and other interested individuals, including parent training and information centers, protection and advocacy agencies, independent living centers, and other appropriate entities, the State procedures under §§ 300.151 through 300.153.

(b) *Remedies for denial of appropriate services.* In resolving a complaint in which the SEA has found a failure to provide appropriate services, an SEA, pursuant to its general supervisory authority under Part B of the Act, must address—

(1) The failure to provide appropriate services, including corrective action appropriate to address the needs of the child (such as compensatory services or monetary reimbursement); and

(2) Appropriate future provision of services for all children with disabilities.

(Approved by the Office of Management and Budget under control numbers 1820–0030 and 1820–0600)

(Authority: 20 U.S.C. 1221e–3)

### §300.152   Minimum State complaint procedures.

(a) *Time limit; minimum procedures.* Each SEA must include in its complaint procedures a time limit of 60 days after a complaint is filed under § 300.153 to—

(1) Carry out an independent on-site investigation, if the SEA determines that an investigation is necessary;

(2) Give the complainant the opportunity to submit additional information, either orally or in writing, about the allegations in the complaint;

(3) Provide the public agency with the opportunity to respond to the complaint, including, at a minimum—

(i) At the discretion of the public agency, a proposal to resolve the complaint; and

(ii) An opportunity for a parent who has filed a complaint and the public agency to voluntarily engage in mediation consistent with § 300.506;

(4) Review all relevant information and make an independent determination as to whether the public agency is violating a requirement of Part B of the Act or of this part; and

(5) Issue a written decision to the complainant that addresses each allegation in the complaint and contains—

(i) Findings of fact and conclusions; and

(ii) The reasons for the SEA's final decision.

(b) *Time extension; final decision; implementation.* The SEA's procedures described in paragraph (a) of this section also must—

(1) Permit an extension of the time limit under paragraph (a) of this section only if—

(i) Exceptional circumstances exist with respect to a particular complaint; or

(ii) The parent (or individual or organization, if mediation or other alternative means of dispute resolution is available to the individual or organization under State procedures) and the public agency involved agree to extend the time to engage in mediation pursuant to paragraph (a)(3)(ii) of this section, or to engage in other alternative means of dispute resolution, if available in the State; and

(2) Include procedures for effective implementation of the SEA's final decision, if needed, including—

(i) Technical assistance activities;

(ii) Negotiations; and

(iii) Corrective actions to achieve compliance.

(c) *Complaints filed under this section and due process hearings under § 300.507 and §§ 300.530 through 300.532.* (1) If a written complaint is received that is also the subject of a due process hearing under § 300.507 or §§ 300.530 through 300.532, or contains multiple issues of which one or more are part of that hearing, the State must set aside any part of the complaint that is being addressed in the due process hearing until the conclusion of the hearing. However, any issue in the complaint that is not a part of the due process action must be resolved using the time limit and procedures described in paragraphs (a) and (b) of this section.

(2) If an issue raised in a complaint filed under this section has previously

been decided in a due process hearing involving the same parties—

(i) The due process hearing decision is binding on that issue; and

(ii) The SEA must inform the complainant to that effect.

(3) A complaint alleging a public agency's failure to implement a due process hearing decision must be resolved by the SEA.

Approved by the Office of Management and Budget under control numbers 1820–0030 and 1820–0600)

(Authority: 20 U.S.C. 1221e–3)

### § 300.153   Filing a complaint.

(a) An organization or individual may file a signed written complaint under the procedures described in §§ 300.151 through 300.152.

(b) The complaint must include—

(1) A statement that a public agency has violated a requirement of Part B of the Act or of this part;

(2) The facts on which the statement is based;

(3) The signature and contact information for the complainant; and

(4) If alleging violations with respect to a specific child—

(i) The name and address of the residence of the child;

(ii) The name of the school the child is attending;

(iii) In the case of a homeless child or youth (within the meaning of section 725(2) of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11434a(2)), available contact information for the child, and the name of the school the child is attending;

(iv) A description of the nature of the problem of the child, including facts relating to the problem; and

(v) A proposed resolution of the problem to the extent known and available to the party at the time the complaint is filed.

(c) The complaint must allege a violation that occurred not more than one year prior to the date that the complaint is received in accordance with § 300.151.

(d) The party filing the complaint must forward a copy of the complaint to the LEA or public agency serving the child at the same time the party files the complaint with the SEA.

(Approved by the Office of Management and Budget under control numbers 1820–0030 and 1820–0600)

(Authority: 20 U.S.C. 1221e–3)

### Methods of Ensuring Services

### § 300.154   Methods of ensuring services.

(a) *Establishing responsibility for services.* The Chief Executive Officer of a State or designee of that officer must ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each noneducational public agency described in paragraph (b) of this section and the SEA, in order to ensure that all services described in paragraph (b)(1) of this section that are needed to ensure FAPE are provided, including the provision of these services during the pendency of any dispute under paragraph (a)(3) of this section. The agreement or mechanism must include the following:

(1) An identification of, or a method for defining, the financial responsibility of each agency for providing services described in paragraph (b)(1) of this section to ensure FAPE to children with disabilities. The financial responsibility of each noneducational public agency described in paragraph (b) of this section, including the State Medicaid agency and other public insurers of children with disabilities, must precede the financial responsibility of the LEA (or the State agency responsible for developing the child's IEP).

(2) The conditions, terms, and procedures under which an LEA must be reimbursed by other agencies.

(3) Procedures for resolving interagency disputes (including procedures under which LEAs may initiate proceedings) under the agreement or other mechanism to secure reimbursement from other agencies or otherwise implement the provisions of the agreement or mechanism.

(4) Policies and procedures for agencies to determine and identify the interagency coordination responsibilities of each agency to promote the coordination and timely and appropriate delivery of services described in paragraph (b)(1) of this section.

(b) *Obligation of noneducational public agencies.* (1)(i) If any public agency other than an educational agency is otherwise obligated under Federal or State law, or assigned responsibility under State policy or pursuant to paragraph (a) of this section, to provide or pay for any services that are also considered special education or related services (such as, but not limited to, services described in § 300.5 relating to assistive technology devices, § 300.6 relating to assistive technology services, § 300.34 relating to related services, § 300.41 relating to supplementary aids and services, and § 300.42 relating to transition services) that are necessary for ensuring FAPE to children with disabilities within the State, the public agency must fulfill that obligation or responsibility, either directly or through contract or other arrangement pursuant to paragraph (a) of this section or an agreement pursuant to paragraph (c) of this section.

(ii) A noneducational public agency described in paragraph (b)(1)(i) of this section may not disqualify an eligible service for Medicaid reimbursement because that service is provided in a school context.

(2) If a public agency other than an educational agency fails to provide or pay for the special education and related services described in paragraph (b)(1) of this section, the LEA (or State agency responsible for developing the child's IEP) must provide or pay for these services to the child in a timely manner. The LEA or State agency is authorized to claim reimbursement for the services from the noneducational public agency that failed to provide or pay for these services and that agency must reimburse the LEA or State agency in accordance with the terms of the interagency agreement or other mechanism described in paragraph (a) of this section.

(c) *Special rule.* The requirements of paragraph (a) of this section may be met through—

(1) State statute or regulation;

(2) Signed agreements between respective agency officials that clearly identify the responsibilities of each agency relating to the provision of services; or

(3) Other appropriate written methods as determined by the Chief Executive Officer of the State or designee of that officer and approved by the Secretary.

(d) *Children with disabilities who are covered by public benefits or insurance.* (1) A public agency may use the Medicaid or other public benefits or insurance programs in which a child participates to provide or pay for services required under this part, as permitted under the public benefits or insurance program, except as provided in paragraph (d)(2) of this section.

(2) With regard to services required to provide FAPE to an eligible child under this part, the public agency—

(i) May not require parents to sign up for or enroll in public benefits or insurance programs in order for their child to receive FAPE under Part B of the Act;

(ii) May not require parents to incur an out-of-pocket expense such as the payment of a deductible or co-pay amount incurred in filing a claim for services provided pursuant to this part, but pursuant to paragraph (g)(2) of this section, may pay the cost that the parents otherwise would be required to pay;

(iii) May not use a child's benefits under a public benefits or insurance program if that use would—

**46772**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

(A) Decrease available lifetime coverage or any other insured benefit;

(B) Result in the family paying for services that would otherwise be covered by the public benefits or insurance program and that are required for the child outside of the time the child is in school;

(C) Increase premiums or lead to the discontinuation of benefits or insurance; or

(D) Risk loss of eligibility for home and community-based waivers, based on aggregate health-related expenditures; and

(iv)(A) Must obtain parental consent, consistent with § 300.9, each time that access to public benefits or insurance is sought; and

(B) Notify parents that the parents' refusal to allow access to their public benefits or insurance does not relieve the public agency of its responsibility to ensure that all required services are provided at no cost to the parents.

(e) *Children with disabilities who are covered by private insurance.* (1) With regard to services required to provide FAPE to an eligible child under this part, a public agency may access the parents' private insurance proceeds only if the parents provide consent consistent with § 300.9.

(2) Each time the public agency proposes to access the parents' private insurance proceeds, the agency must—

(i) Obtain parental consent in accordance with paragraph (e)(1) of this section; and

(ii) Inform the parents that their refusal to permit the public agency to access their private insurance does not relieve the public agency of its responsibility to ensure that all required services are provided at no cost to the parents.

(f) *Use of Part B funds.* (1) If a public agency is unable to obtain parental consent to use the parents' private insurance, or public benefits or insurance when the parents would incur a cost for a specified service required under this part, to ensure FAPE the public agency may use its Part B funds to pay for the service.

(2) To avoid financial cost to parents who otherwise would consent to use private insurance, or public benefits or insurance if the parents would incur a cost, the public agency may use its Part B funds to pay the cost that the parents otherwise would have to pay to use the parents' benefits or insurance (e.g., the deductible or co-pay amounts).

(g) *Proceeds from public benefits or insurance or private insurance.* (1) Proceeds from public benefits or insurance or private insurance will not

be treated as program income for purposes of 34 CFR 80.25.

(2) If a public agency spends reimbursements from Federal funds (e.g., Medicaid) for services under this part, those funds will not be considered ''State or local'' funds for purposes of the maintenance of effort provisions in §§ 300.163 and 300.203.

(h) *Construction.* Nothing in this part should be construed to alter the requirements imposed on a State Medicaid agency, or any other agency administering a public benefits or insurance program by Federal statute, regulations or policy under title XIX, or title XXI of the Social Security Act, 42 U.S.C. 1396 through 1396v and 42 U.S.C. 1397aa through 1397jj, or any other public benefits or insurance program.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(12) and (e))

**Additional Eligibility Requirements**

**§ 300.155   Hearings relating to LEA eligibility.**

The SEA must not make any final determination that an LEA is not eligible for assistance under Part B of the Act without first giving the LEA reasonable notice and an opportunity for a hearing under 34 CFR 76.401(d).

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(13))

**§ 300.156   Personnel qualifications.**

(a) *General.* The SEA must establish and maintain qualifications to ensure that personnel necessary to carry out the purposes of this part are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities.

(b) *Related services personnel and paraprofessionals.* The qualifications under paragraph (a) of this section must include qualifications for related services personnel and paraprofessionals that—

(1) Are consistent with any State-approved or State-recognized certification, licensing, registration, or other comparable requirements that apply to the professional discipline in which those personnel are providing special education or related services; and

(2) Ensure that related services personnel who deliver services in their discipline or profession—

(i) Meet the requirements of paragraph (b)(1) of this section; and

(ii) Have not had certification or licensure requirements waived on an

emergency, temporary, or provisional basis; and

(iii) Allow paraprofessionals and assistants who are appropriately trained and supervised, in accordance with State law, regulation, or written policy, in meeting the requirements of this part to be used to assist in the provision of special education and related services under this part to children with disabilities.

(c) *Qualifications for special education teachers.* The qualifications described in paragraph (a) of this section must ensure that each person employed as a public school special education teacher in the State who teaches in an elementary school, middle school, or secondary school is highly qualified as a special education teacher by the deadline established in section 1119(a)(2) of the ESEA.

(d) *Policy.* In implementing this section, a State must adopt a policy that includes a requirement that LEAs in the State take measurable steps to recruit, hire, train, and retain highly qualified personnel to provide special education and related services under this part to children with disabilities.

(e) *Rule of construction.* Notwithstanding any other individual right of action that a parent or student may maintain under this part, nothing in this part shall be construed to create a right of action on behalf of an individual student or a class of students for the failure of a particular SEA or LEA employee to be highly qualified, or to prevent a parent from filing a complaint about staff qualifications with the SEA as provided for under this part.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(14))

**§ 300.157   Performance goals and indicators.**

The State must—

(a) Have in effect established goals for the performance of children with disabilities in the State that—

(1) Promote the purposes of this part, as stated in § 300.1;

(2) Are the same as the State's objectives for progress by children in its definition of adequate yearly progress, including the State's objectives for progress by children with disabilities, under section 1111(b)(2)(C) of the ESEA, 20 U.S.C. 6311;

(3) Address graduation rates and dropout rates, as well as such other factors as the State may determine; and

(4) Are consistent, to the extent appropriate, with any other goals and academic standards for children established by the State;

(b) Have in effect established performance indicators the State will use to assess progress toward achieving the goals described in paragraph (a) of this section, including measurable annual objectives for progress by children with disabilities under section 1111(b)(2)(C)(v)(II)(cc) of the ESEA, 20 U.S.C. 6311; and

(c) Annually report to the Secretary and the public on the progress of the State, and of children with disabilities in the State, toward meeting the goals established under paragraph (a) of this section, which may include elements of the reports required under section 1111(h) of the ESEA.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(15))

## §§ 300.158–300.161    [Reserved]

## § 300.162    Supplementation of State, local, and other Federal funds.

(a) *Expenditures.* Funds paid to a State under this part must be expended in accordance with all the provisions of this part.

(b) *Prohibition against commingling.* (1) Funds paid to a State under this part must not be commingled with State funds.

(2) The requirement in paragraph (b)(1) of this section is satisfied by the use of a separate accounting system that includes an audit trail of the expenditure of funds paid to a State under this part. Separate bank accounts are not required. (See 34 CFR 76.702 (Fiscal control and fund accounting procedures).)

(c) *State-level nonsupplanting.* (1) Except as provided in § 300.202, funds paid to a State under Part B of the Act must be used to supplement the level of Federal, State, and local funds (including funds that are not under the direct control of the SEA or LEAs) expended for special education and related services provided to children with disabilities under Part B of the Act, and in no case to supplant those Federal, State, and local funds.

(2) If the State provides clear and convincing evidence that all children with disabilities have available to them FAPE, the Secretary may waive, in whole or in part, the requirements of paragraph (c)(1) of this section if the Secretary concurs with the evidence provided by the State under § 300.164.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(17))

## § 300.163    Maintenance of State financial support.

(a) *General.* A State must not reduce the amount of State financial support for special education and related services for children with disabilities, or otherwise made available because of the excess costs of educating those children, below the amount of that support for the preceding fiscal year.

(b) *Reduction of funds for failure to maintain support.* The Secretary reduces the allocation of funds under section 611 of the Act for any fiscal year following the fiscal year in which the State fails to comply with the requirement of paragraph (a) of this section by the same amount by which the State fails to meet the requirement.

(c) *Waivers for exceptional or uncontrollable circumstances.* The Secretary may waive the requirement of paragraph (a) of this section for a State, for one fiscal year at a time, if the Secretary determines that—

(1) Granting a waiver would be equitable due to exceptional or uncontrollable circumstances such as a natural disaster or a precipitous and unforeseen decline in the financial resources of the State; or

(2) The State meets the standard in § 300.164 for a waiver of the requirement to supplement, and not to supplant, funds received under Part B of the Act.

(d) *Subsequent years.* If, for any fiscal year, a State fails to meet the requirement of paragraph (a) of this section, including any year for which the State is granted a waiver under paragraph (c) of this section, the financial support required of the State in future years under paragraph (a) of this section shall be the amount that would have been required in the absence of that failure and not the reduced level of the State's support.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(18))

## § 300.164    Waiver of requirement regarding supplementing and not supplanting with Part B funds.

(a) Except as provided under §§ 300.202 through 300.205, funds paid to a State under Part B of the Act must be used to supplement and increase the level of Federal, State, and local funds (including funds that are not under the direct control of SEAs or LEAs) expended for special education and related services provided to children with disabilities under Part B of the Act and in no case to supplant those Federal, State, and local funds. A State may use funds it retains under § 300.704(a) and (b) without regard to

the prohibition on supplanting other funds.

(b) If a State provides clear and convincing evidence that all eligible children with disabilities throughout the State have FAPE available to them, the Secretary may waive for a period of one year in whole or in part the requirement under § 300.162 (regarding State-level nonsupplanting) if the Secretary concurs with the evidence provided by the State.

(c) If a State wishes to request a waiver under this section, it must submit to the Secretary a written request that includes—

(1) An assurance that FAPE is currently available, and will remain available throughout the period that a waiver would be in effect, to all eligible children with disabilities throughout the State, regardless of the public agency that is responsible for providing FAPE to them. The assurance must be signed by an official who has the authority to provide that assurance as it applies to all eligible children with disabilities in the State;

(2) All evidence that the State wishes the Secretary to consider in determining whether all eligible children with disabilities have FAPE available to them, setting forth in detail—

(i) The basis on which the State has concluded that FAPE is available to all eligible children in the State; and

(ii) The procedures that the State will implement to ensure that FAPE remains available to all eligible children in the State, which must include—

(A) The State's procedures under § 300.111 for ensuring that all eligible children are identified, located and evaluated;

(B) The State's procedures for monitoring public agencies to ensure that they comply with all requirements of this part;

(C) The State's complaint procedures under §§ 300.151 through 300.153; and

(D) The State's hearing procedures under §§ 300.511 through 300.516 and §§ 300.530 through 300.536;

(3) A summary of all State and Federal monitoring reports, and State complaint decisions (see §§ 300.151 through 300.153) and hearing decisions (see §§ 300.511 through 300.516 and §§ 300.530 through 300.536), issued within three years prior to the date of the State's request for a waiver under this section, that includes any finding that FAPE has not been available to one or more eligible children, and evidence that FAPE is now available to all children addressed in those reports or decisions; and

(4) Evidence that the State, in determining that FAPE is currently

available to all eligible children with disabilities in the State, has consulted with the State advisory panel under § 300.167.

(d) If the Secretary determines that the request and supporting evidence submitted by the State makes a prima facie showing that FAPE is, and will remain, available to all eligible children with disabilities in the State, the Secretary, after notice to the public throughout the State, conducts a public hearing at which all interested persons and organizations may present evidence regarding the following issues:

(1) Whether FAPE is currently available to all eligible children with disabilities in the State.

(2) Whether the State will be able to ensure that FAPE remains available to all eligible children with disabilities in the State if the Secretary provides the requested waiver.

(e) Following the hearing, the Secretary, based on all submitted evidence, will provide a waiver, in whole or in part, for a period of one year if the Secretary finds that the State has provided clear and convincing evidence that FAPE is currently available to all eligible children with disabilities in the State, and the State will be able to ensure that FAPE remains available to all eligible children with disabilities in the State if the Secretary provides the requested waiver.

(f) A State may receive a waiver of the requirement of section 612(a)(18)(A) of the Act and § 300.164 if it satisfies the requirements of paragraphs (b) through (e) of this section.

(g) The Secretary may grant subsequent waivers for a period of one year each, if the Secretary determines that the State has provided clear and convincing evidence that all eligible children with disabilities throughout the State have, and will continue to have throughout the one-year period of the waiver, FAPE available to them.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(17)(C), (18)(C)(ii))

### § 300.165   Public participation.

(a) Prior to the adoption of any policies and procedures needed to comply with Part B of the Act (including any amendments to those policies and procedures), the State must ensure that there are public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities.

(b) Before submitting a State plan under this part, a State must comply with the public participation requirements in paragraph (a) of this section and those in 20 U.S.C. 1232d(b)(7).

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(19); 20 U.S.C. 1232d(b)(7))

### § 300.166   Rule of construction.

In complying with §§ 300.162 and 300.163, a State may not use funds paid to it under this part to satisfy State-law mandated funding obligations to LEAs, including funding based on student attendance or enrollment, or inflation.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(20))

**State Advisory Panel**

### § 300.167   State advisory panel.

The State must establish and maintain an advisory panel for the purpose of providing policy guidance with respect to special education and related services for children with disabilities in the State.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(21)(A))

### § 300.168   Membership.

(a) *General.* The advisory panel must consist of members appointed by the Governor, or any other official authorized under State law to make such appointments, be representative of the State population and be composed of individuals involved in, or concerned with the education of children with disabilities, including—

(1) Parents of children with disabilities (ages birth through 26);

(2) Individuals with disabilities;

(3) Teachers;

(4) Representatives of institutions of higher education that prepare special education and related services personnel;

(5) State and local education officials, including officials who carry out activities under subtitle B of title VII of the McKinney-Vento Homeless Assistance Act, (42 U.S.C. 11431 *et seq.*);

(6) Administrators of programs for children with disabilities;

(7) Representatives of other State agencies involved in the financing or delivery of related services to children with disabilities;

(8) Representatives of private schools and public charter schools;

(9) Not less than one representative of a vocational, community, or business organization concerned with the provision of transition services to children with disabilities;

(10) A representative from the State child welfare agency responsible for foster care; and

(11) Representatives from the State juvenile and adult corrections agencies.

(b) *Special rule.* A majority of the members of the panel must be individuals with disabilities or parents of children with disabilities (ages birth through 26).

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(21)(B) and (C))

### § 300.169   Duties.

The advisory panel must—

(a) Advise the SEA of unmet needs within the State in the education of children with disabilities;

(b) Comment publicly on any rules or regulations proposed by the State regarding the education of children with disabilities;

(c) Advise the SEA in developing evaluations and reporting on data to the Secretary under section 618 of the Act;

(d) Advise the SEA in developing corrective action plans to address findings identified in Federal monitoring reports under Part B of the Act; and

(e) Advise the SEA in developing and implementing policies relating to the coordination of services for children with disabilities.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(21)(D))

**Other Provisions Required for State Eligibility**

### § 300.170   Suspension and expulsion rates.

(a) *General.* The SEA must examine data, including data disaggregated by race and ethnicity, to determine if significant discrepancies are occurring in the rate of long-term suspensions and expulsions of children with disabilities—

(1) Among LEAs in the State; or

(2) Compared to the rates for nondisabled children within those agencies.

(b) *Review and revision of policies.* If the discrepancies described in paragraph (a) of this section are occurring, the SEA must review and, if appropriate, revise (or require the affected State agency or LEA to revise) its policies, procedures, and practices relating to the development and implementation of IEPs, the use of positive behavioral interventions and supports, and procedural safeguards, to ensure that these policies, procedures, and practices comply with the Act.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(22))

### § 300.171    Annual description of use of Part B funds.

(a) In order to receive a grant in any fiscal year a State must annually describe—

(1) How amounts retained for State administration and State-level activities under § 300.704 will be used to meet the requirements of this part; and

(2) How those amounts will be allocated among the activities described in § 300.704 to meet State priorities based on input from LEAs.

(b) If a State's plans for use of its funds under § 300.704 for the forthcoming year do not change from the prior year, the State may submit a letter to that effect to meet the requirement in paragraph (a) of this section.

(c) The provisions of this section do not apply to the Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and the freely associated States.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1411(e)(5))

### § 300.172    Access to instructional materials.

(a) *General.* The State must—

(1) Adopt the National Instructional Materials Accessibility Standard (NIMAS), published as appendix C to part 300, for the purposes of providing instructional materials to blind persons or other persons with print disabilities, in a timely manner after publication of the NIMAS in the **Federal Register** on July 19, 2006 (71 FR 41084); and

(2) Establish a State definition of ''timely manner'' for purposes of paragraphs (b)(2) and (b)(3) of this section if the State is not coordinating with the National Instructional Materials Access Center (NIMAC) or (b)(3) and (c)(2) of this section if the State is coordinating with the NIMAC.

(b) *Rights and responsibilities of SEA.* (1) Nothing in this section shall be construed to require any SEA to coordinate with the NIMAC.

(2) If an SEA chooses not to coordinate with the NIMAC, the SEA must provide an assurance to the Secretary that it will provide instructional materials to blind persons or other persons with print disabilities in a timely manner.

(3) Nothing in this section relieves an SEA of its responsibility to ensure that children with disabilities who need instructional materials in accessible formats, but are not included under the definition of blind or other persons with print disabilities in § 300.172(e)(1)(i) or who need materials that cannot be produced from NIMAS files, receive those instructional materials in a timely manner.

(4) In order to meet its responsibility under paragraphs (b)(2), (b)(3), and (c) of this section to ensure that children with disabilities who need instructional materials in accessible formats are provided those materials in a timely manner, the SEA must ensure that all public agencies take all reasonable steps to provide instructional materials in accessible formats to children with disabilities who need those instructional materials at the same time as other children receive instructional materials.

(c) *Preparation and delivery of files.* If an SEA chooses to coordinate with the NIMAC, as of December 3, 2006, the SEA must—

(1) As part of any print instructional materials adoption process, procurement contract, or other practice or instrument used for purchase of print instructional materials, must enter into a written contract with the publisher of the print instructional materials to—

(i) Require the publisher to prepare and, on or before delivery of the print instructional materials, provide to NIMAC electronic files containing the contents of the print instructional materials using the NIMAS; or

(ii) Purchase instructional materials from the publisher that are produced in, or may be rendered in, specialized formats.

(2) Provide instructional materials to blind persons or other persons with print disabilities in a timely manner.

(d) *Assistive technology.* In carrying out this section, the SEA, to the maximum extent possible, must work collaboratively with the State agency responsible for assistive technology programs.

(e) *Definitions.* (1) In this section and § 300.210—

(i) *Blind persons or other persons with print disabilities* means children served under this part who may qualify to receive books and other publications produced in specialized formats in accordance with the Act entitled ''An Act to provide books for adult blind,'' approved March 3, 1931, 2 U.S.C 135a;

(ii) *National Instructional Materials Access Center* or *NIMAC* means the center established pursuant to section 674(e) of the Act;

(iii) *National Instructional Materials Accessibility Standard* or *NIMAS* has the meaning given the term in section 674(e)(3)(B) of the Act;

(iv) *Specialized formats* has the meaning given the term in section 674(e)(3)(D) of the Act.

(2) The definitions in paragraph (e)(1) of this section apply to each State and LEA, whether or not the State or LEA chooses to coordinate with the NIMAC.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(23), 1474(e))

### § 300.173    Overidentification and disproportionality.

The State must have in effect, consistent with the purposes of this part and with section 618(d) of the Act, policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of children as children with disabilities, including children with disabilities with a particular impairment described in § 300.8.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(24))

### § 300.174    Prohibition on mandatory medication.

(a) *General.* The SEA must prohibit State and LEA personnel from requiring parents to obtain a prescription for substances identified under schedules I, II, III, IV, or V in section 202(c) of the Controlled Substances Act (21 U.S.C. 812(c)) for a child as a condition of attending school, receiving an evaluation under §§ 300.300 through 300.311, or receiving services under this part.

(b) *Rule of construction.* Nothing in paragraph (a) of this section shall be construed to create a Federal prohibition against teachers and other school personnel consulting or sharing classroom-based observations with parents or guardians regarding a student's academic and functional performance, or behavior in the classroom or school, or regarding the need for evaluation for special education or related services under § 300.111 (related to child find).

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(a)(25))

### § 300.175    SEA as provider of FAPE or direct services.

If the SEA provides FAPE to children with disabilities, or provides direct services to these children, the agency—

(a) Must comply with any additional requirements of §§ 300.201 and 300.202 and §§ 300.206 through 300.226 as if the agency were an LEA; and

(b) May use amounts that are otherwise available to the agency under Part B of the Act to serve those children without regard to § 300.202(b) (relating to excess costs).

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(b))

### § 300.176    Exception for prior State plans.

(a) *General.* If a State has on file with the Secretary policies and procedures approved by the Secretary that demonstrate that the State meets any requirement of § 300.100, including any policies and procedures filed under Part B of the Act as in effect before, December 3, 2004, the Secretary considers the State to have met the requirement for purposes of receiving a grant under Part B of the Act.

(b) *Modifications made by a State.* (1) Subject to paragraph (b)(2) of this section, policies and procedures submitted by a State in accordance with this subpart remain in effect until the State submits to the Secretary the modifications that the State determines necessary.

(2) The provisions of this subpart apply to a modification to an application to the same extent and in the same manner that they apply to the original plan.

(c) *Modifications required by the Secretary.* The Secretary may require a State to modify its policies and procedures, but only to the extent necessary to ensure the State's compliance with this part, if—

(1) After December 3, 2004, the provisions of the Act or the regulations in this part are amended;

(2) There is a new interpretation of this Act by a Federal court or a State's highest court; or

(3) There is an official finding of noncompliance with Federal law or regulations.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(c)(2) and (3))

### § 300.177    States' sovereign immunity.

(a) *General.* A State that accepts funds under this part waives its immunity under the 11th amendment to the Constitution of the United States from suit in Federal court for a violation of this part.

(b) *Remedies.* In a suit against a State for a violation of this part, remedies (including remedies both at law and in equity) are available for such a violation in the suit against a public entity other than a State.

(c) *Effective date.* Paragraphs (a) and (b) of this section apply with respect to

violations that occur in whole or part after the date of enactment of the Education of the Handicapped Act Amendments of 1990.

(Authority: 20 U.S.C. 1404)

### Department Procedures

### § 300.178    Determination by the Secretary that a State is eligible to receive a grant.

If the Secretary determines that a State is eligible to receive a grant under Part B of the Act, the Secretary notifies the State of that determination.

(Authority: 20 U.S.C. 1412(d)(1))

### § 300.179    Notice and hearing before determining that a State is not eligible to receive a grant.

(a) *General.* (1) The Secretary does not make a final determination that a State is not eligible to receive a grant under Part B of the Act until providing the State—

(i) With reasonable notice; and
(ii) With an opportunity for a hearing.

(2) In implementing paragraph (a)(1)(i) of this section, the Secretary sends a written notice to the SEA by certified mail with return receipt requested.

(b) *Content of notice.* In the written notice described in paragraph (a)(2) of this section, the Secretary—

(1) States the basis on which the Secretary proposes to make a final determination that the State is not eligible;

(2) May describe possible options for resolving the issues;

(3) Advises the SEA that it may request a hearing and that the request for a hearing must be made not later than 30 days after it receives the notice of the proposed final determination that the State is not eligible; and

(4) Provides the SEA with information about the hearing procedures that will be followed.

(Authority: 20 U.S.C. 1412(d)(2))

### § 300.180    Hearing official or panel.

(a) If the SEA requests a hearing, the Secretary designates one or more individuals, either from the Department or elsewhere, not responsible for or connected with the administration of this program, to conduct a hearing.

(b) If more than one individual is designated, the Secretary designates one of those individuals as the Chief Hearing Official of the Hearing Panel. If one individual is designated, that individual is the Hearing Official.

(Authority: 20 U.S.C. 1412(d)(2))

### § 300.181    Hearing procedures.

(a) As used in §§ 300.179 through 300.184 the term party or parties means the following:

(1) An SEA that requests a hearing regarding the proposed disapproval of the State's eligibility under this part.

(2) The Department official who administers the program of financial assistance under this part.

(3) A person, group or agency with an interest in and having relevant information about the case that has applied for and been granted leave to intervene by the Hearing Official or Hearing Panel.

(b) Within 15 days after receiving a request for a hearing, the Secretary designates a Hearing Official or Hearing Panel and notifies the parties.

(c) The Hearing Official or Hearing Panel may regulate the course of proceedings and the conduct of the parties during the proceedings. The Hearing Official or Hearing Panel takes all steps necessary to conduct a fair and impartial proceeding, to avoid delay, and to maintain order, including the following:

(1) The Hearing Official or Hearing Panel may hold conferences or other types of appropriate proceedings to clarify, simplify, or define the issues or to consider other matters that may aid in the disposition of the case.

(2) The Hearing Official or Hearing Panel may schedule a prehearing conference with the Hearing Official or Hearing Panel and the parties.

(3) Any party may request the Hearing Official or Hearing Panel to schedule a prehearing or other conference. The Hearing Official or Hearing Panel decides whether a conference is necessary and notifies all parties.

(4) At a prehearing or other conference, the Hearing Official or Hearing Panel and the parties may consider subjects such as—

(i) Narrowing and clarifying issues;
(ii) Assisting the parties in reaching agreements and stipulations;
(iii) Clarifying the positions of the parties;
(iv) Determining whether an evidentiary hearing or oral argument should be held; and
(v) Setting dates for—
(A) The exchange of written documents;
(B) The receipt of comments from the parties on the need for oral argument or evidentiary hearing;
(C) Further proceedings before the Hearing Official or Hearing Panel (including an evidentiary hearing or oral argument, if either is scheduled);
(D) Requesting the names of witnesses each party wishes to present at an evidentiary hearing and estimation of time for each presentation; or
(E) Completion of the review and the initial decision of the Hearing Official or Hearing Panel.

ED-000238

(5) A prehearing or other conference held under paragraph (b)(4) of this section may be conducted by telephone conference call.

(6) At a prehearing or other conference, the parties must be prepared to discuss the subjects listed in paragraph (b)(4) of this section.

(7) Following a prehearing or other conference the Hearing Official or Hearing Panel may issue a written statement describing the issues raised, the action taken, and the stipulations and agreements reached by the parties.

(d) The Hearing Official or Hearing Panel may require parties to state their positions and to provide all or part of the evidence in writing.

(e) The Hearing Official or Hearing Panel may require parties to present testimony through affidavits and to conduct cross-examination through interrogatories.

(f) The Hearing Official or Hearing Panel may direct the parties to exchange relevant documents or information and lists of witnesses, and to send copies to the Hearing Official or Panel.

(g) The Hearing Official or Hearing Panel may receive, rule on, exclude, or limit evidence at any stage of the proceedings.

(h) The Hearing Official or Hearing Panel may rule on motions and other issues at any stage of the proceedings.

(i) The Hearing Official or Hearing Panel may examine witnesses.

(j) The Hearing Official or Hearing Panel may set reasonable time limits for submission of written documents.

(k) The Hearing Official or Hearing Panel may refuse to consider documents or other submissions if they are not submitted in a timely manner unless good cause is shown.

(l) The Hearing Official or Hearing Panel may interpret applicable statutes and regulations but may not waive them or rule on their validity.

(m)(1) The parties must present their positions through briefs and the submission of other documents and may request an oral argument or evidentiary hearing. The Hearing Official or Hearing Panel shall determine whether an oral argument or an evidentiary hearing is needed to clarify the positions of the parties.

(2) The Hearing Official or Hearing Panel gives each party an opportunity to be represented by counsel.

(n) If the Hearing Official or Hearing Panel determines that an evidentiary hearing would materially assist the resolution of the matter, the Hearing Official or Hearing Panel gives each party, in addition to the opportunity to be represented by counsel—

(1) An opportunity to present witnesses on the party's behalf; and

(2) An opportunity to cross-examine witnesses either orally or with written questions.

(o) The Hearing Official or Hearing Panel accepts any evidence that it finds is relevant and material to the proceedings and is not unduly repetitious.

(p)(1) The Hearing Official or Hearing Panel—

(i) Arranges for the preparation of a transcript of each hearing;

(ii) Retains the original transcript as part of the record of the hearing; and

(iii) Provides one copy of the transcript to each party.

(2) Additional copies of the transcript are available on request and with payment of the reproduction fee.

(q) Each party must file with the Hearing Official or Hearing Panel all written motions, briefs, and other documents and must at the same time provide a copy to the other parties to the proceedings.

(Authority: 20 U.S.C. 1412(d)(2))

### § 300.182  Initial decision; final decision.

(a) The Hearing Official or Hearing Panel prepares an initial written decision that addresses each of the points in the notice sent by the Secretary to the SEA under § 300.179 including any amendments to or further clarifications of the issues, under § 300.181(c)(7).

(b) The initial decision of a Hearing Panel is made by a majority of Panel members.

(c) The Hearing Official or Hearing Panel mails, by certified mail with return receipt requested, a copy of the initial decision to each party (or to the party's counsel) and to the Secretary, with a notice stating that each party has an opportunity to submit written comments regarding the decision to the Secretary.

(d) Each party may file comments and recommendations on the initial decision with the Hearing Official or Hearing Panel within 15 days of the date the party receives the Panel's decision.

(e) The Hearing Official or Hearing Panel sends a copy of a party's initial comments and recommendations to the other parties by certified mail with return receipt requested. Each party may file responsive comments and recommendations with the Hearing Official or Hearing Panel within seven days of the date the party receives the initial comments and recommendations.

(f) The Hearing Official or Hearing Panel forwards the parties' initial and responsive comments on the initial decision to the Secretary who reviews the initial decision and issues a final decision.

(g) The initial decision of the Hearing Official or Hearing Panel becomes the final decision of the Secretary unless, within 25 days after the end of the time for receipt of written comments and recommendations, the Secretary informs the Hearing Official or Hearing Panel and the parties to a hearing in writing that the decision is being further reviewed for possible modification.

(h) The Secretary rejects or modifies the initial decision of the Hearing Official or Hearing Panel if the Secretary finds that it is clearly erroneous.

(i) The Secretary conducts the review based on the initial decision, the written record, the transcript of the Hearing Official's or Hearing Panel's proceedings, and written comments.

(j) The Secretary may remand the matter to the Hearing Official or Hearing Panel for further proceedings.

(k) Unless the Secretary remands the matter as provided in paragraph (j) of this section, the Secretary issues the final decision, with any necessary modifications, within 30 days after notifying the Hearing Official or Hearing Panel that the initial decision is being further reviewed.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1412(d)(2))

### § 300.183  Filing requirements.

(a) Any written submission by a party under §§ 300.179 through 300.184 must be filed by hand delivery, by mail, or by facsimile transmission. The Secretary discourages the use of facsimile transmission for documents longer than five pages.

(b) The filing date under paragraph (a) of this section is the date the document is—

(1) Hand-delivered;

(2) Mailed; or

(3) Sent by facsimile transmission.

(c) A party filing by facsimile transmission is responsible for confirming that a complete and legible copy of the document was received by the Department.

(d) If a document is filed by facsimile transmission, the Secretary, the Hearing Official, or the Hearing Panel, as applicable, may require the filing of a follow-up hard copy by hand delivery or by mail within a reasonable period of time.

(e) If agreed upon by the parties, service of a document may be made upon the other party by facsimile transmission.

(Authority: 20 U.S.C. 1412(d))

## § 300.184  Judicial review.

If a State is dissatisfied with the Secretary's final decision with respect to the eligibility of the State under section 612 of the Act, the State may, not later than 60 days after notice of that decision, file with the United States Court of Appeals for the circuit in which that State is located a petition for review of that decision. A copy of the petition must be transmitted by the clerk of the court to the Secretary. The Secretary then files in the court the record of the proceedings upon which the Secretary's decision was based, as provided in 28 U.S.C. 2112.

(Authority: 20 U.S.C. 1416(e)(8))

## § 300.185  [Reserved]

## § 300.186  Assistance under other Federal programs.

Part B of the Act may not be construed to permit a State to reduce medical and other assistance available, or to alter eligibility, under titles V and XIX of the Social Security Act with respect to the provision of FAPE for children with disabilities in the State.

(Authority: 20 U.S.C. 1412(e))

## By-pass for Children in Private Schools

## § 300.190  By-pass—general.

(a) If, on December 2, 1983, the date of enactment of the Education of the Handicapped Act Amendments of 1983, an SEA was prohibited by law from providing for the equitable participation in special programs of children with disabilities enrolled in private elementary schools and secondary schools as required by section 612(a)(10)(A) of the Act, or if the Secretary determines that an SEA, LEA, or other public agency has substantially failed or is unwilling to provide for such equitable participation then the Secretary shall, notwithstanding such provision of law, arrange for the provision of services to these children through arrangements which shall be subject to the requirements of section 612(a)(10)(A) of the Act.

(b) The Secretary waives the requirement of section 612(a)(10)(A) of the Act and of §§ 300.131 through 300.144 if the Secretary implements a by-pass.

(Authority: 20 U.S.C. 1412(f)(1))

## § 300.191  Provisions for services under a by-pass.

(a) Before implementing a by-pass, the Secretary consults with appropriate public and private school officials, including SEA officials, in the affected State, and as appropriate, LEA or other public agency officials to consider matters such as—

(1) Any prohibition imposed by State law that results in the need for a by-pass; and

(2) The scope and nature of the services required for private school children with disabilities in the State, and the number of children to be served under the by-pass.

(b) After determining that a by-pass is required, the Secretary arranges for the provision of services to private school children with disabilities in the State, LEA or other public agency in a manner consistent with the requirements of section 612(a)(10)(A) of the Act and §§ 300.131 through 300.144 by providing services through one or more agreements with appropriate parties.

(c) For any fiscal year that a by-pass is implemented, the Secretary determines the maximum amount to be paid to the providers of services by multiplying—

(1) A per child amount determined by dividing the total amount received by the State under Part B of the Act for the fiscal year by the number of children with disabilities served in the prior year as reported to the Secretary under section 618 of the Act; by

(2) The number of private school children with disabilities (as defined in §§ 300.8(a) and 300.130) in the State, LEA or other public agency, as determined by the Secretary on the basis of the most recent satisfactory data available, which may include an estimate of the number of those children with disabilities.

(d) The Secretary deducts from the State's allocation under Part B of the Act the amount the Secretary determines is necessary to implement a by-pass and pays that amount to the provider of services. The Secretary may withhold this amount from the State's allocation pending final resolution of any investigation or complaint that could result in a determination that a by-pass must be implemented.

(Authority: 20 U.S.C. 1412(f)(2))

## § 300.192  Notice of intent to implement a by-pass.

(a) Before taking any final action to implement a by-pass, the Secretary provides the SEA and, as appropriate, LEA or other public agency with written notice.

(b) In the written notice, the Secretary—

(1) States the reasons for the proposed by-pass in sufficient detail to allow the SEA and, as appropriate, LEA or other public agency to respond; and

(2) Advises the SEA and, as appropriate, LEA or other public agency

that it has a specific period of time (at least 45 days) from receipt of the written notice to submit written objections to the proposed by-pass and that it may request in writing the opportunity for a hearing to show cause why a by-pass should not be implemented.

(c) The Secretary sends the notice to the SEA and, as appropriate, LEA or other public agency by certified mail with return receipt requested.

(Authority: 20 U.S.C. 1412(f)(3)(A))

## § 300.193  Request to show cause.

An SEA, LEA or other public agency in receipt of a notice under § 300.192 that seeks an opportunity to show cause why a by-pass should not be implemented must submit a written request for a show cause hearing to the Secretary, within the specified time period in the written notice in § 300.192(b)(2).

(Authority: 20 U.S.C. 1412(f)(3))

## § 300.194  Show cause hearing.

(a) If a show cause hearing is requested, the Secretary—

(1) Notifies the SEA and affected LEA or other public agency, and other appropriate public and private school officials of the time and place for the hearing;

(2) Designates a person to conduct the show cause hearing. The designee must not have had any responsibility for the matter brought for a hearing; and

(3) Notifies the SEA, LEA or other public agency, and representatives of private schools that they may be represented by legal counsel and submit oral or written evidence and arguments at the hearing.

(b) At the show cause hearing, the designee considers matters such as—

(1) The necessity for implementing a by-pass;

(2) Possible factual errors in the written notice of intent to implement a by-pass; and

(3) The objections raised by public and private school representatives.

(c) The designee may regulate the course of the proceedings and the conduct of parties during the pendency of the proceedings. The designee takes all steps necessary to conduct a fair and impartial proceeding, to avoid delay, and to maintain order.

(d) The designee has no authority to require or conduct discovery.

(e) The designee may interpret applicable statutes and regulations, but may not waive them or rule on their validity.

(f) The designee arranges for the preparation, retention, and, if appropriate, dissemination of the record of the hearing.

(g) Within 10 days after the hearing, the designee—

(1) Indicates that a decision will be issued on the basis of the existing record; or

(2) Requests further information from the SEA, LEA, other public agency, representatives of private schools or Department officials.

(Authority: 20 U.S.C. 1412(f)(3))

### § 300.195  Decision.

(a) The designee who conducts the show cause hearing—

(1) Within 120 days after the record of a show cause hearing is closed, issues a written decision that includes a statement of findings; and

(2) Submits a copy of the decision to the Secretary and sends a copy to each party by certified mail with return receipt requested.

(b) Each party may submit comments and recommendations on the designee's decision to the Secretary within 30 days of the date the party receives the designee's decision.

(c) The Secretary adopts, reverses, or modifies the designee's decision and notifies all parties to the show cause hearing of the Secretary's final action. That notice is sent by certified mail with return receipt requested.

(Authority: 20 U.S.C. 1412(f)(3))

### § 300.196  Filing requirements.

(a) Any written submission under § 300.194 must be filed by hand-delivery, by mail, or by facsimile transmission. The Secretary discourages the use of facsimile transmission for documents longer than five pages.

(b) The filing date under paragraph (a) of this section is the date the document is—

(1) Hand-delivered;

(2) Mailed; or

(3) Sent by facsimile transmission.

(c) A party filing by facsimile transmission is responsible for confirming that a complete and legible copy of the document was received by the Department.

(d) If a document is filed by facsimile transmission, the Secretary or the hearing officer, as applicable, may require the filing of a follow-up hard copy by hand-delivery or by mail within a reasonable period of time.

(e) If agreed upon by the parties, service of a document may be made upon the other party by facsimile transmission.

(f) A party must show a proof of mailing to establish the filing date under paragraph (b)(2) of this section as provided in 34 CFR 75.102(d).

(Authority: 20 U.S.C. 1412(f)(3))

### § 300.197  Judicial review.

If dissatisfied with the Secretary's final action, the SEA may, within 60 days after notice of that action, file a petition for review with the United States Court of Appeals for the circuit in which the State is located. The procedures for judicial review are described in section 612(f)(3) (B) through (D) of the Act.

(Authority: 20 U.S.C. 1412(f)(3)(B)–(D))

### § 300.198  Continuation of a by-pass.

The Secretary continues a by-pass until the Secretary determines that the SEA, LEA or other public agency will meet the requirements for providing services to private school children.

(Authority: 20 U.S.C. 1412(f)(2)(C))

### State Administration

### § 300.199  State administration.

(a) *Rulemaking.* Each State that receives funds under Part B of the Act must—

(1) Ensure that any State rules, regulations, and policies relating to this part conform to the purposes of this part;

(2) Identify in writing to LEAs located in the State and the Secretary any such rule, regulation, or policy as a State-imposed requirement that is not required by Part B of the Act and Federal regulations; and

(3) Minimize the number of rules, regulations, and policies to which the LEAs and schools located in the State are subject under Part B of the Act.

(b) *Support and facilitation.* State rules, regulations, and policies under Part B of the Act must support and facilitate LEA and school-level system improvement designed to enable children with disabilities to meet the challenging State student academic achievement standards.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1407)

## Subpart C—Local Educational Agency Eligibility

### § 300.200  Condition of assistance.

An LEA is eligible for assistance under Part B of the Act for a fiscal year if the agency submits a plan that provides assurances to the SEA that the LEA meets each of the conditions in §§ 300.201 through 300.213.

(Authority: 20 U.S.C. 1413(a))

### § 300.201  Consistency with State policies.

The LEA, in providing for the education of children with disabilities within its jurisdiction, must have in effect policies, procedures, and programs that are consistent with the State policies and procedures established under §§ 300.101 through 300.163, and §§ 300.165 through 300.174.

(Approved by the Office of Management and Budget under control number 1820–0600)

(Authority: 20 U.S.C. 1413(a)(1))

### § 300.202  Use of amounts.

(a) *General.* Amounts provided to the LEA under Part B of the Act—

(1) Must be expended in accordance with the applicable provisions of this part;

(2) Must be used only to pay the excess costs of providing special education and related services to children with disabilities, consistent with paragraph (b) of this section; and

(3) Must be used to supplement State, local, and other Federal funds and not to supplant those funds.

(b) *Excess cost requirement*—(1) *General.* (i) The excess cost requirement prevents an LEA from using funds provided under Part B of the Act to pay for all of the costs directly attributable to the education of a child with a disability, subject to paragraph (b)(1)(ii) of this section.

(ii) The excess cost requirement does not prevent an LEA from using Part B funds to pay for all of the costs directly attributable to the education of a child with a disability in any of the ages 3, 4, 5, 18, 19, 20, or 21, if no local or State funds are available for nondisabled children of these ages. However, the LEA must comply with the nonsupplanting and other requirements of this part in providing the education and services for these children.

(2)(i) An LEA meets the excess cost requirement if it has spent at least a minimum average amount for the education of its children with disabilities before funds under Part B of the Act are used.

(ii) The amount described in paragraph (b)(2)(i) of this section is determined in accordance with the definition of *excess costs* in § 300.16. That amount may not include capital outlay or debt service.

(3) If two or more LEAs jointly establish eligibility in accordance with § 300.223, the minimum average amount is the average of the combined minimum average amounts determined in accordance with the definition of excess costs in § 300.16 in those agencies for elementary or secondary school students, as the case may be.

(Approved by the Office of Management and Budget under control number 1820–0600)

(Authority: 20 U.S.C. 1413(a)(2)(A))

**46780**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

### § 300.203  Maintenance of effort.

(a) *General.* Except as provided in §§ 300.204 and 300.205, funds provided to an LEA under Part B of the Act must not be used to reduce the level of expenditures for the education of children with disabilities made by the LEA from local funds below the level of those expenditures for the preceding fiscal year.

(b) *Standard.* (1) Except as provided in paragraph (b)(2) of this section, the SEA must determine that an LEA complies with paragraph (a) of this section for purposes of establishing the LEA's eligibility for an award for a fiscal year if the LEA budgets, for the education of children with disabilities, at least the same total or per capita amount from either of the following sources as the LEA spent for that purpose from the same source for the most recent prior year for which information is available:

(i) Local funds only.

(ii) The combination of State and local funds.

(2) An LEA that relies on paragraph (b)(1)(i) of this section for any fiscal year must ensure that the amount of local funds it budgets for the education of children with disabilities in that year is at least the same, either in total or per capita, as the amount it spent for that purpose in the most recent fiscal year for which information is available and the standard in paragraph (b)(1)(i) of this section was used to establish its compliance with this section.

(3) The SEA may not consider any expenditures made from funds provided by the Federal Government for which the SEA is required to account to the Federal Government or for which the LEA is required to account to the Federal Government directly or through the SEA in determining an LEA's compliance with the requirement in paragraph (a) of this section.

(Approved by the Office of Management and Budget under control number 1820–0600)

(Authority: 20 U.S.C. 1413(a)(2)(A))

### § 300.204  Exception to maintenance of effort.

Notwithstanding the restriction in § 300.203(a), an LEA may reduce the level of expenditures by the LEA under Part B of the Act below the level of those expenditures for the preceding fiscal year if the reduction is attributable to any of the following:

(a) The voluntary departure, by retirement or otherwise, or departure for just cause, of special education or related services personnel.

(b) A decrease in the enrollment of children with disabilities.

(c) The termination of the obligation of the agency, consistent with this part, to provide a program of special education to a particular child with a disability that is an exceptionally costly program, as determined by the SEA, because the child—

(1) Has left the jurisdiction of the agency;

(2) Has reached the age at which the obligation of the agency to provide FAPE to the child has terminated; or

(3) No longer needs the program of special education.

(d) The termination of costly expenditures for long-term purchases, such as the acquisition of equipment or the construction of school facilities.

(e) The assumption of cost by the high cost fund operated by the SEA under § 300.704(c).

(Approved by the Office of Management and Budget under control number 1820–0600)

(Authority: 20 U.S.C. 1413(a)(2)(B))

### § 300.205  Adjustment to local fiscal efforts in certain fiscal years.

(a) *Amounts in excess.* Notwithstanding § 300.202(a)(2) and (b) and § 300.203(a), and except as provided in paragraph (d) of this section and § 300.230(e)(2), for any fiscal year for which the allocation received by an LEA under § 300.705 exceeds the amount the LEA received for the previous fiscal year, the LEA may reduce the level of expenditures otherwise required by § 300.203(a) by not more than 50 percent of the amount of that excess.

(b) *Use of amounts to carry out activities under ESEA.* If an LEA exercises the authority under paragraph (a) of this section, the LEA must use an amount of local funds equal to the reduction in expenditures under paragraph (a) of this section to carry out activities that could be supported with funds under the ESEA regardless of whether the LEA is using funds under the ESEA for those activities.

(c) *State prohibition.* Notwithstanding paragraph (a) of this section, if an SEA determines that an LEA is unable to establish and maintain programs of FAPE that meet the requirements of section 613(a) of the Act and this part or the SEA has taken action against the LEA under section 616 of the Act and subpart F of these regulations, the SEA must prohibit the LEA from reducing the level of expenditures under paragraph (a) of this section for that fiscal year.

(d) *Special rule.* The amount of funds expended by an LEA for early intervening services under § 300.226 shall count toward the maximum

amount of expenditures that the LEA may reduce under paragraph (a) of this section.

(Approved by the Office of Management and Budget under control number 1820–0600)

(Authority: 20 U.S.C. 1413(a)(2)(C))

### § 300.206  Schoolwide programs under title I of the ESEA.

(a) *General.* Notwithstanding the provisions of §§ 300.202 and 300.203 or any other provision of Part B of the Act, an LEA may use funds received under Part B of the Act for any fiscal year to carry out a schoolwide program under section 1114 of the ESEA, except that the amount used in any schoolwide program may not exceed—

(1)(i) The amount received by the LEA under Part B of the Act for that fiscal year; divided by

(ii) The number of children with disabilities in the jurisdiction of the LEA; and multiplied by

(2) The number of children with disabilities participating in the schoolwide program.

(b) *Funding conditions.* The funds described in paragraph (a) of this section are subject to the following conditions:

(1) The funds must be considered as Federal Part B funds for purposes of the calculations required by § 300.202(a)(2) and (a)(3).

(2) The funds may be used without regard to the requirements of § 300.202(a)(1).

(c) *Meeting other Part B requirements.* Except as provided in paragraph (b) of this section, all other requirements of Part B of the Act must be met by an LEA using Part B funds in accordance with paragraph (a) of this section, including ensuring that children with disabilities in schoolwide program schools—

(1) Receive services in accordance with a properly developed IEP; and

(2) Are afforded all of the rights and services guaranteed to children with disabilities under the Act.

(Approved by the Office of Management and Budget under control number 1820–0600)

(Authority: 20 U.S.C. 1413(a)(2)(D))

### § 300.207  Personnel development.

The LEA must ensure that all personnel necessary to carry out Part B of the Act are appropriately and adequately prepared, subject to the requirements of § 300.156 (related to personnel qualifications) and section 2122 of the ESEA.

(Approved by the Office of Management and Budget under control number 1820–0600)

(Authority: 20 U.S.C. 1413(a)(3))

ED-000242

## § 300.208  Permissive use of funds.

(a) *Uses.* Notwithstanding §§ 300.202, 300.203(a), and 300.162(b), funds provided to an LEA under Part B of the Act may be used for the following activities:

(1) *Services and aids that also benefit nondisabled children.* For the costs of special education and related services, and supplementary aids and services, provided in a regular class or other education-related setting to a child with a disability in accordance with the IEP of the child, even if one or more nondisabled children benefit from these services.

(2) *Early intervening services.* To develop and implement coordinated, early intervening educational services in accordance with § 300.226.

(3) *High cost special education and related services.* To establish and implement cost or risk sharing funds, consortia, or cooperatives for the LEA itself, or for LEAs working in a consortium of which the LEA is a part, to pay for high cost special education and related services.

(b) *Administrative case management.* An LEA may use funds received under Part B of the Act to purchase appropriate technology for recordkeeping, data collection, and related case management activities of teachers and related services personnel providing services described in the IEP of children with disabilities, that is needed for the implementation of those case management activities.

(Approved by the Office of Management and Budget under control number 1820–0600)

(Authority: 20 U.S.C. 1413(a)(4))

## § 300.209  Treatment of charter schools and their students.

(a) *Rights of children with disabilities.* Children with disabilities who attend public charter schools and their parents retain all rights under this part.

(b) *Charter schools that are public schools of the LEA.* (1) In carrying out Part B of the Act and these regulations with respect to charter schools that are public schools of the LEA, the LEA must—

(i) Serve children with disabilities attending those charter schools in the same manner as the LEA serves children with disabilities in its other schools, including providing supplementary and related services on site at the charter school to the same extent to which the LEA has a policy or practice of providing such services on the site to its other public schools; and

(ii) Provide funds under Part B of the Act to those charter schools—

(A) On the same basis as the LEA provides funds to the LEA's other public schools, including proportional distribution based on relative enrollment of children with disabilities; and

(B) At the same time as the LEA distributes other Federal funds to the LEA's other public schools, consistent with the State's charter school law.

(2) If the public charter school is a school of an LEA that receives funding under § 300.705 and includes other public schools—

(i) The LEA is responsible for ensuring that the requirements of this part are met, unless State law assigns that responsibility to some other entity; and

(ii) The LEA must meet the requirements of paragraph (b)(1) of this section.

(c) *Public charter schools that are LEAs.* If the public charter school is an LEA, consistent with § 300.28, that receives funding under § 300.705, that charter school is responsible for ensuring that the requirements of this part are met, unless State law assigns that responsibility to some other entity.

(d) *Public charter schools that are not an LEA or a school that is part of an LEA.* (1) If the public charter school is not an LEA receiving funding under § 300.705, or a school that is part of an LEA receiving funding under § 300.705, the SEA is responsible for ensuring that the requirements of this part are met.

(2) Paragraph (d)(1) of this section does not preclude a State from assigning initial responsibility for ensuring the requirements of this part are met to another entity. However, the SEA must maintain the ultimate responsibility for ensuring compliance with this part, consistent with § 300.149.

(Approved by the Office of Management and Budget under control number 1820–0600)

(Authority: 20 U.S.C. 1413(a)(5))

## § 300.210  Purchase of instructional materials.

(a) *General.* Not later than December 3, 2006, an LEA that chooses to coordinate with the National Instructional Materials Access Center (NIMAC), when purchasing print instructional materials, must acquire those instructional materials in the same manner, and subject to the same conditions as an SEA under § 300.172.

(b) *Rights of LEA.* (1) Nothing in this section shall be construed to require an LEA to coordinate with the NIMAC.

(2) If an LEA chooses not to coordinate with the NIMAC, the LEA must provide an assurance to the SEA that the LEA will provide instructional materials to blind persons or other persons with print disabilities in a timely manner.

(3) Nothing in this section relieves an LEA of its responsibility to ensure that children with disabilities who need instructional materials in accessible formats but are not included under the definition of blind or other persons with print disabilities in § 300.172(e)(1)(i) or who need materials that cannot be produced from NIMAS files, receive those instructional materials in a timely manner.

(Approved by the Office of Management and Budget under control number 1820–0600)

(Authority: 20 U.S.C. 1413(a)(6))

## § 300.211  Information for SEA.

The LEA must provide the SEA with information necessary to enable the SEA to carry out its duties under Part B of the Act, including, with respect to §§ 300.157 and 300.160, information relating to the performance of children with disabilities participating in programs carried out under Part B of the Act.

(Approved by the Office of Management and Budget under control number 1820–0600)

(Authority: 20 U.S.C. 1413(a)(7))

## § 0.212  Public information.

The LEA must make available to parents of children with disabilities and to the general public all documents relating to the eligibility of the agency under Part B of the Act.

(Approved by the Office of Management and Budget under control number 1820–0600)

(Authority: 20 U.S.C. 1413(a)(8))

## § 300.213  Records regarding migratory children with disabilities.

The LEA must cooperate in the Secretary's efforts under section 1308 of the ESEA to ensure the linkage of records pertaining to migratory children with disabilities for the purpose of electronically exchanging, among the States, health and educational information regarding those children.

(Approved by the Office of Management and Budget under control number 1820–0600)

(Authority: 20 U.S.C. 1413(a)(9))

## §§ 300.214–300.219  [Reserved]

## § 300.220  Exception for prior local plans.

(a) *General.* If an LEA or a State agency described in § 300.228 has on file with the SEA policies and procedures that demonstrate that the LEA or State agency meets any requirement of § 300.200, including any policies and procedures filed under Part B of the Act as in effect before December 3, 2004, the SEA must consider the LEA or State agency to have met that requirement for purposes of receiving assistance under Part B of the Act.

(b) *Modification made by an LEA or State agency.* Subject to paragraph (c) of this section, policies and procedures submitted by an LEA or a State agency in accordance with this subpart remain in effect until the LEA or State agency submits to the SEA the modifications that the LEA or State agency determines are necessary.

(c) *Modifications required by the SEA.* The SEA may require an LEA or a State agency to modify its policies and procedures, but only to the extent necessary to ensure the LEA's or State agency's compliance with Part B of the Act or State law, if—

(1) After December 3, 2004, the effective date of the Individuals with Disabilities Education Improvement Act of 2004, the applicable provisions of the Act (or the regulations developed to carry out the Act) are amended;

(2) There is a new interpretation of an applicable provision of the Act by Federal or State courts; or

(3) There is an official finding of noncompliance with Federal or State law or regulations.

(Authority: 20 U.S.C. 1413(b))

§ **300.221  Notification of LEA or State agency in case of ineligibility.**

If the SEA determines that an LEA or State agency is not eligible under Part B of the Act, then the SEA must—

(a) Notify the LEA or State agency of that determination; and

(b) Provide the LEA or State agency with reasonable notice and an opportunity for a hearing.

(Authority: 20 U.S.C. 1413(c))

§ **300.222  LEA and State agency compliance.**

(a) *General.* If the SEA, after reasonable notice and an opportunity for a hearing, finds that an LEA or State agency that has been determined to be eligible under this subpart is failing to comply with any requirement described in §§ 300.201 through 300.213, the SEA must reduce or must not provide any further payments to the LEA or State agency until the SEA is satisfied that the LEA or State agency is complying with that requirement.

(b) *Notice requirement.* Any State agency or LEA in receipt of a notice described in paragraph (a) of this section must, by means of public notice, take the measures necessary to bring the pendency of an action pursuant to this section to the attention of the public within the jurisdiction of the agency.

(c) *Consideration.* In carrying out its responsibilities under this section, each SEA must consider any decision resulting from a hearing held under §§ 300.511 through 300.533 that is

adverse to the LEA or State agency involved in the decision.

(Authority: 20 U.S.C. 1413(d))

§ **300.223  Joint establishment of eligibility.**

(a) *General.* An SEA may require an LEA to establish its eligibility jointly with another LEA if the SEA determines that the LEA will be ineligible under this subpart because the agency will not be able to establish and maintain programs of sufficient size and scope to effectively meet the needs of children with disabilities.

(b) *Charter school exception.* An SEA may not require a charter school that is an LEA to jointly establish its eligibility under paragraph (a) of this section unless the charter school is explicitly permitted to do so under the State's charter school statute.

(c) *Amount of payments.* If an SEA requires the joint establishment of eligibility under paragraph (a) of this section, the total amount of funds made available to the affected LEAs must be equal to the sum of the payments that each LEA would have received under § 300.705 if the agencies were eligible for those payments.

(Authority: 20 U.S.C. 1413(e)(1) and (2))

§ **300.224  Requirements for establishing eligibility.**

(a) *Requirements for LEAs in general.* LEAs that establish joint eligibility under this section must—

(1) Adopt policies and procedures that are consistent with the State's policies and procedures under §§ 300.101 through 300.163, and §§ 300.165 through 300.174; and

(2) Be jointly responsible for implementing programs that receive assistance under Part B of the Act.

(b) *Requirements for educational service agencies in general.* If an educational service agency is required by State law to carry out programs under Part B of the Act, the joint responsibilities given to LEAs under Part B of the Act—

(1) Do not apply to the administration and disbursement of any payments received by that educational service agency; and

(2) Must be carried out only by that educational service agency.

(c) *Additional requirement.* Notwithstanding any other provision of §§ 300.223 through 300.224, an educational service agency must provide for the education of children with disabilities in the least restrictive environment, as required by § 300.112.

(Approved by the Office of Management and Budget under control number 1820–0600)

(Authority: 20 U.S.C. 1413(e)(3) and (4))

§ **300.225  [Reserved]**

§ **300.226  Early intervening services.**

(a) *General.* An LEA may not use more than 15 percent of the amount the LEA receives under Part B of the Act for any fiscal year, less any amount reduced by the LEA pursuant to § 300.205, if any, in combination with other amounts (which may include amounts other than education funds), to develop and implement coordinated, early intervening services, which may include interagency financing structures, for students in kindergarten through grade 12 (with a particular emphasis on students in kindergarten through grade three) who are not currently identified as needing special education or related services, but who need additional academic and behavioral support to succeed in a general education environment. (See Appendix D for examples of how § 300.205(d), regarding local maintenance of effort, and § 300.226(a) affect one another.)

(b) *Activities.* In implementing coordinated, early intervening services under this section, an LEA may carry out activities that include—

(1) Professional development (which may be provided by entities other than LEAs) for teachers and other school staff to enable such personnel to deliver scientifically based academic and behavioral interventions, including scientifically based literacy instruction, and, where appropriate, instruction on the use of adaptive and instructional software; and

(2) Providing educational and behavioral evaluations, services, and supports, including scientifically based literacy instruction.

(c) *Construction.* Nothing in this section shall be construed to either limit or create a right to FAPE under Part B of the Act or to delay appropriate evaluation of a child suspected of having a disability.

(d) *Reporting.* Each LEA that develops and maintains coordinated, early intervening services under this section must annually report to the SEA on—

(1) The number of children served under this section who received early intervening services; and

(2) The number of children served under this section who received early intervening services and subsequently receive special education and related services under Part B of the Act during the preceding two year period.

(e) *Coordination with ESEA.* Funds made available to carry out this section may be used to carry out coordinated, early intervening services aligned with activities funded by, and carried out under the ESEA if those funds are used

to supplement, and not supplant, funds made available under the ESEA for the activities and services assisted under this section.

(Approved by the Office of Management and Budget under control number 1820–0600)

(Authority: 20 U.S.C. 1413(f))

### § 300.227   Direct services by the SEA.

(a) *General.* (1) An SEA must use the payments that would otherwise have been available to an LEA or to a State agency to provide special education and related services directly to children with disabilities residing in the area served by that LEA, or for whom that State agency is responsible, if the SEA determines that the LEA or State agency—

(i) Has not provided the information needed to establish the eligibility of the LEA or State agency, or elected not to apply for its Part B allotment, under Part B of the Act;

(ii) Is unable to establish and maintain programs of FAPE that meet the requirements of this part;

(iii) Is unable or unwilling to be consolidated with one or more LEAs in order to establish and maintain the programs; or

(iv) Has one or more children with disabilities who can best be served by a regional or State program or service delivery system designed to meet the needs of these children.

(2) *SEA administrative procedures.* (i) In meeting the requirements in paragraph (a)(1) of this section, the SEA may provide special education and related services directly, by contract, or through other arrangements.

(ii) The excess cost requirements of § 300.202(b) do not apply to the SEA.

(b) *Manner and location of education and services.* The SEA may provide special education and related services under paragraph (a) of this section in the manner and at the locations (including regional or State centers) as the SEA considers appropriate. The education and services must be provided in accordance with this part.

(Authority: 20 U.S.C. 1413(g))

### § 300.228   State agency eligibility.

Any State agency that desires to receive a subgrant for any fiscal year under § 300.705 must demonstrate to the satisfaction of the SEA that—

(a) All children with disabilities who are participating in programs and projects funded under Part B of the Act receive FAPE, and that those children and their parents are provided all the rights and procedural safeguards described in this part; and

(b) The agency meets the other conditions of this subpart that apply to LEAs.

(Authority: 20 U.S.C. 1413(h))

### § 300.229   Disciplinary information.

(a) The State may require that a public agency include in the records of a child with a disability a statement of any current or previous disciplinary action that has been taken against the child and transmit the statement to the same extent that the disciplinary information is included in, and transmitted with, the student records of nondisabled children.

(b) The statement may include a description of any behavior engaged in by the child that required disciplinary action, a description of the disciplinary action taken, and any other information that is relevant to the safety of the child and other individuals involved with the child.

(c) If the State adopts such a policy, and the child transfers from one school to another, the transmission of any of the child's records must include both the child's current IEP and any statement of current or previous disciplinary action that has been taken against the child.

(Authority: 20 U.S.C. 1413(i))

### § 300.230   SEA flexibility.

(a) *Adjustment to State fiscal effort in certain fiscal years.* For any fiscal year for which the allotment received by a State under § 300.703 exceeds the amount the State received for the previous fiscal year and if the State in school year 2003–2004 or any subsequent school year pays or reimburses all LEAs within the State from State revenue 100 percent of the non-Federal share of the costs of special education and related services, the SEA, notwithstanding §§ 300.162 through 300.163 (related to State-level nonsupplanting and maintenance of effort), and § 300.175 (related to direct services by the SEA) may reduce the level of expenditures from State sources for the education of children with disabilities by not more than 50 percent of the amount of such excess.

(b) *Prohibition.* Notwithstanding paragraph (a) of this section, if the Secretary determines that an SEA is unable to establish, maintain, or oversee programs of FAPE that meet the requirements of this part, or that the State needs assistance, intervention, or substantial intervention under § 300.603, the Secretary prohibits the SEA from exercising the authority in paragraph (a) of this section.

(c) *Education activities.* If an SEA exercises the authority under paragraph

(a) of this section, the agency must use funds from State sources, in an amount equal to the amount of the reduction under paragraph (a) of this section, to support activities authorized under the ESEA, or to support need-based student or teacher higher education programs.

(d) *Report.* For each fiscal year for which an SEA exercises the authority under paragraph (a) of this section, the SEA must report to the Secretary—

(1) The amount of expenditures reduced pursuant to that paragraph; and

(2) The activities that were funded pursuant to paragraph (c) of this section.

(e) *Limitation.* (1) Notwithstanding paragraph (a) of this section, an SEA may not reduce the level of expenditures described in paragraph (a) of this section if any LEA in the State would, as a result of such reduction, receive less than 100 percent of the amount necessary to ensure that all children with disabilities served by the LEA receive FAPE from the combination of Federal funds received under Part B of the Act and State funds received from the SEA.

(2) If an SEA exercises the authority under paragraph (a) of this section, LEAs in the State may not reduce local effort under § 300.205 by more than the reduction in the State funds they receive.

(Authority: 20 U.S.C. 1413(j))

## Subpart D—Evaluations, Eligibility Determinations, Individualized Education Programs, and Educational Placements

### Parental Consent

### § 300.300   Parental consent.

(a) *Parental consent for initial evaluation.* (1)(i) The public agency proposing to conduct an initial evaluation to determine if a child qualifies as a child with a disability under § 300.8 must, after providing notice consistent with §§ 300.503 and 300.504, obtain informed consent, consistent with § 300.9, from the parent of the child before conducting the evaluation.

(ii) Parental consent for initial evaluation must not be construed as consent for initial provision of special education and related services.

(iii) The public agency must make reasonable efforts to obtain the informed consent from the parent for an initial evaluation to determine whether the child is a child with a disability.

(2) For initial evaluations only, if the child is a ward of the State and is not residing with the child's parent, the public agency is not required to obtain informed consent from the parent for an

ED-000245

initial evaluation to determine whether the child is a child with a disability if—

(i) Despite reasonable efforts to do so, the public agency cannot discover the whereabouts of the parent of the child;

(ii) The rights of the parents of the child have been terminated in accordance with State law; or

(iii) The rights of the parent to make educational decisions have been subrogated by a judge in accordance with State law and consent for an initial evaluation has been given by an individual appointed by the judge to represent the child.

(3)(i) If the parent of a child enrolled in public school or seeking to be enrolled in public school does not provide consent for initial evaluation under paragraph (a)(1) of this section, or the parent fails to respond to a request to provide consent, the public agency may, but is not required to, pursue the initial evaluation of the child by utilizing the procedural safeguards in subpart E of this part (including the mediation procedures under § 300.506 or the due process procedures under §§ 300.507 through 300.516), if appropriate, except to the extent inconsistent with State law relating to such parental consent.

(ii) The public agency does not violate its obligation under § 300.111 and §§ 300.301 through 300.311 if it declines to pursue the evaluation.

(b) *Parental consent for services.* (1) A public agency that is responsible for making FAPE available to a child with a disability must obtain informed consent from the parent of the child before the initial provision of special education and related services to the child.

(2) The public agency must make reasonable efforts to obtain informed consent from the parent for the initial provision of special education and related services to the child.

(3) If the parent of a child fails to respond or refuses to consent to services under paragraph (b)(1) of this section, the public agency may not use the procedures in subpart E of this part (including the mediation procedures under § 300.506 or the due process procedures under §§ 300.507 through 300.516) in order to obtain agreement or a ruling that the services may be provided to the child.

(4) If the parent of the child refuses to consent to the initial provision of special education and related services, or the parent fails to respond to a request to provide consent for the initial provision of special education and related services, the public agency—

(i) Will not be considered to be in violation of the requirement to make

available FAPE to the child for the failure to provide the child with the special education and related services for which the public agency requests consent; and

(ii) Is not required to convene an IEP Team meeting or develop an IEP under §§ 300.320 and 300.324 for the child for the special education and related services for which the public agency requests such consent.

(c) *Parental consent for reevaluations.* (1) Subject to paragraph (c)(2) of this section, each public agency—

(i) Must obtain informed parental consent, in accordance with § 300.300(a)(1), prior to conducting any reevaluation of a child with a disability.

(ii) If the parent refuses to consent to the reevaluation, the public agency may, but is not required to, pursue the reevaluation by using the consent override procedures described in paragraph (a)(3) of this section.

(iii) The public agency does not violate its obligation under § 300.111 and §§ 300.301 through 300.311 if it declines to pursue the evaluation or reevaluation.

(2) The informed parental consent described in paragraph (c)(1) of this section need not be obtained if the public agency can demonstrate that—

(i) It made reasonable efforts to obtain such consent; and

(ii) The child's parent has failed to respond.

(d) Other consent requirements. (1) Parental consent is not required before—

(i) Reviewing existing data as part of an evaluation or a reevaluation; or

(ii) Administering a test or other evaluation that is administered to all children unless, before administration of that test or evaluation, consent is required of parents of all children.

(2) In addition to the parental consent requirements described in paragraph (a) of this section, a State may require parental consent for other services and activities under this part if it ensures that each public agency in the State establishes and implements effective procedures to ensure that a parent's refusal to consent does not result in a failure to provide the child with FAPE.

(3) A public agency may not use a parent's refusal to consent to one service or activity under paragraphs (a) or (d)(2) of this section to deny the parent or child any other service, benefit, or activity of the public agency, except as required by this part.

(4)(i) If a parent of a child who is home schooled or placed in a private school by the parents at their own expense does not provide consent for the initial evaluation or the

reevaluation, or the parent fails to respond to a request to provide consent, the public agency may not use the consent override procedures (described in paragraphs (a)(3) and (c)(1) of this section); and

(ii) The public agency is not required to consider the child as eligible for services under §§ 300.132 through 300.144.

(5) To meet the reasonable efforts requirement in paragraphs (a)(1)(iii), (a)(2)(i), (b)(2), and (c)(2)(i) of this section, the public agency must document its attempts to obtain parental consent using the procedures in § 300.322(d).

(Authority: 20 U.S.C. 1414(a)(1)(D) and 1414(c))

**Evaluations and Reevaluations**

**§ 300.301   Initial evaluations.**

(a) *General.* Each public agency must conduct a full and individual initial evaluation, in accordance with §§ 300.305 and 300.306, before the initial provision of special education and related services to a child with a disability under this part.

(b) *Request for initial evaluation.* Consistent with the consent requirements in § 300.300, either a parent of a child or a public agency may initiate a request for an initial evaluation to determine if the child is a child with a disability.

(c) *Procedures for initial evaluation.* The initial evaluation—

(1)(i) Must be conducted within 60 days of receiving parental consent for the evaluation; or

(ii) If the State establishes a timeframe within which the evaluation must be conducted, within that timeframe; and

(2) Must consist of procedures—

(i) To determine if the child is a child with a disability under § 300.8; and

(ii) To determine the educational needs of the child.

(d) *Exception.* The timeframe described in paragraph (c)(1) of this section does not apply to a public agency if—

(1) The parent of a child repeatedly fails or refuses to produce the child for the evaluation; or

(2) A child enrolls in a school of another public agency after the relevant timeframe in paragraph (c)(1) of this section has begun, and prior to a determination by the child's previous public agency as to whether the child is a child with a disability under § 300.8.

(e) The exception in paragraph (d)(2) of this section applies only if the subsequent public agency is making sufficient progress to ensure a prompt completion of the evaluation, and the

ED-000246

parent and subsequent public agency agree to a specific time when the evaluation will be completed.

(Authority: 20 U.S.C. 1414(a))

**§ 300.302   Screening for instructional purposes is not evaluation.**

The screening of a student by a teacher or specialist to determine appropriate instructional strategies for curriculum implementation shall not be considered to be an evaluation for eligibility for special education and related services.

(Authority: 20 U.S.C. 1414(a)(1)(E))

**§ 300.303   Reevaluations.**

(a) *General.* A public agency must ensure that a reevaluation of each child with a disability is conducted in accordance with §§ 300.304 through 300.311—

(1) If the public agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation; or

(2) If the child's parent or teacher requests a reevaluation.

(b) *Limitation.* A reevaluation conducted under paragraph (a) of this section—

(1) May occur not more than once a year, unless the parent and the public agency agree otherwise; and

(2) Must occur at least once every 3 years, unless the parent and the public agency agree that a reevaluation is unnecessary.

(Authority: 20 U.S.C. 1414(a)(2))

**§ 300.304   Evaluation procedures.**

(a) *Notice.* The public agency must provide notice to the parents of a child with a disability, in accordance with § 300.503, that describes any evaluation procedures the agency proposes to conduct.

(b) *Conduct of evaluation.* In conducting the evaluation, the public agency must—

(1) Use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child, including information provided by the parent, that may assist in determining—

(i) Whether the child is a child with a disability under § 300.8; and

(ii) The content of the child's IEP, including information related to enabling the child to be involved in and progress in the general education curriculum (or for a preschool child, to participate in appropriate activities);

(2) Not use any single measure or assessment as the sole criterion for

determining whether a child is a child with a disability and for determining an appropriate educational program for the child; and

(3) Use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors.

(c) *Other evaluation procedures.* Each public agency must ensure that—

(1) Assessments and other evaluation materials used to assess a child under this part—

(i) Are selected and administered so as not to be discriminatory on a racial or cultural basis;

(ii) Are provided and administered in the child's native language or other mode of communication and in the form most likely to yield accurate information on what the child knows and can do academically, developmentally, and functionally, unless it is clearly not feasible to so provide or administer;

(iii) Are used for the purposes for which the assessments or measures are valid and reliable;

(iv) Are administered by trained and knowledgeable personnel; and

(v) Are administered in accordance with any instructions provided by the producer of the assessments.

(2) Assessments and other evaluation materials include those tailored to assess specific areas of educational need and not merely those that are designed to provide a single general intelligence quotient.

(3) Assessments are selected and administered so as best to ensure that if an assessment is administered to a child with impaired sensory, manual, or speaking skills, the assessment results accurately reflect the child's aptitude or achievement level or whatever other factors the test purports to measure, rather than reflecting the child's impaired sensory, manual, or speaking skills (unless those skills are the factors that the test purports to measure).

(4) The child is assessed in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities;

(5) Assessments of children with disabilities who transfer from one public agency to another public agency in the same school year are coordinated with those children's prior and subsequent schools, as necessary and as expeditiously as possible, consistent with § 300.301(d)(2) and (e), to ensure prompt completion of full evaluations.

(6) In evaluating each child with a disability under §§ 300.304 through 300.306, the evaluation is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified.

(7) Assessment tools and strategies that provide relevant information that directly assists persons in determining the educational needs of the child are provided.

(Authority: 20 U.S.C. 1414(b)(1)-(3), 1412(a)(6)(B))

**§ 300.305   Additional requirements for evaluations and reevaluations.**

(a) *Review of existing evaluation data.* As part of an initial evaluation (if appropriate) and as part of any reevaluation under this part, the IEP Team and other qualified professionals, as appropriate, must—

(1) Review existing evaluation data on the child, including—

(i) Evaluations and information provided by the parents of the child;

(ii) Current classroom-based, local, or State assessments, and classroom-based observations; and

(iii) Observations by teachers and related services providers; and

(2) On the basis of that review, and input from the child's parents, identify what additional data, if any, are needed to determine—

(i)(A) Whether the child is a child with a disability, as defined in § 300.8, and the educational needs of the child; or

(B) In case of a reevaluation of a child, whether the child continues to have such a disability, and the educational needs of the child;

(ii) The present levels of academic achievement and related developmental needs of the child;

(iii)(A) Whether the child needs special education and related services; or

(B) In the case of a reevaluation of a child, whether the child continues to need special education and related services; and

(iv) Whether any additions or modifications to the special education and related services are needed to enable the child to meet the measurable annual goals set out in the IEP of the child and to participate, as appropriate, in the general education curriculum.

(b) *Conduct of review.* The group described in paragraph (a) of this section may conduct its review without a meeting.

(c) *Source of data.* The public agency must administer such assessments and

other evaluation measures as may be needed to produce the data identified under paragraph (a) of this section.

(d) *Requirements if additional data are not needed.* (1) If the IEP Team and other qualified professionals, as appropriate, determine that no additional data are needed to determine whether the child continues to be a child with a disability, and to determine the child's educational needs, the public agency must notify the child's parents of—

(i) That determination and the reasons for the determination; and

(ii) The right of the parents to request an assessment to determine whether the child continues to be a child with a disability, and to determine the child's educational needs.

(2) The public agency is not required to conduct the assessment described in paragraph (d)(1)(ii) of this section unless requested to do so by the child's parents.

(e) *Evaluations before change in eligibility.* (1) Except as provided in paragraph (e)(2) of this section, a public agency must evaluate a child with a disability in accordance with §§ 300.304 through 300.311 before determining that the child is no longer a child with a disability.

(2) The evaluation described in paragraph (e)(1) of this section is not required before the termination of a child's eligibility under this part due to graduation from secondary school with a regular diploma, or due to exceeding the age eligibility for FAPE under State law.

(3) For a child whose eligibility terminates under circumstances described in paragraph (e)(2) of this section, a public agency must provide the child with a summary of the child's academic achievement and functional performance, which shall include recommendations on how to assist the child in meeting the child's postsecondary goals.

(Authority: 20 U.S.C. 1414(c))

**§ 300.306    Determination of eligibility.**

(a) *General.* Upon completion of the administration of assessments and other evaluation measures—

(1) A group of qualified professionals and the parent of the child determines whether the child is a child with a disability, as defined in § 300.8, in accordance with paragraph (b) of this section and the educational needs of the child; and

(2) The public agency provides a copy of the evaluation report and the documentation of determination of eligibility at no cost to the parent.

(b) *Special rule for eligibility determination.* A child must not be determined to be a child with a disability under this part—

(1) If the determinant factor for that determination is—

(i) Lack of appropriate instruction in reading, including the essential components of reading instruction (as defined in section 1208(3) of the ESEA);

(ii) Lack of appropriate instruction in math; or

(iii) Limited English proficiency; and

(2) If the child does not otherwise meet the eligibility criteria under § 300.8(a).

(c) *Procedures for determining eligibility and educational need.* (1) In interpreting evaluation data for the purpose of determining if a child is a child with a disability under § 300.8, and the educational needs of the child, each public agency must—

(i) Draw upon information from a variety of sources, including aptitude and achievement tests, parent input, and teacher recommendations, as well as information about the child's physical condition, social or cultural background, and adaptive behavior; and

(ii) Ensure that information obtained from all of these sources is documented and carefully considered.

(2) If a determination is made that a child has a disability and needs special education and related services, an IEP must be developed for the child in accordance with §§ 300.320 through 300.324.

(Authority: 20 U.S.C. 1414(b)(4) and (5))

**Additional Procedures for Identifying Children With Specific Learning Disabilities**

**§ 300.307    Specific learning disabilities.**

(a) *General.* A State must adopt, consistent with § 300.309, criteria for determining whether a child has a specific learning disability as defined in § 300.8(c)(10). In addition, the criteria adopted by the State—

(1) Must not require the use of a severe discrepancy between intellectual ability and achievement for determining whether a child has a specific learning disability, as defined in § 300.8(c)(10);

(2) Must permit the use of a process based on the child's response to scientific, research-based intervention; and

(3) May permit the use of other alternative research-based procedures for determining whether a child has a specific learning disability, as defined in § 300.8(c)(10).

(b) *Consistency with State criteria.* A public agency must use the State criteria adopted pursuant to paragraph (a) of this section in determining whether a child has a specific learning disability.

(Authority: 20 U.S.C. 1221e–3; 1401(30); 1414(b)(6))

**§ 300.308    Additional group members.**

The determination of whether a child suspected of having a specific learning disability is a child with a disability as defined in § 300.8, must be made by the child's parents and a team of qualified professionals, which must include—

(a)(1) The child's regular teacher; or

(2) If the child does not have a regular teacher, a regular classroom teacher qualified to teach a child of his or her age; or

(3) For a child of less than school age, an individual qualified by the SEA to teach a child of his or her age; and

(b) At least one person qualified to conduct individual diagnostic examinations of children, such as a school psychologist, speech-language pathologist, or remedial reading teacher.

(Authority: 20 U.S.C. 1221e–3; 1401(30); 1414(b)(6))

**§ 300.309    Determining the existence of a specific learning disability.**

(a) The group described in § 300.306 may determine that a child has a specific learning disability, as defined in § 300.8(c)(10), if—

(1) The child does not achieve adequately for the child's age or to meet State-approved grade-level standards in one or more of the following areas, when provided with learning experiences and instruction appropriate for the child's age or State-approved grade-level standards:

(i) Oral expression.

(ii) Listening comprehension.

(iii) Written expression.

(iv) Basic reading skill.

(v) Reading fluency skills.

(vi) Reading comprehension.

(vii) Mathematics calculation.

(viii) Mathematics problem solving.

(2)(i) The child does not make sufficient progress to meet age or State-approved grade-level standards in one or more of the areas identified in paragraph (a)(1) of this section when using a process based on the child's response to scientific, research-based intervention; or

(ii) The child exhibits a pattern of strengths and weaknesses in performance, achievement, or both, relative to age, State-approved grade-level standards, or intellectual development, that is determined by the group to be relevant to the identification of a specific learning disability, using appropriate assessments, consistent with §§ 300.304 and 300.305; and

(3) The group determines that its findings under paragraphs (a)(1) and (2)

of this section are not primarily the result of—

(i) A visual, hearing, or motor disability;

(ii) Mental retardation;

(iii) Emotional disturbance;

(iv) Cultural factors;

(v) Environmental or economic disadvantage; or

(vi) Limited English proficiency.

(b) To ensure that underachievement in a child suspected of having a specific learning disability is not due to lack of appropriate instruction in reading or math, the group must consider, as part of the evaluation described in §§ 300.304 through 300.306—

(1) Data that demonstrate that prior to, or as a part of, the referral process, the child was provided appropriate instruction in regular education settings, delivered by qualified personnel; and

(2) Data-based documentation of repeated assessments of achievement at reasonable intervals, reflecting formal assessment of student progress during instruction, which was provided to the child's parents.

(c) The public agency must promptly request parental consent to evaluate the child to determine if the child needs special education and related services, and must adhere to the timeframes described in §§ 300.301 and 300.303, unless extended by mutual written agreement of the child's parents and a group of qualified professionals, as described in § 300.306(a)(1)—

(1) If, prior to a referral, a child has not made adequate progress after an appropriate period of time when provided instruction, as described in paragraphs (b)(1) and (b)(2) of this section; and

(2) Whenever a child is referred for an evaluation.

(Authority: 20 U.S.C. 1221e–3; 1401(30); 1414(b)(6))

### § 300.310 Observation.

(a) The public agency must ensure that the child is observed in the child's learning environment (including the regular classroom setting) to document the child's academic performance and behavior in the areas of difficulty.

(b) The group described in § 300.306(a)(1), in determining whether a child has a specific learning disability, must decide to—

(1) Use information from an observation in routine classroom instruction and monitoring of the child's performance that was done before the child was referred for an evaluation; or

(2) Have at least one member of the group described in § 300.306(a)(1) conduct an observation of the child's academic performance in the regular classroom after the child has been referred for an evaluation and parental consent, consistent with § 300.300(a), is obtained.

(c) In the case of a child of less than school age or out of school, a group member must observe the child in an environment appropriate for a child of that age.

(Authority: 20 U.S.C. 1221e–3; 1401(30); 1414(b)(6))

### § 300.311 Specific documentation for the eligibility determination.

(a) For a child suspected of having a specific learning disability, the documentation of the determination of eligibility, as required in § 300.306(a)(2), must contain a statement of—

(1) Whether the child has a specific learning disability;

(2) The basis for making the determination, including an assurance that the determination has been made in accordance with § 300.306(c)(1);

(3) The relevant behavior, if any, noted during the observation of the child and the relationship of that behavior to the child's academic functioning;

(4) The educationally relevant medical findings, if any;

(5) Whether—

(i) The child does not achieve adequately for the child's age or to meet State-approved grade-level standards consistent with § 300.309(a)(1); and

(ii)(A) The child does not make sufficient progress to meet age or State-approved grade-level standards consistent with § 300.309(a)(2)(i); or

(B) The child exhibits a pattern of strengths and weaknesses in performance, achievement, or both, relative to age, State-approved grade level standards or intellectual development consistent with § 300.309(a)(2)(ii);

(6) The determination of the group concerning the effects of a visual, hearing, or motor disability; mental retardation; emotional disturbance; cultural factors; environmental or economic disadvantage; or limited English proficiency on the child's achievement level; and

(7) If the child has participated in a process that assesses the child's response to scientific, research-based intervention—

(i) The instructional strategies used and the student-centered data collected; and

(ii) The documentation that the child's parents were notified about—

(A) The State's policies regarding the amount and nature of student performance data that would be collected and the general education services that would be provided;

(B) Strategies for increasing the child's rate of learning; and

(C) The parents' right to request an evaluation.

(b) Each group member must certify in writing whether the report reflects the member's conclusion. If it does not reflect the member's conclusion, the group member must submit a separate statement presenting the member's conclusions.

(Authority: 20 U.S.C. 1221e–3; 1401(30); 1414(b)(6))

### Individualized Education Programs

### § 300.320 Definition of individualized education program.

(a) *General.* As used in this part, the term individualized education program or IEP means a written statement for each child with a disability that is developed, reviewed, and revised in a meeting in accordance with §§ 300.320 through 300.324, and that must include—

(1) A statement of the child's present levels of academic achievement and functional performance, including—

(i) How the child's disability affects the child's involvement and progress in the general education curriculum (i.e., the same curriculum as for nondisabled children); or

(ii) For preschool children, as appropriate, how the disability affects the child's participation in appropriate activities;

(2)(i) A statement of measurable annual goals, including academic and functional goals designed to—

(A) Meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and

(B) Meet each of the child's other educational needs that result from the child's disability;

(ii) For children with disabilities who take alternate assessments aligned to alternate achievement standards, a description of benchmarks or short-term objectives;

(3) A description of—

(i) How the child's progress toward meeting the annual goals described in paragraph (2) of this section will be measured; and

(ii) When periodic reports on the progress the child is making toward meeting the annual goals (such as through the use of quarterly or other periodic reports, concurrent with the issuance of report cards) will be provided;

(4) A statement of the special education and related services and

supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided to enable the child—

(i) To advance appropriately toward attaining the annual goals;

(ii) To be involved in and make progress in the general education curriculum in accordance with paragraph (a)(1) of this section, and to participate in extracurricular and other nonacademic activities; and

(iii) To be educated and participate with other children with disabilities and nondisabled children in the activities described in this section;

(5) An explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in the activities described in paragraph (a)(4) of this section;

(6)(i) A statement of any individual appropriate accommodations that are necessary to measure the academic achievement and functional performance of the child on State and districtwide assessments consistent with section 612(a)(16) of the Act; and

(ii) If the IEP Team determines that the child must take an alternate assessment instead of a particular regular State or districtwide assessment of student achievement, a statement of why—

(A) The child cannot participate in the regular assessment; and

(B) The particular alternate assessment selected is appropriate for the child; and

(7) The projected date for the beginning of the services and modifications described in paragraph (a)(4) of this section, and the anticipated frequency, location, and duration of those services and modifications.

(b) *Transition services.* Beginning not later than the first IEP to be in effect when the child turns 16, or younger if determined appropriate by the IEP Team, and updated annually, thereafter, the IEP must include—

(1) Appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills; and

(2) The transition services (including courses of study) needed to assist the child in reaching those goals.

(c) *Transfer of rights at age of majority.* Beginning not later than one year before the child reaches the age of majority under State law, the IEP must include a statement that the child has been informed of the child's rights under Part B of the Act, if any, that will transfer to the child on reaching the age of majority under § 300.520.

(d) *Construction.* Nothing in this section shall be construed to require—

(1) That additional information be included in a child's IEP beyond what is explicitly required in section 614 of the Act; or

(2) The IEP Team to include information under one component of a child's IEP that is already contained under another component of the child's IEP.

(Authority: 20 U.S.C. 1414(d)(1)(A) and (d)(6))

### § 300.321   IEP Team.

(a) *General.* The public agency must ensure that the IEP Team for each child with a disability includes—

(1) The parents of the child;

(2) Not less than one regular education teacher of the child (if the child is, or may be, participating in the regular education environment);

(3) Not less than one special education teacher of the child, or where appropriate, not less then one special education provider of the child;

(4) A representative of the public agency who—

(i) Is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities;

(ii) Is knowledgeable about the general education curriculum; and

(iii) Is knowledgeable about the availability of resources of the public agency.

(5) An individual who can interpret the instructional implications of evaluation results, who may be a member of the team described in paragraphs (a)(2) through (a)(6) of this section;

(6) At the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate; and

(7) Whenever appropriate, the child with a disability.

(b) *Transition services participants.* (1) In accordance with paragraph (a)(7) of this section, the public agency must invite a child with a disability to attend the child's IEP Team meeting if a purpose of the meeting will be the consideration of the postsecondary goals for the child and the transition services needed to assist the child in reaching those goals under § 300.320(b).

(2) If the child does not attend the IEP Team meeting, the public agency must take other steps to ensure that the child's preferences and interests are considered.

(3) To the extent appropriate, with the consent of the parents or a child who has reached the age of majority, in implementing the requirements of paragraph (b)(1) of this section, the public agency must invite a representative of any participating agency that is likely to be responsible for providing or paying for transition services.

(c) *Determination of knowledge and special expertise.* The determination of the knowledge or special expertise of any individual described in paragraph (a)(6) of this section must be made by the party (parents or public agency) who invited the individual to be a member of the IEP Team.

(d) *Designating a public agency representative.* A public agency may designate a public agency member of the IEP Team to also serve as the agency representative, if the criteria in paragraph (a)(4) of this section are satisfied.

(e) *IEP Team attendance.* (1) A member of the IEP Team described in paragraphs (a)(2) through (a)(5) of this section is not required to attend an IEP Team meeting, in whole or in part, if the parent of a child with a disability and the public agency agree, in writing, that the attendance of the member is not necessary because the member's area of the curriculum or related services is not being modified or discussed in the meeting.

(2) A member of the IEP Team described in paragraph (e)(1) of this section may be excused from attending an IEP Team meeting, in whole or in part, when the meeting involves a modification to or discussion of the member's area of the curriculum or related services, if—

(i) The parent, in writing, and the public agency consent to the excusal; and

(ii) The member submits, in writing to the parent and the IEP Team, input into the development of the IEP prior to the meeting.

(f) *Initial IEP Team meeting for child under Part C.* In the case of a child who was previously served under Part C of the Act, an invitation to the initial IEP Team meeting must, at the request of the parent, be sent to the Part C service coordinator or other representatives of the Part C system to assist with the smooth transition of services.

(Authority: 20 U.S.C. 1414(d)(1)(B)–(d)(1)(D))

### § 300.322   Parent participation.

(a) *Public agency responsibility—general.* Each public agency must take steps to ensure that one or both of the parents of a child with a disability are present at each IEP Team meeting or are

afforded the opportunity to participate, including—

(1) Notifying parents of the meeting early enough to ensure that they will have an opportunity to attend; and

(2) Scheduling the meeting at a mutually agreed on time and place.

(b) *Information provided to parents.* (1) The notice required under paragraph (a)(1) of this section must—

(i) Indicate the purpose, time, and location of the meeting and who will be in attendance; and

(ii) Inform the parents of the provisions in § 300.321(a)(6) and (c) (relating to the participation of other individuals on the IEP Team who have knowledge or special expertise about the child), and § 300.321(f) (relating to the participation of the Part C service coordinator or other representatives of the Part C system at the initial IEP Team meeting for a child previously served under Part C of the Act).

(2) For a child with a disability beginning not later than the first IEP to be in effect when the child turns 16, or younger if determined appropriate by the IEP Team, the notice also must—

(i) Indicate—

(A) That a purpose of the meeting will be the consideration of the postsecondary goals and transition services for the child, in accordance with § 300.320(b); and

(B) That the agency will invite the student; and

(ii) Identify any other agency that will be invited to send a representative.

(c) *Other methods to ensure parent participation.* If neither parent can attend an IEP Team meeting, the public agency must use other methods to ensure parent participation, including individual or conference telephone calls, consistent with § 300.328 (related to alternative means of meeting participation).

(d) *Conducting an IEP Team meeting without a parent in attendance.* A meeting may be conducted without a parent in attendance if the public agency is unable to convince the parents that they should attend. In this case, the public agency must keep a record of its attempts to arrange a mutually agreed on time and place, such as—

(1) Detailed records of telephone calls made or attempted and the results of those calls;

(2) Copies of correspondence sent to the parents and any responses received; and

(3) Detailed records of visits made to the parent's home or place of employment and the results of those visits.

(e) *Use of interpreters or other action, as appropriate.* The public agency must take whatever action is necessary to ensure that the parent understands the proceedings of the IEP Team meeting, including arranging for an interpreter for parents with deafness or whose native language is other than English.

(f) *Parent copy of child's IEP.* The public agency must give the parent a copy of the child's IEP at no cost to the parent.

(Authority: 20 U.S.C. 1414(d)(1)(B)(i))

## § 300.323   When IEPs must be in effect.

(a) *General.* At the beginning of each school year, each public agency must have in effect, for each child with a disability within its jurisdiction, an IEP, as defined in § 300.320.

(b) *IEP or IFSP for children aged three through five.* (1) In the case of a child with a disability aged three through five (or, at the discretion of the SEA, a two-year-old child with a disability who will turn age three during the school year), the IEP Team must consider an IFSP that contains the IFSP content (including the natural environments statement) described in section 636(d) of the Act and its implementing regulations (including an educational component that promotes school readiness and incorporates pre-literacy, language, and numeracy skills for children with IFSPs under this section who are at least three years of age), and that is developed in accordance with the IEP procedures under this part. The IFSP may serve as the IEP of the child, if using the IFSP as the IEP is—

(i) Consistent with State policy; and

(ii) Agreed to by the agency and the child's parents.

(2) In implementing the requirements of paragraph (b)(1) of this section, the public agency must—

(i) Provide to the child's parents a detailed explanation of the differences between an IFSP and an IEP; and

(ii) If the parents choose an IFSP, obtain written informed consent from the parents.

(c) *Initial IEPs; provision of services.* Each public agency must ensure that—

(1) A meeting to develop an IEP for a child is conducted within 30 days of a determination that the child needs special education and related services; and

(2) As soon as possible following development of the IEP, special education and related services are made available to the child in accordance with the child's IEP.

(d) *Accessibility of child's IEP to teachers and others.* Each public agency must ensure that—

(1) The child's IEP is accessible to each regular education teacher, special education teacher, related services

provider, and any other service provider who is responsible for its implementation; and

(2) Each teacher and provider described in paragraph (d)(1) of this section is informed of—

(i) His or her specific responsibilities related to implementing the child's IEP; and

(ii) The specific accommodations, modifications, and supports that must be provided for the child in accordance with the IEP.

(e) *IEPs for children who transfer public agencies in the same State.* If a child with a disability (who had an IEP that was in effect in a previous public agency in the same State) transfers to a new public agency in the same State, and enrolls in a new school within the same school year, the new public agency (in consultation with the parents) must provide FAPE to the child (including services comparable to those described in the child's IEP from the previous public agency), until the new public agency either—

(1) Adopts the child's IEP from the previous public agency; or

(2) Develops, adopts, and implements a new IEP that meets the applicable requirements in §§ 300.320 through 300.324.

(f) *IEPs for children who transfer from another State.* If a child with a disability (who had an IEP that was in effect in a previous public agency in another State) transfers to a public agency in a new State, and enrolls in a new school within the same school year, the new public agency (in consultation with the parents) must provide the child with FAPE (including services comparable to those described in the child's IEP from the previous public agency), until the new public agency—

(1) Conducts an evaluation pursuant to §§ 300.304 through 300.306 (if determined to be necessary by the new public agency); and

(2) Develops, adopts, and implements a new IEP, if appropriate, that meets the applicable requirements in §§ 300.320 through 300.324.

(g) *Transmittal of records.* To facilitate the transition for a child described in paragraphs (e) and (f) of this section—

(1) The new public agency in which the child enrolls must take reasonable steps to promptly obtain the child's records, including the IEP and supporting documents and any other records relating to the provision of special education or related services to the child, from the previous public agency in which the child was enrolled, pursuant to 34 CFR 99.31(a)(2); and

(2) The previous public agency in which the child was enrolled must take reasonable steps to promptly respond to the request from the new public agency.

(Authority: 20 U.S.C. 1414(d)(2)(A)–(C))

**Development of IEP**

**§ 300.324  Development, review, and revision of IEP.**

(a) *Development of IEP*—(1) *General.* In developing each child's IEP, the IEP Team must consider—

(i) The strengths of the child;

(ii) The concerns of the parents for enhancing the education of their child;

(iii) The results of the initial or most recent evaluation of the child; and

(iv) The academic, developmental, and functional needs of the child.

(2) *Consideration of special factors.* The IEP Team must—

(i) In the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior;

(ii) In the case of a child with limited English proficiency, consider the language needs of the child as those needs relate to the child's IEP;

(iii) In the case of a child who is blind or visually impaired, provide for instruction in Braille and the use of Braille unless the IEP Team determines, after an evaluation of the child's reading and writing skills, needs, and appropriate reading and writing media (including an evaluation of the child's future needs for instruction in Braille or the use of Braille), that instruction in Braille or the use of Braille is not appropriate for the child;

(iv) Consider the communication needs of the child, and in the case of a child who is deaf or hard of hearing, consider the child's language and communication needs, opportunities for direct communications with peers and professional personnel in the child's language and communication mode, academic level, and full range of needs, including opportunities for direct instruction in the child's language and communication mode; and

(v) Consider whether the child needs assistive technology devices and services.

(3) *Requirement with respect to regular education teacher.* A regular education teacher of a child with a disability, as a member of the IEP Team, must, to the extent appropriate, participate in the development of the IEP of the child, including the determination of—

(i) Appropriate positive behavioral interventions and supports and other strategies for the child; and

(ii) Supplementary aids and services, program modifications, and support for school personnel consistent with § 300.320(a)(4).

(4) *Agreement.* (i) In making changes to a child's IEP after the annual IEP Team meeting for a school year, the parent of a child with a disability and the public agency may agree not to convene an IEP Team meeting for the purposes of making those changes, and instead may develop a written document to amend or modify the child's current IEP.

(ii) If changes are made to the child's IEP in accordance with paragraph (a)(4)(i) of this section, the public agency must ensure that the child's IEP Team is informed of those changes.

(5) *Consolidation of IEP Team meetings.* To the extent possible, the public agency must encourage the consolidation of reevaluation meetings for the child and other IEP Team meetings for the child.

(6) *Amendments.* Changes to the IEP may be made either by the entire IEP Team at an IEP Team meeting, or as provided in paragraph (a)(4) of this section, by amending the IEP rather than by redrafting the entire IEP. Upon request, a parent must be provided with a revised copy of the IEP with the amendments incorporated.

(b) *Review and revision of IEPs*—(1) *General.* Each public agency must ensure that, subject to paragraphs (b)(2) and (b)(3) of this section, the IEP Team—

(i) Reviews the child's IEP periodically, but not less than annually, to determine whether the annual goals for the child are being achieved; and

(ii) Revises the IEP, as appropriate, to address—

(A) Any lack of expected progress toward the annual goals described in § 300.320(a)(2), and in the general education curriculum, if appropriate;

(B) The results of any reevaluation conducted under § 300.303;

(C) Information about the child provided to, or by, the parents, as described under § 300.305(a)(2);

(D) The child's anticipated needs; or

(E) Other matters.

(2) *Consideration of special factors.* In conducting a review of the child's IEP, the IEP Team must consider the special factors described in paragraph (a)(2) of this section.

(3) *Requirement with respect to regular education teacher.* A regular education teacher of the child, as a member of the IEP Team, must, consistent with paragraph (a)(3) of this section, participate in the review and revision of the IEP of the child.

(c) *Failure to meet transition objectives*—(1) *Participating agency failure.* If a participating agency, other than the public agency, fails to provide the transition services described in the IEP in accordance with § 300.320(b), the public agency must reconvene the IEP Team to identify alternative strategies to meet the transition objectives for the child set out in the IEP.

(2) *Construction.* Nothing in this part relieves any participating agency, including a State vocational rehabilitation agency, of the responsibility to provide or pay for any transition service that the agency would otherwise provide to children with disabilities who meet the eligibility criteria of that agency.

(d) *Children with disabilities in adult prisons*—(1) *Requirements that do not apply.* The following requirements do not apply to children with disabilities who are convicted as adults under State law and incarcerated in adult prisons:

(i) The requirements contained in section 612(a)(16) of the Act and § 300.320(a)(6) (relating to participation of children with disabilities in general assessments).

(ii) The requirements in § 300.320(b) (relating to transition planning and transition services) do not apply with respect to the children whose eligibility under Part B of the Act will end, because of their age, before they will be eligible to be released from prison based on consideration of their sentence and eligibility for early release.

(2) *Modifications of IEP or placement.* (i) Subject to paragraph (d)(2)(ii) of this section, the IEP Team of a child with a disability who is convicted as an adult under State law and incarcerated in an adult prison may modify the child's IEP or placement if the State has demonstrated a bona fide security or compelling penological interest that cannot otherwise be accommodated.

(ii) The requirements of §§ 300.320 (relating to IEPs), and 300.112 (relating to LRE), do not apply with respect to the modifications described in paragraph (d)(2)(i) of this section.

(Authority: 20 U.S.C. 1412(a)(1), 1412(a)(12)(A)(i), 1414(d)(3), (4)(B), and (7); and 1414(e))

**§ 300.325  Private school placements by public agencies.**

(a) *Developing IEPs.* (1) Before a public agency places a child with a disability in, or refers a child to, a private school or facility, the agency must initiate and conduct a meeting to develop an IEP for the child in accordance with §§ 300.320 and 300.324.

(2) The agency must ensure that a representative of the private school or facility attends the meeting. If the representative cannot attend, the agency must use other methods to ensure participation by the private school or facility, including individual or conference telephone calls.

(b) *Reviewing and revising IEPs.* (1) After a child with a disability enters a private school or facility, any meetings to review and revise the child's IEP may be initiated and conducted by the private school or facility at the discretion of the public agency.

(2) If the private school or facility initiates and conducts these meetings, the public agency must ensure that the parents and an agency representative—

(i) Are involved in any decision about the child's IEP; and

(ii) Agree to any proposed changes in the IEP before those changes are implemented.

(c) *Responsibility.* Even if a private school or facility implements a child's IEP, responsibility for compliance with this part remains with the public agency and the SEA.

(Authority: 20 U.S.C. 1412(a)(10)(B))

### § 300.326   [Reserved]

### § 300.327   Educational placements.

Consistent with § 300.501(c), each public agency must ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child.

(Authority: 20 U.S.C. 1414(e))

### § 300.328   Alternative means of meeting participation.

When conducting IEP Team meetings and placement meetings pursuant to this subpart, and subpart E of this part, and carrying out administrative matters under section 615 of the Act (such as scheduling, exchange of witness lists, and status conferences), the parent of a child with a disability and a public agency may agree to use alternative means of meeting participation, such as video conferences and conference calls.

(Authority: 20 U.S.C. 1414(f))

## Subpart E—Procedural Safeguards Due Process Procedures for Parents and Children

### § 300.500   Responsibility of SEA and other public agencies.

Each SEA must ensure that each public agency establishes, maintains, and implements procedural safeguards that meet the requirements of §§ 300.500 through 300.536.

(Authority: 20 U.S.C. 1415(a))

### § 300.501   Opportunity to examine records; parent participation in meetings.

(a) *Opportunity to examine records.* The parents of a child with a disability must be afforded, in accordance with the procedures of §§ 300.613 through 300.621, an opportunity to inspect and review all education records with respect to—

(1) The identification, evaluation, and educational placement of the child; and

(2) The provision of FAPE to the child.

(b) *Parent participation in meetings.* (1) The parents of a child with a disability must be afforded an opportunity to participate in meetings with respect to—

(i) The identification, evaluation, and educational placement of the child; and

(ii) The provision of FAPE to the child.

(2) Each public agency must provide notice consistent with § 300.322(a)(1) and (b)(1) to ensure that parents of children with disabilities have the opportunity to participate in meetings described in paragraph (b)(1) of this section.

(3) A meeting does not include informal or unscheduled conversations involving public agency personnel and conversations on issues such as teaching methodology, lesson plans, or coordination of service provision. A meeting also does not include preparatory activities that public agency personnel engage in to develop a proposal or response to a parent proposal that will be discussed at a later meeting.

(c) *Parent involvement in placement decisions.* (1) Each public agency must ensure that a parent of each child with a disability is a member of any group that makes decisions on the educational placement of the parent's child.

(2) In implementing the requirements of paragraph (c)(1) of this section, the public agency must use procedures consistent with the procedures described in § 300.322(a) through (b)(1).

(3) If neither parent can participate in a meeting in which a decision is to be made relating to the educational placement of their child, the public agency must use other methods to ensure their participation, including individual or conference telephone calls, or video conferencing.

(4) A placement decision may be made by a group without the involvement of a parent, if the public agency is unable to obtain the parent's participation in the decision. In this case, the public agency must have a record of its attempt to ensure their involvement.

(Authority: 20 U.S.C. 1414(e), 1415(b)(1))

### § 300.502   Independent educational evaluation.

(a) *General.* (1) The parents of a child with a disability have the right under this part to obtain an independent educational evaluation of the child, subject to paragraphs (b) through (e) of this section.

(2) Each public agency must provide to parents, upon request for an independent educational evaluation, information about where an independent educational evaluation may be obtained, and the agency criteria applicable for independent educational evaluations as set forth in paragraph (e) of this section.

(3) For the purposes of this subpart—

(i) *Independent educational evaluation* means an evaluation conducted by a qualified examiner who is not employed by the public agency responsible for the education of the child in question; and

(ii) *Public expense* means that the public agency either pays for the full cost of the evaluation or ensures that the evaluation is otherwise provided at no cost to the parent, consistent with § 300.103.

(b) *Parent right to evaluation at public expense.*

(1) A parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency, subject to the conditions in paragraphs (b)(2) through (4) of this section.

(2) If a parent requests an independent educational evaluation at public expense, the public agency must, without unnecessary delay, either—

(i) File a due process complaint to request a hearing to show that its evaluation is appropriate; or

(ii) Ensure that an independent educational evaluation is provided at public expense, unless the agency demonstrates in a hearing pursuant to §§ 300.507 through 300.513 that the evaluation obtained by the parent did not meet agency criteria.

(3) If the public agency files a due process complaint notice to request a hearing and the final decision is that the agency's evaluation is appropriate, the parent still has the right to an independent educational evaluation, but not at public expense.

(4) If a parent requests an independent educational evaluation, the public agency may ask for the parent's reason why he or she objects to the public evaluation. However, the public agency may not require the parent to provide an explanation and may not unreasonably delay either providing the independent educational evaluation at

**46792**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

public expense or filing a due process complaint to request a due process hearing to defend the public evaluation.

(5) A parent is entitled to only one independent educational evaluation at public expense each time the public agency conducts an evaluation with which the parent disagrees.

(c) *Parent-initiated evaluations.* If the parent obtains an independent educational evaluation at public expense or shares with the public agency an evaluation obtained at private expense, the results of the evaluation—

(1) Must be considered by the public agency, if it meets agency criteria, in any decision made with respect to the provision of FAPE to the child; and

(2) May be presented by any party as evidence at a hearing on a due process complaint under subpart E of this part regarding that child.

(d) *Requests for evaluations by hearing officers.* If a hearing officer requests an independent educational evaluation as part of a hearing on a due process complaint, the cost of the evaluation must be at public expense.

(e) *Agency criteria.* (1) If an independent educational evaluation is at public expense, the criteria under which the evaluation is obtained, including the location of the evaluation and the qualifications of the examiner, must be the same as the criteria that the public agency uses when it initiates an evaluation, to the extent those criteria are consistent with the parent's right to an independent educational evaluation.

(2) Except for the criteria described in paragraph (e)(1) of this section, a public agency may not impose conditions or timelines related to obtaining an independent educational evaluation at public expense.

(Authority: 20 U.S.C. 1415(b)(1) and (d)(2)(A))

§ 300.503   **Prior notice by the public agency; content of notice.**

(a) *Notice.* Written notice that meets the requirements of paragraph (b) of this section must be given to the parents of a child with a disability a reasonable time before the public agency—

(1) Proposes to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child; or

(2) Refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child.

(b) *Content of notice.* The notice required under paragraph (a) of this section must include—

(1) A description of the action proposed or refused by the agency;

(2) An explanation of why the agency proposes or refuses to take the action;

(3) A description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action;

(4) A statement that the parents of a child with a disability have protection under the procedural safeguards of this part and, if this notice is not an initial referral for evaluation, the means by which a copy of a description of the procedural safeguards can be obtained;

(5) Sources for parents to contact to obtain assistance in understanding the provisions of this part;

(6) A description of other options that the IEP Team considered and the reasons why those options were rejected; and

(7) A description of other factors that are relevant to the agency's proposal or refusal.

(c) *Notice in understandable language.* (1) The notice required under paragraph (a) of this section must be—

(i) Written in language understandable to the general public; and

(ii) Provided in the native language of the parent or other mode of communication used by the parent, unless it is clearly not feasible to do so.

(2) If the native language or other mode of communication of the parent is not a written language, the public agency must take steps to ensure—

(i) That the notice is translated orally or by other means to the parent in his or her native language or other mode of communication;

(ii) That the parent understands the content of the notice; and

(iii) That there is written evidence that the requirements in paragraphs (c)(2)(i) and (ii) of this section have been met.

(Authority: 20 U.S.C. 1415(b)(3) and (4), 1415(c)(1), 1414(b)(1))

§ 300.504   **Procedural safeguards notice.**

(a) *General.* A copy of the procedural safeguards available to the parents of a child with a disability must be given to the parents only one time a school year, except that a copy also must be given to the parents—

(1) Upon initial referral or parent request for evaluation;

(2) Upon receipt of the first State complaint under §§ 300.151 through 300.153 and upon receipt of the first due process complaint under § 300.507 in a school year;

(3) In accordance with the discipline procedures in § 300.530(h); and

(4) Upon request by a parent.

(b) *Internet Web site.* A public agency may place a current copy of the

procedural safeguards notice on its Internet Web site if a Web site exists.

(c) *Contents.* The procedural safeguards notice must include a full explanation of all of the procedural safeguards available under § 300.148, §§ 300.151 through 300.153, § 300.300, §§ 300.502 through 300.503, §§ 300.505 through 300.518, § 300.520, §§ 300.530 through 300.536 and §§ 300.610 through 300.625 relating to—

(1) Independent educational evaluations;

(2) Prior written notice;

(3) Parental consent;

(4) Access to education records;

(5) Opportunity to present and resolve complaints through the due process complaint and State complaint procedures, including—

(i) The time period in which to file a complaint;

(ii) The opportunity for the agency to resolve the complaint; and

(iii) The difference between the due process complaint and the State complaint procedures, including the jurisdiction of each procedure, what issues may be raised, filing and decisional timelines, and relevant procedures;

(6) The availability of mediation;

(7) The child's placement during the pendency of any due process complaint;

(8) Procedures for students who are subject to placement in an interim alternative educational setting;

(9) Requirements for unilateral placement by parents of children in private schools at public expense;

(10) Hearings on due process complaints, including requirements for disclosure of evaluation results and recommendations;

(11) State-level appeals (if applicable in the State);

(12) Civil actions, including the time period in which to file those actions; and

(13) Attorneys' fees.

(d) *Notice in understandable language.* The notice required under paragraph (a) of this section must meet the requirements of § 300.503(c).

(Approved by the Office of Management and Budget under control number 1820–0600)

(Authority: 20 U.S.C. 1415(d))

§ 300.505   **Electronic mail.**

A parent of a child with a disability may elect to receive notices required by §§ 300.503, 300.504, and 300.508 by an electronic mail communication, if the public agency makes that option available.

(Authority: 20 U.S.C. 1415(n))

ED-000254

## § 300.506   Mediation.

(a) *General.* Each public agency must ensure that procedures are established and implemented to allow parties to disputes involving any matter under this part, including matters arising prior to the filing of a due process complaint, to resolve disputes through a mediation process.

(b) *Requirements.* The procedures must meet the following requirements:

(1) The procedures must ensure that the mediation process—

(i) Is voluntary on the part of the parties;

(ii) Is not used to deny or delay a parent's right to a hearing on the parent's due process complaint, or to deny any other rights afforded under Part B of the Act; and

(iii) Is conducted by a qualified and impartial mediator who is trained in effective mediation techniques.

(2) A public agency may establish procedures to offer to parents and schools that choose not to use the mediation process, an opportunity to meet, at a time and location convenient to the parents, with a disinterested party—

(i) Who is under contract with an appropriate alternative dispute resolution entity, or a parent training and information center or community parent resource center in the State established under section 671 or 672 of the Act; and

(ii) Who would explain the benefits of, and encourage the use of, the mediation process to the parents.

(3)(i) The State must maintain a list of individuals who are qualified mediators and knowledgeable in laws and regulations relating to the provision of special education and related services.

(ii) The SEA must select mediators on a random, rotational, or other impartial basis.

(4) The State must bear the cost of the mediation process, including the costs of meetings described in paragraph (b)(2) of this section.

(5) Each session in the mediation process must be scheduled in a timely manner and must be held in a location that is convenient to the parties to the dispute.

(6) If the parties resolve a dispute through the mediation process, the parties must execute a legally binding agreement that sets forth that resolution and that—

(i) States that all discussions that occurred during the mediation process will remain confidential and may not be used as evidence in any subsequent due process hearing or civil proceeding; and

(ii) Is signed by both the parent and a representative of the agency who has the authority to bind such agency.

(7) A written, signed mediation agreement under this paragraph is enforceable in any State court of competent jurisdiction or in a district court of the United States.

Discussions that occur during the mediation process must be confidential and may not be used as evidence in any subsequent due process hearing or civil proceeding of any Federal court or State court of a State receiving assistance under this part.

(c) *Impartiality of mediator.* (1) An individual who serves as a mediator under this part—

(i) May not be an employee of the SEA or the LEA that is involved in the education or care of the child; and

(ii) Must not have a personal or professional interest that conflicts with the person's objectivity.

(2) A person who otherwise qualifies as a mediator is not an employee of an LEA or State agency described under § 300.228 solely because he or she is paid by the agency to serve as a mediator.

(Approved by the Office of Management and Budget under control number 1820–0600)

(Authority: 20 U.S.C. 1415(e))

## § 300.507   Filing a due process complaint.

(a) *General.* (1) A parent or a public agency may file a due process complaint on any of the matters described in § 300.503(a)(1) and (2) (relating to the identification, evaluation or educational placement of a child with a disability, or the provision of FAPE to the child).

(2) The due process complaint must allege a violation that occurred not more than two years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the due process complaint, or, if the State has an explicit time limitation for filing a due process complaint under this part, in the time allowed by that State law, except that the exceptions to the timeline described in § 300.511(f) apply to the timeline in this section.

(b) *Information for parents.* The public agency must inform the parent of any free or low-cost legal and other relevant services available in the area if—

(1) The parent requests the information; or

(2) The parent or the agency files a due process complaint under this section.

(Approved by the Office of Management and Budget under control number 1820–0600)

(Authority: 20 U.S.C. 1415(b)(6))

## § 300.508   Due process complaint.

(a) *General.* (1) The public agency must have procedures that require either party, or the attorney representing a party, to provide to the other party a due process complaint (which must remain confidential).

(2) The party filing a due process complaint must forward a copy of the due process complaint to the SEA.

(b) *Content of complaint.* The due process complaint required in paragraph (a)(1) of this section must include—

(1) The name of the child;

(2) The address of the residence of the child;

(3) The name of the school the child is attending;

(4) In the case of a homeless child or youth (within the meaning of section 725(2) of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11434a(2)), available contact information for the child, and the name of the school the child is attending;

(5) A description of the nature of the problem of the child relating to the proposed or refused initiation or change, including facts relating to the problem; and

(6) A proposed resolution of the problem to the extent known and available to the party at the time.

(c) *Notice required before a hearing on a due process complaint.* A party may not have a hearing on a due process complaint until the party, or the attorney representing the party, files a due process complaint that meets the requirements of paragraph (b) of this section.

(d) *Sufficiency of complaint.* (1) The due process complaint required by this section must be deemed sufficient unless the party receiving the due process complaint notifies the hearing officer and the other party in writing, within 15 days of receipt of the due process complaint, that the receiving party believes the due process complaint does not meet the requirements in paragraph (b) of this section.

(2) Within five days of receipt of notification under paragraph (d)(1) of this section, the hearing officer must make a determination on the face of the due process complaint of whether the due process complaint meets the requirements of paragraph (b) of this section, and must immediately notify the parties in writing of that determination.

(3) A party may amend its due process complaint only if—

(i) The other party consents in writing to the amendment and is given the opportunity to resolve the due process

**46794**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

complaint through a meeting held pursuant to § 300.510; or

(ii) The hearing officer grants permission, except that the hearing officer may only grant permission to amend at any time not later than five days before the due process hearing begins.

(4) If a party files an amended due process complaint, the timelines for the resolution meeting in § 300.510(a) and the time period to resolve in § 300.510(b) begin again with the filing of the amended due process complaint.

(e) *LEA response to a due process complaint.* (1) If the LEA has not sent a prior written notice under § 300.503 to the parent regarding the subject matter contained in the parent's due process complaint, the LEA must, within 10 days of receiving the due process complaint, send to the parent a response that includes—

(i) An explanation of why the agency proposed or refused to take the action raised in the due process complaint;

(ii) A description of other options that the IEP Team considered and the reasons why those options were rejected;

(iii) A description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action; and

(iv) A description of the other factors that are relevant to the agency's proposed or refused action.

(2) A response by an LEA under paragraph (e)(1) of this section shall not be construed to preclude the LEA from asserting that the parent's due process complaint was insufficient, where appropriate.

(f) *Other party response to a due process complaint.* Except as provided in paragraph (e) of this section, the party receiving a due process complaint must, within 10 days of receiving the due process complaint, send to the other party a response that specifically addresses the issues raised in the due process complaint.

(Authority: 20 U.S.C. 1415(b)(7), 1415(c)(2))

### § 300.509    Model forms.

(a) Each SEA must develop model forms to assist parents and public agencies in filing a due process complaint in accordance with §§ 300.507(a) and 300.508(a) through (c) and to assist parents and other parties in filing a State complaint under §§ 300.151 through 300.153. However, the SEA or LEA may not require the use of the model forms.

(b) Parents, public agencies, and other parties may use the appropriate model form described in paragraph (a) of this section, or another form or other

document, so long as the form or document that is used meets, as appropriate, the content requirements in § 300.508(b) for filing a due process complaint, or the requirements in § 300.153(b) for filing a State complaint.

(Authority: 20 U.S.C. 1415(b)(8))

### § 300.510    Resolution process.

(a) *Resolution meeting.* (1) Within 15 days of receiving notice of the parent's due process complaint, and prior to the initiation of a due process hearing under § 300.511, the LEA must convene a meeting with the parent and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the due process complaint that—

(i) Includes a representative of the public agency who has decision-making authority on behalf of that agency; and

(ii) May not include an attorney of the LEA unless the parent is accompanied by an attorney.

(2) The purpose of the meeting is for the parent of the child to discuss the due process complaint, and the facts that form the basis of the due process complaint, so that the LEA has the opportunity to resolve the dispute that is the basis for the due process complaint.

(3) The meeting described in paragraph (a)(1) and (2) of this section need not be held if—

(i) The parent and the LEA agree in writing to waive the meeting; or

(ii) The parent and the LEA agree to use the mediation process described in § 300.506.

(4) The parent and the LEA determine the relevant members of the IEP Team to attend the meeting.

(b) *Resolution period.* (1) If the LEA has not resolved the due process complaint to the satisfaction of the parent within 30 days of the receipt of the due process complaint, the due process hearing may occur.

(2) Except as provided in paragraph (c) of this section, the timeline for issuing a final decision under § 300.515 begins at the expiration of this 30-day period.

(3) Except where the parties have jointly agreed to waive the resolution process or to use mediation, notwithstanding paragraphs (b)(1) and (2) of this section, the failure of the parent filing a due process complaint to participate in the resolution meeting will delay the timelines for the resolution process and due process hearing until the meeting is held.

(4) If the LEA is unable to obtain the participation of the parent in the resolution meeting after reasonable efforts have been made (and

documented using the procedures in § 300.322(d)), the LEA may, at the conclusion of the 30-day period, request that a hearing officer dismiss the parent's due process complaint.

(5) If the LEA fails to hold the resolution meeting specified in paragraph (a) of this section within 15 days of receiving notice of a parent's due process complaint or fails to participate in the resolution meeting, the parent may seek the intervention of a hearing officer to begin the due process hearing timeline.

(c) *Adjustments to 30-day resolution period.* The 45-day timeline for the due process hearing in § 300.515(a) starts the day after one of the following events:

(1) Both parties agree in writing to waive the resolution meeting;

(2) After either the mediation or resolution meeting starts but before the end of the 30-day period, the parties agree in writing that no agreement is possible;

(3) If both parties agree in writing to continue the mediation at the end of the 30-day resolution period, but later, the parent or public agency withdraws from the mediation process.

(d) *Written settlement agreement.* If a resolution to the dispute is reached at the meeting described in paragraphs (a)(1) and (2) of this section, the parties must execute a legally binding agreement that is—

(1) Signed by both the parent and a representative of the agency who has the authority to bind the agency; and

(2) Enforceable in any State court of competent jurisdiction or in a district court of the United States, or, by the SEA, if the State has other mechanisms or procedures that permit parties to seek enforcement of resolution agreements, pursuant to § 300.537.

(e) *Agreement review period.* If the parties execute an agreement pursuant to paragraph (c) of this section, a party may void the agreement within 3 business days of the agreement's execution.

(Authority: 20 U.S.C. 1415(f)(1)(B))

### § 300.511    Impartial due process hearing.

(a) *General.* Whenever a due process complaint is received under § 300.507 or § 300.532, the parents or the LEA involved in the dispute must have an opportunity for an impartial due process hearing, consistent with the procedures in §§ 300.507, 300.508, and 300.510.

(b) *Agency responsible for conducting the due process hearing.* The hearing described in paragraph (a) of this section must be conducted by the SEA or the public agency directly responsible for the education of the child, as determined under State statute,

State regulation, or a written policy of the SEA.

(c) *Impartial hearing officer.* (1) At a minimum, a hearing officer—

(i) Must not be—

(A) An employee of the SEA or the LEA that is involved in the education or care of the child; or

(B) A person having a personal or professional interest that conflicts with the person's objectivity in the hearing;

(ii) Must possess knowledge of, and the ability to understand, the provisions of the Act, Federal and State regulations pertaining to the Act, and legal interpretations of the Act by Federal and State courts;

(iii) Must possess the knowledge and ability to conduct hearings in accordance with appropriate, standard legal practice; and

(iv) Must possess the knowledge and ability to render and write decisions in accordance with appropriate, standard legal practice.

(2) A person who otherwise qualifies to conduct a hearing under paragraph (c)(1) of this section is not an employee of the agency solely because he or she is paid by the agency to serve as a hearing officer.

(3) Each public agency must keep a list of the persons who serve as hearing officers. The list must include a statement of the qualifications of each of those persons.

(d) *Subject matter of due process hearings.* The party requesting the due process hearing may not raise issues at the due process hearing that were not raised in the due process complaint filed under § 300.508(b), unless the other party agrees otherwise.

(e) *Timeline for requesting a hearing.* A parent or agency must request an impartial hearing on their due process complaint within two years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the due process complaint, or if the State has an explicit time limitation for requesting such a due process hearing under this part, in the time allowed by that State law.

(f) *Exceptions to the timeline.* The timeline described in paragraph (e) of this section does not apply to a parent if the parent was prevented from filing a due process complaint due to—

(1) Specific misrepresentations by the LEA that it had resolved the problem forming the basis of the due process complaint; or

(2) The LEA's withholding of information from the parent that was required under this part to be provided to the parent.

(Approved by the Office of Management and Budget under control number 1820–0600)

(Authority: 20 U.S.C. 1415(f)(1)(A), 1415(f)(3)(A)–(D))

**§ 300.512  Hearing rights.**

(a) *General.* Any party to a hearing conducted pursuant to §§ 300.507 through 300.513 or §§ 300.530 through 300.534, or an appeal conducted pursuant to § 300.514, has the right to—

(1) Be accompanied and advised by counsel and by individuals with special knowledge or training with respect to the problems of children with disabilities;

(2) Present evidence and confront, cross-examine, and compel the attendance of witnesses;

(3) Prohibit the introduction of any evidence at the hearing that has not been disclosed to that party at least five business days before the hearing;

(4) Obtain a written, or, at the option of the parents, electronic, verbatim record of the hearing; and

(5) Obtain written, or, at the option of the parents, electronic findings of fact and decisions.

(b) *Additional disclosure of information.* (1) At least five business days prior to a hearing conducted pursuant to § 300.511(a), each party must disclose to all other parties all evaluations completed by that date and recommendations based on the offering party's evaluations that the party intends to use at the hearing.

(2) A hearing officer may bar any party that fails to comply with paragraph (b)(1) of this section from introducing the relevant evaluation or recommendation at the hearing without the consent of the other party.

(c) *Parental rights at hearings.* Parents involved in hearings must be given the right to—

(1) Have the child who is the subject of the hearing present;

(2) Open the hearing to the public; and

(3) Have the record of the hearing and the findings of fact and decisions described in paragraphs (a)(4) and (a)(5) of this section provided at no cost to parents.

(Authority: 20 U.S.C. 1415(f)(2), 1415(h))

**§ 300.513  Hearing decisions.**

(a) *Decision of hearing officer on the provision of FAPE.* (1) Subject to paragraph (a)(2) of this section, a hearing officer's determination of whether a child received FAPE must be based on substantive grounds.

(2) In matters alleging a procedural violation, a hearing officer may find that a child did not receive a FAPE only if the procedural inadequacies—

(i) Impeded the child's right to a FAPE;

(ii) Significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or

(iii) Caused a deprivation of educational benefit.

(3) Nothing in paragraph (a) of this section shall be construed to preclude a hearing officer from ordering an LEA to comply with procedural requirements under §§ 300.500 through 300.536.

(b) *Construction clause.* Nothing in §§ 300.507 through 300.513 shall be construed to affect the right of a parent to file an appeal of the due process hearing decision with the SEA under § 300.514(b), if a State level appeal is available.

(c) *Separate request for a due process hearing.* Nothing in §§ 300.500 through 300.536 shall be construed to preclude a parent from filing a separate due process complaint on an issue separate from a due process complaint already filed.

(d) *Findings and decision to advisory panel and general public.* The public agency, after deleting any personally identifiable information, must—

(1) Transmit the findings and decisions referred to in § 300.512(a)(5) to the State advisory panel established under § 300.167; and

(2) Make those findings and decisions available to the public.

(Authority: 20 U.S.C. 1415(f)(3)(E) and (F), 1415(h)(4), 1415(o))

**§ 300.514  Finality of decision; appeal; impartial review.**

(a) *Finality of hearing decision.* A decision made in a hearing conducted pursuant to §§ 300.507 through 300.513 or §§ 300.530 through 300.534 is final, except that any party involved in the hearing may appeal the decision under the provisions of paragraph (b) of this section and § 300.516.

(b) *Appeal of decisions; impartial review.* (1) If the decision required by § 300.511 is conducted by a public agency other than the SEA, any party aggrieved by the findings and decision in the hearing may appeal to the SEA.

(2) If there is an appeal, the SEA must conduct an impartial review of the findings and decision appealed. The official conducting the review must—

(i) Examine the entire hearing record;

(ii) Ensure that the procedures at the hearing were consistent with the requirements of due process;

(iii) Seek additional evidence if necessary. If a hearing is held to receive additional evidence, the rights in § 300.512 apply;

ED-000257

**46796**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

(iv) Afford the parties an opportunity for oral or written argument, or both, at the discretion of the reviewing official;

(v) Make an independent decision on completion of the review; and

(vi) Give a copy of the written, or, at the option of the parents, electronic findings of fact and decisions to the parties.

(c) *Findings and decision to advisory panel and general public.* The SEA, after deleting any personally identifiable information, must—

(1) Transmit the findings and decisions referred to in paragraph (b)(2)(vi) of this section to the State advisory panel established under § 300.167; and

(2) Make those findings and decisions available to the public.

(d) *Finality of review decision.* The decision made by the reviewing official is final unless a party brings a civil action under § 300.516.

(Authority: 20 U.S.C. 1415(g) and (h)(4), 1415(i)(1)(A), 1415(i)(2))

§ 300.515   **Timelines and convenience of hearings and reviews.**

(a) The public agency must ensure that not later than 45 days after the expiration of the 30 day period under § 300.510(b), or the adjusted time periods described in § 300.510(c)—

(1) A final decision is reached in the hearing; and

(2) A copy of the decision is mailed to each of the parties.

(b) The SEA must ensure that not later than 30 days after the receipt of a request for a review—

(1) A final decision is reached in the review; and

(2) A copy of the decision is mailed to each of the parties.

(c) A hearing or reviewing officer may grant specific extensions of time beyond the periods set out in paragraphs (a) and (b) of this section at the request of either party.

(d) Each hearing and each review involving oral arguments must be conducted at a time and place that is reasonably convenient to the parents and child involved.

(Authority: 20 U.S.C. 1415(f)(1)(B)(ii), 1415(g), 1415(i)(1))

§ 300.516   **Civil action.**

(a) *General.* Any party aggrieved by the findings and decision made under §§ 300.507 through 300.513 or §§ 300.530 through 300.534 who does not have the right to an appeal under § 300.514(b), and any party aggrieved by the findings and decision under § 300.514(b), has the right to bring a civil action with respect to the due process complaint notice requesting a

due process hearing under § 300.507 or §§ 300.530 through 300.532. The action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy.

(b) *Time limitation.* The party bringing the action shall have 90 days from the date of the decision of the hearing officer or, if applicable, the decision of the State review official, to file a civil action, or, if the State has an explicit time limitation for bringing civil actions under Part B of the Act, in the time allowed by that State law.

(c) *Additional requirements.* In any action brought under paragraph (a) of this section, the court—

(1) Receives the records of the administrative proceedings;

(2) Hears additional evidence at the request of a party; and

(3) Basing its decision on the preponderance of the evidence, grants the relief that the court determines to be appropriate.

(d) *Jurisdiction of district courts.* The district courts of the United States have jurisdiction of actions brought under section 615 of the Act without regard to the amount in controversy.

(e) *Rule of construction.* Nothing in this part restricts or limits the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under these laws seeking relief that is also available under section 615 of the Act, the procedures under §§ 300.507 and 300.514 must be exhausted to the same extent as would be required had the action been brought under section 615 of the Act.

(Authority: 20 U.S.C. 1415(i)(2) and (3)(A), 1415(l))

§ 300.517   **Attorneys' fees.**

(a) *In general.* (1) In any action or proceeding brought under section 615 of the Act, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to—

(i) The prevailing party who is the parent of a child with a disability;

(ii) To a prevailing party who is an SEA or LEA against the attorney of a parent who files a complaint or subsequent cause of action that is frivolous, unreasonable, or without foundation, or against the attorney of a parent who continued to litigate after the litigation clearly became frivolous, unreasonable, or without foundation; or

(iii) To a prevailing SEA or LEA against the attorney of a parent, or

against the parent, if the parent's request for a due process hearing or subsequent cause of action was presented for any improper purpose, such as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation.

(2) Nothing in this subsection shall be construed to affect section 327 of the District of Columbia Appropriations Act, 2005.

(b) *Prohibition on use of funds.* (1) Funds under Part B of the Act may not be used to pay attorneys' fees or costs of a party related to any action or proceeding under section 615 of the Act and subpart E of this part.

(2) Paragraph (b)(1) of this section does not preclude a public agency from using funds under Part B of the Act for conducting an action or proceeding under section 615 of the Act.

(c) *Award of fees.* A court awards reasonable attorneys' fees under section 615(i)(3) of the Act consistent with the following:

(1) Fees awarded under section 615(i)(3) of the Act must be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished. No bonus or multiplier may be used in calculating the fees awarded under this paragraph.

(2)(i) Attorneys' fees may not be awarded and related costs may not be reimbursed in any action or proceeding under section 615 of the Act for services performed subsequent to the time of a written offer of settlement to a parent if—

(A) The offer is made within the time prescribed by Rule 68 of the Federal Rules of Civil Procedure or, in the case of an administrative proceeding, at any time more than 10 days before the proceeding begins;

(B) The offer is not accepted within 10 days; and

(C) The court or administrative hearing officer finds that the relief finally obtained by the parents is not more favorable to the parents than the offer of settlement.

(ii) Attorneys' fees may not be awarded relating to any meeting of the IEP Team unless the meeting is convened as a result of an administrative proceeding or judicial action, or at the discretion of the State, for a mediation described in § 300.506.

(iii) A meeting conducted pursuant to § 300.510 shall not be considered—

(A) A meeting convened as a result of an administrative hearing or judicial action; or

(B) An administrative hearing or judicial action for purposes of this section.

ED-000258

(3) Notwithstanding paragraph (c)(2) of this section, an award of attorneys' fees and related costs may be made to a parent who is the prevailing party and who was substantially justified in rejecting the settlement offer.

(4) Except as provided in paragraph (c)(5) of this section, the court reduces, accordingly, the amount of the attorneys' fees awarded under section 615 of the Act, if the court finds that—

(i) The parent, or the parent's attorney, during the course of the action or proceeding, unreasonably protracted the final resolution of the controversy;

(ii) The amount of the attorneys' fees otherwise authorized to be awarded unreasonably exceeds the hourly rate prevailing in the community for similar services by attorneys of reasonably comparable skill, reputation, and experience;

(iii) The time spent and legal services furnished were excessive considering the nature of the action or proceeding; or

(iv) The attorney representing the parent did not provide to the LEA the appropriate information in the due process request notice in accordance with § 300.508.

(5) The provisions of paragraph (c)(4) of this section do not apply in any action or proceeding if the court finds that the State or local agency unreasonably protracted the final resolution of the action or proceeding or there was a violation of section 615 of the Act.

(Authority: 20 U.S.C. 1415(i)(3)(B)–(G))

### § 300.518  Child's status during proceedings.

(a) Except as provided in § 300.533, during the pendency of any administrative or judicial proceeding regarding a due process complaint notice requesting a due process hearing under § 300.507, unless the State or local agency and the parents of the child agree otherwise, the child involved in the complaint must remain in his or her current educational placement.

(b) If the complaint involves an application for initial admission to public school, the child, with the consent of the parents, must be placed in the public school until the completion of all the proceedings.

(c) If the complaint involves an application for initial services under this part from a child who is transitioning from Part C of the Act to Part B and is no longer eligible for Part C services because the child has turned three, the public agency is not required to provide the Part C services that the child had been receiving. If the child is found eligible for special education and

related services under Part B and the parent consents to the initial provision of special education and related services under § 300.300(b), then the public agency must provide those special education and related services that are not in dispute between the parent and the public agency.

(d) If the hearing officer in a due process hearing conducted by the SEA or a State review official in an administrative appeal agrees with the child's parents that a change of placement is appropriate, that placement must be treated as an agreement between the State and the parents for purposes of paragraph (a) of this section.

(Authority: 20 U.S.C. 1415(j))

### § 300.519  Surrogate parents.

(a) *General.* Each public agency must ensure that the rights of a child are protected when—

(1) No parent (as defined in § 300.30) can be identified;

(2) The public agency, after reasonable efforts, cannot locate a parent;

(3) The child is a ward of the State under the laws of that State; or

(4) The child is an unaccompanied homeless youth as defined in section 725(6) of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11434a(6)).

(b) *Duties of public agency.* The duties of a public agency under paragraph (a) of this section include the assignment of an individual to act as a surrogate for the parents. This must include a method—

(1) For determining whether a child needs a surrogate parent; and

(2) For assigning a surrogate parent to the child.

(c) *Wards of the State.* In the case of a child who is a ward of the State, the surrogate parent alternatively may be appointed by the judge overseeing the child's case, provided that the surrogate meets the requirements in paragraphs (d)(2)(i) and (e) of this section.

(d) *Criteria for selection of surrogate parents.* (1) The public agency may select a surrogate parent in any way permitted under State law.

(2) Public agencies must ensure that a person selected as a surrogate parent—

(i) Is not an employee of the SEA, the LEA, or any other agency that is involved in the education or care of the child;

(ii) Has no personal or professional interest that conflicts with the interest of the child the surrogate parent represents; and

(iii) Has knowledge and skills that ensure adequate representation of the child.

(e) *Non-employee requirement; compensation.* A person otherwise qualified to be a surrogate parent under paragraph (d) of this section is not an employee of the agency solely because he or she is paid by the agency to serve as a surrogate parent.

(f) *Unaccompanied homeless youth.* In the case of a child who is an unaccompanied homeless youth, appropriate staff of emergency shelters, transitional shelters, independent living programs, and street outreach programs may be appointed as temporary surrogate parents without regard to paragraph (d)(2)(i) of this section, until a surrogate parent can be appointed that meets all of the requirements of paragraph (d) of this section.

(g) *Surrogate parent responsibilities.* The surrogate parent may represent the child in all matters relating to—

(1) The identification, evaluation, and educational placement of the child; and

(2) The provision of FAPE to the child.

(h) *SEA responsibility.* The SEA must make reasonable efforts to ensure the assignment of a surrogate parent not more than 30 days after a public agency determines that the child needs a surrogate parent.

(Authority: 20 U.S.C. 1415(b)(2))

### § 300.520  Transfer of parental rights at age of majority.

(a) *General.* A State may provide that, when a child with a disability reaches the age of majority under State law that applies to all children (except for a child with a disability who has been determined to be incompetent under State law)—

(1)(i) The public agency must provide any notice required by this part to both the child and the parents; and

(ii) All rights accorded to parents under Part B of the Act transfer to the child;

(2) All rights accorded to parents under Part B of the Act transfer to children who are incarcerated in an adult or juvenile, State or local correctional institution; and

(3) Whenever a State provides for the transfer of rights under this part pursuant to paragraph (a)(1) or (a)(2) of this section, the agency must notify the child and the parents of the transfer of rights.

(b) *Special rule.* A State must establish procedures for appointing the parent of a child with a disability, or, if the parent is not available, another appropriate individual, to represent the educational interests of the child throughout the period of the child's eligibility under Part B of the Act if, under State law, a child who has

reached the age of majority, but has not been determined to be incompetent, can be determined not to have the ability to provide informed consent with respect to the child's educational program.

(Authority: 20 U.S.C. 1415(m))

**§§ 300.521–300.529   [Reserved]**

**Discipline Procedures**

**§ 300.530   Authority of school personnel.**

(a) *Case-by-case determination.* School personnel may consider any unique circumstances on a case-by-case basis when determining whether a change in placement, consistent with the other requirements of this section, is appropriate for a child with a disability who violates a code of student conduct.

(b) *General.* (1) School personnel under this section may remove a child with a disability who violates a code of student conduct from his or her current placement to an appropriate interim alternative educational setting, another setting, or suspension, for not more than 10 consecutive school days (to the extent those alternatives are applied to children without disabilities), and for additional removals of not more than 10 consecutive school days in that same school year for separate incidents of misconduct (as long as those removals do not constitute a change of placement under § 300.536).

(2) After a child with a disability has been removed from his or her current placement for 10 school days in the same school year, during any subsequent days of removal the public agency must provide services to the extent required under paragraph (d) of this section.

(c) *Additional authority.* For disciplinary changes in placement that would exceed 10 consecutive school days, if the behavior that gave rise to the violation of the school code is determined not to be a manifestation of the child's disability pursuant to paragraph (e) of this section, school personnel may apply the relevant disciplinary procedures to children with disabilities in the same manner and for the same duration as the procedures would be applied to children without disabilities, except as provided in paragraph (d) of this section.

(d) *Services.* (1) A child with a disability who is removed from the child's current placement pursuant to paragraphs (c), or (g) of this section must—

(i) Continue to receive educational services, as provided in § 300.101(a), so as to enable the child to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP; and

(ii) Receive, as appropriate, a functional behavioral assessment, and behavioral intervention services and modifications, that are designed to address the behavior violation so that it does not recur.

(2) The services required by paragraph (d)(1), (d)(3), (d)(4), and (d)(5) of this section may be provided in an interim alternative educational setting.

(3) A public agency is only required to provide services during periods of removal to a child with a disability who has been removed from his or her current placement for 10 school days or less in that school year, if it provides services to a child without disabilities who is similarly removed.

(4) After a child with a disability has been removed from his or her current placement for 10 school days in the same school year, if the current removal is for not more than 10 consecutive school days and is not a change of placement under § 300.536, school personnel, in consultation with at least one of the child's teachers, determine the extent to which services are needed, as provided in § 300.101(a), so as to enable the child to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP.

(5) If the removal is a change of placement under § 300.536, the child's IEP Team determines appropriate services under paragraph (d)(1) of this section.

(e) *Manifestation determination.* (1) Within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct, the LEA, the parent, and relevant members of the child's IEP Team (as determined by the parent and the LEA) must review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine—

(i) If the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or

(ii) If the conduct in question was the direct result of the LEA's failure to implement the IEP.

(2) The conduct must be determined to be a manifestation of the child's disability if the LEA, the parent, and relevant members of the child's IEP Team determine that a condition in either paragraph (e)(1)(i) or (1)(ii) of this section was met.

(3) If the LEA, the parent, and relevant members of the child's IEP Team determine the condition described in paragraph (e)(1)(ii) of this section was met, the LEA must take immediate steps to remedy those deficiencies.

(f) *Determination that behavior was a manifestation.* If the LEA, the parent, and relevant members of the IEP Team make the determination that the conduct was a manifestation of the child's disability, the IEP Team must—

(1) Either—

(i) Conduct a functional behavioral assessment, unless the LEA had conducted a functional behavioral assessment before the behavior that resulted in the change of placement occurred, and implement a behavioral intervention plan for the child; or

(ii) If a behavioral intervention plan already has been developed, review the behavioral intervention plan, and modify it, as necessary, to address the behavior; and

(2) Except as provided in paragraph (g) of this section, return the child to the placement from which the child was removed, unless the parent and the LEA agree to a change of placement as part of the modification of the behavioral intervention plan.

(g) *Special circumstances.* School personnel may remove a student to an interim alternative educational setting for not more than 45 school days without regard to whether the behavior is determined to be a manifestation of the child's disability, if the child—

(1) Carries a weapon to or possesses a weapon at school, on school premises, or to or at a school function under the jurisdiction of an SEA or an LEA;

(2) Knowingly possesses or uses illegal drugs, or sells or solicits the sale of a controlled substance, while at school, on school premises, or at a school function under the jurisdiction of an SEA or an LEA; or

(3) Has inflicted serious bodily injury upon another person while at school, on school premises, or at a school function under the jurisdiction of an SEA or an LEA.

(h) *Notification.* On the date on which the decision is made to make a removal that constitutes a change of placement of a child with a disability because of a violation of a code of student conduct, the LEA must notify the parents of that decision, and provide the parents the procedural safeguards notice described in § 300.504.

(i) *Definitions.* For purposes of this section, the following definitions apply:

(1) *Controlled substance* means a drug or other substance identified under schedules I, II, III, IV, or V in section

202(c) of the Controlled Substances Act (21 U.S.C. 812(c)).

(2) *Illegal drug* means a controlled substance; but does not include a controlled substance that is legally possessed or used under the supervision of a licensed health-care professional or that is legally possessed or used under any other authority under that Act or under any other provision of Federal law.

(3) *Serious bodily injury* has the meaning given the term ''serious bodily injury'' under paragraph (3) of subsection (h) of section 1365 of title 18, United States Code.

(4) *Weapon* has the meaning given the term ''dangerous weapon'' under paragraph (2) of the first subsection (g) of section 930 of title 18, United States Code.

(Authority: 20 U.S.C. 1415(k)(1) and (7))

### § 300.531   Determination of setting.

The child's IEP Team determines the interim alternative educational setting for services under § 300.530(c), (d)(5), and (g).

(Authority: 20 U.S.C. 1415(k)(2))

### § 300.532   Appeal.

(a) *General.* The parent of a child with a disability who disagrees with any decision regarding placement under §§ 300.530 and 300.531, or the manifestation determination under § 300.530(e), or an LEA that believes that maintaining the current placement of the child is substantially likely to result in injury to the child or others, may appeal the decision by requesting a hearing. The hearing is requested by filing a complaint pursuant to §§ 300.507 and 300.508(a) and (b).

(b) *Authority of hearing officer.* (1) A hearing officer under § 300.511 hears, and makes a determination regarding an appeal under paragraph (a) of this section.

(2) In making the determination under paragraph (b)(1) of this section, the hearing officer may—

(i) Return the child with a disability to the placement from which the child was removed if the hearing officer determines that the removal was a violation of § 300.530 or that the child's behavior was a manifestation of the child's disability; or

(ii) Order a change of placement of the child with a disability to an appropriate interim alternative educational setting for not more than 45 school days if the hearing officer determines that maintaining the current placement of the child is substantially likely to result in injury to the child or to others.

(3) The procedures under paragraphs (a) and (b)(1) and (2) of this section may be repeated, if the LEA believes that returning the child to the original placement is substantially likely to result in injury to the child or to others.

(c) *Expedited due process hearing.* (1) Whenever a hearing is requested under paragraph (a) of this section, the parents or the LEA involved in the dispute must have an opportunity for an impartial due process hearing consistent with the requirements of §§ 300.507 and 300.508(a) through (c) and §§ 300.510 through 300.514, except as provided in paragraph (c)(2) through (4) of this section.

(2) The SEA or LEA is responsible for arranging the expedited due process hearing, which must occur within 20 school days of the date the complaint requesting the hearing is filed. The hearing officer must make a determination within 10 school days after the hearing.

(3) Unless the parents and LEA agree in writing to waive the resolution meeting described in paragraph (c)(3)(i) of this section, or agree to use the mediation process described in § 300.506—

(i) A resolution meeting must occur within seven days of receiving notice of the due process complaint; and

(ii) The due process hearing may proceed unless the matter has been resolved to the satisfaction of both parties within 15 days of the receipt of the due process complaint.

(4) A State may establish different State-imposed procedural rules for expedited due process hearings conducted under this section than it has established for other due process hearings, but, except for the timelines as modified in paragraph (c)(3) of this section, the State must ensure that the requirements in §§ 300.510 through 300.514 are met.

(5) The decisions on expedited due process hearings are appealable consistent with § 300.514.

(Authority:

20 U.S.C. 1415(k)(3) and (4)(B), 1415(f)(1)(A))

### § 300.533   Placement during appeals.

When an appeal under § 300.532 has been made by either the parent or the LEA, the child must remain in the interim alternative educational setting pending the decision of the hearing officer or until the expiration of the time period specified in §A300.530(c) or (g), whichever occurs first, unless the parent and the SEA or LEA agree otherwise.

(Authority: 20 U.S.C. 1415(k)(4)(A))

### § 300.534   Protections for children not determined eligible for special education and related services.

(a) *General.* A child who has not been determined to be eligible for special education and related services under this part and who has engaged in behavior that violated a code of student conduct, may assert any of the protections provided for in this part if the public agency had knowledge (as determined in accordance with paragraph (b) of this section) that the child was a child with a disability before the behavior that precipitated the disciplinary action occurred.

(b) *Basis of knowledge.* A public agency must be deemed to have knowledge that a child is a child with a disability if before the behavior that precipitated the disciplinary action occurred—

(1) The parent of the child expressed concern in writing to supervisory or administrative personnel of the appropriate educational agency, or a teacher of the child, that the child is in need of special education and related services;

(2) The parent of the child requested an evaluation of the child pursuant to §§ 300.300 through 300.311; or

(3) The teacher of the child, or other personnel of the LEA, expressed specific concerns about a pattern of behavior demonstrated by the child directly to the director of special education of the agency or to other supervisory personnel of the agency.

(c) *Exception.* A public agency would not be deemed to have knowledge under paragraph (b) of this section if—

(1) The parent of the child—

(i) Has not allowed an evaluation of the child pursuant to §§ 300.300 through 300.311; or

(ii) Has refused services under this part; or

(2) The child has been evaluated in accordance with §§ 300.300 through 300.311 and determined to not be a child with a disability under this part.

(d) *Conditions that apply if no basis of knowledge.* (1) If a public agency does not have knowledge that a child is a child with a disability (in accordance with paragraphs (b) and (c) of this section) prior to taking disciplinary measures against the child, the child may be subjected to the disciplinary measures applied to children without disabilities who engage in comparable behaviors consistent with paragraph (d)(2) of this section.

(2)(i) If a request is made for an evaluation of a child during the time period in which the child is subjected to disciplinary measures under

§ 300.530, the evaluation must be conducted in an expedited manner.

(ii) Until the evaluation is completed, the child remains in the educational placement determined by school authorities, which can include suspension or expulsion without educational services.

(iii) If the child is determined to be a child with a disability, taking into consideration information from the evaluation conducted by the agency and information provided by the parents, the agency must provide special education and related services in accordance with this part, including the requirements of §§ 300.530 through 300.536 and section 612(a)(1)(A) of the Act.

(Authority: 20 U.S.C. 1415(k)(5))

**§ 300.535   Referral to and action by law enforcement and judicial authorities.**

(a) *Rule of construction.* Nothing in this part prohibits an agency from reporting a crime committed by a child with a disability to appropriate authorities or prevents State law enforcement and judicial authorities from exercising their responsibilities with regard to the application of Federal and State law to crimes committed by a child with a disability.

(b) *Transmittal of records.* (1) An agency reporting a crime committed by a child with a disability must ensure that copies of the special education and disciplinary records of the child are transmitted for consideration by the appropriate authorities to whom the agency reports the crime.

(2) An agency reporting a crime under this section may transmit copies of the child's special education and disciplinary records only to the extent that the transmission is permitted by the Family Educational Rights and Privacy Act.

(Authority: 20 U.S.C. 1415(k)(6))

**§ 300.536   Change of placement because of disciplinary removals.**

(a) For purposes of removals of a child with a disability from the child's current educational placement under §§ 300.530 through 300.535, a change of placement occurs if—

(1) The removal is for more than 10 consecutive school days; or

(2) The child has been subjected to a series of removals that constitute a pattern—

(i) Because the series of removals total more than 10 school days in a school year;

(ii) Because the child's behavior is substantially similar to the child's behavior in previous incidents that resulted in the series of removals; and

(iii) Because of such additional factors as the length of each removal, the total amount of time the child has been removed, and the proximity of the removals to one another.

(b)(1) The public agency determines on a case-by-case basis whether a pattern of removals constitutes a change of placement.

(2) This determination is subject to review through due process and judicial proceedings.

(Authority: 20 U.S.C. 1415(k))

**§ 300.537   State enforcement mechanisms.**

Notwithstanding §§ 300.506(b)(7) and 300.510(d)(2), which provide for judicial enforcement of a written agreement reached as a result of mediation or a resolution meeting, there is nothing in this part that would prevent the SEA from using other mechanisms to seek enforcement of that agreement, provided that use of those mechanisms is not mandatory and does not delay or deny a party the right to seek enforcement of the written agreement in a State court of competent jurisdiction or in a district court of the United States.

(Authority: 20 U.S.C. 1415(e)(2)(F), 1415(f)(1)(B))

**§§ 300.538–300.599   [Reserved]**

**Subpart F—Monitoring, Enforcement, Confidentiality, and Program Information**

**Monitoring, Technical Assistance, and Enforcement**

**§ 300.600   State monitoring and enforcement.**

(a) The State must monitor the implementation of this part, enforce this part in accordance with § 300.604(a)(1) and (a)(3), (b)(2)(i) and (b)(2)(v), and (c)(2), and annually report on performance under this part.

(b) The primary focus of the State's monitoring activities must be on—

(1) Improving educational results and functional outcomes for all children with disabilities; and

(2) Ensuring that public agencies meet the program requirements under Part B of the Act, with a particular emphasis on those requirements that are most closely related to improving educational results for children with disabilities.

(c) As a part of its responsibilities under paragraph (a) of this section, the State must use quantifiable indicators and such qualitative indicators as are needed to adequately measure performance in the priority areas identified in paragraph (d) of this section, and the indicators established

by the Secretary for the State performance plans.

(d) The State must monitor the LEAs located in the State, using quantifiable indicators in each of the following priority areas, and using such qualitative indicators as are needed to adequately measure performance in those areas:

(1) Provision of FAPE in the least restrictive environment.

(2) State exercise of general supervision, including child find, effective monitoring, the use of resolution meetings, mediation, and a system of transition services as defined in § 300.43 and in 20 U.S.C. 1437(a)(9).

(3) Disproportionate representation of racial and ethnic groups in special education and related services, to the extent the representation is the result of inappropriate identification.

(Approved by the Office of Management and Budget under control number 1820–0624)

(Authority: 20 U.S.C. 1416(a))

**§ 300.601   State performance plans and data collection.**

(a) *General.* Not later than December 3, 2005, each State must have in place a performance plan that evaluates the State's efforts to implement the requirements and purposes of Part B of the Act, and describes how the State will improve such implementation.

(1) Each State must submit the State's performance plan to the Secretary for approval in accordance with the approval process described in section 616(c) of the Act.

(2) Each State must review its State performance plan at least once every six years, and submit any amendments to the Secretary.

(3) As part of the State performance plan, each State must establish measurable and rigorous targets for the indicators established by the Secretary under the priority areas described in § 300.600(d).

(b) *Data collection.* (1) Each State must collect valid and reliable information as needed to report annually to the Secretary on the indicators established by the Secretary for the State performance plans.

(2) If the Secretary permits States to collect data on specific indicators through State monitoring or sampling, and the State collects the data through State monitoring or sampling, the State must collect data on those indicators for each LEA at least once during the period of the State performance plan.

(3) Nothing in Part B of the Act shall be construed to authorize the development of a nationwide database of personally identifiable information

on individuals involved in studies or other collections of data under Part B of the Act.

(Approved by the Office of Management and Budget under control number 1820–0624)

(Authority: 20 U.S.C. 1416(b))

### § 300.602  State use of targets and reporting.

(a) *General.* Each State must use the targets established in the State's performance plan under § 300.601 and the priority areas described in § 300.600(d) to analyze the performance of each LEA.

(b) *Public reporting and privacy*—(1) *Public report.* (i) Subject to paragraph (b)(1)(ii) of this section, the State must—

(A) Report annually to the public on the performance of each LEA located in the State on the targets in the State's performance plan; and

(B) Make the State's performance plan available through public means, including by posting on the Web site of the SEA, distribution to the media, and distribution through public agencies.

(ii) If the State, in meeting the requirements of paragraph (b)(1)(i) of this section, collects performance data through State monitoring or sampling, the State must include in its report under paragraph (b)(1)(i)(A) of this section the most recently available performance data on each LEA, and the date the data were obtained.

(2) *State performance report.* The State must report annually to the Secretary on the performance of the State under the State's performance plan.

(3) *Privacy.* The State must not report to the public or the Secretary any information on performance that would result in the disclosure of personally identifiable information about individual children, or where the available data are insufficient to yield statistically reliable information.

(Approved by the Office of Management and Budget under control number 1820–0624)

(Authority: 20 U.S.C. 1416(b)(2)(C))

### § 300.603  Secretary's review and determination regarding State performance.

(a) *Review.* The Secretary annually reviews the State's performance report submitted pursuant to § 300.602(b)(2).

(b) *Determination*—(1) *General.* Based on the information provided by the State in the State's annual performance report, information obtained through monitoring visits, and any other public information made available, the Secretary determines if the State—

(i) Meets the requirements and purposes of Part B of the Act;

(ii) Needs assistance in implementing the requirements of Part B of the Act;

(iii) Needs intervention in implementing the requirements of Part B of the Act; or

(iv) Needs substantial intervention in implementing the requirements of Part B of the Act.

(2) *Notice and opportunity for a hearing.* (i) For determinations made under paragraphs (b)(1)(iii) and (b)(1)(iv) of this section, the Secretary provides reasonable notice and an opportunity for a hearing on those determinations.

(ii) The hearing described in paragraph (b)(2) of this section consists of an opportunity to meet with the Assistant Secretary for Special Education and Rehabilitative Services to demonstrate why the Department should not make the determination described in paragraph (b)(1) of this section.

(Authority: 20 U.S.C. 1416(d))

### § 300.604  Enforcement.

(a) *Needs assistance.* If the Secretary determines, for two consecutive years, that a State needs assistance under § 300.603(b)(1)(ii) in implementing the requirements of Part B of the Act, the Secretary takes one or more of the following actions:

(1) Advises the State of available sources of technical assistance that may help the State address the areas in which the State needs assistance, which may include assistance from the Office of Special Education Programs, other offices of the Department of Education, other Federal agencies, technical assistance providers approved by the Secretary, and other federally funded nonprofit agencies, and requires the State to work with appropriate entities. Such technical assistance may include—

(i) The provision of advice by experts to address the areas in which the State needs assistance, including explicit plans for addressing the area for concern within a specified period of time;

(ii) Assistance in identifying and implementing professional development, instructional strategies, and methods of instruction that are based on scientifically based research;

(iii) Designating and using distinguished superintendents, principals, special education administrators, special education teachers, and other teachers to provide advice, technical assistance, and support; and

(iv) Devising additional approaches to providing technical assistance, such as collaborating with institutions of higher education, educational service agencies, national centers of technical assistance supported under Part D of the Act, and

private providers of scientifically based technical assistance.

(2) Directs the use of State-level funds under section 611(e) of the Act on the area or areas in which the State needs assistance.

(3) Identifies the State as a high-risk grantee and imposes special conditions on the State's grant under Part B of the Act.

(b) *Needs intervention.* If the Secretary determines, for three or more consecutive years, that a State needs intervention under § 300.603(b)(1)(iii) in implementing the requirements of Part B of the Act, the following shall apply:

(1) The Secretary may take any of the actions described in paragraph (a) of this section.

(2) The Secretary takes one or more of the following actions:

(i) Requires the State to prepare a corrective action plan or improvement plan if the Secretary determines that the State should be able to correct the problem within one year.

(ii) Requires the State to enter into a compliance agreement under section 457 of the General Education Provisions Act, as amended, 20 U.S.C. 1221 *et seq.* (GEPA), if the Secretary has reason to believe that the State cannot correct the problem within one year.

(iii) For each year of the determination, withholds not less than 20 percent and not more than 50 percent of the State's funds under section 611(e) of the Act, until the Secretary determines the State has sufficiently addressed the areas in which the State needs intervention.

(iv) Seeks to recover funds under section 452 of GEPA.

(v) Withholds, in whole or in part, any further payments to the State under Part B of the Act.

(vi) Refers the matter for appropriate enforcement action, which may include referral to the Department of Justice.

(c) *Needs substantial intervention.* Notwithstanding paragraph (a) or (b) of this section, at any time that the Secretary determines that a State needs substantial intervention in implementing the requirements of Part B of the Act or that there is a substantial failure to comply with any condition of an SEA's or LEA's eligibility under Part B of the Act, the Secretary takes one or more of the following actions:

(1) Recovers funds under section 452 of GEPA.

(2) Withholds, in whole or in part, any further payments to the State under Part B of the Act.

(3) Refers the case to the Office of the Inspector General at the Department of Education.

(4) Refers the matter for appropriate enforcement action, which may include referral to the Department of Justice.

(d) *Report to Congress.* The Secretary reports to the Committee on Education and the Workforce of the House of Representatives and the Committee on Health, Education, Labor, and Pensions of the Senate within 30 days of taking enforcement action pursuant to paragraph (a), (b), or (c) of this section, on the specific action taken and the reasons why enforcement action was taken.

(Authority: 20 U.S.C. 1416(e)(1)–(e)(3), (e)(5))

§ 300.605   Withholding funds.

(a) *Opportunity for hearing.* Prior to withholding any funds under Part B of the Act, the Secretary provides reasonable notice and an opportunity for a hearing to the SEA involved, pursuant to the procedures in §§ 300.180 through 300.183.

(b) *Suspension.* Pending the outcome of any hearing to withhold payments under paragraph (a) of this section, the Secretary may suspend payments to a recipient, suspend the authority of the recipient to obligate funds under Part B of the Act, or both, after the recipient has been given reasonable notice and an opportunity to show cause why future payments or authority to obligate funds under Part B of the Act should not be suspended.

(c) *Nature of withholding.* (1) If the Secretary determines that it is appropriate to withhold further payments under § 300.604(b)(2) or (c)(2), the Secretary may determine—

(i) That the withholding will be limited to programs or projects, or portions of programs or projects, that affected the Secretary's determination under § 300.603(b)(1); or

(ii) That the SEA must not make further payments under Part B of the Act to specified State agencies or LEAs that caused or were involved in the Secretary's determination under § 300.603(b)(1).

(2) Until the Secretary is satisfied that the condition that caused the initial withholding has been substantially rectified—

(i) Payments to the State under Part B of the Act must be withheld in whole or in part; and

(ii) Payments by the SEA under Part B of the Act must be limited to State agencies and LEAs whose actions did not cause or were not involved in the Secretary's determination under § 300.603(b)(1), as the case may be.

(Authority: 20 U.S.C. 1416(e)(4), (e)(6))

§ 300.606   Public attention.

Any State that has received notice under §§ 300.603(b)(1)(ii) through (iv) must, by means of a public notice, take such measures as may be necessary to notify the public within the State of the pendency of an action taken pursuant to § 300.604.

(Authority: 20 U.S.C. 1416(e)(7))

§ 300.607   Divided State agency responsibility.

For purposes of this subpart, if responsibility for ensuring that the requirements of Part B of the Act are met with respect to children with disabilities who are convicted as adults under State law and incarcerated in adult prisons is assigned to a public agency other than the SEA pursuant to § 300.149(d), and if the Secretary finds that the failure to comply substantially with the provisions of Part B of the Act are related to a failure by the public agency, the Secretary takes appropriate corrective action to ensure compliance with Part B of the Act, except that—

(a) Any reduction or withholding of payments to the State under § 300.604 must be proportionate to the total funds allotted under section 611 of the Act to the State as the number of eligible children with disabilities in adult prisons under the supervision of the other public agency is proportionate to the number of eligible individuals with disabilities in the State under the supervision of the SEA; and

(b) Any withholding of funds under § 300.604 must be limited to the specific agency responsible for the failure to comply with Part B of the Act.

(Authority: 20 U.S.C. 1416(h))

§ 300.608   State enforcement.

(a) If an SEA determines that an LEA is not meeting the requirements of Part B of the Act, including the targets in the State's performance plan, the SEA must prohibit the LEA from reducing the LEA's maintenance of effort under § 300.203 for any fiscal year.

(b) Nothing in this subpart shall be construed to restrict a State from utilizing any other authority available to it to monitor and enforce the requirements of Part B of the Act.

(Authority: 20 U.S.C. 1416(f); 20 U.S.C. 1412(a)(11))

§ 300.609   Rule of construction.

Nothing in this subpart shall be construed to restrict the Secretary from utilizing any authority under GEPA, including the provisions in 34 CFR parts 76, 77, 80, and 81 to monitor and enforce the requirements of the Act, including the imposition of special conditions under 34 CFR 80.12.

(Authority: 20 U.S.C. 1416(g))

Confidentiality of Information

§ 300.610   Confidentiality.

The Secretary takes appropriate action, in accordance with section 444 of GEPA, to ensure the protection of the confidentiality of any personally identifiable data, information, and records collected or maintained by the Secretary and by SEAs and LEAs pursuant to Part B of the Act, and consistent with §§ 300.611 through 300.627.

(Authority: 20 U.S.C. 1417(c))

§ 300.611   Definitions.

As used in §§ 300.611 through 300.625—

(a) *Destruction* means physical destruction or removal of personal identifiers from information so that the information is no longer personally identifiable.

(b) *Education records* means the type of records covered under the definition of "education records" in 34 CFR part 99 (the regulations implementing the Family Educational Rights and Privacy Act of 1974, 20 U.S.C. 1232g (FERPA)).

(c) *Participating agency* means any agency or institution that collects, maintains, or uses personally identifiable information, or from which information is obtained, under Part B of the Act.

(Authority: 20 U.S.C. 1221e–3, 1412(a)(8), 1417(c))

§ 300.612   Notice to parents.

(a) The SEA must give notice that is adequate to fully inform parents about the requirements of § 300.123, including—

(1) A description of the extent that the notice is given in the native languages of the various population groups in the State;

(2) A description of the children on whom personally identifiable information is maintained, the types of information sought, the methods the State intends to use in gathering the information (including the sources from whom information is gathered), and the uses to be made of the information;

(3) A summary of the policies and procedures that participating agencies must follow regarding storage, disclosure to third parties, retention, and destruction of personally identifiable information; and

(4) A description of all of the rights of parents and children regarding this information, including the rights under FERPA and implementing regulations in 34 CFR part 99.

(b) Before any major identification, location, or evaluation activity, the

notice must be published or announced in newspapers or other media, or both, with circulation adequate to notify parents throughout the State of the activity.

(Authority: 20 U.S.C. 1412(a)(8); 1417(c))

### § 300.613    Access rights.

(a) Each participating agency must permit parents to inspect and review any education records relating to their children that are collected, maintained, or used by the agency under this part. The agency must comply with a request without unnecessary delay and before any meeting regarding an IEP, or any hearing pursuant to § 300.507 or §§ 300.530 through 300.532, or resolution session pursuant to § 300.510, and in no case more than 45 days after the request has been made.

(b) The right to inspect and review education records under this section includes—

(1) The right to a response from the participating agency to reasonable requests for explanations and interpretations of the records;

(2) The right to request that the agency provide copies of the records containing the information if failure to provide those copies would effectively prevent the parent from exercising the right to inspect and review the records; and

(3) The right to have a representative of the parent inspect and review the records.

(c) An agency may presume that the parent has authority to inspect and review records relating to his or her child unless the agency has been advised that the parent does not have the authority under applicable State law governing such matters as guardianship, separation, and divorce.

(Authority: 20 U.S.C. 1412(a)(8); 1417(c))

### § 300.614    Record of access.

Each participating agency must keep a record of parties obtaining access to education records collected, maintained, or used under Part B of the Act (except access by parents and authorized employees of the participating agency), including the name of the party, the date access was given, and the purpose for which the party is authorized to use the records.

(Authority: 20 U.S.C. 1412(a)(8); 1417(c))

### § 300.615    Records on more than one child.

If any education record includes information on more than one child, the parents of those children have the right to inspect and review only the information relating to their child or to be informed of that specific information.

### § 300.616    List of types and locations of information.

Each participating agency must provide parents on request a list of the types and locations of education records collected, maintained, or used by the agency.

(Authority: 20 U.S.C. 1412(a)(8); 1417(c))

### § 300.617    Fees.

(a) Each participating agency may charge a fee for copies of records that are made for parents under this part if the fee does not effectively prevent the parents from exercising their right to inspect and review those records.

(b) A participating agency may not charge a fee to search for or to retrieve information under this part.

(Authority: 20 U.S.C. 1412(a)(8); 1417(c))

### § 300.618    Amendment of records at parent's request.

(a) A parent who believes that information in the education records collected, maintained, or used under this part is inaccurate or misleading or violates the privacy or other rights of the child may request the participating agency that maintains the information to amend the information.

(b) The agency must decide whether to amend the information in accordance with the request within a reasonable period of time of receipt of the request.

(c) If the agency decides to refuse to amend the information in accordance with the request, it must inform the parent of the refusal and advise the parent of the right to a hearing under § 300.619.

(Authority: 20 U.S.C. 1412(a)(8); 1417(c))

### § 300.619    Opportunity for a hearing.

The agency must, on request, provide an opportunity for a hearing to challenge information in education records to ensure that it is not inaccurate, misleading, or otherwise in violation of the privacy or other rights of the child.

(Authority: 20 U.S.C. 1412(a)(8); 1417(c))

### § 300.620    Result of hearing.

(a) If, as a result of the hearing, the agency decides that the information is inaccurate, misleading or otherwise in violation of the privacy or other rights of the child, it must amend the information accordingly and so inform the parent in writing.

(b) If, as a result of the hearing, the agency decides that the information is not inaccurate, misleading, or otherwise in violation of the privacy or other rights of the child, it must inform the parent of the parent's right to place in

the records the agency maintains on the child a statement commenting on the information or setting forth any reasons for disagreeing with the decision of the agency.

(c) Any explanation placed in the records of the child under this section must—

(1) Be maintained by the agency as part of the records of the child as long as the record or contested portion is maintained by the agency; and

(2) If the records of the child or the contested portion is disclosed by the agency to any party, the explanation must also be disclosed to the party.

(Authority: 20 U.S.C. 1412(a)(8); 1417(c))

### § 300.621    Hearing procedures.

A hearing held under § 300.619 must be conducted according to the procedures in 34 CFR 99.22.

(Authority: 20 U.S.C. 1412(a)(8); 1417(c))

### § 300.622    Consent.

(a) Parental consent must be obtained before personally identifiable information is disclosed to parties, other than officials of participating agencies in accordance with paragraph (b)(1) of this section, unless the information is contained in education records, and the disclosure is authorized without parental consent under 34 CFR part 99.

(b)(1) Except as provided in paragraphs (b)(2) and (b)(3) of this section, parental consent is not required before personally identifiable information is released to officials of participating agencies for purposes of meeting a requirement of this part.

(2) Parental consent, or the consent of an eligible child who has reached the age of majority under State law, must be obtained before personally identifiable information is released to officials of participating agencies providing or paying for transition services in accordance with § 300.321(b)(3).

(3) If a child is enrolled, or is going to enroll in a private school that is not located in the LEA of the parent's residence, parental consent must be obtained before any personally identifiable information about the child is released between officials in the LEA where the private school is located and officials in the LEA of the parent's residence.

(Authority: 20 U.S.C. 1412(a)(8); 1417(c))

### § 300.623    Safeguards.

(a) Each participating agency must protect the confidentiality of personally identifiable information at collection, storage, disclosure, and destruction stages.

(b) One official at each participating agency must assume responsibility for

ensuring the confidentiality of any personally identifiable information.

(c) All persons collecting or using personally identifiable information must receive training or instruction regarding the State's policies and procedures under § 300.123 and 34 CFR part 99.

(d) Each participating agency must maintain, for public inspection, a current listing of the names and positions of those employees within the agency who may have access to personally identifiable information.

(Authority: 20 U.S.C. 1412(a)(8); 1417(c))

**§ 300.624   Destruction of information.**

(a) The public agency must inform parents when personally identifiable information collected, maintained, or used under this part is no longer needed to provide educational services to the child.

(b) The information must be destroyed at the request of the parents. However, a permanent record of a student's name, address, and phone number, his or her grades, attendance record, classes attended, grade level completed, and year completed may be maintained without time limitation.

(Authority: 20 U.S.C. 1412(a)(8); 1417(c))

**§ 300.625   Children's rights.**

(a) The SEA must have in effect policies and procedures regarding the extent to which children are afforded rights of privacy similar to those afforded to parents, taking into consideration the age of the child and type or severity of disability.

(b) Under the regulations for FERPA in 34 CFR 99.5(a), the rights of parents regarding education records are transferred to the student at age 18.

(c) If the rights accorded to parents under Part B of the Act are transferred to a student who reaches the age of majority, consistent with § 300.520, the rights regarding educational records in §§ 300.613 through 300.624 must also be transferred to the student. However, the public agency must provide any notice required under section 615 of the Act to the student and the parents.

(Authority: 20 U.S.C. 1412(a)(8); 1417(c))

**§ 300.626   Enforcement.**

The SEA must have in effect the policies and procedures, including sanctions that the State uses, to ensure that its policies and procedures consistent with §§ 300.611 through 300.625 are followed and that the requirements of the Act and the regulations in this part are met.

(Authority: 20 U.S.C. 1412(a)(8); 1417(c))

**§ 300.627   Department use of personally identifiable information.**

If the Department or its authorized representatives collect any personally identifiable information regarding children with disabilities that is not subject to the Privacy Act of 1974, 5 U.S.C. 552a, the Secretary applies the requirements of 5 U.S.C. 552a(b)(1) and (b)(2), 552a(b)(4) through (b)(11); 552a(c) through 552a(e)(3)(B); 552a(e)(3)(D); 552a(e)(5) through (e)(10); 552a(h); 552a(m); and 552a(n); and the regulations implementing those provisions in 34 CFR part 5b.

(Authority: 20 U.S.C. 1412(a)(8); 1417(c))

**Reports—Program Information**

**§ 300.640   Annual report of children served—report requirement.**

(a) The SEA must annually report to the Secretary on the information required by section 618 of the Act at the times specified by the Secretary.

(b) The SEA must submit the report on forms provided by the Secretary.

(Approved by the Office of Management and Budget under control numbers 1820–0030, 1820–0043, 1820–0659, 1820–0621, 1820–0518, 1820–0521, 1820–0517, and 1820–0677)

(Authority: 20 U.S.C. 1418(a))

**§ 300.641   Annual report of children served—information required in the report.**

(a) For purposes of the annual report required by section 618 of the Act and § 300.640, the State and the Secretary of the Interior must count and report the number of children with disabilities receiving special education and related services on any date between October 1 and December 1 of each year.

(b) For the purpose of this reporting provision, a child's age is the child's actual age on the date of the child count.

(c) The SEA may not report a child under more than one disability category.

(d) If a child with a disability has more than one disability, the SEA must report that child in accordance with the following procedure:

(1) If a child has only two disabilities and those disabilities are deafness and blindness, and the child is not reported as having a developmental delay, that child must be reported under the category "deaf-blindness."

(2) A child who has more than one disability and is not reported as having deaf-blindness or as having a developmental delay must be reported under the category "multiple disabilities."

(Approved by the Office of Management and Budget under control numbers 1820–0030, 1820–0043, 1820–0621, 1820–0521, and 1820–0517)

(Authority: 20 U.S.C. 1418(a), (b))

**§ 300.642   Data reporting.**

(a) *Protection of personally identifiable data.* The data described in section 618(a) of the Act and in § 300.641 must be publicly reported by each State in a manner that does not result in disclosure of data identifiable to individual children.

(b) *Sampling.* The Secretary may permit States and the Secretary of the Interior to obtain data in section 618(a) of the Act through sampling.

(Approved by the Office of Management and Budget under control numbers 1820–0030, 1820–0043, 1820–0518, 1820–0521, and 1820–0517)

(Authority: 20 U.S.C. 1418(b))

**§ 300.643   Annual report of children served—certification.**

The SEA must include in its report a certification signed by an authorized official of the agency that the information provided under § 300.640 is an accurate and unduplicated count of children with disabilities receiving special education and related services on the dates in question.

(Approved by the Office of Management and Budget under control numbers 1820–0030 and 1820–0043)

(Authority: 20 U.S.C. 1418(a)(3))

**§ 300.644   Annual report of children served—criteria for counting children.**

The SEA may include in its report children with disabilities who are enrolled in a school or program that is operated or supported by a public agency, and that—

(a) Provides them with both special education and related services that meet State standards;

(b) Provides them only with special education, if a related service is not required, that meets State standards; or

(c) In the case of children with disabilities enrolled by their parents in private schools, counts those children who are eligible under the Act and receive special education or related services or both that meet State standards under §§ 300.132 through 300.144.

(Approved by the Office of Management and Budget under control numbers 1820–0030, 1820–0043, 1820–0659, 1820–0621, 1820–0521, and 1820–0517)

(Authority: 20 U.S.C. 1418(a))

**§ 300.645   Annual report of children served—other responsibilities of the SEA.**

In addition to meeting the other requirements of §§ 300.640 through 300.644, the SEA must—

(a) Establish procedures to be used by LEAs and other educational institutions

in counting the number of children with disabilities receiving special education and related services;

(b) Set dates by which those agencies and institutions must report to the SEA to ensure that the State complies with § 300.640(a);

(c) Obtain certification from each agency and institution that an unduplicated and accurate count has been made;

(d) Aggregate the data from the count obtained from each agency and institution, and prepare the reports required under §§ 300.640 through 300.644; and

(e) Ensure that documentation is maintained that enables the State and the Secretary to audit the accuracy of the count.

(Approved by the Office of Management and Budget under control numbers 1820–0030, 1820–0043, 1820–0659, 1820–0621, 1820–0518, 1820–0521, and 1820–0517)

(Authority: 20 U.S.C. 1418(a))

### § 300.646  Disproportionality.

(a) *General.* Each State that receives assistance under Part B of the Act, and the Secretary of the Interior, must provide for the collection and examination of data to determine if significant disproportionality based on race and ethnicity is occurring in the State and the LEAs of the State with respect to—

(1) The identification of children as children with disabilities, including the identification of children as children with disabilities in accordance with a particular impairment described in section 602(3) of the Act;

(2) The placement in particular educational settings of these children; and

(3) The incidence, duration, and type of disciplinary actions, including suspensions and expulsions.

(b) *Review and revision of policies, practices, and procedures.* In the case of a determination of significant disproportionality with respect to the identification of children with disabilities, or the placement in particular educational settings of these children, in accordance with paragraph (a) of this section, the State or the Secretary of the Interior must—

(1) Provide for the review and, if appropriate revision of the policies, procedures, and practices used in the identification or placement to ensure that the policies, procedures, and practices comply with the requirements of the Act.

(2) Require any LEA identified under paragraph (a) of this section to reserve the maximum amount of funds under section 613(f) of the Act to provide

comprehensive coordinated early intervening services to serve children in the LEA, particularly, but not exclusively, children in those groups that were significantly overidentified under paragraph (a) of this section; and

(3) Require the LEA to publicly report on the revision of policies, practices, and procedures described under paragraph (b)(1) of this section.

(Authority: 20 U.S.C. 1418(d))

## Subpart G—Authorization, Allotment, Use of Funds, and Authorization of Appropriations

### Allotments, Grants, and Use of Funds

### § 300.700  Grants to States.

(a) *Purpose of grants.* The Secretary makes grants to States, outlying areas, and freely associated States (as defined in § 300.717), and provides funds to the Secretary of the Interior, to assist them to provide special education and related services to children with disabilities in accordance with Part B of the Act.

(b) *Maximum amount.* The maximum amount of the grant a State may receive under section 611 of the Act is—

(1) For fiscal years 2005 and 2006—

(i) The number of children with disabilities in the State who are receiving special education and related services—

(A) Aged three through five, if the State is eligible for a grant under section 619 of the Act; and

(B) Aged 6 through 21; multiplied by—

(ii) Forty (40) percent of the average per-pupil expenditure in public elementary and secondary schools in the United States (as defined in § 300.717); and

(2) For fiscal year 2007 and subsequent fiscal years—

(i) The number of children with disabilities in the 2004–2005 school year in the State who received special education and related services—

(A) Aged three through five if the State is eligible for a grant under section 619 of the Act; and

(B) Aged 6 through 21; multiplied by

(ii) Forty (40) percent of the average per-pupil expenditure in public elementary and secondary schools in the United States (as defined in § 300.717);

(iii) Adjusted by the rate of annual change in the sum of—

(A) Eighty-five (85) percent of the State's population of children aged 3 through 21 who are of the same age as children with disabilities for whom the State ensures the availability of FAPE under Part B of the Act; and

(B) Fifteen (15) percent of the State's population of children described in

paragraph (b)(2)(iii)(A) of this section who are living in poverty.

(Authority: 20 U.S.C. 1411(a) and (d))

### § 300.701  Outlying areas, freely associated States, and the Secretary of the Interior.

(a) *Outlying areas and freely associated States.* (1) *Funds reserved.* From the amount appropriated for any fiscal year under section 611(i) of the Act, the Secretary reserves not more than one percent, which must be used—

(i) To provide assistance to the outlying areas in accordance with their respective populations of individuals aged 3 through 21; and

(ii) To provide each freely associated State a grant in the amount that the freely associated State received for fiscal year 2003 under Part B of the Act, but only if the freely associated State—

(A) Meets the applicable requirements of Part B of the Act that apply to States.

(B) Meets the requirements in paragraph (a)(2) of this section.

(2) *Application.* Any freely associated State that wishes to receive funds under Part B of the Act must include, in its application for assistance—

(i) Information demonstrating that it will meet all conditions that apply to States under Part B of the Act.

(ii) An assurance that, notwithstanding any other provision of Part B of the Act, it will use those funds only for the direct provision of special education and related services to children with disabilities and to enhance its capacity to make FAPE available to all children with disabilities;

(iii) The identity of the source and amount of funds, in addition to funds under Part B of the Act, that it will make available to ensure that FAPE is available to all children with disabilities within its jurisdiction; and

(iv) Such other information and assurances as the Secretary may require.

(3) *Special rule.* The provisions of Public Law 95–134, permitting the consolidation of grants by the outlying areas, do not apply to funds provided to the outlying areas or to the freely associated States under Part B of the Act.

(b) *Secretary of the Interior.* From the amount appropriated for any fiscal year under section 611(i) of the Act, the Secretary reserves 1.226 percent to provide assistance to the Secretary of the Interior in accordance with §§ 300.707 through 300.716.

(Authority: 20 U.S.C. 1411(b))

### § 300.702  Technical assistance.

(a) *In general.* The Secretary may reserve not more than one-half of one percent of the amounts appropriated

under Part B of the Act for each fiscal year to support technical assistance activities authorized under section 616(i) of the Act.

(b) *Maximum amount.* The maximum amount the Secretary may reserve under paragraph (a) of this section for any fiscal year is $25,000,000, cumulatively adjusted by the rate of inflation as measured by the percentage increase, if any, from the preceding fiscal year in the Consumer Price Index For All Urban Consumers, published by the Bureau of Labor Statistics of the Department of Labor.

(Authority: 20 U.S.C. 1411(c))

### § 300.703  Allocations to States.

(a) *General.* After reserving funds for technical assistance under § 300.702, and for payments to the outlying areas, the freely associated States, and the Secretary of the Interior under § 300.701 (a) and (b) for a fiscal year, the Secretary allocates the remaining amount among the States in accordance with paragraphs (b), (c), and (d) of this section.

(b) *Special rule for use of fiscal year 1999 amount.* If a State received any funds under section 611 of the Act for fiscal year 1999 on the basis of children aged three through five, but does not make FAPE available to all children with disabilities aged three through five in the State in any subsequent fiscal year, the Secretary computes the State's amount for fiscal year 1999, solely for the purpose of calculating the State's allocation in that subsequent year under paragraph (c) or (d) of this section, by subtracting the amount allocated to the State for fiscal year 1999 on the basis of those children.

(c) *Increase in funds.* If the amount available for allocations to States under paragraph (a) of this section for a fiscal year is equal to or greater than the amount allocated to the States under section 611 of the Act for the preceding fiscal year, those allocations are calculated as follows:

(1) *Allocation of increase.*—(i) *General.* Except as provided in paragraph (c)(2) of this section, the Secretary allocates for the fiscal year—

(A) To each State the amount the State received under this section for fiscal year 1999;

(B) Eighty-five (85) percent of any remaining funds to States on the basis of the States' relative populations of children aged 3 through 21 who are of the same age as children with disabilities for whom the State ensures the availability of FAPE under Part B of the Act; and

(C) Fifteen (15) percent of those remaining funds to States on the basis

of the States' relative populations of children described in paragraph (c)(1)(i)(B) of this section who are living in poverty.

(ii) *Data.* For the purpose of making grants under this section, the Secretary uses the most recent population data, including data on children living in poverty, that are available and satisfactory to the Secretary.

(2) *Limitations.* Notwithstanding paragraph (c)(1) of this section, allocations under this section are subject to the following:

(i) *Preceding year allocation.* No State's allocation may be less than its allocation under section 611 of the Act for the preceding fiscal year.

(ii) *Minimum.* No State's allocation may be less than the greatest of—

(A) The sum of—

(*1*) The amount the State received under section 611 of the Act for fiscal year 1999; and

(*2*) One third of one percent of the amount by which the amount appropriated under section 611(i) of the Act for the fiscal year exceeds the amount appropriated for section 611 of the Act for fiscal year 1999;

(B) The sum of—

(*1*) The amount the State received under section 611 of the Act for the preceding fiscal year; and

(*2*) That amount multiplied by the percentage by which the increase in the funds appropriated for section 611 of the Act from the preceding fiscal year exceeds 1.5 percent; or

(C) The sum of—

(*1*) The amount the State received under section 611 of the Act for the preceding fiscal year; and

(*2*) That amount multiplied by 90 percent of the percentage increase in the amount appropriated for section 611 of the Act from the preceding fiscal year.

(iii) *Maximum.* Notwithstanding paragraph (c)(2)(ii) of t his section, no State's allocation under paragraph (a) of this section may exceed the sum of—

(A) The amount the State received under section 611 of the Act for the preceding fiscal year; and

(B) That amount multiplied by the sum of 1.5 percent and the percentage increase in the amount appropriated under section 611 of the Act from the preceding fiscal year.

(3) *Ratable reduction.* If the amount available for allocations to States under paragraph (c) of this section is insufficient to pay those allocations in full, those allocations are ratably reduced, subject to paragraph (c)(2)(i) of this section.

(d) *Decrease in funds.* If the amount available for allocations to States under paragraph (a) of this section for a fiscal

year is less than the amount allocated to the States under section 611 of the Act for the preceding fiscal year, those allocations are calculated as follows:

(1) *Amounts greater than fiscal year 1999 allocations.* If the amount available for allocations under paragraph (a) of this section is greater than the amount allocated to the States for fiscal year 1999, each State is allocated the sum of—

(i) *1999 amount.* The amount the State received under section 611 of the Act for fiscal year 1999; and

(ii) *Remaining funds.* An amount that bears the same relation to any remaining funds as the increase the State received under section 611 of the Act for the preceding fiscal year over fiscal year 1999 bears to the total of all such increases for all States.

(2) *Amounts equal to or less than fiscal year 1999 allocations.*—(i) *General.* If the amount available for allocations under paragraph (a) of this section is equal to or less than the amount allocated to the States for fiscal year 1999, each State is allocated the amount it received for fiscal year 1999.

(ii) *Ratable reduction.* If the amount available for allocations under paragraph (d) of this section is insufficient to make the allocations described in paragraph (d)(2)(i) of this section, those allocations are ratably reduced.

(Authority: 20 U.S.C. 1411(d))

### § 300.704  State-level activities.

(a) *State administration.* (1) For the purpose of administering Part B of the Act, including paragraph (c) of this section, section 619 of the Act, and the coordination of activities under Part B of the Act with, and providing technical assistance to, other programs that provide services to children with disabilities—

(i) Each State may reserve for each fiscal year not more than the maximum amount the State was eligible to reserve for State administration under section 611 of the Act for fiscal year 2004 or $800,000 (adjusted in accordance with paragraph (a)(2) of this section), whichever is greater; and

(ii) Each outlying area may reserve for each fiscal year not more than five percent of the amount the outlying area receives under § 300.701(a) for the fiscal year or $35,000, whichever is greater.

(2) For each fiscal year, beginning with fiscal year 2005, the Secretary cumulatively adjusts—

(i) The maximum amount the State was eligible to reserve for State administration under section 611 of the Act for fiscal year 2004; and

(ii) $800,000, by the rate of inflation as measured by the percentage increase, if any, from the preceding fiscal year in the Consumer Price Index For All Urban Consumers, published by the Bureau of Labor Statistics of the Department of Labor.

(3) Prior to expenditure of funds under paragraph (a) of this section, the State must certify to the Secretary that the arrangements to establish responsibility for services pursuant to section 612(a)(12)(A) of the Act are current.

(4) Funds reserved under paragraph (a)(1) of this section may be used for the administration of Part C of the Act, if the SEA is the lead agency for the State under that Part.

(b) *Other State-level activities.* (1) States may reserve a portion of their allocations for other State-level activities. The maximum amount that a State may reserve for other State-level activities is as follows:

(i) If the amount that the State sets aside for State administration under paragraph (a) of this section is greater than $850,000 and the State opts to finance a high cost fund under paragraph (c) of this section:

(A) For fiscal years 2005 and 2006, 10 percent of the State's allocation under § 300.703.

(B) For fiscal year 2007 and subsequent fiscal years, an amount equal to 10 percent of the State's allocation for fiscal year 2006 under § 300.703 adjusted cumulatively for inflation.

(ii) If the amount that the State sets aside for State administration under paragraph (a) of this section is greater than $850,000 and the State opts not to finance a high cost fund under paragraph (c) of this section—

(A) For fiscal years 2005 and 2006, nine percent of the State's allocation under § 300.703.

(B) For fiscal year 2007 and subsequent fiscal years, an amount equal to nine percent of the State's allocation for fiscal year 2006 under § 300.703 adjusted cumulatively for inflation.

(iii) If the amount that the State sets aside for State administration under paragraph (a) of this section is less than or equal to $850,000 and the State opts to finance a high cost fund under paragraph (c) of this section:

(A) For fiscal years 2005 and 2006, 10.5 percent of the State's allocation under § 300.703.

(B) For fiscal year 2007 and subsequent fiscal years, an amount equal to 10.5 percent of the State's allocation for fiscal year 2006 under § 300.703 adjusted cumulatively for inflation.

(iv) If the amount that the State sets aside for State administration under paragraph (a) of this section is equal to or less than $850,000 and the State opts not to finance a high cost fund under paragraph (c) of this section:

(A) For fiscal years 2005 and 2006, nine and one-half percent of the State's allocation under § 300.703.

(B) For fiscal year 2007 and subsequent fiscal years, an amount equal to nine and one-half percent of the State's allocation for fiscal year 2006 under § 300.703 adjusted cumulatively for inflation.

(2) The adjustment for inflation is the rate of inflation as measured by the percentage of increase, if any, from the preceding fiscal year in the Consumer Price Index For All Urban Consumers, published by the Bureau of Labor Statistics of the Department of Labor.

(3) Some portion of the funds reserved under paragraph (b)(1) of this section must be used to carry out the following activities:

(i) For monitoring, enforcement, and complaint investigation; and

(ii) To establish and implement the mediation process required by section 615(e) of the Act, including providing for the costs of mediators and support personnel;

(4) Funds reserved under paragraph (b)(1) of this section also may be used to carry out the following activities:

(i) For support and direct services, including technical assistance, personnel preparation, and professional development and training;

(ii) To support paperwork reduction activities, including expanding the use of technology in the IEP process;

(iii) To assist LEAs in providing positive behavioral interventions and supports and mental health services for children with disabilities;

(iv) To improve the use of technology in the classroom by children with disabilities to enhance learning;

(v) To support the use of technology, including technology with universal design principles and assistive technology devices, to maximize accessibility to the general education curriculum for children with disabilities;

(vi) Development and implementation of transition programs, including coordination of services with agencies involved in supporting the transition of students with disabilities to postsecondary activities;

(vii) To assist LEAs in meeting personnel shortages;

(viii) To support capacity building activities and improve the delivery of services by LEAs to improve results for children with disabilities;

(ix) Alternative programming for children with disabilities who have been expelled from school, and services for children with disabilities in correctional facilities, children enrolled in State-operated or State-supported schools, and children with disabilities in charter schools;

(x) To support the development and provision of appropriate accommodations for children with disabilities, or the development and provision of alternate assessments that are valid and reliable for assessing the performance of children with disabilities, in accordance with sections 1111(b) and 6111 of the ESEA; and

(xi) To provide technical assistance to schools and LEAs, and direct services, including supplemental educational services as defined in section 1116(e) of the ESEA to children with disabilities, in schools or LEAs identified for improvement under section 1116 of the ESEA on the sole basis of the assessment results of the disaggregated subgroup of children with disabilities, including providing professional development to special and regular education teachers, who teach children with disabilities, based on scientifically based research to improve educational instruction, in order to improve academic achievement to meet or exceed the objectives established by the State under section 1111(b)(2)(G) of the ESEA.

(c) *Local educational agency high cost fund.* (1) In general—

(i) For the purpose of assisting LEAs (including a charter school that is an LEA or a consortium of LEAs) in addressing the needs of high need children with disabilities, each State has the option to reserve for each fiscal year 10 percent of the amount of funds the State reserves for other State-level activities under paragraph (b)(1) of this section—

(A) To finance and make disbursements from the high cost fund to LEAs in accordance with paragraph (c) of this section during the first and succeeding fiscal years of the high cost fund; and

(B) To support innovative and effective ways of cost sharing by the State, by an LEA, or among a consortium of LEAs, as determined by the State in coordination with representatives from LEAs, subject to paragraph (c)(2)(ii) of this section.

(ii) For purposes of paragraph (c) of this section, *local educational agency* includes a charter school that is an LEA, or a consortium of LEAs.

(2)(i) A State must not use any of the funds the State reserves pursuant to paragraph (c)(1)(i) of this section, which

are solely for disbursement to LEAs, for costs associated with establishing, supporting, and otherwise administering the fund. The State may use funds the State reserves under paragraph (a) of this section for those administrative costs.

(ii) A State must not use more than 5 percent of the funds the State reserves pursuant to paragraph (c)(1)(i) of this section for each fiscal year to support innovative and effective ways of cost sharing among consortia of LEAs.

(3)(i) The SEA must develop, not later than 90 days after the State reserves funds under paragraph (c)(1)(i) of this section, annually review, and amend as necessary, a State plan for the high cost fund. Such State plan must—

(A) Establish, in consultation and coordination with representatives from LEAs, a definition of a high need child with a disability that, at a minimum—

(1) Addresses the financial impact a high need child with a disability has on the budget of the child's LEA; and

(2) Ensures that the cost of the high need child with a disability is greater than 3 times the average per pupil expenditure (as defined in section 9101 of the ESEA) in that State;

(B) Establish eligibility criteria for the participation of an LEA that, at a minimum, take into account the number and percentage of high need children with disabilities served by an LEA;

(C) Establish criteria to ensure that placements supported by the fund are consistent with the requirements of §§ 300.114 through 300.118;

(D) Develop a funding mechanism that provides distributions each fiscal year to LEAs that meet the criteria developed by the State under paragraph(c)(3)(i)(B) of this section;

(E) Establish an annual schedule by which the SEA must make its distributions from the high cost fund each fiscal year; and

(F) If the State elects to reserve funds for supporting innovative and effective ways of cost sharing under paragraph (c)(1)(i)(B) of this section, describe how these funds will be used.

(ii) The State must make its final State plan available to the public not less than 30 days before the beginning of the school year, including dissemination of such information on the State Web site.

(4)(i) Each SEA must make all annual disbursements from the high cost fund established under paragraph (c)(1)(i) of this section in accordance with the State plan published pursuant to paragraph (c)(3) of this section.

(ii) The costs associated with educating a high need child with a disability, as defined under paragraph (c)(3)(i)(A) of this section, are only those

costs associated with providing direct special education and related services to the child that are identified in that child's IEP, including the cost of room and board for a residential placement determined necessary, consistent with § 300.114, to implement a child's IEP.

(iii) The funds in the high cost fund remain under the control of the State until disbursed to an LEA to support a specific child who qualifies under the State plan for the high cost funds or distributed to LEAs, consistent with paragraph (c)(9) of this section.

(5) The disbursements under paragraph (c)(4) of this section must not be used to support legal fees, court costs, or other costs associated with a cause of action brought on behalf of a child with a disability to ensure FAPE for such child.

(6) Nothing in paragraph (c) of this section—

(i) Limits or conditions the right of a child with a disability who is assisted under Part B of the Act to receive FAPE pursuant to section 612(a)(1) of the Act in the least restrictive environment pursuant to section 612(a)(5) of the Act; or

(ii) Authorizes an SEA or LEA to establish a limit on what may be spent on the education of a child with a disability.

(7) Notwithstanding the provisions of paragraphs (c)(1) through (6) of this section, a State may use funds reserved pursuant to paragraph (c)(1)(i) of this section for implementing a placement neutral cost sharing and reimbursement program of high need, low incidence, catastrophic, or extraordinary aid to LEAs that provides services to high need children based on eligibility criteria for such programs that were created not later than January 1, 2004, and are currently in operation, if such program serves children that meet the requirement of the definition of a high need child with a disability as described in paragraph (c)(3)(i)(A) of this section.

(8) Disbursements provided under paragraph (c) of this section must not be used to pay costs that otherwise would be reimbursed as medical assistance for a child with a disability under the State Medicaid program under Title XIX of the Social Security Act.

(9) Funds reserved under paragraph (c)(1)(i) of this section from the appropriation for any fiscal year, but not expended pursuant to paragraph (c)(4) of this section before the beginning of their last year of availability for obligation, must be allocated to LEAs in the same manner as other funds from the appropriation for that fiscal year are allocated to LEAs under § 300.705 during their final year of availability.

(d) *Inapplicability of certain prohibitions.* A State may use funds the State reserves under paragraphs (a) and (b) of this section without regard to—

(1) The prohibition on commingling of funds in § 300.162(b).

(2) The prohibition on supplanting other funds in § 300.162(c).

(e) *Special rule for increasing funds.* A State may use funds the State reserves under paragraph (a)(1) of this section as a result of inflationary increases under paragraph (a)(2) of this section to carry out activities authorized under paragraph(b)(4)(i), (iii), (vii), or (viii) of this section.

(f) *Flexibility in using funds for Part C.* Any State eligible to receive a grant under section 619 of the Act may use funds made available under paragraph (a)(1) of this section, § 300.705(c), or § 300.814(e) to develop and implement a State policy jointly with the lead agency under Part C of the Act and the SEA to provide early intervention services (which must include an educational component that promotes school readiness and incorporates preliteracy, language, and numeracy skills) in accordance with Part C of the Act to children with disabilities who are eligible for services under section 619 of the Act and who previously received services under Part C of the Act until the children enter, or are eligible under State law to enter, kindergarten, or elementary school as appropriate.

(Approved by the Office of Management and Budget under control number 1820–0600)

(Authority: 20 U.S.C. 1411(e))

### § 300.705  Subgrants to LEAs.

(a) *Subgrants required.* Each State that receives a grant under section 611 of the Act for any fiscal year must distribute any funds the State does not reserve under § 300.704 to LEAs (including public charter schools that operate as LEAs) in the State that have established their eligibility under section 613 of the Act for use in accordance with Part B of the Act.

(b) *Allocations to LEAs.* For each fiscal year for which funds are allocated to States under § 300.703, each State shall allocate funds as follows:

(1) *Base payments.* The State first must award each LEA described in paragraph (a) of this section the amount the LEA would have received under section 611 of the Act for fiscal year 1999, if the State had distributed 75 percent of its grant for that year under section 611(d) of the Act, as that section was then in effect.

(2) *Base payment adjustments.* For any fiscal year after 1999—

(i) If a new LEA is created, the State must divide the base allocation

determined under paragraph (b)(1) of this section for the LEAs that would have been responsible for serving children with disabilities now being served by the new LEA, among the new LEA and affected LEAs based on the relative numbers of children with disabilities ages 3 through 21, or ages 6 through 21 if a State has had its payment reduced under § 300.703(b), currently provided special education by each of the LEAs;

(ii) If one or more LEAs are combined into a single new LEA, the State must combine the base allocations of the merged LEAs; and

(iii) If, for two or more LEAs, geographic boundaries or administrative responsibility for providing services to children with disabilities ages 3 through 21 change, the base allocations of affected LEAs must be redistributed among affected LEAs based on the relative numbers of children with disabilities ages 3 through 21, or ages 6 through 21 if a State has had its payment reduced under § 300.703(b), currently provided special education by each affected LEA.

(3) *Allocation of remaining funds.* After making allocations under paragraph (b)(1) of this section, as adjusted by paragraph (b)(2) of this section, the State must—

(i) Allocate 85 percent of any remaining funds to those LEAs on the basis of the relative numbers of children enrolled in public and private elementary and secondary schools within the LEA's jurisdiction; and

(ii) Allocate 15 percent of those remaining funds to those LEAs in accordance with their relative numbers of children living in poverty, as determined by the SEA.

(c) *Reallocation of funds.* If an SEA determines that an LEA is adequately providing FAPE to all children with disabilities residing in the area served by that agency with State and local funds, the SEA may reallocate any portion of the funds under this part that are not needed by that LEA to provide FAPE to other LEAs in the State that are not adequately providing special education and related services to all children with disabilities residing in the areas served by those other LEAs.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1411(f))

## § 300.706 [Reserved]

## Secretary of the Interior

## § 300.707 Use of amounts by Secretary of the Interior.

(a) *Definitions.* For purposes of §§ 300.707 through 300.716, the following definitions apply:

(1) *Reservation* means Indian Country as defined in 18 U.S.C. 1151.

(2) *Tribal governing body* has the definition given that term in 25 U.S.C. 2021(19).

(b) *Provision of amounts for assistance.* The Secretary provides amounts to the Secretary of the Interior to meet the need for assistance for the education of children with disabilities on reservations aged 5 to 21, inclusive, enrolled in elementary schools and secondary schools for Indian children operated or funded by the Secretary of the Interior. The amount of the payment for any fiscal year is equal to 80 percent of the amount allotted under section 611(b)(2) of the Act for that fiscal year. Of the amount described in the preceding sentence, after the Secretary of the Interior reserves funds for administration under § 300.710, 80 percent must be allocated to such schools by July 1 of that fiscal year and 20 percent must be allocated to such schools by September 30 of that fiscal year.

(c) *Additional requirement.* With respect to all other children aged 3 to 21, inclusive, on reservations, the SEA of the State in which the reservation is located must ensure that all of the requirements of Part B of the Act are implemented.

(Authority: 20 U.S.C. 1411(h)(1))

## § 300.708 Submission of information.

The Secretary may provide the Secretary of the Interior amounts under § 300.707 for a fiscal year only if the Secretary of the Interior submits to the Secretary information that—

(a) Meets the requirements of section 612(a)(1), (3) through (9), (10)(B) through (C), (11) through (12), (14) through (16), (19), and (21) through (25) of the Act (including monitoring and evaluation activities);

(b) Meets the requirements of section 612(b) and (e) of the Act;

(c) Meets the requirements of section 613(a)(1), (2)(A)(i), (7) through (9) and section 613(i) of the Act (references to LEAs in these sections must be read as references to elementary schools and secondary schools for Indian children operated or funded by the Secretary of the Interior);

(d) Meets the requirements of section 616 of the Act that apply to States

(references to LEAs in section 616 of the Act must be read as references to elementary schools and secondary schools for Indian children operated or funded by the Secretary of the Interior).

(e) Meets the requirements of this part that implement the sections of the Act listed in paragraphs (a) through (d) of this section;

(f) Includes a description of how the Secretary of the Interior will coordinate the provision of services under Part B of the Act with LEAs, tribes and tribal organizations, and other private and Federal service providers;

(g) Includes an assurance that there are public hearings, adequate notice of the hearings, and an opportunity for comment afforded to members of tribes, tribal governing bodies, and affected local school boards before the adoption of the policies, programs, and procedures related to the requirements described in paragraphs (a) through (d) of this section;

(h) Includes an assurance that the Secretary of the Interior provides the information that the Secretary may require to comply with section 618 of the Act;

(i)(1) Includes an assurance that the Secretary of the Interior and the Secretary of Health and Human Services have entered into a memorandum of agreement, to be provided to the Secretary, for the coordination of services, resources, and personnel between their respective Federal, State, and local offices and with the SEAs and LEAs and other entities to facilitate the provision of services to Indian children with disabilities residing on or near reservations.

(2) The agreement must provide for the apportionment of responsibilities and costs, including child find, evaluation, diagnosis, remediation or therapeutic measures, and (where appropriate) equipment and medical or personal supplies, as needed for a child with a disability to remain in a school or program; and

(j) Includes an assurance that the Department of the Interior will cooperate with the Department in its exercise of monitoring and oversight of the requirements in this section and §§ 300.709 through 300.711 and §§ 300.713 through 300.716, and any agreements entered into between the Secretary of the Interior and other entities under Part B of the Act, and will fulfill its duties under Part B of the Act. The Secretary withholds payments under § 300.707 with respect to the requirements described in this section in the same manner as the Secretary withholds payments under section 616(e)(6) of the Act.

(Authority: 20 U.S.C. 1411(h)(2) and (3))

### § 300.709   Public participation.

In fulfilling the requirements of § 300.708 the Secretary of the Interior must provide for public participation consistent with § 300.165.

(Authority: 20 U.S.C. 1411(h))

### § 300.710   Use of funds under Part B of the Act.

(a) The Secretary of the Interior may reserve five percent of its payment under § 300.707(b) in any fiscal year, or $500,000, whichever is greater, for administrative costs in carrying out the provisions of §§ 300.707 through 300.709, 300.711, and 300.713 through 300.716.

(b) Payments to the Secretary of the Interior under § 300.712 must be used in accordance with that section.

(Authority: 20 U.S.C. 1411(h)(1)(A))

### § 300.711   Early intervening services.

(a) The Secretary of the Interior may allow each elementary school and secondary school for Indian children operated or funded by the Secretary of the Interior to use not more than 15 percent of the amount the school receives under § 300.707(b) for any fiscal year, in combination with other amounts (which may include amounts other than education funds), to develop and implement coordinated, early intervening services, which may include interagency financing structures, for children in kindergarten through grade 12 (with a particular emphasis on children in kindergarten through grade three) who have not been identified as needing special education or related services but who need additional academic and behavioral support to succeed in a general education environment, in accordance with section 613(f) of the Act.

(b) Each elementary school and secondary school for Indian children operated or funded by the Secretary of the Interior that develops and maintains coordinated early intervening services in accordance with section 613(f) of the Act and § 300.226 must annually report to the Secretary of the Interior in accordance with section 613(f) of the Act.

(Authority: 20 U.S.C. 1411(h) and 1413(f))

### § 300.712   Payments for education and services for Indian children with disabilities aged three through five.

(a) *General.* With funds appropriated under section 611(i) of the Act, the Secretary makes payments to the Secretary of the Interior to be distributed to tribes or tribal organizations (as defined under section

4 of the Indian Self-Determination and Education Assistance Act) or consortia of tribes or tribal organizations to provide for the coordination of assistance for special education and related services for children with disabilities aged three through five on reservations served by elementary schools and secondary schools for Indian children operated or funded by the Department of the Interior. The amount of the payments under paragraph (b) of this section for any fiscal year is equal to 20 percent of the amount allotted under § 300.701(b).

(b) *Distribution of funds.* The Secretary of the Interior must distribute the total amount of the payment under paragraph (a) of this section by allocating to each tribe, tribal organization, or consortium an amount based on the number of children with disabilities aged three through five residing on reservations as reported annually, divided by the total of those children served by all tribes or tribal organizations.

(c) *Submission of information.* To receive a payment under this section, the tribe or tribal organization must submit the figures to the Secretary of the Interior as required to determine the amounts to be allocated under paragraph (b) of this section. This information must be compiled and submitted to the Secretary.

(d) *Use of funds.* (1) The funds received by a tribe or tribal organization must be used to assist in child find, screening, and other procedures for the early identification of children aged three through five, parent training, and the provision of direct services. These activities may be carried out directly or through contracts or cooperative agreements with the BIA, LEAs, and other public or private nonprofit organizations. The tribe or tribal organization is encouraged to involve Indian parents in the development and implementation of these activities.

(2) The tribe or tribal organization, as appropriate, must make referrals to local, State, or Federal entities for the provision of services or further diagnosis.

(e) *Biennial report.* To be eligible to receive a grant pursuant to paragraph (a) of this section, the tribe or tribal organization must provide to the Secretary of the Interior a biennial report of activities undertaken under this section, including the number of contracts and cooperative agreements entered into, the number of children contacted and receiving services for each year, and the estimated number of children needing services during the two years following the year in which

the report is made. The Secretary of the Interior must include a summary of this information on a biennial basis in the report to the Secretary required under section 611(h) of the Act. The Secretary may require any additional information from the Secretary of the Interior.

(f) *Prohibitions.* None of the funds allocated under this section may be used by the Secretary of the Interior for administrative purposes, including child count and the provision of technical assistance.

(Authority: 20 U.S.C. 1411(h)(4))

### § 300.713   Plan for coordination of services.

(a) The Secretary of the Interior must develop and implement a plan for the coordination of services for all Indian children with disabilities residing on reservations served by elementary schools and secondary schools for Indian children operated or funded by the Secretary of the Interior.

(b) The plan must provide for the coordination of services benefiting those children from whatever source, including tribes, the Indian Health Service, other BIA divisions, other Federal agencies, State educational agencies, and State, local, and tribal juvenile and adult correctional facilities.

(c) In developing the plan, the Secretary of the Interior must consult with all interested and involved parties.

(d) The plan must be based on the needs of the children and the system best suited for meeting those needs, and may involve the establishment of cooperative agreements between the BIA, other Federal agencies, and other entities.

(e) The plan also must be distributed upon request to States; to SEAs, LEAs, and other agencies providing services to infants, toddlers, and children with disabilities; to tribes; and to other interested parties.

(Authority: 20 U.S.C. 1411(h)(5))

### § 300.714   Establishment of advisory board.

(a) To meet the requirements of section 612(a)(21) of the Act, the Secretary of the Interior must establish, under the BIA, an advisory board composed of individuals involved in or concerned with the education and provision of services to Indian infants, toddlers, children, and youth with disabilities, including Indians with disabilities, Indian parents or guardians of such children, teachers, service providers, State and local educational officials, representatives of tribes or tribal organizations, representatives from State Interagency Coordinating Councils under section 641 of the Act in

States having reservations, and other members representing the various divisions and entities of the BIA. The chairperson must be selected by the Secretary of the Interior.

(b) The advisory board must—

(1) Assist in the coordination of services within the BIA and with other local, State, and Federal agencies in the provision of education for infants, toddlers, and children with disabilities;

(2) Advise and assist the Secretary of the Interior in the performance of the Secretary of the Interior's responsibilities described in section 611(h) of the Act;

(3) Develop and recommend policies concerning effective inter- and intra-agency collaboration, including modifications to regulations, and the elimination of barriers to inter- and intra-agency programs and activities;

(4) Provide assistance and disseminate information on best practices, effective program coordination strategies, and recommendations for improved early intervention services or educational programming for Indian infants, toddlers, and children with disabilities; and

(5) Provide assistance in the preparation of information required under § 300.708(h).

(Authority: 20 U.S.C. 1411(h)(6))

### § 300.715   Annual reports.

(a) *In general.* The advisory board established under § 300.714 must prepare and submit to the Secretary of the Interior and to Congress an annual report containing a description of the activities of the advisory board for the preceding year.

(b) *Availability.* The Secretary of the Interior must make available to the Secretary the report described in paragraph (a) of this section.

(Authority: 20 U.S.C. 1411(h)(7))

### § 300.716   Applicable regulations.

The Secretary of the Interior must comply with the requirements of §§ 300.103 through 300.108, 300.110 through 300.124, 300.145 through 300.154, 300.156 through 300.160, 300.165, 300.170 through 300.186, 300.226, 300.300 through 300.606, 300.610 through 300.646, and 300.707 through 300.716.

(Authority: 20 U.S.C. 1411(h)(2)(A))

### Definitions that Apply to this Subpart

### § 300.717   Definitions applicable to allotments, grants, and use of funds.

As used in this subpart—

(a) *Freely associated States* means the Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau;

(b) *Outlying areas* means the United States Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands;

(c) *State* means each of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico; and

(d) *Average per-pupil expenditure in public elementary schools and secondary schools in the United States* means—

(1) Without regard to the source of funds—

(i) The aggregate current expenditures, during the second fiscal year preceding the fiscal year for which the determination is made (or, if satisfactory data for that year are not available, during the most recent preceding fiscal year for which satisfactory data are available) of all LEAs in the 50 States and the District of Columbia); plus

(ii) Any direct expenditures by the State for the operation of those agencies; divided by (2) The aggregate number of children in average daily attendance to whom those agencies provided free public education during that preceding year.

(Authority: 20 U.S.C. 1401(22), 1411(b)(1) (C) and (g))

### Acquisition of Equipment and Construction or Alteration of Facilities

### § 300.718   Acquisition of equipment and construction or alteration of facilities.

(a) *General.* If the Secretary determines that a program authorized under Part B of the Act will be improved by permitting program funds to be used to acquire appropriate equipment, or to construct new facilities or alter existing facilities, the Secretary may allow the use of those funds for those purposes.

(b) *Compliance with certain regulations.* Any construction of new facilities or alteration of existing facilities under paragraph (a) of this section must comply with the requirements of—

(1) Appendix A of part 36 of title 28, Code of Federal Regulations (commonly known as the "Americans with Disabilities Accessibility Standards for Buildings and Facilities"); or

(2) Appendix A of part 101–19.6 of title 41, Code of Federal Regulations (commonly known as the "Uniform Federal Accessibility Standards").

(Authority: 20 U.S.C. 1404)

## Subpart H—Preschool Grants for Children with Disabilities

### § 300.800   In general.

The Secretary provides grants under section 619 of the Act to assist States to provide special education and related services in accordance with Part B of the Act—

(a) To children with disabilities aged three through five years; and

(b) At a State's discretion, to two-year-old children with disabilities who will turn three during the school year.

(Authority: 20 U.S.C. 1419(a))

### §§ 300.801–300.802   [Reserved]

### § 300.803   Definition of State.

As used in this subpart, State means each of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico.

(Authority: 20 U.S.C. 1419(i))

### § 300.804   Eligibility.

A State is eligible for a grant under section 619 of the Act if the State—

(a) Is eligible under section 612 of the Act to receive a grant under Part B of the Act; and

(b) Makes FAPE available to all children with disabilities, aged three through five, residing in the State.

(Approved by the Office of Management and Budget under control number 1820–0030)

(Authority: 20 U.S.C. 1419(b))

### § 300.805   [Reserved]

### § 300.806   Eligibility for financial assistance.

No State or LEA, or other public institution or agency, may receive a grant or enter into a contract or cooperative agreement under subpart 2 or 3 of Part D of the Act that relates exclusively to programs, projects, and activities pertaining to children aged three through five years, unless the State is eligible to receive a grant under section 619(b) of the Act.

(Authority: 20 U.S.C. 1481(e))

### § 300.807   Allocations to States.

The Secretary allocates the amount made available to carry out section 619 of the Act for a fiscal year among the States in accordance with §§ 300.808 through 300.810.

(Authority: 20 U.S.C. 1419(c)(1))

### § 300.808   Increase in funds.

If the amount available for allocation to States under § 300.807 for a fiscal year is equal to or greater than the amount allocated to the States under section 619 of the Act for the preceding

**46812**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

fiscal year, those allocations are calculated as follows:

(a) Except as provided in § 300.809, the Secretary—

(1) Allocates to each State the amount the State received under section 619 of the Act for fiscal year 1997;

(2) Allocates 85 percent of any remaining funds to States on the basis of the States' relative populations of children aged three through five; and

(3) Allocates 15 percent of those remaining funds to States on the basis of the States' relative populations of all children aged three through five who are living in poverty.

(b) For the purpose of making grants under this section, the Secretary uses the most recent population data, including data on children living in poverty, that are available and satisfactory to the Secretary.

(Authority: 20 U.S.C. 1419(c)(2)(A))

§ 300.809   Limitations.

(a) Notwithstanding § 300.808, allocations under that section are subject to the following:

(1) No State's allocation may be less than its allocation under section 619 of the Act for the preceding fiscal year.

(2) No State's allocation may be less than the greatest of—

(i) The sum of—

(A) The amount the State received under section 619 of the Act for fiscal year 1997; and

(B) One-third of one percent of the amount by which the amount appropriated under section 619(j) of the Act for the fiscal year exceeds the amount appropriated for section 619 of the Act for fiscal year 1997;

(ii) The sum of—

(A) The amount the State received under section 619 of the Act for the preceding fiscal year; and

(B) That amount multiplied by the percentage by which the increase in the funds appropriated under section 619 of the Act from the preceding fiscal year exceeds 1.5 percent; or

(iii) The sum of—

(A) The amount the State received under section 619 of the Act for the preceding fiscal year; and

(B) That amount multiplied by 90 percent of the percentage increase in the amount appropriated under section 619 of the Act from the preceding fiscal year.

(b) Notwithstanding paragraph (a)(2) of this section, no State's allocation under § 300.808 may exceed the sum of—

(1) The amount the State received under section 619 of the Act for the preceding fiscal year; and

(2) That amount multiplied by the sum of 1.5 percent and the percentage

increase in the amount appropriated under section 619 of the Act from the preceding fiscal year.

(c) If the amount available for allocation to States under § 300.808 and paragraphs (a) and (b) of this section is insufficient to pay those allocations in full, those allocations are ratably reduced, subject to paragraph (a)(1) of this section.

(Authority: 20 U.S.C. 1419(c)(2)(B) and (c)(2)(C))

§ 300.810   Decrease in funds.

If the amount available for allocations to States under § 300.807 for a fiscal year is less than the amount allocated to the States under section 619 of the Act for the preceding fiscal year, those allocations are calculated as follows:

(a) If the amount available for allocations is greater than the amount allocated to the States for fiscal year 1997, each State is allocated the sum of—

(1) The amount the State received under section 619 of the Act for fiscal year 1997; and

(2) An amount that bears the same relation to any remaining funds as the increase the State received under section 619 of the Act for the preceding fiscal year over fiscal year 1997 bears to the total of all such increases for all States.

(b) If the amount available for allocations is equal to or less than the amount allocated to the States for fiscal year 1997, each State is allocated the amount the State received for fiscal year 1997, ratably reduced, if necessary.

(Authority: 20 U.S.C. 1419(c)(3))

§ 300.811   [Reserved]

§ 300.812   Reservation for State activities.

(a) Each State may reserve not more than the amount described in paragraph (b) of this section for administration and other State-level activities in accordance with §§ 300.813 and 300.814.

(b) For each fiscal year, the Secretary determines and reports to the SEA an amount that is 25 percent of the amount the State received under section 619 of the Act for fiscal year 1997, cumulatively adjusted by the Secretary for each succeeding fiscal year by the lesser of—

(1) The percentage increase, if any, from the preceding fiscal year in the State's allocation under section 619 of the Act; or

(2) The rate of inflation, as measured by the percentage increase, if any, from the preceding fiscal year in the Consumer Price Index For All Urban Consumers, published by the Bureau of

Labor Statistics of the Department of Labor.

(Authority: 20 U.S.C. 1419(d))

§ 300.813   State administration.

(a) For the purpose of administering section 619 of the Act (including the coordination of activities under Part B of the Act with, and providing technical assistance to, other programs that provide services to children with disabilities), a State may use not more than 20 percent of the maximum amount the State may reserve under § 300.812 for any fiscal year.

(b) Funds described in paragraph (a) of this section may also be used for the administration of Part C of the Act.

(Authority: 20 U.S.C. 1419(e))

§ 300.814   Other State-level activities.

Each State must use any funds the State reserves under § 300.812 and does not use for administration under § 300.813—

(a) For support services (including establishing and implementing the mediation process required by section 615(e) of the Act), which may benefit children with disabilities younger than three or older than five as long as those services also benefit children with disabilities aged three through five;

(b) For direct services for children eligible for services under section 619 of the Act;

(c) For activities at the State and local levels to meet the performance goals established by the State under section 612(a)(15) of the Act;

(d) To supplement other funds used to develop and implement a statewide coordinated services system designed to improve results for children and families, including children with disabilities and their families, but not more than one percent of the amount received by the State under section 619 of the Act for a fiscal year;

(e) To provide early intervention services (which must include an educational component that promotes school readiness and incorporates preliteracy, language, and numeracy skills) in accordance with Part C of the Act to children with disabilities who are eligible for services under section 619 of the Act and who previously received services under Part C of the Act until such children enter, or are eligible under State law to enter, kindergarten; or

(f) At the State's discretion, to continue service coordination or case management for families who receive services under Part C of the Act, consistent with § 300.814(e).

(Authority: 20 U.S.C. 1419(f))

ED-000274

## § 300.815  Subgrants to LEAs.

Each State that receives a grant under section 619 of the Act for any fiscal year must distribute all of the grant funds that the State does not reserve under § 300.812 to LEAs in the State that have established their eligibility under section 613 of the Act.

(Authority: 20 U.S.C. 1419(g)(1))

## § 300.816  Allocations to LEAs.

(a) *Base payments.* The State must first award each LEA described in § 300.815 the amount that agency would have received under section 619 of the Act for fiscal year 1997 if the State had distributed 75 percent of its grant for that year under section 619(c)(3), as such section was then in effect.

(b) *Base payment adjustments.* For fiscal year 1998 and beyond—

(1) If a new LEA is created, the State must divide the base allocation determined under paragraph (a) of this section for the LEAs that would have been responsible for serving children with disabilities now served by the new LEA, among the new LEA and affected LEAs based on the relative numbers of children with disabilities ages three through five currently provided special education by each of the LEAs;

(2) If one or more LEAs are combined into a single new LEA, the State must combine the base allocations of the merged LEAs; and

(3) If for two or more LEAs, geographic boundaries or administrative responsibility for providing services to children with disabilities ages three through five changes, the base allocations of affected LEAs must be redistributed among affected LEAs based on the relative numbers of children with disabilities ages three through five currently provided special education by each affected LEA.

(c) *Allocation of remaining funds.* After making allocations under paragraph (a) of this section, the State must—

(1) Allocate 85 percent of any remaining funds to those LEAs on the basis of the relative numbers of children enrolled in public and private elementary schools and secondary schools within the LEA's jurisdiction; and

(2) Allocate 15 percent of those remaining funds to those LEAs in accordance with their relative numbers of children living in poverty, as determined by the SEA.

(d) *Use of best data.* For the purpose of making grants under this section, States must apply on a uniform basis across all LEAs the best data that are available to them on the numbers of children enrolled in public and private elementary and secondary schools and the numbers of children living in poverty.

(Authority: 20 U.S.C. 1419(g)(1))

## § 300.817  Reallocation of LEA funds.

If an SEA determines that an LEA is adequately providing FAPE to all children with disabilities aged three through five residing in the area served by the LEA with State and local funds, the SEA may reallocate any portion of the funds under section 619 of the Act that are not needed by that LEA to provide FAPE to other LEAs in the State that are not adequately providing special education and related services to all children with disabilities aged three through five residing in the areas the other LEAs serve.

(Authority: 20 U.S.C. 1419(g)(2))

## § 300.818  Part C of the Act inapplicable.

Part C of the Act does not apply to any child with a disability receiving FAPE, in accordance with Part B of the Act, with funds received under section 619 of the Act.

(Authority: 20 U.S.C. 1419(h))

## Appendix A to Part 300—Excess Costs Calculation

Except as otherwise provided, amounts provided to an LEA under Part B of the Act may be used only to pay the excess costs of providing special education and related services to children with disabilities. Excess costs are those costs for the education of an elementary school or secondary school student with a disability that are in excess of the average annual per student expenditure in an LEA during the preceding school year for an elementary school or secondary school student, as may be appropriate. An LEA must spend at least the average annual per student expenditure on the education of an elementary school or secondary school child with a disability before funds under Part B of the Act are used to pay the excess costs of providing special education and related services.

Section 602(8) of the Act and § 300.16 require the LEA to compute the minimum average amount separately for children with disabilities in its elementary schools and for children with disabilities in its secondary schools. LEAs may not compute the minimum average amount it must spend on the education of children with disabilities based on a combination of the enrollments in its elementary schools and secondary schools.

The following example shows how to compute the minimum average amount an LEA must spend for the education of each of its elementary school children with disabilities under section 602(3) of the Act before it may use funds under Part B of the Act.

a. First the LEA must determine the total amount of its expenditures for elementary school students from all sources—local, State, and Federal (including Part B)—in the preceding school year. Only capital outlay and debt services are excluded.

*Example:* The following is an example of a computation for children with disabilities enrolled in an LEA's elementary schools. In this example, the LEA had an average elementary school enrollment for the preceding school year of 800 (including 100 children with disabilities). The LEA spent the following amounts last year for elementary school students (including its elementary school children with disabilities):

| | | |
|---|---|---|
| (1) | From State and local tax funds. | $6,500,000 |
| (2) | From Federal funds ......... | 600,000 |
| | Total expenditures ....... | 7,100,000 |

Of this total, $60,000 was for capital outlay and debt service relating to the education of elementary school students. This must be subtracted from total expenditures.

| | | |
|---|---|---|
| (1) | Total Expenditures .......... | $7,100,000 |
| (2) | Less capital outlay and debt. | −60,000 |
| | Total expenditures for elementary school students less capital outlay and debt. | $7,040,000 |

b. Next, the LEA must subtract from the total expenditures amounts spent for:

(1) IDEA, Part B allocation,

(2) ESEA, Title I, Part A allocation,

(3) ESEA, Title III, Parts A and B allocation,

(4) State and local funds for children with disabilities, and

(5) State or local funds for programs under ESEA, Title I, Part A, and Title III, Parts A and B.

These are funds that the LEA actually spent, not funds received last year but carried over for the current school year.

*Example:* The LEA spent the following amounts for elementary school students last year:

| | | |
|---|---|---|
| (1) | From funds under IDEA, Part B allocation. | $ 200,000 |
| (2) | From funds under ESEA, Title I, Part A allocation. | 250,000 |
| (3) | From funds under ESEA, Title III, Parts A and B allocation. | 50,000 |
| (4) | From State funds and local funds for children with disabilities. | 500,000 |
| (5) | From State and local funds for programs under ESEA, Title I, Part A, and Title III, Parts A and B. | 150,000 |
| | Total ............................ | 1,150,000 |

| | | |
|---|---|---|
| (1) | Total expenditures less capital outlay and debt. | 7,040,000 |
| (2) | Other deductions .............. | −1,150,000 |
| | Total ............................ | $5,890,000 |

c. Except as otherwise provided, the LEA next must determine the average annual per

student expenditure for its elementary schools dividing the average number of students enrolled in the elementary schools of the agency during the preceding year (including its children with disabilities) into the amount computed under the above paragraph. The amount obtained through this computation is the minimum amount the LEA must spend (on the average) for the education of each of its elementary school children with disabilities. Funds under Part B of the Act may be used only for costs over and above this minimum.

| (1) | Amount from Step b ........ | $5,890,000 |
| (2) | Average number of students enrolled. | 800 |
| (3) | $5,890,000/800 Average annual per student expenditure. | $ 7,362 |

d. Except as otherwise provided, to determine the total minimum amount of funds the LEA must spend for the education of its elementary school children with disabilities in the LEA (not including capital outlay and debt service), the LEA must multiply the number of elementary school children with disabilities in the LEA times the average annual per student expenditure obtained in paragraph c above. Funds under Part B of the Act can only be used for excess costs over and above this minimum.

| (1) | Number of children with disabilities in the LEA's elementary schools. | 100 |
| (2) | Average annual per student expenditure. | $ 7,362 |
| (3) | $7,362 x 100. Total minimum amount of funds the LEA must spend for the education of children with disabilities enrolled in the LEA's elementary schools before using Part B funds. | $ 736,200 |

## Appendix B to Part 300—Proportionate Share Calculation

Each LEA must expend, during the grant period, on the provision of special education and related services for the parentally-placed private school children with disabilities enrolled in private elementary and secondary schools located in the LEA an amount that is equal to—

(1) A proportionate share of the LEA's subgrant under section 611(f) of the Act for children with disabilities aged 3 through 21. This is an amount that is the same proportion of the LEA's total subgrant under section 611(f) of the Act as the number of parentally-placed private school children with disabilities aged 3 through 21 enrolled in private elementary schools and secondary schools located in the LEA is to the total number of children with disabilities enrolled in public and private elementary schools and secondary schools located in the LEA aged 3 through 21; and

(2) A proportionate share of the LEA's subgrant under section 619(g) of the Act for children with disabilities aged 3 through 5. This is an amount that is the same proportion of the LEA's total subgrant under section 619(g) of the Act as the total number of parentally-placed private school children

with disabilities aged 3 through 5 enrolled in private elementary schools in the LEA is to the total number of children with disabilities enrolled in public and private elementary schools located in the LEA aged 3 through 5.

Consistent with section 612(a)(10)(A)(i) of the Act and § 300.133 of these regulations, annual expenditures for parentally-placed private school children with disabilities are calculated based on the total number of children with disabilities enrolled in public and private elementary schools and secondary schools located in the LEA eligible to receive special education and related services under Part B, as compared with the total number of eligible parentally-placed private school children with disabilities enrolled in private elementary schools located in the LEA. This ratio is used to determine the proportion of the LEA's total Part B subgrants under section 611(f) of the Act for children aged 3 through 21, and under section 619(g) of the Act for children aged 3 through 5, that is to be expended on services for parentally-placed private school children with disabilities enrolled in private elementary schools and secondary schools located in the LEA.

The following is an example of how the proportionate share is calculated:

There are 300 eligible children with disabilities enrolled in the Flintstone School District and 20 parentally-placed private school children with disabilities enrolled in private elementary schools and secondary schools located in the LEA for a total of 320 eligible public and private school children with disabilities (note: proportionate share for parentally-placed private school children is based on total children eligible, not children served). The number of eligible parentally-placed private school children with disabilities (20) divided by the total number of eligible public and private school children with disabilities (320) indicates that 6.25 percent of the LEA's subgrant must be spent for the group of eligible parentally-placed children with disabilities enrolled in private elementary schools and secondary schools located in the LEA. Flintstone School District receives $152,500 in Federal flow through funds. Therefore, the LEA must spend $9,531.25 on special education or related services to the group of parentally-placed private school children with disabilities enrolled in private elementary schools and secondary schools located in the LEA. (Note: The LEA must calculate the proportionate share of IDEA funds before earmarking funds for any early intervening activities in § 300.226).

The following outlines the calculations for the example of how the proportionate share is calculated.

Proportionate Share Calculation for Parentally-Placed Private School Children With Disabilities For Flintstone School District:

| | |
|---|---|
| Number of eligible children with disabilities in public schools in the LEA ............................... | 300 |
| Number of parentally-placed eligible children with disabilities in private elementary schools and secondary schools located in the LEA ............................... | 20 |
| Total number of eligible children ............................... | 320 |

FEDERAL FLOW-THROUGH FUNDS TO FLINTSTONE SCHOOL DISTRICT

| | |
|---|---|
| Total allocation to Flintstone ......................... | $152,500 |
| Calculating Proportionate Share: | |
| Total allocation to Flinstone ....... | 152,500 |
| Divided by total number of eligible children ............................. | 320 |
| Average allocation per eligible child ......................................... | 476.5625 |
| Multiplied by the number of parentally placed children with disabilities ............................... | 20 |
| Amount to be expended for parentally-placed children with disabilities ............................... | 9,531.25 |

## Appendix C to Part 300—National Instructional Materials Accessibility Standard (NIMAS)

Under sections 612(a)(23)(A) and 674(e)(4) of the Individuals with Disabilities Education Act, as amended by the Individuals with Disabilities Education Improvement Act of 2004, the Secretary of Education establishes the NIMAS. Under section 674(e)(4) of the Act, the NIMAS applies to print instructional materials published after July 19, 2006. The purpose of the NIMAS is to help increase the availability and timely delivery of print instructional materials in accessible formats to blind or other persons with print disabilities in elementary and secondary schools.

### Technical Specifications—The Baseline Element Set

The Baseline Element Set details the minimum requirement that must be delivered to fulfill the NIMAS. It is the responsibility of publishers to provide this NIMAS-conformant XML content file, a package file (OPF), a PDF-format copy of the title page (or whichever page(s) contain(s) ISBN and copyright information), and a full set of the content's images. All of the images included within a work must be provided in a folder and placeholders entered in the relevant XML document indicating their location (all images must be included). The preferred image type is SVG, next is either PNG or JPG format. Images should be rendered in the same size/proportion as their originals at 300 dpi. Images should be named with relative path filenames in XML files (example: img id="staricon4" src="./images/U10C02/staricon4.jpg" alt="star icon").

NIMAS-conformant content must be valid to the NIMAS 1.1 [see ANSI/NISO Z39.86 2005 or subsequent revisions]. In addition, files are required to use the tags from the Baseline Element Set when such tags are appropriate. Publishers are encouraged to augment the required Baseline Element Set with tags from the Optional Element Set (elements not included in the Standard) as applicable. For the purposes of NIMAS, appropriate usage of elements, both baseline

ED-000276

and optional, is defined by the DAISY Structure Guidelines. Files that do not follow these guidelines in the selection and application of tags are not conformant to this Standard. Both optional elements and appropriate structure guidelines may be located within Z39.86–2002 and Z39.86–2005 available from *http://www.daisy.org/* *z3986/*. Use of the most current standard is recommended.

## THE BASELINE ELEMENT SET

| Element | Description |
|---|---|
| **a. Document-level tags** ||
| dtbook ...................................... | The root element in the Digital Talking Book DTD. <dtbook> contains metadata in <head> and the contents itself in <book>. |
| head .......................................... | Contains metainformation about the book but no actual content of the book itself, which is placed in <book>. |
| book .......................................... | Surrounds the actual content of the document, which is divided into <frontmatter>, <bodymatter>, and <rearmatter>. <head>, which contains metadata, precedes <book>. |
| meta .......................................... | Indicates metadata about the book. It is an empty element that may appear repeatedly only in <head>. |
| | For the most current usage guidelines, please refer to *http://www.daisy.org/z3986/* |
| **b. Structure and Hierarchy** ||
| frontmatter ............................... | Usually contains <doctitle> and <docauthor>, as well as preliminary material that is often enclosed in appropriate <level> or <level1> etc. Content may include a copyright notice, a foreword, an acknowledgements section, a table of contents, etc. <frontmatter> serves as a guide to the content and nature of a <book>. |
| bodymatter .............................. | Consists of the text proper of a book, as contrasted with preliminary material <frontmatter> or supplementary information in <rearmatter>. |
| rearmatter ................................ | Contains supplementary material such as appendices, glossaries, bibliographies, and indices. It follows the <bodymatter> of the book. |
| level1 ........................................ | The highest-level container of major divisions of a book. Used in <frontmatter>, <bodymatter>, and <rearmatter> to mark the largest divisions of the book (usually parts or chapters), inside which <level2> subdivisions (often sections) may nest. The class attribute identifies the actual name (e.g., part, chapter) of the structure it marks. Contrast with <level>. |
| level2 ........................................ | Contains subdivisions that nest within <level1> divisions. The class attribute identifies the actual name (e.g., subpart, chapter, subsection) of the structure it marks. |
| level3 ........................................ | Contains sub-subdivisions that nest within <level2> subdivisions (e.g., sub-subsections within subsections). The class attribute identifies the actual name (e.g., section, subpart, subsubsection) of the subordinate structure it marks. |
| level4 ........................................ | Contains further subdivisions that nest within <level3> subdivisions. The class attribute identifies the actual name of the subordinate structure it marks. |
| level5 ........................................ | Contains further subdivisions that nest within <level4> subdivisions. The class attribute identifies the actual name of the subordinate structure it marks. |
| level6 ........................................ | Contains further subdivisions that nest within <level5> subdivisions. The class attribute identifies the actual name of the subordinate structure it marks. |
| h1 .............................................. | Contains the text of the heading for a <level1> structure. |
| h2 .............................................. | Contains the text of the heading for a <level2> structure. |
| h3 .............................................. | Contains the text of the heading for a <level3> structure. |
| h4 .............................................. | Contains the text of the heading for a <level4> structure. |
| h5 .............................................. | Contains the text of the heading for a <level5> structure. |
| h6 .............................................. | Contains the text of the heading for a <level6> structure. |
| | For the most current usage guidelines, please refer to *http://www.daisy.org/z3986/* |
| **c. Block elements** ||
| author ....................................... | Identifies the writer of a work other than this one. Contrast with <docauthor>, which identifies the author of this work. <author> typically occurs within <blockquote> and <cite>. |
| blockquote ............................... | Indicates a block of quoted content that is set off from the surrounding text by paragraph breaks. Compare with <q>, which marks short, inline quotations. |
| list ............................................ | Contains some form of list, ordered or unordered. The list may have an intermixed heading <hd> (generally only one, possibly with <prodnote>), and an intermixture of list items <li> and <pagenum>. If bullets and outline enumerations are part of the print content, they are expected to prefix those list items in content, rather than be implicitly generated. |
| li ............................................... | Marks each list item in a <list>. <li> content may be either inline or block and may include other nested lists. Alternatively it may contain a sequence of list item components, <lic>, that identify regularly occurring content, such as the heading and page number of each entry in a table of contents. |
| hd ............................................. | Marks the text of a heading in a <list> or <sidebar>. |
| note .......................................... | Marks a footnote, endnote, etc. Any local reference to <note id="yyy"> is by <noteref idref="#yyy"">. [Attribute id] |
| p ............................................... | Contains a paragraph, which may contain subsidiary <list> or <dl>. |
| sidebar ..................................... | Contains information supplementary to the main text and/or narrative flow and is often boxed and printed apart from the main text block on a page. It may have a heading <hd>. |
| cite ........................................... | Marks a reference (or citation) to another document. |
| dd ............................................. | Marks a definition of the preceding term <dt> within a definition list <dl>. A definition without a preceding <dt> has no semantic interpretation, but is visually presented aligned with other <dd>. |
| dl ............................................. | Contains a definition list, usually consisting of pairs of terms <dt> and definitions <dd>. Any definition can contain another definition list. |

ED-000277

**46816**     **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

THE BASELINE ELEMENT SET—Continued

| Element | Description |
| --- | --- |
| dt | Marks a term in a definition list <dl> for which a definition <dd> follows.<br>For the most current usage guidelines, please refer to *http://www.daisy.org/z3986/* |

**d. Inline Elements**

| Element | Description |
| --- | --- |
| em | Indicates emphasis. Usually <em> is rendered in italics. Compare with <strong>. |
| q | Contains a short, inline quotation. Compare with <blockquote>, which marks a longer quotation set off from the surrounding text. |
| strong | Marks stronger emphasis than <em>. Visually <strong> is usually rendered bold. |
| sub | Indicates a subscript character (printed below a character's normal baseline). Can be used recursively and/or intermixed with <sup>. |
| sup | Marks a superscript character (printed above a character's normal baseline). Can be used recursively and/or intermixed with <sub>. |
| br | Marks a forced line break. |
| line | Marks a single logical line of text. Often used in conjunction with <linenum> in documents with numbered lines. [Use only when line breaks must be preserved to capture meaning (e.g., poems, legal texts).] |
| linenum | Contains a line number, for example in legal text. [Use only when <line> is used, and only for lines numbered in print book.] |
| pagenum | Contains one page number as it appears from the print document, usually inserted at the point within the file immediately preceding the first item of content on a new page. [NB: Only valid when it includes an id attribute]. |
| noteref | Marks one or more characters that reference a footnote or endnote <note>. Contrast with <annoref>. <noteref> and <note> are independently skippable.<br>For the most current usage guidelines, please refer to *http://www.daisy.org/z3986/* |

**e. Tables**

| Element | Description |
| --- | --- |
| table | Contains cells of tabular data arranged in rows and columns. A <table> may have a <caption>. It may have descriptions of the columns in <col>s or groupings of several <col> in <colgroup>. A simple <table> may be made up of just rows <tr>. A long table crossing several pages of the print book should have separate <pagenum> values for each of the pages containing that <table> indicated on the page where it starts. Note the logical order of optional <thead>, optional <tfoot>, then one or more of either <tbody> or just rows <tr>. This order accommodates simple or large, complex tables. The <thead> and <tfoot> information usually helps identify content of the <tbody> rows. For a multiple-page print <table> the <thead> and <tfoot> are repeated on each page, but not redundantly tagged. |
| td | Indicates a table cell containing data. |
| tr | Marks one row of a <table> containing <th> or <td> cells.<br>For the most current usage guidelines, please refer to *http://www.daisy.org/z3986/* |

**f. Images**

| Element | Description |
| --- | --- |
| imggroup | Provides a container for one or more <img> and associated <caption>(s) and <prodnote>(s). A <prodnote> may contain a description of the image. The content model allows: 1) multiple <img> if they share a caption, with the ids of each <img> in the <caption imgref="id1 id2 ...">, 2) multiple <caption> if several captions refer to a single <img id="xxx"> where each caption has the same <caption imgref="xxx">, 3) multiple <prodnote> if different versions are needed for different media (e.g., large print, braille, or print). If several <prodnote> refer to a single <img id="xxx">, each prodnote has the same <prodnote imgref="xxx">. |
| img | Points to the image to be rendered. An <img> may stand alone or be grouped using <imggroup>. Note that providing extracted images is not a requirement of the NIMAS. If they are included, it is best to refer to them using <img> within the <imggroup> container. |
| caption | Describes a <table> or <img>. If used with <table> it must follow immediately after the <table> start tag. If used with <imggroup> it is not so constrained.<br>For the most current usage guidelines, please refer to *http://www.daisy.org/z3986/* |

**1. The Optional Elements and Guidelines for Use**

Publishers are encouraged to apply markup beyond the baseline (required) elements. The complete DTBook Element Set reflects the tags necessary to create the six types of Digital Talking Books and Braille output. Because of the present necessity to subdivide the creation of alternate format materials into distinct phases, the Panel determined that baseline elements would be provided by publishers, and optional elements would be added to the NIMAS-conformant files by third party conversion entities. In both circumstances the protocols for tagging digital files should conform to the most current ANSI/NISO Z39.86 specification. Content converters are directed to the most current DAISY Structure Guidelines (*http://www.daisy.org/z3986/*) for guidance on their use.

Since the publication of the original National File Format report from which the NIMAS technical specifications were derived, ANSI/NISO Z39.86–2002 was updated and is now ANSI/NISO Z39.86–2005. It may be best to avoid using the following optional elements which are no longer included in ANSI/NISO Z39.86–2005: style, notice, hr, and levelhd.

Also, the following new elements were introduced by ANSI/NISO Z39.86–2005 and should be considered optional elements for the NIMAS: bridgehead, byline, covertitle, dateline, epigraph, linegroup, and poem. Please refer to ANSI/NISO Z39.86–2005 for additional information regarding these elements. To access the ANSI/NISO Z39.86–2005 specification, go to *http://www.daisy.org/z3986/*.

**2. Package File**

A package file describes a publication. It identifies all other files in the publication and provides descriptive and access information about them. A publication must include a package file conforming to the NIMAS. The package file is based on the

Open eBook Publication Structure 1.2 package file specification (For most recent detail please see *http://www.openebook.org/oebps/oebps1.2/download/oeb12-xhtml.htm#sec2*). A NIMAS package file must be an XML-valid OeB PS 1.2 package file instance and must meet the following additional standards:

The NIMAS Package File must include the following Dublin Core (dc:)metadata:

dc:Title.

dc:Creator (if applicable).

dc:Publisher.

dc:Date (Date of NIMAS-compliant file creation—yyyy-mm-dd).

dc:Format (=''NIMAS 1.0'').

dc:Identifier (a unique identifier for the NIMAS-compliant digital publication, e.g., print ISBN + ''-NIMAS''—exact format to be determined).

dc:Language (one instance, or multiple in the case of a foreign language textbook, etc.).

dc:Rights (details to be determined).

dc:Source (ISBN of print version of textbook).

And the following x-metadata items:

nimas-SourceEdition (the edition of the print textbook).

nimas-SourceDate (date of publication of the print textbook).

The following metadata were proposed also as a means of facilitating recordkeeping, storage and file retrieval:

dc:Subject (Lang Arts, Soc Studies, etc.).

nimas-grade (specific grade level of the print textbook, *e.g.*; Grade 6).

nimas gradeRange (specific grade range of the print textbook, *e.g.*; Grades 4–5).

An additional suggestion references the use of:

dc:audience:educationLevel (for the grade and gradeRange identifiers, noting that Dublin Core recommends using educationLevel with an appropriate controlled vocabulary for context, and recommends the U.S. Department of Education's Level of Education vocabulary online at *http://www.ed.gov/admin/reference/index.jsp*. Using educationLevel obviates the need for a separate field for gradeRange since dc elements can repeat more than once. A book used in more than one grade would therefore have two elements, one with value ''Grade 4'' and another with value ''Grade 5.''

A final determination as to which of these specific metadata elements to use needs to be clarified in practice. The package manifest must list all provided files (text, images, etc.).

(**Note:** For purposes of continuity and to minimize errors in transformation and processing, the NIMAS-compliant digital text should be provided as a single document.)

**3. Modular Extensions**

The most current DAISY/NISO standard, formally the *ANSI/NISO Z39.86, Specifications for the Digital Talking Book* defines a comprehensive system for creating Digital Talking Books. A part of this standard is DTBook, an XML vocabulary that provides a core set of elements needed to produce most types of books. However, DTBook is not intended to be an exhaustive vocabulary for all types of books.

Guidelines for the correct approach to extend the DAISY/NISO standard have been established. Mathematics, video support, testing, workbooks, music, dictionaries, chemistry, and searching are some of the extensions that have been discussed. Visit *http://www.daisy.org/z3986/* to learn more about modular extensions.

*End*

**Appendix D to Part 300—Maintenance of Effort and Early Intervening Services**

LEAs that seek to reduce their local maintenance of effort in accordance with § 300.205(d) and use some of their Part B funds for early intervening services under § 300.226 must do so with caution because the local maintenance of effort reduction provision and the authority to use Part B funds for early intervening services are interconnected. The decisions that an LEA makes about the amount of funds that it uses for one purpose affect the amount that it may use for the other. Below are examples that illustrate how §§ 300.205(d) and 300.226(a) affect one another.

*Example 1:* In this example, the amount that is 15 percent of the LEA's total grant (see § 300.226(a)), which is the maximum amount that the LEA may use for early intervening services (EIS), is greater than the amount that may be used for local maintenance of effort (MOE) reduction (50 percent of the increase in the LEA's grant from the prior year's grant) (see § 300.205(a)).

| | |
|---|---|
| Prior Year's Allocation ................. | $900,000. |
| Current Year's Allocation .............. | 1,000,000. |
| Increase .................................. | 100,000. |
| Maximum Available for MOE Reduction ................................. | 50,000. |
| Maximum Available for EIS .......... | 150,000. |

If the LEA chooses to set aside $150,000 for EIS, it may not reduce its MOE (MOE maximum $50,000 less $150,000 for EIS means $0 can be used for MOE).

If the LEA chooses to set aside $100,000 for EIS, it may not reduce its MOE (MOE maximum $50,000 less $100,000 for EIS means $0 can be used for MOE).

If the LEA chooses to set aside $50,000 for EIS, it may not reduce its MOE (MOE maximum $50,000 less $50,000 for EIS means $0 can be used for MOE).

If the LEA chooses to set aside $30,000 for EIS, it may reduce its MOE by $20,000 (MOE maximum $50,000 less $30,000 for EIS means $20,000 can be used for MOE).

If the LEA chooses to set aside $0 for EIS, it may reduce its MOE by $50,000 (MOE maximum $50,000 less $0 for EIS means $50,000 can be used for MOE).

*Example 2:* In this example, the amount that is 15 percent of the LEA's total grant (see § 300.226(a)), which is the maximum amount that the LEA may use for EIS, is less than the amount that may be used for MOE reduction (50 percent of the increase in the LEA's grant from the prior year's grant) (see § 300.205(a)).

| | |
|---|---|
| Prior Year's Allocation ................. | $1,000,000. |
| Current Year's Allocation .............. | 2,000,000. |
| Increase .................................. | 1,000,000. |
| Maximum Available for MOE Reduction ................................. | 500,000. |
| Maximum Available for EIS .......... | 300,000. |

If the LEA chooses to use no funds for MOE, it may set aside $300,000 for EIS (EIS maximum $300,000 less $0 means $300,000 for EIS).

If the LEA chooses to use $100,000 for MOE, it may set aside $200,000 for EIS (EIS maximum $300,000 less $100,000 means $200,000 for EIS).

If the LEA chooses to use $150,000 for MOE, it may set aside $150,000 for EIS (EIS maximum $300,000 less $150,000 means $150,000 for EIS).

If the LEA chooses to use $300,000 for MOE, it may not set aside anything for EIS (EIS maximum $300,000 less $300,000 means $0 for EIS).

If the LEA chooses to use $500,000 for MOE, it may not set aside anything for EIS (EIS maximum $300,000 less $500,000 means $0 for EIS).

**Appendix E to Part 300—Index for IDEA—Part B Regulations (34 CFR Part 300)**

ACCESS TO
- Access rights (Parents) ......................................................................... 300.613.
- Assistive technology devices in child's home ........................................ 300.105(b).
- Disciplinary records ................................................................................ 300.229.
- Education records (Procedural safeguards notice) ................................. 300.504(c)(4).
- General curriculum (Ensure access to) ................................................... 300.39(b)(3)(ii).
- Instructional materials (see §§ 300.172, 300.210).
- List of employees who may have access to records .............................. 300.623(d).
- Parent's private insurance proceeds ...................................................... 300.154(e).
- Record of access (Confidentiality) .......................................................... 300.614.

ACCESSIBILITY STANDARDS (Regarding construction)
- Americans with Disabilities Accessibility Standards for Buildings and Facilities ................................................ 300.718(b)(1).
- Uniform Federal Accessibility Standards ............................................... 300.718(b)(2).

ACCOMMODATIONS
- In assessments ....................................................................................... 300.320(a)(6)(i).
- State level activities in support of ......................................................... 300.704(b)(4)(x).

ED-000279

**46818**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

ACT (Definition) ................................................................................................................... 300.4.
ADD AND ADHD (See ''Attention deficit disorder'' and ''Attention deficit hyperactivity disorder'')
ADDITIONAL DISCLOSURE OF INFORMATION REQUIREMENT ......................................... 300.512(b).
ADULT CORRECTIONAL FACILITIES (See ''Correctional facilities'')
ADULT PRISONS (Children with disabilities in)
• Divided State agency responsibility ................................................................................ 300.607.
• FAPE requirements:
    ○ Exception to FAPE ...................................................................................................... 300.102(a)(2).
    ○ Modifications of IEP or placement ............................................................................. 300.324(d)(2).
    ○ Requirements that do not apply ................................................................................. 300.324(d)(1).
• Governor ...................................................................................................................... 300.149(d).
• Other public agency responsibility ................................................................................ 300.149(d).
ADVERSELY AFFECTS EDUCATIONAL PERFORMANCE (See ''Child with a disability,'' § 300.8(c)(1)(i), (c)(3),
  (c)(4)(i), (c)(5), (c)(6), (c)(8), (c)(9)(ii), (c)(11), (c)(12))
ADVISORY BOARD
(Secretary of the Interior) ................................................................................................ 300.714.
ADVISORY PANEL (See ''State advisory panel'')
AGE–APPROPRIATE CLASSROOM ..................................................................................... 300.116(e).
ALLOCATION(S)
• By-pass for private school children (see § 300.191(d)).
• To LEAs (see §§ 300.705(b), 300.816)
• To Outlying areas ......................................................................................................... 300.701(a).
• To Secretary of the Interior .......................................................................................... 300.707.
• To States (see §§ 300.703, 300.807 through 300.810).
ALLOWABLE COSTS
(By SEA for State administration) .................................................................................... 300.704(a).
ALTERATION OF FACILITIES ............................................................................................. 300.718(b).
ALTERNATE ASSESSMENTS
• Aligned with alternate achievement standards .............................................................. 300.320(a)(2)(ii).
• Development and provision of in accordance with ESEA ................................................ 300.704(b)(4)(x).
• Participation determined by IEP Team ........................................................................... 300.320(a)(6)(ii).
ALTERNATIVE PLACEMENTS (Continuum) ........................................................................ 300.115.
ALTERNATIVE STRATEGIES to meet transition objectives .................................................. 300.324(c)(1).
AMENDMENTS
• To LEA policies and procedures ................................................................................... 300.220(b).
• To State policies and procedures:
    ○ Made by State ........................................................................................................... 300.176(b).
    ○ Required by the Secretary ......................................................................................... 300.176(c).
ANNUAL GOALS (IEPs)
• FAPE for children suspended or expelled (see §§ 300.101(a), 300.530(d))
• IEP content:
    ○ How progress will be measured .................................................................................. 300.320(a)(3).
    ○ Special education and related services ....................................................................... 300.320(a)(4).
    ○ Statement of measurable annual goals ...................................................................... 300.320(a)(2)(i).
• Review and revision of IEP ............................................................................................ 300.324(b)(1).
• Review of existing evaluation data ............................................................................... 300.305(a).
ANNUAL REPORT
Of children served (see §§ 300.640 through 300.646)
On education of Indian children ...................................................................................... 300.715.
APPENDICES TO PART 300 (A through E)
Excess Costs Calculation (see Appendix A)
Proportionate Share Calculation (see Appendix B)
National Instructional Materials Accessibility Standard (NIMAS) (see Appendix C)
Maintenance of Effort and Early Intervening Services (see Appendix D)
Index for IDEA—Part B Regulations (This Appendix E)
APPLICABILITY OF THIS PART to State, local, and private agencies ................................... 300.2.
APPLICATION
• Initial admission to public school ................................................................................. 300.518(b).
• Initial services ............................................................................................................. 300.518(c).
ASSESSMENT(S)
• For specific learning disability (see § 300.309(a)(2)(ii), (b)(2))
• Functional behavioral assessment (see § 300.530(d)(1)(ii), (f)(1)(i))
• In evaluation (see §§ 300.304(b), (c), 300.305(a)(1)(ii), (c), (d))
• Of leisure function (in ''Recreation'') ........................................................................... 300.34(c)(11)(i).
ASSESSMENTS—STATE and DISTRICT-WIDE
Alternate assessments (see § 300.320 (a)(2)(ii), (a)(6)(ii))
Performance indicators .................................................................................................... 300.157.
ASSISTANCE UNDER OTHER FEDERAL PROGRAMS ......................................................... 300.186.
ASSISTIVE TECHNOLOGY (AT)
• AT devices ................................................................................................................... 300.5.
• AT services .................................................................................................................. 300.6.

ED-000280

**Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations  **46819**

- Consideration of special factors ........................................................................................ 300.324(a)(2)(v).
- Hearing aids .................................................................................................................... 300.113.
- Requirement:
  - ○ Ensure availability of ................................................................................................. 300.105(a).
  - ○ Use of AT in child's home ........................................................................................... 300.105(b).
- Surgically implanted medical devices (see §§ 300.5, 300.34(b), 300.113(b))
ASTHMA ............................................................................................................................. 300.8(c)(9).
ATTENTION DEFICIT DISORDER (ADD) ........................................................................... 300.8(c)(9).
ATTENTION DEFICIT HYPERACTIVITY DISORDER (ADHD) ........................................... 300.8(c)(9).
ATTORNEYS' FEES ............................................................................................................. 300.517.
- Award of fees ................................................................................................................. 300.517(c).
- Prohibition on use of funds for ....................................................................................... 300.517(b).
- When court reduces fee awards ....................................................................................... 300.517(c)(4).
AUDIOLOGY ....................................................................................................................... 300.34(c)(1).
AUTHORITY (A–O)
- Of guardian .................................................................................................................... 300.30(a)(3).
- Of hearing officer (Discipline) ........................................................................................ 300.532(b).
- Of school personnel (Discipline) ..................................................................................... 300.530.
- Of Secretary to monitor and enforce ............................................................................... 300.609.
AUTHORITY (P–Z)
- Parental authority to inspect and review records .............................................................. 300.613.
- State complaint procedures .............................................................................................. 300.151(b).
- Waiver request (Signed by person with authority) ........................................................... 300.164(c)(1).
AUTISM .............................................................................................................................. 300.8(c)(1).
AVERAGE PER-PUPIL EXPENDITURE
(Definition) ......................................................................................................................... 300.717(d).
BASE PAYMENTS (to LEAs) (See § 300.705(b)(1), (b)(2))
BASIS OF KNOWLEDGE: Protection for children not yet eligible ...................................... 300.534(b).
BEHAVIORAL ASSESSMENT (See "Functional behavioral assessment")
BEHAVIORAL INTERVENTION(S) ...................................................................................... 300.530(f).
- Assist in developing ........................................................................................................ 300.34(c)(10)(vi).
- Behavioral intervention plan ........................................................................................... 300.530(f).
- Consideration of by IEP Team ........................................................................................ 300.324(a)(2)(i).
- Not a manifestation of disability ..................................................................................... 300.530(d).
- Regular education teacher (Determination of) .................................................................. 300.324(a)(3).
- Suspension and expulsion rates ....................................................................................... 300.170(a).
BENCHMARKS OR SHORT TERM OBJECTIVES .............................................................. 300.320(a)(2)(ii).
BENEFITS TO NONDISABLED (Permissive use of funds) ................................................... 300.208(a)(1).
BIA (See "Bureau of Indian Affairs")
BLIND(NESS): Under "Visual impairment"
- Access to instructional materials (see §§ 300.172, 300.210(b)(3))
- Consideration of special factors by IEP Team ................................................................. 300.324(a)(2).
- Definition ....................................................................................................................... 300.8(c)(13).
BRAILLE (see §§ 300.29(b), 300.324(a)(2)(iii))
BUREAU OF INDIAN AFFAIRS (BIA)
- BIA funded schools ......................................................................................................... 300.28(c).
- In definition of "LEA" ................................................................................................... 300.28(c).
- See also §§ 300.21(c), 300.713(b), (d), 300.714
- Use of funds .................................................................................................................... 300.712(d).
BUSINESS DAY
- Definition ....................................................................................................................... 300.11(b).
- See "Timelines," "Timelines—Discipline"
BY-PASS: Private school children with disabilities (see §§ 300.190 through 300.198)
CALENDAR DAY
- Definition ....................................................................................................................... 300.11(a).
- See "Timelines," "Timelines—Discipline"
CERTIFICATION
- Annual report of children served ..................................................................................... 300.643.
CHANGE OF PLACEMENT BECAUSE OF DISCIPLINARY REMOVALS ............................ 300.536.
CHARTER SCHOOLS
- Applicability of this part to ............................................................................................. 300.2(b)(1)(ii).
- Definition ....................................................................................................................... 300.7.
- Exception: joint establishment of eligibility .................................................................... 300.223(b).
- In definition of "Elementary school" .............................................................................. 300.13.
- In definition of "LEA" ................................................................................................... 300.28(b)(2).
- In definition of "Public agency" ..................................................................................... 300.33.
- In definition of "Secondary school" ............................................................................... 300.36.
- State-level activities regarding charter schools ................................................................ 300.704(b)(4)(ix).
- Treatment of charter schools and their students ............................................................... 300.209.
CHIEF EXECUTIVE OFFICER (CEO)

ED-000281

- Adult prisons (Assigned by Governor) ........................................................................ 300.149(d).
- Methods of ensuring services (see § 300.154(a), (c))

CHILD COUNT
- Annual report of children served (see §§ 300.640 through 300.646)
- Certification ........................................................................ 300.643.
- Criteria for ........................................................................ 300.644.
- Dates for count ........................................................................ 300.641(a).
- Indian children ........................................................................ 300.712(b).
- LEA records of private school children ........................................................................ 300.132(c).
- Procedures for counting children served ........................................................................ 300.645(a).

CHILD FIND
- Basic requirement ........................................................................ 300.111(a).
- Children advancing from grade to grade ........................................................................ 300.111(c)(1).
- Developmental delay ........................................................................ 300.111(b).
- Highly mobile children ........................................................................ 300.111(c)(2).
- Homeless children ........................................................................ 300.111(a)(1)(i).
- Indian children aged 3 through 5 ........................................................................ 300.712(d)(1).
- Migrant children ........................................................................ 300.111(c)(2).
- Private school children ........................................................................ 300.131(b).
- Protections for children not determined eligible ........................................................................ 300.534.
- Secretaries of the Interior and Health and Human Services (Memo of agreement) ........................................................................ 300.708(i)(2).

CHILD WITH A DISABILITY (CWD)
- Adversely affects educational performance (see § 300.8(c)(1)(i), (c)(3), (c)(4)(i), (c)(5), (c)(6), (c)(8), (c)(9)(ii), (c)(11), (c)(12), (c)(13))
- Children experiencing developmental delay(s) ........................................................................ 300.8(b)(1).
- Children who need only a related service ........................................................................ 300.8(a)(2).
- Definition ........................................................................ 300.8(a)(1).
- Individual disability terms (Defined) ........................................................................ 300.8(c).
- Requirement ........................................................................ 300.111(b).
- See "Developmental delay(s)"

CHILD'S STATUS DURING PROCEEDINGS
- Discipline (see §§ 300.530(f)(2), 300.533)
- Pendency (Stay put) ........................................................................ 300.518.

CHILDREN ADVANCING FROM GRADE TO GRADE
- Child find ........................................................................ 300.111(c)(1).
- FAPE ........................................................................ 300.101(c).

CHILDREN EXPERIENCING DEVELOPMENTAL DELAY(S) (See "Developmental delay(s)")

CHILDREN'S RIGHTS (Confidentiality) ........................................................................ 300.625.

CIVIL ACTION—PROCEEDINGS ........................................................................ 300.516.
- Finality of review decision ........................................................................ 300.514(d).
- Mediation ........................................................................ 300.506(b)(6)(i).
- Procedural safeguards notice ........................................................................ 300.504(c)(12).
- See "Court(s)"

COCHLEAR IMPLANT (See "Surgically implanted medical device") ........................................................................ 300.34(b).

CODE OF CONDUCT
- Case-by-case determination ........................................................................ 300.530(a).
- Manifestation determination review ........................................................................ 300.530(e).
- Protections for children not determined eligible ........................................................................ 300.534(a).

COMMINGLING—PROHIBITION AGAINST ........................................................................ 300.162(b).

COMMUNITY-BASED WAIVERS (Public benefits or insurance) ........................................................................ 300.154(d)(2)(iii).

COMPLAINT(S): DUE PROCESS
- Attorneys' fees ........................................................................ 300.517(a)(1).
- Civil action ........................................................................ 300.516(a).
- Pendency ........................................................................ 300.518(a).
- Private school children (Complaints) ........................................................................ 300.140(c).
- See "Due process hearing(s) and reviews"

COMPLAINT(S): STATE COMPLAINT PROCEDURES (A–P)
- Adoption of State complaint procedures ........................................................................ 300.151(a).
- Complaint investigations (SEA allocations for) ........................................................................ 300.704(b)(3)(i).
- Filing a complaint ........................................................................ 300.153(a).
- Minimum State complaint procedures ........................................................................ 300.152.
- Private schools (State complaints) ........................................................................ 300.140.
- Procedural safeguards notice ........................................................................ 300.504(c).
- Provisions for services under by-pass ........................................................................ 300.191(d).
- Public agency failure to implement hearing decision ........................................................................ 300.152(c)(3).

COMPLAINT(S): STATE COMPLAINT PROCEDURES (Q–Z)
- See also §§ 300.151 through 300.153
- Time limit ........................................................................ 300.152(a).
- Waiver of nonsupplanting requirement ........................................................................ 300.163(c)(2).

COMPLIANCE—COMPLY (A–M)
- Child find requirements ........................................................................ 300.111(a).
- Department procedures (If failure to comply) ........................................................................ 300.604(c).
- FAPE requirement ........................................................................ 300.101(a).

- LEA and State agency compliance ..................................................................................... 300.222(a).
- LRE (State funding mechanism) ...................................................................................... 300.114(b).
- Modifications of policies:.
  - Made by LEA or State agency ................................................................................... 300.176(b).
  - Required by SEA .................................................................................................... 300.220(c).
  - Required by Secretary ............................................................................................ 300.176(c).
- Monitoring (See ''Monitor; Monitoring activities'');

COMPLIANCE—COMPLY (N–Z)
- Physical education ...................................................................................................... 300.108.
- Private school placement by parents ............................................................................... 300.148(e).
- Private school placements by public agencies:
  - IEP requirement .................................................................................................... 300.325(c).
  - SEA (Monitor compliance) ...................................................................................... 300.147(a)
- Public participation requirements .................................................................................. 300.165.
- SEA responsibility if LEA does not comply ....................................................................... 300.227(a).
- State funding mechanism (LRE) .................................................................................... 300.114(b).
- COMPREHENSIVE EVALUATION ................................................................................. 300.304(c)(6).

CONDITION OF ASSISTANCE
- LEA eligibility ........................................................................................................... 300.200.
- State eligibility .......................................................................................................... 300.100.

CONFIDENTIALITY (A–C)
- Access rights ............................................................................................................. 300.613.
- Children's rights ........................................................................................................ 300.625.
- Consent .................................................................................................................... 300.622.

CONFIDENTIALITY (D–E)
Definitions:
  - Destruction of information ...................................................................................... 300.611(a).
  - Education records ................................................................................................. 300.611(b).
  - Participating agency .............................................................................................. 300.611(c).
- Department use of personally identifiable information ......................................................... 300.627.
- Disciplinary information .............................................................................................. 300.229.
- Enforcement by SEA .................................................................................................. 300.626.

CONFIDENTIALITY (F–Z)
- Family Educational Rights and Privacy Act:
  - Children's rights ................................................................................................... 300.625.
  - Disciplinary records .............................................................................................. 300.535(b)(2).
  - In definition of ''Education records'' ......................................................................... 300.611(b).
  - Notice to parents .................................................................................................. 300.612(a)(3).
- Fees ........................................................................................................................ 300.617.
- Hearing procedures .................................................................................................... 300.621.
- List of types and location of information .......................................................................... 300.616.
- Notice to parents ....................................................................................................... 300.612(a).
- Opportunity for a hearing ............................................................................................ 300.619.
- Parental authority to inspect and review records ................................................................ 300.613(b).
- Record of access ........................................................................................................ 300.614.
- Records on more than one child ..................................................................................... 300.615.
- Result of hearing ....................................................................................................... 300.620.
- Safeguards ............................................................................................................... 300.623.
- State eligibility requirement ......................................................................................... 300.123.

CONSENT (A–I)
- Confidentiality (Records to non-agency officials) ................................................................ 300.622(a).
- Definition ................................................................................................................. 300.9.
- IEP vs. IFSP .............................................................................................................. 300.323(b)(2)(ii).
- Initial evaluations ...................................................................................................... 300.300(a).
- Initial provision of services ........................................................................................... 300.300(b).

CONSENT (J–Z)
- Not required:
  - Before administering a test or other evaluation to all children ........................................... 300.300(d)(1)(ii).
  - Before reviewing existing data ................................................................................. 300.300(d)(1)(i).
  - When screening for instructional purposes .................................................................. 300.302.
- Private insurance (Accessing) ....................................................................................... 300.154(e)(1).
- Reasonable efforts to obtain consent:
  - For initial evaluation ............................................................................................. 300.300(a)(1)(iii).
  - For initial evaluations for wards of the State ............................................................... 300.300(a)(2).
  - For initial provision of services ................................................................................ 300.300(b)(2).
  - Reasonable efforts requirements ............................................................................... 300.300(d)(5).
- Reevaluations ........................................................................................................... 300.300(c)(2).
- Release of information from education records ................................................................... 300.622

CONSIDERATION OF SPECIAL FACTORS (by IEP Team) ................................................... 300.324(a)(2).

CONSISTENCY WITH STATE POLICIES: LEA ................................................................. 300.201.

CONSTRUCTION
- Accessibility standards ................................................................................................ 300.718(b).
- Exception to maintenance of effort (Termination of costly expenditures for construction) ............... 300.204(d).
- Private schools (No funds may be used for) ....................................................................... 300.144(e).

CONSTRUCTION CLAUSES (A–I)
- Child find (Nothing requires classifying children by disability) ................................ 300.111(d).
- Civil action (Exhaust administrative remedies under Part B before filing a civil action) .................................... 300.516(e).
- Early intervening services ................................................................................... 300.226(c).
- Funding mandated by State law ........................................................................... 300.166.
- Hearing: right of parent to appeal decision ......................................................... 300.513(b).
- Highly qualified SEA or LEA staff ...................................................................... 300.156(e).
- Highly qualified teacher ...................................................................................... 300.18(f).
- IEP (Inclusion of additional information beyond explicit requirements) .................. 300.320(d)(1).
- IEP (Information in more than one component not required) .................................. 300.320(d)(2).

CONSTRUCTION CLAUSES (J–Z)
- Prohibition on mandatory medication .................................................................. 300.174(b).
- Referral to and action by law enforcement and judicial authorities ...................... 300.535(a).
- Secretary's authority to monitor enforcement under GEPA .................................. 300.609.
- State Medicaid agency (Nothing alters requirements imposed under Titles XIX or XXI or other public benefits or insurance program) ..................... 300.154(h).
- Transition service ............................................................................................... 300.324(c)(2).

CONSUMER PRICE INDEX For All Urban Consumers (regarding rate of inflation) (See §§ 300.702(b), 300.704(a)(2)(ii), (b)(2), 300.812(b)(2))

CONTENT OF IEP ................................................................................................. 300.320(a).

CONTINUUM OF ALTERNATIVE PLACEMENTS (See "Least restrictive environment") .................................... 300.115.

CONTROLLED SUBSTANCE (Definition) ............................................................ 300.530(i)(1).

COORDINATION OF SERVICES
- Methods of ensuring services .............................................................................. 300.154(a).
- Secretary of the Interior ...................................................................................... 300.708(i)(1).
  ○ Advisory board (Service coordination within BIA) .......................................... 300.714(b)(1).
  ○ Payments for children aged 3 through 5 ......................................................... 300.712(a).
  ○ Plan for coordination of services ..................................................................... 300.713.
- See "Interagency agreements," "Interagency coordination"
- State advisory panel (Advise SEA on) ................................................................ 300.169(e).
- Use of LEA funds for early intervening services ................................................. 300.208(a)(2).
- Use of SEA allocations for transition .................................................................. 300.704(b)(4)(vi).

CO-PAY OR DEDUCTIBLE (Public benefits or insurance) ................................... 300.154(d)(2)(ii).

CORE ACADEMIC SUBJECTS
- Definition ............................................................................................................ 300.10.
- See "Highly qualified special education teachers" .............................................. 300.18.

CORRECTIONAL FACILITIES
- Applicability of this part to .................................................................................. 300.2(b)(1)(iv).
- Divided State agency responsibility ..................................................................... 300.607.
- Exception to FAPE (Children in adult facilities) .................................................. 300.102(a)(2).
- See also "Adult prisons"
- State advisory panel (Representatives on) ........................................................... 300.168(a)(11).
- State juvenile-adult correctional facilities ........................................................... 300.2(b)(1)(iv).
- Transfer of rights to children in ........................................................................... 300.520(a)(2).

CORRECTIVE ACTION (PLAN)
- Corrective actions to achieve compliance (see §§ 300.152(b)(2)(iii), 300.607)
- Monitoring activities ........................................................................................... 300.120(b)(2).
- Needs intervention by Secretary .......................................................................... 300.604(b)(2)(i).
- State advisory panel (Advise SEA on) ................................................................ 300.169(d).

COUNSELING SERVICES (Definition) ................................................................ 300.34(c)(2).

COUNT (See "Child count")

COURT(S)
- Attorneys' fees .................................................................................................... 300.517.
- Civil action .......................................................................................................... 300.516.
- Court order:
  ○ Exception to FAPE for certain ages ............................................................... 300.102(a)(1).
- Judicial review:
  ○ By-pass ......................................................................................................... 300.197.
  ○ Department procedures .................................................................................. 300.184.
- New interpretation of Act by courts requiring modification ................................. 300.176(c)(2).
- Reimbursement for private school placement (see § 300.148(b) through (e))

CRIME (See "Reporting a crime") ........................................................................ 300.535.

CRITERIA (A–I)
- Child count .......................................................................................................... 300.644.
- Child eligibility (Determinant factor) .................................................................. 300.306(b)(1).
- IEP Team (Public agency representative) ............................................................ 300.321(a)(4).
- Independent educational evaluation ..................................................................... 300.502.

CRITERIA (J–Z)
- Specific learning disability (see §§ 300.307, 300.309)
- Surrogate parents ................................................................................................ 300.519(d).

CURRENT PLACEMENT (Discipline)
- Authority of hearing officer ................................................................................ 300.532(b).
- Placement during appeals .................................................................................... 300.533.

ED-000284

DATA (A–L)
- Allocation of remaining funds to LEAs ......................................................................................... 300.816(d).
- Average per-pupil expenditure (Definition) ................................................................................ 300.717(d).
- By-pass (Provision of services under) .......................................................................................... 300.191(c)(2).
- Determination of needed evaluation data .................................................................................. 300.305(c).
- Disaggregated data ........................................................................................................................ 300.704(b)(4)(xi).
- Evaluation data:
  ○ Procedures for determining eligibility and placement ......................................................... 300.306(c).
  ○ Review of existing data ............................................................................................................ 300.305(a)(1).
- Grants to States most recent data .............................................................................................. 300.703(c)(1)(ii).
- LRE (Placements—meaning of evaluation data ......................................................................... 300.116(a)(1).

DATA (M–Z)
- Parental consent (Not required for reviewing existing evaluation data) ............................... 300.300(d)(1)(i).
- State advisory council (Advise SEA on) ...................................................................................... 300.169(c).
- Suspension and expulsion rates .................................................................................................. 300.170(a).

DAY
- Business day (Definition) ............................................................................................................. 300.11(b).
- Day (Calendar) ............................................................................................................................... 300.11(a).
- Discipline (See ''Timelines—Discipline'')
- School day (Definition) ................................................................................................................. 300.11(c).
- See ''Timelines''.

DECREASE IN ENROLLMENT (Exception to LEA maintenance of effort) ................................. 300.204(b).

DECREASE IN FUNDS (To States) ..................................................................................................... 300.703(d).

DEDUCTIBLE OR CO-PAY (Public benefits or insurance) ............................................................. 300.154(d)(2)(ii).

DEFINITIONS (A–D)
- Act ..................................................................................................................................................... 300.4.
- Assistive technology device .......................................................................................................... 300.5.
- Assistive technology service ......................................................................................................... 300.6.
- At no cost ........................................................................................................................................ 300.39(b)(1).
- Audiology ........................................................................................................................................ 300.34(c)(1).
- Autism .............................................................................................................................................. 300.8(c)(1).
- Average per-pupil expenditure in public elementary and secondary schools in the United States ... 300.717(d).
- Business day ................................................................................................................................... 300.11(b).
- Charter school ................................................................................................................................ 300.7.
- Child with a disability ................................................................................................................... 300.8(a)(1).
- Consent ............................................................................................................................................ 300.9.
- Controlled substance ..................................................................................................................... 300.530(i)(1).
- Core academic subjects ................................................................................................................. 300.10.
- Counseling services ........................................................................................................................ 300.34(c)(2).
- Day; business day; school day ...................................................................................................... 300.11.
- Deaf-blindness ................................................................................................................................ 300.8(c)(2).
- Deafness ........................................................................................................................................... 300.8(c)(3).
- Destruction (Of information) ........................................................................................................ 300.611(a).
- Developmental delays(s) ............................................................................................................... 300.8(b).

DEFINITIONS (E–H)
- Early identification and assessment ............................................................................................ 300.34(c)(3).
- Education records ........................................................................................................................... 300.611(b).
- Educational service agency ........................................................................................................... 300.12.
- Elementary school .......................................................................................................................... 300.13.
- Emotional disturbance ................................................................................................................... 300.8(c)(4).
- Equipment ....................................................................................................................................... 300.14.
- Evaluation ....................................................................................................................................... 300.15.
- Excess costs ..................................................................................................................................... 300.16.
- Extended school year services ....................................................................................................... 300.106(b).
- Free appropriate public education ............................................................................................... 300.17.
- Freely associated States ................................................................................................................ 300.717(a).
- Hearing impairment ....................................................................................................................... 300.8(c)(5).
- Highly qualified special education teacher ................................................................................. 300.18(b).
- Homeless children .......................................................................................................................... 300.19.

DEFINITIONS (I)
- IEP Team ......................................................................................................................................... 300.23.
- Illegal drug ..................................................................................................................................... 300.530(i)(2).
- Include ............................................................................................................................................. 300.20.
- Independent educational evaluation ........................................................................................... 300.502(a)(3)(i).
- Indian .............................................................................................................................................. 300.21(a).
- Indian tribe ..................................................................................................................................... 300.21(b).
- Individualized education program (IEP) ..................................................................................... 300.22.
- Individualized family service plan ............................................................................................... 300.24.
- Infant or toddler with a disability ............................................................................................... 300.25.
- Institution of higher education ..................................................................................................... 300.26.
- Interpreting services ...................................................................................................................... 300.34(c)(4).

DEFINITIONS (J–O)
- Limited English proficient (LEP) ................................................................................................. 300.27.
- Local educational agency (LEA) .................................................................................................. 300.28.

ED-000285

- Medical services ............................................................................................................ 300.34(c)(5).
- Mental retardation ......................................................................................................... 300.8(c)(6).
- Multiple disabilities ...................................................................................................... 300.8(c)(7).
- Native language ............................................................................................................. 300.29(a).
- Occupational therapy .................................................................................................... 300.34(c)(6).
- Orientation and mobility services .............................................................................. 300.34(c)(7).
- Orthopedic impairment ................................................................................................ 300.8(c)(8).
- Other health impairment .............................................................................................. 300.8(c)(9).
- Outlying areas ................................................................................................................ 300.717(b).

DEFINITIONS (P–R)
- Parent .............................................................................................................................. 300.30(a).
- Parent counseling and training ................................................................................... 300.34(c)(8).
- Parent training and information center ...................................................................... 300.31.
- Parentally-placed private school children with disabilities ..................................... 300.130.
- Participating agency (as used in "Confidentiality") ................................................ 300.611(c).
- Party or parties (Regarding procedures) ................................................................... 300.181(a).
- Personally identifiable ................................................................................................. 300.32.
- Physical education ........................................................................................................ 300.39(b)(2).
- Physical therapy ........................................................................................................... 300.34(c)(9).
- Psychological services .................................................................................................. 300.34(c)(10).
- Public agency ................................................................................................................. 300.33.
- Public expense ............................................................................................................... 300.502(a)(3)(ii).
- Recreation ....................................................................................................................... 300.34(c)(11).
- Rehabilitation counseling services .............................................................................. 300.34(c)(12).
- Related services .............................................................................................................. 300.34(a).

DEFINITIONS (S)
- School day ...................................................................................................................... 300.11(c).
- School health services ................................................................................................... 300.34(c)(13).
- School nurse services .................................................................................................... 300.34(c)(13).
- Scientifically based research ........................................................................................ 300.35.
- Secondary school ........................................................................................................... 300.36.
- Secretary ......................................................................................................................... 300.38.
- Serious bodily injury .................................................................................................... 300.530(i)(3).
- Services plan ................................................................................................................... 300.37.
- Social work services in schools .................................................................................... 300.34(c)(14).
- Special education ........................................................................................................... 300.39(a).
- Specially designed instruction .................................................................................... 300.39(b)(3).
- Specific learning disability ........................................................................................... 300.8(c)(10).
- Speech-language pathology services ........................................................................... 300.34(c)(15).
- Speech or language impairment .................................................................................. 300.8(c)(11).
- State ................................................................................................................................. 300.40.
- State (Special definition) .............................................................................................. 300.717(c).
- State educational agency (SEA) ................................................................................... 300.41.
- Supplementary aids and services ............................................................................... 300.42.

DEFINITIONS (T–Z)
- Transition services ........................................................................................................ 300.43.
- Transportation ............................................................................................................... 300.34(c)(16).
- Traumatic brain injury ................................................................................................. 300.8(c)(12).
- Travel training ............................................................................................................... 300.38(b)(4).
- Universal design ............................................................................................................ 300.44.
- Visual impairment including blindness ...................................................................... 300.8(c)(13).
- Vocational education ..................................................................................................... 300.39(b)(5).
- Ward of the State ........................................................................................................... 300.45.
- Weapon ........................................................................................................................... 300.530(i)(4).

DEPARTMENT OF LABOR, Bureau of Labor Statistics (Regarding rate of inflation) (see §§ 300.702(b), 300.704(a)(2)(ii), (b)(2), 300.812(b)(2))
DEPARTMENT (U.S. Department of Education)
- Enforcement: hearing procedures (see §§ 300.178 through 300.184)
- Monitoring (Regarding Secretary of the Interior) ..................................................... 300.708(a).
- Personally identifiable information (Use of) .............................................................. 300.627.

DESTRUCTION OF INFORMATION
- Definition ....................................................................................................................... 300.624(b).

DETERMINANT FACTOR for eligibility determination
- Lack of instruction in reading or math (see § 300.306(b)(1)(i), (b)(1)(ii))
- Limited English proficiency ......................................................................................... 300.306(b)(1)(iii).

DEVELOPMENT, REVIEW, AND REVISION OF IEP .................................................. 300.324.

DEVELOPMENTAL DELAY(S)
- In definition of "Child with a disability" .................................................................. 300.8(b).
- Requirements for using "Developmental delay" ...................................................... 300.111(b).
- State definition .............................................................................................................. 300.111(b).
- Using specified disability categories .......................................................................... 300.111(d).

DIABETES ............................................................................................................................ 300.8(c)(9)(i).

DIRECT SERVICES
- For children in private schools (see §§ 300.132(a); 300.133(a); 300.134(d)(1))

ED-000286

- Nature and location of services .................................................................................................. 300.227(b).
- Payment by Secretary of the Interior ......................................................................................... 300.712(d).
- SEA (Additional information) ..................................................................................................... 300.175(a).
- State-level activities .................................................................................................................... 300.704(b)(4)(i).
- Use of LEA allocations for ......................................................................................................... 300.227(a).

DISABILITY: ADVERSELY AFFECTS EDUCATIONAL PERFORMANCE (See "Adversely affects educational performance")

DISAGGREGATED DATA
- Assessment results for subgroup of children with disabilities ................................................. 300.704(b)(4)(xi).
- For suspension and expulsion by race and ethnicity ................................................................. 300.170(a).

DISCIPLINE (A–B)
- Alternative educational setting (see §§ 300.530(d)(1), (d)(2), (d)(4), (g), 300.531, 300.533)
- Appeal ........................................................................................................................................... 300.532(a).
- Behavioral interventions—intervention plan ............................................................................ 300.530(f).

DISCIPLINE (C–H)
- Change of placements for disciplinary removals ....................................................................... 300.536.
- Child's status during due process hearings ............................................................................... 300.518.
- Determination of setting ............................................................................................................. 300.531.
- Expedited due process hearings ................................................................................................. 300.532(c).
- Functional behavioral assessment (see § 300.530(d)(1)(ii), (f)(1)(i)).
- Hearing officer (authority of) (see §§ 300.532(b), 300.533).

DISCIPLINE (I–Z)
- IEP Team (relevant members) (see §§ 300.530(e)(1), (f), 300.531).
- Interim alternative educational setting (see §§ 300.530(b), (d)(2), (g), 300.531, 300.532(b)(2)(ii), 300.533).
- Manifestation determination ...................................................................................................... 300.530(e).
- Placement during appeals ........................................................................................................... 300.533.
- Protections for children not determined eligible ....................................................................... 300.534.
- Referral to and action by law enforcement and judicial authorities ....................................... 300.535.
- School personnel (Authority of) ................................................................................................. 300.530(b).
- See "Timelines—Discipline".

DISCLOSURE
- Additional disclosure of information requirement ..................................................................... 300.512(b).
- Consent required before disclosing:
    ○ Education records to public benefits or insurance agencies ................................................ 300.154(d)(2)(iv).
    ○ Personal information to non-agency officials ....................................................................... 300.622(a).
- Notice on disclosure of evaluation results ................................................................................. 300.504(c)(10).
- Policies on disclosing information to 3rd parties ....................................................................... 300.612(a)(3).
- Prohibit evidence not disclosed .................................................................................................. 300.512(a)(3).

DISPROPORTIONALITY ....................................................................................................................... 300.646.

DISPUTES
- Interagency disputes (Methods of ensuring services):
    ○ Ensure services during pendency of dispute ....................................................................... 300.154(a).
    ○ Procedures for resolving ...................................................................................................... 300.154(a)(3).
- Mediation (see also § 300.532(c)(3)) .......................................................................................... 300.506.
    ○ Attorneys' fees for ................................................................................................................ 300.517(c)(2)(ii).
    ○ During discipline appeal process .......................................................................................... 300.532(c)(3).
    ○ During resolution process (see § 300.510(b)(3), (c)(3))
    ○ Enforcement of agreement (see §§ 300.506(b)(7), 300.510(d)(2), 300.537)

DIVIDED STATE AGENCY RESPONSIBILITY (Adult prisons) ....................................................... 300.607.

DIVORCE—SEPARATION (Authority to review records) ................................................................. 300.613(c).

DROPOUT RATES (Performance indicators) ..................................................................................... 300.157(a)(3).

DUE PROCESS HEARING(S) AND REVIEWS (A–E)
- Agency responsible for conducting hearing ............................................................................... 300.511(b).
- Appeal of decisions; impartial review ........................................................................................ 300.514(b).
- Attorneys' fees ............................................................................................................................. 300.517(c).
- Basic requirements (see §§ 300.507 through 300.514)
- Child's status during proceedings (Pendency) ........................................................................... 300.518.
    ○ Parent request for hearing (Discipline) ................................................................................ 300.532(a).
- Civil action .................................................................................................................................... 300.516(a).
- Evaluations disclosed at least 5 business days before hearing ................................................. 300.512(a)(3).
- Expedited due process hearings (Discipline) ............................................................................. 300.532(c).

DUE PROCESS HEARING(S) AND REVIEWS (F–I)
- Failure to implement a due process hearing decision ............................................................... 300.152(c)(3).
- Finality of decision; appeal; impartial review ........................................................................... 300.514.
- Findings of fact and decisions (see § 300.512(a)(5), (c)(3)):
    ○ To State advisory panel (see §§ 300.513(d), 300.514(c))
- Hearing rights .............................................................................................................................. 300.512(a).
- Impartial hearing officer ............................................................................................................. 300.511(c).
    ○ See "Hearing officer(s)"

DUE PROCESS HEARING(S) AND REVIEWS (J–Z)
- Parental rights at hearings .......................................................................................................... 300.512(c).
- Party notice to other party .......................................................................................................... 300.508(c).
    ○ Model form to assist parents ................................................................................................ 300.509.

- Party request for hearing (Discipline) .................................................................................................. 300.532(a).
- Pendency (Stay put) ............................................................................................................................... 300.518.
- Prohibit evidence not introduced 5 business days before hearing .......................................................... 300.512(a)(3).
- Record of hearing .................................................................................................................................. 300.512(c)(3).
- See "Civil action—proceedings," "Court(s)" "Procedural safeguards," "Timelines"
- Timelines and convenience of hearings—reviews (see §§ 300.506(b)(5), 300.511(e), 300.516(b))

EARLY IDENTIFICATION AND ASSESSMENT (Definition) ................................................................... 300.34(c)(3).

EARLY INTERVENING SERVICES ............................................................................................................ 300.226.
- Adjustment to local fiscal efforts ........................................................................................................... 300.205(d).
- Do not limit/create right to FAPE .......................................................................................................... 300.226(c).
- For children not currently identified as needing special education or related services ........................... 300.226(a).
- Permissive use of funds ......................................................................................................................... 300.208(a)(2).
- Scientifically based literacy instruction ................................................................................................. 300.226(b).
- Use of funds:
  ○ By LEA ............................................................................................................................................. 300.226(a).
  ○ By Secretary of the Interior ............................................................................................................... 300.711.

EDUCATION RECORDS (Definition) ........................................................................................................ 300.611(b).

EDUCATIONAL PLACEMENTS (LRE) ...................................................................................................... 300.114.

EDUCATIONAL SERVICE AGENCY (ESA)
- Definition ............................................................................................................................................... 300.12.
- In definition of "LEA" ........................................................................................................................... 300.28(b)(1).
- Joint establishment of eligibility (Regarding ESAs) ............................................................................... 300.224(b).
  ○ Additional requirements (Regarding LRE) ......................................................................................... 300.224(c).

ELEMENTARY AND SECONDARY EDUCATION ACT OF 1965 (ESEA)
- Coordination of early intervening services .............................................................................................. 300.226(e).
- Excess cost requirement ......................................................................................................................... 300.202(b).
- Schoolwide programs ............................................................................................................................. 300.206(a).

ELIGIBILITY (CHILD—STUDENT) (A–G)
- Additional eligibility requirements (see §§ 300.121 through 300.124, 300.307 through 300.311)
- Children with disabilities in adult prisons ............................................................................................... 300.324(d).
- Children with specific learning disabilities (Documentation of eligibility determination) .......................... 300.311(a).
- Determinant factor for ............................................................................................................................ 300.306(b)(1).
- Determination of eligibility ...................................................................................................................... 300.306.
- Developmental delay (Non-use of term by LEA if not adopted by State) .................................................. 300.111(b)(iv).
- Documentation of eligibility (To parent) ................................................................................................. 300.306(a)(2).
- Graduation with regular diploma: termination (see §§ 300.102(a)(3), 300.305(e)(2)).

ELIGIBILITY (CHILD—STUDENT) (H–Z)
- Lack of instruction in reading or math ................................................................................................... 300.306(b).
- Limited English proficiency .................................................................................................................... 300.306(b).
- Public benefits or insurance (Risk loss of eligibility) .............................................................................. § 300.154(d)(2) (iii).
- Termination of eligibility (see §§ 300.204(c), 300.305(e)(2)) ................................................................. 
- Transfer of rights (Special rule) ............................................................................................................. 300.520(b).

ELIGIBILITY (PUBLIC AGENCIES)
- Hearings related to (See "Hearings—Hearing procedures")
- Joint establishment of (see §§ 300.202(b)(3), 300.223(a), 300.224(a))
- LEA (See "LEA eligibility") Secretary of the Interior ............................................................................. 300.712(e).
- State (See "State eligibility")
- State agency eligibility ........................................................................................................................... 300.228.
  ○ See "State agencies"

EMOTIONAL DISTURBANCE (Definition) ................................................................................................ 300.8(c)(4).

ENFORCEMENT
- Department procedures (see §§ 300.600, 300.604, 300.605)
- Referral to law enforcement authorities ................................................................................................. 300.535.
- State policies and procedures:
  ○ Enforcement mechanisms ................................................................................................................. 300.537.
  ○ LEA not meeting requirements .......................................................................................................... 300.608.
  ○ Regarding confidentiality .................................................................................................................. 300.626.

EPILEPSY ................................................................................................................................................. 300.8(c)(9)(i).

EQUIPMENT
- Acquisition of ........................................................................................................................................ 300.718(a).
- Definition ............................................................................................................................................... 300.14.
- Exception to maintenance of effort ........................................................................................................ 300.204(d).
- Placement in private school .................................................................................................................... 300.144.

EVALUATION (A–G)
- Assessments in (see §§ 300.304(b), (c) 300.305(c)).
- Basic requirements (see §§ 300.301, 300.303, 00.324)
- Comprehensive (Identify all special education needs) ............................................................................ 300.304(c)(6).
- Definition of ........................................................................................................................................... 300.15.
- Evaluation procedures ............................................................................................................................ 300.304.
- Evaluation report to parents .................................................................................................................. 300.306(a)(2).
- Existing evaluation data (Review of) ...................................................................................................... 300.305(a)(1).
- Graduation (Evaluation not required for) ................................................................................................ 300.305(e)(2).

EVALUATION (H–Z)

- Independent educational evaluation (IEE) ................................................................................ 300.502.
- Initial evaluation (see §§ 300.301, 300.305)
- Observation in determining SLD .......................................................................................... 300.310.
- Parent consent ................................................................................................................ 300.300.
- Parent right to evaluation at public expense ......................................................................... 300.502(b).
- Reevaluation .................................................................................................................. 300.303.

EXCEPTION
- Charter schools exception (Joint eligibility) ......................................................................... 300.223(b).
- For prior local policies and procedures ............................................................................... 300.220.
- For prior State policies and procedures .............................................................................. 300.176(a).
- To FAPE:
  - For certain ages ......................................................................................................... 300.102.
  - For graduating with a regular diploma ............................................................................. 300.102(a)(3)(i).
  - For children in adult prisons (see §§ 300.102(a)(2), 300.324(d)).
- To maintenance of effort .................................................................................................. 300.204.
- To reimbursement for parental placement ............................................................................ 300.148(e).

EXCESS COSTS
- Calculation of (see Appendix A—Excess Costs Calculation)
- Definition ...................................................................................................................... 300.16.
- Excess cost requirement .................................................................................................. 300.202(b)
- Joint establishment of eligibility ....................................................................................... 300.202(b)(3)
- LEA requirement ............................................................................................................ 300.202(b)
- Limitation on use of Part B funds ....................................................................................... 300.202(b)
- Meeting the excess cost requirement .................................................................................. 300.202(b)(2)
- See also §§ 300.163(a), 300.175(b), 300.202(a), 300.227(a)(2)(ii)

EXISTING EVALUATION DATA (Review of) ................................................................................ 300.305(a)(1).

EXPEDITED DUE PROCESS HEARINGS
- Authority of hearing officer ............................................................................................. 300.532(c).
- Party appeal (Hearing requested by parents) ........................................................................ 300.532(a).

EXPULSION (See ''Suspension and expulsion'')

EXTENDED SCHOOL YEAR SERVICES ...................................................................................... 300.106.

EXTRACURRICULAR
- IEP content .................................................................................................................. 300.320(a)(4)(ii).
- In supplementary aids and services .................................................................................... 300.42.
- Nonacademic services ..................................................................................................... 300.107.
- Nonacademic settings ..................................................................................................... 300.117.

FACILITIES
- Alteration of ................................................................................................................. 300.718.
- Children in private schools or facilities (see §§ 300.130, 300.142(a), 300.144(b), (c), 300.147(c))
- Construction of .............................................................................................................. 300.718.
- Physical education (In separate facilities) ............................................................................ 300.108(d).
- Private schools and facilities ............................................................................................ 300.2(c).
- See also ''Correctional facilities''
- Termination of expenses for construction of ......................................................................... 300.204(d).

FAMILY EDUCATIONAL RIGHTS AND PRIVACY ACT (FERPA) (See ''Confidentiality'')

FAPE (A–G)
- Definition ..................................................................................................................... 300.17.
- Documentation of exceptions ............................................................................................ 300.102(b).
- Exception to FAPE:
  - For certain ages ......................................................................................................... 300.102(a).
  - For children receiving early intervention services .............................................................. 300.102(a)(4).
  - For children graduating with a regular diploma ................................................................. 300.102(a)(3).
  - For children in adult correctional facilities ....................................................................... 300.102(a)(2).
- For children:
  - Advancing from grade to grade ...................................................................................... 300.101(c).
  - Beginning at age 3 ..................................................................................................... 300.101(b).
  - On Indian reservations ................................................................................................ 300.707(c).
  - Suspended or expelled from school ................................................................................. 300.101(a).
- General requirement ....................................................................................................... 300.101(a).

FAPE (H–Z)
- Methods and payments .................................................................................................... 300.103.
- Private school children with disabilities:
  - Placed by parents when FAPE is at issue .......................................................................... 300.148.
  - Placed in or referred by public agencies (see §§ 300.145 through 300.147)
- Reallocation of LEA funds (FAPE adequately provided) ........................................................... 300.705(c).
- Services (and placement) for FAPE:
  - Based on child's needs (Not disability category) ................................................................ 300.304(c)(6).
- State eligibility condition ................................................................................................. 300.100.
- FAS (Freely associated States) ........................................................................................... 300.717(a).

FAX (FACSIMILE TRANSMISSION)
- Department procedures (see §§ 300.183, 300.196(a) through (e))

FERPA (Family Educational Rights and Privacy Act) (See ''Confidentiality'')

FILING A CLAIM (Private insurance) ..................................................................................... 300.154(e).

FILING A COMPLAINT (State complaint procedures) ............................................................ 300.153.
FILING REQUIREMENTS
• By-pass (Regarding private school children) .................................................................. 300.196.
• Department procedures ................................................................................................... 300.183.
• See §§ 300.178 through 300.186.
FINALITY OF DECISION ........................................................................................................ 300.514.
FORMULA
• Allocations to LEAs ......................................................................................................... 300.705(b).
• Allocations to States ........................................................................................................ 300.703.
• Allocation to States when by-pass is implemented ....................................................... 300.191.
• Allocation to States regarding section 619 (see §§ 300.807, 300.810).
• Parentally-placed private school children ..................................................................... 300.133.
• SEA set aside funds ......................................................................................................... 300.704(b).
• See also § 300.171(a).
FOSTER PARENT .................................................................................................................... 300.30(a)(2).
• See also § 300.45(b).
FREELY ASSOCIATED STATES AND OUTLYING AREAS
• Funding for ....................................................................................................................... 300.701(a).
• Purpose of grants .............................................................................................................. 300.700(a).
FULL EDUCATIONAL OPPORTUNITY GOAL ....................................................................... 300.109.
FUNCTIONAL BEHAVIORAL ASSESSMENT (see § 300.530(d)(1)(ii), (f)(1)(i))
FUNDING MECHANISM: LRE ................................................................................................ 300.114(b).
FUNDS (See "Use of funds")
GENERAL CURRICULUM
• Discipline (Continue participating in) ........................................................................... 300.530(d)(1)(i).
• Evaluation procedures:
  ○ Be involved and progress in ....................................................................................... 300.304(b)(1)(ii).
  ○ Review of existing evaluation data ............................................................................ 300.305(a)(1).
• IEPs:
  ○ Measurable annual goals ............................................................................................ 300.320(a)(2)(i).
  ○ Present levels of educational performance ................................................................ 300.320(a)(1).
  ○ Review and revision of IEPs ...................................................................................... 300.324(b)(1)(ii).
  ○ Special education and related services ....................................................................... 300.320(a)(4)(ii).
• IEP Team ........................................................................................................................... 300.321(a)(4)(ii).
• Specially designed instruction (Definition) ................................................................... 300.39(b)(3).
GOALS
Annual goals (See "IEP" and "Annual goals").
• Performance goals and indicators ................................................................................... 300.157.
  ○ State and local activities to meet ................................................................................ 300.814(c).
  ○ Use of State-level funds to meet ................................................................................. 300.704(b)(4)(x).
GOVERNOR (Adult prisons) .................................................................................................. 300.149(d).
• See also "Chief executive officer".
GRADUATION
• Evaluation not required for ............................................................................................. 300.305(e)(2).
• Exception to FAPE ............................................................................................................ 300.102(a)(3)(i).
• Graduation rates as performance indicators .................................................................. 300.157(a)(3).
• Written prior notice required .......................................................................................... 300.102(a)(3)(iii).
GRANDPARENT OR STEPPARENT (In definition of "Parent") ........................................... 300.30(a)(4).
GRANTS
• Grants to States: ............................................................................................................... 300.700.
  ○ Maximum amount ........................................................................................................ 300.700(b).
  ○ Purpose of ................................................................................................................... 300.700(a).
• See "Subgrants".
GUARDIAN (In definition of "Parent") .................................................................................. 300.30(a)(3).
GUARDIANSHIP, SEPARATION, AND DIVORCE (Regarding parent's authority to review records) ..... 300.613(c).
HEALTH AND HUMAN SERVICES (Secretary of) ................................................................. 300.708(i)(1).
HEARING AIDS: Proper functioning of .................................................................................. 300.113(a).
HEARING IMPAIRMENT
• Definition .......................................................................................................................... 300.8(c)(5).
• Related services, audiology .............................................................................................. 300.34(c)(1).
HEARING OFFICER(S) (A–B)
• Additional disclosure of information requirement .......................................................... 300.512(b).
• Attorneys' fees .................................................................................................................. 300.517(c)(2)(i).
• Authority of (Discipline) ................................................................................................. 300.532(b).
  ○ Basis of decisions ........................................................................................................ 300.513(a).
HEARING OFFICER(S) (C–Z)
• Change of placement:
  ○ Hearing officer decision agrees with parents ............................................................ 300.518(d).
  ○ Hearing officer may order ........................................................................................... 300.532(b)(2)(ii).
• Expedited due process hearing (Discipline) ................................................................... 300.532(c).
• Impartial hearing officer .................................................................................................. 300.511(c).
• Parent appeal (Discipline) ............................................................................................... 300.532(a).

ED-000290

- Placement during appeals ............................................................................................ 300.533.
- Private school placement when FAPE is at issue ...................................................... 300.148(b).
- Reimbursement for private school placement by parents .......................................... 300.148(c).
- Requests for evaluations by ......................................................................................... 300.502(d).
HEARING RIGHTS ............................................................................................................ 300.512.
HEARINGS—HEARING PROCEDURES
- Due process (See ''Due process hearings'').
- Public hearings on policies and procedures ............................................................... 300.165(a).
- State and local eligibility:
  ○ LEA eligibility ....................................................................................................... 300.155.
  ○ Notification in case of LEA or State ineligibility .............................................. 300.221.
  ○ State eligibility (Notice and hearing) (see §§ 300.178, 300.179, 300.181).
HEART CONDITION .......................................................................................................... 300.8(c)(9)(i).
HEIGHTENED ALERTNESS TO ENVIRONMENTAL STIMULI (In ''Other health impairment'') .... 300.8(c)(9).
HIGH COST FUND (LEA) ................................................................................................. 300.704(c).
HIGHLY MOBILE CHILDREN (e.g., homeless and migrant children) .......................... 300.111(c)(2).
HIGHLY QUALIFIED TEACHER (A–Q)
- Alternative route to certification ................................................................................. 300.18(b)(2).
- Definition of ................................................................................................................... 300.18.
- Private school teachers ................................................................................................. 300.18(h).
HIGHLY QUALIFIED TEACHER (R–Z)
- Requirements for in general .......................................................................................... 300.18(b).
- Requirements for teaching to alternate achievement standards ............................... 300.18(c).
- Requirements for teaching multiple subjects .............................................................. 300.18(d).
- Personnel qualifications ................................................................................................ 300.156(c).
HIGH NEED CHILD .......................................................................................................... 300.704(c)(3)(i).
HOMELESS CHILDREN
- Child find ....................................................................................................................... 300.111(a)(1)(i).
- Definition of ................................................................................................................... 300.19.
- McKinney-Vento Homeless Assistance Act (see §§ 300.19, 300.149(a)(3), 300.153(b)(4)(iii), 300.168(a)(5), 300.508(b)(4)).
- Surrogate parents for ................................................................................................... 300.519(a)(4).
HYPERACTIVITY (Attention deficit hyperactivity disorder) .......................................... 300.8(c)(9)(i).
INAPPLICABILITY (Of requirements that prohibit commingling and supplanting of funds) .............. 300.704(d).
IEE (See ''Independent educational evaluation'')
IEP (A–I)
- Agency responsibilities for transition services .......................................................... 300.324(c)(1).
- Basic requirements (see §§ 300.320 through 300.324).
- Child participation when considering transition ........................................................ 300.321(b)(1).
- Consideration of special factors .................................................................................. 300.324(a)(2).
- Consolidation of IEP Team meetings ........................................................................... 300.324(a)(5).
- Content of IEPs .............................................................................................................. 300.320(a).
- Definition (see §§ 300.22, 300.320).
- Development, review, and revision of ........................................................................... 300.324.
- IEP or IFSP for children aged 3 through 5 ................................................................ 300.323(b).
- IEP Team ....................................................................................................................... 300.321.
IEP (J–Z)
- Modifications of IEP or placement (FAPE for children in adult prisons) .................. 300.324(d)(2)(i).
- Modify/Amend without convening meeting (see § 300.324(a)(4), (a)(6)).
- Parent participation ...................................................................................................... 300.322.
- Alternative means .......................................................................................................... 300.328.
- Part C coordinator involvement .................................................................................... 300.321(f).
- Private school placements by public agencies ............................................................. 300.325(a)(1).
- Regular education teacher (See ''IEP Team'').
- Review and revision of IEPs .......................................................................................... 300.324(b).
- SEA responsibility regarding private school ............................................................... 300.325(c).
- State eligibility requirement ........................................................................................ 300.112.
- Transition services ........................................................................................................ 300.320(b).
- When IEPs must be in effect ......................................................................................... 300.323.
IEP TEAM ......................................................................................................................... 300.321.
- Alternative educational setting (Determined by) ....................................................... 300.531.
- Consideration of special factors .................................................................................. 300.324(a)(2).
  ○ Assistive technology ............................................................................................... 300.324(a)(2)(v).
  ○ Behavioral interventions ....................................................................................... 300.324(a)(2)(i).
  ○ Braille needs ........................................................................................................... 300.324(a)(2)(iii).
  ○ Communication needs (Deafness and other needs) ............................................. 300.324(a)(2)(iv).
  ○ Limited English proficiency ................................................................................... 300.324(a)(2)(ii).
- Determination of knowledge or special expertise ....................................................... 300.321(c).
- Discipline procedures (see §§ 300.530(e), 300.531).
- Manifestation determination ......................................................................................... 300.530(e).
- Other individuals who have knowledge or special expertise (At parent or agency discretion) .......... 300.321(a)(6).
- Participation by private school (public agency placement) ......................................... 300.325(a).
- Regular education teacher (see §§ 300.321(a)(2), 300.324(a)(3)).

IFSP (INDIVIDUALIZED FAMILY SERVICE PLAN)
- Definition ............................................................................. 300.24.
- Transition from Part C ........................................................ 300.124.
- IFSP vs. IEP ......................................................................... 300.323(b).
ILLEGAL DRUG (Definition—discipline) ................................ 300.530(i)(2).
IMPARTIAL DUE PROCESS HEARING ...................................... 300.511.
- See "Due process hearings and reviews".
IMPARTIAL HEARING OFFICER ................................................ 300.511(c).
IMPARTIALITY OF MEDIATOR .................................................. 300.506(b)(1).
INCIDENTAL BENEFITS (Permissive use of funds) .................. 300.208.
INCIDENTAL FEES (In definition of "at no cost" under "Special education") ... 300.39(b)(1).
INCLUDE (Definition) ............................................................... 300.20.
INDEPENDENT EDUCATIONAL EVALUATION (IEE) ................ 300.502.
- Agency criteria (see § 300.502(a)(2), (b)(2)(ii), (c)(1), (e)).
- Definition ............................................................................. 300.502(a)(3)(i).
- Parent-initiated evaluations ................................................ 300.502(c).
- Parent right to ..................................................................... 300.502(a)(1).
- Procedural safeguards notice .............................................. 300.504(c)(1).
- Public expense (Definition under IEE) ................................ 300.502(a)(3)(ii).
- Request by hearing officers ................................................ 300.502(d).
- Use as evidence at hearing ................................................. 300.502(c)(2).
INDIAN; INDIAN CHILDREN
- Child find for Indian children aged 3 through 5 ............... 300.712(d).
- Definition of "Indian" .......................................................... 300.21(a).
- Definition of "Indian tribe" ................................................. 300.21(b).
- Early intervening services .................................................... 300.711.
- Payments and use of amounts for:
  - Education and services for children aged 3 through 5 ...... 300.712(a).
  - Education of Indian children ............................................ 300.707.
- Plan for coordination of services ....................................... 300.713.
- Submission of information by Secretary of Interior .......... 300.708.
INDICATORS ............................................................................. 300.157(b).
- See "Performance goals and indicators".
INDIVIDUALIZED EDUCATION PROGRAM (See "IEP")
INDIVIDUALIZED FAMILY SERVICE PLAN (See "IFSP")
INFORMED CONSENT (See "Consent")
INITIAL EVALUATION ............................................................... 300.301.
- Consent before conducting ................................................. 300.300(a)(1)(i).
  - For ward of State ............................................................. 300.300(a)(2).
  - Not construed as consent for initial placement ............. 300.300(a)(1)(ii).
  - When not required ........................................................... 300.300(a)(2).
- Review of existing evaluation data .................................... 300.305(a).
INSTITUTION OF HIGHER EDUCATION
- Definition ............................................................................. 300.26.
INSTRUCTIONAL MATERIALS
- Access to .............................................................................. 300.172.
- Audio-visual materials .......................................................... 300.14(b).
- LEA purchase of .................................................................. 300.210.
- NIMAC:
  - SEA coordination with ..................................................... 300.172(c).
  - SEA rights and responsibilities if not coordinating ........ 300.172(b).
INSURANCE
- Community-based waivers (see § 300.154(d)(2)(iii)(D)).
- Financial costs ...................................................................... 300.154(f)(2).
- Financial responsibility of LEA/SEA ................................... 300.154(a)(1).
- Out-of-pocket expense .......................................................... 300.154(d)(2)(ii).
- Private insurance .................................................................. 300.154(e).
- Public benefits or insurance ................................................ 300.154(d).
- Risk of loss of eligibility (see § 300.154(d)(2)(iii)(D)).
INTERAGENCY AGREEMENTS
- FAPE methods and payments (Joint agreements) .............. 300.103(a).
- LRE (Children in public/private institutions) .................... 300.114(a)(2)(i).
- Methods of ensuring services ............................................. 300.154(a).
- SEA responsibility for general supervision ........................ 300.149.
- Secretary of Interior—with Health and Human Services Secretary ... 300.708(i)(1).
  - Cooperative agreements (BIA and other agencies) .......... 300.712(d).
INTERAGENCY COORDINATION (See "Coordination of services," "Interagency agreements")
INTERAGENCY DISPUTES ......................................................... 300.154(a)(3).
INTERAGENCY RESPONSIBILITIES (Transition services) ........ 300.320(b).
INTERIM ALTERNATIVE EDUCATIONAL SETTING (See §§ 300.530(b), 300.531, 300.532(b)(2)(ii), 300.533)
INTERPRETING SERVICES

ED-000292

- As a related service ................................................................................................ 300.34(a).
- Definition .............................................................................................................. 300.34(c)(4).
JOINT ESTABLISHMENT OF ELIGIBILITY (LEAs) ................................................ 300.223.
- See also §§ 300.202(b)(3), 300.224.
JUDICIAL
- Authorities (Referral to) ......................................................................................... 300.535.
- Finding of unreasonableness ................................................................................... 300.148(d)(3).
- Proceeding (During pendency) ................................................................................ 300.518(a).
- Review .................................................................................................................. 300.197.
- See also:
  ○ Civil action (see §§ 300.504(c)(12), 300.514(d), 300.516).
  ○ Court(s) (see §§ 300.102(a)(1), 300.184, 300.148(c), (d)(3), 300.197, 300.516(a), (c), (d), 300.517(a), (c)).
JUVENILE-ADULT CORRECTIONS FACILITIES (See ''Correctional facilities'')
LAW ENFORCEMENT AND JUDICIAL AUTHORITIES
- Referral to ............................................................................................................ 300.535.
LEA (LOCAL EDUCATIONAL AGENCY) (A–C)
- Allocations to LEAs ............................................................................................... 300.705(b).
  ○ Reallocation of funds (If LEA is adequately providing FAPE) .............................. 300.705(c).
- Charter schools and LEAs (See ''Charter schools'').
- Child count—LEAs:
  ○ Parentally-placed private school children with disabilities ................................... 300.133(c).
  ○ Procedures for counting all children served (Annual report) ............................... 300.645.
  ○ See also ''Child count''.
- Child find—LEAs:
  ○ Parentally-placed private school children with disabilities ................................... 300.131.
  ○ See also ''Child find''.
- Compliance (LEA and State agency) ........................................................................ 300.222.
- Consistency of LEA policies with State policies ....................................................... 300.201.
LEA (D–G)
- Definition of LEA .................................................................................................. 300.28.
- Developmental delay: Use of term by LEAs (see § 300.111(b)(2) through (b)(4)).
- Direct services by SEA (If LEA is unable or unwilling to serve CWDs, etc.) ............... 300.227.
- Discipline and LEAs (See ''Discipline'').
- Eligibility of LEA:
  ○ Condition of assistance (see §§ 300.200 through 300.213).
  ○ Exception for prior local plans. ........................................................................... 300.220.
  ○ Ineligibility of LEA (Notice by SEA) .................................................................. 300.221.
  ○ SEA hearings on LEA eligibility ......................................................................... 300.155.
- Excess cost requirement—LEA: .............................................................................. 300.202(b).
  ○ Use of amounts for excess costs ......................................................................... 300.202(a)(2).
  ○ See also ''Excess costs''.
LEA (H–L)
- Hearings relating to LEA eligibility ........................................................................ 300.155.
- Information for SEA ............................................................................................... 300.211.
- Instructional materials (Purchase of) ....................................................................... 300.210.
- Joint establishment of eligibility (By two or more LEAs) ......................................... 300.202(b)(3).
  ○ See also §§ 300.223, 300.224.
- LEA and State agency compliance ........................................................................... 300.222.
- LEA policies (Modification of) ................................................................................ 300.220(b).
  ○ See ''LEA eligibility,'' ''Eligibility of LEA''.
LEA (M–P)
- Maintenance of effort regarding LEAs (See ''Maintenance of effort'').
- Methods of ensuring services—LEAs (see § 300.154(a)(1) through (a)(4), (b)).
- Migratory children with disabilities (Linkage with records under ESEA) ................... 300.213.
- Modification of policies by LEA .............................................................................. 300.220(b).
- Noncompliance of LEA (SEA determination) ........................................................... 300.222(a).
- Notice requirement (On LEA) ................................................................................. 300.222(b).
- Purchase of instructional materials .......................................................................... 300.210.
- Personnel shortages (Use of funds to assist LEAs in meeting) ................................... 300.704(b)(4)(vii).
- Public information (By LEA) ................................................................................... 300.212.
LEA (R–T)
- Reallocation of LEA funds (If LEA is adequately providing FAPE) ........................... 300.705(c).
- Reimbursement of LEAs by other agencies (See ''Methods of ensuring services,'' § 300.154(a)(2) through (a)(3), (b)(2)).
- Review and revision of policies ............................................................................... 300.170(b).
- SEA reduction in payments to LEA ......................................................................... 300.222(a).
- SEA use of LEA allocations for direct services ........................................................ 300.227.
- Show cause hearing (By-pass requirement) .............................................................. 300.194.
- State-level nonsupplanting ...................................................................................... 300.162(a).
- Subgrants to LEAs .................................................................................................. 300.705(a).
- Suspension and expulsion rates—LEAs ................................................................... 300.170(a)(1).
- Transition planning conferences (Part C to B) .......................................................... 300.124(c).
LEA (U–Z)
- Use of amounts (by LEA) ....................................................................................... 300.202.

ED-000293

○ (See ''Permissive use of funds'').
- Use of SEA allocations (Regarding LEAs) ........................................................................ 300.704.
  ○ For capacity-building, etc. (see § 300.704(b)(4)(viii)).
  ○ To assist in meeting personnel shortages (see § 300.704(b)(4)(vii)).

LEA ELIGIBILITY (A–I)
- Adjustment to local fiscal efforts in certain fiscal years ................................................ 300.205.
- Charter schools—public:
  ○ Rights of children with disabilities who attend public charter schools ...................... 300.209(a).
  ○ That are public schools of the LEA ............................................................................ 300.209(b).
  ○ That are LEAs .............................................................................................................. 300.209(c).
  ○ That are not an LEA or a school that is part of an LEA ............................................. 300.209(d).
  ○ Treatment of charter schools and their students ..................................................... 300.209.
  ○ See also ''Charter schools''.
- Condition of assistance ................................................................................................... 300.200.
  ○ See §§ 300.201 through 300.213.
- Consistency with State policies ...................................................................................... 300.201.
- Information for SEA ........................................................................................................ 300.211.

LEA ELIGIBILITY (M–Z)
- Maintenance of effort ...................................................................................................... 300.203.
  ○ Exception to .............................................................................................................. 300.204.
- Migratory children with disabilities—records regarding .............................................. 300.213.
- Permissive use of funds .................................................................................................. 300.208.
  ○ Administrative case management .............................................................................. 300.208(b).
  ○ Early intervening services ......................................................................................... 300.208(a)(2).
  ○ High cost special education and related services ...................................................... 300.208(a)(3).
  ○ Services and aids that also benefit nondisabled children ......................................... 300.208(a)(1).
- Personnel development .................................................................................................... 300.207.
- Records regarding migratory children with disabilities ................................................. 300.213.
- State prohibition (If LEA is unable to establish/maintain programs of FAPE) ........... 300.205(c).
- Treatment of charter schools and their students ........................................................... 300.209.

LEAD POISONING (Other health impairment) ................................................................... 300.8(c)(9)(i).

LEAST RESTRICTIVE ENVIRONMENT (LRE)
- Children in public or private institutions ...................................................................... 300.118.
- Continuum of alternative placements ............................................................................ 300.115.
- Educational service agency (Additional requirement regarding LRE) ......................... 300.224(c).
- Monitoring activities ....................................................................................................... 300.120.
- Nonacademic settings ..................................................................................................... 300.117.
- Placements ...................................................................................................................... 300.116.
- State eligibility requirements ......................................................................................... 300.114.
- Additional requirement: State funding mechanism ....................................................... 300.114(b).
- Technical assistance and training ................................................................................... 300.119.

LEISURE EDUCATION (Recreation) .................................................................................... 300.34(c)(11)(iv).

LEP (See ''Limited English proficient'')

LEUKEMIA (Other health impairment) ............................................................................... 300.8(c)(9)(i).

LIMITED ENGLISH PROFICIENT (LEP)
- Definition of ................................................................................................................... 300.27.
- Determinant factor in eligibility determination ............................................................. 300.306(b)(1)(iii).
- In development, review, and revision of IEP ................................................................. 300.324(a)(2)(ii).
- In ''native language'' (Definition) .................................................................................. 300.29(a).
- Special rule—LEP not determinant factor ..................................................................... 300.306(b)(1)(iii).

LOCAL EDUCATIONAL AGENCY (See ''LEA'')

LRE (See ''Least restrictive environment'')

MAINTENANCE OF EFFORT (MOE–LEA) (A–R)
- Amounts in excess (Reduce level) .................................................................................. 300.205(a).
- Exception to .................................................................................................................... 300.204.
- Maintenance of effort and early intervening services (see Appendix D).
- Maintenance of effort—LEA .......................................................................................... 300.203.
- Non-reduction of (State enforcement) ........................................................................... 300.608.
- Public benefits or insurance proceeds are not MOE ..................................................... 300.154(g)(2).
  ○ See ''Methods of ensuring services''.

MAINTENANCE OF EFFORT (MOE–LEA) (S–Z)
- SEA flexibility ................................................................................................................ 300.230(a).
- State enforcement (SEA must prohibit LEA from reducing MOE) ............................... 300.608.

MAINTENANCE OF STATE FINANCIAL SUPPORT ............................................................. 300.163.
- Reduction of funds for failure to maintain support ....................................................... 300.163(b).
- Subsequent years (Regarding a waiver) ......................................................................... 300.163(d).
- Waivers: Exceptional or uncontrollable circumstances ................................................. 300.163(c).

MANIFESTATION DETERMINATION (See ''Discipline'') ..................................................... 300.530(e).

McKINNEY-VENTO HOMELESS ASSISTANCE ACT
- In definition of ''Homeless children'' ............................................................................ 300.19.
- In filing a State complaint ............................................................................................. 300.153(b)(4)(iii).
- SEA responsibility for general supervision (Regarding homeless children) ................. 300.149(a)(3).
- State advisory panel (Membership) ................................................................................ 300.168(a)(5).

- Surrogate parents (Homeless child's rights protected ............................................................................ 300.519(a)(4).

MEDIATION (A–O)
- Benefits of (Meeting to explain) ............................................................................................................ 300.506(b)(2)(ii).
- Confidential discussions ......................................................................................................................... 300.506(b)(6)(i).
- Cost of (Borne by State) ......................................................................................................................... 300.506(b)(4).
- Disinterested party (To meet with parents and schools ....................................................................... 300.506(b)(2).
- Disputes (Resolve through mediation) ................................................................................................... 300.506(a).
- Legally binding agreement ..................................................................................................................... 300.506(b)(6).
- Mediation procedures (By public agency to allow parties to resolve disputes) .................................. 300.506(a).
- Mediators:.
  - Impartiality of .............................................................................................................................. 300.506(c).
  - List of ........................................................................................................................................... 300.506(b)(3)(i).
  - Qualified and impartial (see § 300.506(b)(1)(iii)).
- Meeting to explain benefits of ............................................................................................................... 300.506(b)(2)(ii).
- Not used as evidence in hearing ............................................................................................................ 300.506(b)(8).
- Not used to deny/delay right to hearing ................................................................................................ 300.506(b)(1)(ii),
- Opportunity to meet ................................................................................................................................ 30.506(b)(2).

MEDIATION (P–Z)
- Parent training and information center .................................................................................................. 300.506(b)(2)(i).
- Procedural safeguards notice .................................................................................................................. 300.504(c)(6).
- Random selection of mediators ............................................................................................................. 300.506(b)(3)(ii).
- Use of SEA allocations to establish ....................................................................................................... 300.704(b)(3)(ii).
- Voluntary ................................................................................................................................................ 300.506(b)(1)(i).
- Written mediation agreement ................................................................................................................. 300.506(b)(7).

MEDICAID
- Children covered by public benefits or insurance ................................................................................. 300.154(d)(1).
- Construction (Nothing alters requirements imposed under Titles XIX or XXI ..................................... 300.154(h).
- Financial responsibility of each non-educational public agency (e.g., State Medicaid) ....................... 300.154(a)(1).
- LEA high cost fund (Disbursements not medical assistance under State Medicaid) ............................ 300.704(c)(8).
- Medicaid reimbursement not disqualified because service in school context ....................................... 300.154(b)(1)(ii).
- Methods of ensuring services (see § 300.154(a)(1), (b)(1)(ii), (d), (g)(2), (h)).
- Proceeds from public or private insurance ............................................................................................ 300.154(g)(1).
- Public agency may use Medicaid ............................................................................................................ 300.154(a)(1).
- State Medicaid, etc., must precede financial responsibility of LEA ..................................................... 300.154(a)(1).

MEDICAL (A–L)
- Assistance under other Federal programs .............................................................................................. 300.186.
- Assistive technology device (Does not include a surgically implanted medical device) ...................... 300.5.
- LEA high cost fund (Disbursements not medical assistance under State Medicaid) ............................ 300.704(c)(8).

MEDICAL (M–Q)
- Medical services in ("Related services"):
  - Audiology (Referral for) ............................................................................................................. 300.34(c)(1)(ii).
  - Definition of ................................................................................................................................. 300.34(c)(5).
  - For diagnostic purposes ............................................................................................................... 300.34(a).
  - Speech-language pathology (Referral for) ................................................................................... 300.34(c)(15)(iii).
- Medical supplies, etc. (Memo of agreement between HHS and Interior) .............................................. 300.708(i)(2).
- Non-medical (Residential placement) ..................................................................................................... 300.104.

MEDICAL (R–Z)
- Referral for medical services:
  - Audiology ..................................................................................................................................... 300.34(c)(1)(ii).
  - Speech-language pathology services ............................................................................................ 300.34(c)(15)(iii).
- Related services: Exception; surgically implanted devices ("Cochlear implants") ............................... 300.34(b).
- Routine checking of hearing aids and other devices ............................................................................. 300.113.
- SLD: Educationally relevant medical findings, if any ............................................................................ 300.311(a)(4).

MEDICATION
- Prohibition on mandatory medication ................................................................................................... 300.174.

MEETING(S)
- Alternative means of meeting participation ........................................................................................... 300.328.
- Consolidation of IEP Team meetings ..................................................................................................... 300.324(a)(5).
- Equitable services determined (Parentally-placed private school CWDs) ............................................. 300.137.
- IEP Team meetings (See "IEP").
- Mediation (Opportunity to meet) ........................................................................................................... 300.506(b)(2).
- Opportunity to examine records; participation in IEP Team meetings ................................................. 300.501.
- Parent participation in meetings (see § 300.506(b)(2), (b)(4)).
- Private school placements by public agencies ....................................................................................... 300.325.
- Reviewing and revising IEPs (Private school placements) ................................................................... 300.325(b).
- Services plan for private school children (Meetings) ............................................................................ 300.137(c)(1).

MENTAL RETARDATION (Definition) ...................................................................................................... 300.8(c)(6).

METHODS OF ENSURING SERVICES ..................................................................................................... 300.154.

MIGRANT CHILDREN
- Child find ................................................................................................................................................ 300.111(c)(2).
- Records regarding migratory children (Linkage with ESEA) ............................................................... 300.213.

MINIMUM STATE COMPLAINT PROCEDURES .................................................................................... 300.152.
- See "Complaints," "State complaint procedures".

MONITOR; MONITORING ACTIVITIES (A–N)

ED-000295

- Allowable costs for monitoring .......... 300.704(b)(3)(i).
- Children placed in private schools by public agencies .......... 300.147(a).
- Implementation by SEA .......... 300.147(a).
- LRE (SEA monitoring activities) .......... 300.120.
- Monitoring activities (LRE) .......... 300.120.
- Monitoring—Enforcement (Subpart F) .......... 300.600.
  - Rule of construction (Use any authority under GEPA to monitor) .......... 300.609.
  - Secretary's review and determination regarding State performance .......... 300.603(b)(1).
  - State exercise of general supervision .......... 300.600(d)(2).
  - State use of targets and reporting .......... 300.602(a), (b)(1).

MONITOR; MONITORING ACTIVITIES (O–Z)
- Outlying areas, etc. (see § 300.701(a)(1)(ii)).
- Private school children: SEA monitoring
- SEA responsibility for general supervision .......... 300.149(b).
- Secretary of the Interior .......... 300.708.
- State advisory panel functions (Advise SEA on corrective action plans) .......... 300.169(d).
- Use of SEA allocations for monitoring .......... 300.704(b)(3)(i).
- Waiver (State's procedures for monitoring) .......... 300.164(c)(2)(ii)(B).
  - Summary of monitoring reports .......... 300.164(c)(3).

MULTIPLE DISABILITIES (Definition) .......... 300.8(c)(7).
NATIONAL INSTRUCTIONAL MATERIALS ACCESS CENTER (NIMAC) .......... 300.172(e)(1)(ii).
NATIONAL INSTRUCTIONAL MATERIALS ACCESSIBILITY STANDARDS (NIMAS) .......... 300.172(e)(1)(iii).
- See also Appendix C.

NATIVE LANGUAGE
- Confidentiality (Notice to parents) .......... 300.612(a)(1).
- Definition .......... 300.29.
- Definition of ''Consent'' .......... 300.9.
- Evaluation procedures (Tests in native language) .......... 300.304(c)(1)(ii).
- Notice to parents: Confidentiality (In native language) .......... 300.612(a)(1).
- Prior notice:
  - Notice in native language .......... 300.503(c)(1)(ii).
  - Notice translated orally .......... 300.503(c)(2)(i).
  - Steps if not a written language .......... 300.503(c)(2).

NATURE/LOCATION OF SERVICES (Direct services by SEA) .......... 300.227.
NEPHRITIS (In ''Other health impairment'') .......... 300.8(c)(9)(i).
NIMAC (See ''National Instructional Materials Access Center'')
NIMAS (See ''National Instructional Materials Accessibility Standard'')

NONACADEMIC
- Activities: Participate in (IEP content) .......... 300.320(a)(4)(ii).
- Services and extracurricular activities (Equal opportunity to participate in) .......... 300.107(a).
- Settings .......... 300.117.

NONCOMMINGLING .......... 300.162(b).

NONDISABLED (Children; students) (A–P)
- At no cost (In definition of ''special education'') .......... 300.39(b)(1).
- Disciplinary information .......... 300.229(a).
- Excess cost requirement .......... 300.202(b).
- IEP (definition) (see § 300.320(a)(1)(i), (a)(4)(iii), (a)(5)).
- LRE (General requirement) .......... 300.114.
- Nonacademic settings .......... 300.117.
- Placement .......... 300.116.
- Program options .......... 300.110.

NONDISABLED (Children; students) (R–Z)
- Regular physical education .......... 300.108(b).
- Services and aids that also benefit nondisabled children .......... 300.208(a)(1).
- Special education (Definition: In definition of ''at no cost'') .......... 300.39(b)(1).
- Supplementary aids and services .......... 300.42.
- Suspension and expulsion rates .......... 300.170(a)(2).

NONEDUCATIONAL (Public agency)
- Medicaid service (May not be disqualified because in school context) .......... 300.154(b)(1)(ii).
- Methods of ensuring services (see § 300.154(a), (b))
- Obligation of .......... 300.154(b).
- Reimbursement for services by .......... 300.154(b)(2).

NON-MEDICAL CARE (Residential placement) .......... 300.104.

NONSUPPLANTING
- Excess cost requirement (Regarding children aged 3 through 5 and 18 through 21) .......... 300.202(b)(1)(ii).
- LEA nonsupplanting .......... 300.202(b)(1)(ii).
- SEA flexibility .......... 300.230(a).
- State-level activities (Inapplicability of certain provisions) .......... 300.704(d).
- State-level nonsupplanting .......... 300.162(c).
- Waiver of requirement .......... 300.164.

NOTICES: By parents or parties
- Attorneys' fees: When court reduces fee award regarding due process request notice .......... 300.517(c)(4)(iv).

ED-000296

- Children enrolled by parents in private schools when FAPE is at issue ........................................ 300.148(d)(1)(i).
- Due process complaint (Notice before a hearing on a complaint) .................................................. 300.508(c).
- Private school placement by parents (When FAPE is at issue) ...................................................... 300.148(d)(1)(i).

NOTICES: Public agency (A–M)
- By-pass (Judicial review) ................................................................................................................ 300.197.
- Children's rights (Transfer of rights) ............................................................................................. 300.625(c).
- Confidentiality (Notice to parents) ................................................................................................ 300.612.
- Department procedures (Notice to States) ..................................................................................... 300.179.
  - See ''Judicial review'' .................................................................................................................. 300.184.
- Discipline (Notification) ................................................................................................................ 300.530(h).
- Exception to FAPE (Graduation) ................................................................................................... 300.102(a)(3).
- Hearings relating to LEA eligibility .............................................................................................. 300.155.
- IEP meetings (Parent participation) ............................................................................................... 300.322(b).
- Judicial review: If State dissatisfied with eligibility determination .............................................. 300.184.
- LEA and State agency compliance ................................................................................................. 300.222.
  - Notification in case of ineligibility ............................................................................................. 300.221(b).

NOTICES: Public agency (N–P)
- Notice before a hearing on a due process complaint ...................................................................... 300.508(c).
- Notice and hearing before State ineligible ..................................................................................... 300.179.
- Notice in understandable language ................................................................................................ 300.503(c).
- Notification of LEA in case of ineligibility ................................................................................... 300.221(b).
- Parent participation in meetings .................................................................................................... 300.501(b)(2).
- Prior notice by public agency ........................................................................................................ 300.503.
- Private school placement by parents when FAPE is at issue (Public agency notice) ...................... 300.148(d)(2).
- Procedural safeguards notice .......................................................................................................... 300.504.
- Public attention .............................................................................................................................. 300.606.
- Public participation (Notice of hearings) ....................................................................................... 300.165(a).

NOTICES: Public agency (Q–Z)
- Secretary of the Interior (Submission of information) ..................................................................... 300.708(g).
- Secretary's review and determination of State performance ........................................................... 300.603(b)(2).
- Transfer of parental rights ............................................................................................................. 300.520(a)(1)(i).
- Use of electronic mail ..................................................................................................................... 300.505.
- Withholding funds .......................................................................................................................... 300.605.

OCCUPATIONAL THERAPY .......................................................................................................... 300.34(c)(6).

OPPORTUNITY TO EXAMINE RECORDS .................................................................................... 300.501.

ORIENTATION AND MOBILITY SERVICES ................................................................................ 300.34(c)(7).

ORTHOPEDIC IMPAIRMENT ......................................................................................................... 300.8(c)(8).

OTHER HEALTH IMPAIRMENT ..................................................................................................... 300.8(c)(9).

OTHER INDIVIDUALS ON IEP TEAM .......................................................................................... 300.321(a)(6).

OUTLYING AREAS—FREELY ASSOCIATED STATES
- Allocations to States (General) ...................................................................................................... 300.703(a).
- Annual description of use of funds ................................................................................................ 300.171(c).
- Definitions applicable to allotments, grants and use of funds:
  - Freely associated States .............................................................................................................. 300.717(a).
  - Outlying areas ............................................................................................................................. 300.717(b).
- Definition of ''State'' (Includes ''Outlying areas'') ...................................................................... 300.40.
- Outlying areas and freely associated States ................................................................................... 300.701.
- Purpose of grants ........................................................................................................................... 300.700(a).

OUT-OF-POCKET EXPENSE (Public benefits or insurance) .......................................................... 300.154(d)(2)(ii).

PARAPROFESSIONALS
In ''Personnel qualifications'' .......................................................................................................... 300.156(b).

PARENT (Definition) ........................................................................................................................ 300.30.

PARENT: RIGHTS AND PROTECTIONS (A–G)
- Appeal (Manifestation determination) ........................................................................................... 300.532.
- Confidentiality (Authority to inspect and review records) ............................................................. 300.613(c).
- Consent (See ''Consent'')
- Counseling and training (Definition) ............................................................................................. 300.34(c)(8).
- Definition of ''Parent'' ................................................................................................................... 300.30.
  - Foster parent .............................................................................................................................. 300.30(a)(2).
  - Grandparent or stepparent .......................................................................................................... 300.30(a)(4).
  - Guardian .................................................................................................................................... 300.30(a)(3).

PARENT: RIGHTS AND PROTECTIONS (H–N)
- Independent educational evaluation ............................................................................................... 300.502.
  - Parent-initiated evaluations ....................................................................................................... 300.502(c).
  - Parent right to evaluation at public expense ............................................................................... 300.502(b).
- IEP and parent involvement:
  - Copy of child's IEP .................................................................................................................... 300.322(f).
  - Informed of child's progress ...................................................................................................... 300.320(a)(3)(ii).
  - Option to invite other individuals .............................................................................................. 300.321(a)(6).
  - Participation in meetings ............................................................................................................ 300.322.
  - Team member ............................................................................................................................. 300.321(a)(1).
- Informed consent (Accessing private insurance) ........................................................................... 300.154(e)(1).
- Involvement in placement decisions ............................................................................................... 300.501(c).

ED-000297

- Meetings (Participation in) ........................................................................................ 300.501(b).
- Notice to public agency:
  ○ Before a hearing on a due process complaint ........................................................ 300.508(c).
  ○ Before removing child from public school ............................................................ 300.148(d)(1)(ii).
  ○ Timeline for requesting a hearing ........................................................................ 300.511(e).
    ▪ Exceptions to timeline .................................................................................... 300.511(f).
  ○ Opportunity to examine records .......................................................................... 300.501(a).

PARENT: RIGHTS AND PROTECTIONS (O–Z)
- Parent counseling and training ................................................................................ 300.34(c)(8).
- Placement decisions (Involvement in) ...................................................................... 300.501(c).
- Request for hearing (Discipline) .............................................................................. 300.532(a).
- Right to an independent educational evaluation ........................................................ 300.502(b).

PARENTAL CONSENT (See "Consent")
PARENTALLY-PLACED PRIVATE SCHOOL CHILDREN WITH DISABILITIES (A–E)
- Annual count of the number of ................................................................................ 300.133(c).
- Bypass (see §§ 300.190 through 300.198)
- Child find for .......................................................................................................... 300.131.
- Calculating proportionate amount ............................................................................ 300.133(b).
- Compliance ............................................................................................................. 300.136.
- Consultation with private schools ............................................................................ 300.134.
- Written affirmation ................................................................................................. 300.135.
- Definition of ........................................................................................................... 300.130.
- Due process complaints and State complaints .......................................................... 300.140.
- Equitable services determined ................................................................................. 300.137.
  ○ Equitable services provided ................................................................................ 300.138.
- Expenditures ........................................................................................................... 300.133.
  ○ Formula .............................................................................................................. 300.133(a).

PARENTALLY-PLACED PRIVATE SCHOOL CHILDREN WITH DISABILITIES (F–R)
- No individual right to special education and related services ..................................... 300.137(a).
- Property, equipment, and supplies ........................................................................... 300.144.
- Proportionate share of funds ................................................................................... 300.134(b).
  ○ See "Appendix B—Proportionate Share Calculation"
- Provision of equitable services ................................................................................ 300.138(c).
- Religious schools (see §§ 300.131(a), 300.137(c), 300.139(a))
- Requirement that funds not benefit a private school ................................................. 300.141.

PARENTALLY-PLACED PRIVATE SCHOOL CHILDREN WITH DISABILITIES (S–T)
- Separate classes prohibited ...................................................................................... 300.143.
- Services on private school premises .......................................................................... 300.139(a).
- Services plan (Definition) ........................................................................................ 300.37.
  ○ For each child served under §§ 300.130 through 300.144 ...................................... 300.137(c).
  ○ See also §§ 300.132(b), 300.138(b), 300.140(a)
- State eligibility requirement .................................................................................... 300.129.
- Transportation (Cost of) .......................................................................................... 300.139(b)(2).

PARENTALLY-PLACED PRIVATE SCHOOL CHILDREN WITH DISABILITIES (U–Z)
- Use of personnel:
  ○ Private school personnel ...................................................................................... 300.142(b).
  ○ Public school personnel ........................................................................................ 300.142(a).
- Written affirmation ................................................................................................. 300.135.
- Written explanation by LEA regarding services ......................................................... 300.134(e).

PARTICIPATING AGENCY
- Confidentiality provisions:
  ○ Definition of participating agency ......................................................................... 300.611(c).
  ○ See also §§ 300.613(c), 300.614, 300.616, 300.618, 300.623
- IEP requirements (Transition services) ..................................................................... 300.324(c).

PENDENCY (Stay put)
- Child's status during due process proceedings .......................................................... 300.518.
- Placement during appeals (Discipline) ...................................................................... 300.533.
- Procedural safeguards notice .................................................................................... 300.504(c)(7).

PERFORMANCE GOALS AND INDICATORS
- Assess progress toward achieving goals .................................................................... 300.157(c).
- Establishment of goals ............................................................................................. 300.157.
- Other State level activities ....................................................................................... 300.814(c).
- Performance goals and indicators ............................................................................. 300.157.
- State monitoring and enforcement ........................................................................... 300.600(c).
- State performance plans and data collection ............................................................. 300.601.

PERFORMANCE; PERFORMANCE PLANS (STATE)
- Enforcement ............................................................................................................ 300.604.
- Public reporting and privacy .................................................................................... 300.602(b).
- Secretary's review and determination regarding State performance ........................... 300.603.
- State performance plans and data collection ............................................................. 300.601.
- State performance report .......................................................................................... 300.602(b)(2).
- State use of targets and reporting ............................................................................. 300.602.
  ○ Public reporting .................................................................................................. 300.602(b)(1).
  ○ State performance report ...................................................................................... 300.602(b)(2).

ED-000298

PERMISSIVE USE OF FUNDS (LEAs)
- Administrative case management ......................................................... 300.208(b).
- Early intervening services .................................................................. 300.208(a)(2).
- High cost education and related services .............................................. 300.208(a)(3).
- Permissive use of funds ..................................................................... 300.208.
- Services and aids that also benefit nondisabled children ........................ 300.208(a)(1).

PERSONALLY IDENTIFIABLE (PI) INFORMATION (A–H)
- Confidentiality of (State eligibility requirement) .................................. 300.123.
- Consent (confidentiality) .................................................................... 300.622(a).
- Data collection (State performance plans) ........................................... 300.601(b)(3).
- Definition of "personally identifiable" ................................................ 300.32.
- Department use of information ........................................................... 300.627.
- Destruction:
  ○ Definition of ................................................................................ 300.611(a).
  ○ Destruction of information ............................................................ 300.624.
- Hearing decisions to advisory panel and the public .............................. 300.513(d).

PERSONALLY IDENTIFIABLE (PI) INFORMATION (I–Z)
- Notice to parents (Confidentiality):
  ○ Children on whom PI information is maintained .............................. 300.612(a)(2).
  ○ Policies and procedures regarding disclosure to third parties, etc ....... 300.612(a)(3).
- Participating agency (Definition) ........................................................ 300.611(c).
- Protection of PI information ............................................................... 300.642(a).
- See also § 300.610.
- Safeguards (Protect PI information) .................................................... 300.623.

PERSONNEL QUALIFICATIONS ........................................................... 300.156.

PERSONNEL SHORTAGES
- Use of SEA allocations to meet .......................................................... 300.704(b)(4)(vii).

PHYSICAL EDUCATION.
- Definition ........................................................................................ 300.39(b)(2).
- State eligibility requirement .............................................................. 300.108.

PHYSICAL THERAPY (Definition) ........................................................ 300.34(c)(9).

PLACEMENT(S) (A–Co)
- Adult prisons (CWDs in):
  ○ Last educational placement before incarceration .............................. 300.102(a)(2)(i).
  ○ Modifications to IEPs and placements ............................................ 300.324(d)(2).
- Alternative means of meeting participation (Regarding "Placement meetings") ... 300.328.
- Change in placement: Graduation ....................................................... 300.102(a)(3)(iii).
- Child's placement during pendency of any complaint ............................ 300.504(c)(7).
  ○ See also "Pendency" (Child's status during proceedings) .................. 300.518.
- Children with disabilities in adult prisons: Placements regarding (see §§ 300.102(a)(2)(i), 300.324(d)(2)).
- Continuum of alternative placements (Continuum—LRE) ...................... 300.115.

PLACEMENT(S) (Cu–L)
- Current placement (see § 300.530(b)((2), (d) )
- Current "Educational placement:"
  ○ Change of placements because of disciplinary removals .................... 300.536.
  ○ Child's status during proceedings ................................................. 300.518(a).
- Disciplinary changes in placement ...................................................... 300.530(c).
- Discipline procedures and placements (see §§ 300.530 through 300.536).
- Educational placements (Parents in any group that makes placement decisions) ... 300.327.
- Graduation: A change in placement (Exception to FAPE) ...................... 300.102(a)(3)(iii).
- Last educational placement (Before incarceration) ................................ 300.102(a)(2)(i).
- Least restrictive environment (LRE) (see §§ 300.114 through 300.120)
- Notification: LEA must notify parents of decision to change placement .... 300.530(h).

PLACEMENT(S) (O–Z)
- Pendency (Child's status during proceedings) ...................................... 300.518.
- Placement of children by parents if FAPE is at issue ............................ 300.148.
- Placements (LRE) ............................................................................ 300.116.
- Requirements for unilateral placement by parents of CWDs in private schools (In "Procedural safeguards notice"). ... 300.504(c)(9).
- State funding mechanism (Must not result in placements that violate LRE) ... 300.114(b)(1).

POLICY: POLICIES AND PROCEDURES
- Condition of assistance (LEA eligibility) ............................................. 300.200.
  ○ Consistency with State policies ..................................................... 300.201.
  ○ See also §§ 300.200 through 300.213
- Eligibility for assistance (State) ......................................................... 300.100.
- Exception for prior policies on file:
  ○ With the SEA ............................................................................. 300.220.
  ○ With the Secretary ..................................................................... 300.176(a).
- FAPE policy .................................................................................... 300.101(a).
- Joint establishment of eligibility (Requirements) .................................. 300.223.
- Modifications of:
  ○ LEA or State agency policies ....................................................... 300.220(b).
  ○ Required by Secretary ................................................................ 300.176(c).
  ○ State policies (By a State) ........................................................... 300.176(b).

**46838**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

- Public participation .......................................................................................... 300.165.
- Secretary of the Interior .................................................................................... 300.708.
  ○ Public participation ...................................................................................... 300.709.
  ○ Submission of information ............................................................................ 300.708.

PREPONDERANCE OF EVIDENCE
- Civil action ........................................................................................................ 300.516(c)(3).

PRESCHOOL GRANTS
- Allocations to LEAs .......................................................................................... 300.816.
  ○ Subgrants to LEAs ........................................................................................ 300.815.
- Other State-level activities ............................................................................... 300.814.
  ○ Provide early intervention services in accordance with Part C of the Act ..... 300.814(e).
  ○ Service coordination or case management .................................................. 300.814(f).
- State administration .......................................................................................... 300.813.
- Use of funds for administration of Part C ......................................................... 300.813(b).

PRIOR NOTICE
- By public agency .............................................................................................. 300.503.
- Notice required before a hearing on a due process complaint ......................... 300.508(c).
- Procedural safeguards notice ........................................................................... 300.504.

PRISONS (See "Adult prisons")

PRIVATE INSURANCE
- Children with disabilities who are covered by .................................................. 300.154(e).
  ○ Proceeds from public benefits or insurance or private insurance ................ 300.154(g).
  ○ Use of Part B funds ...................................................................................... 300.154(f).

PRIVATE SCHOOLS AND FACILITIES
- Applicability of this part to State and local agencies:
  ○ CWDs placed in private schools by parents under § 300.148 ..................... 300.2(c)(2).
  ○ CWDs referred to or placed in private schools by public agency ............... 300.2(c)(1).

PRIVATE SCHOOL CHILDREN ENROLLED BY THEIR PARENTS
- Placement of children by parents when FAPE is at issue ................................ 300.148.
- See "Parentally-placed private school children with disabilities"

PRIVATE SCHOOL PLACEMENTS BY PUBLIC AGENCIES (A–D)
- Applicability of this part to private schools .................................................... 300.2(c)(1).
- Applicable standards (SEA to disseminate to private schools involved) ......... 300.147(b).

PRIVATE SCHOOL PLACEMENTS BY PUBLIC AGENCIES (E–Z)
- Implementation by SEA (Must monitor, provide standards, etc.) ..................... 300.147.
- Monitor compliance ........................................................................................... 300.147(a).
- Input by private schools (Provide for) ............................................................. 300.147(c).
- Responsibility of SEA ....................................................................................... 300.146.

PROCEDURAL SAFEGUARDS: DUE PROCESS PROCEDURES (A–C)
- Additional disclosure of information (5 business days before hearing) ........... 300.512(b).
- Agency responsible for conducting hearing ..................................................... 300.511(b).
- Appeal of hearing decisions; impartial review ................................................ 300.514(b).
- Attorneys' fees ................................................................................................. 300.517.
- Child's status during proceedings ................................................................... 300.518.
- Civil action ........................................................................................................ 300.516.
- Consent (Definition) ......................................................................................... 300.9.
- Court (See "Court(s)")

PROCEDURAL SAFEGUARDS: DUE PROCESS PROCEDURES (D–H)
- Electronic mail (Parent may elect to receive notices by) ................................ 300.505.
- Evaluation (Definition) ..................................................................................... 300.15.
- Evaluations: Hearing officer requests for ....................................................... 300.502(d).
- Finality of decision; appeal; impartial review ................................................. 300.514.
- Findings and decision to advisory panel and public ........................................ 300.513(d).
- Hearing rights ................................................................................................... 300.512.

PROCEDURAL SAFEGUARDS: DUE PROCESS PROCEDURES (I–Pa)
- Impartial due process hearing .......................................................................... 300.511.
- Impartial hearing officer ................................................................................... 300.511(c).
- Impartiality of mediator .................................................................................... 300.506(c).
- Independent educational evaluation ................................................................. 300.502.
  ○ Definition ...................................................................................................... 300.502(a)(3)(i).
- Jurisdiction of district courts ............................................................................ 300.516(d).
  ○ See "Court(s)"
- Mediation ........................................................................................................... 300.506.
  ○ Opportunity to meet with a disinterested party ........................................... 300.506(b)(2).
- Model form to assist parties in filing a due process or State complaint .......... 300.509.
- Notice required before a hearing on a due process complaint ......................... 300.508(c).
- Opportunity to examine records ....................................................................... 300.501(a).
- Parental consent ............................................................................................... 300.300.
- Parent-initiated evaluations ............................................................................. 300.502(c).
- Parent involvement in placement decisions ..................................................... 300.501(c).
- Parent participation in meetings ....................................................................... 300.501(b).
- Parental rights at hearings ............................................................................... 300.512(c).
- Parent right to evaluation at public expense .................................................... 300.502(b).
  ○ Public expense (Definition) ........................................................................... 300.502(a)(3)(ii).

PROCEDURAL SAFEGUARDS: DUE PROCESS PROCEDURES (Pe–Z)
- Pendency ............................................................................................................. 300.518.
- Personally identifiable (Definition) .................................................................. 300.32.
- Prior notice by public agency .......................................................................... 300.503.
- Procedural safeguards notice ........................................................................... 300.504.
- Prohibition on introduction of undisclosed evidence 5 business days before hearing .......... 300.512(a)(3).
- Record of hearing ............................................................................................. 300.512(a)(4).
- Resolution process ............................................................................................ 300.510.
- SEA implementation of ..................................................................................... 300.150.
- See "Civil Action Proceedings," "Court(s)," "Hearing Officer(s)," "Timelines"
- Surrogate parents .............................................................................................. 300.519.
- Timelines and convenience of hearings ........................................................... 300.515.
- Transfer of parental rights at age of majority ................................................. 300.520.
PROCEDURAL SAFEGUARDS NOTICE ................................................................ 300.504.
- Internet Web site (Notice on) ........................................................................... 300.504(b).
PROCEEDS FROM PUBLIC BENEFITS OR INSURANCE OR PRIVATE INSURANCE .......... 300.154(g).
PROGRAM INCOME (Not treated as proceeds from insurance) ........................ 300.154(g.)
PROGRAM MODIFICATIONS OR SUPPORTS (IEP content) ............................... 300.320(a)(4).
PROPORTIONATE SHARE CALCULATION (See Appendix B)
PROTECTIONS FOR CHILDREN NOT DETERMINED ELIGIBLE (Discipline) .......... 300.534.
PSYCHOLOGICAL SERVICES (Definition) ........................................................... 300.34(c)(10).
PUBLIC AGENCY (Definition) ............................................................................... 300.33.
PUBLIC BENEFITS OR INSURANCE ..................................................................... 300.154(d).
PUBLIC BENEFITS OR INSURANCE OR PRIVATE INSURANCE (Proceeds from) .......... 300.154(g).
PUBLIC CHARTER SCHOOLS (See "Charter schools")
PUBLIC EXPENSE (Definition under IEE) .......................................................... 300.502(a)(3)(ii).
PUBLIC HEARINGS (On policies)
- State eligibility ................................................................................................. 300.165(a).
- Secretary of the Interior .................................................................................. 300.708(g).
PUBLIC INFORMATION (LEA) .............................................................................. 300.212.
PUBLIC NOTICE
- LEA and State agency compliance .................................................................. 300.222(b).
- Public attention (If State has received a notice under § 300.603) ................ 300.606.
PURPOSES (Of this Part 300) ............................................................................... 300.1.
QUALIFIED PERSONNEL ....................................................................................... 300.156.
- Related services definitions (see § 300.34(c)(2), (c)(5), (c)(6), (c)(7), (c)(9), (c)(12), (c)(13)).
RATE OF INFLATION (In the Consumer Price Index for All Urban Consumers) (see §§ 300.702(b), 300.704(a)(2)(ii), 300.704(b)(2), 300.812(b)(2)).
REALLOCATION OF LEA FUNDS (If SEA determines LEA adequately providing FAPE) (see §§ 300.705(c), 300.817)).
RECORDS (A–D)
- Access rights (Parents' right to inspect) ......................................................... 300.613.
  ○ Fees for records ........................................................................................... 300.617.
  ○ Records on more than one child ................................................................. 300.615.
- Civil action (Court shall receive records) ....................................................... 300.516(c)(1).
- Conducting IEP Team meetings without parents (Records of attempts to convince parents) .......... 300.322(d).
Confidentiality (See "Confidentiality")
- Consent to release records .............................................................................. 300.622(b).
Disciplinary records:
  ○ Determination that behavior not manifestation ........................................ 300.530(e).
  ○ Disciplinary information ............................................................................. 300.229(c).
  ○ Referral to and action by law enforcement and judicial authorities ......... 300.535.
RECORDS (E–Z)
- Education records (Definition) ......................................................................... 300.611(b).
- Of parentally-placed private school CWDs (LEA to SEA) ............................. 300.132(c).
- Opportunity to examine records ..................................................................... 300.501(a).
- Procedural safeguards notice (Access to education records) ........................ 300.504(c)(4).
- Record of access .............................................................................................. 300.614.
- See also "Transfer during academic year"
RECREATION (Definition) ..................................................................................... 300.34(c)(11).
REDUCTION OF FUNDS FOR FAILURE TO MAINTAIN SUPPORT ....................... 300.163(b).
REEVALUATION
- Frequency of occurrence .................................................................................. 300.303(b).
- Parental consent required before conducting ................................................ 300.300(c)(1).
  ○ If parent fails to consent ............................................................................. 300.300(c)(1)(ii).
- Parental consent not required for:
  ○ Administering a test that all children take ................................................ 300.300(d)(1)(ii).
  ○ Reviewing existing data .............................................................................. 300.300(d)(1)(i).
- Parent refusal to consent ................................................................................ 300.300(c)(1)(ii).
- Review of existing evaluation data ................................................................. 300.305(a).
- Revision of IEP (To address reevaluation) ...................................................... 300.324(b)(1)(ii).

**46840**    **Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations

REFERRAL (A–M)
- Discipline:
  - Referral to and action by law enforcement and judicial authorities ................................ 300.535.
  - Protections for children not determined eligible ................................................................ 300.534.
- Enforcement (Referral for) ..................................................................................................... 300.604(b)(2)(vi).
- Indian children (Referral for services or further diagnosis) ................................................ 300.712(d)(2).
- Medical attention (Referral for):
  - Audiology ............................................................................................................................ 300.34(c)(1)(ii).
  - Speech-language pathology services ................................................................................. 300.34(c)(15)(iii).

REFERRAL (N–Z)
- Nonacademic and extracurricular services (Referral to agencies regarding assistance to individuals with disabilities). .................................................................................................. 300.107(b).
- Prior notice (If not initial referral for evaluation) ............................................................... 300.503(b)(4).
- Private school placement when FAPE is at issue (Reimbursement when no referral by public agency) ........... 300.148(c).
- Procedural safeguards notice (Upon initial referral for evaluation) .................................... 300.504(a)(1).
- Referral to and action by law enforcement and judicial authorities ................................... 300.535.

REGULAR EDUCATION TEACHER
- Access to IEP .......................................................................................................................... 300.323(d).
- IEP Team member .................................................................................................................. 300.321(a)(2).
- Participate in IEP development ............................................................................................. 300.324(a)(3).
  - Behavioral interventions ................................................................................................... 300.324(a)(3)(i).
  - Supplementary aids and services ..................................................................................... 300.324(a)(3)(ii).

REGULATIONS
- Applicable regulations (Secretary of the Interior) .............................................................. 300.716.
- Applicability of this part to State, local, and private agencies .......................................... 300.2.

REHABILITATION
- Assistive technology service (see § 300.6(d), (f))
- Rehabilitation Act of 1973 (see §§ 300.34(c)(12), 300.516(e))
- Rehabilitation counseling services:
  - Definition .......................................................................................................................... 300.34(c)(12).
  - In vocational rehabilitation (VR) programs .................................................................... 300.34(c)(12).
- Transition services (State VR agency responsibility) ......................................................... 300.324(c)(2).

REHABILITATION COUNSELING SERVICES ........................................................................ 300.34(c)(12).

REIMBURSEMENT
- Methods of ensuring services (see § 300.154(a)(3), (b)(1)(ii), (b)(2), (g)(2))
- Private school placement when FAPE is at issue:
  - Limitation on reimbursement ........................................................................................... 300.148(d).
  - Reimbursement for private school placement ................................................................. 300.148(c).
  - Subject to due process procedures ................................................................................... 300.148(b).
- Reimbursement by non-educational public agency ............................................................ 300.154(b)(2).
- Reimbursement by SEA to LEA ............................................................................................. 300.704(c)(7).

RELATED SERVICES
- Definition ............................................................................................................................... 300.34.
- Observations by teachers and related services providers regarding existing evaluation data ............................. 300.305(a)(1)(iii).

RELATION OF PART B TO OTHER FEDERAL PROGRAMS .................................................. 300.186.

RELIGIOUS SCHOOLS
- Child find for parentally-placed private school children ................................................... 300.131(a).
- Child find for out-of-State children ..................................................................................... 300.131(f).
- Formula for LEA expenditures on ........................................................................................ 300.133(a).
- See "Parentally-placed private school children with disabilities"
- Services plan for each child served .................................................................................... 300.137(c).
- Services provided on-site ...................................................................................................... 300.139(a).

REMEDIES FOR DENIAL OF APPROPRIATE SERVICES ....................................................... 300.151(b).

REPORTS (A–C)
- Annual report of children served .......................................................................................... 300.640.
  - See also §§ 300.641 through 300.646
- Annual report to Secretary of Interior by advisory board on Indian children .................. 300.715(a).
- Biennial report (Indian tribes) ............................................................................................. 300.712(e).
- Child count (Annual report of children served) ................................................................. 300.641.

REPORTS (D–Z)
- Evaluation reports to parents ............................................................................................... 300.306(a)(2).
- Monitoring compliance of publicly placed children in private schools (*e.g.*, written reports) ................. 300.147(a)(a).
- Monitoring reports (Waiver of nonsupplanting requirement) ............................................. 300.164(c)(3).
- Performance goals (Progress reports) .................................................................................. 300.157(c).
- Secretary's report to States regarding 25% of funds ......................................................... 300.812(b).

REPORT CARDS ........................................................................................................................ 300.320(a)(3)(ii).

REPORTING A CRIME to law enforcement and judicial authorities .................................... 300.535.

RESIDENTIAL PLACEMENTS .................................................................................................. 300.104.

REVOKE CONSENT AT ANY TIME (In definition of "Consent") ......................................... 300.9(c)(1).

RHEUMATIC FEVER ................................................................................................................. 300.8(c)(9)(i).

RISK OF LOSS OF ELIGIBILITY FOR INSURANCE ............................................................... 300.154(d)(2)(iii)(D).

SCHOOL DAY

ED-000302

• Definition ........................................................................................................... 300.11(c).
• See "Timelines," "Timelines—Discipline"
SCHOOL HEALTH SERVICES AND SCHOOL NURSE SERVICES ............................ 300.34(c)(13).
SCHOOL PERSONNEL
• Content of IEP ................................................................................................... 300.320(a)(4).
• Development, review, and revision of IEP ........................................................ 300.324(a)(4).
• Disciplinary authority ....................................................................................... 300.530.
• Use of private school personnel ........................................................................ 300.142(b).
• Use of public school personnel ......................................................................... 300.142(a).
SCHOOLWIDE PROGRAMS ................................................................................... 300.206.
SEA RESPONSIBILITY
• For all education programs ................................................................................ 300.149.
• For direct services ............................................................................................. 300.227.
• For each parentally-placed private school child designated to receive services .... 300.132(b).
• For impartial review .......................................................................................... 300.514(b)(2).
• Prohibition of LEA from reducing maintenance of effort ................................... 300.608.
SECRETARY
• Determination that a State is eligible ................................................................ 300.178.
• Notice and hearing before determining that a State is not eligible .................... 300.179.
• Waiver of nonsupplanting requirement ............................................................. 300.164.
SECRETARY OF THE INTERIOR
• Advisory board establishment .......................................................................... 300.714.
   ○ Annual report by advisory board ................................................................. 300.715.
• Biennial report (By tribe or tribal organization) ............................................... 300.712(e).
• Eligibility (see §§ 300.708 through 300.716)
• Payments for:
   ○ Children aged 3 through 5 ............................................................................ 300.712.
   ○ Child find and screening .............................................................................. 300.712(d).
• Plan for coordination of services ....................................................................... 300.713.
• Use of funds for early intervening services ....................................................... 300.711.
SEPARATION—DIVORCE (Authority to review records) ......................................... 300.613(c).
SERVICES PLAN for parentally-placed private school children (see §§ 300.132(b), 300.137(c) 300.138(b))
SERVICES THAT ALSO BENEFIT NONDISABLED CHILDREN ................................. 300.208(a)(1).
SHORTAGE OF PERSONNEL (Policy to address) .................................................... 300.704(b)(4)(vii).
SHORT TERM OBJECTIVES OR BENCHMARKS .................................................... 300.320(a)(2)(ii).
SHOULD HAVE KNOWN (Regarding due process complaint) ................................. 300.511(e).
SHOW CAUSE HEARING ....................................................................................... 300.194.
• Decision ............................................................................................................ 300.195.
• Implementation of by-pass (see §§ 300.192(b)(2), 300.193)
• Right to legal counsel ........................................................................................ 300.194(a)(3).
SICKLE CELL ANEMIA .......................................................................................... 300.8(c)(9)(i).
SLD (See "Specific Learning Disability")
SOCIAL WORK SERVICES IN SCHOOLS (Definition) ............................................. 300.34(b)(14).
SPECIAL FACTORS (IEP Team) ............................................................................. 300.324(a)(2).
SPECIAL EDUCATION (Definition) ........................................................................ 300.39.
SPECIAL EDUCATION PROVIDER ......................................................................... 300.321(a)(3).
SPECIAL EDUCATION TEACHER
• IEP accessible to ............................................................................................... 300.323(d).
• On IEP Team .................................................................................................... 300.321(a)(3).
• Requirements regarding highly qualified .......................................................... 300.18.
SPECIAL RULE
• Adjustments to local efforts .............................................................................. 300.205(d).
• For child's eligibility determination .................................................................. 300.306(b).
• For increasing funds ......................................................................................... 300.704(e).
• Methods of ensuring services ........................................................................... 300.154(c).
• LEA high cost fund ........................................................................................... 300.704(c).
• Regarding outlying areas and freely associated States ...................................... 300.701(a)(3).
• Regarding transfer of rights .............................................................................. 300.520(b).
• Regarding use of FY 1999 amount .................................................................... 300.703(b).
• State advisory panel (Parent members) ............................................................. 300.168(b).
SPECIFIC LEARNING DISABILITY
• Definition .......................................................................................................... 300.8(c)(10).
• Evaluation requirements and report (see §§ 300.306(a), 300.307 through 300.311)
• Other alternative research-based procedures ..................................................... 300.307(a)(3).
• Response to scientific, research-based intervention (see §§ 300.307(a)(2), 300.309(a)(2)(i), 300.311(a)(7))
• Scientifically based research:
   ○ Definition .................................................................................................... 300.35.
   ○ Enforcement ................................................................................................ 300.604(a)(1)(ii).
• Severe discrepancy ........................................................................................... 300.307(a)(1).
SPEECH-LANGUAGE PATHOLOGY SERVICES
• Definition .......................................................................................................... 300.34(b)(15).

• Speech or language impairment (Definition) ........................................................................... 300.8(c)(11).

STATE
• Definition .................................................................................................................................. 300.40.
• Special definition for grants ..................................................................................................... 300.717(c).
• Sovereign immunity .................................................................................................................. 300.177.

STATE ADMINISTRATION (Use of funds for) (see §§ 300.704(a), 300.812(a)).

STATE ADVISORY PANEL .......................................................................................................... 300.167
• Due process hearings (Findings and decisions to State advisory panel) (see §§ 300.513(d)(1), 300.514(c)(1)) 
• Duties ....................................................................................................................................... 300.169.
• Establishment .......................................................................................................................... 300.167.
• Membership .............................................................................................................................. 300.168.
• Waiver of nonsupplant requirement (State has consulted with advisory panel regarding provision of FAPE) 300.164(c)(4).

STATE AGENCIES
• Applicability of Part B to other State agencies ........................................................................ 300.2(b)(1)(iii).
• Compliance (LEA and State agency) ........................................................................................ 300.222.
• Eligibility (LEA and State agency):
    ○ General conditions (see §§ 300.200 through 300.213)
• Notification of LEA or State agency in case of ineligibility ....................................................... 300.221.
• State advisory panel (Membership) ......................................................................................... 300.168.
• State agency eligibility ............................................................................................................. 300.228.
• State Medicaid agency ............................................................................................................. 300.154(a)(1), (h).

STATE COMPLAINT PROCEDURES (see §§ 300.151 through 300.153)
• See ''Complaint(s): State complaint procedures''

STATE ELIGIBILITY
• Condition of assistance ............................................................................................................ 300.100.
• Department procedures (see §§ 300.178 through 300.186)
• Determination of eligibility (By the Secretary) ......................................................................... 300.178.
• General conditions ................................................................................................................... 300.100.
• Notice and hearing before determining that a State is not eligible .......................................... 300.179.
• Specific conditions (see §§ 300.101 through 300.176)

STATE JUVENILE AND ADULT CORRECTIONAL FACILITIES .................................................. 300.2(b)(1)(iv).
• See also ''Correctional facilities,'' ''Adult prisons''

STATE-LEVEL ACTIVITIES (With Part B funds) ........................................................................ 300.704.

STATE-LEVEL NONSUPPLANTING .......................................................................................... 300.162(c).
• Waiver by Secretary ................................................................................................................. 300.162(c)(2).
• Waiver of requirement .............................................................................................................. 300.164.

STATE MAINTENANCE OF EFFORT ......................................................................................... 300.163.

SUBGRANT(S)
• State agency eligibility ............................................................................................................. 300.228.
• To LEAs .................................................................................................................................... 300.705(a).

STATE MEDICAID AGENCY
• Methods of ensuring services .................................................................................................. 300.154(a)(1).
• See also ''Medicaid''

STATE SCHOOLS
• Applicability of this part to schools for children with deafness or blindness .......................... 300.2(b)(1)(iii).

STATE VOCATIONAL REHABILITATION AGENCY (See ''Rehabilitation'')

STATES' SOVEREIGN IMMUNITY ............................................................................................ 300.177.

STAY-PUT (Child's status during proceedings) ....................................................................... 300.518.
• See also ''Pendency''

SUBSTANTIAL LIKELIHOOD OF INJURY (Discipline) ............................................................. 300.532(a).

SUPPLEMENTARY AIDS AND SERVICES
• Definition .................................................................................................................................. 300.42.
• IEP content .............................................................................................................................. 300.320(a)(4).
• In ''assistive technology'' ......................................................................................................... 300.105(a)(3).
• LRE requirements .................................................................................................................... 300.114(a)(2)(ii).
• Methods of ensuring services .................................................................................................. 300.154(b).
• Requirement regarding regular education teacher (IEP) .......................................................... 300.324(a)(3)(ii).
• Services that also benefit nondisabled children ....................................................................... 300.208(a)(1).

SUPPLEMENT—NOT SUPPLANT
• LEA requirement ...................................................................................................................... 300.202(a)(3).
• State level nonsupplanting ....................................................................................................... 300.162(c).
• See ''Nonsupplanting''

SUPPORT SERVICES (see §§ 300.704(b)(4)(i)), 300.814(a))

SURGICALLY IMPLANTED MEDICAL DEVICE (see §§ 300.5, 300.34(b), 300.113(b))

SURROGATE PARENTS ............................................................................................................ 300.519.
• Appointed for homeless youth ................................................................................................. 300.519(f).
• In definition of ''Parent'' ........................................................................................................... 300.30(a)(5).
• Timeline for assignment ........................................................................................................... 300.519(h).

SUSPENSION (EXPULSION)
• Alternative programming for children expelled ........................................................................ 300.704(b)(4)(ix).
• Provision of FAPE .................................................................................................................... 300.101(a).

ED-000304

- Suspension and expulsion rates ............................................................................................... 300.170(a).
- Suspension or expulsion without services ............................................................................... 300.534(d)(2)(ii).

TEACHERS
See ''Regular education teacher''
See ''Special education teacher''
TECHNICAL ASSISTANCE (Amounts to support) ....................................................................... 300.702.
TECHNICALLY SOUND INSTRUMENTS (Evaluation) ................................................................ 300.304(b)(3).
TERMINATION OF AGENCY OBLIGATION to provide special education to a particular child (Exception to MOE). 300.204(c).

THERAPEUTIC RECREATION ......................................................................................................... 300.34(b)(11)(ii).
TIMELINES (A–D)
- Access rights (Confidentiality: 45 days) ................................................................................. 300.613(a).
- Annual report of children served (Between Oct. 1 and Dec. 1) ........................................... 300.641(a).
- Annual count of parentally-placed private school children (Between Oct. 1 and Dec. 1) . 300.133(c).
- Assignment of surrogate parent (Not more than 30 days) .................................................... 300.519(h).
- Attorneys' fees (10 days prohibition) ...................................................................................... 300.517(c)(2)(i).
- Complaint procedures (State: 60 days) .................................................................................... 300.152(a).
- Department hearing procedures (30 days) ............................................................................... 300.179(b)(3).
  ○ See also §§ 300.181 through 300.184
- Due process hearings and reviews (see §§ 300.510(b)(2), 300.511(e), (f)):
  ○ Conducted within 20 school days; decision within 10 school days .................................. 300.532(c)(2).
  ○ Decision within 45 days after expiration of 30 day period ............................................. 300.515(a).
  ○ Disclose evaluations before hearings (5 business days) .................................................... 300.512(a)(3).

TIMELINES (E–H)
- Hearing procedures (State eligibility: 30 days) ..................................................................... 300.179(b)(3).
- Hearing rights:
  ○ Disclosure of evaluations (At least 5 business days before hearing) ............................. 300.512(b)(1).
  ○ Prohibit introduction of evidence not disclosed (At least 5 business days before hearing) 300.512(a)(3).
  ○ Reviews (Decision not later than 30 days) ....................................................................... 300.515(b).

TIMELINES (I–Z)
- IEP (Initial meeting: 30 days) ................................................................................................ 300.323(c)(1).
- Initial evaluation (60 days) ...................................................................................................... 300.301(c)(1).
- Parent notice before private placement (At least 10 business days) ................................... 300.148(d)(2).
- Show cause hearing .................................................................................................................... 300.194(g).
- Decision .......................................................................................................................................... 300.195(a)(1).
- State eligibility: Department hearing procedures (see §§ 300.179(b)(3), 300.181(b), 300.182(d), (e), (g), (k), 300.184)
- Timelines and convenience of hearings and reviews ............................................................. 300.515.

TIMELINES—DISCIPLINE (A–P)
- Authority of hearing officer (May order change of placement for not more than 45 school days) ..... 300.532(b)(2)(ii).
- Authority of school personnel:
  ○ Change of placement for not more than 45 consecutive days for weapons or drugs ...... 300.530(g).
  ○ Removal of a child for not more than 10 school days .................................................... 300.530(b).
- Change of placement for disciplinary removals:
  ○ Of more than 10 consecutive school days ........................................................................ 300.536(a)(1).
  ○ Because series of removals total more than 10 school days ............................................ 300.536(a)(2)(i).
- Due process hearing request ..................................................................................................... 300.507(a)(2).
- Expedited due process hearings:
  ○ Conducted within 20 days ................................................................................................. 300.532(c)(2).
  ○ Decision within 10 days ..................................................................................................... 300.532(c)(3)(i).
- Hearing officer (Order change of placement for not more than 45 days) ............................ 300.532(b)(2)(ii).
- Manifestation determination review (Conducted in no more than 10 school days) ............. 300.530(e).
- Placement during appeals (Not longer than 45 days) ........................................................... 300.532(b)(2)(ii).

TIMELINES—DISCIPLINE (Q–Z)
- Removals for not more than:
  ○ 10 school days (By school personnel) ............................................................................... 300.530(b).
  ○ 45 days (To interim alternative educational setting) ....................................................... 300.532(b)(2)(ii).
     By hearing officer (For substantial likelihood of injury to child or others) ................... 300.532(b)(2)(ii).
     By school personnel (For weapons or drugs) (see § 300.530(g)(1), (g)(2))

TIMETABLE: Full educational opportunity goal (FEOG) ............................................................ 300.109.
TRAINING
- Assistive technology services (see § 300.6(e), (f))
- Confidentiality procedures (Personnel using personally identifiable information must receive training) ... 300.623(c).
- Parent counseling and training .................................................................................................. 300.34(b)(8).
- Technical assistance and training for teachers and administrators ....................................... 300.119.
- Travel training (see § 300.39(a)(2)(ii), (b)(4))
TRANSFER DURING ACADEMIC YEAR
- Assessments coordinated between public agencies .................................................................. 300.304(c)(5).
- New school district responsibilities (see § 300.323(e), (f))
- Transmittal of records ................................................................................................................ 300.323(g).
TRANSFER OF PARENTAL RIGHTS ............................................................................................ 300.520.
- IEP requirement ........................................................................................................................... 300.320(c).
- Special rule .................................................................................................................................... 300.520(b).

ED-000305

- To children in correctional institutions ............................................................................................ 300.520(a)(2).
TRANSITION FROM PART C TO PART B ..................................................................................... 300.124.
TRANSITION SERVICES (NEEDS)
- Agency responsibilities for (see §§ 300.321(b)(3), 300.324(c)(2))
- Alternative strategies ......................................................................................................................... 300.324(c)(1).
- Child participation in IEP Team meetings ....................................................................................... 300.321(b)(1).
- Definition .......................................................................................................................................... 300.43.
- IEP requirement (Statement of)
  ○ Transition service needs ................................................................................................................ 300.320(b).
  ○ Needed transition services ............................................................................................................. 300.43(b).
- State rehabilitation agency ................................................................................................................ 300.324(c)(2).
TRANSMITTAL OF RECORDS TO LAW ENFORCEMENT AND JUDICIAL AUTHORITIES ......... 300.535(b).
TRANSPORTATION
- Definition .......................................................................................................................................... 300.34(c)(16).
- Nonacademic services ........................................................................................................................ 300.107(b).
- Of private school children ................................................................................................................. 300.139(b).
TRAUMATIC BRAIN INJURY (Definition) ................................................................................... 300.8(c)(12).
TRAVEL TRAINING (see § 300.39(a)(2)(ii), (b)(4))
- Definition .......................................................................................................................................... 300.39(b)(4).
TREATMENT OF CHARTER SCHOOLS AND THEIR STUDENTS ............................................. 300.209.
TREATMENT OF FEDERAL FUNDS IN CERTAIN YEARS ......................................................... 300.205.
UNIVERSAL DESIGN
- Definition .......................................................................................................................................... 300.44.
- Support technology with universal design principles ....................................................................... 300.704(b)(4)(v).
USE OF AMOUNTS (LEA) ............................................................................................................. 300.202.
USE OF FUNDS BY LEAs
- Coordinated services system ............................................................................................................. 300.208(a)(2).
- For school-wide programs .................................................................................................................. 300.206.
- For services and aids that also benefit nondisabled children .......................................................... 300.208(a)(1).
- For use in accordance with Part B .................................................................................................... 300.705.
USE OF FUNDS BY STATES (SEAs) (A–C)
- Administering Part B State activities ................................................................................................ 300.704(a)(1).
- Administering Part C (If SEA is Lead Agency) ................................................................................ 300.704(a)(4).
- Administrative costs of monitoring and complaint investigations .................................................... 300.704(b)(3)(i).
- Allowable costs .................................................................................................................................. 300.704(b)(3).
- Amount for State administration ....................................................................................................... 300.704(a)
- Annual description of use of Part B funds ........................................................................................ 300.171.
- Assist LEAs in meeting personnel shortages ................................................................................... 300.704(b)(4)(vii).
- Complaint investigations ................................................................................................................... 300.704(b)(3)(i).
- Coordination of activities with other programs ................................................................................ 300.704(b)(1).
USE OF FUNDS BY STATES (SEAs) (D–Z)
- Direct and support services ............................................................................................................... 300.704(b)(4)(i).
- High cost fund ................................................................................................................................... 300.704(c).
- Mediation process .............................................................................................................................. 300.704(b)(3)(ii).
- Monitoring ......................................................................................................................................... 300.704(b)(3)(i).
- Personnel preparation, professional development and training (see § 300.704(b)(4)(i), (b)(4)(xi)).
- State plan ........................................................................................................................................... 300.704(c)(3)(i).
- Statewide coordinated services system ............................................................................................. 300.814(d).
- Support and direct services ............................................................................................................... 300.704(b)(4)(i).
- Technical assistance:
  ○ To LEAs ........................................................................................................................................ 300.704(b)(4)(xi).
  ○ To other programs that provide services ...................................................................................... 300.704(a)(1).
USE OF FUNDS BY SECRETARY OF THE INTERIOR (see §§ 300.707 through 300.716)
- By Indian tribes:
  ○ For child find for children aged 3 through 5 ................................................................................ 300.712(d).
  ○ For coordination of assistance for services .................................................................................. 300.712(a).
- For administrative costs ..................................................................................................................... 300.710(a).
USE OF SEA ALLOCATIONS ........................................................................................................ 300.704.
- Inapplicability of requirements that prohibit commingling and supplanting of funds ..................... 300.704(d).
VISUAL IMPAIRMENT INCLUDING BLINDNESS (Definition) ................................................... 300.8(c)(13).
VOCATIONAL EDUCATION
- Definition .......................................................................................................................................... 300.39(b)(5).
- In definition of "Special education" ................................................................................................. 300.39(a)(2)(iii).
- Program options ................................................................................................................................. 300.110.
- Transition services ............................................................................................................................ 300.320(b)(1).
VOCATIONAL REHABILITATION (See "Rehabilitation")
VOLUNTARY DEPARTURE OF PERSONNEL
(Exception to LEA maintenance of effort) ....................................................................................... 300.204(a).
WAIVER(S)
- For exceptional and uncontrollable circumstances (State maintenance of effort) ........................... 300.163(c).
- "In whole or in part" ......................................................................................................................... 300.164(e).
- Public benefits or insurance (Risk of loss of eligibility for home and community-based waivers) .................... 300.154(d)(2)(iii)(D).

**Federal Register** / Vol. 71, No. 156 / Monday, August 14, 2006 / Rules and Regulations   **46845**

- State-level nonsupplanting ............................................................................................................. 300.162(c).
- State maintenance of effort ............................................................................................................ 300.163.
- State's procedures for monitoring ................................................................................................. 300.164(c)(2)(ii)(B).
- Waiver procedures ......................................................................................................................... 300.164.

WARD OF THE STATE
- Appointment of surrogate parent ................................................................................................... 300.519(c).
- Definition ....................................................................................................................................... 300.45.
- See definition of "Parent" ............................................................................................................. 300.30(a)(3).
- See "Surrogate parents" ................................................................................................................ 300.519(a)(3).

WEAPON (Definition) ......................................................................................................................... 300.530(i)(4).

WHEN IEPS MUST BE IN EFFECT ..................................................................................................... 300.323.

## PART 301—[REMOVED]

■ 2. Remove part 301.

[FR Doc. 06–6656 Filed 8–3–06; 8:45 am]

**BILLING CODE 4000–01–P**

ED-000307

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| BETH and DAVID PETIT, in their individual capacities and as next friends to their minor son, H.P., 12 Emery Lane Stratham, NH 03885 <br><br> and <br><br> NICOLE and BENNIE UNDERWOOD, in their individual capacities and as next friends to their minor daughter, A.U. 9936 Castle Lane Knoxville, TN 37922 <br><br>                   Plaintiffs, <br><br>             v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION, 400 Maryland Ave, SW Washington, DC 20202 <br><br> and <br><br> MARGARET SPELLINGS, in her official capacity as Secretary of the United States Department of Education 400 Maryland Ave, SW Washington, DC 20202 <br><br>                 Defendants. | Civil Action No. 1:07CV01583(RMU) |

## CERTIFICATION OF ADMINISTRATIVE RECORD

      Pursuant to 28 U.S.C. § 1746, Susan Craig declares as follows:

1.     I am Assistant General Counsel of the Division of Educational Equity and

Research in the Office of General Counsel of the United States Department of Education,

a position I have held from 1986 to the present, and at all times relevant to the above-captioned matter. In this capacity, I was responsible for supervising the review for legal sufficiency of the solicitation of public comment and of the preparation of the final regulations, including review of the response to comments received, that are at issue in this case.

2.    Pursuant to the provisions of 20 U.S.C. § 3472 and the authority delegated to me from the Secretary and the General Counsel of the United States Department of Education, I hereby certify that the annexed documents provided in electronic form on the accompanying CD-ROM compact disk are true copies of the documents that constitute the administrative rulemaking record pertaining to the promulgation of the portions of the Individuals with Disabilities Education Act, Part B regulation related to the mapping of cochlear implants at issue in the above-captioned case.

3.    Privileged documents reflecting internal agency deliberations are not part of this administrative record. See, e.g., Nat'l Courier Ass'n v. Bd. of Governors of Fed. Reserve Sys., 516 F.2d 1229, 1241-42 (D.C. Cir. 1975); Maritel, Inc. v. Collins, 422 F. Supp. 2d 188, 196 (D.D.C. 2006). To that end, hand written notations reflecting internal agency deliberations have been redacted from A. R. ED-005413-5418. The remaining portions of this document that have been included in the administrative record reflect factual information considered by the United States Department of Education in promulgating its final rule.

2

I certify under penalty of perjury that the foregoing is true and correct, and have caused the seal of the Department of Education to be affixed on this certification made on this 7th day of December, 2007.

Susan Craig
Assistant General Counsel
Division of Educational Equity
and Research

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| BETH and DAVID PETIT, in their ) | |
| individual capacities and as next friends ) | |
| to their minor son, H.P., ) | |
| 12 Emery Lane ) | |
| Stratham, NH 03885 ) | |
| ) | |
| and ) | |
| ) | |
| NICOLE and BENNIE UNDERWOOD, ) | |
| in their individual capacities and as ) | |
| next friends to their minor daughter, ) | |
| A.U. ) | |
| 9936 Castle Lane ) | |
| Knoxville, TN 37922 ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civ. No. 1:07CV01583(RMU) |
| ) | |
| UNITED STATES DEPARTMENT ) | |
| OF EDUCATION, ) | |
| 400 Maryland Ave, SW ) | |
| Washington, DC 20202 ) | |
| ) | |
| and ) | |
| ) | |
| MARGARET SPELLINGS, in her official ) | |
| capacity as Secretary of the ) | |
| United States Department of Education ) | |
| 400 Maryland Ave, SW ) | |
| Washington, DC 20202 ) | |
| Defendants. ) | |
| _____ ) | |

## PROPOSED ORDER

Upon consideration of Defendants' Motion to Dismiss, or Alternatively for Summary

Judgment, the opposition thereto, and the complete record in this case, it is hereby

ORDERED that Defendants' Motion is GRANTED, Plaintiffs' claim under the

Individuals with Disabilities Education Act ("IDEA") is dismissed with prejudice, and judgment

is entered in favor of Defendants on Plaintiffs' Administrative Procedures Act ("APA") claim.


SO ORDERED.

Dated:_____          _____

                                              UNITED STATES DISTRICT JUDGE

I certify that on this 13th day of December 2007, I caused a copy of the foregoing

Defendants' Motion to Dismiss Or Alternatively, For Summary Judgment and attachments hereto

to be filed with the Clerk of the Court via the CM/ECF system, causing them to be served

electronically.  The documents are available for viewing and downloading from the ECF system.


/s/ Tamra T. Moore
Tamra T. Moore