**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BETH and DAVID PETIT**,** in their individual capacities and as next friends to their minor son, H. P., and  NICOLE and BENNIE UNDERWOOD**,** in their individual capacities and as next friends to their minor daughter, A.U.,<br><br>Plaintiffs<br><br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION, and MARGARET SPELLINGS, in her official capacity as Secretary of the U.S. Department of Education,<br><br>Defendants. | CASE NO.  07-1583-RMU |

## <u>PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Federal Rule of Civil Procedure 56(a), plaintiffs Beth and David Petit and Nicole and Bennie Underwood move for summary judgment.  Plaintiffs challenge two regulations promulgated by defendants United States Department of Education and Secretary Margaret Spellings.  These regulations exclude mapping of cochlear implants from the definition of "related services," thereby permitting local education agencies to exclude mapping from the services that they are required by Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq*., to provide to a child with disabilities.

The challenged regulations are contrary to both the plain language of the statute and the legislative history of the recent amendments to IDEA.  Local agencies must provide "audiology services" as part of the "related services" required under IDEA, and cochlear implant mapping – a service provided only by licensed audiologists – unambiguously qualifies as an

audiology service.  The Department's regulation are also invalid because they are inconsistent with the objectives of IDEA, and therefore represent an impermissible construction of the statute.

For the reasons stated in the accompanying memorandum in support of this motion, plaintiffs are entitled to summary judgment.  A Statement of Material Facts not in Dispute and a Proposed Order are also submitted with this motion.

Respectfully submitted,

_____/s/ Mark W. Mosier_____
S. William Livingston (D.C. Bar No. 59055)
Emily Johnson Henn (D.C. Bar No. 471077)
Mark W. Mosier (D.C. Bar No. 974887)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC  20004
Telephone:  (202) 662-6000
Facsimile:  (202) 662-6291

*Attorneys for Plaintiffs Beth and David Petit,*
*and Nicole and Bennie Underwood*

January 30, 2008

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BETH and DAVID PETIT, in their individual
capacities and as next friends to their minor son,
H. P., and NICOLE and BENNIE
UNDERWOOD, in their individual capacities and
as next friends to their minor daughter, A.U.,

Plaintiffs

v.

UNITED STATES DEPARTMENT OF
EDUCATION, and MARGARET SPELLINGS,
in her official capacity as Secretary of the U.S.
Department of Education,

Defendants.

CASE NO. 07-1583-RMU

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS OR ALTERNATIVELY, FOR SUMMARY JUDGMENT**

S. William Livingston (D.C. Bar No. 59055)
Emily Johnson Henn (D.C. Bar No. 471077)
Mark W. Mosier (D.C. Bar No. 974887)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC 20004
Telephone: (202) 662-6000
Facsimile: (202) 662-6291

*Attorneys for Plaintiffs Beth and David Petit,
and Nicole and Bennie Underwood*

January 30, 2008

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 4

    A.    Cochlear Implant Mapping ................................................................ 4

    B.    IDEA and Its Implementing Regulations.................................................. 6

        1.    Individuals with Disabilities Education Act. ............................. 6

        2.    The Department of Education's IDEA Regulations. ................................. 9

    C.    Plaintiffs ......................................................................................... 10

        1.    Beth, David, and H. Petit ......................................................... 10

        2.    Nicole, Bennie, and A. Underwood ........................................ 11

ARGUMENT ...................................................................................................... 13

I.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR APA
CLAIM BECAUSE THE DEPARTMENT'S REGULATIONS ARE
CONTRARY TO LAW. ................................................................................. 13

    A.    The Regulations Should Be Invalidated Under *Chevron*'s First Step
Because the Definition of "Related Services" Unambiguously Includes
Cochlear Implant Mapping. ............................................................... 14

        1.    By defining "related services" to include "audiology services," the
statutory text unambiguously expresses Congress's  intent to
include cochlear implant mapping as a related service............................ 15

        2.    The medical devices exception neither excludes mapping nor
creates ambiguity as to whether mapping is a related service. ................ 19

        3.    The legislative history confirms Congress's intent to define
"related services" to include cochlear implant mapping.......................... 22

        4.    The decision in *A. U. v. Roane County* should be given no weight
because it did not decide the issue before this Court and its dicta
are unpersuasive....................................................................... 25

    B.    The Regulations Also Fail *Chevron*'s Second Step Because They Are
Inconsistent With IDEA's Objectives and Are Arbitrary and Capricious............ 26

II.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR
       IDEA CLAIM BECAUSE THE SECRETARY EXCEEDED HER STATUTORY
       AUTHORITY BY ENACTING THE MAPPING REGULATIONS. ............................ 30

       A.    Plaintiffs State a Valid Claim Under IDEA. ......................................... 31

             1.    Plaintiffs may bring suit under IDEA because defendants' violation
                   of IDEA deprived them of rights protected by the statute. ....................... 31

             2.    Defendants' arguments for limiting IDEA's private right of action
                   to suits against states and local agencies are unpersuasive. ..................... 35

             3.    IDEA's exhaustion requirement does not bar Plaintiffs' claims. ............. 36

       B.    The Mapping Regulations Exceed the Secretary's Rulemaking Authority
             Because They Are Contrary to Law and Because They Substantively
             Lessen the Protections Provided to Children with Disabilities. ............................ 38

             1.    The Secretary violated IDEA by implementing regulations that
                   contradict the statute. ............................................................................. 39

             2.    The Secretary violated IDEA by implementing regulations that
                   substantively lessen the protections provided by the 1983
                   regulations. .............................................................................................. 39

CONCLUSION ............................................................................................................. 41

## **TABLE OF AUTHORITIES**

### **CASES**

*American Federation of Federal Employees v. Glickman*, 215 F.3d 7
(D.C. Cir. 2000) ..................................................................................................15

*Anaheim & Riverside v. Federal Energy Regulatory Commission*,
692 F.2d 773 (D.C. Cir. 1982) ..........................................................................38

*Athens Community Hospital, Inc. v. Shalala*, 21 F.3d 1176 (D.C. Cir. 1994)..................28

*Atlantic City Electric Co. v. FERC*, 295 F.3d 1 (D.C. Cir. 2002).....................................18

*A.U., ex rel. N.U. v. Roane County Board of Education*, 501 F. Supp. 2d 1134
(E.D. Tenn. 2007) .......................................................................................12, 25

*Bennett v. Spear*, 520 U.S. 154 (1997) ............................................................................34

*Bernard v. School Board of City of Norfolk*, 58 F. Supp. 2d 669
(E.D. Va. 1999)...................................................................................................33

*Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53 (1884) .......................................40

*C.I.R. v. Clark*, 489 U.S. 726 (1989) ..............................................................................21

*Cannon v. University of Chicago*, 441 U.S. 677 (1979)....................................................17

*Cedar Rapids Community Sch. District v. Garrett F.*, 526 U.S. 66 (1999).......8, 16, 28, 30

*Chadmoore Communs., Inc. v. FCC*, 113 F.3d 235 (D.C. Cir. 1997) ..............................36

*Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996).....................................36

*Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)............. *passim*

*Duncan v. Walker*, 533 U.S. 167 (2001)..........................................................................26

*Engine Manufacturers Association v. EPA*, 88 F.3d 1075 (D.C. Cir. 1996)....................18

*Florida Audubon Society v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996) ...............................34

*General Instrument Corp. v. FCC*, 213 F.3d 724 (D.C. Cir. 2000)..................................27

*Goldring v. District of Columbia*, 416 F.3d 70 (D.C. Cir. 2005) .....................................22

*Greenland Sch. District v. Amy N.*, 358 F.3d 150 (1st Cir. 2004) .....................................38

*Halverson v. Slater*, 129 F.3d 180 ( D.C. Cir. 1997).........................................................14

*Heldman v. Sobol*, 962 F.2d 148 (2d Cir. 1992)........................................................32, 37

*Hill v. Norton*, 275 F.3d 98 (2001) ..................................................................................27

*Hoeft v. Tucson Unified Sch. District*, 967 F.2d 1298 (9th Cir. 1992) .............................37

*Honig v. Doe*, 484 U.S. 305 (1988) ..................................................................................36

*I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421 (1987) .............................................................22

*International Alliance of Theatrical & Stage Employees v. NLRB*,
   334 F.3d 27 (D.C. Cir. 2003) .................................................................................26, 29

*Irving Independent Sch. District v. Tatro*, 468 U.S. 883 (1984)..................................16, 18

*Kennecott Greens Creek Min. Co. v. Mine Safety and Health Admin.*,
   476 F.3d 946 (D.C. Cir. 2007)....................................................................................27

*Knight v. C.I.R.*, No. 06-1286, __ S. Ct. __, 2008 WL 140749 (Jan. 16, 2008)..............21

*MCI Telecom. Corp. v. AT&T*, 512 U.S. 218 (1994).......................................................15

*Maroni v. Pemi-Baker Regional Sch. District*, 346 F.3d 247 (1st Cir 2003)....................33

*Microsoft Corp. v. C.I.R.*, 311 F.3d 1178 (9th Cir. 2002) ................................................23

*Natural Resources Defense Council v. EPA*, 489 F.3d 1250 (D.C. Cir. 2007) ..........22, 24

*Northeastern Fla. Chapter of Associated General Contractors of America v.
   Jacksonville*, 508 U.S. 656 (1993) ..............................................................................33

*Northpoint Tech., Ltd. v. FCC*, 412 F.3d 145 (D.C. Cir. 2005).......................................26

*Pardini v. Allegheny Intermediate Unit*, 420 F.3d 181 (3d Cir. 2005) .............................38

*Pihl v. Massachusetts Department of Education*, 9 F.3d 184 (1st Cir. 1993) ..................38

*Rafferty v. Cranston Public Sch. Committee*, 315 F.3d 21 (1st Cir. 2002).......................37

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
   547 U.S. 47 (2006)........................................................................................................26

*Russello v. United States*, 464 U.S. 16 (1983) .................................................................23

*Ryan v. Bentsen*, 12 F.3d 245 (D.C. Cir. 1993) ...............................................................38

*Sch. Committee of Burlington v. Department of Ed. of Mass.*,
    471 U.S. 359 (1985)........................................................................................................30

*Scheduled Airlines Traffic Offices, Inc. v. Department of Defense*,
    87 F.3d 1356 (D.C. Cir. 1996) .............................................................................33, 34

*In re Sealed Case*, 494 F.3d 139 (D.C. Cir. 2007)...........................................................25

*Sierra Club v. EPA*, 294 F.3d 155 (D.C. Cir. 2002) ........................................................22

*Sierra Club v. EPA.*, 311 F.3d 853 (7th Cir. 2002).........................................................22

*Spencer v. District of Columbia*, 416 F. Supp. 2d 5 (D.D.C. 2006) ...........................32, 36

*Stratham School District v. Beth P.*, No. 02-135, 2003 WL. 260728
    (D.N.H. 2003) ....................................................................................................... *passim*

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001).................................................................21, 23

*Toy v. United States*, 263 F. Supp. 2d 1 (D.D.C. 2002)................................................14, 28

*Ullmo v. Gilmour Academy*, 273 F.3d 671 (6th Cir. 2001) .............................................31

*United States v. Collins*, 56 F.3d 1416 (D.C. Cir. 1995) ...................................................40

## STATUTES AND REGULATIONS

5 U.S.C. § 701............................................................................................................1

5 U.S.C. § 702 .........................................................................................................35

20 U.S.C. § 1400.....................................................................................................1, 34

20 U.S.C. § 1401.............................................................................................. *passim*

20 U.S.C. § 1403........................................................................................................36

20 U.S.C. § 1406.............................................................................................. *passim*

20 U.S.C. § 1411......................................................................................................6, 37

20 U.S.C. § 1415 ................................................................................................31, 32, 36

28 U.S.C. § 2412 ..............................................................................................................36

34 C.F.R. § 300.13(a) (1983) (superseded) ....................................................................41

34 C.F.R. §§ 300.20 (2008) .............................................................................................19

34 C.F.R. §§ 300.34 (2008) ...................................................................................... *passim*

34 C.F.R. § 300.113 (2008) ...................................................................................... *passim*

150 Cong. Rec. S5,394 ................................................................................................3, 8

N.H. Code Admin. R. Ed 1102.44 (2008) .......................................................................38

S. Rep. No. 108-185 (2003) ..................................................................................... *passim*

## MISCELLANEOUS

*American Heritage Stedman's Medical Dictionary* (28th ed. 2006)..................................16

*Webster's New World Dictionary* (3d ed. 1988) ..............................................................16

Plaintiffs Beth and David Petit and Nicole and Bennie Underwood bring claims under both the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, challenging two regulations enacted by defendants Department of Education and Secretary Margaret Spellings. These regulations exclude mapping of cochlear implants from the definition of "related services," thereby permitting local education agencies to exclude mapping from the services they provide to children with disabilities.

As a result of these regulations, plaintiffs' respective children, H. P. and A. U., have been denied coverage of the costs associated with mapping. Because the mapping regulations are contrary to law, plaintiffs' cross-motion for summary judgment should be granted and defendants' motion denied. Defendants' motion to dismiss the IDEA claim should also be denied because IDEA creates a private right of action against the Secretary and Department when, as here, a plaintiff's injuries are attributable to their conduct.[1]

## **INTRODUCTION**

Unlike many challenges to agency regulations under *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), this case does not require the Court to determine Congress's intent on an issue that Congress had never actually considered. *See, e.g.*, *id.* at 851. In this case, the text of the statute, the legislative history, and the administrative record make clear that Congress knew that its definition of "related services" would determine whether local education agencies could be required to provide mapping for cochlear implants, and that Congress decided that local agencies should provide this service.

---

[1] Although defendants' motion appears to request that the Court dismiss the suit in its entirety, defendants' proposed order and the memorandum supporting the motion make clear that defendants seek to dismiss only the IDEA claim. Defendants seek summary judgment for the APA claim.

The text of the statute establishes that Congress intended for local agencies to provide mapping to children with cochlear implants. The term "related services" expressly includes "audiology services," 20 U.S.C. § 1401(26)(A), and cochlear implant mapping – a service that can only be provided by a licensed audiologist – is surely such a service. Moreover, the statute's "medical device" exception excludes only the surgically implanted device and its replacement; it does not exclude any other "related services." § 1401(26)(B).

