UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| BETH PETIT, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 07-1583 (RMU) |
| | : | | |
| v. | : | Re Document Nos.: | 26, 27 |
| | : | | |
| U.S. DEPARTMENT OF EDUCATION, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

# MEMORANDUM OPINION

**GRANTING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE IDEA CLAIM;
DENYING THE PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT ON THE IDEA CLAIM**

## I. INTRODUCTION

This matter concerns a regulation promulgated by the U.S. Department of Education ("the Department") that excludes cochlear implant mapping as a service covered under the Individuals with Disabilities Education Act ("the IDEA" or "the Act"), 20 U.S.C. §§ 1400 *et seq*. The plaintiffs, parents of children with cochlear implants, argue that the regulation violates the IDEA and the Administrative Procedure Act ("APA"). The court, having already granted the defendant's motion for summary judgment with regard to the plaintiffs' APA claim, now turns to the parties' cross motions for summary judgment on the remaining IDEA claim. For the reasons discussed below, the court grants the defendants' motion for summary judgment and denies the plaintiffs' cross-motion for summary judgment on the plaintiffs' IDEA claim.

## II. BACKGROUND

### A. Legal & Factual Background[1]

The IDEA entitles children with disabilities to special education and "related services" that are "designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. §§ 1400(d)(1)(A), 1414(d). The IDEA defines "related services" to include

> such developmental, corrective, and other supportive services (including . . . audiology services . . . and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children.

20 U.S.C. § 1401(26)(A). In 2004, Congress amended the IDEA to state that "[t]he term [related services] does not include a medical device that is surgically implanted, or the replacement of such device." 20 U.S.C. § 1401(26)(B) (the "medical device exception").

Cochlear implants are surgically implanted hearing aids that are "significantly more complex than the traditional acoustical hearing aid. Unlike an acoustical hearing aid, which amplifies sound, a cochlear implant converts sound into electrical stimuli that are delivered directly into the cochlea – bypassing the outer ear completely." Compl. ¶ 18. Each implant has an external and an internal component. *Id.* ¶ 19. The external component consists of a microphone, speech processor and transmitter system. *Id.* The microphone, worn at ear level, detects sounds from the environment. *Id.* The pager-size speech processor then converts the sound detected by the microphone into electrical signals and then, with the help of the transmitter system, transmits the electrical signals to the internal component. *Id.*; Defs.' Supplemental

---

[1] The factual background of this case has been thoroughly discussed in the court's previous memorandum opinion. *See Petit v. U.S. Dept. of Educ.*, 578 F. Supp. 2d 145, 148-49 (D.D.C. 2008).

Mem. in Support of their Mot. to Dismiss or Alternatively, for Summ. J. ("Defs.' Suppl. Mem.") at 8. The internal component is a surgically implanted receiver connected to electrodes; the receiver "takes the radio waves from the transmitter system and stimulates the selected electrodes so that the brain receives" audio signals. Compl. ¶ 20.

A properly functioning cochlear implant stimulates the auditory nerve in a manner that allows the brain to process the electrical stimuli. *Id.* ¶ 21. A process known as "mapping" allows an audiologist to optimize the amount of stimulation to the auditory nerve. *Id.* ¶¶ 21-22. Mapping requires that an audiologist connect the child's external speech processor to a computer that utilizes special software to measure a child's response to electrical stimulation. *Id.* ¶ 22. The software measures the characteristics of the implanted electrodes and adjusts "the parameters controlling the stimuli that will be delivered to the electrodes" within the implant. *Id.* The first mapping session typically takes place after the receiver is surgically implanted; the implant is then calibrated to the child's unique needs through subsequent mapping sessions. Pls.' Cross-Mot. for Summ. J. & Opp'n to Defs.' Mot. to Dismiss or Alternatively, for Summ. J. ("Pls.' Cross-Mot.") at 5-6; Defs.' Mot. to Dismiss or Alternatively, for Summ. J. ("Defs.' Mot.") at 9.