The legislative history and administrative record confirm that Congress intended for local agencies to provide cochlear implant mapping. Congress was aware of a federal court decision that the term "audiology services" brought mapping within the statutory definition of "related services," and therefore school districts could be required to provide this service under IDEA. (*See* Admin. R. ED-005413–18 (discussing *Stratham School District v. Beth P.*, No. 02-135, 2003 WL 260728 (D.N.H. 2003)).) In a letter to Senator Judd Gregg, the school district's expert witness in *Stratham School District* discussed the court's decision and explained why she thought it was wrongly decided. (*Id.*) She contacted Senator Gregg not only because he represented New Hampshire – where the case was decided – but also because, as the Chairman of the Senate Health, Education, Labor and Pensions ("HELP") Committee, he would play an important role in determining whether cochlear implant mapping would remain within the definition of "related services."

Senator Gregg was initially persuaded to propose an amendment to IDEA that would exclude mapping but later changed his mind. The bill that emerged from the HELP Committee was drafted to exclude surgically implanted devices and their maintenance,

programming, and replacement.  S. Rep. No. 108-185 at 8 (2003).[2]  But by the time Senator

Gregg brought the bill to the floor of the Senate, he reversed course and introduced the bill with

a manager's amendment that removed "maintenance" and "programming" from the exception to

the definition of "related services."  150 Cong. Rec. S5,394 (daily ed. May 13, 2004) (statement

of Sen. Gregg).  As a result, Congress enacted a definition of "related services" that still provides

for "audiology services" and only excludes the surgically implanted device and its replacement.

20 U.S.C. § 1401(26).

When the Department proposed regulations to exclude mapping from the

definition of "related services," Senator Gregg wrote Secretary Spellings "express[ing] his strong

objection" to the proposed regulations and explaining why "maintenance" and "programming"

were not included in the statutory exception.  (Admin. R. ED-000786–87.)  Senator Gregg

proposed the manager's amendment because he had "made a determination that it was

appropriate that the definition of related services cover the cost of the maintenance and

programming of surgically implanted devices." (*Id.* at ED-000787.)  As Senator Gregg explained

to Secretary Spellings, the proposed regulation was contrary to both the legislative intent and the

statutory text because "[t]he absence of a reference to post-surgical 'maintenance' and

'programming' of a surgically implanted device in the exception clause clearly indicates that

those activities are assumed in the definition of related services."  (*Id.*)  Despite the statutory

language, legislative history, and Senator Gregg's explanation, the Department promulgated

regulations excluding mapping from the definition of "related services."

Because the statutory text and legislative history establish that Congress intended

to include mapping in the definition of "related services," the Department's regulations are

---

[2] Creating an exception for "programming" would exclude cochlear implant mapping because mapping refers to the programming of the implant's speech processor.  (Compl. ¶ 22.)

contrary to law and therefore invalid under *Chevron*. Moreover, even if some degree of ambiguity existed, the Secretary's interpretation of "related services" is impermissible under *Chevron* because it neither furthers the statute's objectives nor is it adequately explained.

In implementing regulations that exclude mapping, the Secretary asserted that the regulations were necessary because Congress's intent on this issue was "clear." To support this view, the Secretary quoted the HELP Committee's report, which intended to exclude mapping, but which does not accurately reflect the bill with the "manager's amendment" that was ultimately passed. Defendants now disavow both their assertion that Congress's intent is clear and their reliance on the Senate report. Rather, they argue that Congress's intent was ambiguous and therefore the Secretary was free to exclude mapping based on the rulemaking authority granted by IDEA. Defendants argue that mapping's exclusion was a reasonable decision based on, among other factors, the cost of this service. But the administrative record does not support the contention that the Secretary based her decision on the cost of mapping. Indeed, to establish the cost of mapping, defendants cite a webpage that no longer exists and not the administrative record. Defendants' arguments before this Court cannot substitute for the reasons given by the Secretary when she adopted the regulations.

Because Congress intended to include cochlear implant mapping in the definition of "related services," the Department's mapping regulations are invalid and plaintiffs are entitled to summary judgment.

## BACKGROUND

### A.    Cochlear Implant Mapping

A cochlear implant is a type of hearing aid that has both an external component and a surgically implanted, internal component. (Compl. ¶ 18.) The external component

consists of a microphone, speech processor, and transmitter system. (*Id.* ¶ 19.)  The microphone

detects sounds from the environment, which the speech processor encodes and – with the help of

the transmitter system – transmits the sound as radio waves to the internal component of the

implant. (*Id.*)  The internal component includes a receiver connected to an electrode array. (*Id.*

¶ 20.)  The receiver takes the radio waves from the transmitter system and stimulates the selected

electrodes so that the brain receives the desired information. (*Id.*)   For a cochlear implant to

function properly, it must stimulate the auditory nerve in a manner that allows the brain to

process the electrical stimuli. (*Id.* ¶ 21.)  This is achieved by "mapping" the implant to meet the

unique needs of the child at the time of each mapping. (*Id.*)

Mapping is performed by an audiologist with specific training and expertise in

cochlear implants. (*Id.*  ¶ 22.)  As defendants explain, "Mapping is performed by an audiologist

who has specific expertise in cochlear implants, including 450 hours of direct contact with

individuals with cochlear implants, 50 hours of case management of individuals with cochlear

implants, and expertise in cochlear implants." (Defs.' Mem. at 9 (internal quotation marks and

alteration omitted).)  Proper mapping of the speech processor is essential for a cochlear implant

user.  If not properly mapped, the cochlear implant does not provide auditory information that

accurately reflects the sounds around the user. (*Id.* ¶ 23.)

Although purchasing and using cochlear implants is expensive, mapping accounts

for only a fraction of this cost.  Plaintiffs do not dispute that "the total cost for cochlear

implantation . . . can range between $45,000 and $55,000 and can far exceed $60,000 for patients

with extensive post-operative care." (Defs.' Mem. at 11 (citing http://www.cochlear.org/sys-

tmpl/cochlearimplantcosts/).)  But the only cost that is arguably relevant in this case is the cost of

mapping.  The source cited by defendants establishes that purchasing the device is "by far the

largest expense involved with the cochlear implant procedure." (Mosier Decl., Ex. A.) In 2000, the average invoice price for a cochlear implant was $19,745, and some hospitals charged as much as $33,000 for the device. (*Id.*) In contrast, "audiologists incurred an average cost of $91.25 per programming [mapping] session." (*Id.*) Based on this average cost and the average number of sessions needed per year, mapping costs run between $1,095-$1825 in the first year after implantation, and less than $200 each year after that. (*Id.*)

### B.    IDEA and Its Implementing Regulations

1.    *Individuals with Disabilities Education Act.*

IDEA provides federal funding to states that provide public education to children with disabilities according to the terms set out in the statute. 20 U.S.C. § 1411(a)(1). To remain eligible for funding, a state must ensure that local education agencies identify students with disabilities and create an "individualized education program" ("IEP") to ensure that a student's needs are met. § 1412(a)(4). The IEP must, among other things, provide for the special education and "related services" for the child to receive an appropriate education. § 1414(d)(1)(A)(IV). The term "related services, as amended in 2004, provides:

(26) Related Services

(A) In General

The term "related services" means transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services . . .) as may be required to assist a child with a disability to benefit from special education . . . .

(B) Exception

The term does not include a medical device that is surgically implanted, or the replacement of such device.

20 U.S.C. § 1401(26).

Although the term "related services" is not new to IDEA, the current definition is. Prior to 2004, the definition of "related services" was limited to the current subsection (A); the exception found in subsection (B) did not exist.  Based on this earlier version of the statute, a federal district court – in a case involving plaintiffs Beth and David Petit – interpreted "related services" to include cochlear implant mapping.  *See Stratham School District*, 2003 WL 260728. The court concluded that mapping was covered as part of the "audiology services" included in the definition of "related services" because cochlear implant mapping is a service provided only by licensed audiologists.  *Id.* at *4.  This decision was brought to Congress's attention shortly after it was decided.  (Admin. R. ED-005413–18).

Although *Stratham School District* addressed only whether a local education agency could be required to provide mapping to a child with cochlear implants, the Senate HELP Committee considered how all expenses related to surgically implanted devices should be treated.  The Committee recognized that local agencies can be required to provide an "assistive technology device" to children with disabilities, and cochlear implants arguably fell within the definition of that term.  20 U.S.C. § 1401(1) (2003).[3]  Moreover, for over a decade, the Department had considered a traditional acoustical hearing aid to be an "assistive technology device," and thus took the position that local agencies could be required to provide hearing aids under IDEA.  (*See* Mosier Decl., Ex. B.)

The HELP Committee concluded that IDEA should impose only minimal requirements on local education agencies with respect to surgically implanted devices.  To achieve this result, the Committee recognized that it needed to amend the definitions of both

---

[3] Section 1401(1) provided: "The term 'assistive technology device' means any item, piece of equipment, or product system, whether acquired commercially off the shelf, modified, or customized, that is used to increase, maintain, or improve functional capabilities of a child with a disability."  20 U.S.C. § 1401(1) (2003).

"assistive technology device," which arguably covered the medical device itself, and "related services," which covered the programming, or mapping, of the device. S. Rep. No. 108-185, at 8 (2003). The Committee thus adopted identical exceptions for both terms:

> The term does not include a medical device that is surgically implanted, *or the post-surgical maintenance, programming*, or replacement of such device, *or an external device connected with the use of a surgically implanted medical device (other than the costs of performing routine maintenance and monitoring of such external device at the same time the child is receiving other services under this Act).*

*Id* (emphasis added).

When the bill reached the floor of the Senate, Senator Gregg included a manager's amendment striking most of the proposed exception. 150 Cong. Rec. S5,394 (daily ed. May 13, 2004) (statement of Sen. Gregg). As a result, the current definitions of both "assistive technology device" and "related services" provide that "[t]he term does not include a medical device that is surgically implanted, or the replacement of such device." 20 U.S.C §§ 1401(1)(B), (26)(B).

The decision to offer a partial amendment to the exception was intended to strike a reasonable balance. A local education agency cannot be asked to purchase a cochlear implant for a child; nor can the agency be required to pay for the surgery to implant the device. But once a child has the device and has begun using it to assist with his or her learning, the local agency can be required to ensure that the device is mapped properly because proper mapping helps the child learn. The cost and burden of providing mapping is insubstantial in comparison to the nursing services that the Supreme Court held was included within the definition of "related services." *See Cedar Rapids Cmty. Sch. Dist. v. Garrett F.*, 526 U.S. 66 (1999).

2.     *The Department of Education's IDEA Regulations.*

Although the statute that Congress enacted did not contain an exception for maintaining or programming surgically implanted devices, the Secretary nonetheless determined that Congress intended to exclude these services.  Relying on the HELP Committee Report, the Secretary explained that the regulations must exclude cochlear implant mapping to give effect to Congress's clear intent:

> We believe **Congress was clear in its intent** in S. Rpt. 108–185, p. 8, which states:
>
> [T]he definitions of ''assistive technology device'' and ''related services'' do not include a medical device that is surgically implanted, or the post-surgical maintenance, programming, or replacement of such device, or an external device connected with the use of a surgically implanted medical device (other than the costs of performing routine maintenance and monitoring of such external device at the same time the child is receiving other services under the act).

(Admin. R. ED-000043 (emphasis added); *see also id.* at ED-000031–32 ("The exclusion of mapping from the definition of *related services* reflects the language in Senate Report (S. Rpt.) No. 108–185, p. 8, which states that the Senate committee did not intend that mapping a cochlear implant . . . be the responsibility of a school district.").)  The Secretary thus based her understanding of congressional intent on a report describing a version of the bill that was not enacted.

To further Congress's supposedly "clear" intent, the Secretary promulgated two regulations expressly providing that local agencies are not responsible for maintaining or programming surgically implanted devices. 34 C.F.R. §§ 300.34(b), 300.113(b) (2008).  Section 300.34(b)(1) explicitly excludes "mapping" from the definition of "related services":

> (b) Exception; services that apply to children with surgically implanted devices, including cochlear implants.

> (1) Related services do not include a medical device that is
> surgically implanted, the optimization of that device's functioning
> (e.g., mapping), maintenance of that device, or the replacement of
> that device.

34 C.F.R. § 300.34(b)(1) (2008).

Section 300.113(b)(2) makes clear that a local agency's obligation to provide

routine checking of hearing aids does not require it to provide maintenance or programming of a

surgically implanted device:

> (2) For a child with a surgically implanted medical device who is
> receiving special education and related services under this part, a
> public agency is not responsible for the post-surgical maintenance,
> programming, or replacement of the medical device that has been
> surgically implanted (or of an external component of the surgically
> implanted medical device).

34 C.F.R. § 300.113(b)(1) (2008).

These regulations, 34 C.F.R. §§ 300.34(b)(1) & 300.113(b)(1), are the subject of

plaintiffs' complaint.

### C.    Plaintiffs

Before the current regulations went into effect, courts held that plaintiffs H. P. and

A. U. were both entitled to cochlear implant mapping under IDEA.  Since the regulations took

effect, however, neither child has had mapping covered by their local education agency.  (Compl.

¶ 3.)

### 1.    *Beth, David, and H. Petit*

H. P. was born in 1996 with sensorineural hearing loss in both ears. On March 3,

1999, he underwent surgery to receive a cochlear implant.  (*Id.* ¶ 35.)  In May 1999, Stratham

School District in New Hampshire determined that he was eligible for special education services

under IDEA.  (*Id.*)  In 2003, in response to the decision in *Stratham School District*, the school district began including cochlear implant mapping in H.P.'s IEPs.  (*Id.* ¶ 36.)