After receiving numerous comments requesting clarification as to whether the IDEA covered cochlear implant mapping as a "related service," Defs.' Supplemental Resp. Mem. ("Defs.' Resp. Mem.") at 9; *see also* 71 Fed. Reg. at 46,569 (Aug. 14, 2006), the Secretary of Education ("the Secretary") promulgated a regulation on August 14, 2006 specifying that "[r]elated services do not include . . . the optimization of [a surgically implanted] device's functioning (e.g., mapping)." 34 C.F.R. § 300.34(b)(1) ("the 2006 regulation"). The 2006

regulation states that "routine checking of an external component" of a cochlear implant, however, remains a "related service" under the IDEA. *Id.* § 300.34(b)(2)(iii).

## B. Procedural History

The plaintiffs, parents of disabled children with cochlear implants, brought suit under the IDEA and the APA on September 6, 2007, alleging that the 2006 regulation excluding cochlear implant mapping from the definition of "related services" contravenes the IDEA, exceeds the Secretary's rulemaking authority and is arbitrary, capricious and an abuse of discretion. Compl. ¶¶ 46-53. On December 13, 2007, the defendants moved to dismiss the complaint under Rule 12(b)(6) or, alternatively, for summary judgment. *See generally* Defs.' Mot. The court rejected the defendants' arguments that the plaintiffs were required to exhaust administrative remedies prior to bringing suit and that the IDEA does not create a private right of action against the federal government. *Petit v. U.S. Dept. of Educ.*, 578 F. Supp. 2d 145, 151-53 (D.D.C. 2008). Accordingly, the court denied the defendants' motion to dismiss the plaintiffs' IDEA claim. *Id.*

The court, however, granted the defendants' motion for summary judgment on the plaintiffs' APA claim after concluding that the Secretary had acted reasonably in interpreting the definition of "related service" under the IDEA so as not to include cochlear mapping. *Id*. at 153-60. Because the parties' did not fully address the merits of the plaintiffs' IDEA claim, the court declined to rule on the defendants' motion for summary judgment with regard to that claim, and ordered the parties to provide additional briefing on the issue. Minute Order (July 14, 2009). With the parties' supplemental briefing now complete, the court turns to the parties' arguments and the applicable legal standards.

## III.  ANALYSIS

### A.  Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  To determine which facts are "material," a court must look to the substantive law on which each claim rests.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action.  *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.  *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment.  *Id.*

The nonmoving party may defeat summary judgment through factual representations made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record," *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338

5

(D.C. Cir. 2006). Indeed, for the court to accept anything less "would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *Greene*, 164 F.3d at 675.

**B. The Court Grants the Defendants' Motion for Summary Judgment and Denies the Plaintiffs' Cross-Motion for Summary Judgment on the IDEA Claim**

The defendants argue that, pursuant to the Department's 2006 regulation, cochlear implant mapping is not a required service under the IDEA. Defs.' Suppl. Mem. at 13-25. The plaintiffs counter that the 2006 regulation violates the IDEA and is thus void. Pls.' Supplemental Mem. in Support of their Mot. for Summ. J. ("Pls.' Suppl. Mem.") at 1-7.

The Secretary's authority to promulgate regulations is governed by 20 U.S.C. §§ 1406(a)-(b), which state as follows:

> (a) In general: In carrying out the provisions of this chapter, the Secretary shall issue regulations under the chapter only to the extent that such regulations are necessary to ensure that there is compliance with the specific requirements of this chapter.
>
> (b) Protections provided to children: The Secretary may not implement, or publish in final form, any regulation prescribed pursuant to this chapter that (1) violates or contradicts any provision of this chapter; or (2) procedurally or substantively lessens the protections provided to children with disabilities under this chapter, as embodied in regulations in effect on July 20, 1983 (particularly as such protections related to parental consent to initial evaluation or initial placement in special education, least restrictive environment, related services, timelines, attendance of evaluation personnel at individualized education program meetings, or qualifications of personnel), except to the extent that such regulation reflects the clear and unequivocal intent of Congress in legislation.