On October 20, 2006, a week after the effective date of the Department's regulations, the Petits received a letter from the co-director of Special Services at their son's school.  (*Id.* ¶ 37.)  The letter informed the Petits of a meeting to review changes to the IEP "occasioned by new regulations going into effect on cochlear implants."  (*Id.*)  At this meeting, which was held on November 2, 2006, the school district – over the objection of the Petits – removed mapping from the IEP.  (*Id.* ¶ 38.)  In the meeting notes, the school justified the change based on the Department's new regulations.  According to the school:  "The school district has no legal obligation to provide 'mapping' for [H. P.'s] implant. We are proposing to implement the new law."  (*Id.*)

2.    *Nicole, Bennie, and A. Underwood*

Plaintiffs Nicole and Bennie Underwood are the parents of A. U., who was born in 2001 with bilateral sensorineural hearing loss.  (*Id.* ¶ 40.)  She had a cochlear implant surgically implanted in her right ear in May 2002 and in her left ear in March 2005.  (*Id.*)  The Roane County School District in Tennessee identified her as eligible for special education services under IDEA in 2004.  (*Id.*)

Prior to the 2004 amendments to IDEA, the school district provided mapping services as part of her IEP.  (*Id.* ¶ 41.)  The school district removed mapping, however, for the 2005-06 school year based on the Department's proposed rulemaking, despite the fact that the proposed rules had not yet been adopted.  (*Id.*)

The Underwoods successfully challenged the school district's refusal to provide mapping services at a due process hearing.  (*Id.* ¶ 42.)  The hearing officer interpreted the statute to require the school district to provide mapping services.  (*Id.*)  The school district challenged

this ruling in federal district court. (*Id.* ¶ 43.) Agreeing with the hearing officer, the district

court concluded that the school district should have provided mapping services for the 2005-06

school year, and ordered the school district to pay for these mapping services. *A.U., ex rel. N.U.*

*v. Roane County Board of Education*, 501 F. Supp. 2d 1134, 1143 (E.D. Tenn. 2007).

The court did not limit its order to the 2005-06 school year. Instead, the court

ordered the school district to pay for mapping services to October 13, 2006 – the effective date of

the Department's new regulations. *Id.* at 21-22. According to the court, the regulations

"changed the playing field," and thus the school district was not responsible for mapping as of

their effective date. *Id.* Although the court referred to the effect of the new regulations, their

validity was beyond the scope of the lawsuit, which addressed only whether the school district

was required to provide mapping services during the 2005-06 school year, and thus before the

new regulations took effect. *Id.*

Defendants accuse the Underwoods of taking a position in this case that is

contrary to the position they took in *A.U., ex rel. N.U. v. Roane County Board of Education*, 501

F. Supp. 2d 1134, 1143 (E.D. Tenn. 2007). But a closer look at that case shows that the

Underwoods have consistently maintained that mapping is unambiguously covered by the

statute. Although the district court's opinion states that "the parents argue that the amendment is

ambiguous and does not specifically exclude mapping," the court confused the parties' position

on this issue. The school district argued that the statute was ambiguous; the Underwoods argued,

as they do now, that the statute unambiguously includes mapping. In opposing the school

district's motion for summary judgment, the Underwoods expressly stated that they "do[] not

concede that the language in the statute is 'ambiguous.'  It is quite clear that the exclusion applies to the device, not the mapping process."  (Mosier Decl., Ex. C at 2).)[4]

## ARGUMENT

Plaintiffs bring claims under both the APA and IDEA challenging defendants' decision to exclude cochlear implant mapping from the definition of "related services."  Because the two causes of action seek the same declaratory and injunctive relief based on the same conduct by defendants, plaintiffs' APA and IDEA claims largely overlap.  Plaintiffs first address the APA claim because defendants concede that the Court can reach the merits of plaintiffs' challenge to the Department's regulations under this claim.  Plaintiffs then address whether IDEA provides a cause of action under which plaintiffs can challenge defendants' conduct.  Although granting the injunctive and declaratory relief requested for the APA claim will moot Plaintiffs' request for similar relief under IDEA, the Court must still determine whether a cause of action exists under IDEA because IDEA provides a fee-shifting remedy not available under the APA.

## I.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR APA CLAIM BECAUSE THE DEPARTMENT'S REGULATIONS ARE CONTRARY TO LAW.

The parties agree that plaintiffs have properly stated a claim under the APA and that this claim may be resolved on summary judgment.[5]  Because the parties also agree that the

---

[4] Nor did Ms. Underwood claim at a public hearing that the statute was ambiguous.  (*See* Defs.' Mem. at 25 n. 6.)  When she requested a regulation that explicitly stated that mapping was a "related service[]," she was not offering her views of statutory interpretation.  She requested this regulation to prevent school districts from interpreting the statute to exclude mapping, as her daughter's school district had done. (Admin. R. ED-003321–25.)   To the extent that her personal views on this pure question of law are relevant, she thought the school district's interpretation was "incorrect."  (*Id.* at ED-003321.)

challenged regulations should be analyzed under the *Chevron* framework, the Court need only apply *Chevron* to these regulations to resolve the APA claim.

Applying *Chevron* is a two-step process. The Court must first decide whether Congress has "directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842-43 (footnote omitted). If "the statute is silent or ambiguous with respect to the specific issue," the Court must then consider whether the agency's interpretation "is based on a permissible construction of the statute." *Id.* at 843. For this latter inquiry, the Court should review the agency's action based on the record before the Secretary at the time she determined that mapping should be excluded from the definition of "related services." *Toy v. United States*, 263 F.Supp.2d 1, 8 (D.D.C. 2002).

The regulations excluding mapping from the definition of "related services" fail both steps of *Chevron*.

**A.    The Regulations Should Be Invalidated Under *Chevron*'s First Step Because the Definition of "Related Services" Unambiguously Includes Cochlear Implant Mapping.**

Under *Chevron*'s first step, a court must employ the "traditional tools of statutory construction" to determine whether Congress has "directly spoken to the precise issue." 467 U.S. at 842-43 & n. 9. Although this analysis should begin with the text of the statute, a court is also permitted to consider legislative history and apply canons of statutory construction. *See, e.g., Halverson v. Slater*, 129 F.3d 180, 184 ( D.C. Cir. 1997).

---

[5] Although plaintiffs dispute that the Underwoods previously argued that IDEA's definition of "related services" was ambiguous, this dispute does not preclude summary judgment because whether an argument was presented in a previous case is not relevant to deciding this case.

The mapping regulations fail *Chevron*'s first step.  Congress spoke clearly to the issue of whether mapping is a related service by defining "related services" to include "audiology services," which unambiguously includes cochlear implant mapping.  Moreover, the statutory exception to "related services" excludes only a "medical device" and its replacement; it does not create an exception for mapping.  The legislative history of the recent IDEA amendments confirms the plain meaning of the statute.

> 1.  *By defining "related services" to include "audiology services," the statutory text unambiguously expresses Congress's  intent to include cochlear implant mapping as a related service.*

IDEA defines "related services" broadly and expressly includes "audiology services" within this definition:

> The term "related services" means transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and ***audiology services*** . . .) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

20 U.S.C. § 1401(26)(A) (emphasis added).  This definition further provides that "[t]he term does not include a medical device that is surgically implanted, or the replacement of such device."  § 1401(26)(B).

Because IDEA does not define "audiology services," the term should be given its "ordinary, common meaning."  *See Am. Fed'n of Fed. Employees v. Glickman*, 215 F.3d 7, 10-11 (D.C. Cir. 2000) ("[T]he lack of a statutory definition does not render a term ambiguous. It simply leads us to give the term its ordinary, common meaning.") (citation omitted).  To determine a word's ordinary meaning, courts may consult a dictionary.  *See MCI Telecom. Corp. v. AT&T*, 512 U.S. 218, 225-30 (1994).  Based on the dictionary definition, "audiology" means "the evaluation of hearing defects and the rehabilitation of those who have such defects."

*Webster's New World Dictionary* 89 (3d ed. 1988); *see also American Heritage Stedman's Medical Dictionary* 181 (28th ed. 2006) (defining "audiology" as "[t]he study of hearing disorders through the identification and measurement of hearing impairment"). The term "audiology services" therefore must include services intended to evaluate and rehabilitate hearing defects and impairments.

Defendants' description of the mapping process leaves little doubt that mapping satisfies this definition. To map a cochlear implant, an audiologist evaluates the child's response to sound. (Defs.' Mem. at 9-10.) The audiologist uses the results of this evaluation to ensure that the cochlear implant is programmed to permit the child to recognize sounds. (*Id.*) Mapping is necessary for a cochlear implant "to operate effectively," and if "performed incorrectly, it can lead to physical harm to the child." (*Id.* at 9.) Mapping therefore is an "audiology service[]" because it involves "the evaluation of hearing defects and the rehabilitation of those who have such defects." *Webster's New World Dictionary* 89 (3d ed. 1988).

The Supreme Court's interpretation of "medical services" provides further support for interpreting "audiology services" to include cochlear implant mapping. *See Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883 (1984); *Cedar Rapids Cmty. Sch. Dist. v. Garrett F.*, 526 U.S. 66 (1999). In *Tatro* and *Garrett F.*, the Supreme Court interpreted "medical services" – another undefined term used in IDEA's definition of "related services" – by focusing on the person who provides the service. *Garrett F.*, 526 U.S. at 73-74; *id. at* 81 (Thomas, J., dissenting) (criticizing "*Tatro*'s provider-specific approach"). Under this approach, the Court interpreted "medical services" to refer "to services that must be performed by a physician." *Id.* at 73-74.

Following *Tatro*'s logic, cochlear implant mapping is an audiology service because it is a service provided only by licensed audiologists. The *Stratham School District*

court recognized as much: "Only a specially trained audiologist can perform mapping. A speech language pathologist works closely with the audiologist for mapping, but a pathologist cannot map the device." 2003 WL 260728, at *1. Defendants do not dispute this point, acknowledging that "[m]apping is performed by an audiologist who has specific expertise in cochlear implants." (Defs.' Mem. at 9.)

The decision in *Stratham School District* provides further support for interpreting "audiology services" to include cochlear implant mapping. When Congress amended IDEA, it is presumed to know that "audiology services" had been judicially interpreted to include cochlear implant mapping. *See, generally, Cannon v. Univ. of Chicago*, 441 U.S. 677, 696-97 (1979). The administrative record makes clear that Congress was, in fact, aware of this interpretation. (Admin. R. ED-005413–18.) By retaining "audiology services" without limiting its meaning, Congress may be presumed to have adopted the court's construction of that term.[6]

Defendants suggest that Congress cannot have spoken directly to whether mapping is a related service because the definition of "related services" does not include the phrase "cochlear implant mapping." (Defs.' Mem. at 21.) But *Chevron*'s first step cannot be avoided so easily. In *Chevron* itself, the Supreme Court acknowledged that neither the statutory text nor legislative history explicitly addressed the "'bubble concept'" at issue in that case. 467 U.S. at 851. But that acknowledgment marked the beginning – not the end – of the Court's inquiry into whether Congress spoke directly to the issue. The Court then looked to the statutory

---

[6] Defendants correctly note that this presumption may not apply when Congress revises a statute, but they apply this principle too broadly. (*See* Defs.' Mem. at 28.) In amending IDEA, Congress revised the definition of "related services," but it did not alter the meaning of "audiology services," and thus the only sensible conclusion is that Congress adopted the *Stratham School District* court's interpretation of that term.

term "stationary source" to determine whether the meaning of that term was sufficiently clear to express Congress's intent on the issue before it. *Id.* at 859-62.[7]

The D.C. Circuit has also rejected the argument that a statutory provision is necessarily silent on an issue that is not explicitly mentioned in the statute. *See Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075 (D.C. Cir. 1996). In *Engine Manufacturers*, the Environmental Protection Agency argued that Congress could not have spoken directly to the issue of preemption because the relevant statutory provision did not say "preemption." *Id.* at 1088. The court, however, had no trouble finding a clear congressional intent on preemption despite the absence of that term. *Id.* The Court explained that, "if [the text] clearly requires a particular outcome, then the mere fact that it does so implicitly rather than expressly does not mean that it is 'silent' in the *Chevron* sense." *Id.*

Defendants downplay the ordinary meaning of "audiology services" by noting that IDEA's implementing regulations "define[] the term 'audiology' without reference to the provision of mapping services." (Defs.' Mem. at 22.) But defendants cite no case in which statutory ambiguity is created by an administrative regulation. The lack of support for this point is unsurprising: If an agency could render a clear statutory term ambiguous by enacting an ambiguous regulation, it could always avoid *Chevron*'s first step. *See Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 11 (D.C. Cir. 2002) (agency cannot "rely on one of its own regulations to trump the plain meaning of a statute," for this "would turn *Chevron* on its head"). The relevant

---

[7] When the Supreme Court considered whether "clean intermittent catheterization" was a "related service[]" under IDEA, the absence of that specific term was of no consequence. *See Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883 (1984). The Court noted that "related services" was defined to include "supportive services," that clean intermittent catheterization was a supportive service, and therefore Congress intended that this service be included in the definition of "related services." *Id.* at 891-92.

question under *Chevron* is whether *Congress* spoke directly to the issue – not whether one agency regulation creates an ambiguity for a second regulation to resolve.

Further, the "audiology" regulation does not help defendants because it does not provide a comprehensive definition of "audiology."  Instead, the regulation merely provides examples of audiology services.  34 C.F.R. § 300.34 (2008) ("Audiology includes . . .").  The regulations make clear that this list is not exhaustive.  *Id.* § 300.20 (2008) ("*Include* means that the items named are not all of the possible items that are covered, whether like or unlike the ones named.").  And therefore cochlear implant mapping's absence from this list is irrelevant.  *See Stratham School District v. Beth P.*, No. 02-135, 2003 WL 260728, at *4 (D.N.H. 2003).

Defendants next argue that the term "audiology services" is ambiguous when interpreted in context with the statutory exception for surgically implanted devices.  (Defs.' Mem. at 22-23.)  According to Defendants, "[g]iven Congress's intent to except the provision or replacement of cochlear implants from the related services definition, it is, at the very least, ambiguous to what extent states must provide 'audiology services' in connection with those exempted medical devices."  (*Id.* at 23.)  But the medical devices exception modifies the definition of "related services," not the meaning of "audiology services."  Thus, the term "audiology services" should be given its ordinary meaning, which includes cochlear implant mapping.

      2.    *The medical devices exception neither excludes mapping nor creates ambiguity as to whether mapping is a related service.*

Because cochlear implant mapping is an audiology service, it is included in the definition of "related services" so long as it does not fall within the statutory exception to this term.  The exception to "related services" provides that "[t]his term does not include a medical device that is surgically implanted, or the replacement of such device."  20 U.S.C.

§ 1401(26)(B).  Mapping is neither the device itself nor the replacement of the device and therefore is not excluded by this provision.

Defendants argue that, because a surgically implanted device is excluded from the definition of "related services," it is ambiguous whether schools have to provide services relating to that device.  (Defs.' Mem. at 23.)  Defendants never fully explain exactly how the medical devices exception creates an ambiguity about coverage of mapping services, but two theories seem possible: (1) the phrase "a medical device that is surgically implanted" is sufficiently ambiguous that it could be interpreted to exclude only the medical device itself, or it could be interpreted broadly to include both the device and services relating to the device; or (2) the existence of an express exception for surgically implanted devices and their replacement creates the possibility that Congress intended an implied exception for services related to medical devices.  Neither theory has merit.