20 U.S.C. §§ 1406(a)-(b). Thus, the 2006 regulation comports with the IDEA only if it (1) is necessary for compliance with the IDEA, (2) does not violate or contradict the IDEA and (3) does not procedurally or substantively lessen the protections for children with disabilities, as embodied in the regulations that were in effect in 1983 ("the 1983 regulations").

6

First, the plaintiffs assert, without elaboration, that the 2006 regulation fails under § 1406(a) because it was "not necessary for compliance with the [IDEA]." Compl. ¶ 49. The defendants counter that given the statute's ambiguity on the topic and the vast number of requests for clarification during the public comment period, the Secretary "reasonably decided that it was necessary" to clarify whether the states were responsible under the IDEA to provide free cochlear implant mapping services. Defs.' Mot. at 30-31. Because the court has already observed that the IDEA is ambiguous with regard to its coverage of cochlear implant mapping, *Petit*, 578 F. Supp. 2d at 154-59, and in light of the numerous requests for clarification received by the Department, the court determines that the 2006 regulation was necessary to ensure compliance with the specific requirements of the IDEA. 20 U.S.C. § 1406(a).

Next, the plaintiffs argue that the 2006 regulation is unauthorized under 20 U.S.C. § 1406(b)(1) because it contradicts the IDEA's statutory definition of "related services," which they claim unambiguously includes cochlear implant mapping. *See* Pls.' Suppl. Mem. at 1; Compl. ¶ 49. As the defendants accurately observe, however, this court has already concluded that the IDEA's definition of "related services" is ambiguous with regard to its coverage of cochlear implant mapping. *Petit*, 578 F. Supp. 2d at 153-59. Consistent with the reasoning of that decision the court reaffirms that the 2006 regulation does not "violate or contradict" the IDEA. *See id.*

The plaintiffs further contend that the 2006 regulation is void under § 1406(b)(2) because it substantively alters the protections embodied in the 1983 regulations. Pls.' Suppl. Mem. at 2-3. The 1983 regulations defined "related services" to include "audiology" services, 34 C.F.R. § 300.13(a) (1983), which, in turn, was defined to include the following:

> (i) Identification of children with hearing loss; (ii) Determination of the range, nature, and degree of hearing loss, including referral for medical or other

7

professional attention for the habilitation of hearing; (iii) Provision of habilitative activities, such as language habilitation, auditory training, speech reading (lipreading), hearing evaluation, and speech conservation; (iv) Creation and administration of programs for prevention of hearing loss; (v) Counseling and guidance of pupils, parents, and teachers regarding hearing loss; and (vi) Determination of the child's need for group and individual amplification, selecting and fitting an appropriate aid, and evaluation of the effectiveness of amplification.

34 C.F.R. § 300.13(b)(1) (1983).

The plaintiffs argue that cochlear implant mapping is encompassed by the 1983 regulatory definition of audiology services and thus cannot be excluded by regulation from the IDEA's coverage.[2] Pls.' Suppl. Mem. at 3. The plaintiffs contend that the regulatory definition of audiology services is not exhaustive, and that cochlear implant mapping fits within this definition because it involves measuring "the range, nature, and degree of hearing loss," requires referral to an audiologist "for the habilitation of hearing" and involves "fitting [of] an appropriate aid, and evaluating [its] effectiveness." *Id.* at 2-3.

The defendants assert that the regulatory definition existing in 1983 does not encompass cochlear implant mapping and is ambiguous at best with respect to whether cochlear implant mapping is required. Defs.' Suppl. Mem. at 15-25. In light of such ambiguity, the defendants argue that the court should defer to the Department's interpretation of the 1983 regulations. *Id.* at 18. Finally, the defendants maintain that cochlear implant mapping, a procedure which did not exist in 1983, must at least be analogous to the protections embodied in the 1983 regulations to

---

[2] The plaintiffs also note that the 1983 dictionary definition of audiology would have included cochlear implant mapping. Pls.' Supplemental Mem. in Support of their Mot. for Summ. J. ("Pls.' Supp. Mem.") at 3. The court has already rejected the use of said definition in its prior opinion in this case. *Petit*, 578 F. Supp. 2d at 156. Therefore, the court declines to rely on this dictionary definition.