The statutory exception for "a medical device that is surgically implanted" cannot be interpreted to exclude both the device itself and services related to that device.  Congress understood the distinction between a device and services related to a device.  IDEA, for example, defines "assistive technology device" to mean an "item, piece of equipment, or product system," and defines "assistive technology service" to mean a "service that directly assists a child with a disability in the selection, acquisition, or use of an assistive technology device." *See* § 1401(1)(A), (2).  The HELP Committee, which drafted the medical devices exception, understood this distinction as well.  When the Committee sought to exclude services relating to surgically implanted devices it did not draft an exception limited to a "medical device that is surgically implanted," but instead included "the post-surgical maintenance, programming, or

- 20 -

replacement of such device" because, at the time, it intended to exclude both the medical device and services related to the device.  S. Rep. No. 108-185 at 8 (2003).

Interpreting "medical device" to include services related to the device is also contrary to two canons of statutory construction.  *First*, the medical devices exception cannot be interpreted to include mapping without violating the longstanding rule that exceptions should be construed narrowly.  The Supreme Court recently reaffirmed its "inclination, '[i]n construing provisions . . . in which a general statement of policy is qualified by an exception, [to] read the exception narrowly in order to preserve the primary operation of the provision.'"  *Knight v. C.I.R.*, No. 06-1286, __ S. Ct. __, 2008 WL 140749, at *6 (Jan. 16, 2008) (*quoting C.I.R. v. Clark,* 489 U.S. 726, 739 (1989)) (alterations in original); *see also Knight*, 2008 WL 140749, at *6 ("Given that Congress has enacted a general rule . . , we should not eviscerate that legislative judgment through an expansive reading of a somewhat ambiguous exception.") (quotation marks omitted).  *Second*, such an interpretation would render the rest of the medical device exception superfluous.  *See TRW Inc. v. Andrews,* 534 U.S. 19, 31 (2001).  Defining "medical device" so broadly that it includes services like mapping would also bring device replacement within the definition, making an express exception unnecessary.  If Congress intended the exclusion of surgically implanted devices to exclude services for the device, then it had no need to exclude "the replacement of such device."

The existence of an express exception for medical devices does not create ambiguity as to whether Congress also intended an implied exception for services related to medical devices.  The canon *expressio unius est exclusio alterius* precludes such an implication. As courts have long held, the existence of an express exception means that implied exceptions do not exist.  In a recent decision, the D.C. Circuit invalidated an agency regulation, holding that

when Congress creates an express exception, an agency "may not, consistent with *Chevron,* create an additional exception on its own." *Natural Res. Def. Council v. EPA*, 489 F.3d 1250, 1259-60 (D.C. Cir. 2007); *see also Sierra Club v. EPA,* 294 F.3d 155, 160 (D.C. Cir. 2002) (holding that the court "cannot but infer from the presence of these specific exemptions that the absence of any other exemption . . . was deliberate, and that the Agency's attempt to grant such [an exemption] is contrary to the intent of the Congress."); *Sierra Club v. EPA*, 311 F.3d 853, 860 (7th Cir. 2002) ("When Congress creates some exceptions to a statute, it is presumed that this list is intended to be exclusive.").

> 3. *The legislative history confirms Congress's intent to define "related services" to include cochlear implant mapping.*

Because the statutory text unambiguously includes mapping within the definition of "related services," the Court need not consider the legislative history of the recent amendments to IDEA. *See Goldring v. Dist. of Columbia*, 416 F.3d 70, 71 (D.C. Cir. 2005). Nonetheless, the legislative history confirms that Congress intended for cochlear implant mapping to be covered under the statute.

An earlier version of the bill expressly excluded programming and maintenance of surgically implanted devices, but the bill was amended prior to the Senate vote to remove this exclusion. This amendment kept mapping within the definition of "related services" and limited the exception to surgically implanted devices and their replacement. The Supreme Court has explained that "[f]ew principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) (citations omitted). The Court has also noted that, "[w]here Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be

presumed that the limitation was not intended." *Russello v. United States*, 464 U.S. 16, 23-24 (1983); *see also Microsoft Corp. v. C.I.R.*, 311 F.3d 1178, 1186 (9th Cir. 2002) ("It would be unreasonable to conclude that, having rejected more limiting language in favor of more expansive language, Congress intended to retain the limited meaning.") (citations omitted).

Defendants appear to concede this point by arguing only that the legislative history is ambiguous, not that it demonstrates a legislative intent to exclude mapping. But defendants' concession is fatal because they cannot create an additional exception to the definition of "related services" based on ambiguous legislative intent. When Congress creates an express statutory exception, "additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *TRW*, 534 U.S. at 28 (citation omitted). The existence of an express exception for medical devices would therefore preclude an implied exception for mapping even if the legislative history were ambiguous.

In any event, defendants cannot survive *Chevron*'s first step because the legislative history is not ambiguous. Defendants concede that a decision to delete language in a bill prior to enactment is an ambiguous indicator of legislative intent only when multiple plausible interpretations for the omission exist. (*See* Defs.' Mem. at 28.) Defendants suggest two reasons why Congress may not have intended to cover mapping when it deleted the maintenance and programming language: (1) Congress may have considered the language superfluous, or (2) Congress intended to leave a gap for the Secretary to fill. (*Id.* at 27-28.) Because neither of defendants' alternative explanations is plausible, the deletion of the "maintenance" and "programming" language evidences Congress's intent to include mapping in the definition of "related services."

Congress cannot plausibly have considered the exception for "post-surgical maintenance, [and] programming" to be superfluous.  For the deleted language to be superfluous, Congress must have thought that the term "medical device" includes not only the device itself but also services related to the device.  This interpretation is implausible in light of the distinction Congress has drawn between a device and services related to that device elsewhere in the statute.  *Compare* 20 U.S.C. § 1401(1)(A) (defining "assistive technology device"), *with* § 1401(2) (defining "assistive technology service"); *see also* pp. 20-21 *supra*.

Nor is there any basis for thinking that Congress created a gap to be filled by the Secretary when it deleted "post-surgical maintenance, [and] programming."  If courts were willing to interpret Congress's decision not to create a statutory exception as creating a gap in the statute, then agencies would be free to exercise their "gap filling" authority to adopt whatever exceptions they saw fit.  But the case law forecloses this result.  *See, e.g.*, *Natural Res. Def. Council*, 489 F.3d at 1259-60 (holding that, when Congress creates an express exception, an agency "may not, consistent with *Chevron,* create an additional exception on its own").  Statutory exceptions determine the scope of a statutory provision; they do not create or fill gaps within the statute.

The only plausible interpretation for Congress's decision to strike "post-surgical maintenance, [and] programming" from the exception to the definition of "related services" is that Congress did not intend to create an exception for maintenance and programming.  Senator Gregg therefore was correct when he informed Secretary Spellings that "[t]he absence of a reference to post-surgical 'maintenance' and 'programming' of a surgically implanted device in the exception clause clearly indicates that those activities are assumed in the definition of related services." (*Id.* at ED-000787.)

4.    *The decision in* A. U. v. Roane County *should be given no weight because it did not decide the issue before this Court and its dicta are unpersuasive.*

Although Defendants concede that the "A.U. court did not specifically rule on the validity of [the Department's] regulations," they nonetheless assert that "the court's observations . . . are instructive on the issue before this Court."  (Defs.' Mem. at 24 (citing *A.U., ex rel. N.U. v. Roane County Board of Education*, 501 F. Supp. 2d 1134, 1143 (E.D. Tenn. 2007).)  As dicta, the *A.U.* court's observations are only instructive insofar as they are persuasive.  *See In re Sealed Case*, 494 F.3d 139, 155-56 (D.C. Cir. 2007) (dicta "is only controlling . . . to the extent it is persuasive").  Because the court's cursory analysis of the mapping regulations is unpersuasive, its observations should be given no weight.

The *A.U.* court did not analyze the text of the statute; nor did it purport to apply the first step of *Chevron* to determine whether Congress spoke directly to the issue of mapping. The court merely agreed with the hearing officer and the school district that the statute was "somewhat ambiguous."  *A.U.*, 501 F. Supp. 2d at 1143 ("The hearing officer found, and in its brief Roane County concedes, that the amendment [*i.e.*, the medical devices exception] is 'somewhat ambiguous.'  The court agrees.  The amendment to the definition of related services is anything but clear.").[8]

The district court did not analyze whether Congress spoke directly to whether mapping is covered under IDEA.  As the party seeking to rely on the reasonableness of the Secretary's interpretation, the school district was in no position to "concede[]" the first step of *Chevron*.  Moreover, even when the parties agree on the meaning of a statute, a court has an obligation to ensure that the agreed-upon construction is correct.  The Supreme Court recently explained that a court need not "accept an interpretation of a statute simply because it is agreed

---

[8] The Underwoods did not, as defendants assert, concede that the statute is ambiguous.  *See* pp. 12-13 *supra*.

to by the parties.  After all, '[the court's] task is to construe what Congress has enacted.'"

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 56 (2006) (quoting

*Duncan v. Walker*, 533 U.S. 167, 172 (2001)).

The *A.U.* court did not apply *Chevron* to determine whether Congress has spoken

directly to the issue of cochlear implant mapping because the court had no need to determine the

validity of the mapping regulations.  This Court should give no weight to the *A.U.* court's

statement that the statute is "somewhat ambiguous."

> **B.      The Regulations Also Fail *Chevron*'s Second Step Because They Are
>           Inconsistent With IDEA's Objectives and Are Arbitrary and Capricious.**

If the Court concludes that the definition of "related services" is sufficiently

ambiguous to survive *Chevron*'s first step, it must then decide whether the Secretary's

interpretation is a "permissible construction of the statute."  *See Chevron*, 467 U.S. at 843.  An

agency's construction is permissible if it is consistent with the statute's objectives and purpose.

*See Int'l Alliance of Theatrical & Stage Employees v. NLRB*, 334 F.3d 27, 33-34 (D.C. Cir.

2003).  The Secretary must also provide a reasonable explanation of how her interpretation

furthers the statutory purpose: "A reasonable explanation of how an agency's interpretation

serves the statute's objectives is the stuff of which a permissible construction is made; an

explanation that is arbitrary, capricious, or manifestly contrary to the statute, however, is not."

*Northpoint Tech., Ltd. v. FCC*, 412 F.3d 145, 151 (D.C. Cir. 2005) (citations and quotation

marks omitted).

Defendants suggest a number of grounds for upholding the Secretary's

interpretation.[9]  According to Defendants, the Secretary's interpretation is a permissible

---

[9] The structure of Defendants' brief suggests that they view some arguments as addressing the
reasonableness of the Secretary's interpretation under *Chevron*'s second step, while others

construction of the statute: (1) because of the cost of mapping; (2) because mapping does not

need to be done at school or during the school day; (3) because mapping is not necessary to

protect a child's health or safety; and (4) because mapping requires a higher level of expertise

than a school employee may have.  None of these rationales supports the Secretary's

interpretation.

   *First*, defendants fail to provide a reasonable explanation of how IDEA's

objectives are served by interpreting "related services" to exclude mapping based on cost.

Defendants argue that *Tatro* and *Garrett F.* permit the Secretary to take the cost of services into

consideration when defining "related services."  (Defs.' Mem. at 33.)  But even if a service could

be excluded based solely on cost, the administrative record does not support defendants' claim

that mapping was excluded because of its cost, and the Court cannot "assume that the arguments

of counsel are the same as the Secretary's official position."  *Hill v. Norton*, 275 F.3d 98, 105

(2001).

   In any event, if the Secretary had interpreted "related services" to exclude

mapping based on the cost of mapping, this decision would be arbitrary and capricious because

defendants cite no evidence in the administrative record to establish the cost of mapping.  *See*

*Kennecott Greens Creek Min. Co. v. Mine Safety and Health Admin.*, 476 F.3d 946, 952 (D.C.

Cir. 2007) (agency action is arbitrary and capricious if the agency has not examined the "relevant

data").  Instead, defendants rely on a webpage, which no longer exists, to establish the total costs

associated with cochlear implants. (Defs.' Mem. at 11 (citing http://www.cochlear.org/sys-

---

address reasonableness under arbitrary and capricious review.  Plaintiffs do not attempt to draw a
similar distinction because of the overlap between these arguments.  *See Northpoint Tech., Ltd.*
*v. FCC*, 412 F.3d 145, 151 (D.C. Cir. 2005); *Gen. Instrument Corp. v. FCC,* 213 F.3d 724, 732
(D.C. Cir. 2000) ("[W]e have recognized that an arbitrary and capricious claim and a *Chevron*
step two argument overlap.").

tmpl/cochlearimplantcosts/).)  This evidence should not be considered in light of the "well established rule that judicial review of an agency decision is normally limited to the administrative record."  *Toy v. United States*, 263 F.Supp.2d 1, 8 (D.D.C. 2002).

Even if this webpage were part of the administrative record, it does not support the view that mapping can be excluded because it is too costly.  According to the webpage, "audiologists incurred an average cost of $91.25 per programming [mapping] session."  (Defs.' Mem. at 11 (citing http://www.cochlear.org/sys-tmpl/cochlearimplantcosts/).)  This expense is quite modest compared to other services included in the definition of "related services."  *See, e.g.*, *Garrett F.*, 526 U.S. at 79 (requiring school district to provide full-time nurse services). The purported exclusion of mapping for cost reasons is therefore arbitrary and capricious.  *See Athens Cmty. Hosp., Inc. v. Shalala*, 21 F.3d 1176, 1179 (D.C. Cir. 1994) (recognizing that deference can be denied under *Chevron* if the agency's explanation is sufficiently implausible).

Moreover, *Tatro* and *Garrett F.* only permit the Secretary to define "related services" based on the "cost concerns that *Congress* may have had" – she cannot base the definition on cost itself.  *See Garrett F.*, 526 U.S. at 77 (emphasis added).  If Congress includes a particular service within the definition of "related services," then it has necessarily determined that the service should not be excluded based on cost, and the Secretary cannot exclude that service simply because she thinks the service is too expensive.  Neither the statutory text nor legislative history provide any basis to think that Congress had specific concerns about mapping costs.