8

implicate § 1406(b)(2), and insist that the plaintiffs fail to successfully draw such an analogy.[3] Defs.' Resp. Mem. at 8-10.

In determining the standard for its review of the plaintiffs' IDEA claim, the court takes instruction from the Supreme Court's decision in *Irving Independent School District v. Tatro*, 468 U.S. 883, 886 (1984). In *Tatro*, the Court considered whether providing a child with clean intermittent catheterization was a "related service" under the Education of the Handicapped Act ("EHA"), the statute that preceded the IDEA. 468 U.S. at 886. The Court began its analysis "with the regulations of the Department of Education, which are entitled to deference," *id* at 891, and ultimately concluded that the Department had reasonably interpreted the EHA's definition of "related services" to require school districts to provide catheterization, *id.* at 895. In a subsequent case again analyzing the "related service" provision of the IDEA, the Court upheld *Tatro*'s reliance on the Department of Education's regulations, despite the dissent's position that *Tatro* should be overruled because an appropriate analysis should commence with the plain text of the IDEA. *Cedar Rapids Cmty. Sch. Dist. v. Garret*, 526 U.S. 66, 80 (1999).

Although *Tatro* failed to specify the amount or type of deference to which the Secretary's regulations are entitled, the court finds guidance in the well-established body of case law regarding judicial deference to an agency's regulations under the APA. Under these cases, a court reviewing an agency's interpretation of its own regulation is not to choose between competing interpretations of a regulation, but is instead required to give the agency's interpretation "controlling weight unless it is plainly erroneous or inconsistent with the

---

[3] The defendants initially assert that the protections of the 1983 regulations did not embody cochlear implant mapping because cochlear implants did not exist in 1983. Defs.' Supplemental Mem. in Support of their Mot. to Dismiss or Alternatively, for Summ. J. ("Defs.' Suppl. Mem.") at 15. In their reply, however, the defendants concede that the protections embodied in the regulations of 1983 may cover new advances in technology. *See* Defs.' Suppl. Mem. at 8-10.

regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (citations omitted) (deferring to the Secretary of Health and Human Services' regulatory definition of "reimbursable costs" under the Medicare program); *see*, *e.g., Devon Energy Corp. v. Kempthorne*, 551 F.3d 1030, 1041 (D.C. Cir. 2008) (affirming the district court's deferral to the Department of Interior's interpretation of its own regulation). If a regulation is ambiguous, an agency's interpretation of the regulation is entitled to deference. *Christensen v. Harris County*, 529 U.S. 576, 586 (2000); *United States v. Levin*, 496 F. Supp. 2d 116, 120 (D.D.C. 2007) (citing *Drummond Coal Co. v. Hodel*, 610 F. Supp. 1489, 1498 (D.D.C. 1985) (asserting that a regulation is ambiguous if its language could reasonably be interpreted in multiple ways which give rise to multiple conclusions). With these standards in mind, the court considers whether the Secretary, in issuing the 2006 regulation that excluded cochlear implant mapping from IDEA coverage, substantively lessened the protections unambiguously guaranteed by the 1983 regulatory definition of audiology.

The plaintiffs' strongest argument is their assertion that cochlear implant mapping is embodied in the 1983 regulations because it involves the "fitting [of] an appropriate aid, and evaluating [its] effectiveness." Pls.' Suppl. Mem. at 3. As an initial matter, the court observes that the 1983 regulatory definition of audiology fails to expound as to what qualifies as "fitting" an appropriate aid. *See generally* 34 C.F.R. § 300.13(a). In its common usage, however, the term "fitting" can reasonably be interpreted as either the superficial placement and adjustment of a device to ensure comfort, or the technical adjustment to ensure a device's utility. MERRIAM WEBSTER DICTIONARY, http://www.merriam-webster.com/dictionary/fit?show=3&t=1291668106 (last visited Dec. 6, 2010) (defining the word "fit," *inter alia*, as "the conform correctly to the shape or size of" and "to harmonize with"). Given the competing and reasonable interpretations

10

of the word "fit" in this context, the court must defer to the Secretary's interpretation that "fitting" a device does not include its technical adjustments. *See Thomas Jefferson Univ.*, 512 U.S. at 512; *Levin*, 496 F. Supp. at 120.