*Second*, interpreting "related services" based on whether a service must be provided at school or during the school day is impermissible because it is inconsistent with the requirement to provide "special education" outside of school.  *See, e.g, Int'l Alliance of*

- 28 -

*Theatrical & Stage Employees v. NLRB*, 334 F.3d 27, 34 (D.C. Cir. 2003) (finding an agency

interpretation unreasonable in part because it "renders the Act internally inconsistent").  IDEA

defines "special education" broadly to include "instruction conducted in the classroom, in the

home, in hospitals and institutions, and in other settings."  20 U.S.C. § 1401(29)(A).  In order to

achieve Congress's goal of providing "related services" to assist with "special education,"

20 U.S.C. § 1401(26)(A), related services must be available wherever special education occurs.

Otherwise, a broad range of related services would be available for special education in the

classroom but not for special education made available at other locations.  Excluding services

based solely on the time or place where they are performed furthers no statutory purpose.

Because there is no evidence that Congress intended such a result, interpreting "related services"

based on when or where the service is provided is an unreasonable construction of the statute.

      *Third*, defendants cannot justify excluding cochlear implant mapping on the

grounds that mapping is not necessary to protect a child's health or safety.  IDEA requires a local

agency to provide "related services" that "assist a child with a disability to benefit from special

education."  20 U.S.C. § 1401(26)(A).  This objective is frustrated by a regulation that prevents

children from receiving a service that will assist them in learning simply because that service is

not necessary to protect their health or safety.  Moreover, defendants do not point to any

evidence in the administrative record to support the contention that proper mapping does not

raise health concerns.  To the contrary, Defendants concede that "[w]hen mapping is performed

incorrectly, it can lead to physical harm."  (Defs.' Mem. at 9.)  The exclusion of mapping on

health grounds is therefore arbitrary and capricious.

      *Fourth*, IDEA's objectives are not furthered by interpreting "related services"

based on the level of expertise needed for a particular service because many of the services

included within the definition of "related services" – for example, "speech-language pathology" and "psychological" services – require a high level of expertise.  20 U.S.C. § 1401(26)(A). IDEA does not permit a local agency to refuse to provide a service if it lacks the requisite expertise.  *See Garrett F.*, 526 U.S. at 76 n.8 ("the District cannot limit educational access simply by pointing to the limitations of existing staff").  Indeed, if a local agency is unable to provide appropriate services, parents may enroll their child at a private school and seek reimbursement for their expenses.  *See Sch. Comm. of Burlington v. Dep't of Ed. of Mass.*, 471 U.S. 359, 369 (1985) (court may "order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act").

        The Secretary's interpretation does not further the objectives of IDEA.  Moreover, many of the rationales asserted before this Court are not adequately supported by the administrative record and therefore are arbitrary and capricious.  As a result, the mapping regulations are not a permissible construction of IDEA and are therefore invalid under *Chevron*.

## II.    PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR IDEA CLAIM BECAUSE THE SECRETARY EXCEEDED HER STATUTORY AUTHORITY BY ENACTING THE MAPPING REGULATIONS.

        As defendants acknowledge, the issue of the validity of the Department's regulations is properly before the Court.  Defendants concede that plaintiffs' APA claim permits them to challenge the Secretary's interpretation of "related services" under *Chevron*.  But even without the APA, plaintiffs could challenge the mapping regulations because IDEA itself creates a cause of action under which an aggrieved party can bring suit in federal court.  Because plaintiffs have stated a claim under IDEA, defendants' motion to dismiss should be denied, and summary judgment granted for plaintiffs.

### A.     Plaintiffs State a Valid Claim Under IDEA.

In moving to dismiss plaintiffs' IDEA claim, defendants rely heavily on case law concerning implied rights of action.  Plaintiffs, however, are not relying on an implied right of action to vindicate their rights under IDEA because the statute creates an express right of action. 20 U.S.C. § 1415(i)(2).  The only question before the Court is whether IDEA's right of action permits suits only against the state or local agency, as Defendants' claim.  The answer to this question is clearly "no."  Because "IDEA does not specifically name the party against whom such an action may be brought,"  *Ullmo v. Gilmour Academy*, 273 F.3d 671, 679 (6th Cir. 2001), a suit can be maintained against any defendant whose violation of IDEA injures a child with disabilities.

By implementing the mapping regulations, defendants acted contrary to IDEA. This conduct directly resulted in plaintiffs being denied rights they are entitled under IDEA.  A party denied rights under the statute can bring suit against the party whose violation of IDEA caused the injury, even if the violator is the Department of Education or Secretary of Education. Consequently, defendants' motion to dismiss should be denied.

1.     *Plaintiffs may bring suit under IDEA because defendants' violation of IDEA deprived them of rights protected by the statute.*

IDEA's private right of action permits an aggrieved party to bring suit in federal court and does not limit the class of defendants against whom a suit may be brought:

> Any party aggrieved by the findings and decision made under subsection (f) or (k) of this section who does not have the right to an appeal under subsection (g) of this section, and any party aggrieved by the findings and decision made under this subsection, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy.

20 U.S.C. § 1415(i)(2)(A).[10]

   The statute creates no limitations on who may be sued, and certainly does not say that federal agencies or officials cannot be sued. Plaintiffs were denied benefits guaranteed under IDEA as a direct result of defendants' violation of the statute – which expressly restricts the Secretary's rulemaking authority in order to provide "protections . . . to children." *See* 20 U.S.C. § 1406(b) (prohibiting the Secretary from adopting certain regulations under the heading, "Protections provided to children"). The statute permits claims to vindicate rights granted by IDEA that were deprived as a result of a violation of IDEA. In this case, plaintiffs' injuries can be remedied most directly by suing defendants because it is their regulations that have prevented plaintiffs from obtaining mapping under IDEA.

   In an analogous case, the Second Circuit held that IDEA's private right of action permitted suit against the New York's Commissioner of Education to challenge the state's regulations implementing IDEA. *See Heldman v. Sobol*, 962 F.2d 148, 158 (2d Cir. 1992). Because IDEA does not expressly exclude challenges to regulations, the court analyzed whether this suit was proper based on traditional justiciability concerns. *Id.* at 153-54. The court held that the father's suit could proceed only if he had standing to challenge the state's rulemaking. *Id.* Since the standing requirements were met, the court of appeals remanded so the district court could decide the case on its merits. *Id.* at 158.

---

[10] Although this provision refers to suits challenging "the findings and decisions made under subsection (f) or (k)," after a "complaint [was] presented pursuant to this section," this language merely imposes an exhaustion requirement on parties seeking judicial review. *See, e.g.*, *Spencer v. Dist. of Columbia*, 416 F.Supp.2d 5, 10 (D.D.C. 2006) (discussing IDEA's exhaustion requirement). However, there are well-established exceptions to the exhaustion requirement. *Id.* For example, plaintiffs can bring suit under IDEA – without waiting to be aggrieved by findings or a decision under subsection (f) or (k) – because administrative review would be futile. *See* Part II.A.3 *infra*.

Plaintiffs' claims are similarly justiciable.  As parents of disabled children, plaintiffs have standing to bring an action challenging the Department's regulations on behalf of themselves, and as next friends to their children.  To establish Article III standing, a plaintiff must demonstrate three things: "(1) 'injury in fact' . . .; (2) a causal relationship between the injury and the challenged conduct . . .; and (3) a likelihood that the injury will be redressed by a favorable decision . . . ."  *Scheduled Airlines Traffic Offices, Inc. v. Department of Defense*, 87 F.3d 1356, 1358 (D.C. Cir. 1996) (quoting *Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 664 (1993).)  A plaintiff must also "establish that it has 'prudential standing' by showing that its interests are 'arguably within the zone of interests to be protected or regulated by the statute . . . in question.'" *Id.* at 1359 (quoting *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 396 (1987)).  Plaintiffs satisfy these requirements.

The requirements for Article III standing are clearly met.  *First*, plaintiffs have suffered an injury in fact because H. P. and A.U. no longer receive cochlear implant mapping, and plaintiffs must either pay costs associated with the mapping services formerly covered by their children's IEPs or their children will not receive an adequate education.[11]  *Second*, plaintiffs' injuries are fairly traceable to defendants' conduct because the Department's regulations directly caused the local agencies to remove mapping from plaintiffs' children's

---

[11] Numerous decisions make clear that this is a sufficient injury.  *See, e.g.*, *Bernard v. School Bd. of City of Norfolk*, 58 F.Supp.2d 669, 673 (E.D. Va. 1999) ("Plaintiffs maintain that they were required to make expenditures due to Defendant's failure to provide the needed services for their son [under IDEA]. Obviously, a monetary loss is an injury in fact"); *Maroni v. Pemi-Baker Regional Sch. Dist.*, 346 F.3d 247, 254 (1st Cir 2003) ("Parents whose children are denied [a free appropriate public education] suffer the injury-in-fact of either paying for private educational services or risking that their children's education will not fully prepare their children for employment and independent living.").

IEPs.[12]  The Supreme Court has explained that an injury is traceable to a defendant's conduct

even when the injury is "produced by determinative or coercive effect upon the action of

someone else."  *Bennett v. Spear,* 520 U.S. 154, 169-70 (1997) (internal quotations and citations

omitted); *see also Heldman*, 962 F.2d at 156 ("Although a third party not before the court . . .

played a role in [the plaintiff's] alleged injury, [the third party's] actions were the direct result of

the regulations and do not constitute 'independent action.'").  *Third*, plaintiffs' injuries will be

redressed by a favorable decision because, when the Department's mapping regulations are

invalidated, local agencies will be required to provide mapping to plaintiffs' children, just as they

did before the regulations went into effect.  *See Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658,

663-64 (D.C. Cir. 1996) ("Redressability examines whether the relief sought, assuming that the

court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff.").

Plaintiffs also satisfy the requirements of prudential standing.  Children with

disabilities and their parents fall within the "zone of interests" protected by the IDEA.

*See Scheduled Airlines*, 87 F.3d at 1359 (a party may establish that it is within the zone of

interest by demonstrating that it is "among those who Congress directly indicated were the

intended beneficiaries of the statute") (citations and quotation marks omitted).  IDEA was

designed to benefit children with disabilities, and the statute makes clear that it provides

protection to their parents as well.  *See* 20 U.S.C. § 1400(d)(1) (IDEA intended "to ensure that

the rights of children with disabilities and parents of such children are protected").

---

[12] The Complaint alleges that H. P.'s school district removed cochlear implant mapping from his
IEP a week after the effective date of the Department's regulations and the notes of the school
district's meeting with Plaintiffs explain that this change was justified based on the Department's
new regulations.  (Compl. ¶¶ 37-39.)  A. U. received mapping services until the Department's
proposed rulemaking, which proposed elimination of coverage of such services.  Plaintiffs
challenged this removal and the court required the school district to continue to pay for the
mapping services but only until the effective date of the mapping regulations when such services
would no longer be covered.  (*Id.* ¶¶ 41-44.)

2.     *Defendants' arguments for limiting IDEA's private right of action to suits against states and local agencies are unpersuasive.*

Defendants do not assert any textual basis for interpreting IDEA's private right of action to exclude suits against federal defendants.  Instead, they argue that IDEA claims may be brought only against state and local agencies because of "the state's pervasive role under the IDEA" and the fact that states are "primarily responsible" for providing special education. (Defs.' Mem. at 14.)  Plaintiffs do not dispute that states are primarily responsible for special education under IDEA.  Indeed, the state's "pervasive role" explains why most IDEA claims are brought against state or local agencies.  But the fact that suits are typically brought against a state or local agency does not mean that suits cannot be brought against a federal agency.[13]  Moreover, the federal role under IDEA is not displaced by "pervasive" state activity.  Rather, the federal regulations are paramount, and it is the federal regulations that govern the availability of mapping under IDEA.

Defendants point out that IDEA's waiver of immunity mentions a "State" but not the federal government. (*See* Defs.' Mem. at 16 (citing 20 U.S.C. § 1403 (a) ("A State shall not be immune under the 11th amendment . . . from suit in Federal court for a violation of this chapter")).)  Of course, Congress had no need to mention the federal government in that provision because the 11th Amendment applies only to the states.  The lack of a similar waiver for the federal government is irrelevant in this case because, as Congress was surely aware, the APA waives sovereign immunity for the declaratory and injunctive relief sought by plaintiffs. *See* 5 U.S.C. § 702.[14]  The D.C. Circuit has held that "[t]he APA's waiver of sovereign immunity

---

[13] Defendants' reliance on legislative history is similarly unhelpful.  The history discusses the important role played by the states without suggesting that this role somehow precludes suits against a federal agency.

[14] The Equal Access to Justice Act waives sovereign immunity with respect to plaintiffs' request for attorney's fees.  28 U.S.C. § 2412(b); 20 U.S.C. § 1415(i)(3)(B).

applies to any suit whether under the APA or not." *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996). Consequently, plaintiffs' IDEA claim is not barred by sovereign immunity.

Defendants cite only one case in which a court concluded that an IDEA claim could not be brought against a federal agency. (*See* Defs.' Mem. at 15 (citing *Rodriguez-Pedraza v. U.S. Dep't of Defense*, 445 F. Supp. 2d 195 (D.P.R. 2006)).) This case is readily distinguishable. In *Rodriguez-Pedraza*, plaintiffs brought suit against the Department of Defense and the U.S. Forest Service, two federal agencies that have no obligations under IDEA. In contrast, plaintiffs assert claims against the Department of Education and the Secretary of Education, whose conduct is expressly regulated by IDEA. *See* 20 U.S.C. § 1406(b). Moreover, *Rodriguez-Pedraza* has minimal persuasive authority because the court did not actually resolve plaintiff's claim. Instead, the court determined only whether the claim had a substantial likelihood of success based on the arguments raised during the preliminary injunction proceedings. *Id.* at 198-99.[15]

3.    *IDEA's exhaustion requirement does not bar Plaintiffs' claims.*

Although plaintiffs are typically required to exhaust administrative remedies before bringing a claim in federal court, exhaustion is not required if it would be futile or if the potential relief from the administrative process would be inadequate. *See Chadmoore Communs., Inc. v. FCC*, 113 F.3d 235, 239 (D.C. Cir. 1997). IDEA's exhaustion requirement incorporates these exceptions. *See Honig v. Doe,* 484 U.S. 305, 327 (1988) ("parents may bypass the administrative process where exhaustion would be futile or inadequate"); *Spencer*, 416 F. Supp. 2d at 10. Plaintiffs meet their burden of showing futility.