As for the plaintiffs' further assertion that cochlear implant mapping involves "evaluating [the implants'] effectiveness," Pls.' Suppl. Mem. at 3, the court notes that the 1983 regulatory definition of audiology provides for the "evaluation of the effectiveness *of amplification*." *See* 34 C.F.R. § 300.13(a) (emphasis added). The plaintiffs themselves acknowledge that a cochlear implant is "[u]nlike an acoustical hearing aid, which amplifies sound, [because it] converts sound into electrical stimuli that are delivered directly to the cochlea – bypassing the outer ear completely." Compl. ¶ 18. Indeed, a cochlear implant does not work through amplification, relying instead on the mapping procedure to determine the optimal amount of stimulation of the auditory nerve. *Id.* ¶¶ 21-22 (noting that a properly functioning cochlear implant stimulates the auditory nerve in a manner that allows the brain to process the electrical stimuli). Because the 1983 regulations provide for the "evaluation for the effectiveness of *amplification*," and because mapping does not entail amplification but rather involves determining the effectiveness of the electrical stimulation of the auditory nerve, it cannot be soundly asserted that the 1983 regulation unambiguously provides for mapping.

Next, the plaintiffs argue that cochlear implant mapping falls within the protections embodied in the 1983 regulations because it involves the "determination of the range, nature, and degree of hearing loss." Pls.' Suppl. Mem. at 3. As the plaintiffs themselves acknowledge, however, the primary purpose of mapping is not to determine the range and type of a child's hearing loss, but instead to ensure that "the implant [is] function[ing] properly" by modifying the amounts of electrical stimulation that the child receives. Compl. ¶¶ 21-22. Because the primary

11

purpose of mapping is not to determine hearing loss but rather to ensure that the cochlear implant is functioning in order to alleviate the hearing loss, the Department's interpretation of the 1983 regulations as excluding cochlear implant mapping is not "plainly erroneous." *Thomas Jefferson Univ.*, 512 U.S. at 512.

Nor is cochlear implant mapping unambiguously embodied in the 1983 regulations because the procedure "requires referral to an audiologist for 'habilitation of hearing.'" Pls.' Suppl. Mem. at 3. As the defendants properly point out, the 1983 regulations define audiology to include the "*referral* for medical or other professional attention for the habilitation of hearing," but not the actual *provision* of such attention. Defs.' Resp. Mem. at 4; 34 C.F.R. § 300.13(b)(1)(ii) (1983) (emphasis added). Thus, although the 1983 regulations provide for services that include the *making* of a referral for cochlear implant mapping, they do not clearly provide for the mapping service itself, and it is, accordingly, not "plainly erroneous" to interpret the 1983 regulations as not covering cochlear implant mapping. *Thomas Jefferson Univ.*, 512 U.S. at 512.

In sum, the plaintiffs failed to show that the 1983 regulatory definition of audiology services unambiguously encompasses cochlear implant mapping, and thus their arguments are insufficient to overcome the deference this court is required to give to an agency's interpretation of its own regulation. *Id.*; *Tatro*, 468 U.S. at 886. Accordingly, the court concludes that the 2006 regulation excluding cochlear implant mapping from the IDEA's coverage does not violate 20 U.S.C. §1406(b)(2).[4]

---

[4] The plaintiffs point out that § 1406(b)(2) requires that an agency not regulate in a way that lessens protections embodied in the 1983 regulations *unless it reflects the clear and unequivocal intent of Congress in legislation*, and argue that Congress has not clearly and unequivocally expressed intent to exclude cochlear implant mapping from "audiology services." Pls.' Mem. at 4. Because the court determines that the current mapping exclusion regulations do not lessen the protections embodied in the 1983 regulations, the court does not reach this argument.

## IV. CONCLUSION

For the foregoing reasons, the court grants the defendants' motion for summary judgment on the plaintiffs' IDEA claim. An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this 21st day of December, 2010.

RICARDO M. URBINA
United States District Judge