---

[15] The other cases cited by defendants do not address whether a suit can be brought against a federal agency; they merely recognize that states can be sued under IDEA because of their responsibility to enforce IDEA. (*See* Defs.' Mem. at 13-14.)

In this case, challenging a local agency's refusal to provide mapping services in an administrative proceeding would be futile because the local agency would be required to apply the Department's mapping regulations. Because states must provide "related services" to receive federal funding, 20 U.S.C. § 1411(a)(1), they must either follow the Secretary's interpretation of this term or risk losing their funding. In *Heldman*, the Second Circuit relied on the futility exception to permit the plaintiff to sue New York's Commissioner of Education without first raising his claim in an administrative hearing. *See* 962 F.2d at 159. The court stated that "[b]ecause the regulation implements a New York statute, neither the Commissioner nor the assigned hearing officer has the authority to alter the procedure; therefore, it would be an exercise in futility to require Heldman to exhaust the state administrative remedies." *Id.* at 158–59. This reasoning has even more force when a federal regulation is at issue.[16]

If the denial of mapping to plaintiffs had anything to do with their individual circumstances, then requiring exhaustion might make sense. The denial, however, resulted from the Department's regulations, and thus requiring individualized hearings would be a wasteful, futile exercise. The Ninth Circuit explained that, when "challenged policies or practices are enforced at the highest administrative level[,] . . . the only meaningful remedy is through the courts." *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1305 (9th Cir. 1992); *see also Rafferty v. Cranston Pub. Sch. Comm.*, 315 F.3d 21, 25 (1st Cir. 2002) (plaintiff bringing an

---

[16] An administrative challenge would also be futile because state law often imposes similar requirements on the local education agencies. For example, New Hampshire's regulations explicitly adopt the federal regulation's definition of "related services," which excludes mapping of cochlear implants from the services provided under the IDEA. *See* N.H. Code Admin. R. Ed 1102.44 (2008). In addition, courts have held that, when the New Hampshire regulations adopted the federal regulations, a plaintiff's "rights under New Hampshire law are the same as her rights under federal law and no greater." *Greenland Sch. Dist. v. Amy N.*, 358 F.3d 150, 156–157 (1st Cir. 2004).

IDEA claim "can circumvent the exhaustion requirement if she can show that the agency's adoption of an unlawful general policy or practice would make resort to the agency futile").

Because plaintiffs raise issues of statutory interpretation, their claims involve only questions of law and exhausting administrative remedies would be futile. Courts have concluded that IDEA's administrative remedies do not need to be exhausted when a plaintiff raises a pure legal challenge. "While parties ordinarily must exhaust administrative remedies under the IDEA before initiating court action . . . they may bypass the administrative process . . . when the issues raised involve purely legal questions." *Pihl v. Massachusetts Dep't of Educ.*, 9 F.3d 184, 190–191 (1st Cir. 1993); *see also Pardini v. Allegheny Intermediate Unit*, 420 F.3d 181, 192 n.13 (3d Cir. 2005) (noting that exhaustion was not required when a plaintiff challenged the state's interpretation of IDEA because the question was "purely legal"). The D.C. Circuit has recognized this exception to the exhaustion requirement in non-IDEA cases. *See, e.g.*, *Anaheim & Riverside v. Federal Energy Regulatory Comm'n.*, 692 F.2d 773, 782 (D.C. Cir. 1982) (holding that exhaustion not required for a claim based on "purely legal issues of statutory construction that involve no factual disputes"); *Ryan v. Bentsen*, 12 F.3d 245, 248 (D.C. Cir. 1993) (holding that when "the only issue is the constitutionality of a provision of the Act, the court could . . . find futility and therefore deem the exhaustion requirement waived").

**B.      The Mapping Regulations Exceed the Secretary's Rulemaking Authority Because They Are Contrary to Law and Because They Substantively Lessen the Protections Provided to Children with Disabilities.**

Although the Secretary is permitted to issue regulations to ensure compliance with IDEA, the statute places two restrictions on the Secretary's rulemaking authority. *See* 20 U.S.C. § 1406(a)-(b). In a subsection entitled "Protections provided to children," IDEA prohibits the Secretary from implementing a regulation that "violates or contradicts any

- 38 -

provision of this Chapter." § 1406(b)(1). This subsection also prohibits the Secretary from implementing regulations that "substantively lessen the protections provided to children with disabilities under this title, as embodied in regulations in effect on July 20, 1983." § 1406(b)(2).

By implementing regulations that exclude cochlear implant mapping from the definition of "related services," the Secretary has acted contrary to both of these provisions.

1.    *The Secretary violated IDEA by implementing regulations that contradict the statute.*

As previously explained, the mapping regulations are invalid under *Chevron*. *See* Part I *supra*. The definition of "related services" unambiguously includes cochlear implant mapping, as both the statutory text and legislative history make clear. Moreover, even if some ambiguity existed, the mapping regulations impermissibly construe the statute because they frustrate the statute's objective of providing "audiology services" to assist a child with disabilities in learning. The same analysis leads to the conclusion that the regulations violate and contradict IDEA under 20 U.S.C. § 1406(b)(1).

2.    *The Secretary violated IDEA by implementing regulations that substantively lessen the protections provided by the 1983 regulations.*

By enacting the mapping regulations, the Secretary also violated the IDEA, which prohibits implementing a regulation that

> procedurally or substantively lessens the protections provided to
> children with disabilities under this title, as embodied in
> regulations in effect on July 20, 1983 (particularly as such
> protections related to . . . related services . . .), except to the extent
> that such regulation reflects the clear and unequivocal intent of
> Congress in legislation.

20 U.S.C. § 1406(b)(2). Because the mapping regulations do not reflect the "clear and unequivocal intent of Congress," *see* Part I *supra*, the Secretary violated IDEA if mapping would have been provided to children with disabilities under the regulations in effect on July 20, 1983.

Defendants argue that mapping cannot be embodied in the 1983 regulations because cochlear implants were not available in 1983.  (Defs.' Mem. at 18 n. 3.)  But if Congress had intended this provision only to guarantee that those services provided in 1983 are still provided today, it could have said so.  Instead, the statute focuses on the *regulations* in effect in 1983, and limits the Secretary's authority to amend the regulations.  Thus, the relevant question is not whether a child with disabilities received mapping in 1983, but whether a child today would receive mapping if the current regulations were the same as those in effect in 1983.[17]

Mapping is a "related service[]" under the regulations in effect on July 20, 1983 because those regulations provided for "audiology," and there is no reason to define this term as excluding mapping.  *See* 34 C.F.R. § 300.13(a) (1983) (superseded) (defining "related services" to include "audiology").  In *Stratham School District*, the court interpreted the 2003 regulations and concluded that a similar term in those regulations, "audiology services," included mapping.  *Stratham School District v. Beth P.*, No. 02-135, 2003 WL 260728 (D.N.H. 2003).  The same analysis should have applied if the court had been looking to the 1983 regulations.

Defendants also suggest that, even if the mapping regulations lessen the protections provided under the 1983 regulations, they are nonetheless valid because "Congress itself amended the IDEA to make clear that the implantation of medical devices is not covered as

---

[17] If the regulations enacted in 1983 were still in effect today, Defendants could not argue that mapping must be excluded because the regulations were adopted before cochlear implants were approved for use in children.  Regulations, like statutes, are prospective in nature.  Courts have recognized that subsequent technological developments can result in laws regulating technologies that were neither considered nor anticipated when the laws were originally promulgated.  *See, e.g.*, *United States v. Collins*, 56 F.3d 1416 (D.C. Cir. 1995) (holding that federal criminal conversion statute, enacted in 1948, encompassed improper use of government computer time, despite the fact that computers were not used by government employees until decades after the statute was enacted); *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53 (1884) (holding that photographs were copyrightable subject matter under the Copyright Clause of the Constitution, even though photography was not invented until well after Constitution was ratified).

a related service under the Act." (Defs.' Mem. at 18 n. 3.) That is beside the point. The issue is whether Congress has unequivocally intended to exclude *mapping*, not implantation of medical devices. As discussed above, Congress intended to include mapping, not exclude it. In any event, defendants cannot argue that Congress unequivocally intended to exclude mapping in light of their arguments elsewhere that Congress's intent is ambiguous. (*See* Defs.' Mem. at 20-29.)

Under the 1983 regulations, local agencies would have been required to provide mapping. The current regulations expressly exclude mapping and therefore violate IDEA because they lessen the protections provided to children with disabilities.

## **CONCLUSION**

For the foregoing reasons, plaintiffs' Motion for Summary Judgment should be granted, and defendants' Motion to Dismiss or Alternatively, for Summary Judgment should be denied.

Respectfully submitted,

_____/s/ Mark W. Mosier_____
S. William Livingston (D.C. Bar No. 59055)
Emily Johnson Henn (D.C. Bar No. 471077)
Mark W. Mosier (D.C. Bar No. 974887)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC  20004
Telephone:  (202) 662-6000
Facsimile:  (202) 662-6291

*Attorneys for Plaintiffs Beth and David Petit,*
January 30, 2008                          *and Nicole and Bennie Underwood*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing

Memorandum in Support of Their Cross-Motion for Summary Judgment and in Opposition to

Defendants' Motion to Dismiss or Alternatively, for Summary Judgment, as well as their Cross-

Motion for Summary Judgment, Statement of Material Facts Not in Dispute, and Response to

Defendants' Statement of Material Facts as to Which There Is No Genuine Issue were filed using

the Court's electronic case filing system this 30th day of January, 2008, which automatically

results in service on all counsel of record registered on ECF.


        /s/ Mark W. Mosier
        Mark W. Mosier
        *Attorney for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

BETH and DAVID PETIT**,** in their individual
capacities and as next friends to their minor
son, H. P., and  NICOLE and BENNIE
UNDERWOOD**,** in their individual capacities
and as next friends to their minor daughter,
A.U.,

Plaintiffs

v.

UNITED STATES DEPARTMENT OF
EDUCATION, and MARGARET
SPELLINGS, in her official capacity as
Secretary of the U.S. Department of
Education,

Defendants.

---

CASE NO.  07-1583-RMU

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS
THAT ARE NOT IN DISPUTE**

In support of their Cross-Motion for Summary Judgment, plaintiffs Beth

and David Petit and Nicole and Bennie Underwood state that the following material facts

are not in dispute:

1.   Plaintiffs Petit are parents of a child with a cochlear implant and

plaintiffs Underwood are parents of a child with a cochlear implant. (Compl. ¶¶ 8-9.)

2.   Cochlear implant mapping can only be performed by an audiologist

who has specific expertise with cochlear implants.  (Admin. R. ED-000388.)  When

mapping is performed incorrectly, it can lead to physical harm to the child.  (*Id.* at ED-

000388–89.)

3.    Plaintiffs' children received cochlear implant mapping as part of their individualized education plan ("IEP") before defendants implemented regulations that exclude mapping from the definition of "related services" under 30 C.F.R. §§ 300.34, 300.113.  (Compl. ¶ 3.)

4.    Since these regulations took effect, plaintiffs' children have not received mapping as part of their IEP.  (Compl. ¶ 3.)

Respectfully submitted,

_____/s/ Mark W. Mosier_____
S. William Livingston (D.C. Bar No. 59055)
Emily Johnson Henn (D.C. Bar No. 471077)
Mark W. Mosier (D.C. Bar No. 974887)
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC  20004
Telephone:  (202) 662-6000
Facsimile:  (202) 662-6291

January 30, 2008

*Attorneys for Plaintiffs Beth and David Petit, and Nicole and Bennie Underwood*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BETH and DAVID PETIT**,** in their individual capacities and as next friends to their minor son, H. P., and NICOLE and BENNIE UNDERWOOD**,** in their individual capacities and as next friends to their minor daughter, A.U., <br><br> Plaintiffs <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION, and MARGARET SPELLINGS, in her official capacity as Secretary of the U.S. Department of Education, <br><br> Defendants. | CASE NO.  07-1583-RMU |

## DECLARATION OF MARK W. MOSIER

I, Mark W. Mosier, declare as follows:

1.      I am an associate at the law firm of Covington & Burling LLP, counsel to plaintiffs in the above-captioned matter.  I have personal knowledge of and am competent to testify to the matters set forth herein.

2.      The exhibits attached to this declaration are not intended to supplement the administrative record but rather are provided as a courtesy to the Court.

3.      Attached hereto as Exhibit A is a true and correct copy of the webpage cited by Defendants at page 11 of their Memorandum and Points and Authorities in Support of Defendants' Motion to Dismiss or Alternatively, for Summary Judgment.  The webpage is no longer accessible at the address provided by Defendants.  This webpage remained in Google's

"cache" as of January 16, 2008, when the attached copy was retrieved.  As of January 29, 2008, I could no longer locate the page using Google.

4.    Attached hereto as Exhibit B is a true and correct copy of a November 19, 1993 opinion letter written by Thomas Hehir, Director, Office of Special Education Programs, Department of Education.  This letter was published in the Individuals with Disabilities Education Law Report and is available in that reporter at 20 IDELR 1216 (1993).

5.    Attached hereto as Exhibit C is a true and correct copy of Plaintiff's Response to Motion for Summary Judgment filed by Bennie and Nicole Underwood in *A.U., ex rel. N.U. v. Roane County Board of Education*, 501 F. Supp. 2d 1134 (E.D. Tenn. 2007). Attached to the Response is a letter dated June 24, 2005 from Senator Judd Gregg to Secretary Spellings.  This document is also available through PACER from the United States District Court for the Eastern District of Tennessee.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 30th of January, 2008, in Washington, D.C.

_____

Mark W. Mosier

# EXHIBIT A

This is **G o o g l e**'s cache of http://www.cochlear.org/sys-tmpl/cochlearimplantcosts/ as retrieved on Nov 9, 2007 09:00:58 GMT.

**G o o g l e**'s cache is the snapshot that we took of the page as we crawled the web.

The page may have changed since that time. Click here for the current page without highlighting.

This cached page may reference images which are no longer available. Click here for the cached text only.

To link to or bookmark this page, use the following url: `http://www.google.com/search?q=cache:jCxOeCV6gmwJ:www.cochlear.org/sys-tmpl/cochlearimplantcosts/+cochlearimplantcosts&hl=en&ct=clnk&cd=1&gl=us`

*Google is neither affiliated with the authors of this page nor responsible for its content.*

These terms only appear in links pointing to this page: **cochlearimplantcosts**



# Cochlear Implant Costs

email: reimburse@cochlear.org

- **Johns Hopkins**
  Sample Cochlear Implantation Charges at Johns Hopkins University
- **Mayo Clinic**
  Sample Cochlear Implantation Charges at Mayo Scottsdale
- **Children's Seattle**
  Sample Cochlear Implantation Charges at Children's Hospital-Seattle
- **UCSF**
  Sample Cochlear Implantation Charges at University of California-San Francisco

**COCHLEAR IMPLANTS**

**OVERVIEW**

**What's New**

**Medicare**

**Medicaid**

**Other Federal and State Health Plans**

**Private Plans and Managed Care**

**Fraud and Abuse**

**Billing Codes**

**Cochlear Implant Devices**

**Number of Cochlear Implant Users**

Costs for cochlear implantation vary widely depending upon several factors, principally the length of time the patient has been without hearing and the physiology of their inner ear. Charges are usually divided into four categories: Pre-operative testing, device aquisition, surgical and hospital costs, post-operative maintenance and rehabilitation.

Generally, total costs range from $45,000-$55,000 (according to the American Speech-Language-Hearing Association), regardless of which device is purchased. All three FDA-approved companies have nearly identical invoice prices due to kickback schemes by Cochlear Americas that are currently the subject of a Federal criminal probe. By controlling referral patterns of physicians and audiologists through kickbacks, Cochlear controls over 70 percent of the market. Because kickbacks prevent physicians and audiologists from taking

**Cochlear Implant Costs**

**Cost-Effectiveness Studies**

**Certification**

**Reimbursement Abroad**

**DISABILITY RIGHTS**

**HALL OF SHAME**

**Disability Access After 9-11**

**COMMUNICATIONS**

**Cochlear Implant Polls**

**Disability Rights Polls**

**Discussion Groups**

**Definition of Audiologic Terms**

**Frequent Questions**

**Links**

**Contact Information**

**Download Files**

**Website Images**

Sitemap

advantage of lower priced devices, competing companies have no choice but to match Cochlear's price or lose money. Hence, they remove any true competition, keeping the price of cochlear implant devices artificially high.

However, for patients with surgical complications or requiring extensive post-operative care, average costs of the procedure can far exceed $60,000. For example, ASHA states most patients require between 12-20 visits for speech processor programming and aural rehabilitation in the first year after surgery, and at least 1-2 visits per year thereafter. However, for prelingually deafened adults who never acquired speech, the greater need for aural rehabilitation can increase total costs for the procedure to above $80,000. In fact, Wisconsin Medicaid claims data reveals that average costs of cochlear implant procedures billed to their program in 1999 exceeded $62,000.



The wide range of costs is demonstrated by 1999-2001 data obtained from the four cochlear implant centers linked above. These are just a sample of charges and should not be interpreted as the full range of possible charges nationwide.

Pre-operative testing

This is the least cost of the four categories. However, the array of tests performed varies widely according to the patient's clinical indications and each center's preferences. Click here for codes associated with commonly performed tests.

As shown in the links above, 1999-2001 pre-operative costs ranged from $2,400 at Johns Hopkins University Hospital in Baltimore, MD (among the nation's premier cochlear implant centers) to $5,698 at Mayo Clinic in Scottsdale, AZ. Most of this cost relates to radiological and audiological tests to determine if the candidate meets FDA criteria for implantation.

Device acquisition

This is by far the largest expense involved with the cochlear implant procedure. Because of the enormous device costs, many hospitals are willing to provide other services for a reduced rate to indigent candidates if third-party health plans simply reimbursed their acquisition cost. Since hospitals purchase the device directly from the manufacturer, they assume the full financial risk if health plan reimbursement is below the purchase price.

According to the RAND study, U.S. hospitals incurred an average of $19,745 as the invoice purchase price for a cochlear implant device in 2000. Even though manufacturer invoice prices do not vary appreciably, there is a wide range of hospital charges for the device to third-party health plans. This is because most hospitals are forced to significantly "mark-up" the device cost in order to avoid significant losses resulting from very low reimbursement from Medicare, Medicaid, and other plans.

As shown on links above, only Johns Hopkins billed at the actual invoice price, with University of California-San Francisco Implant Center marking the device up **72 percent** to $33,000.

Also contributing to the wide range of charges is Cochlear America's illegal practice of charging a higher invoice price for a two-processor system. Because the L8614 billing code for cochlear implants makes no distinction between the standard one-processor device and the more expensive two-processor option, hospitals can charge the higher price for the two-processor system without the insurer's knowledge, even Medicare and most health plans prohibit coverage of two-processor systems. Many centers purchase the two-processor Nucleus device, as acknowledged by the data from Children's Hospital in Seattle, WA.

Hospital and surgical costs

According to RAND, hospitals further incurred an average of $5,600 in surgical costs associated with the implantation of the device. Thus, the total average cost that hospitals must incur for the cochlear implant procedure in 2000 was $25,345.

However, while RAND reported that private plans reimbursed

hospitals approximately $48,000 per procedure in 2000, reimbursement under Medicare and Medicaid forced hospitals to lose between $6,000 and $12,000 per procedure. Medicare reimbursement for inpatient surgeries totaled only $16,500 in 2000, while outpatient surgeries paid $19,180. Medicaid programs average only $14,000, with some programs paying as low as $3,000 for the entire procedure.

This largest component of this category includes the surgeon's professional fee that in the links above ranged from $3,314 at Children's Seattle to $5,490 at Johns Hopkins. It also includes charges for anesthesia, facial nerve monitoring, operating room, and room and board (if inpatient stay required.)

Post-operative care

This category is the most difficult to predict. It includes the audiology charges for fitting and programming (or mapping) the cochlear implant speech processor after surgery, as well as any maintenance that may be required. It also includes charges for the lengthy aural rehabilitation by speech language pathologists that may be required, especially for patients who have been without hearing for an extended number of years.

According to the Archives of Otolaryngology, Head and Neck Surgery, Volume 128 (October 2002), audiologists incurred an average cost of $91.25 per programming session. However, while private plans paid an average of $100 per session, Medicare and Medicaid reimbursed only $41 and $37 respectively.

Programming sessions average at least 2.5 hours in length, according to the RAND study. Thus, after only 45 minutes audiologists will lose money when servicing Medicare or Medicaid beneficiaries.

As shown in the links above, estimated post-operative costs for just the **first year** after surgery ranged from $4,784 at Children's Seattle to $8,327 at Mayo Scottsdale.

COSTS OF DEAFNESS

According to RAND, total costs of cochlear implantation (including pre-operative testing, device acquisition, surgical costs, and post-operative rehabilitation) averaged as high as

$63,000 in 2000. While these amounts appear staggering in isolation, they pale in comparison to the long-term costs of deafness that society must incur in terms of special education, vocational rehabilitation, uncompensated medical expenses, and lost productivity.

For persons who lost their hearing after birth (post-lingual), the average cost to society is $297,000. For pre-lingually deafened persons, the cost soars to over $1.2 million. Just the cost of one-year in a school for the deaf exceeds $30,000, more than the cost of the surgical procedure itself. [SOURCE: Project Hope (April 2000) and the Journal of the American Medical Association, Vol. 284, No. 7 (August 2000).]

For these reasons, cochlear implantation has been found to be the second most cost-effective high-technology medical procedure available. Simply put, only neonatal care provides society with more bang for the buck.

Costs Abroad

Cochlear implantation costs vary widely in other countries, as shown in the Cochlear Implant Reimbursement Abroad section.

For example, click here for a itemized list of cochlear implant costs in England, showing total costs to range from $31,000-$46,000, far less than the U.S.

Furthermore, Cochlear Americas sells the devices for nearly 50 percent less in Latin America countries such as Brazil and Mexico by smuggling them as contraband without import duties. Consequently, total implantation costs in those countries are dramatically lower than elsewhere in the world.

# EXHIBIT B

# DECISIONS
## Volume 20, Issue 16



NOTICE
This material may be protected by copyright law (Title 17 U.S. Code)

**BARBARA B.** a Minor by and through **ALFRED AND MARY B.**, Her Parents as Next Friends,

Plaintiff

v.

**BOARD OF EDUCATION OF HARDIN COUNTY SCHOOL DISTRICT, HARDIN COUNTY,** et al.,

Defendants

No. C-93-0069-L(M)

U.S. District Court, Western District of Kentucky, At Louisville

October 7, 1993

    A 17-year-old student with disabilities was placed and funded by the state of Illinois in a special education residential program located in Maine. The student's parents moved to Kentucky, and the local school district refused to register the student at the Maine facility, claiming she was a resident of either Illinois or Maine. Level one due process hearings were held in Illinois and Kentucky and both hearing officers ruled that the student was a resident of the local school district due to her family's move. The district appealed the decision to the state appeals board, and it was upheld. The parents filed for attorneys' fees.

    *HELD:* for the parents, in part.

    The district court found that the parents prevailed in gaining all of the relief that they requested on the issues of the student's enrollment in the local school district and her placement at the Maine facility at the local district's expense. Because of this success, it was irrelevant that the parents' motion for a temporary restraining order, which they filed in an attempt to remove themselves from the district's appeal, was denied. On the issue of attorneys' fees, the court found that local counsel's fees were necessary and reasonable, since the state department of education required the presence of the local counsel at the administrative proceedings. The court also determined that the parents were entitled to attorneys' fees for the Illinois proceedings, but not for Maine proceedings which were withdrawn.

While the court found that quarter hour billing was an acceptable practice, it reduced the lead counsel's request of $150.00 per hour to $125.00 per hour, and approved the local counsel's rate of $100 per hour. Lastly, the court found that the hours claimed by lead counsel in preparing her fee petition were unreasonable. Accordingly, the court issued an interim order, awarding local counsel $2,252.89 in attorneys' fees and costs, and invited her to submit a supplemental fee petition. The court also ordered lead counsel to submit a revised fee petition.

---

Counsel for Parents: Lead Counsel-Margie Best, Law Offices of Margie Best, One North LaSalle Street, Suite 2200, Chicago, Ill. 60602. Local Counsel-Christina Norris, Law Offices of Christina Norris, 710 West Main Street, Suite 401, Louisville, KY 40202-2662.

Counsel for District: Kimberly Winkenhofer Shumate, Skeeters and Bennett, 550 West Lincoln Trail Blvd., Radcliff, KY 40160.

**RONALD E. MEREDITH**, Chief Judge United States District Court.

### Memorandum

    Plaintiffs brought this action for attorneys fees and costs as prevailing parties under the Individuals with Disabilities Education Act (the IDE), Title 20 U.S.C. § 1415(4) (1991).[1] The plaintiffs have moved for summary judgment in their favor. Fed.R.Civ.P. 56. Pending before the Court is an application for interim attorneys fees.

    Barbara B. is a seventeen year old child with disabilities as defined in the IDE. The IDE mandates that Barbara, as a handicapped child, is entitled to a free, appropriate public education from participating local governments such as Hardin County, Kentucky. Title 20 U.S.C. §§ 1400-1461.

    In July of 1992, Alfred B. was relocated from Antiock, Illinois to Elizabethtown, Kentucky, in connection with his employment. At the time of Alfred B.'s transfer, Barbara B. had been placed at the Elan School in Poland Spring, Maine by the Illinois State Department of Education and Special Education District. Alfred and Mary B. repeatedly attempted to register Barbara at a school in Elizabethtown, a prerequisite for continued funding of her placement at the Elan School. Hardin County School officials resisted Barbara's enrollment

1055-520X/94/$2+$1.50.

environment occurs only when the nature and severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily (see 34 CFR § 300.550(b) enclosed). As was discussed in communication to your Office from the West Virginia Department of Education (WVDE), numerous reviews of the Martin School by the U.S. Department of Education's Office for Civil Rights (OCR), Office of Special Education Programs within OSERS, and the WVDE have consistently indicated that the determination to place children with disabilities into this segregated setting could not be justified from data available in student files or through interview of personnel involved in the placement decisions regarding these children.

Both OCR and WVDE required corrective action plans and negotiated settlement agreements with Wood County Schools to ensure that placements for children in Martin School were based upon the unique educational needs of the children as set forth in their individualized education programs. As placement decisions were reconsidered, determinations were made by placement committees that a great many of these children could be educated in regular education facilities with nondisabled children. Therefore, the number of children with mental retardation at Martin School has lessened dramatically over the past several years.

State Senator Boley indicates that Martin School is now being used to house two preschool classes and three substance abuse classes. Although this facility was originally built for children with mental retardation, there is no Federal requirement that addresses how a school district uses its facilities. Many K-12 facilities have become K-6 schools in later years, just as high schools may become vocational buildings or middle schools. Wood County may want to consider utilizing Martin School as a local or "home" school for regular education students and, as appropriate, children with mental retardation could attend Martin School as their "home" school.

I trust this information will prove helpful to you in your response if you require further information.

Judith E. Heumann
Assistant Secretary

---

Peter J. Seiler, Ed.D.
Superintendent
Illinois School for the Deaf
125 Webster Street
Jacksonville, Illinois 62650

### Digest of Inquiry
(April 21, 1993)

- If a student needs a hearing aid and the device is put on the student's IEP, does the IDEA require the school district to purchase the device?

### Digest of Response
(November 19, 1993)

*Hearing Aid Must Be Provided at No Cost When Specified in IEP*

A hearing aid is considered a covered device under the definition of "assistive technology device". Thus, where a district has determined that a child with a disability requires a hearing aid in order to receive FAPE and the child's IEP specifies that the child needs a hearing aid, the district is responsible for providing the hearing aid at no cost to the child and his or her parents in accordance with 34 CFR 300.308.

---

### Text of Inquiry

Several of our administrators have been reading a number of items related to assistive devices as they pertain to IDEA. A question has surfaced and we would like to ask you for a response.

The question: If a student needs a hearing aid (assistive device), is the school district responsible for purchasing the device under the new IDEA if the device is put on the student's IEP?

Thank you for your attention to this request, and I look forward to your response.

### Text of Response

This is in response to your letter to Dr. Judy A. Schrag, former Director of the Office of Special Education programs (OSEP), in which you seek a response to the following question:

If a student needs a hearing aid (assistive device), is the school district responsible for purchasing the device under the new [Individuals with Disabilities Education Act] IDEA if the device is put on the student's [individualized education program] IEP?

Historically, it has been the policy of this Office that a public agency was not required to purchase a hearing aid for a student who was deaf or hearing impaired because a public agency is not responsible for providing a personal device that the student would require regardless of whether he/she was attending school. However, this policy does not apply to a situation where a public agency determines that a child with a disability requires a hearing aid in order to receive a free appropriate public education (FAPE), and the child's individualized education program (IEP) specifies that the child needs a hearing aid.

As your letter recognizes, Public Law 101-476, the Education of the Handicapped Act Amendments of 1990, amended IDEA by adding definitions of the terms "assistive technology device" and "assistive technology service." 20 U.S.C. § 1401(a)(25)-(a)(26). In implementing these statutory amendments, the Department amended the regulations implementing Part B of IDEA by adding the following three regulatory provisions. New definitions of the terms "assistive technology device" and "assistive technology service," which essentially tracked

**INDIVIDUALS with DISABILITIES EDUCATION LAW REPORT**    Cite as 20 IDELR 1217

the statutory language, were added at §§ 300.5-300.6. As applied to your specific inquiry, the term "assistive technology device," means "any item, piece of equipment, or product system, whether acquired commercially off the shelf, modified, or customized, that is used to increase, maintain, or improve the functional capabilities of children with disabilities." 34 CFR § 300.5 (copy enclosed). A device such as a hearing aid could be a covered device under this definition.

In addition, under the new § 300.308, each public agency must ensure that assistive technology devices and assistive technology services, or both, as those terms are defined in 34 CFR §§ 300.5 and 300.6, are made available to a child with a disability if required as part of a child's special education under § 300.17, related services under § 300.16, or supplementary aids and services under § 300.550(b)(2). Under Part B, each child's IEP must contain, among other elements, a statement of the specific special education and related services to be provided to the child. 34 CFR § 300.346(a)(3). In addition, any supplementary aids or services to be provided to the child in connection with the child's placement in the regular educational environment must be described in his or her IEP. Appendix C to 34 CFR Part 300, question 48. Therefore, a determination of whether a child with a disability requires an assistive technology device and/or service in order to receive FAPE must be made by the participants on that child's IEP team in accordance with applicable IEP requirements.

Previously, the Department has provided guidance on the scope of a public agency's responsibility to provide assistive technology devices or services to children with disabilities in accordance with the requirements of Part B. In response to public comments on the proposed § 300.308, the Department provided the following pertinent discussion in the *Analysis of Comments and Changes* that accompanied the final regulations:

> . . . the requirement in § 300.308 limits the provision of assistive technology to educational relevancy—i.e., an assistive technology device or service is only required if it is determined, through the IEP process, to be (1) special education, as defined in § 300.17, (2) a related service, as defined in § 300.16, or (3) supplementary aids and services required to enable a child to be educated in the least restrictive environment. The Secretary believes that the effect of § 300.308 is to limit the provision of assistive technology devices and services to those situations in which they are required in order for a child to receive FAPE.

57 Fed. Reg. 44794, 44841 (Sept. 29, 1992) (copy enclosed).

Thus, participants at the meeting held to develop a child's IEP must determine whether, in light of a particular child's educational needs, the public agency must make an assistive technology device and/or service available in order for the child to receive FAPE. In the situation you describe, the IEP team has determined that the child requires a hearing aid in order to receive TAPE, and the child's IEP reflects the need for the hearing aid. Accordingly, the public agency would be responsible for providing the hearing aid at no cost to the child and his or her parents.

I hope that this information is helpful. If I can be of any further assistance please let me know.

Thomas Hehir
Director
Office of Special Education Programs

————————————

Ms. Ginger VanWart
Paralegal
Advocacy Center for the
Elderly and Disabled
210 O'Keefe Avenue
Suite 700
New Orleans, Louisiana 70112

**Digest of Inquiry**
(September 4, 1992)

- Can a school system combine students who are moderately mentally disabled and students who are autistic in the same classroom for instruction during the day? Does such a policy violate the least restrictive environment requirement?

- What is the federal requirement for waiving a state's policy which prohibits combining students with different disabilities in the same classroom?

**Digest of Response**
(December 13, 1993)

*Part B May Allow Placement of Different Disabilities in Same Class*

A determination as to whether students with moderate mental disabilities can be combined with students who are autistic in the same classroom for instruction during the school day must be made on a case-by-case basis. Such an arrangement does not necessarily violate Part B requirements, provided that the placement decision is made on an individual basis in light of the applicable LRE requirements, impermissible factors do not constitute the basis for the placement decision, and that the instruction and services in a student's IEP can be fully implemented. Impermissible factors for determining placements may include category of disability, configuration of the delivery system, availability of educational or related services, availability of space, and administrative convenience.

*LEA Must Comply with Federal Standards When Waiving State Policy*

If a state education agency (SEA) or local education agency (LEA) decides to waive a state policy which prohibits combining students with different

1055-520X/94/$2+$1.50.

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| A. U., by her parents and next friends, | ) | |
| N. U. and B. U., | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 3:06-CV-123 |
| | ) | Judge Jordan |
| ROANE COUNTY SCHOOLS, | ) | |
|     Defendant. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ROANE COUNTY BOARD OF | ) | |
| EDUCATION | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 3:06-CV-125 |
| | ) | Judge Jordan |
| A.U., a minor, Individually, and by and | ) | |
| through BENNIE and NICOLE | ) | |
| UNDERWOOD, the natural parents and | ) | |
| guardians of A.U., | ) | |
|     Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT**

Defendant Roane County Schools has filed a Motion for Summary Judgment on the issue

of whether "mapping" of a hearing impaired child's cochlear implants constitutes a related

service under the Individuals with Disabilities Education Act.  Plaintiff A.U. addressed this issue

in her Memorandum in Support of Motion for Judgment on the Pleadings filed previously with

the court.

**A.  IDEA 2004 Does Not Exclude Mapping**

The definitions of Related Services and Assistive Technology Device in the 2004 statute

passed by Congress by their very terms do not exclude the process of mapping.  The terms

exclude the *medical device that is surgically implanted, or the replacement of such device.* 20 U.S.C. §1401 (1) and (26). Mapping is not the medical device; it is the process of computer programming the speech processor, which is worn externally, after the cochlear device is surgically implanted in the ear. Mapping is not a medical procedure; it is performed by an audiologist. Audiology services are specifically included in the definition of related services.

As stated in Plaintiff's Memorandum in Support of Judgment on the Pleadings, the legislative history supports the interpretation that Congress did not intend to exclude mapping as a related service. See, Plaintiff's Memorandum, pp. 25-26. Briefly stated, the original Senate version of the bill contained language that excluded mapping, but the Conference Committee rejected that wording and took out the mapping exclusion in the final bill that was adopted by both the Senate and House of Representatives. *id.*

A letter written by U.S. Senator Judd Gregg, New Hampshire, to the Secretary of Education Margaret Spellings on June 24, 2005, further clarifies the distinction. Attached as Exhibit A to this Memorandum.

### B. Federal Regulations Not Effective until October 13, 2006

In its Memorandum, Roane County Schools admit that the language in the statute is "ambiguous." See, Memorandum, p. 10. Therefore, it relied on the federal regulations that expanded on the definition of related services and assistive technology device. Plaintiff does not concede that the language in the statute is "ambiguous." It is quite clear that the exclusion applies to the device, not the mapping process.

The definitions in the federal regulations did not take effect until October 13, 2006, well after the 2005-2006 school year that is the subject of this proceeding. Additionally, the State of

2

Tennessee has not adopted by rulemaking procedures required by state law any change in the definition of related services or assistive technology device.  Tenn. Code Ann. §4-5-210 *et seq.*

## C. Factual Misconceptions

Several factual statements are outlined in the Motion for Summary Judgment that require clarification.  The IEP that was presented to and rejected by A.U.'s parents in May 2005 for implementation in the 2005-2006 school year called for placement in a new program that had not been developed.  Further, the classroom for the new program was undergoing significant modifications even after the school year began due to serious sound deficiencies that would have affected A.U.'s ability to hear.  Those modification, including the installation of a sound field system, were being carried out as the Due Process proceeding was going on, three months after the school year began.  The placement was not appropriate at the time the IEP was offered in May 2005, and it was not appropriate at the beginning of the 2005-2006 school year.

## Conclusion

For the reasons stated, and those stated previously in Plaintiff's Memorandum in Support of Motion for Judgment on the Pleadings, A.U. asks the Court to deny the Motion for Summary Judgment of Roane County Schools.

Respectfully submitted,


/s/ William Allen
William Allen, BPR#4264
Mostoller, Stulberg & Whitfield
136 S. Illinois Avenue, Suite 104
Oak Ridge, TN 37830
(865) 482-4466

3

CERTIFICATE OF SERVICE

I certify that I have provided a copy of the foregoing Memorandum in Support of Motion for Summary Judgment electronically and by U.S. Mail to Charles W. Cagle and Deborah A. Smith, attorneys for Roane County Schools, on this 6th day of November, 2006.


/s/ William Allen

DEC-21-2005 WED 06:08 PM de maximis inc.          FAX NO. 8656916485          P. 19

Case 1:07-cv-01583-RMU     Document 14-2     Filed 01/30/2008     Page 18 of 19

Jun-27-05   06:44pm   From-Dept. of EDUC/OLCA          2022809439          T-331   P.001/003   F-158

NEW HAMPSHIRE

COMMITTEES:
BUDGET, *Chairman*
APPROPRIATIONS
HEALTH, EDUCATION, LABOR
AND PENSIONS

# United States Senate
### WASHINGTON, DC 20510-2904
### (202) 224-3324

June 24, 2005

OFFICES:

125 NORTH MAIN STREET
CONCORD, NH 03301
(603) 225-7115

DEPARTMENT OF EDUCATION
OS/ES/OCCU

2005 JUN 28   A 11: 22

41 HOOKSETT ROAD, UNIT 2
MANCHESTER, NH 03104
(603) 622-7979

2 PLEASANT STREET
BERLIN, NH 03570
(603) 752-2604

16 PEASE BOULEVARD
PORTSMOUTH, NH 03801
(603) 431-2171

The Honorable Margaret Spellings
Secretary
U.S. Department of Education
400 Maryland Avenue
Washington, D.C. 20202

Dear Madam Secretary:

    I am writing to express my strong objection to the Department's interpretation of the definition of "related services" in the Individuals with Disabilities Education Improvement Act of 2004 (Public Law 108-446). In the draft regulations for Public Law 108-446, published on Tuesday, June 21 2005, proposed section 300.34(b) stipulates that the definition of related services does not include "the costs of maximizing the functioning of a surgically implanted device or the maintenance of a surgically implanted medical device." The regulation goes further in stating that "school districts should not be required to bear these costs, which are integral to the functioning of the implanted device."

    The Department's assertion as reflected in the regulation is in direct conflict with the intent of the definition of related services as it appears in public law. The definition of related services in current law is consistent with the definition of related services in the IDEA bill that passed the Senate (S. 1248). The fact that the IDEA Conference Report reflected the Senate's definition of related services is an important indicator of Congressional intent on whether related services should include the maintenance of surgically implanted medical devices.

    Let me explain. As you may be aware, when the Health, Education, Labor and Pensions Committee reported S. 1248 out of committee, the definition of related services included the following exception:

> "The term [related services] does not include a medical device that is surgically implanted, or the post-surgical maintenance, programming or replacement of such device or an external device connected with the use of a surgically implanted medical device (other than the costs of performing routine maintenance and monitoring of such external device at the same time the child is receiving other services under this Act)."

    Clearly, this language would exclude schools from having to cover the costs of programming or maintenance of a surgically implanted device. This language was

PRINTED ON RECYCLED PAPER

DEC-21-2005 WED 06:09 PM de maximis inc.          FAX NO. 8656916485          P. 20

Case 1:07-cv-01583-RMU     Document 14-2     Filed 01/30/2008     Page 19 of 19

Jun-27-05    05:44pm    From-Dept. of EDUC/OLCA          2022608439          T-331   P.002/009   F-150

significantly altered prior to Senate passage, as I made a determination that it was
appropriate that the definition of related services cover the cost of the maintenance and
programming of surgically implanted devices. As a result, the definition of related
services was altered to reflect the following exception:

> "The term does not include a medical device that is surgically implanted,
> or the replacement of such device."

The absence of a reference to post surgical "maintenance" and "programming" of
a surgically implanted device in the exception clause clearly indicates that those activities
are assumed in the definition of related services.

I believe that the Department has narrowly interpreted the statute and that the
statute does not exclude the maintenance or programming of surgically implanted devices
from the definition of related services.  In fact, the legislative history of the definition of
related services indicates just the opposite; maintenance and programming of surgically
implanted medical devices are to be considered related services.

In light of the legislative history on this matter, I urge you to correct this proposed
regulation to clarify that programming and maintenance of surgically implanted devices
are included in the definition of related services.

Sincerely,

Judd Gregg
U.S. Senator

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BETH and DAVID PETIT, in their individual
capacities and as next friends to their minor son,
H. P., and  NICOLE and BENNIE
UNDERWOOD, in their individual capacities and
as next friends to their minor daughter, A.U.,

Plaintiffs                                           CASE NO.  07-1583-RMU

                   v.

UNITED STATES DEPARTMENT OF
EDUCATION, and MARGARET SPELLINGS,
in her official capacity as Secretary of the U.S.
Department of Education,

Defendants.

## [PROPOSED] ORDER

Upon consideration of plaintiffs' Motion for Summary Judgment, defendants'

Motion to Dismiss, or Alternatively for Summary Judgment, the oppositions thereto, and the

complete record in this case, it is hereby

ORDERED that defendants' Motion to Dismiss, or Alternatively for Summary

Judgment is DENIED; it is further

ORDERED that plaintiffs' Motion for Summary Judgment is GRANTED; it is

further

ORDERED that 34 C.F.R. §§ 300.34(b)(1) & 300.113(b)(1) (2008) are

DECLARED unlawful and invalid to the extent that they purport to exclude mapping of cochlear

implants from the definition of "related services"; it is further

ORDERED that defendants are hereby PERMANENTLY ENJOINED from implementing, enforcing, or otherwise taking any action pursuant to the parts of 34 C.F.R. §§ 300.34(b)(1) & 300.113(b)(1) (2008) that relate to mapping of cochlear implants; and it is further

ORDERED that plaintiffs are awarded attorney's fees pursuant to 20 U.S.C. § 1415(i)(3)(B).

Dated: _____

_____
The Honorable Ricardo M. Urbina